Michael McShane (CA State Bar #127944)
mmcshane@audetlaw.com
Jonas P. Mann (CA State Bar #263314)
jmann@audetlaw.com
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco CA 94105
Telephone: 415.568.2555
Facsimile: 415.568.2556

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSS McCULLOUGH, A/K/A "Big Russ McCullough," RYAN SAKODA, and MATTHEW R. WIESE, A/K/A "Luther Reigns," individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Russ McCullough, Ryan Sakoda, and Matt Wiese (collectively, "Plaintiffs") allege the following upon personal knowledge as to their own transactions and upon information and belief and investigation of counsel as to all other matters.

## INTRODUCTION

1. This class action concerns World Wrestling Entertainment, Inc.'s ("WWE") egregious mistreatment of its wrestlers for its own benefit, as well as its

concealment and denial of medical research and evidence concerning traumatic brain injuries suffered by WWE wrestlers.[1] The injuries at issue include the increased risk and development of permanent degenerative brain diseases that resulted from the repeated head injuries, including but not limited to chronic traumatic encephalopathy ("CTE"), dementia, Alzheimer's disease, or similar cognitive impairing conditions. The injuries suffered cause latent harms which appear years after their precipitating traumas.

2.   The WWE further disavowed, concealed, and prevented any medical care for these head injuries after they were sustained and to date. The WWE, as organizer and purveyor of professional wrestling, in which head trauma occurs often, had a duty to take measures to protect its wrestlers. The WWE was, and is, aware of the risks of repeated head trauma and multiple concussive events, but nevertheless chose to deliberately ignore and conceal from the wrestlers and their families the risks of serious long-term health effects resulting from head injuries.

3.   Additionally, the WWE voluntarily assumed a duty to monitor and maintain its wrestlers' health through its announced health policies. The WWE chose to actively deceive wrestlers and encourage them to continue to wrestle despite long term health risks. The WWE encouraged them to wrestle prematurely after injuries and concussive events, thereby creating further risk of future harm.

4.   Under the guise of providing "entertainment," WWE has for decades subjected its wrestlers to extreme physical brutality that it knew, or should have known, caused created latent conditions and long term irreversible bodily damage, including brain damage. For most of its history, WWE has engaged in a campaign

---

[1] "World Wrestling Entertainment, Inc." and "WWE," as used in this Complaint, refer to the company in its current incarnation, along with all predecessor companies, including, but not limited to, Titan Sports, Inc., World Wrestling Federation, Inc., World Wrestling Federation Entertainment, Inc., World Championship Wrestling, Inc., and Extreme Championship Wrestling.

of misinformation and deception to prevent its wrestlers from understanding the true nature and consequences of the injuries they have sustained. WWE's representations, actions, and inactions have caused its wrestlers to suffer long-term debilitating injuries, lost profits, premature retirement, medical expenses, and other losses as alleged herein.

5.    WWE is in the business of selling violence. This is evident from the descriptions of its wrestling matches on the WWE website. To take one of many examples, the website recounts in gruesome detail how, in 2014's Royal Rumble (an annual event often referred to as "the Super Bowl of wrestling"), one wrestler "demolished" another "with series of brutal steel chair attacks that will be talked about for years to come." The site then directs visitors to "photos of the carnage created by" the match's victor.[2]

6.    The immediate injuries suffered by WWE wrestlers tell only part of the story. Throughout their careers, WWE wrestlers sustain countless blows to their heads, both concussive and sub-concussive. These blows alter wrestlers' brains. This, in turn, results in an array of side effects, including depression, cognitive deterioration, and suicide. Though aspects of the disorders caused by repeated head trauma continue to come to light, the debilitating effects of receiving repeated blows to the head have long been known.

7.    It is not simply that WWE has failed to protect its wrestlers. WWE deliberately creates and heightens the violence of its matches in order to "heat" up audiences and increase its profits.

8.    WWE has forced its wrestlers to engage in activities and subject themselves to danger in a manner that dramatically increases (often to a near-certainty) their chances of sustaining brain damage. It does so in order to increase

---

[2] Bobby Melok, "Brock Lesnar def. Big Show" (Jan. 26, 2014), available at http://www.wwe.com/shows/royalrumble/2014/big-show-brock-lesnar-26175059.

CLASS ACTION COMPLAINT

the popularity of its product. These stunts would be dangerous if performed by, and on, the most skilled stunt persons.

9.     Instead of properly assuming its duty and power to govern the conduct of its wrestlers, WWE has continually engaged in a pattern of behavior and practices deliberately designed to increase the injuries suffered by its wrestlers.

10.     Instead of stopping events when wrestlers have sustained head injuries, WWE, along with its doctors and medical professionals, has allowed such events to continue, placing injured wrestlers at even greater risk.

11.     During and after wrestling events, medical professionals associated with WWE have negligently or purposefully failed to diagnose concussions. This has served to assuage the concerns of wrestlers and continued to conceal WWE's exploitation of wrestlers.

12.     Far from attempting to prevent these injuries, WWE routinely profits from, and glorifies, them. WWE's announcers commonly revel in the ability of wrestlers to continue to fight through injuries, downplaying concussions as mere "wooziness."

13.     WWE knows, and has known for some time, the dangers to which it is subjecting its wrestlers. Indeed, a WWE executive admitted in 2007 that "WWE wrestlers are at risk for concussions because of the nature of their work."

14.     WWE failed to disclose in a timely manner the true risks of repeated traumatic head impacts in WWE wrestling, and failed to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and latent brain injury. Indeed, by refusing to acknowledge the risks it was creating—and by attempting to conceal those risks from its wrestlers—WWE effectively guaranteed that they would not seek the help they needed to avoid or mitigate latent brain injury.

15.     The WWE's purposeful concealment and misrepresentation of the

severe neurological risks it exposed its wrestlers to, subjected them to dangers they could have avoided had the WWE provided them with truthful and accurate information.

16.     When forced to acknowledge the risks to which it subjects its wrestlers—by script, on a daily basis—WWE took inadequate steps to correct the problem or to address its injurious conduct, the full consequences of which are still coming to light.

17.     Plaintiffs seek a declaration of liability, injunctive relief, medical monitoring, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by Plaintiffs as a result of WWE's willful, wanton, reckless, and grossly negligent conduct, which resulted in its wrestlers suffering brain trauma, concussions, and other related injuries.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The matter in controversy in this class action exceeds $5,000,000.00 exclusive of interest and costs, and some members of the Class are citizens of states other than the state in which Defendant has its primary place of business.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

20.     Plaintiff Russ McCullough is a resident of Corona, California. He wrestled with the WWE from 1999 to 2001. Plaintiff McCullough wrestled under the name "Big Russ McCullough."

21.     Plaintiff Matthew "Matt" Wiese is a resident of Los Angeles, California. He wrestled with the WWE from 2004 to 2005. Plaintiff Wiese wrestled under the name "Luther Reigns."

22.     Plaintiff Ryan Sakoda is a resident of West Hollywood, California. He wrestled with the WWE from 2003 to 2004.

23.     Defendant World Wrestling Entertainment, Inc. is a company existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut and conducts business in this jurisdiction.

24.     Although WWE is a public company, it is controlled by a small group of related executives who manage both polices and the conduct of wrestlers during matches. Vince McMahon has been Chairman of WWE since the retirement of his father, Vince McMahon Sr., in 1980. Vince McMahon has served as CEO from 1980 to 1993, and from 2009 to the present. McMahon controls over 80 percent of WWE's voting power. McMahon's wife, Linda McMahon, served as WWE President from 1993 to 2009, and as CEO from 1997 to 2009. Their daughter, Stephanie McMahon Levesque, is WWE's Chief Brand Officer. Her husband, Paul Levesque, also known as Triple H, is Executive Vice President, Talent, Live Events & Creative.

## FACTUAL ALLEGATIONS

### I.     Background: WWE and Its Wrestlers

25.     WWE is the largest wrestling entertainment organization in the world. Since purchasing its main competitor, World Championship Wrestling, in 2001, WWE has had no serious competitors in the field of wrestling entertainment. The company generates approximately $500,000,000 in revenue annually.

26.     The majority of WWE's revenues stem from its televised wrestling events. WWE programs consistently rank among the most popular in weekly television ratings. WWE programming is broadcast in more than 170 countries and 35 languages and reaches more than 650 million homes worldwide.

27.     For nearly three decades, WWE has been the world's pre-eminent provider of pay-per-view programming, consistently ranking among the highest-selling live event programs in the world.

28.     As of this year, WWE also has its own television network, WWE

CLASS ACTION COMPLAINT

Network.

29.    WWE markets its brand to children. For example, WWE sells toys in partnership with Mattel. Indeed, for three consecutive years, WWE ranked as the number two Action Figure Brand in the United States. Moreover, WWE video games have sold more than 60 million units since 1999, generating more than $1.8 billion in revenues.

30.    Despite WWE's enormous revenues, WWE does not provide its wrestlers, past or current, with health insurance, disability insurance, or unemployment insurance. Wrestlers are effectively on their own.

**II.    The Science of Head Trauma**

31.    This lawsuit concerns head injuries occurring in former and current WWE wrestlers. The primary classification of head injuries relevant to WWE are traumatic brain injuries ("TBIs," or colloquially, "concussions") and chronic traumatic encephalopathy ("CTE"). Concussions can cause CTE, but are not the only cause: repeated sub-concussive head trauma also causes CTE. Over their career, WWE wrestlers suffer repeated concussions and countless sub-concussive blows.

32.    Concussions have no standard definition, and require complex diagnosis based on clinical signs, observed symptoms, neuroimaging, medical records and personal interviews.[3] The Center for Disease Control defines concussions as a type of TBI caused by a "bump, blow, or jolt to the head or body."[4] A blow to the head that does not cause a concussion, or that has not been

---

[3] National Center for Injury Prevention and Control, "Report to Congress on Mild Traumatic Brain Injury in the United States: Steps to Prevent a Serious Health Problem" 1 (2003), available at
http://www.cdc.gov/ncipc/pub-res/mtbi/report.htm.

[4] Center for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), available at
 http://www.cdc.gov/concussion/signs_symptoms.html.

verified to cause a concussion, is commonly referred to as a sub-concussive blow.

33.    Because there is no obvious way to determine whether a trauma causes a concussion, many concussions go undiagnosed and untreated. Though concussions are often associated with a loss of consciousness, the majority of concussions are not so obviously recognized.

34.    Even absent a loss of consciousness, *each concussion alters the way your brain functions.* Symptoms can include headaches and problems with concentration, memory, balance coordination, loss of consciousness, confusion, disoriented, nausea, vomiting, fatigue or drowsiness, difficulty sleeping, sleeping more than usual, and seizures.[5]

35.    Post-concussion syndrome remains with a person for days, weeks or even months. Indeed, while, "[s]ome of these symptoms may appear right away. . . others may not be noticed for days or months after the injury."[6] In some cases, concussions can cause bleeding in the brain, which can be fatal.[7]

36.    Repeated blows sustained without sufficient recovery time are exponentially more dangerous. Sometimes called "second impact syndrome," multiple blows can *amplify* the original injury. According to the Mayo Clinic, "[e]xperiencing a second concussion before signs and symptoms of a first concussion have resolved may result in rapid and usually fatal brain swelling."

37.    CTE is a disorder cause by neurodegeneration including cognitive

---

[5]  Mayo Clinic, "Post-Concussion Syndrome: Definition," (Aug. 19, 2014), available    at    http://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/basics/definition/con-20032705.

[6] Center for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012),
 http://www.cdc.gov/concussion/signs_symptoms.html.

[7]  Mayo Clinic, "Concussions: Causes" (Apr 2, 2014), available at http://www.mayoclinic.org/diseases-conditions/concussion/basics/causes/con-20019272.

CLASS ACTION COMPLAINT

and neuropsychiatric symptoms. Long-known as dementia pugilistica or punch-drunk syndrome, an increasing consensus has emerged that mild and infrequent trauma can cause similar long term neurological effects to those experienced by boxers.

38.     CTE is a permanent change to brain structure caused by repeated blows. CTE's accompanying symptoms include depression, dementia, cognitive impairment, Parkinsonism, personality change, speech and gait abnormalities. Unlike concussions, CTE can only be diagnosed with direct tissue examination, which can detect an elevated level of Tau protein in brain tissue.[8]

39.     CTE can be caused by a single traumatic brain injury, but is much more often the result of repeated minor traumas. According to a NIH study, "[t]here is overwhelming evidence that the condition is the result of repeated sublethal brain trauma that often occurs well before the development of clinical manifestations."[9]

40.     As dangerous as individual concussions and sub-concussive blows can be in the short term, the long terms effects are more debilitating and insidious. Because CTE is difficult to detect, manifests years later, and includes chronic mental issues, many suffers do not understand their illness. Whereas a concussion's symptoms are often sensory and manifest immediately, CTE manifests years later, and can be caused by blows which have no accompanying symptoms.

41.     Many suffers of CTE spend years with no idea—and no way of

---

[8] Bennet I. Omalu et al., "Chronic Traumatic Encephalopathy, Suicides and Parasuicides in Professional American Athletes," 31 Am. J. Forensic Med. Pathology 130, 132 (2010).

[9] Ann C. McKee et al., "Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy following Repetitive Head Injury," J. Neuropathol Exp Neurol. 2009 July; 68(7): 709–735.

CLASS ACTION COMPLAINT

knowing—that they suffer from this disorder.

42.    Depression—including depression caused by CTE—is destructive, often leading to substance abuse and suicide. If caused by a physical trauma years ago, with no reason or warning to suspect that the true cause, these symptoms can be bewildering as well as debilitating.

43.    Research into the effects on professional athletes shows grim disparities based on head trauma: professional football players who had at least three concussive incidents over their career were three times more likely to be diagnosed with clinical depression and five times more likely to be diagnosed with dementia than were players who had limited history of concussions.[10]

44.    As discussed below, at least one former WWE wrestler's autopsy revealed he suffered from CTE.

**III.    WWE Sacrifices the Brains of Its Wrestlers for Its Own Profit.**

**A.    WWE Wrestling Has Real Consequences to Its Wrestlers.**

45.    WWE calls itself an "action soap opera."[11] Its events are scripted, with preordained winners and losers, and it has a carefully written, ongoing plot. WWE predetermines much of the dialogue between the wrestlers and the winners of the events, as well as many of the violent acts perpetrated by the wrestlers on each other.

46.    Many WWE wrestlers fight hundreds of times per year. And unlike professional athletes in traditional sports leagues, WWE wrestlers have no off-

---

[10] Kevin M. Guskiewicz et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," 39 Med. & Sci. Sports & Exercise 903, 906 (2007).

[11] Examiner.com, "WWE to be called an 'action soap opera' not pro-wresting, Bans more terms" (Apr. 13, 2011), available at
 http://www.examiner.com/article/wwe-to-be-called-an-action-soap-opera-not-pro-wrestling-bans-more-terms.

season in which to rest and recover from their injuries.

47. During WWE matches, wrestlers perform activities that are exceedingly dangerous to themselves and their adversaries. They are particularly dangerous when performers make mistakes in executing the stunts.

48. For wrestlers directed to perform complicated and dangerous stunts day after day, such mistakes are not only inevitable, but frequent. This is so because (a) wrestlers are not properly trained to execute their "moves" in a safe—or at least, safer—manner; and (b) wrestlers have a grueling scheduling, meaning they are often tired during their matches, and more prone to inflict and suffer traumatic injury.

49. Even where no mistakes occur, these stunts can result in detrimental blows to the head. Over the span of a career, these blows greatly increase the chance of CTE and related illnesses.

50. WWE adds so-called "heat" to its scripts in order to ensure that there is "extra physicality" in its matches. In her testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives, WWE executive Stephanie McMahon Levesque defined "heat" as "when you are really beating someone down in order to elicit a reaction from the crowd of, 'Oh, my God, please get up, get up, get up,' and the guy can't."[12]

51. In her testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives, WWE executive Stephanie McMahon Levesque explained that the producers of a show might also encourage WWE wrestlers that they use "heat" in their fights:

> For example, if there are a number of guys in the ring,

---

[12] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 119 (Dec. 14, 2007), available at http://oversight-archive.waxman.house.gov/documents/20081231140942.pdf.

like say there is five guys attacking one guy, and I am a good guy going to come out, if I come out by myself, I am going to get beat down just as bad as the other guy. But if I come out with a chair, I might have a better chance. Logically, so that is how the chairs are used. You might have seen -- or I don't know if you have seen any of our scripts -- but there might be chair shots written in at some point.[13]

52.     These beatings, though nominally "fake," greatly increase the chance of wrestler injuries, particularly when a wrestler administering the "heat" commits an error. But even where no error is committed, the "heat" administered by wrestlers results in blows to the head. Over time, these can greatly increase the chance of CTE.

**B.     WWE's Use of Weapons and Elaborate Staging Make Its Wrestlers Particularly Susceptible to Injuries, Including Brain Damage.**

53.     WWE events include activities which cannot be performed safely.

54.     To elicit "heat" in events, WWE directs its wrestlers to use various weapons.

55.     As Levesque's Congressional testimony suggests, WWE instructs its wrestlers to use steel chairs to batter each other. In countless WWE matches, fighters have slammed chairs over the heads of their opponents. Much, if not all, of these "chair shots" are scripted by WWE. Even where WWE wrestlers use chairs or other dangerous weapons without WWE's explicit direction, they do so with WWE's encouragement and tacit approval.

56.     Below is a picture of WWE CEO Vince McMahon slamming an employee on the head with a steel chair.

---

[13] *Id.* at 120.

1
2
3
4
5
6
7



8   57.   In many instances, these chair shots have delivered dangerous levels

9 of force to the recipient's skull. The use of dangerous weapons like steal chairs by

10 wrestlers cannot be done safely. It inherently puts wrestlers at risk of serious

11 physical injury, including long-term brain damage.

12   58.   The chair shot is as ubiquitous in WWE wrestling as it is brutal. To

13 take but one of many examples, in a 1999 match, wrestler Michael "Mick" Foley

14 was knocked unconscious after being hit by a chair eleven times while his hands

15 were tied behind his back. Five shots connected directly with Foley's head. Foley

16 later remarked, "I was in a match that had gotten carried away. I was suffering a

17 great deal, and I wanted it to end." [14]

18   59.   Likewise, in a notorious "no disqualification" match in 2008, WWE

19 wrestler Shawn Hickenbotton, also known as Shawn Michaels, delivered blows to

20 Lance McNaught, also known as Lance Cade, with a steel chair. One shot,

21 delivered at full force, hit McNaught directly in the skull.[15] McNaught died less

22 than two years later, at the age of 29.

23   60.   WWE has greatly profited off of the chair shot's brutality. For

24 example, in 2007, a wrestler was knocked unconscious when he received

25

26   [14] Saira Stewart, "Mick Foley on Life Beyond the Mat," ABCNews (June 5 2000),

27 available at http://abcnews.go.com/WNT/story?id=130970.

28   [15] *See* https://www.youtube.com/watch?v=s7SxW_Jz0D8.

numerous chair shots to the head from the highly paid wrestler and WWE executive Paul Michael Levesque, as known as Triple H. In an attempt to further enrich itself from the brutal beating, WWE published a "Chair Classic Moments" story on its website the following Sunday, which featured accounts, photos, and videos of numerous memorable chair shots in WWE history. The story continued, "Watching [Triple H's] brutal attack made WWE.com think back to classic moments in Raw, SmackDown and ECW history where our audience's favorite seating apparatus came into play and caused championship changes or altered the course of history."

61.    Although WWE purports to have banned chair shots to the head as of 2010, WWE continues to use particularly vicious chair shots to head promote its product. For example, a recent promotion for WWE Network contains a clip of a defenseless wrestler taking a chair short to the head.[16]

62.    Moreover, despite supposedly banning WWE chair shots to the head as of 2010, there have been several reported instances of wrestlers hitting each other with metal chairs since that time. Indeed, one chair shot to the head perpetrated after the "ban" was committed by Paul Levesque, or "Triple H," who is a WWE executive and the son-in-law of Vince McMahon.[17]

63.    WWE wrestlers use a myriad of other dangerous weapons in their fights. Indeed, some WWE events are explicitly predicated upon the use of dangerous weapons.

---

[16] *See* Geno Mrosko, "WWE uses unprotected chair shot to the head to promote its Network" (July 12, 2014), available at
http://www.cagesideseats.com/wwe/2014/7/12/5893661/wwe-uses-unprotected-chair-shot-to-the-head-to-promote-its-network.

[17]David Bixenspan, "After Wrestlemania, it looks like WWE has unbanned chair shots to the head" (Apr. 4, 2011), available at
http://www.cagesideseats.com/2011/4/4/2090779/after-wrestlemania-it-looks-like-wwe-had-unbanned-chairs-to-the-head.

64.    For example, there is oft-used "Table Match," which ends when one wrestler smashes the other through a pine table. Former WWE wrestler Christopher Nowinski, who suffered concussions while working for WWE, has explained that, during his time with WWE, he "used to go through tables four days a week."[18]

65.    There is also the "Chain Match" in which two wrestlers are chained together, with the chain also serving as a weapon to be used by either wrestler on the other.

66.    There is also the "Ladder Match," wherein an item, hung from a rope above the ring, must be retrieved by way of a ladder located in the center of the ring. Scripts for Ladder Matches instruct the wrestlers to strike their opponents with the ladder and to launch themselves from the top of the ladder onto their opponents. Inevitably, wrestlers fall from the top of the ladder during the fight. After one recent ladder match, two wrestlers required staples on their head. On its website, WWE posted close-up pictures of the men receiving stiches after the "brutal" match.[19]

67.    Below are photographs, from WWE's website, glorifying the head injuries of a wrestler after the above-described Ladder Match.



----

[18] https://www.youtube.com/watch?v=Cvd__8uUScs.

[19] WWE.com, "Rob Van Dam and CM Punk treated by doctors after Money in the Bank 2013: photos," available at
 http://www.wwe.com/shows/moneyinthebank/2013/rob-van-dam-and-cm-punk-treated-by-doctors-after-money-in-the-bank-2013-photos.

68.    WWE matches take place in small ring enclosed by ropes with posts at each corner ("turnbuckles"). Many matches will spill out of the ring, allowing wrestlers to use surrounding objects as weapons.

69.    Many matches are held in special "cages"—steel enclosures with 3-story walls. In some cases, a gap is left between the ring and the cage ("Hell in a Cage" matches) and matches sometimes spill onto the ceiling of the cages.

70.    Variations on the cage match include the "Punjabi Prison match" (two nested bamboo cages with spiked walls), the "Thunder Cage" (top of cage electrified), and the "Inferno Match" (cage surrounded by fire).

71.    Many cage matches have been promoted as having "literally anything goes rules," "No-Holds Barred" or "Hardcore, no submission rules."

72.    Matches between multiple wrestlers are common, often causing confusion and increased risk of injury. Multi-wrestler matches include "Triple Threat Matches," "Champion Scramble Matches," "Battle Royale Matches," "Royal Rumbles" or "Tag-Team Matches."

73.    Common moves employed by wrestlers at WWE's direction include:

- "Brain Buster" – a front facelock combined with a vertical suplex in which the victim lands headfirst;
- "Bulldog" – a wrestler grabs his opponent's head and leaps forward, so that the victim's face is driven into the ground;
- "Cobra Clutch Slam" – a wrestler places the opponent in a hold called the cobra clutch, lifts his opponent, and then jumps into the air, landing his opponent on the ground;
- "Facebreaker" – a knee to the face, including many variants involving throwing an opponent down onto one's propped up knee, headfirst;
- "Jawbreaker" – a move in which the opponent's jaw is slammed into the wrestler's body, usually the knee or elbow; and,
- "Powerslam" – a move in which the performer falls face-first into his

opponent.

**C.    WWE Wrestlers Commonly Suffer from Concussions and Long-Term Brain Damage.**

74.    The WWE coerces its wrestlers to work while they are injured by, among other methods, threatening to strip them of their position within the organization if they refuse. Wrestlers are routinely coerced into wrestling through injuries. The WWE adhered to a general policy that "there was no getting injured" in the WWE, meaning wrestling in the organization meant enduring injuries and pain in order to keep one's job and livelihood. Wrestlers are universally encouraged to "wrestle through the pain" in order to keep working to maximize profit for the WWE. The WWE's doctors and medical professionals have allowed such events to continue, and provided a false veneer of safety and security to wrestlers.

75.    WWE wrestlers suffer countless blows to the head over the course of their careers, and are at a grave, obvious risk for concussion as well as CTE.  In addition to painful injuries, the unseen head trauma from repeated blows to the head, day after day, takes its toll on the wrestlers who often exhibit symptoms of brain damage: memory loss, headaches and migraines, confusion, depression and violent personality changes.

76.    Former WWE star Mick Foley has stated that, while working for WWE, he suffered "too many [concussions] for me to count really."[20]

77.    In fact, it is commonplace for wrestlers to experience numerous concussions over their career. As one former WWE wrestler, who suffered numerous concussions while working for WWE, has noted, "as much as wrestling

---

[20] StarTribune.com, "C.J.: Mick Foley's brain shows no sign of needing study" (March 1, 2014), available at
http://www.startribune.com/featuredColumns/248040151.html?page=all&prepage=1&c=y#continue.

is performance, there's a very, very small margin of error. And especially when you're learning the thing, you fall on your head a lot."[21]

78.    Apart and aside from concussions, wrestlers receive countless sub-concussive hit, when they are kicked or smacked in the head with a prop or a fight and when they are thrown outside the ring or slammed to the ground. For example, Chris Benoit often employed "the flying head butt," wherein he jumped off the ropes and smacked his head against the head of his opponent. Many wrestlers are directed to perform, or be subjected to, situations that put their brains are as great a risk.

79.    Below is a picture of Benoit performing "the flying head butt:"



80.    Moreover, like other WWE wrestlers, Benoit was routinely hit in the head with a chair.[22]

81.    In 2007, Benoit died and thereafter, Dr. Bennet Omalu and Dr. Julian Bailes—leading forensic neuropathologists who discovered CTE in the brains of several former football players—examined Benoit's brain. Drs. Omalu and Bailes concluded that Benoit had unmistakably suffered from CTE. Their findings were subsequently published in a peer-reviewed medical journal.[23]

---

[21] Michael Kirk, "League of Denial: the NFL's Concussion Crisis" (June 12, 2013), available at http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/the-frontline-interview-chris-nowinski/.

[22] Mark Fainaru-Wada and Steve Fainaru, League of Denial 249 (2013).

[23] *See* Bennet Omalu, et al., *Chronic traumatic encephalopathy in a professional*

82.   Dr. Bailes explained that Benoit's brain was so damaged from CTE that it "resembled the brain of an 85-year-old Alzheimer's patient."[24]

83.   Two years later, former WWE wrestler Andrew "Test" Martin died, at the age of 33. Dr. Omalu conducted an analysis of Martin's brain tissue. Dr. Omalu found that Martin, like Benoit, suffered from CTE stemming from repeated blows to the head.

84.   Benoit and Martin are not the only WWE wrestlers to die young. It is well-established that WWE wrestlers tend to die far younger than average Americans, even those engage in other violent sports, such as football or hockey.

85.   This is in part due to the stunningly high suicide rate among former wrestlers. At least 13 wrestlers have died of suicide over the last 10 years.[25] Each of these wrestlers sustained repeated blows to the head while working for WWE. For example, one of these wrestlers, Chris Kanyon, suffered at least twelve concussions over his career. Before committing suicide, Kanyon told friends that he believed he had suffered brain damage from wrestling in WWE.[26]

86.   It is well established that CTE can cause both depression and suicide.

**D.   Despite Promising to Keep Its Wresters Safe, WWE Does Little to Protect Them from Brain Damage.**

87.   WWE has continually represented to its wrestlers, and the public, that the safety of its wrestlers is a top priority. To take but one example, Vince

---

*American wrestler*, J. FORENSIC NURS., Vol. 6, Issue 3, Fall 2010, at 130-6.

[24] Stephen J. Giannanello, Real Life Monsters: A Psychological Examination of Serial Murder 38 (2012).

[25] Keith Harris, "Sean O'Haire: A stark reminder about the long term-effects of brain trauma?" (Sept 13, 2014), available at
 http://www.cagesideseats.com/wwe/2014/9/13/6144849/sean-ohaire-a-stark-reminder-about-the-long-term-effects-of-brain.

[26] *Id.*

McMahon told the Committee on Oversight and Government Reform of the U.S. House of Representatives, "Let me just say, [WWE] is always concerned about safety of our talent, absolutely. We were the first people to do any number of things to make things safe for our talent, if that's the direction in which you're going."[27]

88.    In fact, WWE puts its wrestlers at grave risk, and encourages wrestlers to hurt themselves for WWE's benefit. Indeed, the WWE compensated wrestlers who performed more dangerous moves at a higher rate than those who performed safer routines and actively encourage the most violent and dangerous types of wrestling moves in order to maximize profits.

89.    WWE does not – in some instances, cannot – adequately protect the safety of its wrestlers during matches. Indeed, WWE allowing or encourages matches to continue after a wrestler has suffered a devastating injury, sometimes downplaying or glorifying the injuries for their own benefit. For years, WWE employed medical staff for the purpose of rubber-stamping a wrestler's participation long past the outer boundaries of then-known safety guidelines.

90.    By way of example, in 2007, WWE wrestler Candice Michelle was knocked unconscious when she fell from the rope during a match. Rather than ending the match or seeking assistance for the unconscious Michelle, the "referee" directed the other wrestler to pull Michelle by her neck and her underarm to the middle of the ring, so that Michelle could be pinned.

91.    Likewise, in 1998 match fittingly called "Hell in a Cell," wrestler Mick Foley was thrown from the top of a steel cage, at which point he was

---

[27] Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of Vince Kennedy McMahon (Dec. 14, 2007), available at https://www.scribd.com/doc/33253381/Vince-McMahon-s-Testimony-to-Waxman-committee.

CLASS ACTION COMPLAINT

knocked unconscious. Rather than ending the fight, the "referee" and the "medical team" on sight allowed the wrestler to finish the match when he regained consciousness. Indeed, the video from the incident suggests that the medical staff merely pretended to examine Foley for the benefit of the ongoing "action soap opera."[28] When Foley stood up, a WWE announcer yelled with glee, "He's either crazier than hell, or he's the toughest S.O.B. I've ever seen . . . !" The announcers then proceeded to debate whether the item sticking out of Foley's bloody nose was a tooth or some other foreign object. In fact, it was one of Foley's teeth. After Foley sustained these injuries, the match continued for an additional ten minutes. At the end of the match, when Foley was being helped out of the arena, one announcer exclaimed that "if anybody ever deserved a standing ovation," it was Foley, for fighting through his injuries.

92.    Below is a picture of Foley taken during the Hell in the Cell match, with his tooth lodged in his nose.



93.    In a 2010 match, Oscar Gutierrez, also known as Rey Mysterio, jumped off the ropes and landed on the nose of his opponent, Mark Calloway, also known as The Undertaker. Calloway, who suffered a concussion and broke his

---

[28] *See* https://www.youtube.com/watch?v=NgYoYTbnPo4 at roughly 11:00.

nose, was visibly "woozy" and "wearing the wounds of war," according to a reverent WWE announcer. Nonetheless, WWE permitted the match to continue until its scripted end, several minutes later.

94.    Despite the fact that WWE put, and continues to put, its wrestlers at a grave risk, WWE has downplayed the dangerous associated with wrestling, while profiting off the injuries of its wrestlers.

95.    Despite the countless deaths and debilitating injuries suffered by WWE wrestlers, WWE has done little to make WWE wrestling safer. Although WWE has purportedly banned chair shots to the head, it has declined to implement safety measures that would limit the risk of wrestlers sustaining long-term brain damage. In a 2007 CNN documentary, *Death Grip: Inside Pro Wrestling*, WWE CEO Vince McMahon insisted that WWE would not substantially change the way its matches were conduct. McMahon remarked, "Accidents occur. It's not ballet, as they say." As McMahon promised, little else about WWE matches has changed. WWE wrestlers continue to perform dangerous "moves" on one another, to throw each other around and outside the ring, and the hit each other with dangerous weapons.

96.    Moreover, despite the McMahon's claim that they were banning chair shots to the head in 2007, chair shots to the head were in fact not banned until three years later. And even after the implementation of this "ban," wrestlers continue to hit each other in the head with chairs.

97.    Wrestlers at the WWE reasonably relied on the WWE medical staff, trainers and bookers in assessing the risks of their participation. The WWE has used the disparity in resources and information to its great advantage

### E.    WWE Encourages Steroid Use, Thereby Increasing the Change of Wrestlers Hurting One Another.

98.    WWE's signature is, and has always been, the enormous size of its wrestlers. Its large wrestlers are central its appeal, and was key to WWE becoming

dominance in the field of wrestling entertainment. Champion wrestlers average 6'1"-6'4" in height and 215-275 lbs.

99.    The rampant use of steroids in WWE has exacerbated the concussion crises, and further demonstrates WWE's tendency to put profits above the well-being of its wrestlers.

100.    In 1989, federal investigators discovered that Dr. George T. Zahorian III, a physician connected with WWE, had been regularly distributing anabolic steroids to current WWE CEO Vince McMahon, as well as various WWE wrestlers. The physician was later indicted, and convicted, of illegally distributing steroids. During the investigation, WWE executive Linda McMahon sent a letter to a fellow WWE executive, stating that "[a]lthough you and I discussed before about continuing to have Zahorian at our events as the doctor on call, I think that is now not a good idea," and instructing the other executive to "clue [Dr. Zahorian] in on any action that the Justice Department is thinking of taking." Just before Dr. Zahorian was indicted, federal prosecutors alleged that an unnamed WWE official called the doctor and instructed him to "destroy any evidence of his contact with WWF or WWF wrestling personnel."[29]

101.    Other wrestlers have suggested that Bollea's testimony underestimated the percentage of WWE wrestlers who used steroids.

102.    In 2006, following the steroids-related death of a high profile wrestler and a Congressional investigation, WWE finally put into place a "wellness policy" that purportedly outlawed steroids in WWE. When implemented, 40 percent of wrestlers tested positive for steroid use.

103.    In fact, the "wellness policy" did not stem the tide of steroid use in WWE, because it contains a loophole permitting wrestlers to use steroids if they

---

[29] Ted Mann, "McMahon warned steroid doctor of investigation" (Apr 9, 2010), available at http://www.theday.com/article/20100409/NWS12/100409727/1017.

have a prescription. Many wrestlers inappropriately exploited, and continue to exploit, this loophole. Moreover, six months after implementing its steroid policy, WWE relaxed the policy to allow wrestlers suspended for steroid abuse to participate in "selected television events" and pay-per-view events.

104.   Despite its "wellness policy," former WWE employees have revealed that WWE continues to encourage steroid use.[30]

105.   As a result of steroid use, WWE wrestlers are far stronger than other persons, including other athletes. By extension, they inflict more damage on their counterparts in the ring.

106.   Moreover, anabolic steroid use increases one's tolerance for pain, meaning that wrestlers using steroids are able to sustain more pain during a fight.[31] Due to this increased tolerance for pain, wrestlers on steroids are more likely to sustain serious head injuries, and more likely wrestle through any head injuries they sustain.

107.   Thus, WWE has increased the likelihood that its wrestlers will hurt themselves and each other.

## IV.   WWE Has Denied, Covered Up, and Concealed Injuries, Including Head Injuries, Suffered by Its Wrestlers.

108.   Every blow to the head is dangerous. Both repeated concussions and sub-concussive blows cause permanent brain damage. During WWE practice as well as the documented matches WWE wrestlers such as Plaintiffs sustained thousands of hits to the head and numerous concussions. Such repeated blows result in permanently impaired brain function.

109.   WWE has covered up the harms it knew or should have known it was

---

[30] *See* https://www.youtube.com/watch?v=Cvd__8uUScs.

[31] William N. Taylor, M.D., *Anabolic Steroids and the Athlete, 2d ed.* 68-69 (2002).

subjecting wrestlers to. It did so in three ways: first, by concealing, and failing to acknowledge, medical research concerning the risks of head trauma; second, by downplaying the injuries suffered by its wrestlers before, during, and after matches; and third, by denying that WWE wrestlers have suffered, and are at grave risk of suffering, concussions and long term brain damage.

110.   By concealing known risks and downplaying the injuries suffered during matches, WWE denied its wrestlers opportunities to recover from head injuries, to seek appropriate medical treatment, and to monitor themselves for long term brain damage. Moreover, by concealing the nature, extent, and consequences of their wrestlers' injuries, WWE denied them information vital to balancing the risks and rewards of continuing to work for WWE.

**A.     WWE Has Concealed and Failed to Disclosure Relevant Medical Literature.**

111.   For decades, WWE has known, or should have known, that wrestlers have been subjected to extremely dangerous conditions and blows at its direction. And it therefore should have, but never did, warn its wrestlers of the risks associated with wrestling in the WWE.

112.   The risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades. Below is a selection of mounting medical literature concerning head trauma:

•      During the 1950s, 60s, 70, 80s, and 90s, studies were authored by the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine, concerning head trauma and concussions. In particular, many of the studies focused on sports-related head trauma and concussions and the long term implications of such injuries (which include loss of brain function and dementia).

•      In 1973, Drs. Corsellis, Bruton, & Freeman-Browne reported as to the physical neurological impact of boxing. The study outlined the

neuropathological characteristics of dementia, loss of brain cells and cerebral atrophy.

- In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines (updated in 2001).

- In 2001 and 2004, conventions of neurological experts met in Prague and Vienna with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out." These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

- A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

- In 2007, scientists concluded that a former WWE wrestler had suffered from CTE. Scientists concluded in 2009 that a second former WWE wrestler had suffered from the same affliction.

113.  WWE knew, or should have known, about this and other research demonstrating the dangers of receiving concussive and sub-concussive blows to the head. Moreover, WWE knew or should have known that the research associated with boxing, hockey, and football also reflected dangers associated with WWE wrestling. Indeed, for the reasons set forth above, wrestlers have a greater risk of receiving frequent concussive and sub-concussive blows to the head than athletes in those sports.[32]

---

[32] Notably, some commentators have pointed out that where the rules or practices

114.    On information and belief, WWE and its predecessors in interest were also advised by various physicians and medical experts of the risks associated with repeated blows to the head, including the risks associated with concussions and sub-concussive blows. WWE ignored these warnings, just as it ignored the warnings embedded in the relevant medical literature.

**B.    WWE Downplayed Injuries Before, During, and After Matches.**

115.    Apart and aside from ignoring and failing to disclose the risks of concussive and sub-concussive blows, WWE perpetrated a widespread policy of ignoring, concealing, and downplaying the dangerous injuries of its wrestlers.

116.    Though WWE has staff on-site for matches purportedly to monitor and protect its wrestlers, WWE has prioritized the continuation of matches over the safety of WWE wrestlers.

117.    WWE personnel and medical staff have negligently or purposefully failed to intervene in wrestling matches wherein a wrestler had suffered a

---

of a given activity inevitably result in these injuries, they should be subject to strict liability:

There is, as we highlighted already, considerable evidence that concussions received by NFL players result in those players' lowered overall result in those players' lowered overall life expectancy, as well as serious decline in their mental and physical health. Players cannot avoid receiving concussions unless the fundamental rules of the sport are changed. While the violent nature of the sport is often taken for granted, the level of violence encouraged by team ownerships is often far greater than the level required to win the game. Incentives are created for players to engage in levels of violence that are inappropriate for the circumstances and that greatly increase the physical harm suffered by other players. Thus, it is apparent that there is a plausible argument in favor of imposing strict liability in order to correct the perverse incentive structures that perpetuate excessive violence.

Barker, Caleb, et. al. "NFL Concussions: The Current Situation and Policy Implications" *available at* http://learning.law.harvard.edu/frontiertorts/wp-content/uploads/2013/04/NFL-Concussions-White-Paper-2.pdf

concussion. WWE downplayed clear symptoms of concussions, glorifying their wrestlers for fighting through their "wooziness."

118.    Moreover, WWE personnel and medical staff have negligently or purposefully failed to diagnose wrestlers with concussions after wrestling matches, and negligently or purposefully failed to report concussions to the wrestlers.

119.    WWE personnel and medical staff have negligently or purposefully failed to adequately screen wrestlers for prior head trauma before allowing them to wrestle. Individuals who suffered concussions but who continue to engage in dangerous conduct are at substantially greater risk of long term or permanent brain damage.

120.    Remedial programs undertaken the WWE may indeed have had the opposite of the intended effect, clearing wrestlers to return to the ring while still suffering the aftereffects of head trauma. A "study of studies" in 2012 revealed that the "Impact" program may increase the risk of long term damage because of its error rate.[33]

121.    In 2014, Philip Jack Brooks, who wrestled under the name "Punk," sustained serious injuries but was cleared to wrestle. He has stated: "I got a concussion in the Royal Rumble . . . I knew I had a concussion. Everyone knew I had a concussion. And they were like we want you to take this test. . . . I took the test while texting you and listening to my headphones and I 'passed' with flying colors. But then they were like we want you to go to the ring and run the ropes. And I was like but I just passed your test and they were like yeah, but we still think you have a concussion. I was like so your test is worthless."[34]

---

[33] *See* http://m.espn.go.com/general/story?storyId=8297794&src=desktop&wjb.

[34]    http://www.wrestlezone.com/news/530395-wwe-issues-statement-following-cm-punk-blasting-company-doctors

**C.     WWE Has Denied Its Wrestlers Have Developed Concussions and Suffered from Brain Damage.**

122.    WWE has systemically denied that its wrestlers routinely suffer from concussions, or that its wrestlers suffer from long term brain damage.  No one at WWE ever warned plaintiff and the member of the Class about the risk of sustaining numerous sub-concussive and concussive blows.

123.    For example, in 2007, WWE Executive Stephanie McMahon Levesque testified to the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were no documented concussions in WWE's history. [35]

124.    A cursory look at clips of any wrestling match will reveal that the wrestlers have undergone – and continue to undergo – significant head trauma regularly.

125.    On information and belief, at the time of Levesque's testimony, WWE wrestlers cumulatively experienced hundreds—if not thousands—of concussions. To categorically deny that these concussions were documented amounts to an admission that WWE refused to acknowledge the extreme risks it was subjecting its wrestlers to.

126.    WWE also attempted to cover up the connection between the death of Chris Benoit and the brain damage he suffered in the ring. WWE actively worked to erase Benoit from WWE's history, editing his matches out of DVDs and redacting his name and numerous "championships" from the record books.

127.    Moreover, in a joint interview for the 2007 CNN documentary *Death Grip: Inside Pro Wrestling*, WWE CEO Vince McMahon and former WWE CEO

---

[35] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 117 available at
http://oversight-archive.waxman.house.gov/documents/20081231140942.pdf.

Linda McMahon attacked Drs. Omalu and Bailes's finding that Benoit had suffered from CTE. This was part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had.

128.   Ignoring the mounting research, WWE has continued to allow, and even encourage, repeated blows to the head both unarmed and with various weapons.

129.   The WWE's chief doctor, Dr. Joseph Maroon, has been involved in prior concussion and head trauma related cover ups, including attempts to discredit research related to CTE.[36]

## V.    Facts Concerning Named Plaintiffs

### Russ McCullough

130.   Plaintiff Russ McCullough who stands at 6 feet 10 inches 350 pounds, is a resident of Corona, Riverside County, California. Russ McCullough wrestled for the WWE from 1999 to 2001. His stage name was "Big Russ McCullough."

131.   McCullough often wrestled several times per week, did not have adequate time to rest between matches, and was encouraged to wrestle while injured. In one instance was forced to wrestle with a torn knee ligament while on crutches.

132.   As a wrestler for WWE, McCullough suffered numerous injuries to the upper body, neck and head during his career. Specifically, Russ McCullough was knocked completely unconscious after being struck by the back of a metal chair in Cincinnati. After he was knocked unconscious the beating continued and he was struck in the head with a metal chair more than 15 times without intervention by WWE staff. McCullough sought medical treatment on his own and the head injury was diagnosed as a severe concussion. He reported the event to

---

[36] http://concussioninc.net/?p=9617

WWE who responded: "Not our problem."

133.   In addition Russ McCullough participated in numerous matches where he suffered sub-concussive or concussive blows, yet WWE, its personnel, and medical staff did not intervene or take measures to prevent further injury. Indeed, WWE failed to provide or recommend adequate medical care, even when he was showing unmistakable signs of serious injury.

134.   As a direct result of his participation in WWE events, McCullough has suffered physical changes placing him at a higher risk of future harm for neurological problems.

135.   Today Russ McCullough, suffers from numerous symptoms including but not limited to headaches, severe migraines memory loss, and severe depression and panic attacks which have required over forty emergency room visits since he retired.



**Plaintiff Ryan Sakoda**

136.   Plaintiff Ryan Sakoda born in Tokyo Japan and is a resident of West Hollywood, Los Angeles County, California. Ryan Sakoda wrestled for the WWE from 2003 to 2004.

137.   Ryan Sakoda states that the WWE operated by "intimidation and abuse" and disregarded his health and safety, and that of others, to a degree that has left him traumatized. He states he and others were "forced to wrestle injured or you lost your job," and that concussions were not discussed or treated.

138.   While wrestling for  the WWE in 2003, he was knocked unconscious in a match by a Super Kick. The course of treatment recommended to Ryan by the WWE medical staff and trainer was "not to go to sleep," suggesting that if he did, he may bleed to death and die. He stayed awake that night.

139.   Sakoda states that the WWE treated him "as less than a human being," and "with total indifference as to whether he lived or died," let alone any concern for his head injuries or health.

140.   Today Ryan Sakoda, suffers from numerous symptoms including but not limited to headaches, severe migraines, memory loss and severe depression.

///

///

///

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15  **Plaintiff Matt Wiese**

16      141.   Plaintiff Matt Wiese, is a resident of Los Angeles, Los Angeles

17  County, California. Matt Wiese  wrestled for the WWE from 2003 to 2005. His

18  stage name was "Luther Reigns."

19      142.   Matt Wiese wrestled regularly in SmackDown! in both singles and

20  tag team events where he faced the Undertaker, Eddie Guerreo and Rey Mysterio.

21  During these and other events, he sustained numerous untreated head injuries.

22  Matt Wiese observed that there was a "code of silence" related to injuries, and that

23  the WWE fostered an environment of fear. During one WWE event, Matt Wiese

24  was punched so hard in the head by Big Show, another WWE wrestler, that he had

25  visible injuries to his head and he vomited following the event. WWE staff took

26  no steps to intervene in the event and WWE medical staff did nothing to treat Matt

27  Wiese following the incident.

28      143.   Matt Wiese suffers from massive sustained headaches and suffered a

stroke.

144.   Today Matt Wiese suffers from post-concussion symptoms including but not limited to severe fatigue, dizziness, and severe short and long term memory loss. Mr. Wiese is unable to remember much of his life.

## CLASS ACTION ALLEGATIONS

145.   Plaintiff seeks to bring this case as a class action, under Federal Rule of Civil Procedure 23, on behalf of himself and all others similarly situated. The proposed Class is defined as:

> All persons who currently or formerly wrestled for World Wide Entertainment or a predecessor company, and who reside in the United States.

> Excluded from the Class are Defendant, any entity in which Defendant have a controlling interest or which has a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

146.   Numerosity. The number of persons who are members of the Class described above are so numerous – at minimum, 500 – that joinder of all members in one action is impracticable.

147.   Commonality and predominance. Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

a.   Whether Defendant breached its duty to warn the Class about brain trauma and/ or concussions;

b.   Whether Defendant's breaches caused injuries to the Class;

c.   Whether Defendant concealed and misrepresented vital health related information from the Class, medical professionals and its fans;

d.   Whether Defendant knew that the Class sustained brain trauma or

concussions;

    e.    Whether Defendant's rule-making decisions and investigations promoted player safety;

    f.    Whether Defendant promoted violent behaviors which led to the injuries alleged herein;

    g.    Whether the Class is entitled to restitution and other equitable relief requested herein; and

    h.    Whether the Class suffered damages and are entitled to damages.

148.  Typicality. Plaintiffs' claims are typical of the Class's claims. Plaintiffs and the Class sustained similar injuries as a direct result of the actions of the WWE and suffered serious head injuries.

149.  Adequacy. Plaintiffs will fairly and adequately represent and protect the Class's interests. Plaintiffs have  no interests antagonistic to the Class. Plaintiffs  have retained counsel with experience prosecuting consumer class-action and complex litigation claims.

150.  Superiority. A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

151.  This action is appropriate. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for Defendant under the laws alleged herein.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATION

152.  Because the injuries to the Class are latent and not detectable until manifestation, Plaintiffs and the Class members were not reasonably able to

discover their injuries until after being diagnosed, despite their exercise of due diligence.

153. Defendant knew that the Plaintiffs and Class were suffering concussions during and prior to their careers and concealed that material information from Plaintiff and all WWE wrestlers.

154. Because Defendant concealed the true character, quality and nature of these injuries, it is estopped from relying on any statute of limitations defense. The applicable statute of limitations is tolled because Defendant's fraudulent concealment of the dangers and adverse effects of head injuries prevented Plaintiffs from learning of or properly appreciating the hazards to their health.

155. The WWE had a duty toward its wrestlers, including Plaintiffs, based upon its special relationship, assumed duty of care, and superior knowledge about the causes, frequency, severity, and proper treatment of concussions, mild traumatic brain injuries, and other sub-concussive injuries and head trauma.

156. Despite the exercise of due diligence, and in part due to the WWE's policies and representations, Plaintiffs were unable to anticipate, discover, or properly mitigate the harms caused by, the injuries suffered while wrestling.

157. As such, any applicable statutes of limitation have been tolled by WWE's concealment of material facts and Defendant is estopped from relying on any such statutes of limitation.

## THE CHOICE OF LAW AND FORUM SELECTION CLAUSES IN DEFENDANT'S CONTRACTS ARE INVALID

158. Because the contracts entered into between Plaintiffs and members of the class and Defendant were contracts of adhesion and against public policy, the choice of law and forum selection provisions are invalid and unenforceable.

159. Plaintiffs had no opportunity to negotiate or modify the contracts presented to them by Defendant prior to entering into them.

160. Plaintiff Sakoda was presented with his contract after he was already

working for Defendant and was told by WWE that it was on a "take it or leave it basis." He had no opportunity to have it reviewed by independent counsel or even suggest modification of any of its terms.

161.   Plaintiffs Wiese and McCullough were similarly not afforded any opportunity to negotiate their agreements with the WWE. They were told to sign the contracts if they wanted to wrestle.

162.   Based on the monopolistic nature of Defendant's business and the identical contracts of adhesion presented to Plaintiffs and members of the class, the unbargained for choice of law and forum selection clauses in Defendant's contracts are against public policy and unenforceable.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (FRAUDULENT CONCEALMENT AND FAILURE TO DISCLOSE OR WARN)

163.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

164.   During the Class period, Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from its wrestlers, including Plaintiffs, material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long term neurological damage.

165.   Defendant had a duty to disclose and warn Plaintiffs and the Class about the actual knowledge it maintained about such injuries and the true nature of the risks posed to its wrestlers.

166.   The misrepresentations, omissions, and concealments complained of herein were material and were made on a uniform basis. As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiffs and the

Class have been damaged, as alleged herein.

167.   Plaintiffs and the Class reasonably and actually relied upon Defendant's representations, omissions and concealments. Such reliance may also be imputed, based upon the materiality of Defendant's wrongful conduct.

168.   Based on such reliance, Plaintiffs and the Class suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.

169.   Had Plaintiffs and the Class been aware of the true nature of Defendant's business practices, they would not have participated in WWE's business in the manner they did.

170.   Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud and/or malice entitling Plaintiffs and the Class to an award of punitive damages to the extent allowed in an amount appropriate to punish or to set an example of Defendant so as to deter future similar conduct on the part of Defendant and others.

171.   Plaintiffs and the Class are entitled to damages and injunctive relief as claimed below.

## SECOND CAUSE OF ACTION
## (NEGLIGENT MISREPRESENTATION)

172.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

173.   During the Class period, WWE negligently and/or recklessly misrepresented, omitted, and concealed from wrestlers material facts concerning repetitive head impacts and related injuries.

174.   Defendant had a duty to disclose to Plaintiffs and the Class any actual knowledge is possessed conceding such injuries and any associated risks it was aware of.

175.   The WWE materially misrepresented the risks faced by Plaintiffs related to head, back, and spine injuries through misleading public statements,

requiring players to fight through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

176.   Plaintiffs justifiably and reasonably relied on the WWE's negligent misrepresentations to his detriment when wrestling for the WWE.

177.   The misrepresentations, omissions, and concealments complained of herein were negligently or recklessly made to wrestlers, teams, and the general public on a uniform basis. As a direct and proximate result of these misrepresentations, omissions, and concealments, Plaintiffs and the Class members have been damaged, as alleged herein.

178.   As a direct and proximate result of the WWE's negligent misrepresentations, Plaintiffs have suffered and continue to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, emotional distress, and loss of consortium. Plaintiffs and the members of the Class seek the full measure of damages allowed under applicable law.

179.   Plaintiffs and the Class reasonably and actually relied upon Defendant's representations, omissions, and concealments. Such reliance may also be imputed based upon the materiality of Defendant's wrongful conduct.

180.   Based on such reliance, Plaintiffs and Class members participated in WWE as wrestlers and, as a result, suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.

181.   Had Plaintiffs and the Class been aware of the true nature of Defendant's business policies and practices, they would not have participated in WWE wrestlers in the manner they did.

182.   The failure of the WWE to publicize the mounting evidence in the scientific literature of the evolving and chronic neuro-cognitive problems amongst former and current WWE wrestlers caused wrestlers to believe that their physical

1  and psychological problems (as described herein) were neither serious nor related
2  to wrestling. These commissions or omissions caused Plaintiffs and the members
3  of the Class to ignore the need for necessary treatment.

4  183.  Defendant's acts and misconduct, as alleged herein, constitute
5  oppression, fraud, and/or malice entitling Plaintiffs and the Class to an award of
6  punitive damages to the extent allowed in an amount appropriate to punish or to
7  set an example of Defendant so as to deter future similar conduct on the part of
8  Defendant and others.

9  184.  Plaintiffs and the Class are entitled to damages and injunctive relief
10  as claimed below.

## THIRD CAUSE OF ACTION
## (DECLARATORY AND INJUNCTIVE RELIEF)

13  185.  Plaintiffs re-allege and incorporate by reference each of the
14  paragraphs above.

15  186.  Plaintiffs and the Class are entitled to declaratory relief establishing
16  that Defendant negligently injured them with conduct that was intentional or
17  negligent.

18  187.  Plaintiffs, pursuant to 28 U.S.C. § 2201 seek a declaration that WWE
19  (a) knew of should have known that concussions suffered by its wrestlers pose
20  serious risks to their wrestlers health as alleged herein, (b) had a duty to warn it
21  wrestlers of the risk of participating in WWE matches, (c) willfully and
22  intentionally concealed material information concerning the risks, and (d) engaged
23  in actions that endangered its wrestlers.

## FOURTH CAUSE OF ACTION
## (NEGLIGENCE)

26  188.  Plaintiffs re-allege and incorporate by reference each of the
27  paragraphs above.

28  189.  Defendant owed a duty to Plaintiffs and the Class to exercise

reasonable care in the safety and quality control of its wrestling matches, both due to their relationship and Defendant's voluntary undertakings and superior knowledge.

190.   Defendant breached its duty to Plaintiffs and the Class by ignoring and not properly addressing knowledge that it possessed concerning repetitive head trauma injuries in its events and associated risks and by failing to take necessary steps to warn or otherwise inform its wrestlers and the general public. These breaches include, *inter alia*:

a.   Creating, fostering, and promoting a culture of extreme violence, including head hits with metal folding chairs, techniques causing severe trauma to the spine, neck, and head;

b.   Failing to inform the WWE Talent about the scientific research on the negative health effects of head trauma and about anecdotal evidence from the negative health effects of head trauma;

c.   Failing to warn of the potential negative effects of head injuries suffered while wrestling for the WWE, including but not limited to, the possibility of CTE;

d.   Failing to adequately address the continuing health risks associated with concussive events, sub-concussive events and/or brain injuries that wrestlers sustained;

e.   Failing to make any statements or substance about concussions, MTBI, CTE and/or other head injuries; and,

f.   Willfully, wantonly, recklessly, and/or negligently inducing Plaintiffs to wrestle and/or continue wrestling having sustained serious injuries including, but not limited to, concussions, sub-concussions, and CTE without being properly treated and rehabilitated.

191.   Defendant was aware, or reasonably should have been aware, that injuries were prevalent in its events and posed great risk to its wrestlers.

192.   When they participated as wrestlers in WWE, Plaintiffs and the Class were not aware WWE had concealed and ignored certain vital medical information.   As a direct and proximate result of the Defendant's negligent acts and omissions as previously stated, Plaintiffs suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries.

193.   As a direct and proximate cause of the foregoing, Plaintiffs and the Class have suffered and will continue to suffer damages and economic loss described fully above, in an amount to be proven at trial.

<strong>FIFTH CAUSE OF ACTION</strong><br/><strong>(MEDICAL MONITORING)</strong>

194.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

195.   Repetitive blows during WWE events has a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

196.   The effects of WWE's negligence and the circumstances it subjected wrestlers to may lead to latent physical changes which ultimately cause significant neurological impairment.

197.   WWE exposed Plaintiffs and the Class to hazardous conditions and out-of-the-ordinary risks of harm. Repetitive head traumas to which the Plaintiffs

have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiffs' exposure to the risks of harm as described above would have been materially lower.

198.   Accordingly, the repetitive head impacts sustained exposed Plaintiffs and the members of the Class, to subtle and repetitive changes within the brain on the cellular level. For that reasons, the environment within which WWE wrestlers have sustained repetitive head impacts exposed them to substantive hazards.

199.   Plaintiffs and the members of the class suffered latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and related disorders.

200.   WWE wrestlers were and continue to be:

a.     Exposed to greater than normal background levels;

b.     Of a proven hazardous substance, condition, activity, or event;

c.     Which was caused by the Defendant's willful, wanton, reckless or negligent acts; and,

d.     As a proximate result of the exposure, Plaintiffs and the Class have significantly increased risk of contracting serious latent diseases.

e.     Further, a monitoring procedure exists that makes the early detection of the disease possible; and,

f.     Such a monitoring regime is different from that normally recommended in the absence of the exposure or activities at issue here;

g.     Which is reasonably necessary according to contemporary scientific principles.

201.   By monitoring and testing the affected brains and bodies of the Plaintiffs and Class, it can be determined whether they have suffered the injuries alleged herein.

202. By monitoring and testing Plaintiffs and the members of the Class, the risk that Plaintiffs and the members of the Class will suffer long term injuries, disease, and losses will be significantly reduced.

203. By monitoring and testing Plaintiffs and the members of the Class, the risk that Plaintiffs and the members of the Class will suffer long term injuries, disease, and losses without adequate treatment will be significantly reduced.

204. The medical monitoring regime must include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with WWE wrestling. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiffs and the members of the Class suffered as a result of participating in WWE events.

205. Accordingly, Defendant should be required to establish a medical monitoring program that, among other things:

a. Establishes a trust fund, in an amount to be determined, to pay for the medical monitoring of all wrestlers subjected to checks and hits, as frequently as determined to be medically necessary, as well as to pay to develop and research other methods by which the risk of those affected can be reduced;

b. Notifies all Class Members in writing that they require frequent medical monitoring; and

c. Provides information to treating physicians to aid them in detecting such injuries.

206. Plaintiffs and the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of concussions and repeated sub-concussive blows. Without a Court-approved medical monitoring program as described herein, Plaintiffs and the Plaintiff Class Members will

1  continue to face unreasonable risks alleged herein.

2  207.   Plaintiffs and the Class are entitled to damages in an amount to be

3  determined at trial.

4  **SIXTH CAUSE OF ACTION**

5  **(STRICT LIABILITY FOR ABNORMALLY DANGEROUS ACTIVITIES)**

6  208.   Plaintiffs re-allege and incorporate by reference each of the

7  paragraphs above.

8  209.   The entertainment product produced, managed, directed and sold by

9  WWE inherently involves a high degree of risk of harm to its wrestlers.

10  210.   The harm resulting from the risks the WWE exposed its wrestlers too

11  is great. The harm sustained as a direct result of WWE's conduct is grave,

12  including permanent brain damage, depression, and fatalities.

13  211.   Wrestling and other activities required of wrestlers by the WWE

14  create a substantial risk that cannot be eliminated by the exercise of reasonable

15  care.

16  212.   The activities and conduct engaged in and encouraged by WWE, far

17  from being common usage, are in fact outrageous, abnormal and shocking to the

18  conscience.

19  213.   It is inappropriate, in any setting, for WWE to subject poorly trained

20  wrestlers to the dangerous environment fostered by its events.

21  214.   The community captures no benefit from – and indeed is harmed by –

22  the unmitigated brutality and violence disseminated by WWE.

23  215.   As a direct and proximate cause of the foregoing, Plaintiffs and the

24  Class have suffered and will continue to suffer damages and economic loss

25  described fully above, in an amount to be proven at trial, and WWE should be

26  held strictly liable for orchestrating the circumstances that gave rise to these

27  injuries.

28  **SEVENTH CAUSE OF ACTION**

## VIOLATION OF THE CALIFORNIA UNFAIR
## COMPETITION LAW ("UCL")

### Cal. Bus. & Prof. Code § 17200, *et seq.*

216.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above.

217.   Defendants engaged in and continue to engage in acts or practices that constitute unfair competition as defined by Business and Professions Code section 17200, including, but are not limited to knowingly, fraudulently, and actively misrepresented, omitted, and concealed from its wrestlers, including Plaintiffs, material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long term neurological damage.

218.   The acts and practices of Defendant alleged in this Complaint constitute unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code section 17200.

219.   Plaintiffs and the Class reasonably and actually relied upon Defendant's representations, omissions and concealments. Such reliance may also be imputed, based upon the materiality of Defendant's wrongful conduct.

220.   Based on such reliance, Plaintiffs and the Class suffered and will continue to suffer damages and economic loss in an amount to be proven at trial.

221.   Had Plaintiffs and the Class been aware of the true nature of Defendant's business practices, they would not have participated in WWE's business in the manner they did.

222.   Plaintiffs and the Class have been injured and have suffered loss of money or property as a result of Defendants' unfair, unlawful, and/or fraudulent business acts and practices.

223.   All named Plaintiffs have standing to pursue claims under the UCL as

they all suffered injuries both physical and monetary as a result of Defendants' unlawful, unfair, or fraudulent business practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Defendant as follows:

1.     For an order certifying that the action may be maintained as a class action, certifying Plaintiffs as representative of the Class, and designating their attorneys as Class counsel;

2.     Enjoining Defendant from the conduct alleged herein and order medical monitoring;

3.     Declaratory relief as requests pursuant to 28 U.S.C. § 2201;

3.     For actual damages in an amount to be determined at trial;

4.     For an award of attorneys' fees;

5.     For compensatory and punitive damages;

6.     For the costs of this suit;

7.     For pre-and post-judgment interest on any amounts awarded; and

8.     For such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.


DATE: April 9, 2015          By:   /s/Michael A. McShane_____
                              Michael A. McShane
                              Jonas P. Mann
                              AUDET & PARTNERS, LLP
                              221 Main Street, Suite 1460
                              San Francisco, CA 94105
                              Telephone: (415) 568-2555
                              Facsimile: (415) 576-1776
                              mmcshane@audetlaw.com
                              jmann@audetlaw.com

                              *Attorneys for Plaintiffs and the Class*

CLASS ACTION COMPLAINT