## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| EVAN SINGLETON and VITO LOGRASSO,<br><br>                     **Plaintiffs,**<br><br>**vs.**<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br><br>                     **Defendant.** | **Case No. 3:15-cv-00425-VLB**<br><br><br><br>**JUNE 29, 2015** |

## DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

**Thomas D. Goldberg (ct04386)**
**Jonathan B. Tropp (ct11295)**
**Jeffrey P. Mueller (ct27870)**
**DAY PITNEY LLP**
**242 Trumbull Street**
**Hartford, CT 06103**
**Phone: (860) 275-0100**
**Fax: (860) 275-0343**
**Email: tgoldberg@daypitney.com**
**Email: jbtropp@daypitney.com**
**Email: jmueller@daypitney.com**

**Jerry S. McDevitt  (pro hac vice)**
**Terry Budd (pro hac vice)**
**Curtis B. Krasik  (pro hac vice)**
**K&L GATES LLP**
**K&L Gates Center**
**210 Sixth Avenue**
**Pittsburgh, PA  15222**
**Telephone:  (412) 355-6500**
**Facsimile:   (412) 355-6501**
**Email: jerry.mcdevitt@klgates.com**
**Email: terry.budd@klgates.com**
**Email: curtis.krasik@klgates.com**

*Counsel for Defendant*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................. 1

II.  PLAINTIFFS' THEORY OF THE CASE DEPENDS NOT ON FACTS, BUT RATHER THE STATE OF THE SCIENCE REGARDING CTE .......................... 10

III.  SUMMARY OF CLAIMS AND ARGUMENT FOR DISMISSAL ........................ 13

IV.  RELEVANT PROCEDURAL BACKGROUND .................................... 16

V.  ARGUMENT ................................................................... 17

    A.  Standard of Review .................................................... 17

    B.  All of LoGrasso's Claims Are Time-Barred ........................... 20

        1.  LoGrasso's Claims Based on Fraud and Deceit (Second, Fourth and Eighth Causes of Action) Are Barred by C.G.S. § 52-577 ...................................................... 23

        2.  LoGrasso's Negligent Misrepresentation Claim (Sixth Cause of Action), Negligence Claim (Tenth Cause of Action) and Negligence Based Medical Monitoring Claim (Twelfth Cause of Action) Are Barred Both By C.G.S. § 52-577 and § 52-584 .............................................. 23

        3.  No Estoppel or Tolling Doctrine Salvages LoGrasso's Claims ............................................................ 24

    C.  Plaintiffs' Negligence Claims (Count V, VI, IX, X, XI and XII) All Fail to State a Claim Under Connecticut Law ............................ 28

        1.  Plaintiffs' Admissions Regarding the Inherent Risks of Head Injury .......................................................... 28

        2.  WWE Owed No Negligence Based Duties to Plaintiffs ............. 30

    D.  Plaintiffs' Fraud Claims (Counts I, II, III, and IV), Negligent Misrepresentation Claims (Count V and VI) and the Deceit Claims (Count VII and VIII) All Fail As a Matter Of Law ..................... 35

        1.  The Fraud, Deceit and the Negligent Misrepresentation Claims Must Comply with Rule 9 Standards ........................... 35

        2.  The SAC Fails to Allege the Misrepresentation or Omission of a Past or Present Material Fact ................................. 40

3.    Connecticut Law Does Not Recognize A Cause of Action for Fraudulent Concealment (Count I and II) ....................................40

4.    Plaintiffs' Fraudulent Omission Claims Fails to State A Claim.41

    a.    No Occasion or Duty to Speak ...........................................41

    b.    A Fraudulent Nondisclosure Claim Based On Information that Is Publicly-Available Is Not Viable ........43

E.    Plaintiffs' XI and XII Causes of Action Fails To State A Claim.............44

VI.   CONCLUSION ...................................................................................45

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222
(E.D.N.Y. 2013) ........................................................................... 19

*Advest Grp v. Arthur Andersen, LLP*, No. CV 970571417,
1998 Conn. Super. LEXIS 2137 (Conn. Super. July 20, 1998) ............................ 35

*Alliance Grp. Servs. Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157
(D. Conn. 2005) ........................................................................... 38

*Allstate Ins. Co. v. Advanced Health Prof'ls, P.C.*, 256 F.R.D. 49
(D. Conn. 2008) ........................................................................... 18

*Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989) .................. 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................... 18

*AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*,
No. 3:10-cv-01539 (JAM), 2014 WL 7270160 (D. Conn. Dec. 18, 2014) ......... 26, 40

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
134 S. Ct. 568 (2013) .................................................................. 16, 17

*Austin v. Ford Models Inc.*, 149 F.3d 148 (2d Cir. 1998) .......................................... 28

*Baldwin v. Vill. Walk Condo, Inc.*, No. FSTCV085007925S,
2010 WL 5095319 (Conn. Super. Nov.19, 2010) .................................... 40

*Bartholomew v. Warner*, 32 Conn. 98 (1864) .............................................. 40

*Bartone v. Robert L. Day Co.*, 232 Conn. 527 (1995) ................................. 26

*Baxter v. Sturm, Ruger & Co.*, 230 Conn. 335 (1994) .......................................... 21, 22

*Bilodeau v. Vlack*, Civil Action No. 07-CV-1178(JCH),
2009 WL 1505571 (D. Conn. May 20, 2009) ........................................ 20

*Bowerman v. United Illuminating*, No. X04CV 940115436S,
1998 WL 910271 (Conn. Super. Dec. 15, 1998) .................................... 44

*Bradley v. Ovaitt*, 86 Conn. 63 (1912) .......................................................... 35

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .......................... 3, 18

*Cheshire v. Lockwood*, No. 122135, 2005 WL 1634776
(Conn. Super. June 9, 2005) ................................................................. 42

*Citicorp Vendor Fin., Inc. v. Sonnelitter*, No. CV030350572S,
2005 WL 469330 (Conn. Super. Jan. 28, 2005)................................. 43-44

*City of New Britain v. Law Eng'g & Envtl. Servs., Inc.*,
Civil Action No. 3:10-CV-31 (JCH), 2012 WL 124597
(D. Conn. Jan. 17, 2012)................................................................... 22, 23

*Conn. Ins. Guar. Ass'n v. Yocum*, No. CV 940539691S,
1996 WL 367726 (Conn. Super. June 6, 1996)...................................... 27

*Consol. Plan of Conn., Inc. v. Cross*, 4 Conn. Cir. Ct. 641
(Conn. Cir. 1967) ................................................................................... 35

*Creelman v. Rogowski*, 152 Conn. 382 (1965)........................................... 41

*Criscuolo v. Shaheen*, 46 Conn. Supp. 53 (Conn. Super. 1999) ............... 35

*Crow & Sutton Assocs., Inc. v. C.R. Klewin N.E., LLC*,
No. HHDX04CV054016823S, 2009 WL 1057977
(Conn. Super. Mar. 26, 2009) ............................................................... 27

*Deswal v. U.S. Nat'l Ass'n*, No. 14-2169-cv, 2015 WL 1061641
(2d Cir. Mar. 12, 2015) ..................................................................... 20, 22

*Doe v. City of Stamford*, 241 Conn. 692 (1997) ........................................ 44

*Dubay v. Irish*, 207 Conn. 518 (1988) ...................................................... 32

*Duksa v. City of Middletown*, 173 Conn. 124 (1977) ........................... 41, 43

*Edelson v. Uniondale Union Free Sch. Dist.*, 219 A.D. 2d 614
(N.Y. App. Div. 1995) ............................................................................ 34

*Egger v. St. Dominic High Sch.*, 238 A.D. 2d 542 (N.Y. App. Div. 1997)................. 34

*Eidson v. Medtronic, Inc.*, 40 F. Supp. 3d 1202 (N.D. Cal. 2014)............................ 19

*Eno Farms Coop. Ass'n, Inc. v. Corp. for Indep. Living*,
Civ. No. 3:06cv1983 (AHN), 2007 WL 3308016
(D. Conn. Nov. 13, 2007) ...................................................................... 27

*Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188 (D. Conn. 2007)........... 21, 23, 36

iv

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004) ........................................................ 19, 36, 37

*Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*,
    281 Conn. 84 (2007) ..................................................................... 26

*Foronda v. Haw. Int'l Boxing Club*, 25 P.3d 826
    (Haw. Int. Ct. of App. 2001) ......................................................... 33

*Franchey v. Hannes*, 152 Conn. 372 (1965) ......................................... 41

*Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13 Civ. 3956,
    2014 WL 837050 (S.D.N.Y. Mar. 3, 2014) .................................... 19

*Gayne v. Smith*, 104 Conn. 650 (1926) ............................................... 40

*Giulietti v. Giulietti*, 65 Conn. App. 813 (Conn. App. 2001) ................. 22

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996) .......................... 19, 36

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20 (2000)................. 42

*Hubbard-Hall, Inc. v. Monsanto, Co.*, No. 3:13-cv-104 (RNC),
    2015 WL 1456835 (D. Conn. Mar. 29, 2015) ............................... 22

*Hughes v. Ester C Co.*, 930 F. Supp. 2d 439 (E.D.N.Y. 2013) ............... 18

*In re Nat'l Football League Players' Concussion Injury Litig.*,
    No. 2:12-md-02323-AB, 2015 WL 1822254 (E.D. Pa. Apr. 22, 2015).............. 11, 12

*Int'l Strategies Grp., Ltd. v. Ness*, 645 F.3d 178 (2d Cir. 2011)......................... *passim*

*Jaworski v. Kiernan*, 241 Conn. 399 (1997) .................................. 30, 31, 32

*Johnson v. Wadia*, No. CV 85 0075560 S, 1991 WL 50291
    (Conn. Super. Mar. 28, 1991) ................................................. 26, 27

*Karas v. Strevell*, 884 N.E. 2d 122 (Ill. 2008) ............................... 33, 34

*Kent v. Pan Am. Ballroom*, No. F038650,
    2002 WL 31776394 (Cal. Ct. App. Dec. 10, 2002) ....................... 33, 34

*Kidder v. Read*, 150 Conn. App. 720 (Conn. App. 2014)....................... 22

*Kilduff v. Adams, Inc.*, 219 Conn. 314 (1991) .................................... 35

*Konover Dev. Corp. v. Zeller*, 228 Conn. 206 (1994) ........................ 41-42

*LaBow v. Rubin*, 95 Conn. App. 454 (Conn. App. 2006) ....................... 22

*Leonard v. Comm'r of Revenue Servs.*, 264 Conn. 286 (2003) .................................. 35

*Lilley v. Elk Grove Unified Sch. Dist.*, 80 Cal. Rptr. 2d 638
    (Cal. Ct. App. 1998) ..................................................................... 33, 34-35

*MacDermid Printing Solutions, Inc. v. Cortron Corp.*,
    No. 3:08cv1649 (MPS), 2014 WL 3943629 (D. Conn. Aug. 12, 2014)....... 10, 19, 40

*Macri v. Torello*, 105 Conn. 631 (1927)........................................................ 35

*Marchese v. Marchant Ladder, Inc.*, Civ. No. 3:11cv337(PCD),
    2011 WL 4433680 (D. Conn. Sept. 22, 2011)........................................... 20

*Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313 (D. Conn. 2002) .................................. 44

*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*,
    10 F. Supp. 2d 138 (D. Conn. 1998)...................................................... 27

*Martinez v. Yale-New Haven Hosp.*, No. X02CV0404001227S,
    2005 WL 2364901 (Conn. Super. Sept. 1, 2005) ....................................... 20

*Mercier v. Greenwich Acad.*, Civil Action No. 3:13-CV-4 (JCH),
    2013 WL 3874511 (D. Conn. July 25, 2013) ...................................... 31, 33

*Merly v. State*, 211 Conn. 199 (1989).......................................................... 21

*Miller v. Appleby*, 183 Conn. 51 (1981) ....................................................... 35

*MM Global Servs., Inc. v. Dow Chem. Co.*,
    283 F. Supp. 2d 689 (D. Conn. 2003)................................................. 41, 42

*Mountaindale Condo. Ass'n, Inc. v. Zappone*,
    59 Conn. App. 311 (Conn. App. 2000) .............................................. 21, 23

*Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619 (Conn. 2006)................................. 20

*Neuhaus v. DeCholnoky*, 280 Conn. 190 (2006)............................................. 21, 22

*OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*,
    503 F. Supp. 2d 490 (D. Conn. 2007)................................................. 25, 26

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,
    85 F. Supp. 2d 282 (S.D.N.Y 2000) ............................................... 19-20, 36

*Palozzi v. Priest*, 280 A.D. 2d 986 (N.Y. App. Div. 2001) ............................................ 34

*Pearsall Holdings, LP v. Mountain High Funding, LLC*,
    No. 3:13cv437 (JBA), 2014 WL 7270334 (D. Conn. Dec. 18, 2014).............. *passim*

*Pension Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs.*
*Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.,*
712 F.3d 705 (2d Cir. 2013) .................................................... 18

*Pfau v. Mortenson*, 858 F. Supp. 2d 1150 (D. Mont. 2012)......................................... 19

*Pospisil v. Pospisil*, 59 Conn. App. 446 (Conn. App. 2000) ..................................... 41

*Protegrity Corp. v. Paymetric, Inc.,*
Civil Action No. 3:13-CV-01549 (VLB), 2014 WL 3849972
(D. Conn. Aug. 5, 2014)........................................................... 17, 18

*Rispoli v. Long Beach Union Free Sch. Dist.*, 111 A.D. 3d 690
(N.Y. App. Div. 2013) ............................................................. 34

*Saggese v. Beazley Co. Realtors,*
155 Conn. App. 734 (Conn. App. 2015) ................................. 43

*Saperstein v. Danbury Hosp.,*
Nos. X06CV075007185S, X06CV085011032S, 2010 WL 760402
(Conn. Super. Jan. 27, 2010) .................................................. 27

*Siemiatkoski v. Windsor Fed. Sav. & Loan Ass'n,*
No. X07CV065001791S, 2008 WL 4379060
(Conn. Super. Sept. 10, 2008)................................................ 43

*Slekis v. Nat'l R.R. Passenger Corp.*, 56 F. Supp. 2d 202
(D. Conn. 1999)................................................................ 20, 21

*Stuart & Sons, L.P. v. Curtis Publ'g Co.*, 456 F. Supp. 2d 336
(D. Conn. 2006).................................................................... 20

*Sulton v. Wright*, 265 F. Supp. 2d 292 (S.D.N.Y. 2003) ............................................. 28

*Thompson v. Home Depot, U.S.A., Inc.*, No. CV065006389,
2007 WL 2036467 (Conn. Super. June 22, 2007)..................... 20

*Torti v. Hoag*, No. 4:14CV00330 JLH,
2014 U.S. Dist. LEXIS 148471 (E.D. Ark. Oct. 17, 2014)....................... 19

*Trefoil Park, LLC v. Key Holdings, LLC,*
Civil Action No. 3:14-CV-00364 (VLB), 2015 WL 1138542
(D. Conn. Mar.13, 2015) .................................................. 10, 19, 40

*Trujillo v. Yeager*, 642 F. Supp. 2d 86 (D. Conn. 2009) ......................................... 31-32

*Turcotte v. Fell*, 502 N.E. 2d 964 (N.Y. 1986) ..................................................... 32, 33

***USA ex rel. Monda v. Sikorsky Aircraft Corp.***, No. Civ. 3:99CV1026
(JBA), 2005 WL 1925903 (D. Conn. Aug. 11, 2005)............................................. 36

***Watertown Sav. Bank v. Mattoon***, 78 Conn. 388 (1905)........................................... 41

***Yurevich v. Sikorsky Aircraft Div.***, 51 F. Supp. 2d 144 (D. Conn. 1999).......... *passim*

## I.    INTRODUCTION

At the end of the June 8, 2015 Scheduling Conference, this Court ordered plaintiffs to amend their Complaint and "read it this time." 6/8 TR at 60. The Court further ordered plaintiffs' counsel to give close consideration to the federal pleading standards, and to file a complaint without "any scrivener errors, without a lot of superfluous, hyperbolic, inflammatory opinions and references to things that don't have any relevance." *Id.* The Court reminded plaintiffs' counsel of the basic command of Rule 8 – to be clear and concise in stating facts supporting each claim – and to research what facts are necessary to prove each claim. After plaintiffs' lead counsel, Mr. Kyros, attempted to justify certain material as necessary to illustrate a supposed "culture of abuse" at WWE and referenced a deceased wrestler, the Court responded:

> Are you going to reference every wrestler that's dead in your complaint? I don't – I don't follow that. You really need to read and get a better grip on the pleading standard in the next week and file an amended complaint.

*Id.* at 62. The Court further cautioned against filing time-barred claims. *Id.* at 49. Lastly, the Court questioned the purpose of including references to reports that became public in 2014, pointing out that both plaintiffs had stopped wrestling before 2014, and that the only purpose for including such matters was to inflame.[1]

In response to these directives from the Court, which essentially order compliance with Rules 8, 9, and 11, Mr. Kyros promised that "we will get a clear, concise version of this to the Court." Unfortunately, the Second Amended

---

[1] In response to this remark of the Court, the plaintiffs did not remove the references to 2014 events, see SAC, n.5, 8, 16, and added a gratuitous reference to remarks made on the NFL Network in March 2015 by Dr. Joseph Maroon. *Id.* at 55.

Complaint ("SAC"), does not comply with the Court's directive or Rules 8, 9, and 11. It is not the "simple, direct, and concise" allegations required by Rule 8(d)(1). The original complaint, with class action allegations, had 194 paragraphs and was 40 pages in length. The first amended complaint ("FAC"), which deleted the class action allegations, was 168 paragraphs and 32 pages. The SAC, which was to cure problems in the FAC by being clear and concise, is 281 paragraphs and 65 pages long, nearly 87 paragraphs and 25 pages longer than the original complaint containing class action allegations. It is riddled with the same typos, tense errors, illiterate sentences, and redundant paragraphs as the FAC.

Insofar as compliance with the Court's directive to get a grip on pleading standards, the SAC continues to hurl fraud charges at WWE, both as substantive claims and as a tolling doctrine, without complying with Rule 9(b)'s particularity standard. For example, the SAC repeatedly alleges that WWE "knew or should have known" about certain alleged medical and scientific studies. *See* SAC, ¶¶ 3, 4, 54, 56, 58, 195, 210, 223, 231. Under law easily located, that is not sufficient to charge fraud. Elsewhere, it is inconsistently alleged that such studies were known only within "the medical community." *Id.* at ¶ 57. Both plaintiffs accuse WWE of fraudulent deceit in identically worded counts which allege that WWE issued "deceptive public statements and published articles" which "downplayed known long-term health risks of concussions to Plaintiff," and caused both plaintiffs to have CTE. *Id.* at ¶¶ 222, 228, 230, 236. Yet no "public statements or published articles" are identified with particularity, or even at all, and the SAC elsewhere admits that CTE can only be diagnosed post-mortem. *Id.* at ¶ 33. As a tolling doctrine, plaintiffs do not even attempt to plead the elements of fraudulent concealment under C.G.S. § 52-595.

Insofar as Rule 11 is concerned, not only is there the false allegation that both plaintiffs have CTE; the SAC contains at least three deliberate attempts to concoct facts.  First, when attempting to demonstrate that WWE concealed the risk of concussions inherent in professional wrestling, plaintiffs' counsel deliberately distorts the testimony Stephanie McMahon provided to a Congressional Committee in 2007 to suggest that she testified "there were no documented concussions in WWE's history," and that her testimony amounted to an admission that WWE refused to acknowledge the extreme risks of wrestling. *Id.* at ¶¶ 64-65.  Not only did she not so testify, she specifically acknowledged that "WWE wrestlers are at risk for concussions because of the nature of their work," and plaintiffs' counsel <u>know she did so</u>.[2]  Indeed, in other portions of the SAC alleging that WWE supposedly knew about the risks it otherwise accuses Stephanie McMahon of concealing, plaintiffs' counsel cites to the exact passage from Ms. McMahon's Congressional testimony doing so, but deliberately does not identify her as the speaker in order to conceal their sharp pleading practices. *Compare* SAC ¶ 64 with ¶ 55.

A second deliberate distortion and outright fabrication is at SAC ¶¶ 66-71, where plaintiffs' counsel continue their attempt to create some cover-up.  There, plaintiffs' counsel first notes CTE findings about two Pittsburgh Steelers in July 2005 having nothing to do with WWE.  SAC ¶ 66.  Immediately thereafter, it is alleged that "WWE attempted to discredit these studies," when in fact WWE said nothing at all about such studies and would have had no reason to do so. *Id.* at ¶

---

[2] **The actual contents of documents integral to the SAC that demonstrate the episodes of deliberate distortion are attached to the affidavit of Curtis B. Krasik.** *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  **Stephanie McMahon's testimony acknowledging the risks of concussions is at Exhibit A, p.115.  She did not testify that there were no documented concussions in WWE's history, but indicated there had been none she knew of since the Wellness Policy was started, which was in the same time frame as her testimony.** *See id.*, **p.118.**

67.  To support the false allegation that WWE attempted to discredit 2005 findings about Pittsburgh Steelers, plaintiffs next note that the Steelers team doctor, Dr. Maroon, expressed his view that conclusions as to the reason one of those Steelers committed suicide were speculative.[3]  *Id.* at ¶ 68.  The deliberate distortion suggesting WWE's involvement in that matter continues in the very next paragraph, which begins by alleging that "WWE responded on ESPN," but then quotes comments made not in response to any 2005 findings about Pittsburgh Steelers, but in 2009 about tests supposedly done on two deceased wrestlers.[4]

A third distortion was deliberately concocted to allege that WWE had somehow voluntarily assumed some duty to monitor the health and welfare of former performers who had not performed for WWE in years, such as LoGrasso.  Thus, again omitting the source or speaker, plaintiffs alleged that "WWE has stated that it has 'the finest monitoring program in American Sports,' thereby admitting the undertaking by WWE to monitor its wrestler's health and safety, and establishing its duty to provide full and accurate information to its wrestlers."  SAC ¶ 81.  This supposed description of WWE's Wellness Program is then alleged to have deceived the plaintiffs that the heath and safety of former wrestlers was somehow being monitored by WWE.[5]  *Id.* at ¶ 82.  In actual fact,

---

[3] Dr. Maroon was not affiliated with WWE in any way in 2005, and is not alleged to have been affiliated at the time of his opinions regarding the suicide of a former Pittsburgh Steeler.

[4] The 2009 comments were contained in an ESPN article, which is attached to the Krasik affidavit as Exhibit B.

[5] Plaintiffs' counsel knows that the Wellness Program makes no such statement, as Plaintiffs actually cite to the summary of it on WWE's corporate website.  *See* SAC p.23, n.30.  For the Court's convenience, this summary of the Wellness Program is attached to the Krasik affidavit as Exhibit C.  As is self-evident, WWE makes no commitment in the Wellness Program to monitor, advise, or pay for health care or medical advice to former talent.

plaintiffs' counsel again actually knew that WWE did not state that it had "the finest monitoring program in American sports" or that it was monitoring the health of former performers.  The words put in quotes about the "finest monitoring program" were not the words of WWE, but a characterization of the author of an article in the *Pittsburgh City Paper* published in 2010, <u>three years after LoGrasso departed</u>, about the views of WWE's lead counsel regarding the Wellness Program he had helped WWE establish.  Those words were not in quotes at all, and where something was actually said by WWE or its counsel for the article, the writer put it in quotes.  Plaintiffs' counsel unquestionably knew they were distorting the facts, as again they actually cite to the full article in question elsewhere in the Complaint. [6] *See* SAC p.23, n.26.

Absent the Court's clear directions to plead facts, those three deliberate attempts at factual distortion would be highly improper.  To do so in the face of the Court's instruction, issued after plaintiffs' counsel had falsely alleged one of the plaintiffs was dead, is arrogant beyond belief and as unprofessional as it gets.

Despite these deliberate distortions and failure to abide by the Court's directives, it is now clear that Singleton's situation is very different from LoGrasso's, a point also made by the Court during the status conference.  It is now obvious that LoGrasso filed this lawsuit on January 16, 2015 blaming WWE for alleged "serious neurological damage, including severe headaches, memory loss, depression and anxiety, as well as deafness" (Complt. ¶ 133) without any medical diagnosis justifying doing so.  That he did so is evident from the newly filed SAC, where he now admits that after leaving WWE he had headaches, which he treated with aspirin, and "continued fighting, " obviously for other promoters.  SAC ¶ 140.  Six years later, and three months after he sued, with litigation

---

[6] This article is attached to the Krasik affidavit as Exhibit D.

motives then in mind, he saw a neurologist who allegedly diagnosed him for the first time as having traumatic brain injury, headache and apnea. *Id.* at ¶ 143.  A month later, a different doctor stated (to whom it is not alleged) that LoGrasso had cervical dysfunction and T.M.J., and "signs of post-concussion syndrome." *Id.* at ¶ 144.  Originally, LoGrasso claimed he was "coerced into wrestling while seriously and obviously injured" including when "losing consciousness <u>before</u> . . . matches."  Complt. ¶ 129 (emphasis added).  Although now abandoning that implausible claim, he continues the coercion theme in the SAC, while professing complete ignorance of any risk from head trauma.  Nowhere does he specifically plead ever actually sustaining a concussion at WWE at a particular time or place; or telling anybody he had a concussion or head injury; or ever asking anybody to examine him for a concussion.  He does not allege that WWE ever made any affirmative statement to him about head injuries generally; whether he had sustained a concussion; and certainly not that anybody at WWE ever directed him to perform with knowledge that he had an unresolved concussion.  In fact, he squarely admits that he never received any medical information regarding concussive or sub-concussive blows while performing for WWE.  SAC ¶ 139.  Despite specifically asserting that WWE never said anything to him about the subject, he then inconsistently accuses WWE in boilerplate language of "actively" misrepresenting unspecified material facts and "repeatedly [making] material misrepresentations" to him about the lack of evidence linking concussions to "CTE and its related symptoms" in the substantive counts.  *Id.* at ¶¶ 166, 168.

LoGrasso claims he relied on WWE's medical personnel to continue "to fight and receive sustained head trauma," for "over twenty years" even though he admits they said nothing to him about such subjects and his own pleadings

establish he was not with WWE for 20 years.  *Id.* at ¶ 132.  For the first time, LoGrasso suggests that a Dr. Rios, described as the in-ring doctor for WWE, committed malpractice by not properly assessing whether LoGrasso had sustained a concussion, but never alleges he ever sought treatment from Dr. Rios for any suspected head injury.  LoGrasso does not make any medical malpractice claim against Dr. Rios, which would be time-barred anyway.

As to Singleton, the originally-pled claim has now been abandoned completely.  First, Singleton falsely alleged that WWE downplayed the seriousness of an alleged head injury, and discouraged him from getting medical help, including from a neurologist.  Complt. ¶ 123.  He asserted that he suffered a serious head injury during a match with Eric Rowan, and then falsely alleged that WWE "cleared him to continue wrestling after inadequate rest time and downplayed his injury."  *Id.* at ¶ 124.  In the FAC, he then admitted that he did see a trainer after the injury, but claimed that he did not see a doctor until a month later.  He made no mention of the continuous efforts of multiple health providers to find out what, if anything, was his problem, and claimed he returned to practice several months later despite not being cleared to wrestle.  FAC ¶¶ 93-94.  He falsely claimed it was not until 10 months later he was diagnosed with a traumatic brain injury, including an intracranial hemorrhage and that he was "nearly fully disabled and cannot perform simple tasks like driving a car."  *Id.* at ¶¶ 96, 99.

Now, Singleton continues to allege that he was seriously injured on September 27, 2012 while performing a specific move known as a choke slam in a match with Eric Rowan which he alleges (falsely) that he had only performed once about five minutes before the match.  SAC ¶ 100.  Now, he admits seeing a trainer right afterwards, and that by October 2, 2012 WWE medical personnel had tested him and recommended rest.  *Id.* at ¶¶ 104 - 105.  He admits he was seen by

Dr. Amann (one of WWE's ringside doctors) and sent by WWE to an independent neurologist, Dr. Greenberg, who is in Florida. *Id.* at ¶ 106.  Contrary to the original allegation that he was rushed back without medical clearance, he admits that Dr. Greenberg cleared him to return on January 18, 2013, nearly four months after his alleged injury.  He then returned to watch practice 3 days later, where he admits the plan of WWE was to "slowly integrate him into full practice within the next month."  *Id.* at ¶ 107.  He admits to doing 7 minutes of in-ring activity (not wrestling) after being cleared by Dr. Greenberg and complaining of being dizzy and woozy.  He admits he was never medically cleared by WWE to wrestle again. Contrary to the original allegation that he was discouraged from getting medical help, he now describes, partially and incompletely, the parade of ensuing medical and psychological help WWE provided in an effort to determine why he would not/could not perform after being medically cleared by an independent neurologist in January 2013.  That included sending him to an epilepsy specialist, Dr. Rogers-Neone, who Singleton now suggests diagnosed him as having an intracranial hemorrhage.  WWE believes Singleton told her that in his recitation of his medical history to justify his behavior, but exactly the opposite is true.  The actual medical tests done prior to his visit to Dr. Rogers-Neone indicated he did <u>not</u> have an intracranial hemorrhage.  He claims that he is "almost completely disabled" at age 22 and, in a tacit admission at odds with the claim made a month ago that he could not drive, now alleges he "was not able to drive a car for years."  *Id.* at ¶ 115.  Thus, Singleton fundamentally admits that he was injured doing one specific maneuver in one specific match; that he never performed again, and claims that he is nearly or almost fully disabled from that single concussion in 2012.

Despite the clear differences in the factual allegations of these two plaintiffs, the SAC asserts six claims for each plaintiff which are identically phrased, down to the same typos and illiterate sentences.  *Compare* SAC ¶ 202 *with* ¶ 217; ¶ 224 *with* ¶ 243.  In boilerplate language, both are alleged to have CTE, even though the SAC admits that CTE can only be diagnosed post-mortem. Compare ¶ 228 and ¶ 244 with ¶ 33.  Irrelevant and false allegations about "WWE wrestlers," as opposed to these two plaintiffs, continue to be made.  *See* ¶¶ 261, 274 (alleging that "WWE wrestlers" were and continue to be exposed to greater than normal background levels of a hazardous substance).  Factually inapposite fraud claims are made by Singleton that WWE concealed the heightened risk of returning to the ring before he made a proper recovery.  *Id.* ¶ 155.  In a second fraud count, Singleton alleges "Had Plaintiff been aware of such information they [sic] would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and his brain had completely <u>healed before returning to the ring</u>."  *Id.* at ¶ 182 (emphasis added).  The same theme is advanced in stock allegations of the Fifth count , *i.e.*, that WWE actively omitted telling Singleton that he faced serious health problems "if they [sic] returned to the ring too soon after sustaining a concussion."  *Id.* ¶ 195.  In the Fraudulent Deceit Count which previously alleged falsely that one of the plaintiffs was dead, it is now falsely alleged that Singleton has CTE caused by WWE through "deceptive public statements and published articles" made "when it knew, or should have known, that Plaintiff faced serious health problems if he was forced to return to the ring too soon after suffering brain trauma."  *Id.* at ¶¶ 222, 223, and 228.  Not a single "public statement or published article" is identified containing <u>any</u> factual misrepresentation; allegations that a party knew or should have known are inadequate to charge fraud under well-established law, and, as noted,

Singleton never returned to the ring.  Indeed, despite all the fraud allegations, Singleton now admits that WWE medical staff actually protected him from any further injury by never medically clearing him to perform again.

## II.    PLAINTIFFS' THEORY OF THE CASE DEPENDS NOT ON FACTS, BUT RATHER THE STATE OF THE SCIENCE REGARDING CTE

The overarching theme of Plaintiffs' lawsuit is that WWE, an entertainment company, can be charged with fraud and negligent misrepresentation because it said nothing to Plaintiffs about alleged scientific and medical opinions regarding concussions generally and CTE specifically.  It is root law that fraud and negligent misrepresentation claims require that the alleged statement or omission be of a material fact, and that statements of opinion are not actionable. *Yurevich v. Sikorsky Aircraft Div.,* 51 F. Supp. 2d 144, 152 (D. Conn. 1999); *MacDermid Printing Solutions, Inc. v. Cortron Corp.*, No. 3:08cv1649 (MPS), 2014 WL 3943629, at *6 (D. Conn. Aug. 12, 2014) ("To be liable for fraud or negligent misrepresentation under Connecticut law, the defendant must make . . . 'a statement of a material past or present fact'"); *Trefoil Park, LLC v. Key Holdings, LLC*, Civil Action No. 3:14-CV-00364 (VLB), 2015 WL 1138542 *12, (D. Conn. Mar.13, 2015) (noting there can be no false representation of a fact where there is no ascertainable statement of fact, and that statements of opinion do not support fraud charges).

Here, Plaintiffs dedicate several pages to "The Science of Head Trauma." SAC ¶¶ 25-39.  Plaintiffs allege "[c]oncussions can cause CTE, but are not the only cause:  repeated sub-concussive head trauma also causes CTE."  *Id.* at ¶ 25. Plaintiffs claim that an "increasing consensus has emerged that mild and infrequent trauma can cause similar long term neurological effects to those experienced by boxers," and that CTE has specific symptoms associated with it. *Id.* at ¶¶ 32-33.  Plaintiffs assert as fact that CTE "can be caused by blows which

have no accompanying symptoms." *Id.* at ¶ 35.  Thereafter, it is alleged that WWE "knew or should have known" of medical literature and such scientific evidence, even though Plaintiffs now allege that the risks were known "to the medical community." *Id.* at ¶¶ 54, 57.

The theme of this case is that medical science established as fact as early as the period in which LoGrasso performed that concussive and sub-concussive blows cause a neuro-degenerative disease called chronic traumatic encephalopathy ("CTE"); that WWE performers routinely receive concussive and sub-concussive blows; that there are certain specific symptoms which were known to be associated with CTE; that medical and scientific research has existed in the public realm establishing such matters as fact for some time; that WWE somehow concealed such publicly available information from Plaintiffs or failed to disclose it to them; and that each of the Plaintiffs suffer from some of the specific symptoms said to be associated with CTE such as depression, headaches, anxiety, and the like.

Under the law, these characterizations of the state of scientific opinions must approximate certain <u>fact</u> to support fraud and misrepresentation charges, *i.e.*, something akin to the certainty of the laws of gravity.  The plausibility of these allegations as a factual predicate to support fraud and misrepresentation claims must be analyzed in light of recent findings by the Honorable Anita Brody regarding the state of the science, made in the context of approving the recent settlement of identical brain injury claims asserted against the National Football League ("NFL") on April 22, 2015:

(1)     "[The] . . . complex scientific and medical issues [have] not yet [been] comprehensively studied." *In re Nat'l Football League Players' Concussion Injury Litig.,* No. 2:12-md-02323-AB, 2015 WL 1822254, at *31 (E.D. Pa. Apr. 22, 2015).

(2)     "[T]he association between repeated concussive trauma and long-term neurocognitive impairment remains unclear."  *Id.*

(3)     "[T]he scientific literature discussing repetitive mild traumatic brain injury is publicly available."  *Id.* at *34.

(4)     "Though '[t]here has been widespread media coverage and speculation regarding the late-life or post-retirement risks of cognitive impairment in athletes who engaged in sports involving repetitive head trauma, . . . there has been very little in the way of peer-reviewed scientific literature involving data that suggests any such risk.'"  *Id.* at *36 (citation omitted).

(5)     "[N]o diagnostic or clinical profile of CTE exists, and the symptoms of the disease, if any, are unknown."  *Id.* at *42.

(6)     "The study of CTE is nascent, and the symptoms of the disease, if any, are unknown."  *Id.* at *43.

(7)     "[N]o one can conclusively say that someone had CTE until a scientist looks at sections of that persons brain under a microscope. . . ."  *Id.*

(8)     "Beyond identifying the existence of abnormal tau protein in a person's brain, researchers know very little about CTE.  They have not reliably determined which events make a person more likely to develop CTE."  *Id.*

(9)     "[I]t is not possible to determine the causality or risk factors [for CTE] with any certainty.  As such, the speculation that repeated concussion or subconcussive impacts cause CTE remains unproven."  *Id. (*emphasis added) (citation omitted).

(10)    "[R]esearchers have not determined what symptoms individuals with CTE typically suffer from while they are alive."  *Id.*

(11)    "[T]he idea that CTE progresses in defined stages – or even that it is associated with the symptoms listed – has not been sufficiently tested in living subjects."  *Id.* at *45.

(12)    "[R]esearchers dispute whether repetitive head trauma is a prerequisite for developing CTE."  *Id.* at *46 n.55.

As is obvious from the foregoing, the central alleged scientific "fact"

alleged by plaintiffs – that repeated sub-concussive blows or concussions cause

-12-

CTE – was characterized by Judge Brody as unproven speculation after reviewing the state of the science.  Likewise, Judge Brody's decision repudiates another key concept of plaintiffs' themes – that CTE has certain symptoms associated with it, calling attempts to so claim "suspect."

## III.   SUMMARY OF CLAIMS AND ARGUMENT FOR DISMISSAL

Each plaintiff asserts six identical claims due to alleged head injuries in the SAC.  In the first two counts, they both allege "Fraudulent Concealment" but do not satisfy the heightened pleading requirements to charge fraud.  Instead, WWE is generically accused of fraudulently and actively misrepresenting, omitting or concealing material facts from "WWE wrestlers [and] former WWE wrestlers" including Plaintiffs.  SAC, ¶¶ 154-156.  Without particulars, WWE is accused of taking affirmative actions to conceal the risk of returning to the ring before a proper recovery and repeatedly making material misrepresentations, none of which are identified, that there was insufficient evidence linking head trauma to CTE and its symptoms.

Counts III and IV are styled "Fraud by Omission /Failure to Warn."  Despite alleging fraud by omission, the actual allegation is that WWE "specifically [stated] that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE. . . ."  As a result of this alleged statement, which is not identified with particularity, the alleged result was "incomplete, partial, or ambiguous – and therefore misleading – statements regarding safety and head injuries."  *Id.* at ¶ 178.  These two counts have identical language to the corresponding claim in the FAC, except for paragraphs 173 and 181, an incomprehensible sentence added to the various claims.  *See also* ¶¶ 188, 196, 211, 224, 232, 243, 252.  Ignoring that Singleton never was medically cleared by WWE to return to the ring, both counts make the same allegation – that each

plaintiff would have made sure his brain had healed "before returning to the ring" had he known the omitted information.

Count V and VI, styled "Negligent Misrepresentation," accuse WWE of issuing unidentified "misleading public statements" and "criticizing the legitimate scientific studies." *Id.* ¶ 193. There is no allegation of any specific factual misrepresentation ever made to either Plaintiff, and an incoherent allegation that WWE "had a duty to disclose to Plaintiff[s] any actual knowledge is [sic] possessed conceding [sic] such injuries and any associated risks it was aware of."[7] *Id.* at ¶¶ 202, 217. Plaintiffs nowhere allege any actual knowledge by WWE of any particular scientific opinion, and, as noted previously, inconsistently allege that WWE "knew or should have known" such information.

Counts VII and VIII are styled as "Fraudulent Deceit." These counts allege that WWE misrepresented the risks of head injuries by unidentified "misleading and deceptive public statements and "published articles." *Id. at* ¶¶ 222, 230*.* Although required to plead particulars of date, place and content of any such fraudulent statements, Plaintiffs allege these misrepresentations occurred "at a time when [WWE] knew, or should have known" that Plaintiffs faced serious health problems if they returned to the ring too soon. *Id.* at ¶¶ 223, 231. That "time" is not identified anywhere. LoGrasso and Singleton performed at least seven years apart. Singleton never did perform again after getting an alleged concussion, and does not allege that he did. LoGrasso does not allege, anywhere, that he suffered a head injury on a certain date or event, and that WWE, with knowledge that he had such an injury which had not healed, represented anything to him about the safety of returning to action.

---

[7] In yet another indication that plaintiffs' counsel made no attempt to comply with the Court's order to read what they file, paragraph 202 of the SAC has the exact same errors as it did originally in paragraph 136 of the FAC.

Counts IX and X are negligence counts alleging that WWE had a duty to Plaintiffs regarding head trauma, and ignores the inherent risk of the Plaintiffs' chosen profession.

Lastly, Plaintiffs assert two so-called medical monitoring counts, making inane allegations about WWE wrestlers being exposed to greater than normal background levels of a proven hazardous substance.

The Court should dismiss this lawsuit in its entirety for several reasons. First, all of LoGrasso's claims are barred by Connecticut's statutes of limitations and repose.  All negligence claims must be brought within two years of sustaining "some" injury, and in no event more than three years after the "act or omission complained of."  LoGrasso claims he had "unmistakable signs of serious injury" prior to his departure from WWE in 2007.  Complt. ¶ 131.  He claims to have been "beaten repeatedly," and sustained head trauma in "every match" during a program in 2006.  SAC ¶ 133.  All other tort claims must be brought within three years of "the act or omission complained of." LoGrasso last performed for WWE in 2007.  His negligence claims were barred by 2009 and all tort claims were barred by 2010 at the latest by the repose statutes.

Second, all of the negligence claims are defective under Connecticut law because Plaintiffs alleged injuries arise from risks inherent in their chosen profession which are within the normal expectations of professional wrestlers.

Third, medical monitoring is not a cause of action in Connecticut.

Fourth, the fraud and negligent misrepresentation counts do not comply with the heightened pleading standards of Rule 9(b).  The SAC does not identify a single specific material fact known to WWE that was misrepresented or concealed from either Plaintiff; the speaker of any misrepresentation to either Plaintiff; any employee of WWE who knew of a material fact but omitted

disclosing such a fact or concealed it from either Plaintiff; and fails to provide any context for any alleged, but otherwise unidentified misrepresentation or omission or plausibly allege how WWE could conceal publicly available scientific information regarding health risks of concussions or sub-concussive blows. None of these counts sufficiently plead scienter, and allegations that WWE "should have known" are insufficient to establish scienter.  Further, the failure to publicize scientific opinions of third parties is not actionable since it does not involve an existing *fact*, but rather opinions of third-parties which are hardly universally accepted, as discussed at length in Judge Brody's recent opinion in the NFL case.  Such claims also fail because no relationship between the parties is pled giving rise to a duty to disclose, and even if a duty to speak does exist, the duty is to refrain from deliberate misrepresentations, none of which are alleged.

## IV.    RELEVANT PROCEDURAL BACKGROUND

Plaintiffs originally filed this case in the U.S. District Court for the Eastern District of Pennsylvania on January 16, 2015 as a purported class action.  Both Plaintiffs agreed to a forum selection clause in their contracts with WWE which provided as follows:  "The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut."

On February 27, 2015, WWE filed a Motion to Transfer Venue Due to Forum-Selection Clauses in the Contracts Between the Parties pursuant to 28 U.S.C. § 1404(a).  In doing so, WWE followed the exact procedure for enforcing forum selection clauses set forth in *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas,* 134 S. Ct. 568 (2013).  Plaintiffs filed no opposition to the Motion to Transfer.  By Order dated March 23, 2015, the Eastern District of Pennsylvania granted WWE's Motion to Transfer, noting that "[t]he plaintiffs do not oppose a

transfer of venue and agree that the District of Connecticut is an appropriate forum." 3/23/15 Order at 1 n.1.

In the *Atlantic Marine* decision, Justice Alito, writing for a unanimous Court, made clear that "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules." *Atl. Marine*, 134 S. Ct. at 582. The Supreme Court held that "a plaintiff who files suit in violation of a forum-selection clause enjoys no such 'privilege' with respect to its choice of forum, and therefore it is entitled to no concomitant 'state-law advantages.' Not only would it be inequitable to allow the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also encourage gamesmanship." *Id.* at 583. The Supreme Court therefore concluded that "[t]he court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right." *Id.* Thus, *Atlantic Marine* dictates that Connecticut choice-of-law rules govern this lawsuit.

## V.    ARGUMENT

### A.    Standard of Review

"[T]he Court should follow a 'two-pronged approach' to evaluate the sufficiency of the complaint. [First], a court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Protegrity Corp. v. Paymetric, Inc.*, Civil Action No. 3:13-CV-01549 (VLB), 2014 WL 3849972, at *2 (D. Conn. Aug. 5, 2014) (citation omitted).

"At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Second Circuit has recognized that "Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure . . . help 'to prevent settlement extortion — using discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit.'" *Pension Benefit Guar. Corp. ex rel St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.,* 712 F.3d 705, 719 (2d Cir. 2013) (citation omitted). "Rule 12(b)(6) serves as a type of gatekeeper, preventing claims that fail to satisfy Rule 8's requisites from proceeding onward through the labyrinthine terrain of a case's progression to resolution." *Hughes v. Ester C Co.,* 930 F. Supp. 2d 439, 455 (E.D.N.Y. 2013). Thus, conclusory allegations regarding essential elements of a claim which are not plausible warrant dismissal at this phase. *See Int'l Strategies Grp., Ltd. v. Ness*, 645 F.3d 178 (2d Cir. 2011)[8] (affirming dismissal after noting four failures to make plausible allegations on needed elements).

Plaintiffs must satisfy the even stricter standards of Fed. R. Civ. P. 9(b) for the fraud, negligent misrepresentation, and deceit claims. *Allstate Ins. Co. v. Advanced Health Prof'ls, P.C.*, 256 F.R.D. 49, 52 (D. Conn. 2008). Rule 9(b) has consistently been applied to negligent misrepresentation claims in this district. *Yurevic,* 51 F. Supp.2d at 152; *Pearsall Holdings, LP v. Mountain High Funding, LLC*, No. 3:13cv437 (JBA), 2014 WL 7270334, at *3 (D. Conn. Dec. 18, 2014) (same). Federal courts have also held that claims of deceit are subject to heightened pleading standards and must be pled with the requisite particularity. *See*

---

[8]  In reviewing a Rule 12(b)(6) motion, the Court may consider "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Protegrity Corp.*, 2014 WL 3849972, at *2 (citation omitted). The Court may also consider "matters of which judicial notice may be taken," *id.*, and documents that are "integral" to the complaint. *Chambers*, 282 F.3d at 153.

-18-

*Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13 Civ. 3956, 2014 WL 837050, at *8 (S.D.N.Y. Mar. 3, 2014); *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 234 (E.D.N.Y. 2013); *Eidson v. Medtronic, Inc.*, 40 F. Supp. 3d 1202, 1212 (N.D. Cal. 2014); *Torti v. Hoag*, No. 4:14CV00330 JLH, 2014 U.S. Dist. LEXIS 148471, at *12 (E.D. Ark. Oct. 17, 2014); *Pfau v. Mortenson*, 858 F. Supp. 2d 1150, 1158 (D. Mont. 2012).  Rule 9(b) requires plaintiff attempting to plead such claims to:

> (1)    Specify the factual statements claimed to be fraudulent;
>
> (2)    Identify the speaker;
>
> (3)    Identify where and when the statement was made, and
>
> (4)    Explain why the statement was fraudulent.

*Yurevich*, 51 F.Supp. 2d at 152; *Pearsall*, 2014 WL 7270334, at *7; *see also Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).  The statement alleged to have been fraudulent must be of a material fact, and, as noted previously, statements of opinion are not actionable.  *Yurevich*, 51 F. Supp. 2d at 152; *Trefoil Park,* 2015 WL 1138542, at *12; *MacDermid,* 2014 WL 3943629, at *6.  It is grounds for dismissal not to specifically allege what factual statements or omissions were untrue, and also when insufficient facts are pled to plausibly allege that a false representation was made as a statement of fact.  *Pearsall*, 2014 WL 7270334, at *8.

Additionally, Plaintiffs must allege facts giving rise to a "strong inference" of fraudulent intent, either by alleging facts to show both motive and opportunity to commit fraud or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).  To satisfy that standard, Plaintiffs must allege facts showing concrete benefits realized by the fraud, and making profits is not a sufficient allegation.  *Odyssey Re (London)*

*Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 295 (S.D.N.Y 2000). Allegations that the defendants "knew or should have known" do not satisfy the first two elements of common law fraud in Connecticut. *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 628 (Conn. 2006); *Martinez v. Yale-New Haven Hosp.,* No. X02CV0404001227S, 2005 WL 2364901, at *2 (Conn. Super. Sept. 1, 2005) ("The 'knew or should have known' formulation is not sufficient for fraud, which requires proof that a false representation was 'known to be untrue by the party making it.'"); *Thompson v. Home Depot, U.S.A., Inc.,* No. CV065006389, 2007 WL 2036467, at *5 (Conn. Super. June 22, 2007) ("Allegations of what a defendant 'knew or should have known' do not satisfy the requirement . . . that the defendant knew the representation of fact to be untrue when made.").

Lastly, a limitations defense can be decided on a Rule 12(b)(6) motion if the defense appears on the face of the Complaint. *Deswal v. U.S. Nat'l Ass'n*, No. 14-2169-cv, 2015 WL 1061641, at *1 (2d Cir. Mar. 12, 2015).

### B.   All of LoGrasso's Claims Are Time-Barred

In Connecticut, "the law of the forum state governs on matters of procedure." *Bilodeau v. Vlack*, Civil Action No. 07-CV-1178(JCH), 2009 WL 1505571, at *3 (D. Conn. May 20, 2009) (citations omitted).  "Under Connecticut law, statutes of limitations are considered procedural and thus Connecticut's own statutes of limitations will usually govern claims asserted in federal diversity cases in Connecticut" when the underlying cause of action existed at common law. *Slekis v. Nat'l R.R. Passenger Corp.*, 56 F. Supp. 2d 202, 204 (D. Conn. 1999); *see also Stuart & Sons, L.P. v. Curtis Publ'g Co.*, 456 F. Supp. 2d 336, 343 (D. Conn. 2006); *Marchese v. Marchant Ladder, Inc.*, Civ. No. 3:11cv337(PCD), 2011 WL 4433680, at *3 (D. Conn. Sept. 22, 2011) (Connecticut limitations statute applies in diversity matter and is properly presented in a motion to dismiss).

LoGrasso's claims are all subject to one of two Connecticut statutes of limitation with clearly established repose aspects.  C.G.S. § 52-584 is the limitations/repose statute applicable to personal injury claims based on negligence.  That section provides:

> No action to recover damages for injury to the person . . . caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . .

Negligence claims must be brought within two years from the date when the injury is first sustained or discovered or should have been discovered, and the repose aspect prohibits any negligence action brought more than three years from the date of the "act or omission complained of."  *Id.*  C.G.S. § 52-577 applies repose to all tort claims, providing "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."  *See Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 203  (D. Conn. 2007) (all common law tort claims in Connecticut, including fraud and negligent misrepresentation are subject to § 52-577).  Repose statutes prevent stale and fraudulent claims.  *Neuhaus v. DeCholnoky*, 280 Conn. 190, 206-07 (2006); *see also Baxter v. Sturm, Ruger & Co.,* 230 Conn. 335, 344 (1994).

The "injury" which triggers the running of the two year limitations portion of C.G.S. § 52-584 occurs when plaintiff discovers or should have discovered that he suffered "*some*" physical injury.  *Slekis*, 56 F. Supp. 2d at 206; *Mountaindale Condo. Ass'n, Inc. v. Zappone*, 59 Conn. App. 311, 323 (Conn. App. 2000).  Because only "some" injury is required, the harm need not have reached its fullest manifestation before the statute begins to run.  *Slekis*, 56 F. Supp. 2d at 206; *Merly v. State*, 211 Conn. 199, 206 (1989).

-21-

If not barred by the two-year limitation period, the repose components of both C.G.S § 52-577 and § 52-584 bar all tort claims commenced three years after the "act or omission complained of."  C.G.S. § 52-577 begins to run "at the moment" the act or omission occurs.  *LaBow v. Rubin*, 95 Conn. App. 454, 468 (Conn. App. 2006).  The repose statute at times operates to bar an action even before it accrues.  *Baxter*, 230 Conn. at 341-42.  Significantly, Connecticut's statutes of repose are not subject to equitable tolling.  *Hubbard-Hall, Inc. v. Monsanto, Co.*, No. 3:13-cv-104 (RNC), 2015 WL 1456835, at *1 (D. Conn. Mar. 29, 2015).  The only material facts to a decision on repose are the date of the wrongful conduct alleged in the Complaint and the date the action was filed.  *LaBow, 95 Conn. App.* at 470; *City of New Britain v. Law Eng'g & Envtl. Servs., Inc.*, Civil Action No. 3:10-CV-31 (JCH), 2012 WL 124597, at *8 (D. Conn. Jan. 17, 2012) (same); *Kidder v. Read*, 150 Conn. App. 720, 726-27 (Conn. App. 2014) (the three year period begins when the negligent conduct occurs and not the date when plaintiff sustains damage or discovers his injury).

"The question of whether a party's claim is barred by the statute of limitations is a question of law."  *Giulietti v. Giulietti*, 65 Conn. App. 813, 833 (Conn. App. 2001).  Limitations defenses can be decided on a Rule 12(b)(6) motion when the defense appears on the face of the complaint.  *Deswal,* 2015 WL1061641, at *1.  The court also may decide issues relating to tolling doctrines on a motion to dismiss.  *See Int'l Strategies Grp.,* 645 F.3d at 183-85.  The Connecticut Supreme Court has held that the time limits of § 52-584 are to be respected in all but the most exceptional cases because any tolling of the statute compromises the goal of the statute.  *Neuhaus*, 280 Conn. at 207.

-22-

### 1. LoGrasso's Claims Based on Fraud and Deceit (Second, Fourth and Eighth Causes of Action) Are Barred by C.G.S. § 52-577

C.G.S. § 52-577 applies to the fraud and deceit claims asserted by LoGrasso. *Estate of Axelrod*, 476 F. Supp. 2d at 203. As noted, previously, the only facts material to the court's decision are the date of the wrongful conduct alleged in the complaint and the date the action was filed.

The SAC admits that LoGrasso last wrestled for WWE in 2007. *See* SAC ¶ 14. The latest date on which WWE conceivably could have committed any "act or omission" relevant to his attempted fraud claims would have been December 31, 2007. Accordingly, the latest date on which an "act or omission" could have occurred would have been December 31, 2007 and the statute of repose on any such claims expired no later than December 31, 2010. The Complaint was filed on January 16, 2015, and is over four years late under the statute. LoGrasso's fraud and deceit claims are time-barred by § 52-577.

### 2. LoGrasso's Negligent Misrepresentation Claim (Sixth Cause of Action),[9] Negligence Claim (Tenth Cause of Action) and Negligence Based Medical Monitoring Claim (Twelfth Cause of Action) Are Barred Both By C.G.S. § 52-577 and § 52-584

LoGrasso's negligence claims are subject to both time limitations in § 52-584. As noted, only "some" physical injury caused by Defendants' alleged negligence is necessary to start the two year period running, and the harm a party sustains need not have reached its fullest manifestation before the statute began to run. Thus, the focus is on the Plaintiffs' knowledge of facts, rather than on discovery of applicable legal theories. *Mountaindale Condo. Ass'n*, 59 Conn. App. At 323 (citing *Catz v. Rubenstein*, 201 Conn. 39, 47 (1986). Here, LoGrasso

---

[9] Certain courts have applied § 52-577 to claims for negligent misrepresentation. See *City of New Britain,* 2012 WL 124597, at *8 (citing cases). It does not make a substantive difference in this case which statute the Court applies because LoGrasso's negligence claims are equally time-barred under the three-year repose period of either § 52-577 or § 52-584.

has squarely admitted that he knew he suffered *some* harm during his tenure with WWE which ended in 2007.  He admits he repeatedly put his body and head "in harm's way."  FAC ¶ 101.  He claims he suffered concussive or sub-concussive blows in numerous matches, even claiming he showed "unmistakable signs of serious injury" and wrestled "while seriously and obviously injured countless times."  *Id.* ¶¶ 101-102.  He recently added the allegation that he "suffer[ed] sustained head trauma . . . in every match" during a program with another performer in 2006.  SAC ¶ 133.  LoGrasso obviously knew of these injuries, which starts the two year period under § 52-584.  Since LoGrasso's relationship with WWE ended in 2007, and he plainly knew of his alleged injuries prior to the end of his relationship with WWE, he had until the end of 2009 before the two year limitations period barred negligence claims.

As to the three year repose aspect, the SAC generically alleges that LoGrasso relied on unspecified misrepresentations "when wrestling for WWE" SAC ¶ 214.  The latest date on which WWE could have committed a negligent "act or omission," therefore, would have been December 31, 2007.  Thus, the repose aspect of C.G.S. § 52-584 also expired no later than December 31, 2010.

  3.  <u>No Estoppel or Tolling Doctrine Salvages LoGrasso's Claims</u>

During the status conference, plaintiffs' counsel made statements regarding tolling doctrines which reflect a complete ignorance of the law and indeed the content of the FAC then on file, which insufficiently attempted to allege tolling doctrines, including fraudulent concealment in four conclusory paragraphs.  *See* FAC ¶¶ 106-109.  When asked why LoGrasso's claims were not barred, Mr. Bloss alluded to fraudulent concealment but incorrectly stated that was "not something that can be decided on a motion to dismiss" 46:16-46:17.  When pressed again on the subject, Mr. Bloss stated "there's no way to plead a fraudulent concealment tolling of the – of whatever the applicable limitation

-24-

period is under either Connecticut law or whatever substantive law applies." *Id.* at 47:10-47:14.  Unable to answer the Court's question, Mr. Bloss then deferred to Mr. Kyros, who advised the Court he was not prepared to argue why LoGrasso's claims were not time-barred.  When pressed to answer, Mr. Kyros did not claim estoppel or fraudulent concealment as tolling rationales (which the FAC did in insufficient fashion).  Instead, he claimed WWE voluntarily assumed a duty to "take care of them and educate them about the nature of these long term degenerative brain injuries . . ." (50:7-50:10).  That is not a tolling argument under Connecticut law.

Despite the Court's admonition to research the law, plaintiffs' counsel made no change whatsoever in the insufficient four paragraphs from the FAC. The SAC repeated those four paragraphs without adding or changing a syllable. *Compare* SAC ¶¶ 149-152 to FAC ¶¶ 106-109.  The four sentences reiterate the same conclusory, non-particularized theme as the substantive claims – that WWE did not tell Plaintiffs that concussions result in brain trauma and failed to disclose unspecified "vital information" about brain injuries.

It is well-established that the plaintiff "has the burden of pleading facts sufficient to establish that the statutes of limitations should be tolled" where a claim is time-barred on the face of the complaint.  *OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 504 (D. Conn. 2007).  Conclusory allegations regarding the elements needed to invoke tolling doctrines result in dismissal.  *Int'l Strategies Grp.,* 645 F.3d at 184.  If LoGrasso seeks to toll the statute of limitations by claiming fraudulent concealment, he "must 'allege with particularity the circumstances' surrounding the alleged fraudulent concealment in accordance with the heightened pleading requirements for fraud that are specified in Rule 9(b) of the Federal Rule[s] of

Civil Procedure." *OBG Technical*, 503 F. Supp. 2d at 504 (citing *In re Publ'n Paper Antitrust Litig.*, No. 304MD1631SRU, 2005 WL 2175139, at *5 (D. Conn. Sept. 7, 2005)) ("A claim that the statute of limitations should be tolled because of fraud is, obviously, a claim of fraud, and therefore the circumstances constituting that fraud must meet Rule 9(b)'s requirements."); *see also AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, No. 3:10-cv-01539 (JAM), 2014 WL 7270160, at *11 (D. Conn. Dec. 18, 2014) (fraudulent concealment "must be affirmatively pleaded with sufficient 'particularity' to satisfy Rule 9(b)'s requirements for allegations of fraud").

Connecticut has a specific statute setting forth the requirements to claim fraudulent concealment to toll the operative limitations at C.G.S. § 52-595.  Under that statute, LoGrasso must specifically plead particularized facts showing (1) that WWE had actual awareness, rather than imputed knowledge, of the facts necessary to establish his claim; (2) that WWE intentionally concealed these facts from him, and (3) did so for the purpose of obtaining delay on the part of LoGrasso in filing suit.  *See Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105 (2007); *AT Engine Controls,* 2014 WL 7270160, at *12. Additionally, LoGrasso would also have to plead facts explaining why due diligence did not lead, or could not have led, to discovery of the facts.  *Johnson v. Wadia*, No. CV 85 0075560 S, 1991 WL 50291, at *4 (Conn. Super. Mar. 28, 1991).

LoGrasso makes no attempt to comply with these requirements.  LoGrasso points to no actual awareness by WWE that he was allegedly experiencing any symptoms of anything.  *See Bartone v. Robert L. Day Co.*, 232 Conn. 527, 533 (1995) (must show actual awareness, not imputed knowledge, of facts needed to establish plaintiff's claims).  Indeed, he claims that by 2008, after he left WWE, he had only headaches, knew of no connection to head trauma, and took aspirin.  He

claims the headaches worsened in 2009 and 2010, but there are no allegations that WWE had actual knowledge of his headaches or dissuaded him from inquiring or filing suit.  By the end of 2010, the repose statute had already run. LoGrasso cites to no affirmative act or statement made by WWE to him during the period that limitations was running aimed at obtaining delay by LoGrasso in filing suit.  *Johnson*, 1991 WL 50291, at *3 (fraudulent concealment for tolling purposes requires some affirmative act or statement, not mere silence); *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 10 F. Supp. 2d 138, 144-145 (D. Conn. 1998) (must show affirmative act absent a fiduciary relationship); *Eno Farms Coop. Ass'n, Inc. v. Corp. for Indep. Living*, Civ. No. 3:06cv1983 (AHN), 2007 WL 3308016, at *7 (D. Conn. Nov. 13, 2007) (alleged misrepresentations to support fraudulent concealment tolling must occur within tolling period).

        As to LoGrasso's cursory attempt to invoke equitable tolling or estoppel to prevent the bar of statutes of repose, including those in §§ 52-577 and 52-584 at issue here, Connecticut law does not permit that tact.  *See Saperstein v. Danbury Hosp.,* Nos. X06CV075007185S, X06CV085011032S, 2010 WL 760402, at *13 (Conn. Super. Jan. 27, 2010) ("[T]he law is well established that equitable tolling does not apply to statutes of repose."); *Crow & Sutton Assocs., Inc. v. C.R. Klewin N.E., LLC*, No. HHDX04CV054016823S, 2009 WL 1057977, at *4 (Conn. Super. Mar. 26, 2009) ("This court agrees with the analyses of Judges Sheldon and Covello, which found that the doctrine of equitable tolling is inapplicable to a statute of repose, such as § 52-577."); *Conn. Ins. Guar. Ass'n v. Yocum*, No. CV 940539691S, 1996 WL 367726, at *6 (Conn. Super. June 6, 1996) ("[I]t is well settled that neither equitable tolling nor equitable estoppel applies to statutes of repose").  In the limitations sense, equitable estoppel comes into play where the defendant misrepresents the length of the limitations period or in some way lulled

-27-

the plaintiff into believing that it was not necessary for him to commence litigation. *Int'l Strategies Grp.*, 645 F.3d at 185. There are no allegations, nor could there be, that WWE ever said or did anything to LoGrasso regarding how long he had to sue following his departure in 2007.

### C. Plaintiffs' Negligence Claims (Count V, VI, IX, X, XI and XII) All Fail to State a Claim Under Connecticut Law

#### 1. Plaintiffs' Admissions Regarding the Inherent Risks of Head Injury

All three Complaints filed by plaintiffs admit the inherent risk of head injuries in their profession. These admissions are directly relevant under Connecticut law, and all can be considered. The Second Circuit has held that allegations in a prior complaint that are omitted from an amended complaint remain party admissions.[10] *See Austin v. Ford Models Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) (stating that the plaintiff could not "erase" admissions in a prior complaint by omitting them from an amended complaint); *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party.").

Plaintiffs in this case are both grown men who chose a profession where the stunts and physicality of the action make the risk of concussive and sub-concussive blows inherent to the activity. Indeed, both men signed contracts whereby they agreed they were independent contractors who understood the

---

[10] District courts within the Second Circuit have held that admissions in a prior complaint can be considered in connection with a motion to dismiss an amended complaint. *See Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) ("Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings. As such, the Court may consider them on a motion to dismiss under Rule 12(b)(6).") (citation omitted).

inherent risk of injury.[11]  Their own pleadings make the following admissions of inherent risk:

- Over their career, wrestlers sustain repeated concussions and countless sub-concussive blows.  SAC ¶ 25.

- Many concussions go untreated and undiagnosed, as the majority of concussions do not involve loss of consciousness.  *Id.* at 27.

- Plaintiffs performed activities that are exceedingly dangerous to themselves, and those activities are particularly dangerous when performers make mistakes in executing the stunts.  *Id. at 40.*

- It is commonplace for wrestlers to experience numerous concussions over their careers, and LoGrasso sustained repeated concussions day after day over many years.  *Id.* at 42.

- During practice and matches, Plaintiffs sustained thousands of hits to their heads as part of scripted and choreographed moves.  *Id.* at 50.

- In countless matches, performers have used various weapons, including hitting each other on the head with chairs.  *Id.* at 45.

- Even the most basic move – the bump" – involves head injury risk even though wrestlers are taught not to hit their heads.  *Id.* at 52.

- The risks associated with concussion and sub-concussive blows have been known for decades.[12]  Complt. ¶ 104; FAC ¶ 54.

- Wrestlers have a greater risk of receiving frequent concussive and sub-concussive blows than boxers, hockey players and football players.  SAC ¶ 58.

---

[11] **The contracts of both Plaintiffs are part of the record as they were attached to WWE's Motion to Enforce the Forum Selection Clauses. *See* Defendant World Wrestling Entertainment, Inc.'s Memorandum of Law in Support of Motion to Transfer Venue Due to Forum-Selection Clauses in the Contracts Between the Parties at Tab 2, Exhibits A & B.**

[12] **No doubt realizing the impact of this admission as a result of the Motion to Dismiss filed by WWE in the Oregon case launched by Mr. Kyros, the SAC adds the words "to the medical community," at the end of this admission in an attempt to temper this admission.  *Compare* Complt. ¶ 104 and FAC ¶ 54 to SAC  ¶57. WWE is not part of the medical community.  The addition of the allegation that the risks were known to the medical community does not alter their previous admission, and serves only to render allegations that WWE "knew or should have known" about these alleged medical risks even less plausible and insufficient.**

- In professional wrestling, "head trauma is a regular and repeated occurrence." SAC ¶ 85 (emphasis added).

- Wrestlers "are at a grave, obvious risk for concussion as well as CTE." Complt. ¶ 69 (emphasis added).

### 2.    WWE Owed No Negligence Based Duties to Plaintiffs

Counts V, VI, IX and X are explicitly labeled negligence counts.  Count  XI and XII seek medical monitoring due to the "effects of WWE's negligence."  SAC ¶¶ 257, 270.  Under Connecticut law, whether a defendant owes a duty to the plaintiff for negligence purposes is a question of law for the Court, and is determined by the circumstances surrounding the conduct of the plaintiff. *Jaworski v. Kiernan*, 241 Conn. 399, 405-06 (1997).  The plaintiff in *Jaworski* was injured in a co-ed soccer game by incidental contact which was not an essential part of the sport.  The Connecticut Supreme Court established the critical factors to consider when the plaintiff attempts to blame others for injuries sustained during sporting-type activities, stating "[t]he normal expectations of participants in contact team sports include the potential for injuries resulting from conduct that violates the rules of the sport.  These expectations, in turn, inform the question of the extent of the duty owed by one participant to another." *Id.* at 408.

Thus, under *Jaworski*, a threshold determination that the specific harm alleged by the plaintiff was foreseeable to the defendant does not mandate that the defendant had a legal duty to plaintiff regarding such foreseeable harm.  *Id.* at 406-07.  Instead, *Jaworski* establishes that other factors determine whether a duty exists to protect participants from injuries which are inherent to the activity.  Those factors include the normal expectations of participants in the activity in which plaintiff and defendant were engaged, the avoidance of increased litigation by participants in activities where injuries are an inherent part of the activity, the

public policy of encouraging participation in sporting activities, and decisions of other jurisdictions regarding such matters.  *Id.* at 407.

After considering such factors, the Connecticut Supreme Court noted that a negligence concept would encourage a flood of litigation, and squarely ruled that negligence was an insufficient basis to create liability.  Instead, the Connecticut Supreme Court ruled that the duty owed plaintiff in such a situation was to refrain from reckless or intentional misconduct.  *Id.* at 409.  Significantly, the Court did so in a situation where the physical contact was not even an essential part of the activity.  The *Jaworski* decision indicated that duty was a flexible concept dependent principally on the normal expectation of participants in a given activity and the risks inherent to the activity in question.  The court's reasoning establishes that there is a gradient to an even lesser duty, or none at all, when physical contact is not merely incidental to or an accidental consequence of the sporting activity as was the case in soccer, but instead is an essential and expected aspect of the activity.  Significantly, the court stated "We, therefore, leave the question of what standard of care might be applicable in other factual circumstances for another day."  *Id.* at 412.

The *Jaworski* holding that negligence concepts do not apply in sporting-type situations has been applied twice in this Court.  *See Trujillo v. Yeager*, 642 F. Supp. 2d 86 (D. Conn. 2009) (dismissing negligence charges against opposing player, coach and university brought by plaintiff severely injured in soccer match); *Mercier v. Greenwich Acad.*, Civil Action No. 3:13-CV-4 (JCH), 2013 WL 3874511 (D. Conn. July 25, 2013) (dismissing negligence counts for concussion injuries by plaintiff in basketball game).  Judge Hall correctly interpreted *Jaworski* as establishing that "the normal and reasonable expectations of participants in contact team sports include the potential for injuries."  *Trujillo*, 642 F. Supp. 2d at

-31-

90.  Thus, Judge Hall ruled that the appropriate standard of care where the
contact is incidental to the activity, but not an essential part of the activity, is the
duty to refrain from reckless or intentional conduct standard of *Jaworski.*  Under
Connecticut law, recklessness is more than negligence and more than gross
negligence, and requires both the action producing the injury and the resulting
injury to have been intentional.  *See Dubay v. Irish*, 207 Conn. 518, 532-33 (1988).

An examination of case law elsewhere, as mandated by *Jaworski*,
demonstrates that the duty issue becomes further refined when professional
athletes take risks for compensation and when contact is a known and purposeful
part of the activity, as is the case in activities such as football, boxing, hockey,
and both professional and amateur wrestling.  In *Turcotte v. Fell*, 502 N.E. 2d 964
(N.Y. 1986), fabled jockey Ron Turcotte was paralyzed as a result of a racetrack
accident and sued another jockey and the owner/operator of the track.  The court
noted that professional athletes are more aware of the dangers of the activity, and
more willing to accept them in exchange for a salary than an amateur.  *Id.* at 969.
Specifically, the court found that "a professional clearly understands the usual
incidents of competition resulting from carelessness, particularly those which
result from the customarily accepted method of playing the sport, and accepts
them.  They are within the known, apparent and foreseeable dangers of the sport
and not actionable."  *Id.* at 970*.*

Thus, New York's highest court held that the duty analysis must consider
the risks assumed by the plaintiff by participating, stating that "assumed risk"
means advance consent to relieve the defendant of an obligation of conduct
towards the participant, and to take the chances of injury from a known risk
arising from what the defendant is to do or leave undone.  Citing *Prosser on Torts*
and the *Harvard Law Review*, the court stated:

> The situation is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury. . . .  The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.

*Id.* at 968 (citation omitted).

Similarly, in *Karas v. Strevell*, 884 N.E. 2d 122 (Ill. 2008), cited by Judge Hall in *Mercier*, the Illinois Supreme Court distinguished between full-contact sports, where a conscious disregard for the safety of opposing players is an inherent part of the activity, and situations where physical contact is just an unavoidable and incidental by-product of the activity, such as soccer or basketball.  For full contact sports, the Illinois Supreme Court rejected the reckless or wanton misconduct standard and instead adopted a rule that participants and organizers of such activities could only be liable if they acted with actual intent to cause the injury or "engaged in conduct 'totally outside the range of the ordinary activity'" engaged in by those participating in the activity.  *Id.* at 137; *see also Foronda v. Haw. Int'l Boxing Club*, 25 P.3d 826 (Haw. Int. Ct. of App. 2001) (noting that the "atavistic nature of [boxing] indicates that its inherent risks are extreme").

In the context of analyzing the duties, if any, owed to participants in contact activities where physicality and injuries are inherent to the activity, it is consistently held that the very concept of participants assuming the inherent risk of injury does <u>not</u> depend on the participants' subjective knowledge or perception of it.  *Id.* at 842; *see also Lilley v. Elk Grove Unified Sch. Dist.*, 80 Cal. Rptr. 2d 638, 640 (Cal. Ct. App. 1998) (plaintiff's subjective awareness is not relevant.).

All of the above principles have been applied in professional and amateur wrestling cases.  In *Kent v. Pan Am. Ballroom*, No. F038650, 2002 WL 31776394 (Cal. Ct. App. Dec. 10, 2002), the court dismissed a claim against an arena owner/operator by a pro-wrestler who had jumped from the top rope to the floor

and injured himself.  In the words of the *Kent* court, "[w]restling, and *particularly professional wrestling, entails inherent risks of injury*.  It is a sport where two persons grab, twist, throw or otherwise exert forces and holds upon each other's heads, necks, arms, legs, feet and torsos with the object of forcing the opponent to the mat."  *Id.* at *2 (emphasis added); s*ee also Lilley,* 80 Cal. Rptr. 2d at 643-44 (affirming dismissal of claim against coach and school district by middle school wrestler who broke arm during training); *Edelson v. Uniondale Union Free Sch. Dist.*, 219 A.D. 2d 614, 615 (N.Y. App. Div. 1995) (affirming dismissal of claim against school district by wrestler injured by blow to jaw); *Egger v. St. Dominic High Sch.*, 238 A.D. 2d 542, 543 (N.Y. App. Div. 1997) (affirming dismissal of claim for injuries by sixteen year old wrestler thrown to floor); *Palozzi v. Priest*, 280 A.D. 2d 986 (N.Y. App. Div. 2001) (affirming dismissal of claim of thirteen year old injured while "fake wrestling" on trampoline); *Rispoli v. Long Beach Union Free Sch. Dist.*, 111 A.D. 3d 690, 692 (N.Y. App. Div. 2013) (dismissing claim by amateur wrestler that he was injured by negligent refereeing).

Plaintiffs' own pleading extensively admit the inherent risks of injury each assumed as a professional wrestler.  Plaintiffs specifically plead that concussions and sub-concussive blows are part and parcel of the inherent risks of their chosen profession to the extent they were "at a grave, <u>obvious</u> risk for concussions."  Singleton admits he was injured while performing a conventional maneuver, and suggests that he was not ready to perform that maneuver.  Such allegations are of no legal significance.  *See Karas*, 884 N.E. 2d at 136 (learning a sport is part of the inherent risk of it and that risk is not increased by challenging the student to reach a new level of competence); *Lilley*, 80 Cal. Rptr. 2d at 641 (citation omitted) ("One assumes the risks inherent in an active sporting activity by participating in it, regardless of whether the participation is practice or formal

-34-

competition."). In short, he alleges nothing more than an in-ring injury that was part of the inherent risk the moment he walked into the ring.

Here, it is not necessary for the Court to determine the nature of the duty, if any, WWE owed to Plaintiffs given the admittedly "grave, obvious" inherent risks of concussion associated with performing the actions these compensated professional independent contractors performed, as it is clear under Connecticut law that WWE cannot be liable under negligence standards. Thus, all negligence-based claims should be dismissed.

**D.    Plaintiffs' Fraud Claims (Counts I, II, III, and IV), Negligent Misrepresentation Claims (Count V and VI) and the Deceit Claims (Count VII and VIII) All Fail As a Matter Of Law**

**1.    The Fraud, Deceit and the Negligent Misrepresentation Claims Must Comply with Rule 9 Standards**

Under Connecticut law, a deceit claim is essentially the same as a fraud claim, and the claims are treated interchangeably. The elements of a deceit claim are: (1) that the representation was made as a statement of fact; (2) that it was known to be untrue by the party making it; (3) that it was made for the purpose of inducing the other party to act upon it; and (4) that the party to whom the representation was made was in fact induced thereby to act to his injury. *See Macri v. Torello*, 105 Conn. 631, 633 (1927); *Bradley v. Ovaitt*, 86 Conn. 63, 67 (1912); *Consol. Plan of Conn., Inc. v. Cross*, 4 Conn. Cir. Ct. 641, 642 (Conn. Cir. 1967); *Advest Grp v. Arthur Andersen, LLP*, No. CV 970571417, 1998 Conn. Super. LEXIS 2137, at *9-11 (Conn. Super. July 20, 1998). These are the same elements of a fraud claim. *See Leonard v. Comm'r of Revenue Servs.*, 264 Conn. 286, 296 (2003); *Kilduff v. Adams, Inc.,* 219 Conn. 314, 329 (1991); *Miller v. Appleby*, 183 Conn. 51, 54-55 (1981). The claims also require the plaintiff to prove that he has been injured. *See Criscuolo v. Shaheen*, 46 Conn. Supp. 53, 56-57 (Conn. Super. 1999).

-35-

Fraud and negligent misrepresentation claims must comply with Fed. R. Civ. P. 9(b).  *See Eternity Global,* 375 F. 3d at 187; *Yurevich,* 51 F. Supp. 2d at 152; *Pearsall,* 2014 WL 7270334, at *3.  Rule 9(b) exists to protect against strike suits, and against harm caused by unfounded allegations of fraud.  *Estate of Axelrod*, 476 F. Supp. 2d at 192.

Rule 9 requires specification of (1) the statements or omissions said to be fraudulent, (2) the identification of the speaker of the false statements, (3) identification of where and when it was made, and (4) explanation of why the statement was fraudulent.  *Harsco Corp.,* 91 F.3d at 347*; USA ex rel. Monda v. Sikorsky Aircraft Corp.*, No. Civ. 3:99CV1026 (JBA), 2005 WL 1925903, at *2 (D. Conn. Aug. 11, 2005); *Yurevich,* 51 F. Supp. 2d at 152.  If the alleged fraud is an omission, the Plaintiff is required to allege with particularity (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omission and the manner in which they mislead the plaintiff, and (4) what the Defendant obtained by fraud.  *Odyssey*, 85 F. Supp. 2d at 293; *Estate of Axelrod*, 476 F. Supp. 2d at 192.

Rule 9(b) requires factual allegations giving rise to a "strong inference" of fraudulent intent.  *Pearsall,* 2014 WL 7270334, at *3; *Eternity Global*, 375 F.3d at 187.  This requires Plaintiffs to allege facts showing both motive and opportunity to commit fraud or facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *Eternity Global*, 375 F. 3d at 187.  To establish fraudulent intent, Plaintiff must allege concrete benefits that were realized by the Defendant as a result of the fraud.  *Odyssey*, 85 F. Supp. 2d at 295.

Plaintiffs here do not come close to satisfying these standards in the fraud claims, the deceit claims, or the negligent misrepresentation claims.  A specific factual representation or omission by WWE to these two Plaintiffs is not plead

with the requisite particularity.  Nobody is named as the speaker of any misrepresentation, or as the person with knowledge of some material fact which was fraudulently represented to, or omitted to be told, these two Plaintiffs.  There are no dates, places or circumstances pled as to when any misrepresentation or omission occurred as to these Plaintiffs.  There are no facts pled establishing the requisite "strong inference" of fraudulent intent; nor is a single fact pled showing a motive or opportunity to misrepresent any fact to these Plaintiffs.  No plausible explanation is given as to how WWE had an "opportunity" to conceal or misrepresent publicly available scientific opinions to either of these Plaintiffs, nor any motive for doing so.  It is grounds for dismissal to base fraud claims on such conclusory allegations.  *Eternity Global*, 375 F. 3d at 187; s*ee also Pearsall*, 2014 WL 7270334, at *7 (interpreting Second Circuit standards as precluding complaints which vaguely attribute allegedly fraudulent statements to "defendants").

Instead of complying with these well-established standards, the fraud counts epitomize conclusory non-specific pleading.  In the fraudulent concealment counts, WWE is accused of "voluntarily and repeatedly [making] material misrepresentations to its WWE wrestlers, former wrestlers, including Plaintiff,[13] and the public at large that there was no evidence linking, or insufficient evidence linking, multiple concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms."  SAC ¶¶ 156, 168.  Despite alleging this was done repeatedly, and the additional language indicating it was done to Plaintiffs not one such instance is set forth with particularity.  Not who did so, what was said, where it

---

[13] The only modification to this allegation from the FAC is the addition of the words "including plaintiff."

was said, or anything remotely justifying that allegation.  Completely lacking are any allegations showing that any of the unidentified representations made by WWE were knowingly false when made.  *See Alliance Grp. Servs. Inc. v. Grassi & Co.,* 406 F. Supp. 2d 157, 167 (D. Conn. 2005).  Indeed, the allegation of repeatedly making misrepresentations is entirely inconsistent with other allegations that WWE never said anything to either plaintiff at all on the subject.  It is also alleged that "WWE concealed material facts and information with the intent to deceive and defraud."  SAC ¶¶ 157, 169.  The "material facts" allegedly concealed are not identified, nor any facts pled in support of the fraudulent intent charge, as required by law.  No context is given for when WWE omitted disclosing the unspecified "material facts," nor is anything pled as to how either Plaintiff in fact relied upon the alleged concealment.

The fraud by omission counts are equally flawed.  Contrary to the omission charge, WWE is accused of "specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE . . . ," but none of the specifics required by Rule 9(b) are provided – not the speaker, the date or place, the context, or even what exactly was said.  *Id.* at ¶ 178, 185.  The remainder of that fraud count does not allege any fact known to WWE that it did not disclose to either Plaintiff under circumstances which called for the disclosure of some known material fact, but instead bases fraud charges on not disclosing medical and scientific opinions not specifically alleged to have even been known by anybody at WWE, and which are not facts in any event.  As to Singleton, he makes the nonsensical allegation that had he known of "such information," he would have been sure he was healthy before returning to the ring, when in fact he never did return to the ring because WWE's physicians never cleared him to do so.

-38-

The fraudulent deceit counts are even worse.  Here, WWE is accused of misrepresenting the risks faced by Plaintiffs through "misleading and deceptive public statements and published articles" which supposedly downplayed long-term health risks.  SAC ¶¶ 222, 230.  No such statements or articles are identified, nor is the content described.  The date, time and speaker are not identified.  Nothing is alleged to have been misrepresented <u>to</u> the Plaintiffs.  Then, it is alleged that WWE made these unidentified "misrepresentations and actively concealed adverse information <u>at a time</u> when it knew, or <u>should have known</u> that Plaintiff[s] faced serious health problems if [they were] forced to return to the ring . . . ."  *Id.* at ¶¶ 223, 231.  That time is not specified by date or event, and the allegation that WWE "should have known" defeats any legitimate basis to assert fraud.  Neither Plaintiff here even alleges that his injuries were caused by returning to the ring too soon after a prior concussion, and Singleton squarely admits he was never cleared to return after his single alleged concussion.

The negligent misrepresentation counts are equally flawed.  Previously, this claim alleged that "[t]he failure of the WWE to publicize the mounting evidence in the scientific literature of the evolving and chronic neuro-cognitive problems amongst former and current WWE wrestlers caused [unidentified] wrestlers to believe that their physical and psychological problems . . . were neither serious nor related to wrestling."  Complt. ¶ 161.  Although those specious allegations have been abandoned, the amended negligent misrepresentation claim runs along the same theme.  Instead of setting forth any representation to either plaintiff, WWE is accused of issuing otherwise unidentified "public statements" and "criticizing the legitimate scientific studies," again with no specifics.  SAC ¶¶ 193, 208.  It is alleged that WWE or its Talent Wellness Program "had no reasonable ground for believing its statements to be

true" without ever identifying what statements are being referred to.  Id. at ¶¶ 197, 212.

> ### 2.    The SAC Fails to Allege the Misrepresentation or Omission of a Past or Present Material Fact

As a matter of law, not publicizing scientific opinions of others or expressing critical opinions about scientific matters is simply not a misrepresentation of a past or present material *fact*.  Under clearly established law, opinions are not actionable.  *Yurevich*, 51 F. Supp. 2d at 152; *see also Trefoil Park*, 2015 WL 1138542, at *8 (noting that Connecticut courts have long excluded statements of opinion as being sufficient to support fraud or negligent misrepresentation claims); *MacDermid*, 2014 WL 3943629, at *8 (noting that differing points of view on a subject suggests statement is opinion).  The failure of an entertainment company to publicize scientific opinions of others is not a tort, especially when such opinions are publicly available.  Likewise, criticizing or commenting on science is certainly not a tortious negligent misrepresentation.

> ### 3.    Connecticut Law Does Not Recognize A Cause of Action for Fraudulent Concealment (Count I and II)

There is no affirmative cause of action for fraudulent concealment under Connecticut law in any event.  *See AT Engine Controls,* 2014 WL 7270160, at *11 n.17 ("Connecticut law does not even recognize any affirmative cause of action for fraudulent concealment.");  *Baldwin v. Vill. Walk Condo, Inc.*, No. FSTCV085007925S, 2010 WL 5095319, at *13 (Conn. Super. Nov.19, 2010).  Early Connecticut jurisprudence drew a distinction between concealment and a mere failure to disclose.  Under that distinction, a person cannot conceptually be accused of concealment of something unless called upon to produce it.  *Bartholomew v. Warner*, 32 Conn. 98, 103 (1864); *Gayne v. Smith*, 104 Conn. 650 (1926) ("Unasked, the defendant was under no duty to say anything as to it");

*Watertown Sav. Bank v. Mattoon*, 78 Conn. 388 (1905) ("The term 'conceal' implies something more than a mere failure to disclose.  We do not in general speak of a person concealing a thing, unless he is in some way called upon to produce it").  Nowhere does the SAC allege that either Plaintiff ever asked anybody at WWE anything about concussions or head injuries, let alone that WWE concealed some material fact in responding to such an inquiry.

        **4.**      <u>Plaintiffs' Fraudulent Omission Claims Fails to State A Claim</u>

      Plaintiffs' claims for fraudulent nondisclosure likewise fail for other reasons in addition to those previously set forth.  Fraud can be based on nondisclosure only in exceptional circumstances.  *Creelman v. Rogowski*, 152 Conn. 382, 385 (1965).  Mere silence is not actionable where the parties deal at arm's length, unless the circumstances or existence of a confidential relationship gives rise to a duty to speak.  *Franchey v. Hannes*, 152 Conn. 372, 378 (1965); *Duksa v. City of Middletown*, 173 Conn. 124, 127 (1977) ("Mere nondisclosure . . . does not amount to fraud.").  Even if one assumes a duty to speak, the obligation is to then avoid "deliberate nondisclosure."  *Franchey*, 152 Conn. at 379.  Fraudulent nondisclosure requires a failure of a "disclosure of known facts."  *Pospisil v. Pospisil*, 59 Conn. App. 446 (Conn. App. 2000) (internal citations of quotations omitted).  "The key element in a case of fraudulent non-disclosure is that there must be circumstances which impose a duty to speak."  *MM Global Servs., Inc. v. Dow Chem. Co.*, 283 F. Supp. 2d 689, 705 (D. Conn. 2003) (citation omitted).  Furthermore, silence cannot give rise to an action for fraud with respect "to all facts which are open to discovery upon reasonable inquiry."  *Duksa*, 173 Conn. at 127.

        **a.**      <u>No Occasion or Duty to Speak</u>

      Plaintiffs have not pled a special or confidential relationship between WWE and Plaintiffs.  "[A] fiduciary or confidential relationship is characterized by a

unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.'" *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 219 (1994) (citation omitted).  Conclusory allegations of superior knowledge and expertise are deemed not plausible to establish a special relationship. *Int'l Strategies Grp.*, 645 F.3d at 184.  As a matter of law, an arms-length contractual relationship is not such a confidential or special relationship. *See Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38-39 (2000) ("[C]ertain relationships, as a matter of law, do not impose upon either party the duty of a fiduciary. . . . In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence."); *MM Global Servs.*, 283 F. Supp. 2d at 705 (granting motion to dismiss fraudulent misrepresentation/non-disclosure claim because complaint "fail[ed] to allege any facts indicating that the parties had a special/fiduciary or confidential relationship or that they were dealing with one another other than at arms-length"); *Cheshire v. Lockwood*, No. 122135, 2005 WL 1634776, at *8 (Conn. Super. June 9, 2005) ("The plaintiff and the defendant were not in a fiduciary or confidential relationship. . . . In fact, the opposite is true; the plaintiff and the defendant were dealing with each other as acquaintances in an arm's-length transaction.").  Here, Plaintiffs performed as independent contractors pursuant to written agreements with WWE, and do not allege any fiduciary or confidential relationship.

Likewise, the SAC here is devoid of allegations of any circumstances in which WWE supposedly assumed a duty to speak to either of these Plaintiffs but failed to make a full and fair disclosure of known facts.  To the contrary, the entire

thrust of Plaintiffs' SAC — albeit misguided — is that WWE did not disclose and failed to publicize scientific opinions of third parties regarding the alleged risks of traumatic brain injuries.  Absent a circumstance in which WWE supposedly assumed a duty to speak, the parties' arms-length contractual relationship could not give rise to a duty to speak.  Plaintiffs' fraudulent nondisclosure claims, therefore, are legally untenable for that additional reason.

> **b.    A Fraudulent Nondisclosure Claim Based On Information that Is Publicly-Available Is Not Viable**

Silence cannot give rise to an action for fraudulent nondisclosure with respect "to all facts which are open to discovery upon reasonable inquiry." *Duksa*, 173 Conn. at 127.  Notwithstanding their attempt to alter it, the plaintiffs have judicially admitted that "[t]he risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades." FAC ¶ 54.  Plaintiffs go on to identify "a selection of mounting medical literature concerning head trauma," including specifically-identified articles dating back to the 1970s, each of which is publicly available.  *Id.*

By Plaintiffs' own admission, this information was publicly-available and thus accessible to Plaintiffs upon reasonable inquiry and, as such, is an additional reason their fraudulent nondisclosure claim is fatally flawed.  *See Saggese v. Beazley Co. Realtors*, 155 Conn. App. 734, 755 (Conn. App. 2015) (finding publicly-available records of litigation to be "open to discovery upon reasonable inquiry had [plaintiff's real estate attorney] only communicated with any of the attorneys representing the parties involved in the litigation or gone to the courthouse in New Haven and reviewed the files"); *Siemiatkoski v. Windsor Fed. Sav. & Loan Ass'n*, No. X07CV065001791S, 2008 WL 4379060, at *5 (Conn. Super. Sept. 10, 2008) (holding defendant did not have a duty to disclose publically available information); *Citicorp Vendor Fin., Inc. v. Sonnelitter*, No.

CV030350572S, 2005 WL 469330, at *3 (Conn. Super. Jan. 28, 2005) ("[W]here information is equally available to both parties, neither party has a duty to disclose that information to the other").

    **E.**    **Plaintiffs' XI and XII Causes of Action Fails To State A Claim**

    Plaintiffs purport to assert claims for "medical monitoring" due to WWE's alleged negligence.  Medical monitoring, however, is not an independent cause of action under Connecticut law.  In fact, the few courts to address the issue have limited medical monitoring to claims under the Connecticut Workers' Compensation Act, which is not at issue here.  *See Doe v. City of Stamford*, 241 Conn. 692, 699 (1997) (finding "it would be contrary to the humanitarian and remedial purpose of the act to infer that the legislature intended that an employee who sustains actual exposure to a potentially fatal infectious disease must await the onset of the disease before he can recover expenses associated with necessary, and possibly lifesaving, medical intervention"); *Bowerman v. United Illuminating*, No. X04CV 940115436S, 1998 WL 910271, at *10 (Conn. Super. Dec. 15, 1998) (finding *Doe* "inapposite to the case at bar" involving 15 lawsuits brought by 109 plaintiffs for asbestos-related personal injury claims because *Doe* was decided based on definition of "injury" under the Workers' Compensation Act and the court "stressed the *humanitarian and remedial purposes of the Workers' Compensation Act*") (emphasis in original); *accord Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 323 (D. Conn. 2002) (distinguishing *Doe* and *Bowerman* in denying summary judgment with respect to medical monitoring "as a remedy if other actionable injuries exist").

    Accordingly, plaintiffs' XI and XII Causes of Action fail to state a claim and must be dismissed.

-44-

## VI.    **CONCLUSION**

For all of the foregoing reasons, plaintiffs' Second Amended Complaint should be dismissed in its entirety with prejudice.

**DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.,**

**By:   /s/ Jerry S. McDevitt**
**Jerry S. McDevitt (pro hac vice)**
**Terry Budd (pro hac vice)**
**Curtis B. Krasik (pro hac vice)**
**K&L GATES LLP**
**K&L Gates Center**
**210 Sixth Avenue**
**Pittsburgh, PA 15222**
**Phone: (412) 355-6500**
**Fax: (412) 355-6501**
**Email: jerry.mcdevitt@klgates.com**
**Email: terry.budd@klgates.com**
**Email: curtis.krasik@klgates.com**


**Thomas D. Goldberg (ct04386)**
**Jonathan B. Tropp (ct11295)**
**Jeffrey P. Mueller (ct27870)**
**DAY PITNEY LLP**
**242 Trumbull Street**
**Hartford, CT 06103**
**Phone: (860) 275-0100**
**Fax: (860) 275-0343**
**Email: tgoldberg@daypitney.com**
**Email: jbtropp@daypitney.com**
**Email: jmueller@daypitney.com**


**Its Attorneys.**

-45-

## CERTIFICATION

I hereby certify that on this date a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_/s/ Jeffrey P. Mueller_
Jeffrey P. Mueller (ct27870)