## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

---

**RUSS McCULLOUGH, a/k/a "Big Russ McCullough", RYAN SAKODA, and MATTHEW R. WEISE, a/k/a "Luther Reigns," individually and on behalf of all Others similarly situated,**

**Plaintiffs,**

**No. 3:15-cv-01074-VLB**

**v.**

**WORLD WRESTLING ENTERTAINMENT, INC.,**

**Defendant.**

---

### PLAINTIFFS' FIRST AMENDED COMPLAINT

---

**Plaintiffs Russ McCullough, Ryan Sakoda, and Matt Wiese (collectively, "Plaintiffs") allege the following upon personal knowledge as to their own transactions and upon information and belief and investigation of counsel as to all other matters.**

### INTRODUCTION

**1.     This class action concerns World Wrestling Entertainment, Inc.'s ("WWE")[1] negligent and fraudulent mistreatment of its wrestlers who sustained long-term occupational post-concussion injuries as WWE professional wrestlers.  The Plaintiffs allege WWE's concealment, omission, and denial of medical information**

---

[1] "World Wrestling Entertainment, Inc." and "WWE", as used in this Complaint, refer to the company in its current incarnation, along with all predecessor companies, including, but not limited to, Titan Sports, Inc., World Wrestling Federation, Inc., and World Wrestling Federation Entertainment, Inc.

pertaining to traumatic brain injuries has caused their harm, tolls the statutes of limitations and repose and violates a continuous duty that the WWE owes and has voluntarily undertaken to these Plaintiffs and the putative class.

2.      Plaintiffs have developed symptoms and been diagnosed with permanent, degenerative post-concussion brain injuries from their wrestling performances with WWE.  Additionally, Plaintiffs believe they are at greater risk for developing long-term brain diseases such as dementia, Alzheimer's disease, ALS, and CTE. Plaintiffs believe they are substantially more likely than the general population to develop such diseases in the future as a result of WWE's misconduct.

3.      WWE has known or should have known for decades that repeated concussive and sub-concussive impacts substantially increase the probability that a wrestler will develop a permanent, degenerative brain disease.  The plaintiffs argue the WWE's knowledge of these injuries stem from the large body of medical and scientific studies that date as far back to the 1920's that link head trauma to long term neurological problems.  The WWE chose to hide this necessary information from the Plaintiffs to preserve the huge profits made from the violent culture created by the WWE.

4.      WWE took affirmative steps to mislead Plaintiffs into wrestling while injured, resulting in the accumulation of concussive and sub-concussive impacts without sufficient recuperation time.  The accumulation of head trauma is exponentially more dangerous than isolated blows, a fact WWE knew or should have known.  Yet, WWE failed to take adequate steps to prevent, or even disclose the risk of, these successive injuries.

5.     WWE's representations, actions, and inactions have caused Plaintiffs to suffer long-term debilitating injuries, lost income, premature retirement, medical expenses, and other losses as alleged herein.

6.     WWE failed to disclose in a timely manner the true risks of repeated head impacts in WWE wrestling, and failed to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and latent brain injury.  Indeed, by refusing to acknowledge the risks it was creating – and by attempting to conceal those risks from its wrestlers – WWE effectively guaranteed that they would not seek the help they needed to avoid latent brain injury.

7.     When forced to acknowledge the risks to which it subjects its wrestlers – by script, on a daily basis – WWE took inadequate steps to correct the problem or to address its injurious conduct, the full consequences of which are still coming to light.  Indeed, WWE continues a course of conduct designed to mislead Plaintiffs about the injuries they have sustained by failing to disclose pertinent facts or offering misleading half-truths.

8.     The Plaintiffs had a special relationship with the WWE.  Not only did they rely on the WWE to script and direct the wrestling performances in a safe manner, the Plaintiffs also relied on WWE to communicate medical and safety information to them.   When the WWE communicated medical and safety information to the Plaintiffs the WWE had superior information about the long-term risks of repeated head trauma and had an ongoing duty to disclose accurate information to the Plaintiffs.   According to the Plaintiffs the WWE breached its duty to disclose

accurate information to them during and after their wrestling careers, specifically the WWE breached its duty by negligently omitting material information regarding the link between the type of head injuries sustained in the WWE and cognition impairing conditions.  The Plaintiffs with only high school educations justifiably and reasonably relied to their detriment on these negligent representations by omission.

9.      WWE's medical personnel are subject to the standards of the profession at the time that the medical care was provided.  Concussion research during the years Plaintiffs wrestled for WWE was such that the WWE had actual notice of the causal connection between head trauma suffered while wrestling for WWE and long-term neurological injury.   Plaintiffs would not reasonably be expected to research medical literature during their employment with WWE, nor would they be expected to know the sophisticated medical jargon and language of the medical profession. Plaintiffs reasonably relied on WWE's superior knowledge and position of authority, evidenced by the special relationship between Plaintiffs and WWE, which resulted in Plaintiffs' reliance to their detriment on WWE's fraudulent concealment and omissions regarding Plaintiffs' health and safety.

10.      Plaintiffs seek a declaration of liability, injunctive relief, medical monitoring, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs as a result of WWE's conduct, which resulted in Plaintiffs suffering brain trauma, concussions, and other related injuries.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The matter in controversy in this class action exceeds $5,000,000.00 exclusive of interest and costs, and some members of the Class are citizens of states other than the state in which Defendant has its primary place of business.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

13.     Plaintiff Russ McCullough is a resident of Corona, California. He wrestled with the WWE from 1999 to 2001. Plaintiff McCullough wrestled under the name "Big Russ McCullough."

14.     Plaintiff Matthew "Matt" Wiese is a resident of Los Angeles, California. He wrestled with the WWE from 2004 to 2005. Plaintiff Wiese wrestled under the name "Luther Reigns."

15.     Plaintiff Ryan Sakoda is a resident of West Hollywood, California. He wrestled with the WWE from 2003 to 2004.

16.     Defendant World Wrestling Entertainment, Inc. is a company existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut and conducts business in this jurisdiction.

17.     Although WWE is a public company, it is controlled by a small group of related executives who manage both polices and the conduct of wrestlers during matches. Vince McMahon has been Chairman of WWE since the retirement of his father, Vince McMahon Sr., in 1980. Vince McMahon has served as CEO from 1980

to 1993, and from 2009 to the present. McMahon controls over 80 percent of WWE's voting power. McMahon's wife, Linda McMahon, served as WWE President from 1993 to 2009, and as CEO from 1997 to 2009. Their daughter, Stephanie McMahon Levesque, is WWE's Chief Brand Officer. Her husband, Paul Levesque, also known as Triple H, is Executive Vice President, Talent, Live Events & Creative.

## FACTUAL ALLEGATIONS

I.      Background: WWE and Its Wrestlers

18.     WWE is the largest wrestling entertainment organization in the world. Since purchasing its main competitor, World Championship Wrestling, in 2001, WWE has had no serious competitors in the field of wrestling entertainment. The company generates approximately $500 million in revenue annually.

19.     The majority of WWE's revenues stem from its televised wrestling events. WWE programs consistently rank among the most popular in weekly television ratings. WWE programming is broadcast in more than 170 countries and 35 languages and reaches more than 650 million homes worldwide.

20.     For nearly three decades, WWE has been the world's pre-eminent provider of pay-per-view programming, consistently ranking among the highest-selling live event programs in the world.

21.     WWE calls itself an "action soap opera."[2]  Its events are scripted, with preordained winners and losers, and it has a carefully written, ongoing plot. WWE predetermines much of the dialogue between the wrestlers and the winners of the

---

[2] Examiner.com, "WWE to be called an 'action soap opera' not pro-wrestling, Bans more terms" (Apr. 13, 2011), available at http://www.examiner.com/article/wwe-to-be-called-an-action-soap-opera-not-pro-wrestling-bans-more-terms.

6

events, as well as many of the violent acts perpetrated by the wrestlers on each other.

22.    Many WWE wrestlers fight hundreds of times per year. And unlike professional athletes in traditional sports leagues, WWE wrestlers have no off-season in which to rest and recover from their injuries.

23.    Despite WWE's enormous revenues, WWE does not provide its wrestlers, past or current, with health insurance, disability insurance, or unemployment insurance. Wrestlers are effectively on their own.

24.    WWE scripts events and matches, including some moves.  The trainers, bookers, and other WWE employees, organize and oversee the action that takes place in each performance, effectuating WWE's scripts.

25.    Throughout the history of WWE, wrestlers, including Plaintiffs, look to and rely on their trainers, bookers, and WWE staff, both to provide specific direction from WWE, and to ensure their safety during performances.

II.    The Science of Head Trauma

26.    The primary classification of head injuries relevant to WWE are traumatic brain injuries ("TBIs," or colloquially, "concussions") and chronic traumatic encephalopathy ("CTE"). Concussions can cause CTE, but are not the only cause: repeated sub-concussive head trauma also causes CTE. Over their career, WWE wrestlers suffer repeated concussions and countless sub-concussive blows.

27.    Concussions have no standard definition, and require complex diagnosis based on clinical signs, observed symptoms, neuroimaging, medical records and

personal interviews.[3] The Centers for Disease Control and Prevention ("CDC") define concussions as a type of TBI caused by a "bump, blow, or jolt to the head or body."[4] A blow to the head that does not cause a concussion, or that has not been diagnosed to cause a concussion, is commonly referred to as a sub-concussive blow.

28.     Many concussions go undiagnosed and untreated. Though concussions are often associated with a loss of consciousness, the majority of concussions are not so obviously recognized.

29.     Even absent a loss of consciousness, each concussion alters the way the brain functions.   Symptoms can include headaches and problems with concentration, memory, balance coordination, loss of consciousness, confusion, disorientation, nausea, vomiting, fatigue or drowsiness, difficulty sleeping, sleeping more than usual, and seizures.[5] Although concussion research continues to grow, WWE had actual notice of these symptoms during Plaintiffs wrestling careers as concussion research had already established these symptoms as evidencing concussions.[6]

30.     Post-concussion syndrome remains with a person for days, weeks or even months.   Indeed, while, "[s]ome of these symptoms may appear right away. . .

---

[3] National Center for Injury Prevention and Control, "Report to Congress on Mild Traumatic Brain Injury in the United States: Steps to Prevent a Serious Health Problem" 1 (2003), available at http://www.cdc.gov/ncipc/pubres/mtbi/report.htm.
[4] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), *available at* http://www.cdc.gov/concussion/signs_symptoms.html.
[5] Mayo Clinic, "Post-Concussion Syndrome: Definition," (Aug. 19, 2014), *available at* http://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/basics/definition/con-20032705.
[6] Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS003 20/DSECTION=2.

others may not be noticed for days or months after the injury."[7] In some cases, concussions can cause bleeding in the brain, which can be fatal.[8] This also has been evident to the medical community since Plaintiffs were employed by WWE, providing WWE's medical personnel with the necessary information to diagnose and treat Plaintiffs' concussion and sub-concussive symptoms and injuries.[9]

31.    Repeated blows sustained without sufficient recovery time are exponentially more dangerous. Sometimes called "second impact syndrome," multiple blows can amplify the original injury. According to the Mayo Clinic, "[e]xperiencing a second concussion before signs and symptoms of a first concussion have resolved may result in rapid and usually fatal brain swelling."  Even in 2005, the Mayo Clinic recognized "a violent blow to your head can cause your brain to slide forcefully against the inner wall of your skull…A concussion causes at least a temporary loss in brain function.  Although losing consciousness is a common sign of a concussion, it's possible to suffer a concussion without being completely knocked out."[10]

32.    The WWE and WWE's medical personnel were in a unique position to have the wealth of medical literature on concussion and sub-concussive injuries in their possession, and in fact, had a duty to have such information available to them in

---

[7] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), http://www.cdc.gov/concussion/signs_symptoms.html.
[8] Mayo Clinic, "Concussions: Causes" (Apr 2, 2014), available at http://www.mayoclinic.org/diseasesconditions/concussion/basics/causes/con-20019272.
[9] Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS003 20/DSECTION=2.
[10] Mayo Clinic, "Concussion: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS003 20/DSECTION=3.

order to practice to the standards of the medical profession during the years Plaintiffs were wrestling. Therefore, it can be imputed that WWE was knowledgeable about the likelihood head trauma would cause concussions and sub-concussive injuries and the resulting long-term neurological injuries, and had actual notice and knowledge as to the signs and symptoms associated with concussion and sub-concussive injuries when Plaintiffs were wrestling for the WWE.

33. CTE is a disorder caused by neurodegeneration including cognitive and neuropsychiatric symptoms. Long-known as dementia pugilistica or punch-drunk syndrome, an increasing consensus has emerged that mild and infrequent trauma can cause similar long term neurological effects to those experienced by boxers.

34. CTE is a permanent change to brain structure caused by repeated blows. CTE's accompanying symptoms include depression, dementia, cognitive impairment, Parkinsonism, personality change, speech and gait abnormalities. Unlike concussions, CTE can only be diagnosed with direct tissue examination, which can detect an elevated level of Tau protein in brain tissue.[11]

35. CTE can be caused by a single traumatic brain injury, but is much more often the result of repeated minor traumas. According to an NIH study, "[t]here is overwhelming evidence that the condition is the result of repeated sublethal brain trauma that often occurs well before the development of clinical manifestations."[12]

---

[11] Bennet I. Omalu et al., "Chronic Traumatic Encephalopathy, Suicides and Parasuicides in Professional American Athletes," 31 AM. J. FORENSIC MED. PATHOLOGY 130, 132 (2010).
[12] Ann C. McKee et al., "Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy following Repetitive Head Injury," J. NEUROPATHOL EXP NEUROL. 2009 July; 68(7): 709–735.

36.     As dangerous as individual concussions and sub-concussive blows can be in the short term, the long-term effects are more debilitating and insidious. Because CTE is difficult to detect, manifests years later, and includes chronic mental issues, many sufferers do not understand their illness. Whereas a concussion's symptoms are often sensory and manifest immediately, CTE manifests years later, and can be caused by blows which have no accompanying symptoms.

37.     Many sufferers of CTE spend years with no idea—and no way of knowing—that they suffer from this disorder.

38.     Depression—including depression caused by CTE—is destructive, often leading to substance abuse and suicide. If caused by a physical trauma that happened years ago, with no reason or warning to suspect the true cause, these symptoms can be bewildering as well as debilitating.

39.     Research into the effects on professional athletes shows grim disparities based on head trauma: professional football players who had at least three concussive incidents over their careers were three times more likely to be diagnosed with clinical depression and five times more likely to be diagnosed with dementia than were players who had limited history of concussions.[13]

40.     As discussed below, at least one former WWE wrestler's autopsy revealed he suffered from CTE.

III.    **WWE Created a Culture of Violence Putting Profits Over Plaintiffs' Safety**

---

[13] Kevin M. Guskiewicz et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," 39 MED. & SCI. SPORTS & EXERCISE 903, 906 (2007)

41.    During WWE matches, wrestlers including Plaintiffs performed activities that are exceedingly dangerous to themselves and to their adversaries. They are particularly dangerous when performers make mistakes in executing the stunts.

42.    For wrestlers directed to perform complicated and dangerous stunts day after day, including Plaintiffs, such mistakes are not only inevitable, but frequent. This is so because (a) wrestlers are not properly trained to execute their "moves" in a safe—or at least, safer—manner; and (b) wrestlers have a grueling schedule, meaning they are often tired during their matches and more prone to inflict and suffer traumatic injury.

43.    It is commonplace for WWE wrestlers to experience numerous concussions over their careers, during which many fight hundreds of times each year.  A wrestler such as Plaintiff LoGrasso, wrestling on average five times a week, sustained repeated concussions day after day over many years, resulting in a greatly increased chance of CTE and related illnesses.

44.    Even where no mistakes occur, these stunts can result in detrimental blows to the head. Over the span of a career, these blows greatly increase the chance of CTE and related illnesses.

45.    WWE intentionally and willfully adds what it calls "heat" to its scripts in order to ensure that there is "extra physicality" in its matches. In her testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives in 2007, WWE executive Stephanie McMahon Levesque defined "heat" as "when you are really beating someone down in order to elicit a reaction

from the crowd of, 'Oh, my God, please get up, get up, get up,' and the guy can't."[14]

She provided an example of "heat," stating:

> For example, if there are a number of guys in the ring, like say there is five guys attacking one guy, and I am a good guy going to come out, if I come out by myself, I am going to get beat down just as bad as the other guy. But if I come out with a chair, I might have a better chance. Logically, so that is how the chairs are used. You might have seen -- or I don't know if you have seen any of our scripts -- but there might be chair shots written in at some point.[15]

46.    To elicit "heat" in events, WWE directs its wrestlers to use various weapons. As Ms. Levesque's testimony suggests, WWE instructs its wrestlers to use metal chairs to batter each other.  In countless WWE matches, fighters have slammed chairs over the heads of their opponents.  Even where WWE wrestlers use chairs or other dangerous weapons without WWE's explicit direction, they do so with WWE's encouragement and tacit approval.  In many instances, these chair shots have delivered dangerous levels of force to the recipient's skull including to Plaintiffs.

47.    The chair shot itself, though supposedly banned in 2010, is an iconic image of concussion-causing destruction which WWE utilizes to its fullest in advertisements and promotions.[16]  Even Paul Levesque, a WWE executive and son-

---

[14] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 119 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.
[15] *Id.* at 120.
[16] See Geno Mrosko, "WWE uses unprotected chair shot to the head to promote its Network" (July 12, 2014), available at http://www.cagesideseats.com/wwe/2014/7/12/5893661/wwe-uses-unprotected-chair-shot-to-the-headto-promote-its-network.

in-law to Vincent K. McMahon, has used chair shots since 2010 in performances, as a wrestler under the name "Triple H."[17]

48.    WWE's announcers commonly revel in the ability of wrestlers to fight through injuries, downplaying concussions as mere "wooziness."

49.    These beatings, though nominally "fake," greatly increase the chance of wrestler injuries, particularly when a wrestler administering the "heat" commits an error. But even where no error is committed, the "heat" administered by wrestlers results in blows to the head.

50.    Some of these moves involve acrobatic feats that involve lifting opponents more than six feet in the air.

51.    During WWE practice and WWE matches, Plaintiffs sustained thousands of hits to their heads as part of scripted and choreographed moves.

52.    Instead of stopping events when Plaintiffs sustained injuries, WWE allowed such events to continue, requiring that Plaintiffs fight through the pain, and subjecting them to the long-term consequences of cumulative brain injury.

53.    Even the most basic wrestling move, the "bump," involves the risk of injury to the head and spine.  A bump involves falling to the mat backwards so the wrestler lands on his back. Wrestlers are taught to and are directed by WWE to fall so that the top of their back hits the mat, and to avoid hitting their heads.  However, depending on the speed at which they are taking the bump, wrestlers hit their heads

---

[17] David Bixenspan, "After Wrestlemania, it looks like WWE has unbanned chair shots to the head" (Apr. 4, 2011), available at http://www.cagesideseats.com/2011/4/4/2090779/after-wrestlemania-it-looks-like-wwe-had-unbannedchairs-to-the-head.

or necks resulting in head injuries.  Plaintiffs conducted this move multiple times over their careers.

54.     Over time, these blows greatly increase the chance of CTE.

IV.     **WWE Was Aware of and Covered Up the Dangers to Plaintiffs**

    A.  **Through Medical Literature, WWE Knew or Should Have Known the Risks Associated With Its Activities**

55.     As previously alleged, WWE knew or should have known during Plaintiffs' WWE careers of the growing body of scientific evidence and its conclusions that persons such as Plaintiffs who sustain repetitive concussive events, sub-concussive events and/or other brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities whether during their wrestling careers, or especially, later in life.

56.     WWE was and is aware of the risks of repeated head trauma and multiple concussive events caused by wrestling in their matches.  In 2007, a WWE executive admitted that "WWE wrestlers are at risk for concussions because of the nature of their work."  And yet, WWE continues to understate the risks and dangers of CTE, as evidenced by Dr. Joseph Maroon's statements to the NFL Network, Total Access in March 2015, "The problem of CTE, although real, is its being over-exaggerated".[18]  WWE and its medical personnel use their unique positions of authority and superior knowledge to quell their wrestlers', including Plaintiffs', fears regarding injuries and convince them it is safe to continue wrestling through

---

[18] NFL Network, NFL Total Access, "Dr. Maroon: The NFL Has Never Been Safer", (March 2015), *available at* http://www.nfl.com/videos/nfl-network-total-access/0ap3000000479597/Dr-Maroon-The-NFL-has-never-been-safer

concealment of necessary information, omission of pertinent medical information, and failures to properly assess, diagnose, and treat their wrestlers', including Plaintiffs' injuries, leading to Plaintiffs reliance to their detriment on WWE's allowance of Plaintiffs continuing to wrestle and perform after suffering symptoms of concussions and sub-concussive injuries and being allowed and encouraged to fight through the pain and continue wrestling despite having suffered concussions and sub-concussive injuries.

57.    For decades spanning back to the 1920s WWE has known, or should have known, that wrestlers have been subjected to extremely dangerous conditions and blows at its direction.[19] Specifically, WWE was aware in 2005 and beyond that wrestling for the WWE and suffering head trauma would result in long-term injuries.[20]  And it therefore should have, but never did, warn Plaintiffs of the risks of concussions and other brain injuries associated with wrestling with WWE.

58.    The risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades to the medical community. Below is a selection of mounting medical literature concerning head trauma:

- During the 1950s, 60s, 70, 80s and 90s, studies were authored by the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine, concerning head trauma and concussions. In particular, many of the studies focused on sports-related head trauma and concussions and

---

[19] *See* http://concussioninc.net/?p=3286
[20] *See* Mayo Clinic, "Concussions: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS003 20/DSECTION=3.

the long term implications of such injuries (which include loss of brain function and dementia).

- In 1973, Drs. Corsellis, Bruton, & Freeman-Browne reported as to the physical neurological impact of boxing. The study outlined the neuropathological characteristics of dementia, loss of brain cells and cerebral atrophy.

- In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines (updated in 2001).

- In 2001 and 2004, conventions of neurological experts met in Prague and Vienna with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out." These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

- A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same game."

- In 2007, scientists concluded that a former WWE wrestler had suffered from CTE. Scientists concluded in 2009 that a second former WWE wrestler had suffered from the same affliction.

59.    WWE knew, or should have known, about this and other research demonstrating the dangers of receiving concussive and sub-concussive blows to the head.   Moreover, WWE knew or should have known that the research associated with boxing, hockey, and football also reflected dangers associated with WWE wrestling. Indeed, for the reasons set forth above, wrestlers have a greater risk of receiving frequent concussive and sub-concussive blows to the head than athletes in those sports.

B.    WWE Has Attempted to Cover Up the Dangers of Head Trauma Associated with Wrestling

60.    WWE has engaged in a campaign of misinformation and deception to prevent Plaintiffs from understanding the true nature and consequences of the injuries they have sustained.

61.    WWE concealed important medical information, including the effects of multiple head traumas, and prematurely allowed Plaintiffs to return to the ring or to practice, even when injured. As a result, wrestlers, including Plaintiffs, suffered serious permanent and debilitating injuries and damages.

62.    WWE has continually represented directly to Plaintiffs, and indirectly to them through the public, that the safety of its wrestlers is a top priority. To take but one example, Vincent K. McMahon told the Committee on Oversight and Government Reform of the U.S. House of Representatives, "Let me just say, [WWE] is always concerned about safety of our talent, absolutely. We were the first people to do any

18

number of things to make things safe for our talent, if that's the direction in which you're going."[21]

63.     The NFL had created the Mild Traumatic Brain Injury Committee in 1994.  The NHL introduced a Concussion Policy in 1997 requiring NHL team doctors to document all concussions and collected data on standardized injury report forms. In 1997, the NHL began baseline testing for its players and required team doctors and trainers to maintain records of all players believed to have concussions.  Yet WWE waited nearly a decade before adopting similar policies.

64.     Indeed, WWE has systematically denied to Plaintiffs and their co-wrestlers that its wrestlers routinely suffer from concussions, or that its wrestlers suffer from long term brain damage.  No one at WWE ever warned Plaintiffs about the risk of sustaining numerous sub-concussive and concussive blows.

65.     For example, in 2007, WWE Executive Stephanie McMahon Levesque testified to the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were no documented concussions in WWE's history.[22]

66.     At the time of Levesque's testimony, WWE wrestlers likely had cumulatively experienced hundreds—if not thousands—of concussions. To deny that these concussions were documented amounts to an admission that WWE refused to acknowledge the extreme risks it was subjecting its wrestlers to.

---

[21] Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of Vince Kennedy McMahon (Dec. 14, 2007), available at https://www.scribd.com/doc/33253381/Vince-McMahons-Testimony-to-Waxman-committee.
[22] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 117 available at http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.

67.    Dr. Bennett Omalu, who pioneered the research into CTE, studied the brain tissue of a deceased NFL player named Mike Webster and published his findings in Neurosurgery in July 2005.  A month previously, Terry Long, a 45 year old Pittsburgh Steelers player committed suicide.  Dr Omalu opined that the cause may have been brain damage in line with his studies.

68.    In a pattern that echoes that of the NFL's original response to the discovery of CTE, WWE attempted to discredit these studies.

69.    Dr. Joseph Maroon, NFL Pittsburgh Steelers team doctor for twenty-five years and now WWE's chief doctor, attacked this conclusion.  Dr. Maroon reportedly told the Pittsburgh Post-Gazette that Dr. Omalu's conclusion that NFL Player Terry Long's suicide may have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon stated "to go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative…"

70.    WWE stated on ESPN, "[w]hile this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for [professional wrestlers] Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring…WWE has been asking to see the research and tests results in the case of Mr. Benoit for years

20

and has not been supplied with them."[23] Yet, Chris Benoit spurred "a more comprehensive look at [WWE's] talent".[24]

71.     WWE's request to examine the research and tests was feigned, as Dr. Omalu reported that "Dr. Maroon was there with us and he was shown all our research information, slides, and specimens- on Chris Benoit and all the athletes' brains we studied."[25]

72.     In November of 2006, Dr. Omalu published a second paper after finding CTE in the brain of former Steelers' player Terry Long. He linked Webster and Long's career to the brain damage: "Our first and second cases both had long careers without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement."

73.     He further commented to ESPN after studying WWE former wrestler Andrew Martin's brain: "People wondered if Mike Webster was an isolated event . . . and then came Terry Long and Andre Waters. When we announced our findings about Chris [Benoit], some in the media said it was 'roid rage. We said at the time the real finding was that repeated head trauma was the cause. With Andrew Martin as the second case, the WWE and the sport in general have to ask themselves, 'Is this a trend?' The science tells us that jumping off 10-foot ladders and slamming people with tables and chairs is simply bad for the brain."[26]

---

[23] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.
[24] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque, 58, available at http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.
[25] Irwin, Muchnick, Concussion, Inc., p. 67 (ECW Press, 2015).
[26] See ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.

74.     In a joint interview for the 2007 CNN documentary Death Grip: Inside Pro Wrestling, WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon attacked Dr. Omalu and Dr. Bailes's finding that Benoit had suffered from CTE. This was part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had.

75.     The NFL engaged in a protracted debate about the mounting evidence linking head trauma to CTE and the severe, long-term resulting injuries.  After attempting to discredit the research of doctors examining brain tissue of deceased NFL players, the NFL acknowledged its mistake in July of 2010 and began noticing players that concussions "may lead to problems with memory and communication, personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever."

76.     Through its actions of failing to properly assess, diagnose, and treat wrestlers such as Plaintiffs who suffered concussion and sub-concussive injuries during their scripted performances and who showed clear signs of concussion, sub-concussive injury and CTE symptoms, evidence WWE's refusal and ongoing, continued refusal to properly inform and provide necessary medical care to the Plaintiffs throughout their WWE careers despite this wealth of information uniquely at WWE's disposal.

77.     WWE created its "Wellness Program" in 2006, and selected Dr. Maroon as its architect, despite his involvement in public efforts to discredit Dr. Omalu's research. An attorney for WWE has been publicly credited with establishing the

"medical-testing program to protect wrestlers' health."[27]  That attorney has stated that the untimely death of popular wrestler Eddie Guerrero in November of 2005 "was the catalyst to the program that [WWE] now ha[s] in place."[28] That attorney retained by WWE recommended that WWE employ Dr. Joseph Maroon to set the program up.[29]

78.    WWE's chief doctor, Dr. Joseph Maroon, has been involved in prior concussion and head trauma related cover ups, including attempts to discredit research related to CTE.[30]

79.    The WWE Wellness policy advised; "WWE implemented its Talent Wellness Program on February 27, 2006... Since its implementation the Wellness Program has been refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals."[31]

80.    The Wellness Program uses a concussion diagnostic system which a "study of studies" in 2012 revealed may increase the risk of long term damage because of its error rate.[32]

81.    The Wellness Program also reaches out to former wrestlers to offer support for drug and alcohol abuse, but these contacts fail to advise former wrestlers, including Plaintiffs, about head injuries.

---

[27] Deitch, "Heavyweight Champions." Pittsburgh City Paper (December 2, 2010) available at http://www.pghcitypaper.com/gyrobase/Content?oid=oid%3A88609.
[28] *Id.*
[29] *Id.*
[30] *See* http://concussioninc.net/?p=9617.
[31] *See* Corporate WWE.com, http://corporate.wwe.com/wellness/talent-wellness-summary, last accessed February 13, 2015.
[32] *See* http://m.espn.go.com/general/story?storyId=8297794&src=desktop&wjb.

82.   WWE has stated that it has "the finest monitoring program in American Sports," thereby admitting the undertaking by WWE to monitor its wrestler's health and safety, and establishing its duty to provide full and accurate information to its wrestlers.

83.   WWE's Wellness Program served to deceive Plaintiffs by providing a false sense of security and assurance that their health and safety were being adequately monitored, both in the ring and as former wrestlers.  The Wellness Program, by purporting to protect Plaintiffs, merely led them into not seeking adequate treatment or otherwise protecting their health.

84.   By concealing known risks and downplaying the injuries suffered during matches, and by prematurely clearing wrestlers who needed recuperation time, WWE denied Plaintiffs the opportunity to recover from head injuries, to seek appropriate medical treatment, and to monitor themselves for long term brain damage.

85.   In reliance on both misleading statements issued by WWE attempting to downplay the severity of concussion and sub-concussive injuries, as well as WWE's actions in failing to properly assess, diagnose, and treat concussion and sub-concussive injuries, Plaintiffs have failed to take actions which otherwise could have mitigated their injuries, both during and after their wrestling careers.

V.   WWE Had a Duty to Plaintiffs and Breached That Duty

86.   WWE, as organizer and purveyor of professional wrestling in which head trauma is a regular and repeated occurrence, had a duty to act in the best interest of its wrestlers' health and safety – including to keep wrestlers informed of the

neurological risks associated with head injuries suffered while wrestling for WWE. WWE had superior knowledge and access to information, and should have disclosed that information to Plaintiffs and not concealed such information.

87.    Stephanie Levesque described the scene of a typical performance in her Congressional testimony as follows:

> "The referee has an IFB, which is a hearing device.  And the referee is wired to what is called guerilla position...And then the referee, however, does still have communication with the people at that position, at that entry point, that are hidden from the camera.  So the referee, for example, if they need to cut the match short, we can tell the referee, cut the match short.  If it looks as though someone is hurt, we ask, is so and so okay? The referee goes over – and this is, you know, very inside – but the referee goes over and either asks the performer verbally, are you okay, and he will either get a response; or if someone's unconscious, you know clearly he will end the match.  If a person is okay, he gives a signal.... Because we know in our business what is meant to happen and what isn't meant to happen."[33]

88.    Surprisingly, after such a detailed description of what would happen if someone was hurt, when asked whether referees had ended a match due to injury, Ms. Levesque responded "I can't think of an instance off the top of my head, but I am sure that there are." *Id.* at 110.

89.    By virtue of its employment of medical staff and provision of treatment to Plaintiffs, WWE assumed a duty to conduct itself reasonably and to provide these services with reasonable care. WWE hired medical personnel whose stated purpose was to monitor and assess the wrestlers inside and outside of the ring. Plaintiffs reasonably relied on these medical personnel in determining whether

---

[33] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 108-110 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf (emphasis added).

they should return to the ring and continue fighting or practicing or had suffered serious injury necessitating further medical treatment.

90.     WWE's doctors and medical personnel failed to properly monitor, diagnose, and treat Plaintiffs before, during, and after the wrestling matches, in some cases allowing them to return to the ring despite "wooziness"—a sign of brain trauma.

91.     Despite WWE's clear recognition its wrestlers suffered concussions, when asked during her Congressional testimony whether a wrestler had been diagnosed with a concussion, Ms. Levesque responded, "That I am aware of, no.  There was a doctor who issued a warning to us, you know, that this person could develop a concussion but currently didn't have signs of it, and that person never wound up developing one."[34]  This is just one of countless examples of WWE's undermining and hiding the injuries its wrestlers routinely suffer from and which have resulted in Plaintiffs' inability to recognize, understand, and receive treatment for the traumatic brain injuries suffered as a result of WWE's negligent and fraudulent conduct.

92.     WWE undertakes to train all wrestlers including those against whom Plaintiffs wrestled, and therefore WWE had a duty to do so with reasonable care. In fact, the training provided was inadequate and unreasonable, causing Plaintiffs harm.

93.     Upon information and belief, WWE regularly collected and continues to collect wrestler injury reports, including during Plaintiffs' careers with WWE,

---

[34] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 114 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf (emphasis added).

becoming a repository of substantial concussion and other head injury information and conducting exclusive analysis.  Plaintiffs, lacking this information, had to rely on WWE to inform them of their health and safety information relating to their wrestling careers with WWE.

94.   By issuing statements and engaging in programs to address Plaintiffs' health, WWE had a duty to ensure that these statements were complete and were not misleading or fraudulent.  Instead, WWE provided incomplete information to Plaintiffs, who reasonably relied on it to their detriment.

95.   Contrary to its assertions concerning safety, WWE demanded Plaintiffs perform acts which it knew or should have known cannot be performed safely.  For example, the use of dangerous weapons like steel chairs against the head by wrestlers cannot be done safely.

96.   WWE's employees meet with the wrestlers both before and after the performances, observing, instructing, interacting, engaging, and questioning the wrestlers, including Plaintiffs.   In her Congressional testimony, Stephanie Levesque admitted as much:

> "The producer meets with the talent after the match.  The producer who is responsible for that match meets with the talent after the match and goes through what worked, what didn't work, *what were you feeling out there*, you know, all those kinds of things – or congratulating them if they had a great match."[35]

97.   Upon information and belief, WWE has as recently as 2015 implemented the use of helmets during training at WWE training facilities.  Helmets had previously

---

[35] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 43-44 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf (emphasis added).

not been worn by wrestlers at the WWE training facilities and were not worn by the Plaintiffs when they trained and wrestled with WWE.



Captured from embedded video on WWE's WWE Tough Enough Facebook page, *available at* https://www.facebook.com/WWEtoughenough/videos/vb.181273445231240/101203 7205488189/?type=2&theater, posted on June 11, 2015.

VI.    **Facts Concerning the Named Plaintiffs**

   A.  **Russ McCullough**

98.    **Plaintiff Russ McCullough who stands at 6 feet 10 inches 350 pounds, is a resident of Corona, Riverside County, California. Russ McCullough wrestled for the WWE from 1999 to 2001. His stage name was "Big Russ McCullough."**

99.    **McCullough often wrestled several times per week, did not have adequate time to rest between matches, and was encouraged to wrestle while injured. In one instance was forced to wrestle with a torn knee ligament while on crutches.**

100.   **As a wrestler for WWE, McCullough suffered numerous injuries to the upper body, neck and head during his career. Specifically, Russ McCullough was**

knocked completely unconscious after being struck by the back of a metal chair in Cincinnati. After he was knocked unconscious the beating continued and he was struck in the head with a metal chair more than 15 times without intervention by WWE staff. McCullough sought medical treatment on his own and the head injury was diagnosed as a severe concussion. He reported the event to WWE who responded: "Not our problem."

101.   In addition, Russ McCullough participated in numerous matches where he suffered sub-concussive or concussive blows, yet WWE, its personnel, and medical staff did not intervene or take measures to prevent further injury. Indeed, WWE failed to provide or recommend adequate medical care, even when he was showing unmistakable signs of serious injury.

102.   As a direct result of his participation in WWE events, McCullough has suffered physical changes placing him at a higher risk of future harm for neurological problems.

103.   Today Russ McCullough, suffers from numerous symptoms including but not limited to headaches, severe migraines memory loss, and severe depression and panic attacks which have required over forty emergency room visits since he retired.

### B. Ryan Sakoda

104.   Plaintiff Ryan Sakoda born in Tokyo Japan and is a resident of West Hollywood, Los Angeles County, California. Ryan Sakoda wrestled for the WWE from 2003 to 2004.

105.   Ryan Sakoda states that the WWE operated by "intimidation and abuse" and disregarded his health and safety, and that of others, to a degree that has left him traumatized. He states he and others were "forced to wrestle injured or you lost your job," and that concussions were not discussed or treated.

106.   While wrestling for the WWE in 2003, he was knocked unconscious in a match by a Super Kick. The course of treatment recommended to Ryan by the WWE medical staff and trainer was "not to go to sleep," suggesting that if he did, he may bleed to death and die. He stayed awake that night.

107.   Sakoda states that the WWE treated him "as less than a human being," and "with total indifference as to whether he lived or died," let alone any concern for his head injuries or health.

108.   Today Ryan Sakoda, suffers from numerous symptoms including but not limited to headaches, severe migraines, memory loss and severe depression.

C. Matt Wiese

109.   Plaintiff Matt Wiese, is a resident of Los Angeles, Los Angeles County, California. Matt Wiese wrestled for the WWE from 2003 to 2005. His stage name was "Luther Reigns."

110.   Matt Wiese wrestled regularly in SmackDown! in both singles and tag team events where he faced the Undertaker, Eddie Guerreo and Rey Mysterio. During these and other events, he sustained numerous untreated head injuries. Matt Wiese observed that there was a "code of silence" related to injuries, and that the WWE fostered an environment of fear. During one WWE event, Matt Wiese was punched so hard in the head by Big Show, another WWE wrestler that he had visible injuries

to his head and he vomited following the event. WWE staff took no steps to intervene in the event and WWE medical staff did nothing to treat Matt Wiese following the incident.

111.   Matt Wiese suffers from massive sustained headaches and suffered a stroke.

112.   Today Matt Wiese suffers from post-concussion symptoms including but not limited to severe fatigue, dizziness, and severe short and long term memory loss. Mr. Wiese is unable to remember much of his life.

## CLASS ACTION ALLEGATIONS

113.   Plaintiff seeks to bring this case as a class action, under Federal Rule of Civil Procedure 23, on behalf of himself and all others similarly situated. The proposed Class is defined as:

> All persons who currently or formerly wrestled for World Wide Entertainment or a predecessor company, and who reside in the United States.
>
> Excluded from the Class are Defendant, any entity in which Defendant have a controlling interest or which has a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

114.   Numerosity. The number of persons who are members of the Class described above are so numerous – at minimum, 500 – that joinder of all members in one action is impracticable.

115.   Commonality and predominance. Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained of herein were generally applicable to the entire Class. These legal and factual questions include, but are not limited to:

a.   Whether Defendant breached its duty to warn the Class about brain trauma and/ or concussions;

b.   Whether Defendant's breaches caused injuries to the Class;

c.   Whether Defendant concealed and misrepresented vital health related information from the Class, medical professionals and its fans;

d.   Whether Defendant knew that the Class sustained brain trauma or concussions;

e.   Whether Defendant's rule-making decisions and investigations promoted player safety;

f.   Whether Defendant promoted violent behaviors which led to the injuries alleged herein;

g.   Whether the Class is entitled to restitution and other equitable relief requested herein; and

h.   Whether the Class suffered damages and are entitled to damages.

116.   **Typicality.** Plaintiffs' claims are typical of the Class's claims. Plaintiffs and the Class sustained similar injuries as a direct result of the actions of the WWE and suffered serious head injuries.

117.   **Adequacy.** Plaintiffs will fairly and adequately represent and protect the Class's interests. Plaintiffs have no interests antagonistic to the Class. Plaintiffs have retained counsel with experience prosecuting consumer classaction and complex litigation claims.

118.   **Superiority.** A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be

encountered in the management of this action that would preclude its maintenance as a class action.

119.    This action is appropriate. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards of conduct for Defendant under the laws alleged herein.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATION

120.    Plaintiffs reasonably relied on WWE's statements to inform them about safety and health. As a direct result of statements and conduct (and omissions) outlined above, Plaintiffs were lulled into inaction by WWE.

121.    Plaintiffs reasonably acted on what WWE omitted – that concussions and sub-concussive hits are serious and result in permanent disability and brain trauma, and that returning to wrestling before being properly evaluated, treated and cleared to wrestle could result in enormous risks of permanent damage, especially in returning to wrestle immediately after taking brutal hits to the head.

122.    Knowing its wrestlers were being exposed to concussion risks and were routinely concussed and suffering traumatic brain injuries, WWE was obligated to disclose, but failed to disclose,  vital information to Plaintiffs based upon its special relationship with its wrestlers, assumed duty of care, voluntary medical care it provided to its wrestlers, voluntary undertaking of the Wellness Program, trust and authority it maintained with and over its wrestlers, and its superior knowledge about the causes, frequency, severity and proper treatment of concussions, mild traumatic brain injuries and other sub-concussive injuries and head trauma.  WWE

affirmatively concealed facts, and continues to conceal facts, which prevented Plaintiffs from discovering their claims.

123.   Years or decades may pass before a concussion produces symptoms of post-concussion syndrome.  Being difficult to detect for a non-medical personnel or individual trained to detect the symptoms of a traumatic brain injury, as well as how they affect mental fitness, a reasonable person may not understand how they were injured.  In fact, Plaintiffs were not aware of the harm they suffered as a result of WWE's negligent and fraudulent conduct, nor were they aware of the causal link between WWE's breach of duty and their injuries.  Plaintiffs had no knowledge of the link between repeated head injuries, concussions, and the long-term effects, including latent neurological injuries and TBIs as a result of the active concealment of information by WWE regarding the link between head trauma and neurological injuries.

124.   To the extent that it is applicable, the statute of limitations is tolled because of Defendants' fraudulent concealment of the dangers and adverse effects of head injuries, the risks associated with wrestling, the injuries suffered while wrestling, and the negligent medical care provided to Plaintiffs through WWE.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FRAUDULENT CONCEALMENT

125.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein.

126.    Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and

related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long-term neurological damage.

127.   WWE took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma, in particular the heightened risk created by returning to the ring before making a proper recovery from head injuries.

128.   WWE has voluntarily and repeatedly made material misrepresentations to its WWE wrestlers, former WWE wrestlers, including Plaintiffs and the putative class, and the public at large that there was no evidence linking, or insufficient evidence linking, multiple concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

129.   WWE concealed material facts and information with the intent to deceive and defraud.  WWE's conduct left Plaintiffs without the necessary knowledge to make informed decisions to plan for his own future and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

130.   WWE knew that Plaintiffs and the putative class would rely on the inaccurate information provided by WWE.

131.   Plaintiffs and the putative class relied on this inaccurate information during and after his career with WWE.

132.   Defendant had a duty to disclose and warn Plaintiffs about the actual knowledge it maintained about such injuries and the true nature of the risks posed to wrestlers.  Despite the overwhelming medical literature available to WWE agents and personnel tasked with promoting the health and safety of  WWE wrestlers and

Plaintiffs, WWE routinely failed to inform Plaintiffs of the symptoms of concussions and the dangers of concussions and sub-concussive injuries, and the resulting long-term injuries.  In part resulting from WWE's culture of silence regarding head trauma and concussion and sub-concussive injuries, WWE failed to properly assess and diagnose concussions and sub-concussive injuries in their wrestlers, preventing Plaintiffs from receiving necessary medical treatment and preventing Plaintiffs from receiving necessary information to make an informed decision regarding his health and safety.

133.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiffs' health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiffs so he could take the necessary medical action and make informed decisions regarding his health and safety.

134.   WWE was silent when confronted with a duty to disclose such pertinent, material information, and the fact that some information is publicly available does not foreclose a finding of concealment.

135.   The Plaintiffs and the putative class reasonably and actually relied on Defendant's representations, omissions and concealments given WWE's knowledge and expertise, and given the special relationship existing between WWE and its wrestlers, such as Plaintiffs and the class.  Such reliance may also be imputed, based upon the materiality of WWE's wrongful conduct.  Accordingly, the Plaintiffs and the putative class justifiably relied to his detriment on WWE's less

than candid conduct and guidance, such conduct intended to deter Plaintiffs' and the putative class's inquiry into the matter, in part by permeating a culture of silence with regard to injuries and head trauma.

136.  As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiffs and the putative class have been damaged, as alleged herein.

**SECOND CAUSE OF ACTION**
**FRAUD BY OMISSION / FAILURE TO WARN**

137.  Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein.

138.  WWE had a duty to Plaintiffs and the putative class to promptly disclose and speak the full truth regarding the health risks caused by concussions and sub-concussive blows to the head.  This duty arose because WWE had superior special knowledge of material medical information that WWE wrestlers did not have access to, nor was readily available to them, WWE communicated with WWE wrestlers and the public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE, resulting in incomplete, partial, or ambiguous—and therefore misleading— statements regarding safety and head injuries.

139.  WWE breached that duty by fraudulently failing to disclose material information to Plaintiff regarding the risks of head injuries suffered due to WWE's activities, including, the link between concussions and brain injury, resulting negative effects and cognition-impairing conditions, and their increased risk of

CTE, the need for additional diagnostic testing, and the increased risk of other irreversible brain damage and neuro-cognitive impairment.

140. Plaintiffs justifiably relied on WWE's fraudulent omissions to their detriment.

141. WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiffs' health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiffs and the putative class so they could take the necessary medical action and make informed decisions regarding their health and safety.

142. Had Plaintiffs and the putative class been aware of such information they would have ensured that they received appropriate medical treatment and ensured that they were completely healthy and their brains had completely healed before returning to the ring.

143. As a direct and proximate result of WWE's fraud by omission and failure to warn, Plaintiffs and the putative class suffered serious injuries, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

144. Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein.

145. WWE negligently and/or recklessly misrepresented, omitted, and concealed from Plaintiffs and the putative class material facts concerning repetitive head impacts and related injuries.

146.    WWE materially misrepresented the risks faced by Plaintiffs and the putative class related to head, back, and spine injuries through misleading public statements, requiring Plaintiffs and the class to fight through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

147.    WWE negligently failed to disclose material information to its wrestlers regarding the link between head injuries suffered while wrestling for WWE and the resulting negative effects and cognition-impairing conditions.

148.    WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Plaintiffs and the putative class faced serious health problems if they returned to the ring too soon after sustaining a concussion.

149.    WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiffs' and the putative class's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiffs and the class so he could take the necessary medical action and make informed decisions regarding his health and safety.

150.    WWE and/or the WWE's "Talent Wellness Program," had no reasonable ground for believing its statements to be true.

151.    WWE intended to induce Plaintiffs and the putative class's reliance on these misrepresentations.

152.   Plaintiffs and the putative class justifiably and reasonably relied on WWE's negligent misrepresentations to their detriment when wrestling for WWE, relying on what WWE said and failed to say to WWE wrestlers about concussions and other head injuries.

153.   Plaintiffs and the putative class acted and failed to act in reliance on these statements to their detriment.

154.   WWE failed to act with reasonable care by negligently failing to disclose material information to Plaintiffs and the putative class regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

155.   Defendant had a duty to disclose to Plaintiffs and the putative class any actual knowledge it possessed conceding such injuries and any associated risks it was aware of.

156.   As a direct and proximate result of these misrepresentations, omissions, and concealments, Plaintiffs and the putative class have been damaged, as alleged herein.

157.   As a direct and proximate result of WWE's negligent misrepresentations, Plaintiffs and the putative class have suffered and continues to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, and emotional distress. Plaintiffs and the putative class seek the full measure of damages allowed under applicable law.

158.   Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud, and/or malice entitling Plaintiffs and the putative class to an award of punitive damages to the extent allowed by law.

## FOURTH CAUSE OF ACTION
## FRAUDULENT DECEIT

159.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein.

160.   WWE materially misrepresented the risks faced by Plaintiffs and the putative class related to head injuries.  WWE, through misleading and deceptive public statements and published articles, and downplayed known long-term health risks of concussions to Plaintiffs and the putative class.

161.   WWE made these misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Plaintiffs and the putative class faced serious health problems if forced to return to the ring too soon after suffering brain trauma.

162.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiffs' and the putative class's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiffs and the class so they could take the necessary medical action and make informed decisions regarding their health and safety.

163.   WWE intended to induce Plaintiffs' and the putative class's reliance on the misrepresentations and to induce them to alter their position related to injury and risk.

164.   Plaintiffs and the putative class justifiably and reasonably relied on these misrepresentations when wrestling for WWE.  Had they known the true risks to their health, they would have acted to protect their health.

165.   WWE's misrepresentations were substantial factors leading to Plaintiffs' and the putative class's injuries.

166.   As a direct and proximate result of WWE's misrepresentations, Plaintiffs and the putative class experienced pain and suffering and suffered serious permanent and debilitating injuries, including but not limited to neurological damage and CTE, which caused and/or contributed to the injuries described above, as well as emotional distress, pain and suffering, and economic and noneconomic damages.

### FIFTH CAUSE OF ACTION
### NEGLIGENCE

167.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein.

168.    WWE has a duty to Plaintiffs and the putative class, based in part on voluntarily assumptions of duties, regarding safety and head trauma.

169.   Yet, as previously outlined throughout this Complaint, WWE has failed to discharge this duty non-negligently.

170.   WWE had and continues to have a duty to exercise reasonable care in training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances.

171.   Defendant owed a duty to Plaintiffs and the putative class to exercise reasonable care in the safety and quality control of its wrestling matches.

172.   Defendant was aware, or reasonably should have been aware, that concussion injuries were prevalent in its events and posed great risk to its wrestlers, including Plaintiffs and the putative class.

173.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiffs' and the putative class's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiffs and the putative class so they could take the necessary medical action and make informed decisions regarding their health and safety.

174.   As a direct and proximate result of the Defendant's negligent acts and omissions as previously stated, Plaintiffs and the putative class suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, and have an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from their severe injuries.

175.   As a direct and proximate cause of the foregoing, Plaintiffs and the putative class have suffered and will continue to suffer damages and economic loss described fully above, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## MEDICAL MONITORING

176.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein.

43

177.   Repetitive blows to the head during WWE events have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

178.   The effects of WWE's negligence and the circumstances it subjected wrestlers to may lead to latent physical changes which ultimately cause significant neurological impairment.

179.   Wrestling exposed Plaintiffs and the putative class to hazardous conditions and out-of-the ordinary risks of harm. Repetitive head traumas to which the Plaintiffs and the class have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiffs' and the putative class's exposure to the risks of harm as described above would have been materially lower.

180.   Accordingly, the repetitive head impacts sustained by wrestlers exposed Plaintiffs and the putative class to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which Plaintiffs and the putative class have sustained repetitive head impacts exposed them to substantive hazards.

181.   Plaintiffs and the putative  class suffered latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-

44

cognitive disability, decline, personality change, mood swings, rage, and related disorders. These are present injuries that increase the risk of future harm.

182.   WWE wrestlers were and continue to be:

   a.  Exposed to greater than normal background levels;

   b.  Of a proven hazardous substance, condition, activity, or event;

   c.  Which was caused by the Defendant's willful, wanton, reckless or negligent acts; and,

   d.  As a proximate result of the exposure, Plaintiffs and the putative class have significantly increased risk of contracting serious latent diseases.

   e.  Further, a monitoring procedure exists that makes the early detection of the disease possible; and,

   f.  Such a monitoring regime is different from that normally recommended in the absence of the exposure or activities at issue here;

   g.  All of which is reasonably necessary according to contemporary scientific principles.

183.   By monitoring and testing the affected brains and bodies of the Plaintiffs and the putative class, it can be determined whether they have suffered additional injuries.

184.   By monitoring and testing Plaintiffs and the putative class, the risk that Plaintiffs and the class will suffer further long term injuries, disease, and losses will be significantly reduced.

185.   The medical monitoring regime must include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse

health effects associated with WWE wrestling. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiffs and the putative class suffered as a result of participating in WWE events.

186.   Accordingly, Defendant should be required to establish a medical monitoring program that, among other things:

   a.   Establishes a trust fund, in an amount to be determined, to pay for the medical monitoring of Plaintiffs and the putative class, as frequently as determined to be medically necessary, as well as to pay to develop and research other methods by which the risk of those affected can be reduced; and

   b.   Provides information to treating physicians to aid them in detecting such injuries.

187.   Plaintiffs and the putative class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of concussions and repeated sub-concussive blows. Without a Court-approved medical monitoring program as described herein, Plaintiffs and the putative class will continue to face unreasonable risks alleged herein.

188.   Plaintiffs and the putative class are entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1.      Compensatory and punitive damages;

2.      Costs;

3.      Interest as allowed by law; and,

4.      For such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

DATE: September 21, 2015

Respectfully submitted,

/s/ William M. Bloss
William M. Bloss
Federal Bar No: CT01008
Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: 203-336-4421
Facsimile: 203-368-3244

Konstantine W. Kyros
KYROS LAW OFFICES
17 Miles Rd.
Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com

Charles J. LaDuca
Brendan Thompson
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
charles@cuneolaw.com
brendant@cuneolaw.com

**Robert K. Shelquist**
**Scott Moriarity**
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
**100 Washington Ave., S., Suite 2200**
**Minneapolis, MN 55401-2179**
**Telephone: (612) 339-6900**
**Facsimile: (612) 339-0981**
**rkshelquist@locklaw.com**
**samoriarity@locklaw.com**

**Harris L. Pogust, Esquire**
**Pogust Braslow & Millrood, LLC**
**Eight Tower Bridge**
**161 Washington Street Suite 940**
**Conshohocken, PA 19428**
**Telephone: (610) 941-4204**
**Facsimile: (610) 941-4245**
**hpogust@pbmattorneys.com**

**Erica Mirabella**
**CT Fed. Bar #: phv07432**
**MIRABELLA LAW LLC**
**132 Boylston Street, 5th Floor**
**Boston, MA 02116**
**Telephone: 617-580-8270**
**Facsimile: 617-593-1905**
**Erica@mirabellaLLC.com**

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day September, 2015, a copy of foregoing Motion to Dismiss and accompanying Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ William M. Bloss*
William M. Bloss