UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **RUSS McCULLOUGH, a/k/a "Big Russ McCullough," RYAN SAKODA, and MATTHEW R. WIESE, a/k/a "Luther Reigns," individually and on behalf of all others similarly situated,**<br><br>      **Plaintiffs,**<br><br>**vs.**<br><br>**WORLD WRESTLING ENTERTAINMENT, INC.,**<br><br>      **Defendant.** | **LEAD CONSOLIDATED CASE NO. 3:15-cv-01074-VLB**<br><br><br><br><br><br>**NOVEMBER 16, 2015** |

---

## WWE'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE WINDHAM ACTION

---

Thomas D. Goldberg (ct04386)
Jonathan B. Tropp (ct11295)
Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone:  (860) 275-0100
Facsimile:  (860) 275-0343
Email:  tgoldberg@daypitney.com
Email:  jbtropp@daypitney.com
Email:  jmueller@daypitney.com

Jerry S. McDevitt (pro hac vice)
Terry Budd (pro hac vice)
Curtis B. Krasik (pro hac vice)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222
Phone: (412) 355-6500
Facsimile:  (412) 355-6501
Email:  jerry.mcdevitt@klgates.com
Email:  terry.budd@klgates.com
Email:  curtis.krasik@klgates.com

*Counsel for*
*World Wresting Entertainment, Inc.*

<u>**TABLE OF CONTENTS**</u>

**Page**

I.      **INTRODUCTION** ..................................................................................... **1**

II.     **FACTS ESTABLISHING A CASE OR CONTROVERSY** ..................................... **9**

III.    **ARGUMENT** ....................................................................................... **25**

    **A.**      **There is a Case or Controversy As to Whether Any Tort Claims by the Defendants Alleging Personal Injuries, Including TBIs, Are Time-Barred** ..................................................................................... **25**

    **B.**      **Defendants' Argument Aimed at the Court's Discretion is Meritless and Does Not Address the Proper Standard** ....................................... **37**

    **C.**      **WWE is Not Seeking a Declaration Against an Unnamed Class of Wrestlers** ............................................................................. **42**

    **D.**      **No Part of the Complaint Should be Stricken.** ................................... **43**

IV.     **CONCLUSION** ..................................................................................... **44**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
    134 S. Ct. 568 (2013) ................................................. 35

*Ballmer v. Babbitt*, 926 F. Supp. 575 (S.D. W. Va. 1996) ........................................... 33

*Barry v. Donnelly*, 781 F.2d 1040 (4th Cir. 1986) ......................................... 32

*BASF Crop. v. Symington*, 50 F.3d 555 (8th Cir. 1995) ............................................. 42

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) .................................... 32, 40

*Bilodeau v. Vlack*, No. 07-CV-1178(JCH),
    2009 WL 1505571 (D. Conn. May 20, 2009) .......................................... 27

*Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir. 1969) .......... 6, 29, 38

*City of New Britain v. Law Eng'g & Envtl. Servs., Inc.*,
    Civil Action No. 3:10-CV-31(JCH), 2012 WL 124597
    (D. Conn. Jan. 17, 2012) ................................................. 7, 31

*Collum v. Chapin*, 40 Conn. App. 449, 671 A.2d 1329 (1996) ...................................... 8

*Converse v. General Motors Corp.*, 893 F.2d 513 (2d Cir. 1990) ............................... 8

*Cortlandt Street Recovery Corp. v. Hellas Telecomms.*,
    790 F.3d 411 (2d Cir. 2015) ................................................. 9

*Credle-Brown v. Conn.*, 502 F. Supp. 2d 292 (D. Conn. 2007) ............................ 26-27

*D2L v. Blackboard, Inc.*, 671 F. Supp. 2d 768 (D. Md. 2009) ...................................... 29

*Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372 (D. Conn. 2007) .................................... 30

*Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357 (2d Cir. 2003) .......................... 37, 38

*Enoxy Coal, Inc. v. United Mine Workers of Am. 1974 Benefit Plan &
    Trust*, 879 F.2d 862 (4th Cir. 1989) ....................................... 41

*Ernst & Young v. Matsumoto*, 14 F.3d 1380 (9th Cir. 1994) ...................................... 32

*Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188 (D. Conn. 2007) ................... 7, 31

*Golden v. Zwickler*, 394 U.S. 103 (1969) ...................................................... 28

*Hanes Corp. v. Milland*, 531 F.2d 585 (D.C. Cir. 1976) ................................ 41

*Hoelzer v. City of Stamford*, 933 F.2d 1131 (2d Cir. 1991)......................... 32

*ICOS Vision Sys. Corp., N.V. v. Scanner Techs. Corp.*,
    699 F. Supp. 2d 664 (S.D.N.Y. 2010) ............................................... 6-7, 29

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
    925 F.2d 556 (2d Cir. 1991) ..................................................... 6, 28, 30, 40

*LaBow v. Rubin*, 95 Conn. App. 454, 897 A.2d 136 (2006) ..................... 7, 8

*Makarova v. U.S.*, 201 F.3d 110 (2d Cir. 2000) ........................................... 9

*Medtronic, Inc. v. Shope*, 135 F. Supp. 2d 988 (D. Minn. 2001)........................... 32-33

*Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897 (Fed. Cir. 2008) ........... 30-31

*Neuhaus v. DeCholnoky*, 280 Conn. 190, 905 A.2d 1135 (2006) .............................. 31

*PharmaNet, Inc. v. DataSci Ltd. Liab. Co.*, Civ. No. 08-2965 (GEB),
    2009 WL 396180 (D. N.J. Feb. 17, 2009)................................................... 31

*Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993)........................................ 37

*Shell Oil Co. v. Hickman*, 716 F. Supp. 931 (W.D. Va. 1989)............................. *passim*

*Slekis v. Nat'l R.R. Passenger Corp.*,
    56 F. Supp. 2d 202 (D. Conn. 1999).................................................... 7, 27

*Stephens v. Norwalk Hosp.*, 162 F. Supp. 2d 36 (D. Conn. 2001) .................. 8, 31-32

*Stuart & Sons, L.P. v. Curtis Pub. Co.*,
    456 F. Supp. 2d 336 (D. Conn. 2006)....................................................... 27

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
    752 F.3d 239 (2d Cir. 2014) ....................................................................... 9

*Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967)................................................. 37

*Transsaero, Inc. v. LaFueiza Aerea Boliviana*,
    162 F.3d 724 (2d Cir. 1998) ..................................................................... 27

*Veoh Networks, Inc. v. UMG Recordings*,
    522 F. Supp. 2d 1265 (S.D. Cal. 2007)..................................................... 42

iii

***Wyeth v. Wolfe***, Civil Action No. 08-0754,
    2008 WL 3984076 (E.D. Pa. Aug. 28, 2008) .......................................................... 33

***Zubulake v. UBS Warburg LLC***, 230 F.R.D. 212 (S.D.N.Y. 2003) .............................. 30

World Wrestling Entertainment, Inc. ("WWE") respectfully submits this opposition to Defendants' motion to dismiss (McCullough Dkt. 72) the declaratory judgment action styled *World Wrestling Entertainment, Inc. v. Windham, et al.*, Case No. 3:15-CV-00994 (the "DJ Action" or "Windham Action").

## I.    INTRODUCTION

WWE filed this DJ Action amidst a barratrous scheme orchestrated by Konstantine Kyros ("Kyros"), a Massachusetts attorney who describes himself on his website as a "pioneer in online legal services."  *See* Affidavit of Curtis Krasik ("Krasik Aff."), Ex. 1.  Beginning in 2014, Kyros began using the internet to foment litigation against WWE by former performers similar to the well-publicized class action suit against the National Football League for alleged traumatic brain injuries ("TBI claims").  *See* Windham Dkt. 1 at ¶ 8.  In doing so, Kyros made and continues to make representations suggesting that he was personally responsible for obtaining a lucrative settlement of such claims for NFL players. His website states "Kyros Law represented over 100 former NFL players in a lawsuit that settled for over $760 million against the NFL over long term health problems they suffered from sustaining head injuries during their careers."  *See* Krasik Aff., Ex. 2.  As set forth herein, these representations are grotesquely misleading if not outright false, yet are serving to fuel the overall scheme to subject WWE to vexatious litigation over stale and fraudulent claims which are otherwise subject to repose under Connecticut law.  Indeed, in close proximity to the representations about his claimed role in the NFL litigation on his website,

Kyros claims he is representing "dozens" of former WWE performers in what he describes as the "WWE Concussion Injury Litigation."[1] *Id.*

The barratrous plan is being aided, assisted, and fueled by a few disgruntled former wrestlers who performed decades ago, enlisted in Kyros' scheme, and who now present claims that have been time-barred for many years, sometimes decades.  The first to respond to Kyros' internet solicitation scheme was a person who performed briefly for WWE in his wrestling career, and not after 1988 — William Albert Haynes III a/k/a "Billy Jack Haynes."  Kyros and four other law firms enlisted by him for the litigation campaign filed a purported class action suit in Oregon on October 23, 2014 despite the fact Haynes' claims were time-barred prior to the turn of the century.  Since then, Haynes and another former performer he recruited, Robert Windham, a defendant here, have openly stated they are looking for people with "axe[s] to grind," and that the goal is to put WWE out of business and obtain union-style benefits for themselves and those who participate in the scheme.  *See* Krasik Aff., Exs. 4-6.  In their efforts to recruit others, they have parroted the same highly misleading theme created by

---

[1]  To date, Kyros has filed suit on behalf of eight named plaintiffs, not dozens. Unless his website is false, he must plan on litigating the claims of at least 16 other people in order to represent "dozens" in such "Litigation."  If true, his own website belies the argument that there is no case or controversy regarding suits by others.  Despite the bold claims suggesting that Kyros Law is directly responsible for obtaining hundreds of millions of dollars for its clients, the website lists only 2 lawyers, Kyros and another lawyer said to lead a Securities Arbitration practice group out of an office in Naples, Florida.  Elsewhere on the website Kyros states that "our lawyers" maintain contact with many firms "for whom we often act as co-counsel on actions that Kyros Law originates, develops cases and <u>locates</u> <u>plaintiffs.</u>"  Krasik Aff., Ex. 3 (emphasis added).

2

Kyros' internet representations — that he was personally responsible for the NFL agreeing to settle with its players for over a billion dollars.  They have publicly identified other former performers who have supposedly agreed to join the litigation campaign including the named defendants here, and at other times spoke of unidentified persons who have supposedly also agreed to join the litigation.

Kyros has threatened WWE with additional claims on behalf of the four named defendants and has publicly expressed the intention to file as many suits as possible against WWE, brazenly proclaiming that the sheer number of suits could dictate an outcome.  He has appeared in media interviews proclaiming that he can win a case against WWE "if every wrestler who believes that they'd been harmed by the WWE right now decided to file a lawsuit against the WWE, this would surely decide I think an outcome."[2]  *See* Krasik Aff., Ex. 7 at 8.  In a similar vein, current internet solicitations of Kyros state "[i]f you are a former WWE wrestler this is the time to act to help.  The more wrestlers that step up the stronger our case & more pressure we can put on the WWE. . . ."  *See* Krasik Aff., Ex. 8.

---

[2] Attempting to discredit the notion that such statements and actions are evidence of an actual case or controversy and intent to sue on behalf of the named defendants and John Doe defendants, Kyros now cavalierly dismisses his own admissions as mere "media puffery" that is "of the kind most accurately viewed in advertising claims, and which fail to rise to the level of actual case or controversy."  McCullough Dkt. 72-1 at 15.

Hoping to achieve that goal, the solicitations of his disgruntled former performers allude to various benefits they suggest will be obtained from joining into no-risk lawsuits against WWE, with the constant theme being that Kyros was the lawyer who obtained a billion dollar settlement from the NFL, an assertion with no known basis in fact.  Plaintiff Haynes in his solicitations to others claims he has the same attorneys that beat the NFL for $1.2 Billion; that they hope to put WWE out of business, and it was time for "Vince" to go.  *See* Krasik Aff., Ex. 5. Haynes has posted various illiterate rants on social media identifying those allegedly joining the lawsuit, alluding to the various claims being made in a "multi-million dollar lawsuit" and claiming "my attorneys represented and defeated the NFL."  *See* Krasik Aff., Ex. 9.  In other illiterate posts, Haynes admits that he was a drug addict for the last 27 years and speaks of his lawsuit as his "cause to have a union in the pro wrestling industry, vacation, time off injured, a 5 day/night work week, buy[ing] stock in company . . . ."  *See* Krasik Aff., Ex. 6. All this even though Haynes has not been affiliated in any way with WWE in over 27 years.  Haynes himself has specifically stated that the four named defendants in this case have signed on to sue WWE in one of his solicitations.  *See* Krasik Aff., Ex. 5.  Defendant Windham has posted comments on social media stating "Heads up any wrestlers who feel they have a[n] axe to grind with Vince concussions !!  Join us in class action suite [sic]!!  For help, pension injury help!! Leave number bill lycros [sic] [attorney] who won NFL suit 1.5 billion !![3]  *See*

---

[3]  The "Vince" and "VKM" mentioned in Haynes' and Windham's solicitations

4

Krasik Aff., Ex. 4.  Likewise, Plaintiff Vito LoGrasso has openly solicited others to call Kyros and join the litigation campaign, alluding to it being a chance to share in a billion dollars divided up like in the [NFL] case.  *See* Krasik Aff., Ex. 12.  In the campaign to foment litigation, people are being signed up to sue WWE despite never even being injured while performing for WWE, let alone sustaining a TBI.  One former performer, Del Wilkes, recently posted on social media that he had been solicited to and did join in the litigation but was withdrawing from it because he had never even been injured while performing for WWE.  *See* Krasik Aff., Ex. 13.

This lawyer-driven litigation campaign has sought to avoid the application of Connecticut repose policies by relentless and now adjudicated forum shopping.  As discussed herein, the pattern of adjudicated forum shopping by Attorney Kyros has resulted to date in five separate orders from five different

---

refer to Vince McMahon, the Chairman and driving force of WWE.  These are examples of the many pieces of evidence showing that the people being solicited to join the lawsuit campaign have peculiar beliefs about the purpose of litigation and have been led to believe that Kyros is the lawyer who obtained a billion dollar settlement from the NFL.  This case is not about pensions or benefits and Kyros had no role whatsoever in negotiating a settlement with the NFL, contrary to suggestions he has made and the evident beliefs of people who have enlisted in his litigation campaign.  At least one report questioned the ethics of Kyros' NFL claims.  *See* Krasik Aff., Ex. 10.  Following review of that report, the law firm which represented the NFL was contacted to determine if Kyros had any known role in that litigation or its settlement.  According to the NFL's law firm, they never even heard of him.  *See* Krasik Aff., Ex. 11.  WWE raised this issue in a Rule 11 motion served upon Kyros in the *Haynes* case.  Thereafter, but long after the NFL settlement had been negotiated, Kyros entered an appearance on behalf of certain NFL players on March 31, 2015.  *See* Notice of Appearance by Konstantine Kyros, *In re National Football League Players' Concussion Injury Litigation*, 2:12-md-02323-AB (Dkt. No. 6499).

federal jurisdictions transferring duplicative lawsuits to this Court.  Despite the documented pattern of duplicative litigation, repeated assertion of time-barred claims, solicitation of additional clients to bring such suits, and explicit threats of more litigation made by Kyros and his plaintiffs/recruiters looking for people with axes to grind or sharing the goal of putting WWE out of business, the motion to dismiss incredibly argues that there is no actual case or controversy. McCullough Dkt. 72-1 at ¶ 2.  Such a decision, if rendered, would permit Kyros to continue his relentless forum shopping aimed at defeating this Court's jurisdiction which <u>five</u> federal courts have acted to remedy to date.

In reality, the motion to dismiss is a meritless and dilatory motion.  The Second Circuit has made clear that it is reversible error for a court not to entertain a declaratory judgment action if <u>either</u> of two criteria are met: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969); *see also Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) (reiterating the rule that if either of the two criteria stated above can be satisfied the matter should be heard).  Here, both criteria are satisfied.  Indeed, the Second Circuit has specifically held that a "history of fierce litigation between parties strongly evidences a justiciable controversy."  *Broadview Chem. Corp.*, 417 F.2d at 1000; *see also ICOS Vision Sys. Corp., N.V. v. Scanner Techs. Corp.*,

6

699 F. Supp. 2d 664, 668 (S.D.N.Y. 2010) ("When considering whether declaratory judgment jurisdiction exists, courts have given great weight to whether there has been prior litigation between the parties or brought by the defendant . . . and whether the defendant has made a direct or implied threat to assert its rights against the declaratory judgment plaintiff."); *Shell Oil Co. v. Hickman*, 716 F. Supp. 931, 934 (W.D. Va. 1989) (prior history of litigation and forum shopping in other jurisdictions to avoid Virginia's limitations deemed sufficient case and controversy as to whether claims were time-barred in Virginia).

The DJ Action seeks a declaration that the tort claims by the named defendants, and the "dozens" of John Doe defendants Kyros claims to represent, are time-barred under Connecticut law.  Windham Dkt. 1 at ¶ 1.  It is well established that "[u]nder Connecticut law, statutes of limitations are considered procedural and thus Connecticut's own statutes of limitations will usually govern claims asserted in federal diversity cases in Connecticut."  *Slekis v. Nat'l R.R. Passenger Corp.*, 56 F. Supp. 2d 202, 204 (D. Conn. 1999).  Specifically, all common law tort claims are subject to the three year repose limitation which begins to run "at the moment" the act or omission complained of occurs, not the date plaintiff first discovered an injury.  *Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 203 (D. Conn. 2007); *City of New Britain v. Law Eng'g & Envtl. Servs., Inc.*, Civil Action No. 3:10-CV-31(JCH), 2012 WL 124597, at *8 (D. Conn. Jan. 17, 2012); *LaBow v. Rubin*, 95 Conn. App. 454, 468-69 (2006).  The only material facts to consider in determining whether an action is time-barred are the

date of the wrongful conduct alleged in the complaint and the date the action was commenced.  *See LaBow*, 95 Conn. App. at 468; *Collum v. Chapin*, 40 Conn. App. 449, 451 (1996).  Under Connecticut law, an action is commenced for statute of limitations purposes when the complaint is served on the defendant.  *See Converse v. General Motors Corp.,* 893 F.2d 513, 514-16 (2d Cir. 1990); *Stephens v. Norwalk Hosp.*, 162 F. Supp. 2d 36, 38-40 (D. Conn. 2001).  Thus, the only facts relevant are when any of the defendants here last performed for WWE and thus could have received a brain injury.  If that date is three years ago or more, and it is with respect to all the named defendants in this DJ Action, tort claims are time-barred.  Such a declaration both settles the legal relationships and avoids the uncertainty and insecurity of future or other proceedings involving such claims and claimants.  Moreover, this Court has held that "Connecticut has a <u>strong interest</u> in . . . protecting its courts and defendants within its borders from stale claims," stating that the "purpose of the statute of limitations . . . is to protect defendants from stale claims, and Connecticut has a <u>significantly greater interest</u> in application of that rule to defendant domiciliaries" than another state has in applying longer tolling rules to Connecticut defendants.  *Stephens*, 162 F. Supp. 2d at 43-44 (emphasis added).

For these reasons, and those which follow, it is respectfully submitted that the Court should deny the motion to dismiss.

## II.   <u>FACTS ESTABLISHING A CASE OR CONTROVERSY</u>[4]

In 2014, Konstantine Kyros began an internet marketing scheme which continues to this date to recruit former WWE performers to sue WWE in a class action case in the hopes of replicating the result of TBI cases which had been filed against the NFL.  Windham Dkt. 1 at ¶ 24.  On October 23, 2014, Kyros and four other law firms he had enlisted in the effort filed the first suit against WWE on behalf of Billy Jack Haynes, who last performed for WWE in 1988.[5]  Haynes Dkt. 1 at ¶ 28.  In the decades since his brief stint with WWE ended decades ago, Haynes has engaged in a well-known pattern of bizarre behavior evidencing a deep rooted hatred and animus towards WWE.  He has put out videos with

---

[4]  Defendants' motion to dismiss is asserted pursuant to Rule 12(b)(1) and Rule 12(b)(6).  When subject matter jurisdiction is challenged under Rule 12(b)(1), the court is to take all uncontroverted facts in the complaint as true and draw all reasonable inferences in favor of the party asserting subject matter jurisdiction.  *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  The court also has the power and the obligation to decide any contested issues of jurisdictional facts by reference to evidence outside the pleadings, such as affidavits.  *Id.*; *see also Cortlandt Street Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 417 (2d Cir. 2015); *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000).  Defendants have not submitted any affidavits or actual evidence to controvert any fact alleged in the complaint and the unsubstantiated assertions of "fact" in their memorandum of law should be summarily rejected.  WWE has submitted actual evidence with this opposition.  Thus, on the foregoing standards, all the allegations of the complaint are deemed true, and the Court can and should consider the evidence submitted by WWE and draw all reasonable inferences in favor of subject matter jurisdiction.  Defendants' Rule 12(b)(6) argument is nothing more than a rehash of their argument that there is no case or controversy and hence no subject matter jurisdiction under Rule 12(b)(1).  It, therefore, fails for the same reasons.

[5]  Aside from Kyros' law office, lawyers and firms from Maryland, Oregon, New York, Minneapolis and Boston are listed as co-counsel on the *Haynes* original complaint.

assorted rants about WWE, and later admitted in another video release that he was high on methadone at the time and had been diagnosed as a sociopath.  His bizarre rants are the subject of caustic reviews by internet followers.  *See* The Name on the Marquee: RF Video – Conspiracy Theory With Billy Jack Haynes, 411Mania, http://411mania.com/wrestling/the-name-on-the-marquee-rf-video-conspiracy-theory-with-billy-jack-haynes/ (last visited Nov. 5, 2015).  In 2013, news reports indicated he had been hospitalized in critical condition for an aortic aneurysm.  The same public reports indicated Haynes had been jumped and beaten by drug kingpins because he skimmed money while acting as a drug mule transporting cocaine.  *See* Krasik Aff., Ex. 14.  Haynes has admitted to being a drug addict for several decades.  *See* Krasik Aff., Ex. 6.  Despite these well-known facts, Kyros selected Haynes to purportedly represent a class of all former and current wrestlers for WWE in the United States.[6]

It was the first in what would become a recurrent pattern of voluminous, incendiary complaints rife with Rule 11 violations designed to camouflage that time-barred and otherwise defective claims were being presented.  Windham Dkt. 1 at ¶ 34.  It was filed in complete disregard of Oregon's ten year statute of repose which operated to bar all of Haynes' claims not later than 1998, and Connecticut's statutes of limitation/repose which barred the claims by 1991.  The lawsuit was

_____

[6]  As has been true for virtually all of the former performers who have sued or threatened to sue via Kyros, Haynes spent very little of his wrestling career performing for WWE and spent most of it elsewhere, including for his own promotion.  *See* Krasik Aff., Ex. 15.

designed to and did draw media attention and attract potential clients to join the litigation siege being planned against WWE.  Indeed, after filing it, Kyros evidently arranged with Google such that anybody who typed in "WWE concussion lawsuit" or "Billy Jack Haynes" as search terms were immediately directed to his law firm and a link on how to join the lawsuit.  *See* Krasik Aff., Ex. 16.  Kyros and one of the other lawyers he recruited to join in the *Haynes* suit, Charles LaDuca then did a media tour to tout the lawsuit to drum up business.  Kyros stated that Haynes was "a good candidate to get this suit [against WWE] rolling" and that it was "sort of our opening case."[7]  *See* Krasik Aff., Ex. 17.  For his part, LaDuca expressed the hope on NPR that Haynes would open the "floodgates" of litigation against WWE.  *See* Krasik Aff., Ex. 18.

Under the local rules in Oregon, WWE was required to and did consult with the five firms representing Haynes before filing dispositive motions and a Rule 11 motion then being considered for the violations in the original *Haynes* complaint.  On December 22, 2014, such a conference was held.  When the five firms representing Haynes were asked if they were aware of Oregon's repose statute, and how they intended to get around it, neither Kyros nor any of the multiple lawyers could even respond.  *See* Krasik Aff., Ex. 19 at ¶ 4.[8]  Instead, Kyros and

---

[7]  In that *Haynes* was brought as a putative class action on behalf of all former and current wrestlers, it could not be properly viewed as an "opening case."  One who brings such a case, if legitimate, does not thereafter file multiple duplicative lawsuits in other jurisdictions.

[8]  WWE's Motion for Sanctions in the Haynes Action was served on Kyros and his associates but has not yet been filed with the Court.

his associates requested until January 30, 2015 to file an amended complaint.

Having gained an extension of time until January 30, 2015 to amend *Haynes* after learning of the repose problems with their much publicized "opening case," Kyros then utilized that time to devise and file the *LoGrasso* suit in the Eastern District of Pennsylvania.  That suit, filed on January 16, 2015, no doubt hoped to capture the same venue as had produced the NFL settlement, and was on behalf of a purported class identical in every respect to the purported class in *Haynes.*  Windham Dkt. 1 at ¶ 38; *see also* LoGrasso Dkt. 1 at ¶ 134.  The local counsel in the Oregon case was replaced with a Pennsylvania firm, and the complaint included the same lawyers who had signed on to the *Haynes* complaint.  This second purported class action had the exact same class definition as did *Haynes*.  On January 30, 2015, Kyos and his affiliates then amended the *Haynes* case, but did not abandon time-barred claims (which all were) and did not abandon the class action allegations.  Thus, as of the end of January 2015, Kyros and his affiliates had lodged two purported class actions with identical allegations on behalf of an identical purported class of all current and former performers residing in the United States.

Like the *Haynes* case, the *LoGrasso* complaint was chock full of scandalous and false allegations, and LoGrasso's claim was time-barred if brought in Connecticut where he was legally obligated to bring it.  Windham Dkt. 1 ¶ 39. The complaint included false allegations that WWE had discouraged Singleton from seeking appropriate medical help for an alleged concussion and

forcing him back into the ring before he had healed, when in fact WWE had him treated by at least six different physicians including two neurologists and never did clear him to wrestle.  *Id.*; *see also* LoGrasso Dkt. 1 at ¶ 123.  Once again, Kyros' cohort, Charles LaDuca took to the media to tout the false allegations.  On January 22, 2015, LaDuca reiterated the false claims about Singleton while touting the lawsuit on National Public Radio, stating "[t]he WWE discouraged them from seeking additional appropriate medical help, for example, seeing a neurologist."  *See* Krasik Aff., Ex. 18.  As it had to do in *Haynes*, WWE repeatedly put Kyros, LaDuca and other counsel on notice of the falsities of the complaint in the *LoGrasso* suit, and notified all counsel that forum selection clauses required the case to be heard in Connecticut.  *See* Krasik Aff., Ex. 20.

After filing two purported class actions on behalf of all former WWE performers, Kyros launched another salvo in his legal assault and forum shopping.  Thus, on February 18, 2015, Kyros, Mirabella and his Tennessee counsel, Christopher Gilreath, filed an even more incendiary and prolix complaint in Tennessee on behalf of the widow of a deceased former performer, Nelson Frazier, even though Mr. Frazier was a member of the class of the two purported class actions already filed by Kyros, et al.  Windham Dkt. 1 at ¶ 52.  Far from being the short and plain set of allegations designed to show an entitlement to relief required by the Rules, the *Frazier* complaint is a rambling 123 page document containing 529 paragraphs designed to conceal, not reveal, the lack of entitlement to relief.  *See* Frazier Dkt. 1.  According to Kyros' own complaint,

Frazier last performed for WWE on March 11, 2008, and died of a massive heart attack on February 18, 2014. *Id.* at ¶¶ 406, 511.  In essence, this lawsuit attempts to allege that Frazier had CTE, which cannot be proven because no autopsy was performed.[9]  *See* Krasik Aff., Ex. 21.  Evidently obtaining the dates and places of every match Frazier performed in from internet sources, Kyros included 49 pages which listed every single match Frazier appeared in followed by the stock allegation that in every single match "he sustained head and other long-term injuries by participating in this event."  Frazier Dkt. 1 at ¶¶ 117- 406.  The first such match is alleged to have been on June 14, 1993 and the last match was alleged to have occurred on March 11, 2008.  Based on injury allegations beginning in 1993 and ending in 2008, Frazier's claims include ante-mortem injuries, all of which are plainly time-barred under Connecticut's three-year repose statute.  As to the post-mortem claim for wrongful death, which is also time-barred, one must read 120 pages into the complaint to ascertain the basis for suing WWE because Mr. Frazier died of a heart attack six years after last performing for WWE.  Thus, buried in paragraph 516, some 120 pages into the

---

[9]  In every lawsuit filed by Kyros <u>except Frazier</u>, he has alleged that CTE can only be diagnosed by direct tissue examination of the brain.  *See* Haynes Dkt. 1 at ¶ 35; Haynes Dkt. 43 at ¶ 32; LoGrasso Dkt. 1 at ¶ 33; LoGrasso Dkt. 67 at ¶ 30; LoGrasso Dkt. 72 at ¶ 33; McCullough Dkt. 1 at ¶ 38; McCullough Dkt. 73 at ¶ 34; James Dkt. 1 ¶ 37.  It is telling that such an allegation was omitted from the *Frazier* Complaint since Frazier's brain was not subjected to the required autopsy, which in reality requires dissection of the brain and preparation of tissue slides utilizing specialized staining techniques.  In fact, the official records of Tennessee establish that no autopsy at all was done.  *See* Krasik Aff., Ex. 21. Thus, the CTE allegation in *Frazier* was made despite Kyros knowing it can never be proven.

Complaint, it is alleged that Frazier's "worse-off state of well being as evidenced by the above complications [(such as scar tissue, head trauma, CTE)] . . . more likely than not attributed (sic) to Nelson Frazier's heart attack and his inability to survive the heart attack."  Frazier Dkt. 1 at ¶ 516.  Once again, these claims were filed in Tennessee in violation of forum selection clauses requiring the claims to be litigated in Connecticut in the hope of escaping Connecticut's repose statute.  *See* Windham Dkt. 1 at ¶ 52.

On March 23, 2015, the federal court in the Eastern District of Pennsylvania ordered that the *LoGrasso* case be transferred to the federal court in Connecticut after finding that Kyros et al. had "agree[d] the District of Connecticut is an appropriate forum."  LoGrasso Dkt. 11 at 1 n.1.  Despite agreeing to the transfer of the *LoGrasso* case due to the forum selection clauses of both plaintiffs in that case, Kyros, Gilreath and Mirabella refused to transfer the *Frazier* case to Connecticut even though Frazier had signed multiple contracts with the same forum selection clauses requiring that suit be brought in Connecticut.

By April of 2015, if not earlier, Kyros and his affiliated counsel were well aware that Connecticut's statutes of limitations and repose were even more stringent than Oregon's and stood as a real impediment to the plan to place WWE under siege by people with axes to grind working in concert with class action lawyers looking for a payday.  Thus, on April 9, 2015, Kyros resorted to outright subterfuge and deceit in his campaign to vex WWE with stale claims barred by the laws of Connecticut.  On April 9, 2015, he caused a third purported class

15

action lawsuit for alleged TBIs to be filed by three different former performers in what he hoped was a more favorable forum — the Central District of California. Windham Dkt. 1 at ¶ 63. Unlike all other suits, neither Kyros' name nor the names of any of the lawyers who had signed on to the *Haynes* and *LoGrasso* suits appeared on the California complaint to conceal the fact they had filed two identical class action suits in other jurisdictions, and were reneging on their agreement to litigate an identical class action case in Connecticut. *Id.* at ¶ 65. Like all other suits, the claims presented in the California suit were all subject to forum selection clauses requiring the claims to be litigated in Connecticut. *Id.* at ¶ 63. As before, all the claims were barred by Connecticut's limitations and repose in that none of the three plaintiffs had performed for WWE later than 2005. *Id.* at ¶¶ 64, 71. Like the other suits, the complaint was full of incendiary and false allegations but extremely short on specifics regarding the three plaintiffs. Although 46 pages long and containing some 223 paragraphs, there were six brief paragraphs unique to plaintiff McCullough (McCullough Dkt. 1 at ¶¶ 130-135); five brief paragraphs for plaintiff Sakoda (*Id.* at ¶¶ 136-140); and four for plaintiff Wiese (*Id.* at ¶¶ 141-144).

In phone calls and emails, WWE counsel repeatedly asked Kyros and the other lawyers involved in the litigation against WWE to confirm their involvement in the filing of the California case and that Kyros had been retained by those three plaintiffs. *See* Krasik Aff., Ex. 22. Despite liberally alleging that WWE had engaged in fraudulent concealment in every case without the particulars required

by law, neither Kyros nor any of the other lawyers would reveal that they were deliberately concealing their involvement in the duplicative California case from both that Court and opposing counsel in order to facilitate the attempt to circumvent their agreement to litigate such claims in federal court in Connecticut.

In furtherance of the plan to defeat this Court's jurisdiction to hear the class action case they had agreed to have transferred to Connecticut, Kyros and affiliated counsel then filed an amended complaint in the *LoGrasso* case which abandoned the class action allegations on May 22, 2015.  LoGrasso Dkt. 67. Evidencing the legal gamesmanship, it is noteworthy that they did so only two days after LoGrasso utilized social media to solicit others to call Kyros and join his alleged class action case, all of which was dutifully fed to the media to report. *See* Krasik Aff., Exs. 12, 23.

Amidst these acts of concealment and manipulation designed to defeat this Court's jurisdiction and avoid repose, Kyros then mailed letters to WWE headquarters in Connecticut on June 2, 2015 on behalf of the four named defendants in this case, claiming all were "allegedly injured as a result of WWE's negligent and fraudulent conduct."  Windham Dkt. 1-1 through 1-4.  Even prior to Kyros' letter, on May 7, 2015 Haynes had already announced that Defendant Oreal Perras a/k/a "Ivan Koloff" and Defendant Robert Windham a/k/a "Black Jack Mulligan" had joined the class action lawsuit, and did the same for Defendant Thomas Billington a/k/a "Dynamite Kid" on April 30, 2015.  *See* Krasik Aff., Ex. 6. Kyros' multiple letters of June 2, 2015 explicitly referenced "possible litigation;"

17

instructed WWE to refrain from communicating with his clients, and demanded

that WWE preserve the kinds and types of evidence that would be sought in

personal injury litigation, including medical records.  Windham Dkt. 1-1 though 1-

4.  The threatened claims made on behalf of the four former performers were even

more stale than LoGrasso's, Frazier's or the three plaintiffs in the California case.

Six days after Kyros sent his letters to WWE headquarters, the Court held a

status conference in the *LoGrasso* case, which at that time was the only one of

the cases filed by Kyros that had been transferred to Connecticut.  The Court was

advised of the status of other litigation commenced by Kyros and his co-counsel

and WWE's efforts to enforce the forum selection clauses in those other matters.

The significant pleading problems in the *LoGrasso* case were also reviewed with

the Court, including that the first amended complaint in that case falsely alleged

that WWE's alleged tortious activities had caused the death of the plaintiffs in

that case, when both were alive.  In response, Mr. Kyros dismissed the false

allegations as nothing more than scrivener error, and then noted that Nelson

Frazier died at age 43.  LoGrasso Dkt. 73 at 61-62.  The Court then stated:

> Does the complaint reference Mr. [Frazier]?  Are you going to
> reference every wrestler that's dead in your complaint?  I don't — I
> don't follow that.  You really need to read and get a better grip on the
> pleading standard in the next week and file an amended complaint.

*Id.*  at 62.

In response, Kyros did not advise the Court that he had done just that

already in the *Frazier* complaint wrongly filed in Tennessee, where he listed

various wrestlers who had passed away, some decades ago, from a myriad of

18

causes and had actually included pictures of them.  Frazier Dkt. 1 at ¶¶ 30-69.

Likewise, he did not discuss that he planned to do the same thing in yet another

case he intended to file in Texas weeks later, again in violation of a forum

selection clause.  The Court directed Kyros to file an amended complaint in

*LoGrasso* within a week which complied with both the Federal Rules and the

explicit directions given to Kyros by the Court.[10]  LoGrasso Dkt. 73 at 62.

During this time, Billy Jack Haynes continued his attempts to recruit others

to sue WWE, soliciting a former prominent performer known as Billy "Superstar"

Graham on June 23, 2015.  *See* Krasik Aff., Ex. 5.  Haynes' email to Graham first

apologized for being "pushy and angry."  Echoing Kyros' website

representations, Haynes claimed "I have the same attorneys that beat the NFL

union (sic) for $1.2 Billion."  He claimed that other wrongful death suits had been

filed with "many more on the way."  He claimed that 50 litigants had joined into

the class action effort, specifically naming each of the four named defendants in

this case by their ring names.  He stated that "we are going to put WWE out of

business" and that "it [is] time for Vince to go," an obvious reference to WWE's

Chairman — Vince McMahon.  *Id.*

On June 25, 2015, the Honorable Janice Stewart issued an opinion and

order transferring the *Haynes* case from Oregon to this Court in which she

specifically found that Kyros had been forum shopping.  Haynes Dkt. 59 at 8.  In a

---

[10]  As demonstrated in WWE's Motion to Dismiss the Second Amended Complaint
in LoGrasso, Kyros did not comply with the Court's order.  McCullough Dkt. 43.

19

passage which demonstrates the effects of Kyros' deliberate concealment of his involvement in the *McCullough* case, Magistrate Judge Stewart noted that WWE had not been able to confirm his role in the California class action but then took note of the similarities in the allegations in that case to other suits by Kyros.[11]  *Id.* In ordering the transfer, the Oregon court noted that many of the putative class members had forum selection clauses which dictated that the claims be litigated in federal court in Connecticut.[12]  *Id.* at 7.

The very next day, Kyros acted in disdain of the order and directives of two federal judges to continue his relentless quest to avoid Connecticut in order to present stale and fraudulent claims which would not be permitted under Connecticut's laws.  In disregard of Magistrate Stewart's finding that he was

---

[11]  Kyros' ruse of not acknowledging his involvement in the *McCullough* case continued even after that case was transferred to this Court on July 10, 2015. Kyros did not admit his role until August 6, 2015 when he responded to this Court's show cause order of July 23, 2015.  In that response, he recast the issue as being that WWE's counsel had "feigned indignation" to Kyros "for referring residents of California to a reputable and well-qualified California law firm" to "buttress . . . twisted argument[s] that because the lawyers in *Singleton, et al.* agreed to a transfer to Connecticut from Pennsylvania, entirely different counsel should agree to a transfer to Connecticut."  McCullough Dkt. 51 at 11.  On the amended complaint in the *McCullough* matter filed <u>after</u> Kyros made this disingenuous admission amidst his revisionist history, Kyros, together with the same lawyers on the *Haynes* and *LoGrasso* complaints are now listed as counsel. McCullough Dkt. 73.  The California firm that filed the suit is no longer listed as counsel and they have not entered an appearance.  These facts further confirm the deliberate concealment of the attempt to avoid the agreement to litigate the alleged class action in Connecticut made by all the lawyers involved in the *LoGrasso* case, and demonstrate the total pretext of suggesting that the California firm was "entirely different counsel" not acting at Kyros' direction.

[12]  Despite Kyros' objections to the forum shopping finding and request it be modified, the transfer order was affirmed in all respects without modifications on July 27, 2015.  Haynes Dkt. 66.

forum shopping and that forum selection clauses mandated that the claims be litigated in Connecticut, Kyros, Gilreath and Mirabella, together with a local Texas attorney, filed a 71 page complaint with 263 paragraphs in federal court in Texas regarding the death of a former performer, Matthew Osborne.  In disregard of the directives and admonitions of this Court at the June 8, 2015 status conference, the complaint listed and depicted various deceased wrestlers having nothing to do with the claims advanced about Osborne.  *See* James Dkt. 1 at ¶¶ 92-130.  The depiction of deceased wrestlers went as far back as 1993, and included dozens of people well outside applicable statutes of repose and limitation.

Mr. Osborne had also signed a contract with a forum selection clause, which Kyros and his affiliates again ignored in the most blatant forum shopping exercise of all since none of the plaintiffs even reside in Texas but instead in Pennsylvania.  *Id.* at ¶¶ 16-18.  As has been the case in every complaint filed to date, the Complaint makes false and incendiary allegations designed to camouflage the fraudulent nature of the time-barred claims being presented. Mr. Osborne had two short stints with WWE.  He performed for approximately a year from 1985-1986, and for approximately another year in 1992-1993.  Windham Dkt. 1 at ¶ 82.  After being terminated, he publicly admitted many years later that he had been terminated in 1993 by WWE due to a cocaine problem.  *See* Krasik Aff., Ex. 24.  He died of a drug overdose two decades after he last regularly performed for WWE.  Windham Dkt. at ¶ 86.

To conceal these core facts, the complaint falsely alleges that he performed for WWE for 22 years beginning in 1985 and ending in 2007, that unnamed WWE trainers and medical staff mistreated him during those two decades, and that he supposedly was exposed to WWE's wellness program which did not even begin until 2006.  James Dkt. 1 at ¶¶ 86, 153, 244.  This alleged but nonexistent exposure to the wellness program supposedly gave him a sense of security that WWE was somehow monitoring his health even when no longer affiliated with WWE.  *Id.* at ¶ 86.  The sensational and false nature of the allegations served their intended purpose of garnering publicity for Kyros' barratrous campaign.  Indeed, Texas papers reprinted the photographs of the deceased wrestlers set forth in the Complaint.  *See* Mother of Wrestler's Children Sues WWE, Claims It Concealed Head Trauma Risks, Houston Chronicle, [http://www.chron.com/news/houston-texas/texas/article/Mother-of-wrestler-s-children-sues-WWE-claims-it-6358266.php#photo-6164688](http://www.chron.com/news/houston-texas/texas/article/Mother-of-wrestler-s-children-sues-WWE-claims-it-6358266.php#photo-6164688) (last visited Nov. 5, 2015).[13]

On June 29, 2015, in an effort to protect this Court's jurisdiction, combat the relentless forum shopping then ongoing, and obtain relief from the pattern of suits making the kind of stale and fraudulent claims the Connecticut repose

---

[13]  Due to the constantly recurring pattern of making false allegations, ignoring the forum selection clauses, and ignoring this Court's directives at the June 8th conference, WWE served Kyros and the other counsel in *James* with a Rule 11 motion on July 17, 2015.  Kyros and his affiliates did nothing to correct the Rule 11 issues, and WWE filed that motion with the court on September 11, 2015 after the case was transferred to this Court.  *See* James Dkt. 35.

statutes are designed to protect against, WWE filed suit against the four former performers covered by Kyros' threatening letters of June 2, 2015.  None of those men had performed for WWE in this century.  The suit also named John Doe Defendants, defined to be any former performer who has signed a retainer agreement with Kyros but who has not performed for WWE within three years — the period of limitations/repose under Connecticut law.  Windham  Dkt. 1 at ¶ 7.

In a July 1, 2015 article in the *New York Times* reporting on the DJ Action filed by WWE, Kyros claimed that he had been retained by dozens of former performers and that he intended to argue that limitations did not apply to the claims.  Further evidencing the plan to bring additional suits against WWE on behalf of others, Kyros asserted that WWE was trying to prevent performers from having their day in court.  *See* Krasik Aff., Ex. 25.

On July 7, 2015, a former performer named Bill Anderson posted a statement on social media demonstrating that Haynes' recruitment efforts were continuing on behalf of Kyros.  *See* Krasik Aff., Ex. 26.  His posting noted that Haynes had instigated the lawsuit and had messaged him repeatedly and gotten angry because Anderson had not returned the call.  Anderson noted that he, and others, wanted no part of the lawsuit.

On July 23, 2015, this Court issued an order consolidating the *LoGrasso/Singleton* case, the *McCullough* case, and the *Windham* case, and issued a show cause order on Kyros as to why he should be permitted to continue to file cases in other jurisdictions.  McCullough Dkts. 41 & 42.  On

23

August 6, 2015, Kyros filed his response to the show cause order making clear his intention to continue to file lawsuits outside Connecticut if permitted. Oddly, Kyros accused WWE of not working with Plaintiffs' counsel in the interest of judicial economy, and choking out efforts at collegiality, by filing the *Windham* case. McCullough Dkt. 51 at 5. Kyros did not explain how his adjudicated forum shopping was in the interest of judicial economy, nor amplify on any efforts at collegiality in a campaign by him marked by incendiary and false allegations against WWE and its personnel while asserting stale and fraudulent claims.

Five days later, the federal court in Tennessee became the fourth federal judge to reject the efforts to avoid litigation in Connecticut, and transferred the *Frazier* case to this Court. Even then, Kyros, Gilreath and Mirabella refused to transfer the last remaining case — the *James* case in Texas — necessitating the expense of a reply brief by WWE. After WWE filed its reply brief, Kyros and his affiliates agreed to withdraw opposition to the transfer and the Texas federal court issued an order doing so on August 24, 2015. James Dkts. 25 & 26.

On September 21, 2015, Kyros moved to dismiss this case on the grounds that there is no case or controversy between WWE and the defendants. On the same day that Kyros filed this motion to dismiss he caused to be filed an amended complaint in the McCullough Action on behalf of "[a]ll persons who currently or formerly wrestled for World [Wrestling] Entertainment . . . and who reside in the United States." McCullough Dkt. 73 at ¶ 113. Of course, this putative class includes each of the named defendants and John Doe Defendants

in this case.  Thus, Kyros argues in this case that there is no case or controversy between WWE and any of these former performers while inconsistently asserting the existence of a case or controversy with respect to the claims in the McCullough amended complaint on behalf of a putative class including these very same individuals.  Kyros cannot have it both ways.

The parties held a Rule 26 conference pursuant to the Court's order of October 2, 2015 (McCullough Dkt. 78).  During that conference, which Kyros refused to participate in, LaDuca advised that the plaintiffs intend to amend their suits yet again, or to file new suits on behalf of former persons who did not have a contract with WWE.  These are the very John Does who they have refused to identify and which Kyros argues do not present a case or controversy.

III.   **ARGUMENT**

    A.   **There is a Case or Controversy As to Whether Any Tort Claims by the Defendants Alleging Personal Injuries, Including TBIs, Are Time-Barred**

The foregoing factual record sets forth a case or controversy sufficient to establish subject-matter jurisdiction to issue the requested declaratory judgment. This record leaves no doubt that Kyros has solicited former performers to sue; that he has done so repeatedly; and that he claims to represent dozens more with an avowed desire to file as many suits as he can to coerce a desired outcome. The record further demonstrates that there are repose issues in every suit to date, including any claims by the named defendants here.  Indeed, the issues raised by WWE as to limitation/repose in the DJ Action are identical to the issues

which have been raised, and will be raised, in every single TBI case now before the Court brought by Kyros and his co-counsel against WWE.  The arguments presented by defendants are red herrings which are not based on the actual facts, controlling law, or stated intentions of Kyros, and are made in the hope that this Court will dismiss and thereby facilitate a resumption of the forum shopping five federal courts have acted to curb by existing transfer orders.

Defendants argue that there is no actual case or controversy "because three of the four named Defendants do not have Booking Contracts restricting them to Connecticut law and forum, nor is there any evidence that the unnamed 'Various John Doe' parties have Booking Contracts restricting them to Connecticut law and forum."  McCullough Dkt. 72 at 1-2.  Aside from admitting that at least one of the named defendants __does__ have a forum selection clause, their argument entirely misses the point.  Regarding the Connecticut forum, none of the named defendants challenged this Court's personal jurisdiction over them and consequently any objection to personal jurisdiction has been waived.[14]  *See Credle-Brown v. Conn.*, 502 F.Supp.2d 292, 297 (D.  Conn. 2007) ("A party who fails to object to personal jurisdiction in the first of either his answer or motion to

---

[14]  In the initial draft of the Rule 26 report to the Court, counsel for the defendant-former wrestlers indicated that they had challenged personal jurisdiction over the named defendants in this case.  After seeing WWE's position that they had not done so, the defendant-former wrestlers' counsel attempted to restate their objection in the final version of the Rule 26 report filed with the Court, stating that the wrestlers "did not agree to any choice of law provision subjecting them to the personal jurisdiction of this Court."  McCullough Dkt. 85 at 7-8.  Plainly, the motion to dismiss cites Rule 12(b)(1), which is subject matter jurisdiction, not Rule 12(b)(2) which is personal jurisdiction.

dismiss has waived his objection"); *Transsaero, Inc. v. LaFueiza Aerea Boliviana*, 162 F.3d 724, 730 (2d Cir. 1998) (defendant must object to personal jurisdiction at the time he makes his first significant defensive move).  There being no challenge to personal jurisdiction, it is immaterial that certain of the named defendants supposedly did not agree to a forum selection clause; they are now before this Court and did not object to this Court's personal jurisdiction over them.

It is equally irrelevant that certain of the named defendants supposedly did not agree to the application of Connecticut law.  This case is before this Court based on diversity jurisdiction.  "[I]n Connecticut, the law of the forum state governs on matters of procedure."  *Bilodeau v. Vlack*, No. 07-CV-1178(JCH), 2009 WL 1505571, at *3 (D. Conn. May 20, 2009) (citations omitted).  It is well established that "[u]nder Connecticut law, statutes of limitations are considered procedural and thus Connecticut's own statutes of limitations will usually govern claims asserted in federal diversity cases in Connecticut."  *Slekis*, 56 F. Supp. 2d at 204; *see also Stuart & Sons, L.P. v. Curtis Pub. Co.*, 456 F. Supp. 2d 336, 343 (D. Conn. 2006) ("Under Connecticut's choice of law rules, if the underlying claim existed at common law, the statute of limitations is considered procedural.").  Thus, under Connecticut choice of law rules, this Court must apply Connecticut statutes of limitation/repose to all of the common law tort claims at issue.  Whether any of the defendants affirmatively "agreed" to the application of Connecticut law is of no moment.  Connecticut choice of law rules dictate that Connecticut statutes of limitations/repose will determine whether a defendant's

claims are time-barred.  As such, there is an indisputable case or controversy whether any of the defendants over whom this Court now has unquestioned personal jurisdiction has any tort claims for alleged TBIs against WWE that are not barred by Connecticut statutes of limitation and repose.

Once this red herring is set aside, the defendants make no serious attempt to demonstrate the lack of a case or controversy under the proper controlling standard.  "[T]he question in each case [in which a declaratory judgment is sought] is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Kidder, Peabody & Co.*, 925 F.2d at 562 (quoting *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)) (emphasis added).  More specifically, as noted at the outset, "[a] declaratory judgment action should be entertained when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. . . . It follows as a general corollary to this rule that if either of these objectives can be achieved the action should be entertained."  *Kidder, Peabody & Co.*, 925 F.2d at 562 (citations omitted).

The totality of the circumstances set forth above amply demonstrates a real and substantial case or controversy among the parties.  First, five different federal courts have now issued orders mandating that every single lawsuit filed

28

to date by Attorney Kyros is to be heard in Connecticut.  Those orders include three purported class actions, and two suits filed on behalf of deceased individuals.  Transfer orders have issued when the plaintiffs had forum selection clauses, and even in *Haynes* where none was signed by him.  There is, therefore, no issue as to whether this Court has jurisdiction over the TBI controversy fomented by Kyros and his recruiters.  As noted, a "history of fierce litigation between parties strongly evidences a justiciable controversy."  *Broadview Chem. Corp.*, 417 F.2d at 1000; *see also ICOS Vision Sys. Corp.,* 699 F. Supp. 2d at 668 ("When considering whether declaratory judgment jurisdiction exists, courts have given great weight to whether there has been prior litigation between the parties or brought by the defendant . . . and whether the defendant has made a direct or implied threat to assert its rights against the declaratory judgment plaintiff."); *D2L v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 777 (D. Md. 2009) ("Prior litigious conduct is one circumstance to be considered in assessing whether the totality of circumstances creates an actual controversy.") (citation omitted); *Shell Oil*, 716 F. Supp. at 934 ("[I]t is apparent that based on the existence of [other pending litigation] as well as the actions and representations of the defendants' counsel, the plaintiffs' fears of an impending suit . . . were real and immediate.").

Second, in the midst of Kyros' adjudicated forum shopping filing lawsuits against WWE in jurisdictions across the country, Kyros sent letters to WWE on behalf of the named defendants advising WWE of, among other things, (i) his representation of each named defendant; (ii) "possible litigation" against WWE

29

involving TBI claims and other torts; and (iii) WWE's purported duty to preserve
physical and electronic data supposedly arising "when you have reasonable
anticipation of litigation."  Based on Kyros' own representation, WWE was
supposed to anticipate litigation by each of the named defendants.  The Second
Circuit has found that such a threat of litigation establishes a case or controversy
for a declaratory judgment jurisdiction.  *See Kidder, Peabody & Co.*, 925 F.2d at
562.  Further, only the reasonable anticipation of litigation could give rise to the
purported duty to preserve data that Kyros claimed in his letters.  *See Doe v.
Norwalk Cmty. Coll.*, 248 F.R.D. 372, 377 (D. Conn. 2007) ("[T]he court finds that
the duty to preserve [evidence] certainly arose no later than . . . when [plaintiff's]
counsel sent the defendants a demand letter indicating [plaintiff's] intention to
sue [defendant]."); *see also Zubulake v. UBS Warburg LLC*, 230 F.R.D. 212, 217
(S.D.N.Y. 2003) ("The duty to preserve attached at the time that litigation was
reasonably anticipated.").  Moreover, given Kyros' public statements that he
represented dozens of former wrestlers and that "if every wrestler who believes
that they'd been harmed by the WWE right now decided to file a lawsuit against
the WWE, this would surely decide I think an outcome" (*See* Krasik Aff., Ex. 7), it
further is reasonable to assume that such other wrestlers who have retained
Kyros — i.e., the John Doe Defendants — intend to sue WWE.  *See Micron Tech.,
Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 901 (Fed. Cir. 2008) (finding declaratory
judgment jurisdiction based, in part, on the declaratory judgment defendant's
"recent public statements . . . [that] confirm its intent to continue an aggressive

litigation strategy"); *PharmaNet, Inc. v. DataSci Ltd. Liab. Co.*, Civ. No. 08-2965 (GEB), 2009 WL 396180, at *8 (D. N.J. Feb. 17, 2009) (finding declaratory judgment jurisdiction based, in part, on the declaratory judgment defendant's public statements announcing a "strategy to sue").  Indeed, there would be no other reason for them to have retained Kyros except to sue WWE — that is what he does and what he has promised to continue to do.

Third, Connecticut has strong statutes of limitations and repose which exist for the express purpose of preventing stale and fraudulent claims. *See Neuhaus v. DeCholnoky,* 280 Conn. 190, 206-07 (2006).  Under Connecticut law, it is well-established that the relevant date for repose purposes is <u>not</u> the date the plaintiff first sustains or manifests injury but is the date the tortious act or omission occurs; an action brought more than three years from the date of the act or omission is barred regardless of whether the plaintiff had not or even could not have discovered the nature of the injuries in that time period.  *Id.* at 201; s*ee also Estate of Axelrod*, 476 F. Supp. 2d at 203 (repose statute begins to run "at the moment the act or omission complained of occurs," not the date plaintiff first discovered an injury); *City of New Britain*, 2012 WL 124597, at *8 (repeating that repose statute runs "at the moment" the act or omission occurs and that the date of injury and date of plaintiff's discovery of the injury are irrelevant).

Fourth, this Court has expressly acknowledged that Connecticut has a greater interest in applying its statutes of repose to protect domestic domiciliaries than other states with longer limitations periods.  *See Stephens*, 162

31

F. Supp. 2d at 43.  The claims filed to date are textbook examples of the claims Connecticut law prohibits after three years, as would be any claims by the named and John Doe Defendants here.

Fifth, contrary to defendants' suggestion otherwise, there is no prohibition on presenting limitations/repose issues in declaratory judgment actions and courts routinely do so.  The Supreme Court has expressly ruled that the Declaratory Judgment Act permits "prospective defendants to sue to establish their nonliability" and that "any defenses, equitable or legal," can be raised in such an action.  *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959). Consistent with this principle, there are numerous decisions in the Second Circuit and elsewhere addressing both limitations and tolling issues raised by declaratory judgment actions.  *See Hoelzer v. City of Stamford*, 933 F.2d 1131, 1133 (2d Cir. 1991) (entertaining declaratory judgment action asserting that limitations had run on claim for return of artwork and ruling also on tolling doctrines); *Ernst & Young v. Matsumoto*, 14 F.3d 1380, 1383 (9th Cir. 1994) (entertaining declaratory judgment action that state and federal claims were time-barred and deciding that no tolling doctrine applied); *Barry v. Donnelly*, 781 F.2d 1040, 1041 (4th Cir. 1986) (deciding declaratory judgment as to whether defendant was time-barred and whether tolling doctrine of equitable estoppel applied under Virginia law); *Shell Oil Co.,* 716 F. Supp. at 933 (deciding that certain claims were time-barred under Virginia law where opposing counsel had prior history of attempting to circumvent jurisdiction); *Medtronic, Inc. v. Shope*, 135 F. Supp. 2d

32

988, 990 (D. Minn. 2001) (court granted summary judgment in declaratory judgment action that defendant's claim of entitlement to stock certificates was time-barred); *Ballmer v. Babbitt*, 926 F. Supp. 575, 577 (S.D. W. Va. 1996) (holding in declaratory judgment action that limitations precluded a claim for delinquent federal and state penalties); *Wyeth v. Wolfe*, Civil Action No. 08-0754, 2008 WL 3984076, at * 1 (E.D. Pa. Aug. 28, 2008) (granting summary judgment that claims of a doctor were time-barred in declaratory judgment action).

The *Shell Oil* case cited above is particularly pertinent. There, the counsel for the defendants in the declaratory judgment action had previously filed several other claims against Shell Oil over alleged exposure to toxic chemicals at a plant in Virginia. One case had been filed in Mississippi, even though most of the activities were in Virginia, to get the advantage of a six year limitation period in Mississippi instead of Virginia's two year period. Counsel for the Mississippi claimant then stipulated to have that case transferred to Virginia, just as Kyros and his co-counsel agreed to have the *LoGrasso* case transferred from Pennsylvania to Connecticut after wrongfully filing it in Pennsylvania. In *Shell Oil*, the same plaintiff's lawyer then threatened to bring yet another action in Mississippi on behalf of another claimant whose claim was barred under Virginia law. In this case, Kyros not only threatened to do so, but did file three other cases in other jurisdictions <u>after</u> agreeing to litigate the claims of a purported class of all former and current performers in Connecticut federal court. He further has sought out additional litigants and threatened to file additional cases

in other jurisdictions.  In language equally apt to this situation, the court in *Shell Oil* had no problem in finding that Shell Oil's declaratory judgment action presented a case or controversy, stating that it was "apparent . . . based on the existence of [the other] cases, as well as the actions and representations of the defendants' counsel, the plaintiffs' fears of an impending suit filed on behalf of [decedent] were real and immediate."  *Shell Oil Co.*, 716 F. Supp. at 934.  The court then granted summary judgment to Shell Oil on limitations grounds, just as WWE requests here.

Sixth, the "totality of the circumstances" includes not only the actions, statements and representations of defendants' lead counsel but also the actions and statements of those litigants he has recruited who in turn are soliciting others to sue.  Their avowed purpose of seeking to put WWE out of business and searching for people with axes to grind is plainly ample cause to assert an immediate case or controversy seeking to restore repose to these claims which had been the case for years, indeed decades, prior to Kyros' solicitation scheme. The following chart demonstrates that every claim actually made or specifically threatened upon behalf of the named defendants here has been time-barred except for the claim of plaintiff Singleton, which is defective for other reasons. [15]

---

[15]  Kyros and his co-counsel have no argument as to whether Connecticut limitations applies to all of the plaintiffs to date except possibly for Haynes.  WWE briefed that issue in its motion to dismiss *LoGrasso* (LoGrasso Dkt. 74-1) and the opposition brief did not contest whether Connecticut limitations/repose applied. In short, the Supreme Court has unanimously held that a transfer due to a forum selection clause does not carry with it the rule that the choice of law rules of the transferor state then apply.  To the contrary, the court ruled that the choice of law

| CLAIMANT | LATEST POSSIBLE DATE OF ACT OR OMISSION | LATEST DATE ON WHICH STATUTE OF REPOSE EXPIRED | DATE COMPLAINT WAS SERVED |
|---|---|---|---|
| Windham | 1987 | December 31, 1990 | July 9, 2015 |
| Haynes | 1988 | December 31, 1991 | October 28, 2014 |
| Billington | 1988 | December 31, 1991 | July 27, 2015 |
| Ware | 1999 | December 31, 2002 | July 8, 2015 |
| McCullough | 2001 | December 31, 2004 | April 22, 2015 |
| Sakoda | 2004 | December 31, 2007 | April 22, 2015 |
| Wiese | 2005 | December 31, 2008 | April 22, 2015 |
| LoGrasso | 2007 | December 31, 2010 | February 3, 2015 |
| Osborne | 2007[16] | December 31, 2010 | July 15, 2015 |
| Frazier | 2008 | December 31, 2011 | February 27, 2015 |

*See* Haynes Dkt. 43 at ¶¶ 16, 122; McCullough Dkt. 73 at ¶¶ 13-15, 98, 104, 109;

LoGrasso Dkt. 72 at ¶ 14; James Dkt. 1 at ¶ 1; Frazier Dkt 1-1 at ¶ 42; Windham

---

rules of the agreed upon forum apply.  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 582 (2013).  Kyros and his co-counsel did not contest such precepts when opposing dismissal in *LoGrasso,* thereby conceding that Connecticut limitations and repose applied to every other case currently in this Court which was transferred due to forum selection clauses.  Separately, WWE has briefed the Court on whether *Haynes* should also be decided under Connecticut law.  McCullough Dkt. 84.

[16]  Plaintiffs falsely allege in their Complaint that Osborne performed for WWE for over twenty years from 1985 to 2007.  *See* James Dkt. 1 ¶ 1-2.  As WWE demonstrated in its motion for sanctions, Osborne last regularly performed for WWE in 1993 and then made a one-time appearance for a few minutes at a special anniversary show in 2007.  *See* McCullough Dkt. 80-1 at 4, 26-29.

Dkt. 1 at ¶¶ 16-18.[17]  These are not claims at the margin of the applicable time limits for bringing suit.  Seven of the claims have been in repose for at least a decade, and five were time-barred before the turn of the century.

Accordingly, the totality of the circumstances demonstrates that Kyros, and at least Haynes, Windham and LoGrasso continue to recruit people to sue WWE despite these time limits.  Kyros has expressly and publicly announced his view that filing more claims and lawsuits will dictate an outcome.  This not so subtle attempt at imposing enormous financial costs on WWE to defend against claims entitled to repose is an obvious plan to coerce WWE to settle meritless and time-barred claims to avoid such costs.  In sum, the threat is real, imminent and ongoing, and WWE is entitled to seek relief from this Court to establish that time-barred claims are to remain in repose.[18]  WWE will be severely harmed if forced to continue to defend duplicative lawsuits in other jurisdictions instead of

---

[17]  One claimant, Oreal Perras, has the oldest of all of the claims asserted.  The available evidence indicates that Perras last performed for an entity known as Capitol Wrestling Corporation in 1983 and that any claims he may have are patently time-barred.  *See* Windham Dkt. 1 at ¶ 19.

[18]  Although defendants' opposition brief is divided into sections, there is no discernible difference in the arguments presented, and they fall into one of two categories.  The first portion appears to argue, in different ways, the same incorrect theme — that there is no case or controversy.  Thereafter, defendants appear to argue that the Court should exercise its discretion not to hear the case if there is a case or controversy.  The discretionary argument is addressed in the next section of this brief.

enjoying the protections of Connecticut's statutes designed to protect it from such tactics.[19]

### B. Defendants' Argument Aimed at the Court's Discretion is Meritless and Does Not Address the Proper Standard

In a last ditch attempt at convincing the Court not to hear the controversy WWE has raised by its DJ Action, the defendants advise the Court that it has discretion not to hear the case and is to consider five criteria in exercising its discretion, citing to *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357 (2d Cir. 2003). McCullough Dkt. 72-1 at 23-24.  In actuality, the Second Circuit noted in *Dow Jones* that the Second Circuit adopted the simple test that asks two questions previously cited herein in *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998 (2d Cir. 1969).  Those two questions are:

> (1)    Whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and

> (2)    Whether a judgment would finalize the controversy and offer relief from uncertainty.

*Dow Jones & Co.*, 346 F.3d at 359.  In a significant point of law ignored by defendants, the Second Circuit ruled in *Broadview* that it is error not to exercise

---

[19]  Defendants suggest that WWE must demonstrate "substantial harm" to it in order for the case to satisfy ripeness requirements, citing *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993) and *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967).  Neither case establishes such a standard, and it is frankly difficult to understand any basis for the proposition advanced by defendants.  Both cases involved challenges to administrative regulations and the familiar rule that in such a setting, it is best for a court not to review a regulation until it is applied in some specific and concrete way to the plaintiff seeking declaratory relief.

discretion in favor of a declaratory judgment if <u>either</u> of these criteria can be achieved. *Broadview Chem. Corp.*, 417 F.2d at 1001.

Without expressly adopting such other criteria, the Second Circuit noted in *Dow Jones* that other circuits had built on the two tests of *Broadview* to ask three other questions relevant to the exercise of discretion:

    (1)    Whether the proposed remedy is being used merely for procedural fencing or a race to *res judicata;*

    (2)    Whether the use of a declaratory judgment would increase friction between sovereign legal systems or encroach on the domain of a state or foreign court; and

    (3)    Whether there is a better or more effective remedy.

*Dow Jones & Co.*, 346 F.3d at 359-60. Of these cumulative five factors, defendants advise the Court that three criteria have weight here — (1) whether the declaratory judgment clarifies the issues, (2) whether it offers finality and relief from uncertainty, and (3) whether it is being used for procedural fencing or a race to the courthouse. McCullough Dkt. 72-1 at 24. However, there is no attempt to demonstrate how those factors favor the defendants in the ensuing argument. Defendants fail to explain how a judgment that their tort claims are barred would not clarify issues between them and WWE. Likewise, no attempt is made to demonstrate that such a declaration would not offer finality, as it certainly would do so. And, in light of the documented record of adjudicated forum shopping by Kyros and his affiliates which preceded the filing of this DJ Action, no argument can be made that this case was a race to the courthouse by WWE. The facts upon which the Court must rely in exercising its discretion show this controversy

was triggered by Kyros' race <u>from</u> the very courthouse he and other counsel agreed was the appropriate forum.  Thus, under a proper application of the Second Circuit standard which controls this Court's discretion, it would be reversible error not to hear the DJ Action since both prongs of the Second Circuit test are satisfied when it is only necessary to satisfy one.

That result does not change if the Court considers the additional three issues considered in other circuits.  The proposed remedy is not procedural fencing, but rather goes to the important policy of repose and involves a pure legal issue that is involved in every other case filed by Kyros which are now in this Court.  There are no issues about friction between legal systems, nor a competing state court proceeding.  All courts to date have transferred all claims to this Court and there are no other pending cases anywhere.  And lastly, there is not a better or more effective remedy.  A determination by this Court in a single proceeding regarding limitations/repose is far more cost-effective and in the interest of judicial economy than the alternative evidently desired by Kyros.  Moreover, the exercise of discretion to hear and decide the DJ Action eliminates the possibility of inconsistent results.

Rather than demonstrate a reason not to exercise discretion under the controlling standards, the defendants offer a few last red herrings.  First, defendants claim that an alleged tortfeasor cannot use a declaratory judgment to obtain a declaration of non-liability, for which it cites no controlling authority from this Circuit.  McCullough Dkt. 72-1 at 24.  Moreover, both the United States

Supreme Court and the Second Circuit have recognized that declaratory

judgment procedures can be used to establish a prospective defendant's non-

liability.  *See Beacon Theatres*, 359 U.S. at 504 (stating the Declaratory Judgment

Act allows "prospective defendants to sue to establish their nonliability"); *Kidder,*

*Peabody & Co.*, 925 F.2d at 559 (affirming declaratory judgment that plaintiff was

not liable to the defendant for alleged securities laws violations).

Next, defendants present a muddled argument that suggests declaratory

judgments are reserved for determinations about future obligations, that tort

claims may present questions about fraud, duress and manifestations of injury

which render declaratory relief inappropriate; and that some courts have rejected

declaratory judgment actions as an infringement on the nominal plaintiff's right to

choose a forum.  McCullough Dkt. 72-1 at 25-27.  However, WWE is not seeking to

litigate the merits of any tort claim, however denominated by opposing counsel.

Instead, WWE seeks only a prospective decree that all such claims are time-

barred, which does not examine the merits of such claims.  *389 Orange Street*

*Partners*, 179 F. 3d 656, 661 n.1 (9th Cir. 1999).  Such a declaration does not

address fraud, duress, or manifestation of injury issues at all since none of these

issues have the slightest thing to do with the repose statutes at issue.[20]  Under

the well-established law of Connecticut previously cited but which Kyros and his

---

[20]  Duress has nothing to do with this case.  Even if it did, it is worth noting that
the Supreme Court in the *Beacon Theatres* case considered a duress affirmative
defense and did so while stating that <u>any</u> defenses can be raised by declaratory
judgment.  *See Beacon Theatres, Inc.*, 359 U.S. at 508.

co-counsel refuse to accept, the date of manifestation of injury is completely irrelevant to the application of Connecticut's repose statutes.  Defendants also ignore that they actually agreed to this forum and have already included every single defendant as a putative class member before this Court.

Additionally, defendants suggest that there is something improper about seeking a declaratory judgment for what they term affirmative defenses, including limitations/repose matters.  McCullough Dkt. 72-1 at 27-28.  For that proposition, defendants cite no Second Circuit authority and ignore the authority from the Second Circuit and elsewhere directly on point cited previously which demonstrates that courts have routinely addressed both limitations and tolling issues via declaratory judgment procedure.  None of the cases cited by defendants supports the proposition that limitations should not be considered in a declaratory judgment action.  In *Hanes Corp. v. Milland*, 531 F.2d 585 (D.C. Cir. 1976), the trial court actually entered a declaratory judgment that certain claims were time-barred.  *Id.* at 588. That decision was reversed, not because it was found to be inappropriate to hear such matters in a declaratory judgment action, but because the parties had agreed to arbitrate such issues.  *Id.* at 594.  Likewise *Enoxy Coal, Inc. v. United Mine Workers of Am. 1974 Benefit Plan & Trust*, 879 F.2d 862 (4th Cir. 1989) did not hold it was improper to litigate limitations issues by a declaratory judgment action.  *Id.* at *3.  Instead, the Fourth Circuit affirmed dismissal of a declaratory judgment action brought in a pure race to the courthouse after another action was brought which could resolve those issues.

41

*Id.*  Likewise, the *Veoh Networks, Inc. v. UMG Recordings*, 522 F. Supp. 2d 1265 (S.D. Cal. 2007) decision cited by defendants has nothing to do with the propriety of raising limitations issue via a declaratory judgment action.  And finally, the case principally relied upon by defendants in this branch of their argument, *BASF Crop. v. Symington*, 50 F.3d 555 (8th Cir. 1995), squarely states the argument is "off the mark in advocating a blanket prohibition on raising affirmative defenses by declaratory action."  *Id.* at 558.  Indeed, that decision goes on to specifically cite cases from the Second, Fourth and Ninth Circuit where limitations issues were addressed in a declaratory judgment action.  *Id.*  Notably, in contravention of the conventions governing briefings to the Court, defendants did <u>not</u> bring to this Court's attention the controlling authority from the Second Circuit directly cited in the *BASF* case which was contrary to the proposition advanced by them to this Court.

C.  <u>WWE is Not Seeking a Declaration Against an Unnamed Class of Wrestlers</u>

Defendants' final argument suggests there is something wrong with seeking a declaratory judgment against an "indefinite number of 'John Doe' wrestlers."  McCullough Dkt. 72-1 at 28.[21]  Once again, defendants' argument

---

[21]  Defendants also reiterate the argument that there is something improper about seeking a declaratory judgment against Perras because he allegedly is not bound by contracts to WWE.  As discussed above, whether Perras had a written contract with WWE is absolutely irrelevant to the issues framed by the DJ Action.  What is relevant is that Kyros sent WWE a letter claiming that Perras had been injured by the alleged negligence and fraud of WWE, together with demands that WWE preserve various medical records in anticipation of possible tort litigation over

misses the mark.  It is simply incorrect to state that WWE seeks a declaratory

judgment against an indefinite number of persons.  The complaint carefully

defined the John Doe defendants so as to include only "former performers who

have not performed for WWE within three years and who have signed, or do sign,

retainer agreements with Konstantine Kyros, or any other attorney working in

concert with Kyros, to assert tort claims against WWE."  Windham Dkt. 1 at ¶ 7.

The complaint specifically alleges that discovery will be needed to ascertain the

identity of these John Doe defendants, at which time WWE will seek to amend to

add each as a named defendant.  *Id*. at ¶ 96.  To prevent this from occurring,

Kyros has refused to identify those who fit that description, preventing WWE

from adding necessary parties at this time.  In order to identify and join the John

Doe Defendants in their real names, WWE has filed a Motion for Expedited

Discovery seeking the Court's approval of a subpoena on Kyros for all retainer

agreements of former performers who fit the John Doe definition.  WWE's Motion

is fully briefed and under advisement with the Court.

> D. <u>No Part of the Complaint Should be Stricken</u>

In a one paragraph section, defendants labeled unspecified statements

made in the complaint as false, inflammatory and irrelevant.  They do not cite the

standard for striking material from a complaint, and likewise fail to identify a

---

alleged injuries Kyros claimed were caused by WWE's negligence or fraud, just
as he has done in every case filed to date.  Perras a/k/a "Ivan Koloff" also was
identified by Haynes in one of his internet rants as having signed on to the
litigation effort.  *See* Krasik Aff., Ex. 9.

single statement in the complaint that supposedly is false, irrelevant or inflammatory.  The simple reality is that the tactics of Kyros in fomenting litigation against WWE, and his improper forum selection campaign seeking to avoid the jurisdiction of this Court and the strong repose policies of Connecticut are a central part of the evidence demonstrating the presence of an actual case or controversy, just as was the case in the *Shell Oil* case previously cited.  That he now refuses to acknowledge that the claims he has been fomenting are time-barred does not demonstrate the lack of a case or controversy.  Instead, it demonstrates the presence of one, and it is indisputable that limitations issues are present in every single case brought by him to date, all of which are now before this Court.  There is no other forum where any such claims are pending, and it is inconceivable that any additional claims brought elsewhere would not be transferred to this Court in light of the existing history of transfer orders and the pendency of two purported class actions in which all former and current performers are putative class members in the cases filed by Kyros and his co-counsel.

IV.   **CONCLUSION**

For the foregoing reasons, the motion to dismiss should be denied.

**DEFENDANT WORLD WRESTLING
ENTERTAINMENT, INC.,**

By:  __/s/ Jerry S. McDevitt_____
**Jerry S. McDevitt (pro hac vice)
Terry Budd (pro hac vice)
Curtis B. Krasik (pro hac vice)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: terry.budd@klgates.com
Email: curtis.krasik@klgates.com**

**Thomas D. Goldberg (ct04386)
Jonathan B. Tropp (ct11295)
Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: tgoldberg@daypitney.com
Email: jbtropp@daypitney.com
Email: jmueller@daypitney.com**

**Its Attorneys.**

## CERTIFICATION

I hereby certify that on this date a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 */s/ Jeffrey P. Mueller_____*