# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **RUSS MCCULLOUGH, RYAN SAKODA, and MATTHEW ROBERT WIESE,** individually and on behalf of all others similarly situated, | |
| **Plaintiffs,** | **Case No. 3:15-cv-01074-VLB** |
| **v.** | |
| **WORLD WRESTLING ENTERTAINMENT, INC.,** | |
| **Defendant.** | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S
MOTION TO DISMISS THE AMENDED COMPLAINT
OF MCCULLOUGH, SAKODA AND WIESE**

# TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................. 2

    A.   Plaintiffs' First Amended Complaint is Well Founded......................... 2

    B.   The Procedural History of Other Plaintiffs' Claims is Irrelevant.......... 5

II.  PLAINTIFFS' CLAIMS ARE NOT TIME BARRED ................................. 6

    A.   Plaintiffs Did Not Discover Actionable Harm Until After
        Retirement. ................................................................................. 8

    B.   WWE's Continuing Course of Conduct Implicates the Tolling
        Doctrines .................................................................................. 10

        1.   WWE's relationships with Plaintiffs were ongoing. ................. 12

        2.   WWE Held a Special Relationship with Plaintiffs .................... 15

        3.   WWE's "Some Injury" Arguments Fail as Inapplicable .......... 18

    C.   WWE's Fraudulently Concealed the Risks of Repeated Head
        Injuries .................................................................................... 19

III. DEFENDANT WRONGFULLY ASSERTS ADDITIONAL GROUNDS FOR
    DISMISSAL ................................................................................. 22

    A.   The Contact Sports Exception is Inapplicable. ............................... 23

    B.   Rule 9(b) Does Not Preclude Claims. ........................................... 25

    C.   Claims Plausibly Allege the Misrepresentation or Omission of
        Material Fact. ............................................................................. 25

    D.   The Existence of Publically Available Information Does Not
        Automatically Put Plaintiffs on Notice. ......................................... 26

    E.   Claims Sufficiently Allege Scienter, Motive to Commit Fraud or
        That WWE Should Have Known................................................... 26

    F.   WWE Owed an Affirmative Duty to Disclose. ................................. 27

    G.   Claim for Medical Monitoring are Appropriate. ............................... 27

IV.  CONCLUSION ............................................................................... 28

    CERTIFICATE OF SERVICE ................................................................ 31

i

I.     **INTRODUCTION**

Defendant World Wrestling Entertainment, Inc.'s (hereinafter "WWE") motion to dismiss once again ignores the substance of Plaintiffs Russ McCullough, Ryan Sakoda, and Matthew Robert Weise's ("Plaintiffs") First Amended Complaint (FAC) and devotes the first 20 pages of its memorandum to *ad hominem* attacks on Plaintiffs' counsels and reprisals of its motions to dismiss the complaints brought by Plaintiffs Evan Singleton, Vito LoGrasso, and William Albert Haynes III.  WWE disregards Connecticut's definition of "injury," the discovery rule, and the "continuing course of conduct" doctrine.  It further misinterprets and misapplies *Jaworski v. Kiernan* and its progeny to take the absurd position that WWE owes its wrestlers no duty despite clear precedent to the contrary.  The District of Minnesota rejected these arguments when they were raised by the National Hockey League, and this Court should reject them here.

A.     **Plaintiffs' First Amended Complaint is Well Founded.**

Plaintiffs are residents of the State of California who originally sought redress in their home state for serious neurological injuries that arose after they retired as a result of numerous blows to their head and concussive injuries Plaintiffs suffered during their tenure as wrestlers for WWE.  FAC ¶¶ 13-15, 98-112.  Plaintiffs had and made good faith arguments that they were properly before the U.S. District Court for the Central District of California, but the Court opted to enforce the adhesion contracts and forum-selection clauses signed by Plaintiffs when they had no bargaining power and were in a vastly inferior position to negotiate their contracts with WWE.

Today, Plaintiffs come before the Connecticut court with sound reasons for denying WWE's motion to dismiss.  Their arguments that (a) they did not discover the causal connection between their neurological injuries and their wrestling careers for some time after they retired from wrestling and (b) that WWE's continuing course of conduct and fraudulent concealment merit tolling of Connecticut's statutes of limitation and repose are neither novel nor frivolous.  In fact, these arguments have already been accepted by the U.S. District Court for the District of Minnesota.

Plaintiffs' reliance on the *NHL Concussion Litigation* decision as persuasive authority in support of their position is well founded.  *In re Nat'l Hockey League Players' Concussion Injury Litig.* ("*NHL Concussion Litig.*"), No. 14-md-2551, 2015 WL 1334027 (D. Minn. Mar. 25, 2015).  Though the district court was interpreting different statutes of limitations, the standards it applied to those statutes were materially the same as those that apply to Plaintiffs' claims here.  The district court looked to the discovery rule and the date of injury to determine when those plaintiffs' claims accrued.  *Id.* at *5-7.  For the reasons set forth in Section II, *infra*, the District of Minnesota's analysis applies equally to Plaintiffs' claims.  Years or decades may pass before a concussion produces symptoms of post-concussion syndrome. FAC ¶ 123.  The symptoms can be difficult to detect, and because they affect mental fitness, a reasonable person may not understand how they were injured.  Given the slow, insidious development of concussion symptoms, this precludes dismissal under the statute of limitations.

At the direction of WWE, Plaintiffs performed complex, dangerous stunts.  They are sometimes equipped with weapons such as tables, chairs, and chains.

FAC ¶¶ 45-46.  "WWE intentionally and willfully adds what it calls 'heat' to its scripts in order to ensure that there is 'extra physicality' in its matches."  FAC ¶ 45.  WWE accordingly knew that wrestlers were being exposed to concussion risks and in fact routinely suffered concussions.  Yet until recently, WWE took no steps to warn wrestlers about concussions, assess them for concussions during matches, or provide any sort of care or treatment for concussions.  *See infra* Section II.B.2, II.C.2.

At the same time, "WWE hired medical personnel whose stated purpose was to monitor and assess the wrestlers inside and outside of the ring. Plaintiffs reasonably relied on these medical personnel in determining whether they should return to the ring and continue fighting or practicing or had suffered serious injury necessitating further medical treatment."  FAC ¶ 89.  But instead of providing reasonable medical care, WWE used its position of trust and authority to discourage wrestlers from receiving needed medical care and treatment.  WWE was more concerned with generating drama during matches than its performers' well-being. Mr. McCullough "was forced to wrestle with a torn knee ligament while on crutches."  FAC ¶ 99.  During one match, he was knocked unconscious and then "struck in the head with a metal chair more than 15 times without intervention by WWE staff."  FAC ¶ 100.  Mr. Sakoda alleges that he and others "were 'forced to wrestle injured or you lost your job.'"  FAC ¶ 105.  After being knocked unconscious during one match, WWE simply advised him "'not to go to sleep'" and offered no further treatment.  FAC ¶ 106.  Mr. Wiese "observed that there was a 'code of silence' related to injuries."  FAC ¶ 110.  He was once punched so hard during a match that he had visible injuries on his head and vomited afterward, yet "WWE

staff took no steps to intervene in the event and WWE medical staff did nothing to treat [Mr.] Wiese following the incident." FAC ¶ 110.

Because of these misplaced priorities and the trauma inflicted through repeated blows to the head, Plaintiffs now suffer from serious symptoms of post-concussive syndrome. Mr. McCullough "suffers from numerous symptoms including but not limited to headaches, severe migraines[,] memory loss, and severe depression and panic attacks which have required over forty emergency room visits since he retired." FAC ¶ 103. Mr. Sakoda "suffers from numerous symptoms including but not limited to headaches, severe migraines, memory loss and severe depression." FAC ¶ 108. Mr. Wiese "suffers from post-concussion symptoms including but not limited to severe fatigue, dizziness, and severe short and long term memory loss. Mr. Wiese is unable to remember much of his life." FAC ¶ 112.

WWE has also conducted a campaign to conceal or downplay the risks of harm from concussions. This campaign goes beyond WWE's general failure to warn wrestlers about concussion risks. When an autopsy revealed that WWE wrestler Chris Benoit had suffered from severe concussion-related symptoms, WWE publicly attacked those findings. FAC ¶ 70. In testimony before a U.S. House committee, WWE said there were no documented concussions during its matches. FAC ¶ 65. And WWE's chief medical officer, Dr. Joseph Maroon, is connected to efforts to discredit research about concussion pathology. FAC ¶ 69.

B.    **The Procedural History of Other Plaintiffs' Claims is Irrelevant.**

WWE devotes a substantial portion of its motion to dismiss discussing the procedural history of related lawsuits brought by Messrs. Singleton, LoGrasso, and

Haynes.  This includes a nine-page regurgitation of reasons WWE believes these plaintiffs' complaints should be dismissed.  Those plaintiffs have addressed WWE's rhetoric in briefs already before the Court, and it is not the place of Plaintiffs McCullough, Sakoda, and Wiese to reargue on their behalf here.

In any event, Plaintiffs will address the "cut and paste jobs" that WWE apparently takes great offense to.  Plaintiffs are bringing a class action lawsuit against WWE because "[q]uestions of law and fact that are common to the entire Class predominate over individual questions."  FAC ¶ 115.  WWE's conduct giving rise to Plaintiffs' claims, described herein and in the FAC, is the same as the conduct giving rise to Messrs. Singleton, LoGrasso, and Haynes's claims.  As a result, their complaints, as written, are largely the same.

Because of WWE's negligence and misconduct, Plaintiffs suffered permanent and profound brain injuries.  As the following discussion shows, Plaintiffs have plausible claims that are solidly supported by the facts and Connecticut law.  To ensure they have a fair opportunity to vindicate their claims, Plaintiffs respectfully request that this Court deny WWE's motion to dismiss.

II.    **PLAINTIFFS' CLAIMS ARE NOT TIME BARRED**

"On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in plaintiffs' favor." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *8 (S.D.N.Y. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible… [But, t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184-85 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013). "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News, L.L.C.*, 680 F.3d at 189. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

WWE endeavors to circumvent the well-established requirements of Rule 12(b)(6) with attempts to discredit Plaintiffs' allegations, which must be taken as true. While WWE will have the opportunity to engage in discovery and retain experts regarding these matters, a Rule 12(b)(6) motion is not the forum for such fact finding. Plaintiffs allege that WWE was aware of certain facts regarding the risks of repeated head injuries, and this Court must accept those allegations as true. *See In re Nat. Hockey League Players' Concussion Injury Litig.*, 2015 WL 1334027, at *6 (D. Minn. Mar. 25, 2015) (accepting as true NHL hockey player allegations that they suffered "'an increased risk of developing serious latent neurodegenerative disorders and diseases including but not limited to CTE,

dementia, Alzheimer's disease or similar cognitive-impairing conditions'" and that ""'CTE is caused by repeated sublethal brain trauma of the sort Plaintiffs repeatedly suffered'" and denying motion to dismiss fraud claims based on the NHL's alleged knowledge and concealment of the same).

The key to determining when Plaintiffs' claims against WWE accrued lies with (1) when they discovered their injuries; and, (2) whether WWE engaged in a continuing course of conduct meriting tolling of the applicable statutes of limitation and repose.  Although WWE argues that the continuing course of conduct is purely a question of law, Connecticut has found that to determine whether the statute of limitations is tolled is a "mixed question of law and fact". *See Giulietti*, 784 A.2d 905, 925 (Conn. App. 2001), *citing Starkweather v. Patel*, 641 A.2d 809 (Conn. App.), cert. denied, 644 A.2d 918 (Conn. 1994) (further noting at 834, "The continuing course of conduct doctrine is 'conspicuously fact bound.'"). It is therefore inappropriate to answer these questions at this stage of litigation.  In any event, the statutes of limitations and repose governing Plaintiffs' claims did not begin to run until they learned of the permanent and long term effects of the concussions they suffered while performing for WWE.  These statutes are further tolled by WWE's continued concealment of scientific information related to head injuries.  WWE's continuing course of wrongful conduct, coupled with its unique ongoing relationship with Plaintiffs, and specific, actual knowledge of the initial injury and ongoing injuries require the tolling of all applicable statutes.

A. **Plaintiffs Did Not Discover Actionable Harm Until After Retirement.**

The statute of limitations governing Plaintiffs' claims states as follows:

> No action to recover damages for injury to the person . . . caused by
> negligence, or by reckless or wanton misconduct . . . shall be brought
> but within two years from the date when the injury is first sustained or
> discovered or in the exercise of reasonable care should have been
> discovered, and except that no such action may be brought more than
> three years from the date of the act or omission.

CONN. GEN. STAT. ANN. § 52-584. "[A]n injury occurs when a party suffers some form

of actionable harm.'" *Lindsay v. Pierre*, 879 A.2d 482, 484-85 (Conn. App. 2005)

(quoting *Mountaindale Condominium Ass'n., Inc. v. Zappone,* 757 A.2d 608, 616

(Conn. App. 2000), *cert. denied*, 762 A.2d 903 (Conn.)).

> Actionable harm occurs when the plaintiff discovers, or in the exercise
> of reasonable care, should have discovered the essential elements of
> a cause of action . . . . A breach of duty by the defendant and a causal
> connection between the defendant's breach of duty and the resulting
> harm to the plaintiff are essential elements of a cause of action in
> negligence; they are therefore necessary ingredients for actionable
> harm."

*Lindsay* 879 A.2d at 484-85 (quoting *Lagassey v. State,* 846 A.2d 831, 846-47 (Conn.

2004)) (alteration in original).

Actionable harm also requires the discovery of "a causal connection

between the defendant's breach of duty and the resulting harm to the plaintiff." *Id.*

(quoting *Lagassey,* 846 A.2d at 846-47). Concussion injuries may not manifest until

years or decades after the original trauma. Until then, Plaintiffs had no cognizable

legal claim. *NHL Concussion Litig.*, 2015 WL 1334027, at *13-14. The district court

considering the hockey players' complaint in the *NHL Concussion Litigation*

understood and accepted this argument when the NHL sought dismissal of their

claims based on statutes of limitations:

> Plaintiffs have alleged injuries in the form of "an increased risk of
> developing serious latent neurodegenerative disorders and diseases
> including but not limited to CTE, dementia, Alzheimer's disease or
> similar cognitive-impairing conditions," and "latent or manifest neuro-

**Page 9 of 32**

degenerative disorders and diseases". They have further alleged that, for example, "CTE is caused by repeated sublethal brain trauma of the sort Plaintiffs repeatedly suffered," including sub-concussive impacts that are not diagnosed as concussions and which are sustained by the thousands by NHL players each year, and that "brain injury and brain disease in NHL retirees is a latent disease that can appear years or decades after the player experiences head trauma in his NHL career," Thus, when such injuries "occurred" or "resulted" are matters that cannot be determined from the face of the Master Complaint and are proper subjects of discovery.

*Id.* at *6.  Similarly, Plaintiffs allege that, "[b]ecause CTE is difficult to detect, manifests years later, and includes chronic mental issues, many sufferers do not understand their illness."  FAC ¶ 36.  They further allege that they did not understand the long term repercussions of repeated head injuries until very recently and had no knowledge of the link between repeated head injuries, concussions, and the long term effects, including latent neurological injuries, thereof.  FAC ¶¶ 91, 123.  Finally, Plaintiffs allege that WWE actively concealed information regarding the link between head trauma and neurological injuries from him and other wrestlers. FAC ¶¶ 55-57, 60-62, 64-66, 68-74, 81, 83-84.

B.  **WWE's Continuing Course of Conduct Implicates the Tolling Doctrines.**

Under the statute of repose, "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." CONN. GEN. STAT. ANN. § 52-577.  However, "'the continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied.'"  *Macellaio v. Newington Police Dep't*, 75 A.3d 78, 85 (Conn. App. 2013) (quoting *Watts v. Chittenden*, 22 A.3d 1214 (Conn. 2011)).  The doctrine should be applied "'where the negligence consists of a series of acts or

omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run.'" *Id.* (quoting *Rosato v. Mascardo*, 844 A.2d 893 (Conn. App. 2004)).  It applies equally to the applicable statutes of limitations and repose.  *See Cefaratti v. Aranow*, 105 A.3d 265, 274 (Conn. App. 2014) (citing *Blanchette v. Barrett,* 640 A.2d 74 (Conn. 1994)) (finding that "the statute of repose may be tolled under the continuing course of conduct doctrine"); *Giulietti v. Giulietti*, 784 A.2d 905, 925 (Conn. App. 2001) (applying "continuing course of conduct" doctrine to Section 52-577).

> This Court should examine
>
> whether the defendant (1) committed an initial wrong upon the plaintiff, and (2) whether a duty continued to exist after the cessation of the act or omission relied upon by (a) evidence of a special relationship between the parties giving rise to such a continuing duty or (b) some later wrongful conduct of the defendants related to the prior act.

*Macellaio*, 75 A.3d at 85.  A continuing duty has been found where "there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Giulietti*, 784 A.2d at 925 (quoting *Sanborn v. Greenwald,* 664 A.2d 803 (Conn. App. 1995) (internal citations omitted).  The continuing wrongful conduct may be an act of omission or an affirmative act of misconduct.  *Sherwood v. Danbury Hosp.*, 746 A.2d 730, 738 (Conn. 2000); *Witt v. St. Vincent's Med. Ctr.*, 746 A.2d 753, 757 (Conn. 2000).  An ongoing physician-patient relationship is not necessary to finding a continuing duty.  *Witt*, 746 A.2d at 759 n.8; *Sherwood*, 746 A.2d at 739.  "[W]hether a party engaged in a continuing course of conduct that tolled the running of the statute of limitations is a mixed question of law and fact." *Giulietti*,

784 A.2d at 925 (citing *Starkweather v. Patel,* 641 A.2d 809 (Conn. App.), *cert. denied*, 644 A.2d 918 (Conn. 1994)).  "The continuing course of conduct doctrine is 'conspicuously fact bound.'"  *Id.* at 834.

In *Blanchette v. Barrett*, the Connecticut Supreme Court held the continuing course of conduct doctrine is specifically designed for situations where there is an ongoing relationship and the tortious acts or omissions may be difficult to identify and may yet be remedied:

> Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act…. *The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied*.

640 A.2d at 275-276 (emphasis added).

> *1.    WWE's relationships with Plaintiffs were ongoing.*

Here, WWE has assumed such a duty during its  ongoing relationships with Plaintiffs through its Wellness Program, its public statements, its ongoing fiduciary relationships with Plaintiffs, including payment of royalties for the footage of the severe head trauma Plaintiffs suffered while performing for WWE, its ongoing maintenance of its dedicated webpage to former Talent, and its continuing research into concussions and concussion syndrome while repeatedly downplaying and omitting evidence of concussions in the WWE which Plaintiffs continued to rely on to their detriment by failing to seek and receive necessary medical treatment which they would have sought had they known of the severe neurological risks they suffered performing for WWE.  FAC ¶¶ 86-97.

Such continuing duty was directly related to the initial wrong as Plaintiffs only suffered the initial head trauma because WWE scripted and facilitated matches while failing to safeguard, inform, and treat Plaintiffs for concussions and sub-concussive injuries which compounded throughout their careers and worsened after their careers ended.

> In order to satisfy the second prong of the *Witt* test, the plaintiff must demonstrate that the defendant breached a duty related to the negligent act or omission complained of, which duty remain[s] in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong…. Where [our appellate courts] have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of *either a special relationship* between the parties giving rise to such a continuing duty *or* some *later wrongful conduct* of a defendant related to the prior act.

*Martinelli v. Fusi*, 963 A.2d 640, 646 (Conn. 2009) (emphasis added).

Further, in *Sherwood v. Danbury Hospital*, the Connecticut Supreme Court found that a patient who received blood never tested for HIV antibodies during a transfusion, and which blood was later determined by the hospital to contain HIV, owed a duty to the patient to notify the patient of its negligence. 746 A.2d at 732. This "evidence of the defendant's continuing failure to inform the plaintiff" was evidence of a continuing course of conduct. *Id.* at 739.

WWE owed a duty to Plaintiffs to safeguard them from concussion and sub-concussive injuries and to inform them of the risks associated with WWE's performances, including the risks of concussions and sub-concussive injuries and the long-term health effects such injuries would cause.

*Each time* WWE learned of a new concussion event, a new discovery in concussion research, or a new treatment in concussive injuries, WWE owed

Page 13 of 32

Plaintiffs a duty to inform them of the severe injuries it subjected Plaintiffs to throughout their careers.  WWE's failure to inform Plaintiffs of WWE's negligence resulted in later wrongful conduct evidencing a continuing course of conduct which implicated the tolling doctrines.

The Connecticut Appeals Court reiterated in *Navin v. Essex Savings Bank* that the continuing course of conduct doctrine is implicated when the negligence or wrongful conduct complained of is ongoing or consists of a series of acts or omissions which would make pinpointing the exact date of injury difficult:

> Where [our Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there had been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act…. [T]he doctrine is generally applicable under circumstances where[i]t may be impossible to pinpoint the exact date of a particular negligent act or omission that caused injury or where the negligence consists of a series of acts or omissions and it is appropriate to allow the course of [action] to terminate before allowing the repose section of the statute of limitations to run…

843 A.2d 679, 684-85 (Conn. App. 2004), *cert. denied*, 859 A.2d 563 (Conn. 2004).

The continuing course of conduct doctrine is implicated in this case. Plaintiffs allege a continuing course of fraudulent concealment, negligent misrepresentation, and fraudulent omission and failure to warn stemming from the initial negligence occurring during Plaintiffs' repeated performances for WWE,[1] as

---

[1] Although WWE briefly argues Plaintiffs' failure to meet Rule 9's heightened pleading standard, Plaintiffs' FAC sufficiently sets forth with particularity fraudulent concealment and omission and negligent misrepresentation. *See* Fed. R. Civ. P. 9(b); *GSGSB, Inc. v. New York Yankees*, 862 F. Supp. 1160, 1177 (S.D.N.Y. 1994); *Gelles v. TDA Indus., Inc.*, 1991 WL 39673, at *5 (S.D.N.Y. Mar. 18, 1991) (noting "Rule 9(b) does not require that a plaintiff set out all evidence for its case in chief, but rather, that a complaint set forth sufficient facts to tell a defendant what conduct he stands accused of."). *See generally*, *Cosmas v. Hasset*, 886 F.2d 8, 11 (2d Cir. 1989) (stating "On a motion to dismiss, a court must read the complaint generously, and draw all inferences in favor of the pleader.").

well as from the ongoing special relationship Plaintiffs have with WWE.  Plaintiffs need not repeat the Complaint here, but will specify particular facts to rebut WWE's false accusations and claims.[2]

Indeed, WWE further facilitated an ongoing fiduciary relationship with Plaintiffs, both throughout their employment with WWE, and continuing to the present with owed royalties which are often directly related to profits stemming from the brutal head injuries sustained while performing for WWE.   The Connecticut court in *Partitions, Inc. v. Blumberg Assoc., Inc.*, 2001 Conn. Super. LEXIS 2960 (Conn. Super. Ct. Oct. 9, 2001), acknowledges that fiduciary relationships where particular reliance entrusted onto one party exists, the continuing course of conduct doctrine is implicated:

> [F]or the purpose of the continuing course of conduct doctrine: generally these relationships have been attorney-client, physician-patient, or some related sort of fiduciary-type relationship in which one party reasonable reposes trust in the other to exercise continuing care on his behalf.

*Id.*, at *15-16.

### 2.    *WWE Held a Special Relationship with Plaintiffs.*

WWE's special relationship with Plaintiffs began when Plaintiffs and WWE formed a fiduciary relationship and Plaintiffs began practicing and performing for WWE.   WWE's duty to Plaintiffs is evidenced from the control over training exercises, the ownership and set -up of the rings performed on (which caused injuries themselves); the scripting of the moves and storylines, the complete

---

[2] Despite WWE's routine references to the pleading requirements, WWE implies Plaintiffs have a responsibility to rebut affirmative defenses in a Complaint.  As this is patently false, Plaintiffs will gloss over such unnecessary argument, including much of the improper Rule 11 accusations WWE continues to hurl with abandon at Plaintiffs' Counsel.

control WWE has over the performances; and the employment and monitoring of the referees, trainers, and medical personnel who would be on notice of potential injuries sustained while wrestling for WWE.  FAC ¶¶ 21, 24-25, 41-42, 45-50, 86-87, 89, 93.  Further, the duty was implicated by the knowledge WWE held regarding the prevalence and existence of concussions among wrestlers in its organization. Knowing WWE watched, monitored, scripted, and controlled completely the WWE work environment, Plaintiffs, who have high school educations, relied entirely on WWE's assessments of their injuries and sought treatment for injuries according to WWE's information, diagnoses, and treatments, including by onsite medical personnel employed by WWE.[3]  FAC ¶¶ 8-9, 89.

Plaintiffs' reliance on WWE's unique knowledge regarding their health and safety did not end when they stopped performing for WWE.  WWE continued to deceive Plaintiffs through its Wellness Program, which was created to allegedly help WWE's current and former wrestlers navigate problems a large range of health issues, including neurocognitive problems.  FAC ¶ 79.  WWE "reache[d] out to former wrestlers to offer support for drug and alcohol abuse" but "fail[ed] to advise former wrestlers, including Plaintiffs, about head injuries."  FAC ¶ 81.  Further, WWE monitored Plaintiffs through the maintenance of its former Talent's webpage, which not only advertised WWE's benevolence towards its former Talent to the public, but also put WWE in the unique position of knowing its former Talent's

---

[3] WWE did not provide Plaintiffs with health insurance, nor could they afford their own, creating additional reliance on WWE's assessments of Plaintiffs' injuries and further facilitating the special relationship between them.  FAC ¶ 23.

health and wellness, including any symptoms indicating neurological injuries. *See* FAC ¶ 79 n.31 (citing to WWE's Wellness Program website).

WWE's duties to Plaintiffs were further extended when it provided him with medical care.

> WWE hired medical personnel whose stated purpose was to monitor and assess the wrestlers inside and outside of the ring. Plaintiffs reasonably relied on these medical personnel in determining whether they should return to the ring and continue fighting or practicing or had suffered serious injury necessitating further medical treatment.

FAC ¶ 89. WWE and its physicians were well aware of the risks of head injuries Plaintiffs suffered while wrestling, and it knew they had suffered repeated head injuries. *See* FAC ¶¶ 56-57, 65-66, 78, 93, 148.

Because WWE provided Plaintiffs with medical care through its physicians, it had a continuing duty to warn them of the risks they faced as a result of the injuries they suffered while wrestling for WWE, including CTE, post-concussive syndrome, and a host of other serious medical conditions. *See Witt*, 746 A.2d at 758 (finding a doctor's knowledge of a patient's cancer risks triggered a continuing duty to warn and the continuing course of conduct doctrine). Moreover, WWE's "duty to make the report commenced when the information became available . . . and . . . the duty continued until disclosure resulting in a complete diagnosis was made, that is, until such time as the findings were reported in their entirety." *Id.* at 759. That is, WWE's duty, which it never fulfilled as it continues to deny the risks today, continued even after Plaintiffs retired.

These allegations are sufficient to raise an issue of fact as to whether the "continuing course of conduct" doctrine should be applied to Plaintiffs' claims, making a decision under Rule 12(b)(6) inappropriate.

**Page 17 of 32**

### 3.   *WWE's "Some Injury" Arguments Fail as Inapplicable.*

WWE's assertions that Plaintiffs' claims must fail because Plaintiffs have acknowledged they suffered injuries while wrestling for WWE is nothing more than further evasion of its responsibilities to its former wrestlers.  In WWE's own cited case, *Neuhaus v. DeCholnoky*, the Connecticut Supreme Court recognized the following:

> **It is well established that the relevant date of the act or omission complained of, as that phrase is used in § 52-584, is the date when the negligent conduct of the defendant occurs and . . . *not the date when the plaintiff first sustains damage*.**

**905 A.2d 1135, 1142 (Conn. 2006) (emphasis added).**

WWE's negligent and fraudulent conduct, as alleged in Plaintiffs' FAC and partially repeated here, occurred during WWE's own calculations of the Statutes of Limitations and Repose, thereby implicating the tolling doctrines under Conn. Gen. Laws Secs. 52-584 and 52-577, and which negligent and fraudulent conduct continues today.[4]

Plaintiffs were not allowed to stop wrestling for injuries, including head injuries.  Through the culture permeated by WWE, Plaintiffs were required to fight through the pain and not seek diagnosis or treatment for their injuries.  Relying entirely on WWE's benevolence, authority, information, and treatment, Plaintiffs relied on WWE's omission of all information relating to concussion injuries and the

---

[4] Such conduct as alleged in Plaintiffs' FAC, includes the repeated denial of any concussions known to WWE in WWE wrestlers (*See* Stephanie McMahon's Congressional testimony), WWE's disparagement and denial of ongoing medical literature regarding concussions and CTE (*See* the multiple studies on concussions and the repeated downplaying by WWE), and the scripts written by WWE, the procedures implemented by WWE and the protocols maintained by WWE which omit any information of concussions and which prevent Plaintiffs from receiving any information or treatment when such concussions are inevitably sustained, and which long-term ramifications are then ignored by WWE, resulting in Plaintiffs' claims.

long-term consequences the neurological injuries cause.  Once the initial headache disappeared, which they had to continue to fight through, Plaintiffs believed they had fully healed and were not suffering from any other injuries, like concussions and sub-concussive injuries.  Plaintiffs did not know they were potentially increasing the build-up of Tau protein in their brains, and becoming more susceptible to CTE.  But for WWE's concealment of these additional injuries, Plaintiffs, who relied solely on WWE for this information to their detriment, would have received the necessary medical care and treatment and would not have continued to wrestle in contravention of accepted medical practice.

WWE misconstrues the nature of this case.  Focusing on the head impacts Plaintiffs were aware of evades the fundamental basis of Plaintiffs' claims.  Just because the Plaintiffs knew they were being hit on the head does not equate to their knowledge that by performing repeatedly for WWE they were receiving severe concussions and sub-concussive injuries which have and will continue to result in long-term neurological injuries.

WWE not only allowed Plaintiffs to continue believing they were not suffering neurological injury such as concussions and the long-term effects from them, but actively concealed and continued to conceal that knowledge from Plaintiffs despite having a duty to them.  This ongoing duty coupled with the wrongful conduct is precisely what the Connecticut legislature intended to implicate the tolling doctrines, and provides material facts satisfying Rule 12(b)(6) muster.

C.   **WWE Fraudulently Concealed the Risks of Repeated Head Injuries.**

Connecticut has codified the "fraudulent concealment" doctrine as follows:

> If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

CONN. GEN. STAT. ANN. § 52-595.

> [T]o prove fraudulent concealment, the plaintiff is required to show: (1) the defendants' actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action; (2) the defendants' intentional concealment of these facts from the plaintiff; and (3) the defendants' concealment of these facts was for the purpose of obtaining delay on the plaintiff's part in filing a complaint on his cause of action.

*Macellaio*, 75 A.3d at 83-84 (citing *Bartone v. Robert L. Day Co.*, 656 A.2d 221 (Conn. 1995)).

Plaintiffs explicitly allege that WWE knew about the risks of repeated head injuries and intentionally withheld that information from them when it had a duty to disclose such information.  WWE created a Wellness Program on February 27, 2006, which it claimed was "'refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals.'"  FAC ¶ 79.  Moreover, "WWE regularly collected and continues to collect wrestler injury reports, including during Plaintiffs' careers with WWE, becoming a repository of substantial concussion and other head injury information and conducting exclusive analysis."  FAC ¶ 93.  In addition, Plaintiffs properly allege that "WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Plaintiff[s] faced serious health problems if they returned to the ring too soon after sustaining a concussion."  FAC ¶ 148.  In fact, its executives have simultaneously

Page 20 of 32

acknowledged that concussions are a risk of professional wrestling and denied

that WWE has documented any concussions among its wrestlers:

> Q Okay. Have ringside doctors or treating physicians ever diagnosed a wrestler with a concussion and reported this to WWE?
>
> A That I am aware of, no. There was a doctor who issued a warning to us, you know, that this person could develop a concussion but currently didn't have signs of it, and that person never wound up developing one.
>
> Q Okay. Are you aware of any times where wrestlers have I guess self-reported -- where wrestlers have self-reported to you that they received concussions and this information came from the wrestler rather than a treating doctor?
>
> A Not that I am aware of but I am not saying that that never happened.
>
> Q Right.
>
> A Just not involved me.
>
> Q Okay. All right. Are you aware of any incident where a wrestler in a match received a concussion?
>
> A No

Ex. A, Testimony of Stephanie McMahon Levesque at 114.[5]  In fact, Ms. Levesque

even denies that "chair shots" and "pile drivers" can result in concussions:

> Q Would a chair shot to the head or a pile driver on an unpadded surface, would those present concussion risks?
>
> A Not -- I mean, a pile driver, no, because your head never actually hits. And a chair shot, there is a particular way to hit someone with a chair. And again, if you screwed up and hit someone wrong, then sure. Or if you slipped on a pile driver and let somebody go, absolutely.

---

[5] Though these facts are not specifically alleged in Plaintiffs' SAC, the transcript of Ms. Levesque's testimony was quoted therein and further attached, in its entirety, as an exhibit to WWE's motion to dismiss.  It is therefore incorporated by reference and proper for consideration by this Court. *P&S Printing LLC v. Tubelite, Inc.*, No. 14-cv-1441, 2015 WL 4425793, at *2 (D. Conn. July 17, 2015) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)).

*Id.* at 115-16.  She further told the committee, "[W]e don't believe that there is any particular move, unless it is an accident, that will cause a concussion."  *Id.* at 122. Finally, Ms. Levesque testified, "I can't think of any major injury that someone has had that was chronic and required outside rehabilitation that we were unable to provide."  *Id.* at 131.  Construing these allegations "in a light most favorable to Plaintiffs," Plaintiffs alleged facts from which this Court can infer that the WWE "took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma" and that it did so to avoid the filing of any lawsuits against it., making tolling based on the doctrine of fraudulent concealment appropriate.  *NHL Concussion Litig.*, 2015 WL 1334027, at *8 .

III.   **DEFENDANT WRONGFULLY ASSERTS ADDITIONAL GROUNDS FOR DISMISSAL**

After using 18 pages of its motion to dismiss to launch *ad hominem* attacks on Plaintiffs' counsel and reprise its arguments against Plaintiffs Singleton, LoGrasso, and Haynes, WWE attempts to improperly skirt the page limitations set forth in this Court's local rules and pretrial preferences. By incorporating 26 pages of its motion to dismiss the Singleton and LoGrasso claims by reference, WWE brings it brief to 68 pages, a full 22 pages more than this Court permits.   Plaintiffs therefore move this Court to strike Section V of WWE's motion to dismiss or, in the alternative, strike all incorporations by reference.

Should this Court permit WWE to incorporate its prior arguments by reference, Plaintiffs likewise incorporate the arguments raised in the opposition previously filed by Plaintiffs Singleton and LoGrasso to WWE's motion to dismiss their Second Amended Complaint. *See* Brief in Opposition to Defendant World

Wrestling Entertainment, Inc.'s Motion to Dismiss Second Amended Complaint ("Singleton Brief") at 17-37 (Dkt. 53). Plaintiffs also highlight in summary fashion why each of WWE's arguments fails.

A.    The Contact Sports Exception is Inapplicable.

WWE attempts to exempt itself from its duty of care by citing to the "contacts sports exception;" however, the principle is wholly inapplicable to the instant case. *See* Singleton Brief at 17-19 (citing *Jaworski v. Kiernan*, 696 A.2d 332 (Conn. 1997) (involving soccer); *Mehr v. Fed'n Int'l de Football Ass'n*, 2015 WL 4366044 (N.D. Cal. July 16, 2015) (involving soccer); *Pierscionek v. Ill. High Sch. Ass'n*, No. 14 CH 1931 (Ill. Cir. Ct. Cook Cnty. Oct. 27, 2015) (involving football)). WWE is attempting to invoke the contacts sports exception by analogizing actual competitive sports, like soccer or football, with the controlled, scripted "action soap opera" of the WWE. FAC ¶ 21. However, professional wrestling is indisputably distinct, and the rules drawn from all three cases showcase this difference.

The *Jaworski* court looked to four factors in determining the standard of care assigned to co-participants in sports like soccer: (1) the normal expectations of participants in the sport in which the plaintiff and the defendant were engaged; (2) the public policy of encouraging continued vigorous participation in recreational sporting activities while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions. *Jaworski,* 696 A.2d at 336-37.

With respect to the first factor, the court reasoned that, "[i]n athletic competitions, the object obviously is to win. In games, particularly those played by teams and involving some degree of physical contact, it is reasonable to assume

that the competitive spirit of the participants will result in some rules violations and injuries." *Id.* at 337. The FAC clearly alleges, and WWE cannot seriously dispute, that professional wrestling is not a competitive sport aimed at winning. The performances have "preordained winners and losers, and it has a carefully written, ongoing plot. WWE predetermines much of the dialogue between the wrestlers and the winners of the events, as well as many of the violent acts perpetrated by the wrestlers on each other." FAC ¶ 21. "WWE scripts events and matches, including some moves. The trainers, bookers, and other WWE employees, organize and oversee the action that takes place in each performance, effectuating WWE's scripts." FAC ¶ 24. With respect to the second factor, clearly, there is no benefit to the public by encouraging "vigorous competition" in a scripted event. Further, unlike *Jaworski*, the parties to this lawsuit are not co-participants playing on the field together. Plaintiffs are the performers, and WWE is the coordinator, promoter, and director of the events. FAC ¶¶ 18-20. This fact is of heightened importance as explained below.

The new *Mehr* and *Pierscionek* cases cited for support by WWE actually undermine WWE's own argument. In both cases, the courts held and understood that the relationship between the parties and the sport was critical to the determination of what type of duty arose and if the contact sports exception applied. *Mehr*, 2015 WL 4366044, *25 ("the duty owed . . . depends on the defendant's role or relationship to the sport"); *Pierscionek*, No. 14 CH 1931, at 6 ("the supreme court . . . held that whether the contacts sports exception applies to a non-participant defendant is a policy determination that rests on . . . *the relationship of the parties to the sport and to each other*...") (emphasis added). The

defendants' relationships in both *Mehr* and *Piercionek* (indifferent organizations overseeing, and not profiting from, amateur sports leagues) vastly differed from the relationship WWE has with wrestling and its performers (profiteering media empire influencing the sport and its participants). As a result, the ordinary negligence standard is appropriate here.

**B.    Rule 9(b) Does Not Preclude Claims.**

WWE overstates the standard governing Plaintiffs' fraud claims. In particular, in cases involving fraud by omission, a plaintiff will "not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim" *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098-99 (N.D. Cal. 2007). Plaintiffs sufficiently allege, among other facts, fraud by omission in this case. FAC ¶ 57. *See also* Singleton Brief at 22-23.

**C.    Claims Plausibly Allege the Misrepresentation or Omission of Material Fact.**

Plaintiffs allege more than sufficient facts to sustain to their fraud-based claims.   The manner in which WWE conducted its closely scripted matches, including their pretextual ring-side medical care, caused unreasonable danger. FAC ¶ 9, 56.  In particular, by forcing matches to continue which should have been stopped due to injury, and approving excessively overbooked schedules, through supposed medical advice, WWE vastly exacerbated the known harms of repeated trauma. FAC ¶¶ 24-25, 42, 55-56.  WWE's failure to disclose facts about head trauma, known through WWE's special expertise and position, coupled with efforts to conceal the extent of the possible consequences of head trauma, effectively

prevented wrestlers from obtaining proper care and pursuing legal claims against it. FAC ¶¶ 6, 32. *See also* Singleton Brief at 24-29.

**D.    The Existence of Publically Available Information Does Not Automatically Put Plaintiffs on Notice.**

Information in the public domain does not automatically place a party on constructive notice of its existence. *Diaz v. First Am. Home Buyers Prot. Corp.*, 541 F. App'x 773, 775 (9th Cir. 2013); *see also* Singleton Brief at 31-32.  Plaintiffs allege that they were unaware of the medical data referenced in the complaint, and this Court must accept those allegations as true. FAC ¶¶, 93, 122-23, 129 ("Plaintiffs had no knowledge of the link between repeated head injuries, concussions, and the long-term effects, including latent neurological injuries and TBIs."). *See NHL Concussion Litig.*, 2015 WL 1334027, at *9 ("Plaintiffs—at this stage of the litigation—need only have alleged facts, which taken as true, demonstrate the existence of some material information known by the NHL and to which Plaintiffs did not have access.").

**E.    Claims Sufficiently Allege Scienter, Motive to Commit Fraud or That WWE Should Have Known.**

Plaintiffs allege sufficient facts to show WWE knew or should have known of the risks of repeated head trauma.  Mr. McCullough alleges that he "wrestled several times per week, did not have adequate time to rest between matches, and was encouraged to wrestle while injured. In one instance was forced to wrestle with a torn knee ligament while on crutches." FAC ¶ 99.  He further alleges that he was knocked unconscious by a blow to the head with a chair and then was "struck in the head with a metal chair more than 15 times without intervention by WWE staff. McCullough sought medical treatment on his own and the head injury was

diagnosed as a severe concussion. He reported the event to WWE who responded: 'Not our problem.'" FAC ¶ 100.  "WWE failed to provide or recommend adequate medical care, even when he was showing unmistakable signs of serious injury." FAC ¶ 101.  Mr. Sakoda alleges that he was forced to choose between wrestling injured and losing his job with WWE.  FAC ¶ 105.  After being knocked unconscious during one wrestling match in 2003, WWE simply told him not go to sleep that night. FAC ¶ 106.  Mr. Wiese alleges that he suffered numerous head injuries.  He also alleges that he "observed that there was a 'code of silence' related to injuries, and that the WWE fostered an environment of fear."  FAC ¶ 110.  *See also* Singleton Brief at 16.

F.    **WWE Owed an Affirmative Duty to Disclose.**

An affirmative duty to disclose the risks of repeated head trauma plainly existed, and WWE breached that duty. *See* Singleton Brief at 29-31. WWE's role and relationship with its performers, including Plaintiffs, created a duty to disclose and warn of these risks. *Pelletier v. Sordoni/Skanska Const. Co.*, 825 A.2d 72, 78 (Conn. 2003). This duty was further heightened by WWE's possession of material medical information to which Plaintiffs lack access. FAC ¶ 93.  *See also* Singleton Brief at 41-43.

G.    **Claim for Medical Monitoring are Appropriate.**

Medical monitoring expenses are recoverable when plaintiffs "sustain[] actionable injuries." *Bowerman v. United Illuminating*, 1998 WL 910271, at *10 (Conn. Super. Dec. 15, 1998). "Symptoms are a sufficient basis for damages for future medical costs." *Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 322 (D. Conn.

2002). Consistent with this rule, Plaintiffs allege that they "suffered latent injuries which develop over time and manifest later in life." FAC ¶¶ 177-78, 181..

To date, named Plaintiffs suffer from neurological symptoms including: headaches, severe migraines, memory loss, severe depression, fatigue, dizziness, panic attacks, and strokes. FAC ¶¶  103, 108, 111-12. Plaintiffs also describe the following future risks they face as a result of WWE's negligent and fraudulent conduct:

> Repetitive blows to the head during WWE events have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

FAC ¶177. Accepted as true, these allegations are sufficient to give rise to a claim for medical monitoring.  *See also* Singleton Brief at 43-44.

IV.    CONCLUSION

For the reasons set forth above, Plaintiffs claims are not barred by Connecticut's statutes of limitation or repose.  The First Amended Complaint plausibly alleges claims sounding in fraud and negligence against WWE. Plaintiffs therefore respectfully requests that the Court deny WWE's motion to dismiss.


DATE: December 15, 2015

Respectfully Submitted,

_s/ Konstantine W. Kyros_
Konstantine W. Kyros
KYROS LAW OFFICES
17 Miles Rd.
Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com

William M. Bloss
Federal Bar No: CT01008
Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: 203-336-4421
Facsimile: 203-368-3244

Charles J. LaDuca
Brendan Thompson
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
charles@cuneolaw.com
brendant@cuneolaw.com

Robert K. Shelquist
Scott Moriarity
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Ave., S., Suite 2200
Minneapolis, MN 55401-2179
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
samoriarity@locklaw.com

Harris L. Pogust, Esquire
Pogust Braslow & Millrood, LLC
Eight Tower Bridge
161 Washington Street Suite 940
Conshohocken, PA 19428
Telephone: (610) 941-4204
Facsimile: (610) 941-4245
hpogust@pbmattorneys.com

Page 29 of 32

Erica Mirabella
CT Fed. Bar #: phv07432
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-580-8270
Erica@mirabellaLLC.com

*Attorneys for Plaintiffs.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of December 2015, a copy of foregoing Brief in Opposition to Defendant's Motion to Dismiss the Amended Complaint of McCullough, Sakoda and Wiese was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*s/ Konstantine W. Kyros*
**Konstantine W. Kyros**