## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RUSS McCULLOUGH, a/k/a "Big Russ McCullough", RYAN SAKODA, and MATTHEW R. WEISE, a/k/a "Luther Reigns," individually and on behalf of all Others similarly situated, | : : : : : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 3:15-cv-001074 (VLB) |
| | : | Lead Case |
| v. | : | |
| | : | |
| WORLD WRESTLING ENTERTAINMENT, INC., | : : | |
| | : | |
| Defendant. | : | |

_____

| | | |
|---|---|---|
| EVAN SINGLETON and VITO LOGRASSO | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:15-cv-00425 (VLB) |
| | : | Consolidated Case |
| v. | : | |
| | : | |
| WORLD WRESTLING ENTERTAINMENT, INC., | : : | |
| | : | |
| Defendant. | : | |

_____

| | | |
|---|---|---|
| WILLIAM ALBERT HAYNES III, Individually and on behalf of all Others similarly situated, | : : : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:15-cv-01156 (VLB) |
| | : | Consolidated Case |
| v. | : | |
| | : | |
| WORLD WRESTLING ENTERTAINMENT, INC., | : : | |
| | : | |
| Defendant. | : | |

_____

**March 21, 2015**

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART

**DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT BROUGHT BY PLAINTIFFS SINGLETON AND LOGRASSO [Dkt. 43], GRANTING DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT BROUGHT BY PLAINTIFF HAYNES [Dkt. 64] AND GRANTING THE DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT BROUGHT BY PLAINTIFFS MCCULLOUGH, SAKODA, AND WEISE [Dkt. 95].**

Plaintiffs in this consolidated action are former wrestlers for World Wrestling Entertainment Inc. ("WWE"), a Connecticut entertainment company which produces televised wrestling programming. Plaintiffs allege that they are either suffering from symptoms of permanent degenerative neurological conditions resulting from traumatic brain injuries sustained during their employment as wrestlers for WWE or are at increased risk of developing such conditions. Plaintiffs claim that they were injured as a result of WWE's negligence in scripting violent conduct and failing to properly educate, prevent, diagnose and treat them for concussions. Plaintiffs also claim that WWE had knowledge of evidence suggesting a link between repeated head trauma that could be sustained during WWE events and permanent degenerative neurological conditions such as CTE and either concealed such evidence, fraudulent or negligently denied that it existed, or failed to disclose it in the face of a duty to disclose. Plaintiffs allege that they relied on such fraudulent statements or omissions to their detriment in making decisions regarding their health. In total, plaintiffs have asserted six claims against WWE in their Complaints, including: "Fraudulent Concealment"; (Count II) "Fraud by Omission"; (Count III) Negligent Misrepresentation; (Count IV) Fraudulent Deceit; (Count V) Negligence; and (Count VI) Medical Monitoring.

Currently before the Court are WWE's Motions to Dismiss the Second Amended Complaint brought by plaintiffs Singleton and LoGrasso, in its entirety, for failure to state a claim, as well as WWE's similar Motions to Dismiss the Amended Complaints brought by Plaintiff William Albert Haynes III and Plaintiffs Russ McCullough, Ryan Sakoda and Matthew Wiese, both of which are purported class actions. [Dkt. # 74, Dkt. 95].

Specifically, WWE argues that the claims of all of the plaintiffs except Singleton must be dismissed because they are all time-barred by the applicable Connecticut statutes of limitations and repose, Conn. Gen. Stat. § 52-584 and § 52–577. [Dkt. 43-1, Def.'s Mem. at 1]. WWE also argues that Plaintiffs' negligence-based claims must be dismissed because WWE owed no duty of care to protect Plaintiffs from injuries resulting "from the inherent risks of professional wrestling and within the normal expectations of professional wrestlers." [Id. at 2]. Finally, WWE argues that the plaintiffs' fraud claims, negligent misrepresentation claims and deceit claims must be dismissed either because they fail to comply with the heightened pleading requirements of Rule 9(b) or because they fail to state a cognizable cause of action under Connecticut law. [Id.].

Plaintiffs respondby arguing that the statutes of limitation and repose are subject to tolling based on the continuous course of conduct tdoctrine and because of fraudulent concealment pursuant to Conn. Gen. Stat. § 52-595. Plaintiffs argue that they have stated claims for negligence because WWE owed a duty of care to protect the Plaintiffs from the long term neurological effects that

may result from sustaining multiple concussions and have stated claims for fraud because WWE failed to disclose that Plaintiffs were at risk for such neurological conditions.

For the reasons that follow, WWE's Motion to Dismiss the *Singleton* action [Dkt. 43] is GRANTED IN PART AND DENIED IN PART, and WWE's Motions to Dismiss the *McCullough* and *Haynes* actions [Dkt. 95, Dkt. 64] are GRANTED.

## I.    <u>Factual Background</u>

The following facts and allegations are taken from the Second Amended Complaint in the action brought by Evan Singleton and Vito LoGrasso [3:15-cv-00425-VLB, Dkt. #73] (hereinafter "SAC")] as well as the Amended Complaint in the purported class action brought by Russ McCullough [Dkt. 73] (hereinafter "MAC")] and the Amended Complaint in the purported class action brought by William Albert Haynes [3:15-cv-01156-VLB, Dkt. #43] (hereinafter "HAC")]. All three Complaints contain nearly identical factual allegations with the exception of certain paragraphs alleging facts particular to each named plaintiff.  The Complaints are also excessively lengthy, including large numbers of paragraphs that offer content unrelated to the Plaintiffs' causes of action and appear aimed at an audience other than this Court.

a)  **World Wrestling Entertainment, Inc.**

The WWE is an "organizer and purveyor of professional wrestling events, programs, and matches."  [SAC ¶ 19].  WWE events are alleged to be an "action

4

soap opera" in that the events are scripted, both as to dialogue between the wrestlers as well as the actual physical wrestling stunts, and the events have preordained winners and losers.  [Id. ¶ 20].  Plaintiffs allege that WWE creates scripts for its performances that require its wrestlers to perform "activities that are exceedingly dangerous."  [Id. ¶¶ 40, 44].  Plaintiffs allege that WWE adds what it calls "heat" to its scripts in order to ensure that there is "extra physicality" in its matches, including the use of weapons or chairs in its stunts.  [Id. ¶ 44].  Plaintiffs allege that they have sustained "thousands of hits to their heads as part of scripted and choreographed moves."  [Id. ¶ 50].  As a result, Plaintiffs "believe they are at greater risk for developing long-term brain diseases such as dementia, Alzheimer's disease, ALS, and CTE."  [Id. ¶ 2].

The WWE employs trainers and doctors to oversee its wrestling events and to treat and monitor its wrestlers for injuries they sustain from participation in the events or practices.  [Id. ¶¶ 86, 129, 131].  Specifically, the WWE created a "Wellness Program," launched on February 27, 2006, which provides "[c]omprehensive medical and wellness staffing, cardiovascular testing and monitoring, ImPACT concussion testing, substance abuse and drug testing, annual physicals, [and] health care referrals" to current and former WWE wrestlers.  [Id. ¶ 78].  The WWE also is alleged to collect injury reports concerning injuries sustained by WWE talent in the ring.  [Id. ¶ 89].

b) Concussions and CTE

Plaintiffs define a "concussion" as a type of mild traumatic brain injury

("MTBI") caused by a 'bump, blow, or jolt to the head or body.' A blow to the head that does not cause a concussion, or that has not been diagnosed to cause a concussion, is commonly referred to as a sub-concussive blow." [Id. ¶ 26]. Concussions cause numerous symptoms including: "headaches and problems with concentration, memory, balance coordination, loss of consciousness, confusion, disorientation, nausea, vomiting, fatigue or drowsiness, difficulty sleeping, sleeping more than usual, and seizures." [Id. ¶ 28].

Chronic traumatic encephalopathy ("CTE") is defined in the Complaints as a permanent change to brain structure caused by repeated blows to the head. [SAC ¶¶ 32-33]. CTE is usually caused by repeated minor traumatic brain injuries that "often occur[] well before the development of clinical manifestations," rather than from a single injury. [Id. ¶ 34]. Concussions can cause CTE, but are not the only cause: repeated sub-concussive head trauma can also cause CTE." [Id. ¶ 25]. Furthermore, sustaining repeated mild traumatic brain injuries without taking sufficient time to recover may significantly increase the risk of developing CTE. [Id. ¶ 30]. Symptoms of CTE include "depression, dementia, cognitive impairment, Parkinsonism, personality change, speech and gait abnormalities." [SAC ¶ 33]. Whereas a concussion's symptoms "are often sensory and manifest immediately," CTE can manifest much later, and "can be caused by blows which have no accompanying symptoms." [Id. ¶¶ 35-36]. Unlike concussions, CTE can only be diagnosed *post mortem* with a "direct tissue examination, which can detect an elevated level of Tau protein in brain tissue." *Id.*

c) **Concussion Training, Education and Prevention at WWE**

Each of the six named plaintiffs alleges that they were "never educated about the ramifications of head trauma and injury and never received any medical information regarding concussion or sub-concussive injuries while employed by the WWE." [SAC ¶¶ 138-139]. Rather, Plaintiffs claim that they "relied on WWE's superior knowledge and position of authority." [Id. at ¶140].

Beyond that sole allegation, the Complaints devote large portions of their overall length alleging various injuries and slights sustained by WWE wrestlers other than the named plaintiffs. In fact, despite the length of the Complaints, the Court's prior admonishment of plaintiffs' counsel and the Court's provision of additional time to file a Second Amended Complaint in the *Singleton* action, there are precious few allegations which detail specific instances of conduct that have wronged any of the five plaintiffs. The Complaints are replete with theoretical allegations of conditions from which a hypothetical person could suffer without alleging that any particular Plaintiff actually suffers from such a condition which has been causally connected by an expert to such Plaintiff's performance at WWE events.

For example, the Complaints allege that the WWE did not adequately train "its wrestlers" to execute "their moves," [SAC ¶88], and that WWE created "complicated and dangerous stunts" which it directed "its wrestlers" to perform. [SAC ¶ 91]. Some allegations single out a former WWE trainer, Bill Demott, who is alleged to have ordered "wrestlers who complained of injuries" to "sit in time out," and to have assaulted or verbally humiliated those wrestlers. [Id. ¶ 98].

Nowhere do the Complaints allege that any of the named Plaintiffs were subjected to such conduct. Other allegations are patently vague. As an example, WWE is accused of having "continuously permeate[d] (sic) an environment of humiliation and silence." [Id. ¶ 124]. Demott is accused of having "fostered a brutal culture" and of having forced unnamed wrestlers into "dangerous drills that led to many injuries." [Id. ¶ 98].

Some allegations do not seem to fit plaintiffs' own timeline of events. The Complaints allege that "WWE's Wellness Program served to deceive Plaintiffs by providing a false sense of security and assurance that their health and safety were being adequately monitored, both in the ring and as former wrestlers." [MAC ¶ 83]. The Wellness Program, however, was created after McCullough, Sakoda and Wiese had retired, and plaintiffs do not allege that WWE has ever claimed its Wellness Program was intended to monitor former talent.

Other allegations are patently false.[1] They are simply copied and pasted in whole cloth from one Complaint to another. For example, the McCullough Complaint parrots *verbatim* the allegation that "LoGrasso, wrestling on average five times a week, sustained repeated concussions day after day over many years," without bothering to change the name of the plaintiff. [MAC ¶ 43]. Even LoGrasso's allegation that he suffered concussions "day after day" is contradicted by the fact that LoGrasso never alleges that he was diagnosed with a concussion during his entire tenure with WWE. Rather, his Complaint speculatively alleges only that "upon information and belief" a WWE doctor

[1] The Court notes that a Motion for Sanctions pursuant to Rule 11 has been filed by WWE in the instant case. [Dkt. 80].

"would on numerous occasions" witness LoGrasso suffer head trauma *extremely likely* to cause concussions."  [SAC ¶ 135 (emphasis added].  Further, it is unclear what LoGrasso's basis is for alleging *daily* concussions would be, given that he also alleges that while he was wrestling for WWE he was never educated "regarding concussion or sub-concussive injuries" and "never knew that he could sustain a concussion while remaining awake."  [SAC ¶ 137].

   d) WWE's Alleged Knowledge and Concealment of Risks

   Plaintiffs allege that WWE "concealed important medical information, including the effects of multiple head traumas" from the plaintiffs, in a campaign of misinformation and deception to prevent Plaintiffs from understanding the true nature and consequences of the injuries they have sustained."  [Id. ¶ 60-61].  Specifically, the *Singleton* and *McCullough* Complaints allege that WWE was aware "in 2005 and beyond" that wrestling for the WWE and suffering head trauma "would result in long-term injuries."  [SAC ¶ 57, MAC ¶ 57].  It is unclear how plaintiffs arrive precisely at the year 2005 – the paragraph containing this allegation cites a link to an internet article on the website of the Mayo Clinic regarding the causes of concussions that is no longer available.  Elsewhere, the Complaints cite to studies conducted in 2009 and 2010 and findings in 2007 that former wrestlers may have suffered from CTE.  [SAC ¶ 34, 35, 58].  The Complaints also contain allegations undermining the claim that WWE "was aware" of the medical information allegedly concealed, as they later allege only that "WWE knew, *or should have known*, of developments in medical science

9

during the last decade," citing to a "large body of medical and scientific studies that date as far back to the 1920's that link head trauma to long term neurological problems." [Id. ¶ 3 (emphasis added)].

Plaintiffs allege that "WWE had superior special [sic] knowledge of material medical information that WWE wrestlers did not have access to," although the only specific allegation regarding specialized knowledge is that the WWE allegedly had exclusive access to a "repository of substantial concussion and other head injury information," because the WWE "[u]pon information and belief, [] regularly collected and continues to collect wrestler injury reports, including during [the] Plaintiffs' careers with WWE[.]" [Id. ¶ 89].

The WWE is alleged to have "published articles and . . . downplayed known long-term health risks of concussions." [Id. ¶ 72]. Specifically, WWE is alleged to have issued a statement to ESPN questioning the veracity of a report suggesting a former wrestler, Chris Benoit, suffered from CTE. [Id. ¶ 70]. WWE is alleged to have stated that it was:

> "unaware of the veracity of any of these tests . . . Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85 year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring . . . ." [Id.].

The Complaints allege that WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon further attacked those findings in a joint interview on CNN in 2007. [Id. ¶ 74]. Plaintiffs cite Dr. Joseph Maroon's statements to the NFL Network, Total Access in March of 2015 that "[t]he problem of CTE, although real, is its being overexaggerated." [Id. ¶ 56]. Plaintiffs also allege that WWE

Executive Stephanie McMahon Levesque's testified in 2007 to the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were "no documented concussions in WWE's history."[2]  [Id. ¶ 64].  Plaintiff LoGrasso further alleges that he has received pamphlets and e-mails from the WWE Wellness Program offering support to former wrestlers struggling with drug and alcohol abuse, but that he has not received any communication from the WWE Wellness Program regarding long-term neurological disorders resulting from wrestling activities.  [Id. ¶76].

Finally, plaintiffs allege that the WWE did not "properly assess, diagnose, and treat their wrestlers," although, as described below, none of the five named plaintiffs brings any allegation that on any specific date they complained to a specific WWE employee about concussion-like symptoms and were wrongfully diagnosed as having not suffered a concussion or medically cleared to wrestle without adequate rest.

e) The Named Plaintiffs

   i)  *Plaintiff Vito LoGrasso*

Plaintiff Vito LoGrasso began to wrestle for the WWE in 1990 as an extra, eventually signing a full-time contract with the WWE in 2005.  [Id. ¶¶ 118, 122-23]. LoGrasso alleges that he "never knew that he could sustain a concussion while remaining awake" and claims he believed that "having his 'bells rung' would not result in a concussion."  [Id. ¶ 137].  LoGrasso alleges that during his tenure with

---

[2] As the Court notes in Part 3(a), *supra*, the Defendant has also called into question the veracity of this allegation.

the WWE, his trainer Bill Dumott and other unidentified WWE employees encouraged LoGrasso "to fight through serious injury," although such injuries are unspecified. [Id. ¶ 124]. LoGrasso alleges that he was told by unidentified WWE employees that injuries he suffered were part of "paying his dues." [Id. ¶ 125].

LoGrasso alleges that on some date in September of 2006, he was "kicked in the face outside the ring," which knocked LoGrasso to the ground "where he struck his head against concrete steps." [Id. ¶ 134]. LoGrasso alleges that he was not examined by WWE medical staff for a possible concussion after the incident. [Id.]. However, LoGrasso does not allege that he ever approached any WWE employee to report concussion-like symptoms or that any specific WWE employee had knowledge of his condition.

LoGrasso retired from wrestling in 2007. [Id. ¶ 136]. In 2008 LoGrasso began experiencing "symptoms of neurological injury in the form of residual, pounding headaches." [Id. ¶ 140]. In either 2009 or 2010, LoGrasso was diagnosed with "TMJ of the jaw" and was diagnosed as "near deaf in one ear and mostly deaf in the other." [Id. at ¶ 141]. In 2014 or 2015 LoGrasso alleges that he was diagnosed as "having numerous neurological injuries," which are not specified. [Id. ¶¶ 142-47].

### ii) Plaintiff Evan Singleton

Plaintiff Evan Singleton is a Pennsylvania resident who signed a contract with the WWE in 2012 and wrestled for WWE from 2012 to 2013. [SAC ¶ 93].

Singleton alleges that he "did not have adequate time to rest between matches and was encouraged to wrestle while injured." [Id. ¶ 95]. Singleton also alleges that he sustained "numerous" injuries to the "upper body, neck and head" during his two year wrestling career with WWE, though such injuries are unspecified in the Complaint. [Id.].

Singleton simultaneously alleges that WWE was negligent because, during training, Singleton was matched "with inexperienced opponents which due to lack of experience resulted in more injuries" and that WWE was negligent because Singleton was scripted to perform a "choke slam" with a "more skilled, more experienced" wrestler despite Singleton's own lack of experience with the maneuver. [Id. ¶¶ 96, 100]. While performing this maneuver on or about September 27, 2012, Singleton alleges that he was "knocked completely unconscious" after being "thrown with extra force" to the wrestling mat. [Id. ¶ 102]. Singleton alleges that he "suffered a blow to the left side of his head and sustained a brain injury as a result." [Id. ¶ 103]. He further alleges that he experienced symptoms immediately after suffering the blow to the head in the choke slam maneuver and that after regaining consciousness he had "balance problems." [Id. ¶ 100, 103].

While Singleton alleges that he was "not treated" after the incident, he admits that he saw a WWE trainer immediately after the incident and was instructed to rest over the following weekend and have his father and roommate monitor his condition. [Id. ¶ 104]. Singleton was later seen by a WWE-affiliated doctor who prescribed additional rest, followed by a WWE-affiliated neurologist

who ordered additional testing and a referral to a WWE treating psychiatrist. [Id. ¶¶ 105-106, 115]. Singleton then simultaneously alleges that he was "not medically cleared to wrestle" by WWE but that he was "encouraged" to return and "criticized" and "threaten[ed]" and "harass[ed]" for his inability to return by his trainer, Demott. [Id. ¶ 108].

Singleton does not allege that the WWE ever cleared him to wrestle again, or otherwise failed to prevent additional injury or treatment. Rather, he alleges that as a result of a referral to an inpatient facility by WWE, his primary care physician determined that he suffered from a "possible intracranial hemorrhage." [Id. ¶ 113]. Singleton also alleges that he currently experiences migraines and severe mental health issues as a result of the injury he sustained on September 27, 2015. [Id. ¶¶ 113, 115].

### iii) Plaintiff Russ McCullough

Plaintiff Russ McCullough is a California resident who wrestled for the WWE from 1999 to 2001. [MAC ¶ 98]. Several of McCullough's allegations appear to have been copied and pasted from the Singleton Complaint. Like Singleton, McCullough alleges that he "did not have adequate time to rest between matches and was encouraged to wrestle while injured." [Id. ¶ 99]. Also like Singleton, McCullough alleges that he sustained "numerous" injuries to the "upper body, neck and head" during his two year wrestling career with WWE, though such injuries are also unspecified in his Complaint. [Id. ¶ 100].

McCullough alleges alleges that he was "knocked completely

14

unconscious" after being struck to the head with a metal chair during a WWE wrestling match. [Id.] While unconscious, he was struck in the head with the metal chair "more than 15 times." [Id.] McCullough "sought treatment on his own and on an unspecified date not later than 2001 and he was diagnosed with a severe concussion" following the incident. [Id.] McCullough also alleges that while participating in numerous WWE wrestling matches he suffered "sub-concussive or concussive blows." [ Id. ¶ 101]. McCullough currently suffers from "headaches, memory loss and severe mental health issues." [Id. ¶ 103].

### iv) Plaintiff Ryan Sakoda

Plaintiff Ryan Sakoda is a California resident who wrestled for the WWE from 2003 to 2004. [Id. ¶ 104]. Sakoda alleges that he knowingly suffered a traumatic brain injury when, on an unspecified date in 2003, he was "knocked unconscious in a match by a Super Kick." [Id. ¶ 106]. Sakoda w alleges that WWE trainers and medical staff told him "not to go to sleep, suggesting that if he did he may bleed to death and die." [Id.]. He alleges that he was "forced to wrestle injured" on the threat of losing his job. [Id. ¶ 105]. Sakoda alleges that he currently suffers from headaches, memory loss and depression. [Id. ¶ 108].

### v) Plaintiff Matt Wiese

Plaintiff Matt Wiese is a California resident who wrestled from 2003 to 2005 under the stage name "Luther Reigns." [Id. ¶ 109]. Wiese alleges that he knowingly "sustained numerous untreated head injuries" although such injuries

are not specified.  [Id. ¶ 110].  Wiese alleges that during a WWE event on an unspecified date he was punched by a wrestler under the stage name "Big Show" and sustained "visible injuries" to his head and vomited afterward.  [Id.].  Wiese alleges that "WWE staff took no steps to intervene in the event" or to treat his condition.  [Id.].  However, Wiese does not allege that he ever approached any WWE employee to report concussion-like symptoms or seek treatment or that any specific WWE employee had knowledge of his condition.  Wiese alleges that he suffers from headaches and memory loss and has had a stroke.  [Id. ¶ 111].

### vi) Plaintiff William Albert Haynes III

Plaintiff William Albert Haynes, III ("Haynes") wrestled for WWE from 1986 to 1988.  [HAC ¶ 122].  The Complaint alleges that "Haynes is [sic] well known champion wrestler."  *Id.*  Like the other named plaintiffs, Haynes alleges that at unspecified times he "suffered sub-concussive or concussive blows" and was subjected to "verbal abuse and pressure" from unidentified WWE employees.  *Id.* at 123-124.  Haynes alleges that on March 29, 1987, he was "hit in the head with a large metal chain" which led to an unspecified "head injury" that was not treated.  *Id.* at 126.  Haynes does not allege that he ever sought treatment or from the WWE or a physician or trainer employed by WWE or that he ever complained of concussion-like symptoms.  Haynes alleges that he was never educated "about the risk of sustaining numerous subconcussive and concussive blows."  *Id.* at 125.  Haynes "exhibits symptoms of dementia" and depression.  *Id.* at 131.

### f)  Procedural History

Plaintiffs Singleton and LoGrasso originally filed their Complaint in the U.S. District Court for the Eastern District of Pennsylvania on January 16, 2015 as a purported class action. On February 27, 2015, WWE filed a Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a) due to forum-selection clauses in the contracts signed by each of the wrestlers. [Dkt. 6]. Those clauses state that: "[t]he parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut." Plaintiffs filed no opposition to the Motion to Transfer. By Order dated March 23, 2015, the Eastern District of Pennsylvania granted WWE's Motion to Transfer, noting that "[t]he plaintiffs do not oppose a transfer of venue and agree that the District of Connecticut is an appropriate forum." [Dkt. 11].

The *McCullough* suit was filed as a purported class action in the Central District of California on April 9, 2015. On May 14, 2015, WWE filed a Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a) due to forum-selection clauses in the contracts signed by each of the wrestlers. [Dkt. 16]. The *McCullough* plaintiffs opposed the Motion to Transfer, arguing that the forum selection clauses in the contracts are unconscionable under California and Connecticut law. [Dkt. 21]. On July 24, 2015, the McCullough Suit was transferred to this District after a court in the Central District of California found that the forum selection clauses in the Plaintiffs' contracts with the WWE were valid and enforceable. [Dkt. 24].

Haynes filed his own lawsuit in the United States District Court for the District of Oregon, purporting to be a class action. [No. 3:15-cv-0115-VLB, Dkt. 1].

Unlike the named plaintiffs in the *Singleton* and *McCullough* actions, Plaintiff Haynes did not sign a contract with a forum-selection clause limiting jurisdiction to the District of Connecticut. Nonetheless, on June 25, 2015, the District Court for the District of Oregon granted WWE's Motion to Transfer the *Haynes* action to this District pursuant to 28 U.S.C. § 1404(a), finding that Haynes' choice of forum was entitled to little weight since he had brought a class action on behalf of individuals throughout the United States, because of evidence of forum-shopping on the part of Plaintiff's counsel and because "*forum non conveniens* considerations" weighed in favor of transfer. [Dkt. 59].

In addition, Cassandra Frazier and Michelle James, decedents of former WWE wrestlers have also filed separate wrongful death actions in the Western District of Tennessee and in the Northern District of Texas. [3:15-cv-01305-VLB; 3:15-cv-01229-VLB].[3] Finally, the defendant has counter-sued in a declaratory judgment action styled *World Wrestling Entertainment, Inc v. Windham, et al*, No. 3:15-cv-00994 (VLB), seeking a declaration from this Court that any claims by former wrestlers similar to those of McCullough and LoGrasso are time-barred under the Connecticut statutes of limitations. The outcome of the instant motions to dismiss should therefore be dispositive as to the *Windham* action.

II.  <u>Standard of Review</u>

"'To survive a motion to dismiss, a complaint must contain sufficient

_____

[3] The *Frazier* and *James* actions have also been transferred to this district and subsequently consolidated with the *Singleton* and *McCullough* suits. Motions to Dismiss the Amended Complaints in *Frazier* and *James* are now pending before the Court, however they are not examined in this memorandum of opinion.

factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. U.S.*, 678 F.3d 147 (2d Cir. 2012) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations and internal quotations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (*quoting Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (*quoting Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal

quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs.*, Inc., 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

III.　　Discussion

At the outset, neither the *Singleton* nor the *McCullough* plaintiffs challenge WWE's assertion that Connecticut law applies to their claims by virtue of the forum-selection clause in the contracts between the wrestlers and WWE; and plaintiffs in both cases have submitted opposition briefing relying exclusively on Connecticut law.

Plaintiff Haynes, however, argues that Oregon substantive and procedural law must apply to his claims, noting that he never signed a contract with the WWE which included a forum-selection clause. The Court therefore begins by examining the choice-of-law question with respect to *Haynes*.

1.　**Connecticut Law Applies to the Claims in the Haynes, Singleton and McCullough Actions**

Ordinarily, when a case is transferred pursuant to 28 U.S.C. § 1404(a), "the transferee court generally adheres to the choice of law rules of the transferor court." *Sissel v. Rehwaldt*, 519 Fed. Appx. 13, 17 (2d Cir. 2013) (*citing Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)). WWE notes that an exception applies when the transferor court lacks personal jurisdiction over the defendant(s), in which case the transferee court's choice-of-law principles govern. *See Garena v. Korb*, 617 F.3d 197, 204 (2d Cir. 2010) ("[W]hen a case is transferred under 28 U.S.C. § 1404(a), the law of the transferor state is to be applied so long as the transferor state could properly have exercised jurisdiction.").[4] However, in this case the determination of which state's choice-of-law rules to apply is made easier by the fact that both Oregon and Connecticut courts consider choice-of-law questions by examining the same factors, which are set forth in the Restatement (Second) of Conflicts § 145. *Jaiguay v. Vasquez*, 287 Conn. 948 A.2d 955 (Conn. 2008) ("we have moved away from the place of the injury rule for tort actions and adopted the most significant relationship test found in §§ 6 and 145 of the Restatement (Second) of Conflict of Laws."); *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 662 (9th Cir. 1999) ("Oregon courts follow the Restatement (Second) of Conflicts of Laws § 145 approach to determining the appropriate substantive law."). Under the factors set forth in the Restatement and the precedent cases in

---

[4] WWE notes that its Motion to Dismiss the Haynes action argued that the District Court for the District of Oregon lacked personal jurisdiction over WWE. Thus, WWE argues that if this Court were to determine that WWE was not subject to personal jurisdiction in Oregon, Connecticut choice-of-law rules would apply. The Court need not determine whether WWE was subject to personal jurisdiction in Oregon, as the outcome would be the same under either state's choice-of-law analysis.

either jurisdiction, Connecticut substantive law must be applied to Haynes'
claims.

Section 145 of the Restatement (Second) of Conflicts provides that "[t]he
rights and liabilities of the parties with respect to an issue in tort are determined
by the local law of the state which, with respect to that issue, has the most
significant relationship to the occurrence and the parties."  Restatement (Second)
Conflict of Laws § 145(2) (1971).  The "contacts" that are to be taken into account
in determining which state has the most significant relationship include: "(a) the
place where the injury occurred, (b) the place where the conduct causing the
injury occurred, (c) the domicile, residence, nationality, place of incorporation
and place of business of the parties, and (d) the place where the relationship, if
any, between the parties is centered."  *Id.*  These contacts "are to be evaluated
according to their relative importance with respect to the particular issue."  *Id.*;
*see also Jaiguay*, 948 A.2d at 974 (applying same); *389 Orange Street Partners*,
179 F.3d at 661 (applying same).

The first factor, the place where the injury occurred, is essentially neutral in
this case.  Haynes alleges that he competed in "hundreds" of matches for the
WWE, including matches in front of nationally-televised audiences.  [HAC ¶ 122].
Although Plaintiffs argue that "at least four" of those matches occurred in
Oregon, [Pl.'s Supp. Mem. at  10], it cannot be said that the "injury" alleged – in
the form of increased risk of degenerative neurological conditions – occurred
exclusively – or even substantially – within Oregon borders or indeed within any
jurisdiction.  Haynes has also brought a purported class action on behalf of

wrestlers who also presumably were injured in numerous jurisdictions.

The second factor, the place where the conduct giving rise to the injury occurred, weighs heavily in favor of the application of Connecticut law. The documents and witnesses that would be likely to support Haynes' fraud claims are likely to be in or near WWE's corporate headquarters located in Stamford, Connecticut. To the extent Haynes alleges negligence in the form of inadequate training, education, assessment or medical diagnosis, such conduct is likely to have occurred in numerous jurisdictions, but with the direction and coordination of WWE staff located in Connecticut at that time.

The third factor – the domicile of the parties – is neutral. Haynes is an Oregon resident and WWE is incorporated in Connecticut. And the fourth factor, the place where the relationship between the parties is centered, weighs somewhat in favor of Connecticut, as WWE attorneys and staff are likely to have at least contributed to the development and negotiation of Haynes' booking contract and at least contributed to determining the location, dates and times of Haynes' wrestling engagements nationwide.

The four factors enumerated above weigh in favor of the application of Connecticut law. The Court also notes that two important factors in the Oregon court's decision to transfer this action to Connecticut were: (1) evidence of forum-shopping on the part of Plaintiff's counsel, and (2) the fact that the *Haynes* action, along with the *McCullough* action which had already been transferred to this District, was a purported class action on behalf of individuals domiciled throughout the United States. [Dkt. 59]. These factors must also be taken into

account here, and lead this Court to assign little value to the fact that Haynes is an Oregon resident, essentially the only fact supporting application of Oregon law. Courts in both the Second and Ninth Circuits have reached the same conclusion in similar circumstances. *See 389 Orange Street Partners*, 179 F.3d at 662 (applying Connecticut law to claims brought by former basketball player Clifford Robinson and noting that "the only factor favoring Oregon substantive law is Robinson's residence in Oregon."). In such circumstances, the Court must apply Connecticut substantive law.

Because the Court applies Connecticut substantive law, the Connecticut statutes of limitations and repose must also apply. "Under Oregon law, the statute of limitation is provided by the state which supplies the substantive law." *389 Orange Street Partners*, 179 F.3d at 661. And under Connecticut law, the statute of limitations is considered procedural and the Connecticut statute of limitations will govern if the underlying claims existed at common law. *Baxter v. Sturm, Ruger & Co. Inc.*, 32 F.3d 48, 49 (2d Cir. 1994) (rejecting application of Oregon statute of limitations and after the Connecticut Supreme Court found the statute to be procedural and not substantive); *Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d 337, 353 (D. Conn. 2013) (Connecticut courts traditionally apply Connecticut's statute of limitations when the plaintiff pursues a common law cause of action").

      **2.** <u>**Plaintiffs' Claims Are Not Time-Barred By Connecticut Statutes of Limitations and Repose**</u>

The WWE urges dismissal of all of the claims of Plaintiffs LoGrasso,

McCullough, Sakoda, and Wiese on the grounds that these plaintiffs' fraud and deceit claims are time-barred pursuant to Conn. Gen. Stat. § 52–577, the Connecticut statute of limitations for tort claims, and that their negligent misrepresentation, negligence, and medical monitoring claims are time-barred pursuant to Conn. Gen. Stat. § 52–584, the Connecticut statute of limitations applicable to negligence claims.

Conn. Gen. Stat. § 52-584 provides in relevant part:

> "No action to recover damages for injury to the person, or to real or personal property, caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of ...."
> Conn. Gen. Stat. § 52-584 (West).

Section 584, applicable to Plaintiffs negligence claim, is both a statute of limitations and a statute of repose, as it contains both a two-year limitations component running from the date of discovery of the injury as well as a three-year repose component which runs from the date of the act or omission alleged to have caused the injury. *See Neuhaus v. DeCholnoky*, 905 A.2d 1135, 1142 (Conn. 2006). Section 577, applicable to Plaintiffs tort claims for fraud and deceit, is a three-year statute of repose which provides simply that: "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Conn. Gen. Stat. § 52–577 (West).

Because plaintiff Singleton wrestled for WWE as late as 2013, WWE has not argued that his claims are time barred. However, Plaintiffs Haynes, LoGrasso, McCullough, Sakoda and Wiese each ceased wrestling for WWE well before 2012

25

(together, the "Pre-2012 Plaintiffs").  Whether the Pre-2012 Plaintiffs' claims are time-barred depends on: (1) when each of the plaintiffs first discovered "actionable harm" such that the discovery provision of Conn. Gen. Stat. § 52-584 began to accrue on their negligence claims; (2) whether WWE engaged in a continuing course of conduct that tolled the applicable statutes of repose as to all claims; or (3) whether WWE engaged in fraudulent concealment in violation of Conn. Gen. Stat. § 52-595, such that the applicable statutes of limitations must be tolled as to all claims.

For the reasons stated below, the Court finds that to the extent that the harm alleged is an increased risk for permanent degenerative neurological conditions, it is not evident from the face of the Complaints that any plaintiff discovered the actionable harm more than two years prior to the filing of the instant suits.  The Court also finds the statute of limitations and repose may be tolled only as to the fraudulent omission claim and only to the extent that the Complaint raises questions of fact as to whether WWE owed a continuing duty to disclose, or fraudulently concealed, information pertaining to a link between WWE wrestling activity and permanent degenerative neurological conditions.

### a.    Date of Discovery of Actionable Harm

WWE first argues that the Pre-2012 Plaintiffs' negligence claims are barred by the discovery portion of the statute of limitations at Sec. 584 because the Plaintiffs discovered the injuries they have complained of well prior to their retirement from wrestling.  The Connecticut Supreme Court has defined the term

'injury' in Sec. 52-584 to be an event that occurs when the plaintiff suffers "actionable harm." *Lagassey v. State*, 846 A.2d 831, 845 (Conn. 2004). "Actionable harm," in turn, "occurs when the plaintiff discovers, or in the exercise of reasonable care, should have discovered the essential elements of a cause of action." *Id.* at 846. Thus, "the statute of limitations begins to run when the claimant has knowledge of facts which would put a reasonable person on notice of the nature and extent of an injury and that the injury was caused by the wrongful conduct of another. . . The focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories." *Id.* The determination of when a plaintiff in the exercise of reasonable care should have discovered 'actionable harm' is ordinarily a question reserved for the trier of fact." *Id.* at 847.

The WWE notes that under Connecticut law, although an injury occurs "when a party discovers some form" of actionable harm, "the harm complained of need not have reached its fullest manifestation in order for the limitation period to begin to run." *BellSouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 614 (2d Cir. 1996), *citing Burns v. Hartford Hosp.*, 472 A.2d 1257, 1261 (1984); *Mollica v. Toohey*, 39 A.3d 1202, 1206 (2012). Thus, with regard to physical injuries, a plaintiff need only discover "some physical injury," not the "full manifestation" of a given injury, for his or her claim to accrue. *See, e.g., Dennis v. ICL*, Inc., 957 F. Supp. 376, 380 (D. Conn. 1997) (claim accrued when plaintiff first learned she had tendinitis and "overuse syndrome" in her wrists due to her work; later diagnosis of Carpal Tunnel Syndrome was merely the full manifestation of the condition "that caused her earlier symptoms.").

The WWE argues, therefore, that the statutes of limitations began to run on the Pre-2012 Plaintiffs' claims at the time that each plaintiff knowingly sustained head injuries while participating in WWE's wrestling matches, because each plaintiff has alleged that he was aware that he had sustained head trauma and/or concussions and was at least somewhat symptomatic of concussive injury at that time that he was wrestling. [Def.'s Mem. at 24]. It is inconsequential, WWE argues, that the Pre-2012 Plaintiffs "did not discover the full manifestation of these alleged head injuries" until a later date. [Def.'s Reply at 7].

The Pre-2012 Plaintiffs have different responses on the issue of the date of discovery of actionable harm. Plaintiff Vito LoGrasso, the only Pre-2012 Plaintiff to have been diagnosed with any permanent condition, argues that he did not discover actionable harm until 2014, when he was diagnosed as "permanently disabled," allegedly due to the head trauma he sustained during his tenure with the WWE. [Pls.' Rep. Mem. at 6-9]. Other Pre-2012 Plaintiffs have alleged that the injuries they sustained are not the discrete head injuries that they suffered while wrestling for WWE, but rather the increased risk of developing permanent neurological conditions, including but not limited to CTE, as a result of their wrestling activity. [Pls.'s Opp. Mem. at 21 ("[j]ust because the Plaintiffs knew they were being hit on the head does not equate to their knowledge that they were receiving severe concussions . . . which . . . will continue to result in long-term neurological injuries")].

On this issue, the Court must concur with the Plaintiffs. The mere fact that the Pre-2012 Plaintiffs allege that they sustained concussions and head trauma

during their tenure with the WWE; and that they allege awareness of those concussions and possible concussion-like symptoms at the time, is not necessarily dispositive here at the motion to dismiss stage. A single MTBI such as a concussion, and the symptoms that a discrete MTBI can manifest, are not the same "condition" as a disease such as CTE or another degenerative neurological disorder that may – or may not – be caused by repeated MTBIs.

The distinction between cause and condition is critical. An individual who smokes cannot be said to be aware of developing lung cancer merely because the individual is aware that he or she smokes. And where, as here, the injury alleged is not an actual condition at all, but rather an *increased risk* of developing a condition, the date of discovery of "some injury" becomes even more difficult to pinpoint. In such cases, it is perhaps possible for a plaintiff to be aware of some form of the risk so as to have discovered the actionable harm. Certainly the widespread publicity of the hazards of smoking in recent decades can be said to have put the American public on notice of an increased risk for lung cancer. On the face of the Complaints, however, the Court cannot determine date(s) of discovery in this case which would bar the instant claims.

Only one court has considered this issue previously, in the context of current and former professional hockey players. *See In re Nat. Hockey League Players' Concussion Injury Litig.*, 2015 WL 1334027, at *5-7 (D. Minn. Mar. 25, 2015) (hereinafter the "NHL case"). In the *NHL* case, Judge Nelson rejected the NHL's substantially similar argument on a Motion to Dismiss under Minnesota law that "the statutes of limitations began to run on Plaintiffs' claims when

Plaintiffs sustained head injuries in the NHL because they were aware at that time that they had been injured . . . and the fact that the injuries are now more extensive than they realized at the time they sustained them does not extend the limitations period." *Id.* at *7. Judge Nelson held that because the NHL plaintiffs "alleged "injury in the form of an increased risk of developing neurodegenerative diseases," it could not be determined from the face of the Complaint that the NHL plaintiffs "were aware that they had suffered an injury—or the possibility of injury—while they were playing in the NHL." *Id.*

The cases cited by WWE in support of an earlier discovery date under Connecticut law are inapposite and do not urge a different outcome here. In *Slekis v. Nat'l R.R. Passenger Corp.*, 56 F. Supp. 2d 202, 206 (D. Conn. 1999), one court held there was an issue of material fact as to whether a paraplegic plaintiff who could not feel a foot injury should have been aware of his cause of action. In that case, the record was "not clear as to what plaintiff saw or experienced at the time of the accident" and whether the experience should have put him on notice of the injury. *Id.* at 206. Similarly, in *Mountaindale Condo. Ass'n, Inc. v. Zappone*, 59 Conn. App. 311 (Conn. App. 2000), the question was whether plaintiff knew of construction defects in an apartment building sufficient to put the plaintiff on notice "that it was likely there were building and fire code violations . . . in the units" prior to the discovery of those specific code violations. *Id.* at 324-325. In both cases the plaintiffs saw or heard some fact or witnessed some incident which could have reasonably put them on notice of their cause of action.

Here, however, it cannot be determined from the face of the Complaints and as a matter of law that the Pre-2012 Plaintiffs were on notice of an increased risk for a latent, permanent neurological condition merely because they knew they had suffered a concussion and/or sustained other minor brain trauma during the time they wrestled for WWE. The Pre-2012 Plaintiffs' knowledge, or lack thereof, of a connection repeated concussions or sub-concussive blows to the head and latent, permanent neurological conditions presents a material issue of fact that must be decided at a later date.[5] Without knowledge of such a

---

[5] Several facts set forth in LoGrasso's lengthy, 281-paragraph Amended Complaint, do suggest that perhaps, at the very least, LoGrasso should have been aware of some degenerative neurological condition prior to his diagnosis of CTE in 2015, such that his claim may have accrued at an earlier date. Specifically, the Amended Complaint alleges that "by 2008, Mr. LoGrasso was showing symptoms of neurological injury in the form of residual, pounding headaches." [SAC ¶ 140]. Further, LoGrasso alleges that "[i]n 2009 and 2010 [LoGrasso's] headaches continued to worsen and become more frequent." [SAC ¶ 141]. Apparently in either 2009 or 2010, Mr. LoGrasso "was diagnosed with TMJ of the jaw and was disabled near deaf in one ear and mostly deaf in the other." [Id.]. These admissions raise the question whether LoGrasso, by admitting that he began experiencing residual headaches well after he retired in 2008 which worsened in 2009 and 2010, has essentially admitted that he discovered or should have discovered "some injury" that is the basis for his present claim.

LoGrasso, for his part, contends that, although he began experiencing neurological symptoms in 2008, he was unaware that his symptoms were connected to the head trauma he received while wrestling with the WWE until his diagnosis 2014. [Pls.' Rep. Mem. at 8-9]. Yet the allegation that LoGrasso did not know of a connection between his headaches and head trauma sustained during wrestling activity, accepted as true for the purposes of this motion, nonetheless pushes the boundary between possible and plausible. Plaintiffs will carry a heavy burden to convince any reasonable trier of fact that LoGrasso, one year after retiring from wrestling in 2007, could not pinpoint the source of his headaches, deafness, and TMJ.

connection, Plaintiffs may have discovered "some injury," but not "actionable harm" because of their inability to tie head trauma that they knew they were sustaining to another party's breach of a duty to disclose increased risks for latent, permanent neurological conditions. *See Lagassey*, 846 A.2d at 846-47; *Slekis*, 56 F. Supp. 2d. at 206.

The Court notes that the WWE has not argued in the instant motions to dismiss that the Pre-2012 Plaintiffs should have reasonably become aware of their causes of action on the basis of widely-publicized studies, lawsuits and settlements linking CTE and other disorders with professional athletes in other sports in recent years. The Court is skeptical, however, of the inherent contradiction which underlies plaintiffs' fraud claims. Plaintiffs simultaneously argue on the one hand that studies and data linking MTBIs with permanent degenerative neurological conditions were both widespread and widely-publicized, and on the other hand that Plaintiffs had no knowledge of any of this widely-publicized information and instead relied, to their detriment, on a television entertainment company to explain to them the dangers of volunteering, for compensation, to be hit in the head repeatedly with a metal folding chair.[6]

---

WWE did not address this issue in briefing, perhaps because further factual development is necessary to determine whether LoGrasso – or any of the other Pre-2012 Plaintiffs – discovered some form of permanent neurological disorder prior to 2014 or 2015, even if not its "full manifestation." WWE relied upon the sole argument that LoGrasso knew he suffered concussions while wrestling, and therefore discovered "some form" of his latent neurological condition.

[6] The Court also notes that the term "punch-drunk" has been common parlance for decades and certainly well before Plaintiffs began wrestling for WWE. And in 1984, three years before Plaintiff Haynes began wrestling for WWE, the boxer

Nonetheless, because LoGrasso's claim crosses a minimum threshold of plausibility, and because WWE did not argue the point in support of its Motion, further factual development is needed to determine whether any of the Pre-2012 Plaintiffs discovered, or should have discovered actionable harm in the form of an increased risk for latent, permanent degenerative neurological conditions prior to 2013. WWE's Motions are DENIED to the extent they argue that these plaintiffs negligence claims are time-barred by the operation of the statute of limitations in Conn. Gen. Stat. § 52-584.

b.    Application of Connecticut's Statute of Repose

Even if plaintiffs did not discover actionable harm at the time they wrestled for WWE, such that their claims are not barred by the statutes of limitations, their claims may still be barred by the Connecticut statutes of repose.

Specifically, Section 52-584 bars a plaintiff from bringing a negligence claim "more than three years from the date of the act or omission complained of." Conn. Gen. Stat. § 52-584 (West). "[T]he relevant date of the act or omission complained of, as that phrase is used in § 52–584, is the date when the negligent conduct of the defendant occurs and ... not the date when the plaintiff first sustains damage . . . ." *Martinelli v. Fusi*, 963 A.2d 640, 644 (Conn. 2009). Therefore, any action commenced more than three years from the date of the negligent act or omission is barred by Sec. 52-584, "regardless of whether the plaintiff could not reasonably have discovered the nature of the injuries within

_____

Muhammad Ali was famously diagnosed with early-onset Parkinson's disease incident to the head trauma he sustained while boxing.

that time period." *Id.* (Internal quotation marks omitted).

Similarly, Sec. 52-577 allows a tort action to be brought within three years "from the date of the act or omission complained of." Conn. Gen. Stat. § 52-577 (West). And, as with Sec. 52-584, operation of Sec. 52-577 cannot be delayed until the cause of action has accrued, "which may on occasion bar an action even before the cause of action accrues." *Prokolkin v. Gen. Motors Corp.*, 365 A.2d 1180, 1184 (Conn. 1976). Thus, even if the Pre-2012 Plaintiffs did not discover the actionable harm alleged until more recently, their claims may still be barred by the operation of the two statutes of repose.

Nonetheless, the Connecticut Supreme Court has recognized that Sec. 52–584 "may be tolled under the continuing course of conduct doctrine." *Neuhaus*, 905 A.2d at 1143. In addition, Conn. Gen. Stat. § 52-595 tolls any statute of limitations or repose, including Sec. 52-584 and Sec. 52-577, if a defendant fraudulently conceals a cause of action from a plaintiff. *See Connell v. Colwell*, 571 A.2d 116, 118 (Conn. 1990) (concluding that "the exception contained in § 52–595 constitutes a clear and unambiguous general exception to any Connecticut statute of limitations that does not specifically preclude its application.").

WWE argues that "the latest date on which WWE conceivably could have committed any 'act or omission'" with regard to any plaintiff would have been the last day of their employment with WWE. For each the Pre-2012 Plaintiffs, this would have been far more than three years prior to the filing of the instant

lawsuits, meaning that each of the claims would be reposed.[7]

The Pre-2012 Plaintiffs appear to concede that the acts or omissions that form the bases of their suits occurred more than three years prior to the filing of their suits, and instead argue solely that their claims are nonetheless timely because the allegations are sufficient to show that WWE fraudulently concealed their cause of action and/or engaged in a continuous course of conduct that justifies tolling the statutes of repose.

### c. The Statute of Repose May Be Tolled by the Continuing Course of Conduct Doctrine

Under appropriate circumstances, the Connecticut statutes of repose may be tolled under the continuing course of conduct doctrine. *Blanchette v. Barrett*, 640 A.2d 74, 83 (Conn. 1994). The plaintiff must show the defendant: "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the original wrong; and (3) continually breached that duty." *Witt v. St. Vincent's Medical Center*, 746 A.2d 753, 762 (Conn. 2000).

Where Connecticut courts have found a duty "continued to exist after the act or omission relied upon: there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Macellaio v. Newington Police Dep't*, 75 A.3d 78, 85 (Conn. App. 2013). The existence of a special relationship "will depend on the circumstances that exist between the

---

[7] Plaintiff LoGrasso, for example, has not contested the WWE's assertion that the date of the wrongful acts or omissions he complains of last occurred on or before December 31, 2007.

parties and the nature of the claim at issue." *Saint Bernard School of Montville, Inc. v. Bank of America*, 95 A.3d 1063, 1077 (Conn. 2014). Connecticut courts examine each unique situation "in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." *Alaimo v. Royer*, 448 A.2d 207, 209 (Conn. 1982). Specifically, a "'special relationship' is one that is built upon a fiduciary or otherwise confidential foundation characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Saint Bernard School of Montville*, 95 A.3d at 1077.

However, "a mere contractual relationship does not create a fiduciary or confidential relationship," *id.* at 835-36, and employers do necessarily not owe a fiduciary duty to their employees. *Grappo v. Atitalia Linee Aeree Italiane, S.P.A.*, 56 F.3d 427, 432 (2d Cir. 1995); *Bill v. Emhart Corp.*, No. CV 940538151, 1996 WL 636451, at *3-4 (Conn. Super. Ct. Oct. 24, 1996). The law will imply [fiduciary responsibilities] only where one party to a relationship is unable to fully protect its interests [or where one party has a high degree of control over the property or subject matter of another] and the unprotected party has placed its trust and confidence in the other." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1279-80 (Conn. 2000).

The Pre-2012 Plaintiffs allege that WWE assumed a continuing duty by virtue of its "ongoing relationships with Plaintiffs through its Wellness Program," and "its public statements . . . which Plaintiffs continued to rely on to their detriment by failing to seek and receive necessary medical treatment." [Pls.'

Opp. Mem. at 14].

The WWE strenuously argues that under Connecticut law, a continuing duty owed by a defendant must "rest on the factual bedrock of actual knowledge," *Neuhaus*, 905 A.2d at 1143, and stresses that none of the Pre-2012 Plaintiffs alleges that they ever informed the WWE that they were experiencing concussion-like symptoms. In *Neuhaus*, the defendant hospital failed to warn the plaintiff of the risks – including brain damage – associated with her child's respiratory condition upon the plaintiff's discharge. *Id.* at 196. One of the defendant's doctors had assessed the child's risk factors for complications and determined the child was not at risk of permanent injury. *Id.* The Connecticut Supreme Court held that because there was no evidence that the doctor was ever confronted with actual knowledge that the child's treatment at the hospital "had been mishandled" or became "aware that his original assessment . . . may have been incorrect," the hospital did not have a continuing duty to warn the plaintiff regarding the risks associated with the underlying condition. *Id.* at 204.

Ignoring the thrust of WWE's argument, Plaintiffs state that "[b]ecause WWE provided [them] with medical care . . . it had a continuing duty to warn them of the risks they faced . . . until disclosure resulting in a complete diagnosis." [Pls.'s Mem. at 17]. In support, Plaintiffs cite to the case of *Witt v. St. Vincent's Med. Ctr.*, 746 A.2d 753 (Conn. 2000), in which the defendant doctor made a diagnosis while expressing concern that his diagnosis may have been incorrect; and later wrote another note expressing concern that the plaintiff could develop cancer. However, the issue in *Witt*, as later clarified by the Connecticut Supreme

Court in *Neuhaus*, was the defendant's "initial and continuing concern" that had "never been eliminated" which "triggered his duty to disclose." 905 A.2d at 1144. Thus, *Witt* as clarified by *Neuhaus* stands for the proposition that a continuing duty arises when the medical care provider has reason to suspect that further treatment is needed at the time of treatment; and not for the proposition that once treatment is provided a medical care provider has a duty to advise a patient in perpetuity about medical discoveries, risks and treatment for any possible condition that a patient might reasonably develop.

WWE argues that the court in *Neuhaus* rejected the "expansive type of duty urged here . . . to warn of all potential risks associated with head injuries," and that the court in *Neuhaus* declined to hold that the hospital had a continuing duty to warn of "the universe of potential risks associated with respiratory distress syndrome." [Dkt. 95-1, Def.'s Mem. at 41]. The WWE further argues that none of the Pre-2012 Plaintiffs have pled any specific wrongful diagnosis or wrongful treatment of any specific injury on the part of a WWE-affiliated medical provider.

However, it is at least plausibly alleged[8] under *Neuhaus* that WWE may have had both the requisite initial and continuing concern about the long-term health of its wrestlers such that it owed a continuing duty to warn those wrestlers

---

[8] The Court notes that *Neuhaus* and each of the other Connecticut cases rejecting a plaintiff's claim of a continuing duty on the part of a medical provider or practice have occurred at the summary judgment stage, after factual development shed light on whether an initial and continuing concern existed. *See Martinelli*, 290 Conn. at 347-355 (no issue of material fact as to whether the defendant had a subjective concern or awareness that the plaintiff's condition, required further treatment or warning); *Neuhaus*, 280 Conn. at 190 (same); *Witt*, 252 Conn. at 370 (material issue of fact as to whether the defendant physician had an initial and ongoing concern about the plaintiff); *Bednarz v. Eye Physicians of Cent. Connecticut, P.C.*, 287 Conn. 158, 947 A.2d 291 (2008)(same).

about the long-term risks of head trauma sustained in the ring even after they had retired.  As to an initial concern, it is at least plausibly alleged that WWE knew as early as 2005 about research linking repeated brain trauma with permanent degenerative disorders and that such brain trauma and such permanent conditions could result from wrestling.  For example, the WWE is alleged to have created its Wellness Program in 2006 on the advice of its attorney after the deaths of several former wrestlers from drug and alcohol abuse.  WWE's attorney is alleged to have recommended to head this Program Doctor Maroon, a noted neurosurgeon and head injury specialist for the NFL, who, together with a colleague, invented the ImPACT concussion test.  [SAC ¶ 76, n. 26].  This fact alone, indeed to WWE's credit, plausibly suggests WWE had knowledge causing it to have an early and strong concerns about the health effects of wrestling and the long-term neurological health of WWE wrestlers.

Plaintiffs also plausibly allege that these concerns continued even after plaintiffs retired from wrestling.  For example, LoGrasso alleges that he has received, during his retirement, "pamphlets and emails from the Wellness Program regarding the health and safety of retired wrestlers."  [Id. ¶ 148].  The Wellness Program is also alleged to have reached out to former wrestlers "to offer support for drug and alcohol abuse."  [Id. ¶ 80].  Finally, WWE is alleged to have issued a statement in response to a 2009 ESPN article downplaying the likelihood that a deceased former wrestler suffered from CTE.  [Id. ¶ 69].  Such allegations of ongoing contact may be threadbare, but it cannot be determined from the face of the Complaints that WWE did not exhibit an ongoing concern

about the health of its former wrestlers.

Furthermore, the key issue here is whether it can be determined from the face of the Complaints that WWE's initial concern about permanent neurological disorders had ever "*been eliminated.*" *Witt*, 280 Conn. at 206 (emphasis added). For example, in *Sherwood v. Danbury Hosp.*, 746 A.2d 730, 733 (Conn. 2000) (*Sherwood I*), a plaintiff in 1985 had received a transfusion of blood that she alleged had been knowingly administered despite having not been tested for the presence of HIV, even though tested blood was available. *Id.* The patient had no further contact or treatment with the hospital where the transfusion was performed whatsoever until her discovery that she had contracted the HIV virus in 1994. *Id.* Noting that the plaintiff's expert had testified that in 1987, "the Center for Disease Control ... issued a recommendation that recipients of multiple transfusions between 1978 and late spring of 1985 be advised that they were at risk for ... HIV ... infection and [be] offered HIV antibody testing," and that another hospital had done so for approximately 17,000 former patients, the court found that there was a material issue of fact as to whether the hospital owed a continuing duty to warn the plaintiff, and remanded the case. *Id.* at 740. Only after factual development revealed that the hospital did not knowingly administer untested blood did the Connecticut Supreme Court later hold that there was no continuing duty to warn the plaintiff of the risks associated with her blood transfusion. *Sherwood v. Danbury Hosp.*, 896 A.2d 777, 797 (Conn. 2006)

(*Sherwood II*). [9]  At the very least, further factual development is necessary to determine the scope of any initial and ongoing concern by WWE about head injuries in its wrestling programs.

The WWE also argues that an ordinary contractual relationship, such as that between an employer and an employee or independent contractor, does not *ipso facto* create a "special relationship" giving rise to a continuing duty.  *See AT Engine Controls, Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, No. 3:10-cv-01539 (JAM), 2014 WL 7270160 (D. Conn. Dec. 18, 2014).  WWE argues that plaintiffs' allegations that WWE possessed specialized knowledge or skill with respect to head trauma are "conclusory" and that it would be improper to impose upon "WWE, an entertainment company, a legal obligation to continually update former performers of developments in medical science regarding potential risks of head trauma."  [Def.'s Rep. Mem. at 10].

Plaintiffs note WWE's expansive role in monitoring the safety of wrestling and the welfare of its wrestlers.  They allege that "WWE trained its wrestlers, choreographed their performances, and employed medical staff to monitor its wrestlers' health."  [Pls.' Opp. Mem. at 29].  Specifically, the WWE is alleged to have designed and scripted the specific stunts performed by the wrestlers, and to have publicly advised that the activities were safe.  [SAC ¶¶ 23, 61].  Plaintiffs alleged that WWE regularly collected and continues to collect wrestler injury

_____

[9] Although the WWE may be an entertainment company and not exclusively a medical provider, the existence of the Wellness Program and its employment of knowledgeable doctors, including experts in head trauma such as Dr. Maroon, suggests that cases such as *Neuhaus* and *Sherwood* are at least somewhat analogous to the case at bar.

reports, including during Plaintiffs' careers with WWE.  [Id. ¶ 86].  Plaintiffs allege that the WWE took on a greater role as a caretaker for its active wrestlers after its creation of the Wellness Program in 2007.  The WWE is alleged to have publicly stated the intent of the Wellness Program to monitor active wrestlers for concussions, including providing concussion testing, and to have boasted that the program is the "finest monitoring program in American Sports."  [Id. ¶ 82].  Although the Wellness Program is not alleged to have taken any active role in monitoring retired wrestlers, the program's doctors are alleged to have been knowledgeable with regard to the latest scientific studies concerning CTE and other permanent degenerative disorders, including the head of the program, Dr. Maroon, who is alleged to have been a critic of certain studies and findings regarding CTE.  [Id. ¶ 76].  These allegations, if true, would suggest that a special relationship could have existed between plaintiffs and WWE, one "characterized by a unique degree of trust and confidence between the parties" and by WWE's "superior knowledge, skill or expertise" regarding the prevention and diagnosis of traumatic brain injuries.

Even if WWE did not have a "special relationship" with its wrestlers that continued past their retirement, the plaintiffs here have alleged later wrongful conduct that could relate back to the initial wrong for the purpose of tolling the statutes of repose.  For example, the Wellness Program is alleged to have contacted former wrestlers about drug and alcohol abuse, but not about the long-term effects of head trauma sustained while wrestling or the need for testing for neurological disorders.  [Id. ¶ 80].  The WWE is alleged to have discredited or

disparaged research surrounding CTE or the possibility that former wrestlers could have been diagnosed with CTE.  [Id. ¶¶ 68-73].  WWE adamantly disputes many of these allegations and argues plaintiffs have selectively edited quotes to fabricate such claims.  Nonetheless, accepted as true for the purposes of these Motions to Dismiss, such allegations suggest that WWE may have committed later wrongful conduct related to the initial wrongs.  Once again, further factual development is necessary to determine whether a special relationship existed by virtue of WWE's superior knowledge, and whether that relationship extended beyond the time period of the wrestlers' employment with WWE.[10]

The Court finds that the complaints plausibly allege the existence of a continuing course of conduct that may toll the statutes of repose on the basis of an initial concern about possible long-term effects of head injuries sustained while wrestling that was ongoing and never eliminated.  The Court also finds the possible existence of a special relationship based on the complaints' allegations of WWE's superior knowledge as well as later wrongful conduct related to the initial failure to disclose.  Thus, the statutes of repose may tolled by virtue of a continuing duty.

---

[10] The WWE also argues that "LoGrasso's admission that he had discovered some form of harm during his tenure with WWE also precludes him from invoking the continuing course of conduct doctrine."  [Def.'s Rep. Mem. at n. 7]; *see Rosato v. Mascardo*, 82 Conn. App. 396, 405 (2004) ("the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm").  However, as the Court earlier held at Part III.a, *supra*, it cannot be determined from the face of the complaint that any plaintiff discovered the harm – in the form of an increased risk of permanent degenerative neurological conditions or actual diagnoses of such conditions prior to 2012.

### d. The Statutes of Repose May Be Tolled Because of Fraudulent Concealment

Connecticut has codified the doctrine of fraudulent concealment in Conn. Gen. Stat. § 52–595 ("Section 52-595"), which provides: "[i]f any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence."  In order to rely on Section 52-595 to toll the statutes of limitations and repose, a plaintiff must demonstrate that "the defendant: (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the cause of action, (2) intentionally concealed those facts from the plaintiff and (3) concealed those facts for the purpose of obtaining delay on the part of the plaintiff in filing a cause of action against the defendant."  *Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105, 912 A.2d 1019, 1033 (2007).

Fraudulent concealment under Section 52-595 must be pled with sufficient particularity to satisfy the requirements Fed. R. Civ. P. 9(b) with regard to fraud claims, because a claim that the statute of limitations should be tolled because of fraud, is "obviously, a claim for fraud."  *In re Publ'n Paper Antitrust Litig.*, No. 304MD1631SRU, 2005 WL 2175139, at *5 (D. Conn. Sept. 7, 2005).  In addition, a plaintiff must show that due diligence "did not lead, and could not have led, to discovery" of the cause of action.  *Martinelli v. Bridgeport Roman Catholic Dioceses*, 196 F.3d 409, 427 (2nd Cir.1999).  "Typically, a plaintiff will prove

reasonable diligence either by showing that: (a) the circumstances were such that a reasonable person would not have thought to investigate, or (b) the plaintiff's attempted investigation was thwarted." *OBG Technical Services, Inc. v. Northrop Grumman Space & Mission Systems Corp.*, 503 F.Sup.2d 490 (D. Conn. 2007) (Internal quotation marks omitted).

The WWE argues that "[t]here is no concealment of a cause of action unless the defendant makes an affirmative act or statement concealing the cause of action." [Def.'s Rep. Mem. at 12, *citing Johnson v. Wadia*, No. CV85 0075560 S, 1991 WL 50291 (Conn. Super. Mar. 28, 1991)]. On the contrary, the Connecticut Supreme Court specifically noted in *Falls Church Group* that it had not determined "whether affirmative acts of concealment are always necessary to satisfy the requirements of § 52–595." The court further held that mere nondisclosure may be sufficient "when the defendant has a fiduciary duty to disclose material facts." *Id.* at 107

Plaintiffs' allegations that WWE failed to disclose and concealed information repeated a link between repeated concussive trauma and permanent degenerative neurological conditions may implicate the tolling provision of Sec. 52-595. As the Court noted above, it is at least plausibly alleged that WWE had actual knowledge about research linking repeated brain trauma with permanent degenerative disorders and that such brain trauma and such permanent conditions could result from wrestling and that the WWE.

The complaints also allege various public comments made by WWE officials and doctors that could form the basis of affirmative acts of concealment,

even if no fiduciary relationship existed between the WWE and its wrestlers, as well as an intent to conceal. For example, WWE is alleged to have issued a statement to ESPN questioning the veracity of a report suggesting a former wrestler, Chris Benoit, suffered from CTE. WWE is alleged to have stated that it was "unaware of the veracity of any of these tests . . . Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring . . . ." [SAC ¶ 70]. The complaints allege that WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon further attacked those findings in a joint interview on CNN in 2007. [SAC ¶ 74]. Although WWE disputes the truthfulness, meaning and import of such statements and argues that several have been largely taken out of context, at this stage of the litigation plaintiffs' theory that WWE affirmatively concealed its knowledge of CTE-related risks is plausible.

Similarly, in the *NHL* case, Judge Nelson noted the NHL's alleged response to questions surrounding concussions in professional hockey that the league needed "more data, more research, we cannot say anything conclusive." 2008 WL 4307568 at *13. NHL Commissioner Bettman was alleged to have said of fighting that "[m]aybe it is [dangerous] and maybe it's not." *Id.* at *10. Deputy NHL Commissioner Daly was alleged to have publicly stated that "[The NHL is] completely satisfied with the responsible manner in which the league and the players' association have managed player safety over time, including with respect

46

to head injuries and concussions . . . ." *Id.* at *12. These and other statements were found to have adequately alleged equitable tolling under the doctrine of fraudulent concealment.

It can also be inferred from the facts pled that WWE had knowledge of plaintiffs' cause of action and that any concealment was for the specific purpose of delaying any litigation. Plaintiffs have alleged, for example, that the Wellness Program was created for WWE by an attorney in response to the death of a former wrestler and appears to have immediately embraced a critic of some aspects of recent CTE studies. As noted earlier, the WWE and its executives also made statements questioning one doctor's conclusion that a deceased former wrestler likely suffered from CTE. These facts, assumed to be true for the purposes of this motion, are sufficient to plausibly allege intent on the part of the WWE to conceal a cause of action for the purpose of obtaining delay. *See, e.g.,* *Puro v. Henry,* 449 A.2d 176, 180 (Conn. 1982) (fraudulent concealment may be inferred by a reasonable trier of fact from the balance of the evidence, even if only by circumstantial evidence).

### 3. Plaintiffs Fail to State A Claim for Negligence Under Connecticut Law

WWE argues that plaintiffs' negligence claims fail to state a claim, as the only duty WWE argues that it owed to plaintiffs under Connecticut law was a duty "to refrain from reckless or intentional misconduct." [Def.'s Mem. at 32].

"The determination of whether a duty exists between individuals is a question of law." *Jaworski v. Kiernan,* 696 A.2d 332, 335 (Conn. 1997). The Court

must consider "whether the specific harm alleged by the plaintiff was foreseeable to the defendant." *Id.* at 336. In other words, "whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result." *Id.* The Court must then "determine as a matter of policy the extent of the legal duty to be imposed upon the defendant." *Id.*

Plaintiff in *Jaworski* suffered a knee injured in a co-ed soccer game by incidental contact – a trip from behind by the defendant, who was another soccer player – which was not an essential part of the sport. Although the injury was a foreseeable consequence of the defendant's actions, the Connecticut Supreme Court held that "the normal expectations of participants in contact team sports include the potential for injuries resulting from conduct that violates the rules of the sport." *Id.* at 337. These expectations, in turn, "inform the question of the extent of the duty owed by one participant to another." *Id.* Considering the prospect for a flood of litigation and the public policy goal of encouraging athletic competition, the court found that "[a] proper balance of the relevant public policy considerations surrounding sports injuries arising from team contact sports also supports limiting the defendant's responsibility for injuries to other participants to injuries resulting from reckless or intentional conduct." *Id.*

Citing *Jaworski*, WWE argues that all of plaintiffs' negligence claims "fail under the contact sports exception" embodied in "the *Jaworski* rule" because "negligence concepts do not apply in sporting-type situations." [Def.'s Mem. at 31]. WWE argues that in *Mercier v. Greenwich Acad.*, No. 3:13-CV-4 (JCH), 2013

48

WL 3874511 (D. Conn. July 25, 2013), Judge Hall cited *Jaworski* in holding that a school could not be held liable for the actions of its basketball coach in failing to rest and properly asses the plaintiff, who had sustained a concussion from another player during a basketball game. Again noting a concern for a possible flood of litigation, Judge Hall held that "[c]oaches are often required to make split-second decisions during a game . . . holding coaches liable for negligence for such decisions, including player substitution decisions, would dampen their willingness to coach aggressively and would unreasonably threaten to chill competitive play." *Id.* at *4 (internal quotations omitted); *see also Trujillo v. Yeager*, 642 F. Supp. 2d 86 (D. Conn. 2009) (applying *Jaworski* to a co-participant's coach and that coach's employer).

It is clear from these cases that the "Jaworski rule" has established a limited exception to liability for general negligence in the "*contact team sports*" setting by limiting the extent of the duty owed by a coach in the midst of a game and the duty "*owed by one participant to another.*" *Jaworski*, 696 A.2d 337 (emphasis added). In the instant case, however, the defendant is not a co-participant and the injury alleged did not result from participation in a contact team sport.

WWE nonetheless argues that *Jaworski* should be extended to include the facts and circumstances of the instant case, arguing that "plaintiffs' alleged injuries "arise from risks inherent in their chosen profession which are within the normal expectations of professional wrestlers." [Def.'s Rep. Mem. at 2]. WWE argues that cases in other jurisdictions have further narrowed the scope of

liability where "professional athletes take risks for compensation and when contact is a known and purposeful part of the activity." [Def.'s Mem. at 32]. WWE cites to *Turcotte v. Fell*, 502 N.E. 2d 964 (N.Y. 1986), in which the New York Court of Appeals granted summary judgment in favor of a defendant racetrack owner accused of negligently watering a portion of a racetrack, as well as a co-participant jockey accused of "foul riding" leading to the plaintiff jockey's injury. The court held that the plaintiff assumed the risk of falling from his horse, an injury well within the "known, apparent and forseeable dangers of the sport." *Id.* at 970. Similarly, in *Karas v. Strevell*, 884 N.E. 2d 122 (Ill. 2008), plaintiff sued both co-participant hockey players who had caused his injury by illegally "bodychecking" him from behind as well as the hockey league that organized the match, for failing to appropriately enforce rules against such conduct. The Illinois Supreme Court held that the league could not be held liable for inadequate rule enforcement, as "rules violations are inevitable in contact sports and are generally considered an inherent risk of playing the game." *Id.* at 137.

Similarly, in the instant case, Plaintiffs broadly allege negligence on the part of the WWE in failing to "exercise reasonable care in training, techniques . . . and diagnosing of injuries such as concussions and sub-concussions." [SAC ¶ 249]. Each of the named plaintiffs allege only one specific incident of negligent conduct in the Complaints, despite the length of all of the Complaints. Each of the wrestlers alleges a similar incident – they sustained head trauma due to a blow from another wrestler or object and WWE failed to either intervene or

diagnose them with concussions following the incident.[11]  Taking one example,

Plaintiff Singleton alleges an incident on September 27, 2012 in which he was

"choke slammed" by another wrestler named Erick Rowan, whom Singleton

described as a "more skilled, more experienced" wrestler.  [SAC ¶ 100].

Singleton alleges he had only performed a "choke slam" once before that date

even though it is "considered by wrestlers themselves to be one of the more

dangerous moves."  [SAC ¶ 102].  Singleton alleges that he "sustained a brain

injury as a result."  [SAC ¶ 103].  Singleton also alleges that WWE failed to treat

him for a concussion after the incident.  [Id. ¶¶ 104,134-135].  Tellingly, however,

none of the six named plaintiffs alleges that they approached any WWE employee

after any of the six listed incidents to report head trauma or any symptom of head

---

[11] Plaintiff LoGrasso alleges that WWE scripted a program involving LoGrasso
and another wrestler named "Regal" and that LoGrasso "was forced to endure
and be beaten repeatedly and suffer sustained head trauma" which caused
LoGrasso to "have his 'bell rung' every match."  [SAC ¶ 133].  On an unspecified
date in September of 2006, LoGrasso alleges that Regal kicked him in the face
causing him to strike his head against concrete steps, resulting in unspecified
head trauma.  [SAC ¶ 134].  Plaintiff Matt Weise alleges that he "was punched so
hard in the head by Big Show, another WWE wrestler that he had visible injuries
to his head and he vomited following the event. WWE staff took no steps to
intervene in the event and WWE medical staff did nothing to treat Matt Wiese
following the incident."  [MAC ¶ 110].  Plaintiff Ryan Sakoda alleges that "[w]hile
wrestling for the WWE in 2003, [Sakoda] was knocked unconscious in a match by
a Super Kick. The course of treatment recommended to Ryan by the WWE
medical staff and trainer was "not to go to sleep," suggesting that if he did, he
may bleed to death and die. He stayed awake that night."  [MAC ¶ 106].  Plaintiff
Russ McCullough alleges that he "was knocked completely unconscious after
being struck by the back of a metal chair in Cincinnati. After he was knocked
unconscious the beating continued and he was struck in the head with a metal
chair more than 15 times without intervention by WWE staff. McCullough sought
medical treatment on his own and the head injury was diagnosed as a severe
concussion."  [MAC ¶ 100].  Plaintiff William Albert Haynes III alleges that Haynes
alleges that on March 29, 1987, he was "hit in the head with a large metal chain"
which led to an unspecified "head injury" that was not treated.  [HAC ¶ 126].

trauma such as dizziness, and only two of the six plaintiffs specifically allege that they sustained a concussion from the incidents in question.

The Court agrees with WWE that under the contact sports exception they could only be held liable for reckless and intentional conduct, and not ordinary negligence.  Plaintiffs were professional wrestlers who were financially compensated to engage in an activity in which physical violence was a known and even purposeful part of the activity.  They were injured by other participants in what the plaintiffs describe as a "scripted" performance and thus in a manner that the plaintiff knew or should have reasonably anticipated.  *See Kent v. Pan Am. Ballroom*, No. F038650, 2002 WL 31776394 (Cal. Ct. App. Dec. 10, 2002) ("[w]restling, and particularly professional wrestling, entails inherent risks of injury. It is a sport where two persons grab, twist, throw or otherwise exert forces and holds upon each other's heads, necks, arms, legs, feet and torsos with the object of forcing the opponent to the mat."); *Walcott v. Lindenhurst Union Free School Dist.*, 243 A.D.2d 558, 662 N.Y.S.2d 931, 121 Ed. Law Rep. 832 (2d Dep't 1997)(high school wrestler assumed the risk of injury resulting from "takedown maneuver" by opponent as such a risk is inherent in wrestling).  Or they were injured in a manner that could be reasonably anticipated by an ordinary person who volunteers to "endure" an at least partially-simulated beating before a television audience and hits his head outside the ring.  *See, e.g., Foronda ex rel. Estate of Foronda v. Hawaii Intern. Boxing Club*, 96 Haw. 51, 25 P.3d 826 (Ct. App. 2001) (risk of boxer falling through the ropes of a boxing ring is an inherent risk of the sport assumed by any boxer).  As such, their claims are well within the type

of claims for which *Jaworski* provides an exception to the general duty of care.

Plaintiff LoGrasso also alleges that he "never received any medical information regarding concussions or sub-concussive injuries while employed by the WWE, and that a WWE trainer named "Bill Demott" (SAC ¶ 97), or alternatively, "Bill Dumott" (SAC ¶ 124), would "continuously permeate (sic) an environment of humiliation and silence," which led WWE wrestlers "to fight through serious injury," which plaintiffs alleged that "upon information and belief has led to Mr. LoGrasso's long-term and latent injuries." [SAC ¶ 124]. Read liberally, plaintiffs allege that WWE was negligent in failing to train and educate its wrestlers about concussions and failed to encourage an environment in which its wrestlers could seek appropriate treatment. These are precisely the same allegations, however, that a court in the Northern District of California recently rejected in a concussion case brought by seven youth soccer players. The soccer players alleged that various soccer leagues, clubs and associations had negligently failed to "to educate players and their parents concerning symptoms that may indicate a concussion has occurred," among other allegations. *Mehr v. Fed'n Int'l de Football Ass'n*, No. 14-cv-3879-PJH, 2015 WL 4366044 (N.D. Cal. July 16, 2015). In dismissing the negligence claim, the court held that, the soccer plaintiffs "alleged no basis for imputing to any defendant a legal duty to reduce the reduce the risks inherent in the sport of soccer, or to implement any of the "Consensus Statement" guidelines or concussion management protocols, and have alleged no facts showing that any defendant took any action that increased the risks beyond those inherent in the sport." *Id.* at *19. The court noted that

under California law, "a failure to alleviate a risk cannot be regarded as tantamount to increasing that risk." *Id.*, *citing Paz v. State of California*, 22 Cal.4th 550, 560, 93 Cal.Rptr.2d 703, 994 P.2d 975 (2000).

This Court is similarly convinced that plaintiffs here have failed to allege specific facts – as opposed to vague and conclusory accusations – that WWE acted recklessly or intentionally under *Jaworski* with respect to the risks that are inherent in compensated professional stunt wrestling. As such, plaintiffs' negligence claims fail to state a claim under Connecticut law. Plaintiffs' Negligence claims are DISMISSED.

### 4. No Separate Cause of Action for Fraudulent Concealment

WWE argues for dismissal of plaintiffs' fraudulent concealment counts on the grounds that fraudulent concealment is not a separate cause of action under Connecticut law. [Def.'s Mem. at 40]. WWE is correct that fraudulent concealment is not a separate cause of action. *See AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, No. 3:10-CV-01539 (JAM), 2014 WL 7270160, at *11, n. 17 (D. Conn. Dec. 18, 2014) ("Connecticut law does not even recognize any affirmative cause of action for fraudulent concealment"); *Liebig v. Farley*, No. CV085005405S, 2009 WL 6499423, at *3 (Conn. Super. Ct. Oct. 27, 2009) ("a claim of fraudulent concealment does not constitute a separate, self-contained cause of action"). Plaintiffs did not directly address this argument in

briefing, and so the claim may also be considered abandoned.[12]  Plaintiffs'

separately-titled causes of action for fraudulent concealment are DISMISSED.

### 5. Plaintiffs' Fraudulent Deceit and Negligent Misrepresentation Claims Are Not Pled With Sufficient Particularity

To plead a claim for negligent misrepresentation under Connecticut law, a

plaintiff must allege (1) that the defendant made a misrepresentation of fact; (2)

that the defendant knew or should have known was false; (3) that the plaintiff

reasonably relied upon the misrepresentation; and (4) that the plaintiff suffered

pecuniary harm as a result thereof.  *Trefoil Park, LLC v. Key Holdings*, LLC, No.

3:14-CV-00364 (VLB), 2015 WL 1138542, at *12 (D. Conn. Mar. 13, 2015), *citing*

*Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 73, 873 A.2d 929, 954 (2005).

For a claim of common law fraud, a plaintiff must allege "(1) that the

representation was made as a statement of fact; (2) that it was known to be

untrue by the party making it; (3) that it was made for the purpose of inducing the

other party to act upon it; and (4) that the party to whom the representation was

made was in fact induced thereby to act to his injury."  *Leonard v. Comm'r of*

*Revenue Servs.*, 264 Conn. 286, 296, 823 A.2d 1184, 1191 (2003).  A key difference

between plaintiffs' deceit  and negligent misrepresentation claims is that whereas

a defendant may negligently misrepresent a fact that the defendant *should have*

*known* to be false, a deceitful representation is one that the defendant must

"know[] to be untrue."  *Id.* at 1191; *see also Sturm v. Harb Dev., LLC*, 298 Conn.

---

[12] *See, e.g., Paul v. Bank of Am.*, N.A., 3:11–CV–0081 (JCH), 2011 WL 5570789, at *2 (D.Conn. Nov.16, 2011) ("When a party 'offer[s] no response' to its opponent's motion to dismiss a claim, that claim is abandoned")

124, 142, 2 A.3d 859, 872 (2010) ("[i]n contrast to a negligent representation, [a] fraudulent representation ... is one that is knowingly untrue, or made without belief in its truth it.").

The WWE argues that plaintiffs failed to plead their fraud by omission, fraudulent deceit and negligent misrepresentation claims with particularity, as is required under Fed. R. Civ. P. 9(b).

In order to satisfy Rule 9(b)'s particularity requirement with regard to fraud claims, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Parola v. Citibank (S. Dakota) N.A.*, 894 F. Supp. 2d 188, 200 (D. Conn. 2012) (VLB), *citing Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Put another way, "Rule 9(b) particularity means the who, what, when, where, and how: the first paragraph of any newspaper story." *Walters v. Performant Recovery, Inc.*, No. 3:14-CV-01977 (VLB), 2015 WL 4999796, at *2 (D. Conn. Aug. 21, 2015). The Complaints utterly fail to satisfy this standard.

In addition, a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." *Parola*, 894 F. Supp. 2d at 200, *citing Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). "The 'strong inference of fraud' may be established by either alleging facts to show that a defendant had both motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* The

requirements of Rule 9(b) are also applicable to negligent misrepresentation claims. *Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*, 51 F. Supp. 2d 144, 152 (D. Conn. 1999); *Pearsall Holdings, LP v. Mountain High Funding, LLC*, No. 3:13cv437 (JBA), 2014 WL 7270334, at *3 (D. Conn. Dec. 18, 2014). The Complaint utterly fail to satisfy this standard as well.

Plaintiffs' 281-paragraph complaint is replete with allegations that WWE has "repeatedly" misrepresented material facts to the plaintiffs, often in the form of statements that WWE "misrepresented, omitted, and concealed" various short and long-term risks or possible diagnoses regarding plaintiffs' health, without actually specifying whether such statements were affirmatively misrepresented, or rather affirmatively concealed, or simply omitted. But in regard to the fraud claims the length of plaintiffs' complaints is deceiving, as the length belies an utter lack of substance.

In opposition to WWE's motion to dismiss the Singleton and LoGrasso complaint, plaintiffs could manage to identify[13] only three specific statements that they allege to have been fraudulent:

1. Vince K. McMahon told a congressional committee that the WWE "is always concerned about safety of our talent." SAC ¶ 67.

2. Dr. Joseph Maroon's statement to the NFL Network, Total Access in March, 2015 that "the problem of CTE, although real, is its being over-exaggerated." [SAC ¶ 55].

3. WWE Executive Stephanie McMahon Levesque's testimony in 2007 to

---

[13] In their opposition to WWE's Motion to Dismiss the *McCullough* complaint, plaintiffs did cite any specific statements and focused almost exclusively on their fraudulent omission claims, essentially conceding the argument.

the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were "no documented concussions in WWE's history." [SAC ¶ 64].

With regard to Vince K. McMahon's statement that the WWE is "always concerned" about its wrestlers' safety, Plaintiffs did not provide any reason why the statement was fraudulent or why McMahon knew or should have known the statement to be false.

With regard to Dr. Maroon's statement to NFL Network, WWE argues that "expressing critical opinions about scientific matters is simply not a misrepresentation of a past or present material fact." [Def.'s Mem. at 40]; *see, e.g., Trefoil Park*, 2015 WL 1138542, at *8 (noting that Connecticut courts have long excluded statements of opinion as being sufficient to support fraud or negligent misrepresentation claims). Plaintiffs have not addressed this argument and again appear to have abandoned the claim. More importantly, the complaints do not allege facts indicating that at the time the statement was uttered, Dr. Maroon knew or should have known that CTE was not "over-exaggerated," or facts indicating that any plaintiff relied upon the statement – particularly given that the statement was made after the first complaint in this action had already been filed.[14]

With regard to Stephanie McMahon Levesque's testimony, plaintiffs appear to have repeatedly misrepresented both the substance and meaning of Levesque's testimony. Plaintiffs describe Levesque as having testified that there

_____

[14] Plaintiffs had presumably been informed about the nature and extent of CTE – at the very least by the attorneys who drafted their complaints – by March of 2015.

were no "no documented concussions in WWE's history," and provided a link to the full transcript of the Congressional hearing at which Levesque testified. On a motion to dismiss, the Court may consider any document "attached to the complaint or incorporated in it by reference" as such documents "are deemed part of the pleading and may be considered." *McClain v. Pfizer, Inc.*, No. 3:06-CV-1795 (VLB), 2008 WL 681481, at *2 (D. Conn. Mar. 7, 2008), *citing Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

The full transcript provides:

> (Buffone) Q: So, if I understand you correctly, since the enactment of the wellness policy, WWE has documented no concussions?
>
> (Levesque) A: As far as I know, as far as I was told –
>
> (Buffone) Q: Yes.
>
> (Levesque) A: -- no.

[Dkt. 74, Ex. A at 118]. Plaintiffs argue that this statement was false because, at the time of the statement, "WWE wrestlers likely had cumulatively experienced hundreds—if not thousands—of concussions." [SAC ¶ 65]. However, Levesque was asked only about *documented* instances of concussions, and not whether any concussions had in fact occurred – the allegation that concussions *likely* occurred does not establish the statement about a lack of *documented* concussions to be false. Moreover, Levesque was clearly asked about documented instances of concussions "since the enactment of the wellness policy" and not, as the plaintiffs repeatedly and – at the very least, misleadingly – asserted in their complaints, "in WWE's history."

In fact, the one specific statement contained in the complaints that comes closest to providing a basis for a misrepresentation or deceit claim is one never mentioned in plaintiffs' briefing.  The Complaints cite a 2009 ESPN article on the deaths of former WWE wrestlers Chris Benoit and Andrew Martin.  [SAC ¶ 69].  In the article, Dr. Bennett Omalu – credited with discovery of CTE in NFL players – alleges that he diagnosed Benoit and Martin with CTE after post-mortem autopsies.  WWE issued the following statement quoted in the article:

> "[w]hile this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for [professional wrestlers] Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring…WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them."  [SAC ¶ 69].

WWE's statement mocks Dr. Omalu's claim that Benoit and Martin suffered from CTE by questioning whether his behavior was consistent with CTE, but does not state any material fact which plaintiffs allege to be false.  While one could accuse the WWE of having made the statement perhaps with the intent of downplaying a link between wrestling and CTE, plaintiffs have not advanced an argument that any aspect of the statement falsely claimed that Benoit and Martin either did not suffer from CTE or that no link existed between wrestling and CTE.  Plaintiffs do claim that "WWE's request to examine the research and tests was feigned," but do not allege the statement to be false or to be a statement upon which plaintiffs have reasonably relied.

Fraudulent statements must be statements of fact and therefore an

expression of an opinion or skepticism as to the truth of a matter asserted by another cannot usually support a fraud claim.  As the Connecticut Appellate Court has stated: "[t]he essential elements of a cause of action in fraud" include that "a false representation was made as a statement of fact" and "the absence of any one" element "is fatal to a recovery."  *Citino v. Redevelopment Agency,* 721 A.2d 1197 (Conn. App. 1998).

As plaintiffs have failed to plead specific facts indicating that WWE made any specific statement that it knew or should have known to be false at the time, upon which plaintiffs reasonably relied, Plaintiffs' Negligent Misrepresentation and Fraudulent Deceit claims are DISMISSED.

6.  **Plaintiffs Singleton and LoGrasso Have Alleged A Plausible Claim for Fraud by Omission**

In order to adequately plead a fraudulent non-disclosure claim, a party must allege: "the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak."  Reville v. Reville, 93 A.3d 1076, 1087 (Conn. 2014).   A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment." *Id.* (Internal quotation marks omitted.) "The key element in a case of fraudulent non-disclosure is that there must be circumstances which impose a duty to speak."  *Id.*

In addition, in order to satisfy the requirements of Rule 9(b) a plaintiff must "detail the omissions made, state the person responsible for the failure to speak, provide the context in which the omissions were made, and explain how the omissions deceived the plaintiff."  *Frulla v. CRA Holdings, Inc.*, 596 F. Supp. 2d 275, 288 (D. Conn. 2009) (JCH), *citing Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

The WWE argues that plaintiffs have failed to "allege any fact known to WWE that it did not disclose to either Plaintiff under circumstances which called for the disclosure."  Rather, the WWE argues that plaintiffs base their fraud charges "on not disclosing medical and scientific opinions not specifically alleged to have even been known by anybody at WWE, and which are not facts in any event."  [Def.'s Mem. at 41].

Plaintiffs argue that their allegations are substantially similar to those brought by the hockey plaintiffs in  the *NHL* case, where Judge Nelson held that plaintiffs there had plead sufficient facts to for a fraudulent omission claim to proceed against the NHL. In examining whether plaintiffs had detailed the "what" – the specific omissions made, the court noted that plaintiffs had alleged:

> 5. "Although the NHL knew or should have known . . . about this scientific evidence . . . the NHL never told Plaintiffs about the dangers of repeated brain trauma."
>
> 134. "[T]he NHL never told its players that these . . . studies demonstrate an increased risk for NHL players . . . ."
>
> 143. "At no time, including during the seven year Concussion Program and in the following seven year silence before publishing the Program's report, did the NHL warn players that the data suggested at a minimum that greater attention to concussions and head injuries was necessary, that it was possible that playing in the same game, or soon after, a head injury

was potentially dangerous, or any other such warning."

*Id.* at *11. The Singleton and McCullough complaints do allege similar

allegations against the WWE. Specifically, plaintiffs here allege that:

3. "WWE has known or should have known for decades that *repeated concussive and sub-concussive impacts substantially increase the probability that a wrestler will develop a permanent, degenerative brain disease. . . .*"

56. ". . . WWE was aware in 2005 and beyond *that wrestling for the WWE and suffering head trauma would result in long-term injuries.* And it therefore should have, but never did, warn Plaintiffs of *the risks of concussions and other brain injuries associated with wrestling with WWE.*"

138. "Mr. LoGrasso was *never educated about the ramifications of head trauma and injury and the likelihood of concussions and sub-concussions and the resulting latent neurological injuries* suffered from sustaining concussions and sub-concussive injuries."

 [SAC at ¶¶ 3, 138, 150 (emphasis added)].

In the *NHL* case, the court also held that plaintiffs had adequately pled the

"who" aspect of their fraud claim – the person(s) responsible for the omissions.

Specifically, the court noted plaintiffs' allegations that:

16. "Despite the mountain of evidence connecting hockey to brain injuries, NHL Commissioner Gary Bettman subsequently stated that more study on the issue is necessary...";

84. "At no time during his NHL career did any NHL personnel advise these players, generally or specifically, of the negative long-term effects of sustaining concussions and sub-concussive blows to the head, including the risks of repeat concussions and sub-concussive blows....";

122. "[Brian] Benson, with Jian Kang, 'contributed to the drafting of the [Concussion Program's report] manuscript.'";

127. "Hockey players, no differently from anyone else, grow up believing that medical personnel, such as League medical directors, supervisors, doctors and trainers, put the patient-players' interests first and foremost. Cleared to play immediately after getting knocked out[,] ... players believed they were, in fact, 'good to go' and not doing any lasting harm to

**themselves[.]"**

2015 WL 1334027 at *12.  Similarly, plaintiffs here have alleged facts

shedding light on both the "who" – the specific person(s) allegedly responsible

for the omissions – and the "when" – the context of the omissions. Specifically,

plaintiffs here have alleged that:

> 55. " . . . WWE continues to understate the risks and dangers of CTE, *as evidenced by Dr. Joseph Maroon's statements* to the NFL Network, Total Access in March 2015, 'The problem of CTE, although real, is its being over-exaggerated.'

> 73. "In a joint interview for the 2007 CNN documentary Death Grip: Inside Pro Wrestling, *WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon attacked Dr. Omalu and Dr. Bailes's finding that Benoit had suffered from CTE.* This was part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had."

> 125. "During his training and wrestling career with WWE, *Mr. LoGrasso was told by WWE employees* and at the time believed that injuries he suffered were part of 'paying his dues', and believed that having 'your bells rung', or receiving 'black and blues' and bloody noses only resulted in the immediate pain and injury with no long-term ramifications or effects."

[SAC at ¶¶ 55, 73, 125, 132 (emphasis added]. The complaints also allege

facts indicating the "how" – the ways in which they were allegedly deceived by

the omissions.

> 132. "Mr. LoGrasso reasonably relied on the WWE's medical personnel, trainers, agents, and documents when he continued to fight and receive sustained head trauma repeatedly.

> 150. Plaintiffs reasonably acted on what WWE omitted – that *concussions and sub-concussive hits are serious and result in permanent disability and brain trauma,* and that returning to wrestling before being properly evaluated, treated and cleared to wrestle could result in enormous risks of permanent damage, especially in returning to wrestle immediately after taking brutal hits to the head.

> 157. WWE's conduct left [Singlton] without the necessary knowledge to

make informed decisions to plan for his own future and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

As to the existence of a duty to speak, the Court determined in Part III.C above that it is plausible at this stage of the litigation that defendant owed plaintiffs a duty on the basis of a special relationship that existed by virtue of WWE's superior knowledge and the expertise of its medical staff as well as a general duty that may have arisen as a result of WWE's voluntarily undertaking to create the Wellness Program, to provide concussion testing and to reach out to current and former wrestlers about other hazards linked with WWE participation, including drug and alcohol abuse. Further factual development may shed light on the existence or nonexistence of such a duty.

The WWE argues that under Connecticut law, a fraudulent omission claim cannot proceed with respect "to all facts which are open to discovery upon reasonable inquiry." [Def.'s Mem. at 50, *citing* Saggese v. Beazley Co. Realtors, 109 A.3d 1043, 1056 (Conn. App. 2015)]. The WWE notes that plaintiffs allege in their complaints – in an attempt to bolster their negligence claim – that "[t]he risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades," and go on to describe "a selection of mounting medical literature concerning head trauma." [SAC ¶ 57].

In *Saggese v. Beazley Co. Realtors*, a Connecticut Appellate Court upheld a trial court's finding after a bench trial that a real estate agent could not be held liable for fraudulent non-disclosure of a letter concerning litigation affecting a parcel of property that had a negative effect on the value of the property in

question. 109 A.3d at 1050. In *Saggese*, the plaintiff was made aware of the litigation when she and her attorney were provided the docket numbers of the cases involved. *Id.* at 1056. Finding that there had been no fraudulent non-disclosure, the court held that "[t]he substance of the [related] litigation was open to discovery upon reasonable inquiry" and that "all of the material information was in the plaintiff's possession, but neither she nor her agents made proper use of it." *Id.* The court noted that the real estate agent was not an attorney and was not in a position to analyze or comment on the importance of the related litigation. *Id.*

This Court reads *Saggese* as upholding a finding, upon a full record after a bench trial, that the defendant had not failed to make a "full and fair disclosure of known facts," because the known "facts" that the defendant had a duty to disclose were the docket numbers, and the very existence, of the related litigation. A legal analysis of those facts – which might have led the plaintiff to conclude that the value of the property was at risk in the litigation, was incumbent upon plaintiff's attorney and the defendant was under no further duty to disclose. The Court does not read *Saggese* as holding that under Connecticut law a defendant cannot be held liable for non-disclosure of publicly available facts.[15] Indeed, such a holding would seem to conflict with the Restatement

---

[15] At the very least, Connecticut law is not clear that the public availability of the facts alleged to have been non-disclosed will bar recovery in a fraudulent non-disclosure action. But even if Connecticut law did bar such claims, accepting all of the facts pled in the complaints as true, WWE's superior knowledge regarding such issues may not have been open to discovery by the plaintiffs upon reasonable inquiry. Again, factual development could shed light on whether

(Second) of Torts § 540, which provides that "[t]he recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Restatement (Second) of Torts § 540 (1977); *see also Vega v. Jones, Day, Reavis & Pogue*, 17 Cal.Rptr.3d 26, 35 (Cal. App. 2004) ("[T]he contention that publicly available information cannot form the basis for a concealment claim is mistaken. The mere fact that information exists somewhere in the public domain is by no means conclusive."). Rather, *Saggese* appears to concern issues of duty and non-disclosure that may present themselves at a later stage in this case.

The Court notes that Plaintiffs' 281-paragraph "kitchen sink" Complaints certainly seem to present contradictory claims that could make reliance upon non-disclosure of "known facts" difficult to prove. Namely, Plaintiffs allege both that information about concussion risks was both widely known by the public and at the same time fraudulently concealed from Plaintiffs.

Read liberally, however, the complaints allege that increasing public and scientific awareness of the risks related to head trauma ultimately resulted in recent discoveries regarding a link between repeated head trauma and permanent degenerative neurological conditions. In particular, the WWE is alleged in the various complaints to have had knowledge of such a link as early as 2005.[16] For

_____

WWE possessed information outside the public domain that was omitted or concealed.

[16] As the Court noted in part I(D), *supra*, it is unclear how the complaints arrive at the year 2005 as the year in which the WWE had knowledge of a link between repeated head trauma from concussive blows with permanent degenerative conditions. Plaintiffs will need to establish a Record upon which a trier of fact

wrestlers active during and after 2005, information about a link to permanent degenerative conditions could plausibly have informed plaintiffs' own choices about whether and when to re-enter the ring after sustaining a head injury and could plausibly have prevented permanent brain damage. Plaintiffs also allege that by virtue of its Wellness Program, begun in 2007, WWE possessed superior knowledge regarding a link between participation in WWE wrestling events and such permanent conditions. Because Singleton and LoGrasso are alleged to have wrestled on or after 2005, when WWE's knowledge of the non-disclosed facts is alleged to have begun, their claims for fraudulent non-disclosure may proceed.

Whether WWE may be held liable as a matter of law for non-disclosure of known facts about permanent degenerative neurological conditions that may result from repeated concussions or sub-concussive impacts is an issue that must be determined at a later stage in this case. The fact that some or all of the material known facts alleged to have been non-disclosed are within the public domain could undermine Plaintiffs' claim to detrimental reliance, at the very least. More importantly, the development of a factual record may reveal that WWE did not possess or fail to disclose "known facts" about CTE or other degenerative conditions and whether such conditions could result from participation in WWE wrestling events.

WWE's Motions to Dismiss is DENIED with respect to the Fraud by Omission claims asserted by Plaintiffs Singleton and LoGrasso. The Fraud by

could conclude that WWE had knowledge of such a link at that time or at any later time.

Omission claims brought by Plaintiffs Haynes and McCullough are DISMISSED.

### 7. <u>No Separate Cause of Action for Medical Monitoring</u>

Lastly, WWE argues that there is "no independent cause of action" under Connecticut law for "medical monitoring." [Def.'s Mem. at 43]. Plaintiffs respond only to the extent that they argue that medical monitoring "expenses are recoverable," citing to cases where such damages have been awarded. [Pl.'s Opp. Mem. at 32]. In other words, plaintiffs failed to address the argument completely, as the availability of damages for medical monitoring costs and the availability of medical monitoring as an independent cause of action are wholly separate issues. A particular type or measure of damages and a cause of action entitling a person to a particular type or measure of damages are separate and distinct legal principles.

Few Connecticut courts have addressed this question. One Connecticut trial court has held that "[r]ecovery for such expenses would only be allowable if these plaintiffs have sustained actionable injuries." *Bowerman v. United Illuminating*, No. X04CV 940115436S, 1998 WL 910271, at *10 (Conn. Super. Ct. Dec. 15, 1998). One court in this district also noted the availability of medical monitoring damages if the plaintiff proved the existence of an actionable injury. *Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 316 (D. Conn. 2002) (JCH). Because plaintiffs have failed to articulate any authority supporting the proposition that plaintiffs can bring a cause of action for "medical monitoring" separate and apart

from their cause of action for fraudulent omission under Connecticut law, Plaintiffs' claims for "Medical Monitoring," are DISMISSED. The court expresses no opinion as to whether plaintiffs may recover such damages in the event that they establish liability under a cause of action for fraud by omission.

IV.     Conclusion

For the foregoing reasons, Plaintiffs' negligence counts are DISMISSED as those counts fail to state a claim under Connecticut law. Plaintiffs' negligent misrepresentation and fraudulent deceit claims are DISMISSED as plaintiffs have failed to identify with specificity any false representation by WWE upon which they have relied. Plaintiffs' fraudulent concealment and medical monitoring claims are DISMISSED as those claims do not state separate and independent causes of action under Connecticut law.

However, WWE's motion is DENIED IN PART with respect to the fraudulent omission claim brought by Plaintiffs Evan Singleton and Vito LoGrasso, to the extent that claim asserts that in 2005 or later WWE became aware of and failed to disclose to its wrestlers information concerning a link between repeated head trauma and permanent degenerative neurological conditions as well as specialized knowledge concerning the possibility that its wrestlers could be exposed to a greater risk for such conditions.

WWE's Motion to Dismiss the *Singleton* action [Dkt. 43] is GRANTED IN PART AND DENIED IN PART, and WWE's Motions to Dismiss the *McCullough* and *Haynes* actions [Dkt. 95, Dkt. 64] are GRANTED in FULL.

**IT IS SO ORDERED.**

**_____/s/_____**
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: March 21, 2016**