# Exhibit 7

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT
---------------------------------x
RUSS MCCULLOUGH, et al.,

       Plaintiff,

    vs.                        No. 3:15-cv-01074 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,


       Defendant.
---------------------------------x
EVAN SINGLETON and VITO LOGRASSO,

       Plaintiffs,

    vs.                        No. 3:15-cv-00425 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,


       Defendant.
---------------------------------x



    VIDEOTAPED DEPOSITION OF VITO LOGRASSO

       Philadelphia, Pennsylvania

          May 18, 2016

           9:35 a.m.



Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 44300

## Page 2

                    May 18, 2016
                    9:35 a.m.

        Videotaped Deposition of VITO
    LOGRASSO, held at the offices of
    Kleinbard, LLC, 1650 Market Street,
    Philadelphia, Pennsylvania, pursuant to
    notice, before Jennifer Ocampo-Guzman,
    a Certified Real-Time Shorthand
    Reporter and Notary Public of the
    Commonwealth of Pennsylvania.

## Page 3

APPEARANCES:

    Attorneys for Plaintiff Vito LoGrasso
        POGUST BRASLOW MILLROOD, LLC
        Eight Tower Bridge
        161 Washington St., Suite 1520
        Conshohocken, Pennsylvania 19428
        BY:  ANDREW J. SCIOLLA, ESQ.
            asciolla@pbmattorneys.com

    Attorneys for Plaintiff Vito LoGrasso
        KYROS LAW OFFICES
        17 Miles Road
        Hingham, Massachusetts 02043
        BY:  KONSTANTINE W. KYROS, ESQ.
            kon@kyroslaw.com
            ANTHONY NORRIS, ESQ.

## Page 4

APPEARANCES (Cont.d):

    Attorneys for Defendant
        K&L GATES, LLP
        210 Sixth Avenue
        Pittsburgh, Pennsylvania 15222
        BY:  JERRY McDEVITT, ESQ.
            jerry.mcdevitt@klgates.com
            STEFANIE M. LACY, ESQ.
            stefanie.lacy@klgates.com

ALSO PRESENT:
    JOSEPH WILLS, Videographer

## Page 5

        THE VIDEOGRAPHER:  We are now on
the record.
        My name is Joseph Wills, the
videographer obtained by David Feldman
Worldwide.  This is a video deposition
for the United States District Court for
the District of Connecticut.  Today's
date is May 18, 2016, and the video time
is 9:35 a.m.
        This deposition is being held at
1650 Market Street, Philadelphia,
Pennsylvania, in the matters of
McCullough, et al., versus World
Wrestling Entertainment Incorporated and
Singleton and LoGrasso versus World
Wrestling Entertainment Incorporated.
The deponent is Vito LoGrasso.
        Will all counsel please identify
themselves.
        MR. SCIOLLA:  Andrew Sciolla from
Pogust Braslow Millrood, on behalf the
plaintiff, Vito LoGrasso.
        MR. KYROS:  Konstantine Kyros,
Kyros Law Offices, for the plaintiff,
Vito LoGrasso.

```
                                    6
 1        MR. NORRIS: Anthony Norris, Kyros
 2    Law Offices, for the plaintiff.
 3        MR. McDEVITT: Jerry McDevitt for
 4    WWE.
 5        MS. LACY: Stefanie Lacy for WWE.
 6    V I T O   J.   L O G R A S S O, called
 7    as a witness, having been duly sworn, was
 8    examined and testified as follows:
 9    EXAMINATION BY
10    MR. McDEVITT:
11        Q.  Would you state your name for the
12    record, please?
13        A.  Veto J. LoGrasso.
14        Q.  Have you ever testified under oath
15    before?
16        A.  No, sir.
17        Q.  Do you understand the oath you've
18    just taken?
19        A.  Yes, sir.
20        Q.  And you understand it obligates you
21    to tell the truth, even if telling the truth
22    is against your interest?
23        A.  Yes.
24        Q.  And even if the truth is contrary
25    to what you said in court pleadings?

                                    7
 1        A.  Yes, sir.
 2        Q.  What's your date of birth, sir?
 3        A.  6/18/64.
 4        Q.  And what is your current address?
 5        A.  12 Flemming Drive, Coatesville,
 6    Pennsylvania, 19320.
 7        Q.  Do you own that property?
 8        A.  No, I do not. My wife does.
 9        Q.  How long have you lived there?
10        A.  Two years, I think.
11        Q.  Does anybody else live there
12    besides you and your wife?
13        A.  No, just us.
14        Q.  What is your wife's name?
15        A.  Becca, B-E-C-A -- C-C-A.
16        Q.  What was her maiden name?
17        A.  Ford.
18        Q.  And am I correct, she was also a
19    previous performer in the wrestling business?
20        A.  Yes, sir.
21        Q.  But not with WWE, correct?
22        A.  No.
23        Q.  She was with WCW?
24        A.  No.
25        Q.  Who did she perform for?

                                    8
 1        A.  She was more of an indie wrestler.
 2        Q.  When were you married?
 3        A.  September 27, 2014.
 4            If I got that wrong, I die.
 5        Q.  We're going ask her whether you
 6    were right.
 7            MR. SCIOLLA: Jerry, I don't meant
 8    interrupt, but as you can see, he's
 9    leaning toward you. As much as you can,
10    keep your voice up so that he can hear.
11            MR. McDEVITT: If you can't hear or
12    understand any question I ask you, just
13    tell me and I will be glad to raise my
14    voice, but I don't want to appear like
15    I'm yelling at you.
16            I may yell at you anyway, but --
17            THE WITNESS: It's okay.
18        Q.  But seriously, if you cannot hear
19    me, tell me.
20        A.  Okay.
21        Q.  Is your wife disabled?
22        A.  Yes.
23        Q.  And what's the nature of her
24    disability?
25        A.  She has three herniated disks and

                                    9
 1    spinal stenosis.
 2        Q.  And prior to moving to
 3    Pennsylvania, you lived in Florida?
 4        A.  Yes, sir.
 5        Q.  When did you move to Pennsylvania?
 6        A.  Let's see. I'm not sure of the
 7    day. I know it was in 2014, I think.
 8        Q.  The year is fine. The year 2014?
 9        A.  I think so, yeah.
10        Q.  Why did you move back to
11    Pennsylvania?
12        A.  Because I closed my wrestling
13    school, and I decided to get married.
14        Q.  Why couldn't you stay in Florida?
15        A.  My wife lives here, and she has two
16    children here.
17        Q.  Is it true you hate living in
18    Pennsylvania?
19        A.  Say that one more time?
20        Q.  You hate living in Pennsylvania?
21        A.  I'm not fond of Pennsylvania. The
22    people are nice, but I'm not too fond of
23    Pennsylvania.
24        Q.  Have you told some of your
25    healthcare providers you hate living in
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

```
                                    22
 1   matches.
 2        Do you recall that?
 3        A.  Yes.
 4        Q.  Is it the same matches that you
 5   watched?
 6        A.  Yes, sir.
 7        Q.  What were you watching them for?
 8        MR. SCIOLLA:  Object to the form.
 9        You can answer, to the extent you
10   know.
11        A.  Those matches were the matches
12   where I sustained head injuries.
13        Q.  Did you watch the match where
14   Steven Regal appears to throw you into the
15   metal steps going up to the cage, or up to
16   the ring?
17        A.  I'm sorry?
18        Q.  Did you watch the match where
19   Steven Regal appeared to throw you into the
20   metal steps leading up to the ring?
21        A.  Yes.
22        Q.  And that's when you claim you hit
23   your head on the steps and got a concussion?
24        A.  That's when I hit my head.  I
25   didn't know if I had a concussion.
```

```
                                    23
 1        Q.  But that's one of the matches you
 2   claim now that you hit your head on those
 3   steps and you got a concussion, right?
 4        A.  That's when I hit my head.  I did
 5   not know I had a concussion.
 6        Q.  I understand that.  But now you
 7   claim you did get a concussion, right?  You
 8   didn't know it then, but now you're claiming
 9   you had a concussion, right?
10        MR. McDEVITT:  He's talking about
11        your current knowledge, not what you
12        know then.
13        Q.  As I understand what you're saying,
14   Mr. LoGrasso, you watched the match with
15   Steven Regal, you say you hit your head on
16   those metal steps.  You didn't know then that
17   you got a concussion, but you believe now
18   that you did.
19        Is that an accurate statement?
20        A.  That's -- that's my explanation.
21        Q.  What other documents did you
22   review?  Any other ones?
23        What other documents did you review
24   in preparation for your deposition?
25        A.  It would just be the ones that I
```

```
                                    24
 1   said.
 2        Q.  Did you review any of your medical
 3   records?
 4        A.  No.
 5        Q.  Are you currently taking any drugs
 6   which would impair your memory --
 7        A.  No.
 8        Q.  -- or your ability to recall
 9   things?
10        A.  No.
11        Q.  How much time did you spend
12   watching the videotapes of the matches in
13   preparation for your deposition?
14        A.  I never watched them.  I never
15   watched them in preparation.  I just, you
16   know, produced the videotapes.  That was it.
17   I didn't do it in preparation for this.
18        Q.  I'm sorry, I thought you said in
19   your preparation for today you watched those
20   matches.  That's what we were just talking
21   about a couple of questions ago.
22        A.  Yes, I watched the matches.
23        Q.  And you watched those with your
24   attorneys, right?
25        A.  I did not watch them with the
```

```
                                    25
 1   attorneys, no.
 2        Q.  So you watched them outside of your
 3   preparation session with the attorneys?
 4        A.  I watched the matches.  I submitted
 5   them to the attorneys.  I did not watch them
 6   with the attorneys.
 7        Q.  Where did you get those matches?
 8        A.  From tapes I had.
 9        Q.  Were they tapes?  Do you keep tapes
10   of all your matches?
11        A.  There are some that I -- there are
12   a lot of them that I kept.  I just didn't
13   recall I had them recorded.  And usually
14   there's a lot of stuff on the WWE network.
15        Q.  Did you pull any of those matches
16   off the network?
17        A.  No.
18        Q.  In terms of social media, do you
19   have a Facebook account?
20        A.  Yes.
21        Q.  Under what name?
22        A.  Vito LoGrasso.
23        Q.  Do you have a Snapshot account?
24        A.  I don't think so, no.
25        Q.  Snapchat?
```

```
                                          34
 1      A.   I did get hit with chairs in WCW
 2   and in ECW.
 3      Q.   And by the way, the matches you
 4   identified that you got hurt in WWE, there
 5   were no chairs involved in any of those
 6   matches, were there?
 7      A.   No, sir.
 8      Q.   Those were conventional wrestling
 9   matches, right?
10           MR. SCIOLLA:  Object to the form.
11      A.   Conventional in what manner?
12      Q.   Well, there were no other objects.
13   It was you and another performer wrestling,
14   correct?
15      A.   Except for the steel steps and the
16   mat and the posts and the ring, those are all
17   objects you hit your head against.
18      Q.   But those are all part of a normal
19   wrestling match, correct?
20      A.   Stairs are not part of the
21   wrestling match, and the table is not, you
22   know -- when you go against tables or the
23   announce tables or the barriers.  Those are
24   all part of it, too.
25      Q.   And you claim you did that in any
```

```
                                          35
 1   of the matches you identified as hurting
 2   yourself in WWE?
 3      A.   One more time?  I'm sorry.
 4      Q.   Are you claiming you got thrown
 5   through a table in any WWE match?
 6      A.   No, I didn't say that.
 7      Q.   And are you claiming you got hurt
 8   by thrown into a barrier at a WWE match?
 9      A.   I just didn't say.  You asked me if
10   there was a conventional match and what was
11   used, and that's what I'm saying.  We used
12   the ring, we used the posts, we used all of
13   that stuff, and it's all part of the
14   conventional thing.
15      Q.   So your headaches started in 2006.
16           And then did they continue
17   thereafter?
18      A.   They -- it was 2006, after -- after
19   I got hit, when I hit my head against the
20   stairs; and that's when things started to,
21   started to go different, started to change.
22      Q.   And the stairs being the same one
23   we're talking about in the Steve Regal match
24   that you identified as the one --
25      A.   Steel chairs, steel, yes.
```

```
                                          36
 1      Q.   And that's when you're saying your
 2   headaches started, because you got your head
 3   hit in that match?
 4      A.   Uh-huh.
 5      Q.   You have to say yes or no.  That's
 6   all he writes down is words, not shaking your
 7   head.
 8      A.   I'm listening and --
 9      Q.   I understand.
10      A.   -- those are the same stairs that
11   we used, yes.
12      Q.   And you're saying that when you hit
13   your head on those stairs in that match with
14   Steven Regal is when these headaches really
15   began?
16      A.   That's when they started, that's --
17   after I got hit, after I hit my head in that
18   match, that's when my headaches became -- I
19   didn't understand why I was getting them, and
20   that's when things changed for me and my
21   health changed with my head.
22      Q.   So that match with Steve Regal,
23   then, where you claim he threw you into the
24   stairs was sort of a turning point for you,
25   wasn't it, in the sense that these headaches
```

```
                                          37
 1   that you now claim, that's when the genesis
 2   of this is?
 3           MR. SCIOLLA:  Object to the form.
 4   Mischaracterizes his testimony.
 5           You can answer.
 6      A.   Can you repeat the question?
 7      Q.   Well, prior to that episode that
 8   you've just described where you claim Steven
 9   Regal threw you into the steps, in the match
10   you've identified in this case, is it your
11   testimony you didn't have headaches before
12   that event?
13           MR. SCIOLLA:  Object to the form.
14   Mischaracterizes his testimony.
15      A.   Not that I recall.
16      Q.   So that in all the matches with
17   ECW -- and by the way, you were with the ECW
18   before WWE, right?
19      A.   No.  Actually I was in WWF before I
20   was in ECW.
21      Q.   Didn't you go from ECW to WCW?
22      A.   No, sir, I started my career in
23   WWF.
24      Q.   Well, when you were a job -- I
25   understand you were a jobber for couple years
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

```
                                    202
 1     A.  I know for a fact he does.
 2     Q.  But again, every wrestler who walks
 3  in that ring understands there is a risk of
 4  serious injury associated with what we do; is
 5  that a fair statement?
 6     A.  Fair statement.
 7     Q.  Okay.  And would you agree, in this
 8  document, if you would look back to page 9 --
 9  sorry, page 16.
10     A.  You said page 15?
11     Q.  I'm sorry, page 16.  In bold print
12  there, under 9.12(b), would you just take a
13  minute and read that?
14     A.  Okay.  Okay.  I've read it.
15     Q.  And does that embrace the concept
16  that we were just talking about, that you
17  understand there is risk involved, and you're
18  indicating that you're accepting those risks
19  that come with being a professional wrestler?
20         MR. SCIOLLA:  Object to form.
21     A.  Yes, sir.
22     Q.  And that you assumed full
23  responsibility for all inherent risks as well
24  as those due to the negligence of a promoter
25  or other wrestlers?

                                    203
 1     A.  Yes, sir.
 2     Q.  And then down below that in (c),
 3  did you agree that you waived and discharged
 4  the WWE from all liability to you on account
 5  of injury to you which results in serious or
 6  permanent injury?
 7         MR. SCIOLLA:  Object to form.
 8     A.  I see that, sir, yes.
 9     Q.  And that's what you agreed to,
10  right?
11     A.  Yes, sir.
12     Q.  In fact, did you hear during I
13  think the pendency of this lawsuit about the
14  Mexican wrestler who died in the ring?
15     A.  I heard about it.
16     Q.  Did you actually ever see the match
17  in which he died?
18     A.  No, I didn't see it.
19     Q.  You didn't see it was sort of just
20  a routine maneuver, he hit the ropes and...
21     A.  I didn't see -- I might have saw
22  the end -- I think I saw the clip where he
23  was laying like this.  That's about the
24  extent I saw.
25     Q.  And the other wrestlers thought he

                                    204
 1  was selling, correct?
 2         MR. SCIOLLA:  Object to the form.
 3     Q.  As far as you could tell?
 4     A.  From what I could tell.
 5     Q.  Let's go now to the October 10th
 6  match that we've been describing and talking
 7  about today with Mr. Regal, in which you
 8  claim that you had a traumatic brain injury
 9  and began to suffer headaches thereafter.
10         MS. LACY:  Can you please play
11  LoGrasso, September 10, 2006 full match.
12         THE WITNESS:  Is there something
13  I'm looking for, or do I have to explain
14  something to you after this match?
15         MR. SCIOLLA:  I'm going ask you
16  some questions afterwards, but just
17  watch it, to refresh your memory.  This
18  is the one you identified we've been
19  talking about all day.
20         I think just before we start, I
21  don't think there is multiple occasions
22  where the chair or the steps come into
23  play.  I think it's one scene.
24     A.  One time.
25         (Video played.)

                                    205
 1     Q.  Is that the match we've been
 2  talking about all day, in which you now claim
 3  you got a serious traumatic brain injury from
 4  hitting the steps?
 5     A.  That's the match we talked about.
 6     Q.  And at the end of that match were
 7  you dancing?
 8     A.  Yes, making my way back to the
 9  dressing room.
10     Q.  And what part of your head hit the
11  steps?
12     A.  The top part.
13     Q.  Point with your finger to what part
14  of your head hit the steps.
15     A.  It was in here.
16     Q.  And you are pointing to the crown
17  of your head?
18     A.  Crown of my head.
19     Q.  You're saying you went head first
20  into those steps?
21     A.  When I got kicked, I was going to
22  fall, then when I turned, I didn't have
23  enough room.  I didn't have enough room for
24  me to go anywhere except that when I took --
25  when I saw the steps, I just, you know, they
```

206

1  were there. You know, there is nothing,
2  nothing for me to do. It was just one of
3  those things that happened.
4      Q.  When you say there was nothing for
5  you to do, what do you mean by that?
6      A.  Well, there was no place for me to
7  land, really, because the angle, like I
8  explained before, that I got hit, you know,
9  when I went into the steps I was going to
10 take the bump, that means a fall, I mean I
11 looked and I looked where I was and where I
12 was headed and, you know, I did the best I
13 could not to make a full impact with those
14 stairs, but I got a good stop. Top of my
15 head was hit.
16     Q.  Are you saying you didn't know that
17 move was going to be part of that match?
18         You have to say yes or no.
19     A.  No.
20     Q.  So you didn't know that?
21     A.  No.
22     Q.  So you're saying he actually kicked
23 you?
24     A.  The kick was part of it.
25     Q.  And that was a real kick, not a

207

1  fake kick; is that what your testimony is?
2      A.  It's a kick.
3      Q.  What's a flatfoot called? Do you
4  know what a flatfoot is in wrestling
5  parlance?
6      A.  Flatfoot, a flatfoot is when you
7  hit somebody with the flat of your boot, if
8  I'm not mistaken.
9      Q.  And your testimony is that's not
10 what he did there, he actually kicked you?
11     A.  The impact of what I was hit with,
12 it did hit me. He didn't kick me with the
13 tip, he didn't kick me with the heel; but
14 when he did flatfoot, like you are
15 suggesting, the impact behind it; you know,
16 like we said, nobody goes to hurt anybody,
17 and you do try and protect each other. And
18 when you're outside and your adrenaline is
19 going and you see the ferocity of the match
20 and you see the speed you're going at and the
21 hits I'm taking, it does get physical at
22 times.
23     Q.  So you claim you hit the top of
24 your head flush on the steps, right?
25     A.  If I remember. I know I hit my

208

1  head.
2      Q.  When you are seen after that
3  holding your head, are you holding your head
4  because you actually hit your head or are you
5  holding your head --
6      A.  I hit my head.
7      Q.  -- because you're selling the move?
8      A.  I hit my head.
9      Q.  You hit your head.
10        Is there a stunt component or what
11 you might call tricks of the trade aspect of
12 that move that you were supposed to have
13 done?
14     A.  If it was part of the match. There
15 is a way that you go into the stairs.
16     Q.  And how is that?
17     A.  On that particular match, no.
18     Q.  And if you want to execute that
19 move in a way that makes it appear to the
20 crowd that you hit your head, make a big
21 noise by hitting your head, but you don't
22 really hit your head, how do you do that
23 move? What do you do?
24     A.  Try to put your hand in front of
25 your head and, you know, put your hand, try

209

1  to make your hand go to the point of contact
2  and then you peel off. Peel off means to
3  skim.
4      Q.  So the hand, properly done --
5      A.  Properly done.
6      Q.  -- the hand hits the metal steps
7  first, makes a loud noise, makes people think
8  your head is the one that hit the steps; and
9  then you roll away and hold your head to make
10 look like that's what happened, right?
11     A.  Sometimes when you do that
12 particular move, as you know, when you are
13 doing it or when it's being applied to you,
14 sometimes you can't defend the force that's
15 behind the person doing it to you or the
16 force that you're going actually into it. So
17 there are times when you can hurt yourself
18 even doing a safe move like you're saying.
19     Q.  Mr. LoGrasso, before I play the
20 next tape, I'm going to give you an
21 opportunity to recant the testimony which was
22 just given and admit it's false.
23        Would you care to do that?
24     A.  Say again?
25     Q.  I'm going to give you an

53 (Pages 206 to 209)

210

1  opportunity, before I play the next piece of
2  evidence, that the testimony you've given
3  today about that step and hitting that step
4  with your head is categorically false. If
5  you wish to take the opportunity before I
6  show you the next tape, this is your chance
7  to do it. You might want to talk to your
8  counsel beforehand.
9       You understand perjury is a
10 significant Federal crime; you understand
11 that, right? All right.
12      Do you want to talk to your counsel
13 before I show the next piece of tape about
14 whether you wish to recant what you've
15 testified to before I confront you with a
16 piece of evidence? I'm giving you an
17 opportunity. I don't have to, but I'm giving
18 you the opportunity.
19      MR. SCIOLLA: Do you want to talk?
20      MR. KYROS: Yeah, let's talk.
21 Might as well.
22      THE VIDEOGRAPHER: The time is
23 2:32 p.m. Off the record.
24      (A brief recess was taken.)
25      THE VIDEOGRAPHER: Back on. The

211

1  time is 2:41 p.m. Back on the record.
2       Q. Mr. LoGrasso, you understand you
3  are still under oath?
4       A. Yes, sir.
5       Q. You've had a chance now to consult
6  with your counsel?
7       A. Yes, sir.
8       Q. And before we go any further, do
9  you wish to recant the testimony you gave
10 this morning about hitting your head on the
11 steps as false?
12      A. No, sir.
13      Q. What?
14      A. No, sir.
15      Q. All right. Let's play the tape.
16      MS. LACY: Can you please play
17 the --
18      MR. SCIOLLA: Is this a different
19 this is a slow motion depiction of what
20 that step episode is.
21      (LoGrasso Exhibit 20, CD labeled,
22 "LoGrasso October 10, 2006 Stairs Clip,"
23 marked for identification, this date.)
24      Q. Would you like to see it again?
25      A. Uh-huh.

212

1       Q. Your hand comes out, your hand hits
2  the steps. Your head never hits the steps,
3  does it, Mr. LoGrasso?
4       A. It's not how I remember it
5  happening.
6       Q. Do you agree with me that what you
7  saw just now is your hand hits the steps, and
8  your head never does?
9       A. Yes, sir.
10      Q. So you lied this morning?
11      MR. SCIOLLA: Object to the form.
12      Q. You lied repeatedly this morning,
13 didn't you?
14      A. No, I did not. That's how I
15 remember what happened.
16      Q. Your lawyers have told the judge in
17 a pending motion that is now before the court
18 in one match positioned -- in one match the
19 position of LoGrasso against Regal in
20 September 2006, which we already covered, is
21 the one we just watched, "The video of the
22 match, which has been in defendant's
23 possession since it aired, shows LoGrasso,
24 one, falling head first in the steel steps
25 that were ringside; two, looking dazed and

213

1  disoriented afterwards; three, repeatedly
2  holding his head with his hand; and four,
3  continuing to wrestler regardless.
4       "Accordingly, it rings quite hollow
5  when WWE claims that there was no treatment,
6  no suspicion, no knowledge of LoGrasso's head
7  injury at that time. In fact, the argument
8  only further highlights attempts by WWE to
9  deny reality and continue the same course of
10 conduct to this day."
11      That description of events is
12 false, isn't it?
13      MR. SCIOLLA: I'm sorry, what are
14 you reading from, counsel?
15      MR. McDEVITT: From your opposition
16 to our petition for reconsideration
17 which is currently pending before the
18 court --
19      MR. SCIOLLA: Okay.
20      MR. McDEVITT: -- that you filed on
21 -- I'll answer your question -- that you
22 filed on, through Mr. Flaharty, on
23 5/9/16. There is a currently pending
24 motion before the Federal judge.
25      MR. SCIOLLA: It's a brief, written