# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

----------------------------------x

RUSS MCCULLOUGH, et al.,

Plaintiff,

vs. No. 3:15-cv-01074 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,

Defendant.

----------------------------------x

EVAN SINGLETON and VITO LOGRASSO,

Plaintiffs,

vs. No. 3:15-cv-00425 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,

Defendant.

----------------------------------x

VIDEOTAPED DEPOSITION OF VITO LOGRASSO

Philadelphia, Pennsylvania

May 18, 2016

9:35 a.m.

Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 44300

May 18, 2016
9:35 a.m.

Videotaped Deposition of VITO LOGRASSO, held at the offices of Kleinbard, LLC, 1650 Market Street, Philadelphia, Pennsylvania, pursuant to notice, before Jennifer Ocampo-Guzman, a Certified Real-Time Shorthand Reporter and Notary Public of the Commonwealth of Pennsylvania.

A P P E A R A N C E S:

Attorneys for Plaintiff Vito LoGrasso
POGUST BRASLOW MILLROOD, LLC
Eight Tower Bridge
161 Washington St., Suite 1520
Conshohocken, Pennsylvania 19428
BY: ANDREW J. SCIOLLA, ESQ.
asciolla@pbmattorneys.com

Attorneys for Plaintiff Vito LoGrasso
KYROS LAW OFFICES
17 Miles Road
Hingham, Massachusetts 02043
BY: KONSTANTINE W. KYROS, ESQ.
kon@kyroslaw.com
ANTHONY NORRIS, ESQ.

A P P E A R A N C E S (Cont.d):

Attorneys for Defendant
K&L GATES, LLP
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
BY: JERRY McDEVITT, ESQ.
jerry.mcdevitt@klgates.com
STEFANIE M. LACY, ESQ.
stefanie.lacy@klgates.com

ALSO PRESENT:
JOSEPH WILLS, Videographer

THE VIDEOGRAPHER: We are now on the record.

My name is Joseph Wills, the videographer obtained by David Feldman Worldwide. This is a video deposition for the United States District Court for the District of Connecticut. Today's date is May 18, 2016, and the video time is 9:35 a.m.

This deposition is being held at 1650 Market Street, Philadelphia, Pennsylvania, in the matters of McCullough, et al., versus World Wrestling Entertainment Incorporated and Singleton and LoGrasso versus World Wrestling Entertainment Incorporated. The deponent is Vito LoGrasso.

Will all counsel please identify themselves.

MR. SCIOLLA: Andrew Sciolla from Pogust Braslow Millrood, on behalf the plaintiff, Vito LoGrasso.

MR. KYROS: Konstantine Kyros, Kyros Law Offices, for the plaintiff, Vito LoGrasso.

MR. NORRIS: Anthony Norris, Kyros Law Offices, for the plaintiff.
MR. McDEVITT: Jerry McDevitt for WWE.
MS. LACY: Stefanie Lacy for WWE.
VITO J. LOGRASSO, called as a witness, having been duly sworn, was examined and testified as follows:
EXAMINATION BY
MR. McDEVITT:
**Q. Would you state your name for the record, please?**
A. Veto J. LoGrasso.
**Q. Have you ever testified under oath before?**
A. No, sir.
**Q. Do you understand the oath you've just taken?**
A. Yes, sir.
**Q. And you understand it obligates you to tell the truth, even if telling the truth is against your interest?**
A. Yes.
**Q. And even if the truth is contrary to what you said in court pleadings?**

A. Yes, sir.
**Q. What's your date of birth, sir?**
A. 6/18/64.
**Q. And what is your current address?**
A. 12 Flemming Drive, Coatesville, Pennsylvania, 19320.
**Q. Do you own that property?**
A. No, I do not. My wife does.
**Q. How long have you lived there?**
A. Two years, I think.
**Q. Does anybody else live there besides you and your wife?**
A. No, just us.
**Q. What is your wife's name?**
A. Becca, B-E-C-A -- C-C-A.
**Q. What was her maiden name?**
A. Ford.
**Q. And am I correct, she was also a previous performer in the wrestling business?**
A. Yes, sir.
**Q. But not with WWE, correct?**
A. No.
**Q. She was with WCW?**
A. No.
**Q. Who did she perform for?**

A. She was more of an indie wrestler.
**Q. When were you married?**
A. September 27, 2014.
If I got that wrong, I die.
**Q. We're going ask her whether you were right.**
MR. SCIOLLA: Jerry, I don't meant interrupt, but as you can see, he's leaning toward you. As much as you can, keep your voice up so that he can hear.
MR. McDEVITT: If you can't hear or understand any question I ask you, just tell me and I will be glad to raise my voice, but I don't want to appear like I'm yelling at you.
I may yell at you anyway, but --
THE WITNESS: It's okay.
**Q. But seriously, if you cannot hear me, tell me.**
A. Okay.
**Q. Is your wife disabled?**
A. Yes.
**Q. And what's the nature of her disability?**
A. She has three herniated disks and

spinal stenosis.
**Q. And prior to moving to Pennsylvania, you lived in Florida?**
A. Yes, sir.
**Q. When did you move to Pennsylvania?**
A. Let's see. I'm not sure of the day. I know it was in 2014, I think.
**Q. The year is fine. The year 2014?**
A. I think so, yeah.
**Q. Why did you move back to Pennsylvania?**
A. Because I closed my wrestling school, and I decided to get married.
**Q. Why couldn't you stay in Florida?**
A. My wife lives here, and she has two children here.
**Q. Is it true you hate living in Pennsylvania?**
A. Say that one more time?
**Q. You hate living in Pennsylvania?**
A. I'm not fond of Pennsylvania. The people are nice, but I'm not too fond of Pennsylvania.
**Q. Have you told some of your healthcare providers you hate living in**

MR. McDEVITT: Strike that.

**Q. Did you read the judge's decision on our motion to dismiss?**

A. Did I read the judge's decision on?

**Q. Yes, we moved to dismiss your case, and she issued a written opinion.**

**Did you read it?**

A. I believe I did.

**Q. And what is your understanding of the claim that you have in this case that remains?**

MR. SCIOLLA: I'll object to the form, but you can answer.

A. I'm really not understanding what you're saying, so I really can't answer it.

**Q. Well, what is the claim you are making against WWE?**

A. About not providing information about head injuries and CTE during my time there. And not getting proper care, not getting proper medical treatment, not getting evaluated for head trauma.

**Q. What specific information do you think they should have told you?**

MR. SCIOLLA: Object to the form, calls for speculation.

A. Well, being that you're in -- there is no time or rest between wrestling and you go in every day, you know, and you're on the road and you're banging your body around, you know, there was no evaluation on how my head was or any evaluation on how my physical well-being was. And WWE never sought to evaluate me at any time and never, you know, sought to check and see if I was okay, if I had any, any problems.

**Q. My question was, what specific information do you contend they should have told you that they didn't tell you?**

MR. SCIOLLA: Same objection.

A. When they -- well, the information they should have done and should have provided was an evaluation or a physical of some sort to see if I was suffering from any head trauma, if I had any head injuries, if I needed any assistance.

I was getting the B-12 shots because I was fatigued, and I did have the headaches, you know. And I was feeling lethargic and Dr. Rios was giving me those on his, you know, you know, on his recommendation to help me along.

**Q. I'm going to ask you for the third and last time, what information about head injuries are you contending that WWE should have given you that you didn't know?**

A. They should have given me the information that there was something that could be happening to your head, some awareness or some knowledge of head trauma.

**Q. And what is the something that could be happening to your head that they should have told you about?**

A. That you can suffer from a concussion and that you can, you don't have to be knocked out to get a concussion. Because that was my understanding of what a concussion was.

**Q. Anything else they should have told you that you didn't know?**

MR. SCIOLLA: Object to the form.

A. I mean they didn't give us -- I mean you have a drug policy that goes for addicts, for drug addiction, for alcohol addiction, but you have nothing in place for people who suffer head injuries or people who suffer from headaches or depression or people who have, you know, irregularities with their brain.

**Q. You mean former talent? You mean former talent?**

A. Former talent, former employees. You make it aware that there is a drug policy, but that's only if you have a drug addiction. And you have drug addiction, alcohol addiction, but there is nothing in place for the talent to where they can get help if they need it for head injuries.

And you offer this through your program, but there is nothing for guys like myself who have these problems, and all I'm looking for is help.

**Q. And who do you contend at WWE was engaged in fraud, who specifically?**

A. Huh?

**Q. Do you contend that people at WWE were engaged in trying to defraud you?**

MR. SCIOLLA: Object to the form, to the extent it calls for a legal conclusion or evaluation.

You can answer.
A. I didn't come out and say that they tried to defraud me. I said they didn't give me any awareness or knowledge.
**Q. Do you contend that somebody at WWE was trying to defraud you?**
MR. SCIOLLA: Object to the form.
A. And my answer is, nobody gave me the awareness or the knowledge for head injury and for the trouble I was having.
**Q. Well, that's not the question I'm asking you, sir.**
**Who at WWE, if anybody, are you accusing of engaging in fraud towards you?**
A. I didn't accuse anybody of saying fraud. All I said is they did not provide any information about CTE awareness or concussions.
**Q. And do you think, sir, that maybe a reason that they wouldn't tell you anything about CTE is either because they didn't know it either, or they probably figured you might be reading it in the newspaper like everybody else did?**
MR. SCIOLLA: Object to the form and calls for speculation.

A. Well, maybe.
**Q. Are you trying to tell me that in all the years since 2007, that you never read anything about CTE?**
A. I was not -- it didn't -- I didn't know up until 2014 that I had any of these problems that could contribute to me having CTE.
**Q. That's not my question.**
**Did you read in the newspapers anything about CTE?**
A. No.
**Q. Well, let's take, for example, in 2005. Were you in the WWE locker rooms in 2005?**
A. Yes.
**Q. Was there any talk about CTE in the locker rooms in 2005?**
A. No.
**Q. Was there any talk that you heard of in 2005 about Mike Webster?**
A. I don't know who Mike Webster is.
**Q. Do you know the former Pittsburgh Steeler Mike Webster?**

A. Might have heard the name. I'm not a Pittsburgh Steeler fan, so, I'm sorry.
**Q. In 2005 you don't recall hearing any talk about CTE inside of WWE's locker rooms from anybody, right?**
MR. SCIOLLA: Objection, asked and answered.
A. No.
**Q. How about in 2006, did you hear any talk in the locker rooms in 2006 about CTE?**
A. No.
**Q. Did you hear any wrestlers talking about it?**
A. Not that I recall.
**Q. Did you hear any management talking about it?**
A. Not that I recall.
**Q. Did you hear Vince McMahon ever talk about it?**
A. Not that I recall.
**Q. And you left in 2007, right?**
A. Uh-huh.
**Q. And Chris Benoit was a friend of yours, wasn't he?**
A. I wrestled with him up until May of 2007.

**Q. And Chris Benoit was a friend of yours, wasn't he?**
A. We worked together in the WWE.
**Q. Was Chris Nowinski a friend of yours?**
A. He was before me.
**Q. Did you know him?**
A. I might have met him once or twice. I think he was there in 2003.
**Q. Did you watch Tough Enough?**
A. I don't watch Tough Enough.
**Q. Did you know his persona, Chris Harvard?**
A. I really didn't.
**Q. You never saw him perform?**
A. I can't say that I have. I wasn't a Tough Enough watch, I wasn't a fan of the show.
**Q. Well, he made it to the main roster. Did you watch him when he made it to the main roster?**
A. I might have remembered him being on the main roster with Chris Nowinski. But that's about it. I never watched him, per

246

(LoGrasso Exhibit 22, Twitter update, marked for identification, this date.)

**Q. I've handed you what's been marked as exhibit -- what number is that?**

A. 22.

**Q. -- 22.**

**Can you confirm that is a document that you authored?**

THE WITNESS: You want me to give them --

MR. SCIOLLA: No, I have it.

MR. McDEVITT: He has a copy.

**Q. Did you write that on April 22nd of this year?**

A. Yes, I did.

**Q. You say, "Dr. Omalu, working on my behalf and on the behalf of others. More is coming. What a ride this has been." What does that mean?**

A. I believe that Dr. Omalu is working as a consultant with -- with the lawyers on the CTE study.

**Q. And has he examined you?**

A. Never once. I never met the man.

247

**Q. What did you mean "More is coming"?**

A. Meaning that there is more to this that is coming, basically. It was just an out-there statement.

**Q. Well, what is "More"?**

A. Just an out-there statement.

**Q. Let me go back to a question I asked you before.**

**Can you identify anything that anybody at WWE, beyond what you testified to, did that you regard as deceiving you or fraudulent towards you?**

A. Deceiving or fraudulent towards me, if you could explain in what manner you mean.

**Q. Well, in any manner, did they say or do anything to you that deceived you, had misled you in any way?**

A. I guess as far as being misled, it goes about time when I was going back and forth to, when I was going back and forth to Louisville and Deep South Wrestling, and I was doing a new gimmick down there and Mike and Steve Curran were working for that company, and I believe Mike was in charge of talent relations, along with the Steve

248

Curran, and they came down to look at my new gimmick. And they had told me that I was going up to TV the week -- the next week, and then the following week I was released from WWE.

**Q. Anything else?**

A. That's about it.

**Q. You've made allegations about Bill DeMott in this case. You never trained under Bill DeMott, did you?**

A. At Deep South.

**Q. You had been a professional wrestler for how many decades by the time you went to Deep South?**

A. I still abided by his rules, because it was his training facility.

**Q. How many decades had you been a wrestler?**

A. I think it was up to 15 years at the time.

**Q. And when you went down there, you went down there as a WWE Superstar to help those people, did you?**

A. I went down there to help and keep training.

249

**Q. And you were by that time a fully accomplished professional wrestler, fair to say?**

A. You always could learn some things.

**Q. And that was after these matches with Steve Regal that you lied about this morning, correct?**

MR. SCIOLLA: Objection.

A. So your point being?

**Q. So whatever you ran into with Bill DeMott, that is after these matches that you lied about this morning, isn't it?**

MR. SCIOLLA: Objection to the characterization.

A. You didn't tell me what Bill DeMott did that I could say yes or no to.

**Q. Well, you didn't even encounter Bill DeMott until what, 2007? When did you go down there, in 2007?**

A. I'm sorry?

**Q. When did you go down to Deep South?**

A. When did go down to Deep South?

**Q. Yes.**

A. I was going down to Deep South, I believe from 2005 to 2007, because I would go

on the weeks that I was off.
**Q. Was DeMott a Facebook friend of yours?**
A. No.
**Q. Never?**
A. He was at one time, I believe.
**Q. And when was that?**
A. I'm not even sure.
**Q. Did you ever read any congressional testimony in the Benoit matter?**
A. Read congressional testimony?
**Q. Yeah.**
A. No.
**Q. Are you a boxing fan?**
A. A boxing fan?
**Q. Yes.**
A. Yes, sir.
**Q. And do you follow Muhammad Ali?**
A. Pretty much.
**Q. And have you followed his deterioration in health?**
A. I know of it. I don't follow it, as per se.
**Q. And what is your understanding of what caused his deterioration?**

MR. SCIOLLA: Objection, calls for speculation.
A. It's a lot of blows to the head.
**Q. Did you see him light the Olympic torch in Atlanta several years ago?**
A. I might have.
**Q. Did you generally watch the Olympics?**
A. I watched the Olympics. I might have watched him do it. I'm not sure.
**Q. Are you familiar with what I'm talking about? How he came out and lit the Olympic torch in Atlanta in 1996?**
A. Vaguely.
**Q. And if you watched that in 1996 and you watched Muhammad Ali, did you conclude that he was suffering from brain damage?**
MR. SCIOLLA: Objection, calls for speculation.
A. I don't know because I didn't watch the tape, so I don't know. Again, I can't answer that.
**Q. Have you seen him in public where he shakes?**
A. I've seen him with the shakes.

**Q. And he didn't seen talk any more, does he?**
A. Not that I know of, sir.
MR. SCIOLLA: Objection, calls for speculation.
**Q. And he's been that way for quite a while, hasn't he?**
MR. SCIOLLA: Objection.
A. I think so.
**Q. And that's another instance where you could have deduced that that man suffered brain damage from blows to the head, right?**
MR. SCIOLLA: Objection.
A. I would assume so.
**Q. You indicated I think --**
MR. McDEVITT: Strike that.
**Q. When did you say your last match in 2007 with WWE in the main roster was?**
A. I didn't.
**Q. When was that?**
A. I'm not sure.
**Q. It was prior to June though, wasn't it.**
**I mean, you were gone by the time Benoit had murdered his wife, right?**

A. Yes.
**Q. Did you talk to him in that part of 2007, prior to the murders?**
A. Locker room talk?
**Q. Yeah.**
A. "How are you doing, what's going on."
**Q. Right.**
A. I mean before Eddie Guerrero died, we were talking this, me, Nunzio, Chavo, Benoit and Eddie, we used to go to the gym all the time at the same time, and we all used to meet.
So you're asking me if I was friendly with him, during train or after shows, yes.
Have an extensive conversations with him, no.
**Q. Do you remember the last time you talked to him?**
A. Not at all.
**Q. Have you ever known any 85-year-old people with dementia?**
A. 85-year-old people with the dementia?

254

**Q. Around 85 years old. Have you ever known anybody with dementia?**
A. I know one or two people.
**Q. And how old are they?**
A. I could say the one person I know is 50 or 60.
**Q. And how far along is their dementia?**
A. I really don't keep up with him. I know him, when I see him I'm nice to him. I say, hello, how are you doing today. It doesn't look very well but, you know.
**Q. Is he capable of managing his affairs?**
A. Is he capable of what?
**Q. Capable of managing his own affairs?**
A. No.
**Q. Would he be capable, for example, of getting on a plane and flying to a strange city?**
MR. SCIOLLA: Objection, calls for speculation.
A. No.
**Q. Did the Chris Benoit that you knew**

255

**before you left WWE strike you as an 85 year old with dementia?**
A. No.
**Q. No.**
**And nobody who knew him would have thought he had dementia on a scale of an 85 year old dementia, would they?**
MR. SCIOLLA: Objection, calls for speculation.
A. It wasn't even a thought.
**Q. And so if somebody had said to you back in 2007 when Chris Benoit did what he did, "Vito, he's like an 85-year-old with dementia," what would you have said to that?**
MR. SCIOLLA: Objection, calls for a hypothetical.
A. I would say that it's a standard no way, I can't believe it. But that's I think everybody's reaction.
**Q. And if you had said that, would you think you would be committing some kind of fraud by expressing your opinion that you didn't believe that?**
MR. SCIOLLA: Objection, calls for speculation.

256

A. You're talking like in general circles about your own opinion about different people. So I mean you know it's not about being any kind of thing like fraud, but it's what you think about that person.
**Q. So that, in your mind, if you express your truthful opinion, based on your knowledge of Chris Benoit, no way; you don't think you're trying to deceive anybody. You're just expressing your opinion about what you knew about the man?**
MR. SCIOLLA: Object to the form.
**Q. Is that fair to say?**
A. Fair, fair statement.
**Q. Back in 2007, after Benoit, after the initial discovery of the murders, do you recall, there was a lot of discussion about whether that was associated with steroid rage?**
A. That's what they said it was part of.
**Q. Right after the murder.**
**And did that concern you as a steroid user?**
A. Well, when you are on steroids like

257

that, you know, you do have these bits of rage. So I mean, it is possible.
**Q. So did that make you more interested in the story as to whether or not that could have been the cause?**
A. There's a difference between taking steroids and taking testosterone replacement.
**Q. Understood.**
A. So I mean when you are taking testosterone replacement, you are replacing testosterone because you have a deficiency. When you are taking steroids, you're taking them for other gains and goals.
So when you are on a mild dose, you know, the effect of having those rages are very limited. You do get irritable. I'm not saying that. But they're much greater when you're actually taking steroids.
**Q. But is the fact that steroids were put in play in this case something that made you more interested in the story?**
A. No. Like I said -- like I said, you know, like him doing that and everything that happened, my interest of it was, okay, it's a shock value, but after that, it really

**Q. Well, do you think it's fair to try to blame somebody else for his murderous acts?**

A. I didn't say that, Mr. McDevitt.

**Q. So you wouldn't have any problem if WWE, in responding to media articles, were suggesting that WWE in some way was responsible for what Chris Benoit chose to do, that they would say, this has nothing to do with us or wrestling?**

MR. SCIOLLA: Object to the form.

A. I don't know. It's just something I read. It's a statement.

**Q. In all the years that you were ignorant, according to you, about what concussions mean, is there any reason whatsoever that you could not have read articles in a public realm or watched media articles that discussed at length the emerging science about CTE and concussions that has been going on for years?**

MR. SCIOLLA: Object, calls for speculation.

A. No, I didn't think it pertained to me until 2014.

**Q. Well, whether you thought it or not. You could have read it in the newspapers the same as anybody else, right?**

MR. SCIOLLA: Same objection.

A. I could have, but I didn't.

**Q. And whatever was in the newspapers about Chris Benoit and his CTE that WWE may or may not have read, you could have read the same, couldn't you?**

MR. SCIOLLA: Calls for speculation.

A. I don't know, Mr. McDevitt.

**Q. I mean they didn't have any exclusive access to the public reporting on anything, did they?**

MR. SCIOLLA: Objection, calls for speculation.

A. I'm not sure. I wasn't there.

**Q. Now, you mentioned Stephanie McMahon. Did you ever once tell Stephanie McMahon that you think you had a head injury in a match?**

A. No, I did not.

**Q. Did you ever once tell Vince McMahon that you thought you had a head**

**injury in a match?**

A. No, I did not.

**Q. Did you ever once tell John Laurinaitis that you thought you had a head injury in a match?**

A. No, I did not.

**Q. I think you've already indicated you never once told Dr. Rios that either?**

A. Yes, that is true.

**Q. And I think you also indicated, your testimony, that generally speaking, Dr. Rios was in the back when matches were going on?**

A. Unless he was asked to be ringside for something specific.

**Q. Understood. But I think you indicated the most usual course is he is in the back?**

A. In the back.

**Q. So would it be fair to say the only way Dr. Rios is going to know if something happened out there is if somebody tells him?**

MR. SCIOLLA: Objection, calls for speculation.

A. The only way during a TV taping Dr.

Rios would know is if he was matching his monitor. It's in the back. It's in the trainers room. And if something bad happened, he would be summoned to the ring by the TV crew or somebody, the runner would could come back and get him and bring him to the ring.

**Q. And that never happened at any of your matches, did it?**

A. No.

**Q. Did you like Dr. Rios?**

A. Yes.

**Q. Did you think he was a good doctor?**

A. Yes.

**Q. Do you have any indication or any knowledge that any person involved in WWE management ever told Dr. Rios not to tell you something about head injuries or concussions?**

A. I don't know. I wasn't there. I don't know what they told him to say or not say. But I do know one thing --

**Q. I'm not asking what you know about one thing. I'm asking you specifically.**

**Do you have any knowledge, did you ever hear anybody in management at WWE tell**

**Dr. Rios, look, I don't want you telling Vito anything about concussions?**

A. No, I didn't.

**Q. Do you have any evidence that anybody at WWE ever directed anybody in the medical staff to withhold any information from you?**

A. From me personally, no.

**Q. Do you have any knowledge that anybody at WWE management or employees ever told Dr. Rios or the medical staff to lie to you about anything?**

A. Not that I'm aware of.

MR. McDEVITT: Again, I don't think I have anything more, Mr. LoGrasso, and I thank you for your time.

MR. SCIOLLA: All done.

THE VIDEOGRAPHER: This concludes the video deposition. The time 6:14 p.m., off the record.

MR. McDEVITT: On the record.

What do you plan on doing about what I asked you about, what you said in the reconsideration motion to the court that we now know is false.

MR. SCIOLLA: I'm not prepared to give you an answer right now.

MR. McDEVITT: Well, as you all know, we are supposed to talk to the court at 4 o'clock tomorrow. I would appreciate some answer before the conference call, because I will bring it up if you don't tell me.

MR. SCIOLLA: For sure.

MR. McDEVITT: I would appreciate it if you would consult with whoever you are going to consult with, and let me know the answer.

MR. SCIOLLA: Agreed.

MR. McDEVITT: Off the record.

(Time noted: 6:14 p.m.)

STATE OF ______________ )
) :ss
COUNTY OF ______________)

I, VITO LOGRASSO, the witness herein, having read the foregoing testimony of the pages of this deposition, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

______________________
VITO LOGRASSO

Sworn and subscribed to before me, this day of , 2015.

______________________________
Notary Public

C E R T I F I C A T E

COMMONWEALTH OF PENNSYLVANIA )
: ss.
COUNTY OF PHILADELPHIA )

I, Jennifer Ocampo-Guzman, a Notary Public within and for the Commonwealth of Pennsylvania, do hereby certify:

That VITO LOGRASSO, the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of May 2016.

______________________________
JENNIFER OCAMPO-GUZMAN, CRR, CLR