# Exhibit 15

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

----------------------------------x
RUSS MCCULLOUGH, et al.,

       Plaintiff,

    vs.                     No. 3:15-cv-01074 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,


       Defendant.
----------------------------------x
EVAN SINGLETON and VITO LOGRASSO,

       Plaintiffs,

    vs.                     No. 3:15-cv-00425 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,


       Defendant.
----------------------------------x



   VIDEOTAPED DEPOSITION OF VITO LOGRASSO

     Philadelphia, Pennsylvania

        May 18, 2016

         9:35 a.m.



Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 44300

**Page 2**

```
                    May 18, 2016
                    9:35 a.m.

         Videotaped Deposition of VITO
    LOGRASSO, held at the offices of
    Kleinbard, LLC, 1650 Market Street,
    Philadelphia, Pennsylvania, pursuant to
    notice, before Jennifer Ocampo-Guzman,
    a Certified Real-Time Shorthand
    Reporter and Notary Public of the
    Commonwealth of Pennsylvania.
```

**Page 3**

```
APPEARANCES:


    Attorneys for Plaintiff Vito LoGrasso
       POGUST BRASLOW MILLROOD, LLC
       Eight Tower Bridge
       161 Washington St., Suite 1520
       Conshohocken, Pennsylvania 19428
       BY:  ANDREW J. SCIOLLA, ESQ.
            asciolla@pbmattorneys.com


    Attorneys for Plaintiff Vito LoGrasso
       KYROS LAW OFFICES
       17 Miles Road
       Hingham, Massachusetts 02043
       BY:  KONSTANTINE W. KYROS, ESQ.
            kon@kyroslaw.com
            ANTHONY NORRIS, ESQ.
```

**Page 4**

```
APPEARANCES (Cont.d):


    Attorneys for Defendant
       K&L GATES, LLP
       210 Sixth Avenue
       Pittsburgh, Pennsylvania 15222
       BY:  JERRY McDEVITT, ESQ.
            jerry.mcdevitt@klgates.com
            STEFANIE M. LACY, ESQ.
            stefanie.lacy@klgates.com


ALSO PRESENT:
    JOSEPH WILLS, Videographer
```

**Page 5**

THE VIDEOGRAPHER:  We are now on the record.

My name is Joseph Wills, the videographer obtained by David Feldman Worldwide.  This is a video deposition for the United States District Court for the District of Connecticut.  Today's date is May 18, 2016, and the video time is 9:35 a.m.

This deposition is being held at 1650 Market Street, Philadelphia, Pennsylvania, in the matters of McCullough, et al., versus World Wrestling Entertainment Incorporated and Singleton and LoGrasso versus World Wrestling Entertainment Incorporated.  The deponent is Vito LoGrasso.

Will all counsel please identify themselves.

MR. SCIOLLA:  Andrew Sciolla from Pogust Braslow Millrood, on behalf the plaintiff, Vito LoGrasso.

MR. KYROS:  Konstantine Kyros, Kyros Law Offices, for the plaintiff, Vito LoGrasso.

Page 6

1    MR. NORRIS: Anthony Norris, Kyros
2    Law Offices, for the plaintiff.
3        MR. McDEVITT: Jerry McDevitt for
4    WWE.
5        MS. LACY: Stefanie Lacy for WWE.
6    V I T O  J.  L O G R A S S O, called
7    as a witness, having been duly sworn, was
8    examined and testified as follows:
9    EXAMINATION BY
10   MR. McDEVITT:
11       Q. Would you state your name for the
12   record, please?
13       A. Veto J. LoGrasso.
14       Q. Have you ever testified under oath
15   before?
16       A. No, sir.
17       Q. Do you understand the oath you've
18   just taken?
19       A. Yes, sir.
20       Q. And you understand it obligates you
21   to tell the truth, even if telling the truth
22   is against your interest?
23       A. Yes.
24       Q. And even if the truth is contrary
25   to what you said in court pleadings?

Page 7

1        A. Yes, sir.
2        Q. What's your date of birth, sir?
3        A. 6/18/64.
4        Q. And what is your current address?
5        A. 12 Flemming Drive, Coatesville,
6    Pennsylvania, 19320.
7        Q. Do you own that property?
8        A. No, I do not. My wife does.
9        Q. How long have you lived there?
10       A. Two years, I think.
11       Q. Does anybody else live there
12   besides you and your wife?
13       A. No, just us.
14       Q. What is your wife's name?
15       A. Becca, B-E-C-A -- C-C-A.
16       Q. What was her maiden name?
17       A. Ford.
18       Q. And am I correct, she was also a
19   previous performer in the wrestling business?
20       A. Yes, sir.
21       Q. But not with WWE, correct?
22       A. No.
23       Q. She was with WCW?
24       A. No.
25       Q. Who did she perform for?

Page 8

1        A. She was more of an indie wrestler.
2        Q. When were you married?
3        A. September 27, 2014.
4           If I got that wrong, I die.
5        Q. We're going ask her whether you
6    were right.
7           MR. SCIOLLA: Jerry, I don't meant
8    interrupt, but as you can see, he's
9    leaning toward you. As much as you can,
10   keep your voice up so that he can hear.
11          MR. McDEVITT: If you can't hear or
12   understand any question I ask you, just
13   tell me and I will be glad to raise my
14   voice, but I don't want to appear like
15   I'm yelling at you.
16          I may yell at you anyway, but --
17          THE WITNESS: It's okay.
18       Q. But seriously, if you cannot hear
19   me, tell me.
20       A. Okay.
21       Q. Is your wife disabled?
22       A. Yes.
23       Q. And what's the nature of her
24   disability?
25       A. She has three herniated disks and

Page 9

1    spinal stenosis.
2        Q. And prior to moving to
3    Pennsylvania, you lived in Florida?
4        A. Yes, sir.
5        Q. When did you move to Pennsylvania?
6        A. Let's see. I'm not sure of the
7    day. I know it was in 2014, I think.
8        Q. The year is fine. The year 2014?
9        A. I think so, yeah.
10       Q. Why did you move back to
11   Pennsylvania?
12       A. Because I closed my wrestling
13   school, and I decided to get married.
14       Q. Why couldn't you stay in Florida?
15       A. My wife lives here, and she has two
16   children here.
17       Q. Is it true you hate living in
18   Pennsylvania?
19       A. Say that one more time?
20       Q. You hate living in Pennsylvania?
21       A. I'm not fond of Pennsylvania. The
22   people are nice, but I'm not too fond of
23   Pennsylvania.
24       Q. Have you told some of your
25   healthcare providers you hate living in

3 (Pages 6 to 9)

114

1  time in WWE, and in this article, I said the
2  truth, which is the truth.
3      Q.  You had no negatives at all, that
4  was the truth?
5      A.  At that time, yes.
6      Q.  And that time, 2013 --
7      A.  In 2013.
8      Q.  What you now say is you were
9  suffering from various symptoms of head
10 trauma that you today dated as beginning when
11 Steven Regal supposedly threw you into the
12 steps in the match in 2006?
13     MR. SCIOLLA:  Object to the form --
14 excuse me.  Object to the form.
15     Q.  Correct?
16     A.  Like I said in a lot of my
17 interviews, I always said positive things.
18     Q.  Well, was it a lie, then?
19     MR. SCIOLLA:  Object to the form,
20 asked and answered.
21     A.  In my interviews I always say
22 positive things.
23     Q.  That's not my question.
24         Were you lying in this interview?
25     A.  I wasn't lying in the interview.

115

1  That's what I said.
2         (LoGrasso Exhibit 6, Article
3         entitled, "Big Vito speaks out on Dixie
4         Carter/TNA, Russo & More," marked for
5         identification, this date.)
6     Q.  Mr. LoGrasso, I've handed you
7  what's been marked as Exhibit 6, which
8  appears to be, at least on the date of it, up
9  at the top right-hand corner it's dated
10 4/21/2016; but I don't want to mislead you,
11 because I don't think that's date of the
12 interview.  I could be wrong.
13     MR. SCIOLLA:  If you look at the
14 last page, there's a different date.
15     MR. McDEVITT:  Yes, 2013.
16     Q.  I just want to ask you, on the
17 second page here, there are some quotes that
18 are attributed to you, where you are asked
19 about "On the current WWE product."
20         Do you see that paragraph that
21 begins with that?
22     A.  On the current WWE product.  Yes, I
23 have it.
24     Q.  And then if you skip down where it
25 says "On Ryback."

116

1         Do you see that?
2         Have you found that paragraph, sir?
3     A.  I'm reading.
4     MR. SCIOLLA:  One more down.
5     A.  "On Ryback."
6     Q.  It quotes you as saying, "They
7  brought Ryback in, you know.  Ryback was up
8  and then he was down.  If I could work a
9  program with him, you would never hear Big
10 Vito complain about how he ever got hit too
11 hard.  I would love to work with that guy,
12 because it would be a hard hitting thing."
13         Did you say that?
14     A.  Yes, I did say that.
15     Q.  And what did you mean by "it would
16 be a hard hitting thing"?
17     A.  Because my persona is always a
18 rugged wrestler, and here you have this guy
19 who everybody is complaining with wrestling
20 against and, you know, being that I thought
21 it would be a good match between him and I.
22     Q.  And so were you sort of promoting
23 the idea that the WWE should bring you back
24 to wrestle Ryback?
25     A.  No, I just said that it would be a

117

1  good match.
2     Q.  Were you hoping that would happen?
3     A.  No, I just said it would be a good
4  match.
5     Q.  And in 2013 is when you claim you
6  were suffering from the symptoms of head
7  injury, right?
8     A.  I didn't hear the last part of what
9  you said, I'm sorry.
10    Q.  You claim you were suffering from
11 the symptoms of the head injury in 2013, too,
12 right?
13    A.  Yes, sir.
14    Q.  How many times prior to this
15 lawsuit, sir, did you publicly state that you
16 have been three-quarters deaf your whole
17 life?
18    A.  I did that in an article that I
19 wrote for people, for people who were doing
20 a, it was a deaf, a guy who was wrestling, a
21 Coach McKay who was teaching wrestlers who
22 were deaf how to, they were trying to get
23 into the Olympics.  Wanted me to be a guest
24 speaker and to come down to his college, and
25 he really had no money.  So I took it upon

```
                                                    118
 1   myself to write something inspiring for them
 2   and write this article that was published.
 3       Q.   Where was it published?
 4       A.   I'm not sure where it was
 5   published.  I think it was on my Facebook.
 6   It could have been, it could have been
 7   something that was put out there.  But I know
 8   I wrote it, and I wrote it just for inspiring
 9   kids that you can do things even if you're
10   handicapped.
11       Q.   And what year did you write that?
12       A.   I'm not sure.
13       Q.   Before you came to the WWE?
14            Let me rephrase it.  Was it before
15   or after your last run at the WWE?
16       A.   It was afterwards.
17       Q.   And what did you say in that piece?
18       A.   I don't recall.  I would have to
19   read it.  I have it in front of me.
20       Q.   Well, what did it say about your
21   deafness?
22       A.   Just as you repeated it, that I was
23   deaf, three-quarters deaf or deaf, you know,
24   half my whole life, and then I was able to
25   overcome it.

                                                    119
 1       Q.   And that's what you wrote?
 2       A.   That's what I wrote.
 3       Q.   Was it true?
 4       A.   No.
 5       Q.   So you wrote a lie to inspire
 6   people?
 7       A.   You write things to help people and
 8   inspire them, just like the WWE writes things
 9   to inspire people, like the anti-bullying
10   campaign, even though they might do it in
11   their own backyard, you know, they do it to
12   inspire, you know, bullying and do all that
13   kind of stuff.
14            It's kind of like when the turkey
15   thing came out, and they insulted me and they
16   had this big anti-bullying thing going on,
17   and they took liberties of making fun of me,
18   calling me a turkey, and my career
19   was nothing to be made fun of.
20       Q.   Do you remember the question I
21   asked you?
22            Do you remember the question I just
23   asked you?
24       A.   Uh-huh.
25       Q.   What was it?

                                                    120
 1       A.   If I wrote it, and do I write
 2   things to inspire people, with lies.
 3       Q.   No.  Did you lie to inspire people.
 4   Then you went off on this rant about other
 5   subjects.
 6       A.   I was answering the question.
 7       Q.   My question was, did you lie in
 8   that article in an attempt to inspire them?
 9       A.   I guess you could say I lied, yes.
10       Q.   And did you ever make any other
11   public statements anywhere else that you were
12   three-quarters deaf since birth?
13       A.   I don't recall.
14       Q.   Did you ever tell your doctors you
15   were deaf since birth?
16       A.   I don't recall.
17       Q.   Have you been deaf since birth?
18       A.   No, sir, I haven't.
19       Q.   So any time you've said that, you
20   were lying?
21       A.   Yes, sir.
22       Q.   Why would you lie about that?
23            MR. SCIOLLA:  Object to the form.
24   And asked and answered.
25       A.   Why would I lie about it?  Well, in

                                                    121
 1   that instance, it was to inspire people.
 2       Q.   Well, in other instances where
 3   you've said it.
 4            Have you said it in other
 5   instances, or are you claiming that's the
 6   only time in your life that you ever told
 7   people you were deaf since birth?
 8            MR. SCIOLLA:  Object to the form,
 9       asked and answered.
10       A.   I don't recall if I did.
11       Q.   Well, has it been a habitual lie
12   that you've told all your life, that you've
13   been deaf since birth?
14       A.   No, you asked me that one article,
15   and I said I lied about that.  You asked me
16   if I told people I was deaf my whole life,
17   and obviously I'm not, I wasn't.
18       Q.   No, I didn't ask you about the one
19   article.  You identified the one article.  I
20   asked you if you ever made those statements
21   publicly, and you identified that one article
22   with what you did.
23       A.   Because that's the one that I knew
24   about.
25       Q.   And my question is, what other
```

```
                                            122
 1   ones, what other times have you made that
 2   statement publicly that you've been deaf
 3   since birth?
 4       A.  I don't know.
 5       Q.  As you sit there today, can you
 6   think of any other times where you have lied
 7   and told people in the public that you've
 8   been deaf since birth?
 9       A.  No, I can't.
10       Q.  Did you tell any other performers
11   that you were deaf since birth?
12       A.  I don't recall if I did.
13       Q.  Did you tell Tommy Dreamer you were
14   deaf since birth?
15       A.  I don't recall.
16       Q.  So for other wrestlers who have
17   known you through your career and say you've
18   told them you were deaf since birth, would
19   they be lying?
20       MR. SCIOLLA:  Object to the form.
21       A.  I couldn't be deaf since birth,
22   obviously.
23       Q.  If they said you told them that,
24   would they be lying?
25       A.  Not lying.
```

```
                                            123
 1       (LoGrasso Exhibit 7, Article
 2   entitled, "Big Vito talks about wanting
 3   to work with Jeff Jarrett, and much
 4   more," marked for identification, this
 5   date.)
 6       Q.  I've shown you what's been marked
 7   as Exhibit 7, Mr. LoGrasso.
 8           Again, do you recognize this as
 9   your picture there?
10       A.  It's me in the picture.
11       Q.  And this is posted on Online World
12   of Wrestling.  And it's a column, and it
13   quotes you as saying, "Big Vito On Wrestling
14   Deaf."  "I don't advertise that I'm
15   handicapped.  I am three-quarters deaf, and I
16   have been that way my whole life.  I made it,
17   I did my thing."
18           Did you say that?
19       A.  What year was this?
20       Q.  It apparently was published in
21   2014, prior to this lawsuit.
22       A.  I couldn't have been deaf my whole
23   life.
24       Q.  Did you say that or didn't you?
25       A.  I did say it.
```

```
                                            124
 1       Q.  Was that a lie when you told this
 2   person that?
 3       A.  Yes, it is a lie.
 4       Q.  Who was that supposed to inspire?
 5       MR. SCIOLLA:  Object to the form.
 6       A.  I was just going along with what I
 7   had said previously.
 8       Q.  Well, where had you said it
 9   previously?
10       A.  When you asked me if I ever said it
11   before in that other article.
12       Q.  You state here "I don't advertise
13   that I'm handicapped."
14       A.  That's a time I know I said it.
15   You just mentioned Tommy Dreamer.
16       Q.  Well, why wouldn't you tell him,
17   then, that, look, I'm not really deaf.  I
18   just said that to inspire people.  I just
19   told a story"?
20       A.  Well, it was done to inspire people
21   that you could do things.  Maybe I used poor
22   judgment.
23       Q.  Well, fine.  But why didn't you
24   tell the truth in this interview and say, I'm
25   not deaf?
```

```
                                            125
 1   So you were lying in 2014, too --
 2       MR. SCIOLLA:  Object to the form.
 3       Q.  -- is that right?
 4       A.  No, sir.
 5       Q.  Well, you're saying now this isn't
 6   true.  The statements you make here, "I'm
 7   three-quarters deaf, and I have been that way
 8   my whole life," is that true or is it false?
 9       A.  I have not been three-quarters deaf
10   my whole life.
11       Q.  So then you told a lie, then,
12   right?
13       A.  In that, yes.
14       Q.  Do you remember appearing on an
15   interview called the Angry Marks Podcast in
16   February of 2014?
17       A.  No.
18       Q.  Did you tell that same tale on that
19   podcast --
20       A.  Don't recall.
21       Q.  -- of being deaf?
22       MR. McDEVITT:  We are going to mark
23   this.
24       (LoGrasso Exhibit 8, CD labeled,
25   "The Undisputed Wrestling Show with Big
```

126

1   Vito & Lucky Thurteen (February 2014),"
2   marked for identification, this date.)
3       Q.  Mr. LoGrasso, you are going to hear
4   a voice talking here, and I'm going to ask,
5   after you are done hearing it, whether you
6   recognize it as your voice saying what you
7   hear.
8       MS. LACY:  Can you please skip to
9   4724.  At least before it.  If you can't
10  get close, that's fine.
11      (Video played and transcribed
12  following:)
13      "Voice:  I was and this week I'm
14  supposed to be getting a big boy.  And I
15  don't know, I've said this before, you
16  know, I've mentioned it a few times in
17  interviews.  A lot of people don't know
18  that I'm deaf.  And, you know, and
19  people ask me all the time, how the hell
20  do you wrestle, if you're deaf, and how
21  did you play ball?  I was born deaf.  I
22  was born deaf, you know.  And sometimes
23  when I'm in the house, you know, I hear,
24  my hearing is so accurate that I hear
25  things all the time and every little

127

1   thing.  And I'm so used to having a dog
2   with me and, you know, just like I need
3   that extra just in case I can't hear
4   something or something is going on that
5   I don't know.  So unless you're a
6   120-pound Rottie, his name is King, I'm
7   going to change his name to Brother,
8   come on, Brother.  His name is going to
9   be Brother.  And he's two years old and
10  he's 100, started out at 140.  He's been
11  training, so he's about 125 pounds right
12  now.  They hey, goodbye, somebody I
13  could pal around with, somebody I could
14  train with, somebody to have a companion
15  with, somebody to be in the house with
16  me and, you know, I don't advertise it.
17  Like I said, I don't advertise it that
18  I'm handicapped.  I'm deaf.  I'm
19  three-quarters deaf, you know, and I've
20  been like that my whole life.
21      And you know, I made it.  I did my
22  thing and I just need, you know, I've
23  been" --
24      (End of transcription.)
25      Q.  Is that your voice?

128

1       A.  Yes.
2       Q.  And that's you in a radio interview
3   in February of 2014 saying you were born
4   deaf, right?
5       A.  I said that.  I was just saying it.
6       Q.  And that was, again, before the
7   lawsuit you were telling people that you were
8   born deaf, right?
9       A.  That's what I was saying.
10      Q.  And you said you had been like that
11  your whole life?
12      A.  That's what I said.
13      Q.  So were you lying then, or are you
14  lying now?
15      MR. SCIOLLA:  Object to the form.
16      A.  No.
17      Q.  Which is it?
18      A.  I can't hear you.
19      Q.  Were you lying then or are you
20  lying now?
21      A.  I'm not lying.
22      Q.  Were you born deaf?
23      A.  No, I couldn't be born deaf.
24      Q.  You could be born deaf.
25      Why couldn't you be born deaf?

129

1       A.  How I did get in the military?
2       Q.  I don't know.  Maybe you lied
3   there, too.
4       A.  How could you lie in an exam or a
5   state physical?
6       Q.  I've been in the military Mr.
7   LoGrasso.  I know you how get into the
8   military?
9       A.  I know you've been in the military.
10      Q.  Don't kid me about that.  They'll
11  take anybody, especially in the time when you
12  were going in.
13      A.  It's 1983, it was peacetime.  They
14  take anybody?
15      Q.  They took you.
16      A.  Thank you for the compliment, I
17  appreciate it.
18      Q.  What was your discharge?
19      MR. SCIOLLA:  Object to the form.
20  Asked and answered.
21      Q.  So you basically have been shown
22  now to have said repeatedly that you were
23  deaf since birth, right?
24      A.  I said this in interviews.
25      Q.  Now, apart from interviews, you

33 (Pages 126 to 129)

130

1  also told a doctor that, too, didn't you?
2      A.  Not that I recall.
3      Q.  Is it fair to assume, Mr. LoGrasso,
4  that you would not lie to your doctors about
5  your condition?
6      A.  I have hearing loss.
7      Q.  But you would not lie to them,
8  would you?
9      A.  No.
10     Q.  I mean you want to get treated
11 accurately, don't you?
12     A.  Yes, sir.
13     Q.  And you know you can't get treated
14 accurately unless you tell them the truth
15 about your condition?
16         MR. SCIOLLA:  Object to the form.
17     A.  About my condition, yes.
18         (LoGrasso Exhibit 9, Medical
19     records, Bates Nos. Smith020516_00031
20     through Smith020516_00040, marked for
21     identification, this date.)
22     Q.  Showing you what's been marked as
23 Exhibit 9, Mr. LoGrasso, which comes out of
24 your medical records from Dr. Smith.  And if
25 I could, sir, I would direct your attention

131

1  to page 3 of this document, under the last
2  paragraph on page 3.
3         Am I correct that what the doctor's
4  note states is "Congenitally deaf on left,
5  severe loss on right"?
6         Is that what your doctor's own note
7  states?
8      A.  I'm reading it.
9      Q.  Is that what they say, do you know
10 what that means?
11     A.  That I'm deaf on the left and
12 severely lost on the right.
13     Q.  Do you know what "congenitally
14 deaf" means?
15     A.  I can't hear nothing out of the
16 left.
17     Q.  No.  Did you tell the doctor you
18 had been death since birth?
19     A.  No.  I just don't hear good out of
20 the ear.
21     Q.  And there is a note that is made in
22 May of 2012.  This is way before your
23 lawsuit, right?  At the top right it says
24 "May 2012."
25     A.  Right.

132

1      Q.  And then when you went back after
2  this lawsuit --
3         (LoGrasso Exhibit 10, Medical
4     records, Bates Nos. Smith020516_00002
5     through Smith020516_00006, marked for
6     identification, this date.)
7      Q.  Showing you what's been marked as
8  Exhibit 10.  This is the same Dr. Smith,
9  isn't it, that this is addressed to, from
10 Jennersville Neurology Center, do you see
11 that?
12     A.  Jennersville.
13     Q.  Jennersville at the top there?
14     A.  Yes.
15     Q.  Did you go to Jennersville
16 Neurology?
17     A.  Yes.
18     Q.  And you went there after this
19 lawsuit was brought, right?
20         That's March of 2015 --
21     A.  Yes.
22     Q.  -- two months after you brought
23 this lawsuit, right?
24     A.  Yes.
25     Q.  Knowing that you have to

133

1  demonstrate some kind of symptoms to support
2  your brain injury claim, right?
3         MR. SCIOLLA:  Object to the form,
4     argumentative.
5      Q.  You know that by then, don't you?
6  You know it by then.  You are trying to show
7  that you have symptoms associated with the
8  injuries that you're claiming in the lawsuit,
9  right?
10         MR. SCIOLLA:  Object to form.
11     A.  This was when I could get an
12 appointment to see a neurologist.
13     Q.  Two months after your suit?
14     A.  I was getting everything done,
15 because I was going by what Dr. Smith had
16 said, so this is where he referred me.
17     Q.  And when you go to this
18 Jennersville, you tell them --
19         MR. McDEVITT:  Strike that.
20     Q.  If you look at the History of
21 Present Illness on the second page, it says,
22 "Mr. LoGrasso is a 50-year-old man referred
23 by Dr. Smith for evaluation of headaches and
24 head trauma.  He has some difficulty giving a
25 concise history."  And then it goes on to

134

1  state that you were "A former WWE wrestler,
2  completely stopped wrestling only five months
3  ago. He attributes most of his problems to
4  consequences of his wrestling career spanning
5  almost 30 years. This includes deafness in
6  the left ear, moderate hearing loss in the
7  right ear." Right?
8      Isn't that what it says?
9      A. I'm reading it.
10     MR. SCIOLLA: Can you repeat the
11  question.
12     Q. And my question, Mr. LoGrasso, is
13  whether you told the Jennersville folks that
14  your deafness issue you associated with your
15  wrestling career.
16     A. Yes, I did tell them that.
17     Q. So after the lawsuit, you weren't
18  telling them that you were deaf since birth,
19  you were selling them that it was associated
20  with your wrestling career?
21     MR. SCIOLLA: Object to the form.
22     A. I told -- he asked me how this
23  happened, and I said repeated blows to the
24  head and that I had, this had gotten worse
25  and worse during my wrestling career.

135

1      Q. Did you tell him that you had
2  previously made statements to the effect that
3  you had been deaf since birth?
4      A. No.
5      Q. This also goes on to state, you
6  told him, this doctor, whoever he is --
7  Handler, Dr. Handler, that you did not recall
8  having any significant post-concussive
9  symptoms during your career, do you see that?
10     A. I was not educated on what they
11  were, so I didn't know what I was -- I was
12  finding out as I was going along what was
13  going on with me.
14     Q. Well, he says, "He did not recall
15  having any significant post-concussive
16  systems during his career, such as loss of
17  consciousness, prolonged headaches, nausea,
18  balance problems or memory loss."
19     That's what he says, right?
20     A. That's what it says there.
21     Q. And that's what -- you claim those
22  things now, the prolonged headaches --
23     A. That's what I'm suffering from, and
24  that's what I didn't know what was going on,
25  because I wasn't educated on what was

136

1  happening. So it was the doctors telling me
2  what is going on, and then I told him what
3  was happening. And now I know what
4  everything is, I put everything together.
5  But during this time I'm finding out like
6  everybody else, I'm finding out what is wrong
7  with me.
8      Q. This was all done after you filed
9  the lawsuit where you had listed all the
10  symptoms, supposedly, of head injuries.
11     A. This is all of what --
12     Q. You knew the symptoms of the head
13  injuries by the time you went to the doctor,
14  didn't you, and filed a lawsuit about it;
15  isn't that true?
16     A. Say that one more time.
17     Q. You already filed a lawsuit where
18  you claimed a symptomatology of head injuries
19  in the lawsuit that you claimed and filed in
20  a Federal court, so you knew the symptoms by
21  the time you went to this doctor.
22     A. I was getting checked out.
23     Q. And you report to him you didn't
24  have any prolonged headaches, according to
25  what he says, and that you didn't have any

137

1  significant post-concussion symptoms during
2  your career, which he says only ended a short
3  time ago.
4      MR. SCIOLLA: Object to the form
5  and characterization.
6      Q. Right?
7      A. I can't speak for the doctor's
8  notes.
9      Q. Do you have some reason to think
10  they don't reflect what you told him?
11     A. This is what is his observation,
12  and I'm telling you what I was going through.
13     Q. And he's basing his --
14     MR. McDEVITT: Strike that.
15     Q. Do you agree that every symptom you
16  claim is a subjective symptom?
17     MR. SCIOLLA: Object to the form.
18     A. If you could say that one more
19  time.
20     Q. Every symptom you now claim is
21  subjective, right?
22     MR. SCIOLLA: Object to the form.
23     A. "Subjective" meaning?
24     Q. You claim you have headaches, but
25  it can't be verified.

35 (Pages 134 to 137)