# Exhibit 15

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

---------------------------------x
RUSS MCCULLOUGH, et al.,

       Plaintiff,

       vs.                   No. 3:15-cv-01074 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,

       Defendant.
---------------------------------x
EVAN SINGLETON and VITO LOGRASSO,

       Plaintiffs,

       vs.                   No. 3:15-cv-00425 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,

       Defendant.
---------------------------------x

VIDEOTAPED DEPOSITION OF VITO LOGRASSO

Philadelphia, Pennsylvania

May 18, 2016

9:35 a.m.

Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 44300

|   | 2 |   | 4 |
|---|---|---|---|
|   |   | 1 | A P P E A R A N C E S (Cont.d): |
|   |   | 2 |   |
|   |   | 3 |   |
|   |   | 4 | Attorneys for Defendant |
|   |   | 5 |    K&L GATES, LLP |
|   |   | 6 |    210 Sixth Avenue |
|   |   | 7 |    Pittsburgh, Pennsylvania 15222 |
| 8 | May 18, 2016 | 8 |    BY: JERRY McDEVITT, ESQ. |
| 9 | 9:35 a.m. | 9 |      jerry.mcdevitt@klgates.com |
| 10 |   | 10 |      STEFANIE M. LACY, ESQ. |
| 11 | Videotaped Deposition of VITO | 11 |      stefanie.lacy@klgates.com |
| 12 | LOGRASSO, held at the offices of | 12 |   |
| 13 | Kleinbard, LLC, 1650 Market Street, | 13 |   |
| 14 | Philadelphia, Pennsylvania, pursuant to | 14 | ALSO PRESENT: |
| 15 | notice, before Jennifer Ocampo-Guzman, | 15 |    JOSEPH WILLS, Videographer |
| 16 | a Certified Real-Time Shorthand | 16 |   |
| 17 | Reporter and Notary Public of the | 17 |   |
| 18 | Commonwealth of Pennsylvania. | 18 |   |

|    | 3 |    | 5 |
|----|---|----|---|
| 1 | A P P E A R A N C E S: | 1 | THE VIDEOGRAPHER: We are now on |
| 2 |   | 2 | the record. |
| 3 |   | 3 | My name is Joseph Wills, the |
| 4 | Attorneys for Plaintiff Vito LoGrasso | 4 | videographer obtained by David Feldman |
| 5 |    POGUST BRASLOW MILLROOD, LLC | 5 | Worldwide. This is a video deposition |
| 6 |    Eight Tower Bridge | 6 | for the United States District Court for |
| 7 |    161 Washington St., Suite 1520 | 7 | the District of Connecticut. Today's |
| 8 |    Conshohocken, Pennsylvania 19428 | 8 | date is May 18, 2016, and the video time |
| 9 |    BY: ANDREW J. SCIOLLA, ESQ. | 9 | is 9:35 a.m. |
| 10 |      asciolla@pbmattorneys.com | 10 | This deposition is being held at |
| 11 |   | 11 | 1650 Market Street, Philadelphia, |
| 12 |   | 12 | Pennsylvania, in the matters of |
| 13 | Attorneys for Plaintiff Vito LoGrasso | 13 | McCullough, et al., versus World |
| 14 |    KYROS LAW OFFICES | 14 | Wrestling Entertainment Incorporated and |
| 15 |    17 Miles Road | 15 | Singleton and LoGrasso versus World |
| 16 |    Hingham, Massachusetts 02043 | 16 | Wrestling Entertainment Incorporated. |
| 17 |    BY: KONSTANTINE W. KYROS, ESQ. | 17 | The deponent is Vito LoGrasso. |
| 18 |      kon@kyroslaw.com | 18 | Will all counsel please identify |
| 19 |      ANTHONY NORRIS, ESQ. | 19 | themselves. |
| 20 |   | 20 | MR. SCIOLLA: Andrew Sciolla from |
| 21 |   | 21 | Pogust Braslow Millrood, on behalf the |
| 22 |   | 22 | plaintiff, Vito LoGrasso. |
| 23 |   | 23 | MR. KYROS: Konstantine Kyros, |
| 24 |   | 24 | Kyros Law Offices, for the plaintiff, |
| 25 |   | 25 | Vito LoGrasso. |

Page 6

1  MR. NORRIS: Anthony Norris, Kyros
2  Law Offices, for the plaintiff.
3  MR. McDEVITT: Jerry McDevitt for
4  WWE.
5  MS. LACY: Stefanie Lacy for WWE.
6  V I T O  J.  L O G R A S S O, called
7  as a witness, having been duly sworn, was
8  examined and testified as follows:
9  EXAMINATION BY
10 MR. McDEVITT:
11    Q. Would you state your name for the
12 record, please?
13    A. Veto J. LoGrasso.
14    Q. Have you ever testified under oath
15 before?
16    A. No, sir.
17    Q. Do you understand the oath you've
18 just taken?
19    A. Yes, sir.
20    Q. And you understand it obligates you
21 to tell the truth, even if telling the truth
22 is against your interest?
23    A. Yes.
24    Q. And even if the truth is contrary
25 to what you said in court pleadings?

Page 7

1    A. Yes, sir.
REDACTED
7    Q. Do you own that property?
8    A. No, I do not. My wife does.
9    Q. How long have you lived there?
10   A. Two years, I think.
11   Q. Does anybody else live there
12 besides you and your wife?
13   A. No, just us.
14   Q. What is your wife's name?
15   A. Becca, B-E-C-A -- C-C-A.
16   Q. What was her maiden name?
17   A. Ford.
18   Q. And am I correct, she was also a
19 previous performer in the wrestling business?
20   A. Yes, sir.
21   Q. But not with WWE, correct?
22   A. No.
23   Q. She was with WCW?
24   A. No.
25   Q. Who did she perform for?

Page 8

1    A. She was more of an indie wrestler.
2    Q. When were you married?
3    A. September 27, 2014.
4       If I got that wrong, I die.
5    Q. We're going ask her whether you
6  were right.
7       MR. SCIOLLA: Jerry, I don't meant
8  interrupt, but as you can see, he's
9  leaning toward you. As much as you can,
10 keep your voice up so that he can hear.
11      MR. McDEVITT: If you can't hear or
12 understand any question I ask you, just
13 tell me and I will be glad to raise my
14 voice, but I don't want to appear like
15 I'm yelling at you.
16      I may yell at you anyway, but --
17      THE WITNESS: It's okay.
18   Q. But seriously, if you cannot hear
19 me, tell me.
20   A. Okay.
REDACTED

Page 9

2    Q. And prior to moving to
3  Pennsylvania, you lived in Florida?
4    A. Yes, sir.
5    Q. When did you move to Pennsylvania?
6    A. Let's see. I'm not sure of the
7  day. I know it was in 2014, I think.
8    Q. The year is fine. The year 2014?
9    A. I think so, yeah.
10   Q. Why did you move back to
11 Pennsylvania?
12   A. Because I closed my wrestling
13 school, and I decided to get married.
14   Q. Why couldn't you stay in Florida?
15   A. My wife lives here, and she has two
16 children here.
17   Q. Is it true you hate living in
18 Pennsylvania?
19   A. Say that one more time?
20   Q. You hate living in Pennsylvania?
21   A. I'm not fond of Pennsylvania. The
22 people are nice, but I'm not too fond of
23 Pennsylvania.
24   Q. Have you told some of your
25 healthcare providers you hate living in

|  | 114 |  | 116 |
|---|---|---|---|
| 1 | time in WWE, and in this article, I said the | 1 | Do you see that? |
| 2 | truth, which is the truth. | 2 | Have you found that paragraph, sir? |
| 3 | Q. You had no negatives at all, that | 3 | A. I'm reading. |
| 4 | was the truth? | 4 | MR. SCIOLLA: One more down. |
| 5 | A. At that time, yes. | 5 | A. "On Ryback." |
| 6 | Q. And that time, 2013 -- | 6 | Q. It quotes you as saying, "They |
| 7 | A. In 2013. | 7 | brought Ryback in, you know. Ryback was up |
| 8 | Q. What you now say is you were | 8 | and then he was down. If I could work a |
| 9 | suffering from various symptoms of head | 9 | program with him, you would never hear Big |
| 10 | trauma that you today dated as beginning when | 10 | Vito complain about how he ever got hit too |
| 11 | Steven Regal supposedly threw you into the | 11 | hard. I would love to work with that guy, |
| 12 | steps in the match in 2006? | 12 | because it would be a hard hitting thing." |
| 13 | MR. SCIOLLA: Object to the form -- | 13 | Did you say that? |
| 14 | excuse me. Object to the form. | 14 | A. Yes, I did say that. |
| 15 | Q. Correct? | 15 | Q. And what did you mean by "it would |
| 16 | A. Like I said in a lot of my | 16 | be a hard hitting thing"? |
| 17 | interviews, I always said positive things. | 17 | A. Because my persona is always a |
| 18 | Q. Well, was it a lie, then? | 18 | rugged wrestler, and here you have this guy |
| 19 | MR. SCIOLLA: Object to the form, | 19 | who everybody is complaining with wrestling |
| 20 | asked and answered. | 20 | against and, you know, being that I thought |
| 21 | A. In my interviews I always say | 21 | it would be a good match between him and I. |
| 22 | positive things. | 22 | Q. And so were you sort of promoting |
| 23 | Q. That's not my question. | 23 | the idea that the WWE should bring you back |
| 24 | Were you lying in this interview? | 24 | to wrestle Ryback? |
| 25 | A. I wasn't lying in the interview. | 25 | A. No, I just said that it would be a |

|  | 115 |  | 117 |
|---|---|---|---|
| 1 | That's what I said. | 1 | good match. |
| 2 | (LoGrasso Exhibit 6, Article | 2 | Q. Were you hoping that would happen? |
| 3 | entitled, "Big Vito speaks out on Dixie | 3 | A. No, I just said it would be a good |
| 4 | Carter/TNA, Russo & More," marked for | 4 | match. |
| 5 | identification, this date.) | 5 | Q. And in 2013 is when you claim you |
| 6 | Q. Mr. LoGrasso, I've handed you | 6 | were suffering from the symptoms of head |
| 7 | what's been marked as Exhibit 6, which | 7 | injury, right? |
| 8 | appears to be, at least on the date of it, up | 8 | A. I didn't hear the last part of what |
| 9 | at the top right-hand corner it's dated | 9 | you said, I'm sorry. |
| 10 | 4/21/2016; but I don't want to mislead you, | 10 | Q. You claim you were suffering from |
| 11 | because I don't think that's date of the | 11 | the symptoms of the head injury in 2013, too, |
| 12 | interview. I could be wrong. | 12 | right? |
| 13 | MR. SCIOLLA: If you look at the | 13 | A. Yes, sir. |
| 14 | last page, there's a different date. | 14 | Q. How many times prior to this |
| 15 | MR. McDEVITT: Yes, 2013. | 15 | lawsuit, sir, did you publicly state that you |
| 16 | Q. I just want to ask you, on the | 16 | have been three-quarters deaf your whole |
| 17 | second page here, there are some quotes that | 17 | life? |
| 18 | are attributed to you, where you are asked | 18 | A. I did that in an article that I |
| 19 | about "On the current WWE product." | 19 | wrote for people, for people who were doing |
| 20 | Do you see that paragraph that | 20 | a, it was a deaf, a guy who was wrestling, a |
| 21 | begins with that? | 21 | Coach McKay who was teaching wrestlers who |
| 22 | A. On the current WWE product. Yes, I | 22 | were deaf how to, they were trying to get |
| 23 | have it. | 23 | into the Olympics. Wanted me to be a guest |
| 24 | Q. And then if you skip down where it | 24 | speaker and to come down to his college, and |
| 25 | says "On Ryback." | 25 | he really had no money. So I took it upon |

**118**

1  myself to write something inspiring for them
2  and write this article that was published.
3      Q.  Where was it published?
4      A.  I'm not sure where it was
5  published.  I think it was on my Facebook.
6  It could have been, it could have been
7  something that was put out there.  But I know
8  I wrote it, and I wrote it just for inspiring
9  kids that you can do things even if you're
10 handicapped.
11     Q.  And what year did you write that?
12     A.  I'm not sure.
13     Q.  Before you came to the WWE?
14         Let me rephrase it.  Was it before
15 or after your last run at the WWE?
16     A.  It was afterwards.
17     Q.  And what did you say in that piece?
18     A.  I don't recall.  I would have to
19 read it.  I have it in front of me.
20     Q.  Well, what did it say about your
21 deafness?
22     A.  Just as you repeated it, that I was
23 deaf, three-quarters deaf or deaf, you know,
24 half my whole life, and then I was able to
25 overcome it.

**119**

1      Q.  And that's what you wrote?
2      A.  That's what I wrote.
3      Q.  Was it true?
4      A.  No.
5      Q.  So you wrote a lie to inspire
6  people?
7      A.  You write things to help people and
8  inspire them, just like the WWE writes things
9  to inspire people, like the anti-bullying
10 campaign, even though they might do it in
11 their own backyard, you know, they do it to
12 inspire, you know, bullying and do all that
13 kind of stuff.
14         It's kind of like when the turkey
15 thing came out, and they insulted me and they
16 had this big anti-bullying thing going on,
17 and they took liberties of making fun of me,
18 calling me a turkey, and my career
19 was nothing to be made fun of.
20     Q.  Do you remember the question I
21 asked you?
22         Do you remember the question I just
23 asked you?
24     A.  Uh-huh.
25     Q.  What was it?

**120**

1      A.  If I wrote it, and do I write
2  things to inspire people, with lies.
3      Q.  No.  Did you lie to inspire people.
4  Then you went off on this rant about other
5  subjects.
6      A.  I was answering the question.
7      Q.  My question was, did you lie in
8  that article in an attempt to inspire them?
9      A.  I guess you could say I lied, yes.
10     Q.  And did you ever make any other
11 public statements anywhere else that you were
12 three-quarters deaf since birth?
13     A.  I don't recall.
14     Q.  Did you ever tell your doctors you
15 were deaf since birth?
16     A.  I don't recall.
17     Q.  Have you been deaf since birth?
18     A.  No, sir, I haven't.
19     Q.  So any time you've said that, you
20 were lying?
21     A.  Yes, sir.
22     Q.  Why would you lie about that?
23         MR. SCIOLLA:  Object to the form.
24     And asked and answered.
25     A.  Why would I lie about it?  Well, in

**121**

1  that instance, it was to inspire people.
2      Q.  Well, in other instances where
3  you've said it.
4         Have you said it in other
5  instances, or are you claiming that's the
6  only time in your life that you ever told
7  people you were deaf since birth?
8         MR. SCIOLLA:  Object to the form,
9      asked and answered.
10     A.  I don't recall if I did.
11     Q.  Well, has it been a habitual lie
12 that you've told all your life, that you've
13 been deaf since birth?
14     A.  No, you asked me that one article,
15 and I said I lied about that.  You asked me
16 if I told people I was deaf my whole life,
17 and obviously I'm not, I wasn't.
18     Q.  No, I didn't ask you about the one
19 article.  You identified the one article.  I
20 asked you if you ever made those statements
21 publicly, and you identified that one article
22 with what you did.
23     A.  Because that's the one that I knew
24 about.
25     Q.  And my question is, what other

122

1 ones, what other times have you made that
2 statement publicly that you've been deaf
3 since birth?
4     A.  I don't know.
5     Q.  As you sit there today, can you
6 think of any other times where you have lied
7 and told people in the public that you've
8 been deaf since birth?
9     A.  No, I can't.
10    Q.  Did you tell any other performers
11 that you were deaf since birth?
12    A.  I don't recall if I did.
13    Q.  Did you tell Tommy Dreamer you were
14 deaf since birth?
15    A.  I don't recall.
16    Q.  So for other wrestlers who have
17 known you through your career and say you've
18 told them you were deaf since birth, would
19 they be lying?
20        MR. SCIOLLA:  Object to the form.
21    A.  I couldn't be deaf since birth,
22 obviously.
23    Q.  If they said you told them that,
24 would they be lying?
25    A.  Not lying.

123

1       (LoGrasso Exhibit 7, Article
2    entitled, "Big Vito talks about wanting
3    to work with Jeff Jarrett, and much
4    more," marked for identification, this
5    date.)
6     Q.  I've shown you what's been marked
7 as Exhibit 7, Mr. LoGrasso.
8         Again, do you recognize this as
9 your picture there?
10    A.  It's me in the picture.
11    Q.  And this is posted on Online World
12 of Wrestling.  And it's a column, and it
13 quotes you as saying, "Big Vito On Wrestling
14 Deaf."  "I don't advertise that I'm
15 handicapped.  I am three-quarters deaf, and I
16 have been that way my whole life.  I made it,
17 I did my thing."
18        Did you say that?
19    A.  What year was this?
20    Q.  It apparently was published in
21 2014, prior to this lawsuit.
22    A.  I couldn't have been deaf my whole
23 life.
24    Q.  Did you say that or didn't you?
25    A.  I did say it.

124

1     Q.  Was that a lie when you told this
2 person that?
3     A.  Yes, it is a lie.
4     Q.  Who was that supposed to inspire?
5         MR. SCIOLLA:  Object to the form.
6     A.  I was just going along with what I
7 had said previously.
8     Q.  Well, where had you said it
9 previously?
10    A.  When you asked me if I ever said it
11 before in that other article.
12    Q.  You state here "I don't advertise
13 that I'm handicapped."
14    A.  That's a time I know I said it.
15 You just mentioned Tommy Dreamer.
16    Q.  Well, why wouldn't you tell him,
17 then, that, look, I'm not really deaf.  I
18 just said that to inspire people.  I just
19 told a story"?
20    A.  Well, it was done to inspire people
21 that you could do things.  Maybe I used poor
22 judgment.
23    Q.  Well, fine.  But why didn't you
24 tell the truth in this interview and say, I'm
25 not deaf?

125

1    So you were lying in 2014, too --
2        MR. SCIOLLA:  Object to the form.
3    Q.  -- is that right?
4    A.  No, sir.
5    Q.  Well, you're saying now this isn't
6 true.  The statements you make here, "I'm
7 three-quarters deaf, and I have been that way
8 my whole life," is that true or is it false?
9    A.  I have not been three-quarters deaf
10 my whole life.
11   Q.  So then you told a lie, then,
12 right?
13   A.  In that, yes.
14   Q.  Do you remember appearing on an
15 interview called the Angry Marks Podcast in
16 February of 2014?
17   A.  No.
18   Q.  Did you tell that same tale on that
19 podcast --
20   A.  Don't recall.
21   Q.  -- of being deaf?
22        MR. McDEVITT:  We are going to mark
23    this.
24        (LoGrasso Exhibit 8, CD labeled,
25    "The Undisputed Wrestling Show with Big

32 (Pages 122 to 125)

126

1   Vito & Lucky Thurteen (February 2014),"
2   marked for identification, this date.)
3      Q.  Mr. LoGrasso, you are going to hear
4   a voice talking here, and I'm going to ask,
5   after you are done hearing it, whether you
6   recognize it as your voice saying what you
7   hear.
8      MS. LACY:  Can you please skip to
9   4724.  At least before it.  If you can't
10  get close, that's fine.
11     (Video played and transcribed
12  following:)
13     "Voice:  I was and this week I'm
14  supposed to be getting a big boy.  And I
15  don't know, I've said this before, you
16  know, I've mentioned it a few times in
17  interviews.  A lot of people don't know
18  that I'm deaf.  And, you know, and
19  people ask me all the time, how the hell
20  do you wrestle, if you're deaf, and how
21  did you play ball?  I was born deaf.  I
22  was born deaf, you know.  And sometimes
23  when I'm in the house, you know, I hear,
24  my hearing is so accurate that I hear
25  things all the time and every little

127

1   thing.  And I'm so used to having a dog
2   with me and, you know, just like I need
3   that extra just in case I can't hear
4   something or something is going on that
5   I don't know.  So unless you're a
6   120-pound Rottie, his name is King, I'm
7   going to change his name to Brother,
8   come on, Brother.  His name is going to
9   be Brother.  And he's two years old and
10  he's 100, started out at 140.  He's been
11  training, so he's about 125 pounds right
12  now.  They hey, goodbye, somebody I
13  could pal around with, somebody I could
14  train with, somebody to have a companion
15  with, somebody to be in the house with
16  me and, you know, I don't advertise it.
17  Like I said, I don't advertise it that
18  I'm handicapped.  I'm deaf.  I'm
19  three-quarters deaf, you know, and I've
20  been like that my whole life.
21     And you know, I made it.  I did my
22  thing and I just need, you know, I've
23  been" --
24     (End of transcription.)
25     Q.  Is that your voice?

128

1      A.  Yes.
2      Q.  And that's you in a radio interview
3   in February of 2014 saying you were born
4   deaf, right?
5      A.  I said that.  I was just saying it.
6      Q.  And that was, again, before the
7   lawsuit you were telling people that you were
8   born deaf, right?
9      A.  That's what I was saying.
10     Q.  And you said you had been like that
11  your whole life?
12     A.  That's what I said.
13     Q.  So were you lying then, or are you
14  lying now?
15     MR. SCIOLLA:  Object to the form.
16     A.  No.
17     Q.  Which is it?
18     A.  I can't hear you.
19     Q.  Were you lying then or are you
20  lying now?
21     A.  I'm not lying.
22     Q.  Were you born deaf?
23     A.  No, I couldn't be born deaf.
24     Q.  You could be born deaf.
25     Why couldn't you be born deaf?

129

1      A.  How I did get in the military?
2      Q.  I don't know.  Maybe you lied
3   there, too.
4      A.  How could you lie in an exam or a
5   state physical?
6      Q.  I've been in the military Mr.
7   LoGrasso.  I know you how get into the
8   military?
9      A.  I know you've been in the military.
10     Q.  Don't kid me about that.  They'll
11  take anybody, especially in the time when you
12  were going in.
13     A.  It's 1983, it was peacetime.  They
14  take anybody?
15     Q.  They took you.
16     A.  Thank you for the compliment, I
17  appreciate it.
18     Q.  What was your discharge?
19     MR. SCIOLLA:  Object to the form.
20  Asked and answered.
21     Q.  So you basically have been shown
22  now to have said repeatedly that you were
23  deaf since birth, right?
24     A.  I said this in interviews.
25     Q.  Now, apart from interviews, you

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

```
                                                    130
 1   also told a doctor that, too, didn't you?
 2       A.  Not that I recall.
 3       Q.  Is it fair to assume, Mr. LoGrasso,
 4   that you would not lie to your doctors about
 5   your condition?
 6       A.  I have hearing loss.
 7       Q.  But you would not lie to them,
 8   would you?
 9       A.  No.
10       Q.  I mean you want to get treated
11   accurately, don't you?
12       A.  Yes, sir.
13       Q.  And you know you can't get treated
14   accurately unless you tell them the truth
15   about your condition?
16           MR. SCIOLLA:  Object to the form.
17       A.  About my condition, yes.
18           (LoGrasso Exhibit 9, Medical
19       records, Bates Nos. Smith020516_00031
20       through Smith020516_00040, marked for
21       identification, this date.)
22       Q.  Showing you what's been marked as
23   Exhibit 9, Mr. LoGrasso, which comes out of
24   your medical records from Dr. Smith.  And if
25   I could, sir, I would direct your attention
```

```
                                                    131
 1   to page 3 of this document, under the last
 2   paragraph on page 3.
 3           Am I correct that what the doctor's
 4   note states is "Congenitally deaf on left,
 5   severe loss on right"?
 6           Is that what your doctor's own note
 7   states?
 8       A.  I'm reading it.
 9       Q.  Is that what they say, do you know
10   what that means?
11       A.  That I'm deaf on the left and
12   severely lost on the right.
13       Q.  Do you know what "congenitally
14   deaf" means?
15       A.  I can't hear nothing out of the
16   left.
17       Q.  No.  Did you tell the doctor you
18   had been death since birth?
19       A.  No.  I just don't hear good out of
20   the ear.
21       Q.  And there is a note that is made in
22   May of 2012.  This is way before your
23   lawsuit, right?  At the top right it says
24   "May 2012."
25       A.  Right.
```

```
                                                    132
 1       Q.  And then when you went back after
 2   this lawsuit --
 3           (LoGrasso Exhibit 10, Medical
 4       records, Bates Nos. Smith020516_00002
 5       through Smith020516_00006, marked for
 6       identification, this date.)
 7       Q.  Showing you what's been marked as
 8   Exhibit 10.  This is the same Dr. Smith,
 9   isn't it, that this is addressed to, from
10   Jennersville Neurology Center, do you see
11   that?
12       A.  Jennersville.
13       Q.  Jennersville at the top there?
14       A.  Yes.
15       Q.  Did you go to Jennersville
16   Neurology?
17       A.  Yes.
18       Q.  And you went there after this
19   lawsuit was brought, right?
20           That's March of 2015 --
21       A.  Yes.
22       Q.  -- two months after you brought
23   this lawsuit, right?
24       A.  Yes.
25       Q.  Knowing that you have to
```

```
                                                    133
 1   demonstrate some kind of symptoms to support
 2   your brain injury claim, right?
 3           MR. SCIOLLA:  Object to the form,
 4       argumentative.
 5       Q.  You know that by then, don't you?
 6   You know it by then.  You are trying to show
 7   that you have symptoms associated with the
 8   injuries that you're claiming in the lawsuit,
 9   right?
10           MR. SCIOLLA:  Object to form.
11       A.  This was when I could get an
12   appointment to see a neurologist.
13       Q.  Two months after your suit?
14       A.  I was getting everything done,
15   because I was going by what Dr. Smith had
16   said, so this is where he referred me.
17       Q.  And when you go to this
18   Jennersville, you tell them --
19           MR. McDEVITT:  Strike that.
20       Q.  If you look at the History of
21   Present Illness on the second page, it says,
22   "Mr. LoGrasso is a 50-year-old man referred
23   by Dr. Smith for evaluation of headaches and
24   head trauma.  He has some difficulty giving a
25   concise history."  And then it goes on to
```

134

1  state that you were "A former WWE wrestler,
2  completely stopped wrestling only five months
3  ago.  He attributes most of his problems to
4  consequences of his wrestling career spanning
5  almost 30 years.  This includes deafness in
6  the left ear, moderate hearing loss in the
7  right ear."  Right?
8      Isn't that what it says?
9   A.  I'm reading it.
10      MR. SCIOLLA:  Can you repeat the
11  question.
12   Q.  And my question, Mr. LoGrasso, is
13  whether you told the Jennersville folks that
14  your deafness issue you associated with your
15  wrestling career.
16   A.  Yes, I did tell them that.
17   Q.  So after the lawsuit, you weren't
18  telling them that you were deaf since birth,
19  you were selling them that it was associated
20  with your wrestling career?
21      MR. SCIOLLA:  Object to the form.
22   A.  I told -- he asked me how this
23  happened, and I said repeated blows to the
24  head and that I had, this had gotten worse
25  and worse during my wrestling career.

135

1   Q.  Did you tell him that you had
2  previously made statements to the effect that
3  you had been deaf since birth?
4   A.  No.
5   Q.  This also goes on to state, you
6  told him, this doctor, whoever he is --
7  Handler, Dr. Handler, that you did not recall
8  having any significant post-concussive
9  symptoms during your career, do you see that?
10   A.  I was not educated on what they
11  were, so I didn't know what I was -- I was
12  finding out as I was going along what was
13  going on with me.
14   Q.  Well, he says, "He did not recall
15  having any significant post-concussive
16  systems during his career, such as loss of
17  consciousness, prolonged headaches, nausea,
18  balance problems or memory loss."
19      That's what he says, right?
20   A.  That's what it says there.
21   Q.  And that's what -- you claim those
22  things now, the prolonged headaches --
23   A.  That's what I'm suffering from, and
24  that's what I didn't know what was going on,
25  because I wasn't educated on what was

136

1  happening.  So it was the doctors telling me
2  what is going on, and then I told him what
3  was happening.  And now I know what
4  everything is, I put everything together.
5  But during this time I'm finding out like
6  everybody else, I'm finding out what is wrong
7  with me.
8   Q.  This was all done after you filed
9  the lawsuit where you had listed all the
10  symptoms, supposedly, of head injuries.
11   A.  This is all of what --
12   Q.  You knew the symptoms of the head
13  injuries by the time you went to the doctor,
14  didn't you, and filed a lawsuit about it;
15  isn't that true?
16   A.  Say that one more time.
17   Q.  You already filed a lawsuit where
18  you claimed a symptomatology of head injuries
19  in the lawsuit that you claimed and filed in
20  a Federal court, so you knew the symptoms by
21  the time you went to this doctor.
22   A.  I was getting checked out.
23   Q.  And you report to him you didn't
24  have any prolonged headaches, according to
25  what he says, and that you didn't have any

137

1  significant post-concussion symptoms during
2  your career, which he says only ended a short
3  time ago.
4      MR. SCIOLLA:  Object to the form
5  and characterization.
6   Q.  Right?
7   A.  I can't speak for the doctor's
8  notes.
9   Q.  Do you have some reason to think
10  they don't reflect what you told him?
11   A.  This is what is his observation,
12  and I'm telling you what I was going through.
13   Q.  And he's basing his --
14      MR. McDEVITT:  Strike that.
15   Q.  Do you agree that every symptom you
16  claim is a subjective symptom?
17      MR. SCIOLLA:  Object to the form.
18   A.  If you could say that one more
19  time.
20   Q.  Every symptom you now claim is
21  subjective, right?
22      MR. SCIOLLA:  Object to the form.
23   A.  "Subjective" meaning?
24   Q.  You claim you have headaches, but
25  it can't be verified.

35 (Pages 134 to 137)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099