**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **RUSS McCULLOUGH, *et al.,*** | : | **No. 3:15-cv-01074 (VLB)** |
| | : | **Lead Case** |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **WORLD WRESTLING** | : | |
| **ENTERTAINMENT, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **EVAN SINGLETON and VITO** | : | **No. 3:15-cv-00425 (VLB)** |
| **LOGRASSO,** | : | **Consolidated Case** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **WORLD WRESTLING** | : | |
| **ENTERTAINMENT, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

**DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S REDACTED**
**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................. 1

II.  FACTUAL BACKGROUND .................................................. 6

III. ARGUMENT ...................................................................... 6

    A.   Standard of Review.................................................... 6

    B.   There Is No Evidence To Support the Fraud By Omission Claims...... 7

        1.   Plaintiffs' Testimonial Admissions Are Dispositive of the Fraud Claim ................................................................. 8

        2.   There Is No Evidence Of Contemporaneous Fraudulent Intent ................................................................. 10

            a.   Discovery Demonstrated the Absence of Fraudulent Intent................................................................. 11

            b.   The "Inherent Contradiction" Underlying Plaintiffs' Fraud Claims Also Undermines Fraudulent Intent ......... 16

        3.   There Is No Evidence that WWE Omitted "Known Facts"....... 18

            a.   There Is No Evidence that WWE Omitted "Known Facts" from LoGrasso.................................................... 18

            b.   The Information that WWE Is Alleged To Have Omitted Does Not Constitute "Known Facts" for Fraud Purposes  .......................................................... 19

        4.   There Is No Evidence That Plaintiffs Detrimentally Relied On Any Omission by WWE.............................................. 23

            a.   No Detrimental Reliance Based on the "Inherent Contradiction" Underlying Plaintiffs' Fraud Claims ....... 23

            b.   Singleton Was Not Injured By Any Detrimental Reliance On Any Omission By WWE ............................... 25

            c.   There Is Not Clear and Convincing Evidence That LoGrasso's Alleged Injuries Were Caused By Detrimentally Relying On Any Omission By WWE ......... 27

        5.   WWE Neither Had Nor Breached Any Duty of Disclosure to LoGrasso and Did Not Breach Any Duty to Singleton If Such A Duty Existed in 2012.............................................. 29

            a.   WWE Did Not Have A Confidential Relationship With LoGrasso.................................................... 30

i

            **b.**    **WWE Had No Duty to LoGrasso after Their Relationship Ended** ........................................................... 34

    **C.**    **LoGrasso's Claim Is Time-Barred** ........................................................ 35

        **1.**    **LoGrasso's Discovery of His Injury Precludes Continuing Course of Conduct and Fraudulent Concealment Tolling** ....... 35

        **2.**    **LoGrasso Cannot Invoke Continuing Course of Conduct Tolling for Other Reasons** ........................................................ 38

        **3.**    **Fraudulent Concealment Is Not An Available Tolling Mechanism** .............................................................................. 45

**IV.**    **CONCLUSION** ................................................................................................ 46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Turner Corp.*, No. 00 CIV 4677 HB, 2001 WL 225049
(S.D.N.Y. Mar. 2, 2001) ............................................................ 17

*Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157
(D. Conn. 2005)......................................................................... 11

*Aquart v. Jacobowski*, No. 3:08CV1562 VLB, 2012 WL 1067486
(D. Conn. Mar. 30, 2012) ............................................................ 7

*AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys.,
Inc.*, No. 3:10-cv-01539, 2014 WL 7270160 (D. Conn. Dec. 18, 2014)........... 36, 37

*Bergeron v. Select Comfort Corp.*, No. A-15-CV-00657-LY-ML, 2016
WL 155088 (W.D. Tex. Jan. 11, 2016)....................................... 17

*Blanchette v. Barrett*, 229 Conn. 256, 640 A.2d 74 (1994) ......................... 35

*Campbell v. Town of Plymouth*, No. CV00501061, 2001 WL 752718
(Conn. Super. June 6, 2001) ..................................................... 37

*Censor v. ASC Techs. Of Conn., LLC*, 900 F. Supp. 2d 181
(D. Conn. 2012)....................................................................... 6, 7

*Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206
(S.D.N.Y. 2007).......................................................................... 7

*Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994) ....................... 27

*City of Philadelphia v. Lead Indus. Ass'n*, No. 90-7064,
1992 WL 98482 (E.D. Pa. Apr. 23, 1992).................................... 24

*Connell v. Colwell*, 214 Conn. 242, 571 A.2d 116 (1990)........................... 45

*Creelman v. Rogowski*, 152 Conn. 382, 207 A.2d 272 (1965) .............................. 4, 30

*Crigger v. Fahnestock & Co.*, 443 F.3d 230 (2d Cir. 2006)........................... 23

*Danise v. Safety-Kleen Corp.*, 17 F. Supp. 2d 87 (D. Conn. 1998) ........................... 28

*Dime Sav. Bank of N.Y., FSB v. Fucetola*, No. CV91286416S,
1994 WL 67054 (Conn. Super. Feb. 24, 1994) ...................... 28

*Duksa v. City of Middletown*, 173 Conn. 124, 376 A.2d 1099 (1977)......................... 8

*E-21 Global, Inc. v. Second Renaissance, LLC*, 360 Fed. Appx. 172
(2d Cir. 2009) ............................................................................ 7

*Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84,
912 A.2d 1019 (2007).............................................................. 45

*Flannery v. Singer Asset Finance Co.*, 312 Conn. 286, 94 A.3d 553
(2014) ...................................................................................... 39

*Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224 (S.D.N.Y. 1995) ................... 24

*Franchey v. Hannes*, 152 Conn. 372, 207 A.2d 268 (1965) .................... 8, 30

*Golden v. Johnson Mem'l Hosp.*, 66 Conn. App. 518, 785 A.2d 234
(2001) ................................................................................ 34, 44

*Haas v. Haas*, 137 Conn. App. 424, 48 A.3d 713 (2012) ........................ 39

*Haesche v. Kissner*, 229 Conn. 213, 640 A.2d 89 (1994) ......................... 28

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 761 A.2d 1268
(2000) ...................................................................................... 31

*Holliday v. Ludgin*, No. CV085023554, 2009 WL 3838915
(Conn. Super. Oct. 16, 2009) ............................................... 36-37

*Hubbard-Hall, Inc. v. Monsanto Co., Inc.*, 98 F. Supp. 3d 480
(D. Conn. 2015).......................................................................... 36

*Iacurci v. Sax*, 313 Conn. 786, 99 A.3d 1145 (2014) ......................... 30, 31

*In re Bak*, No. 10–23045 ASD, 2013 WL 653073
(Bankr. D. Conn. Feb. 20, 2013) ............................................ 38

*In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. 351
(E.D. Pa. 2015) ....................................................................... 21

*In re NFL Players' Concussion Injury Litig.*, 821 F.3d 410
(3d Cir. 2016) ......................................................................... 21

*Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245 (5th Cir. 1997)................. 24

*Kilduff v. Adams, Inc.*, 219 Conn. 314, 593 A.2d 478 (1991)................... 27

*L.S. v. Webloyalty, Inc.*, 138 F. Supp. 3d 164 (D. Conn. 2015) ................... 9

*LaBow v. Rubin*, 95 Conn. App. 454, 897 A.2d 136 (2006) ..................... 35

*Law v. Camp*, 116 F. Supp. 2d 295 (D. Conn. 2000) ......................... 27-28

*MacDermid Printing Solutions, Inc. v. Cortron Corp.*, No. 3:08cv1649,
   2014 WL 3943629 (D. Conn. Aug. 12, 2014) ........................................ 19

*Martinelli v. Bridgeport Roman Catholic Dioceses*, 196 F.3d 409
   (2d Cir. 1999) ................................................................... 36, 46

*Martinelli v. Fusi*, 290 Conn. 347, 963 A.2d 640 (2009) .................................... *passim*

*Maslak v. Maslak*, No. LLICV126006437, 2013 WL 5663798
   (Conn. Super. Sept. 27, 2013)................................................... 45-46

*Miller v. Comm'r of Correction*, 242 Conn. 745, 700 A.2d 1108 (1997) ..................... 7

*Miller v. Imaging On Call, LLC*, No. 3:13-cv-00679, 2015 WL 150287
   (D. Conn. Jan. 12, 2015).......................................................... 32

*Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32 (1st Cir. 2001) ....................... 9

*Mountaindale Condo. Ass'n v. Zappone*, 59 Conn. App. 311,
   757 A.2d 608 (2000)........................................................... 35-36

*Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031 (D.C. Cir. 1980) ........................ 17

*Neuhaus v. DeCholnoky*, 280 Conn. 190, 905 A.2d 1135 (2006) ..................... *passim*

*New Jersey Carpenters Health Fund v. Philip Morris, Inc.*,
   17 F. Supp. 2d 324 (D.N.J. 1998) ............................................... 24

*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969).................... 9

*Republic Bank & Trust Co. v. Bear, Stearns & Co.*,
   707 F. Supp. 2d 702 (W.D. Ky. 2010)............................................. 23

*Reville v. Reville*, 312 Conn. 428, 93 A.3d 1076 (2014) ................................. 7

*Ride, Inc. v. APS Tech., Inc.*, 11 F. Supp. 3d 169 (D. Conn. 2014) ........................ 36

*Rosato v. Mascardo*, 82 Conn. App. 396, 844 A.2d 893 (2004) ................... 35, 36, 38

*Saggese v. Beazley Co. Realtors*, 155 Conn. App. 734, 109 A.3d 1043
   (2015) ........................................................................ 7

*Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1 (1st Cir. 2007)........................... 8, 9, 11

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir. 1997) .................. 23

*Sherwood v. Danbury Hosp.*, 278 Conn. 163, 896 A.2d 777 (2006)................. *passim*

*Siemiatkoski v. Windsor Fed. Savings & Loan Ass'n*,
   No. X07CV065001791S, 2008 WL 4379060
   (Conn. Super. Sept. 10, 2008)...................................................................... 8

*Stewart v. Federated Dept. Stores, Inc.*, 234 Conn. 597, 662 A.2d 753
   (1995) ........................................................................................................... 8

*Trefoil Park, LLC v. Key Holdings, LLC*, No. 3:14-CV-00364 (VLB),
   2015 WL 1138542 (D. Conn. 2015) ................................................... 18, 19

*U.S. v. Encarnacion-LaFontaine*, No. 15-1223, 2016 WL 611925
   (2d Cir. Feb. 16, 2016) ............................................................................... 16

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650
   (2d Cir. 2016) .................................................................................. 8, 10-11

*Witt v. St. Vincent's Med. Center*, 252 Conn. 363, 746 A.2d 753 (2000)............. 38, 43

*World Wrestling Entm't, Inc. v. THQ, Inc.*, No. X05CV065002512S,
   2008 WL 4307568 (Conn. Super. Aug. 29, 2008) .................................... 46

*Yurevich v. Sikorsky Aircraft Div.*, 51 F. Supp. 2d 144 (D. Conn. 1999).................. 19

## I.      INTRODUCTION

Previously, this Court dismissed all of the claims in this case except for "the fraudulent omission claim brought by Plaintiffs Evan Singleton and Vito LoGrasso, to the extent that claim asserts that in 2005 or later WWE became aware of and failed to disclose to its wrestlers information concerning a link between repeated head trauma and permanent degenerative neurological conditions as well as specialized knowledge concerning the possibility that its wrestlers could be exposed to a greater risk for such conditions."  Dkt. 116 at 70.

The Court also expressed its skepticism of the inherent contradiction underlying the fraud claim.  *Id.* at 32.  That contradiction is that the information WWE supposedly fraudulently omitted to tell these Plaintiffs — that repetitive head trauma sustained while wrestling was supposedly linked to long-term diseases like CTE — was widely-publicized yet completely unknown to them.  *Id.* The Court identified two ways that contradiction would be resolved by a factual record.  First, Plaintiffs would have to prove that they had "no knowledge of any of the widely-publicized information and instead relied, to their detriment, on a television entertainment company to explain to them the dangers of volunteering for compensation, to be hit on the head repeatedly with a metal folding chair."[1] *Id.*  Second, as to the repose issues surrounding LoGrasso's claims, the Court noted that although it was required to accept his denial of knowledge of reports of a connection between repetitive head trauma and latent permanent

_____

[1] The allegation that either of these Plaintiffs was hit on the head with metal chairs while at WWE was shown to be just another patent falsehood pled by Plaintiffs' counsel.  *See* Local Rule 56(a)(1) Statement ("SOF") ¶¶ 65-66, 201*.*

neurological conditions at the pleading stage, it pushed the boundary between possible and plausible.  *Id.* at 31 n.5.  LoGrasso, therefore, would "carry a heavy burden" to establish that he could not pinpoint the source of his headaches and other symptoms given his allegations that symptoms began in 2008.  *Id.*

The actual evidence developed in discovery proved that Plaintiffs' fraud claims had no basis in fact to begin with, and were based entirely on allegations concocted by Plaintiffs' counsel.  Most incredibly, Singleton did not even know he was accusing WWE of fraud, and LoGrasso disavowed claiming fraud. Specifically, Singleton testified as follows:

> Q: Do you realize that you're claiming fraud in this case?
> A: No.
> Q: You don't realize that you're making a fraud claim?
> A: No.
> Q: Can you tell me who you think, if anybody, committed a fraud on you?
> A: I'm sorry?
> Q: Who do you think, if anybody, at WWE committed a fraud on you?
> A: I don't know.
> Q: Did anybody at WWE fail to tell you something that you think you should have known?
> A: I don't know.
> * * *
> Q: So, as you sit here today, you can't identify a single act or anything done or not done by WWE that you consider to be fraudulent to you?
> A: I don't know.
> Q: Well, you're the one who is bringing that lawsuit, sir, so I'm asking you: Do you have anything that you considered that was done that was fraudulent to you?
> A: I don't know.[2]

---

[2] In a different portion of his deposition, Singleton admitted that he knew the risks of professional wrestling; knew the moves that he would be performing; knew how to do those moves without getting hurt; knew that he could get hurt if he did the moves wrong; signed a contract assuming the inherent risks of serious

SOF ¶¶ 253-55.

LoGrasso actually denied claiming that anybody at WWE attempted to defraud him.

> **Q. Do you contend that people at WWE were engaged in trying to defraud you?**
> **A. I didn't come out and say that they tried to defraud me . . .**
>
> **\*\*\***
> **Q. Who at WWE, if anybody, are you accusing of engaging in fraud towards you?**
> **A. I didn't accuse anybody of saying fraud. . . .**

SOF ¶¶ 126-27.

These admissions alone warrant dismissal on the law presented herein. But there are more, many more, reasons for dismissal.  On the previously noted repose and detrimental reliance issues identified by the Court, WWE served comprehensive Requests for Admissions (the "RFAs") which attached what in reality is only a small sampling of the massive electronic and print media attention given the subject at issue over the years at issue.  SOF ¶ 4.  The RFAs asked Plaintiffs to admit the authenticity of the attached media reports, and sought other admissions of knowledge of such matters by certain times.  SOF ¶¶ 1-4.  After securing a thirty-day extension, Plaintiffs' counsel served defective responses outside of the time allotted, which by operation of Rule 36(a)(3) now

---

injury; and that he got a concussion because in fact he did the move wrong. When asked why he was then suing WWE, after thinking about it for over 20 seconds on the tape of his deposition, his answer was "I don't know."  SOF ¶¶ 166-68.  WWE respectfully urges the Court to watch the video of the key segments of Plaintiffs' depositions as it reveals so much more than naked words on a transcript.  *See* App. Tab 48.

means those Requests are deemed admitted.[3]  SOF ¶¶ 1-8.  Beyond those deemed admissions, LoGrasso testified that he has been aware since 2007 of the extensive media coverage reporting that his former friend and WWE performer, Chris Benoit, had CTE as a result of repetitive head trauma.  SOF ¶¶ 103-06.  ██████

██████ SOF ¶¶ 89, 98.  Thus, the pled denials of knowledge on his behalf were exposed as pretext, █████████

It is also undisputed that LoGrasso never reported any alleged head injury to WWE management or doctors while performing for WWE, let alone repetitive head trauma.  SOF ¶¶ 32-36, 41, 46, 48.  Although LoGrasso has made inconsistent claims that his symptoms of brain injury began in three different years, either 2006, 2007, or 2008, depending on which version he tells, he squarely testified that his symptoms actually began when hit on the head while wrestling during a specific WWE match in October of 2006.  SOF ¶¶ 47, 67-70.  He admitted he did absolutely nothing thereafter to diligently pursue any claims then or for eight years, despite learning about CTE being allegedly discovered in his friend Benoit in 2007.  SOF ¶¶ 107-14.

LoGrasso's fraud by omission claim can only withstand summary judgment if the Court finds that it is "exceptional" in two respects:  First, "[i]t is only in <u>exceptional</u> circumstances that fraud can be based on nondisclosure."  *Creelman v. Rogowski*, 152 Conn. 382, 385 (1965) (emphasis added).  Second, the

---

[3]  No motion under 36(b) was ever filed by Plaintiffs seeking to withdraw the deemed admissions, and discovery is now closed.

three-year statute of repose under C.G.S. § 52-577 "should be respected in all but the most <u>exceptional</u> circumstances."  *Martinelli v. Fusi*, 290 Conn. 347, 364 n.12 (2009) (citation omitted) (emphasis added).  The Connecticut Supreme Court has indicated that repose is so strongly favored that a plaintiff like LoGrasso may be required "to find evidence of the proverbial 'smoking gun' in order to prevail under the continuous course of conduct doctrine."  *Id.*  LoGrasso's claim is not exceptional in either respect.

As to Singleton, he squarely admitted that he understood the risk of injury associated with being a professional wrestler generally and in connection with specific wrestling moves he would be performing.  SOF ¶¶ 141-43, 159, 163.  He admitted being taught how to receive a choke slam without sustaining a head injury, and that he had performed the move correctly without being hurt.  SOF ¶¶ 158-63. CONFIDENTIAL

SOF ¶¶ 182-84.  On September 27, 2012, he admittedly performed a move incorrectly, received a concussion, and never again performed for WWE, CONFIDENTIAL

[4]  SOF ¶¶ 161, 214-19, 236.  In

---

[4] The allegations which portrayed WWE as discouraging Singleton from seeing neurologists and as a result having suffered from an undiagnosed intracranial hemorrhage for months were shown to be patently false allegations in discovery. CONFIDENTIAL

reality, his only claim is that he received a concussion when he performed a

move wrong and not about some fear of CTE:

> Q: When did you first hear about CTE?
> A: What is CTE?
> Q: Well, I'm asking you, when did you first hear--
>> Mr. Pogast:  If you have
> Q: of CTE
> A: Oh, I didn't.
> * * *
> Q: So I take it then, nobody's told you you have CTE?
> A: No.
> Q: And nobody's told you that you should fear having CTE?
> A: Not that I know of.  I don't know.
> Q: And I take it if you don't know what CTE is, you don't have any fear of having CTE?
> A: No.
> Q: No, I'm correct?
> A: Yes
> Q: In other words, you don't have fear of having CTE?
> A: No.  I don't know what it is.

SOF ¶¶ 249-50.

## II.   FACTUAL BACKGROUND

The undisputed facts supporting WWE's motion for summary judgment are

set forth in WWE's Local Rule 56(a)(1) Statement that is being filed concurrently

herewith and is incorporated by reference herein.  Due to length restrictions, only

some facts can be discussed herein.

## III.   ARGUMENT

### A.   Standard of Review

The summary judgment standard is well known to the Court.  *See Censor v.*

CONFIDENTIAL

█████████████████████████   SOF ¶ 213.

*ASC Techs. Of Conn., LLC*, 900 F. Supp. 2d 181, 192 (D. Conn. 2012) (Bryant, J.) (granting summary judgment on fraud claim where claim was not supported by admissible evidence); *Aquart v. Jacobowski*, No. 3:08CV1562 VLB, 2012 WL 1067486, at *1 (D. Conn. Mar. 30, 2012) (Bryant, J.).  The remaining fraudulent omission claim must be proven by clear and convincing evidence.  *See Censor*, 900 F. Supp. 2d at 222.  This heightened standard for fraud "forbids relief whenever the evidence is loose, equivocal or contradictory."  *Miller v. Comm'r of Correction*, 242 Conn. 745, 795 (1997); *Saggese v. Beazley Co. Realtors*, 155 Conn. App. 734, 754 (2015).  This standard of proof applies at summary judgment as well as trial.  *See Censor*, 900 F. Supp. 2d at 222; *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007); *see also E-21 Global, Inc. v. Second Renaissance, LLC*, 360 Fed. Appx. 172, 175 (2d Cir. 2009) (affirming summary judgment for fraud claim because plaintiffs failed to prove scienter by clear and convincing evidence).

**B.     There Is No Evidence To Support the Fraud By Omission Claims**

This Court has ruled that fraud by omission involves "the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak. . . . A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment."  Dkt. 116 at 61 (quoting *Reville v. Reville*, 312 Conn. 428, 441 (2014)).

Equally important is that, once one assumes a duty to speak, the duty to

make full and fair disclosure requires the speaker to avoid "a deliberate nondisclosure." *Franchey v. Hannes*, 152 Conn. 372, 378-79 (1965). A party does not have an obligation to disclose information that is "open to discovery upon reasonable inquiry." *Duksa v. City of Middletown*, 173 Conn. 124, 127 (1977). Plaintiffs must also prove that nondisclosure caused their damage by a cause-in-fact standard, *i.e.,* they would not have suffered the alleged damages were it not for the defendant's nondisclosure. *Siemiatkoski v. Windsor Fed. Savings & Loan Ass'n*, No. X07CV065001791S, 2008 WL 4379060, at *5 (Conn. Super. Sept. 10, 2008) (citing *Stewart v. Federated Dept. Stores, Inc.,* 234 Conn. 597, 605 (1995)).

      1.    <u>Plaintiffs' Testimonial Admissions Are Dispositive of the Fraud Claim</u>

      As described at the outset, Singleton testified both that he did not know why he was suing WWE and did not even know that he made a fraud claim against WWE. SOF ¶¶ 253-55. Thus, he did not articulate the basis of any fraud claim against WWE. LoGrasso affirmatively disavowed that he was accusing anyone of fraud and was unable to articulate any basis for a fraud claim or identify anyone at WWE who defrauded him. SOF ¶¶ 126-27.

      The Second Circuit has recently cited with approval the dismissal of fraud claims when the plaintiffs are unable to articulate any basis for their claims. *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 663 n.14 (2d Cir. 2016) (citing *Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 10 (1st Cir. 2007)). In *Sanchez*, the First Circuit noted that "the plaintiffs could not say how the communications they received from the defendants concealed their alleged schemes." *Sanchez*, 492 F.3d at 5. The district court then "decided to consider

*sua sponte* summary judgment against the plaintiffs based on what they said at their own depositions" and ruled that "their deposition testimony did not support the allegations of mail and wire fraud set forth in the amended complaint."  *Id.* at 8, 10.  The First Circuit affirmed, finding that the outcome was ordained by the plaintiffs' own deposition testimony.  *Id.* (citing *Morales v. A.C. Orssleff's EFTF*, 246 F.3d 32, 33 (1st Cir. 2001)) (summary judgment proper where plaintiff's deposition testimony "foreclosed any possibility of recovery from defendant"). Even prior to *Countrywide*, fraud claims had been dismissed in this Circuit and in this Court under such circumstances.  *See Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 577-78 (2d Cir. 1969) (upholding summary judgment where, during his deposition, the plaintiff's president "was repeatedly asked to specify the basis of the fraud he alleged" and could not point to any evidence of fraudulent intent); *L.S. v. Webloyalty, Inc.*, 138 F. Supp. 3d 164, 174-76 (D. Conn. 2015) (dismissing fraud claim where, during his deposition, the plaintiff was "unable to identify any statement by any Defendant that he relied upon and subsequently concluded was false or misleading" prompting the court to observe that "there is a near-total failure of proof on essential elements upon which Plaintiff bears the burden of proof").

Accordingly, Plaintiffs' fraud claim never gets out of the starting blocks. There is simply no evidence of an omission of a known fact made to either of them by WWE, no testimony establishing any detrimental reliance on an omission, no evidence of fraudulent intent contemporaneous with any otherwise unidentified omission, and no injury in fact that followed and was caused by any

omission.  But there were even more fatal admissions.

In this case, much time and effort was spent by WWE and this Court dealing with various allegations that Plaintiffs' counsel claimed were the requisite fraudulent omissions, ranging from Stephanie McMahon's Congressional testimony, to various statements made by the McMahons in television interviews, to a 2015 opinion stated by Dr. Maroon on the NFL Network.  SOF ¶¶ 55, 64, 73.  Since detrimental reliance is a critical aspect of a fraud claim, one would think those allegations would not have been made unless the Plaintiffs in some way detrimentally relied upon them.  However, all of these were shown to be complete red herrings which were not even known to either Plaintiff, let alone detrimentally relied upon by Plaintiffs in any way.  Singleton and LoGrasso both admitted that they had never read Stephanie McMahon's Congressional testimony (SOF ¶¶ 124, 258) which, as this Court found, was repeatedly mischaracterized by Plaintiffs' counsel anyway (Dkt. 116 at 58-59).  Neither mentioned Dr. Maroon's 2015 statement at all.  Singleton also admitted he never watched the televised programs where the McMahons were interviewed regarding the Benoit findings.  SOF ¶ 259.  He could not identify anything that he considered to be fraudulent to him.  SOF ¶ 255.  As to Mr. McMahon's statements questioning media reports that Benoit had the brain of an 85-year old with dementia, LoGrasso not only did <u>not</u> claim that was a fraudulent omission that misled him; he actually <u>agreed</u> with Mr. McMahon's personal observation about Benoit's mental acuity.  SOF ¶¶ 119-22.

2.    <u>There Is No Evidence Of Contemporaneous Fraudulent Intent</u>

A basic tenet of common law fraud is that — "a representation is fraudulent

only if made with the <u>contemporaneous</u> intent to defraud."  *U.S. ex rel. O'Donnell*, 822 F.3d at 658 (emphasis added).  In the fraud by omission context, "that fraudulent intent must accompany silence to constitute fraud."  *Id.* at 663 n.14. "A defendant's failure to disclose information, without more," is not fraud. *Sanchez*, 492 F.3d at 10; *see also Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 167 (D. Conn. 2005) (granting summary judgment due to lack of evidence that defendant knew any representations were false at the time made).

<div align="center">

a.    <u>Discovery Demonstrated the Absence of Fraudulent Intent</u>

</div>

Despite deposing three senior executives of WWE and WWE's medical director, Dr. Maroon, there is not a shred of evidence, much less clear and convincing evidence, of fraudulent intent by anybody not to tell either Plaintiff some known fact about a reported link between repetitive head trauma, professional wrestling, and CTE.  On the contrary, the undisputed evidence demonstrates that WWE did exactly what a responsible company should do in the face of what this Court aptly described as "recent discoveries regarding a link between repeated head trauma and permanent degenerative neurological conditions" CONFIDENTIAL ████████████████████ **Dkt. 116 at 67.**

<u>First</u>, CONFIDENTIAL ████████████████████████████

**SOF ¶ 24.** CONFIDENTIAL ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ **SOF ¶ 89.  It is also undisputed that there were no reports of any** discovery of such an association between professional wrestling and CTE during

his tenure.  SOF ¶¶ 94, 102.  LoGrasso admitted that the subject of CTE was not anything anybody talked about in WWE's locker rooms during 2005-2006.  SOF ¶¶ 95-96.  LoGrasso never reported a head injury to Dr. Rios (the independent contractor-physician retained by WWE during LoGrasso's tenure), who LoGrasso admitted was a good doctor, or to anybody else at WWE.  SOF ¶¶ 32-36, 41, 46, 48.  Having never reported any head injury, there would have been no occasion for Dr. Rios to discuss repetitive head injury with him, and no ability for Dr. Rios to tell LoGrasso about a discovery not even announced until after LoGrasso was released.  Thus, nobody could have urged him to perform in disregard of some known risk about CTE with fraudulent intent in any event.

**Second,** CONFIDENTIAL



SOF ¶ 99.  LoGrasso has admitted knowing of media reports in 2007 that Benoit had CTE from head trauma.  SOF ¶¶ 103-06.  CONFIDENTIAL

SOF ¶¶ 99-100.

**Third**, WWE's actions after the September 2007 SLI press conference belie fraudulent intent, and reveal a two-fold highly responsible strategy to deal with the then (and still) emerging science.  On September 25, 2007, WWE requested

specific information in writing from SLI regarding the Benoit findings.  SOF ¶ 100.

WWE requested complete access to SLI's work to have it independently analyzed

and evaluated in order to apply any verifiable and peer-reviewed scientific

findings to the prevention and management of concussions in its business. [5]  *Id.*

CONFIDENTIAL

**SOF ¶¶ 169-72.**

CONFIDENTIAL

**SOF ¶ 169.** CONFIDENTIAL

**SOF ¶¶ 170-71.** CONFIDENTIAL

**SOF ¶ 173.** CONFIDENTIAL

---

[5] CONFIDENTIAL

**SOF ¶ 100.  It was
not until September 2010 that he published a peer-reviewed article on Benoit
which contained only a partial description of the chain of custody, an admission
that sections of Benoit's brain had not been retained and examined, and an
admission that a definitive diagnosis of CTE cannot be made without an
examination of the whole brain.  SOF ¶ 102.  To the best of WWE's knowledge, Dr.
Omalu's reported findings regarding Benoit have never passed *Daubert* scrutiny
or been admitted as evidence in any legal proceeding.**

████████████████ [6] SOF ¶¶ 177-81.

These undisputed facts belie the existence of a sinister plan to keep performers in the dark during the LoGrasso era and thereafter.  Such a plan would have required formulation by WWE executives, and agreement by at least three independent physicians, various athletic trainers and other professionals to go along with such a scheme in disregard of medical duties of care.  They would have risked exposure of the alleged (but non-existent) scheme by sending Singleton to multiple independent health care professionals, any one of whom could have told him the allegedly omitted information.  All would have had to maintain such a scheme in the face of widely reported media coverage about CTE through the years.  It is not surprising that there is not a shred of evidence supporting such a nonsensical claim.  Indeed, Plaintiffs' counsel really made no attempt to establish contemporaneous fraudulent intent during discovery.

CONFIDENTIAL

████████████████████████████████

████████████████████████████████

---

[6] CONFIDENTIAL ████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████ App. Tab 65.

**CONFIDENTIAL** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ SOF ¶¶ 98, 101.  The media storyline that repeated blows to the head can cause CTE is easily within the comprehension of a layman and certainly understood by an athlete or entertainer whose profession can involve head trauma.  LoGrasso knew the timeline, and admitted in his deposition that he was not accusing anybody of fraud, and that he had no evidence that anybody at WWE ever directed anyone in the medical staff to withhold information from him.  SOF ¶¶ 126-27, 131-34.  He has no knowledge that anybody at WWE ever told Dr. Rios or the medical staff to lie to him about anything, SOF ¶¶ 133-34; he has no knowledge that anyone in WWE management ever told Dr. Rios not to tell him something about head injuries or concussions, SOF ¶ 132; and he never heard anyone in WWE management tell Dr. Rios not to tell him something about concussions, SOF ¶ 131.  LoGrasso also admitted in his deposition that he knew Dr. Rios to be a good doctor.  SOF ¶ 28.  Indeed, Plaintiffs did not even attempt to depose Dr. Rios.

**CONFIDENTIAL** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ SOF ¶¶ 177-81.

**CONFIDENTIAL** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ SOF ¶ 180.  **CONFIDENTI**

CONFIDENTIAL

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ SOF ¶¶ 182-83.  CONFIDENTIAL

█████████████████████████ *See* App. Tab 62.  CONFIDENTIAL

█████████████████████████████████ however, a Twitter account styled

@MercerWWE tweeted on August 9, 2012 — the same day — "Thank you @WWE

for giving me the background."  SOF ¶ 184.[7] CONFIDENTIAL

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

████████████████████

CONFIDENTIAL

███████████████████████████████████████████

██████████████████████████████ SOF ¶¶ 207-10, 236. CONFIDENTIAL

███████████████████████████████████████████

██████████████████████████ SOF ¶¶ 213-36.

       **b.**    **The "Inherent Contradiction" Underlying Plaintiffs' Fraud
Claims Also Undermines Fraudulent Intent**

---

[7] **Singleton performed as "Adam Mercer" in FCW/NXT, WWE's developmental
program.  SOF ¶ 148.  Although he now denies using that Twitter account, it
includes photographs and personal information of him such that it can be
authenticated despite his denial.  *See, e.g., U.S. v. Encarnacion-LaFontaine*, No.
15-1223, 2016 WL 611925, at \*1-2 (2d Cir. Feb. 16, 2016).**

A plaintiff "cannot show misrepresentation or intent to misrepresent when the alleged fraudulently concealed information was contained in a publicly available document." *Alexander v. Turner Corp.*, No. 00 CIV 4677 HB, 2001 WL 225049, at *5 (S.D.N.Y. Mar. 2, 2001); *see also Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1037 (D.C. Cir. 1980) (reversing district court's conclusion that airline's failure to disclose information to plaintiff "was motivated by deceit and the desire to deprive him of information" because "[t]he practice of overbooking was no secret, no covert operation, but was openly carried on, and Allegheny was entitled to believe that any knowledgeable passenger knew of the practice"); *Bergeron v. Select Comfort Corp.*, No. A-15-CV-00657-LY-ML, 2016 WL 155088, at *7 (W.D. Tex. Jan. 11, 2016) (finding information on "the website created by Defendants . . . negates the required element of a fraudulent concealment claim, that the defendant intentionally concealed the existence of a potential cause of action with the intent to deceive the plaintiff").

As a common sense matter, proving fraudulent intent to omit to tell someone about emerging science that is constantly in the news, and incapable of being concealed, is surely an uphill battle, especially when the burden is to do so by clear, convincing and unequivocal evidence. Plaintiffs have admitted the pervasive media coverage of the reported CTE diagnosis of Chris Benoit in 2007, including at least sixty-one media reports in 2007, 2008, 2009, 2010 and 2011 attached to Requests for Admissions. SOF ¶¶ 7-8, 103-12. LoGrasso admitted in his deposition that he was aware of reports of Benoit's CTE diagnosis at the time it was reported in 2007. SOF ¶ 106. It would have been the worst fraud scheme in

history to think that such information could be concealed by or from anybody.

### 3. There Is No Evidence that WWE Omitted "Known Facts"

As the Court noted in its MTD Opinion, fraud by omission requires the omission of "known facts."  Dkt. 116 at 61.  This Court has held in another case that Connecticut courts have long excluded statements of opinion as being the requisite statement of fact to support fraud.  *Trefoil Park, LLC v. Key Holdings, LLC*, No. 3:14-CV-00364 (VLB), 2015 WL 1138542 (D. Conn. 2015).  The Court further noted that Plaintiffs allege "2005 as the year in which the WWE had knowledge of a link between repeated head trauma from concussive blows with permanent degenerative conditions.  Plaintiffs will need to establish a Record upon which a trier of fact could conclude that WWE had knowledge of such a link at that time or at any later time."  Dkt. 116 at 67 n.16.  The Court cautioned that "the development of a factual record may reveal that WWE did not possess or fail to disclose 'known facts' about CTE or other degenerative conditions and whether such conditions could result from participation in WWE wrestling events."  *Id.* at 68.  Once more, this is precisely what has occurred.

### a. There Is No Evidence that WWE Omitted "Known Facts" from LoGrasso

The pled basis for Plaintiffs' key allegation "that WWE was aware 'in 2005 and beyond' that wrestling for the WWE and suffering head trauma 'would result in long-term injuries'" was based on supposed knowledge of an internet article on the website of the Mayo Clinic.  *Id.* at 9 (citing SAC ¶ 57).  In reality, that article says nothing at all about CTE or degenerative conditions being caused by repetitive head trauma.  SOF ¶ 92.  In discovery, Plaintiffs adduced no evidence

that WWE had knowledge of the Mayo Clinic article or that it even said what they alleged.  SOF ¶¶ 90-92.  Plaintiffs did not even question a witness about it.  SOF ¶ 91.  █CONFIDENTIAL███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████[8]  SOF ¶ 93.

█CONFIDENTIAL████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

SOF ¶¶ 98-99.  █CONFIDENTIAL██████████████████████████

████████████████████████████████████████  media reports about seminal opinions of researchers in an emerging area of science are not the requisite "known fact" upon which a fraud charge can be built in any event.

        **b.**     **The Information that WWE Is Alleged To Have Omitted Does Not Constitute "Known Facts" for Fraud Purposes**

Fraud can only be based on "a material past or present fact."  *Yurevich v. Sikorsky Aircraft Div.*, 51 F. Supp. 2d 144, 152 (D. Conn. 1999); *see also Trefoil Park*, 2015 WL 1138542, at *12 ("[W]here there is no ascertainable statement of fact, there can be no false misrepresentation of that fact."); *MacDermid Printing Solutions, Inc. v. Cortron Corp.*, No. 3:08cv1649, 2014 WL 3943629, at *6 (D. Conn. Aug. 12, 2014).  Previously, this Court recognized that "[f]raudulent statements

---

[8] The 2005 Omalu article could not serve as the alleged basis of a fraud claim for the additional reason that the Omalu article dealt only with the first reported case of CTE in professional football.  The conclusion of the article stated that the prevalence and mechanisms of possible adverse outcomes had not been sufficiently studied and ultimately concluded that the findings did not even confirm a causal link between pro football and CTE, let alone establish a link between professional wrestling and CTE.  *See* Dkt. 150-2.

must be statements of fact and therefore an expression of an opinion or skepticism as to the truth of a matter asserted by another cannot usually support a fraud claim."  Dkt. 116 at 60-61.

As a result of submissions made by WWE in its Local Rule 56(a)(1) Statement, this Court now has before it substantial evidence of the extensive media reports of an alleged association between repetitive head trauma and CTE from 2007 on, but more importantly recent media articles, state of the art actual scientific papers, and the scholarly judicial opinions of the <u>only</u> federal jurists to review the science expressing the view that media reports are well ahead of the true state of the science.[9]

The actual scientific evidence shows that even as late as 2012, the international consensus was that:

> a cause and effect relationship has not as yet been demonstrated between CTE and concussions or exposure to contact sports. . . .  It was further agreed that CTE was not related to concussions alone or simply exposure to contact sports. . . . Owing to the nature of the case reports and pathological case series that have been published, it is not possible to determine the causality or risk factors with any certainty.  <u>As such, the speculation that repeated concussion or subconcussive impacts causes CTE remains unproven</u>.

SOF ¶ 267 (emphasis added).  In 2015, the Honorable Anita Brody, who remains the <u>only</u> federal trial judge to actually review the science, as opposed to the

---

[9] A March 27, 2016 *New York Times* article styled "On C.T.E. and Athletes, Science Remains in its Infancy" is also in the record of this case.  (Dkt. 118 at 10-11 n.9).  That article points out that the American Academy of Clinical Neuropsychology would be putting out a public statement this year that much of the science is still unsettled, and quotes two prominent researchers stating either that the research was still in its infancy or that findings are being put out too fast before certain things about CTE are even understood.

sufficiency of a plaintiff's lawyer's characterizations of that science in a complaint on a motion to dismiss, echoed the 2012 findings in virtually identical language:  (a) "[t]he study of CTE is nascent, and the symptoms of the disease, if any, are unknown;" (b) "the association between repeated concussive trauma and long-term neurocognitive impairment remains unclear;" and (c) "[i]t is not possible to determine the causality or risk factors [for CTE] with any certainty. As such, <u>the speculation that repeated concussion or subconcussive impacts cause CTE remains unproven</u>."  *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. 351, 388, 397-98 (E.D. Pa. 2015) (citations omitted) (emphasis added).

In affirming Judge Brody, the Third Circuit further noted that "surveying the available medical literature, [the district court] found that researchers have not 'reliably determined which events make a person more likely to develop CTE' and 'have not determined what symptoms individuals with CTE typically suffer from while they are alive.'"  *In re NFL Players' Concussion Injury Litig.*, 821 F.3d 410, 441 (3d Cir. 2016).  Thus, the Third Circuit concluded "we still cannot reliably determine the prevalence, symptoms, or risk factors of CTE."  *Id.* at 443.  Also in 2015, the National Institute of Health reported "it is not yet possible to correlate clinical symptoms or future brain health with the signature pathologic feature of CTE" (SOF ¶ 270), and the Department of Defense reported "the evidence does not allow for a conclusive determination of whether exposure to head injury is sufficient and causative in the development of CTE."  SOF ¶ 269.

If WWE had put out press statements, or told its talent that an international consensus of scientists, and a federal judge who evaluated the evidence, had

21

both found that it was unproven speculation to say that repeated concussive or subconcussive blows caused CTE, surely it could not be accused of fraud and forced to defend such a truthful statement because some plaintiff's lawyer characterizes that as downplaying the science.  And what WWE supposedly said that has been questioned in this lawsuit, without any basis, comes nowhere near such a statement.

To be sure, as this science has emerged, there are some scientists who proclaim that their opinions are certain truths, while others will disagree or be more circumspect.  Media reports will sensationalize the subject, and get it wrong.  Leading researchers have recently cautioned that "CTE research has a particular ability to be misunderstood by the lay public and sensationalized in the media."  SOF ¶ 268.  The legal point, however, is that science determined to be nascent and unproven speculation by scientific consensus in 2012 and by one federal Circuit in 2015 cannot credibly have been a "known fact" years ago in another Circuit upon which to base a serious charge of omission fraud.

This plainly is not the stuff of fraud.  As a matter of law, the alleged failure of an entertainment company to publicize nascent and evolving scientific opinions of third parties is not a misrepresentation of a past or present known fact. CONFIDENTIAL

### 4.    There Is No Evidence That Plaintiffs Detrimentally Relied On Any Omission by WWE

#### a.    No Detrimental Reliance Based on the "Inherent Contradiction" Underlying Plaintiffs' Fraud Claims

The wide-spread publicity about CTE generally and Benoit specifically not only negates fraudulent intent, but also any notion of detrimental reliance.  In its MTD Opinion, the Court observed that "Plaintiffs' 281-paragraph 'kitchen sink' Complaints certainly seem to present contradictory claims that could make reliance upon non-disclosure of 'known facts' difficult to prove" and "[t]he fact that some or all of the material known facts alleged to have been non-disclosed are within the public domain could undermine Plaintiffs' claim to detrimental reliance, at the very least."  Dkt. 116 at 67-68.  The Court was correct.

A plaintiff "cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth" about a matter.  *Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir. 2006).  "Put another way, if the plaintiff 'has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.'"  *Id.* at 235 (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)); *Republic Bank & Trust Co. v. Bear, Stearns & Co.*, 707 F. Supp. 2d 702, 710 (W.D. Ky. 2010) ("[I]f a party could have learned of the basis of the fraud, or if he could have uncovered it 'by ordinary vigilance and attention,' his failure to do so deprives him of a remedy.") (citations omitted);

*Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1229 (S.D.N.Y. 1995) (dismissing fraud claim where plaintiff relied on a color transparency that "was readily available, in the public domain, and plaintiff did not reasonably rely on or ascertain the existence and content of the letter").

        This principle has been applied to dismiss fraud claims based on widely known health hazards. *See Jefferson v. Lead Indus. Ass'n,* 106 F.3d 1245, 1254 (5th Cir. 1997) ("[I]t would appear impossible for the injured plaintiff to allege that she ingested the lead pigment in justifiable reliance on the asserted misrepresentations of defendants since . . . the dangers of lead pigment were so publicly known that it was banned by law for residential use 20 years before her birth."); *New Jersey Carpenters Health Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 324, 334 n.13 (D.N.J. 1998) ("[T]his court finds it difficult, if not impossible, to imagine how the Funds will survive a motion for summary judgment with respect to justifiable reliance.  The reasonableness of the Funds' reliance will obviously be evaluated in light of the widely available information regarding the dangers of nicotine and tobacco.  The Funds themselves note the published studies dating back to the 1950s that associated smoking with lung cancer."); *City of Philadelphia v. Lead Indus. Ass'n*, No. 90-7064, 1992 WL 98482, at *5-6 (E.D. Pa. Apr. 23, 1992) ("[I]f the ill effects of lead-based paint were essentially public knowledge, then it cannot be said that plaintiffs <u>relied</u> upon defendants counter-representations in purchasing lead paint.") (emphasis in original).

        These decisions are equally applicable here.  In light of Plaintiffs' admissions of the existence of widespread publicly-available information, and

their deemed admissions that they were aware of the media reports, there is no fact issue as to whether Plaintiffs could have discovered such information through reasonable inquiry.  SOF ¶¶ 7-8, 103-12.  Apart from his deemed admissions, LoGrasso actually admitted he knew all about the news stories that Benoit had CTE reportedly caused by head trauma after his relationship with WWE ended and that it was a huge story.  SOF ¶¶ 103-06.  It is, therefore, conclusively established that LoGrasso had actual knowledge that repetitive head trauma in wresting had been associated in media stories with CTE.  Moreover, nothing said or done by WWE after LoGrasso departed can be said to have been detrimentally relied upon by him to continue performing for WWE and, as noted, he admitted he never heard or read any of the things WWE said after he left which were alleged to have been fraud.  The evidence also shows that he personally witnessed the potential consequences of head trauma having watched a famous match in 1999 involving Bret Hart where Hart's career ended due to a concussion from a kick to the head.  SOF ¶¶ 55-59.  After that, while performing for other promotions before joining WWE, there is undisputed video evidence of him repeatedly receiving unprotected blows to the head with a metal chair and other objects which he made no attempt to block.  SOF ¶¶ 50-53, 60.  After leaving WWE, he admittedly learned that his friend, Chris Benoit, reportedly had CTE from head trauma, yet did not speak to his own doctor or quit wrestling, even though he now claims he was symptomatic at that time.  SOF ¶¶ 112-14.

> **b.** **Singleton Was Not Injured By Any Detrimental Reliance On Any Omission By WWE**

Singleton, who had amateur wrestling experience, readily admitted that he

knew there was an inherent risk of injury involved in professional wrestling

CONFIDENTIAL

SOF ¶¶ 139, 141-43. CONFIDENTIAL

SOF ¶¶ 182-83.

CONFIDENTIAL SOF ¶ 184.  Before performing in the

September 27, 2012 match, he admits being told by WWE's doctors that if he ever

received a concussion, he would not be allowed to perform until all his symptoms

cleared.  SOF ¶¶ 198-99.  Singleton admitted his only head injury occurred in the

match with Erick Rowan on September 27, 2012.  SOF ¶¶ 200-01.  Singleton was

injured while performing a "choke slam" maneuver, a common move Singleton

fully expected to perform when he signed up to be a professional wrestler.  SOF

¶¶ 161-63.  Singleton previously executed a choke slam in a match with Erick

Rowan on June 17, 2012.  SOF ¶ 160.  Singleton knew in advance that the choke

slam move was going to be done to him.  SOF ¶ 164.  Singleton was told before

executing the move that he would get hurt if he did not tuck his chin when getting

the choke slam.  SOF ¶¶ 159, 163.  When executing the move in the match on

September 27, 2012, Singleton failed to tuck his head when performing the choke

slam and therefore his head hit the mat which Singleton claims caused his head

injury.  SOF ¶¶ 159, 161, 163.

Other than the September 27, 2012 incident, Singleton admits he did not

report any other head injury to WWE doctors or trainers.  SOF ¶ 200.  CON

NTIA

<span style="background:black;color:white">CONFIDENTIAL</span>   SOF ¶¶ 210, 236, 247.  Singleton's counsel has admitted to this Court that Singleton never again performed after his match on September 27, 2012.  *See Singleton* Dkt. 73 at 57 ("Singleton does present unique facts in the nature of how his injury occurred and I do believe that you're right Your Honor, that Singleton's case . . . is distinct because the injury alleged is—is more in line with a single incident, single event.").

<span style="background:black;color:white">CONFIDENTIAL</span>

████████████████████████████████████████████

████████████████████████████████████████████

SOF ¶¶ 159, 213-35.  He admitted he has no fear of getting CTE and has never been told he should fear getting CTE.  SOF ¶¶ 249-50.  In sum, Singleton's only injury was a concussion caused by his own failure to execute a move correctly, which was well within the risk he assumed.

      **c.**    **There Is Not Clear and Convincing Evidence That LoGrasso's Alleged Injuries Were Caused By Detrimentally Relying On Any Omission By WWE**

"[T]o recover for fraud, as for all torts generally, a plaintiff must allege injury that is the direct and proximate result of the alleged misconduct."  *Chanoff v. U.S. Surgical Corp.*, 857 F. Supp. 1011, 1017 (D. Conn. 1994); *Kilduff v. Adams, Inc.*, 219 Conn. 314, 323-24 (1991) ("The damages to be recovered in an action of this character are such as are the natural and proximate consequence of the fraudulent representation complained of . . . .").  "[P]roximate cause is more than 'but for' causation.  In addition to showing that but for defendant's alleged misrepresentations plaintiff would not have suffered his asserted damages,

plaintiffs must also show that the misstatements were the reason plaintiff suffered these damages." *Law v. Camp*, 116 F. Supp. 2d 295, 308 (D. Conn. 2000).

A plaintiff cannot establish that a failure to warn proximately caused their alleged injury when the warning would not have altered their behavior. *See Haesche v. Kissner*, 229 Conn. 213, 218-22 (1994). The alleged misrepresentation or omission must <u>precede</u> the harm in order for the plaintiff to assert a fraud claim. Courts, therefore, have rejected fraud claims where a plaintiff has failed to establish that "an adequate warning would have prevented his injuries." *Danise v. Safety-Kleen Corp.*, 17 F. Supp. 2d 87, 97 (D. Conn. 1998) ("The absence of reliance on any misrepresentations precludes a finding that the defendant is liable to the plaintiff for his injuries."); *see also Dime Sav. Bank of N.Y., FSB v. Fucetola*, No. CV91286416S, 1994 WL 67054, at *2 (Conn. Super. Feb. 24, 1994) ("Claims of fraudulent misrepresentation or fraud have as a necessary element a requirement that in reliance upon the fraudulent act the injured party takes some action which causes an injury.").

It cannot be proven by clear and convincing evidence that LoGrasso's alleged symptoms were caused by detrimental reliance on an omission by WWE. For LoGrasso to have relied upon any omission in a manner that caused him to suffer long-term neurodegenerative conditions from head injuries at WWE, it by definition had to be made during the time he performed for WWE. He has identified none. Additionally, Plaintiffs' theory is that repetitive blows to the head cause CTE and/or other long-term neurodegenerative diseases. LoGrasso has admitted that while performing for Extreme Championship Wrestling ("ECW"), a

very violent promotion, and World Championship Wrestling ("WCW") before coming to WWE for his run from 2005-2007, he did "hard core" matches, in which the wrestlers used chairs, bats, tables, and garbage cans to hit each other over the head. SOF ¶¶ 50-52. Graphic footage demonstrates that LoGrasso repeatedly received violent blows to the head from such objects while performing in ECW and WCW, and made no attempt to protect himself to enhance his tough guy persona. SOF ¶¶ 53, 60-62. Conversely, LoGrasso admits that he never did a "hard core" match in WWE, nor received any chair shots while performing for WWE. SOF ¶¶ 64-66. When asked in his deposition how he knows that the neurological symptoms he now claims were not caused by blows to the head while performing in ECW and WCW, LoGrasso squarely admitted "[n]obody knows, I don't know." SOF ¶ 63. This admission proves that LoGrasso cannot demonstrate that any of his now alleged injuries were proximately caused by WWE, much less by his detrimental reliance on any fraudulent omission by WWE.

Additionally, he did not stop wrestling even after learning about Benoit in 2007 even though he was supposedly symptomatic. SOF ¶¶ 80-81. As he boldly proclaimed, it was the life he lived, and "nobody on God's green earth" could have made him do it if he did not want to. SOF ¶ 61.

### 5. WWE Neither Had Nor Breached Any Duty of Disclosure to LoGrasso and Did Not Breach Any Duty to Singleton If Such A Duty Existed in 2012

For the preceding reasons, as well as repose issues unique to LoGrasso, there is no material issue of fact on other elements of the fraud claim which are dispositive. But for the reasons which follow, WWE respectfully submits it had

no disclosure duty to LoGrasso.  The species of fraud based on non-disclosure is very narrowly confined to "exceptional circumstances."  *See Creelman*, 152 Conn. at 385.  There is a duty to speak only where (a) there is a confidential or fiduciary relationship between the parties, or (b) a party "assume[s] to speak, he must make a full and fair disclosure as to the matters about which he assumes to speak.  He must then avoid a deliberate nondisclosure."  *Franchey*, 152 Conn. at 378-79.  As to LoGrasso, neither situation applies here.  It is undisputed that WWE did not assume a duty to speak to LoGrasso about long-term neurodegenerative diseases and never said anything to him on that subject.  Therefore, LoGrasso must have evidence which is clear and convincing that there was a confidential relationship between him and WWE in order to create an issue of fact on the duty element. CONFIDENTIAL

Thus, on the evidence, the duty issue is only an issue with respect to LoGrasso.

a.    WWE Did Not Have A Confidential Relationship With LoGrasso

"The existence of a duty is a question of law."  *Iacurci v. Sax*, 313 Conn. 786, 795-96 (2014) (citations omitted).  "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to

represent the interests of the other." *Id.* at 800.  WWE does not fall within the definition of per se fiduciaries recognized by the Connecticut Supreme Court such as agents, partners, lawyers, physicians, directors, trustees, executors, receivers, bailees, and guardians.  The Connecticut Supreme Court has ruled that an arms-length contractual relationship—as existed between the parties here—is not a fiduciary relationship absent extraordinary circumstances.  *See Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38-39 (2000).  Even where a contractual relationship involves a layperson's reliance on a professional's "'superior knowledge, skill, or expertise' in their trade" (*e.g.*, tax preparer), the Connecticut Supreme Court has refused to recognize a fiduciary relationship and cautioned against "unduly extending the scope of fiduciary obligations to all ordinary business relationships."  *Iacurci*, 313 Conn. at 801-02 (holding "aptitude differential, without a corresponding risk of abuse, does not transform [parties'] professional relationship in any special way to warrant the imposition of a fiduciary duty").

CONFIDENTIAL

CONFIDENTIAL

███████████████████████████ **SOF ¶¶ 12-19.** CONFIDENTIA

██████████████████████████████████

██████████████████████████████████

███████████████████████████ **SOF ¶ 20; *see also***

*Miller v. Imaging On Call, LLC*, **No. 3:13-cv-00679, 2015 WL 150287, at \*6 (D. Conn.**

**Jan. 12, 2015) ("The parties had an independent contractor relationship; there**

**was no fiduciary or employment relationship.").** CONFIDENTIAL

██████████████████████████████

In the MTD Opinion, the Court observed "[a]s to the existence of a duty to speak . . . it is plausible at this stage of the litigation that defendant owed plaintiffs a duty on the basis of a special relationship that existed by virtue of WWE's superior knowledge and the expertise of its medical staff . . . ." Dkt. 116 at 65. The Court further noted that "factual development may shed light on the existence or nonexistence of such a duty." *Id.* The undisputed facts developed thereafter on this issue indicate no such duty should be imposed.

<u>First</u>, as to LoGrasso, CONFIDENTIAL

██████████████████████████████████

██████████████████████████████████

███████████████████████ Indeed, Plaintiffs' counsel did not even attempt to depose Dr. Rios. LoGrasso admitted that Dr. Rios was a good doctor and that he had no evidence that he was ever not truthful with him. SOF ¶¶ 28, 131-34. LoGrasso admitted that Dr. Rios was not his

personal physician, and that he had his own physician the whole time.  SOF ¶¶ 27, 29-30.  Thus, at all times, LoGrasso had access to his own personal physician and his specialized knowledge.

**Second**, there is no evidence that Dr. Rios or WWE abused the medical relationship with LoGrasso.  LoGrasso squarely admitted he never reported any head injury to Dr. Rios or WWE management, and therefore neither could have abused the relationship by not providing him information of known facts about repetitive head injuries that might have informed his choice to wrestle.  SOF ¶¶ 32-36, 41, 46, 48.

CONFIDENTIAL

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████ SOF ¶ 89.  In *Sherwood v. Danbury Hosp.* ("*Sherwood II*"), 278 Conn. 163, 196-97 (2006), the admittedly superior knowledge of a hospital about the status of its untested blood supply was deemed insufficient to impose a fiduciary duty upon the hospital to tell a patient, who subsequently contracted HIV, about that status.  In doing so, the Connecticut Supreme Court emphasized that unlike professional negligence claims, which implicate a duty of care, a breach of fiduciary duty implicates a duty of loyalty and honesty.  *See Sherwood*, 278 Conn. at 196.  If no such duty can be imposed on a health care provider with superior knowledge (like the hospital), there can be no duty placed on a non-health care provider (like WWE) that indisputably does not have superior knowledge.

**b.   WWE Had No Duty to LoGrasso after Their Relationship Ended**

Connecticut law does not impose on a non-health care provider an obligation to warn persons with whom it has no continuing relationship of new scientific opinions regarding potential medical conditions such persons might develop.  There is no such duty even on health care providers when those providers are not aware of any misdiagnosis and there is no ongoing relationship.  *See Neuhaus v. DeCholnoky*, 280 Conn. 190, 205 (2006); *Golden v. Johnson Mem'l Hosp.,* 66 Conn. App. 518, 529 (2001).  In contrast to "product liability situations where a continuing duty to warn may emanate from a defect, without proof that the manufacturer actually knew of the defect," the Connecticut Supreme Court has ruled that a physician who has performed a misdiagnosis does not have a continuing duty to correct that diagnosis in the absence of proof of actual knowledge that the diagnosis was wrong.  *See Neuhaus*, 280 Conn. at 203-04.  For example, in *Golden,* the court held there was no duty to provide follow-up treatment or instructions after a negative diagnosis when the health care provider had no awareness that the diagnosis was wrong and there was no ongoing relationship, even though the original diagnosis was wrong.  *See Golden*, 66 Conn. App. at 529.

Here, there was no misdiagnosis by Dr. Rios and LoGrasso admits he never told Dr. Rios or WWE management that he ever had a head injury.  SOF ¶¶ 32-36, 41, 46, 48.  Even if there were evidence of a misdiagnosis, there is no evidence that Dr. Rios or WWE was aware of it and no evidence of an ongoing relationship.  If a health care provider would have no continuing duty under such

circumstances, it would be inconsistent to impose a continuing duty on WWE.

## C.   LoGrasso's Claim Is Time-Barred

This Court has already ruled that the fraud claim is subject to C.G.S. § 52-577, which "allows a tort action to be brought within three years 'from the date of the act or omission complained of.'"  Dkt. 116 at 34.  In language especially apt to delayed manifestation claims, such as long-term neurodegenerative diseases, "act or omission" has been construed to mean the date when the tortious conduct of defendant occurs and not the date when plaintiff first sustains damage.  *Blanchette v. Barrett,* 229 Conn. 256, 265 (1994).  Thus, Section 52-577 sets a fixed limit after which the tortfeasor will not be held liable and operates in some cases to bar an action before it even accrues.  *LaBow v. Rubin*, 95 Conn. App. 454, 468 (2006) (citations omitted).  Statutes of repose "should be respected in all but the most 'exceptional circumstances.'"  *Neuhaus*, 280 Conn. at 207.  Such "exceptional circumstances" may require plaintiffs to have "smoking gun" evidence to invoke the continuous course of conduct tolling exception relied upon here.  *Martinelli*, 290 Conn. at 364 n.12.

### 1.   LoGrasso's Discovery of His Injury Precludes Continuing Course of Conduct and Fraudulent Concealment Tolling

LoGrasso's admissions that he discovered some form of harm by, at the earliest 2006 and the latest by 2008, precludes continuing course of conduct and fraudulent concealment tolling.  SOF ¶¶ 67-70.  In *Rosato v. Mascardo*, the Court of Appeals held that "the continuing course of conduct doctrine has no application after the plaintiff has discovered the harm."  *Rosato*, 82 Conn. App. 396, 405 (2004).  "Actionable harm occurs when the plaintiff discovers or should

discover, through the exercise of reasonable care, that he or she has been injured and that the defendant's conduct caused such injury. . . . The focus is on the plaintiff's knowledge of facts, rather than on discovery of applicable legal theories." *Mountaindale Condo. Ass'n v. Zappone*, 59 Conn. App. 311, 323 (2000); *Hubbard-Hall, Inc. v. Monsanto Co., Inc.,* 98 F. Supp. 3d 480, 492 (D. Conn. 2015) (actionable harm is not harm which has reached its fullest manifestation; it is notice of facts reasonably indicating legal injury, not certitude of harm). Courts in this District have echoed *Rosato*'s holding and made clear that "the continuing course of conduct doctrine may not be invoked merely because plaintiff has yet to discover the full scope of harm." *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc.*, No. 3:10-cv-01539, 2014 WL 7270160, at *15 (D. Conn. Dec. 18, 2014); *see also Ride, Inc. v. APS Tech., Inc.*, 11 F. Supp. 3d 169, 187 (D. Conn. 2014) ("The harm done need not have been known in its entirety to foreclose the applicability of this doctrine.").

Such knowledge of some form of harm likewise precludes fraudulent concealment tolling. *Martinelli*, 196 F.3d at 427 ("Although § 52-595 does not explicitly say so, it clearly implies that plaintiff's ignorance of the facts is a necessary element of tolling under that statute."); *Holliday v. Ludgin*, No. CV085023554, 2009 WL 3838915, at *3-4 (Conn. Super. Oct. 16, 2009) ("Fraudulent concealment can exist only if the plaintiff lacked the requisite knowledge pertinent to its cause of action . . . Thus, a court will not toll the statute of limitations to the extent the plaintiff had actual knowledge of the defendant's wrongdoing and its own injury when they happened, and yet failed to file suit

36

before the limitations period expired.") (citations omitted); *Campbell v. Town of Plymouth,* No. CV00501061, 2001 WL 752718, at *4 (Conn. Super. June 6, 2001) ("The doctrine of fraudulent concealment cannot be used by a plaintiff to toll a statute of limitations 'when the plaintiff discovers some form of actionable harm.'") (citations omitted); *AT Engine Controls,* 2014 WL 7270160, at *15 (noting that concealing the fact of damage may be grounds for tolling but the extent of damage is not).

In its MTD Opinion, the Court observed that pled admissions "raise the question whether LoGrasso, by admitting that he began experiencing residual headaches well after he retired in 2008 which worsened in 2009 and 2010, has essentially admitted that he discovered or should have discovered 'some injury' that is the basis for his present claim." Dkt. 116 at 31. n.5. LoGrasso's admissions in discovery further cemented that his tolling attempts fail. Although LoGrasso in the SAC claimed that "[b]y 2008, [he] was showing symptoms of neurological injury in the form of residual pounding headaches" (SOF ¶ 68), in interrogatories he claimed that his alleged "symptoms have been chronic since the time of their inception in approximately 2007," which is even earlier. SOF ¶ 69. Then, in his deposition, LoGrasso went even further and claimed that his symptoms including headaches started in response to a head injury in a specific October 10, 2006 WWE match when his head supposedly hit the steel steps. SOF ¶¶ 47, 70. Although he was forced to admit later that his head never actually hit the steps, he refused to recant any of his own testimony about that match, including that the onset of his symptoms started in direct response to head

trauma in that specific WWE match in October of 2006.  *Id.*  He testified:

> That's when they started, that's — after I got hit, after I hit my head in that match, that's when my headaches became — I didn't understand why I was getting them, and that's when things changed for me and my health changed with my head.

*Id.*  The key point is that these alleged symptoms of neurological injury, which he claimed were chronic since their inception in interrogatory responses, started over a decade ago and are the exact same injuries that LoGrasso is claiming in this case.  He cannot therefore invoke continuing course of conduct tolling under *Rosato* or fraudulent concealment under *Martinelli*.[10]

> **2.    LoGrasso Cannot Invoke Continuing Course of Conduct Tolling for Other Reasons**

In addition to being precluded by *Rosato*, there is no issue of fact as to whether WWE (1) committed an initial wrong upon LoGrasso; (2) owed a continuing duty to him that was related to the original wrong; and (3) continually breached that duty.  *Witt v. St. Vincent's Med. Center,* 252 Conn. 363, 370 (2000).  Where the Connecticut Supreme Court has found "a duty continued to exist after

---

[10] In its MTD Opinion, the Court also noted that tolling cannot apply if "Plaintiffs should have reasonably become aware of their causes of action" based on widespread and widely-publicized reports linking traumatic brain injuries with permanent degenerative neurological conditions.  Dkt. 116 at 32.  LoGrasso's deemed and actual admissions further establish his discovery of that form of harm also.  Courts in this District have used deemed admissions under Rule 36(a)(3) in finding that a plaintiff had discovered harm to preclude such tolling.  S*ee In re Bak*, 2013 WL 653073, at *11 (Bankr. D. Conn. Feb. 20, 2013).  LoGrasso is deemed to have admitted that at least sixty-one media reports in 2007, 2008, 2009, 2010 and 2011 reported that Chris Benoit had CTE caused by head trauma sustained while wrestling.  SOF ¶¶ 7-8.  These deemed admissions, plus his testimonial admissions, conclusively establish that by 2007 LoGrasso had knowledge of an increased risk of harm, in the form of long-term neurological diseases even if that is viewed as his "injury".

the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Neuhaus,* 280 Conn. at 201.  When there is no ongoing relationship between the parties, as is the case here, the "later wrongful conduct" must occur before the applicable limitations period otherwise would have expired.  *See Flannery v. Singer Asset Finance Co.,* 312 Conn. 286, 309 (2014).  Thus, LoGrasso would also have to show both an initial wrong during his 2005-2007 tenure and "later wrongful conduct" by 2010, three years following his release from WWE in 2007. He cannot for several reasons.

<u>First</u>, there was no initial wrong.  "[A] precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff."  *Haas v. Haas,* 137 Conn. App. 424, 433 (2012) (citation omitted).  LoGrasso never reported a head injury to anybody at WWE,

CONFIDENTIAL ████████████████████████████████████████████

████████████████████████████████████████████ **SOF ¶¶ 32-**
36, 41, 46, 48, 98.  They could not have failed to tell him something that had not even been reported yet.

In its Memorandum of Decision on WWE's Motion for Reconsideration, the Court observed that *Sherwood I* and *II* required a hospital that had actual knowledge "of a specific risk to the plaintiff" to have committed an initial wrong to satisfy the tolling standard.  Dkt. 185 at 15.  In making that observation, the Court specifically noted "[i]n *Sherwood,* as alleged here, the duty arose based on

a known risk to an identifiable group of individuals.  In *Sherwood*, the court held that the defendants had a duty to disclose a known risk of HIV exposure to patients who defendants infused with untested blood."  *Id.* at 16.  That aspect of the Court's analysis is no doubt derived from *Sherwood I*.

*Sherwood II*, however, gave guidance which will govern at this phase of the proceedings.  In *Sherwood II*, the Connecticut Supreme Court described *Sherwood I* as holding that a genuine issue of material fact existed with respect to whether the defendant had committed an initial wrong upon the plaintiff by its allegedly negligent failure to inform the plaintiff of the status of its blood supply based on <u>the allegations of the plaintiff's complaint</u> "that the defendant knowingly had administered untested blood to the plaintiff even though tested blood was available and that the defendant had failed to advise the plaintiff of that fact."  *Sherwood*, 278 Conn. at 189.  The Connecticut Supreme Court further noted that it "treated that allegation as undisputed" in *Sherwood I* and noted that the hospital defendant had conceded that, under that pled factual scenario, it would have had a duty to inform the plaintiff that the blood with which she was transfused had not been screened because its knowledge of the status of its blood supply would have been superior to that of the treating physician.  *Id.* at 189-90.  In *Sherwood II*, however, the Court found that additional discovery after remand had "established, and the plaintiff does not dispute, that the defendant did not know, and could not have known, which units of blood in its blood bank's inventory had been screened for the presence of HIV antibodies and which units had not been so screened and, therefore, did not knowingly provide the plaintiff

with unscreened blood." *Id.* at 190.  Thus, "the factual allegation that had provided the basis for our statement in *Sherwood [I]* regarding the existence of an initial duty was no longer operative." *Id.*[11]  Indeed, after the lack of knowledge was established factually, there was no further attempt to rely on the continuing course of conduct tolling doctrine in *Sherwood II*, which dismissed all claims on the merits.  Significantly, the court rejected a companion claim that the hospital had a fiduciary duty to warn because of its superior knowledge of the status of the blood supply.  *Id.* at 196-97.  In doing so, the court noted that all of the cases applying fiduciary principles involved only fraud, self-dealing or conflict of interest, and drew a distinction between the duty of care attendant to negligence concepts and fiduciary claims that involve duties of loyalty and honesty.  *Id.*

As in *Sherwood II*, the evidence developed through discovery here has negated LoGrasso's assertion that WWE <u>knowingly</u> and fraudulently omitted to provide him information linking repetitive head trauma to CTE as it is undisputed that (a) CONFIDENTIAL ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ and (b) LoGrasso did not seek or receive medical treatment for any head injury while performing for WWE.[12]

---

[11] The Connecticut Supreme Court further noted that "to the extent our language in [*Sherwood I*] may suggest that a hospital blood bank has a broader duty to patients of the hospital than the duty we have identified in [*Sherwood II*], we expressly disavow any such suggestion."  *Sherwood*, 278 Conn. at 190 n. 22.

[12] Having found no preoperative duty on the hospital to inform the plaintiff of the risks of her transfusion, *Sherwood II* also declined to impose a duty on the hospital to inform of the same risks after the surgery, noting it would be bizarre to say the hospital had no duty to inform the plaintiff at a point in time where she

**Second**, after his contract ended, there was no continuing relationship with WWE or its medical staff, let alone a special one.  SOF ¶¶ 36, 71-76.  The misdirection used by Plaintiffs' counsel at the pleading phase suggesting that WWE's Wellness Program somehow dealt with LoGrasso thereafter was demolished as soon as evidence was taken.  LoGrasso readily admitted he has received no medical treatment from the Wellness Program after termination.CON

███████████████████████████████████████████████████████████████ NT

███████████████████████████████████

**Third**, there is no evidence of any later wrongful conduct towards LoGrasso by WWE related to a prior wrongful act towards him, and certainly none by 2010 which must be the case.  As noted, LoGrasso did not receive any medical treatment from or as a result of WWE's Talent Wellness Program after his tenure with WWE.  SOF ¶¶ 36, 72-73.  Nor did he have any communications with WWE about symptoms of head injuries after he last performed for WWE in 2007.  SOF ¶ 71.  CONFIDENTIAL ███████████████████████████████████████████

███████████████████████████████████████  SOF ¶ 78.  The only written communication LoGrasso has received from WWE since he left WWE is annual letters sent to all former talent in which WWE offers to pay for any talent that has a drug or alcohol problem to go to an approved rehabilitation program,

---

could have avoided the risks altogether, but to impose it after the transfusion when the plaintiff "could do no more than mitigate any harm caused by the transfusion."  *Sherwood,* 278 Conn. at 182. n.17.  The same principle applies here. A post-termination warning to LoGrasso would not have prevented any harm, as CTE is a progressive neurological disease with no known cure.  Thus, imposing such a duty would serve only to use warning theories to defeat repose, which the Connecticut Supreme Court has cautioned against.  *Neuhaus*, 280 Conn. at 207.

CONFIDENTIAL

███████████ **SOF ¶¶ 75-76.  Accordingly, the evidence is undisputed that WWE has had no relationship with LoGrasso in the nearly ten years since he was released in 2007, and that not a syllable was spoken with, to, or by him regarding head trauma or any symptoms he was experiencing.**

**Although no medical malpractice claim has ever been asserted against WWE or any of its contracted doctors, even under the standard applicable to medical care providers, WWE respectfully submits it had no continuing duty to warn LoGrasso.  In its MTD Opinion, the Court agreed that the Connecticut Supreme Court's decision in *Witt*, as subsequently clarified in *Neuhaus*, "stands for the proposition that a continuing duty arises when the medical care provider has reason to suspect that further treatment is needed <u>at the time of treatment</u>; and not for the proposition that once treatment is provided a medical care provider has a duty to advise a patient in perpetuity about medical discoveries, risks and treatment for any possible condition that a patient might reasonably develop."  Dkt. 116 at 38 (emphasis added).  The Court also characterized *Neuhaus* as holding that "because there was no evidence that the doctor was ever confronted with <u>actual knowledge</u> that the child's treatment at the hospital 'had been mishandled' or became 'aware that his original assessment . . . may have been incorrect,' the hospital did not have a continuing duty to warn."  *Id.* at 37 (emphasis added).   Thus, the imposition of a continuing duty to warn, even on a physician, "must rest on the factual bedrock of actual knowledge," of an identified medical condition and subjective knowledge by the physician "that**

further treatment or monitoring was required." *Martinelli*, 290 Conn. at 359, 361. To impose a continuing duty to warn "regardless of the actual knowledge possessed by the defendant, effectively would nullify" the statute of repose contrary to legislative intent. *Neuhaus*, 280 Conn. at 206-07. This "heightened 'actual knowledge' requirement" is exactly why the Connecticut Supreme Court has observed that its decision may "require a plaintiff to find evidence of the proverbial 'smoking gun' in order to prevail under the continuing course of conduct doctrine." *Martinelli*, 290 Conn at 360, 364 n.12.

Under this standard, there is no evidence to support application of this tolling doctrine. Since LoGrasso never sought or received treatment for a head injury while performing for WWE, there could not have been actual knowledge "at the time of treatment" that LoGrasso had sustained any head injury which required "further treatment or monitoring." SOF ¶¶ 32-36, 41, 46, 48. Connecticut law rejects imposing a continuing duty on a medical provider even in the context of a misdiagnosis "when there is no awareness that the diagnosis is wrong" and no continuing relationship. *See Golden*, 66 Conn. App. at 529. By definition, therefore, a continuing duty cannot be imposed when there never even was a diagnosis or treatment in the first place.

In sum, invocation of continuing course of conduct tolling here would impose an even broader duty than the Connecticut Supreme Court has previously rejected: an entertainment company (and not a physician) with no actual knowledge of any reported head trauma and no subjective concern that LoGrasso was in need of further treatment would be held to have a continuing duty to

44

inform him of third-party opinions in emerging medical science concerning a potential generalized risk without any reason to believe it specifically affected him. And in the process, the strong policies of repose would be defeated by warning theories, which the Connecticut Supreme Court has cautioned against.

### 3.   Fraudulent Concealment Is Not An Available Tolling Mechanism

Like substantive fraud, fraudulent concealment must be proven by clear and convincing evidence when used as a tolling mechanism. *See Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105 (2007). As demonstrated, LoGrasso had actual knowledge of his injury when it happened and discovered actionable harm as early as 2006 and not later than 2008. SOF ¶¶ 47, 67-70. On that ground alone, he cannot utilize § 52-595 to defeat repose.

Additionally, just as he admitted he was not accusing WWE of substantive fraud, he disavowed that WWE prevented him from acting on his alleged injuries.

> Q.   In the years 2008 to 2013, do you contend WWE did anything to prevent you from discovering the cause of your injuries?
> Mr. Sciolla:  Objection. Calls for speculation, legal conclusion.
> A:   Did they do anything to prevent me?
> Q.   Yeah, from discovering the cause of your injuries in the years 2008 to 2013.
> A.   No.

SOF ¶ 115. These admissions prove that WWE did nothing for the purpose of delaying LoGrasso from filing suit. *See Connell v. Colwell*, 214 Conn. 242, 251 (1990) (pointing out that the action of the defendant said to be fraudulent concealment "must be directed to the very point of obtaining the delay of which he afterward seeks to take advantage by pleading the statute."); *Maslak v. Maslak*, No. LLICV126006437, 2013 WL 5663798, at *5 (Conn. Super. Sept. 27, 2013) (plaintiff relying on fraudulent concealment tolling "must show he was prejudiced

by a deceptive act of the defendant that kept him from filing his action"). Moreover, fraudulent concealment must be based on independent acts of concealment distinct from the alleged underlying fraud.  *See World Wrestling Entm't, Inc. v. THQ, Inc.*, No. X05CV065002512S, 2008 WL 4307568, at *11 (Conn. Super. Aug. 29, 2008) ("If the initial fraudulent acts were sufficient to activate Section 52-595, all fraud cases would fall outside the purview of Section 52-577, a situation which is not the law in Connecticut.").  No such evidence exists here.

Finally, as this Court noted previously, "a plaintiff must show that due diligence 'did not lead, and could not have led, to discovery' of the cause of action."  Dkt. 116 at 44 (citing *Martinelli v. Bridgeport Roman Catholic Dioceses*, 196 F.3d 409, 427 (2d Cir. 1999)).  Reasonable diligence is typically proven by showing either (1) the circumstances were such that a reasonable person would not have thought to investigate, or (2) plaintiff's attempted investigation was thwarted.  *Id.* at 44-45.  LoGrasso admitted that he did nothing between 2008 and 2013 to determine the cause of the symptoms he now claims and, as noted, WWE did nothing to thwart him from doing so.  SOF ¶¶ 114-17.

## IV.   CONCLUSION

For all of the foregoing reasons, WWE is entitled to summary judgment on Plaintiffs' sole remaining claim for fraud by omission.

<div style="margin-left:40%">

DEFENDANT WORLD WRESTLING
ENTERTAINMENT, INC.,

By:   /s/ Jerry S. McDevitt
Jerry S. McDevitt (pro hac vice)
Terry Budd (pro hac vice)
Curtis B. Krasik (pro hac vice)
K&L GATES LLP

</div>

**K&L Gates Center**
**210 Sixth Avenue**
**Pittsburgh, PA 15222**
**Phone: (412) 355-6500**
**Fax: (412) 355-6501**
**Email: jerry.mcdevitt@klgates.com**
**Email: terry.budd@klgates.com**
**Email: curtis.krasik@klgates.com**


**Thomas D. Goldberg (ct04386)**
**Jonathan B. Tropp (ct11295)**
**Jeffrey P. Mueller (ct27870)**
**DAY PITNEY LLP**
**242 Trumbull Street**
**Hartford, CT 06103**
**Phone: (860) 275-0100**
**Fax: (860) 275-0343**
**Email: tgoldberg@daypitney.com**
**Email: jbtropp@daypitney.com**
**Email: jmueller@daypitney.com**

**Its Attorneys.**

## CERTIFICATION OF SERVICE

I hereby certify that, on August 1, 2016, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 */s/ Jeffrey P. Mueller*         
**Jeffrey P. Mueller (ct27870)**