# App. Tab 4

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT
--------------------------------x
RUSS MCCULLOUGH, et al.,

       Plaintiff,

       vs.               No. 3:15-cv-01074 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,


       Defendant.
--------------------------------x
EVAN SINGLETON and VITO LOGRASSO,

       Plaintiffs,

       vs.               No. 3:15-cv-00425 (VLB)

WORLD WRESTLING ENTERTAINMENT, INC.,


       Defendant.
--------------------------------x



VIDEOTAPED DEPOSITION OF VITO LOGRASSO

Philadelphia, Pennsylvania

May 18, 2016

9:35 a.m.



Reported by:
Jennifer Ocampo-Guzman, CRR, CLR
JOB NO. 44300

2

```
 1
 2
 3
 4
 5
 6
 7
 8                    May 18, 2016
 9                    9:35 a.m.
10
11          Videotaped Deposition of VITO
12   LOGRASSO, held at the offices of
13   Kleinbard, LLC, 1650 Market Street,
14   Philadelphia, Pennsylvania, pursuant to
15   notice, before Jennifer Ocampo-Guzman,
16   a Certified Real-Time Shorthand
17   Reporter and Notary Public of the
18   Commonwealth of Pennsylvania.
19
20
21
22
23
24
25
```

3

```
 1       A P P E A R A N C E S :
 2
 3
 4     Attorneys for Plaintiff Vito LoGrasso
 5        POGUST BRASLOW MILLROOD, LLC
 6        Eight Tower Bridge
 7        161 Washington St., Suite 1520
 8        Conshohocken, Pennsylvania 19428
 9        BY:  ANDREW J. SCIOLLA, ESQ.
10           asciolla@pbmattorneys.com
11
12
13     Attorneys for Plaintiff Vito LoGrasso
14        KYROS LAW OFFICES
15        17 Miles Road
16        Hingham, Massachusetts 02043
17        BY:  KONSTANTINE W. KYROS, ESQ.
18           kon@kyroslaw.com
19           ANTHONY NORRIS, ESQ.
20
21
22
23
24
25
```

4

```
 1     A P P E A R A N C E S (Cont.d):
 2
 3
 4     Attorneys for Defendant
 5        K&L GATES, LLP
 6        210 Sixth Avenue
 7        Pittsburgh, Pennsylvania 15222
 8        BY:  JERRY McDEVITT, ESQ.
 9           jerry.mcdevitt@klgates.com
10           STEFANIE M. LACY, ESQ.
11           stefanie.lacy@klgates.com
12
13
14     ALSO PRESENT:
15        JOSEPH WILLS, Videographer
16
17
18
19
20
21
22
23
24
25
```

5

```
 1          THE VIDEOGRAPHER:  We are now on
 2   the record.
 3          My name is Joseph Wills, the
 4   videographer obtained by David Feldman
 5   Worldwide.  This is a video deposition
 6   for the United States District Court for
 7   the District of Connecticut.  Today's
 8   date is May 18, 2016, and the video time
 9   is 9:35 a.m.
10          This deposition is being held at
11   1650 Market Street, Philadelphia,
12   Pennsylvania, in the matters of
13   McCullough, et al., versus World
14   Wrestling Entertainment Incorporated and
15   Singleton and LoGrasso versus World
16   Wrestling Entertainment Incorporated.
17   The deponent is Vito LoGrasso.
18          Will all counsel please identify
19   themselves.
20          MR. SCIOLLA:  Andrew Sciolla from
21   Pogust Braslow Millrood, on behalf the
22   plaintiff, Vito LoGrasso.
23          MR. KYROS:  Konstantine Kyros,
24   Kyros Law Offices, for the plaintiff,
25   Vito LoGrasso.
```

2 (Pages 2 to 5)

**Page 6**

1      MR. NORRIS:  Anthony Norris, Kyros
2  Law Offices, for the plaintiff.
3      MR. McDEVITT:  Jerry McDevitt for
4  WWE.
5      MS. LACY:  Stefanie Lacy for WWE.
6  V I T O   J.   L O G R A S S O,  called
7  as a witness, having been duly sworn, was
8  examined and testified as follows:
9  EXAMINATION BY
10 MR. McDEVITT:
11     Q.  Would you state your name for the
12 record, please?
13     A.  Veto J. LoGrasso.
14     Q.  Have you ever testified under oath
15 before?
16     A.  No, sir.
17     Q.  Do you understand the oath you've
18 just taken?
19     A.  Yes, sir.
20     Q.  And you understand it obligates you
21 to tell the truth, even if telling the truth
22 is against your interest?
23     A.  Yes.
24     Q.  And even if the truth is contrary
25 to what you said in court pleadings?

**Page 7**

1      A.  Yes, sir.
2  ███████████████████████
3  ███████████████████████
4  ███████████████████████
5  ███████████████████████
6  ████████████
7      Q.  Do you own that property?
8      A.  No, I do not.  My wife does.
9      Q.  How long have you lived there?
10     A.  Two years, I think.
11     Q.  Does anybody else live there
12 besides you and your wife?
13     A.  No, just us.
14     Q.  What is your wife's name?
15     A.  Becca, B-E-C-A -- C-C-A.
16     Q.  What was her maiden name?
17     A.  Ford.
18     Q.  And am I correct, she was also a
19 previous performer in the wrestling business?
20     A.  Yes, sir.
21     Q.  But not with WWE, correct?
22     A.  No.
23     Q.  She was with WCW?
24     A.  No.
25     Q.  Who did she perform for?

**Page 8**

1      A.  She was more of an indie wrestler.
2      Q.  When were you married?
3      A.  September 27, 2014.
4      If I got that wrong, I die.
5      Q.  We're going ask her whether you
6  were right.
7      MR. SCIOLLA:  Jerry, I don't meant
8  interrupt, but as you can see, he's
9  leaning toward you.  As much as you can,
10 keep your voice up so that he can hear.
11     MR. McDEVITT:  If you can't hear or
12 understand any question I ask you, just
13 tell me and I will be glad to raise my
14 voice, but I don't want to appear like
15 I'm yelling at you.
16     I may yell at you anyway, but --
17     THE WITNESS:  It's okay.
18     Q.  But seriously, if you cannot hear
19 me, tell me.
20     A.  Okay.
21 █████████████████████
22 ████████████████████████
23 ██████████████████████████
24 ██████████████████████████
25 ██████████████████████████

**Page 9**

1  ████████████
2      Q.  And prior to moving to
3  Pennsylvania, you lived in Florida?
4      A.  Yes, sir.
5      Q.  When did you move to Pennsylvania?
6      A.  Let's see.  I'm not sure of the
7  day.  I know it was in 2014, I think.
8      Q.  The year is fine.  The year 2014?
9      A.  I think so, yeah.
10     Q.  Why did you move back to
11 Pennsylvania?
12     A.  Because I closed my wrestling
13 school, and I decided to get married.
14     Q.  Why couldn't you stay in Florida?
15     A.  My wife lives here, and she has two
16 children here.
17     Q.  Is it true you hate living in
18 Pennsylvania?
19     A.  Say that one more time?
20     Q.  You hate living in Pennsylvania?
21     A.  I'm not fond of Pennsylvania.  The
22 people are nice, but I'm not too fond of
23 Pennsylvania.
24     Q.  Have you told some of your
25 healthcare providers you hate living in

3  (Pages 6 to 9)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

**10**

1  Pennsylvania?
2      A.  Probably I enjoyed living in
3  Florida more.
4      Q.  My question was:  Did you tell your
5  healthcare providers that you hate living in
6  Pennsylvania?
7      A.  I don't recall if I said "hate."  I
8  just said I would rather live in Florida.
9      Q.  Is it true you want to move back to
10  Florida?
11      A.  Yes, I would like to move back to
12  Florida.
13      Q.  But your wife doesn't want to move
14  back to Florida, does she?
15      A.  She does now.
16

**11**

1      Q.  Have you told healthcare providers
2  that you don't want to take the son to
3  Florida?
4      A.  I don't want to take him away from
5  the family.
6      Q.  Have you told them that you don't
7  want to take him to Florida?
8      A.  I don't want to take him away from
9  his family.
10      Q.  So that would mean you don't want
11  to take him to Florida.
12      A.  No, I don't want to take him away
13  from his family.
14      Q.  Were you ever in the military?
15      A.  Say that one more time?
16      Q.  Were you in the military?
17      A.  Yes.
18      Q.  What branch?
19      A.  U.S. Army.
20      Q.  What period were you in the army?
21      A.  I don't have the sheet in front of
22  me with dates.
23      Q.  Were you drafted or were you, did
24  you enlist?
25      A.  I enlisted.

**12**

1      Q.  Do you remember what century you
2  were in -- I'm sorry, what decade you were
3  in, I should say?  '80s, '90s?
4      A.  '80s.
5      Q.  In the '80s?
6      A.  I think it was 1983 or '4 I think I
7  enlisted.
8      Q.  And how long did you serve?
9      A.  I think it was less than a year.
10  I'm not sure of the dates.
11      Q.  What was your MOS?
12      A.  Infantry, 11 Bravo.
13      Q.  Where were you stationed?
14      A.  I was in, for boot camp I was in
15  Fort Benning, and then I was stationed in
16  Fort Ord, California.
17      Q.  Were you court marshaled?
18      A.  No.
19      Q.  What kind of discharge did you get?
20      A.  Other than honorable.
21      Q.  Was it an undesirable?
22      A.  No.
23      Q.  Was it an administrative discharge?
24      A.  Other than honorable.  That's what
25  it read on my discharge papers.

**13**

1      Q.  Do you still have your DD 214?
2      A.  Yes, I do.
3      Q.  You do?
4      A.  The lawyer has a copy of it, if you
5  need it.
6      Q.  Are you employed?  Are you employed
7  now?
8      A.  No.
9      Q.  Are you on disability?
10      A.  No.
11      Q.  Have you applied for disability?
12      A.  Yes.
13      Q.  And what kind of disability have
14  you applied for?
15      A.  Social Security Disability.
16      Q.  And when did you file your
17  application?
18      A.  I filed the application I think, I
19  think -- I'm not sure of exactly.  I know I
20  have 2014, 2015, and then there was a process
21  where the court got denied and then they gave
22  me and I had to get, I had to find an
23  attorney to do the appeal.  And then they
24  gave me -- and in June there's an appeal
25  date.

4  (Pages 10 to 13)

14

1  So I think from, I started doing
2  from the doctors and started to process in
3  2014 to 2015, so in that time frame.
4      Q.  And did I understand you to say
5  that some court denied your claim?
6      A.  The initial claim.  They deny all
7  the initial claims the first time you apply
8  for Social Security Disability.  It's
9  standard.
10     Q.  And now that's being appealed?  Do
11  I understand you to be saying that's now
12  being appealed?
13     A.  Right.  I think the process is that
14  once you get denied, you have to go to a
15  court date that goes through the courts in
16  Pennsylvania; and then you have to appeal it,
17  so you can fight the, fight the appeal.
18     Q.  So what attorneys are representing
19  you in that?
20     A.  Disability Justice.  That's the
21  name of the firm.
22     Q.  Where are they located?
23     A.  Pennsylvania.
24     Q.  What city, though?
25     A.  I'm not sure.

15

1      Q.  How did you find them?
2      A.  I found them through my attorney,
3  Kyros.
4      Q.  Through who?
5      A.  Bill Kyros recommended them.
6      Q.  All right.
7          And what is the basis of your claim
8  of disability?
9          In other words, why are you saying
10 you're disabled?  What is disabling you?
11     A.  I have my hearing impairment.  I
12 have the headaches.  I have sleep disorder.
13 I have depression.  I have the concussion
14 syndrome.
15         I believe that's it.
16     Q.  And when you made your claim for
17 disability benefits, did you submit any kind
18 of evidence?
19     A.  The doctors' reports that I
20 obtained while I was going to the doctors.
21     Q.  What doctors' reports were
22 submitted?
23     A.  Okay.  Let's see.  I think it was
24 Dr. DeMarco, who's my primary, Dr. Smith who
25 is the ENT.  Dr. Handler who's -- Dr. Smith

16

1  -- Dr. DeMarco, Dr. Smith.  Dr. Smith is the
2  ENT Dr. Handler is the neurologist.
3      Q.  Anybody else?
4      A.  And the psychologist, I think, I'm
5  not sure.
6      Q.  Who is the psychologist?
7          Who is the psychologist?
8      A.  I think it dealt with a Dr. -- I
9  think a Dr. Adams, I'm not sure.  I've only
10 seen him a few times.
11     Q.  Dr. Adams ejected you from the
12 program, didn't he?
13     A.  Excuse me?
14     Q.  Dr. Adams ejected you from their
15 program, didn't he?
16         MR. SCIOLLA:  Object to form.
17         You can answer.  I just objected to
18     the form of the question.  You can
19     answer the question.
20     A.  He asked me to leave the program,
21 yes.
22     Q.  And you went to him seeking support
23 for a disability determination, didn't you?
24     A.  No.  I went for help for my
25 problems.

17

1      Q.  And did you tell him that you
2  wanted him to support a disability
3  determination?
4      A.  I told him I was applying for
5  Social Security Disability.
6      Q.  And were you throwing chairs around
7  there?
8      A.  No.
9      Q.  Acting violently?
10     A.  I was upset.
11     Q.  So you were acting violently?
12     A.  No.
13     Q.  What were you upset about?
14     A.  Just upset that they asked me to
15 leave the program when I came there for help.
16     Q.  He told you to get a job, didn't
17 he?
18     A.  Huh?
19     Q.  He told you to get a job, didn't
20 he?
21     A.  He told me to go get a job.  I
22 said, what job could I possibly get?  I can't
23 wrestle anymore.
24     Q.  You got angry when he told you to
25 go get a job instead of saying you were

5  (Pages 14 to 17)

18

1  disabled?
2       MR. SCIOLLA:  Objection, asked and
3  answered.
4       Q.  When you say it was initially
5  denied, was there a written opinion saying
6  why your disability application was being
7  denied?
8       A.  That's standard process, from what
9  I understand.
10      Q.  Well, did you ever see any
11  explanation in writing for why they were
12  denying your disability?
13      A.  They sent me a form saying that I
14  was denied.  I don't recall what it said in
15  the letter.
16      Q.  And have you turned all those
17  documents over to your attorneys in this
18  case?
19      A.  I don't recall if I gave them those
20  documents.
21      Q.  But you still have them, correct?
22      A.  I believe so.  I'm not sure.
23      Q.  And did any witnesses testify for
24  you in that proceeding?
25      A.  Not that I'm aware of.

19

1       Q.  Did you give any testimony?
2       A.  I was the patient.  That's the best
3  I could tell you.
4       Q.  Well, for example, was there any
5  hearing under which you testified under
6  oath --
7       A.  No.
8       Q.  -- about your disability or
9  anything related to it?
10      A.  No.
11      Q.  What did you do to prepare for your
12  deposition today, sir?
13      A.  I met with my lawyers.
14      Q.  How long?
15      A.  I was with them Monday and Tuesday.
16      Q.  All day?
17      A.  Afternoon.
18      Q.  Which lawyers?
19      A.  I was with Mr. Kyros, Andrew, and
20  Anthony.
21      Q.  And did you read any documents
22  during those prep sessions?
23      A.  Only what was, what I, the
24  documents that I signed and the documents,
25  the question and answer thing.  That was

20

1  about it, I think.
2       Q.  What was the question and answer
3  thing?
4       Do you mean the interrogatories
5  that you signed?
6       A.  I think so.  I'm not sure.  I know
7  I saw paperwork that was filed that I signed.
8       Q.  Did you read Mr. Singleton's
9  deposition?
10      A.  No.
11      Q.  Do you have any understanding of
12  what he testified to?
13      A.  No, sir.
14      Q.  Did talk to him about his
15  deposition?
16      A.  No, sir.
17      Q.  When did you last speak to
18  Mr. Singleton?
19      A.  I met him one time, and that was in
20  Harris' office, and then we had a meeting.
21      Q.  Is that the only time you talked to
22  him?
23      A.  Yes, sir.
24      Q.  Did you read Dr. Adams' testimony,
25  in preparation for the day?

21

1       A.  No, sir.
2       Q.  Did you watch any videotapes of the
3  matches you have identified as the ones you
4  now state you received concussions in?
5       A.  Can you repeat the question?
6       Q.  Sure.  Did you watch any videotapes
7  of WWE matches you participated in and which
8  you now claim you got a concussion in?
9       MR. SCIOLLA:  Object to the form.
10      You can answer.
11      A.  Yes, I did.
12      Q.  Which matches did you watch?
13      A.  The ones with Steven Regal.  I
14  believe there was a six-man tag.
15      Q.  Any others?
16      A.  I believe there is another Steven
17  Regal match and a Mr. Kennedy match.
18      Q.  Do you know if those are the ones
19  that you identified in this case as the ones
20  in which you now claim you received a
21  concussion?
22      A.  I'm not sure which ones you guys
23  put together until I look at them.
24      Q.  Well, you signed an interrogatory
25  in which you swore there were certain

6  (Pages 18 to 21)

22

1    matches.
2         Do you recall that?
3    A.  Yes.
4    Q.  Is it the same matches that you
5    watched?
6    A.  Yes, sir.
7    Q.  What were you watching them for?
8         MR. SCIOLLA:  Object to the form.
9         You can answer, to the extent you
10   know.
11   A.  Those matches were the matches
12   where I sustained head injuries.
13   Q.  Did you watch the match where
14   Steven Regal appears to throw you into the
15   metal steps going up to the cage, or up to
16   the ring?
17   A.  I'm sorry?
18   Q.  Did you watch the match where
19   Steven Regal appeared to throw you into the
20   metal steps leading up to the ring?
21   A.  Yes.
22   Q.  And that's when you claim you hit
23   your head on the steps and got a concussion?
24   A.  That's when I hit my head.  I
25   didn't know if I had a concussion.

23

1    Q.  But that's one of the matches you
2    claim now that you hit your head on those
3    steps and you got a concussion, right?
4    A.  That's when I hit my head.  I did
5    not know I had a concussion.
6    Q.  I understand that.  But now you
7    claim you did get a concussion, right?  You
8    didn't know it then, but now you're claiming
9    you had a concussion, right?
10        MR. McDEVITT:  He's talking about
11        your current knowledge, not what you
12        know then.
13   Q.  As I understand what you're saying,
14   Mr. LoGrasso, you watched the match with
15   Steven Regal, you say you hit your head on
16   those metal steps.  You didn't know then that
17   you got a concussion, but you believe now
18   that you did.
19        Is that an accurate statement?
20   A.  That's -- that's my explanation.
21   Q.  What other documents did you
22   review?  Any other ones?
23        What other documents did you review
24   in preparation for your deposition?
25   A.  It would just be the ones that I

24

1    said.
2    Q.  Did you review any of your medical
3    records?
4    A.  No.
5    Q.  Are you currently taking any drugs
6    which would impair your memory --
7    A.  No.
8    Q.  -- or your ability to recall
9    things?
10   A.  No.
11   Q.  How much time did you spend
12   watching the videotapes of the matches in
13   preparation for your deposition?
14   A.  I never watched them.  I never
15   watched them in preparation.  I just, you
16   know, produced the videotapes.  That was it.
17   I didn't do it in preparation for this.
18   Q.  I'm sorry, I thought you said in
19   your preparation for today you watched those
20   matches.  That's what we were just talking
21   about a couple of questions ago.
22   A.  Yes, I watched the matches.
23   Q.  And you watched those with your
24   attorneys, right?
25   A.  I did not watch them with the

25

1    attorneys, no.
2    Q.  So you watched them outside of your
3    preparation session with the attorneys?
4    A.  I watched the matches.  I submitted
5    them to the attorneys.  I did not watch them
6    with the attorneys.
7    Q.  Where did you get those matches?
8    A.  From tapes I had.
9    Q.  Were they tapes?  Do you keep tapes
10   of all your matches?
11   A.  There are some that I -- there are
12   a lot of them that I kept.  I just didn't
13   recall I had them recorded.  And usually
14   there's a lot of stuff on the WWE network.
15   Q.  Did you pull any of those matches
16   off the network?
17   A.  No.
18   Q.  In terms of social media, do you
19   have a Facebook account?
20   A.  Yes.
21   Q.  Under what name?
22   A.  Vito LoGrasso.
23   Q.  Do you have a Snapshot account?
24   A.  I don't think so, no.
25   Q.  Snapchat?

7  (Pages 22 to 25)

26

1          MR. SCIOLLA:  It's okay, Jerry ten
2  worry about it.
3          MR. McDEVITT:  I meant to say
4  Snapchat.
5      Q.  Do you have snapchat?
6      A.  No.  I'm the worst guy to take a
7  picture with a telephone.  I haven't mastered
8  that yet, so.
9      Q.  How about Tumblr?
10     A.  Tumblr I think I have, but I don't
11  use.
12     Q.  How about Twitter?
13     A.  Twitter I use.
14     Q.  What's your handle on Twitter?
15     A.  I think it's Vito LoGrasso.
16     Q.  How about Instagram?
17     A.  Instagram is Vito LoGrasso.
18     Q.  Do you have any other social media
19  accounts?
20         MR. SCIOLLA:  Are there other ones?
21         MR. McDEVITT:  Nothing that...
22     A.  Social media, I think that's about
23  the extent of it.  I'm not a computer guy.
24     Q.  Have you used social media to
25  discuss this lawsuit?

27

1          MR. SCIOLLA:  Object to the form.
2      You can answer.
3      A.  I've written about the lawsuit.  I
4  didn't have a discussion.  I wrote my
5  opinions.
6      Q.  Have you used social media to try
7  to recruit other people to join in this
8  lawsuit?
9      A.  I wrote down, if guys need help and
10  they would like to join the lawsuit, and I
11  believe I gave Mr. Kyros' number.
12     Q.  Did anybody ever contact you in
13  response to those, telling you that they
14  wanted to join the lawsuit?
15     A.  I believe a few reached out.  I
16  don't remember who.
17     Q.  You don't remember any of the
18  people that reached out?
19     A.  No, because I stopped, you know, I
20  stopped the, you know, I stopped putting -- I
21  put the post out at one point, and then, you
22  know, I figured that was enough for me to do.
23  And if guys wanted to pursue it, they could
24  pursue it on their own.
25     Q.  So as you sit here today, your

28

1  testimony is you can't remember the name of
2  any former performer who contacted you in
3  response to those e-mails or those social
4  media?
5      A.  Rob Holm.
6      Q.  What was his ring name?
7      A.  Mo Enable.
8      Q.  Anybody else?
9      A.  Man On a Mission.
10     Q.  Anybody else?
11     A.  Let me just think.
12         I really can't recall.
13     Q.  Have you had any communications
14  with Billy Jack Haynes?
15     A.  No, sir.
16     Q.  Do you know Billy Jack Haynes?
17     A.  Not personally, no.
18     Q.  Have you had any communications
19  with Ryan Sakoda?
20     A.  No, sir.
21     Q.  Do you know him?
22     A.  I don't believe he was there in the
23  WWE when I was there.  I don't recall meeting
24  him.
25     Q.  How about Russ McCullough?

29

1      A.  I think these guys were there
2  before me.  I'm not sure.
3      Q.  So is it your testimony you haven't
4  had any conversations of any kind with any of
5  the other people suing the WWE over alleged
6  head injuries?
7      A.  Those gentlemen that you mentioned,
8  no.
9      Q.  Is there anybody else that you've
10  had communications with about alleged head
11  injuries in suits against the WWE that used
12  to work with WWE?
13         MR. SCIOLLA:  Object to the form.
14     You can answer.
15     A.  If you can repeat the question
16  again.
17     Q.  Sure.  Have you had any
18  communications about this lawsuit with
19  anybody else who used to work at WWE, other
20  than the ones you identified, Rob Holm?
21         MR. SCIOLLA:  Just wrestlers or
22  anybody?
23         MR. McDEVITT:  Anybody.
24         MR. SCIOLLA:  Anybody.
25     A.  Anybody.  My wife.

8  (Pages 26 to 29)

30

1      Q.  Anybody else?
2      A.  My doctors.
3      Q.  I'm talking about people who used
4   to work for WWE.
5      Your wife didn't work for WWE, I
6   mean you've already testified --
7      A.  I'm just giving you a general
8   answer.  No.
9      Q.  When did you first decide that the
10  symptoms you now claim to have had for years
11  are caused by brain injuries?
12     MR. SCIOLLA:  Object to the form.
13     MR. McDEVITT:  What's the
14  objection?
15     MR. SCIOLLA:  Your characterization
16  that he had all the same symptoms for
17  years and that there wasn't any
18  progression of his symptoms and their
19  severity.
20     MR. McDEVITT:  I didn't make any
21  such characterization at all.
22     Would you like the question read
23  back?
24     MR. SCIOLLA:  Sure, read it back.
25     (A portion of the record was read.)

31

1      MR. SCIOLLA:  Same objection.
2      You can answer.
3      A.  So I get it right.  Can you repeat
4   it for me one more time?  I'd appreciate it.
5      Q.  Yes.  When did you first determine
6   that the symptoms you now claim to have were
7   associated with brain injuries suffered while
8   you performed for WWE?
9      MR. SCIOLLA:  Same objection.
10     A.  That would be the year 2014.
11     Q.  All right.  And what was it in 2014
12  that made you come to that conclusion?
13     A.  When I started going to the
14  doctors, and they started telling me that I
15  had all these symptoms that I was suffering
16  from, you know, these things that I'm dealing
17  with.  So that's when, you know, I started to
18  put two and two together that I had
19  concussion syndrome, and as part of that I
20  might have a brain injury.
21     Q.  Did any doctor tell you in 2014
22  that you had brain injuries caused by
23  wrestling?
24     A.  My neurologist, Dr. Handler.
25     Q.  You say he told that you in 2014?

32

1      A.  When I started seeing Dr. Handler.
2      Q.  I'm not saying when you started
3   seeing him.
4      Is it your testimony that he told
5   you that in 2014?
6      A.  No, you asked -- if you asked me if
7   there was anybody who told you -- told me.
8   And when I seen my neurologist, and you asked
9   me the people who said this, and it was the
10  neurologist who told me.
11     Q.  No.  My question is very precise,
12  Mr. LoGrasso.
13     In 2014, did any doctor tell you
14  that the symptoms you had were associated
15  with brain injuries while you were performing
16  for WWE?
17     A.  I tried to -- I'm trying to gauge
18  when I saw Dr. Handler.  I'm not sure if I
19  saw him in 2014, or was it '15.
20     Q.  Did you have --
21     A.  I'm not sure.
22     Q.  By 2008, your complaint alleges
23  that you had pounding headaches; is that
24  correct?
25     A.  In 2008?

33

1      Q.  Yes.
2      A.  Who alleged that I had that?
3      Q.  You did.
4      A.  Would you repeat the question
5   again.
6      Q.  Is it true that by 2008 you had
7   pounding headaches?
8      A.  I started dealing with headaches.
9      Q.  Was that in 2008?
10     A.  That's been all along, since maybe,
11  I started with the headaches in 2000 -- 2006.
12     Q.  2006.
13     A.  Yeah.
14     Q.  Did you get headaches when you were
15  performing for WCW and getting hit over the
16  head with chairs?
17     A.  I don't recall.
18     Q.  Did you get headaches when you were
19  performing for ECW and getting hit over the
20  head with chairs?
21     A.  I don't recall.
22     Q.  What I just said is true, isn't it?
23  You did get hit over the head with chairs in
24  ECW and WCW, didn't you?
25     MR. SCIOLLA:  Object to the form.

9  (Pages 30 to 33)

34

1     A.  I did get hit with chairs in WCW
2  and in ECW.
3     Q.  And by the way, the matches you
4  identified that you got hurt in WWE, there
5  were no chairs involved in any of those
6  matches, were there?
7     A.  No, sir.
8     Q.  Those were conventional wrestling
9  matches, right?
10        MR. SCIOLLA:  Object to the form.
11     A.  Conventional in what manner?
12     Q.  Well, there were no other objects.
13  It was you and another performer wrestling,
14  correct?
15     A.  Except for the steel steps and the
16  mat and the posts and the ring, those are all
17  objects you hit your head against.
18     Q.  But those are all part of a normal
19  wrestling match, correct?
20     A.  Stairs are not part of the
21  wrestling match, and the table is not, you
22  know -- when you go against tables or the
23  announce tables or the barriers.  Those are
24  all part of it, too.
25     Q.  And you claim you did that in any

35

1  of the matches you identified as hurting
2  yourself in WWE?
3     A.  One more time?  I'm sorry.
4     Q.  Are you claiming you got thrown
5  through a table in any WWE match?
6     A.  No, I didn't say that.
7     Q.  And are you claiming you got hurt
8  by thrown into a barrier at a WWE match?
9     A.  I just didn't say.  You asked me if
10  there was a conventional match and what was
11  used, and that's what I'm saying.  We used
12  the ring, we used the posts, we used all of
13  that stuff, and it's all part of the
14  conventional thing.
15     Q.  So your headaches started in 2006.
16        And then did they continue
17  thereafter?
18     A.  They -- it was 2006, after -- after
19  I got hit, when I hit my head against the
20  stairs; and that's when things started to,
21  started to go different, started to change.
22     Q.  And the stairs being the same one
23  we're talking about in the Steve Regal match
24  that you identified as the one --
25     A.  Steel chairs, steel, yes.

36

1     Q.  And that's when you're saying your
2  headaches started, because you got your head
3  hit in that match?
4     A.  Uh-huh.
5     Q.  You have to say yes or no.  That's
6  all he writes down is words, not shaking your
7  head.
8     A.  I'm listening and --
9     Q.  I understand.
10     A.  -- those are the same stairs that
11  we used, yes.
12     Q.  And you're saying that when you hit
13  your head on those stairs in that match with
14  Steven Regal is when these headaches really
15  began?
16     A.  That's when they started, that's --
17  after I got hit, after I hit my head in that
18  match, that's when my headaches became -- I
19  didn't understand why I was getting them, and
20  that's when things changed for me and my
21  health changed with my head.
22     Q.  So that match with Steve Regal,
23  then, where you claim he threw you into the
24  stairs was sort of a turning point for you,
25  wasn't it, in the sense that these headaches

37

1  that you now claim, that's when the genesis
2  of this is?
3        MR. SCIOLLA:  Object to the form.
4  Mischaracterizes his testimony.
5        You can answer.
6     A.  Can you repeat the question?
7     Q.  Well, prior to that episode that
8  you've just described where you claim Steven
9  Regal threw you into the steps, in the match
10  you've identified in this case, is it your
11  testimony you didn't have headaches before
12  that event?
13        MR. SCIOLLA:  Object to the form.
14  Mischaracterizes his testimony.
15     A.  Not that I recall.
16     Q.  So that in all the matches with
17  ECW -- and by the way, you were with the ECW
18  before WWE, right?
19     A.  No.  Actually I was in WWF before I
20  was in ECW.
21     Q.  Didn't you go from ECW to WCW?
22     A.  No, sir, I started my career in
23  WWF.
24     Q.  Well, when you were a job -- I
25  understand you were a jobber for couple years

10 (Pages 34 to 37)

38

1    in the early '90, right?
2        A.  Yes, I was enhancement talent.
3        Q.  And then in your career pattern
4    after that period of time you went to ECW,
5    correct?
6        A.  Right.
7        Q.  And then you went to WCW?
8        A.  Right.
9        Q.  And then you came to WWE under the
10   only contract you ever signed with WWE in
11   roughly 2005, right?
12       A.  I started working for them again in
13   2004, and then I signed in 2005.
14       Q.  So you were with ECW before your
15   last run with WWE, correct?
16       A.  Yes.
17       Q.  And you were with WCW before your
18   last run with the --
19       A.  Yes.
20       Q.  And in both of those organizations,
21   did you do hard core wrestling?
22       A.  Yes.
23       Q.  Did you ever do a hard core match
24   in WWE?
25       A.  No.

39

1        Q.  So what is a "hard core match"?
2        A.  Hard core match is when you use all
3    the toys, candlesticks, chairs, bats, tables,
4    cookie pans, garbage cans.
5        Q.  And you use them to hit each other
6    over the head with, right?
7        A.  No, not necessarily every shot is
8    over the head.  You hit each other across the
9    body.
10       Q.  But a lot are on the head, aren't
11   they?
12       A.  No, not a lot.  You get a couple in
13   the head.  Not -- the whole match is not
14   hitting everybody over the head.
15       Q.  How long times did you take a chair
16   shot in the head in your career with ECW?
17       A.  I don't recall.
18       Q.  More than ten?
19       A.  I don't recall.
20       Q.  More than 100?
21       A.  I don't recall.
22       Q.  Was it a frequent occurrence?
23       A.  I don't recall.
24       Q.  How about in WCW, how many times
25   did you get hit over the head in hard core

40

1    matches there?
2        A.  I don't recall.
3        Q.  More than ten?
4        A.  I don't recall.
5        Q.  How long were you the champion?
6        A.  How long what?
7        Q.  How long were you the hard core
8    champion in ECW?
9        A.  How long was --
10       Q.  How long were you the hard
11   champion?
12           You were the hard core champion,
13   weren't you?
14       A.  Yes.
15       Q.  In ECW, right?
16       A.  No.
17       Q.  In WCW?
18       A.  Yes.
19       Q.  How long?
20       A.  I would say maybe six, six weeks,
21   maybe two months.
22       Q.  And in ECW was it sort of against
23   the code of honor to put your hands up to try
24   to block a chair shot?
25           MR. SCIOLLA:  Object to the form.

41

1        A.  Code of honor.  Basically you just,
2    you know, take chair shots.  As far as code
3    of honor, you know, you're just, you're
4    wrestling.
5        Q.  Well, ECW stood for Extreme
6    Championship Wrestling, right?
7        A.  Yes, sir.
8        Q.  It was an extreme style of
9    wrestling, correct?
10       A.  Yes, sir.
11       Q.  It was characterized by much more
12   violence than the other wrestling promotions
13   at the time, wasn't it?
14       A.  Yes, sir.
15       Q.  And it was characterized by the use
16   of metal chairs, hitting performers on the
17   head who didn't even try to block the blow,
18   correct?
19       A.  Yes, sir.
20       Q.  And you were one of them, correct?
21       A.  ECW --
22       Q.  Am I correct, you were one of the
23   ones that that was done with and did that?
24       A.  I did.
25       Q.  And did you it voluntarily,

11 (Pages 38 to 41)

42

1    correct?
2    A. Yes.
3    Q. Nobody forced you to do it?
4    A. It was scripted.
5    Q. Did you have the ability to say,
6    I'm not doing that?
7    A. Of course.
8    Q. Did you say, I'm not doing that?
9    A. No.
10   Q. And how many times did you lean in
11   with your head to get smashed over the head
12   with a chair while you were at ECW?
13   A. I don't recall.
14   Q. Did it hurt?
15   A. Yes.
16   Q. Did you see bells -- see stars, I
17   mean, hear bells?
18   A. I don't recall.
19   Q. Looking back on it now, you
20   don't -- now that you have all this increased
21   awareness of concussions, you don't recall
22   now whether those were concussions you were
23   experiencing when you were getting whacked on
24   the head with a metal chair?
25   MR. SCIOLLA: Object to the form.

43

1    A. It's not what you asked me.
2    Q. Well, I'm asking that now.
3    A. Okay, repeat the question directly.
4    Q. Were you getting a concussion when
5    you were getting whacked on the head with
6    those chairs at ECW?
7    MR. SCIOLLA: Object to the form.
8    A. Well, from what -- the education I
9    have now, I would say, yes, from where I'm
10   educated to now. Where I was educated
11   before, I would say no.
12   Q. Did ECW have doctors?
13   A. No.
14   Q. Did WCW have doctors?
15   A. I think WCW had trainers.
16   Q. Did you remember -- I'm sorry, I
17   didn't mean to interrupt you.
18   Are you done?
19   A. If I remember, they had trainers.
20   Q. What were their names?
21   A. I don't know. I don't recall.
22   Q. Did any of those trainers ever talk
23   to you about concussions?
24   A. Who?
25   Q. Any of the trainers at WCW ever

44

1    talk to you about concussions?
2    A. No.
3    Q. Did you ever talk to them about
4    concussions?
5    A. No.
6    Q. When did you first hear the word
7    "concussion"?
8    A. When did I first hear the word
9    "concussion"?
10   Q. Yeah, how old were you?
11   A. I don't recall.
12   Q. Well, you've been in combat sports
13   all of your life, haven't you?
14   MR. SCIOLLA: Object to the form.
15   A. If you could tell me what combat
16   sports are.
17   MR. SCIOLLA: Object to form.
18   Q. Well, how many street fights have
19   you been in?
20   MR. SCIOLLA: Object to the form.
21   Q. Let's start with that.
22   A. I don't recall.
23   Q. Would it be fair to say that you've
24   touted your street toughness?
25   I don't mean that as an insult.

45

1    That's part of what you talk about, your
2    history, right? You grew up in Brooklyn and
3    you fought a lot. Have you made statements
4    to that effect?
5    A. I guess I had my share of kick
6    fights, if that's what you're saying.
7    Q. Did you knock anybody out?
8    A. No.
9    Q. Did you get knocked out?
10   A. No.
11   Q. Did you get knocked down?
12   A. No.
13   Q. Did you get beat in any fights?
14   A. No.
15   Q. You won every fight?
16   A. I guess as a kid I might have lost
17   a few.
18   Q. And when you were doing all of
19   that, you never heard the word "concussion"?
20   A. No.
21   Q. Do you do MMA?
22   A. Did I do MMA?
23   Q. In your life, yeah, have you done
24   MMA?
25   A. Just through the training.

12 (Pages 42 to 45)



46

1     Q.  And you trained people in MMA?
2     A.  Just hitting the bags, hitting the
3  punching bags, hitting the punch dummy and
4  hitting the mix.
5     Q.  And you ran a wrestling school,
6  too, for a while, didn't you?
7     A.  Yes, sir.
8     Q.  Did you teach those people anything
9  about concussions?
10    A.  I wasn't educated in concussions
11 then.
12    Q.  My question was:  When you were
13 running a school, did you teach anybody
14 anything about concussions?
15    A.  No, sir.
16    Q.  So you didn't teach your students
17 anything about concussions, did you?
18    A.  That's because I wasn't educated in
19 concussions.
20    Q.  Did you know there was such a thing
21 as concussions then?
22    A.  No.
23       MR. SCIOLLA:  Object to the form.
24    When?
25    Q.  When you were running your

47

1  wrestling school?
2       MR. SCIOLLA:  I'm sorry, could you
3    repeat the question?
4     Q.  When you were running your
5  wrestling school, did you know there was such
6  a thing as concussions?
7     A.  Did I know such as thing as
8  concussions, yes.
9     Q.  What did you think a concussion was
10 when you were running a wrestling school?
11    A.  My interpretation of a concussion
12 was that you had to be knocked out to have a
13 concussion.  As stupid and uneducated as that
14 is, that's what I thought it was.
15    Q.  That's what you thought in 2000 --
16 what year did you run your wrestling school?
17    A.  I'm not sure of the dates.  That
18 would be like 2013, I think.  I think.
19    Q.  So you thought as late as 2013 that
20 you had to be knocked out to have a
21 concussion?
22    A.  Yes.
23    Q.  And so, did you watch boxing
24 matches?
25    A.  Yes, sir.

48

1     Q.  What did you think they were doing
2  when they were counting to ten?
3       MR. SCIOLLA:  Object to the form.
4     A.  Giving a guy a chance to get up and
5  fight.
6     Q.  And do you think they were gauging
7  whether he was mentally okay to fight?
8       MR. SCIOLLA:  Object to the form.
9     A.  Well, when you give a guy a ten
10 count, you're giving him a chance to get up
11 and defend himself.
12    Q.  To see if his brain is clear?
13       MR. SCIOLLA:  Object to the form.
14    A.  I guess if he's able to continue.
15    Q.  Well, you understood that's what
16 they're doing, right, they're checking to see
17 if the man is mentally capable of defending
18 himself.
19       MR. SCIOLLA:  Object to the form.
20    Q.  You understood that, didn't you?
21    A.  They're giving him a chance to get
22 up, recover and fight, yes.
23    Q.  And in your entire wrestling career
24 up to 2014, are you saying that you were
25 never present in any kind of wrestling event

49

1  where another performer suffered a
2  concussion?
3       MR. SCIOLLA:  Object to the form.
4     A.  Not that I'm aware of.
5     Q.  Never?
6     A.  Not that I'm aware of.  I don't
7  recall.
8     Q.  Who is the most famous wrestler
9  that you know of that had to retire because
10 of a concussion?
11    A.  You're talking about most famous or
12 most recent?
13    Q.  Most famous.
14    A.  I guess it would be Brett Hart.
15    Q.  Guess?  You don't have to guess.
16 You were on the card that night, weren't you?
17 You don't have to guess.  You were on the
18 card the night he got the concussion that
19 made him retire.
20       MR. McDEVITT:  Object to the form.
21    Q.  Weren't you?
22    A.  I'm just answering the question.
23    Q.  You don't have to guess.  You were
24 there, weren't you?
25       You were at the event in which he

13  (Pages 46 to 49)

1  got the concussion that caused him to have to
2  retire, weren't you?
3        MR. SCIOLLA:  I don't think he's
4     arguing with you, counsel, I think he's
5     just guessing whether or not he was --
6     A.  You asked me a question.
7        MR. SCIOLLA:  Hold on, let me
8     finish my --
9     Q.  Is my statement correct?
10       MR. SCIOLLA:  Which statement?
11       MR. McDEVITT:  Read back my
12    question.
13    A.  MR. McDEVITT, you asked me --
14       MR. SCIOLLA:  She'll read it back
15    for you.
16       Just wait for question instead.
17       (A portion of the record was read.)
18    A.  Before that, you asked me who I
19    thought was the most famous wrestler who had
20    a concussion, had to retire.  And I asked you
21    most recent, and you said no, you said most
22    famous.
23       I said I guess Bret Hart in my
24    estimation as being the most famous.  Then
25    you went into, you were there, weren't you,

1  you were there.
2        That's my interpretation of what
3  you just said.  Now I wasn't being a smart
4  ass and I wasn't trying to be facetious.  I
5  was answering your question, because you
6  asked me my assumption, who I thought was the
7  most famous wrestler.  So I said I guess Bret
8  Hart is the most famous that I know of.
9     Q.  Well, let's be clear.  The night
10    Bret Hart suffered the concussion that ended
11    his career, you were on the card and at that
12    event that night, weren't you?
13    A.  Right.
14    Q.  And that was Starrcade 1999, wasn't
15    it?
16    A.  Yes, sir.
17    Q.  You were the opening match in that
18    whole card, right?
19    A.  If I was, if I was the opening
20    match, then I was opening match.  I don't
21    remember my position on the card.
22    Q.  So since 1999, you have known that
23    wrestlers get concussions?
24       MR. SCIOLLA:  Object to the form.
25    A.  He got -- he got a concussion.

1  That was it.
2     Q.  And he didn't get knocked out that
3  night either, did he?
4     A.  I'm not sure.  I wasn't there.
5     Q.  You were there.
6     A.  I wasn't ringside.
7     Q.  Weren't you on that card that
8  night?
9     A.  Being on the card and being
10    ringside and being with him during the match
11    doesn't give me a doctor's look or a bird's
12    eye view of me being Bret Hart or what he
13    felt and how he responded, what he was
14    feeling, how hard he got hit.  I can go by
15    watching a monitor like you do, and you could
16    say I was in the even arena.  I was in the
17    arena like the rest of the 17,000 people.
18    Yeah, I was watching.
19    Q.  So you watched the match?
20    A.  I think I did.  I don't know.
21    Q.  Well, if you watched the match, did
22    you see the kick?
23    A.  I saw a kick.
24    Q.  And did you see Bret Hart continue
25    to fight after the kick?

1     A.  I don't recall the rest of the
2  match.  You asked me if he got, if you asked
3  me who the most famous person was who got a
4  concussion, I told you.  Now you're asking me
5  specifics.
6     Q.  I am.
7     A.  I can't give you specifics, because
8  it was 1999 and I don't recall, because I
9  wasn't in the match.
10    Q.  Well, you said just a minute ago
11    you watched the match.
12    A.  I watched it.
13    Q.  So if you watched the match, then
14    you would have seen what happened, correct?
15    A.  I don't recall everything that
16    happened, because I wasn't in the match.  It
17    wasn't a match that I was, I was involved
18    with.
19    Q.  Bret Hart was the biggest performer
20    in the promotion at the time, wasn't he, him
21    and Goldberg?
22    A.  Well, are you asking me, who's the
23    biggest star back then?  They were all big
24    stars.
25    Q.  Let me rephrase.

14 (Pages 50 to 53)

54

1          Bret Hart was a big star, wasn't
2    he?
3        A.  Yes.
4        Q.  And it was a big story when Bret
5    Hart got knocked out of the business because
6    of that episode, wasn't it?
7        A.  Right.
8        Q.  That's well-known in the wrestling
9    business, isn't it?
10       A.  Yes, it is.
11       Q.  And you were there that night?
12       A.  I was there.
13       Q.  So you knew that Bret Hart was
14   knocked out of the wrestling business by a
15   concussion he sustained that night?
16          MR. SCIOLLA:  Object to the form.
17       Q.  Since 1999 you've known that,
18   haven't you?
19          MR. SCIOLLA:  Object to the form.
20       Q.  Right?
21       A.  Yes.
22       Q.  Would that be a fair statement to
23   say?
24       A.  Yes.
25       Q.  And in the years after that,

55

1    knowing Bret Hart got knocked out of the
2    business completely from a single concussion
3    and the consequences of that, you got hit
4    over the head repeatedly with chairs and
5    objects and everything else in WCW and ECW,
6    didn't you?
7           MR. SCIOLLA:  Object to the form.
8        A.  Well, you're talking 1999 and ECW.
9    That was 1998, and WCW was '99, when I did
10   hard core.
11       Q.  So after you saw Bret Hart get
12   knocked out of the business, you took shots
13   on the head with chairs, didn't you?
14       A.  I don't recall.
15       Q.  Throughout the time you performed
16   for the WWE, and your last run, when did your
17   last run with the WWE start, and when did it
18   end?
19       A.  I started coming back and doing the
20   tryout matches in 2004.
21       Q.  All right.
22       A.  And then it ended in 2007.
23       Q.  Do you recall your last match in
24   2007 on the main roster?
25       A.  No.

56

1        Q.  And then you went to OVW for a
2    while, right?
3        A.  I was in Deep South --
4        Q.  Or Deep South, I'm sorry?
5        A.  -- and then I was at OVW, because I
6    was going to both, both developmentals when I
7    wasn't on the road.  So I would go to Deep
8    South for two days, and then I would go do
9    OVW one day.
10       Q.  During the time you were with the
11   WWE, you had a personal doctor, didn't you?
12       A.  I had a personal doctor, yes.
13       Q.  Dr. Tambour?
14       A.  Yes, sir.
15       Q.  Did I say his name right,
16   Dr. Tambour?
17          So you had the ability at any time
18   to ask your own personal doctor any question
19   you wanted to ask him about why you were
20   having headaches, didn't you?
21       A.  But at the time I was also being
22   seen by Dr. Rios.
23       Q.  That's not my question.
24          My question was:  In 2004 to 2007
25   you had the ability to ask your own personal

57

1    doctor any question you wanted about
2    headaches, didn't you?
3        A.  I could have asked him a question,
4    yes.
5        Q.  And in fact he was prescribing
6    testosterone for you at that time, correct?
7        A.  Yes.
8        Q.  And you submitted his paperwork to
9    the company to get a therapeutic use
10   exception to permit you to continue to use
11   testosterone, right?
12       A.  Yes.
13       Q.  So he was treating you actually
14   during the time you were performing for WWE?
15       A.  Yes.
16       Q.  So if you had headaches, did you go
17   to him and say, doctor, I'm getting a lot of
18   headaches.  I ran into a metal stair in a
19   match, and these headaches are getting worse?
20          MR. SCIOLLA:  Object to the form.
21       Q.  Can you tell me what these are for?
22          MR. SCIOLLA:  Object to form.
23       A.  I did not go to Dr. Tambour with
24   those -- with that.
25       Q.  Can you tell me why you didn't seek

15  (Pages 54 to 57)

58

1  medical attention from your own personal
2  doctor for these matters?
3      A.  Because I was also being treated by
4  Dr. Rios.
5      Q.  You've sworn under oath in the
6  Answers to Interrogatories here that you
7  never told Dr. Rios about any head injuries;
8  is that true?
9      A.  I told him I had headaches, I was
10 feeling woozy.  I told him that I was
11 lethargic, tired from being on the road; and
12 that's when he submitted and gave me
13 B-12 shots.
14     Q.  Did you ever tell him that you
15 thought you sustained a concussion or a head
16 injury in a specific match?
17     A.  I never told Dr. Rios that I had a
18 concussion.
19     Q.  Did you ever tell him, doctor, in a
20 match that just occurred, I think I hurt my
21 head?
22     A.  I told him that when I came back
23 from a match that I needed to collect myself
24 and that I was feeling a little woozy and I
25 had a welt on my stomach, if I'm interpreting

59

1  one particular time and that I wasn't, you
2  know, I wasn't feeling right and I just
3  needed to take a shower just to cool off.
4      Q.  You told him you needed to take a
5  shower, you needed to take a shower to cool
6  off?
7      A.  Yeah.
8      Q.  But I'm being very specific here.
9  I want to make sure I understand.
10         Did you ever go to Dr. Rios and
11 say, doctor, I hit my head on something
12 during that fight, and I think I'm hurt, and
13 have him examine you for a specific head
14 injury that you reported to him?
15     A.  No, sir, I did not.
16     Q.  Including the one where you say
17 Steve Regal threw you into the steps?
18     A.  That's when I went back to him,
19 after the match; and when I went back, he
20 attended to me, because I had a lump on my
21 stomach.  And he saw that I was a little, a
22 little out of it and sweating a lot; and I
23 said that I needed to take a shower just to
24 cool down, then he attended to my stomach
25 afterwards.

60

1      Q.  Did somebody point out to you, in
2  connection with coming in here today, that
3  you did go see the doctor after that event
4  with Steven Regal, but you just didn't bother
5  to report a head injury, you reported a
6  problem with your stomach?
7         MR. SCIOLLA:  Object to the form.
8  I'm going to -- are you asking about
9  what he discussed with his attorneys?
10        MR. McDEVITT:  I'm asking him if
11 somebody pointed that out to him, yes.
12        MR. SCIOLLA:  Including his
13 attorneys?
14        MR. McDEVITT:  Yes.
15        MR. SCIOLLA:  So you're asking for
16 an attorney-client privileged
17 communication?
18        MR. McDEVITT:  I'm asking -- I'm
19 entitled to anything that refreshed his
20 recollection for his testimony today.
21        MR. SCIOLLA:  That wasn't what your
22 question was.
23        MR. McDEVITT:  Let's try it this
24 way:
25     Q.  Did you look at Dr. Rios' notes in

61

1  connection with preparing for your testimony
2  today?
3      A.  No, sir, I didn't.
4      Q.  Was it pointed out to you that you
5  didn't report a head injury to Dr. Rios, but
6  you reported some other thing to Dr. Rios?
7         MR. SCIOLLA:  I am going to object
8  to the form.  And to the extent he's
9  talking about attorney-client
10 communications, I don't want you to
11 answer.
12        MR. McDEVITT:  Well, which
13 attorney?  Which attorney-client --
14 which attorney are we talking about
15 privilege here?
16        MR. SCIOLLA:  Any of the ones that
17 he --
18        MR. McDEVITT:  Well, it's not any.
19 Which attorney specifically had that
20 communication you're claiming the
21 privilege with?  I'm entitled to know
22 the name of the attorney.
23        MR. SCIOLLA:  Any of the attorneys
24 he mentioned that he prepared for his
25 deposition.

16  (Pages 58 to 61)

1       MR. McDEVITT:  So you are claiming
2   a privilege over a communication about
3   that?
4       MR. SCIOLLA:  What I'm claiming is
5   that if you can answer his question
6   without discussing any attorney-client
7   communications, then you should.
8       But I don't want you to reveal any
9   communications that you had with your
10  attorneys.
11      MR. McDEVITT:  That's an improper
12  instruction.  If there were no
13  communications, there's nothing to
14  reveal.  If there was a communication,
15  you could claim a privilege over it.
16      Are you claiming a specific
17  privilege over that communication or
18  not?
19      MR. SCIOLLA:  I made my objection,
20  and you can reask your question.
21      MR. McDEVITT:  I'm not reasking my
22  question.  I'm asking him --
23      MR. SCIOLLA:  Then I will have the
24  court reporter read it back.
25      MR. McDEVITT:  No, I'm asking about

1   a specific privilege claim.  If you are
2   making a specific privilege claim,
3   that's fine.
4       MR. SCIOLLA:  If you're asking him
5   what he discussed with the attorneys,
6   I'm making a specific attorney privilege
7   claim.  Attorney-client privilege.
8       Q.  Mr. LoGrasso, in the second
9   amendment --
10      THE WITNESS:  Excuse me, MR.
11  McDEVITT, can I grab a napkin?
12      MR. McDEVITT:  Absolutely.
13      MR. SCIOLLA:  Let's take a break
14  for a minute.
15      THE VIDEOGRAPHER:  The time is
16  10:33 a.m.  Off the record.
17      (A brief recess was taken.)
18      (LoGrasso Exhibit 1, CD labeled,
19  "Hart vs. Goldberg Starrcade 1999,"
20  marked for identification, this date.)
21      THE VIDEOGRAPHER:  The time is
22  10:42 a.m.  Back on the record.
23      Q.  Mr. LoGrasso, you understand you're
24  still under oath?
25      A.  Yes, I am.

1       Q.  We've marked what's marked as
2   Exhibit 1.  I'm going to hand a copy to your
3   counsel.  It is of the Hart versus Goldberg
4   match at Starrcade '99 that we were talking
5   about before the break.  And what we're going
6   to do now, sir, is on that monitor to your
7   right there, it should, the match should come
8   up that we were talking about between Bret
9   Hart and Goldberg.
10      A.  Right.
11      Q.  So if you -- and it's on
12  December 19th of '99.  If you would watch
13  that, and then I'll ask you some questions
14  when it's over.
15      MS. LACY:  I'm going to jump to
16  11:45.
17      MR. McDEVITT:  We are going to skip
18  midway into the match, rather than watch
19  the whole thing, to where we think this
20  happened.  But go ahead.
21      (Videotape played.)
22      MR. McDEVITT:  You can stop it
23  there.
24      Q.  And you recognize that now, Mr.
25  LoGrasso, as the match we were talking about

1   earlier this morning, as the one in which
2   Bret Hart received a concussion that put him
3   out of the business?
4       A.  If that's the match that happened
5   in, then, yes.
6       Q.  And did you see the kick that he
7   got from Goldberg?
8       A.  I saw the kick.
9       Q.  To the head?
10      A.  Yeah.
11      Q.  And did you see him continue to
12  perform after that kick to the head?
13      A.  Yes.
14      Q.  And he continued the match,
15  correct?
16      A.  Yes.
17      Q.  Right?
18      A.  Yes.
19      Q.  All the way to the end, right?
20      A.  Uh-huh.
21      Q.  Was not knocked unconscious, was
22  he?
23      MR. SCIOLLA:  Object to the form.
24  Calls for speculation.
25      A.  He finished the match.

17 (Pages 62 to 65)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

Q. And that's the one that you would have seen, in fact testified that you did see backstage and watched it?

MR. SCIOLLA: Asked and answered.

A. Yes, sir.

Q. Did you know Bret Hart well?

A. If you can define what you mean, "well."

Q. Well, let me put it this way: You wrestled him, didn't you?

A. Uh-huh.

Q. Again, you have to respond verbally.

A. I'm sorry.

Q. That's all right. You have to say yes, no or whatever your answer is.

A. Yes, sir, I wrestled Bret Hart in WWF when I first started as a rookie, and then when he was in working for WCW, I worked with him there, I didn't work against him. And then I believe he was back, I believe he was in the Hall of Fame in 2006. When he got elected to the Hall of Fame I think I was there.

Q. But would it be fair to say that

when Bret Hart left WWE to go to WCW, it was a pretty big deal, wasn't it?

A. Yes, it was.

Q. And Bret Hart, in the wrestling business, is sort of a legendary character, isn't he?

A. Yes, he is.

Q. He Comes from the Hart family, all the traditions of the Hart family, right?

A. Yes, he does.

Q. So what happened to Bret Hart at Starrcade was big news in the wrestling business, wasn't it?

MR. SCIOLLA: Object to the form.

A. Yes, it was.

Q. I mean everybody knew what had happened to Bret Hart in the wrestling business, that he had got knocked out of the business with that kick from Goldberg?

A. It was a freak thing, a freak accident.

Q. Understood. But it was well-known, wasn't it?

A. Yes, it was.

Q. Now, I want to ask you something

about the language that's been used in this complaint, Mr. LoGrasso.

First of all, do you agree that professional wrestling is not a fight, is it?

A. It's not a fight?

Q. It's not a fight, is it?

A. You're fighting the guy, you're fighting against him. A lot of times it winds up into a struggle, it can wind up into a fight. You're wrestling and there's physical contact.

Q. It's entertainment, isn't it?

A. No, sir, it's wrestling.

Q. Oh, it's not entertainment?

A. It's entertainment for the people in there, as they changed the brand of it, to be wrestling entertainment, but it's still wrestling and fighting.

Q. So you are really trying to hurt the other guy?

A. Not trying to hurt the other guy.

Q. Is the other guy trying to hurt you?

A. He might be, if he doesn't like you in the ring.

Q. Aren't you responsible for each other's safety, once you get in the ring?

MR. SCIOLLA: Object to the form.

A. You are supposed to take care of each other.

Q. I mean you wouldn't last long in this business, if you didn't try to take care of each other, would you?

A. You're absolutely 100 percent right.

Q. If you were the kind of person that went into the ring deliberately trying to hurt people, you wouldn't last long in this business, would you?

A. No, you would not.

Q. And you didn't do that when you were performing, did you?

A. No, I did not.

Q. And as far as you know, did anybody that you were ever up against in the WWE deliberately try to hurt you?

A. No.

Q. Do you have any beef with Steven Regal?

Do you have any beef with Steve

70

```
 1    Regal?
 2        A.  Beef?
 3        Q.  Yeah.
 4        A.  Not that I know of.
 5        Q.  Are you friends with him?
 6        A.  We worked together.
 7        Q.  Did you consider him to be an
 8    experienced pro?
 9        A.  Yes.
10        Q.  I take it you considered yourself
11    to be an experienced professional in those
12    matches you had with him, right?
13        A.  Yes, sir.
14        Q.  Who had been a wrestler longer, you
15    or him?
16        A.  I'm not sure.  I think maybe he
17    might be a few years ahead of me, maybe.  I'm
18    not sure.
19        Q.  Were you fighting him in the sense
20    of trying to hurt him?
21        A.  No, but his style of wrestling is
22    very physical.
23        Q.  Those were comedy matches, weren't
24    they?
25        MR. SCIOLLA:  Object to the form.
```

71

```
 1        Q.  Isn't that what they were, comedy
 2    matches?
 3        A.  They were very physical matches.
 4        Q.  But they were designed to get
 5    laughs from the crowd, weren't they?
 6        A.  Those matches, if I can explain,
 7    okay, have a tough man in a dress.  Nobody
 8    wants to be humiliated by a guy in a dress,
 9    so of course there is the laughter in it when
10    you flash your dress at somebody, a grown man
11    flashes his dress to get a laugh; so I guess
12    you can say in those particular sequences you
13    are entertaining the people.
14        But when you get embarrassed by a
15    man in a dress, the physicality that comes
16    with it that you're not going to embarrass
17    me, you know, and you're coming at somebody,
18    he's known as a very tough, stiff wrestler, a
19    good wrestler, you know.  And, you know,
20    those matches were physical.  It wasn't a
21    ha-ha match.
22        Q.  Who won those matches?
23        A.  I believe I did.
24        Q.  Every one of them, right?
25        A.  I think so.  I don't remember.
```

72

```
 1        Q.  In the parlance of the business, he
 2    was putting you over, wasn't he?
 3        A.  Yes, sir.
 4        Q.  And making you a bigger character
 5    by allowing himself to be humiliated by you,
 6    right?
 7        A.  Yes, sir.
 8        Q.  That was the story line, wasn't it?
 9        A.  Yes, sir.
10        Q.  And did you talk about those
11    matches with him before you performed them?
12        A.  Talk about what we were going to
13    do --
14        Q.  Yes.
15        A.  -- and what the booking agents
16    wanted for us to do?
17        Q.  Well, let's talk about, did you and
18    Regal work out your match?
19        A.  Yes.
20        Q.  And that's fairly common in the
21    business, isn't it, you and the other
22    performer work out what you're going to do?
23        A.  Yes, sir.
24        Q.  In fact, what you're typically
25    given is the time you have of a match and the
```

73

```
 1    finish, and you and the other performer work
 2    out what you are going to do; is that fair to
 3    say?
 4        A.  Yes, sir.
 5        Q.  And that's what you did in those
 6    matches, right?
 7        A.  Say it again?
 8        Q.  And that's what you did in those
 9    matches, right?
10        A.  Yes, sir.
11        Q.  And in fact the throwing you into
12    the metal stairs, you knew that was going to
13    happen, didn't you?
14        A.  I don't recall.  All I know is I
15    went into the stairs.  And a lot of times
16    when you're in those matches and you go
17    outside the ring, everything is not scripted,
18    and a lot of times you ad lib.
19        Q.  But you knew he was going to throw
20    you into those stairs, didn't you?
21        A.  No, I did not.
22        Q.  Don't you have know that to run the
23    camera angles?
24        A.  I didn't know what --
25        MR. SCIOLLA:  Object to the form.
```

19  (Pages 70 to 73)

74

1     **Q.  Let me ask you this, sir.  Let me**
2  **ask you this, sir.**
3       **That's a fairly common move in the**
4  **pro wrestling matches, isn't it?**
5       MR. SCIOLLA:  Object to the form.
6     A.  What is a common move?
7     **Q.  Yeah, it's a fairly common move is**
8  **to throw a wrestler into the steps?**
9     A.  It doesn't happen every night, so
10  it's not common.
11     **Q.  It happens a lot of nights, doesn't**
12  **it?**
13       MR. SCIOLLA:  Object to the form.
14     A.  I just said it's not a common move,
15  and it doesn't happen every night.
16     **Q.  Well, how many times in your career**
17  **have you been thrown into the steps?**
18     A.  I don't recall.
19     **Q.  Have you ever thrown anybody into**
20  **the steps?**
21     A.  I don't recall.
22     **Q.  Do you think if we watched the**
23  **tapes, you would recall?**
24     A.  If I watch tapes of me doing it?
25  Of course, if it's on tape.

75

1     **Q.  Are there tricks to this trade?**
2  **Are there illusions you pull off as a**
3  **professional wrestler?**
4     A.  Are there tricks to the trade?
5     **Q.  Yeah, tricks to the trade.**
6     A.  I don't understand what you mean.
7     **Q.  Well, that maneuver, is there any**
8  **kind of stunt aspect to that maneuver of**
9  **being thrown into the steps?**
10     A.  I would think so.  I mean you got,
11  you know, if it's scripted that you're going
12  to go into the steps, it's very defined on
13  what you're going to do and how you're going
14  to do it.
15     **Q.  And how would you do it, if it was**
16  **scripted?**
17     A.  It depends on what you, what the
18  match concept is.  A lot going into it.  You
19  just don't go outside and throw somebody in
20  the stairs.  And a lot of times when you're a
21  professional and it's outside the ring, if
22  there's two pros, you know, you know, you go
23  with the flow of what's going on.
24     **Q.  Well, if you know you're going to**
25  **be thrown into the stairs, is there a safe**

76

1  way to do that?
2     A.  There is a safe way, but a lot of
3  times, sometimes you try to do something, and
4  it doesn't always come out that way.
5     **Q.  What's a safe way?**
6     A.  Trying to put your hand up and
7  defending yourself.
8     **Q.  And what does that mean?**
9     A.  Trying to protect yourself.  Just
10  like you said before, wrestlers protect each
11  other when they're wrestling each other,
12  because it's an understanding.  Like you
13  said, it's a, you know, you work with each
14  other, you don't try to hurt each other, you
15  try to protect each other, because, as you
16  said, you don't last long in the business.
17     **Q.  But there's also moves you have to**
18  **protect yourself, right?**
19     A.  By landing correctly, yes.
20     **Q.  While also creating the illusion**
21  **that you have really hit the steps, correct?**
22     A.  Right.
23     **Q.  And I mean that's the whole safe**
24  **way to do it, isn't it, to create an illusion**
25  **that you've been thrown into the steps, but**

77

1  **you really haven't been thrown into the**
2  **steps, correct?**
3     A.  Making the illusion and doing it
4  like you just said, that can be done.  Being
5  thrown into the stairs and trying to do it,
6  as we're saying, sometimes doesn't come out
7  the way it's supposed to, because you're
8  going at a speed.  You could be at a
9  different angle, you could be in a different
10  place.  A guy could shoot you off too hard, a
11  guy could handle your body wrong, you could
12  judge the distance wrong.
13       So there's a lot of different ways.
14  It's not about a camera angle and it's not
15  about anything, it's the momentum and the
16  pace of the match.
17     **Q.  You could make a mistake in which**
18  **you wouldn't protect yourself when you're**
19  **thrown into the steps?**
20       MR. SCIOLLA:  Object to the form.
21     A.  Well, if somebody is throwing you
22  into the stairs and you don't know about it,
23  it's kind of hard to protect yourself at the
24  last minute.  You're going and you're really
25  not prepared for it.

20  (Pages 74 to 77)

78

1      Q.  But it's kind of a natural
2   instinct, isn't it, to put your hand up to
3   protect yourself?
4      A.  You would hope so.
5      Q.  I mean if somebody is coming at you
6   with a chair to hit you in the head, if it's
7   supposed to be realistic.  Wouldn't you
8   logically think the person would put their
9   hands up to block the chair?
10     MR. SCIOLLA:  Object to form.
11     A.  In this era, yes.
12     Q.  But when you were getting hit with
13  the chair, you didn't even do that, did you?
14     A.  Back then, no.
15     Q.  You leaned into it and took it full
16  force on the head, didn't you?
17     You would lean in and take it full
18  on the head, wouldn't you?
19     MR. SCIOLLA:  Objection, asked and
20  answered.
21     He can answer again.
22     A.  I don't know if I leaned in.
23     Q.  When were you diagnosed for TMJ?
24     A.  I think we're going into 2014,
25  2015.

79

1      Q.  Who diagnosed you as having TMJ?
2      A.  I believe it was both doctors,
3   Dr. Smith, the ENT, sent me to Dr. Handler.
4      Q.  Were you diagnosed for TMJ after
5   you brought the lawsuit?
6      A.  No.
7      Q.  So it wouldn't be correct to say
8   that you were diagnosed on February 4th of
9   2015?
10     A.  I'm not sure of the date of my
11  diagnosis.  I don't have the records in front
12  of me.
13     Q.  Did anybody tell you that your TMJ
14  was actually caused by head trauma?
15     A.  I'm trying to remember what they
16  told me.
17     They said repeated blows to the
18  head, repeated hits to the jaw, that's how I
19  got TMJ.
20     Q.  And who told you that?
21     A.  The doctors.
22     Q.  Which doctors?
23     A.  Dr. Smith and Dr. Handler, I
24  believe.
25     Q.  Who is first attorney you spoke to

80

1   regarding this lawsuit?
2      A.  The first attorney I spoke to is
3   Mr. Bill Kyros.
4      Q.  And when did you first speak to Mr.
5   Kyros?
6      A.  I'm not sure of the day.
7      Q.  Well, if your original lawsuit was
8   brought January 16th of 2015, to give you
9   some time frame.  That's the date you filed
10  your first complaint.
11     A.  So it would have to be within that
12  time frame.
13     Q.  Well, how long in advance of that
14  lawsuit did you first speak to Mr. Kyros?
15     A.  I would say, I would say it was in
16  January, I believe.
17     Q.  The same month that you brought the
18  lawsuit?
19     A.  I think, I'm not sure.  I'm really
20  not sure of the day.
21     Q.  And how did you know Mr. Kyros?
22     A.  Well, I heard a few guys talking
23  about a lawsuit and they mentioned Bill
24  Kyros' name, and I gave him a call.
25     Q.  Who were the guys that you heard

81

1   talking?
2      A.  It was just wrestlers, guys in the
3   business.
4      Q.  Who?
5      A.  I don't remember who.
6      Q.  Was it January this year and you
7   don't remember who it was that was talking
8   about a lawsuit?
9      A.  It was just in passing.
10     MR. SCIOLLA:  It was January of
11  last year.
12     MR. McDEVITT:  January of last
13  year, I'm sorry.
14     Q.  Did you see any advertisements on
15  the internet for Mr. Kyros?
16     A.  You asked me if I published
17  something on Facebook about people joining
18  the lawsuit, and I said yes.  It wasn't --
19     THE WITNESS:  Excuse me one second.
20     MR. SCIOLLA:  I'm sorry, could you
21  repeat the question back.
22     (A portion of the record was read.)
23     A.  Okay.  Can you give that to me one
24  more time?
25     Q.  Did you see any advertisements by

21 (Pages 78 to 81)

82

1    Mr. Kyros on the internet?
2      A.  Did I see any of Mr. Kyros' --
3      Q.  That's the question.
4      A.  No, I did not.
5      Q.  Did you call him or did he call
6    you?
7      A.  I called him.
8      Q.  The lawsuit says --
9         MR. McDEVITT:  Let me mark this
10   first.
11        (Discussion off the record.)
12        (LoGrasso Exhibit 2, Plaintiff's
13   Second Amended Complaint, marked for
14   identification, this date.)
15        MR. SCIOLLA:  This is 2?
16        MR. McDEVITT:  Yes.
17        MR. SCIOLLA:  The video is 1?
18        MR. McDEVITT:  Yes.
19        MR. SCIOLLA:  Great.
20     Q.  Mr. LoGrasso, I'm directing your
21   attention to Exhibit 2, which is the document
22   in front of you, the second amended
23   complaint.
24        Do you know how many complaints you
25   filed in this case?

83

1      A.  I'm not sure of all the complaints.
2    If you're asking me for a number, you know, I
3    don't recall how many.
4      Q.  Did you know that the original
5    complaint was brought as a purported class
6    action case?
7      A.  Yes.
8      Q.  Did you know that the class action
9    allegations were then dropped?
10     A.  Yes.
11     Q.  Do you know why they were dropped?
12        MR. SCIOLLA:  Objection.  To the
13   extent it goes into attorney-client
14   communications, I don't want you to
15   answer the question.  But if you have
16   some independent understanding about the
17   class action complaint allegations, then
18   you can answer the question.
19     Q.  So you're refusing to answer?
20     A.  I'm sticking to what my attorney
21   says, to don't answer the question.
22     Q.  Do you know you were soliciting
23   people to join the class action after it had
24   been dropped as a class action?
25        MR. SCIOLLA:  I'm sorry.  Object to

84

1    the form.
2      A.  Was I soliciting people after the
3    fact that they -- that the class action was
4    dropped?
5      Q.  Did you know you were soliciting
6    people to join the class action after it was
7    no longer a class action?
8         MR. SCIOLLA:  Object to the form.
9      A.  No.  I'm not aware of it.
10     Q.  In any event, on Exhibit 2, if you
11   would, sir, would you turn to page 39,
12   paragraph 146.
13        MR. SCIOLLA:  Just so you know, the
14   numbers are at the top and the bottom of
15   the pages.  They're consistent.
16     A.  39?
17     Q.  Yes, paragraph 146.
18     A.  146.
19     Q.  Do you recall me asking you earlier
20   when you were diagnosed as having a traumatic
21   brain injury?
22        Do you recall me asking you earlier
23   today when you were first diagnosed as having
24   a traumatic brain injury?
25     A.  Right.  Yes, sir.

85

1      Q.  If you look at paragraph 146, does
2    that refresh your recollection as to when you
3    were first diagnosed?
4      A.  Yes, that was part of it.
5      Q.  Who diagnosed you on April 1st,
6    2015 as having a traumatic brain injury?
7         Look up at paragraph 143, if you
8    would.
9      A.  Joseph Handler was my neurologist,
10   and that's the one who diagnosed me.
11     Q.  Does that refresh your
12   recollection, then, as to the date he
13   diagnosed you?
14     A.  If it's -- I'm not sure of the
15   dates, but if it's put here -- I know he
16   diagnosed me, that's the best I can answer.
17     Q.  But your allegations are that that
18   happened on or about April 1st of 2015.
19        Do you have some reason to think
20   that your lawyers have said something that
21   was false?
22        MR. SCIOLLA:  Object to the form.
23        You can answer.
24        THE WITNESS:  Huh?
25        MR. McDEVITT:  You don't need to

22 (Pages 82 to 85)

86

1    look to him to get an answer.
2        THE WITNESS:  I'm not looking at
3    him to get an answer, I'm trying to
4    hear.  He's saying things.  I'm trying
5    to hear what he's saying by looking at
6    him.  And then I'm turning back to you
7    and giving you my undivided attention.
8        MR. McDEVITT:  Well, you don't need
9    to look at him, because you're bending
10    that ear to hear me.  That's where he
11    faces.  You can hear in that ear.
12        MR. SCIOLLA:  You don't need to
13    engage the witness and tell him what to
14    do.
15        MR. McDEVITT:  I need to tell him
16    not to take coaching.  Absolutely, I do.
17    He's been doing it all morning, and I
18    would ask you to stop it.
19        MR. SCIOLLA:  He's trying to hear
20    me.
21        MR. McDEVITT:  He doesn't need to
22    turn his head to hear you.  His ear is
23    pointing right to you.
24        MR. SCIOLLA:  Not when it's pointed
25    at you.

87

1        MR. McDEVITT:  No, right now it's
2    pointing right at you.
3        MR. SCIOLLA:  I'm not go to bicker
4    with you.  Please don't bicker with the
5    witness.
6        MR. McDEVITT:  I'm not bickering
7    with the witness.  I'm asking him not
8    to --
9        MR. SCIOLLA:  The video shows.
10        MR. McDEVITT:  Well, then we'll see
11    what the video shows.
12        Q.  But Mr. LoGrasso, again, let me ask
13    you, looking at your own pleading here, am I
14    correct that your pleading alleges that it
15    was on or about April 1 that you were
16    diagnosed as having a traumatic brain injury?
17        A.  Yes, sir.
18        Q.  And that is after you brought the
19    lawsuit, isn't it?
20        You brought the lawsuit in January
21    of 2015.
22        A.  Yes, sir.
23        Q.  So you brought the lawsuit for
24    traumatic brain injury before you were even
25    diagnosed with traumatic brain injury?

88

1        MR. SCIOLLA:  Object to the form.
2        A.  I was getting checked out by my
3    doctors.
4        Q.  So is it safe, then, to assume that
5    the first person you talked to about
6    traumatic brain injury was Mr. Kyros and then
7    doctors about whether you had it?
8        MR. SCIOLLA:  Object to the form.
9        Hold on.  I'll also object to the
10    extent it goes to attorney-client
11    privilege, which it definitely does.
12    I'm going to instruct you not to answer.
13        MR. McDEVITT:  How does that go to
14    privilege?
15        MR. SCIOLLA:  You just asked him
16    about conversations with his attorney.
17        MR. McDEVITT:  No, I didn't.
18        MR. SCIOLLA:  Why don't you reread
19    the question.
20        MR. McDEVITT:  Why don't you listen
21    to the question.
22        MR. SCIOLLA:  I'll be happy to.
23    Could you please read it back.
24        (A portion of the record was read.)
25        MR. SCIOLLA:  My objection remains

89

1    the same, and I'll instruct you not to
2    answer.
3        MR. McDEVITT:  Well, let's put it
4    this way:
5        Q.  Did you talk to a lawyer about the
6    subject, without revealing any specific
7    communications, about the subject of your
8    lawsuit, before you were even diagnosed with
9    having a traumatic brain injury?
10        MR. SCIOLLA:  I'll continue my
11    objection and instruct you not to
12    answer.  Again, it goes to the substance
13    of communications with an attorney.
14        Q.  Did you retain Mr. Kyros the first
15    time you talked to him?
16        A.  I believe I spoke to Mr. Kyros a
17    couple of times.
18        Q.  And did you eventually sign some
19    kind of an agreement with him?
20        A.  I believe he sent me some paperwork
21    for me to sign.
22        Q.  How many conversations did you have
23    with him before you signed a retainer
24    agreement?
25        A.  I don't recall.

23  (Pages 86 to 89)

90

1      Q.  More than one?
2      A.  I don't recall.
3      Q.  Did you have conversations with
4   him, though, before you signed a retainer
5   agreement?
6      A.  I did have conversations with him.
7      Q.  And did you, in the conversations
8   you had with him before you retained him, did
9   he tell you about the lawsuits he wanted to
10  bring against the WWE?
11         MR. SCIOLLA:  Objection.  I'm going
12  to continue the objection as to
13  attorney-client privilege and instruct
14  you not to answer.
15         MR. McDEVITT:  My question said
16  before he retained.
17         MR. SCIOLLA:  Your question did not
18  establish whether he was talking with
19  Mr. Kyros for the purpose of
20  representation of his claims.  That is
21  still covered by attorney-client
22  privilege, as you well know.
23         MR. McDEVITT:  Don't tell me what I
24  well know.
25         MR. SCIOLLA:  Okay, I won't -- I

91

1   won't --
2          MR. McDEVITT:  I forgot more than
3   you know.
4          MR. SCIOLLA:  That's probably true.
5          MR. McDEVITT:  Okay.
6      Q.  Before you brought this lawsuit --
7          MR. McDEVITT:  Strike that.
8      Q.  What year did you begin your
9   wrestling career?
10     A.  What year I did start wrestling?
11     Q.  Yes.
12     A.  1990.
13     Q.  1990?
14     A.  Yeah.
15     Q.  And you trained with a fellow by
16  the name of Johnny Rods; is that right?
17     A.  Yes, sir.
18     Q.  And after that you spent some time
19  with what I think you called enhancement
20  talent with the WWE?
21     A.  Yes, sir.
22     Q.  That was 1991?
23     A.  '91 through '98.
24     Q.  Did you send a letter to the WWE in
25  2009 looking for work?

92

1          Do you understand my question?
2      A.  Yes.
3      Q.  Did you send an e-mail to the WWE
4   in 2009 looking for work?
5      A.  I know I spoke to them, and I
6   believe I -- I know I spoke to them.  I might
7   have sent an e-mail.
8          MR. McDEVITT:  Let's mark that.
9      Q.  And do you recall in that you sort
10  of summarized your wrestling career?
11     A.  Say that one more time.
12     Q.  Do you recall summarizing your
13  wrestling career?
14     A.  I don't recall the e-mail.  I don't
15  remember what the contents were.
16         MR. SCIOLLA:  Are we done with
17  Exhibit 2?
18         MR. McDEVITT:  Yes.
19         MR. SCIOLLA:  You can put that to
20  the side.
21         (LoGrasso Exhibit 3, E-mail date
22  5/6/09, Bates Nos. WWE_SING00002132 and
23  WWE_SING00002133, marked for
24  identification, this date.)
25     Q.  Mr. LoGrasso, I've handed you

93

1   what's been marked as Exhibit 3.  If you
2   would take a minute to reread the bottom
3   e-mail that I think you sent there.
4          Have you finished reading it, Mr.
5   LoGrasso?
6      A.  Yes, sir.
7      Q.  And am I correct, this is an e-mail
8   you sent to John Laurinaitis and Ty Bailey in
9   May of 2009?
10     A.  Yes, sir.
11     Q.  And basically trying to inquire
12  about the possibilities of joining the WWE
13  staff as a trainer, correct?
14     A.  Yes, sir.
15     Q.  And am I correct that in this memo
16  you say nothing to anybody about suffering
17  any kind of injuries or symptoms of head
18  injury, correct?
19     A.  Yes, sir.
20     Q.  And you indicate that, in this,
21  that you realize that "the days of wrestling
22  for me are over," do you see that?
23     A.  I do.
24     Q.  You continued to wrestle for five
25  more years after that, right?

24  (Pages 90 to 93)

94

1    A. I was told to write this by Steve
2 Curran, so I can gain employment with the
3 WWE.
4    Q. My question, sir, was, you
5 continued to wrestle for five years after
6 2009, right?
7    A. Yes, sir.
8    Q. WWE didn't give you employment in
9 response to this, did they?
10    A. No, sir.
11    Q. Did anybody call you and talk to
12 you about this, this e-mail?
13    A. About the e-mail, yes. I spoke to
14 John Laurinaitis, I spoke to Steve Curran, I
15 spoke to Tom Pritchard and Norman Smiley.
16    Q. In connection with this particular
17 e-mail?
18    A. Yeah.
19    Q. After you sent it or before?
20    A. It was before I sent it. I went
21 down to FCW. I saw Steve Curran, Tom
22 Pritchard, and Norman Smiley was working
23 there. They thought I would be a good
24 candidate to join the staff as a trainer.
25 And they told me, they said they weren't

95

1 going to hire me unless I sent an e-mail. I
2 had to write a form of e-mail saying that I
3 was going to be done with wrestling, because
4 at the time they were in a transition and
5 they didn't want guys who were trying to
6 still wrestle, possibly with the hope of
7 going back to wrestling on TV. And they
8 said, if you write it in this manner, it
9 would be more in favor of you getting
10 employment to be a trainer.
11    So with the help of those
12 gentlemen, that's why I wrote this the way I
13 did.
14    Q. Was there anything else in these
15 conversations with these gentlemen other than
16 what you just described?
17    A. Just about me trying to be a
18 trainer there. And Steve Curran was a big, a
19 big advocate of mine, and he liked the way I
20 wrestled, he liked the way I trained. Norman
21 Smiley also was a big advocate, and he
22 thought I would be a good fit there. But,
23 you know, ultimately it was up to John
24 Laurinaitis at the time.
25    Q. Now, what I want to focus on, was

96

1 there any other conversation between you and
2 those gentlemen in connection with this,
3 other than what you've testified to?
4    A. No, I don't believe so.
5    Q. Now, in terms of your description
6 of your career pattern that is set forth
7 here, where you give what you describe as a
8 brief background, you indicate that you began
9 at the Johnny Roth School in Brooklyn,
10 correct?
11    A. Uh-huh.
12    Q. Again, you have to say yes or no.
13    A. Yes, sir. I'm sorry.
14    Q. And then it says you started
15 working on TV in '91 for WCW.
16    A. Johnny had sent me down to MM to
17 one TV taping of More Championship Wrestling.
18    Q. And then it says, "and then to WWF
19 as an extra."
20    A. Right?
21    Q. Then from there I worked for All
22 Star Wrestling in Puerto Rico with Hugo
23 Savinovich, and then it has your first tour
24 of Japan in 1992, correct?
25    A. Right.

97

1    Q. And after '92, it goes on to talk
2 about going into the Dominican Republic; and
3 there's no mention in here of working for WWE
4 after 1991, is there?
5    A. It was already known that I did
6 work for them. They didn't know what I --
7 where I worked before, because everybody at
8 WWE knew I worked at Skull Von Crush or Von
9 Crush, in the WWE -- F. And I just put that
10 down as an extensive background, but
11 everybody knew I was working for the company.
12 It was common knowledge.
13    Q. How many matches would you say you
14 had as a jobber for WWE?
15       MR. SCIOLLA: Entire career, or are
16 we limiting it to a certain time period?
17 Counsel?
18       MR. McDEVITT: I'm not here to
19 answer your questions.
20       MR. SCIOLLA: I'm just helping you
21 get the answers.
22       MR. McDEVITT: I don't need your
23 help. If you have an objection, make
24 it.
25       MR. SCIOLLA: Okay. I object to

25  (Pages 94 to 97)

98

1       the form, then.
2       A.  I know I had -- I had many matches
3   as an enhancement talent or, as you were
4   saying, a jobber in the WWE.
5       Q.  What is "many matches"?  Is that
6   50, 100, how many?
7       A.  It was from '91 to '98, there's a
8   lot of matches.
9       Q.  And you weren't working for anybody
10  else in that time period?
11      A.  Well, it says that right here, what
12  I was doing in between those times, not like
13  you were living anyplace else.  So when the
14  TV tapings were available and I was
15  available, I would be called and they would
16  ask me if I was available to do bookings.
17      Q.  Do you have any records that would
18  show the dates you performed as enhancement
19  talent for WWE?
20      A.  Actually there is a list, there's a
21  list of matches, and with the list of matches
22  that you have you can get from the computer,
23  you can find out the towns and where it was
24  and the exact place.  So yes, there is a list
25  available and WWF or E should have documents

99

1   of me being there as an enhancement.
2       Q.  I'm asking what records you have.
3          Do you have any records that show?
4       A.  I believe so.  I believe I have all
5   the matches listed somewhere.
6       Q.  Did you turn them over in this
7   litigation?
8       A.  I'm not sure.
9       Q.  In fact, this e-mail you didn't
10  turn over either, did you?
11      A.  I wasn't asked to turn over this
12  e-mail.
13      Q.  Well, you were asked for
14  communications with WWE.
15      A.  Communication in 2009?
16      Q.  It didn't matter what year.  You
17  were asked for communications with the WWE.
18  This wasn't turned over.
19          Did you search your computers to
20  see if there were other communications with
21  WWE?
22      A.  I don't understand what you're
23  saying.  I'm not understanding what you're
24  trying to get at.
25      Q.  What I'm saying is you didn't give

100

1   us this record in response to our document
2   requests.
3       A.  What document request is that?
4       Q.  You're not aware that we served you
5   with a document request?
6          Don't look at him, he's not going
7   to tell you the answer.  Look at me.
8       A.  I am looking at you, and I'm trying
9   to figure out what you're asking me.
10      Q.  What I'm asking you is, did you
11  know we served you with a document request?
12      A.  I did not recall sending this
13  e-mail.  I don't have a copy of this e-mail.
14      Q.  Did you know we served you with a
15  document request?
16      A.  I know that there were document
17  requests requested, yes.
18      Q.  Did you search your computers for
19  records responsive to that request?
20      A.  I didn't even remember I sent this.
21      Q.  Did you search your computers to
22  see what you sent?
23      A.  My computer is updated, and I do
24  not have a record of this e-mail.
25      Q.  So you did search for this, but you

101

1   just didn't find it?
2       A.  I don't have it in my e-mails.
3       Q.  When did you conduct a search of
4   your e-mails?
5       A.  Mr. Kyros had asked me to --
6          MR. SCIOLLA:  Just answer as far as
7       the date.  I don't want you to going
8       into communications with your attorney.
9       He's only asking for a date.
10      A.  I don't recall the date.
11      Q.  When you performed for WCW, did you
12  sign any contracts?
13      A.  Yes, I did.
14      Q.  How many contracts with them did
15  you sign?
16      A.  I only signed one contract with
17  WCW.
18      Q.  Do you still have a copy of it?
19      A.  Yes, sir.
20      Q.  Did your WCW contract have
21  provisions in it that indicated that you
22  assumed the risk of injury?
23      A.  I don't recall, sir.
24      Q.  Is that common in wrestling
25  contracts?

26  (Pages 98 to 101)

102

1         MR. SCIOLLA:  Object to the form.
2         A.  I don't know, because I don't read
3   everybody's contract.
4         Q.  Well, the ones that you have signed
5   in your career?
6         A.  I don't recall what was in the
7   contract.
8         MR. McDEVITT:  We would ask that
9   that document be produced.  I think it
10  was requested in our document requests.
11        MR. SCIOLLA:  Certainly we will
12  take a look at that.
13        Q.  When you were with the ECW, did you
14  sign any contracts?
15        A.  No, sir.
16        Q.  When you worked for foreigner
17  promoters, did you sign any contracts?
18        A.  No, sir.
19        Q.  You worked for TNA also, right?
20        A.  Yes.
21        Q.  What years did you work for them?
22        A.  2004.
23        Q.  Just one year?
24        A.  Yeah.
25        Q.  Were you terminated from WCW?

103

1         A.  I lasted when they did the
2   takeover, and then when the McMahons bought
3   WCW, I was not taken over in the exchange.
4         Q.  Were you terminated for domestic
5   abuse?
6         A.  No, sir.
7         Q.  I'm sorry, did you say you did or
8   did not have a contract with TNA?
9         A.  I did not.
10        Q.  And in every promotion that you
11  have ever performed for in your wrestling
12  career, have you been treated as an
13  independent contractor?
14        MR. SCIOLLA:  Object to the form.
15        MR. McDEVITT:  Let me rephrase
16  that.
17        Q.  You've been given a 1099, not a
18  W-2, from every wrestling promoter; correct?
19  Is that right?
20        A.  Yes, sir.
21        Q.  Do you contend you weren't an
22  independent contractor when you were working
23  with the WWE?
24        MR. SCIOLLA:  Object to the form.
25        To the extent you can answer, you

104

1   can.
2         A.  Would you say that one more time?
3         Q.  Did you contend that you were not
4   an independent contractor when you were
5   working for the WWE?
6         MR. SCIOLLA:  Same objection.
7         A.  I was under contract when I was an
8   WWE employee.
9         Q.  So you think you were an employee,
10  not an independent contractor?
11        A.  Well --
12        MR. SCIOLLA:  Object to the form.
13        A.  -- when I signed the WWE contract,
14  I couldn't do anything else, couldn't take
15  any dates, couldn't go anyplace else, so you
16  take it as you work for the WWE as an
17  employee.  You're paid.  It's a Catch 22,
18  because they say you're an independent
19  contractor, but then you can't go out and do
20  anything else or take any other -- earn any
21  money anyplace else, unless you get the
22  authorization of the WWE.  And when you are
23  working for the WWE, they basically own you.
24        So there is no outlet for you to go
25  and get any other kind of employment or make

105

1   any other money.
2         Q.  When you say the WWE basically owns
3   you, since you were let go in 2007 and before
4   you filed this lawsuit, have you often
5   praised the WWE?
6         A.  I never spoke badly of company.
7         Q.  I mean before you filed this
8   lawsuit, you were saying wonderful things
9   about the WWE and your time there?
10        MR. SCIOLLA:  Object to form.
11        A.  I always said I had the best time
12  of my life, I said I lived my dream.  I did
13  say these things.
14        Q.  Had no negatives at all, isn't that
15  what you said?
16        A.  Any negativity, any negativity I
17  had I kept to myself, because it was nobody's
18  business.
19        Q.  My question was, you said you had
20  no negatives at all about WWE, did you?
21  Publicly?
22        A.  Publicly, I did not say anything
23  bad about the WWE.
24        Q.  And publicly you kept trying to get
25  back into WWE, didn't you?

27 (Pages 102 to 105)

106

1      A.  Not publicly.  Quietly.
2      Q.  Well, weren't you promoting the
3   idea that it would be a good match between
4   you and Ryback, for example?
5      A.  Saying something on Facebook,
6   saying it would be a good match, of course it
7   would.  So it's not promoting that I wanted a
8   job back.  I said it would be a good match.
9      Q.  How many times since your release
10  have you tried to communicate with the WWE or
11  its personnel about getting a job with WWE?
12     We went through the one already.
13  Any other times?
14     A.  I went to, I went to Tampa and, in
15  the one TV taping where John Laurinaitis had
16  me come in.  And I saw John, I think 2011 he
17  had me come in, maybe, I'm not sure, or 2010.
18     And he basically told me WWE was
19  going in a different direction.  I was too
20  old and they weren't taking the older guys,
21  they wanted to go with somebody else, as far
22  as being talent.  And then started talking
23  about me being a trainer.  They said they had
24  no positions open.
25     And then I had gotten in touch with

107

1   Bill DeMott about possibly being, be a
2   trainer.
3      Q.  What year is that?
4      A.  The Bill DeMott thing had to be a
5   couple of years ago.
6      Q.  2012, 2013?
7      A.  About that, when he was in charge
8   of NXT.
9      Q.  Any other contacts trying to get a
10  job with them?
11     A.  And -- no, basically it was bring
12  you in as a guest trainer.  I called him a
13  few times, then he told me don't call me no
14  more I'll call you.
15     Q.  Who is the "he" there?
16     A.  Bill DeMott.
17     Q.  I didn't mean to interrupt you.  Go
18  ahead.
19     A.  That's fine.
20     Q.  Have you finished your answer?
21     So he told you, don't call me, I'll
22  call you?
23     A.  Yeah.
24     Q.  Was there anything else in that
25  conversation with Bill DeMott other than what

108

1   you just testified to?
2      A.  That was it.
3      Q.  Was there anything else to the
4   conversation with John Laurinaitis other than
5   what you've just testified to?
6      A.  I'm just going to think.
7      Basically told me the WWE was going
8   in a different direction.  They didn't want
9   to hire old guys.  He said the age thing was
10  a factor for Stephanie and Tripe H, so that
11  was the end of that, basically.
12     (LoGrasso Exhibit 4, Canoe Network
13     article entitled, "Big Vito takes aim at
14     Japan," marked for identification, this
15     date.)
16     Q.  Mr. LoGrasso, I've handed you what
17  has been marked as Exhibit 4.
18     Do you recognize the picture there
19  as a picture of you?
20     A.  Do I recognize the picture?
21     Q.  That's you, isn't it?
22     A.  Yes.
23     Q.  And did you give an interview with
24  Slam Wrestling in April of 2008?
25     A.  I would have to read this.  I

109

1   really don't recall it.
2      Q.  Well, let's look back to the second
3   page.
4      Again, that's your likeness there
5   depicted, isn't it?
6      Again, you have to say yes --
7      A.  Yes, sir.
8      Q.  -- or no.
9      And then you go on to talk about
10  your time at the WWE and the character you
11  portrayed when you were wearing a dress.
12     And this quotes you as saying, "'It
13  was one of the most enjoyable times of my
14  career,' he said, explaining he became one of
15  the most recognized performer as a result and
16  even posed for Playgirl magazine.  'How many
17  guys can say they went undefeated for four or
18  five months?  I had a lot of fun with it.'"
19     Did you say that?
20     A.  Yes, sir.
21     Q.  And that time period that you are
22  talking about there would include the time
23  you spent performing with Steven Regal,
24  correct?
25     A.  That was my time frame with the

28 (Pages 106 to 109)

110

1    WWE, yes.
2        Q.  So prior to the lawsuit, you were
3    saying you had a lot of fun with that?
4        A.  That gimmick, yes.
5        Q.  And you were undefeated for four or
6    five months with Mr. Regal, correct?
7        A.  Yes.
8        Q.  And that's always good for your
9    character to be the one who wins, isn't it?
10       A.  You know, when you wear a dress and
11   you win, I guess it's a win/win for
12   everybody, I guess.
13       Q.  And then it says, it closes by
14   saying, "If the opportunity arose to go back,
15   I'd go back.  I have nothing to be bitter
16   about.  I always wanted to wrestler in the
17   WWE and I did.  I have no regrets.  I'm not
18   bitter about one thing."
19           Did you say that?
20       A.  Yes.
21       Q.  And that was in 2008?
22       A.  If that's the date, if I'm reading
23   it correctly, yes, sir, on the top, yes.
24       Q.  On the top.
25           And that would have been at a time

111

1    which according to your time you were having
2    these horrible headaches, right?
3        A.  Yep.
4        Q.  That you have today dated from the
5    match you had with Steven Regal in which you
6    contend he threw you into the metal steps,
7    right?
8            MR. SCIOLLA:  Object to the form.
9        A.  Yes, sir.
10           (LoGrasso Exhibit 5, Article
11       entitled, "Ring Ranting Week 1:  A Rant
12       Sports Exclusive Interview with Former
13       WWE Star Vito (Part 2)," marked for
14       identification, this date.)
15       Q.  We've just handed you what's been
16   marked as Exhibit 5, Mr. LoGrasso.
17           Do you recall doing an interview in
18   2013 with a fellow by the name of Brian, and
19   I'm probably going to mispronounce his name,
20   Rzeppa?
21       A.  I would have to read it.
22       Q.  Feel free.
23           Have you read it all?
24       A.  Yes, sir.
25       Q.  And do you recall being asked the

112

1    question, "What was your favorite part about
2    your time in WWE"?
3        A.  Yes, sir.
4        Q.  And he says your answer was, "Just
5    that I was doing what I loved to do and was
6    wrestling for the company that I wanted to
7    wrestle for.  I was living the dream."
8            Is that what you said?
9        A.  Yes, sir.
10       Q.  And then is it says, "How about
11   your least favorite?"  And you said, "Nothing
12   at all.  I enjoyed every minute of it.
13   Everyone treated me very well.  I have no
14   negatives at all."
15           Is that what you said?
16       A.  Yes, sir.
17       Q.  Were you lying then, or are you
18   lying now?
19           MR. SCIOLLA:  Object to the form.
20       I don't think he can even answer that
21       question.  That's not a legit question.
22       Q.  Which is it, Mr. LoGrasso?
23           MR. SCIOLLA:  Object to the form.
24       Q.  Everyone treated you fairly well,
25   or you were severely beaten while you were

113

1    performing there?
2        A.  Okay, here is where I'm getting a
3    little confused.
4            THE WITNESS:  Do I answer?
5            MR. McDEVITT:  No, you answer.
6            MR. SCIOLLA:  You can answer.
7            MR. McDEVITT:  Unless he instructs
8        you not to answer, you answer.
9        A.  I'm asking, which question would
10   you like me to answer.  I've actually
11   answered the first one before, when you
12   asked me if I was lying, or you asked me to
13   answer this one now, so I'm trying to catch
14   up.
15       Q.  Well, let's put it this way:  In
16   this lawsuit you contend you were severely
17   beaten and mistreated, correct?
18           MR. SCIOLLA:  Object to the form
19       and characterization, but you can
20       answer.
21       A.  In my personal time and when I do
22   interviews, I rarely do not bad mouth
23   anybody, because bad mouthing people doesn't
24   bring you anything.
25           And I always said that I enjoyed my

29 (Pages 110 to 113)

114

1    time in WWE, and in this article, I said the
2    truth, which is the truth.
3        Q.  You had no negatives at all, that
4    was the truth?
5        A.  At that time, yes.
6        Q.  And that time, 2013 --
7        A.  In 2013.
8        Q.  What you now say is you were
9    suffering from various symptoms of head
10   trauma that you today dated as beginning when
11   Steven Regal supposedly threw you into the
12   steps in the match in 2006?
13       MR. SCIOLLA:  Object to the form --
14   excuse me.  Object to the form.
15       Q.  Correct?
16       A.  Like I said in a lot of my
17   interviews, I always said positive things.
18       Q.  Well, was it a lie, then?
19       MR. SCIOLLA:  Object to the form,
20   asked and answered.
21       A.  In my interviews I always say
22   positive things.
23       Q.  That's not my question.
24       Were you lying in this interview?
25       A.  I wasn't lying in the interview.

115

1    That's what I said.
2        (LoGrasso Exhibit 6, Article
3        entitled, "Big Vito speaks out on Dixie
4        Carter/TNA, Russo & More," marked for
5        identification, this date.)
6        Q.  Mr. LoGrasso, I've handed you
7    what's been marked as Exhibit 6, which
8    appears to be, at least on the date of it, up
9    at the top right-hand corner it's dated
10   4/21/2016; but I don't want to mislead you,
11   because I don't think that's date of the
12   interview.  I could be wrong.
13       MR. SCIOLLA:  If you look at the
14   last page, there's a different date.
15       MR. McDEVITT:  Yes, 2013.
16       Q.  I just want to ask you, on the
17   second page here, there are some quotes that
18   are attributed to you, where you are asked
19   about "On the current WWE product."
20       Do you see that paragraph that
21   begins with that?
22       A.  On the current WWE product.  Yes, I
23   have it.
24       Q.  And then if you skip down where it
25   says "On Ryback."

116

1        Do you see that?
2        Have you found that paragraph, sir?
3        A.  I'm reading.
4        MR. SCIOLLA:  One more down.
5        A.  "On Ryback."
6        Q.  It quotes you as saying, "They
7    brought Ryback in, you know.  Ryback was up
8    and then he was down.  If I could work a
9    program with him, you would never hear Big
10   Vito complain about how he ever got hit too
11   hard.  I would love to work with that guy,
12   because it would be a hard hitting thing."
13       Did you say that?
14       A.  Yes, I did say that.
15       Q.  And what did you mean by "it would
16   be a hard hitting thing"?
17       A.  Because my persona is always a
18   rugged wrestler, and here you have this guy
19   who everybody is complaining with wrestling
20   against and, you know, being that I thought
21   it would be a good match between him and I.
22       Q.  And so were you sort of promoting
23   the idea that the WWE should bring you back
24   to wrestle Ryback?
25       A.  No, I just said that it would be a

117

1    good match.
2        Q.  Were you hoping that would happen?
3        A.  No, I just said it would be a good
4    match.
5        Q.  And in 2013 is when you claim you
6    were suffering from the symptoms of head
7    injury, right?
8        A.  I didn't hear the last part of what
9    you said, I'm sorry.
10       Q.  You claim you were suffering from
11   the symptoms of the head injury in 2013, too,
12   right?
13       A.  Yes, sir.
14       Q.  How many times prior to this
15   lawsuit, sir, did you publicly state that you
16   have been three-quarters deaf your whole
17   life?
18       A.  I did that in an article that I
19   wrote for people, for people who were doing
20   a, it was a deaf, a guy who was wrestling, a
21   Coach McKay who was teaching wrestlers who
22   were deaf how to, they were trying to get
23   into the Olympics.  Wanted me to be a guest
24   speaker and to come down to his college, and
25   he really had no money.  So I took it upon

30 (Pages 114 to 117)

118

1    myself to write something inspiring for them
2    and write this article that was published.
3        Q.  Where was it published?
4        A.  I'm not sure where it was
5    published.  I think it was on my Facebook.
6    It could have been, it could have been
7    something that was put out there.  But I know
8    I wrote it, and I wrote it just for inspiring
9    kids that you can do things even if you're
10   handicapped.
11       Q.  And what year did you write that?
12       A.  I'm not sure.
13       Q.  Before you came to the WWE?
14           Let me rephrase it.  Was it before
15   or after your last run at the WWE?
16       A.  It was afterwards.
17       Q.  And what did you say in that piece?
18       A.  I don't recall.  I would have to
19   read it.  I have it in front of me.
20       Q.  Well, what did it say about your
21   deafness?
22       A.  Just as you repeated it, that I was
23   deaf, three-quarters deaf or deaf, you know,
24   half my whole life, and then I was able to
25   overcome it.

119

1        Q.  And that's what you wrote?
2        A.  That's what I wrote.
3        Q.  Was it true?
4        A.  No.
5        Q.  So you wrote a lie to inspire
6    people?
7        A.  You write things to help people and
8    inspire them, just like the WWE writes things
9    to inspire people, like the anti-bullying
10   campaign, even though they might do it in
11   their own backyard, you know, they do it to
12   inspire, you know, bullying and do all that
13   kind of stuff.
14           It's kind of like when the turkey
15   thing came out, and they insulted me and they
16   had this big anti-bullying thing going on,
17   and they took liberties of making fun of me,
18   calling me a turkey, and my career
19   was nothing to be made fun of.
20       Q.  Do you remember the question I
21   asked you?
22           Do you remember the question I just
23   asked you?
24       A.  Uh-huh.
25       Q.  What was it?

120

1        A.  If I wrote it, and do I write
2    things to inspire people, with lies.
3        Q.  No.  Did you lie to inspire people.
4    Then you went off on this rant about other
5    subjects.
6        A.  I was answering the question.
7        Q.  My question was, did you lie in
8    that article in an attempt to inspire them?
9        A.  I guess you could say I lied, yes.
10       Q.  And did you ever make any other
11   public statements anywhere else that you were
12   three-quarters deaf since birth?
13       A.  I don't recall.
14       Q.  Did you ever tell your doctors you
15   were deaf since birth?
16       A.  I don't recall.
17       Q.  Have you been deaf since birth?
18       A.  No, sir, I haven't.
19       Q.  So any time you've said that, you
20   were lying?
21       A.  Yes, sir.
22       Q.  Why would you lie about that?
23           MR. SCIOLLA:  Object to the form.
24   And asked and answered.
25       A.  Why would I lie about it?  Well, in

121

1    that instance, it was to inspire people.
2        Q.  Well, in other instances where
3    you've said it.
4           Have you said it in other
5    instances, or are you claiming that's the
6    only time in your life that you ever told
7    people you were deaf since birth?
8           MR. SCIOLLA:  Object to the form,
9    asked and answered.
10       A.  I don't recall if I did.
11       Q.  Well, has it been a habitual lie
12   that you've told all your life, that you've
13   been deaf since birth?
14       A.  No, you asked me that one article,
15   and I said I lied about that.  You asked me
16   if I told people I was deaf my whole life,
17   and obviously I'm not, I wasn't.
18       Q.  No, I didn't ask you about the one
19   article.  You identified the one article.  I
20   asked you if you ever made those statements
21   publicly, and you identified that one article
22   with what you did.
23       A.  Because that's the one that I knew
24   about.
25       Q.  And my question is, what other

31 (Pages 118 to 121)

122

1    ones, what other times have you made that
2    statement publicly that you've been deaf
3    since birth?
4        A.  I don't know.
5        Q.  As you sit there today, can you
6    think of any other times where you have lied
7    and told people in the public that you've
8    been deaf since birth?
9        A.  No, I can't.
10       Q.  Did you tell any other performers
11   that you were deaf since birth?
12       A.  I don't recall if I did.
13       Q.  Did you tell Tommy Dreamer you were
14   deaf since birth?
15       A.  I don't recall.
16       Q.  So for other wrestlers who have
17   known you through your career and say you've
18   told them you were deaf since birth, would
19   they be lying?
20       MR. SCIOLLA:  Object to the form.
21       A.  I couldn't be deaf since birth,
22   obviously.
23       Q.  If they said you told them that,
24   would they be lying?
25       A.  Not lying.

123

1        (LoGrasso Exhibit 7, Article
2    entitled, "Big Vito talks about wanting
3    to work with Jeff Jarrett, and much
4    more," marked for identification, this
5    date.)
6        Q.  I've shown you what's been marked
7    as Exhibit 7, Mr. LoGrasso.
8        Again, do you recognize this as
9    your picture there?
10       A.  It's me in the picture.
11       Q.  And this is posted on Online World
12   of Wrestling.  And it's a column, and it
13   quotes you as saying, "Big Vito On Wrestling
14   Deaf."  "I don't advertise that I'm
15   handicapped.  I am three-quarters deaf, and I
16   have been that way my whole life.  I made it,
17   I did my thing."
18       Did you say that?
19       A.  What year was this?
20       Q.  It apparently was published in
21   2014, prior to this lawsuit.
22       A.  I couldn't have been deaf my whole
23   life.
24       Q.  Did you say that or didn't you?
25       A.  I did say it.

124

1        Q.  Was that a lie when you told this
2    person that?
3        A.  Yes, it is a lie.
4        Q.  Who was that supposed to inspire?
5        MR. SCIOLLA:  Object to the form.
6        A.  I was just going along with what I
7    had said previously.
8        Q.  Well, where had you said it
9    previously?
10       A.  When you asked me if I ever said it
11   before in that other article.
12       Q.  You state here "I don't advertise
13   that I'm handicapped."
14       A.  That's a time I know I said it.
15   You just mentioned Tommy Dreamer.
16       Q.  Well, why wouldn't you tell him,
17   then, that, look, I'm not really deaf.  I
18   just said that to inspire people.  I just
19   told a story"?
20       A.  Well, it was done to inspire people
21   that you could do things.  Maybe I used poor
22   judgment.
23       Q.  Well, fine.  But why didn't you
24   tell the truth in this interview and say, I'm
25   not deaf?

125

1        So you were lying in 2014, too --
2        MR. SCIOLLA:  Object to the form.
3        Q.  -- is that right?
4        A.  No, sir.
5        Q.  Well, you're saying now this isn't
6    true.  The statements you make here, "I'm
7    three-quarters deaf, and I have been that way
8    my whole life," is that true or is it false?
9        A.  I have not been three-quarters deaf
10   my whole life.
11       Q.  So then you told a lie, then,
12   right?
13       A.  In that, yes.
14       Q.  Do you remember appearing on an
15   interview called the Angry Marks Podcast in
16   February of 2014?
17       A.  No.
18       Q.  Did you tell that same tale on that
19   podcast --
20       A.  Don't recall.
21       Q.  -- of being deaf?
22       MR. McDEVITT:  We are going to mark
23   this.
24       (LoGrasso Exhibit 8, CD labeled,
25   "The Undisputed Wrestling Show with Big

32 (Pages 122 to 125)

1    Vito & Lucky Thurteen (February 2014),"
2  marked for identification, this date.)
3    Q.  Mr. LoGrasso, you are going to hear
4  a voice talking here, and I'm going to ask,
5  after you are done hearing it, whether you
6  recognize it as your voice saying what you
7  hear.
8    MS. LACY:  Can you please skip to
9  4724.  At least before it.  If you can't
10  get close, that's fine.
11    (Video played and transcribed
12  following:)
13    "Voice:  I was and this week I'm
14  supposed to be getting a big boy.  And I
15  don't know, I've said this before, you
16  know, I've mentioned it a few times in
17  interviews.  A lot of people don't know
18  that I'm deaf.  And, you know, and
19  people ask me all the time, how the hell
20  do you wrestle, if you're deaf, and how
21  did you play ball?  I was born deaf.  I
22  was born deaf, you know.  And sometimes
23  when I'm in the house, you know, I hear,
24  my hearing is so accurate that I hear
25  things all the time and every little

1  thing.  And I'm so used to having a dog
2  with me and, you know, just like I need
3  that extra just in case I can't hear
4  something or something is going on that
5  I don't know.  So unless you're a
6  120-pound Rottie, his name is King, I'm
7  going to change his name to Brother,
8  come on, Brother.  His name is going to
9  be Brother.  And he's two years old and
10  he's 100, started out at 140.  He's been
11  training, so he's about 125 pounds right
12  now.  They hey, goodbye, somebody I
13  could pal around with, somebody I could
14  train with, somebody to have a companion
15  with, somebody to be in the house with
16  me and, you know, I don't advertise it.
17  Like I said, I don't advertise it that
18  I'm handicapped.  I'm deaf.  I'm
19  three-quarters deaf, you know, and I've
20  been like that my whole life.
21    And you know, I made it.  I did my
22  thing and I just need, you know, I've
23  been" --
24    (End of transcription.)
25    Q.  Is that your voice?

1    A.  Yes.
2    Q.  And that's you in a radio interview
3  in February of 2014 saying you were born
4  deaf, right?
5    A.  I said that.  I was just saying it.
6    Q.  And that was, again, before the
7  lawsuit you were telling people that you were
8  born deaf, right?
9    A.  That's what I was saying.
10    Q.  And you said you had been like that
11  your whole life?
12    A.  That's what I said.
13    Q.  So were you lying then, or are you
14  lying now?
15    MR. SCIOLLA:  Object to the form.
16    A.  No.
17    Q.  Which is it?
18    A.  I can't hear you.
19    Q.  Were you lying then or are you
20  lying now?
21    A.  I'm not lying.
22    Q.  Were you born deaf?
23    A.  No, I couldn't be born deaf.
24    Q.  You could be born deaf.
25    Why couldn't you be born deaf?

1    A.  How I did get in the military?
2    Q.  I don't know.  Maybe you lied
3  there, too.
4    A.  How could you lie in an exam or a
5  state physical?
6    Q.  I've been in the military Mr.
7  LoGrasso.  I know you how get into the
8  military?
9    A.  I know you've been in the military.
10    Q.  Don't kid me about that.  They'll
11  take anybody, especially in the time when you
12  were going in.
13    A.  It's 1983, it was peacetime.  They
14  take anybody?
15    Q.  They took you.
16    A.  Thank you for the compliment, I
17  appreciate it.
18    Q.  What was your discharge?
19    MR. SCIOLLA:  Object to the form.
20  Asked and answered.
21    Q.  So you basically have been shown
22  now to have said repeatedly that you were
23  deaf since birth, right?
24    A.  I said this in interviews.
25    Q.  Now, apart from interviews, you

33 (Pages 126 to 129)

130

1    also told a doctor that, too, didn't you?
2      A.  Not that I recall.
3      Q.  Is it fair to assume, Mr. LoGrasso,
4    that you would not lie to your doctors about
5    your condition?
6      A.  I have hearing loss.
7      Q.  But you would not lie to them,
8    would you?
9      A.  No.
10      Q.  I mean you want to get treated
11    accurately, don't you?
12      A.  Yes, sir.
13      Q.  And you know you can't get treated
14    accurately unless you tell them the truth
15    about your condition?
16      MR. SCIOLLA:  Object to the form.
17      A.  About my condition, yes.
18      (LoGrasso Exhibit 9, Medical
19      records, Bates Nos. Smith020516_00031
20      through Smith020516_00040, marked for
21      identification, this date.)
22      Q.  Showing you what's been marked as
23    Exhibit 9, Mr. LoGrasso, which comes out of
24    your medical records from Dr. Smith.  And if
25    I could, sir, I would direct your attention

131

1    to page 3 of this document, under the last
2    paragraph on page 3.
3      Am I correct that what the doctor's
4    note states is "Congenitally deaf on left,
5    severe loss on right"?
6      Is that what your doctor's own note
7    states?
8      A.  I'm reading it.
9      Q.  Is that what they say, do you know
10    what that means?
11      A.  That I'm deaf on the left and
12    severely lost on the right.
13      Q.  Do you know what "congenitally
14    deaf" means?
15      A.  I can't hear nothing out of the
16    left.
17      Q.  No.  Did you tell the doctor you
18    had been death since birth?
19      A.  No.  I just don't hear good out of
20    the ear.
21      Q.  And there is a note that is made in
22    May of 2012.  This is way before your
23    lawsuit, right?  At the top right it says
24    "May 2012."
25      A.  Right.

132

1      Q.  And then when you went back after
2    this lawsuit --
3      (LoGrasso Exhibit 10, Medical
4      records, Bates Nos. Smith020516_00002
5      through Smith020516_00006, marked for
6      identification, this date.)
7      Q.  Showing you what's been marked as
8    Exhibit 10.  This is the same Dr. Smith,
9    isn't it, that this is addressed to, from
10    Jennersville Neurology Center, do you see
11    that?
12      A.  Jennersville.
13      Q.  Jennersville at the top there?
14      A.  Yes.
15      Q.  Did you go to Jennersville
16    Neurology?
17      A.  Yes.
18      Q.  And you went there after this
19    lawsuit was brought, right?
20      That's March of 2015 --
21      A.  Yes.
22      Q.  -- two months after you brought
23    this lawsuit, right?
24      A.  Yes.
25      Q.  Knowing that you have to

133

1    demonstrate some kind of symptoms to support
2    your brain injury claim, right?
3      MR. SCIOLLA:  Object to the form,
4    argumentative.
5      Q.  You know that by then, don't you?
6    You know it by then.  You are trying to show
7    that you have symptoms associated with the
8    injuries that you're claiming in the lawsuit,
9    right?
10      MR. SCIOLLA:  Object to form.
11      A.  This was when I could get an
12    appointment to see a neurologist.
13      Q.  Two months after your suit?
14      A.  I was getting everything done,
15    because I was going by what Dr. Smith had
16    said, so this is where he referred me.
17      Q.  And when you go to this
18    Jennersville, you tell them --
19      MR. McDEVITT:  Strike that.
20      Q.  If you look at the History of
21    Present Illness on the second page, it says,
22    "Mr. LoGrasso is a 50-year-old man referred
23    by Dr. Smith for evaluation of headaches and
24    head trauma.  He has some difficulty giving a
25    concise history."  And then it goes on to

34 (Pages 130 to 133)

134

1    state that you were "A former WWE wrestler,
2    completely stopped wrestling only five months
3    ago.  He attributes most of his problems to
4    consequences of his wrestling career spanning
5    almost 30 years.  This includes deafness in
6    the left ear, moderate hearing loss in the
7    right ear."  Right?
8         Isn't that what it says?
9    A.  I'm reading it.
10        MR. SCIOLLA:  Can you repeat the
11   question.
12        Q.  And my question, Mr. LoGrasso, is
13   whether you told the Jennersville folks that
14   your deafness issue you associated with your
15   wrestling career.
16   A.  Yes, I did tell them that.
17        Q.  So after the lawsuit, you weren't
18   telling them that you were deaf since birth,
19   you were selling them that it was associated
20   with your wrestling career?
21        MR. SCIOLLA:  Object to the form.
22   A.  I told -- he asked me how this
23   happened, and I said repeated blows to the
24   head and that I had, this had gotten worse
25   and worse during my wrestling career.

135

1         Q.  Did you tell him that you had
2    previously made statements to the effect that
3    you had been deaf since birth?
4    A.  No.
5         Q.  This also goes on to state, you
6    told him, this doctor, whoever he is --
7    Handler, Dr. Handler, that you did not recall
8    having any significant post-concussive
9    symptoms during your career, do you see that?
10   A.  I was not educated on what they
11   were, so I didn't know what I was -- I was
12   finding out as I was going along what was
13   going on with me.
14        Q.  Well, he says, "He did not recall
15   having any significant post-concussive
16   systems during his career, such as loss of
17   consciousness, prolonged headaches, nausea,
18   balance problems or memory loss."
19        That's what he says, right?
20   A.  That's what it says there.
21        Q.  And that's what -- you claim those
22   things now, the prolonged headaches --
23   A.  That's what I'm suffering from, and
24   that's what I didn't know what was going on,
25   because I wasn't educated on what was

136

1    happening.  So it was the doctors telling me
2    what is going on, and then I told him what
3    was happening.  And now I know what
4    everything is, I put everything together.
5    But during this time I'm finding out like
6    everybody else, I'm finding out what is wrong
7    with me.
8         Q.  This was all done after you filed
9    the lawsuit where you had listed all the
10   symptoms, supposedly, of head injuries.
11   A.  This is all of what --
12        Q.  You knew the symptoms of the head
13   injuries by the time you went to the doctor,
14   didn't you, and filed a lawsuit about it;
15   isn't that true?
16   A.  Say that one more time.
17        Q.  You already filed a lawsuit where
18   you claimed a symptomatology of head injuries
19   in the lawsuit that you claimed and filed in
20   a Federal court, so you knew the symptoms by
21   the time you went to this doctor.
22   A.  I was getting checked out.
23        Q.  And you report to him you didn't
24   have any prolonged headaches, according to
25   what he says, and that you didn't have any

137

1    significant post-concussion symptoms during
2    your career, which he says only ended a short
3    time ago.
4         MR. SCIOLLA:  Object to the form
5    and characterization.
6         Q.  Right?
7    A.  I can't speak for the doctor's
8    notes.
9         Q.  Do you have some reason to think
10   they don't reflect what you told him?
11   A.  This is what is his observation,
12   and I'm telling you what I was going through.
13        Q.  And he's basing his --
14        MR. McDEVITT:  Strike that.
15        Q.  Do you agree that every symptom you
16   claim is a subjective symptom?
17        MR. SCIOLLA:  Object to the form.
18   A.  If you could say that one more
19   time.
20        Q.  Every symptom you now claim is
21   subjective, right?
22        MR. SCIOLLA:  Object to the form.
23   A.  "Subjective" meaning?
24        Q.  You claim you have headaches, but
25   it can't be verified.

35 (Pages 134 to 137)

138

1      A.  What headaches are there?
2      Q.  You claim it, but they can't be
3  objectively verified, right?
4          MR. SCIOLLA:  Object to the form.
5      A.  Objectively verified that they
6  wanted to stick needles in my head to give me
7  relief.  They put me on medication.
8      Q.  Well, they've given you three MRIs,
9  haven't they?
10     A.  I believe I've taken three MRIs.
11     Q.  And every one of them showed your
12 brain was perfectly normal, didn't they?
13         MR. SCIOLLA:  Object to the form.
14     A.  That's not what I was told.
15     Q.  Who told you otherwise?
16     A.  A doctor never told me my brain was
17 perfectly normal.
18     Q.  Did he tell you your MRIs were
19 unremarkable?
20     A.  The doctor told me that I had
21 things wrong with me.
22     Q.  What did he tell you about the
23 MRIs?
24     A.  He said that there was, the MRIs
25 that I took, he said that there was some

139

1  brain issues.
2      Q.  Who, who told you that?
3      A.  Dr. Handler.
4      Q.  Dr. Handler.
5      A.  He's the one who looked at the
6  MRIs.
7      Q.  And did he actually show you the
8  MRIs?
9      A.  No.
10     Q.  And what did he tell you the MRIs
11 showed?
12         Did he identify what the brain
13 issue was?
14     A.  He said that I had brain trauma.
15     Q.  What did he say he saw on the MRIs
16 that would verify that you had brain trauma?
17     A.  He was telling me that I had brain
18 trauma.  That's what I -- that's what I
19 interpreted.
20     Q.  Well, you told him you had brain
21 trauma, didn't you?
22     A.  And he told me that I had brain
23 trauma, and he told me that he sent me for
24 the MRIs.  I went to do the tests.  They put
25 me on medication.  He told me, you do have

140

1  some, you know, concussion, CT, concussion
2  syndrome.  He told me these things, so.
3      Q.  Did he tell you the MRI was a
4  negative study?
5          Did he tell you you have a normal
6  head brain?
7      A.  He gave me three MRIs.  He said the
8  first one came out normal.
9      Q.  And what about the other ones?
10     A.  I don't recall what he said on the
11 other ones.
12         (LoGrasso Exhibit 11, Brandywine
13         Hospital medical records, Bates Nos.
14         Brandywine050416_000020 through
15         Brandywine050416_000083, marked for
16         identification, this date.)
17     Q.  I'm handing you one of the MRI
18 reports, Mr. LoGrasso, and if you would turn
19 back to page, and it's on the bottom
20 right-hand corner, number 34.
21         Do you see the line that says,
22 "Impression"?  It should midway down on page
23 34.  You see "Impression"?
24         MR. McDEVITT:  For the record, I'm
25 just putting a little arrow next to it

141

1  on the exhibit.
2          THE WITNESS:  Thank you.
3      Q.  Do you see the, under the word
4  "impression" it says "Negative study"?
5      A.  Right.
6      Q.  And then if you would leaf back a
7  couple more pages to the one that says "68"
8  on it.
9      A.  You said "68," right?
10     Q.  68 on the bottom right.
11         Have you found it?
12     A.  68.
13     Q.  Do you see the category "Finding"?
14     A.  Got it.
15     Q.  First one is for hemorrhage.  It
16 says, "No intercranial hemorrhage," right?
17     A.  I see that.
18     Q.  The next one says, "Brain
19 unremarkable, no significant white matter
20 disease, no edema," correct?
21     A.  Uh-huh.
22     Q.  Next one for, ventricles,
23 "Unremarkable, no hydrocephalus."
24         Next one, "Bones, no acute
25 fracture.  Sinuses, unremarkable, mastoid ear

36  (Pages 138 to 141)

142

1    cells unremarkable."
2         And what does it say under
3    "Impression"?
4         A.  "Normal."
5         Q.  "Normal head brain," right?  Is
6    that what he told you?
7         MR. SCIOLLA:  Objection.  Who?
8         MR. McDEVITT:  The doctor.
9         MR. SCIOLLA:  The --
10        MR. McDEVITT:  Either doctor.
11        Q.  This was done on March of 2015,
12   after your lawsuit, sir.
13        Did he tell you after you filed
14   your lawsuit that the MRI showed you had a
15   normal head brain?
16        MR. SCIOLLA:  Object to the form.
17   This is the CT scan.
18        A.  He didn't tell me this.
19        MR. McDEVITT:  I stand corrected.
20        Q.  Did you get told that this CT scan
21   shows you had a normal head brain?
22        A.  I don't recall him telling me this.
23        Q.  Does it give you comfort to know
24   that now?
25        MR. SCIOLLA:  Object to form.

143

1         Q.  Does it give you comfort to know
2    that now?
3         A.  I still deal with my headaches
4    every day.
5         (LoGrasso Exhibit 12, OpenMRI
6         medical records, Bates Nos.
7         OpenMRI032316_000002 and
8         OpenMRI032316_000003, marked for
9         identification, this date.)
10        Q.  Showing you what's been marked as
11   Exhibit 12, sir, do you remember being
12   referred to open MRI by Dr. Cavoto?
13        A.  Yes.
14        Q.  And Dr. Cavoto is what?  What kind
15   of doctor?
16        A.  Pain management.
17        Q.  And he referred to you this MRI
18   clinic in April?
19        A.  Yes.
20        Q.  Which is months after you brought
21   your lawsuit?
22        A.  Yes.
23        Q.  And do you see where he says, "Soft
24   tissue swelling over left face likely from
25   recent trauma"?

144

1         A.  I haven't been hit, so I didn't --
2    that's what, that's what they asked me.  He
3    said, what is wrong with your face?
4         I said, nothing.  I haven't been
5    hit or anything.
6         Q.  Why was your face swollen?
7         A.  I don't know.
8         Q.  Did you even know you had a swollen
9    face when you went in to see him?
10        A.  No, I did not.
11        Q.  So you weren't in any fight where
12   you got hit by anybody?
13        A.  No, sir.
14        Q.  Including your wife?
15        A.  No, sir.
16        Q.  What does it say under
17   "Impression"?
18        A.  "Soft tissue swelling over the left
19   face likely from recent trauma.  No
20   significant findings in the brain."
21        Q.  And did you get told that they had
22   made no significant findings in your brain?
23        A.  I wasn't told.
24        Q.  So this is the first time you've
25   learned that?

145

1         A.  This is -- I'm reading this, and
2    all I knew was about the swellings and that I
3    had some trauma on the face.
4         Q.  Well, you knew you were going for
5    an MRI, didn't you?
6         A.  Yes.
7         Q.  Didn't they tell you the results of
8    the MRI?
9         A.  Basically they just -- they didn't
10   tell me this part.
11        Q.  So you go for an MRI, and you don't
12   say to them, well, what did it show about my
13   brain?
14        A.  They didn't say I was normal.
15        Q.  Well, what did they say?
16        A.  I don't recall what they told me.
17        Q.  Do you have some reason to think
18   they would have told you anything other than
19   what the findings are on the MRI report, that
20   it was a normal brain?
21        MR. SCIOLLA:  Object to the form.
22        Q.  Are you comforted by the fact that
23   those objective tests don't show anything
24   wrong with your brain?
25        MR. SCIOLLA:  Object to the form.

37 (Pages 142 to 145)

146

1     A.  Sitting here reading it like you
2  are.
3     Q.  Does it make you feel better to
4  know that there's nothing wrong with your
5  brain?
6        MR. SCIOLLA:  Object to the form.
7     A.  It doesn't make me feel better,
8  because I still have other problems.  I still
9  have the headaches and I still have things
10  that are wrong with me And still have the
11  other stuff that I deal with.  There is
12  something going on up there.
13     Q.  Do you think everybody who gets
14  headaches has brain damage?
15        MR. SCIOLLA:  Object to the form,
16     calls for medical opinion.
17        You can answer.
18     Q.  Does your wife get headaches?
19     A.  Does what?
20     Q.  Does your wife get headaches?
21     A.  Does she get headaches?  I guess.
22  I'm not sure.
23        MR. SCIOLLA:  Jerry, if you're
24     going to switch topics if we can take a
25     break for a little bit; but if you are

147

1     still going on with this line, I can
2     wait a little bit.  I just have to go to
3     the bathroom.
4        MR. McDEVITT:  What time do you
5     guys want to break for lunch?  You want
6     to do it now?
7        MR. SCIOLLA:  If it's a good time
8     for you.
9        MR. McDEVITT:  That's fine, we do
10     it now.  Why don't we get back at 1:15
11     then.
12        MR. SCIOLLA:  Great, perfect.
13        THE VIDEOGRAPHER:  The time is
14     1:15.  We're off the record.
15        (Lunch recess taken at 11:15 p.m.)
16
17
18
19
20
21
22
23
24
25

148

1        A F T E R N O O N   S E S S I O N
2        (Time noted:  1:13 p.m.)
3        (LoGrasso Exhibit 13, Plaintiff
4     Vito LoGrasso's Supplemental Objections
5     and Responses to Defendant World
6     Wrestling Entertainment, Inc.'s First
7     and Second Set of Interrogatories,
8     marked for identification, this date.)
9        THE VIDEOGRAPHER:  The time is
10     1:13 p.m.  Back on the record.
11  V I T O   L O G R A S S O,  resumed.
12  EXAMINATION (Cont'd.)
13  BY MR. McDEVITT:
14     Q.  Mr. LoGrasso, you understand you
15  are still under oath?
16     A.  Yes, sir.
17     Q.  And did you discuss your testimony
18  at lunchtime with anybody?
19     A.  No, sir.
20     Q.  I want to begin by clarifying
21  something I think I know the answer to, based
22  on your testimony this morning, but we will
23  start with, do you have Exhibit 1, the
24  complaint there, sir?  The very first one I
25  gave you, this one.

149

1        And if you would start there by
2  finding, if you will, paragraph 134, on page
3  37.
4        Do you see --
5     A.  Right there.
6     Q.  And that paragraph, if you take a
7  minute and read that for a minute.
8     A.  Read 134?
9     Q.  Yes, sir.  Just read that to
10  yourself for a minute.
11     A.  Okay.
12     Q.  Now, is that paragraph intending to
13  describe the match with Mr. Regal we've been
14  talking about this morning where you got
15  thrown in the metal steps?
16     A.  Yes, I believe so.
17     Q.  Now, just for a minute, I want to
18  clarify.
19        If you would look at the
20  interrogatory, the new exhibit I just gave
21  you.
22     A.  This one?
23     Q.  Yes, that one underneath that one.
24  First of all, that's Exhibit 14.
25  And if you look at the back page, sir, am I

38  (Pages 146 to 149)

150

1   correct, that's your verification where you
2   signed the --
3       MR. SCIOLLA:  13, right?
4       MR. McDEVITT:  14.
5       Q.  What number do you have?
6       A.  13.
7       Q.  Exhibit 13, I'm sorry.  You signed
8   a verification attesting that the answers in
9   that were true and correct, to the best of
10  your belief, right?  On the last page?
11      A.  I see my signature.
12      Q.  Okay.  And what does it say above
13  that?
14      A.  Okay.
15      Q.  Would you read out loud what it
16  says?
17      A.  It says, "I, Vito LoGrasso, duly
18  sworn, hereby verify that I have reviewed the
19  above supplemental objections and responses
20  to WWE's first set of interrogatories --
21  interrogatories and requests for production.
22  And they are true, accurate and complete, to
23  the best of my knowledge."
24      Q.  All right.  Now would you look,
25  sir, to the answer that was given to

151

1   interrogatory number 9 on page 9.
2       This one.  Okay.
3       A.  Thank you, sir.
4       Q.  And while you're reading, that
5   basically asks you to identify the locale of
6   the match that was referenced in paragraph
7   134, the prior document that we talked about,
8   the Regal match, okay?  And if you would just
9   take a minute and read your answer there.
10      A.  Okay.  I read it.
11      Q.  In paragraph 134 the date of that
12  match is said to be September of 2006, and
13  then in your interrogatory answers, which you
14  have verified, it seems to be correcting that
15  date to October 10th; am I correct?
16      A.  There's two different dates.
17  September 6, that's one date.
18      Q.  But it's asking you where, under
19  paragraph, it's asking you about where
20  paragraph 134 took place, and your answer
21  indicates that perhaps the September date was
22  wrong and October 10th is the day of the
23  match.
24      Am I understanding that correctly?
25      MR. SCIOLLA:  Yes, and I'll

152

1   stipulate on the record that more
2   information became available and they
3   are discussing the same exact incident,
4   just a new date and location was found.
5       MR. McDEVITT:  So the date is
6   October 10th?
7       MR. SCIOLLA:  Correct.
8       MR. McDEVITT:  And the reason I'm
9   confused.  There is one more document
10  that we will go through just to get
11  clarification, and maybe you can verify
12  this, too.
13      MR. SCIOLLA:  Sure.
14      MR. McDEVITT:  Mark this.
15      (LoGrasso Exhibit 14, Plaintiffs'
16  Evan Singleton and Vito LoGrasso's Brief
17  in Opposition to Defendant World
18  Wrestling Entertainment, Inc.'s Motion
19  for Reconsideration of March 21, 2016
20  Order with Respect to Singleton and
21  LoGrasso v. World Wrestling
22  Entertainment, Inc., marked for
23  identification, this date.)
24      Q.  I've handed you what's been marked
25  as Exhibit 14, and if I can, sir, I will just

153

1   turn -- this was recently filed with the
2   court.  And in this document, beginning on
3   page 8, at the bottom, if you look, it is
4   describing a match you had with Regal, but
5   now it goes back to the September date.
6       Do you see that, is that an error
7   on your part?
8       MR. SCIOLLA:  That is an error.  I
9   don't know if it was reliance on the
10  complaint.
11      MR. McDEVITT:  That's what I
12  figured, but I wanted to make sure.
13      Q.  So that the date you claim that
14  match occurred that you described this
15  morning as hitting your head and the
16  headaches follow and all the rest of it is
17  the October 10th date; am I correct?
18      MR. SCIOLLA:  That is correct,
19  counsel.
20      Q.  And if we could, sir, go back to,
21  in terms of the I-rog answers?
22      MR. SCIOLLA:  13 or 14?
23      MS. LACY:  Exhibit 13.
24      MR. SCIOLLA:  Thanks.
25      Q.  In your answers to interrogatory

39 (Pages 150 to 153)

1  number 1, on page --
2      A.  13.
3      Q.  Yes.  I'm focusing on your answer
4  to interrogatory number 1 here.
5      A.  All right.
6      Q.  Which asks you to identify all the
7  dates on which you claim to have suffered a
8  TBI while you performed for WWE or any other
9  wrestling organization, persons involved in
10  any matches in which each injury occurred,
11  the location or venue where each injury
12  occurred and how each such injury occurred."
13      And am I correct, sir, that the
14  only ones you identified specifically are the
15  five matches you identify there beginning at
16  the bottom of page 4 and going over to the
17  top of page 5?
18      A.  Yes, sir.
19      Q.  And that includes the October 10th
20  match with Mr. Regal we've been talking
21  about, as well as a different September match
22  with Mr. Regal, and apparently an August
23  match with Mr. Regal, correct?
24      A.  Yes, sir.
25      Q.  And that was all in the program you

1  were running with him?
2      A.  Yes, sir.
3      Q.  In terms of the wrestling
4  vocabulary, what does the term "selling" mean
5  to you?
6      A.  Selling?
7      Q.  Yes.
8      A.  Selling means when somebody does
9  something offensive to you, you register it.
10      Q.  In other words, if I, if I make a
11  move that is designed to look like I punched
12  you, you sell it by having your head move
13  back or some such thing; is that fair?
14      A.  Yes, sir.
15      Q.  And do you also often like a
16  wrestler purports to kick you in the leg, for
17  example, you sell that by indicating you're
18  injured?
19      A.  Right.  Yes, sir.
20      Q.  So it's a lot of different aspects
21  to the performance to make it look real, but
22  it's really not hurting you, it's just you're
23  selling the idea of injury just as part of
24  the match, right?
25      A.  When you sell something, it's to,

1  it's to the point where you are struck and
2  you're selling it for the crowd.  There are
3  some instances where the impact gets a little
4  bit too rough or it comes too forceful, but
5  sometimes you really sell it like for real,
6  like real life, like hey, man, I got hurt, I
7  got stung, you hurt me.
8      So to wrestling people who don't
9  know, you do sell the moves and you do sell
10  them when they're coming in.  There are times
11  when the, when you get hit that with so much
12  force that you sell them like it's a real
13  life shot, like you just explained, and, you
14  know, that's selling.
15      Q.  You used the term in your answer,
16  potato.
17      A.  Right.
18      Q.  By "potato," is that wrestler
19  parlance for when somebody hits you really
20  when they're not supposed to hit you?
21      A.  Yes, Mr. McDevitt, that is a
22  potato.
23      Q.  And that's sort of a mistake that
24  does happen, but it's not really intended,
25  right?

1      A.  Well, Mr. McDevitt, you know as
2  well as I do the first one is okay, the
3  second one is okay.  The third one I'm going
4  to give you a receipt.
5      Q.  And what's the receipt mean?
6      A.  I'm going to give you one for every
7  two potatoes you give me.
8      Q.  So am I understanding, there is
9  sort of an unwritten code among wrestlers
10  that you aren't supposed to be trying to hurt
11  me; and if you do, I'm going to hurt you
12  back?
13      A.  Yes, sir, you are correct.
14      Q.  But again, we talked about this
15  morning if you are doing a program with
16  Steven Regal, you and he want to both be able
17  to perform the next night, right?
18      A.  We would like to.
19      Q.  And so the idea is not to hurt each
20  other and put on a good show?
21      A.  That is the idea.
22      Q.  Now, I'm curious how you picked
23  these five matches.
24      Did you go through every match you
25  had at WWE and pick these matches?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

158

1     A.  No, sir.  Those were the ones that
2  were most memorable, where I actually endured
3  some head shots, where I really did not know
4  what the hell was going on.  And I got, as
5  you said, potato, or I got stiffed or I got
6  my bell rung.
7     Q.  So these in your mind are the most
8  significant indications of performances you
9  gave at WWE during your last run that
10  resulted in traumatic brain injuries?
11     A.  These are the ones that stick out
12  the most in my mind.
13     Q.  And you were trying to be thorough
14  when you did this, correct?
15     A.  Excuse me?
16     Q.  You were trying to be thorough when
17  did you this, I assume?
18     A.  Well, to know which matches, the
19  ones that I know I got rocked, I got my bell
20  rung, yes, I was trying to be as thorough as
21  possible.
22     Q.  And so then is it safe to assume
23  that there were many more matches that you
24  didn't feel you got rocked, in your parlance?
25     A.  Yes, sir, other matches where I

159

1  feel like I did not get rocked or I did not
2  get as severely hit as I did in these
3  matches.
4     Q.  In fact, there are far more matches
5  not listed than are listed, correct?
6     A.  Yes, sir.
7     Q.  Now you don't purport to list
8  matches elsewhere where you may have received
9  a TBI; is that correct?
10        MR. SCIOLLA:  Object to the form.
11     A.  They're not listed anywhere else,
12  no, sir.
13     Q.  If you had to list those, could you
14  do that?
15        Let me put it another way.  Aside
16  from WWE, aside from your time in WWE, when
17  you were performing for other organizations,
18  what is the most significant match you recall
19  being in where you got rocked, in your
20  parlance?
21     A.  I couldn't say off the top of my
22  head.  I don't recall.
23     Q.  Were there any?
24     A.  Probably there were, you know, but
25  I mean I've had a lot of matches.

160

1     Q.  I know you have.  And you've had a
2  lot of hard core matches, too, haven't you?
3     A.  Not for a very long time.
4     Q.  I know you haven't had it for a
5  long time, but when you were a performer you
6  had a lot of hard core matches, didn't you?
7     A.  Yes, I had hard core matches.  But
8  to the extent of what you're saying when you
9  brought up ECW and you brought up the
10  extreme, I know a lot of people are not
11  wrestling people.
12        ECW is a very strong and very
13  violent organization and they carry
14  themselves to be, you know, over the top.  So
15  when you're doing over-the-top stuff, you
16  know, that's good, because some of the
17  wrestlers did not know how to wrestle
18  conventionally, like Mr. McDevitt explained.
19  And conventional wrestling is where I was at
20  my best and, you know, for the guys who
21  needed to do the hard core stuff, they did
22  it.  When you were asked to participate in
23  this type of wrestling, that's where you were
24  asked to do a little bit more and give your
25  heart and soul to the team.

161

1        So conventional wrestling in ECW, I
2  did a majority of those matches, and then I
3  was asked to slide over into the hard core
4  matches with, you know, with different guys,
5  like I'll just say when I did Da Baldies.
6        And then when I was in WCW I was a
7  conventional wrestler.  As you know, I
8  wrestled tag team and then I wrestled as
9  singles.  Then I went into the hard core
10  division because they asked me to, and then I
11  did my little stuff, I did my programs and
12  then I left the hard core division.
13        So it wasn't that I did it every
14  day.  I did it for small periods of time.
15  And, you know, being in the wrestling
16  business, Mr. McDevitt, you make your way
17  through the wrestling ranks being a good
18  solid wrestler, a guy that doesn't hurt
19  anybody.  You take care of your guys.  And as
20  you say, as you're saying, there it's the
21  code, and that's the way it goes.  Getting a
22  potato, you take one, you take two, you might
23  a third.  On the third one you might give it,
24  hey, lighten up.  Hey, give me a break.  Hey,
25  take it easy.

41 (Pages 158 to 161)

162

1    But if the guy doesn't register the
2  first one he gave and he give you a second
3  one, he automatically knows there's a code
4  and you say, hey, calm down.  So I hope that
5  was the best way I can explain it.
6      **Q.  I appreciate your answer, but using**
7  **a distinction you made, mat wrestling has**
8  **meaning, doesn't it?**
9      A.  It's gone.
10     **Q.  You were a good mat wrestler,**
11 **weren't you?  That's sort of what you were**
12 **just saying and you consider yourself skilled**
13 **in that craft?**
14     A.  Yes.
15     **Q.  Holds and submission holds and all**
16 **of those sorts of things?**
17     A.  Yes, sir.
18     **Q.  But then going back to your days in**
19 **ECW and WCW, you did a lot of matches with**
20 **Terry Funk, didn't you?**
21     A.  I did.  I ran a small program with
22 Terry Funk that may have lasted three weeks,
23 where we took the belt off him in one segment
24 on a mitral entity I came back and I beat him
25 in a singles on a Monday Night Nitro.

163

1      **Q.  These were hard core matches,**
2  **weren't they?**
3      A.  Right, for the title.
4      **Q.  He's kind of a legendary hard core**
5  **performer, isn't he?**
6      A.  Yes, sir, he is.
7      **Q.  He does tables, garbage cans,**
8  **chairs.**
9      A.  He is the man.
10     **Q.  You are going to get hit with**
11 **everything when you perform with him, aren't**
12 **you?**
13     A.  When he hits you, he hits you.  You
14 couldn't see, he hits you.
15     **Q.  Let's do this, Mr. LoGrasso.  We**
16 **prepared a little reel here of you in ECW and**
17 **WCW.  And I want you to look at this and tell**
18 **me whether it's depicting shots that you took**
19 **when you performed in WCW and ECW.  And I**
20 **think you will be able to identify where they**
21 **come from, both by the visual sight that**
22 **tells you it's a the logo and Tony Chavonne,**
23 **his voice, for example, was a commentator for**
24 **WCW.**
25     **So I think what you are about to**

164

1  **watch, none of it is from WWE.**
2      MR. SCIOLLA:  Just so I understand.
3  It's a collection of videos or it's one
4  video?
5      MR. McDEVITT:  No, it's a
6  collection from different matches.
7      MS. LACY:  It's clips, from the
8  different matches from ECW and WCW.
9      MR. SCIOLLA:  You guys created this
10 yourself?
11     MS. LACY:  Yes.
12     MR. McDEVITT:  From the films, yes.
13 And we have a copy of what we are going
14 to show you.
15     Hang on just one minute here.
16     (LoGrasso Exhibit 15, CD labeled,
17 "LoGrasso Headshots Received-Full Reel,"
18 marked for identification, this date.)
19     MR. McDEVITT:  Start now.
20     (Video played.)
21     **Q.  Do you agree, Mr. LoGrasso, that**
22 **that film depicts you being hit on the head**
23 **with various objects?**
24     MR. SCIOLLA:  Object to the form.
25     A.  I'm sorry.

165

1      MR. McDEVITT:  What's the
2  objection?
3      MR. SCIOLLA:  Do you want me to
4  speak all of my objections?
5      MR. McDEVITT:  You said it's a form
6  objection.  What is wrong with the form.
7      MR. SCIOLLA:  The form is that
8  you're generalizing and being vague and
9  lumping all of those into one question,
10 many different events that you depicted
11 in this creation of yours.  So some
12 seems like it was hit on the head and
13 some others not.
14     **Q.  Do you agree, Mr. LoGrasso, that**
15 **that video you just saw depicts you being hit**
16 **on the head with various objects?**
17     MR. SCIOLLA:  Same objection.
18     A.  In that video I saw, a lot of the
19 stuff was choreographed, and a lot of the
20 stuff I did get hit on the head with objects.
21     **Q.  You got hit on the head with**
22 **garbage cans, correct?**
23     A.  I saw a garbage can, yes.
24     **Q.  Steel chair?**
25     A.  I saw s steel chair.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

166

1      Q.  Candlestick?
2      A.  I saw a candlestick.
3      Q.  Thrown into steel walls.
4      A.  I saw the wall.
5      Q.  Laying under a garage, Terry Funk
6  hits you full bore with a chair right in the
7  top of the head?
8      A.  Thank God, he hit the top of that
9  steel door.  I don't think I'd be here with
10 that one.
11     Q.  You're claiming he didn't hit you
12 in the head?
13     A.  Not that time.
14     Q.  Did you see the other ones where
15 you lean in and take a full head shot from a
16 chair?
17     A.  I've seen myself and my head down.
18     Q.  And did you see the chair bending
19 when it hits your head?
20     A.  I saw that, sir.
21     Q.  Did that hurt when that happened?
22     A.  I would say that it stung.  And
23 when you're wrestling, when you're wrestling
24 like that, you know, your body is like you
25 become programmed to absorb that.  And you

167

1  know, Mr. McDevitt, like you brought out a
2  few terms, and you said it's a badge of honor
3  and a code, and you're not trying to hurt
4  each other.  And also there's a code
5  backstage that you know of is that you don't
6  complain, you don't open your mouth, and
7  you're a tough guy and you got to take it.
8  And if you complain, you go home, and if you
9  complain, you lose your job.
10        And I'm just speaking as a code and
11 not anything else, that's aside from civilian
12 life, but the wrestling life.  And there are
13 certain things you follow and there are
14 certain rules that you follow; and when you
15 live that life, that's the way you live your
16 life.  And sometimes, you know, you really
17 don't take into consideration things, and you
18 don't realize things as you're going through
19 them; but it's later on that you realize what
20 you did and what you went through, and you
21 deal with the results of what your actions
22 were.  You know, in my case, banging against
23 my head and stuff I deal with today, but
24 that's the best way I answer it, you know, in
25 terms of what you would understand; but not

168

1  these people here, but you would understand
2  it.
3      Q.  I understand you to be claiming
4  you're suffering a consequence of voluntary
5  actions that you took.
6        That's basically what you're
7  saying, isn't it?
8        MR. SCIOLLA:  Object to the form.
9      Q.  Nobody forced you to do any of
10 that, did they?
11     A.  It was part of the script.
12     Q.  Well, you work some of that out
13 with the wrestlers, don't you?
14     A.  You work it out with the wrestlers,
15 and you work it out with the agents.
16     Q.  And if you didn't want to do it,
17 you were free to tell them, I'm not going to
18 take a chair shot to the head unprotected.
19        Let me ask you this:  Did you ever
20 tell any of those people, when you were
21 working through your matches beforehand, I'm
22 not taking the chair shots, I'm not.
23        Did you ever tell anybody that?
24     A.  You're asking me to the tell the
25 truth, yeah.

169

1      Q.  Who?
2      A.  Mr. McDevitt --
3      Q.  On those shots that you just saw,
4  which one of them?
5      A.  No, no, you asked me --
6      Q.  No, I'm asking about that film that
7  you saw.  Don't tell me what I'm asking you,
8  I'm asking you now.
9      A.  No, I don't --
10     Q.  You're going to answer my
11 questions.
12     A.  I'm answering your question.
13     Q.  My question is, on the shots you
14 just saw --
15     A.  I am answering your question, the
16 first one.
17     Q.  What's my question?  I didn't ask
18 that question.  I withdraw that question.
19        Here's my question:  On the shots
20 you just saw of all those wrestlers hitting
21 you on the head, the one you just saw, did
22 you tell any of them that you did not want to
23 do that?
24     A.  Of those shots to the head, I did
25 not say that I did not want to do it.

43 (Pages 166 to 169)

170

1      But the previous question was --
2      **Q.  I'm not talking about the previous**
3  **question.**
4      A.  You asked me --
5      **Q.   That's the only answer I need, the**
6  **answer to that question.**
7          MR. SCIOLLA:  Let the witness
8  answer.
9          MR. McDEVITT:  I'm not asking
10  another question.  That was the question
11  I asked.
12         MR. SCIOLLA:  He's not done with --
13         MR. McDEVITT:  I'm entitled to
14  answers to the questions I ask, not the
15  ones he poses.
16         MR. SCIOLLA:  He answered the
17  question.
18         MR. McDEVITT:  No, he's going to a
19  previous question.
20         MR. SCIOLLA:  You're not entitled
21  to tell him when he's done with his
22  answer.
23         MR. McDEVITT:  I'm entitled to a
24  witness that doesn't evade answers.
25         He answered my question, I'm on to

171

1  the next one.
2          MR. SCIOLLA:  You can wait until
3  he's done.  He's given you the courtesy
4  of listening to your questions.
5          MR. McDEVITT:  I'm not going to sit
6  here while he does open field running on
7  answering things that haven't been asked
8  him.
9          MR. SCIOLLA:  Maybe you have some
10  better questions.
11         MR. McDEVITT:  The problem isn't
12  with the question, it's with the
13  answers.
14         MR. SCIOLLA:  Okay, if you say so.
15     **Q.  It's pretty straightforward.**
16         **Did you tell anybody on that film**
17  **not to hit you on the head?  That's about as**
18  **straightforward a question as you can get.**
19  **It's either yes or no.**
20         MR. SCIOLLA:  Now that you've
21  revised it four times.
22         MR. McDEVITT:  I didn't revise it.
23         MR. SCIOLLA:  Yes, you did.
24         MR. McDEVITT:  No, I didn't revise
25  it.

172

1      **Q.  Let me ask you this, Mr. LoGrasso:**
2  **Were you forced to hit people on the head?**
3      A.  No, I was not forced to hit people
4  on the head.
5      **Q.  Did you take garbage cans and smash**
6  **them over people's heads in the ECW and WCW?**
7      A.  Sorry?
8      **Q.  Did you take garbage cans and**
9  **chairs and foreign objects and hit people**
10  **over the head in ECW and WCW?**
11     A.  Those are the types of matches I
12  was in.
13     **Q.  So you did to others exactly what**
14  **we saw being done to you, right?**
15     A.  Right.  And if there was something
16  that somebody did not like or did not want to
17  do, I did not do it.  And if I was asked if I
18  wanted to do something, I did not do it, and
19  I told the people I didn't want to do it.
20         So there was an instance where
21  somebody did not want to do something, you
22  didn't do it.  If somebody asked me to do
23  something and I didn't want to do it, there
24  is nobody on God's green earth is going to
25  make me do it.

173

1      **Q.  So from your answer, then, I take**
2  **it you wanted to do everything we just saw?**
3      A.  I did what was asked of me.
4      **Q.  Well, you just said nobody on God's**
5  **green earth would make you do it, if you**
6  **didn't want to do it.**
7      A.  That's right.  This was my job, but
8  I did what was asked of me.
9      **Q.  And did you just say, nobody could**
10  **have made you do that, if you didn't want to**
11  **do it?**
12         **That's what you just said, isn't**
13  **it?**
14     A.  I was answering your first
15  question.
16     **Q.  Now --**
17         MR. McDEVITT:  Let's play the --
18         (Discussion off the record.)
19         MR. McDEVITT:  I'm going to
20  condense that prior tape.
21         MS. LACY:  Can you please play the
22  top five clip, please.
23         (LoGrasso Exhibit 16, CD labeled,
24  "LoGrasso Top Hits-Received," marked for
25  identification, this date.)

44  (Pages 170 to 173)

174

1    MR. McDEVITT: Mr. LoGrasso, we are
2  going to mark as 16.  This is another
3  video compilation.  Most of what you are
4  going to see on this one, if not all,
5  you've seen in the longer one, but these
6  are I think five specific shots I want
7  to ask you questions about.
8    THE WITNESS: Yes, sir.
9    MR. SCIOLLA: Just for
10  clarification, these are all still WCW?
11    MS. LACY: Yes.  They are all from
12  WCW or ECW, and they are all contained
13  in the former reel.
14    MR. SCIOLLA: Got you.
15    (Videotape played.)
16    Q.  You saw again that shot, Terry Funk
17  hitting you with the chair, right?
18    A.  Uh-huh.
19    Q.  And you reached up and grabbed your
20  head, right?
21    A.  Uh-huh.
22    Q.  Again, you have to respond
23  verbally, because he can't --
24    A.  I'm sorry.
25    Q.  Yes or no?

175

1    A.  I'm sorry.  Yes, I saw the tape.
2    Q.  And are you saying that he really
3  didn't hit you on the head?
4    A.  He did not hit me on the head, he
5  hit the door.
6    Q.  So when you reached out to hold
7  your head, was that selling?
8    A.  Yes.
9    Q.  So you're faking getting hit on the
10  head?
11    A.  Yes.
12    Q.  So somebody watching that wouldn't
13  know whether you are faking or whether you
14  are selling, right?
15    A.  Right.  They would believe that I
16  got hit on the head.
17    Q.  And that's the whole idea, right?
18  So if somebody sitting ringside or anybody
19  watching that would think you didn't get hit
20  on the head, right?
21    MR. SCIOLLA: Object to the form.
22    A.  I got hit on the head.  Anybody
23  watching would see I got hit on the head,
24  because I sold it.
25    Q.  And there is other ones you're not

176

1  selling, you're getting flat out smashed on
2  the head with chairs and bend when you get
3  hit, aren't you?
4    MR. SCIOLLA: Object to the form.
5    A.  I thought I was selling.  Maybe it
6  was a poor job of selling it.
7    Q.  Put it this way:  You're selling,
8  but you're really getting hit on the head.
9  It's not fake, you're getting smashed on the
10  head, aren't you?
11    A.  Yes.
12    MR. SCIOLLA: Object to the form.
13    Q.  And do you see them bend?
14    A.  Yes, I saw them.
15    Q.  And you saw the one garbage can he
16  hit you with three times and it bends?
17    Did you see stars when that was
18  happening?
19    A.  I don't recall if I saw stars.  It
20  was a long time ago.
21    Q.  Did you go to any doctor after any
22  of those and say, my bell was rung?
23    A.  No.
24    Q.  And you didn't think any of that
25  had any consequence to your health?

177

1    A.  No.  Back then I wasn't educated
2  like I am today.
3    Q.  Let me ask you now, having watched
4  that, sir, with these symptoms that you say
5  you have now, how do you know the symptoms
6  you have now weren't caused by what you just
7  watched on that film?
8    MR. SCIOLLA: Object to the form.
9    A.  I wasn't educated to what getting
10  hit in the head would do to you later on in
11  life.
12    Q.  I heard that answer.  Now you want
13  to answer the question I asked you?
14    A.  I just did answer the question.
15    Q.  How do you know that the symptoms
16  you're having weren't caused by what you just
17  saw?
18    MR. SCIOLLA: Same objection to the
19  form.
20    A.  Nobody knows.  I don't know.
21    Q.  Did you sue WCW?
22    A.  No, I did not.
23    Q.  Why not?
24    MR. SCIOLLA: Object to the form.
25  And to the extent it goes into any

45 (Pages 174 to 177)

178

1     attorney-client communications as to
2     your decisions on suing and who to sue,
3     I'll instruct you not to answer the
4     question.
5          MR. McDEVITT:  That's coaching the
6     witness.
7          MR. SCIOLLA:  No that's posing an
8     objection.
9     **Q.  Why didn't you sue ECW?**
10         MR. SCIOLLA:  And I'll instruct you
11    again, to the extent it goes into the
12    attorney-client privilege, don't answer
13    the question.
14    **Q.  Do you have a reason, Mr. LoGrasso,**
15    **you didn't sue WCW?**
16        MR. SCIOLLA:  Same objection, same
17    instruction.
18    **Q.  Are you going to answer or not?**
19        MR. SCIOLLA:  He's asking you if
20    you are going listen to my instruction.
21        THE WITNESS:  I am listening to
22    your objection.
23    **Q.  So you are not going to answer my**
24    **question as to why --**
25    A.  My attorney advised me not to

179

1     answer your question, Mr. McDevitt.
2    **Q.  No, he advised you not to answer**
3    **the question if it would disclose**
4    **conversations you had with him.  I'm not**
5    **asking you to disclose conversations you had**
6    **with him.**
7        **I'm asking you, why you didn't sue**
8    **WCW?**
9        MR. SCIOLLA:  If you have
10    independent knowledge absent
11    communications with your attorneys, then
12    you can answer his question.  If you
13    don't, then tell him that you can't.
14    A.  I did not sue WCW.  I don't have a
15    rhyme or reason why I didn't.
16    **Q.  Would you agree with me, Mr.**
17    **LoGrasso, what we just saw happening to your**
18    **head in the tapes that we just watched is far**
19    **worse than anything we're going to see in the**
20    **five matches that you identified at WWE?**
21        MR. SCIOLLA:  Object to the form.
22    A.  The best way I could explain is the
23    video you showed of the Bret Hart and
24    Goldberg, where it took that one particular

180

1     shot where that ended Bret Hart's career and
2    changed his life.  And you really can't judge
3    when you're going to get hit a certain way or
4    a certain reaction you are going to have
5    after a hit.  So the stuff that I presented
6    here is stuff, is the stuff that I presented,
7    and I thought I was being, that's when life
8    changed for me.
9    **Q.  What was the question I just asked**
10    **you?**
11        THE WITNESS:  I don't know.  Can
12    you repeat it?
13    **Q.  Can you just try to answer the**
14    **questions I ask you, rather than speeches you**
15    **want to give?**
16    A.  Can I have the question repeated to
17    me.
18        MR. McDEVITT:  Read it back.
19        (A portion of the record was read.)
20    A.  Visually, it probably looks bad.
21    **Q.  It not just looks bad, he's hitting**
22    **you in the head with chairs isn't he?**
23        MR. SCIOLLA:  Objection, asked and
24    answered.
25    A.  I did get hit with a chair.

181

1    **Q.  And you didn't get hit in the head**
2    **with chairs in any of these matches with WCW**
3    **or WWE, do you?**
4    A.  I got hit with the chairs and then
5    a lot of times when you are hit with the
6    direct impact from a person, it comes with a
7    lot greater force.
8    **Q.  Do you have a hard time answering**
9    **questions directly, sir?  The question was**
10    **very simple.**
11        MR. SCIOLLA:  Please don't bully
12    the witness.
13    **Q.  The question was very simple.**
14    **Did you get hit on the head with**
15    **the chairs with the WWE?  That's a very**
16    **straightforward, simple question.  Can you**
17    **answer that?**
18    A.  Mr. McDevitt, I did not get hit
19    with a chair in WWE.
20    **Q.  Thank you.  That was very easy,**
21    **wasn't it?**
22    A.  You're very welcome.
23    **Q.  If we were to watch these matches**
24    **that you identified for WWE, the ones that**
25    **you supposedly got hurt in, will we see you**

46 (Pages 178 to 181)

182

1  dancing, for example?
2      A.  I'm sorry, if you can say that
3  again, sir.
4      Q.  If we were to watch these matches
5  that you say you were hurt in at WWE, at the
6  end of the matches would we see you in the
7  ring dancing all over the ring, being very
8  happy?
9      A.  I don't know.  I'll have to watch
10  the match and see.
11      Q.  Do you think anybody watching a
12  match and seeing you after the finish dancing
13  around the ring and flopping your skirt you
14  up and laughing and playing to the crowd
15  would think you suffered an injury?
16      MR. SCIOLLA:  Object to the form,
17      calls for speculation.
18      A.  Well, it's kind of like the example
19  you used earlier with Bret Hart and Goldberg,
20  when he got hit with that kick, he finished
21  the match and he got out of there.  Nobody
22  knew he was hurt until he went to the back.
23      Q.  You didn't see him dancing, did
24  you?
25      A.  Hmm?

183

1      Q.  You didn't see him dancing around,
2  did you?
3      MR. SCIOLLA:  On the clip that you
4      played?
5      MR. McDEVITT:  Yeah.
6      A.  No.  That wasn't his gimmick to
7  dance around afterwards.
8      MS. LACY:  Do you want to play the
9      August 1st?
10      MR. McDEVITT:  The August.
11      MS. LACY:  Can you please play --
12      MR. McDEVITT:  We're going to play
13      now --
14      MS. LACY:  The match, the 8/29/2006
15      full match.
16      Q.  And when you watch this, Mr.
17  LoGrasso, please tell me where you think in
18  the match you received head trauma.
19      MR. SCIOLLA:  Are we watching the
20      whole thing?
21      MR. McDEVITT:  Yes.
22      (Video played.)
23      MR. SCIOLLA:  Just to make sure
24      he's clear on the instructions, do you
25      want him to stop when it happens, or we

184

1  will talk about it afterwards?
2      MR. McDEVITT:  Afterward.
3      MR. SCIOLLA:  Okay.
4      MR. McDEVITT:  You can stop it.
5      MS. LACY:  I don't want to
6      interrupt the clip, but these are the
7      matches.
8      (LoGrasso Exhibit 17, CD labeled,
9      "LoGrasso Interrogatory Matches," marked
10      for identification, this date.)
11      Q.  You agree with me, Mr. LoGrasso,
12  that at the end of that match you were
13  dancing around the ring and giving the
14  appearance of being happy and fine with the
15  outcome of the match?
16      A.  I finished the match.  I was
17  dancing in the ring.
18      Q.  Did you appear to be happy?
19      A.  That was my persona to be happy.
20      Q.  Playing to the crowd?
21      A.  Yes, sir.
22      Q.  Do you think that portrayed a
23  wrestler who had just suffered a traumatic
24  brain injury?
25      A.  I finished the match.  It's not

185

1  until afterwards when you get back to the
2  ring.  It's not to say that I wasn't dizzy or
3  rocked in the ring or my head wasn't
4  spinning.  Just like you indicated in the
5  Bret Hart match, he got up and finished his
6  match.  I did the same thing.
7      Q.  Bret Hart actually, in fact,
8  suffered a severe concussion, and he didn't
9  dance in the ring.
10      Where did you get hurt in there?
11      A.  But you said that Bret Hart was
12  selling after the kick, which he did.  You
13  saw he got the kick, which he made a
14  reference to.  He got up and he finished the
15  match.  So I was taking the blows to the
16  head, and I got up afterwards, after I was
17  done with my match.  I continued and I did
18  what I was supposed to do.
19      Q.  Where did you take blows to the
20  head?
21      A.  You didn't see any of the blows to
22  the head, you didn't see shots?
23      Q.  No.  Tell me where the blows to the
24  head occurred.
25      Were they punches?

47 (Pages 182 to 185)

186

1      A.  Say it again?
2      Q.  Were they punches?
3      A.  The knees.
4      Q.  So you think you got kneed in the
5  head?
6      A.  Uh-huh.
7      Q.  What else?
8      A.  Knees, just basically the knees.
9  The elbow.
10     Q.  Knees and elbows?  So he potatoed
11 you?
12         Is that what you call it?
13     A.  I guess, yeah.
14     Q.  It wasn't called for him to hit you
15 like that, was it?
16     A.  No.
17     Q.  Did you tell him afterwards that,
18 you know, you hit me twice, you're going to
19 get a receipt now?
20     A.  No.
21     Q.  I thought that was the rule of
22 wrestling.
23     A.  It is a rule of wrestling, but I
24 couldn't do it right then and there.
25     Q.  Did you tell him afterwards?

187

1      A.  There was nothing to say
2  afterwards.
3      Q.  Well, you could have said you gave
4  me two potatoes, next time you're going to
5  get it.
6      A.  But that's a silent code, Mr.
7  McDevitt, like you stated yourself.
8      Q.  Well, I don't know if it's a silent
9  code.  I thought you said you tell somebody,
10 if they do that.
11     A.  Say it again?
12     Q.  I thought you said you would let
13 him know that you are going to get a receipt?
14     A.  You let them know when the next.
15     Q.  Did you give him a receipt?
16     A.  In that match, no.
17     Q.  Any of the subsequent matches, did
18 you?
19     A.  It got physical in there.
20     Q.  Did you give him a receipt?
21     A.  I hit him just as hard as he hit
22 me.
23     Q.  Which match was that?
24     A.  I believe in the rest of the
25 matches I think I fired up a few times.  I

188

1  can't recall where I gave him the potato.  If
2  you ask me for a potato receipt, I can't
3  exactly say.
4      Q.  Did you, when you came out of that
5  match, were you, was your bell rung, as you
6  call it?
7      A.  I went back to the doctor
8  afterwards, you know, and, you know, a lot of
9  times at the matches with him I would go back
10 to the, go back and I would tell Dr. Rios,
11 you know, if I could ask for some Tylenol
12 and, you know, and on those knee shots I know
13 I bang in the face and head.
14     Q.  What's the question I just asked
15 you?
16     A.  Huh.
17     Q.  What's the question I just asked
18 you?
19     A.  Can you repeat the question?
20     Q.  Could you please again answer the
21 question you're asked rather than speeches.
22 Answer the question you're asked, sir.
23         (A portion of the record was read.)
24     A.  My bell was rung.  It was how I had
25 a headache afterwards.

189

1      Q.  And when you say "bell rung," what
2  do think that means?
3      A.  You are hit pretty hard, you're
4  rocked, you don't know where you are.
5      Q.  And you know you don't have a bell
6  in your head, correct?  So when you say that,
7  what do you think is the part of your body
8  that has been injured?
9      A.  It's an expression, Mr. McDevitt.
10     Q.  I understand it's an expression,
11 but it's designed to express the idea that
12 your brain has been hurt, isn't it?
13     A.  Well, if you would like to say your
14 brain got scrambled, if you would like me to
15 say that instead, I'll do that.
16     Q.  Well, did you ever feel that your
17 brain had gotten scrambled?
18     A.  Yeah, there are times when my brain
19 has been scrambled, and there are times when
20 my brain did feel like everything moved
21 around inside it.
22     Q.  So you understand you're having an
23 injury to your brain?
24     A.  You understand it, but you don't
25 know, because you're not educated to the

48 (Pages 186 to 189)

190

1   extent of what's going on.
2       Q.  Well, you have doctors you can ask,
3   don't you?
4       A.  That's why Dr. Rios was my
5   physician at the time.  And when I asked for
6   aspirin, I told them I needed, I was feeling
7   a little woozy, and I needed to go to him and
8   ask him for things.  You know, give me the
9   Tylenol, like I needed.  I told him I needed
10  to take an shower to cool down, you know, to
11  get myself together.  So I was talking to a
12  doctor.
13      Q.  But you had never told Dr. Rios,
14  and you signed interrogatories saying you
15  never sought treatment for any head injury
16  from Dr. Rios, so --
17          MR. SCIOLLA:  Object to the form.
18      Q.  -- why didn't you ask your own
19  personal physician what any of this meant?
20      A.  Because I was seeing Dr. Rios and
21  he was the doctor on staff, and he was the
22  gentleman who was taking care of me.
23      Q.  Who was Dr. Tambour?
24      A.  He was my home physician.
25      Q.  Your personal physician?

191

1       A.  Right.
2       Q.  And is there some reason you could
3   not ask him any question you wanted to ask
4   him?
5       A.  No, because I was seeking the
6   advice from the physician, Dr. Rios.
7       Q.  You were even told Dr. Rios wasn't
8   your personal physician, weren't you?
9       A.  Hmm?
10      Q.  You were even told that Dr. Rios
11  wasn't your personal physician, weren't you?
12      A.  You're right.  He wasn't my
13  personal physician.
14      Q.  And your personal -- he told you,
15  your personal physician is the one you have
16  to go to for personal kind of information,
17  not Dr. Rios.
18          MR. SCIOLLA:  Object to the form.
19      Q.  You knew that.
20      A.  That's after the point.
21      Q.  No, during the time you were
22  performing, you were told, Dr. Rios isn't
23  your personal physician.  He's here to
24  treat-in-ring injuries.
25          You were told that, weren't you?

192

1       A.  So having a headache and asking for
2   aspirin and feeling woozy is not in any way
3   an injury.
4       Q.  Sometimes I go and say I have a
5   headache, that doesn't say I have an injury.
6   Did you go to him and say, I have a head
7   injury?  And you said repeatedly --
8           MR. SCIOLLA:  Object to the form.
9       Q.  -- in your I-rogs that you did not
10  do so.
11          Which is it, Mr. LoGrasso?
12          MR. SCIOLLA:  Object to the form,
13  compound.
14      Q.  Well, under oath you said,
15  "Plaintiff states he did not seek or receive
16  any treatment immediately following those
17  occasions identified in the previous
18  response."  And that's the five times we're
19  talking about.
20          So you didn't seek any treatment
21  for any kind of head injury, did you?
22      A.  I didn't know I had a head injury.
23          THE WITNESS:  Excuse me.  May I use
24  the men's room?
25          MR. McDEVITT:  Absolutely.

193

1           THE WITNESS:  Thank you.
2           THE VIDEOGRAPHER:  The time is
3   2:04 p.m.  We're off the record.
4       (A brief recess was taken.)
5       (LoGrasso Exhibit 18, Memorandum
6   dated 6/19/06, marked for
7   identification, this date.)
8           THE VIDEOGRAPHER:  The time is
9   2:09 p.m.  Back on the record.
10      Q.  Mr. LoGrasso, you've been handed
11  what's been marked as Exhibit 18.
12          Have you had a chance to look at
13  that document?
14      A.  I can look at it now.
15      Q.  Sure.
16          Have you finished reading it, sir?
17      A.  Yes, I have.
18      Q.  Do you recall getting this memo?
19      A.  No, I do not recall getting the
20  memo.
21      Q.  Do you have any reason to dispute
22  that you did?  Do you have any specific
23  reason to dispute that you would have gotten
24  this?
25      A.  I don't remember getting it, to be

49 (Pages 190 to 193)

194

1    honest with you.
2        Q.   Were you with the company in
3    June of 2006?
4        A.   Yes, sir.
5        Q.   Do you recall ever getting sort of
6    memorandums from the talent booking office?
7        A.   I would get some.
8        Q.   And how would they be delivered to
9    you?
10        A.   I think, if I remember, it's been a
11    long time, I think maybe they were in your
12    travel envelope when, your yellow envelope
13    when you got your schedule, your booking
14    schedule.  That's the one way I might have
15    gotten it.
16        I think that's the way -- I'm not
17    sure.  I'm not sure.
18        Q.   And am I correct, this memo tells
19    talent it was sent to, "Dr. Rios is not the
20    personal physician for any WWE employee,
21    talent or production personnel and cannot be
22    regarded as such."
23        That's what it says, correct?
24        A.   That's what it says, yeah.
25        Q.   And was that your understanding,

195

1    too, that he was not your personal physician?
2        A.   Yes, sir.
3        (LoGrasso Exhibit 19, Document
4    entitled, "World Wrestling
5    Entertainment, Inc., Booking Contract,"
6    Bates Nos. WWE_SING00000307 through
7    WWE_SING00000332, marked for
8    identification, this date.)
9        (Discussion off the record.)
10        Q.   Mr. LoGrasso, I've handed you what
11    had been marked as Exhibit 19, which I
12    believe to be a copy of your contract that
13    you signed with WWE.  If you would like to
14    verify that, you can leaf back to page 22 and
15    just confirm that that is, in fact, your
16    signature on the contract?
17        A.   Yes, sir.
18        Q.   And am I correct that you signed
19    that to indicate your agreement with the
20    terms of this contract?
21        A.   If you could say that once more.
22        Q.   Sir, am I correct, you signed that
23    to indicate your agreement with the terms of
24    this contract?
25        A.   Yes.

196

1        Q.   And would you turn, sir, to page
2    9 -- or page 14, section 9.5.
3        A.   9.5, you said?
4        Q.   9.5 under the paragraph "A
5    Wrestler's Obligation."
6        And am I correct that that
7    paragraph reads as follows:  "Wrestlers shall
8    take such precautions as are appropriate to
9    avoid any unreasonable risk of injury to
10    himself and others in any and all events.
11    These precautions shall include without
12    limitation prematch review of all wrestling
13    moves and maneuvers with wrestling partners
14    and opponents and prematch demonstration
15    and/or practice with wrestling partners and
16    opponents to ensure familiarity with
17    anticipated wrestling moves and maneuvers
18    during a wrestling match.  In the event of
19    injury to wrestler, and/or wrestler's
20    partners and opponents during a wrestling
21    match, wrestler shall immediately signal
22    partner, opponent and/or referees that it is
23    time for the match to end, and wrestler shall
24    finish the match forthwith so as to avoid
25    aggravation of such injury."

197

1        Did I read that correctly?
2        A.   Yes, you did.
3        Q.   Did you comply with that paragraph
4    when you were performing for WWE?
5        A.   I believe so.
6        Q.   And in terms of prematch review of
7    wrestling moves and maneuvers with your
8    partners, that's sort of what we talked about
9    before, that you go over what you're going to
10    do in the match?
11        A.   Right.
12        Q.   So that neither of you is,
13    generally speaking, surprised by what
14    happens, and you can all sort of do a good
15    match and sell what you're supposed to sell
16    and do what you're supposed to do, correct?
17        A.   Yes, sir.
18        Q.   And were you aware of this
19    provision that if you were hurt, you were
20    supposed to signal that you were hurt to the
21    referee?
22        A.   Yes, you know about the signal.
23        Q.   What is the signal that the referee
24    then gives, if a wrestler tells the referee
25    that he's hurt?  What happens?

50 (Pages 194 to 197)

198

1      A.  Well, one of two things that
2  happen.  If I just bring up a name, Charles
3  Robinson is one I'm familiar with it.  So if
4  you tell Charles, if a guy takes a bad bump,
5  does something, he will go over and ask the
6  guy if he's okay.  He will back up the
7  wrestler, make sure, you know, give him a
8  couple of seconds just to get his mind
9  together.
10      If he sees the wrestler is hurt and
11  can't go on, he will do the X signal, to
12  signal that the match is going to be over.
13  So basically that would be what would happen
14  during the match with what we're doing.
15      Q.  In your experience, have you seen
16  that happen?
17      A.  I've seen it happen once or twice.
18      Q.  And there's been some pretty famous
19  in-ring injuries through time, hasn't there?
20      A.  There's been some famous injuries,
21  yes.
22      Q.  For example, are you aware of what
23  happened to Stone Cold with Owen Hart?
24      A.  Yes, I was.
25      Q.  And that was one of those examples

199

1  where a guy gets hurt, referee has to step
2  in.  They go to a quick finish, it's not
3  planned, and try to eliminate any further
4  damage to the man, right?
5      A.  Yes, sir.
6      Q.  And again, this goes with -- well,
7  the same, the object is not to hurt anybody,
8  is it?
9      A.  Yes, sir.
10      Q.  I mean that's, you don't want to
11  hurt Stone Cold or anybody else here in the
12  ring.
13      A.  It was an accident.
14      Q.  It was a total accident.
15      And correct me if I'm wrong, sir,
16  every wrestler who enters that ring
17  understands there's risk from going in the
18  ring, don't they?
19      A.  Yes.
20      MR. SCIOLLA:  Object to the form.
21      Q.  They know there can be serious
22  injuries, up to and including death, if they
23  do things wrong, don't they?
24      MR. SCIOLLA:  Object to form.
25      A.  Yes, sir.

200

1      Q.  And for example, have you ever seen
2  the Undertaker's move, where he turns a
3  fellow upside down?
4      A.  The Tombstone.
5      Q.  The Tombstone?  Have you ever had
6  that move performed on you?
7      A.  Yes.
8      Q.  Would it be fair to say that for
9  the wrestler who is in the position of
10  receiving the Tombstone, that is pretty much
11  an ultimate act of trust that he's putting in
12  an Undertaker to execute that move correctly,
13  isn't he?
14      A.  Yes, sir.
15      Q.  If the Undertaker doesn't execute
16  that move correctly, that wrestler risks
17  paralysis, right?
18      A.  Yes, sir.
19      Q.  And you knew that when you executed
20  that move, correct?
21      A.  I never did that move, but I
22  understand your point.
23      Q.  And am I correct that the whole key
24  to that move is that the wrestler has to know
25  to keep your head above Undertaker's knees?

201

1      A.  Yes, he's got you.
2      Q.  So that when he drops to his knees
3  your head doesn't hit the mat, it just looks
4  like it does, and then he rolls you forward?
5      A.  Some guys actually, some guys panic
6  when they're upside down and they do hit the
7  mat.  It's an accident, it does happen.
8      Q.  Do you remember Draws?
9      A.  Yes, sir.
10      Q.  That's what happened to him, isn't
11  it?
12      A.  I remember.
13      Q.  And that's not something anybody
14  could have prevented once you got in the
15  ring, right?  That's just an accident that is
16  going to happen sometimes in wrestling?
17      A.  He was a good, he was a good, he
18  was a good guy.
19      Q.  I didn't say he wasn't.  I agree
20  with you.
21      A.  He was a good guy.
22      Q.  But nobody intended that to happen
23  to him, and the wrestler who executed that
24  move probably feels terrible the rest of his
25  life about that, doesn't he?

51 (Pages 198 to 201)

202

1      A.  I know for a fact he does.
2      Q.  But again, every wrestler who walks
3  in that ring understands there is a risk of
4  serious injury associated with what we do; is
5  that a fair statement?
6      A.  Fair statement.
7      Q.  Okay.  And would you agree, in this
8  document, if you would look back to page 9 --
9  sorry, page 15.
10     A.  You said page 15?
11     Q.  I'm sorry, page 16.  In bold print
12 there, under 9.12(b), would you just take a
13 minute and read that?
14     A.  Okay.  Okay.  I've read it.
15     Q.  And does that embrace the concept
16 that we were just talking about, that you
17 understand there is risk involved, and you're
18 indicating that you're accepting those risks
19 that come with being a professional wrestler?
20     MR. SCIOLLA:  Object to form.
21     A.  Yes, sir.
22     Q.  And that you assumed full
23 responsibility for all inherent risks as well
24 as those due to the negligence of a promoter
25 or other wrestlers?

203

1      A.  Yes, sir.
2      Q.  And then down below that in (c),
3  did you agree that you waived and discharged
4  the WWE from all liability to you on account
5  of injury to you which results in serious or
6  permanent injury?
7      MR. SCIOLLA:  Object to form.
8      A.  I see that, sir, yes.
9      Q.  And that's what you agreed to,
10 right?
11     A.  Yes, sir.
12     Q.  In fact, did you hear during I
13 think the pendency of this lawsuit about the
14 Mexican wrestler who died in the ring?
15     A.  I heard about it.
16     Q.  Did you actually ever see the match
17 in which he died?
18     A.  No, I didn't see it.
19     Q.  You didn't see it was sort of just
20 a routine maneuver, he hit the ropes and...
21     A.  I didn't see -- I might have saw
22 the end -- I think I saw the clip where he
23 was laying like this.  That's about the
24 extent I saw.
25     Q.  And the other wrestlers thought he

204

1  was selling, correct?
2      MR. SCIOLLA:  Object to the form.
3      Q.  As far as you could tell?
4      A.  From what I could tell.
5      Q.  Let's go now to the October 10th
6  match that we've been describing and talking
7  about today with Mr. Regal, in which you
8  claim that you had a traumatic brain injury
9  and began to suffer headaches thereafter.
10     MS. LACY:  Can you please play
11 LoGrasso, September 10, 2006 full match.
12     THE WITNESS:  Is there something
13 I'm looking for, or do I have to explain
14 something to you after this match?
15     MR. SCIOLLA:  I'm going ask you
16 some questions afterwards, but just
17 watch it, to refresh your memory.  This
18 is the one you identified we've been
19 talking about all day.
20     I think just before we start, I
21 don't think there is multiple occasions
22 where the chair or the steps come into
23 play.  I think it's one scene.
24     A.  One time.
25     (Video played.)

205

1      Q.  Is that the match we've been
2  talking about all day, in which you now claim
3  you got a serious traumatic brain injury from
4  hitting the steps?
5      A.  That's the match we talked about.
6      Q.  And at the end of that match were
7  you dancing?
8      A.  Yes, making my way back to the
9  dressing room.
10     Q.  And what part of your head hit the
11 steps?
12     A.  The top part.
13     Q.  Point with your finger to what part
14 of your head hit the steps.
15     A.  It was in here.
16     Q.  And you are pointing to the crown
17 of your head?
18     A.  Crown of my head.
19     Q.  You're saying you went head first
20 into those steps?
21     A.  When I got kicked, I was going to
22 fall, then when I turned, I didn't have
23 enough room.  I didn't have enough room for
24 me to go anywhere except that when I took --
25 when I saw the steps, I just, you know, they

52 (Pages 202 to 205)

206

1    were there.  You know, there is nothing,
2    nothing for me to do.  It was just one of
3    those things that happened.
4         Q.  When you say there was nothing for
5    you to do, what do you mean by that?
6         A.  Well, there was no place for me to
7    land, really, because the angle, like I
8    explained before, that I got hit, you know,
9    when I went into the steps I was going to
10   take the bump, that means a fall, I mean I
11   looked and I looked where I was and where I
12   was headed and, you know, I did the best I
13   could not to make a full impact with those
14   stairs, but I got a good stop.  Top of my
15   head was hit.
16        Q.  Are you saying you didn't know that
17   move was going to be part of that match?
18        You have to say yes or no.
19        A.  No.
20        Q.  So you didn't know that?
21        A.  No.
22        Q.  So you're saying he actually kicked
23   you?
24        A.  The kick was part of it.
25        Q.  And that was a real kick, not a

207

1    fake kick; is that what your testimony is?
2         A.  It's a kick.
3         Q.  What's a flatfoot called?  Do you
4    know what a flatfoot is in wrestling
5    parlance?
6         A.  Flatfoot, a flatfoot is when you
7    hit somebody with the flat of your boot, if
8    I'm not mistaken.
9         Q.  And your testimony is that's not
10   what he did there, he actually kicked you?
11        A.  The impact of what I was hit with,
12   it did hit me.  He didn't kick me with the
13   tip, he didn't kick me with the heel; but
14   when he did flatfoot, like you are
15   suggesting, the impact behind it; you know,
16   like we said, nobody goes to hurt anybody,
17   and you do try and protect each other.  And
18   when you're outside and your adrenaline is
19   going and you see the ferocity of the match
20   and you see the speed you're going at and the
21   hits I'm taking, it does get physical at
22   times.
23        Q.  So you claim you hit the top of
24   your head flush on the steps, right?
25        A.  If I remember.  I know I hit my

208

1    head.
2         Q.  When you are seen after that
3    holding your head, are you holding your head
4    because you actually hit your head or are you
5    holding your head --
6         A.  I hit my head.
7         Q.  -- because you're selling the move?
8         A.  I hit my head.
9         Q.  You hit your head.
10        Is there a stunt component or what
11   you might call tricks of the trade aspect of
12   that move that you were supposed to have
13   done?
14        A.  If it was part of the match.  There
15   is a way that you go into the stairs.
16        Q.  And how is that?
17        A.  On that particular match, no.
18        Q.  And if you want to execute that
19   move in a way that makes it appear to the
20   crowd that you hit your head, make a big
21   noise by hitting your head, but you don't
22   really hit your head, how do you do that
23   move?  What do you do?
24        A.  Try to put your hand in front of
25   your head and, you know, put your hand, try

209

1    to make your hand go to the point of contact
2    and then you peel off.  Peel off means to
3    skim.
4         Q.  So the hand, properly done --
5         A.  Properly done.
6         Q.  -- the hand hits the metal steps
7    first, makes a loud noise, makes people think
8    your head is the one that hit the steps; and
9    then you roll away and hold your head to make
10   look like that's what happened, right?
11        A.  Sometimes when you do that
12   particular move, as you know, when you are
13   doing it or when it's being applied to you,
14   sometimes you can't defend the force that's
15   behind the person doing it to you or the
16   force that you're going actually into it.  So
17   there are times when you can hurt yourself
18   even doing a safe move like you're saying.
19        Q.  Mr. LoGrasso, before I play the
20   next tape, I'm going to give you an
21   opportunity to recant the testimony which was
22   just given and admit it's false.
23        Would you care to do that?
24        A.  Say again?
25        Q.  I'm going to give you an

53 (Pages 206 to 209)

210

1    opportunity, before I play the next piece of
2    evidence, that the testimony you've given
3    today about that step and hitting that step
4    with your head is categorically false.  If
5    you wish to take the opportunity before I
6    show you the next tape, this is your chance
7    to do it.  You might want to talk to your
8    counsel beforehand.
9            You understand perjury is a
10   significant Federal crime; you understand
11   that, right?  All right.
12           Do you want to talk to your counsel
13   before I show the next piece of tape about
14   whether you wish to recant what you've
15   testified to before I confront you with a
16   piece of evidence?  I'm giving you an
17   opportunity.  I don't have to, but I'm giving
18   you the opportunity.
19           MR. SCIOLLA:  Do you want to talk?
20           MR. KYROS:  Yeah, let's talk.
21   Might as well.
22           THE VIDEOGRAPHER:  The time is
23   2:32 p.m.  Off the record.
24           (A brief recess was taken.)
25           THE VIDEOGRAPHER:  Back on.  The

211

1    time is 2:41 p.m.  Back on the record.
2        Q.   Mr. LoGrasso, you understand you
3    are still under oath?
4        A.   Yes, sir.
5        Q.   You've had a chance now to consult
6    with your counsel?
7        A.   Yes, sir.
8        Q.   And before we go any further, do
9    you wish to recant the testimony you gave
10   this morning about hitting your head on the
11   steps as false?
12       A.   No, sir.
13       Q.   What?
14       A.   No, sir.
15       Q.   All right.  Let's play the tape.
16           MS. LACY:  Can you please play
17   the --
18           MR. SCIOLLA:  Is this a different
19   this is a slow motion depiction of what
20   that step episode is.
21           (LoGrasso Exhibit 20, CD labeled,
22   "LoGrasso October 10, 2006 Stairs Clip,"
23   marked for identification, this date.)
24       Q.   Would you like to see it again?
25       A.   Uh-huh.

212

1        Q.   Your hand comes out, your hand hits
2    the steps.  Your head never hits the steps,
3    does it, Mr. LoGrasso?
4        A.   It's not how I remember it
5    happening.
6        Q.   Do you agree with me that what you
7    saw just now is your hand hits the steps, and
8    your head never does?
9        A.   Yes, sir.
10       Q.   So you lied this morning?
11           MR. SCIOLLA:  Object to the form.
12       Q.   You lied repeatedly this morning,
13   didn't you?
14       A.   No, I did not.  That's how I
15   remember what happened.
16       Q.   Your lawyers have told the judge in
17   a pending motion that is now before the court
18   in one match positioned -- in one match the
19   position of LoGrasso against Regal in
20   September 2006, which we already covered, is
21   the one we just watched, "The video of the
22   match, which has been in defendant's
23   possession since it aired, shows LoGrasso,
24   one, falling head first in the steel steps
25   that were ringside; two, looking dazed and

213

1    disoriented afterwards; three, repeatedly
2    holding his head with his hand; and four,
3    continuing to wrestler regardless.
4            "Accordingly, it rings quite hollow
5    when WWE claims that there was no treatment,
6    no suspicion, no knowledge of LoGrasso's head
7    injury at that time.  In fact, the argument
8    only further highlights attempts by WWE to
9    deny reality and continue the same course of
10   conduct to this day."
11           That description of events is
12   false, isn't it?
13           MR. SCIOLLA:  I'm sorry, what are
14   you reading from, counsel?
15           MR. McDEVITT:  From your opposition
16   to our petition for reconsideration
17   which is currently pending before the
18   court --
19           MR. SCIOLLA:  Okay.
20           MR. McDEVITT:  -- that you filed on
21   -- I'll answer your question -- that you
22   filed on, through Mr. Flaharty, on
23   5/9/16.  There is a currently pending
24   motion before the Federal judge.
25           MR. SCIOLLA:  It's a brief, written

54 (Pages 210 to 213)

214

1    by lawyers.  Just making sure.
2         MR. McDEVITT:  It's a motion we
3    filed, and you have filed that, and you
4    now know it's false.  Are you going to
5    withdraw that?  Are you going to tell
6    the judge that that is false?  What is
7    your intention.
8         MR. SCIOLLA:  To amend the
9    statement?
10        MR. McDEVITT:  Are you going to
11   tell the judge that what you have told
12   her is categorically false?  There is a
13   pending motion before the Federal judge
14   on a motion for reconsideration that you
15   now know is false.
16        MR. SCIOLLA:  Okay.
17        MR. McDEVITT:  Are you going to
18   tell the Federal judge that?
19        MR. SCIOLLA:  I'm not here to
20   answer your questions.  He is.
21        MR. McDEVITT:  Mr. Kyros, you're
22   lead counsel.  Are you going to tell the
23   Federal judge that?
24        MR. KYROS:  Well, I'm actually not
25   lead counsel.

215

1         MR. McDEVITT:  Well, you have three
2    lawyers here.  All of you speak for him.
3    Are any of you planning on telling the
4    Federal judge that this statement is
5    false.
6         MR. SCIOLLA:  We will consider,
7    after we look at it and read it, what
8    our actions will be.
9         MR. McDEVITT:  What do you need to
10   read?  I just read it to you.
11        MR. SCIOLLA:  This is not the
12   appropriate venue.
13        MR. McDEVITT:  Well, it is, because
14   the judge is pending --
15        MR. SCIOLLA:  It's not, and we're
16   not going to answer your question.  You
17   can move on.
18        MR. McDEVITT:  Well, the judge is
19   going to be deciding a pending motion.
20   You have a responsibility, ethically, as
21   lawyers, every one of you do.  You've
22   now seen graphic evidence that your
23   client committed perjury.
24        MR. SCIOLLA:  I didn't see that,
25   but.

216

1         MR. McDEVITT:  You didn't see what
2    we just saw.
3         MR. SCIOLLA:  I appreciate your
4    instructions.  Thank you.  You can move
5    on with your question.
6         MR. McDEVITT:  You were given an
7    opportunity to advise him, which I
8    didn't have to do.  I gave him an
9    opportunity to recant his testimony,
10   which he didn't.
11        Do you wish to continue answering
12   questions, or do you want to take the
13   Fifth Amendment?
14        MR. SCIOLLA:  He's going to
15   continue answering questions.
16        MR. McDEVITT:  All right.
17        MR. SCIOLLA:  And no more
18   instructions to counsel, thanks.
19        MR. McDEVITT:  You know, you're
20   sitting there with your client
21   committing perjury.  You're not criminal
22   lawyers, I assume, so I'm just being
23   fair.  I'm being more fair than I
24   probably have to be.
25        MR. SCIOLLA:  I appreciate the

217

1    speech, thank you very much.
2         MR. McDEVITT:  It's not a speech.
3         MR. SCIOLLA:  Little bit of a
4    speech.
5         MR. McDEVITT:  No, it's ethics.
6    It's ethics.  That's what we call it.
7         MR. SCIOLLA:  I'm glad the ethics
8    committee is in the room.
9         MR. McDEVITT:  Well, you can tell
10   the judge.  I'm very comfortable with
11   what I have done with Mr. LoGrasso.
12        MR. SCIOLLA:  Okay.
13        MR. McDEVITT:  If you don't want to
14   tell the judge --
15        MR. SCIOLLA:  Do you have no
16   further questions?
17        MR. McDEVITT:  I will get to my
18   questions.
19        MR. SCIOLLA:  Okay.
20   BY MR. McDEVITT:
21        Q.  Mr. LoGrasso, what you saw in that
22   clip demonstrates that you performed that
23   move exactly the way a skilled professional
24   wrestler would perform it so as not to hit
25   your head on the steps, doesn't it?

55 (Pages 214 to 217)

218

1      A.  That's what it shows.  I just
2   thought I hit my head, that's all.
3      Q.  And in fact you testified this
4   morning that you hit your head so bad that
5   these horrible headaches started right after
6   that?  Do you remember that?
7      A.  I did because of the physicality in
8   the match where I got hit outside the ring.
9   So the kick, and I went into the stairs,
10  obviously the kick was a solid kick, and then
11  the blows to the head in the ring was also a
12  part of it.
13          If you're directing it to one part
14  of the match, it was the whole match, the
15  repeated blows to the head, the kick.  It was
16  a physical match.
17     Q.  Wasn't it your previous testimony
18  that the headaches started after you hit your
19  head on those steel steps?
20          MR. SCIOLLA:  Objection, asked and
21      answered and mischaracterizes his
22      previous testimony.  The record stands
23      for itself.
24     Q.  Isn't that what you said
25  previously?

219

1      A.  Say it again.
2      Q.  Isn't that what you said
3   previously, that these headaches really began
4   after you hit your head on the steps during
5   that match?
6          MR. SCIOLLA:  Object to the form.
7      A.  That's not the way I remember it.
8      Q.  Now, if we were to do slow-mos of
9   your other matches, would we find the same
10  pattern?
11     A.  I have no idea.
12         MR. SCIOLLA:  Object to the form.
13     Q.  Now, after that match you didn't
14  report any head injury, because you had no
15  head injury, correct?
16         MR. SCIOLLA:  Objection, asked and
17     answered.
18     A.  I went back to the -- I went back
19  to Dr. Rios, sat on the table.  He examined
20  me and my stomach.
21     Q.  But you reported -- I'm sorry, I
22  didn't mean to interrupt you, go ahead.
23         Are you done?
24     A.  He advised me of my stomach.  I
25  said I would like to cool down.  I told him I

220

1   had a headache, I told him I needed some
2   Tylenol.  I wanted to go take a shower to
3   cool off.
4      Q.  You have a kind of memory that you
5   can remember that kind of a conversation in
6   October of 2006?  Is that your claim, is that
7   your memory?
8      A.  It's a specific something, because
9   I dealt with Dr. Rios.
10     Q.  What did you talk with Dr. Rios
11  about on December 17, 2006?
12     A.  I don't recall.
13     Q.  How about November 26th?
14     A.  If there were dates for TV and
15  dates that I would see him on Tuesdays on
16  Mondays, I would talk about my health.
17     Q.  No, no, specifically, what did you
18  talk with him about, for example, on
19  November 26th of 2006?
20     A.  Was it a TV taping?
21     Q.  I'm just asking the date.  You
22  apparently can recall dates.
23         MR. SCIOLLA:  Object to the form.
24     Q.  Can you tell me what you talked
25  with him about, say, on January 2, 2007?

221

1      A.  I can't recall.
2      Q.  Even though that's more recent than
3   October 11, 2006, on which you purport to be
4   able to recall the specifics of a
5   conversation that day?
6          MR. SCIOLLA:  I'm not sure if
7      that's a question.
8      Q.  I take it you have a pretty good
9   memory then, huh?
10         This brain injury stuff hasn't
11  affected your memory?
12         MR. SCIOLLA:  Objection.
13     A.  Like I said, I don't remember it
14  happening like that.
15         MR. McDEVITT:  Let's mark this.
16         (LoGrasso Exhibit 21, Medical
17     notes, Bates Nos. WWE_SING00000517
18     through WWE_SING00000521, marked for
19     identification, this date.)
20     Q.  I've shown you, Mr. LoGrasso,
21  what's been marked as Exhibit 21.  These are
22  notes that WWE produced in this litigation of
23  your medical treatment notes.
24         Have you seen this document before?
25     A.  I can't say that I recall seeing

56 (Pages 218 to 221)

222

1    this.
2         Q.   Do you see the October -- well,
3    were you told that these notes existed?
4         MR. SCIOLLA: Objection, calls for
5    attorney-client privilege. I'll
6    instructed you not to answer.
7         MR. McDEVITT: There is no
8    communicative content in that, other
9    than a document exists.
10        MR. SCIOLLA: Were you told.
11        MR. McDEVITT: You're not giving
12   legal advice.
13        MR. SCIOLLA: Were you told. It's
14   attorney-client communications. He's
15   not going to answer.
16        MR. McDEVITT: It's not any
17   attorney-client communication.
18        MR. SCIOLLA: It's
19   communications --
20        MR. McDEVITT: -- given for the
21   purposes of giving or receiving legal
22   advice.
23        MR. SCIOLLA: You're trying to get
24   the substance of communications.
25        MR. McDEVITT: You are telling me

223

1    I'm not allowed to find out if you told
2    him about this document.
3         MR. SCIOLLA: That's what I'm
4    telling you.
5         Q.   Mr. LoGrasso, on this document, it
6    says your complaint that date of
7    October 11th, which is the day after the
8    episode we just went through, you state, "He
9    was kicked in the abdomen during his match.
10   He's complaining along the left side of his
11   erectus muscle."
12        Do you see that?
13        A.   Uh-huh.
14        Q.   No mention of a headache, is there?
15   Nothing about head injuries, is there?
16        A.   I don't think that he recorded
17   everybody that had a headache in the WWE.
18        Q.   Well, there is nothing there that
19   indicates that you told him you had a
20   headache, is there?
21        A.   And not everybody reports
22   headaches.
23        Q.   And you would frequently go to
24   Dr. Rios and ask him to give you a vitamin D
25   shot wouldn't you?

224

1         I'm sorry, a vitamin B-12 shot.
2         A.   Yes, I did.
3         Q.   You still like getting vitamin
4    B-12 shots, don't you?
5         A.   Say again?
6         Q.   You still like getting vitamin
7    B-12 shots, don't you?
8         A.   Yes. I still take them, yes.
9         Q.   And they give you energy, is that
10   why you take them?
11        A.   I take them, they're part of my
12   medication.
13        Q.   What is the reason you take them?
14        A.   Well, now I'm older, they help me,
15   you know, just to stay -- you know, being
16   over 50, you know, kind of sluggish, I'm kind
17   of not, you know, they help you. It's a
18   vitamin I take.
19        Q.   And then if I could, sir, if you go
20   back to your interrogatory answer, you
21   identified August 29th of 2006 as another
22   match with Mr. Regal where you contend you
23   had a traumatic brain injury.
24        Would you look at the medical notes
25   and say what it says, you told Dr. Rios on

225

1    August 29th?
2         A.   I requested B-12 shots.
3         Q.   Again, no indication you went to
4    him and complained to him about a head
5    injury, is there?
6         A.   No, it doesn't report headaches.
7         Q.   Well, I'm not talking headaches,
8    I'm talking about head injury.
9         You didn't go to him and say, I got
10   hit on the head and I have an injury to my
11   head tonight. You went and asked for a B-12
12   shot, right? Is that right?
13        MR. SCIOLLA: Object to the form.
14        A.   Can you repeat that?
15        Q.   You didn't go to him and say, I
16   suffered a head injury tonight. You went to
17   him and said, can I get a B-12 shot.
18        Isn't that what you did?
19        MR. SCIOLLA: Object to the form.
20        A.   I got a B-12 shot from Dr. Rios.
21        Q.   But you didn't tell him you had a
22   head injury that night, did you?
23        A.   No, I didn't say I had a head
24   injury.
25        Q.   Do you understand --

57 (Pages 222 to 225)

226

1        MR. McDEVITT:  Strike that.
2        Q.  Did you read the judge's decision
3  on our motion to dismiss?
4        A.  Did I read the judge's decision on?
5        Q.  Yes, we moved to dismiss your case,
6  and she issued a written opinion.
7             Did you read it?
8        A.  I believe I did.
9        Q.  And what is your understanding of
10  the claim that you have in this case that
11  remains?
12        MR. SCIOLLA:  I'll object to the
13  form, but you can answer.
14        A.  I'm really not understanding what
15  you're saying, so I really can't answer it.
16        Q.  Well, what is the claim you are
17  making against WWE?
18        A.  About not providing information
19  about head injuries and CTE during my time
20  there.  And not getting proper care, not
21  getting proper medical treatment, not getting
22  evaluated for head trauma.
23        Q.  What specific information do you
24  think they should have told you?
25        MR. SCIOLLA:  Object to the form,

227

1  calls for speculation.
2        A.  Well, being that you're in -- there
3  is no time or rest between wrestling and you
4  go in every day, you know, and you're on the
5  road and you're banging your body around, you
6  know, there was no evaluation on how my head
7  was or any evaluation on how my physical
8  well-being was.  And WWE never sought to
9  evaluate me at any time and never, you know,
10  sought to check and see if I was okay, if I
11  had any, any problems.
12        Q.  My question was, what specific
13  information do you contend they should have
14  told you that they didn't tell you?
15        MR. SCIOLLA:  Same objection.
16        A.  When they -- well, the information
17  they should have done and should have
18  provided was an evaluation or a physical of
19  some sort to see if I was suffering from any
20  head trauma, if I had any head injuries, if I
21  needed any assistance.
22             I was getting the B-12 shots
23  because I was fatigued, and I did have the
24  headaches, you know.  And I was feeling
25  lethargic and Dr. Rios was giving me those on

228

1  his, you know, you know, on his
2  recommendation to help me along.
3        Q.  I'm going to ask you for the third
4  and last time, what information about head
5  injuries are you contending that WWE should
6  have given you that you didn't know?
7        A.  They should have given me the
8  information that there was something that
9  could be happening to your head, some
10  awareness or some knowledge of head trauma.
11        Q.  And what is the something that
12  could be happening to your head that they
13  should have told you about?
14        A.  That you can suffer from a
15  concussion and that you can, you don't have
16  to be knocked out to get a concussion.
17  Because that was my understanding of what a
18  concussion was.
19        Q.  Anything else they should have told
20  you that you didn't know?
21        MR. SCIOLLA:  Object to the form.
22        A.  I mean they didn't give us -- I
23  mean you have a drug policy that goes for
24  addicts, for drug addiction, for alcohol
25  addiction, but you have nothing in place for

229

1  people who suffer head injuries or people who
2  suffer from headaches or depression or people
3  who have, you know, irregularities with their
4  brain.
5        Q.  You mean former talent?  You mean
6  former talent?
7        A.  Former talent, former employees.
8  You make it aware that there is a drug
9  policy, but that's only if you have a drug
10  addiction.  And you have drug addiction,
11  alcohol addiction, but there is nothing in
12  place for the talent to where they can get
13  help if they need it for head injuries.
14             And you offer this through your
15  program, but there is nothing for guys like
16  myself who have these problems, and all I'm
17  looking for is help.
18        Q.  And who do you contend at WWE was
19  engaged in fraud, who specifically?
20        A.  Huh?
21        Q.  Do you contend that people at WWE
22  were engaged in trying to defraud you?
23        MR. SCIOLLA:  Object to the form,
24  to the extent it calls for a legal
25  conclusion or evaluation.

58 (Pages 226 to 229)

230

1        You can answer.
2        A.  I didn't come out and say that they
3    tried to defraud me.  I said they didn't give
4    me any awareness or knowledge.
5        Q.  Do you contend that somebody at WWE
6    was trying to defraud you?
7            MR. SCIOLLA:  Object to the form.
8        A.  And my answer is, nobody gave me
9    the awareness or the knowledge for head
10   injury and for the trouble I was having.
11       Q.  Well, that's not the question I'm
12   asking you, sir.
13           Who at WWE, if anybody, are you
14   accusing of engaging in fraud towards you?
15       A.  I didn't accuse anybody of saying
16   fraud.  All I said is they did not provide
17   any information about CTE awareness or
18   concussions.
19       Q.  And do you think, sir, that maybe a
20   reason that they wouldn't tell you anything
21   about CTE is either because they didn't know
22   it either, or they probably figured you might
23   be reading it in the newspaper like everybody
24   else did?
25           MR. SCIOLLA:  Object to the form

231

1    and calls for speculation.
2        A.  Well, maybe.
3        Q.  Are you trying to tell me that in
4    all the years since 2007, that you never read
5    anything about CTE?
6        A.  I was not -- it didn't -- I didn't
7    know up until 2014 that I had any of these
8    problems that could contribute to me having
9    CTE.
10       Q.  That's not my question.
11           Did you read in the newspapers
12   anything about CTE?
13       A.  No.
14       Q.  Well, let's take, for example, in
15   2005.  Were you in the WWE locker rooms in
16   2005?
17       A.  Yes.
18       Q.  Was there any talk about CTE in the
19   locker rooms in 2005?
20       A.  No.
21       Q.  Was there any talk that you heard
22   of in 2005 about Mike Webster?
23       A.  I don't know who Mike Webster is.
24       Q.  Do you know the former Pittsburgh
25   Steeler Mike Webster?

232

1        A.  Might have heard the name.  I'm not
2    a Pittsburgh Steeler fan, so, I'm sorry.
3        Q.  In 2005 you don't recall hearing
4    any talk about CTE inside of WWE's locker
5    rooms from anybody, right?
6            MR. SCIOLLA:  Objection, asked and
7        answered.
8        A.  No.
9        Q.  How about in 2006, did you hear any
10   talk in the locker rooms in 2006 about CTE?
11       A.  No.
12       Q.  Did you hear any wrestlers talking
13   about it?
14       A.  Not that I recall.
15       Q.  Did you hear any management talking
16   about it?
17       A.  Not that I recall.
18       Q.  Did you hear Vince McMahon ever
19   talk about it?
20       A.  Not that I recall.
21       Q.  And you left in 2007, right?
22       A.  Uh-huh.
23       Q.  And Chris Benoit was a friend of
24   yours, wasn't he?
25       A.  I wrestled with him up until May of

233

1    2007.
2        Q.  And Chris Benoit was a friend of
3    yours, wasn't he?
4        A.  We worked together in the WWE.
5        Q.  Was Chris Nowinski a friend of
6    yours?
7        A.  He was before me.
8        Q.  Did you know him?
9        A.  I might have met him once or twice.
10   I think he was there in 2003.
11       Q.  Did you watch Tough Enough?
12       A.  I don't watch Tough Enough.
13       Q.  Did you know his persona, Chris
14   Harvard?
15       A.  I really didn't.
16       Q.  You never saw him perform?
17       A.  I can't say that I have.  I wasn't
18   a Tough Enough watch, I wasn't a fan of the
19   show.
20       Q.  Well, he made it to the main
21   roster.  Did you watch him when he made it to
22   the main roster?
23       A.  I might have remembered him being
24   on the main roster with Chris Nowinski.  But
25   that's about it.  I never watched him, per

59 (Pages 230 to 233)

234

1  se.
2      Q.  And what was your understanding of
3  what happened to Chris Nowinski?
4      A.  I'm not sure.
5      Q.  Did you ever hear he got
6  concussions?
7      A.  Not that I was aware of.
8      Q.  You never heard Chris Nowinski got
9  concussions?
10      A.  I know he runs this foundation.
11      Q.  And when did you learn that, when
12  did you learn that?
13      A.  A concussion foundation.
14      Q.  When did you learn that?
15      A.  I'm not sure.
16      Q.  But your testimony is that you
17  never heard in the locker rooms or anywhere
18  that Chris Nowinski had to retire from the
19  WWE wrestling because of concussions that he
20  received?
21      A.  I didn't know he had to retire
22  because of a concussion.
23      Q.  Did you know that he got
24  concussions?
25      A.  I don't recall if he got a

235

1  concussion.
2      Q.  Did you know that he went into the
3  area of concussion research?
4      A.  I know he was into the research.
5      Q.  Did you know that in 2005, 2006?
6      A.  No.
7      Q.  Did you know he wrote a book?
8      A.  No.
9      Q.  So your testimony is you had no
10  knowledge whatsoever of this wrestler who
11  went into concussion research that led to all
12  these scientific discoveries of what we're
13  here to talk about?
14      A.  I'm sorry, I don't read books.
15      Q.  Did you know Chris Benoit?
16      A.  Yes.
17      Q.  Was he a friend of yours?
18      A.  I guess you could say he was a
19  friend.  We worked together.
20      Q.  And you're aware what happened
21  shortly after you left -- by the way, did you
22  know his wife?
23      A.  Nancy, right?
24      Q.  Yes.
25      A.  Uh-huh.

236

1      Q.  Did you know her, too?
2      A.  Yeah, I knew her.  Yeah.
3      Q.  And did you know Dr. Aston?
4      A.  Dr. Aston I don't think I met.
5      Q.  Did you know that's the person who
6  was supplying him drugs down in Georgia?
7      A.  No.  Person life like that, I don't
8  know.
9      Q.  So you were aware of Chris Benoit
10  murdering his wife and his son and then
11  committing suicide in 2007, weren't you?
12      A.  Yes, sir.
13      Q.  And would you agree with me that
14  was a huge story --
15      A.  Yes, sir.
16      Q.  -- just about everywhere when it
17  happened, wasn't it?  National news, USA
18  Today, People magazine, well-known in
19  wrestling business, wasn't it?
20      A.  Yeah, it was well known.  I mean --
21      Q.  And you followed that story, didn't
22  you?
23      A.  All I know is that she, they said
24  he had CTE, he had brain damage.  They said
25  it could have been a steroid range -- rage,

237

1  excuse me.
2          WWE had said that it had nothing to
3  do with wrestling.
4      Q.  Where did WWE say that?
5      A.  I don't recall.
6      Q.  Then why did you say that, if you
7  don't recall?
8      A.  Because that's what I remember.  If
9  you're asking me.  I remember that you guys
10  took him off, you guys took him off all of
11  your programming, and he was abolished, and
12  he's a memory in the WWE.
13      Q.  What does that have to do with the
14  WWE supposedly saying that it nothing to do
15  with wrestling?
16      A.  Because I believe that's what you
17  guys had said.
18      Q.  Where?
19      A.  I don't remember where, but it had
20  nothing to do with wrestling.  You know, he
21  was just -- he went out of his mind.  He
22  could have had CTE, it could have been a
23  steroid rage.
24      Q.  So when did you hear that he could
25  have had CTE?

60 (Pages 234 to 237)

238

1      A.  Well, at the same time he was
2  having all of these problems when the story
3  came out.
4      Q.  And that was 2007, right?
5      A.  I think it was after 2007.  I'm not
6  sure.
7      Q.  Well, do you recall there being a
8  big press conference that announced he had
9  CLE (sic)?  It was all over the news.
10         MR. SCIOLLA:  CLE?
11         MS. LACY:  CTE.
12         MR. SCIOLLA:  It's not legal
13  classes.
14      Q.  CTE.  Do you remember there being a
15  news conference announcing this and making a
16  whole lot of publicity about the fact that
17  this wrestler who had murdered his wife and
18  his child had this supposed CTE?
19      A.  I mean I feel story that he did
20  that, and I knew Nancy and I knew him and I
21  knew the son, and I feel bad.
22      Q.  I'm sure we all do, Mr. LoGrasso,
23  but my question is:  Did you hear about the
24  press conference where there was this
25  announcement that he had CTE?

239

1      A.  No, I did not.
2      Q.  But you knew it was said publicly
3  in or around the time of that murder that he
4  had CTE?
5      A.  Right.
6      Q.  And that was, frankly, a big story
7  in the wrestling business, wasn't it?
8         MR. SCIOLLA:  Objection, asked and
9  answered.
10      A.  It was.
11      Q.  And there probably wasn't anybody
12  that ever wrestled in that time frame that
13  did not know Chris Benoit had been supposedly
14  diagnosed with CTE?
15         MR. SCIOLLA:  Objection, calls for
16  speculation.
17      Q.  Would you agree with that?
18      A.  It was a big story, like you said.
19      Q.  And people were talking about it in
20  locker rooms, because they were concerned
21  about what does that mean about me; is that
22  fair to say?
23         MR. SCIOLLA:  Object to form.
24      A.  There was a lot of talk at that
25  time.  Like, you know, nobody knew for sure.

240

1  He could have went into a steroid rage,
2  because he was on the gas.  He could have, it
3  could have been, who knows?  You know, I was
4  there, nobody knows for sure what the hell
5  happened.  All I know is that it happened,
6  and it was a shock to the wrestling world.
7      Q.  And a lot of people were wondering
8  about the CTE aspect, weren't they?
9         MR. SCIOLLA:  Objection, calls for
10  speculation.
11      A.  I guess so.  I'm not sure.
12      Q.  Well, what was his finishing move?
13      A.  Flying head butt off the top of, if
14  I remember.  Cripple cross fist.
15      Q.  But in terms of flying head butt,
16  wasn't that a lot of discussion about whether
17  that particular move is what contributed to
18  his alleged head trauma and CTE?
19         MR. SCIOLLA:  Objection, calls for
20  speculation.
21      Q.  Do you recall --
22      A.  It could have been something that
23  he did every night.
24      Q.  And you recall that being part of
25  the discussion as to whether that was part of

241

1  what caused it?
2      A.  No, I don't recall.
3      Q.  Do you know how many newspaper
4  articles and media stories were out there
5  about Chris Benoit and CTE?
6      A.  No, I don't, sir.
7      Q.  But you would agree a lot, right?
8         MR. SCIOLLA:  Objection.
9      A.  I would assume so.  It was a pretty
10  big story.
11      Q.  Well, when you heard that story,
12  did you go to your doctor, your personal
13  doctor and say, do I have anything to worry
14  about?
15      A.  No, because it wasn't until 2014
16  that I started to get myself checked out and
17  realized that something could possibly be
18  wrong.
19         So whatever Chris Benoit did or how
20  or that stuff didn't pertain to me at the
21  time, because I didn't think it was me.  But
22  it wasn't until I started going to these
23  doctors, and they started telling me that I
24  had these symptoms, that I thought that it
25  could be me.  And that's when I started to do

61 (Pages 238 to 241)

242

1  my own research, do my own read up.  But
2  there was no reason for me to read up on
3  something that had nothing to do, that didn't
4  pertain to me.
5      **Q.  So you have knowledge that Bret**
6  **Hart asked to retire from the wrestling**
7  **business in '99 because of concussions.  You**
8  **know Chris Nowinski is out of the business**
9  **because of concussions and involved in**
10 **concussion research.**
11         **You know Chris Benoit had**
12 **supposedly killed his wife because of CTE**
13 **associated with head trauma, but you can't**
14 **put that together that that might have**
15 **something to do with your symptoms?**
16         MR. SCIOLLA:  Objection, that calls
17     for the mischaracterization of the
18     testimony.
19     A.  I don't know how to answer that
20 question.  You're asking me on an assumption,
21 if I only knew about these symptoms in 2014,
22 that they came to frutation (sic), then how
23 would I know how to react to Chris Benoit,
24 and all these other guys, if it wasn't
25 pertaining to me.

243

1      **Q.  What diligence did you do in those**
2  **years to find out after you left WWE, when**
3  **you were experiencing these symptoms, what**
4  **diligence did you use to determine what the**
5  **cause of all these problems supposedly was?**
6         MR. SCIOLLA:  Objection.
7      **Q.  Let's start it this way:  Did you**
8  **try to do any internet research to read up on**
9  **possible reasons you might be suffering from**
10 **headaches and whatnot?**
11     A.  I had no knowledge, like I said, a
12 concussion to me was somebody being knocked
13 out because you and I come to --
14     **Q.  I've heard that speech.  I'd like**
15 **an answer to my question.**
16     A.  It's the same answer I'm going to
17 give you.
18     **Q.  My question was:  Did you do any**
19 **internet research?**
20     A.  Not back then, no.
21     **Q.  But you have since?**
22     A.  Since I found out that I have these
23 symptoms, I have.
24     **Q.  So you could have looked very**
25 **easily then and found out the same thing,**

244

1  correct?
2      A.  If it meant something to me and I
3  was going, having these things going on back
4  then, and I had doctors to see, but since I
5  didn't, no.
6         MR. SCIOLLA:  And I'm offering an
7      objection in for the last question.
8      **Q.  And you also had Dr. Tambour too,**
9  **didn't you?**
10     A.  Actually, no.
11     **Q.  You could have went to any doctor**
12 **in the country and said, "This is what I'm**
13 **experiencing."**
14         MR. SCIOLLA:  Objection, calls for
15     speculation.
16     **Q.  Did you do that?**
17     A.  No, I didn't go to Dr. Tambour.
18     **Q.  Did you go to any doctor, and say,**
19 **"Look" -- "I, you know, I'm just being**
20 **cautious here, I'm having headaches, I took a**
21 **lot of blows to my head when I was a**
22 **wrestler.  I know Chris Benoit had CTE.  I**
23 **just want to make sure I'm okay."  Did you do**
24 **anything like that?**
25         MR. SCIOLLA:  Object to the form.

245

1      A.  No, I didn't go to a doctor and
2  say, my friend Chris Benoit killed himself or
3  his family and go to a doctor and say these
4  things.  No, it didn't happen.
5      **Q.  Did you watch -- do you know Dr.**
6  **Maroon?**
7      A.  Dr. Maroon.  I know of him.  I
8  don't know him personally.
9      **Q.  He came after you were gone, right?**
10     A.  Right.
11     **Q.  So you've never had any personal**
12 **dealings with him?**
13     A.  No.
14     **Q.  How do you know of him?**
15     A.  I think I heard his name mentioned
16 with brain research with the NFL.  I think,
17 I'm not sure.
18     **Q.  Have you talked to the Ben Omalu?**
19     A.  No, sir.
20     **Q.  You just put out a Tweet or a**
21 **Twitter about him supposedly helping you?**
22     A.  I don't recall if I did.
23     **Q.  Do you know who he is?**
24     A.  She does CTE analyzing, studies
25 brains.

62 (Pages 242 to 245)

246

1      (LoGrasso Exhibit 22, Twitter
2  update, marked for identification, this
3  date.)
4      Q.  I've handed you what's been marked
5  as exhibit -- what number is that?
6      A.  22.
7      Q.  -- 22.
8          Can you confirm that is a document
9  that you authored?
10         THE WITNESS:  You want me to give
11  them --
12         MR. SCIOLLA:  No, I have it.
13         MR. McDEVITT:  He has a copy.
14     Q.  Did you write that on April 22nd of
15  this year?
16     A.  Yes, I did.
17     Q.  You say, "Dr. Omalu, working on my
18  behalf and on the behalf of others.  More is
19  coming.  What a ride this has been."  What
20  does that mean?
21     A.  I believe that Dr. Omalu is working
22  as a consultant with -- with the lawyers on
23  the CTE study.
24     Q.  And has he examined you?
25     A.  Never once.  I never met the man.

247

1      Q.  What did you mean "More is coming"?
2      A.  Meaning that there is more to this
3  that is coming, basically.  It was just an
4  out-there statement.
5      Q.  Well, what is "More"?
6      A.  Just an out-there statement.
7      Q.  Let me go back to a question I
8  asked you before.
9          Can you identify anything that
10  anybody at WWE, beyond what you testified to,
11  did that you regard as deceiving you or
12  fraudulent towards you?
13     A.  Deceiving or fraudulent towards me,
14  if you could explain in what manner you mean.
15     Q.  Well, in any manner, did they say
16  or do anything to you that deceived you, had
17  misled you in any way?
18     A.  I guess as far as being misled, it
19  goes about time when I was going back and
20  forth to, when I was going back and forth to
21  Louisville and Deep South Wrestling, and I
22  was doing a new gimmick down there and Mike
23  and Steve Curran were working for that
24  company, and I believe Mike was in charge of
25  talent relations, along with the Steve

248

1  Curran, and they came down to look at my new
2  gimmick.  And they had told me that I was
3  going up to TV the week -- the next week, and
4  then the following week I was released from
5  WWE.
6      Q.  Anything else?
7      A.  That's about it.
8      Q.  You've made allegations about Bill
9  DeMott in this case.  You never trained under
10  Bill DeMott, did you?
11     A.  At Deep South.
12     Q.  You had been a professional
13  wrestler for how many decades by the time you
14  went to Deep South?
15     A.  I still abided by his rules,
16  because it was his training facility.
17     Q.  How many decades had you been a
18  wrestler?
19     A.  I think it was up to 15 years at
20  the time.
21     Q.  And when you went down there, you
22  went down there as a WWE Superstar to help
23  those people, did you?
24     A.  I went down there to help and keep
25  training.

249

1      Q.  And you were by that time a fully
2  accomplished professional wrestler, fair to
3  say?
4      A.  You always could learn some things.
5      Q.  And that was after these matches
6  with Steve Regal that you lied about this
7  morning, correct?
8          MR. SCIOLLA:  Objection.
9      A.  So your point being?
10     Q.  So whatever you ran into with Bill
11  DeMott, that is after these matches that you
12  lied about this morning, isn't it?
13         MR. SCIOLLA:  Objection to the
14  characterization.
15     A.  You didn't tell me what Bill DeMott
16  did that I could say yes or no to.
17     Q.  Well, you didn't even encounter
18  Bill DeMott until what, 2007?  When did you
19  go down there, in 2007?
20     A.  I'm sorry?
21     Q.  When did you go down to Deep South?
22     A.  When did go down to Deep South?
23     Q.  Yes.
24     A.  I was going down to Deep South, I
25  believe from 2005 to 2007, because I would go

63  (Pages 246 to 249)

250

1    on the weeks that I was off.
2        Q.   Was DeMott a Facebook friend of
3    yours?
4        A.   No.
5        Q.   Never?
6        A.   He was at one time, I believe.
7        Q.   And when was that?
8        A.   I'm not even sure.
9        Q.   Did you ever read any congressional
10   testimony in the Benoit matter?
11       A.   Read congressional testimony?
12       Q.   Yeah.
13       A.   No.
14       Q.   Are you a boxing fan?
15       A.   A boxing fan?
16       Q.   Yes.
17       A.   Yes, sir.
18       Q.   And do you follow Muhammad Ali?
19       A.   Pretty much.
20       Q.   And have you followed his
21   deterioration in health?
22       A.   I know of it.  I don't follow it,
23   as per se.
24       Q.   And what is your understanding of
25   what caused his deterioration?

251

1        MR. SCIOLLA:  Objection, calls for
2    speculation.
3        A.   It's a lot of blows to the head.
4        Q.   Did you see him light the Olympic
5    torch in Atlanta several years ago?
6        A.   I might have.
7        Q.   Did you generally watch the
8    Olympics?
9        A.   I watched the Olympics.  I might
10   have watched him do it.  I'm not sure.
11       Q.   Are you familiar with what I'm
12   talking about?  How he came out and lit the
13   Olympic torch in Atlanta in 1996?
14       A.   Vaguely.
15       Q.   And if you watched that in 1996 and
16   you watched Muhammad Ali, did you conclude
17   that he was suffering from brain damage?
18       MR. SCIOLLA:  Objection, calls for
19   speculation.
20       A.   I don't know because I didn't watch
21   the tape, so I don't know.  Again, I can't
22   answer that.
23       Q.   Have you seen him in public where
24   he shakes?
25       A.   I've seen him with the shakes.

252

1        Q.   And he didn't seen talk any more,
2    does he?
3        A.   Not that I know of, sir.
4        MR. SCIOLLA:  Objection, calls for
5    speculation.
6        Q.   And he's been that way for quite a
7    while, hasn't he?
8        MR. SCIOLLA:  Objection.
9        A.   I think so.
10       Q.   And that's another instance where
11   you could have deduced that that man suffered
12   brain damage from blows to the head, right?
13       MR. SCIOLLA:  Objection.
14       A.   I would assume so.
15       Q.   You indicated I think --
16       MR. McDEVITT:  Strike that.
17       Q.   When did you say your last match in
18   2007 with WWE in the main roster was?
19       A.   I didn't.
20       Q.   When was that?
21       A.   I'm not sure.
22       Q.   It was prior to June though, wasn't
23   it.
24           I mean, you were gone by the time
25   Benoit had murdered his wife, right?

253

1        A.   Yes.
2        Q.   Did you talk to him in that part of
3    2007, prior to the murders?
4        A.   Locker room talk?
5        Q.   Yeah.
6        A.   "How are you doing, what's going
7    on."
8        Q.   Right.
9        A.   I mean before Eddie Guerrero died,
10   we were talking this, me, Nunzio, Chavo,
11   Benoit and Eddie, we used to go the gym
12   all the time at the same time, and we all
13   used to meet.
14           So you're asking me if I was
15   friendly with him, during train or after
16   shows, yes.
17           Have an extensive conversations
18   with him, no.
19       Q.   Do you remember the last time you
20   talked to him?
21       A.   Not at all.
22       Q.   Have you ever known any 85-year-old
23   people with dementia?
24       A.   85-year-old people with the
25   dementia?

64  (Pages 250 to 253)

254

1      Q.   Around 85 years old.  Have you ever
2  known anybody with dementia?
3      A.   I know one or two people.
4      Q.   And how old are they?
5      A.   I could say the one person I know
6  is 50 or 60.
7      Q.   And how far along is their
8  dementia?
9      A.   I really don't keep up with him.  I
10  know him, when I see him I'm nice to him.  I
11  say, hello, how are you doing today.  It
12  doesn't look very well but, you know.
13      Q.   Is he capable of managing his
14  affairs?
15      A.   Is he capable of what?
16      Q.   Capable of managing his own
17  affairs?
18      A.   No.
19      Q.   Would he be capable, for example,
20  of getting on a plane and flying to a strange
21  city?
22           MR. SCIOLLA:  Objection, calls for
23  speculation.
24      A.   No.
25      Q.   Did the Chris Benoit that you knew

255

1  before you left WWE strike you as an 85 year
2  old with dementia?
3      A.   No.
4      Q.   No.
5           And nobody who knew him would have
6  thought he had dementia on a scale of an
7  85 year old dementia, would they?
8           MR. SCIOLLA:  Objection, calls for
9  speculation.
10      A.   It wasn't even a thought.
11      Q.   And so if somebody had said to you
12  back in 2007 when Chris Benoit did what he
13  did, "Vito, he's like an 85-year-old with
14  dementia," what would you have said to that?
15           MR. SCIOLLA:  Objection, calls for
16  a hypothetical.
17      A.   I would say that it's a standard no
18  way, I can't believe it.  But that's I think
19  everybody's reaction.
20      Q.   And if you had said that, would you
21  think you would be committing some kind of
22  fraud by expressing your opinion that you
23  didn't believe that?
24           MR. SCIOLLA:  Objection, calls for
25  speculation.

256

1      A.   You're talking like in general
2  circles about your own opinion about
3  different people.  So I mean you know it's
4  not about being any kind of thing like fraud,
5  but it's what you think about that person.
6      Q.   So that, in your mind, if you
7  express your truthful opinion, based on your
8  knowledge of Chris Benoit, no way; you don't
9  think you're trying to deceive anybody.
10  You're just expressing your opinion about
11  what you knew about the man?
12           MR. SCIOLLA:  Object to the form.
13      Q.   Is that fair to say?
14      A.   Fair, fair statement.
15      Q.   Back in 2007, after Benoit, after
16  the initial discovery of the murders, do you
17  recall, there was a lot of discussion about
18  whether that was associated with steroid
19  rage?
20      A.   That's what they said it was part
21  of.
22      Q.   Right after the murder.
23           And did that concern you as a
24  steroid user?
25      A.   Well, when you are on steroids like

257

1  that, you know, you do have these bits of
2  rage.  So I mean, it is possible.
3      Q.   So did that make you more
4  interested in the story as to whether or not
5  that could have been the cause?
6      A.   There's a difference between taking
7  steroids and taking testosterone replacement.
8      Q.   Understood.
9      A.   So I mean when you are taking
10  testosterone replacement, you are replacing
11  testosterone because you have a deficiency.
12  When you are taking steroids, you're taking
13  them for other gains and goals.
14           So when you are on a mild dose, you
15  know, the effect of having those rages are
16  very limited.  You do get irritable.  I'm not
17  saying that.  But they're much greater when
18  you're actually taking steroids.
19      Q.   But is the fact that steroids were
20  put in play in this case something that made
21  you more interested in the story?
22      A.   No.  Like I said -- like I said,
23  you know, like him doing that and everything
24  that happened, my interest of it was, okay,
25  it's a shock value, but after that, it really

65 (Pages 254 to 257)

258

1   wasn't of importance.  That's not to neglect
2   or negate anybody.  It just didn't deal with
3   my everyday life.
4       Q.  Did you hear when Chris Nowinski
5   made a call out to get his brain to get
6   examined for concussions?
7       A.  No, I did not.
8       Q.  What was your understanding of how
9   his brain was obtained?  Did you have any
10  understanding?
11      A.  No, I did not.
12      Q.  Did you know Andrew Martin?
13      A.  Yes.
14      Q.  Did you ever wrestle with Andrew
15  Martin?
16      A.  We wrestled together from the time
17  I was there in the WWE.
18      Q.  Was he a friend of yours?
19      A.  I guess so.  You know, hey, how you
20  doing.
21      Q.  Did you come to learn in 2009 that
22  Andrew Martin reportedly had been diagnosed
23  with CTE?
24      A.  I did not know that.
25      Q.  Is this the first time you learned

259

1   that?
2       A.  I'm learning it as we are going
3   along.
4       Q.  Did you know he died?
5       A.  Yes, I was a Tampa resident.  I
6   knew he died in his condo in Tampa of a drug
7   overdose.
8       Q.  And you never heard anything about
9   a CTE findings for Andrew Martin?
10      MR. SCIOLLA:  Objection, asked and
11  answered.
12      A.  Not that I -- not that I recall.
13      Q.  Did you talk to any friends in the
14  business, the wrestling business in 2009
15  about the fact that Testa died and been
16  diagnosed as supposedly having CTE?
17      A.  No.
18      Q.  Did you used to hang around Hulk
19  Hogan's bar?
20      A.  Say it again.
21      Q.  Did you used to hang around Hulk
22  Hogan's bar down in Tampa?
23      A.  Yes.
24      Q.  Who else was in that bar when you
25  were hanging out there that were in the

260

1   wrestling community?
2       A.  Jimmy Hawk was there every day
3   because he ran it.
4       Basically it was just Jimmy that
5   was there.
6       Q.  Did you talk to him about any of
7   these issues, about brain tumor -- or brain
8   trauma and headaches and all the rest of
9   that?
10      A.  Just there, hey, Jimmy, how you
11  doing, have a good time.
12      Q.  So can you tell me in the year
13  2008, for example, everything you did to
14  determine the cause of your symptoms?
15      A.  Okay.  Repeat that again.
16      Q.  In 2008 --
17      A.  Right.
18      Q.  -- tell me everything you did to
19  determine the cause of your symptoms.
20      A.  Tell you everything I did that
21  caused my symptoms.
22      MR. SCIOLLA:  I'm sorry.  Can you
23  just repeat one more time?  Can you just
24  repeat it?
25      Q.  Let me make sure.

261

1       A.  I'm trying to figure out how to
2   answer it.
3       Q.  Let me make sure you understand the
4   question.
5       The question is, tell me everything
6   you did in 2008 to try to determine the cause
7   of the symptoms you were having?
8       A.  Tell you what I did to determine
9   what were the causes --
10      Q.  In the year 2008, what did you do
11  to determine the cause of the symptoms you
12  were having that year?
13      A.  Seeking medical help, is that what
14  you're asking me?
15      Q.  Anything.  Anything you did.
16  Medical help, research, anything.
17      A.  I don't recall what I did.
18      Q.  Can you tell me anything you did in
19  the year 2009 to figure out the cause of your
20  symptoms?
21      A.  I don't recall.
22      Q.  Can you tell me anything you did in
23  the year 2010 to determine the cause of your
24  symptoms?
25      A.  No, sir.

66 (Pages 258 to 261)

262

1      Q.  How about 2011?
2      A.  I don't -- I don't recall, sir.
3      Q.  How about 2012?
4      A.  I don't recall.
5      Q.  How about 2013?
6      A.  I don't recall.
7      Q.  So is it fair to say that in that
8   six-year period that you were having
9   symptoms, you can't recall doing anything to
10  determine the cause of those symptoms?
11     A.  I didn't know I had these symptoms
12  until I got checked out in 2014.
13     Q.  Well, you knew you had headaches,
14  didn't you?
15     A.  Huh?
16     Q.  You knew you had headaches, didn't
17  you?
18     A.  But I didn't know it was a symptom.
19  I just dealt with the headaches.
20     Q.  It's a symptom of what you're now
21  calling a TMI or a TBI, isn't it?
22     A.  I didn't know that.
23     Q.  What other symptoms did you have in
24  the years 2008 to 2013 that you now
25  characterizing as being associated with TBI?

263

1   Did you have anger?
2      A.  I do have anger issues.
3      Q.  Did you have depression?
4      A.  I did have my own depression.
5      Q.  Did you have any memory loss?
6      A.  I guess vague.
7      Q.  Do you have anxiety?
8      A.  I have anxiety.  I definitely had
9   the sleep apnea was terrible and it still is.
10  They want me to sleep with a machine and I
11  can't do it.
12     Q.  And when did you begin to
13  experience sleep apnea?
14     A.  I had had that for a very long
15  time, and I just -- I sleep a couple of
16  hours.  I would wake up.  I sleep a couple
17  more hours, I get up.  I could never -- seems
18  like unless I was totally wiped out,
19  exhausted, I would sleep, but I don't sleep
20  the whole way through.
21     Q.  What -- from the minute you got
22  sleep apnea, what did you do to determine the
23  cause of the sleep apnea?
24     A.  I went to Brandywine Hospital.
25     Q.  What year?

264

1      A.  2014 I believe, or 2015.
2      Q.  I'm sorry.  When did you say you
3   started experiencing that?
4      A.  I've had that, you know, for a
5   while, a long time.
6      Q.  Prior to 2014?
7      A.  Prior, yes.
8      Q.  And how many years prior to 2014
9   did you have sleep apnea?
10     A.  I would say maybe 2008.
11     Q.  Between 2008 and 2014 what did you
12  do to determine the cause of the sleep apnea?
13     A.  Absolutely, this is not being --
14  this is nothing but I just thought I couldn't
15  sleep.  I just thought anxiety and just --
16     Q.  In the years 2008 to 2013, do you
17  contend WWE did anything to prevent from you
18  discovering the cause of your injuries?
19     MR. SCIOLLA:  Objection, calls for
20     speculation, legal conclusion.
21     A.  Did they do anything to prevent me?
22     Q.  Yeah, from discovering the cause of
23  your injuries in the years 2008 to 2013.
24     MR. SCIOLLA:  Same objection.
25     A.  No.

265

1      Q.  Am I correct, Mr. LoGrasso, that
2   you, in the years when you were still --
3      MR. McDEVITT:  Strike that.
4      Q.  In the years where you were having
5   these symptoms, you were still trying to
6   perform as a professional wrestler?
7      A.  Yes, sir.
8      Q.  When did you perform your last
9   match?
10     A.  I don't recall.
11     Q.  After you left the WWE and any of
12  the matches that you performed in, did you
13  take any chair shots?
14     A.  Did I take any what?
15     Q.  Chair shots?
16     A.  No, sir.
17     Q.  When was the last time you took a
18  chair shot?
19     A.  I don't remember.
20     Q.  I think you already indicated you
21  didn't when you were at WWE and you didn't
22  after you left WWE; am I correct in that?
23     A.  I would say so, yeah.
24     Q.  So it would have been sometime
25  prior to that last run with the WWE that you

67 (Pages 262 to 265)

266

1    took your last chair shot?
2        A.  Prior to WWE is probably, the last
3    time I took a chair shot, prior.  During my
4    time at WWE, I did not take any chair shots.
5    Afterwards, I'm really not sure -- I'm
6    probably saying, I don't remember if I did.
7    I know I wasn't into the hard core.  I wasn't
8    into doing the stuff.  I just, you know --
9        Q.  You were advertising pretty much on
10   social media for wrestling bookings and
11   things of that nature through 2013, weren't
12   you?
13       A.  I think so.
14       Q.  And you were advertising on, the
15   Marmelukes, available for bookings in 2013,
16   correct?
17       A.  I think, I don't remember, but I
18   think so.  But I'm not sure.
19       Q.  And Da Baldies were available for
20   bookings in 2013?
21       A.  I think so.
22       Q.  And then you opened up your
23   wrestling facility down in Florida, correct?
24       A.  Yes, sir.
25       Q.  How did that go?

267

1        A.  I wind up closing my doors.
2        Q.  Would you consider it a financial
3    success?
4        A.  No.
5        Q.  Would you consider it a flop?
6        A.  I considered it a good old fashion
7    college try.  That's about it.
8        Q.  You were doing MMA sparring in
9    there, weren't you?
10       A.  Just dummies and everything.
11       Q.  With dummies, not real people?
12       A.  We were doing sparring with the
13   dummies.  We were practicing kicks, you know.
14       Q.  Didn't you almost get killed?
15       A.  Say it again?
16       Q.  Didn't you almost get killed?
17   Didn't you have to go to the hospital because
18   of a serious injury you got sparring?
19       A.  I had hit my leg and I had -- I
20   didn't know that I had a blood clot in my
21   leg, and I thought it was -- I thought it was
22   a black and blue.
23       Q.  And you got that from getting
24   kicked hard, right?
25       A.  In a kick pad.

268

1        Q.  Did you go to the emergency room?
2        A.  Yes.
3        Q.  And did they tell you you almost
4    died?
5        A.  Yes, they told me it was serious.
6        Q.  Were you sparring with your
7    students in this studio?
8        A.  Yes.
9        Q.  Throwing punches at them?
10       A.  We were doing combination punches,
11   no head shots, kicks, practices kicks to the
12   legs.
13       Q.  So even as late as 2014, while
14   you're experiencing these symptoms, now
15   you're engaging in real fighting?
16           MR. SCIOLLA:  Objection.
17       A.  It wasn't really real fighting.  It
18   was a bunch of kids that didn't know and you
19   are trying to teach them the basics.  So it
20   wasn't fighting.
21       Q.  Did you say, "I spar with each
22   student the whole way through.  I tell them
23   if I have no breaks, no water, no chair, you
24   can do this.  You get to hit the teacher, I
25   tell you to hit"?

269

1        A.  I don't recall that.  Unless you
2    let me read it.
3           (LoGrasso Exhibit 23, Facebook
4           status update, marked for
5           identification, this date.)
6        Q.  I handed you what has been marked
7    as Exhibit 23, Mr. LoGrasso.  Is that
8    something you posted?
9        A.  Can I -- am allowed to read it?
10       Q.  Absolutely.  I'm sorry.
11       A.  I posted this, yes, I did.
12       Q.  Is that what you said, "you get to
13   hit the teacher, I tell you to hit"?
14       A.  Meaning, when you're sparring is
15   that a lot of the guys were afraid to make
16   contact because, you know, they didn't want
17   to hit the teacher.  There was a no heading
18   hunting rule, no head shots allowed.
19   Everything was one, two, three, four, kick,
20   kick, one, two, and all body shots and to the
21   legs.
22           And a lot of guys, a lot of guys
23   who don't know how to fight were intimidated
24   because they didn't want to make a mistake,
25   and as you know, being a new guy, you try not

68 (Pages 266 to 269)

270

1   to -- and, you know, everybody has a fear.
2   And everybody has -- everybody wants to be in
3   MMA fighter and everybody wants to do it.
4   And it's okay to hit the bags, hit the dummy,
5   kick the pads.  But now you're standing in
6   there with a guy who is going to actually
7   throw back at you, everybody was hesitant.
8   And then I used to tell the guys, I said, if
9   I could do, you could do it.  If I could do
10   this and not take a break, you can do this.
11        Q.   In one of the postings you made
12   about this lawsuit, did you state, "The WWE
13   will definitely see this and to know that I
14   will be going on TV soon in a tell all and
15   just prove that you got to believe in you and
16   the sacrifices you made in life.  As you know
17   you had to be tough.  Never say you're hurt.
18   If you were, you lost your spot."  Did you
19   say that?
20        A.   Can I read it?  Is it okay?
21            (LoGrasso Exhibit 24, Facebook
22            status update, marked for
23            identification, this date.)
24        A.   I wrote this.
25        Q.   Is that what you said?  "You know

271

1   you had to be tough.  Never say you're hurt.
2   If you were, you lost your spot"?
3        A.   That was one of the things we
4   talked about before is a code in wrestling.
5   If you say you're hurt, you lose your spot.
6   You always got to, you know, never say you're
7   injured, never say you're hurt.  Always keep
8   going.  I did say that.
9        Q.   And is that sort of the code you
10   followed when you were performing for the
11   WWE, never say you're hurt?
12        A.   You try to follow that code and you
13   try to do it to the best of your ability.
14        Q.   You also say in here, "This is a
15   chance for benefits.  The same as the NFL
16   lawsuit.  No one knew but a billion dollars
17   divided up for the guys who put their time in
18   and have some issues now have relief."
19            What is a chance for benefits?  Do
20   you see this lawsuit as a chance for
21   benefits?
22        A.   To get help.
23        Q.   Well, what benefits do you think
24   this lawsuit is about?
25        A.   To get the help people need so they

272

1   can monitor their head injuries, you know,
2   get what they need to survive this world.
3        Q.   Well, such as what?
4        A.   Well, you know, you're looking at
5   possibly healthcare, you know, some sort of
6   pension, you know, some kind of relief for
7   guys to help them get through their tough
8   times.
9        Q.   So you think this lawsuit is a way
10   of getting a pension?
11            MR. SCIOLLA:  Objection.
12        A.   Well, to get a pension for the guys
13   who put their time in.
14        Q.   By the way, are you one of them?
15        A.   I would think so.
16        Q.   So you put a couple of years in the
17   WWE and you think this lawsuit should get you
18   a pension?
19        A.   I didn't just put a couple of years
20   in the WWE.  It was for wrestling in general.
21            (LoGrasso Exhibit 25, Facebook
22            status update, marked for
23            identification, this date.)
24        Q.   Where did you get this information
25   about the NFL lawsuit is about billion

273

1   dollars divided up by the guys.  Where did
2   that come from?
3        A.   I read about it online.  That's
4   where I got the information from.  It was on
5   the newspaper and in the news.
6        Q.   Do you have some understanding that
7   Mr. Kyros was involved in that?
8        A.   Yes, I do.
9        Q.   What is your understanding?
10        A.   That he helped some of the people
11   in the NFL lawsuit.
12        Q.   Did you understand he had something
13   to do with that settlement?
14        A.   I know he was affiliated with it.
15   But the things that are on there, from what I
16   read, and what I saw on TV, and I wrote about
17   it.  It's my own opinion.
18        Q.   How is he affiliated with the
19   billion dollar settlement?
20        A.   How is Mr. Kyros affiliated with
21   it?
22        Q.   Yeah, how is he affiliated with
23   that.
24        A.   I didn't say he was affiliated with
25   it.  I said he was affiliated with the

                              69  (Pages 270 to 273)

1    lawsuit. I didn't say the billion dollar
2    one.
3         Can I read it?
4    **Q. Well, it was on the one I just**
5    **asked.**
6         (Discussion off the record.)
7    **Q. What was his affiliation with the**
8    **lawsuit?**
9    A. That was what I heard on TV and
10   read online, so that's what I put.
11   **Q. Where did you hear that on TV?**
12   A. I don't recall.
13   **Q. Advertisements?**
14   A. It wasn't advertising. It was on I
15   think maybe Sports Center, or something, one
16   of the sports shows.
17   **Q. Sport Center said Mr. Kyros had**
18   **something to do with that?**
19   A. No, I didn't say that.
20   **Q. What --**
21   A. You asked me about the billion
22   dollar lawsuit. You didn't ask me about Mr.
23   Kyros.
24   **Q. No, well, I'm sorry. I thought I**
25   **did. But I'm asking, what is your reason for**

1    **thinking he had something to do with that**
2    **billion dollar settlement?**
3    A. He represented some of the people
4    in the NFL lawsuit.
5    **Q. And did what?**
6    MR. SCIOLLA: Objection, calls for
7    speculation.
8    **Q. I'm not asking you to speculate.**
9    **I'm asking you, what is your understanding?**
10   A. He represented some of his clients
11   in the lawsuit.
12   THE WITNESS: Is it all right if I
13   take a break?
14   MR. McDEVITT: You want to take a
15   couple of minutes too. Actually that's
16   a probably good idea. It will give me
17   a chance to look through and see if I
18   can shorten.
19   THE VIDEOGRAPHER: The time is
20   3:51 p.m. Off the record.
21   (A brief recess was taken.)
22   THE VIDEOGRAPHER: The time is
23   4:02 p.m. Back on the record.
24   **Q. Just a few more things to cover**
25   **with you today, if I could.**

1    **On Exhibit 25, am I correct that --**
2    **and I'll give it back to you -- am I correct**
3    **that on this one, you also said, "The fear on**
4    **losing your spot is real. Are you hurt, no,**
5    **you keep going. It was the culture."**
6    **That's the same thing you said in**
7    **the prior e-mail, not e-mail, the prior**
8    **posting, about the culture?**
9    A. Basically the same thing.
10   **Q. Did you ever subscribe or read the**
11   **WWE Magazine?**
12   A. No. They stopped sending me the
13   magazine a long time ago.
14   **Q. Are you a subscriber to what is**
15   **called Dirt Cheats?**
16   A. No.
17   **Q. Have you ever been?**
18   A. No.
19   **Q. Do you ever read The Wrestling**
20   **Observer?**
21   A. Wrestle Zone, Wrestling Observer.
22   **Q. How about The Torch?**
23   A. The Torch is still a paper thing,
24   isn't it?
25   **Q. Yes. Well, I think it is. It may**

1    be on the internet too, but paper --
2    A. I don't read The Torch. Maybe
3    Wrestle Zone or the PWInsider.
4    **Q. So they are internet-based rag**
5    **sheets, for lack of a better word?**
6    A. Those two.
7    **Q. Those two. All right.**
8    **How long have you read those?**
9    A. I don't know, on and off.
10   **Q. Have you received written**
11   **communications from the WWE since you left**
12   **there? Have you received any kind of written**
13   **communications from the WWE since you left**
14   **the company in 2007?**
15   A. E-mails about the wellness policy.
16   **Q. Anything else?**
17   A. Asking Tom Luminowski (phonetic)
18   about my royalties.
19   **Q. Tom Rigmoski (phonetic), do you**
20   **mean?**
21   A. Yes.
22   **Q. Anybody else?**
23   A. Let me think. No, not that I know
24   of.
25   **Q. When you say you got e-mails, I**

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 1.800.642.1099

278

1    think that's what you said, e-mails regarding
2    the wellness policy?
3       A.  They used to send them to me I
4    guess as a group blast.
5       Q.  And did you keep those e-mails?
6       A.  No.
7       Q.  What did the e-mails say?
8       A.  Basically what you showed me,
9    something to the effect earlier, about the
10   wellness policy.
11      Q.  I don't recall what I showed you
12   about the wellness policy you're referring
13   to.
14      A.  It was saying that if you have -- I
15   think, if I remember, if you have any
16   problems or you know anybody who needs help,
17   call the wellness policy.
18      Q.  It would say call the WWE, not call
19   the wellness policy?
20      A.  Well, the program, WWE wellness
21   policy.
22      Q.  Well, those letters don't even
23   mention wellness policy, do they?
24      A.  I'm not sure because I don't
25   remember the exact e-mail.  You asked me if

279

1    there was any contact, if I remember, that
2    was the only one.
3       Q.  But you would agree, I take it, the
4    WWE has not provided you any kind of medical
5    care since you left the WWE?
6       A.  No.
7       Q.  All right.  And the letters you're
8    referring to are letters by which WWE offers
9    any talent that has a drug or alcohol
10   problem, help in going to rehab; is that
11   basically what you're talking about?
12      A.  That's it.
13      Q.  And do you happen to know any
14   people who have been helped by that program?
15      A.  No.  Pretty much, I guess the guys
16   who go to the rehab keep it to themselves,
17   and they don't advertise it.
18      Q.  Do you know Scott Hall?
19      A.  I know Scott Hall.  I don't talk to
20   him.  I'm not a friend of his.
21      Q.  Do you think he would be alive
22   today but for the WWE's help in that program?
23      MR. SCIOLLA:  Objection, calls for
24   speculation.
25      A.  I guess -- I guess it did help him,

280

1    and the DDP Yoga he swears by.  I mean it
2    might have helped him.
3       Q.  Do you --
4       THE VIDEOGRAPHER:  4:07 p.m.  Off
5    the record.
6       (A brief recess was taken.)
7       THE VIDEOGRAPHER:  4:08 p.m.  Back
8    on the record.
9       (LoGrasso Exhibit 26, Article
10   entitled, "Is it over for HBK?," Bates
11   Nos. SINGLETON_0000612 through
12   SINGLETON_0000614, marked for
13   identification, this date.)
14      MR. SCIOLLA:  Can I have a copy of
15   25?  I don't think I got one.
16      MS. LACY:  There were two that I
17   handed over.  I don't know where the
18   other copy went.
19      THE WITNESS:  This is 25.
20      MR. SCIOLLA:  You have to keep that
21   there.  That's marked.
22      MR. McDEVITT:  She's going to
23   attach them.
24      MS. LACY:  I don't know where it
25   got lost, but I did have two copies.

281

1       THE WITNESS:  Do you guys want that
2    door shut?
3       MR. McDEVITT:  No, that's okay.
4       Q.  Would you have a minute to take a
5    look at Exhibit 26.
6       Have you read that article before
7    today?
8       A.  No.
9       MR. McDEVITT:  I'm probably going
10   to conclude by showing you the last
11   three matches of WWE that you identified
12   in the interrogatories as the five
13   matches that you were hurt in.  We've
14   seen two already.
15      Let's do the January 16, 2007
16   match.
17      MS. LACY:  It always together.
18   Full match.
19      Q.  And I would like you to do, Mr.
20   LoGrasso, is --
21      MR. McDEVITT:  Are you able to stop
22   that when he speaks?
23      THE VIDEOGRAPHER:  Yes.  Just let
24   me know.
25      Q.  What I would like you to do is when

71 (Pages 278 to 281)



282

1  you watch this one is if -- if you see a
2  place where you think you received a head
3  injury, I would like you to tell us when you
4  see it, stop the tape.  You can identify it
5  and we will continue to roll it.
6       MR. SCIOLLA:  We are going to stop
7  now.
8       MR. McDEVITT:  Whenever he
9  identifies a spot so we can make sure we
10 identify.
11      MR. SCIOLLA:  Okay.  Do you
12 understand?  Okay.
13      (Video played.)
14      MR. McDEVITT:  Can you run that
15 until the match starts.  Run it to until
16 the match actually begins.
17      Okay.  There.
18      (Video played.)
19  A.  Right there is where I got rocked.
20      MR. McDEVITT:  Before we start it.
21  A.  That's where it started.
22  Q.  Who is your opponent there?
23  A.  Steve Taylor.
24  Q.  And you're indicating in the tape
25 where he sort of gives you a series of upper

283

1  cuts with the bent arm?
2  A.  Right.
3  Q.  Let's continue, and if you see any
4  others ones, tell us where is that.
5  A.  That's where it started and that's
6  where I like, from then on, you can go ahead.
7      (Video played.)
8  A.  Right in the corner I was being hit
9  in the head.
10 Q.  And you are indicating that Steven
11 Regal is hitting you in the head in the
12 corner?
13 A.  In that series also.
14 Q.  All right.  Let's continue.
15      (Video played.)
16 A.  Again I'm hit in the head, in the
17 back of the head on that.
18 Q.  Were you indicating the spot where
19 Steven Regal --
20 A.  Where I received a kick to the
21 head.
22 Q.  With his right foot?
23 A.  Yes, sir.
24 Q.  All right.
25      (Videotape played.)

284

1  A.  That was another upper cut on that.
2  Q.  And you've indicated the same
3  movement that that man made earlier in the
4  film with sort of a bent arm upper cut to
5  your chin?
6  A.  Yep.
7  Q.  Does he actually hit you in the
8  face there?
9  A.  Say it again.
10 Q.  Does he actually hit you in the
11 face?
12 A.  I believe so.  All I know is I got
13 it good.
14      (Videotape played.)
15 A.  This is the bit of the match where
16 they're actually tell me to tag, if it is,
17 and I'm not -- like, I'm trying to get there,
18 but I'm having a problem getting to make the
19 tag.
20 Q.  Well, that's conventional issue in
21 tags, the guy is trying to get, but he can't
22 get there because the guy keeps dragging him
23 back?
24 A.  I'm talking about I'm trying to go
25 back -- I'm saying if it's the end, you can

285

1  go forward.
2      (Video played.)
3  A.  That's the point I'm talking about.
4  Like a miss altogether.
5  Q.  That's scripted, isn't it?  That's
6  the scripted part of the finish, isn't it?
7  A.  Not that part.  They were telling
8  me from all three of them, to make the tag,
9  make the tag.  He couldn't missed any more
10 and made it more obvious that, you know, make
11 the tag already.  And I was having a hard
12 time making a tag and I missed it.  As you
13 could see, I missed it.
14 Q.  Well, that often happens, doesn't
15 it?  You miss the tag?  That's sort of
16 setting up the idea, you can't make the tag?
17 A.  Not when you are going on the
18 finish, or the go home.  You are supposed to
19 make the hot tag.
20 Q.  Let's see how it ends here.
21      (Video played.)
22      MR. McDEVITT:  All right.  You can
23 stop.
24 Q.  So after the segment where you
25 didn't make the tag, you made the tag, right?

72 (Pages 282 to 285)

286

1     A.  I missed, and then eventually they
2  tagged me.
3     Q.  That's the scripted.  You are
4  supposed to miss to set up what you
5  eventually do?
6     A.  That end part wasn't supposed to
7  be, I was supposed to make the hot tag diving
8  into the corner, but then it took me a little
9  extra at end to do a neck break.  You never
10 do a neck break that how close to the
11 turnbuckle.  Because as you're making a hot
12 tag, you're coming, you're coming, you're
13 coming, you make a hot tag, you jump and you
14 make the hot tag.  When you're doing a neck
15 breaker and you are doing something like
16 right there, so I have to fall back into the
17 turnbuckle, so I could wave my hands like
18 this.  I still never made the tag.  They made
19 the tag to me.  When you are going into the
20 turnbuckle, you make the tag, hot tag, and
21 you fall.
22    Q.  After every one of the episodes
23 that you indicated you got hurt in, you
24 continued to perform, didn't you?
25    A.  I continued to perform.

287

1     Q.  And you continued to execute
2  various complicated maneuvers, didn't you?
3     A.  Complicated, in dropping to your
4  knees, I don't think so.
5     Q.  If somebody was watching that, do
6  you find anything in that that looks like
7  anything other than a routine wrestling
8  match?
9        MR. SCIOLLA:  Objection, calls for
10       speculation.
11    A.  I'm just telling you what happened
12 in the ring.
13    Q.  I'm just asking you, sir:  If you
14 watched that would you think that was
15 anything other than a routine, garden variety
16 wrestling match?
17    A.  I guess you could say it's a
18 wrestling match.
19    Q.  But you wouldn't find anything in
20 that that would indicate that anybody was
21 seriously hurt, would you?
22    A.  To the blind eye, what you're
23 saying is correct.  To the trained eye, there
24 is something wrong.
25    Q.  What trained eye?  Of a wrestler's?

288

1     A.  Other wrestlers, the agents, the
2  bookers, anybody who knows wrestling.
3     Q.  Well, did any of these wrestlers
4  say to you, were you hurt?
5     A.  They were telling me to make the
6  tag.  They were pushing me to the corner.
7  The ref was telling me to go home.
8     Q.  When we talk to those wrestlers,
9  they will say they knew you were hurt?
10    A.  They were telling me to go long and
11 I couldn't.
12    Q.  So they're going to say they knew
13 you were hurt?
14       MR. SCIOLLA:  Objection, calls for
15       speculation.
16       MR. McDEVITT:  All right.
17       Let's watch the January 30th one.
18       MS. LACY:  The full match.
19    Q.  Let's do the same thing, Mr.
20 LoGrasso.  When you see something that you
21 say now hurt you and took a head injury, tell
22 us and we will stop the tape.
23       (Videotape played.)
24    A.  Right there the knee to the head.
25    Q.  So your testimony is he actually

289

1  kneed you in the head?
2     A.  What you just saw.
3     Q.  No, I'm asking.  Are you selling
4  that he hit you in the head or did he hit you
5  in the head?
6     A.  He hit me in the head.
7     Q.  All right.  Let's go forward.
8        (Video played.)
9        MR. McDEVITT:  All right.  You can
10       stop that.
11       THE WITNESS:  There was more after
12       that, but if you want to stop it.
13       MR. McDEVITT:  All right.  Let's
14       run it just to make sure.  I didn't
15       realize it.
16       (Video played.)
17       THE WITNESS:  That's fine.
18    Q.  Do you recall about halfway through
19 that, when you were laying on the mat, he
20 bends down and appears to be talking to you?
21    A.  I don't know if he was talking to
22 me.
23    Q.  Well, fair enough.
24       But he bends down and his face is
25 near your ear; do you remember that?

73  (Pages 286 to 289)

290

1      A.  I just saw it.  I don't know if he
2  said anything to me.
3      Q.  But that is kind of an example of
4  when wrestlers -- I don't know did that one
5  or not.  But that's how they communicate,
6  right?  He could have told you what move to
7  go to next, right?
8      A.  We talk to each other.
9      Q.  He tells you what is the next move
10 he is going to do to you, or you should do
11 him?
12     A.  Or if you're okay.
13     Q.  Right.  Did he say anything to you
14 there?
15     A.  No.
16     Q.  And then at the end when he was,
17 had the red dress and apparently choking you,
18 he wasn't really choking you, was he?
19     A.  At one point when he had my neck
20 up, I was like, you know.  I was losing it a
21 little bit.  I was choking a little bit at
22 the end.  But, you know, you just did it and
23 that's was it.
24     Q.  You had your hands between the rag
25 and the --

291

1      A.  I had my fingers there, but that
2  strength, it doesn't matter.  If I'm pulling
3  and you have your fingers there, two fingers
4  is not going to separate it.  I did the best
5  I could.  But as he was bringing it back, it
6  was stronger and stronger.
7      Q.  Were you selling that move at that
8  point?
9      A.  Say what.
10     Q.  Were you selling this move there,
11 his choking you?
12     A.  Well, I was selling it and
13 experiencing it.
14     Q.  And if you watch that match, would
15 you agree that it looks like an everyday,
16 ordinary wrestling match?
17     A.  I would say it looks like an
18 everyday, ordinary wrestling match.
19         MR. McDEVITT:  Let's watch the last
20     one, which is --
21         MS. LACY:  Vito versus William
22     Regal, September 12, 2006.
23     Q.  Same thing, whenever you see what
24 hurt you, say so.
25         (Video played.)

292

1          THE WITNESS:  If I could say
2  something, if you could cut that for a
3  second.
4          I know we're watching matches here
5  and I know that the match just had
6  Kennedy, but if I remember right, there
7  was a running boot to where he started
8  off on one side of the ring and he hit
9  me full force, running me across to the
10 other side.  And that wasn't in the
11 tape.  If I remember correctly.  Maybe
12 I'm mistaken, but if I remember, I think
13 there was a running boot in there.
14         MR. McDEVITT:  We haven't edited
15 the tape.
16         THE WITNESS:  I'm just making a
17 statement.  Go ahead.
18         (Video played.)
19         THE WITNESS:  There is another kick
20 to the head on the outside.  I know I
21 took the turnbuckle in the post.  You
22 know, I absorbed the hit, but I just
23 making points.
24         You can go ahead.
25     Q.  What are you saying about the

293

1  turnbuckle, are you saying you hit your head
2  there, or not?
3      A.  I'm saying I absorbed the post.
4      Q.  What does that mean?
5      A.  That I took the post -- if you
6  rewind it back, you see I run into the post.
7      Q.  What part of your body hit the
8  post?
9      A.  The corner post of the ring.
10     Q.  What part of your body hit the
11 post?
12     A.  I'm not sure.
13     Q.  Are you claiming your head did or
14 not?
15     A.  I know I got kicked after that.
16 I'm just making a notation that I hit the
17 post.  I'm not sure if I hit my head.  I
18 don't think I did.  But I'm just letting you
19 know that I did register that with the steel.
20     Q.  And that move with the post, what
21 are you supposed to do to avoid hitting your
22 head and make it realistic?
23     A.  As a guy brings is bringing you in,
24 you hope you don't crack your head open.  You
25 know, and try to get out of there as safe as

74 (Pages 290 to 293)



294

1  possible, because there is a code of safety.
2  But when you blatantly take in a post and you
3  are running into it, you know, there is a
4  chance you can get hurt.
5      Q.  There is always a chance you can
6  get hurt, but what are you supposed to do to
7  avoid getting hurt when you run into a post?
8  What is the stunt aspect of it all?
9      A.  You are supposed to put your hand
10  up.
11      Q.  Right.  And did you do that there?
12      A.  I don't think I did, but I know I
13  took the post.
14      Q.  And then when you say he kicked
15  you, are you saying he actually --
16      A.  Like I did the last time outside
17  the ring.
18      Q.  You're saying he actually kicked
19  you in the face?
20      A.  He kicked me hard in the head.
21      Q.  Am I right, Mr. LoGrasso, that some
22  of these wrestlers are so talented that they
23  can stop a punch, or design a punch
24  one millimeter from your nose?
25          MR. SCIOLLA:  Object to the form.

295

1      A.  Yeah, absolutely correct, and there
2  are some wrestlers who are known to be stiff
3  in the ring.
4      Q.  Understood.  But there are also
5  some that can do the same thing with the
6  foot, aren't they?
7      A.  And like you said, it's an expert,
8  if you're an expert and you can do it, that's
9  great.  If the illusion is there, that's
10  great.  And there are some wrestlers that are
11  stiff in the ring, like Mr. Regal and they --
12  you know, he's a real wrestler.  He's not
13  wrestling there.
14      Q.  And it's a bit of an art form,
15  isn't it?
16      A.  Yes, sir, it is.
17      Q.  And so if you're really good at
18  kicks, he will stop that kick that close to
19  your nose, won't he?
20      A.  If you're that good.  But if you're
21  eating it --
22      Q.  All right.  Let's continue, see
23  what else you say happened here.
24          (Video played.)
25      A.  That was a shot there to my face

296

1  that I was unprotected.  He came with the
2  upper cut.  Same one he has been hitting me
3  with.
4          (Videotape played.)
5      A.  There was a forearm shot and not a
6  punch.  Because as he's coming around, he's
7  turning the forearm in and hitting me, giving
8  me a shimmer, instead of just a punch.
9          (Video played.)
10      A.  Forearm shift to the head, the
11  elbows.
12          (Video played.)
13      A.  There are shots there to the head
14  and the forearm and elbows.
15          (Video played.)
16      A.  And across face, across the jaw in
17  that series.
18          (Video played.)
19      A.  And there's a series of elbows.
20      Q.  And are you saying that he's
21  actually hitting with you those elbows
22  repeated what you called previously potatoes?
23      A.  Shows are stiff shots.
24      Q.  But you're saying he's actually
25  hitting you in your face with his elbows?

297

1      A.  Yeah.
2      Q.  Repeatedly?
3      A.  Repeatedly, and my hands are down.
4      Q.  So this is more than two, right?
5  So he's really due for a receipt from you,
6  isn't he?
7      A.  Yeah.
8      Q.  I mean, if what you've said, he's
9  given you how many potatoes in this match so
10  far?
11      A.  I know but the tape is still
12  rolling.
13      Q.  How many so far?  A lot, right?
14      A.  Yeah, we're rock and rolling,
15  that's for sure.
16      Q.  Have you given him a receipt yet?
17      A.  I haven't had any offense yet.
18          MR. McDEVITT:  Let's go, continue.
19          (Video played.)
20      A.  There is one thing right there.  I
21  tried to kick off, as offense.  It wasn't
22  even a perfectly dump kick, it ways sloppy
23  kick, but I just trying to keep him off.
24          (Video played.)
25      A.  And now I try give back what he's

75 (Pages 294 to 297)

298

1  giving to me.
2      Q.  Now, you're saying you're hitting
3  him in the face now?
4      A.  Giving him the same of what he gave
5  to me.
6      (Video played.)
7      MR. McDEVITT:  You can stop there.
8      Q.  And you don't think that's a comedy
9  match?
10     A.  Not the way we were going at it.
11  You say common, I've taken those shots to the
12  head, and you can see my head is like a
13  pinata in the corner, and if you had just
14  taken forearm blows to the chest, or you are
15  taking punches, but if he's getting me the
16  shimmy from here, with catching me with the
17  elbow with the inning.
18     Q.  If you watched that match, would
19  you think that was anything other than a
20  normal wrestling match?
21     A.  From the naked eye, it looks like a
22  regular wrestling match.
23     Q.  And what saw there is done in just
24  about every wrestling we've ever watched,
25  isn't it?

299

1      A.  Unless you're in there experiencing
2  it, you don't know how if feels and how it's
3  taken.  Am I correct?
4      Q.  And you don't know whether you are
5  selling or whether you don't?
6      A.  Huh.
7      Q.  And you don't know whether you are
8  selling or whether you are not?
9      MR. SCIOLLA:  Object to the form.
10     Q.  Right?
11     You're a big guy, aren't you?
12     A.  I'm a what?
13     Q.  You're pretty big guy?  Do you
14  really think if you punch somebody in the
15  face full amount, they would still be
16  standing?
17     A.  If I punched somebody in the face?
18     Q.  Yeah.  I mean if you punched Steve
19  Regal as hard as you could in the face, you
20  think you would still be standing?
21     A.  There are a bunch of tough guys in
22  WWE.  You know that.
23     Q.  Yeah, I know.  Do you think if
24  somebody hauled off and punched you full in
25  the face, you would still stand there?

300

1      MR. SCIOLLA:  Objection, calls for
2  speculation.
3      A.  Well, I'm standing in there.  So I
4  guess I'll stand outside.
5      MR. McDEVITT:  I think for now, Mr.
6  LoGrasso, I have no further questions
7  for you today.
8      Depending on the outcome of what
9  happens in the case, maybe later, but
10  none for the day.  Thank you for your
11  testimony.
12     I would like to know, counsel, what
13  you intend to do before the call
14  tomorrow.
15     MR. SCIOLLA:  I do have some
16  follow-up questions.
17     MR. McDEVITT:  That's fine.
18     MR. KYROS:  You want to take a
19  five-minute.
20     MR. SCIOLLA:  Very quick.  I will
21  be right back.
22     THE VIDEOGRAPHER:  4:44 p m. Off
23  the record.
24     (A brief recess was taken.)
25     THE VIDEOGRAPHER:  The time is

301

1  4:56 p m.  Back on record.
2  EXAMINATION BY
3  MR. SCIOLLA:
4      Q.  Vito, I have some follow-up
5  questions to address or clarify some of the
6  testimony that you gave earlier.  Okay.
7      First off, we looked at the
8  October 2006 match with Regal where you had
9  initially thought you hit your head into the
10  stairs and certainly that's been talked out
11  at length.
12     Did you honestly believe before
13  seeing the slow motion of that impact that
14  you had hit your head?
15     MR. McDEVITT:  Object to the form
16  and foundation.
17     A.  Honestly thought that I hit my head
18  on the stairs.  I was kicked really hard, and
19  I thought I hit my head honestly and truly,
20  my head in the stairs.
21     Q.  Was there any attempt on your part
22  to deceive any of us about whether or not you
23  hit your head?
24     A.  Not in the least bit.
25     Q.  How do you explain your confusion

76 (Pages 298 to 301)

1    about whether or not you hit your head in
2    that match?
3              MR. McDEVITT:  Object to the form.
4    He didn't express any confusion.
5         A.   I got kicked really hard, and I
6    guess the impact to the kick just sent me, I
7    guess when I made contact with the stairs, I
8    thought that I hit my head, but the kick is
9    what really did me in.
10        Q.   Did you sustain any other, after
11   watching it again, do you recall seeing any
12   other blows to the head during that fight
13   following the stairs?
14        A.   When we watched the tape and went
15   through the fight, there were several blows
16   to the head that I pointed out to Mr.
17   McDevitt, and the people in the room that,
18   you know, affected me.
19        Q.   Okay.  And we've watched several
20   videos of your fights -- excuse me -- your
21   matches with Mr. Regal?
22        A.   Yes.
23        Q.   You described him as a stiff
24   wrestler.  Can you explain what that means?
25        A.   That means he hits harder than

1    most, and he makes it as legit as possible.
2         Q.   When you say as "legit as
3    possible," are there any times when you're
4    actually getting hit in the head?
5         A.   Yes, you are getting hid in the
6    head.  I mean, like we spoke about, you could
7    punch somebody without hurting them, and
8    there's guys, like Mr. Regal, who make
9    contact in a stiff way to bring out the
10   realism in wrestling.  So the contact that
11   was made in those blows were legit shots.
12        Q.   There's been a lot of discussion
13   today about what's real, what's fake, what's
14   selling.
15             Can you explain for those of us who
16   are not, you know, and have never involved in
17   the WWE, the reality versus fiction of what
18   is going on in the ring?
19             MR. McDEVITT:  Object to the
20   question.  I don't understand what you
21   mean.
22             MR. SCIOLLA:  You don't have to
23   answer it.
24             THE WITNESS:  Answer the question.
25             MR. SCIOLLA:  Go ahead.

1              THE WITNESS:  Can you repeat the
2    question again?
3              MR. SCIOLLA:  Sure.
4         Q.   For those who don't have any
5    experience in the WWE --
6         A.   Right.
7         Q.   -- we have talked today about the
8    real aspects, there is fake aspects to the
9    wrestling matches.  Can you take us or
10   explain to us what aspects can be real and
11   which aspects are fake or selling?
12             MR. McDEVITT:  Same objection.
13        A.   To the naked eye when you are
14   watching as a fan, you see -- you see the
15   contact or you see the -- you see a light
16   contact that is perceived as real.  Guys
17   sells it upon contact.
18             There are wrestlers who make it, as
19   they are trained in a certain way, where it's
20   old school wrestling, like it's believable,
21   it's TV, you got to make it -- you know, you
22   got to make it stiff, you got to make
23   contact, you can't leave nothing out.
24   Because for the viewers at home who watch it,
25   they might say, oh, that was full of shit, or

1    that was, you know, full of crap.  That's why
2    some wrestlers from back in the day were
3    trained and taught make contact, make solid
4    contact, and when your adrenaline is running
5    in there, okay, and you're going, and you are
6    throwing constant blows and you get fired up
7    and your adrenaline is going, sometimes you
8    don't realize how hard you're hitting.
9              Like we explained before, the
10   concept and the oath that we take between
11   each other is not to hurt each other, and
12   it's to protect each other.  But in those
13   circumstances, when you are laying it in
14   against somebody, when you're working with
15   them on a nightly basis, you are going back
16   and forth.  And you know how he's going to
17   come at you every night.  So you kind of like
18   got to expect it.  And if you complain about
19   it, or go to the office, you're in the wrong.
20   Because then you lose your spot or they get
21   mad or they say something that's not -- you
22   know, hey, listen, what are you complaining
23   about?  This is the guy you're working the
24   program with.  So you learn not to complain
25   and you just take it.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

306

1      Q.   Now, we watched some of the matches
2  with Regal and you stopped and pointed out, I
3  took this hit, I took that hit.  When you did
4  that, were you saying that you actually
5  received contact?
6      A.   I was receiving full contact hits
7  to my head.
8      Q.   Is it your belief that when
9  receiving those hits that they had an effect
10 on you?
11     A.   I was rocking my head and forth
12 and, you know, it felt like sometimes, like
13 it was like, you know, your mind is juggling
14 or your brain is like scrambled eggs.  You
15 know what I mean, when you get hit and a lot
16 of times when you are getting hit with that
17 kind of force, you know -- I know Mr.
18 McDevitt doesn't like to hear the term you
19 get your bell rung but, you know, you get
20 rocked.  And you get -- you know, you get
21 discombobulated, where you got to regain
22 yourself and try to shake it off.  I mean
23 when you got two, three, four, five shots
24 coming in at you, it's kind of hard to shake
25 it them off.  It's just like a boxer who is

307

1  in the corner and he's taking five, six,
2  seven, eight, nine, and then ref stands in
3  for standing eight count.  In wrestling there
4  is no standing eight count, so he's not
5  breaking up the action.  Any time do you see
6  the refs step, except to maybe give a five
7  count, and then the ref guy will bring it
8  back to three, and then you go back to work.
9        But as you see the ref never
10 stepped in on any of that stuff.
11     Q.   So to you've said the naked eye, or
12 the untrained eye, when we look at the
13 matches and you go and you hold your head, is
14 any of that real, are you ever holding your
15 head because you hit your head?
16     A.   At times it is real, and at times
17 it is legit, you know.  And there are times
18 when you are selling, like it was explained
19 by Mr. McDevitt.
20     Q.   Okay.  And yourself, you also
21 explained that sometimes it's selling?
22     A.   Yes.
23     Q.   Okay.  When you say "rocked," is
24 that something that is in the world of WWE or
25 can you explain what that means?

308

1      A.   Well, being rocked, getting your
2  bell rung, getting your head shaken up.  I
3  mean, it's just an expression, a term.  It
4  might not just be in the WWE universe, but
5  it's used worldwide, that you got rocked, or
6  you got -- you know, you got, say you got
7  your bell rung.
8        And a lot of times, sometimes if
9  they see you've been in a bad match and you
10 are going in the back and you are seeing your
11 agents, like my agents, you know, on Arn
12 Anderson, Fit Bin Li (phonetic), Michael
13 Tondo, Steve Boat, Arn Anderson, and they
14 would say, hey, you okay?  I know that got
15 pretty rough in there.
16       Or if you are walking past
17 Stephanie or Triple H and they say, hey, you
18 okay?
19       I mean during that time Stephanie
20 was the one who gave me the dress gimmick.
21 She's the one who addressed me with it and
22 presented it to me.
23       And I lived that lifestyle.  I did
24 that gimmick to her preference to what she
25 wanted.

309

1      Q.   But going back to something you
2  just said, you mentioned that the wrestlers
3  or Stephanie McMahon or Triple H would come
4  say something to you, as far as untrained
5  eyes versus trained eye, what would you
6  consider the wrestlers and management?
7      A.   The wrestler and management are
8  trained eyes, because they're in the
9  business.
10     Q.   So when you say "trained eye," what
11 do you believe is their understanding of
12 whether you took an actual hit versus a fake
13 hit?
14       MR. McDEVITT:  Object, calls for
15 total speculation.
16     A.   Well, they could tell by your
17 reaction if something was stiff or something
18 was a work.
19     Q.   Why do you think that?
20       MR. McDEVITT:  Calls for
21 speculation.
22     A.   Because -- because they have the
23 understanding of what is going on in the
24 business and could tell.
25     Q.   Do they also know the script?

78  (Pages 306 to 309)

310

1      A.  The writers and everybody, yes.
2      Q.  What about the production?
3      A.  The production team gets the
4   feedback from the writers who are sitting in
5   the gorilla position, or that's the TV
6   position where the monitors are, and they're
7   looking for the focal points where to look
8   and what highlights of the match to key in
9   on.
10     Q.  What if -- are there ever times
11  when you go off script?
12     A.  Yes.
13     Q.  Okay.  We looked at one video where
14  you said you were trying to make the tag and
15  then you had to do a maneuver too close to
16  the belt.  Is that an example of you going
17  off script in that moment?
18     A.  That was off.  They were trying to
19  get me to go, and I couldn't.  You know, he
20  was talking to me, and you could see I was
21  there, and then I'm trying to make the tag.
22  Mr. McDevitt explained, yes, it is correct to
23  have a hot tag and make it.  But when you're
24  that close, you never miss.  I never used to
25  miss.

311

1      Q.  Who besides yourself would you
2   expect to notice that that you're off script
3   at that point?
4      A.  It would be the guys who -- the
5   agents, the guys in the ring, the referee,
6   and you know, they would know because they
7   pretty much know the matches.
8      Q.  Okay.  And you mentioned something
9   about the spotters.  You used the term I'm
10  not -- what is the term for -- the gorilla
11  position?
12     A.  The gorilla position.  That's the
13  TV position where you go out before TV, where
14  you see the big Triton, and you walk through
15  the curtain, and there are cameras back there.
16  And the producers of the show sit behind the
17  cameras during their matches, and they talk
18  to the ring crew, and the people who are
19  doing TV, to catch the spots and get
20  everything on camera, the highlights of the
21  matches that they need so they could produce
22  their matches for TV.
23     Q.  Are they alerted when you are going
24  off script?
25     A.  I believe so.  If they see

312

1   something that is wrong, they will say, turn
2   the camera, or go to another part or focus on
3   something else.  Just like if something gets
4   knocked out in the ring, like it just
5   happened on the last programming of the WWE,
6   where a young wrestler got knocked out, he
7   had a concussion, Enzo Amore, he took a very
8   bad spill, and they had the camera on him,
9   and then they took the camera off him,
10  because they didn't want to show him laying
11  there having a seizure.
12          That's an example of where
13  something where, you know, a guy gets hurt,
14  and they break from the back.  And they, you
15  know, deviate, and they come back to him, but
16  it's not an up-close thing.  It's from far
17  away.
18     Q.  When you missed that tag, who would
19  be alerted that something is wrong that you
20  missed that tag?
21     A.  Basically --
22          MR. McDEVITT:  Form and foundation.
23  You haven't established that anybody was
24  alerted.
25          MR. SCIOLLA:  Okay.  You can

313

1   answer.
2      A.  Basically everybody in the back,
3   oh, shit, what's wrong, why did he miss it or
4   they would get angry because the match was
5   botched, and the last thing you want to do is
6   piss off Mr. McMahon when you are working,
7   because then it comes down from Vince to
8   Stephanie, to Triple H, to the producers.
9      Q.  Had anyone in your history with WWE
10  come to you and said, something went wrong,
11  you did it wrong, you didn't follow the
12  script?
13     A.  Yes.
14     Q.  Who?
15     A.  Vince himself has come out of the
16  position.
17          There is one time where he didn't
18  like the fact that I used the super kick to
19  do a finish.  He sent me right back in the
20  ring.  He yelled at me.  He said go in there
21  and finish the Goddamn match the way you are
22  supposed and do something of your own.
23          I went back out with nobody
24  knowing, and I told them, I told the guys, I
25  said Vince sent me out here.  I said let's do

79  (Pages 310 to 313)

314

1    this finish.  And I tried to tell them as
2    best as possible, you know, what was going
3    on.  So it does happen.
4        Q.  Okay.  Now, we've -- if you will
5    look at Exhibit Number 13, if you can, I know
6    there's a lot in front of you.  But it's
7    interrogatory --
8        A.  Here is 11, here is 12, 10, 9, 7.
9        Q.  On page 4?
10       A.  I have it.
11       Q.  Now, if you look under the response
12   and at the very end of that long paragraph,
13   just follow along with me, it says,
14   "Plaintiff cannot recall every match or date
15   we he suffered a TBI during the relevant time
16   period but he can identify the following
17   matches and dates."  Do you see that?
18       A.  Yes.
19       Q.  Now -- and then listed are the five
20   matches that you have identified, four of
21   which were Regal and one which is Kennedy,
22   all of which we watched today, correct?
23       A.  Yes.
24       Q.  Now, why in your recollection, did
25   you focus on those five?  Why can you recall

315

1    those five versus, you know, you were
2    involved with a lot of matches?
3        A.  Because that was the program I was
4    running with Steven Regal, the guy I was
5    working with.  And those are the ones where I
6    had the most significant head shots and the
7    most real head shots during that time, when I
8    worked with him.
9        Q.  Is that because of who Mr. Regal
10   was?
11       A.  That's just because I was married
12   to him, and that's a married term, means
13   that's the guy you are in the program with,
14   that's the guy you work with, night in and
15   night out.  So the matches I was in, except
16   with the exception of Mr. Kennedy match,
17   which was I believe after those matches -- I
18   think, yes -- I think they were after those
19   matches, and that's when they finished off
20   the dress, you know.  Because there was
21   somebody who didn't like the dress gimmick.
22       Q.  Do you believe that there were
23   certain shots that you took in these matches
24   versus other matches that hurt you more?
25       A.  No.  These were pretty significant.

316

1    These are the ones I remember as being the
2    ones that really laid into me.
3        Q.  Now, do you think there could have
4    been other matches as well that you just
5    couldn't recall?
6        A.  There could be, but I don't recall.
7        Q.  These stand out in your
8    recollection?
9        A.  These stand out.
10       Q.  Okay.
11           And there are dates with all of
12   these matches.  Do you recall those specific
13   dates, or do you just recall the match?
14       A.  As far as the matches, I do have
15   100 percent.  The dates, they're from a long
16   time ago, there could be, you know, hit or
17   miss in what it was.  I'm not a date guy.
18   I'm just a match guy.
19       Q.  Okay.  Speaking of that, you were
20   asked several dates about your communications
21   where Dr. Rios.  Do you recall that?
22       A.  Yes.
23       Q.  And we looked at Exhibit 21, I
24   believe, yes, Exhibit 21.
25           MR. McDEVITT:  Which one is that?

317

1            MR. SCIOLLA:  It's the Rios notes.
2            THE WITNESS:  Mr. McDevitt, it's
3    this one here.
4            MR. McDEVITT:  Yes, I know.
5        Q.  Okay.  Now, you were asked on
6    these, on this date, tell me what you
7    reported to Mr. Rios, on this date tell me
8    what you reported to Dr. Rios, but you had a
9    specific recollection that was challenged
10   about October 11, 2006, that match with Mr.
11   Regal and what you talked to Dr. Rios about.
12           Why do you specifically recall that
13   match and that conversation with Dr. Rios?
14       A.  Because I had the lump on my
15   stomach that was pretty prudent, and that's
16   why I know I definitely went to him, and told
17   him about how I was feeling with the lump on
18   my stomach.  It wasn't -- I mean the lump on
19   the stomach is the key because I remember
20   that significantly because it was a pretty
21   big lump.
22           What a lot of people don't
23   understand with Dr. Rios, Dr. Rios just
24   wasn't a doctor.  He was a -- he took care of
25   everybody, not just me.  And he looked after

80  (Pages 314 to 317)

318

1  a whole roster of guys.  If there's was 100
2  guys, some guys were thumbing him and looked
3  to, some guys kept things from him and didn't
4  talk to him.  But he was the type of doctor
5  that helped you.  He wasn't there to hurt
6  you.
7          And going to him with these things,
8  and getting the B-12 shots, and telling him
9  what I was going through, he's not going to
10  write down I had a headache.  He's not going
11  to write down I took Tylenol.
12          MR. McDEVITT:  He's speculating
13      about what he's going to do.  Form.
14      A.  (Continuing) He's not going to
15  write down these things.  What other doctor
16  reports do you see that you have from
17  anything, oh, he said, he had a headache.  He
18  took aspirin.
19      Q.  Okay.  So you said you have a
20  specific recollection because of the injury
21  to your abdomen.
22      A.  Right.
23      Q.  Do you specifically recall what
24  other things you reported to Dr. Rios during
25  that conversation?

319

1      A.  I told him that I had a headache.
2  I told him that I was feeling a little woozy.
3  I was sweating profusely and I had to sit
4  down before he examined me with my lump on my
5  stomach.  I told him that I needed to go to
6  take a shower to cool off and try to collect
7  myself.
8      Q.  Okay.  There's been some
9  discussion.  Did you tell him that you had a
10  head trauma?  Is that something that you ever
11  told Dr. Rios?
12      A.  No.
13      Q.  Are those words that would have
14  come out of your mouth at the time?
15      A.  No.
16      Q.  What was your -- did you understand
17  those hits to your head to be causing head
18  trauma?
19      A.  No.
20      Q.  What did you understand them to be?
21      A.  Just blows to the head, because I
22  was not educated in CTE or head trauma,
23  because my understanding was that a
24  concussion was that you had to be knocked
25  out.  I didn't understand that you had all

320

1  these other symptoms that went along with it,
2  because I wasn't educated and nobody told me
3  about this.
4      Q.  Okay.  We will get back to that.
5          But, on all of these other -- if
6  you are looking at Exhibit 21, looking at
7  page 1, there's several other entries where
8  you saw him and the complaint is requesting a
9  B-12-shot.  Do you see that?
10      A.  Yes.
11      Q.  And then for each of those three on
12  the first page, as an example, it says
13  "Examination:  None," right?
14      A.  Right.
15      Q.  And then he would give you the
16  B-12-shot, correct?
17      A.  Yes.
18      Q.  What symptoms were you reporting to
19  Dr. Rios when going in to get these
20  B-12 shots?
21          MR. McDEVITT:  On which date?
22      A.  Fatigue --
23      Q.  On these three dates that we're
24  using as an example.
25      A.  Fatigue, feeling lethargic, tired,

321

1  muscle aches and, you know, told him, you
2  know, that I had headaches.  So I would tell
3  him, could I have some aspirin, can I have
4  some Tylenol.  So I mean those were the
5  things.
6          The thing I'm looking at here is,
7  is that I know we have this mentioned and he
8  wasn't supposed to be administer it, but Dr.
9  Rios used to administer my testosterone shots
10  as well.  They're not listed here because he
11  wasn't supposed to administer them because he
12  wasn't my physician.  But he did it anyway.
13      Q.  He wasn't the physician that
14  prescribed the testosterone to you?
15      A.  Yes, sir.
16      Q.  Okay.  When you were getting these
17  B-12 shots, is this directly after a match or
18  is this at a different time period or
19  different day?
20      A.  Usually it would be before a match,
21  when I would go in and ask for a B-12 shot.
22      Q.  So when you are reporting these
23  symptoms you just mentioned of headaches and
24  tired and lethargy, sluggish, this is not
25  right after you took a head shot, this is

81 (Pages 318 to 321)

322

1    before a match?
2        A.  Before, before your match.
3        Q.  Okay.  And what type of examination
4    would Dr. Rios do that perhaps he didn't list
5    here on you to determine the cause of your
6    symptoms?
7            MR. McDEVITT:  Again, calls for
8        speculation.
9        A.  He would look at you, ask you how
10   you felt, but he didn't do no examination.
11       Q.  Okay.  Quickly looking at
12   Exhibit 18 --
13           MR. McDEVITT:  What is 18?
14           MR. SCIOLLA:  This is the
15       memorandum.  You got it.
16       Q.  Looking at Exhibit 18, which is a
17   memo from WWE to talent and production
18   personnel, regarding Dr. Rios.  Do you
19   remember looking at this?
20       A.  When Mr. McDevitt showed it to me.
21       Q.  And if you look at the very first
22   sentence of the second paragraph, it says,
23   "Dr. Rios' main responsibility is to treat
24   talent at the assigned venues for injuries
25   suffered as a result of a performance."  Did

323

1    I read that correctly?
2        A.  Yes, you did.
3        Q.  Now, was that your understanding,
4    that Dr. Rios would treat you for injuries
5    you suffered in the ring?
6        A.  Yes.
7        Q.  And is that what he did?
8        A.  Yes.
9        Q.  And did this memorandum in June 19,
10   2006, in any way change your understanding of
11   whether Dr. Rios was to be treating you for
12   injuries you sustained in the ring?
13       A.  No.
14       Q.  You mentioned what your knowledge
15   of concussions was at the time you were
16   wrestling for WWE involved blacking out.
17   What do you mean when you say blacking out or
18   knocked out?
19       A.  When you knocked off your feet,
20   you're knocked unconscious.
21       Q.  And --
22       A.  I mean you're being out on, you're
23   being out, knocked out, you're down, knocked
24   down, out cold.  That's my understanding of
25   what it was.

324

1        Q.  Had you seen other athletes in
2    other sports get knocked out like that?
3        A.  Boxing is a prime example of being
4    knocked out.
5        Q.  And what about, let's say,
6    football, have you ever seen somebody just
7    lay flat on the grass in football?
8        A.  I've seen it before.
9        Q.  Okay.  And boxing, we talked about,
10   or you talked about Muhammad Ali.  Did you
11   ever see him get knocked out?
12       A.  I seen him get knocked around,
13   never get knocked out.
14       Q.  So is this idea of getting knocked
15   out cold, is that what you believed a
16   concussion was?
17       A.  That's what I believed a concussion
18   was.
19       Q.  When did you learn that's not what
20   a concussion is?
21       A.  2014 when I found out -- when I
22   started to get all the symptoms, and I
23   started to go to doctors to get treated, and
24   I started to get all the testing done.
25       Q.  Had you ever been knocked out cold

325

1    like that?
2        A.  No.
3        Q.  All right.  We talked a little bit
4    about the unfortunate occurrence with Chris
5    Benoit.
6        A.  Yes, sir.
7        Q.  And you knew him?
8        A.  Yes.
9        Q.  And apparently you knew his wife as
10   well?
11       A.  Yes.
12       Q.  And there was a lot of discussion
13   about the news stories and the public
14   knowledge of the circumstances of the
15   murder/suicide.
16           Do you recall that conversation
17   earlier?
18       A.  Yes.
19       Q.  What do you recall, if anything,
20   the WWE said to you or other wrestlers, or
21   publicly about that situation?
22       A.  Well, basically they didn't say
23   directly to me.  But they said, you know,
24   that they made the announcement, I guess
25   that -- basically what was said was, Chris

82 (Pages 322 to 325)

326

1    Benoit killed his family.  It could be
2    because of steroids.  It could be because of
3    CTE.  You know, I remember -- I remember,
4    like I stated before, that I believe it was
5    the WWE said, we believe that they said this
6    had nothing to do with wrestling.  When you
7    make a statement like that, you say, okay, it
8    had nothing to do with wrestling.  You know,
9    and I trusted in the WWE and what they were
10   saying at the time, and when they took him
11   off all their programming and never to make
12   mention of him, never to say anything about
13   him, to delete him out of their files, their
14   archives, everything, tapes.  It's like he
15   didn't exist.
16       So if it didn't have nothing to do
17   with wrestling and it didn't have nothing to
18   do with anything, and of course, with public
19   perception, they don't want to have a guy who
20   killed his family in their environment, which
21   is understandable, but they pushed it to the
22   side and they made him disappear.
23       And that's my understanding of it.
24       Q.  Based upon your trust, as you said,
25   in the WWE and their statement that it had

327

1    nothing to do with wrestling, did you think
2    that, hey, this could happen to me?
3        MR. McDEVITT:  What's "this"?
4        Q.  This type of injury or instance
5    could -- this type of a situation that Chris
6    Benoit was in could happen to me?
7        A.  I really -- I don't think -- I
8    never thought that.  I didn't think it could
9    happen to me because I don't know what went
10   on.  It's just like anybody else.  Nobody
11   knows and nobody was there for that instance.
12       So whether he took -- a steroid
13   rage or he had CTE, his mind snapped.  I
14   would tell you one thing, when Eddie Guerrero
15   died, and this was a big impact on the WWE,
16   you know, Eddie and Chris were best buddies
17   and every night they would do the Chris
18   Benoit -- I mean the Eddie Guerrero would
19   solute and the tribute and everything.
20       And a lot of guys could see he was
21   affected by that.  He kind of lost it.
22       Q.  "He" being?
23       A.  Chris Benoit.
24       Q.  Okay.  Go ahead.
25       A.  I mean he became like -- he would

328

1    stand there sometimes and just stare into
2    space and he would just look with this
3    bewildered look, like in this outcast look
4    like, what the hell is going on, because that
5    was his best friend who died.
6        And that being pushed in his face,
7    night in, night out.  Eddie, Eddie, Eddie,
8    Eddie, as good as a human being he was, as a
9    good father he was, as a good -- his wife,
10   who I knew, Vicky, you know, still the impact
11   that had on that guy, because that was his
12   best buddy.  And he had traveled with him, he
13   went on the roads with him.  That had an
14   affect on him too, and it was pushed.  And,
15   you know, everybody had to console everybody,
16   because it happened on the road.  We were
17   getting ready to go overseas.  We were
18   getting ready to go to the gym, and then you
19   know, nobody shows up to the gym.  We going
20   to the building and find out that Eddie died,
21   you know.  What led to Eddie dying is his
22   own, you know, what he was doing in his
23   personal life and what he was taking at the
24   time.
25       I know that's not Chris Benoit, but

329

1    it's along the same lines.
2        Q.  So when the -- with that background
3    and knowledge of how Chris Benoit reacted to
4    Eddie's death, and combined with the
5    statements by WWE that it wasn't wrestling
6    related, how did, in your mind what was the
7    relationship or what thought processes did
8    you have about whether wrestling could cause
9    these type of brain injuries?
10       MR. McDEVITT:  Asked and answered.
11       A.  If he did have the head trauma, and
12   he did have, you know -- you know, he did
13   have anything wrong with him, with his head
14   or he had CTE, nobody knew about it.  Because
15   we weren't tested for it, and there was no
16   awareness given.
17       Q.  Did you do any research of your own
18   at that time to find out more about
19   concussions or CTE Or anything like?
20       A.  No, I did not.
21       Q.  And why didn't you do it at that
22   time?
23       A.  Because I did not have the symptoms
24   and I did not have anything pertaining to
25   that that affected my life at the time until

83 (Pages 326 to 329)

330

1  2014, when I went to the doctors and I saw
2  that had I had all these symptoms and I had
3  these problems, that's when I started to do
4  my research.
5      **Q.  And the six years or so that was**
6  **pointed out earlier that you didn't see any**
7  **doctors or do any research, why didn't you**
8  **look into it during that time period, why was**
9  **it not until 2014?**
10     A.  Basically I didn't have any health
11 insurance.  I just dealt with my problems.
12 You know, sleepless nights, the headaches,
13 the fatigue, you know, the headaches.  I mean
14 I just dealt with it as it was just a part of
15 life.  I wasn't educated.  I didn't know.
16 The only time I went to doctors was to get my
17 testosterone checked, my B-12, you know, and
18 get that taken care of.
19     But other than that, I didn't go to
20 see any neurologist.  I didn't have the
21 money.  I didn't have the healthcare.  I
22 didn't have nothing for my, you know, for my
23 head, my hearing or anything.
24     **Q.  So what changed in 2014 then?**
25     A.  I started getting all of my

331

1  symptoms worsened, and I was getting worse.
2  And I said I better go get this checked out
3  and that's when I went and I started my quest
4  to get all theses testing and get Medicaid.
5  And then with the Medicaid I was able to go
6  to Dr. DeMarco, and I was able to go to Dr.
7  Smith, then I was able to go to Dr. Handler,
8  and I was able to go to Dr. Cavoto, and then
9  I was able to go to the Dr. Schneider, and I
10 was able to go to Dr. Adams.
11     **Q.  So the relationship of you seeking**
12 **out medical attention had to do with the**
13 **worsening?**
14     A.  Yes, the worsening of my condition.
15     **Q.  And explain what got worse?**
16     A.  My depression got worse, because I
17 would sit there and stare out the window a
18 lot.  My headaches were atrocious.  My
19 irritability was off the wall.  I couldn't
20 explain it.  My sleeping habits were
21 terrible.  They got worse, and sometimes I
22 would stay up all night.  I wouldn't go to
23 sleep.
24     You know, being fatigued.  You
25 know, the headaches.  The constant mild

332

1  headache that I have every day is just
2  ridiculous.  I can't explain it.  I know
3  there was -- one day everybody is going to
4  cut in my brain, they're going to have a
5  field day, and they will see, hey, this guy
6  has a problem and he's also nuts, which I
7  always say is true.  It probably is true.
8      But you know what, I know there is
9  something wrong.  I feel it.  I'm living it.
10 And it's not until the day I die where
11 everybody is going to be able to see what's
12 up there.  And I know this.
13     Am I going to be on that list with
14 the rest of my friends, and the rest of my
15 wrestling family who died.  We already had
16 ten people die this year.  Who knows?  Maybe
17 I might be number 11.  I don't know.
18     **Q.  We looked at some MRIs that came**
19 **back negative or CT scan came back negative**
20 **or didn't show anything in particular.**
21     A.  Yes.
22     **Q.  Do you have any knowledge about**
23 **whether MRIs or CT scans can reveal evidence**
24 **of CTE?**
25     A.  The thing with MRIs is that they

333

1  can show a fresh brain trauma when it first
2  happens.  After it heals and there is scar
3  tissue, it doesn't show or come up.
4      So when you get, when you get a
5  concussion and you go to the doctor, they're
6  able to tell right there, because it comes up
7  on the MRI.
8      After it heals it is very hard to
9  see what was traumatized in your brain
10 because it healed itself.
11     **Q.  What doctor explained that to you?**
12     A.  It was Dr. Handler.
13     **Q.  Okay.  So even after these MRI**
14 **results came back, Dr. Handler told you what?**
15     A.  What I just explained, about that
16 it healed, and that, you know, you do have
17 something going on there.  I mean for him
18 wanting to stick a needle in the back of my
19 head, for him to put me on these two kinds of
20 medications that make me dopey as hell and,
21 you know, to dull my headache.  For him
22 wanting, to -- I had an MRI of my neck.  I
23 have bone spurs on my neck.  I can't get them
24 treated, you know.  And that's from years of
25 wear and tear on my body in wrestling.

84  (Pages 330 to 333)

334

1    So everything attribute from the
2 bottom of my neck, up my neck, to my head.
3    Q.  So despite what the MRI and CT
4 results may show, did Dr. Handler tell you
5 you're fine, you have a clean bill of health?
6    A.  No, never once.  And when I went to
7 do the tests with Dr. Schneider and he gave
8 me his -- he was a brain specialist, and he
9 gave me his test.  He said my brain, I have
10 one side of my brain is weak and the other
11 side is not.  He said your left side is
12 weaker than your right side and just putting
13 spinning me in a chair and doing the testing,
14 he saw that I had some brain issues.
15    Q.  Okay.
16    Real briefly you talked about your
17 headaches getting worse, and you described
18 earlier having headaches the entire time in
19 those six years that you were not getting
20 treatment.
21    While with the WWE, were you still
22 having headaches after matches or even on
23 days off?
24    A.  I would still get headaches, but I
25 never thought anything of them, because I

335

1 just thought I was getting headaches.
2    Q.  Were the headaches limited to only
3 after these five matches that we looked at on
4 the video today?
5    A.  No.  They started coming around
6 more often.  So it wasn't, you know, just
7 because -- it could have been a lot of things
8 but like I started to get them.  And I
9 couldn't explain why.  I was in the unknown.
10 I didn't know why I got them.  I didn't know
11 why I wasn't sleeping.  I didn't know why,
12 you know, I was irritable.  I didn't know why
13 I was having these things I was going
14 through.
15    Q.  And you're saying you didn't know
16 why, and that's during that period of the
17 five matches we were talking about?
18    A.  Yes, sir.  That's when it got
19 worse.
20    Q.  Okay.  And you can specifically
21 recall that time period is when it got worse?
22    A.  Yes.
23    Q.  The Brett Hart, you talked about
24 that incident, when did that happen?
25    A.  Mr. McDevitt pointed out to me, it

336

1 happened in 1999 at Starrcade.  I was the
2 first match on the card.
3    Q.  And that -- after that match he
4 never wrestled again?
5    A.  He -- if I remember correctly, he
6 came back and he wrestled.  He was doing some
7 stuff in the WWE.  He wasn't wrestling as
8 Brett Hart, as we know it, but he did some
9 things.  So He retired and then he came back
10 and did some things.
11    Q.  Is it considered that Brett Hart,
12 maybe just the character, retired after that
13 fight?
14    A.  Brett Hart retired after that
15 fight.
16    Q.  Okay.  And you think that was 1999?
17    A.  Yes.
18    Q.  So when he -- what was your
19 understanding of why he had to retire at that
20 time, if you had one?
21    A.  My understanding was he took a kick
22 from Goldberg and got a concussion.  Nobody
23 explained the severity, nobody said how bad
24 it was, nobody knew nothing, because it
25 wasn't a priority -- a head trauma wasn't the

337

1 priority, it wasn't a thing.  It wasn't
2 the -- you know, if you got, you know, a kick
3 to the head, you had a concussion.  It was
4 like, okay.  It wasn't like you had the
5 knowledge that you have today that you go
6 into all these things.  Being that he retired
7 from it, I mean, it had to be pretty serious.
8    Q.  You mentioned a freak accident.  Is
9 that what you considered that to be?
10    A.  That was a freak accident.  Brett
11 Hart was a great wrestler.  He was a tough
12 wrestler.  He was one of the best of all
13 time.
14    Q.  We looked at that video where he
15 got kicked.  Do you know whether or not he
16 blacked out at any point after that kick?
17    A.  I don't know.  I wasn't in the ring
18 with him.  As Mr. McDevitt pointed out, he
19 was telling me finished the match.  But when
20 your adrenaline is running that high, you are
21 able to keep going just on instincts and when
22 your instincts are kicking in and you just
23 keep going, but sometimes you don't remember
24 you finished, you don't remember what you
25 did, you don't remember what is going on.

85  (Pages 334 to 337)

338

1    You know, in that instance that was a freak
2    thing.
3        Q.  Do you think it's possible that he
4    could have been knocked out and then revived
5    in a couple of seconds like that?
6        MR. McDEVITT:  Calls for
7        speculation and lack of foundation.
8        Q.  Do you have any idea if that's
9    possible?
10       A.  I don't know.  You would have to
11   ask Brett Hart himself.
12       Q.  Do you know if it's possible
13   whether he doesn't remember the rest of that
14   fight because he was blacked out even though
15   not knocked out?
16       MR. McDEVITT:  Same objections.
17       A.  Yes, it's possible.
18       Q.  We looked also at another
19   wrestler's injuries, Exhibit 26, regarding
20   Shawn Michaels.  Do you remember seeing that
21   exhibit?
22       A.  Yes.
23       Q.  Do you recall ever seeing this
24   before today?
25       A.  No.

339

1        Q.  The only indication of the
2    publication is on the third page, which is a
3    blank page, except for the date, that says
4    May 21, 2007.  Do you see that?
5        A.  Yes.
6        Q.  So this occurred after your
7    wrestling matches that we looked at today?
8        A.  This is -- I was released from the
9    WWE May 15, 2007.  So I was out of the
10   company.  So, no, I did not see this.
11       Q.  Okay.  Do you recall Shawn Michaels
12   retiring or hanging up?
13       A.  No.
14       Q.  No.
15       This article seems to discuss the
16   history of concussions going back to 1995
17   that Shawn Michaels has suffered.  Do you see
18   that that?
19       A.  I see it here.  I'm reading it.
20       Q.  Okay.  At any time before your
21   career ended with WWE, was this concern about
22   concussions and repeat concussions something
23   that the WWE spoke to you about?
24       A.  Never.
25       Q.  Is this concern about concussions

340

1    or repeated concussions something that Dr.
2    Rios ever talked to you about when you met
3    with him?
4        A.  Never brought it up once.
5        Q.  You've been -- you talked about
6    receiving communications or letters from WWE
7    since your time with them has ended regarding
8    drug and alcohol.  Do you recall that?
9        A.  Yes.
10       Q.  And do you recall receiving those
11   letters?
12       A.  Yes.
13       Q.  In any of those letters, do you
14   recall them ever mentioning something about
15   concussions or head injuries?
16       A.  Never once.
17       Q.  Did you ever get contacted by
18   someone at the WWE following your time with
19   them expressing concern about concussions or
20   repeated concussions suffered by wrestlers?
21       A.  No, I did not.
22       Q.  Do you know, do you have personal
23   knowledge of what information the WWE
24   gathered during the 2000s and thereafter
25   regarding concussions or repeated

341

1    concussions?
2        A.  I have no knowledge of what they
3    did, nothing.
4        Q.  Did they ever share any of that
5    information with you at any point?
6        A.  No, they did not.
7        Q.  If they had information during that
8    time period between when you, when your
9    career ended in 2007 and 2014, would you have
10   expected them to share that information with
11   you?
12       MR. McDEVITT:  Object to form and
13       foundation.
14       A.  Yes, sir.
15       Q.  Why?
16       A.  Because it was just as important as
17   the alcohol and drug abuse, and it had to do
18   with our health.
19       Q.  And did you think they cared about
20   you?
21       A.  Well, you would hope they would
22   care about you.
23       Q.  Did you trust that they did?
24       A.  We trusted they did.  You know,
25   they always try to put out their best foot

86  (Pages 338 to 341)

342

1   and say we care about with our wrestlers.
2   You know, we care about how we take care of
3   our guys.
4         You know -- and, you know, some
5   things, what you say and what you do is two
6   different things I guess.
7       Q.  You earlier mentioned briefly today
8   maybe a conversation or comment that you've
9   had with Stephanie McMahon.  Do you recall
10  saying that?
11      A.  Yes.
12      Q.  What type of interaction have you
13  ever had with her?
14      A.  Well, she is the one who helps run
15  the WWE and she's, you know, one of the
16  owners and the CEO and the head writers of
17  the company.
18        So she knows, along with her father
19  and the talent people, who comes into the
20  company, who leaves the company, who is being
21  used, who is not being used, who is injured,
22  who is not injured, who is available, who is
23  not available.
24        When you go to TVs and you go to
25  these places where we have SmackDown and we

343

1   have Raw, and if they're on tour, I mean, she
2   says hello to you acknowledges you if you are
3   doing a story line.  She interacts with you.
4   You know, I mean she's one of the directors
5   there.  She's the one who gave me the dress
6   gimmick.  I mean I spent countless times with
7   her in meetings with her and Vince over how
8   to do this particular dress gimmick.
9         And a lot of times -- it was her
10  baby, you know, it was her and Vince.  You
11  know, and she took a lot of credit for this,
12  and Vince said this is going to be big, and I
13  did the best I could with it.
14        You know, I never wore a dress
15  before, but I pulled it off.  I did what they
16  asked me to do, to the best of my ability,
17  and I did it.
18      Q.  So during these matches that we
19  looked at, where you had the dress on, were
20  you in contact with Stephanie during that
21  time period?
22      A.  Yes.
23      Q.  How often?
24      A.  Every time we were doing the
25  tapings or if we were on tour together.

344

1       Q.  That's a good question.  How often
2   were you doing tapings?
3       A.  Every week.
4       Q.  With the WWE?
5       A.  Yes.
6       Q.  Every week?
7       A.  Every week.
8       Q.  And how about with -- we talked a
9   little bit about ECW and WCW.  How often were
10  tapings with those programs?
11      A.  Every week.
12      Q.  Every week.  Okay.
13        And so during this time period
14  where you were wearing the dress, are you
15  still doing a watch every week?
16      A.  Yes.
17      Q.  Are you meeting with the producers
18  before each match?
19      A.  I met the producers.  I met with
20  Stephanie.  I met with Vince.  It was -- it
21  was a pretty big thing back then.
22      Q.  Would they see you after matches?
23      A.  Yes, in the office.
24      Q.  Would they see you before matches?
25      A.  Yes, in the office.

345

1       Q.  Would they know about the script?
2       A.  Yes, they would.
3       Q.  Did they ever help develop the
4   script?
5       A.  Yes, they did.
6       Q.  Did they ever make comments to you
7   after any of these matches we looked at a --
8       A.  They would critique me on my
9   performance.  They would say, you got a
10  pretty good one in that one.  You know, like
11  if I got -- you know, if I got a good blow or
12  got hit pretty good, you know.  I mean, they
13  would see it.  They know the business.  So I
14  mean they would comment you and would joke.
15  You know, that roughly ruffled your skirt,
16  how is your garter?  You know, jokes like
17  that.  Nothing in a facetious way.
18      Q.  And that really ruffled your
19  skirt -- I'm sorry, you said that really
20  ruffled your skirt?
21      A.  Your garter.
22      Q.  Your garter?
23      A.  Meaning that I got, you know -- I
24  got hit pretty good or I took a good shot or
25  I got pumped or, you know.

87 (Pages 342 to 345)

346

1    Q.  And when they talked, you took a
2  good shot, are they ever, from your
3  understanding, are they talking about shots
4  to your body?
5    A.  Shots to your body, shots to your
6  head, you know, they would come up to you,
7  good match, bad match, we would like to see
8  from your match, would like to see that from
9  your match, but they acknowledged you because
10  you were an employee of the company.
11    Q.  Did anyone talk to you about that
12  match where you missed the tag?
13    A.  They asked me what happened in the
14  back.  You know, they said what happened, and
15  I just said I don't know.  I just missed it.
16  I was, you know, messed up.
17    Q.  Who did you have that conversation
18  with?
19    A.  Vince asked me, and then Johnny Ace
20  asked me, and then my agent, I think -- I
21  forgot who my agent was.
22    Q.  Johnny who, I'm sorry?
23    A.  Johnny Ace.  John Laurinaitis, and
24  then the guys in the ring asked me.  They
25  said, "Vito, what the hell were you doing?"

347

1    I said, "I was out of it, I was
2  rocked."
3    So when they seen me go like this
4  and, you know, I'm -- you know, I'm a careful
5  wrestler.  I'm a veteran wrestler.  I'm an
6  expert wrestler.  You know, I do things
7  precisely and very rarely I make a make a
8  mistake.  And for them to see that, they were
9  like, what the hell are you doing.
10    Q.  When I look at that video, I don't
11  see anything to comment to you about.  You're
12  saying that all these people recognized you
13  couldn't make the tag?
14    MR. McDEVITT:  Object to the form.
15  Are you testifying now?
16    MR. SCIOLLA:  I mean it's something
17  you like to do.
18    MR. McDEVITT:  What's that?
19    MR. SCIOLLA:  I said it's something
20  you like to do as well.
21    I'll rephrase.
22    MR. McDEVITT:  You don't understand
23  the difference between what I do and
24  what you just did apparently.
25    MR. SCIOLLA:  Okay.

348

1    Q.  Is it your testimony that they were
2  able to recognize that you missed that tag?
3    MR. McDEVITT:  Object.
4    A.  Yes.
5    MR. McDEVITT:  How are you going to
6  establish a foundation that he is going
7  to speak for what they do?
8    MR. SCIOLLA:  You can answer.
9    A.  To the people who are experienced,
10  they could tell things that happen in a
11  wrestling ring.
12    Q.  Is it your testimony that they
13  recognize that you missed that tag?
14    A.  Yes.
15    Q.  And how do you have that
16  understanding?
17    A.  Because they asked me after the
18  match.
19    Q.  They talked to you about it
20  specifically?
21    A.  Yes.
22    Q.  Aside from those people you just
23  mentioned who talked to you about missing
24  that tag, and the wrestlers in the ring you
25  said noticed, would anyone else have been

349

1  aware that you, something was wrong?
2    MR. McDEVITT:  Again lack of form
3  and foundation.  He can't testify about
4  what people are aware of.
5    MR. SCIOLLA:  We will get there.
6    MR. McDEVITT:  You haven't yet.
7    MR. SCIOLLA:  Go ahead.
8    MR. McDEVITT:  Are you going to try
9  to establish a foundation or is this it?
10  Are you just going to ask him to
11  speculate --
12    MR. SCIOLLA:  Is this a speaking
13  objection?
14    MR. McDEVITT:  -- to what other
15  people knew without establishing?
16    MR. SCIOLLA:  Your objection is
17  noted.  Thank you.
18    Q.  You can continue.
19    A.  The people who are concerned with
20  the match are the people who are involved
21  with it and the people who are running the
22  controls from the back.
23    So you are talking about the people
24  who ran the camera, Vince would run it,
25  Stephanie, Johnny Ace, the agents, the

88 (Pages 346 to 349)

350

1  wrestlers involved, the referee.  Those are
2  the ones you would ask.  If one of your
3  buddies came up to you afterwards and said,
4  hey, you know, what happened on that tag, you
5  know, what was going on in there, you know,
6  then you would tell them.  But not everybody
7  would run up to and ask you, hey, you missed
8  that tag.  That wasn't how it went.
9      Q.  But some people did?
10     A.  Some people.  I don't remember who,
11  but some people.
12     Q.  Okay.  During a match would a
13  referee say any anything to you about you
14  being okay or you missed the part of the
15  script?
16     A.  If he had seen I was down or
17  something was going on, and he would ask.  I
18  mean they always ask, are you okay, are you
19  okay.
20     Q.  And what connection does the
21  referee have to anyone else in the
22  production?
23     A.  The referee wears an earpiece in
24  his ear, and he's told the go home time, what
25  is going on, how much time is left.  He's

351

1  instructing the wrestlers what to do in the
2  ring as per se.  So -- and if there is
3  anything wrong in the ring, the guys in the
4  back ask, what is going on in there, you
5  know, tell me him to hurry up or hey, is
6  that guy okay or like, you know, it was a
7  voice from the back.  So usually it would be
8  Vince's voice, Stephanie's voice or Triple
9  H's voice who would be running the cameras
10  from the back.
11     Q.  In the earpiece --
12     A.  In the earpiece.
13     Q.  -- of the referee?
14     A.  Right.
15     Q.  Were there any trainers around the
16  ring watching your matches?
17     A.  There were trainers in the back,
18  and then there were trainers maybe ringside.
19  I don't recall, but I know they have them.
20     MR. McDEVITT:  I'll get that.
21     THE VIDEOGRAPHER:  5:50 p.m., off
22  the record.
23     (A brief recess was taken.)
24     THE VIDEOGRAPHER:  5:51 p.m., back
25  on the record.

352

1      Q.  You were talking about the
2  trainers.  Would Dr. Rios ever been ringside?
3      A.  Dr. Rios, from what I recall,
4  really never was ringside.  He was just in
5  the back.  If he was out there for a special
6  purpose or a special reason, he would be, but
7  usually he was in the back.
8      Q.  Are there TVs in the back?
9      A.  There are TV monitors in the back.
10     Q.  Okay.  And a lot of your fights
11  were also televised, correct?
12     A.  Yes.
13     Q.  Your matches, excuse me.
14     A.  Yes.  House shows are no cameras.
15  They might have them for -- they might have
16  cameras rolling to tape for the office, and
17  then those were -- and then there is house
18  show reports that go in, and then the house
19  show reports also go into the office, and
20  they tell you what's going on on the house
21  shows.
22     Q.  We used some terminology today, you
23  did, you used glancing blows, potatoes, bad
24  bumps.  To someone who is not familiar with
25  the terminology used in the WWE, can you

353

1  explain what some of those terms mean?
2      A.  Well, potato is when you get hit by
3  an accident.
4      Q.  And hit by an accident with?
5      A.  With force.  Like, give you a black
6  eye, bust your lip, give you a shot to the
7  head, you know.  And they will hit you too
8  hard because it's just a time and a moment,
9  kick you too hard, whatever.
10     Q.  It's a legitimate hit?
11     A.  Yes.
12     Q.  So when we looked at the one video
13  and you said I'm -- I think Mr. McDevitt said
14  that you took a lot of potatoes in that?
15     A.  Yes.
16     Q.  Is that a common occurrence, you
17  would get potatoes in the match?
18     A.  It's not really a common
19  occurrence.  It happens.  And it's a kind of
20  way of saying, excuse me.  So it's not like,
21  you know --
22     Q.  Was it odd that you took so many
23  potatoes in that match?
24     A.  He's just an aggressive wrestler.
25  That's the way he wrestles.

89 (Pages 350 to 353)

354

1      Q.   Mr. Regal?
2      A.   Yes.
3      Q.   And the glancing blows, I think you
4   said forearm elbow?
5      A.   The forearm elbow is hit when you
6   are coming in and it looks like it's going to
7   be a punch, and you're taking a forearm and
8   an elbow at the same time.  And when you take
9   a nose, you know, that is like another word,
10  when you get a flying chicken wing, you know
11  what I mean, because it's a forearm shiver.
12     Q.   Do those hurt?
13     A.   Forearm shiver, when you're taking
14  that.  So when you're taking this and you hit
15  with this part of your body, this part is the
16  hardest part of your body, and when you get
17  with this, this is solid.
18     Q.   Now, we talked about you guys, it's
19  an art form.  You're very professional.  You
20  can stop a punch close to the face?
21     A.   There's a way to hit somebody and a
22  way to not hit somebody.
23     Q.   And then you can sell it if he
24  stops close to your face?
25     A.   Right.

355

1      Q.   What about with the glancing blow,
2   is that something that stops before your
3   face?
4      A.   Try to make contact on a glancing
5   blow, a little bit of contact, so it looks
6   real.
7      Q.   Okay.  And with Mr. Regal how would
8   you describe his glancing blows?
9      A.   They all of connect.
10     Q.   Real quickly.  ECW, WCW, did they
11  have doctors?
12     A.   ECW, no.  WCW, they had trainers.
13     Q.   But did they have doctors?
14     A.   I don't believe -- I think maybe
15  WCW had a doctor.  I'm not sure.
16     Q.   Okay.
17     A.   I think I know they had trainers.
18  ECW did not have no trainers and doctors.
19     Q.   And after matches with those, with
20  ECW, WCW, was any doctor evaluating you
21  after?
22     A.   No.
23     Q.   Was anyone treating you for in-ring
24  injuries?
25     A.   No.

356

1      Q.   Was anyone giving you B-12 shots?
2      A.   No.
3      Q.   So were you -- did ECW or WCW
4   provide with you any kind of medical
5   professional who saw you on a weekly basis?
6      A.   No.
7           MR. McDEVITT:  Do you have any idea
8       how much more you have?
9           MR. SCIOLLA:  I think that's all I
10      actually do have.
11          MR. McDEVITT:  Okay.
12  EXAMINATION BY
13  MR. McDEVITT:
14     Q.   Mr. LoGrasso, you made a statement
15  to the effect that --
16          MR. McDEVITT:  Excuse me.
17          THE VIDEOGRAPHER:  5:56 p m., off
18      the record.
19          (A brief recess was taken.)
20          THE VIDEOGRAPHER:  5:57 p m., back
21      on the record.
22     Q.   You made the statement to the
23  effect that if you complain about something,
24  you lose your spot.  Do you recall that?
25     A.   Yes.

357

1      Q.   Did you ever complain to anybody
2   about anything and lose your spot?
3      A.   No, I tried not to complain.
4      Q.   So you don't know whether that's
5   true or not from a personal basis, do you?
6      A.   No, I do know it's true, because
7   that's the code.  You don't complain about
8   anything.
9      Q.   Well, the code doesn't necessarily
10  mean it's written by the WWE.  Did they ever
11  tell you that?
12     A.   It's practice by the WWE.  They
13  might not have written it, but they practiced
14  it.
15     Q.   Did you ever complain about
16  anything and lose your spot?
17     A.   I did not complain about anything
18  to lose my spot, right.
19     Q.   Did you ever personally work in the
20  gorilla position?
21     A.   Personally work in the gorilla
22  position, I spent a lot of time in there.  I
23  didn't work in there but I watched and
24  learned from there.
25     Q.   You stand in the gorilla position

90 (Pages 354 to 357)

358

1   essentially before you go out to perform,
2   right?
3       A.  And I would stand -- I would stand
4   in there to learn what went on behind the
5   scenes.  You know, the producers would teach
6   me how to do the job.
7       Q.  But when you were actually
8   performing, you don't have any idea what they
9   were doing in the gorilla position, do you?
10      A.  When they're in the gorilla
11  position?
12      Q.  When you are actually out in the
13  ring performing, you have no idea what is
14  going on in the gorilla position, do you?
15      A.  I'm in the ring.  They're in the
16  gorilla position.
17      Q.  You're not watching them, you have
18  no idea if they're even in there?
19      A.  No.
20      Q.  And so when you missed the tag they
21  were talking about, you really have no idea
22  what was being said in the back at that time,
23  do you?
24      A.  Not until I got back there.
25      Q.  And if you miss a finish, that's a

359

1   concern from a creative standpoint, isn't it?
2       A.  Say again.
3       Q.  If you missed a finish, that's a
4   creative concern, isn't it?
5       A.  Yes.
6       Q.  There is nothing usual about Vince
7   asking you why you blew a finish, is there?
8       There is nothing unusual about
9   Vince asking you why you didn't do a finish,
10  is there?
11      A.  No.
12      Q.  And in fact, the contract requires
13  you to do the finishes as given to you,
14  correct?
15      A.  I did, if it's stated in the
16  contract, yes.
17      Q.  And that's essential to the story
18  line, right?
19      A.  Right.
20      Q.  All the wrestlers have to know who
21  is going to win, who is going to lose?
22      A.  Yes.
23      Q.  Then when it comes to Dr. Rios, you
24  made a statement, some guys kept things from
25  him, some didn't.  Do you recall that?

360

1       A.  Yes.
2       Q.  And you said he was there to help
3   you, correct?
4       A.  Yep.
5       Q.  Who kept things from Dr. Rios?
6       A.  I don't recall.
7       Q.  Well, you made the statement.  What
8   was the basis of it?
9       A.  Because guys kept things from him
10  if they were injured.  I don't recall the
11  gentlemen, but I knew a lot of guys were
12  injured.  Because if you complained about
13  being injured and you reported it to the
14  doctor, there was a chance if you were on TV,
15  you could be taken off TV and sent home.
16  They don't like when you complain.
17      Q.  Who is "they"?
18      A.  The office.
19      Q.  Well, Dr. Rios, did Dr. Rios ever
20  say to you, I don't want to hear your
21  complaints?
22      A.  No, it's just an unwritten law.
23      Q.  It's an unwritten law.  Where does
24  one find it then?
25      A.  In the WWE universe.

361

1       Q.  What, floating around a room
2   somewhere?
3       A.  That's it.
4       Q.  And you said some people didn't
5   keep things from Dr. Rios, right?
6       A.  Some people went to him with
7   problems and injuries.
8       Q.  And would tell him?
9       A.  And would tell him, right.
10      Q.  Including people who had head
11  injuries, right?  Including people who had
12  head injuries?
13      A.  I don't know.  I'm not them.
14      Q.  Well, who are the ones that went to
15  him and told him the problems?
16      A.  I'm not sure.  I don't recall.
17      Q.  But yet you're going to sit there
18  and give testimony under oath that some
19  didn't and some didn't, but you can't give --
20      A.  I don't recall the guys who went to
21  him for help.
22      Q.  You can't give the name of anyone
23  who fit into either one of these categories?
24      A.  Bob Holly went to him, and Bob
25  Holly had a cyst in his arm that he almost

91  (Pages 358 to 361)



362

1    lost his arm.  And when they kept stitching
2    him up and bandaging his arm up and sent him
3    out to the ring, and they kept making that
4    man work, he came back.  They knew about the
5    injury.  They knew about what was going on,
6    and they still sent him out there, and he
7    almost lost his arm.
8        Q.   Who is "they"?
9        A.   I said he.
10       Q.   You kept saying "they."
11       A.   The office.
12       Q.   Well, who is the person?  The
13   office is not a person.  What person?
14       A.   The people in charge.
15       Q.   Who?
16       A.   Vince, the booking committee,
17   whoever was in charge.  Bob, I seen his arm.
18   You had asked me, he gotten care of by Dr.
19   Rios.  His arm, he had a puss thing coming
20   out.
21       Q.   And Dr. Rios was treating him?
22       A.   Dr. Rios treated it, wrapped it up
23   and sent him out there.
24       Q.   Did Bob Holly object to that?
25       A.   Excuse me?

363

1        Q.   Did Bob Holly object to that?
2        A.   No.
3        Q.   Did he ever tell he didn't want to
4    be performing?
5        A.   Because it was an unwritten rule
6    you don't complain --
7        Q.   Did he tell you he didn't want to
8    perform?
9        A.   He never told me that.
10       Q.   So for all you know, Bob Holly
11   wanted to be Band-Aided up and perform?
12       A.   Right, because his arm, because he
13   knows if he complained about it, he would be
14   sent home.
15       Q.   Well, you don't know what he knows.
16   You know what you know.
17            And in terms of the some guys told
18   Rios and some guys didn't, you fall in the
19   category of you didn't tell him, right?
20       MR. SCIOLLA:  Object to the form.
21       Q.   Right?  You fall in that category,
22   right?
23       MR. SCIOLLA:  Mischaracterizes
24   testimony.
25       Q.   You didn't tell him about head

364

1    injuries, did you?
2        A.   I didn't know I had head injury.  I
3    told him about my headaches.
4        Q.   Now, you say he was there to help
5    you, right?
6        A.   Yes.
7        Q.   So you would tell him you had a gut
8    injury or certain kind of injuries to get
9    help, right?
10       A.   I never told him I had a head
11   injury.  I said I had headaches.
12       Q.   But you would go to him for help?
13       A.   I would go him for help, my
14   headaches and getting Tylenol and feeling
15   fatigue and getting my B-12 shots.
16       Q.   Did you think a doctor, if you just
17   go and say I have a headache, you are
18   supposed to assume that's from a certain
19   cause?
20       MR. SCIOLLA:  Object to form.
21       A.   I don't know what a doctor can
22   assume, unless he gives you a full
23   examination, but he didn't.
24            So unless you do a full
25   examination, I guess he couldn't really tell.

365

1        Q.   What is the full examination a
2    doctor does when you tell him you have a
3    headache?
4        MR. SCIOLLA:  Object to the form.
5        A.   I guess you would be asking me if I
6    went to him with head injury for head
7    injuries, and I keep saying, no, I did not.
8    And you're telling me, well, why didn't you
9    go to the doctor.  And I said I did go to him
10   with the headaches and feeling fatigue and,
11   you know, muscle aches and everything else.
12       Q.   And you told him you had a
13   headache, give me some aspirin?
14       A.   That it.
15       Q.   You didn't tell him I think I got a
16   headache because I ran into the chairs -- or
17   the stairs tonight, did you?
18       A.   But I did tell him I had headaches.
19       Q.   As far as the testosterone --
20       THE WITNESS:  Excuse me, one
21   second.
22       (Discussion off the record.)
23       THE WITNESS:  Sorry, guys.  Sorry
24   about that.
25       Q.   With respect to him giving you

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

366

1   testosterone shots.  You asked him to do
2   that, didn't you?
3       A.  Yes.
4       Q.  As a favor to you?
5       A.  I have a hard time administering my
6   own shots.
7       Q.  And he's a doctor and he can give
8   you a shot?
9       A.  Right.
10      Q.  And you were grateful for that,
11  right?
12      A.  Yes.
13      Q.  And your testimony is that you
14  didn't understand until the year 2014 what a
15  concussion was, right?
16      A.  Right.
17      Q.  How old were you then?
18      A.  How old am I now?
19      Q.  How old were you in 2014?
20      A.  Forty-nine.
21      Q.  Forty-nine years old.  And how many
22  years had you been involved in the wrestling
23  business?
24      A.  Twenty something.
25      Q.  So you managed to live 49 years,

367

1   and 20-something years in the wrestling
2   business and not know what a concussion was?
3       A.  That was may perception of a
4   concussion.
5       Q.  And you made no effort to teach
6   yourself any better?
7       A.  No.
8       Q.  Why you are getting whacked over
9   the head with chairs and objects and
10  everything else, you just didn't care, did
11  you?
12          MR. SCIOLLA:  Object to the form.
13      Q.  You said, you said something about
14  concussions.  I think you said there was a
15  time where if you got a kick to the head in a
16  concussion, okay.  It wasn't like it is
17  today.  Do you remember that?
18      A.  What was it in reference to?
19      Q.  I don't know.  Your answer to his
20  question.
21      A.  Kick to the head --
22      Q.  Did you say there was a time you
23  get a kick to the head, and a concussion,
24  okay, but not like it is today?
25      A.  I believe he was talking about the

368

1   Brett Hart match.
2       Q.  Yes, he was.
3       A.  Okay.
4       Q.  Did you make that statement?
5       A.  I did.
6       Q.  And things were looked at a
7   different point in time, in '99, about
8   concussions than they are today, isn't it?
9       A.  Yes, they are.
10      Q.  It's not so much that people didn't
11  know concussions were.  They didn't think of
12  them the same way then as they do now?
13      A.  That's because they weren't
14  educated and didn't have the knowledge.
15      Q.  Would you even know when CTE was
16  discovered?
17      A.  No.
18      Q.  So you don't know if in 1999 any
19  knew about it or not?
20      A.  I don't.
21      Q.  Who is Dr. Schneider?
22      A.  Dr. Schneider is another doctor I
23  went to -- with the -- Dr. Cavoto suggested I
24  go see him.
25      Q.  What is his speciality?

369

1       A.  Brain specialist.
2           MR. McDEVITT:  Have the medical
3   records for that been turned over?
4           MR. KYROS:  I don't recognize it.
5           MR. SCIOLLA:  I can't say that they
6   were.
7           MR. McDEVITT:  Why not?
8           MR. SCIOLLA:  I don't know that we
9   were aware of Dr. Schneider either.
10          MR. McDEVITT:  Well, you should
11  have been.
12          MR. SCIOLLA:  Thanks.
13          MR. McDEVITT:  Well, you should
14  have been.  You served document
15  requests.
16      Q.  Did you tell your lawyers you had
17  been seeing Dr. Schneider?
18      A.  I saw Dr. Schneider one time,
19  testing.
20      Q.  Where does he live?
21      A.  He is in Pennsylvania.
22      Q.  In your hometown?
23      A.  No, he's not in my hometown.  I'm
24  not sure of the town in Pennsylvania, but
25  he's in Pennsylvania.

93 (Pages 366 to 369)

370

1    Q.  All right.
2        Now, with respect to Eddie Guerrero
3    you made some comments suggesting the reasons
4    he died.  Do you recall that?
5    A.  Uh-huh.
6    Q.  You don't have any clue why he
7    died, do you?  Did you ever see his autopsy
8    report?
9    A.  Eddie used to the sit in the
10   trainers room.  He used to sit on the table.
11   You know, he used to be out of it.  Eddie had
12   a drug problem.
13   Q.  You don't know if he died from a
14   drug problem, do you?
15   A.  No, I don't but.  He did have a
16   drug problem and drugs can attribute to it.
17   Q.  Do you know if he had a drug
18   problem at the time of his death?
19   A.  I don't know.  All I know when I
20   used to see Eddie sitting in the trainers
21   room.  He always used to sitting there
22   sleeping or doped up or was out of it.
23   Q.  Did you -- you have never looked at
24   Eddie Guerrero's autopsy report, correct?
25   A.  No.

371

1    Q.  You know nothing about the cause or
2    manner of his death, do you?
3    A.  No, I don't.
4    Q.  Yet you are willing to talk about
5    it as if you do?
6        MR. SCIOLLA:  Object to the
7        characterization.
8    A.  I've never seen Eddie Guerrero's
9    autopsy report.
10   Q.  You were also asked a bunch of
11   questions about WWE, and what they said about
12   the Benoit case, and you said, I think, and
13   I'm paraphrasing, but I think you said the
14   WWE said this has to do with wrestling.  Do
15   you understand that?  Is that what you said?
16   What was the "this" in that sentence?
17   A.  This?
18   Q.  Yes, what did you mean, "this"
19   nothing to do with the wrestling?
20   A.  I didn't write it.  I don't know.
21   Q.  Well, where did they say it?
22   A.  I believe it was on the internet
23   or, you know, something like that.  I don't
24   recall where I read it.
25   Q.  Well, was it in reference to the

372

1    murder has nothing to do with wrestling?
2    A.  I just read a statement, I made a
3    statement.  That's what I read at the time
4    and that's how I interpreted it.  This had
5    nothing to do with wrestling.  Is it the
6    murder that had nothing to do with wrestling,
7    it could be.  Was it his symptoms that had
8    nothing to do with wrestling, I don't know.
9    Q.  Well, you don't know and you can't
10   say now?
11   A.  I don't know.
12   Q.  And you can't tell us where this
13   was even said?  And you can't tell us where
14   this was even said?
15   A.  No.
16   Q.  And you talked about how they took
17   him off television?
18   A.  Right.
19   Q.  But I think you also said, you
20   couldn't understand why they would do that,
21   correct?
22   A.  I could understand why because they
23   didn't want nothing to do with him because he
24   killed his family and it was a bad publicity
25   for the company.

373

1    Q.  Well, you certainly wouldn't want
2    to put that on television, would you?
3    A.  No.
4    Q.  So you can understand why they
5    would take that off after it came out that he
6    hog tied his wife and killed his kid, why
7    would they put him on their television
8    program?
9    A.  But I didn't mock the WWE for doing
10   that.  I just said that they took him off all
11   the program.  He doesn't exist in the
12   universe no more.
13   Q.  Do you find it odd that anybody
14   would say Eddie -- or that Chris Benoit and
15   only Chris Benoit is responsible for the
16   homicides he committed?
17   A.  You're absolutely right.  Only he
18   knows.  He was there.  His wife was there.
19   The child was there.  That's the only people
20   that knew.
21   Q.  But he's the only one that is
22   responsible for the decision to murder his
23   family?
24       MR. SCIOLLA:  Object to the form.
25   A.  I wasn't there.  I don't know.

94 (Pages 370 to 373)

374

1      Q.  Well, do you think it's fair to try
2   to blame somebody else for his murderous
3   acts?
4      A.  I didn't say that, Mr. McDevitt.
5      Q.  So you wouldn't have any problem if
6   WWE, in responding to media articles, were
7   suggesting that WWE in some way was
8   responsible for what Chris Benoit chose to
9   do, that they would say, this has nothing to
10  do with us or wrestling?
11         MR. SCIOLLA:  Object to the form.
12     A.  I don't know.  It's just something
13  I read.  It's a statement.
14     Q.  In all the years that you were
15  ignorant, according to you, about what
16  concussions mean, is there any reason
17  whatsoever that you could not have read
18  articles in a public realm or watched media
19  articles that discussed at length the
20  emerging science about CTE and concussions
21  that has been going on for years?
22         MR. SCIOLLA:  Object, calls for
23     speculation.
24     A.  No, I didn't think it pertained to
25  me until 2014.

375

1      Q.  Well, whether you thought it or
2   not.  You could have read it in the
3   newspapers the same as anybody else, right?
4         MR. SCIOLLA:  Same objection.
5      A.  I could have, but I didn't.
6      Q.  And whatever was in the newspapers
7   about Chris Benoit and his CTE that WWE may
8   or may not have read, you could have read the
9   same, couldn't you?
10         MR. SCIOLLA:  Calls for
11     speculation.
12     A.  I don't know, Mr. McDevitt.
13     Q.  I mean they didn't have any
14  exclusive access to the public reporting on
15  anything, did they?
16         MR. SCIOLLA:  Objection, calls for
17     speculation.
18     A.  I'm not sure.  I wasn't there.
19     Q.  Now, you mentioned Stephanie
20  McMahon.  Did you ever once tell Stephanie
21  McMahon that you think you had a head injury
22  in a match?
23     A.  No, I did not.
24     Q.  Did you ever once tell Vince
25  McMahon that you thought you had a head

376

1   injury in a match?
2      A.  No, I did not.
3      Q.  Did you ever once tell John
4   Laurinaitis that you thought you had a head
5   injury in a match?
6      A.  No, I did not.
7      Q.  I think you've already indicated
8   you never once told Dr. Rios that either?
9      A.  Yes, that is true.
10     Q.  And I think you also indicated,
11  your testimony, that generally speaking, Dr.
12  Rios was in the back when matches were going
13  on?
14     A.  Unless he was asked to be ringside
15  for something specific.
16     Q.  Understood.  But I think you
17  indicated the most usual course is he is in
18  the back?
19     A.  In the back.
20     Q.  So would it be fair to say the only
21  way Dr. Rios is going to know if something
22  happened out there is if somebody tells him?
23         MR. SCIOLLA:  Objection, calls for
24     speculation.
25     A.  The only way during a TV taping Dr.

377

1   Rios would know is if he was matching his
2   monitor.  It's in the back.  It's in the
3   trainers room.  And if something bad
4   happened, he would be summoned to the ring by
5   the TV crew or somebody, the runner would
6   could come back and get him and bring him to
7   the ring.
8      Q.  And that never happened at any of
9   your matches, did it?
10     A.  No.
11     Q.  Did you like Dr. Rios?
12     A.  Yes.
13     Q.  Did you think he was a good doctor?
14     A.  Yes.
15     Q.  Do you have any indication or any
16  knowledge that any person involved in WWE
17  management ever told Dr. Rios not to tell you
18  something about head injuries or concussions?
19     A.  I don't know.  I wasn't there.  I
20  don't know what they told him to say or not
21  say.  But I do know one thing --
22     Q.  I'm not asking what you know about
23  one thing.  I'm asking you specifically.
24         Do you have any knowledge, did you
25  ever hear anybody in management at WWE tell

95 (Pages 374 to 377)

378

1   Dr. Rios, look, I don't want you telling Vito
2   anything about concussions?
3       A.  No, I didn't.
4       Q.  Do you have any evidence that
5   anybody at WWE ever directed anybody in the
6   medical staff to withhold any information
7   from you?
8       A.  From me personally, no.
9       Q.  Do you have any knowledge that
10  anybody at WWE management or employees ever
11  told Dr. Rios or the medical staff to lie to
12  you about anything?
13      A.  Not that I'm aware of.
14      MR. McDEVITT:  Again, I don't think
15  I have anything more, Mr. LoGrasso, and
16  I thank you for your time.
17      MR. SCIOLLA:  All done.
18      THE VIDEOGRAPHER:  This concludes
19  the video deposition.  The time 6:14
20  p.m., off the record.
21      MR. McDEVITT:  On the record.
22      What do you plan on doing about
23  what I asked you about, what you said in
24  the reconsideration motion to the court
25  that we now know is false.

379

1       MR. SCIOLLA:  I'm not prepared to
2   give you an answer right now.
3       MR. McDEVITT:  Well, as you all
4   know, we are supposed to talk to the
5   court at 4 o'clock tomorrow.  I would
6   appreciate some answer before the
7   conference call, because I will bring it
8   up if you don't tell me.
9       MR. SCIOLLA:  For sure.
10      MR. McDEVITT:  I would appreciate
11  it if you would consult with whoever you
12  are going to consult with, and let me
13  know the answer.
14      MR. SCIOLLA:  Agreed.
15      MR. McDEVITT:  Off the record.
16      (Time noted:  6:14 p.m.)
17
18
19
20
21
22
23
24
25

380

1   STATE OF _____ )
2                            ) :ss
3   COUNTY OF _____)
4
5
6       I, VITO LOGRASSO, the witness
7   herein, having read the foregoing
8   testimony of the pages of this
9   deposition, do hereby certify it to be a
10  true and correct transcript, subject to
11  the corrections, if any, shown on the
12  attached page.
13
14      _____
15          VITO LOGRASSO
16
17  Sworn and subscribed to before
18  me, this        day of
19          , 2015.
20  _____
21  Notary Public
22
23
24
25

381

1           C E R T I F I C A T E
2   COMMONWEALTH OF PENNSYLVANIA )
3                   : ss.
4   COUNTY OF PHILADELPHIA )
5
6       I, Jennifer Ocampo-Guzman, a
7   Notary Public within and for the Commonwealth
8   of Pennsylvania, do hereby certify:
9       That VITO LOGRASSO, the witness
10  whose deposition is hereinbefore set forth,
11  was duly sworn and that such deposition is a
12  true record of the testimony given by the
13  witness.
14      I further certify that I am not
15  related to any of the parties to this action
16  by blood or marriage, and that I am in no
17  way interested in the outcome of this
18  matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this 19th day of May
21  2016.
22  _____
23      JENNIFER OCAMPO-GUZMAN, CRR, CLR
24
25

96 (Pages 378 to 381)

382

1  -------------- I N D E X ----------------
2  WITNESS      EXAMINATION BY      PAGE
3  VITO LOGRASSO   MR McDEVITT      6, 356
4          MR  SCIOLLA    301
5  --------------- EXHIBITS -----------------
6  LOGRASSO          FOR I D
7  LoGrasso Exhibit 1, CD labeled,
   "Hart vs  Goldberg Starrcade
8  1999"                      63
9  LoGrasso Exhibit 2, Plaintiff's
   Second Amended Complaint        82
10
   LoGrasso Exhibit 3, E-mail date
11 5/6/09, Bates Nos  WWE_SING00002132
   and WWE_SING00002133           92
12
   LoGrasso Exhibit 4, Canoe Network
13 article entitled, "Big Vito takes
   aim at Japan"            108
14
   LoGrasso Exhibit 5, Article
15 entitled, "Ring Ranting Week 1:
   A Rant Sports Exclusive Interview
16 with Former WWE Star Vito (Part 2)"  111
17 LoGrasso Exhibit 6, Article entitled,
   "Big Vito speaks out on Dixie
18 Carter/TNA, Russo & More"      115
19 LoGrasso Exhibit 7, Article entitled,
   "Big Vito talks about wanting to
20 work with Jeff Jarrett, and much
   more"               123
21
   LoGrasso Exhibit 8, CD labeled,
22 "The Undisputed Wrestling Show
   with Big Vito & Lucky Thirteen
23 (February 2014)"         125
24 LoGrasso Exhibit 9, Medical records,
   Bates Nos  Smith020516_00031 through
25 Smith020516_00040           130

383

1  (CONTINUED):
   --------------- EXHIBITS -----------------
2
   LOGRASSO          FOR I D
3
   LoGrasso Exhibit 10, Medical records,
4  Bates Nos  Smith020516_00002 through
   Smith020516_00006           132
5
   LoGrasso Exhibit 11, Brandywine
6  Hospital medical records, Bates Nos
   Brandywine050416_000020 through
7  Brandywine050416_000083      140
8  LoGrasso Exhibit 12, OpenMRI
   Medical records, Bates Nos
9  OpenMRI032316_000002 and
   OpenMRI032316_000003      143
10
   LoGrasso Exhibit 13, Plaintiff Vito
11 LoGrasso's Supplemental Objections and
   Responses to Defendant World Wrestling
12 Entertainment, Inc 's First and Second
   Set of Interrogatories      148
13
   LoGrasso Exhibit 14, Plaintiffs' Evan
14 Singleton and Vito LoGrasso's Brief in
   Opposition to Defendant World Wrestling
15 Entertainment, Inc 's Motion for
   Reconsideration of March 21, 2016
16 Order with Respect to Singleton and
   LoGrasso v  World Wrestling
17 Entertainment, Inc      152
18 LoGrasso Exhibit 15, CD labeled,
   "LoGrasso Headshots Received-Full
19 Reel"            164
20 LoGrasso Exhibit 16, CD labeled,
   "LoGrasso Top Hits-Received"   173
21
   LoGrasso Exhibit 17, CD labeled,
22 "LoGrasso Interrogatory Matches"   184
23 LoGrasso Exhibit 18, Memorandum
   dated 6/19/06         193
24
25

384

1  (CONTINUED):
   --------------- EXHIBITS -----------------
2
   LOGRASSO          FOR I.D.
3  LoGrasso Exhibit 19, Document
   entitled, "World Wrestling
4  Entertainment, Inc., Booking
   Contract," Bates Nos. WWE_SING00000307
5  through WWE_SING00000332...............195
6  LoGrasso Exhibit 20, CD labeled,
   "LoGrasso October 10, 2006 Stairs
7  Clip"..................................211
8  LoGrasso Exhibit 21, Medical notes,
   Bates Nos. WWE_SING00000517 through
9  WWE_SING00000521......................221
10 LoGrasso Exhibit 22, Twitter update... 246
11 LoGrasso Exhibit 23, Facebook
   status update.........................269
12
   LoGrasso Exhibit 24, Facebook
13 status update.........................270
14 LoGrasso Exhibit 25, Facebook
   status update.........................272
15
   LoGrasso Exhibit 26, Article
16 entitled, "Is it over for HBK?,"
   Bates Nos. SINGLETON_0000612 through
17 SINGLETON_0000614....................280
18
   ------------------------------------------
19 DOCUMENT REQUEST:
   PAGE: 102
20
21
22
23
24
25

385

### INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.  After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

386

```
 1
 2              E R R A T A
 3
 4    I wish to make the following changes,
 5    for the following reasons:
 6    PAGE LINE
 7    ___ ___ CHANGE:_____
 8    REASON:_____
 9    ___ ___ CHANGE:_____
10    REASON:_____
11    ___ ___ CHANGE:_____
12    REASON:_____
13    ___ ___ CHANGE: _____
14    REASON:_____
15    ___ ___ CHANGE: _____
16    REASON:_____
17    ___ ___ CHANGE: _____
18    REASON:_____
19
20
21    _____ _____
22    WITNESS' SIGNATURE        DATE
23
24
25
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099