# App. Tab 46

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
-------------------------x
RUSS McCULLOUGH, et al.,    No. 3:15-cv-01074 (VLB)
                            Lead Case
        Plaintiffs,


        -v-


WORLD WRESTLING
ENTERTAINMENT, INC.,


        Defendant.
-------------------------x
EVAN SINGLETON and VITO     No. 3:15-cv-00425 (VLB)
LOGRASSO,                    Consolidated Case


        Plaintiffs,


        -v-


WORLD WRESTLING
ENTERTAINMENT, INC.,


        Defendants.
-------------------------x
```

VIDEOTAPED DEPOSITION OF

EVAN M. SINGLETON

Philadelphia, Pennsylvania

May 11, 2016

9:29 a.m.


Reported by:
Josephine H. Fassett, RPR, CCR
Job No. 44298

2

```
 1              May 11, 2016
 2          Philadelphia, Pennsylvania
 3               9:29 a.m.
 4
 5       T R A N S C R I P T  of the Videotaped
 6   Deposition of EVAN M. SINGLETON, pursuant to the
 7   Federal Rules of Civil Procedure, held at the offices
 8   of Kleinbard LLC, One Liberty Place, 1650 Market
 9   Street, Philadelphia, Pennsylvania, on Wednesday, May
10   11, 2016, commencing at approximately 9:29 a.m.,
11   before Josephine H. Fassett, a Registered
12   Professional Reporter, Certified Court Reporter and
13   Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1   A P P E A R A N C E S  (cont'd.) :
 2
 3   ATTORNEYS FOR DEFENDANT:
 4      K&L GATES LLP
 5      210 Sixth Avenue
 6      Pittsburgh, Pennsylvania 15222
 7      412.355.6500
 8      BY:  JERRY S. McDEVITT, ESQ.
 9         jerry.mcdevitt@klgates.com
10         STEFANIE M. LACY, ESQ.
11         stefanie.lacy@klgates.com
12
13
14   A L S O   P R E S E N T :
15      JOSEPH WILLS, Videographer
16
17
18
19
20
21
22
23
24
25
```

3

```
 1   A P P E A R A N C E S :
 2
 3   ATTORNEYS FOR PLAINTIFFS:
 4      POGUST BRASLOW & MILLROOD LLC
 5      Eight Tower Bridge
 6      161 Washington Street
 7      Suite 940
 8      Conshohocken, Pennsylvania 19428
 9      610.941.4204
10      BY:  HARRIS L. POGUST, ESQ.
11         hpogust@pbmattorneys.com
12
13      -and-
14
15   ATTORNEYS FOR PLAINTIFFS:
16      KYROS LAW OFFICES
17      17 Miles Road
18      Hingham, Massachusetts 02043
19      800.934.2921
20      BY:  KONSTANTINE W. KYROS, ESQ.
21         kon@kyroslaw.com
22
23
24
25
```

5

```
 1   -----------------------INDEX-----------------------
 2   WITNESS                          PAGE
 3   EVAN M. SINGLETON
 4      By Mr. McDevitt                9, 284
 5      By Mr. Pogust                  277
 6
 7         AFTERNOON SESSION - 189
 8
 9   ---------------------EXHIBITS---------------------
10   SINGLETON   DESCRIPTION                    PAGE
11   Exhibit 1  MRI Report for Exam Date        48
12      11/14/2012
13   Exhibit 2  MRI Report for Exam Date        50
14      11/29/2012
15   Exhibit 3  MRI Report for Exam Date        53
16      2/24/2015
17   Exhibit 4  Followup Note on Evan Singleton  55
18      dated December 10, 2012
19   Exhibit 5  Neurological Examination dated   58
20      2/17/2015
21   Exhibit 6  Neurological Examination dated   61
22      3/23/2015
23   Exhibit 7  Emergency Room Visit 11/15/2014  75
24      Report
25
```

2 (Pages 2 to 5)

6

----------------------EXHIBITS----------------------

| | SINGLETON   DESCRIPTION | PAGE |
|---|---|---|
| 3 | Exhibit 8  Adam Mercer @MercerWWE Twitter | 135 |
| 4 | Tweets | |
| 5 | Exhibit 9  Adam Mercer @WWEMercer Twitter | 140 |
| 6 | Tweets | |
| 7 | Exhibit 10  Evan Singleton Talent | 143 |
| 8 | Questionnaire | |
| 9 | Exhibit 11  World Wrestling Entertainment, | 145 |
| 10 | Inc. Booking Contract | |
| 11 | Exhibit 12  Letter dated May 21, 2012 | 148 |
| 12 | | |
| 13 | Exhibit 13  Candace Renshaw Facebook Page | 150 |
| 14 | Exhibit 14  Class Action Complaint | 159 |
| 15 | Exhibit 15  Plaintiffs' First Amended | 183 |
| 16 | Complaint | |
| 17 | Exhibit 16  Plaintiffs' Second Amended | 209 |
| 18 | Complaint | |
| 19 | Exhibit 17  Concussion Evaluation dated | 219 |
| 20 | 2/21/2013 | |
| 21 | Exhibit 18  Followup Note on Evan Singleton | 228 |
| 22 | dated January 18, 2013 | |
| 23 | Exhibit 19  E-mail dated October 1, 2012 | 229 |
| 24 | Exhibit 20  Singleton vs. Erick Rowan | 237 |
| 25 | 6/17/2012 and 9/27/2012 CD | |

7

----------------------EXHIBITS----------------------

| | SINGLETON   DESCRIPTION | PAGE |
|---|---|---|
| 3 | Exhibit 21  Singleton Leg Twitching CD | 249 |
| 4 | Exhibit 22  Evan Singleton Instagram Account | 249 |
| 5 | Page | |
| 6 | Exhibit 23  Evan Singleton Instagram Account | 252 |
| 7 | Page | |
| 8 | Exhibit 24  Evan Singleton Instagram Account | 256 |
| 9 | Page | |
| 10 | Exhibit 25  Evan Singleton Instagram Account | 258 |
| 11 | Page | |
| 12 | Exhibit 26  Evan Singleton Instagram Account | 259 |
| 13 | Page | |
| 14 | Exhibit 27  Evan Singleton Facebook Account | 263 |
| 15 | Page | |
| 16 | Exhibit 28  Evan Singleton Instagram Account | 265 |
| 17 | Page Photograph | |
| 18 | Exhibit 29  Evan Singleton Instagram Account | 268 |
| 19 | Page | |
| 20 | Exhibit 30  Evan Singleton Instagram Account | 268 |
| 21 | Page | |
| 22 | Exhibit 31  Evan Singleton Instagram Account | 270 |
| 23 | Page | |
| 24 | Exhibit 32  Multiple Photographs | 271 |
| 25 | Exhibit 33  CD | 274 |

8

1   (Whereupon, on the video record.)

2        THE VIDEOGRAPHER:  We're now on the

3   record.

4        My name is Joseph Wills, the videographer

5   from David Feldman Worldwide.

6        This is a video deposition in the United

7   States District Court for the District of

8   Connecticut.

9        Today's date is May 11, 2016.  The video

10   time is 9:29 a.m.

11        This deposition is being held at 1650

12   Market Street, Philadelphia, Pennsylvania, in

13   the matters of McCullough, et al. versus World

14   Wrestling Entertainment, Incorporated, and

15   Singleton and LoGrasso versus World Wrestling

16   Entertainment, Incorporated.

17        The deponent is Evan Singleton.

18        Would all counsel please identify

19   themselves.

20        MR. McDEVITT:  I'm Jerry McDevitt.  I

21   represent WWE.

22        MR. POGUST:  Harris Pogust, Pogust

23   Braslow & Millrood, on behalf of the

24   plaintiffs.

25        MR. KYROS:  Konstantine Kyros, Kyros Law,

9

1   on behalf of the plaintiffs.

2        THE VIDEOGRAPHER:  Will the court

3   reporter please swear in the witness.

4   E V A N   M.   S I N G L E T O N, the witness, having

5        been duly sworn, was examined and testified

6        under oath as follows:

7   EXAMINATION BY

8   MR. McDEVITT:

9        Q.   Mr. Singleton, my name is Jerry McDevitt.

10   I represent the WWE, so I'll be asking you questions

11   today.

12        A.   Okay.

13        Q.   And I'd like to begin by asking you to

14   state formally your name and address.

15        A.   My name is Evan Mitchell Singleton.  My

16   address is 5201 Summerfield Drive, Mount Joy,

17   Pennsylvania 17552.

18        Q.   How far is Mount Joy from here?

19        A.   About an hour and a half.

20        Q.   Is that a small town?

21        A.   Uhm... little bit, yes.

22        Q.   How many people live there?

23        A.   I don't know offhand.

24        Q.   You the biggest guy in town?

25        A.   If not, I'm pretty close.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

10

1    Q.    What is your current height and weight?
2    A.    Six-foot-five, 300 pounds.
3    Q.    And how long have you lived at the
4    address you just gave me?
5    A.    I moved in there, I want to say January
6    of 2016. I want to say that, yeah.
7    Q.    Where did you live before that?
8    A.    I lived on Lepore Drive on -- right off
9    of Old Philadelphia Pike in Lancaster, Pennsylvania.
10   Q.    Who lives with you currently?
11   A.    My fiancee, Candace Renshaw; my mother,
12   Donna Singleton; and my step-dad, Darryl Barnes.
13   Q.    And does your mother own that house?
14   A.    Yes.
15   Q.    And your fiancee lives with you in that
16   house?
17   A.    Yes, sir.
18   Q.    When did you first move to Florida to
19   begin your work with WWE?
20   A.    I moved down to Florida in December of
21   2011.
22   Q.    Okay. Did you tell a lot of people in
23   your hometown that you were going down to Florida to
24   become a WWE star?
25   A.    Yeah.

11

1         MR. POGUST: Objection. Go ahead.
2    A.    Yes.
3    Q.    And were there articles in your hometown
4    newspaper to that effect?
5    A.    That I'm not sure of, no, I don't know.
6    Q.    And when did you return to Pennsylvania?
7    A.    I returned to Pennsylvania --
8         MR. POGUST: Objection. Jerry, you mean
9    permanently after?
10        MR. McDEVITT: Well, let me clarify.
11   Q.    When you got done with WWE, when did you
12   return to Pennsylvania?
13   A.    I moved back, I think it was September of
14   2014. I -- I want to say September of 2014.
15   Q.    Did your fiancee move back with you?
16   A.    Yes.
17   Q.    And what did you tell people then as to
18   why you didn't make it in the WWE?
19        MR. POGUST: Objection.
20   A.    I got hurt.
21   Q.    Is that what you tell everybody?
22   A.    Yes.
23   Q.    What did you tell them you were hurt by?
24   A.    I got hurt in the ring.
25   Q.    What was the nature of your injuries?

12

1    A.    I had --
2         MR. POGUST: Objection. Are you asking
3    him what he told people what his nature is or
4    are you asking him what he believes his nature
5    is?
6         MR. McDEVITT: If you have an objection,
7    you make it, you don't speak.
8         MR. POGUST: No, I'm asking you to
9    clarify the question.
10        MR. McDEVITT: No, you make your
11   objections.
12        MR. POGUST: You don't have to tell me
13   how to make it. Thank you. I appreciate it.
14        MR. McDEVITT: But I do.
15        MR. POGUST: No, apparently you don't.
16   BY MR. McDEVITT:
17   Q.    Answer my question, though.
18   A.    I had a brain injury.
19   Q.    And that's what you tell people?
20   A.    Yes.
21   Q.    What do you tell them was the nature of
22   the brain injury?
23   A.    I'm sorry?
24   Q.    What do you tell them was the nature of
25   your brain injury?

13

1    A.    As far as what my symptoms are?
2    Q.    No, what do you tell them was the nature
3    of your brain injury?
4         MR. POGUST: Objection.
5    A.    I got hurt wrestling in a match.
6    Q.    Did you tell them you got a concussion?
7    A.    No. I told them -- I tell them I have a
8    hemorrhage.
9    Q.    You tell them you have a hemorrhage?
10   A.    Uh-hum.
11   Q.    An intracranial hemorrhage?
12   A.    (Nods.)
13   Q.    You have to say verbally --
14   A.    Yes.
15   Q.    -- when you respond.
16   A.    Yes.
17   Q.    How many people have you told that to?
18   A.    I don't know.
19   Q.    If anybody would ask, is that what the
20   reason is you give them for why you didn't make it in
21   the WWE because you had an intracranial hemorrhage?
22        MR. POGUST: Objection.
23   A.    Yes.
24   Q.    Do you know Vito LoGrasso?
25   A.    Yes.

4  (Pages 10 to 13)

14

1     Q.   Are you embarrassed you didn't make it in
2   the WWE?
3     A.   No.
4     Q.   How do you know Vito LoGrasso?
5     A.   I met him at Harris's office.
6     Q.   Harris being your attorney?
7     A.   Yes.
8     Q.   When did you meet him?
9     A.   I don't remember.
10    Q.   Was it this year?
11    A.   I don't remember.
12    Q.   Well, did you meet him before you brought
13  the lawsuit?
14    A.   No.
15    Q.   Had you ever talked to Vito LoGrasso
16  before you and he joined together to bring this
17  lawsuit?
18    A.   No.
19         MR. POGUST:  Objection.
20    Q.   Who was present when you met Mr. LoGrasso
21  in your counsel's office?
22    A.   My lawyer, Harris, and I don't remember
23  if there was anyone else there or not.
24    Q.   Was Mr. Kyros there?
25    A.   I don't remember.

15

1     Q.   Who was the first lawyer you talked to
2   about this lawsuit?
3     A.   It was Konstantine Kyros.
4     Q.   And when did you first speak to him?
5     A.   I don't remember the exact date that we
6   talked first, no.
7     Q.   How did you know Konstantine Kyros?
8     A.   My mother actually found him and gave me
9   his contact information.
10    Q.   Did she tell you how she found him?
11    A.   No.
12    Q.   Did she talk to him before you did?
13    A.   Yes.
14    Q.   What did she tell you about that
15  conversation?
16    A.   She just pretty much gave me his contact
17  information and I went from there.
18    Q.   And when did your mother find him?
19    A.   I don't remember.
20    Q.   Well, how much in advance of you bringing
21  the lawsuit was it?
22    A.   I don't remember.
23    Q.   Did she tell you whether he had contacted
24  her or she had contacted him?
25    A.   She didn't say anything about that.

16

1     Q.   And after she gave you his name, did you
2   call?
3     A.   Yes.
4     Q.   Did you have counsel in Florida when you
5   called Mr. Kyros?
6     A.   Yes.
7     Q.   Who was your counsel in Florida?
8     A.   John Sharpless.
9     Q.   In fact, you gave a deposition in
10  Florida, didn't you?
11         MR. POGUST:  Objection.
12    A.   I --
13         MR. McDEVITT:  Well, let me rephrase
14  that.
15    Q.   You gave a deposition while you were in
16  Pennsylvania in connection with workmen's comp
17  proceedings that you had begun, correct?
18    A.   Yes.
19    Q.   And do you recall the date your
20  deposition was?
21    A.   No.
22    Q.   The record will show it was November 14th
23  of 2014.
24    A.   Okay.
25    Q.   Do you recall whether you had spoken to

17

1   Mr. Kyros by that date?
2     A.   No.
3     Q.   Do you recall your attorney in Florida
4   contacting Mr. Kyros that date?
5     A.   No.
6     Q.   If November 14 was the date of your
7   workmen's comp deposition, had you talked to
8   Mr. Kyros by the time you gave that deposition?
9     A.   I don't remember, honestly.
10    Q.   How long was your initial call to him?
11    A.   I don't remember.
12    Q.   You don't remember.  Are you taking any
13  medicines that would affect your memory?
14    A.   No.
15    Q.   Do you have a good memory?
16    A.   No.
17    Q.   Did you ever claim to have a good memory?
18    A.   I didn't have a bad memory.
19    Q.   Did you ever claim to have a good memory?
20    A.   No.
21    Q.   Never?
22    A.   (Shrugs.)
23    Q.   Never?
24         MR. POGUST:  Objection.
25    A.   No.

5 (Pages 14 to 17)

18

1    Q.   Did you attend any presentations given by
2    Dr. Maroon when you were in Florida?
3       A.   Not that I remember, no.
4       Q.   Not that you remember.  Did you happen to
5    watch a tape that's been produced in this litigation
6    of a presentation he gave?
7          MR. POGUST:  Objection.
8       A.   Not that I remember, no.
9       Q.   You didn't watch the tape?
10      A.   Not that I remember, no.
11      Q.   In the course of preparing for this
12   deposition, nobody showed you a tape of a
13   presentation?
14      A.   No.
15      Q.   In the last couple of weeks, nobody's
16   shown you a tape of a presentation that Dr. Maroon
17   gave to all talent down in Florida?
18         MR. POGUST:  Objection.
19      A.   No.
20      Q.   Were you in Florida in August of 2012?
21      A.   Yes.
22      Q.   So you don't deny or admit that you were
23   at that presentation, you claim you don't remember
24   either way?
25      A.   I don't remember.

19

1       Q.   Do you remember him speaking to you about
2    concussions?
3       A.   No.
4       Q.   Have you ever read any congressional
5    testimony by anybody?
6       A.   I'm sorry, I don't -- congressional
7    testimony.
8       Q.   Of any kind.
9       A.   What is that?
10      Q.   Did you ever read any testimony that
11   anybody gave before a committee of Congress?
12      A.   I don't know.
13      Q.   Well, you'd know, did you do it or didn't
14   you?
15         MR. POGUST:  Objection.
16      A.   No.
17      Q.   Did you ever read any testimony of
18   Stephanie McMahon?
19      A.   No.
20      Q.   Did you ever watch any television
21   programs where Vince and Linda McMahon -- well, first
22   of all, let me ask you:  Do you know who Vince and
23   Linda McMahon are?
24      A.   Yes.
25      Q.   Who are they?

20

1       A.   They're the owners of WWE.
2       Q.   Did you ever watch any television
3    programs where Mr. and Mrs. McMahon were being
4    interviewed regarding the Chris Benoit situation?
5       A.   No.
6       Q.   Never?
7          MR. POGUST:  You have to answer --
8       Q.   You have to respond verbally.
9       A.   No.
10      Q.   Did you ever watch any television
11   programs about the Chris Benoit murder?
12      A.   Yes.
13      Q.   What programs did you watch?
14      A.   Local news.
15      Q.   Local news?
16      A.   Yeah.
17      Q.   And what did you learn by watching those?
18      A.   I got from the news article that I saw
19   that it was about steroid and anti-depressant abuse.
20      Q.   And when did you read that?
21         MR. POGUST:  Objection.
22      A.   I don't remember.
23      Q.   Did you follow the story as it developed?
24      A.   No.
25      Q.   So did you follow the story as it was

21

1    reported that he had brain damage?
2       A.   No.
3       Q.   You missed that somehow?
4       A.   (Nods.)
5       Q.   Is that a yes?
6       A.   Yes.
7       Q.   So you missed all the news coverage of
8    that, of that story?
9       A.   Yes.
10      Q.   Even though you'd been a wrestling fan
11   all your life?
12      A.   Yes.
13      Q.   When did you first learn that Chris
14   Benoit supposedly had brain damage?
15      A.   I didn't.  I didn't, I don't know.  I
16   didn't know that.
17      Q.   So this is the first time you've heard of
18   that?
19      A.   Yeah.
20      Q.   Today?
21      A.   Yeah.
22      Q.   Up until the moment you walked in this
23   room, you never heard that Chris Benoit had brain
24   damage?
25      A.   Yes.

6  (Pages 18 to 21)

22

1     Q.   Were you aware that you just answered
2   Request for Admissions?
3     A.   Excuse me?
4     Q.   Did you review a bunch of Requests for
5   Admissions that were served on you?
6     A.   I remember answering questions sitting
7   down with my lawyers, yes.
8     Q.   And one of questions you were asked was
9   to admit that you knew before you started your career
10  with WWE that Chris Benoit and Andrew Martin had been
11  diagnosed as having CTE caused by head trauma
12  sustained by wrestling.  Do you remember that?
13    A.   No.
14    Q.   You don't remember that?
15    A.   No.
16    Q.   And your answer was:  Plaintiff objects
17  because this is beyond the scope of the discovery
18  order and seeks information irrelevant to the
19  parties' claims and defenses.  Subject to and without
20  waiving these and the general objections, plaintiffs
21  states that -- plaintiff states he did not know
22  before he started his career with WWE that Chris
23  Benoit and Andrew Martin had been diagnosed as having
24  CTE caused by head trauma sustained while wrestling.
25        Is that the answer you gave?

23

1     A.   I don't know.  Yes.
2     Q.   That's what your lawyers gave us,
3   Mr. Singleton, did you provide that answer or not?
4     A.   Yes.
5     Q.   Well, does this indicate that you didn't
6   know about it before you started wrestling?
7         MR. POGUST:  Objection.
8     A.   Yes.
9     Q.   So you would have had to have known that
10  they were diagnosed with it before you walked in this
11  room to even answer that question?
12    A.   I didn't know that they had brain
13  injuries.
14    Q.   Well, when you read and you gave this
15  answer to this question, didn't you find out then?
16    A.   I didn't know when they asked me that
17  question then.
18    Q.   You did not?
19    A.   No.
20    Q.   Okay.  And you, I guess, claim that you
21  didn't know that Andrew Martin had --
22    A.   I don't know who Andrew Martin --
23    Q.   -- traumatic brain injuries?
24    A.   I don't know who Andrew Martin is.
25    Q.   Do you know Test?

24

1     A.   No.
2     Q.   You never heard of the character Test,
3   you never saw him on TV?
4         When did you start watching professional
5   wrestling?
6     A.   I want to say late nineties.
7     Q.   How old were you?
8     A.   Maybe eight.
9     Q.   Eight?
10    A.   Seven, eight years old.
11    Q.   What programs did you watch?
12    A.   Raw and SmackDown.
13    Q.   And did you watch WCW?
14    A.   I did.  A little bit.
15    Q.   You watched that with your father, didn't
16  you?
17    A.   Yes.
18    Q.   Did you watch ECW?
19    A.   No.
20    Q.   Did you buy Pay-per-views?
21    A.   No.
22    Q.   So you watched Raw.  Did you watch
23  SmackDown?
24    A.   Yes.
25    Q.   Did you watch Nitro?

25

1     A.   Yes.
2     Q.   What else did you watch?
3     A.   That was about it.
4     Q.   And did you watch it every week?
5     A.   Not frequently every week, no.  Not
6   consistently.
7     Q.   And did you -- did you ever see any
8   wrestlers, for example, do power slams?
9     A.   Yes.
10    Q.   Joke slams?
11    A.   Yes.
12    Q.   Did you see them jumping off of ladders?
13    A.   Yes.
14    Q.   Did you see them hitting each other over
15  the head with chairs?
16    A.   Yes.
17    Q.   And you decided that's what you wanted to
18  do, isn't it?
19    A.   Yes.
20    Q.   And when did you decide that's what you
21  wanted to do?
22    A.   Maybe high school my sophomore year.
23    Q.   You were also a high school wrestler,
24  weren't you?
25    A.   I was.

7 (Pages 22 to 25)

26

```
1        Q.   Were you the biggest person that you
2   competed against -- or, strike that.
3            Was anybody bigger than that you
4   competed against?
5        A.   Yes.
6        Q.   And how did you do in the state?
7        A.   I ended up taking eighth in states.
8        Q.   Eighth.  Okay.
9            And after you did high school wrestling,
10  you then went and trained somewhere else before you
11  went to WWE, correct?
12       A.   Yes.
13       Q.   What was the name of that outfit?
14       A.   CZW, Combat Zone Wrestling.
15       Q.   And how long did you train with them?
16       A.   Couple of months.
17       Q.   And what was the nature of your training?
18       A.   Very basic in-ring activity.  Running the
19  ropes.  Learn -- learning how to do simple moves,
20  stuff like that, working on my skills.
21       Q.   What kind of moves did you learn?
22       A.   Clothesline.  How to throw a punch.  How
23  to kick.  How to roll.  Just the basic stuff like
24  that.
25       Q.   Did you learn flat back?
```

27

```
1        A.   Yes.
2        Q.   What is a flat back?
3        A.   It's a bump.
4        Q.   What's that mean?
5        A.   Falling flat on your back or crawling and
6   spreading your arms out.
7        Q.   So as not to hurt yourself?
8        A.   Right.
9        Q.   And when you do that move, what are you
10  supposed to do with your head?
11       A.   Tuck it.
12       Q.   Tuck your chin?
13       A.   Yes.
14       Q.   Correct?  The same thing you're supposed
15  to do when you get choke slammed, right?
16       A.   Yes.
17       Q.   And you didn't do that when you got hurt,
18  right?
19       A.   I don't --
20            MR. POGUST:  Objection.
21       A.   I don't remember.
22       Q.   Did you make the move wrong when you got
23  hurt?
24       A.   I'm sorry?
25       Q.   Did you make the move wrong when you got
```

28

```
1   hurt?
2            MR. POGUST:  Objection.
3        A.   I don't remember, no.
4        Q.   Did you tuck your chin?
5        A.   Not that I remember.
6        Q.   So if you didn't tuck your chin, you're
7   going to get hurt, right?
8        A.   Yeah.
9        Q.   And you were told that, right?
10       A.   No.
11       Q.   You weren't told to tuck your chin when
12  you executed the move, that's what --
13       A.   No, I was.
14       Q.   You were?
15       A.   Yeah.
16       Q.   So you knew before that you were doing
17  that move that the key in not getting hurt was to
18  tuck your chin.
19            MR. POGUST:  Objection.
20       Q.   Right?
21       A.   Yes.
22       Q.   And you didn't tuck your chin and you got
23  hurt, right?
24       A.   I don't -- I don't remember.  I -- I
25  don't remember.
```

29

```
1        Q.   Well, did you understand, Mr. Singleton,
2   when you walked into a wrestling ring that there was
3   a risk of injury?
4        A.   Yes.
5        Q.   And you knew that the minute you walk in
6   a ring, right?
7        A.   Yes.
8        Q.   You know that if you don't perform moves
9   correctly, you could hurt your opponent, right?
10       A.   Yes.
11       Q.   And you know if they don't perform them
12  correctly, they can hurt you?
13       A.   Yes.
14       Q.   And that's not the object, is it, it's
15  not to hurt each another?
16       A.   No.
17       Q.   It's supposed to be entertainment, right?
18       A.   Yes.
19       Q.   You're not really punching the person,
20  you're simulating that you're punching the person,
21  correct?
22       A.   Yes.
23       Q.   And what does the term selling mean to
24  you?
25       A.   Selling is if somebody throws one of
```

8  (Pages 26 to 29)

30

1  those punches, then you're supposed to react as if
2  you were getting hit.
3      Q.  Right.  So you pretend like you're hurt
4  even though you're not hurt, right?
5      A.  Right.
6      Q.  And that's a common aspect of
7  professional wrestling, correct?
8      A.  Yes.
9      Q.  Is that you sell the other person's moves
10 as being effective to hurt you when, in fact, it
11 really didn't hurt you?
12     A.  Yes.
13     Q.  And then that sets up your comeback from
14 being hurt and victory in some cases or defeat in
15 others, right?
16     A.  Yes.
17     Q.  It's all entertainment, right?
18     A.  Yes.
19     Q.  When one watches a film and sees you
20 holding your head after somebody executes a move, you
21 can't conclude that you were hurt by the move, can
22 you?
23          MR. POGUST:  Objection.
24     A.  No.
25     Q.  In fact, if you're a good wrestler and

31

1  you're a skilled professional, you sell that move so
2  much that people watching the film would think you
3  were hurt but you really aren't, correct?
4      A.  Yes.
5      Q.  Now, after you had been a high school
6  wrestler -- or, strike that.
7          Who's your favorite character?
8      A.  Goldberg.
9      Q.  Goldberg.  And what was his finishing
10 move?
11     A.  Spear.
12     Q.  And just for, again, for the record,
13 what's finishing move mean?
14     A.  Finishing move is typically a move that
15 would be done at the end of a match.  And after a
16 finishing move was done, someone would climb on top,
17 pin him, and that would be the end of the match.
18     Q.  All right.  Did you know Bret Hart?
19     A.  Yes.
20     Q.  How did Bret Hart's career end?
21     A.  I don't know.
22     Q.  I mean, wasn't he kicked by Goldberg and
23 got a severe concussion?
24     A.  I --
25     Q.  Your favorite wrestler, you didn't know

32

1  that?
2      A.  No.
3      Q.  This is the first time you learned this?
4      A.  Yeah.
5      Q.  You weren't watching that show when that
6  happened?
7      A.  (Nods.)
8      Q.  Did you -- again, you have to answer --
9          MR. POGUST:  You have to say it verbally,
10 Evan.
11     A.  Oh, I'm sorry.  No.
12     Q.  No.  Who else were your favorite
13 wrestlers?
14     A.  I liked Dave Bautista.
15     Q.  What was his finishing move?
16     A.  Power bomb.
17     Q.  Power bomb.  And explain what that
18 entails.
19     A.  You put your opponent's head in between
20 your legs.  You wrap your arms around their waist.
21 You roll them up to your shoulders and then you drop
22 them on their back.
23     Q.  And if you execute that move wrong you
24 can really hurt the other person, correct?
25     A.  Yes.

33

1      Q.  Did you like Stone Cold Steve Austin?
2      A.  Yeah.
3      Q.  Did you watch his matches?
4      A.  Yeah.
5      Q.  Did you watch the match with Owen Hart
6  where he almost got paralyzed?
7      A.  Which one?
8      Q.  Where Owen executed a move wrong and
9  dropped him on his head?
10     A.  Yes.
11     Q.  So you had seen that move?
12     A.  Yes.
13     Q.  And you realized that he was almost
14 paralyzed by that move?
15     A.  No.
16     Q.  Did you actually watch that match when it
17 occurred?
18     A.  No.
19     Q.  But you heard about it later?
20     A.  I saw videos of it later on, yeah.
21     Q.  Where did you see the video?
22     A.  YouTube.
23     Q.  YouTube.  Do you watch wrestling videos
24 on YouTube?
25     A.  No.

9  (Pages 30 to 33)

34

1    Q.   Do you know who Darren Drozdov is?
2    A.   No.
3    Q.   Never heard of him.
4         Do you know any other wrestlers that had
5    to retire because of concussions?
6    A.   Daniel Bryan.
7    Q.   Did you know any before you went into the
8    business that had to retire because of concussions?
9    A.   No.
10   Q.   Did you know that wrestlers got
11   concussions?
12   A.   No.
13   Q.   You didn't know that?
14   A.   No.
15   Q.   Did you think they didn't?
16   A.   Yeah.
17   Q.   You thought they were doing all those
18   moves without ever getting a concussion?
19   A.   Yeah.
20   Q.   What research did you do into that?
21   A.   Not much.
22   Q.   When did you first hear the term
23   concussion?
24   A.   When I was in high school football.
25   Q.   What did they teach you about it?

35

1    A.   Concussion is a brain injury from impact.
2    Q.   And did you get any concussions when you
3    were playing football?
4    A.   No.
5    Q.   What position did you play?
6    A.   Lineman.
7    Q.   Did you bang your head repeatedly?
8    A.   Yeah.
9    Q.   How many years did you play lineman?
10   A.   One.
11   Q.   One.  When you were playing football, did
12   anybody on your team or any opponents that you were
13   playing get a concussion?
14   A.   Not that I remember.
15   Q.   Did they tell you what to do if you got a
16   concussion?
17   A.   No.
18   Q.   Did you have athletic trainers in high
19   school football?
20   A.   Yes.
21   Q.   And your testimony is, they never told
22   you what to do if you had a suspected concussion?
23   A.   To let them know.
24   Q.   To let them know?
25   A.   Yeah.

36

1    Q.   And what did they tell you they would do?
2    A.   They didn't tell us anything.
3    Q.   Just to let you know?
4    A.   Yeah.
5    Q.   Right.  And when you went down to the
6    combat wrestling outfit, did they tell you anything
7    about concussions?
8    A.   No.
9    Q.   Nothing.  So what was your understanding
10   of what a concussion was as of the time you walked
11   into the WWE?
12   A.   It was just a brain injury you get from
13   impact.
14   Q.   And what did you think it would feel like
15   if you got a concussion?
16   A.   It would hurt.
17   Q.   It would hurt.  Did you think you'd be
18   dizzy?
19   A.   Yeah.
20   Q.   Do you watch professional boxing?
21   A.   No.
22   Q.   Never?  In your whole life you've never
23   watched a professional boxing match?
24   A.   No.
25   Q.   Never?

37

1    A.   It's boring.
2    MR. POGUST:  Objection.
3    Q.   It's boring.  Have you watched -- do you
4    know Muhammad Ali?
5    A.   Yes.
6    Q.   Have you watched his condition?
7    A.   What he looks like now?
8    Q.   Yes.
9    A.   Yeah.
10   Q.   Did you know what he looked like when he
11   was a fighter?
12   A.   Roughly, yeah.
13   Q.   Do you notice a difference?
14   A.   Yeah.
15   Q.   What do you think that's due to?
16   MR. POGUST:  Objection.
17   A.   Brain injury.
18   Q.   Brain injury.  When did you realize that
19   his brain injury is what caused his condition?
20   A.   When I heard about it online.
21   Q.   When was that?
22   A.   I don't remember.
23   Q.   So, in any event, you have this
24   background in wrestling and you have some knowledge
25   of wrestling.

10  (Pages 34 to 37)

38

1    A.   Yeah.
2        Q.   And you go down and you sign a contract
3    with WWE, correct?
4        A.   Yes, sir.
5        Q.   And in that contract you indicated that
6    you agreed to the proposition that wrestling had
7    inherent risk and that you accepted those risks,
8    correct?
9        A.   Yes.
10        Q.   And you promised in that contract that
11    you would not try to hold WWE responsible if you got
12    injured because of those risks, correct?
13        A.   Yes.
14        Q.   And you got injured doing exactly what
15    you signed up to do, didn't you?
16        A.   Yes.
17        Q.   And yet you're suing WWE, correct?
18        A.   Yes.
19        Q.   Why is that?
20        A.   I don't know.
21        Q.   You don't know why you're suing WWE?
22            Have you been promised any money for
23    suing WWE?
24        A.   No.
25        Q.   Have you been given any money for suing

39

1    WWE?
2        A.   No.
3        Q.   When you went down to WWE -- when I say
4    WWE, you were actually working with FCW for a while
5    and then NXT, correct?
6        A.   Yes.
7        Q.   And those are, for lack of a better word,
8    the minor leagues, right?
9        A.   Yes.
10        Q.   And the object of everybody who goes down
11    there is to get good enough to make it to the WWE
12    main roster, correct?
13        A.   Yes.
14        Q.   That's what you wanted to do when you
15    went there, wasn't it?
16        A.   Yes.
17        Q.   Who were some of the people that you
18    worked with down there that have since made the main
19    roster?
20        A.   I don't know all of them because I don't
21    follow it anymore.  I know Big E Langston is on the
22    main roster now.  Erick Rowan is on the roster.  Bray
23    Wyatt is on the main roster.  To the best of my
24    knowledge, that's all I know.
25        Q.   Do you stay in contact with any of those

40

1    men?
2        A.   No.
3        Q.   And all of those men went through the
4    same program you went through, right?
5        A.   Yes.
6        Q.   And they made it and you didn't, right?
7        A.   Yes.
8        Q.   Why do you think that is?
9        A.   I don't know.
10        Q.   Do you think they wanted it more than you
11    did?
12        A.   No.
13        Q.   Do you think they were better than you?
14        A.   No.
15        Q.   Do you think they were tougher than you?
16        A.   No.
17        Q.   But they made it and you didn't, right?
18        A.   Yes.
19        Q.   And after you got -- or, strike that.
20            You claim that you got injured on
21    September 27, 2012, right?
22        A.   Yes.
23        Q.   And you claim you got a concussion that
24    day, right?
25        A.   Yes.

41

1        Q.   And after you got that concussion, am I
2    correct that the WWE sent you to various doctors to
3    see if they could find out what was wrong with you?
4        A.   Yes.
5        Q.   How many doctors did they send you to?
6        A.   I don't remember all of them.
7        Q.   Multiple neurologists, correct?
8        A.   Yes.
9        Q.   Neuropsychologists, correct?
10        A.   Yes.
11        Q.   Epilepsy specialists?
12        A.   Yes.
13        Q.   Do you remember Dr. Greenberg?
14        A.   No.
15        Q.   You don't remember a neurologist by the
16    name of Greenberg you treated with down in Florida
17    that cleared you to go back and participate?
18        A.   No.
19        Q.   Do you recall him telling you the results
20    of MRIs?
21        A.   No.
22        Q.   How many MRIs have been done on your
23    brain to date?
24        A.   I don't remember.
25        Q.   Do you remember any of them that have

11  (Pages 38 to 41)

42

1    been done?
2        A.   I remember some.
3        Q.   How many --
4        A.   Not all of them.
5        Q.   How many do you remember?
6        A.   Three.
7        Q.   Three.  And where were they done?
8        A.   Two were done in Florida and one was done
9    in Pennsylvania.
10       Q.   And am I correct that the ones in Florida
11   showed you had no intracranial hemorrhage?
12       A.   I don't know.
13       Q.   Did you read them?
14       A.   I don't know.
15       Q.   Did you read them?
16       A.   I don't know.
17       Q.   You don't know if you read the reports?
18       A.   No.
19       Q.   Did any doctors tell you what the results
20   of those reports were?
21       A.   Yes.
22       Q.   Who?
23       A.   Nancy Rogers.
24       Q.   Nancy Rogers told you the results of the
25   reports?

43

1        A.   Yes.
2        Q.   What did she tell you?
3        A.   Concussion.
4        Q.   Did she tell you that you had an
5    intracranial hemorrhage?
6        A.   No.
7        Q.   You told her that, right?
8        A.   Yes.
9        Q.   You told every doctor you went to that,
10   right?
11       A.   Yes.
12       Q.   But you have no basis to do that, do you?
13            MR. POGUST:  Objection.
14       A.   That's what I was told.
15       Q.   Who told you that?
16       A.   My fiancee, Candace.
17       Q.   Oh, she's a doctor these days?
18       A.   No.
19       Q.   What did she do?
20       A.   She was present when the results were
21   given to me.
22       Q.   Who gave you those results?
23       A.   Greenberg, is that what his name was?
24       Q.   Greenberg.  So you're telling me that
25   Candace was present when Greenberg's results were

44

1    given to you?
2        A.   Yes.
3        Q.   And she's telling you what?
4        A.   That I had a hemorrhage.  That's what the
5    doctor told me.
6        Q.   Well, why did you need her to tell you
7    what the doctor told you; you were there, weren't
8    you?
9        A.   Well, I keep her present because my
10   memory isn't very good.
11       Q.   Oh, your memory's not good.  So you're
12   relying on what your fiancee says a doctor told you?
13       A.   Yes.
14       Q.   Even though every one of the doctors'
15   records say that he told you the exact opposite of
16   that?
17            MR. POGUST:  Objection.
18       A.   Yes.
19       Q.   You have three different MRI reports that
20   have been produced in this litigation, every one of
21   them saying the same thing, no intracranial
22   hemorrhage, and yet you walk around telling people
23   that as an excuse for why you failed --
24            MR. POGUST:  Objection.
25       Q.   -- and you put it in lawsuits, correct?

45

1            MR. POGUST:  Is this a question?
2    Objection.
3        Q.   Can you answer that, sir?
4            MR. POGUST:  Well, there were three
5    questions in there, I think.  Which one do you
6    want him to answer?  Which question do you want
7    him to answer?  There were multiple questions.
8            MR. McDEVITT:  If you have an
9    objection --
10           MR. POGUST:  I did.
11           MR. McDEVITT:  Then you know --
12           MR. POGUST:  And I did.
13           MR. McDEVITT:  Then you need to be quiet.
14           MR. POGUST:  Don't tell me to be quiet.
15           MR. McDEVITT:  Yes, the rules tell you
16   that.  You make your objection --
17           MR. POGUST:  And I did.
18           MR. McDEVITT:  -- and then you be quiet.
19           MR. POGUST:  And which question do you
20   want him to answer?
21       Q.   Answer the question.
22           MR. POGUST:  If you can.
23       A.   Which question?
24       Q.   You have three MRI reports that have been
25   produced in this litigation.  All of them saying you

12  (Pages 42 to 45)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

46

1  did not have intracranial hemorrhage.  And yet you go
2  running around telling everybody that that's why you
3  failed the WWE and you make that allegation in this
4  lawsuit that you had an intracranial hemorrhage,
5  don't you?
6      A.  Yes.
7          MR. POGUST:  Objection.
8      Q.  Despite the fact that every piece of
9  objective evidence says that that is false?
10         MR. POGUST:  Objection.
11     A.  Yes.
12     Q.  Right?
13         Did you show these reports to your
14 fiancee?
15     A.  Yes.
16     Q.  And did she read them to say that they
17 don't have an intracranial hemorrhage?
18     A.  I don't remember.
19     Q.  Did you ask her, well, why are you
20 telling me this when these documents say I don't have
21 it?
22     A.  I don't remember.
23     Q.  When did you last talk to her about it?
24     A.  I don't remember.
25     Q.  Well, how do you remember talking to her

47

1  about it if you don't remember any of this?
2      A.  It's not something that you forget having
3  a brain injury.
4      Q.  Well, you're making the whole thing up,
5  you didn't have an intracranial hemorrhage.
6          MR. POGUST:  Objection.
7      Q.  It's not something you forget, it's
8  you're making it up.
9          MR. POGUST:  Objection.  Is that a
10     question or are you arguing with him?
11     Q.  When did you first --
12         MR. POGUST:  Is that a question?
13     Q.  When did you first speak to her about her
14 interpretation of these records?
15     A.  We don't talk about the records.
16     Q.  Well, when did she first tell you that
17 she heard Dr. Greenberg and what she thought
18 Dr. Greenberg tell you was that you had an
19 intracranial hemorrhage, when did she first tell you
20 that?
21     A.  I don't remember.
22     Q.  Well, was it before you brought the
23 lawsuit?
24     A.  Yes.
25     Q.  And were you aware that issues came up

48

1  during this lawsuit about the accuracy of that
2  statement?
3      A.  No.
4      Q.  You weren't told that that was questioned
5  before the court as to whether that was an accurate
6  statement?
7      A.  No.
8      Q.  And your lawyers have known about that
9  since June of last year that we were challenging that
10 that was an incorrect statement?
11     A.  No.
12     Q.  This is the first time you learned that,
13 too?
14     A.  Yes.
15         MR. McDEVITT:  Give me the MRI reports.
16         (MRI Report for Exam Date 11/14/2012
17     marked as Singleton Exhibit 1, as of this
18     date.)
19 BY MR. McDEVITT:
20     Q.  I've handed you what's been marked as
21 Singleton Exhibit No. 1.  Do you recognize that, sir,
22 as one of the three MRIs that you indicated were done
23 on you?
24     A.  No, I never really looked at the
25 paperwork.

49

1      Q.  Well, let's look at it now.  Do you
2  recognize that at the top of this it says the
3  requesting provider was Dr. Chris Amann.  Do you see
4  that at the top there, right here?
5      A.  Yes.
6      Q.  And you know who Dr. Amann is, correct?
7      A.  Yes.
8      Q.  He was a WWE doctor?
9      A.  Yes.
10     Q.  And do you recall having this MRI done?
11     A.  No.
12     Q.  But you do recall having three MRIs done,
13 correct?
14     A.  Yes.
15     Q.  All right.  And do you see under the --
16 where it says Findings on the bottom of the page?
17     A.  Yes.
18     Q.  Do you see the statement where it says:
19 Parenchyma otherwise has normal signal intensity,
20 without midline shift, mass effect, hemorrhage or
21 edema?
22     A.  Yes.
23     Q.  All right.  And are you telling me this
24 is the first time you've actually seen this report?
25     A.  Yes.

13 (Pages 46 to 49)

50

1     Q.   So in all of this litigation none of your
2  lawyers have asked you to look at this report?
3     A.   No.
4     Q.   None of them talked with you about it?
5     A.   No.
6          (MRI Report for Exam Date 11/29/2012
7  marked as Singleton Exhibit 2, as of this
8  date.)
9  BY MR. McDEVITT:
10    Q.   I'm showing you what's been marked as
11 Exhibit 2.  Have you ever seen this document before,
12 Mr. Singleton?
13    A.   No.
14    Q.   This is the second MRI that you had done
15 in Florida.  Do you see who the referring physician
16 is there, Dr. Greenberg?
17    A.   Yes.
18    Q.   Do you remember him?
19    A.   No.
20    Q.   You don't remember treating with
21 Dr. Greenberg?
22    A.   No.
23    Q.   Do you remember the physician in Florida
24 that cleared you to go back and perform?
25    A.   No.

51

1     Q.   And do you see under Cerebral
2  Hemispheres, midway down on the page, it says, quote:
3  No intracranial mass lesion, shift of the midline
4  structures, or intracranial hemorrhage as identified?
5     A.   Yes.
6     Q.   Do you understand what that means?
7     A.   No.
8     Q.   You don't have a intracranial hemorrhage
9  is what it means.
10         MR. POGUST:  Objection.  It's not a -- is
11 that a question?
12    Q.   You don't understand that's what that
13 means?
14    A.   I do now.
15         MR. POGUST:  After seeing the report.
16         THE WITNESS:  Right.
17         MR. POGUST:  Of Dr. Greenberg.
18 BY MR. McDEVITT:
19    Q.   So when you brought this lawsuit and you
20 made the allegation that you had an intracranial
21 hemorrhage, did you tell the people who were drafting
22 the lawsuit that that allegation was based on what
23 your fiancee was telling you the doctor told you?
24    A.   No.
25    Q.   Where did that allegation come from in

52

1  the lawsuit then?
2     A.   What?
3     Q.   That you had an intracranial hemorrhage.
4  You made that in every complaint that you've filed so
5  far.  On what basis was that statement made?
6     A.   My fiancee's word.
7     Q.   And did you pass that on to the drafters
8  of the complaint?
9     A.   Yes.
10    Q.   That this was coming from your fiancee's
11 word?
12    A.   Yeah.
13    Q.   Not the medical records?
14    A.   I don't know.
15    Q.   Did you give any of these medical records
16 to your lawyers before this lawsuit was brought?
17    A.   Everything that was in my possession,
18 yes.
19    Q.   Did you have these MRI reports in your
20 possession?
21    A.   I had the CD-ROMs.
22    Q.   Of the MRI reports?
23    A.   Yes.
24    Q.   So you gave those to your lawyers before
25 this lawsuit was even brought?

53

1     A.   Yeah.
2          MR. McDEVITT:  Mark those.
3          (MRI Report for Exam Date 2/24/2015
4  marked as Singleton Exhibit 3, as of this
5  date.)
6          THE WITNESS:  Thank you.
7  BY MR. McDEVITT:
8     Q.   I'm showing you what's been marked as
9  Exhibit 3, sir.  This is a report of a 2015 MRI.  Do
10 you recall having this one done?
11    A.   Who is this by?
12    Q.   Dr. Chen.
13    A.   Chen?  Oh, yes.
14    Q.   He was the one who ordered it, I should
15 say.
16    A.   Yes.
17    Q.   Why did you want to have another one done
18 in 2015?
19    A.   I --
20         MR. POGUST:  Objection.
21    A.   I was still having symptoms, and still
22 am.
23    Q.   Did somebody send you to this doctor?
24    A.   Yes.
25    Q.   Who?

14  (Pages 50 to 53)

54

1     A.   My family doctor, Garry Mueller.
2     Q.   All right.  And did this doctor tell you
3  anything about the findings?
4     A.   No.
5     Q.   Did he tell you they were the same as the
6  2012 findings?
7     A.   I don't remember.
8     Q.   Did he tell you you didn't have an
9  intracranial hemorrhage?
10     A.   I don't remember.
11     Q.   Well, did you -- I mean, given your
12  concern about that, did you ask him, did it show
13  whether I have an intracranial hemorrhage?
14     A.   I don't remember.
15     Q.   Well, by this time when you go to this
16  doctor, had your fiancee told you that that's what
17  Dr. Greenberg had told you?
18     A.   I don't remember.
19     Q.   Well, whether you're getting these MRIs
20  with knowledge or belief that you had an intracranial
21  hemorrhage or not.
22     A.   Yes.
23     Q.   So if you were going there thinking
24  that's what you had, then presumably she had told you
25  that before you went to get them?

55

1     A.   Yes.
2     Q.   And yet you didn't ask the doctor after
3  you got it, did they show I had one or not?
4     A.   I don't remember.
5     Q.   So you went to find out.  Did you ask
6  them?
7     A.   I don't remember.
8     Q.   So you went to find out but you don't
9  remember whether you asked him.
10     MR. POGUST:  Objection.
11     Q.   That's your testimony?
12     A.   Yeah, I don't remember.
13     Q.   Are you taking any drugs that affect your
14  memory?
15     A.   No, sir.
16     Q.   Are you deliberately saying you don't
17  remember when you do remember?
18     A.   No.
19     MR. POGUST:  Objection.
20     Q.   You realize it's perjury to say you don't
21  remember if you do?
22     A.   Yes, sir.
23     (Followup Note on Evan Singleton dated
24  December 10, 2012, marked as Singleton Exhibit
25  4, as of this date.)

56

1     THE WITNESS:  Thank you.
2  BY MR. McDEVITT:
3     Q.   I'm showing you a note that's been
4  produced in this litigation.  Take a minute to take a
5  look at this document.  And the first question I'm
6  going to ask you is:  You mentioned a CD-ROM that you
7  gave, I think, to your lawyers; is that right?
8     A.   Yes.
9     Q.   With medical records on it.  Was this one
10  of the ones that was on the records?
11     A.   I don't know.
12     Q.   How did you prepare the CD-ROM?
13     A.   In the same paper packaging that it was
14  given to me by the doctor.
15     Q.   I'm not sure I understand, sir, explain,
16  if you could.
17     A.   When I got the results, they gave me a
18  CD-ROM that had the scan on it, and they put that in
19  a little paper packaging kind of thing.  You know
20  what I'm talking about?
21     Q.   No, but go ahead.
22     A.   Well, they have it in a little paper
23  packaging thing.  It's like the cheapest solution
24  they have.  But --
25     MR. POGUST:  It holds the CD.

57

1     A.   Yeah, it holds the CD.  That was given to
2  me and that -- in that same packaging that they gave
3  it to me, that's how I gave it to them.
4     Q.   And was this from one doctor that gave
5  you or was this all the medical providers?
6     A.   I only received two CD-ROMs.
7     Q.   And who did you receive them from?
8     A.   I don't remember where the first one was
9  from.  The second one I believe was from Rogers.
10     Q.   Rogers.  All right.  Have you had a
11  chance to read Exhibit 4?
12     A.   (Reads.)  Yes.
13     Q.   Do you recall having read this and
14  Dr. Greenberg reviewing with you the MRI findings?
15     A.   No.
16     Q.   Do you dispute when he says here that he
17  reviewed the MRI findings with you?
18     A.   Don't remember.
19     Q.   You don't remember either way.  So if he
20  says he told that you did not have an intracranial
21  hemorrhage, you no memory of which to dispute that,
22  right?
23     A.   I don't remember, yeah.
24     Q.   Do you have any reason to think that
25  Dr. Greenberg would falsify the results of a test

15  (Pages 54 to 57)

58

1  when he spoke to you?
2      A.  I don't know.
3      Q.  Do you have any reason to think that he
4  did?
5      A.  Not that I know of.
6      Q.  Did he seem to be a doctor that cared
7  about your welfare?
8      A.  I don't remember.
9          (Neurological Examination dated
10  2/17/2015 marked as Singleton Exhibit 5, as of
11  this date.)
12  BY MR. McDEVITT:
13      Q.  I'm showing you what's been marked as
14  Exhibit 5, Mr. Singleton.  Take a minute and just
15  look at the document.  I only have a very narrow
16  question, but first:  Have you ever seen this
17  document before?
18      A.  No.
19      Q.  This is from the files of Dr. Wu Chen,
20  the person who was involved in the 2015 MRI?
21      A.  Okay.
22      Q.  And do you recall Dr. Mueller?
23      A.  Yeah.
24      Q.  Who's Dr. Mueller?
25      A.  My family doctor.

59

1      Q.  All right.  And did you tell Dr. Mueller
2  that you had an intracranial hemorrhage?
3      A.  Yes.
4      Q.  Did you tell him that that was based on
5  what your fiancee told you?
6      A.  I don't remember.
7      Q.  Well, what do you tell him is the source
8  of that information?
9      A.  They usually don't ask.
10      Q.  So you just go in and say, I had a brain
11  bleed and I have an intracranial hemorrhage, and they
12  don't say, well, what's the basis for that?
13      A.  Yeah.
14      Q.  They take your word?
15      A.  Yeah.
16      Q.  And would you agree with me, sir, that if
17  you don't have that condition by saying that you do
18  makes it sound like your situation is far more
19  serious than it really is?
20      A.  I don't know.
21          MR. POGUST:  Objection.
22      Q.  You don't know that when you tell people
23  that information?
24      A.  Yeah.
25      Q.  All right.  That sounds pretty serious,

60

1  doesn't it, I had a brain bleed?
2      A.  Yeah.
3      Q.  But if you didn't have a brain bleed,
4  then you're telling them false information.
5          MR. POGUST:  Objection.
6      Q.  Correct?
7      A.  Yeah.
8      Q.  And how do you expect to get accurate
9  medical treatment if you're providing false
10  information to your doctors?
11          MR. POGUST:  Objection.
12      A.  I don't know.
13      Q.  The object isn't to get accurate medical
14  treatment, is it?
15          MR. POGUST:  Objection.
16      Q.  It's to pretend that you have a more
17  serious injury than you really do?
18          MR. POGUST:  Objection.  You don't have
19  to answer that.
20      A.  No, sir.
21      Q.  It says here, quote:  He was told that he
22  had a brain or had a bled on his brain before.  Do
23  you see that?  Right up here in the top part of the
24  document.
25      A.  Yes.

61

1      Q.  Did you tell him who told you that?
2      A.  Not that I remember, I don't know.
3      Q.  And that's the way you put it, that he
4  had bled on his brain before, correct?
5      A.  I don't remember.
6          (Neurological Examination dated
7  3/23/2015 marked as Singleton Exhibit 6, as of
8  this date.)
9  BY MR. McDEVITT:
10      Q.  I show you Exhibit 6, Mr. Singleton.
11  And, again, my question is more narrow.
12          At the bottom of Subjective, do you see
13  the last sentence there?
14      A.  The personal habits?
15      Q.  No, no, no.  Under Subjective right here.
16      A.  Oh.
17      Q.  Do you want to read what that says?
18      A.  Reviewed MRI and brain currently, which
19  is unremarkable, and compared to prior MRI of brain
20  from 2012 which is unchanged.
21      Q.  All right.  And did he tell you that?
22      A.  Who is this?
23      Q.  It's the doctor who did the MRI or
24  Dr. Mueller, did they tell you the results of this?
25      A.  I don't remember.

16  (Pages 58 to 61)

62

1      Q.   You don't remember being relieved that a
2  doctor would tell you that the suspicion you had or
3  the thought that you had that you had an intracranial
4  hemorrhage wasn't correct?
5      A.   I don't remember.
6      Q.   Does that relieve you to know that?
7      A.   Yeah.
8      Q.   I mean, are you glad?  Are you glad or
9  are you sad that you don't have it?
10     A.   I'm glad.
11     Q.   So it took you to walk in this room to
12 realize you don't have an intracranial hemorrhage?
13     A.   I don't remember.
14     Q.   Well, have you learned something that
15 makes you happy today?
16     A.   Yeah.
17     Q.   And up until you walked in here, nobody
18 walked, none of your lawyers walked through these
19 reports with you and said you don't have an
20 intracranial hemorrhage?
21     A.   I don't remember.
22     Q.   You don't remember if your lawyers had
23 asked you --
24     A.   No, sir.
25     Q.   -- where you get the idea of an

63

1  intracranial hemorrhage?
2          MR. POGUST:  Objection.  Don't answer the
3  question.  Jerry, you know that's inadmissible.
4          MR. McDEVITT:  On the basis of what?
5          MR. POGUST:  Attorney-client.
6          MR. McDEVITT:  Client fraud.
7          MR. POGUST:  Excuse me?
8          MR. McDEVITT:  Client fraud.  You're
9  making allegations in a lawsuit that have no
10 basis in fact.
11         MR. POGUST:  You can bring that in front
12 of the judge.  Go for it.
13         MR. McDEVITT:  And he's already told you,
14 you have the records, he's already testified
15 you have the very records.
16         MR. POGUST:  You're asking him what we
17 discussed and I'm telling him not to answer.
18         MR. McDEVITT:  The subject --
19         MR. POGUST:  Do what you want.  I'm not
20 going to argue with you.  All right?  Do what
21 you want.
22         MR. McDEVITT:  We will.
23         MR. POGUST:  That's fine.  You do it all
24 the time, I see that.  Unbelievable.
25         MR. McDEVITT:  What's unbelievable is

64

1  that guys --
2          MR. POGUST:  Jerry, I don't want to talk
3  to you.  Ask your question.
4          MR. McDEVITT:  Well, you're the one who
5  brought it up.
6          MR. POGUST:  I don't --
7          MR. McDEVITT:  What's unbelievable is
8  that you make that allegation --
9          MR. POGUST:  Ask him the question.
10         MR. McDEVITT:  -- in three different
11 complaints.
12         MR. POGUST:  Ask him the question.  We're
13 in a deposition.  We can argue in front of the
14 judge, trust me.
15 BY MR. McDEVITT:
16     Q.   So going back then, Mr. Singleton, to
17 after you get hurt on September 27th and the WWE
18 sends you to these various doctors, at some point am
19 I correct that Dr. Greenberg indicated that you were
20 okay to return to duty?
21     A.   I don't remember.
22     Q.   Did you go back some time in February and
23 run the ropes, more or less?
24     A.   I don't remember.
25     Q.   Well, after you got hurt, did you ever

65

1  wrestle again?
2      A.   No.
3      Q.   Never.  All right.  Do you recall -- so
4  you never did any kind of ring workouts?  Nothing?
5      A.   I don't remember.
6      Q.   Okay.  Do you recall being asked to go do
7  a photo shoot in Orlando?
8      A.   I don't remember.
9          THE WITNESS:  Bless you.
10     Q.   Did you claim subsequently that you were
11 driving to Orlando and you got -- your symptoms
12 returned?
13     A.   I don't remember.
14     Q.   Do you always have these kind of memory
15 problems?
16     A.   Oh, yeah.
17     Q.   You do.  Have they been part of your
18 problems all your life?
19     A.   No.
20     Q.   Just recently?  Just recently?
21         MR. POGUST:  You have to say yes.
22     A.   Yes.
23     Q.   And when was the onset of these memory
24 problems?
25         MR. POGUST:  When did they start.

17 (Pages 62 to 65)

66

1    THE WITNESS: Oh.
2    A.   After the accident happened.
3    Q.   So you -- well, what -- does your memory
4  not go back so far?
5    A.   My memory goes back to before the injury.
6  After, it is very blurry.
7    Q.   Very blurry.  So what, you don't remember
8  nothing?
9        MR. POGUST:  Objection.
10   A.   Not nothing, but a lot, most.
11   Q.   Well, how long is your memory bad after
12 the accident, how many months?
13   A.   Well, after the accident, two weeks after
14 that I still remember absolutely nothing.  Zero.
15   Q.   Nothing?
16   A.   Nothing.
17   Q.   When did you meet your fiancee?
18   A.   I would say maybe February or March of
19 2012.
20   Q.   Twelve.
21   A.   Twelve.
22   Q.   Where did you meet her at?
23   A.   The gym.
24   Q.   What -- did she have a job?
25   A.   Yeah.

67

1    Q.   What was her job?
2    A.   She was the front desk counter girl.
3    Q.   And your injury was on September 27th,
4  when did you get engaged?
5    A.   I want to say October.
6    Q.   October what?
7    A.   I don't remember the exact date.
8    Q.   Was it early October?
9    A.   I think.
10   Q.   October 8 sound familiar to you?
11       MR. POGUST:  You have to answer.
12   A.   I don't, I don't remember.
13   Q.   Did you decide to get engaged before or
14 after you got your alleged concussion?
15       MR. POGUST:  Objection.
16   A.   Before.
17   Q.   Before.  So you then got engaged to be
18 married during a time where you claim you don't
19 really remember much; is that right?
20   A.   Yes.
21   Q.   And when you gave your previous
22 deposition in your workmen's comp case, you claimed
23 you didn't even remember when you got engaged, right?
24   A.   I don't, I don't remember that.
25   Q.   You couldn't recall it?

68

1    A.   No.
2    Q.   You couldn't recall --
3        MR. POGUST:  Objection.  I'm just
4  clarifying.  Do you mean the engagement or the
5  testimony in the workers' comp case?
6        MR. McDEVITT:  I'm not sure what
7  you're --
8        MR. POGUST:  You asked -- you're
9  asking -- you told him what he testified to in
10 his workers' comp case.
11       MR. McDEVITT:  Yeah.
12       MR. POGUST:  And then you said, do you
13 recall it.  I don't know if you're asking him,
14 do you recall giving the testimony in the
15 workers' comp case or do you recall in the
16 engagement.
17       MR. McDEVITT:  Well, let's rephrase it.
18       MR. POGUST:  Yeah.
19 BY MR. McDEVITT:
20   Q.   You testified in the workers' comp
21 proceedings that you didn't even remember where you
22 got the ring, right?
23   A.   I don't remember.
24   Q.   Did you get the ring before or after you
25 got a concussion?

69

1    A.   Oh, I don't remember that.
2    Q.   Did you at the time you were performing
3  for WWE, did you maintain any social media accounts?
4    A.   I'm sorry, can say the question again?
5    Q.   Sure.  When you were performing for WWE
6  under your contract.
7    A.   Okay.
8    Q.   Did you have any social media accounts?
9    A.   Yes.
10   Q.   What did you have?
11   A.   I used my Facebook.  I created a Twitter
12 account.  Yeah.
13   Q.   Anything else?
14   A.   Well, I got Instagram, but that wasn't
15 really too much WWE stuff.
16   Q.   All right.  Anything else?
17   A.   Not that I can recall, no.
18   Q.   What about your fiancee, does she
19 maintain any social media sites?
20   A.   No.
21   Q.   Not a Facebook page?
22   A.   She has one but she doesn't use it.
23   Q.   Did she post anything on there about your
24 activities?
25   A.   I don't know.

18 (Pages 66 to 69)

70

1  Q.   Did you post anything on your Facebook
2  account about your activities?
3  A.   Activities meaning?
4  Q.   Well, let's say with her.
5  A.   Maybe, I don't know.
6  Q.   Did you post anything on your social
7  media accounts about WWE?
8  A.   I -- I don't know.
9  Q.   Well, how about your Twitter account?
10 A.   I never used my Twitter account.  I think
11 I posted once.
12 Q.   You never used your Twitter account?
13 A.   I think I used it once.
14 Q.   When did you use it?
15 A.   When I was at a restaurant.
16 Q.   Did somebody else use your Twitter
17 account?
18 A.   Not that I know of.
19 Q.   Do you still have your Twitter account?
20 A.   I never closed it, I don't think anyway.
21 Q.   Did you download your Twitter messages
22 for your counsel?
23 A.   No.
24 Q.   Have you produced your social media on
25 Instagram or Facebook or Twitter to your counsel in

71

1  this case?
2  A.   Yes.
3  Q.   You did?
4  A.   What -- wait, what was the question
5  again?
6  Q.   Sure.  You can make copies of your
7  Facebook pages, right?
8  A.   Me?
9  Q.   Well, did you?
10 A.   I did not, no.
11 Q.   Did you make copies of your Twitter
12 pages?
13 A.   No.
14 Q.   Did you make copies of your Instagram
15 pages?
16 A.   No.
17 Q.   Have you been asked to preserve that
18 evidence by anybody?
19 A.   Not that I remember, I don't know.
20 Q.   Have you deleted anything since you
21 brought this lawsuit?
22 A.   No.
23 Q.   So everything you ever posted on Twitter
24 should still be there?
25 A.   I don't know.

72

1  Q.   Well, did anybody ask you to review your
2  Twitter account to see if there were activities on that
3  account that should have been produced in response to
4  our request that you produce evidence in this case?
5  A.   I don't remember.
6  Q.   Did you review it to do that?
7  A.   I don't remember.
8  Q.   Have you ever been diagnosed with a
9  psychiatric problem?
10 A.   No.
11 MR. POGUST:  Objection.
12 MR. McDEVITT:  What's your objection?
13 MR. POGUST:  Are you talking depression
14 or are you talking about schizophrenia?
15 MR. McDEVITT:  I asked if he's ever been
16 diagnosed with a psychiatric problem?
17 MR. POGUST:  That's a pretty open-ended
18 question.
19 MR. McDEVITT:  It's intended to be.
20 There's nothing wrong with an open-ended
21 question.
22 MR. POGUST:  Go for it.
23 BY MR. McDEVITT:
24 Q.   And your answer is, you don't think you
25 have been?

73

1  A.   I don't know.
2  Q.   Does psychiatric disorders run in your
3  family?
4  A.   Yes.
5  Q.   Your sister is bipolar?
6  A.   Uh-hum.
7  Q.   Any other?
8  A.   I honestly don't know.
9  Q.   The day after your workmen's comp
10 deposition, which was November 14th, did you go to
11 the emergency room of a hospital?
12 A.   I don't remember.
13 Q.   Do you remember having a panic attack?
14 A.   I don't remember.
15 Q.   And that would be November of 2015.
16 You're claiming your mind is such that you don't even
17 remember what you did in November of 2015?
18 A.   No.
19 Q.   You don't remember if you had a panic
20 attack and went into a hospital because of a fight
21 with your fiancee?
22 A.   No.
23 Q.   As I sit here and talk to you about it,
24 does that bring back any memories?
25 A.   No.

19  (Pages 70 to 73)

74

1    Q.   So even saying it to you now, you have no
2    memory of going to the hospital on November 15th and
3    complaining about a panic attack after an argument
4    with your fiancee?
5        A.   I don't remember.
6        Q.   Do you remember having any arguments with
7    your fiancee?
8            MR. POGUST: Objection. Ever?
9        A.   Well, I --
10       Q.   Well, let's start with ever.
11           MR. POGUST: Okay.
12       A.   I -- I don't remember.
13       Q.   You don't remember if you've ever had an
14   argument. Is that your intention to say you don't
15   remember everything that I ask you today, is that
16   what you're going to do?
17       A.   If you ask me questions to -- if you ask
18   me questions I don't remember, then yes.
19       Q.   So you don't remember if you ever had an
20   argument with your fiancee?
21       A.   I'm sure we have, we're in a
22   relationship.
23       Q.   All right. So do you remember anything
24   in November that made you go to an emergency room
25   after?

75

1        A.   No, I don't remember.
2        Q.   Did your fiancee ever threaten to go back
3    to Florida?
4        A.   I don't remember.
5        Q.   You wouldn't remember if your fiancee
6    said, I'm leaving you and I'm going back to Florida?
7        A.   I don't know.
8        Q.   Your mind doesn't remember if she's ever
9    said that?
10       A.   No.
11       Q.   Either way?
12       A.   No.
13       Q.   So if she told you that last night, you
14   wouldn't even remember that?
15       A.   I don't remember, no.
16           (Emergency Room Visit 11/15/2014 Report
17       marked as Singleton Exhibit 7, as of this
18       date.)
19           THE WITNESS: Thank you.
20   BY MR. McDEVITT:
21       Q.   Let me show you what's been marked as
22   Exhibit 7, Mr. Singleton, and ask you if that
23   refreshes your recollection that you went to the
24   emergency room on November 15th of 2014.
25       A.   Does it refresh my memory?

76

1        Q.   Yes, sir.
2        A.   No.
3        Q.   It indicates here that patient -- and
4    it's referring to you -- is a 22-year-old male
5    presenting following concern for an anxiety/panic
6    attack. He reports that he was in an argument when
7    he developed some chest discomfort, became short of
8    breath and had cramping of his upper extremities.
9    His symptoms have since resolved. He denies having
10   and these episodes in the past. Patient does not
11   have any known cardiac history. Patent additionally
12   reports a headache currently. He is supposed to be
13   on multiple medications for depression but has not
14   been taking them. Do you see that?
15       A.   Yes.
16       Q.   Do you recall going to the hospital and
17   telling the ER people that?
18       A.   No.
19       Q.   So, as you sit there today, you have
20   absolutely no memory of being in that hospital
21   whatsoever?
22       A.   No.
23       Q.   None?
24       A.   No.
25       Q.   Do you have any memory of having a panic

77

1    attack?
2        A.   No.
3        Q.   None?
4        A.   No.
5        Q.   And do you recall telling the medical
6    people that you were supposed to be on multiple
7    medications for depression but haven't been taking
8    them?
9        A.   No.
10       Q.   No?
11       A.   No.
12       Q.   Are you supposed to be on multiple
13   medications for depression?
14       A.   I don't --
15           MR. POGUST: Today? Objection. Today?
16           MR. McDEVITT: Well, let's talk about at
17       that time.
18   BY MR. McDEVITT:
19       Q.   In November of 2014, were you supposed to
20   be on multiple medications for depression?
21       A.   I don't remember.
22       Q.   Were you on them or not?
23       A.   I don't remember.
24       Q.   Are you on them today?
25       A.   No.

20  (Pages 74 to 77)

78

```
 1      Q.   So you do remember that?
 2      A.   I didn't take any pills this morning.
 3      Q.   Did you take any yesterday?
 4      A.   I don't remember.
 5      Q.   You don't remember if you took any pills
 6  yesterday?
 7      A.   No.
 8      Q.   Do you remember what you did yesterday?
 9      A.   I was on the phone with these guys.
10      Q.   What else did you do?
11      A.   Went to work.
12      Q.   And what else?
13      A.   That's it.  That's all I remember.
14      Q.   That's all you remember.  Do you remember
15  what you ate yesterday?
16      A.   No.
17      Q.   No.  That's how your mind works these
18  days, you can't remember even what you ate yesterday?
19          MR. POGUST:  Objection.
20      Q.   Is that right?  That's your testimony?
21      A.   Yeah.
22      Q.   Did you stop taking medications when you
23  came back to Pennsylvania?
24      A.   I don't remember.
25      Q.   Well, do you remember there being a time
```

79

```
 1  when you decided, I'm not going to take these
 2  medicines anymore?
 3      A.   I don't remember.
 4      Q.   Well, you're either taking them or not,
 5  right?
 6      A.   Yes.
 7      Q.   When was the last time you remember
 8  taking them?
 9      A.   I don't remember.
10      Q.   This goes on then to say, on page 3, it
11  says:  He was reporting symptoms of a panic attack
12  elicited by an argument with his girlfriend.  Do you
13  see that?
14      A.   Is it the second page?
15      Q.   The last page.
16      A.   Okay, yeah.
17      Q.   Have you ever had a panic attack before?
18      A.   I don't remember.
19      Q.   Have you had any since?
20      A.   I don't remember.
21      Q.   Did you have any yesterday?
22      A.   I don't remember.
23      Q.   So you could have had a panic attack
24  yesterday but you don't remember?
25      A.   I don't remember having one yesterday.
```

80

```
 1      Q.   Did you have one within the last three
 2  hours?
 3      A.   I don't remember.
 4      Q.   You don't even remember if you had one
 5  within the last three hours?
 6      A.   I didn't have one in the last three
 7  hours.
 8      Q.   How about the last 12 hours, do you
 9  remember if you had one?
10      A.   I don't remember, dude, I don't.
11      Q.   I'm not a dude.
12      A.   Excuse me.  I -- I apologize, sir.
13      Q.   So you don't even remember in the last 12
14  hours whether you had a panic attack?
15      A.   No.
16      Q.   And it's your testimony you recall
17  absolutely nothing about the argument you had with
18  your fiancee as reported in there?
19      A.   Yeah, I don't remember.
20      Q.   Did you indicate to her that you were
21  dropping your workmen's comp claim?
22      A.   I don't remember.
23      Q.   Has she expressed concern to you about
24  your income?
25      A.   I don't remember.
```

81

```
 1      Q.   Has she ever had arguments with you about
 2  you're not making any money?
 3      A.   I don't remember.
 4      Q.   Do you have a date to get married?
 5      A.   No.
 6      Q.   You've been engaged now for four years?
 7      A.   Yes.
 8      Q.   Why do you have no date to get married?
 9          MR. POGUST:  Objection.
10      A.   I don't know.
11      Q.   Have you talked about it?
12      A.   Not really.
13      Q.   She hasn't asked for, why aren't we
14  getting married?
15      A.   No.
16      Q.   In any event, sir, after going back
17  through sort of a rough chronology of your time down
18  at WWE.  After you got your alleged concussion on
19  September 27th, I think you've indicated that the WWE
20  sent you to a variety of different doctors and you do
21  remember that, correct?
22      A.   Yes.
23      Q.   And you do remember that you never
24  wrestled again, correct?  I think you just testified.
25      A.   Yes.
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

82

1      Q.   And so for the next two years you were
2    down there, am I correct that the WWE paid you?
3      A.   Yes.
4      Q.   Sent you to doctors to try to find out
5    what was wrong with you.
6      A.   Yes.
7      Q.   Correct?
8           Did you at some point in all of that
9    learn that the WWE wanted to fire you?
10     A.   I don't remember.
11     Q.   You didn't hear that they were going to
12   get rid of you?
13     A.   I don't remember.
14     Q.   Were they urging you to get back to work?
15     A.   Yes.
16     Q.   You do remember that?
17     A.   Yes.
18     Q.   What do you remember about that?
19     A.   Text messages and phone calls from Bill
20   DeMott.
21     Q.   Do you still have those text messages?
22     A.   No.
23     Q.   What did you do with them?
24     A.   They got deleted when I got a new phone.
25     Q.   What did you do with your old phone?

83

1      A.   Threw it out.
2      Q.   When did you get a new phone?
3      A.   I've gotten a couple of phones since
4    then.
5      Q.   Well, when did you get the phone
6    replaced, the one that had the messages from DeMott?
7      A.   I don't remember.
8      Q.   Where is that phone today?
9      A.   I don't know.
10     Q.   Did you throw it out?
11     A.   Probably, yeah.
12     Q.   And what do you remember the messages
13   saying?
14     A.   Coaxing me to get back to training.  Get
15   back -- get back to work pretty much.
16     Q.   All right.  And did you respond to them?
17     A.   Yeah.
18     Q.   What did you say?
19     A.   I pretty much let him know how my
20   condition was and I let him decide from there whether
21   I should come back or not.
22     Q.   And you never came back, did you?
23     A.   No.
24     Q.   And did you know at the time you were
25   down there that as long as you were reporting that

84

1    you had symptoms of an alleged concussion, that you
2    would not be allowed back in the ring?
3      A.   I'm sorry, can you say that again?
4      Q.   Sure.  Did you know when you were down
5    there that as long as you were reporting that you
6    still had symptoms from an alleged caution, you would
7    not be allowed to be -- return to the ring?
8      A.   Okay.
9      Q.   Did you know that?
10     A.   Yes.
11     Q.   And how did you know that?
12     A.   I was told that.
13     Q.   By whom?
14     A.   Chris Amann.
15     Q.   Chris Amann.
16     A.   Yeah.
17     Q.   So Dr. Amann told you that as long as you
18   were symptomatic you would not be permitted to
19   wrestle again, correct?
20     A.   Yeah.
21     Q.   When did he tell you that?
22     A.   I don't remember.
23     Q.   All right.  And so you knew as long as
24   you continued to say, I have headaches or memory
25   problems or subjective symptomology, you weren't

85

1    going to be put back in that ring, right?
2      A.   Yes.
3      Q.   You knew that for the entire two years
4    you didn't go back in the ring, right?
5      A.   Yes.
6      Q.   There's been allegations made in this
7    complaint that at some point you made statements to
8    the effect that you felt like a crash dummy.
9      A.   Yes.
10     Q.   Did you make that statement?
11     A.   Yes.
12     Q.   To who?
13     A.   I don't remember.
14     Q.   Well, who did you make it to?  Did you
15   make it to -- let me rephrase that.
16          Did you tell anybody at WWE you felt like
17   a crash dummy?
18     A.   No.
19     Q.   Well, who did you tell that to?
20     A.   My fiancee and my lawyers.  To the best
21   my recollection, that's it.
22     Q.   When did you tell your fiancee that?
23     A.   Probably when I was practicing.
24     Q.   So this would have been before your
25   alleged injury in September 27th?

22  (Pages 82 to 85)

86

1    A.   Yes.
2    Q.   So even before the injury you were
3  telling people you felt like a crash dummy?
4    A.   Yes.
5    Q.   What does that mean?
6    A.   Well, a lot of the newer guys would come
7  in and I would just get thrown with the newer guys
8  who were stiff and didn't know what they were doing.
9  Pretty much I was just sent in there to work with
10  them and not really given the opportunity to
11  progress.
12    Q.   But what does it mean to say you felt
13  like a crash dummy?
14    A.   If someone wanted to try out there move
15  or, like, they wanted to, like, grapple with somebody
16  or it was like their first day or whatever, they'd be
17  sent -- they'd be sent to me.
18    Q.   What does it mean to be a jobber?
19    A.   To lose a match on purpose to make the
20  other -- your opponent look good.
21    Q.   And that's what you were doing, isn't it?
22    A.   Yes.
23    Q.   And you didn't like that, did you?
24    A.   It was my job.
25    Q.   You thought you should be a star, didn't

87

1  you?
2    A.   Yeah.
3    Q.   Didn't you?
4    A.   Yeah.
5    Q.   And you weren't becoming a star, were
6  you?
7    A.   I was doing what I was told.
8    Q.   But you weren't becoming a star, were
9  you?
10    A.   No.
11    Q.   And when you say you felt like a crash
12  dummy, does that mean that you were surprised by the
13  physicality of being a professional wrestler?
14    A.   I don't know.
15    Q.   Did you like taking bumps?
16    A.   I'm indifferent either way.
17    Q.   Did you find it to be more physically
18  demanding than what you thought it was going to be?
19    A.   No.
20    Q.   Did you find it more physically demanding
21  than, say, amateur wrestling?
22    A.   No.
23    Q.   Did you like getting choke slammed?
24    A.   No.
25    Q.   Why didn't you like that?

88

1    A.   It gave me a brain injury.
2    Q.   Well, before that, you did, right?  You
3  did that move before that, right?
4    A.   Five minutes before the match.
5    Q.   You did another, another match with him
6  before that, months before, didn't you?
7    A.   Not that I remember, no.
8    Q.   Not that you remember.  If we have
9  videographic evidence that you did, would you dispute
10  that?
11    A.   I don't know.
12    Q.   You know how to do that move, right?
13    A.   I practiced it.
14    Q.   You knew it was a move you were going to
15  do the minute you signed up with the WWE, right?
16    A.   I didn't know I was going to be doing
17  that move specifically, but.
18    Q.   You had seen wrestlers do it.  It's a
19  common staple of wrestling, isn't it?
20    A.   Yes.
21    Q.   It's probably impossible to watch a
22  wrestling show without seeing that move executed
23  several times, isn't it?
24    MR. POGUST:  Objection.
25    A.   I don't know, it depends on what show

89

1  you're watching.
2    Q.   Do you watch Big Show?
3    A.   Ehh.  A little bit, not too much.
4    Q.   Does he do a choke slam?
5    A.   Yes.
6    Q.   Do you watch Undertaker?
7    A.   Little bit.
8    Q.   Does he do a choke slam?
9    A.   Yes.
10    Q.   Kane?
11    A.   Yes.
12    Q.   How many wrestlers do you know do choke
13  slams?
14    A.   Those three actually.
15    Q.   All right.  So --
16    A.   Yeah.
17    Q.   So when you told your fiancee that you
18  felt like a crash dummy, what did she say?
19    A.   I don't remember.
20    Q.   Well, did she sympathize with you?
21    A.   Probably.
22    Q.   Did you guys come up with a plan of
23  action of what you would do because you felt like a
24  crash dummy?
25    A.   I don't remember.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

90

1    Q.   What did you do -- I think September 27th
2  was a Thursday.  Do you recall that?
3    A.   No.
4    Q.   What did you do in two to three days
5  after you got your alleged concussion?
6    A.   I don't remember.
7    Q.   Did you do anything?
8    A.   I don't remember.
9    Q.   Did you go out of the house?
10   A.   I don't remember.
11   Q.   Did you go partying with Candace?
12   A.   I don't remember.
13   Q.   But that wouldn't be typical, would it,
14 if you were home suffering from a concussion and
15 you'd be out partying with Candace, is it?
16       MR. POGUST:  Objection.
17   A.   No.
18   Q.   How did you get from the site of your
19 injury to your home that night on September 27?
20   A.   I was told that my roommate at the time
21 gave me a ride back because I was in no condition to
22 drive.
23   Q.   Teon?
24   A.   Yes.
25   Q.   What did you talk to him about?

91

1    A.   I'm sorry?
2    Q.   What did you talk to him about on the way
3  back?
4    A.   Oh, I don't know.
5    Q.   Did you ask him to stop so you could get
6  some food?
7    A.   I don't know.
8    Q.   Were you aware that people in the WWE,
9  including some of the wrestlers, thought you were
10 faking?
11   A.   Yeah.
12   Q.   And how did that come to your attention?
13   A.   Through one of -- well, actually, through
14 the attitude of a lot of people that I kept in
15 contact with, like Bill DeMott when I was hurt.  I --
16 I heard that from a friend from down in Florida, he
17 helped promote the shows, the local shows.  His name
18 was Alfred.  I don't know what his last name was.
19 But he always kept in contact with the wrestlers and
20 everyone in there and he told me that because he
21 liked me.
22   Q.   Who else told you that?
23   A.   I don't remember.
24   Q.   Do you stay in contact with any of the
25 people you worked with down there?

92

1    A.   No.
2    Q.   Did you make any friends?
3    A.   No.
4    Q.   You didn't make any friends the whole
5  time you were down there you stay in touch with?
6    A.   No.
7    Q.   Have you tried to reach out to any of
8  them?
9    A.   No.
10   Q.   Have any of them tried to call you?
11   A.   No.
12   Q.   In the two years that you weren't
13 performing for WWE after your injury, what did you do
14 with yourself every day?
15   A.   I'm sorry?
16   Q.   What did you do?
17   A.   I -- I don't remember.
18   Q.   Well, you had a lot of time to spend with
19 your fiancee, right?
20   A.   Yes.
21   Q.   So you spent a lot of time with her,
22 right?
23   A.   Yes.
24   Q.   Is she your first serious girlfriend?
25   A.   Yeah.

93

1    Q.   So you were kind of, would it be fair to
2  say, you were sort of enamored with her?
3    A.   I'm sorry, I don't know what that means.
4    Q.   Well, you were obviously smitten, right?
5    A.   Yes.
6        MR. POGUST:  With his fiancee?
7    Q.   How long between -- how long was it from
8  when you -- or, strike that.
9        On your Facebook page, did you announce
10 that you were in a relationship with her?
11   A.   Probably.
12   Q.   What does that mean?
13   A.   You're together.
14   Q.   Is that sort of a way on social media to
15 indicate you've just begun a committed relationship
16 with somebody?
17   A.   I guess, yes.
18   Q.   Well, I'm not asking you to guess, I'm
19 asking what does it mean to you.
20   A.   That you're in an exclusive relationship.
21   Q.   All right.  And that's sort of a way of
22 announcing that to the world?
23   A.   Yeah.
24   Q.   How long was it between when you
25 announced that you were in a committed relationship

24  (Pages 90 to 93)

94

1  with her and when you announced that you were
2  engaged?
3      A.  I don't know.
4      Q.  Does a month sound about right?
5      A.  I -- I don't know.
6      Q.  Well, do you recall it being about a
7  month?
8      A.  I -- I don't know.
9      Q.  So at some point you decided that you
10  were going to leave Florida, right?
11      A.  Yes.
12      Q.  And when was that?
13      A.  I don't remember.
14      Q.  Did you talk to anybody at WWE before you
15  decided to leave Florida?
16      A.  No.
17      Q.  And you decided to discontinue all the
18  medical treatment that you were getting in Florida?
19      A.  Yes.
20      Q.  And you moved back here on your own
21  volition, right?
22      A.  Yes.
23      Q.  Since you moved back to Pennsylvania, are
24  you under the care of any kind of medical doctor for
25  your alleged brain injuries?

95

1      A.  Yes.  The neurologist that did the MRI on
2  me.
3      Q.  Dr. Chen?
4      A.  Yes.  Chen and my family doctor.
5          THE WITNESS:  Bless you.
6      A.  Gary Mueller.
7      Q.  Anybody else?
8      A.  Not to my recollection.
9      Q.  Have you spoken to a Dr. Bennet Omalu?
10      A.  I'm sorry?
11      Q.  Have you spoken to a Dr. Bennet Omalu?
12      A.  I don't know.
13      Q.  You don't know?
14      A.  I don't remember.
15      Q.  Do you know the name?
16      A.  I don't remember.
17      Q.  Well, have you spoken to any doctors that
18  your lawyer recommended you speak to?
19      A.  No.
20      Q.  So are you currently on any kind of
21  medication for your alleged head injuries?
22      A.  No.
23      Q.  So you're currently taking no
24  prescription drugs?
25      A.  No.

96

1      Q.  Not of any kind?
2      A.  No.
3      Q.  How did you prepare for this deposition?
4      A.  Over the phone yesterday.
5      Q.  With who did you speak to?
6      A.  Harris and Kyros.
7      Q.  How long did you take?
8      A.  I don't know.  Hour and a half.
9      Q.  Have you read any of the testimony that's
10  been given in this case by your doctors?
11      A.  I don't remember.
12      Q.  Were you made aware that some of your
13  doctors have been deposed in this case?
14      A.  I -- I don't know.  No.
15      Q.  Have transcripts been given to you of
16  their testimony?
17      A.  I don't remember.
18      Q.  You don't remember somebody handing you a
19  transcript of testimony that was taken within the
20  last couple of weeks?  So your memory doesn't even go
21  back a couple of weeks now; is that right?
22      A.  Yes.
23      Q.  Prior to that conversation yesterday for
24  an hour and a half where you talked to Mr. Kyros and
25  Mr. Pogust, how much time did you spend talking to

97

1  attorneys about the facts of this case?
2      A.  On a regular basis.
3      Q.  Who do you speak to regularly?
4      A.  It goes back and forth between Bill and
5  Harris.
6      Q.  Those two?
7      A.  And occasionally Drew.
8          MR. POGUST:  One of my -- from my office.
9          MR. McDEVITT:  All right.
10  BY MR. McDEVITT:
11      Q.  Have you ever had any meetings with
12  Mr. Kyros in his office?
13      A.  I don't remember.
14      Q.  How about Mr. Pogust?
15      A.  Yes.
16      Q.  Who was present for those meetings?
17      A.  Harris, that's all I remember.
18      Q.  Was your fiancee there?
19      A.  I don't remember.
20      Q.  Was your mother there?
21      A.  I don't remember.
22      Q.  Has your mother been involved in the
23  litigation?
24          MR. POGUST:  Objection.
25      A.  Yes.

25  (Pages 94 to 97)

98

Q.   What does she do?
A.   She does a lot of what Candace helps me do, remember things.  She helps me set up appointments and e-mails and all that.
Q.   Can you name all your attorneys?
A.   Harris.  Kyros.  Drew.  That's all I can remember.
Q.   That's it?
A.   Off the top of my head.
Q.   Do you have other attorneys?
A.   Not that I know of or can remember, no.
Q.   Do you know a person by the name of Clint Woods?
A.   It doesn't sound familiar.
Q.   Have you ever hired him to represent you?
A.   I don't know.
Q.   Do you have any California lawyers representing you that you know of?
A.   No.
Q.   What year did you graduate from high school, sir?
MR. POGUST:  Excuse me.  Jerry, if he needs a break --
THE WITNESS:  Oh, no.  Oh, no, I was just going to ask you if you could grab me a water

99

bottle, please.  Thank you.
MR. McDEVITT:  Do you need a break?
THE WITNESS:  Oh, no, I'm fine, I just wanted --
MR. McDEVITT:  It goes without saying, if you need a break, just tell us.
THE WITNESS:  I appreciate that.  Thank you.
Thank you very much.
BY MR. McDEVITT:
Q.   What year did you graduate from high school?
A.   2011.
Q.   And what are your parents' names?
A.   Donna Singleton and Mitch Singleton.
Q.   I believe you indicated you live with your mother.  Where does your father live these days?
A.   He lives in Lancaster.
Q.   And what year did they get divorced?
A.   It was either 2010 or 2011.  It was -- it was one of them.
Q.   Have you talked about that divorce when you spoke to some of the neuropsychologists and psychiatrists?
A.   I don't remember.

100

Q.   Does it bother you that divorce?
A.   Yeah, it bothered me a little bit, just like it would with anybody.
Q.   As a result of that divorce, you didn't see your mother for years, correct?
A.   Yes.
Q.   When you say yes, does that mean I'm correct, you didn't see her for years?
A.   Yes.  I'm sorry, I hadn't seen here.  I didn't see her in years.
Q.   Where did she go?
A.   I don't know.
Q.   Did you try to stay in touch with her?
A.   Not for that period of time where I wasn't talking to her, no.
Q.   So who were you living with then?
A.   My dad.
Q.   And how did you come back to living with your mother then?
A.   We reconciled.  And when I was living in Florida, she had an apartment that was big enough to house me and Candy.
Q.   In Florida?
A.   In Pennsylvania.
Q.   So when you came back to Pennsylvania,

101

she was the place you and Candy went to?
A.   Yes.
Q.   And that's when you resumed your relationship with her?
A.   Yes.  Yes.
Q.   So she wasn't involved in your life in the two years you were down in Florida?
A.   No.
Q.   So when you were not well --
A.   Not that I remember, no.
Q.   She had no personal knowledge of anything that happened down there, right?
A.   No.
Q.   Did she ever talk to any of your doctors down there?
A.   Well, wait.  No, yeah, she did.  She did go to Nancy Rogers.  She went to an appointment I had with Nancy Rogers with me.  That's right, yeah.
Q.   Why did she go?
A.   She was worried and she wanted to know what was going on.  Like you said, she was outside of the loop and going to a doctor's appointment, yeah.
Q.   I asked you about prescription medications and I think you indicated you're currently not taking any?

26  (Pages 98 to 101)

102

1    A.   Yes.
2    Q.   Does your current doctor know that you
3    discontinued taking a bunch of prescription drugs?
4    A.   I don't know.
5    Q.   Did you tell him?
6        MR. POGUST:  Objection.
7    Q.   Did you tell him?
8    A.   I haven't seen him in a while.
9    Q.   When was the last time you saw him?
10   A.   I don't remember.
11   Q.   So why are you not treating with
12   somebody?
13   A.   I can't afford it.
14   Q.   You don't have insurance?
15   A.   No.
16   Q.   So you didn't obtain health insurance?
17   A.   I'm sorry?
18   Q.   You haven't obtained health insurance
19   despite Obamacare?
20   A.   No.
21   Q.   What are you doing for a living?
22   A.   I'm at a cold storage facility in
23   Lancaster.
24   Q.   And what do you do there?
25   A.   I pick up groceries that get shipped off

103

1    to local grocery stores.  I put them on a cart.  The
2    cart gets wrapped.  I put the cart in the truck.
3    Q.   What does your fiancee do?
4    A.   She works at a Christian-based thrift
5    store in Lancaster.
6    Q.   And so is that the source of your income,
7    is your income and your wife's or your fiancee's
8    income?
9    A.   Yes.
10   Q.   You don't get any kind of disability
11   benefits?
12   A.   No.
13   Q.   Have you applied for any disability
14   benefits?
15   A.   I don't remember.
16   Q.   Do you also compete in body building
17   competitions?
18   A.   I have, yes.
19   Q.   And how many have you competed in?
20   A.   One.
21   Q.   When was that?
22   A.   I think it was June of last -- June of
23   last year.
24   Q.   When the court was being told you were
25   completely disabled?

104

1    A.   I don't know.
2    Q.   Do you consider yourself completely
3    disabled?
4    A.   No.
5    Q.   Well, what was the nature of the body
6    building competition?
7    A.   As far as?
8    Q.   What was it?  Let's start with:  Where
9    was it?
10   A.   New York.
11   Q.   And what did you have to do to prepare
12   for that?
13   A.   I had to strict -- I have a very strict
14   diet and I had a workout regimen that I followed.
15   Q.   And do you take supplements?
16   A.   Yes.
17   Q.   What supplements do you take?
18   A.   Right now?
19   Q.   Well, let's start with when you were
20   doing the body building competition.
21   A.   I had a fat burner.  A testosterone
22   booster.
23       THE WITNESS:  Bless you.
24   A.   Protein powder.  Pre-workout.
25   Q.   Okay.

105

1    A.   Multivitamin.
2    Q.   Uh-hum.
3    A.   B.C.Double A's.  That's a basic amino
4    acid.
5    Q.   Anything else?
6    A.   Off the top -- off the top of my head,
7    that's it.
8    Q.   Is that still the regimen you're
9    following today?
10   A.   No.
11   Q.   Which ones aren't you taking these days?
12   A.   The fat burner, the testosterone booster,
13   and the pre-workout.
14   Q.   But you're still taking the protein
15   powder, the multivitamin and BCAA?
16   A.   Oh, I'm sorry.  I'm not taking the
17   multivitamin anymore either.  I'm doing -- right
18   today I'm doing L-Glutamine, B.C.Double A's and
19   protein powder.
20   Q.   So you remember what you're doing on
21   that?
22   A.   Yeah, I take it every day.
23   Q.   But your memory is such that you can
24   remember that?
25   A.   Well, I have it placed so that I can see

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

106

1    it when I wake up in the morning every day.
2        Q.   When you were taking the fat burner,
3    where did you get it?
4        A.   DNC Supp -- is that what they're called?
5    DNC supplements. Something like that.
6        Q.   Well, what --
7        A.   I think, I think they may have changed
8    their name. But it was a local supplement store in
9    Tampa.
10       Q.   What was the name of the product?
11       A.   Oh, I don't remember.
12       Q.   You say a testosterone booster, what were
13   you taking, DHEA?
14       A.   I don't remember.
15       Q.   Well, what was it?
16       A.   It was a testosterone booster.
17       Q.   What were you taking for pre-workout,
18   creatine?
19           MR. POGUST:  Objection.  Was that --
20       Q.   Well, what were you taking for your
21   pre-workout?
22           MR. POGUST:  Yeah, there you go.
23       A.   I don't remember the specifics of it, it
24   was a while ago.
25       Q.   Did you take creatine?

107

1        A.   No.
2        Q.   Did you take anything with nitrous oxide?
3        A.   Not that I remember.
4        Q.   Any NOX?
5        A.   No.
6        Q.   No.  Did you ever tell any of the
7    physicians you were seeing in Florida -- well, strike
8    that.
9            When you were performing for the WWE, did
10   you also take supplements?
11       A.   Yes.
12       Q.   What supplements did you take then?
13       A.   Before the injury?
14       Q.   Yes.
15       A.   Protein powder, fat burner, and
16   pre-workout.
17       Q.   And what were you taking after the
18   injury?
19       A.   After the injury -- well, after the
20   injury happened, I wasn't doing anything and kind of
21   got a little -- kind of got a little overweight.  I
22   wasn't really doing anything.  And ultimately when I
23   started getting back into it, I started taking
24   protein powder, a fat burner -- protein powder, fat
25   burner, multivitamin, pre-workout.  I think that's

108

1    it.  Maybe the testosterone booster, too.
2        Q.   Did you tell any of the physicians you
3    were treating with about your supplement use?
4        A.   I don't remember that.
5        Q.   Did they ask you?
6        A.   I don't remember.
7        Q.   Did you ever ask any of the treating
8    physicians whether any of these supplements could be
9    causing the symptoms you complain of?
10       A.   I don't remember.
11       Q.   So, as you sit there today, you don't
12   know whether you ever asked anybody that or not?
13       A.   I don't remember.
14       Q.   Did you take any street drugs?
15       A.   No.
16       Q.   Do you take any performance enhancing
17   drugs?
18       A.   No.
19       Q.   Steroids?
20       A.   No.
21       Q.   HGH?
22       A.   No.
23       Q.   Adderall?
24       A.   No.
25       Q.   Have you ever been offered those?

109

1        A.   Offered?
2        Q.   Yes.  You work out in Gold's Gym,
3    correct?
4        A.   Yes.
5        Q.   Are steroids for sale in there?
6        A.   No.
7        Q.   Nobody sells steroids in there?
8        A.   No.  Not that I know of.
9        Q.   Have you ever been told your liver
10   enzymes are messed up?
11       A.   I don't remember.
12       Q.   Do you know what that means?
13       A.   No.
14       Q.   Do you know what it could mean?
15       A.   No.
16       Q.   So you don't know -- no doctor has told
17   you recently that your liver enzymes are --
18           MR. POGUST:  Objection.
19       A.   I don't, I don't know.
20       Q.   Wouldn't that concern you if they did?
21       A.   Yeah.
22       Q.   Would it be the kind of thing you'd
23   remember if they told you that?
24       A.   I don't know.
25           MR. POGUST:  That's why he said he

28 (Pages 106 to 109)

110

1    doesn't remember.
2        MR. McDEVITT:  Yeah, I'm aware he doesn't
3    remember much.
4    BY MR. McDEVITT:
5        Q.   So what -- what are your current symptoms
6    that you claim are attributable to brain injury?
7        A.   Headache.  Headaches and migraines.
8    Memory loss.  I get dizzy.  I'm sensitive to
9    sunlight, loud noises, large crowds of people, that
10   whole thing.  Oh, there's so many.
11        I get night terrors.  I have a hard time
12   sleeping at night.  My depth perception goes in and
13   out.  I can't remember all of them.
14        I'm sorry, there's just -- there's way
15   too many for me to remember.
16        Oh, I hear voices every once in a while.
17   And that -- and then there's the depression and high
18   anxiety.
19        Q.   Anything else?
20        A.   My muscle spams.  Yeah, those are fun.
21        Off the top of my head, that's all I can
22   remember.  Off the top of my head.
23        Q.   When did you start hearing voices?
24        A.   I don't remember the exact time.
25        Q.   Well, what do they say?

111

1        A.   Usually from what I can remember they
2    would -- they would only really say my name calling
3    to me from, like, a distance.
4        Q.   And this is when you're awake?
5        A.   Yes.
6        Q.   You're hearing voices when you're awake?
7        A.   Yeah.
8        Q.   Did that start when you were in Florida?
9        A.   Yes.
10        Q.   Did that start before you had your
11   alleged concussion?
12        A.   No.
13        Q.   So only since you had your alleged
14   concussion are you hearing voices?
15        A.   Yes.
16        Q.   How often does that happen?
17        A.   Not as frequent, maybe once, once or
18   twice a month.
19        Q.   And what else do they say to you, these
20   voices?
21        A.   For -- for what I can remember, off the
22   top of my head, all I -- all I remember is my name.
23        Q.   Your name.  You were a fan of Randy
24   Orton, weren't you?
25        A.   I was.

112

1        Q.   What does his theme song say?
2        A.   I hear voices.  At least when I watched
3    it, that's what his -- that's what his theme song
4    said.
5        Q.   Why did you laugh when I said that?
6        A.   It's just it's funny.  I remember --
7        Q.   Quite a coincidence, isn't it?
8        A.   I thought it was funny, just you made me
9    remember that whole Randy Orton thing.
10        Q.   And yet you're not treating with anybody
11   for any of this.
12        A.   No.
13        Q.   Right?
14        And everything that you've identified
15   there is all subjective, right?
16        MR. POGUST:  Objection.
17        A.   Subjective?
18        Q.   None of this can be objective or
19   verified, that's just what you claim, right?
20        A.   I don't know.  Yes.
21        Q.   Have you ever told a psychiatrist that
22   you hear voices?
23        A.   Yes.
24        Q.   Which one did you tell that?
25        A.   Probably Rothschild.

113

1        Q.   What did he say about that?
2        A.   I don't remember.
3        Q.   Since high school, how many jobs have you
4    successfully had?
5        A.   Four.
6        Q.   What were they?
7        A.   I think four.
8        Q.   What were they?
9        A.   I was working a register at BJ's
10   Wholesale Club.
11        Q.   Okay.
12        A.   WWE happened.  And then I was with
13   security -- Securitas.  I was with Securitas.  I was
14   a temp for them.
15        After them I was a temp for Arrowtech.
16   Temp for Arrowtech.
17        And then now I'm a -- technically I'm a
18   temp for TempStar right now.  They have me in the,
19   the cold storage facility.
20        Q.   When you were at Securitas, how did that
21   go?
22        A.   It was -- it could have been better.
23        Q.   You didn't successfully complete that job
24   either, did you?
25        MR. POGUST:  Objection.

114

1      A.   No.
2      Q.   So what full-time job have you had since
3   high school that you successfully completed?
4           MR. POGUST:  Objection.
5      A.   Define completed.
6           MR. POGUST:  Successfully completed.
7      Q.   Well, did you finish without getting
8   fired, let's put it that way.
9      A.   One.
10      Q.   One.  Which one was that?
11      A.   The cashier job.
12      Q.   Every other job you've gotten fired?
13      A.   Yeah.
14      Q.   And what was the reason they fired you?
15           MR. POGUST:  Which job?
16           MR. McDEVITT:  Every other job he got
17   fired in.
18      A.   I wasn't able to grasp what it took to
19   complete the job successfully, as my supervisors put
20   it.
21      Q.   And that's what you've been told in every
22   job you've been fired from?
23      A.   Yeah.
24      Q.   How much do you expect to get out of this
25   lawsuit?

115

1      A.   I don't know.
2      Q.   What are you looking for?
3      A.   I don't know.
4      Q.   And why do you think -- well, strike
5   that.
6           MR. McDEVITT:  Do you need to take a
7   break, Mr. Singleton?  Do you need to take a
8   break?  Do you need to go to the bathroom or
9   anything?
10           MR. POGUST:  Stretch your legs.
11           THE WITNESS:  Would it be possible to
12   just take a five-minute recess?
13           MR. McDEVITT:  Sure.  Absolutely.  You
14   can take five.  As a matter of fact, we have,
15   if you want it, there's another conference room
16   we have for you guys if you want it.
17           MR. POGUST:  Cool.
18           THE VIDEOGRAPHER:  The time is 11:01 a.m.
19   Off video record.
20           (Whereupon, off the record.)
21           (Whereupon, resumed.)
22           THE VIDEOGRAPHER:  11:13 a.m.  Back on
23   video record.
24   BY MR. McDEVITT:
25      Q.   Mr. Singleton, you understand you're

116

1   still under oath?
2      A.   Yes, sir.
3      Q.   During the break, did you discuss your
4   testimony?
5      A.   No.
6      Q.   When you were a wrestling fan, did you
7   play WWE video games?
8      A.   Yeah.
9      Q.   Which games did you have?
10      A.   Oh, I don't remember the specifics.
11      Q.   Did you read the WWE magazine?
12      A.   No.
13      Q.   Do you know what rag sheets are in the
14   business?
15      A.   No.
16      Q.   Did you ever hear that term?
17      A.   No.
18      Q.   Do you know what the Wrestling News
19   Observer is?
20      A.   No.
21      Q.   Do you know what the Torch is?
22      A.   No.
23      Q.   Are you aware of these sort of Internet
24   sites that cover the wrestling business?
25      A.   Yeah, I'm sure they're out there, yeah.

117

1      Q.   But you don't follow any of them?  You
2   don't read any of those?
3      A.   No.
4      Q.   Do you know Chris Nowinski?
5      A.   No.
6      Q.   Do you know who he is?
7      A.   No.
8      Q.   You never heard his name until now?
9      A.   Right, yeah.
10      Q.   Did you know a performer who performed
11   under the name of Chris Harvard?
12      A.   No.
13      Q.   Did you watch Tough Enough?
14      A.   Yes.
15      Q.   The program where people would try out to
16   be a WWE superstar?
17      A.   Uh-hum.
18      Q.   Do you remember him performing in Tough
19   Enough?
20      A.   No.
21      Q.   The kid who came from Harvard, who
22   portrayed himself as sort of arrogant and
23   well-educated Harvard graduate who was going to
24   change the wrestling business, so to speak?
25      A.   No.

30  (Pages 114 to 117)

118

1      Q.   You don't remember him?  And you're not
2  aware of his history with concussions?
3      A.   No.
4      Q.   Are you aware of his involvement in the
5  CTE science aspect?
6      A.   No.
7      Q.   When did you first hear about CTE?
8      A.   What is CTE?
9      Q.   Well, I'm asking you:  When did you first
10  hear --
11          MR. POGUST:  If you have.
12      Q.   -- of CTE?
13      A.   Oh, I didn't.
14      Q.   You didn't?
15      A.   No.
16      Q.   Is this the first you heard of it when
17  you walked in the room?
18      A.   Yes.
19      Q.   Today?
20      A.   Yes.
21      Q.   You never heard anybody talk about CTE
22  until today?
23      A.   Yes.
24      Q.   And from --
25      A.   Yeah, yeah, yeah.

119

1      Q.   So I take it, then, nobody's told you you
2  have CTE?
3      A.   No.
4      Q.   And nobody's told you that you should
5  fear having CTE?
6      A.   Not that I know of.  I don't know.
7      Q.   And I take it if you don't know what CTE
8  is, you don't have any fear of having CTE?
9      A.   No.
10      Q.   No, I'm correct?
11      A.   Yes.
12      Q.   In other words, you don't have any fear
13  of having CTE?
14      A.   No.  I don't know what it is.
15      Q.   All right.  Do you know what this
16  lawsuit's about?
17      A.   I'm sorry?
18      Q.   Do you know what this lawsuit's about?
19      A.   Yeah.
20      Q.   What's it about?
21      A.   WWE and how they treat talent with severe
22  brain injuries.
23      Q.   That's your understanding of what the
24  case is about?
25      A.   Yes.

120

1      Q.   Did you read the judge's opinion that was
2  issued in connection with our motion to dismiss your
3  claims?
4      A.   No.  Not that I remember.
5      Q.   Do you know what claims you have in this
6  case?
7      A.   I don't know.
8      Q.   Did you read the complaints that were
9  filed, the legal documents, on your behalf?
10      A.   I don't know.
11      Q.   Well, they're rather lengthy documents
12  that explain what supposedly happened to you.
13      A.   I don't know.
14      Q.   You don't know if you read them?
15      A.   (Shrugs.)
16      Q.   You're saying --
17      A.   Oh, I'm sorry.  No, I don't know.
18      Q.   Do you know that Dr. Mattingly has
19  testified in this case?
20      A.   No.
21      Q.   Is he somebody you saw down in Florida?
22      A.   I don't know.
23      Q.   Do you recognize that Dr. Mattingly
24  testified that you gave suboptimal effort on your
25  test for her?

121

1      A.   No.  I don't know.
2      Q.   That you were exaggerating your symptoms?
3      A.   No.
4      Q.   Do you know that Dr. Rogers testified?
5      A.   No.
6      Q.   Do you know that she testified that you
7  weren't trying to get better?
8      A.   No.
9      Q.   You didn't know any of that?
10      A.   No.
11      Q.   Do you have any idea why these doctors
12  would give such opinions --
13      A.   No.
14      Q.   -- about you?
15          Do you dispute those opinions?
16      A.   Yes.
17      Q.   How many -- how many doctors that you
18  have seen have expressed a view that perhaps you're
19  not giving a bona fide explanation of your
20  symptomology?
21      A.   I don't know.
22      Q.   Do you know if it's more than two?
23      A.   I don't know.
24      Q.   Are you a pro football fan?
25      A.   No.

31  (Pages 118 to 121)

122

1    Q.   You didn't watch football?
2    A.   No.
3    Q.   Even when you were playing high school
4    football, you didn't follow, so you don't watch any
5    NFL games?
6    A.   No.
7    Q.   Do you know who Mike Webster was?
8    A.   No.
9    Q.   Did you ever hear his name?
10   A.   No.
11   Q.   Never?
12   A.   No.
13   Q.   So did you ever hear anything about Mike
14   Webster's brain supposedly having CTE?
15   A.   No.
16   Q.   Again, that's the first you heard that
17   coming here?
18   A.   Yes.
19   Q.   I take it, then, you wouldn't know Terry
20   Long?
21   A.   No.
22   Q.   You don't know Justin Strzelczyk?
23   A.   No.
24   Q.   Andre Waters?
25   A.   No.

123

1    Q.   When you were at WWE, you had already
2    indicated Dr. Amann told you you wouldn't be
3    permitted to go back in the ring as long as you're
4    symptomatic.  Do you recall that testimony?
5    A.   Yes.
6    Q.   When you were at WWE, do you remember
7    Dr. Maroon giving a presentation to you and other
8    talent in which he depicted the brain of somebody
9    with CTE?
10   A.   I don't know.
11   Q.   So it's your testimony, then, that you
12   didn't talk about CTE with anybody at FCW?
13   A.   I don't know.
14   Q.   Well, if you've testified --
15        MR. POGUST:  Evan, he wants to know if
16   you do remember, tell him that.
17        THE WITNESS:  Yeah, yeah, yeah.
18   A.   Yeah.
19   Q.   So your testimony is that you never
20   talked with anybody down there about CTE?
21   A.   Yeah.
22   Q.   In fact, if your testimony is correct,
23   you didn't know the phrase until you walked in here
24   today?  You didn't even know what CTE meant until you
25   walked in here today?

124

1    A.   Yes.
2    Q.   So you wouldn't have ever talked about
3    that with anybody until today, right?
4    A.   Yeah.
5    Q.   When you were performing for the WWE, am
6    I correct that right after you first went down there
7    in January of 2012, in around February or so you came
8    down with mono?
9    A.   Yes.
10   Q.   And that kept you out of action for a
11   couple of weeks?
12   A.   Yes.
13   Q.   And did the WWE treat you fairly when you
14   came down with mono?
15   A.   I don't remember.
16   Q.   Well, they told you to take time off and
17   get better, right?
18   A.   I don't know.
19   Q.   Well, is that what you did?
20   A.   I don't know.
21   Q.   So you remembered you had mono?
22   A.   Yes.
23   Q.   Did you recover from the mono?
24   A.   Yes.
25   Q.   And in the interim between when you

125

1    diagnosed with mono and recovering from it, what did
2    you do?
3    A.   I went to the doctors.  Got some
4    medicine.
5    Q.   But you weren't performing or working out
6    or training with WWE at the time, were you?
7    A.   No.
8    Q.   Because mono is infectious, so they
9    wanted to keep you away from everybody.  Do you
10   remember that?
11   A.   Yes.
12   Q.   And eventually you got better?
13   A.   Yeah.
14   Q.   And you came back?
15   A.   Yes.
16   Q.   And they paid you the whole interim,
17   right?
18   A.   Yes.
19   Q.   They didn't punish you in any way because
20   you got sick?
21   A.   No.
22   Q.   They treated you fairly, right?
23   A.   Yes.
24   Q.   Then you came back and you began a period
25   of time from, what, approximately March to September

32  (Pages 122 to 125)

126

1    where you actually were training and performing,
2    correct?
3        A.   Yes.
4        Q.   And in that time period how many actual
5    matches did you have?
6        A.   I don't know.
7        Q.   Well, what's your best recollection?
8        A.   I don't know.  Maybe seven.
9        Q.   Seven?
10       A.   Maybe.
11       Q.   All right.  Seven within a six-month time
12   period, but roughly you're accurate?
13       A.   So what I can recollect, yes.
14       Q.   And some of those were tag matches,
15   right?
16       A.   Yeah.
17       Q.   So you're not even in the ring the whole
18   time, right?
19       A.   No.
20       Q.   Right?  So how many minutes, roughly,
21   were your matches?
22       A.   Five, maybe.  Six.
23       Q.   All right.  So if you wrestled seven
24   matches, six minutes in length, you wrestled a total
25   of 42 minutes in six months.  Does that sound about

127

1    right?
2        A.   About that, yeah.
3        Q.   Does that sound excessive to you?
4        A.   I don't know.
5        Q.   Did you find it a heavy workload?
6        A.   No.
7             MR. POGUST:  Objection.  Just the
8        matches?
9        Q.   Did you say no?
10       A.   No.
11       Q.   All right.  How many matches, individual
12   matches in that time period, were you the talent that
13   got over?  Do you understand what I mean by that?
14       A.   Yeah.
15       Q.   What do I mean by that?
16       A.   The person who won the match.
17       Q.   Right.  All right.  How many?
18       A.   I don't remember.
19       Q.   Did you get over on any?
20       A.   I don't remember.
21       Q.   Did you develop a finishing move?
22       A.   Not really, no.
23       Q.   And is that sort of part of the art of
24   branding your own personality that you have a unique
25   finishing move?

128

1        A.   I guess you could say that, yes.
2        Q.   I mean, for example, what's Stone Cold's
3    finishing move?
4        A.   Stunner.
5        Q.   And what was Rock's?
6        A.   People's elbow.
7        Q.   And what was Randy Orton's?
8        A.   RKO.
9        Q.   All right.  So that's part of becoming an
10   accomplished professional, that you come up with a
11   finishing move that's your signature move, correct?
12       A.   Yes.
13       Q.   And that's what you used in the match,
14   right?
15       A.   Yes.
16       Q.   Did you develop one when you were down
17   there the whole time?
18       A.   Not too much, no.
19       Q.   Until you develop a finishing move, they
20   can't have you be the winner, can you?
21       A.   That's not necessarily true.
22       Q.   In the tag team matches that you had, did
23   you win any?
24       A.   I don't remember.
25       Q.   Did you ever pin anybody the whole time

129

1    you were down there?
2        A.   I don't remember.
3        Q.   But you do remember you weren't being
4    very successful, right, I think you previously
5    testified to that?
6        A.   Jobbing.
7        Q.   Yeah, jobbing.  And you didn't like that,
8    did you?
9        A.   I'm indifferent, it doesn't bother me.
10       Q.   Did you think you were talented?
11       A.   Yeah.
12       Q.   Did you think you were as talented as the
13   people who made it to the main roster?
14       A.   No.
15       Q.   When did you begin to think you weren't
16   as talented as some of those people?
17       A.   I don't know.  As soon as I got there.
18       Q.   And what made you think that?
19       A.   Because they were on the main roster and
20   I wasn't.
21       Q.   Well, Big E wasn't on the main roster,
22   was he?
23       A.   He was one of the more well-known faces
24   in the FCW and NXT.
25       Q.   But he wasn't on the main roster, was he?

33 (Pages 126 to 129)

130

1  A.  When I first got there, no.
2  Q.  And Seth Rollins?
3  A.  No.
4  Q.  He wasn't on the main roster then either,
5  was he?
6  A.  No.
7  Q.  But did you realize he was pretty good?
8  A.  Yeah.
9  Q.  Did that make you feel like you weren't
10 as good?
11 A.  Not really.
12 Q.  How about Bray Wyatt, do you think you
13 were as talented as he was?
14 A.  No.
15 Q.  How about Erick Rowan, do you think you
16 were as talented as he was?
17 A.  No.
18 Q.  Would it be fair to say, Mr. Singleton,
19 that given your size that in most instances in your
20 life you're the biggest guy in the room?
21 A.  Yes.
22 Q.  And when you come from a small town,
23 which I assume, you're one of the biggest people
24 there?
25 A.  Yes.

131

1  Q.  And now when you go down to Florida,
2  you're with some really big boys, aren't you?
3  A.  Some of them were, yeah.
4  Q.  Some of them a lot bigger than you,
5  weren't you?
6  A.  Yeah.
7  Q.  Stronger than you?
8  A.  Yeah.
9  Q.  More accomplished than you?
10 A.  Yeah.
11 Q.  And very competitive?
12 A.  Yeah.
13 Q.  And would you agree that's a very
14 competitive environment down there?
15 A.  Yeah.
16 Q.  People who are really dedicated to the
17 craft and want to get better?
18 A.  Yeah.
19 Q.  And want to make the main roster?
20 A.  Yeah.
21 Q.  And there are many who don't, correct?
22 A.  I don't know.
23 Q.  I mean, of the ones that you performed
24 with, were there some who didn't make it?
25 A.  Yes.

132

1  Q.  I mean, for example, your roommate, what
2  happened to him?
3  A.  I don't know.  I lost contact with him.
4  Q.  Did he make it to the main roster?
5  A.  I don't know, I don't watch wrestling
6  now.
7  Q.  Well, have you ever heard that Teon made
8  it to the main roster?
9  A.  No.
10 Q.  Did you, while you were down there, prior
11 to your injury, form the belief that you weren't
12 going to make it to the main roster?
13 A.  I don't know.
14 Q.  Well, you know what you thought.  Did you
15 think at that time that you were going to make it or
16 you weren't going to make it?
17 A.  I don't know.  If I would have kept
18 practicing, probably.
19 Q.  And throughout 2013 you didn't wrestle at
20 all, right?
21 A.  I don't know.  No.
22 Q.  That's a whole year.  I mean, you
23 didn't -- you didn't perform for WWE at all but you
24 were getting paid the whole year, right?
25 A.  Yes.

133

1  Q.  And were you posting things on your
2  Twitter account?
3  A.  No.
4  Q.  No.  Did you -- did you refer to 2013 as
5  the year of Mercer?
6  A.  Not that I remember, no.
7  Q.  Did anybody else that you know of have
8  access to your Twitter account?
9  A.  Not that I know of.
10 Q.  Did you ever sell it to anybody?
11 A.  No.
12 Q.  So anything that appears on that Twitter
13 account under your name is stuff you would have put
14 in there?
15 A.  It should, yeah.
16 Q.  And throughout 2013 when you were telling
17 doctors about your various symptomology, et cetera,
18 were you making any public postings that would
19 indicate to the public at large that you were ill or
20 you were sick and couldn't perform?
21 A.  No.
22 Q.  Were you doing the opposite of that,
23 telling the public that this was going to be your
24 year and you were going to be the champion, et
25 cetera, et cetera?

34 (Pages 130 to 133)

134

1      A.   No.
2      Q.   Never did that?
3      A.   I posted on Twitter once and it was about
4  the restaurant that I was at.
5      Q.   Did your fiancee post stuff for you on
6  Twitter?
7      A.   No.
8      Q.   To your knowledge, did anybody else use
9  your Twitter account to post things in your name?
10     A.   Not to my knowledge.
11     Q.   Do you have the ability to access your
12 Twitter account as you sit there?
13     A.   I'd have to try the password a couple of
14 times because I don't remember what the password was,
15 but I could try.
16     Q.   When did you last access your Twitter
17 account?
18     A.   I do not remember.
19     Q.   Have you stopped using it since you got
20 done wrestling?
21     A.   I've stopped using it when I was
22 wrestling.  I only used it once.
23     Q.   If we have records that show otherwise,
24 where would those comments on Twitter have come from?
25          MR. POGUST:  Objection.  If you know.

135

1      A.   I don't know.  I don't use Twitter at
2  all.
3      Q.   So you haven't downloaded any of your
4  Twitter pages and provided it to your counsel in
5  these cases?
6      A.   No.
7          (Adam Mercer @MercerWWE Twitter Tweets
8          marked as Singleton Exhibit 8, as of this
9          date.)
10 BY MR. McDEVITT:
11     Q.   Mr. Singleton, looking at the cover
12 page --
13     A.   704.
14     Q.   What did you say?
15     A.   704, that's a lot of tweets for an app I
16 deleted.
17     Q.   Yes, it is.  Well, it's certainly more
18 than one you testified to.
19     A.   Oh, yeah.
20     Q.   Is this the first page of that?  Do you
21 recognize that?
22     A.   No.
23     Q.   Where it says Adam Mercer @MercerWWE, The
24 Official Twitter of WWE/NXT Superstar, Adam Mercer;
25 do you see that?

136

1      A.   My official Twitter was WWEMercer, not
2  MercerWWE.
3      Q.   Well, whose is this?
4          MR. POGUST:  Objection.  If you know.
5      A.   I don't know.
6      Q.   No.  So you don't know whose this is?
7      A.   No.
8      Q.   Do you see the pictures of you, if you
9  scan through this, do you see the pictures in here of
10 you?  Like, for example, if you look on page 5.  Is
11 that you?
12     A.   Yep.
13     Q.   Is that you?
14     A.   Yep.
15     Q.   All right.
16     A.   I think.
17     Q.   Let's do this.  Let's skim back, if you
18 will, to page -- come back, if you will, to the
19 August 2002 -- I'm sorry -- 2012 time frame towards
20 the back.
21     A.   Do you know what page that was on?
22     Q.   I'll find it in a minute here.  It is on
23 page --
24          MR. POGUST:  You're almost all the way to
25 the back now?

137

1          MR. McDEVITT:  Yes.
2      Q.   Page 61 of 69 at the top there.
3          MR. POGUST:  Do you see it?
4      A.   What page?  Sixty-one.  All right.
5      Q.   Have you found page 61 of 69?
6      A.   Yes.
7      Q.   Do you recall me asking you whether you
8  had attended a presentation by Dr. Maroon that was
9  given on August 9th, 2012?
10     A.   Yes.
11     Q.   What does the entry say on August 9,
12 2012?
13     A.   How I wish we lived in a time when laws
14 were not necessary to safeguard us from
15 discrimination.
16     Q.   I think you're reading the wrong --
17     A.   Oh.
18     Q.   What -- are you on --
19          MR. POGUST:  Is it the 9th, the Barbra
20 Streisand, the Barbra Streisand tweet that he
21 retweeted, do you think?  Or a different one?
22          MR. McDEVITT:  No.
23          MR. POGUST:  Number one, I'm going to
24 object just because -- Jerry, can I put an
25 objection on the record?

35 (Pages 134 to 137)

138

1        This is -- he said this isn't his Twitter
2    account.  You can ask questions about it, just
3    so we understand what's going on.
4        MR. McDEVITT:  Well, if he said that
5    doesn't make it true.
6        MR. POGUST:  That's what he's testified
7    to.
8        MR. McDEVITT:  Well, that doesn't make it
9    true.
10        MR. POGUST:  But if he said he's never
11    seen this and this isn't his, you can ask him
12    all you want.
13        MR. McDEVITT:  I'm going to ask him
14    questions and see if it refreshes his memory.
15        MR. POGUST:  He's never seen it.  Go for
16    it.
17    BY MR. McDEVITT:
18        Q.   Do you see the entry on August 9th that
19    is three up from the bottom of page 61?
20        A.   Yes.
21        Q.   What does it say?
22        A.   Thank you at WWE for giving me the
23    background.
24        Q.   Does that refresh your recollection of
25    what you did on August 9th of 2012?

139

1        A.   No.
2        Q.   What would you have been thanking WWE
3    for?
4        A.   I don't know.
5        Q.   Are you denying that you typed that
6    tweet?
7        A.   Yes.
8        Q.   So all these statements that appear
9    throughout this Twitter --
10        MR. POGUST:  Objection.
11        Q.   -- or for this Twitter account --
12        MR. POGUST:  Do you want to go through
13    specific ones?
14        MR. McDEVITT:  Well --
15        MR. POGUST:  Or do you want him to read
16    all of them?
17        MR. McDEVITT:  No, I mean --
18        MR. POGUST:  Evan, take your time and
19    look at all those Tweets and then --
20        MR. McDEVITT:  Can I finish my question
21    before you interrupt?
22        MR. POGUST:  Yeah.  Go for it.
23    BY MR. McDEVITT:
24        Q.   So it's your testimony then that you only
25    sent one Twitter in the entire time you were with

140

1    WWE?
2        A.   Yes.
3        Q.   And that all of what you're seeing here
4    is not stuff that you tweeted?
5        A.   Yes.
6        Q.   That's your testimony?
7        A.   Yes.
8        THE WITNESS:  I wish I was this popular
9    on social media.
10        (Adam Mercer @WWEMercer Twitter Tweets
11    marked as Singleton Exhibit 9, as of this
12    date.)
13    BY MR. McDEVITT:
14        Q.   I'm going to hand you in a minute Exhibit
15    No. 9 and ask you if you recognize this particular
16    document.
17        A.   No.
18        Q.   Is that your picture on it?
19        A.   Yes.
20        Q.   And that is a different account with
21    Twitter, isn't it?
22        A.   Yes.
23        Q.   What's that one?
24        A.   This one is mine.
25        Q.   So that one is yours?

141

1        A.   Yes.
2        Q.   And is that account still on your
3    computers?
4        A.   No, I deleted -- well, I didn't delete
5    the account, but I've deleted all the Twitter apps
6    and access to it.  I don't use it, so I got rid of
7    it.
8        Q.   So anything you put on that Twitter
9    account is now gone?
10        A.   No, I never deleted the account.
11        Q.   So you could -- I'm sorry, maybe I
12    misunderstood.
13        So you could pull back up everything you
14    put on that account?
15        A.   Yeah.
16        Q.   So that one you say is your account?
17        A.   Yeah, this one.
18        Q.   The prior exhibit, Exhibit 8, you deny
19    any involvement in that account?
20        A.   Yes, that's not me.
21        (Whereupon, brief discussion off the
22    record between counsel.)
23        (Whereupon, resumed.)
24    BY MR. McDEVITT:
25        Q.   Mr. Singleton, when you were at the

36 (Pages 138 to 141)

142

1    FCW/NXT in Florida, did they have athletic trainers
2    there?
3        A.   Athletic trainers being like what?
4        Q.   Athletic trainers.
5        A.   What's an athletic trainer?
6            MR. POGUST:  If you don't understand --
7        A.   I don't understand the question.
8        Q.   People that attend to medical ailments
9    and --
10       A.   Oh, okay, okay.  Yes.
11       Q.   And who were they?
12       A.   I remember they had one trainer, his name
13   was Brian, I don't remember his last name.
14       Q.   And did you deal with him much?
15       A.   Not really.
16       Q.   All right.  Aside from the September 27th
17   head injury that you reported to WWE, did you report
18   any other head injury to WWE doctors or trainers
19   while you were performing?
20       A.   I don't know.
21       Q.   Well, as you sit here today, can you
22   identify any other time that you told them that you
23   had a head injury?
24       A.   No.
25       Q.   As you sit there today, aside from the

143

1    September 27th episode that we're here about, do you
2    recall any instance where you had a head injury?
3        A.   No.
4        Q.   And is the, to your knowledge, the injury
5    you sustained on the 27th to your head, is that the
6    only time in your life you have ever had a
7    concussion?
8        A.   Yes.
9        Q.   Have you ever been in a street fight?
10       A.   No.
11       Q.   So you've never gotten punched in the
12   head in a real fight?
13       A.   No.
14       Q.   And you, I think indicated, you never had
15   a concussion playing football?
16       A.   No.
17       Q.   Did you ever land on your head doing
18   amateur wrestling?
19       A.   No.
20       Q.   Never had a concussion there either?
21       A.   No.
22           (Evan Singleton Talent Questionnaire
23       marked as Singleton Exhibit 10, as of this
24       date.)
25

144

1    BY MR. McDEVITT:
2        Q.   Mr. Singleton, I've handed you what's
3    been marked as Exhibit 10.
4            Do you recognize the second, third and
5    fourth pages here as something you submitted to the
6    WWE in connection with trying to get a position with
7    WWE?
8        A.   Yes.
9        Q.   And did you fill this out?
10       A.   I remember mine written down, but.
11       Q.   All right.  And if you go to page 2997 at
12   the bottom there, am I correct it indicates your
13   interest in hobbies was watching wrestling matches?
14       A.   Where's that at?  Okay.  Yes.
15       Q.   At the very bottom of this when it says
16   do you have any hidden talents or passions, what did
17   you write?
18       A.   I am a talented artist and have a great
19   memory .
20       Q.   Does that refresh your recollection that
21   you claim to have a great memory?
22       A.   No.
23       Q.   And then at the top of the page, it says:
24   Why did you get into wrestling?  And what did you
25   answer?

145

1            MR. POGUST:  The next page?
2            MR. McDEVITT:  Yes.
3        A.   You want me to read it?
4        Q.   Yes.
5        A.   I always wanted to be a wrestler since my
6    dad and I watched WCW when I was growing up.  The
7    rest is history.  I just love everything about the
8    business.
9        Q.   What was it about the business that you
10   love?
11       A.   The entertainment factor.
12       Q.   What did you find about it to be so
13   entertaining?
14       A.   The storylines.  The storylines really
15   had a way of just entrancing me when I was at that
16   age.
17       Q.   Any particular storylines that you
18   remember?
19       A.   No, nothing specific, just big picture.
20           (World Wrestling Entertainment, Inc.
21       Booking Contract marked as Singleton Exhibit
22       11, as of this date.)
23   BY MR. McDEVITT:
24       Q.   I've just handed you what's been marked
25   as Exhibit 11.  Do you recognize that document,

37 (Pages 142 to 145)

146

1    Mr. Singleton?
2        A.   Yes.
3        Q.   Is that the contract you signed with WWE?
4        A.   Yes.
5        Q.   When you were at combat wrestling, did
6    you sign a contract?
7        A.   No.
8        Q.   So this was the first wrestling contract?
9        A.   Yes.
10       Q.   And would you turn back to page -- strike
11   that.
12            And you read this when you got it?
13       A.   I skimmed through it.  I wouldn't
14   necessarily say I sat down and read the whole thing.
15       Q.   But you had the ability to sit down and
16   read the whole thing?
17       A.   Yeah.
18       Q.   And you can -- you are literate, correct?
19       A.   Yes.
20       Q.   All right.  Would you turn to page 9 --
21   or, I'm sorry, page 14.  Do you see Section 9.12(a)?
22       A.   Yes.
23       Q.   And am I correct that 9.12(a) begins a
24   series of provisions that are all typed in bold --
25       A.   Yes.

147

1        Q.   -- print that stand out from the rest of
2    the document?
3        A.   Yes.
4        Q.   And do you see Section (b), 9.12(b) at
5    the top of page 15?
6        A.   Yes.
7        Q.   And that's the clause I had asked you
8    about previously whether you had agreed to such a
9    clause.  Do you remember that?
10       A.   Yes.
11       Q.   Would you read 9.12(b), please?
12       A.   Wrestler acknowledges that the
13   participation and activities required by wrestler in
14   connection with his performance in a professional
15   wrestling exhibition may be dangerous and may involve
16   the risk of serious bodily injury, including death.
17   Wrestler knowingly and freely assumes full
18   responsibility for all such inherent risks as well as
19   those due to the negligence of promoter or other
20   wrestlers.
21       Q.   And that was one of the provisions that
22   you agreed to by signing this contract, correct?
23       A.   Yes.
24       Q.   And -- well, nevermind.
25            And then when you got injured, did WWE

148

1    extend the terms of this contract?
2        A.   I don't know.
3            MR. POGUST:  I appreciate you writing the
4    number on it.
5            MR. McDEVITT:  It's the least I can do.
6            (Letter dated May 21, 2012, marked as
7    Singleton Exhibit 12, as of this date.)
8    BY MR. McDEVITT:
9        Q.   Let me show you what's been marked as
10   Exhibit 12, Mr. Singleton, and do you recognize this
11   document?
12       A.   No.
13       Q.   Do you deny receiving this document?
14       A.   No, just not familiar.
15       Q.   And this is -- this is dated in May of
16   2012, correct?
17       A.   Yes.
18       Q.   And do you remember testifying previously
19   about your mono?
20       A.   Yes.
21       Q.   And am I correct that after you had to
22   sit out a little bit because of your mono, what they
23   did is they extended your contract by a corresponding
24   amount so you wouldn't be denied the time to perform?
25       A.   Yes.

149

1        Q.   Did you think that was a fair thing to
2    do?
3        A.   Yes.
4        Q.   And so they extended this contract until
5    February 6 of 2015, right?
6        A.   Yes.
7        Q.   Did you yourself decide to end the
8    contract when you came back to Pennsylvania in
9    October of 2014?
10       A.   Yes.
11       Q.   And did they continue to pay you after
12   that time?
13       A.   Yes.
14       Q.   So they paid you all the way through the
15   end of this contract?
16       A.   Yes.
17       Q.   Even though you never performed for over
18   two years?
19       A.   Yes.
20           THE WITNESS:  What time is it?
21           MR. POGUST:  It's ten to twelve.
22           THE WITNESS:  Okay.
23           MR. POGUST:  You good?
24           THE WITNESS:  Yeah.  I just have to go to
25   the bathroom.  I can wait until lunch time.

38 (Pages 146 to 149)

150

1    MR. McDEVITT:  You can take a break.
2    THE WITNESS:  Oh, no, I can, I can wait
3    until we take our lunch break.
4    MR. McDEVITT:  We can sit here for two
5    minutes.  Go ahead.  You know where it's at,
6    right?
7    MR. POGUST:  Go do it.
8    THE VIDEOGRAPHER:  Time is 11:48 a.m.
9    Off video record.
10   (Whereupon, off the record.)
11   (Whereupon, resumed.)
12   (Candace Renshaw Facebook Page marked as
13   Singleton Exhibit 13, as of this date.)
14   MR. McDEVITT:  Counsel, I'll give you
15   this when I'm done.
16   MR. POGUST:  Yeah, yeah.
17   MR. McDEVITT:  If you want to see it for
18   a minute.
19   MR. POGUST:  Yeah, let me look at that
20   real quick and then I'll give it back to you.
21   What is it?  It's Candace's Facebook
22   page.
23   MR. McDEVITT:  Yes, I think that's
24   correct.
25   MR. POGUST:  Yes, it is.  Okay.

151

1    THE VIDEOGRAPHER:  All set?
2    MR. POGUST:  Yeah.
3    THE VIDEOGRAPHER:  The time is 11:53 a.m.
4    We're back on the record.
5    BY MR. McDEVITT:
6    Q.   You've been handed Exhibit 13,
7    Mr. Singleton.  Do you recognize this as your
8    fiancee's Facebook page?
9    A.   Yes.
10   Q.   And would you turn back to page 11 of
11   13 -- 11 of 30 I should say.
12   Do you see where she posts "In a
13   Relationship with Evan Singleton" on September 3rd of
14   2012?
15   A.   Yes.
16   Q.   Does that refresh your recollection as to
17   when the two of you declared that that's when you
18   were in a relationship?
19   A.   No.
20   Q.   Does that sound about right to you?
21   A.   Yes.
22   Q.   And that's approximately three weeks
23   before your alleged injury, right?
24   A.   Yes.
25   Q.   All right.  Then, if you would, turn to

152

1    page 9.
2    Q.   Do you see the picture -- is that a
3    picture of you and Candace in the middle of the page?
4    A.   Yes.
5    Q.   On September 30th?
6    A.   Yes.
7    Q.   That's three days after you supposedly
8    suffered a concussion?
9    A.   Yes.
10   Q.   Where was that picture taken?
11   A.   I don't know.
12   Q.   What were you doing that day?
13   A.   I don't know.
14   Q.   Do you recognize on the bottom --
15   MR. POGUST:  Let me take a look.  This is
16   hard to do here.
17   The assumption being the picture was
18   taken on the day it was posted?
19   MR. McDEVITT:  That's what I'm asking.
20   BY MR. McDEVITT:
21   Q.   Am I correct that she posted "About to go
22   hang -- with Evan Singleton"?
23   A.   Yes.
24   Q.   And then she posted a picture there,
25   correct?

153

1    A.   Yes.
2    Q.   Do you remember where you were going to
3    go hang three days after you got an alleged
4    concussion?
5    A.   No.
6    Q.   Do you recognize the ladies on the bottom
7    of that page?
8    A.   On the left is my fiancee, Candace.  In
9    the middle is her cousin, Jenna.  And I don't know
10   who the woman on the right is.
11   Q.   Right.  Flip then, if you will, to the
12   next page, page 8.
13   MR. POGUST:  Go back.
14   MR. McDEVITT:  Yeah.
15   Q.   Do you see in the bottom there's another
16   entry for September 30th?
17   A.   Yes.
18   Q.   And with the remark:  I love this guy --
19   with Evan Singleton?
20   A.   Yes.
21   Q.   And you're kissing her on the cheek?
22   A.   Yes.
23   Q.   And would you agree that it appears she
24   has the same outfit on as she had in the prior
25   posting?  Do you see that strap showing, it looks

39 (Pages 150 to 153)

154

1    like the same thing.
2        A.   Yes.
3        Q.   Do you know who took these pictures?
4        A.   No.
5        Q.   Do you have any reason to think they were
6    taken on some day other than the day they were
7    posted?
8        A.   I don't know.
9        Q.   Well, do you remember three days after
10   your concussion going out with your fiancee?
11       A.   No.
12       Q.   Do you agree you look pretty happy in
13   that picture?
14       A.   Yeah.
15       Q.   There don't appear to be any suffering?
16       A.   Yeah.
17       Q.   Then would you look at the next page,
18   which is page 7?
19       A.   Okay.
20       Q.   And am I correct there there's a post in
21   the middle of the page that says Guess What?
22       A.   Yes.
23       Q.   And is that her hand with the ring that
24   you gave her?
25       A.   Yes.

155

1        Q.   Does that look like the ring you gave
2    her?
3        A.   Yes.
4        Q.   So you would have given her a ring 11
5    days after you got this alleged concussion?
6        A.   I don't know.
7        Q.   Well, would you agree October 8th is
8    about 11 days afterwards?
9        A.   Yes.
10       Q.   And then, so does that refresh your
11   recollection 11 days after you got this injury that
12   we're here about today you gave your fiancee a ring
13   and asked her to marry you?
14           That's a pretty serious decision, isn't
15   it?
16       A.   Oh, yeah.
17           MR. POGUST:  I can keep this one, right,
18   Jerry?
19           MR. McDEVITT:  Yeah.
20   BY MR. McDEVITT:
21       Q.   Do you remember where you were when you
22   proposed to her?
23       A.   No.
24       Q.   Do you remember what you said to her?
25       A.   "Will you marry me?"

156

1        Q.   Do you know what she said?
2        A.   "Yes."
3        Q.   And, as you sit there today, do you know
4    how much you paid for that ring?
5        A.   No.
6        Q.   Did she go with you to get it?
7        A.   I don't know.
8        Q.   All right.  Do you know, Mr. Singleton,
9    how many different versions of a complaint has been
10   filed in this case on your behalf?
11       A.   (Nods.)  I don't --
12       Q.   You have to respond verbally.
13       A.   I'm sorry.  I don't, I don't know.
14       Q.   Can you tell me why your claims are
15   joined with Vito LoGrasso's?
16       A.   We both suffer from head injuries.
17       Q.   Did you make that decision?
18       A.   I don't know.
19       Q.   How do you know he suffers from head
20   injuries?
21       A.   What was said.
22       Q.   By whom?
23       A.   Vito.
24       Q.   What did he say?
25       A.   I have a brain injury.

157

1        Q.   When did he say that?
2        A.   When I first met him.
3        Q.   And that was in the office of your
4    counsel?
5        A.   Yes.
6        Q.   Did you know your counsel before
7    Mr. LoGrasso or did Mr. LoGrasso know your counsel
8    before you did?
9        A.   Oh, that I don't know.
10       Q.   Do you know how Mr. LoGrasso found
11   Mr. Kyros?
12       A.   No.
13       Q.   Did he tell you?
14       A.   No.
15       Q.   Did you ever watch Mr. LoGrasso perform
16   as a wrestler?
17       A.   No.
18       Q.   When you were watching WCW?
19       A.   No.
20       Q.   Did you ever hear of him as a performer?
21       A.   I heard when I first met Harris.
22       Q.   All right.  But you didn't know of him
23   from your years of watching?
24       A.   No.
25       Q.   He was not a big name, was he?

40  (Pages 154 to 157)

158

1     A.   I didn't hear of him.
2     Q.   Have you since watched any of his matches
3  on YouTube?
4     A.   I've see clips, not full matches.
5     Q.   Clips of him performing where?
6     A.   I think it was SmackDown.  I think.
7     Q.   Did you see any of those matches at ECW?
8     A.   No.
9     Q.   WCW?
10    A.   No.
11    Q.   Do you know anything about his career?
12    A.   No.
13    Q.   Do you know anything about whether he's
14  fabricating claims?
15    A.   No.
16    Q.   You don't know one way or another, do
17  you?
18    A.   No, I don't know.
19    Q.   Did he tell you when he supposedly got
20  injured?
21    A.   No.
22    Q.   Do you know -- did you know that the
23  lawsuit you originally brought was styled as a class
24  action case?
25    A.   Yes.  Yeah.

159

1     Q.   And you wanted to represent the class of
2  all people who had ever performed for WWE?
3     A.   I don't know.
4     Q.   Was that explained to you what that
5  meant?
6     A.   I don't, I don't know.  I don't remember.
7          (Class Action Complaint marked as
8          Singleton Exhibit 14, as of this date.)
9  BY MR. McDEVITT:
10    Q.   I hand you what's been marked as Exhibit
11  14, Mr. Singleton.  This is the original complaint
12  that was filed on your behalf January 16th of 2015.
13         Do you know who drafted this?
14    A.   Harris.
15    Q.   Do you know --
16    A.   Harris did.
17    Q.   Do you know anybody else who drafted it?
18    A.   I would assume my lawyer, Kyros, too.
19    Q.   All right.  Were you sent drafts of this
20  to review?
21    A.   Yes.
22    Q.   And did you make any comments on the
23  drafts?
24    A.   I don't know.
25    Q.   Do you remember seeing anything in these

160

1  documents that was false?
2     A.   I don't know.
3     Q.   How much time did you spend reviewing it
4  before it was filed?
5     A.   I skimmed through it, and then I signed
6  it and sent it back.
7     Q.   And do you know when this document was
8  later amended?
9     A.   No.
10    Q.   Do you know if it was amended a second
11  time?
12    A.   No.
13    Q.   Did you review any amendments to this
14  lawsuit when they were filed?
15    A.   I don't know.
16    Q.   You don't know or you don't remember?
17    A.   I don't remember.
18    Q.   So were you told that the judge had
19  ordered this lawsuit to be amended?
20    A.   What does amended mean?
21    Q.   Rewritten.
22    A.   Oh.  I don't remember.  I don't remember.
23    Q.   You don't remember if you were told that
24  the judge had ordered that be done?
25    A.   No.

161

1     Q.   And I think you indicated you haven't
2  read the judge's opinions in this case?
3     A.   I don't remember if I did.
4     Q.   What were you sent them?
5     A.   Probably.
6     Q.   And did somebody say to you that the
7  judge has decided WWE's motion to dismiss and here's
8  the opinion where the judge did that for you to read?
9     A.   I don't remember.
10    Q.   Would you be interested in what the judge
11  says about your lawsuit?
12    A.   Sure, yeah.
13    Q.   Would it be fair to assume if you were
14  given it you would read it?
15    A.   How long is it?
16    Q.   It's pretty long.
17    A.   Yeah, I would.
18    Q.   And, as you sit there right now, sir,
19  what is your understanding of the claim you're making
20  against WWE?
21    A.   The way WWE is and works and performs is
22  causing people head injuries and how they -- how they
23  take care of their clients and wrestlers and
24  employees isn't right.
25    Q.   And what is your individual claim?

41  (Pages 158 to 161)

162

1    A.   What happened to me wasn't right.
2    Q.   **Wasn't right in what way?**
3    A.   How I was treated.
4    Q.   **And how were you mistreated?**
5    A.   Well, I was bullied by Bill DeMott and
6  staff.  It took a while before I had any kind of real
7  medical attention given to me.  Just things of that
8  nature.
9    Q.   **Anything else?**
10   A.   Off the top of my head, no.
11   Q.   **Not off the top of your head, you brought**
12 **the lawsuit and I want to know every reason what you**
13 **think your claim is here.**
14   A.   Off the top of my head, that's all I --
15 that's all I have off the top of my head.
16   Q.   **Did WWE intentionally cause you to be**
17 **injured when you did the move with the performer on**
18 **September 27th that injured you?**
19   A.   I'm sorry?
20   Q.   **Strike that.**
21       You acknowledge, I take it, that you were
22 **injured by an accident, correct?**
23   A.   Yes.
24   Q.   **You don't think anybody deliberately**
25 **tried to injure you, do you?**

163

1    A.   When performing the choke slam, you're
2  supposed to fall.  When you're the one getting
3  slammed, you're supposed to fall.  I felt there was a
4  little bit more force behind it than just a fall, but
5  still an accident nonetheless.
6    Q.   **Right.  And the kind of thing that you**
7  **knew from the minute you walked in the ring those**
8  **kind of things can happen, right?**
9    A.   Not this serious.
10   Q.   **You didn't think you could get a serious**
11 **concussion?**
12   A.   Not this bad, no.
13   Q.   **But you realized you could hit your head**
14 **and get injured?**
15   A.   Yes.
16   Q.   **Now, you say it took a while to get**
17 **medical attention.  Isn't it true that you were told**
18 **to go home and rest?**
19   A.   Yes.
20   Q.   **And then you were seen by Dr. Amann?**
21   A.   I guess, I don't know.
22   Q.   **You don't know?**
23   A.   I don't remember.
24   Q.   **Well, how long did it take you to get**
25 **medical attention?**

164

1    A.   The first MRI I got was like a month
2  later.
3    Q.   **Well, before MRIs, did you have medical**
4  **attention?**
5    A.   I was going back to the training facility
6  to meet with the on-site trainer.  That's the extent
7  of my medical treatment.
8    Q.   **Do you realize you're claiming fraud in**
9  **this case?**
10   A.   No.
11   Q.   **You don't realize you're making a fraud**
12 **claim?**
13   A.   No.
14   Q.   **Can you tell me who you think, if**
15 **anybody, committed a fraud on you?**
16   A.   I'm sorry?
17   Q.   **Who do you think, if anybody, at WWE**
18 **committed a fraud on you?**
19   A.   I don't know.
20   Q.   **Did anybody at WWE fail to tell you**
21 **something that you think you should have known?**
22   A.   I don't know.
23   Q.   **Did anybody tell you to go back in the**
24 **ring and perform despite the fact that your head was**
25 **injured?**

165

1    A.   I don't remember.
2    Q.   **Well, you'd know if somebody told you to**
3  **go back in the ring.  I mean, you already testified**
4  **that nobody sent you back into the ring after your**
5  **injury, right?**
6    A.   Yeah.
7    Q.   **And do you think that was the correct and**
8  **right thing for them to do given what you were**
9  **reporting as your symptoms?**
10   A.   Yes.
11   Q.   **And for two years they paid for that,**
12 **right?**
13   A.   Yes.
14   Q.   **So, as you sit here today, you can't**
15 **identify a single act or anything done or not done by**
16 **WWE that you consider to be fraudulent to you?**
17   A.   I don't know.
18   Q.   **Well, you're the one who is bringing that**
19 **lawsuit, sir, so I'm asking you:  Do you have**
20 **anything that you considered that was done that was**
21 **fraudulent to you?**
22   A.   I don't know.
23   Q.   **Do you -- did you like Dr. Amann?**
24   A.   From what I remember, he was okay, I
25 guess.

42 (Pages 162 to 165)

166

1     Q.   Did he seem to be concerned about your
2 health?
3     A.  I guess.
4     Q.   Well, did he do anything that indicated
5 he was taking your reports cavalierly?
6     A.  Not that I remember.  I don't, I don't
7 remember.
8     Q.   I think you indicated that when you were
9 at WWE you did know that as long as you claimed you
10 were symptomatic of a concussion that they would not
11 allow you to go back in the ring.  Do you remember
12 that testimony?
13     A.  Yes.
14     Q.   And would it be fair to say you learned
15 that before September 27th, the day you got injured?
16     A.  Yes.
17     Q.   All right.  So you would have learned by
18 definition, then, that you can get a concussion doing
19 this, and if you get a concussion, you will not be
20 allowed back in the ring, correct?
21     A.  I don't know.
22     Q.   Well, I mean, doesn't that flow from
23 that, sir, if you're told that if you get a
24 concussion you will not be allowed back in the ring,
25 and you knew that before you went in the ring on

167

1 September 27th of 2012, right?
2     A.  Yes.
3     Q.   So you knew going into the ring that day
4 that you could get a concussion?
5     A.  I don't know.
6     Q.   You can't put those two together?
7        MR. POGUST:  Objection.
8     Q.   If somebody is telling you that if you
9 get a concussion, you will not be allowed back in the
10 ring and then you make a choice to go into the ring,
11 right?
12     A.  I -- I don't know.
13     Q.   Was there somebody else I could ask about
14 what you know other than you?
15     A.  I don't know.
16     Q.   When you went down there in January, did
17 you watch a videotape of Dr. Maroon giving a
18 presentation?
19     A.  I don't remember one, no.
20     Q.   Do you recall ever being talked to about
21 a drug called spice?
22     A.  No.
23     Q.   Do you recall seeing a presentation about
24 a drug called spice?
25     A.  No.

168

1     Q.   When you were talking to Dr. Amann, did
2 you have the opportunity to ask him any questions you
3 wanted to ask him?
4     A.  Yes.
5     Q.   And did you ask him any questions?
6     A.  I don't remember.
7     Q.   And you also -- well, do you have any
8 reason to think that Dr. Amann didn't answer your
9 questions honestly?
10     A.  I don't remember.
11     Q.   Well, as you sit there today, can you
12 identify anything he said to you that wasn't true or
13 accurate?
14     A.  I don't remember.
15     Q.   Well, I'm not asking what you remember,
16 I'm asking:  Can you, as you're sitting there today,
17 say anything that Dr. Amann told you that was false?
18     A.  I don't know.
19     Q.   So then, you don't know anything, right,
20 that you can identify that he told you was false,
21 right?
22        MR. POGUST:  Because he doesn't remember
23 it.
24        MR. McDEVITT:  Well, if he doesn't
25 remember it, then he can't say it.

169

1     Q.   I mean, you know, why do we have to have
2 this constant I don't remember.  You either remember
3 something or you don't.  If you don't, then you can't
4 identify it.
5        Can you identify anything, as you sit
6 there, that Dr. Amann told you that was false?
7     A.  I don't know.
8     Q.   How about Dr. Maroon?
9     A.  I don't know.
10     Q.   Can you identify a single thing that he
11 told you that was false?
12     A.  I don't know.
13     Q.   How about any of the medical providers
14 that you saw?
15     A.  I don't know.
16     Q.   So you can't identify a single thing
17 anybody told you that was false as you sit here
18 today, right?
19     A.  I don't know.
20     Q.   Well, you know, you just can't identify
21 anything.  You know if you can identify something,
22 sir.  Can you --
23        MR. POGUST:  Objection.
24        MR. McDEVITT:  He does --
25        MR. POGUST:  Asked and answered.

43 (Pages 166 to 169)

170

1        MR. McDEVITT:  These are nonresponsive
2   answers.
3        MR. POGUST:  That's what they are.
4        MR. McDEVITT:  They're nonresponsive and
5   I'm entitled to push him until I get an answer.
6        MR. POGUST:  Fine.
7        MR. McDEVITT:  I don't have to sit here
8   and listen to this pablum?  He either knows or
9   he doesn't.
10       MR. POGUST:  Wait a second.  What did you
11  say?
12       MR. McDEVITT:  I said, I don't have to
13  sit here and just take pablum, I can push an
14  answer.
15       MR. POGUST:  I still didn't hear what you
16  said.  Pablum, is that what you said?
17       MR. McDEVITT:  Pablum.
18       MR. POGUST:  Okay.
19       MR. McDEVITT:  Do you understand what I
20  said now?
21       MR. POGUST:  Yeah.  I don't think he
22  probably understands.
23       MR. McDEVITT:  Well --
24       THE WITNESS:  I don't.
25

171

1   BY MR. McDEVITT:
2        Q.   You either, as you can sit there today,
3   you can either say you know something that you're
4   prepared to testify was done to you that was false
5   for mistreatment by a doctor or you can't.
6        MR. POGUST:  And he said he doesn't
7   remember any of that that happened.
8        MR. McDEVITT:  That's not the same thing
9   as an answer.  That's an evasive answer.  I
10  don't remember, that means it leaves it open
11  for like two days from now maybe he does.
12       MR. POGUST:  But he actually doesn't --
13  he's testified for three hours that he doesn't
14  remember certain things after the accident.
15       MR. McDEVITT:  I'm aware of how many
16  times he's said --
17       MR. POGUST:  I don't want to argue about
18  it with you.
19       MR. McDEVITT:  I don't want to argue
20  either.
21       MR. POGUST:  Okay.
22  BY MR. McDEVITT:
23       Q.   And so, again, I'm just going to ask you
24  one last time, sir.
25       As you sit there today, can you identify

172

1   anything that any medical provider ever told you in
2   the course of treatment that you considered to have
3   been false or fraudulent?
4        MR. POGUST:  Objection.  You can answer.
5        A.  I don't know.
6        Q.  All right.  Did you ask any of the
7   doctors that you treated with whether going back into
8   the ring after an alleged concussion put you at any
9   increased risk for future injury?
10       A.  I don't remember.
11       Q.  When you were treating with these
12  doctors, what did you principally want to find out?
13       A.  What was wrong with me and how I fix it.
14       Q.  All right.  And so wouldn't you be
15  naturally interested in whether you had some kind of
16  organic brain damage?
17       A.  Yes.
18       Q.  And that's what was going to be shown to
19  you by an MRI, and you knew that, right?
20       A.  Yes.
21       Q.  And you've claimed you didn't even bother
22  to ask him what it showed?
23       A.  I don't remember.
24       Q.  On the exhibit you have, Exhibit 14,
25  would you turn to Paragraph 123.  And actually, just

173

1   to give you a reference, if you start at page 27, you
2   see there's a section that says Facts Concerning
3   Named Plaintiff.  Do you see that on page 27 of the
4   document?
5        A.  27?
6        Q.  27 at the bottom.
7        MR. POGUST:  At the bottom, at the bottom
8   center, yeah.  See, down here.
9        THE WITNESS:  Oh, okay.  All right.
10  There it is.
11       MR. POGUST:  Yeah, the page number is at
12  the top.
13       MR. McDEVITT:  Have you found it?
14       THE WITNESS:  Yep.
15  BY MR. McDEVITT:
16       Q.  Paragraph 123 makes the allegation in the
17  last sentence:  WWE downplayed the seriousness of his
18  head injuries and discouraged him from seeking
19  additional appropriate medical help, for example,
20  from a neurologist.  Do you see that?
21       A.  27, right?
22       Q.  Page 27, Paragraph 123.
23       A.  One --
24       Q.  Let me help you.
25       MR. POGUST:  It's right here.

44  (Pages 170 to 173)

174

1           THE WITNESS: Oh, that's on 28. Oh. I
2   was on page 27.
3           MR. POGUST: Yeah, yeah, start here.
4   BY MR. McDEVITT:
5       Q.  Do you see Paragraph 123 there?
6       A.  Yep.
7       Q.  Am I correct that I have read that last
8   sentence of Paragraph 123 correctly?
9       A.  Yes.
10      Q.  And you make the allegation there that
11  WWE discouraged you from seeking additional
12  appropriate medical help, for example, from a
13  neurologist. The reality is, they sent you to a
14  neurologist, didn't they?
15      A.  Yes.
16      Q.  Many of them?
17      A.  Yes.
18      Q.  So why did you allege that they
19  discouraged you from seeing neurologists when, in
20  fact, you knew they had sent you to see neurologists?
21      A.  They were all neurologists that were
22  given to me. I didn't have the option of picking my
23  own neurologist.
24      Q.  That's not what you allege, though. You
25  allege that they discouraged you from seeking

175

1   appropriate medical help.
2       A.  Yeah.
3       Q.  Did you ever tell them you wanted to see
4   an independent neurologist?
5       A.  Yeah.
6       Q.  Did you have some reason to think
7   Dr. Greenberg wasn't?
8       A.  No.
9       Q.  Who did you tell you wanted to see an
10  independent neurologist?
11      A.  Stacy DePolo.
12      Q.  And when did you tell her that?
13      A.  I don't know.
14      Q.  Did you communicate that to her in
15  writing?
16      A.  No.
17      Q.  Did you do that before or after you saw
18  Dr. Greenberg?
19      A.  I don't remember.
20      Q.  Do you have some reason to think
21  Dr. Greenberg was a hack and incompetent?
22      A.  I don't, I don't know.
23      Q.  Well, why did you want to see an
24  independent neurologist?
25      A.  I wanted to ask someone their personal

176

1   opinion of my choice.
2       Q.  And what did you want to ask them?
3       A.  I wanted to ask them their opinion.
4       Q.  But did -- did you ask Dr. Greenberg his
5   opinion?
6       A.  I don't remember.
7       Q.  Well, and you say you couldn't get your
8   own neurologist, why couldn't you get your own
9   neurologist?
10      A.  It was required of me to go to the ones
11  they were appointing to me.
12      Q.  But you were perfectly capable of calling
13  any neurologist and saying "I want a second opinion,"
14  weren't you?
15      A.  I don't know.
16      Q.  Did you do that?
17      A.  No.
18      Q.  But the WWE didn't discourage you from
19  seeing a neurologist, did they, they sent you to
20  neurologists?
21      A.  Yes.
22      Q.  Paragraph 124 of this document says:
23  After approximately 15 matches during which he
24  sustained multiple traumas he suffered a serious head
25  injury during a match with Erick Rowan. The WWE

177

1   cleared him to continue wrestling after inadequate
2   rest time and downplayed his injury. Do you see
3   that?
4       A.  Yes.
5       Q.  The WWE never cleared you to wrestle
6   again, did they?
7       A.  I don't remember.
8       Q.  Well, you just testified you never
9   wrestled again.
10      A.  I didn't.
11      Q.  And so how did they clear you to continue
12  wrestling when you never wrestled again?
13      A.  I don't remember.
14      Q.  Well, who do you contend cleared you to
15  wrestle?
16      A.  I don't know.
17      Q.  Well, you made this allegation that WWE
18  cleared him to continue wrestling. Who -- who
19  cleared you to continue wrestling?
20      A.  I don't know.
21      Q.  What was the basis of that statement
22  then?
23      A.  I don't know.
24      Q.  Did you provide that to your lawyers?
25      A.  I don't remember.

45 (Pages 174 to 177)

178

1      Q.   When you read this, did you say, "You
2  know, I don't remember that happening"?
3      A.   I don't remember.
4      Q.   Do you agree this makes WWE look like
5  they didn't give a damn what happened to you?
6      A.   Yes.
7      Q.   And, in fact, they sent you to doctor
8  after doctor after doctor for two years, didn't they?
9      A.   Yes.
10     Q.   Do you recall reporting to WWE this
11 episode, was it you driving a car somewhere and going
12 off the road?
13     A.   I don't remember.
14     Q.   As you sit there today, do you have any
15 memory of that episode?
16     A.   No.
17     Q.   Can you testify affirmatively that even
18 happened?
19     A.   I don't remember.
20     Q.   So, as you sit here there today, you
21 can't say that actually happened?
22     A.   I don't know.
23     Q.   So if your testimony is or if the record
24 shows you reported that to WWE afterwards and now
25 you're saying you don't remember, we have to believe

179

1  your memory was such that you could drive a car off
2  the road, report it to people, and no longer remember
3  it today.
4      A.   I don't remember.
5      Q.   Is that your testimony?
6      A.   I don't remember.
7      Q.   That would be pretty serious, wouldn't
8  it, driving a car off a road?
9      A.   Yeah.  Yeah, it would.
10     Q.   And the kind of thing you might remember?
11        MR. POGUST:  Objection.  If he didn't
12 have a head injury.
13        MR. McDEVITT:  Yeah, right.
14     Q.   Would you look at Paragraph 125.
15        Paragraph 125 says:  He has experienced
16 an array of serious symptoms including tremors,
17 convulsions, migraines, et cetera.
18        And then the second sentence says:  In
19 subsequent months it came to light that he had
20 suffered internal bleeding of the left hemisphere of
21 the brain.  Do you see that?
22     A.   Yes.
23     Q.   How did it come to light in subsequent
24 months that you had suffered internal bleeding to the
25 left hemisphere of the brain?

180

1      A.   I don't know.
2      Q.   Well, you made that allegation, what was
3  the basis of it?
4      A.   I was told that I had a hemorrhage in the
5  left side of my brain.
6      Q.   By your girlfriend?
7      A.   Yes.
8      Q.   And that was --
9      A.   Who was at the doctor's office with me.
10     Q.   And that was the basis of your
11 allegation?
12     A.   Yes.
13     Q.   That your girlfriend tells you what the
14 doctor said?
15     A.   I don't know.
16     Q.   Well, do you recall whenever this was
17 being alleged that this makes it sound like you had
18 some kind of serious brain injury that went
19 undiagnosed for several months; that's the way it's
20 designed to make it look, isn't it?
21     A.   I don't know.
22        MR. POGUST:  Objection.
23     Q.   It says:  In subsequent months it came to
24 light that he had suffered internal bleeding to the
25 left hemisphere -- it doesn't say "to," but that's

181

1  what it means -- to the left hemisphere of his brain,
2  it makes it sound like you had an undiagnosed serious
3  injury for months, doesn't it?
4      A.   Yes.
5      Q.   When, in fact, that isn't true, is it?
6        MR. POGUST:  Objection.
7      A.   I don't know.
8      Q.   Well, you can't sit there today and tell
9  me anybody that ever diagnosed you as having an
10 internal bleeding on the left side of your brain, can
11 you?
12     A.   I don't know.
13        MR. POGUST:  Objection.
14     Q.   You've seen the three MRIs that say you
15 didn't?
16     A.   I don't know.
17        MR. POGUST:  Objection.
18     Q.   You know now, don't you?
19     A.   I don't know.
20     Q.   Even when you now have in front of you
21 the MRI reports that say you didn't, you're still
22 sitting there pretending you don't know?
23        MR. POGUST:  Objection.
24     A.   I don't know.
25     Q.   What is it you don't know?

46 (Pages 178 to 181)

182

1      A.   I don't know that if I had -- all I know
2  is what I was told.
3      Q.   By your girlfriend?
4      A.   Yes.  And she has no reason to lie to me.
5      Q.   Well, she could be mistaken.
6      A.   She was in the room with me and the
7  doctor.
8      Q.   Well, would you agree that as between her
9  and the doctor, the doctor knows better what you had?
10     A.   Yes.
11     Q.   Well, do you think before you file a
12 lawsuit you might want to call the doctor instead of
13 relying on your girlfriend's memory?
14          MR. POGUST:  Objection.
15     A.   I don't know.
16     Q.   So you can't tell me what the factual
17 basis is, then, of saying:  In subsequent months it
18 came to light that he had suffered internal bleeding?
19          MR. POGUST:  Objection.  He just did.
20     A.   I don't know.
21     Q.   Well, what happened in the subsequent
22 months other than Candace tells you this?
23     A.   I don't know.
24     Q.   Well, when did she tell you that that's
25 what she thought Dr. Greenberg said?

183

1      A.   I don't remember.
2      Q.   Let's turn to --
3          MR. McDEVITT:  Let's get the second one
4  out.
5          MR. POGUST:  After that, what are you
6  thinking?
7          MR. McDEVITT:  Maybe after we finish this
8  one we'll take a break.
9          MR. POGUST:  Good.
10          MR. McDEVITT:  Break for lunch.
11          (Plaintiffs' First Amended Complaint
12  marked as Singleton Exhibit 15, as of this
13  date.)
14 BY MR. McDEVITT:
15     Q.   Mr. Singleton, I've handed you what's
16 marked Exhibit 15, which is the first amended
17 complaint that was filed on your behalf on May 22nd
18 of this year.
19          Did you know in May that the complaint
20 was going to be amended?
21     A.   I don't remember.
22     Q.   Did you know that the claims for class
23 action treatment were going to be dropped?
24     A.   I don't know.
25     Q.   Do you know why this document was filed?

184

1      A.   No, I don't remember.
2      Q.   Do you recall reviewing this one?
3      A.   No.
4      Q.   Do you think you didn't review it?
5      A.   I don't remember.
6      Q.   When you walked in here today, did you
7  know that three different versions of a complaint had
8  been filed on your behalf?
9      A.   No.
10     Q.   All right.  Would you turn, sir, to page
11 20, Paragraph 96.  Would you read Paragraph 96?
12          MR. POGUST:  Page 21?
13          MR. McDEVITT:  Yes.
14          MR. POGUST:  I thought you said 20.
15     Q.   I'm sorry, page 21, Paragraph 96.
16     A.   It was not until more than 10 months
17 later that he was diagnosed with a traumatic brain
18 injury, including an intracranial hemorrhage.
19     Q.   That's not a true statement, is it?
20     A.   I don't, I don't know.
21     Q.   That's a false statement, is it?
22     A.   I don't know.
23     Q.   Well, you made it, didn't you?
24     A.   I don't remember.
25     Q.   Did you authorize your lawyers to make

185

1  this statement on your behalf?
2      A.   I don't know.
3      Q.   Do you know they made that statement on
4  your behalf?
5      A.   No.
6      Q.   So the first time you realized that they
7  were claiming that is when you just read it today?
8      A.   To the best of my recollection.
9      Q.   All right.  Now, when it says it was not
10 until more than 10 months later, so if you were
11 injured in September, that's now, what, July of 2013.
12 Who in July of 2013 diagnosed you with a traumatic
13 brain injury, including a intracranial hemorrhage?
14     A.   I don't, I don't remember.
15     Q.   Can you identify anybody that diagnosed
16 you with that in July of 2013 or at any time?
17     A.   I don't know.
18     Q.   Do you find it odd that these allegations
19 are being made on your behalf that you don't even
20 know about?
21     A.   I don't know.
22     Q.   Do you know this is not supposed to be an
23 exercise in fiction writing, Mr. Singleton?  Do you
24 understand?
25          MR. POGUST:  Objection.

47 (Pages 182 to 185)

186

1    Q.   It's supposed to be based on facts?
2    A.   Yes.
3    Q.   What fact is there to support Paragraph
4    96?
5    A.   I don't know.
6    Q.   So would you agree that's the time to
7    make it look like you went 10 months with an
8    undiagnosed traumatic brain injury?
9    A.   I don't know.
10   Q.   Do you agree that's the way it reads,
11   that you had some intracranial hemorrhage for 10
12   months that didn't get diagnosed?
13   A.   Yes.
14   Q.   And that's false, isn't it?
15   A.   I don't know.
16   Q.   Well, you would remember, sir, I would
17   think, that if you went 10 months without a diagnosis
18   and the doctor ends up telling you you have a
19   intracranial hemorrhage, do you remember any such
20   event?
21   A.   I don't remember, no.
22   Q.   The doctors that you've been seeing
23   beforehand must have missed this because you had seen
24   many doctors in that 10 months, hadn't you?
25       MR. POGUST:  Objection.  That's

187

1    argumentative.
2    A.   I don't remember.
3    Q.   Well, you had seen many doctors in those
4    10 months, hadn't you?
5    A.   I don't know.
6    Q.   You just saw that Dr. Greenberg was
7    seeing you in December and February of 2013, so he
8    must have missed it, right, if that's true?
9    A.   I don't know.
10   Q.   Well, if somebody told you that, you
11   don't remember of somebody telling you your doctor --
12       MR. POGUST:  Objection.
13   Q.   -- blew the diagnosis?
14       MR. POGUST:  Objection.
15   A.   I don't remember.
16       MR. POGUST:  You're just being
17   argumentative now.
18   BY MR. McDEVITT:
19   Q.   In May of 2015 were you driving a car?
20   A.   Yes.
21   Q.   Read Paragraph 99.
22   A.   At the age of 22, he is nearly fully
23   disabled and cannot perform simple tasks like driving
24   a car.
25   Q.   So that's another false statement, isn't

188

1    it?
2    A.   Yes.
3        MR. McDEVITT:  All right.  If you want to
4    take a break now, this is a good time to break
5    for lunch.
6        MR. POGUST:  Your call.
7        MR. McDEVITT:  12:30 to 1:30.
8        THE VIDEOGRAPHER:  The time is 12:28 p.m.
9    We're off the record.
10       (Whereupon, off the record.)
11       (Whereupon, lunch recess.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

189

1    A F T E R N O O N   S E S S I O N
2        (Whereupon, resumed.)
3        THE VIDEOGRAPHER:  The time is 1:34 p.m.
4    Back on the record.
5    BY MR. McDEVITT:
6    Q.   Good afternoon, Mr. Singleton.  You
7    recognize you're still under oath?
8    A.   Yes.
9    Q.   And during the lunch break did you
10   discuss any aspect of your prior testimony?
11   A.   No.
12   Q.   Did you talk to Candace?
13   A.   Yes.
14   Q.   How long did you talk to Candace?
15   A.   It was a text message.
16   Q.   What did you say?
17   A.   She asked me if it was going well and I
18   said yes.
19   Q.   Did you mention to her that she was
20   brought up?
21   A.   No.
22   Q.   So you didn't bring up about the part of
23   her telling you about having a hemorrhage?
24   A.   No.
25   Q.   Did you talk to anybody else at

48  (Pages 186 to 189)

190

1    lunchtime?
2        A.   No.
3        Q.   How about your mother?
4        A.   No.
5        Q.   Now, you mentioned this morning that your
6    mother, if I understood you correctly, is the one who
7    contacted Mr. Kyros?
8        A.   Yes.
9        Q.   What does your mother do for a living?
10       A.   She works at home.  To my -- the best of
11   my knowledge, I think she's the one in charge of
12   distributing loans to people who are looking for a
13   house or property.
14       Q.   So she works out of her house?
15       A.   Yes.
16       Q.   She's a mortgage broker?
17       A.   I think so.  I don't know her official
18   job title.
19       Q.   Has she ever been in trouble with the
20   law?
21       A.   Not that I know of.
22       Q.   Is she involved in any lawsuits?
23       A.   Not that I know of.
24       Q.   And did she talk to you about the lawsuit
25   against the NFL for head injuries?

191

1        A.   Not that I remember, no.
2        Q.   Did she talk to you about the fact that
3    the NFL agreed to pay a billion dollars to settle a
4    claim made by NFL players?
5        A.   Not that I know of.
6        Q.   Did you know that?
7        A.   No.
8        Q.   You just learned that today for the first
9    time?
10       A.   Yes.
11       Q.   You're totally ignorant of that?
12       A.   Yeah.
13       Q.   Did she tell you why she wanted you to
14   talk to Mr. Kyros?
15       A.   Not that I remember.  I don't remember,
16   no.
17       Q.   That she was urging you to bring a
18   lawsuit?
19            MR. POGUST:  Objection.
20       A.   I don't remember.
21       Q.   Well, why did she tell you she wanted you
22   to talk to Mr. Kyros?
23       A.   I don't remember.
24       Q.   Why did you listen to her?
25       A.   She's my mother.

192

1        Q.   How old are you?
2        A.   Twenty-three.
3        Q.   And so everything your mother tells you
4    at 23 you do?
5        A.   No, but I trust her opinion.
6        Q.   And has she talked to you about how much
7    money you might get out of this case?
8        A.   Not that I remember.
9        Q.   When your parents got divorced, was it
10   traumatic to you?
11       A.   It was upsetting, I don't know
12   necessarily about traumatic.
13       Q.   What was the cause of the divorce?
14       A.   My mother -- we, we -- me and my sister
15   and my dad found out that my mother was having an
16   affair.
17       Q.   And is she with that guy today?
18       A.   No.
19       Q.   That's not who lives with her now?
20       A.   No.
21       Q.   It's a different guy?
22       A.   Yes.
23       Q.   What was that guy's name?
24       A.   I don't remember his name.
25       Q.   Where did he live?

193

1        A.   I don't know.
2        Q.   How did you find out about this affair?
3        A.   My dad found a separate cell phone that
4    she was using, a prepaid cell phone.
5        Q.   So when he found that out, did she leave
6    the house?
7        A.   Yeah.
8        Q.   Why did she have no dealings with you for
9    years?
10       A.   I distanced myself from her.  I didn't
11   really have any interest in talking to her.
12       Q.   And I think you indicated you have a
13   sister who's bipolar?
14       A.   Yes.
15       Q.   Did you resent the fact that she got a
16   lot more attention than you did when growing up?
17            MR. POGUST:  Objection.
18       A.   Yes.
19       Q.   Does she still get more attention than
20   you?
21       A.   I don't know.
22       Q.   Where does she live?
23       A.   She has her own house.
24       Q.   Do you see her often?
25       A.   No.

49  (Pages 190 to 193)

194

1    Q.   With respect to your Instagram account,
2  would it be fair to say that everything that is
3  posted on your Instagram account today was posted
4  during the time that you were under contract with the
5  WWE?
6    A.   I don't know.
7    Q.   Did you post a lot of things on there
8  during that time period?
9    A.   Probably.  I don't remember.
10    Q.   All right.  And have you posted anything
11  recently on Instagram?
12    A.   Not recently, no.
13    Q.   Is there a reason you stopped posting on
14  Instagram?
15    A.   I kind of lost interest.
16    Q.   Did somebody tell you that wasn't a
17  particularly good idea to be doing while you were
18  claiming you were disabled?
19    A.   No.
20    Q.   You posted in there about your body
21  building competition, didn't you?
22    A.   Yes.
23    Q.   Is that the last thing you posted?
24    A.   I think so.
25    Q.   Why have you not done more body building

195

1  competitions?
2    A.   It was a little difficult.  The entire
3  process leading up to the show and then the show
4  itself.  There's a lot of, there's a lot of -- well,
5  there's a lot of things that go into it that I had a
6  little bit of a difficulty with.  Diet is a lot
7  harder than it seems.  The show itself, I had a
8  little bit of trouble with that.  I went up there and
9  I performed the way that I should have but it gave me
10  a lot of -- with all the lights and the people it
11  really kind of kickstarted my whole symptoms up for
12  the day and it didn't, it didn't really feel very
13  good dealing with all of those.  It was a high
14  stress.
15    Q.   Did you post anything about how you did
16  in that competition?
17    A.   I don't remember.
18    Q.   Did you post things indicating this was
19  just a great start for you?
20    A.   I don't remember.
21    Q.   Did you call yourself T-Rex?  Is that
22  what you call yourself?
23    A.   Yeah.
24    Q.   What's that supposed to mean?
25    A.   I'm a big fan of dinosaurs, have been

196

1  since I was a kid.
2    Q.   And T-Rex is the ultimate dinosaur,
3  right?
4    A.   He is.
5    Q.   And that's what you think of yourself as?
6    A.   Yeah.
7    Q.   Do you regularly read any newspapers?
8    A.   No.
9    Q.   Do you read any magazines?
10    A.   No.
11    Q.   Do you ever read Sports Illustrated?
12    A.   No.
13    Q.   Do watch any television news shows?
14    A.   What, like just the news in general?
15    Q.   Well, let's start with that.  Do you
16  watch news in general?
17    A.   No.
18    Q.   Do you watch things like 20/20?
19    A.   No.
20    Q.   Do you watch any of the E:60s on ESPN?
21    A.   No.
22    Q.   Do you watch TV?
23    A.   Yeah.
24    Q.   What do you watch?
25    A.   Cartoons.

197

1    Q.   That's it?
2    A.   Mostly cartoons, yeah.  Game of Thrones
3  is pretty popular.
4    Q.   All right.  Do you still play video
5  games?
6    A.   Every once in a while.
7    Q.   How much time of the day do you spend on
8  video games?
9    A.   Honestly it's more of a -- I probably
10  play video games two days out of the week.  It's not
11  an everyday thing.
12    Q.   Do you still play WWE video games?
13    A.   No.
14    Q.   When did you stop doing that?
15    A.   I don't know, maybe I was a teenager.
16    Q.   So have you now in your mind given up on
17  the idea of being a professional wrestler?
18    A.   Yes.
19    Q.   You have no desire to do that anymore?
20    A.   No.
21    Q.   And when did you lose that desire?
22    A.   When Dr. Nancy Rogers told me another
23  fall like the one I took could kill me.
24    Q.   And you remember that now?
25    A.   It was brought up to me numerous times by

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

198

1  Candy.
2      Q.   Did somebody talk to you about that at
3  lunchtime?
4      A.   No.
5          MR. POGUST:  Objection.
6      Q.   So you just remembered that, Dr. Rogers
7  telling you that just now?
8      A.   No.
9      Q.   You can't remember anything about what
10  any doctors told you this morning but you remember
11  that now?
12         And she supposedly told you one more fall
13  would kill you?
14     A.   Like that.
15     Q.   Like that?
16     A.   Yes.
17     Q.   And what did you say when she said that?
18     A.   I didn't say anything, I was kind of
19  distraught.
20     Q.   Did you go to anybody at WWE and say, I
21  really don't want to perform anymore because
22  Dr. Rogers has told me one more fall would kill me?
23     A.   I don't remember.
24     Q.   Well, if it concerned you so much, did
25  you tell anybody that?

199

1      A.   Not really.
2      Q.   She was treating you to see if you had
3  epilepsy, correct?
4      A.   Yes.
5      Q.   And why you were having seizures, right?
6      A.   Yes.
7      Q.   Is there any document anywhere that
8  reflects her telling you that?
9      A.   I don't know.
10     Q.   Have you ever seen any such document?
11     A.   I don't know.
12     Q.   And you did not make a point that you
13  know of of telling anybody at WWE that you wished to
14  retire because you didn't want to take that risk?
15     A.   I don't know.  I don't remember.
16     Q.   Well, would she have told you that in
17  2013?
18     A.   I don't know.
19     Q.   That's when she treated you, isn't it?
20     A.   I don't know.  Yes.
21     Q.   So if you -- if you decided that after
22  hearing that that you didn't want to be a
23  professional wrestler anymore, why didn't you tell
24  WWE you wish to retire and stop taking their money?
25     A.   I don't know.

200

1      Q.   You kept telling them that you were going
2  to try to get better and take their money, didn't
3  you?
4          MR. POGUST:  Objection.
5      A.   I don't know.
6      Q.   Well, you had the right to call them up
7  and say, I don't want to perform anymore, right?
8      A.   I don't know.
9      Q.   Well, if you -- if you were so worried
10  about your life that you weren't going to perform
11  anymore, why didn't you just be honest with WWE and
12  call them up and say, I don't want to do this
13  anymore?
14     A.   I don't know.
15     Q.   But you didn't do that, did you?
16     A.   I don't know.
17     Q.   Well, you know if you did that.
18     A.   I don't, I don't know.
19     Q.   You don't know what?
20     A.   I don't know if I called them or not.
21     Q.   You don't know if you called them and
22  told them, I want to quit because I'm afraid I'm
23  going to die?
24     A.   I don't know.
25     Q.   So you think you might have done that?

201

1      A.   I don't know.
2      Q.   But you kept taking the money for another
3  couple of years, right?
4          MR. POGUST:  Objection.  Asked and
5          answered.  Three times.
6      Q.   So it would have been sometime during
7  your treatment with Dr. Rogers that you formed a
8  belief that you didn't want to perform anymore; is
9  that right?
10     A.   Yes.
11     Q.   All right.  I want to go back for a
12  minute, Mr. Singleton, to Exhibit 8, the -- well,
13  before I do that, let me ask you this.
14         When you were talking to Mr. LoGrasso,
15  did he tell you any of the other people's names that
16  he's been trying to recruit to join your lawsuit?
17     A.   I don't remember.
18     Q.   Did you guys talk about whether other
19  people would be joining the lawsuit?
20     A.   I don't remember.
21     Q.   Have you ever talked to Billy Jack
22  Haynes?
23     A.   Jack Haynes.  No, not that I remember.
24     Q.   Have you ever talked to Russ McCullough?
25     A.   Not that I remember, no.

51 (Pages 198 to 201)

202

1    Q.   Have you ever talked to any of the other
2  wrestlers that suits have been brought on behalf of?
3    A.   No, not that I remember.
4    Q.   All right.  If you would, go back to
5  Exhibit 8, sir, that Twitter package.
6    A.   The big one or the small one?
7    MR. POGUST:  The big one.
8    Q.   The big one.  Exhibit 8.
9    A.   Okay.
10   Q.   Now your testimony from this morning, if
11 I understand, was you only, you only sent one Twitter
12 message; is that what you said?
13   A.   Yes.
14   Q.   And you deny this is yours?
15   A.   Yes.
16   Q.   Well, let's start with page 2, the entry
17 under June 1.
18       Do you see where it says:  Been upset
19 lately on how WWE has not even contacted me lately.
20 Do you see that?
21   A.   Yes.
22   Q.   And, again, your testimony is, you didn't
23 write that?
24   A.   I did not.
25   Q.   And then go to the next page.  Do you see

203

1  December 22nd where it says:  Got back in the ring
2  finally?
3    A.   Yes.
4    Q.   And your testimony is, you didn't write
5  that?
6    A.   I did not.
7    Q.   And then below that it says:  Must visit
8  the WWE Performance Center soon again.  Need to get a
9  good workout in.  WWE is my life.  Live my job.  You
10 say you didn't write that either?
11   A.   I did not.
12   Q.   Go to the next page on page 4.  Do you
13 see the entry under September 23rd:  Off to the gym
14 with my lady?
15       MR. POGUST:  Toward the bottom.
16   A.   Yes.  There it is, yeah.
17   Q.   Do you work out in the gym with your
18 girlfriend?
19   A.   No.
20   Q.   You don't?
21   A.   No.
22   Q.   She doesn't go to the gym with you?
23   A.   No.
24   Q.   Go to page 9.
25   A.   All right.

204

1    Q.   Do you see the entry, middle of the page,
2  for August 7, 2013:  I hate the situation I'm in
3  right now with being apart of WWE.  I never get put
4  in any matches anywhere.  Not live events or NXT
5  Tapings?
6    A.   Yep.
7    Q.   You didn't write that either?
8    A.   No.
9    Q.   Go to the next page, page 10.
10       Do you see on August 4th where it says:
11 Sitting at home with Candace.  Anyone up for a Q&A?
12 Use the #AskMercer?
13   A.   Yes.
14   Q.   You didn't write that either?
15   A.   No.
16   Q.   And then down below on the 28th of July,
17 it says:  Watching WWE Total Divas.  Candace and
18 myself love this show.  Do you see that?
19   A.   Yes.
20   Q.   Do you two watch that show together?
21   A.   No.
22   Q.   Never?
23   A.   No.
24   Q.   Go to page 12.
25   A.   Okay.

205

1    Q.   The bottom there July 16, 2013:  Hanging
2  out with Candace today.  I love her.  You didn't
3  write that?
4    A.   No.
5    Q.   So whoever's writing this was presumably
6  writing about you and they know the name of your
7  girlfriend?
8    A.   Yeah.
9    Q.   Go to page 14.  June 28:  I'm destined
10 for greatness.  But right now I'm being used for
11 something like catering.  Something I shouldn't be
12 doing.  It's my time.
13   A.   Yes, I see it.
14   Q.   Did you feel that way in June of 2013?
15   A.   No.
16   Q.   Again, you didn't write that?
17   A.   No.
18   Q.   Go to the next page, the 15th, on June 1.
19       Do you see where it says:  Decided to
20 head to Bethlehem, PA, since it's in my home State of
21 Pennsylvania.  My lady and I enjoyed the show at WWE
22 Bethlehem.
23   A.   Yeah, I see it.
24   Q.   Did you go to a show in Bethlehem?
25   A.   No.

52 (Pages 202 to 205)

206

1    Q.   Go to page 22.
2    A.   Okay.
3    Q.   Do you see at the bottom of the page
4  April 4, 2013:  Candace and I are ready to go to
5  Axxess right now.  Let's go Wrestlemania 29?
6    A.   Yep.
7    Q.   Did you go to Wrestlemania 29?
8    A.   No.
9    Q.   Do you see the picture there for April
10 5th?
11   A.   Yes.
12   Q.   Is that you in the picture?
13   A.   Yes.
14   Q.   Do you remember when that happened?
15   A.   Yes.
16   Q.   When did that happen?
17   A.   That happened when I first got into the
18 independent wrestling circuit.  And the man in the
19 picture next to me, that was his last match wrestling
20 on the independent circuit.  And I wanted to get my
21 picture with him because it was the first live show I
22 ever attended at the independent circuit.  And for
23 the entirety of the show he's the one that stood out
24 to me and it was his last match, so I wanted a
25 picture with him.

207

1    Q.   So is that a picture you had in your
2  possession?
3    A.   Yeah.
4    Q.   Did you give that picture to anybody
5  else?
6    A.   No.
7    Q.   Do you have any idea how it got posted on
8  here?
9    A.   It was probably taken off of my Facebook.
10   Q.   So that was on your Facebook page?
11   A.   Yes.
12   Q.   So somebody --
13   A.   Probably.
14   Q.   Your testimony is, you think somebody
15 took that off your Facebook page and put it here to
16 make it look like you met somebody in New York City?
17   A.   Yes.
18   Q.   Go to April 3rd on page 23.
19   A.   Okay.
20   Q.   Do you see where it says:  Did a lot of
21 things today with Candace.  We both checked out
22 MetLife Stadium and visited Axxess which opens
23 tomorrow.  Do you see that?
24   A.   Yes.
25   Q.   And you didn't check out MetLife Stadium

208

1  with her?
2    A.   No.
3    Q.   When you were getting your training down
4  there, did WWE give you any training in social media?
5    A.   No.
6    Q.   Did they tell you about how to use
7  Twitter accounts?
8    A.   They told us we were required to have
9  one, not how to use it.
10   Q.   And did they tell you to use it?
11   A.   Yes.
12   Q.   All right.  To your knowledge, did
13 anybody at WWE write these things for you?
14   A.   To the best of my knowledge, no.
15         MR. POGUST:  Objection.  Write what
16 things?
17         MR. McDEVITT:  These Twitter entries.
18         MR. POGUST:  He said they're not his.
19 BY MR. McDEVITT:
20   Q.   Maybe you didn't hear my question.  I
21 said:  To your knowledge, did anybody at WWE write
22 these for you?
23   A.   To my knowledge.
24         MR. POGUST:  Right.
25   Q.   So, to your knowledge, no?

209

1    A.   No.
2    Q.   To your knowledge, did anybody from WWE
3  somehow put these on your Twitter account without you
4  knowing?
5    A.   To my knowledge, no.
6         MR. POGUST:  Objection.  He said it's not
7  his Twitter account.  It has his name on it, I
8  understand that, but he says it's not his
9  Twitter account.
10        (Plaintiffs' Second Amended Complaint
11 marked as Singleton Exhibit 16, as of this
12 date.)
13 BY MR. McDEVITT:
14   Q.   Mr. Singleton, I've handed you what's
15 been marked as Exhibit 16, which is the second
16 amended complaint that was filed on your behalf by
17 your counsel on June 15 of 2015.
18   A.   Okay.
19   Q.   Did you see this document before it was
20 filed?
21   A.   To the best of my recollection, no.
22   Q.   And did you know that another amendment
23 was going to be made to the lawsuit that had been
24 filed on your behalf?
25   A.   To the best of my recollection, no.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue · Ste 500, New York, NY 10123  1.800.642.1099

210

1    Q.   So would it be fair to say then that you
2  didn't review this document to see if it accurately
3  reflected what had happened to you?
4    A.   I do not, no, I don't remember.
5    Q.   Let's go, if you will, to page 29,
6  Paragraph 102.
7    A.   You said 102?
8    Q.   Paragraph 102, yes.
9    A.   Okay.
10   Q.   Where it says:  A choke slam is
11 considered by wrestlers themselves to be one of the
12 more dangerous moves.  The move involves grabbing
13 Mr. Singleton by the neck, being lift up and slammed
14 to the mat.  Do you see that?
15   A.   Yes.
16   Q.   Actually, that's not an accurate
17 description of how the move is executed, is it?
18   A.   Yes, it is.
19   Q.   Well, it's inaccurate in the sense that
20 you're not being lifted up by the neck by one hand?
21   A.   No.
22   Q.   You're jumping up to facilitate the move?
23   A.   Yes.
24   Q.   You participate in the move?
25   A.   Yes.

211

1       MR. POGUST:  Objection.  Let him ask the
2  question before.  He's making a statement and
3  you're agreeing with him.  He's going to ask
4  you a question.
5       MR. McDEVITT:  I think he did.
6       MR. POGUST:  No, I understand, I'm just
7  trying to --
8  BY MR. McDEVITT:
9    Q.   So the move, to be accurate -- first of
10 all, you know it's going to be done to you before
11 it's done, right?
12   A.   Yes.
13   Q.   Do you know what it means when I say
14 wrestlers call their matches?
15   A.   Yes.
16   Q.   What does it mean?
17   A.   It mean wrestlers talk to themselves,
18 talk to each other in the ring and decide what's
19 going to happen next.
20   Q.   And as a professional you're taught how
21 to do that, right?
22   A.   Yes.
23   Q.   And so you know there's seldom, if ever,
24 a move like being choke slammed that you don't know
25 it's coming, you know it's coming, don't you?

212

1    A.   Yes.
2    Q.   And the move begins with the opponent,
3  Mr. Rowan, clamping his hand around your neck, right?
4    A.   Yes.
5    Q.   And then giving the appearance that he's
6  lifting you up and what's really happening is you're
7  jumping up, right?
8    A.   Yes.
9    Q.   And after you jump up, then you have to
10 turn your body horizontal to the mat, right?
11   A.   Yes.
12   Q.   And then he pushes you down and you take
13 a flat back, the proper execution of the move, with
14 your chin tucked, right?
15   A.   Well, he's supposed to guide you, not
16 throw you down, but yes.
17   Q.   So, and with that qualification,
18 everything I said is correct, right?
19   A.   Yes.
20   Q.   So it's not a move that where he's
21 lifting you up in any sense of the word, nobody could
22 lift you up with one hand, could they?
23   A.   I don't know.
24   Q.   You weigh how much?
25   A.   300.

213

1    Q.   You think Mr. Rowan or anybody could put
2  his hand around your neck and lift your whole body up
3  in the air?
4       MR. POGUST:  Objection.
5    A.   No.
6    Q.   That requires your act of participation
7  in the move, right?
8    A.   Yes.
9    Q.   All right.  Would you turn to page 30,
10 Paragraph 108, and reread 108.
11      Actually, just to give you the context
12 here, Mr. Singleton.  Paragraph 107 first alleges
13 that on January 18th you were cleared by
14 Dr. Greenberg to return to normal activity with no
15 restrictions or limitations.
16      Then it says:  On January 21st Singleton
17 returned to watch practice where the notes indicate,
18 quote, We will get a routine down to slowly integrate
19 him into full practive within the next month.  He was
20 not medically cleared to wrestle, though he did some
21 in-ring activity on February 2nd, 2013, for seven
22 minutes.  Do you recall that?
23   A.   No.
24   Q.   And so you don't recall complaining of
25 being dizzy or being woozy?

54 (Pages 210 to 213)

214

1    A.  I don't know.
2        MR. POGUST:  On that date.
3    Q.  On that date.
4    A.  I don't remember.
5    Q.  All right.  And by the time this was
6   filed in June of 2015, had anybody come back to you
7   and asked you specifically whether you had any kind
8   of medical records that you had that you could make
9   available that would demonstrate that a doctor had
10  diagnosed you as having a brain hemorrhage?
11   A.  I don't, I don't know, I don't remember.
12   Q.  You spoke about Dr. Rogers.  Do you
13  recall her giving you what's called a ambulatory EEG?
14   A.  Is that -- is that the one that's stuck
15  to my head?
16   Q.  As I understand it, Mr. Singleton, it's
17  one where for a couple of days you have to press a
18  button when you're symptomatic.
19   A.  Uhm.
20   Q.  Do you recall that?
21   A.  Faintly, yes.
22   Q.  All right.  And then they correlate that
23  to see if there's any neurological activity going on
24  with you at the time you're pressing the button
25  claiming you're symptomatic in some way.  Do you

215

1   recall that process?
2    A.  Faintly, yes.
3    Q.  And did you actually do what she asked
4   you to do?
5    A.  Yes.
6    Q.  And do you recall what she told you at
7   the end of that whole business?
8    A.  Pretty much.  From what I remember, all I
9   learned that day is that I have evidence of a severe
10  brain injury and I do not have epilepsy.
11   Q.  Did she tell you she couldn't find any
12  correlation whatsoever to any neurological activity
13  for when you were pressing the buttons?
14   A.  I don't remember.
15   Q.  And do you realize that Dr. Rogers has
16  testified that she bases what she believed on what
17  you told her to be accurate?
18   A.  I don't know.
19   Q.  And that she would believe that what you
20  told her about having a brain hemorrhage was an
21  accurate depiction of what, in fact, had happened to
22  you?
23       MR. POGUST:  Objection.  You're asking
24   him whether he knows that she testified to
25   that?

216

1        MR. McDEVITT:  Yeah.
2    Q.  Do you realize that?
3    A.  No.
4    Q.  Would that surprise you that a doctor
5   would think that?
6    A.  I don't know.
7    Q.  And does it surprise you to learn that
8   Dr. Rogers has testified that she didn't think you
9   were trying to get better?
10       MR. POGUST:  Objection.
11   A.  I don't know.
12   Q.  She saw you for quite a while, right?
13   A.  I think.
14   Q.  And this business about her supposedly
15  telling you that if you took another bump in the head
16  you could die.  Do you know why when she was deposed
17  her lawyers didn't ask her if she said that to you?
18       MR. POGUST:  Objection.
19   A.  I'm sorry?
20   Q.  She was just deposed last week and your
21  lawyers didn't ask her if she told you that.
22       MR. POGUST:  You want to know why his
23   lawyers didn't ask a witness a question at a
24   deposition?
25   Q.  Do you understand my question?

217

1    A.  Not really.
2    Q.  Did you -- this business about being told
3   that by Dr. Rogers --
4    A.  Okay.
5    Q.  -- you testified to, about if you take
6   another bump in the head.
7    A.  Okay.
8    Q.  Was today the first time you revealed
9   that to anybody?
10   A.  Revealed?
11   Q.  That she supposedly said that to you?
12   A.  No.
13   Q.  Who did you tell that to before?
14   A.  Candace.
15   Q.  Candace.  How about your lawyers?
16   A.  Yeah.
17   Q.  All right.  Do you know why they didn't
18  ask her during the deposition, then, whether she told
19  you that?
20       MR. POGUST:  Objection.
21   A.  I don't know.
22   Q.  And would you expect them to ask that
23  question if that's what she told you?
24       MR. POGUST:  Objection.
25   A.  I don't know.

55 (Pages 214 to 217)

218

1      Q.   You saw Dr. Maroon in Pittsburgh,
2   correct, during all this?
3      A.   I honestly don't remember.
4      Q.   Well, do you remember going to
5   Pittsburgh?
6      A.   No.
7      Q.   You didn't even remember traveling to
8   Pittsburgh and being tested in Pittsburgh?
9      A.   I remember spending most of the day in
10  the airport.
11     Q.   All right.  And do you remember then
12  seeing doctors?
13     A.   No.
14     Q.   After Dr. Rogers told you what you
15  testified to about taking, if you took another bump
16  you could die, did you ask any other doctor that you
17  were treating with whether that was accurate?
18     A.   I don't remember.
19     Q.   Did you tell any other doctors that she
20  had said that?
21     A.   I don't remember.
22     Q.   Would you expect if you did tell them
23  that it would be reflected in their notes?
24          MR. POGUST:  Objection.
25     A.   I don't know.

219

1      Q.   Well, if that was of concern to you, is
2   there a reason you wouldn't have asked that of other
3   specialists in the area?
4      A.   I don't know.
5      Q.   Did you then do any research yourself on
6   the Internet to see if that was a realistic
7   statement?
8      A.   No.
9          (Concussion Evaluation dated 2/21/2013
10         marked as Singleton Exhibit 18, as of this
11         date.)
12         THE WITNESS:  Thank you.
13         MR. McDEVITT:  Are we on 18?
14         THE WITNESS:  Seventeen.
15         MR. POGUST:  Seventeen.
16  BY MR. McDEVITT:
17     Q.   Mr. Singleton, I'm handing you what's
18  been marked as Exhibit 17, which is a document
19  obtained from one of your treating healthcare
20  providers, Dr. Mattingly.  Do you recall Dr.
21  Mattingly?
22     A.   No.
23     Q.   She is somebody who gave you some
24  neuropsychological tests.  Do you recall that?
25     A.   No.

220

1      Q.   This indicates she examined you in
2   February of 2013, and it contains a history of her
3   findings and what you told her.
4          Do you see under History of Injury, it
5   says:  Evan sustained a concussion or brain bleed in
6   October of 2012?
7      A.   Yes.
8      Q.   And, again, is that what you told her?
9      A.   I don't remember.
10     Q.   But that would be consistent with what
11  you said you told everybody, right?
12     A.   Yeah.
13     Q.   And then it goes on to say:  He reported
14  and anterograde amnesia lasting two weeks post LOC --
15  which I think stands for loss of consciousness -- and
16  having absolutely no recollection of any events
17  during that time.  He reportedly was told he was
18  unable to stand and experienced confusion, dizziness,
19  headaches, and light and sound sensitivity during
20  those two weeks.  He reported gradual improvement in
21  symptoms and experienced a two-week period where he
22  was functioning at 85 percent of his baseline.  He
23  returned to work as an observer but was not
24  participating in workouts or matches.
25          Is what I just read to you an accurate

221

1   depiction of what happened to you after the alleged
2   concussion on the 27th?
3      A.   I don't know.
4      Q.   Well, do you remember having no
5   recollection of the events?
6          MR. POGUST:  Objection.
7      A.   Do I remember having no recollection?
8      Q.   Yeah.  Do you remember that you couldn't
9   remember anything for two weeks afterwards?
10     A.   Yeah.
11     Q.   And do you recall reporting to her that
12  you had a gradual improvement in your symptoms?
13     A.   No.
14     Q.   Do you recall telling her that you had
15  been functioning at 85 percent of baseline?
16     A.   No.
17     Q.   Do you recall telling her that you had
18  returned to work as an observer but wasn't
19  participating in workouts or matches?
20     A.   No.
21     Q.   And then it says:  He was reportedly --
22  I'm sorry, let me start over.
23          It says:  He reportedly was managing his
24  symptoms until three weeks ago when he was driving to
25  Orlando for a photo shoot.  While driving his

56 (Pages 218 to 221)

222

1   symptoms reportedly returned rather acutely and
2   forced him to swerve off the road.  Do you recall
3   telling her that?
4       A.  No.
5       Q.  And as I think this morning you've
6   testified, you don't recall whether that even
7   happened?
8       A.  I don't remember.
9       Q.  One way or another.
10          So, to your knowledge, there's no
11  witnesses to you ever swerving off the road?
12      A.  To my knowledge, no.
13      Q.  No police report about it?
14      A.  To my knowledge, no.
15      Q.  You didn't hit a car?
16      A.  To my knowledge, no.
17      Q.  And you don't have any recollection, as
18  you sit there today, of calling people at the WWE and
19  telling them that, do you?
20      A.  To my knowledge, no.
21      Q.  Is it possible you made that whole thing
22  up?
23      A.  I don't know why I would.
24      Q.  So you didn't have to perform?
25      A.  No.

223

1       Q.  Well, if you had already been told by
2   this date by Dr. Rogers, you wouldn't have wanted to
3   perform, would you?
4       A.  I don't know.
5       Q.  Well, you just testified you didn't want
6   to perform after Dr. Rogers told you what you now say
7   she told you.
8       A.  I don't know.
9       Q.  I take it you wanted to stay in Florida
10  and be with Candace, didn't you?
11      A.  Yes.
12      Q.  So if you had quit your job and told WWE,
13  I don't want to perform anymore, now you don't have a
14  job, you have no income, right?
15      A.  Yes.
16      Q.  What would you have done then?
17      A.  I don't know.
18      Q.  Well, you couldn't live in Florida with
19  no money, could you?
20      A.  No.
21      Q.  So you stayed, taken the money from the
22  WWE, you continued to be with your girlfriend for a
23  couple years, right?
24      A.  I don't know.
25      Q.  Then it goes on to say over here on

224

1   page 2, sir, it says under Background Information, if
2   you want to take a look at it.
3           It says:  He has gained 35 to 40 pounds
4   since October 2012 due to increased appetite.
5           Is that true, that you had gained 35 to
6   40 pounds since October?
7       A.  I don't know.
8       Q.  Did you testify earlier today that you
9   had kind of gotten out of shape after this?
10      A.  Yeah.
11      Q.  Does that consistent that you put on that
12  much weight?
13      A.  Well, yeah, I probably put on about that.
14      Q.  Were you eating a lot of junk food and
15  stuff like that?
16      A.  Yeah.
17      Q.  The kind of stuff that somebody really
18  doesn't do if they're serious about becoming a
19  professional wrestler.
20      A.  I don't know.
21          MR. POGUST:  Objection.  I've seen many
22  fat wrestlers.
23          MR. McDEVITT:  And he's not one of them.
24      Q.  And then it says:  He enjoys wrestling,
25  playing video games, going to the movies and spending

225

1   time with fiancee.  Is that what you told her?
2       A.  I don't remember.
3       Q.  And then, do you see down below that
4   under Task Engagement, she states:  Evan clearly
5   failed two of the three objective effort tests and
6   his performance on the third reflected questionable
7   effort.  Multiple embedded measures also suggested
8   exaggeration of cognitive impairment.  Test results
9   are not believed to accurately reflect his cognition
10  and are believed to underestimate his cognition most
11  likely exaggerating level of cognitive impairment.
12          Did you know she had said that?
13      A.  No.
14      Q.  So this is the first time you realized
15  that that's what she found after she tested you?
16      A.  Yes.
17      Q.  And then go over to the next page, sir,
18  where it says Conclusions.
19      A.  Okay.
20      Q.  Read what she says under Conclusions.
21      A.  Neuropsychological study reflected
22  suboptimal -- suboptimal effort with evidence of
23  exaggeration of cognitive impairment and psychiatric
24  distress.  The severity of cognitive impairment on
25  current testing is inconsistent with his report daily

57 (Pages 222 to 225)

226

1  functioning exclusive of his ability to drive a motor
2  vehicle.  In addition, his report of the temporal
3  sequencing of cognitive and physical symptoms is
4  inconsistent with the typical pattern of brain
5  recovery following a concussion.
6      Q.   And did you know that was her conclusion?
7      A.   No.
8      Q.   And then her diagnostic impressions
9  indicate persistent concussive symptoms; suboptimal
10 effort, correct?
11     A.   Yeah, that's what it says.
12     Q.   Did you deliberately try to perform
13 poorly on the test she gave you that day so that you
14 could basically flunk it and not be ready to perform?
15     A.   I don't remember.
16     Q.   So it's possible you did?
17     A.   Doubtful.
18     Q.   Doubtful?
19     A.   Yeah, no.
20     Q.   Not impossible?
21     A.   No, I would say impossible.
22     Q.   Well, at this point, did you want to get
23 back in the ring?
24     A.   I don't know.  I don't remember.
25     Q.   Well, at this point, had Dr. Rogers told

227

1  you what you testified to this afternoon about being
2  at risk of dying if you got another brain injury?
3      A.   I don't know.
4      Q.   So today then, sir, would be the first
5  time you learned that this particular healthcare
6  professional thought you weren't giving your best
7  effort during these tests?
8      A.   Yes.
9      Q.   And that you were exaggerating your level
10 of cognitive impairment?
11     A.   Yeah, first time.
12     Q.   So, I take it, as you sit there today,
13 sir, you don't remember speaking with a Dr. Mark
14 Lovell of Pittsburgh?
15     A.   No.
16     Q.   And do you remember -- you don't remember
17 doing any tests there either?
18     A.   No.
19     Q.   And do you realize, as you sit there
20 today, that what Dr. Lovell concluded was that your
21 performance was quite unusual and that your balance
22 issues appeared to be exaggerated and that there were
23 signs of exaggeration on cognitive testing?
24     A.   No.
25     Q.   That's the first time you've learned

228

1  that?
2      A.   Yes.
3      Q.   So that's two healthcare professionals
4  that thought you were exaggerating, correct?
5          (Followup Note on Evan Singleton dated
6      January 18, 2013, marked as Singleton Exhibit
7      18, as of this date.)
8  BY MR. McDEVITT:
9      Q.   I'm showing you what's been marked as
10 Exhibit 18, Mr. Singleton.  This is notes, office
11 notes of Dr. Greenberg.
12         Does this refresh your recollection that
13 he, in fact, cleared you to return to normal
14 activity?
15     A.   No.
16     Q.   Have you read the last paragraph?
17     A.   Yes.
18     Q.   All right.  And by the time of
19 January 20, 2013, you hadn't even seen Dr. Rogers
20 yet, had you?
21     A.   No.
22     Q.   And so at this point in time you would
23 have had no reason not to want to go back to work,
24 right?
25     A.   I don't know.

229

1      Q.   Well, aside from feeling like a crash
2  dummy, did you have any reason in January of 2013 why
3  you wouldn't have wanted to go back to work after
4  this man cleared you?
5      A.   I don't know.
6      Q.   When you went back to the place of
7  employment, I should say back to NXT, did you pick up
8  any kind of rumors that they were looking to get rid
9  of you?
10     A.   I don't remember.
11     Q.   Did they talk to you about that?
12     A.   I don't remember.
13     Q.   Did McMahon tell you that they were
14 thinking about terminating you?
15     A.   I don't remember.
16     Q.   Did DeMott?
17     A.   I don't remember.
18     Q.   So if they were to testify that you did
19 know that and they did tell you that, you can't
20 contradict them, can you?
21     A.   Don't remember.
22     Q.   You don't have any memory to the
23 contrary, do you?
24     A.   I don't know.
25         (E-mail dated October 1, 2012, marked as

58  (Pages 226 to 229)

230

1        Singleton Exhibit 19, as of this date.)
2   BY MR. McDEVITT:
3        Q.   I'm showing you what's been marked as
4   Exhibit 19, Mr. Singleton, which is a document we
5   produced in this litigation.
6            First of all, would you go back to the
7   note on September 27th, do you see that?  It's in the
8   next-to-last page.
9        A.   You said next-to-last page?
10       Q.   Yes, sir.
11           MR. POGUST:  The next-to-the-last page.
12       A.   All right.  Okay.
13       Q.   All right.  And it indicates from Brian
14  Duncan.  He's one of the trainers, right?
15       A.   Yes.
16       Q.   That indicates that on that date you
17  sustained a concussion and was given overnight
18  instructions and then you were to come to FCW in the
19  morning so he could reevaluate you, correct?
20       A.   Okay.
21       Q.   Is that what it says?
22       A.   Yes.
23       Q.   And then it says "not medically cleared,"
24  right?
25       A.   Yes.

231

1        Q.   And then above that is an e-mail from
2   Stacy DePolo to Brian, right?
3        A.   Yes.
4        Q.   And who is Stacy DePolo?
5        A.   I'm pretty sure she's HR for WWE.
6        Q.   All right.  And then Mr. Duncan says:  I
7   haven't heard from him.  He hasn't returned any of my
8   texts.  His roommate says he's been gone the whole
9   weekend but he seems better.  Do you see that?
10       A.   Yes.
11       Q.   Did you get texts from Brian Duncan over
12  the weekend inquiring how you were?
13       A.   I don't remember.
14       Q.   Well, if he says he did, do you deny that
15  he did?
16       A.   Yeah.
17       Q.   You deny that he sent you texts?
18       A.   I don't remember, but I always respond
19  when people text me.
20       Q.   So you think Mr. Brian or Duncan is
21  making that up that you actually returned his text?
22           MR. POGUST:  Objection.
23       A.   I don't know.
24       Q.   Were you gone that whole weekend?
25       A.   I don't remember.

232

1        Q.   Do you remember the pictures we saw you
2   kissing Candace, that would have been that weekend,
3   right?
4        A.   I don't know.
5            MR. POGUST:  Objection.
6        Q.   And then it says above that October 1st:
7   He just got back to me.  He says he's feeling better
8   but light still bothers him some.  Is that what you
9   told him on October 1st?
10       A.   I don't remember.
11       Q.   And then above that Stacy says:  Tell him
12  he needs to call Dr. Amann.  Doc has been trying all
13  weekend to get ahold of him.  Do you see that?
14       A.   Yes.
15       Q.   Was Dr. Amann trying to get in touch with
16  you over the weekend?
17       A.   I don't remember.
18       Q.   Well, if that's -- if these e-mails are
19  accurate, it would indicate that both the trainers
20  and the doctors were trying to contact you the
21  weekend after your injury, right?
22       A.   Yeah.
23       Q.   Do you have any reason to believe what
24  they're saying here is false?
25       A.   Yeah.

233

1        Q.   What's your reason?
2        A.   Well, I don't remember the events, but I
3   always answer my cell phone and I always respond to
4   text messages.
5        Q.   But you don't remember the events but you
6   were working on your standard protocol?
7        A.   Yeah.
8        Q.   So if you didn't follow your standard
9   protocol, what would have been the reason why?
10       A.   I don't know.
11       Q.   Maybe you didn't want to tell them where
12  you were?
13       A.   No.
14       Q.   If they said, "Where are you," you didn't
15  want to tell them you were out playing with Candy?
16       A.   No.
17           MR. POGUST:  Objection.
18           If you need a break, let us know.
19           THE WITNESS:  I'm sorry?
20           MR. POGUST:  If you need a break, let us
21  know.
22           MR. McDEVITT:  Do you need a break?  This
23  is a good time to take a break.  That's fine.
24           THE VIDEOGRAPHER:  2:22 p.m.  Off the
25  record.

59 (Pages 230 to 233)

234

1    (Whereupon, off the record.)
2    (Whereupon, resumed.)
3        THE VIDEOGRAPHER:  2:28 p.m.  Back on the
4    record.
5    BY MR. McDEVITT:
6        Q.   Mr. Singleton, as best as we can tell
7    during the break, it appears that you treated with
8    Dr. Rogers from approximately July of 2013 to
9    August 2014, as far as we can tell.  Now, the caveat
10   to that is I don't have the actual records with me,
11   so it may be here or there, but I think that's
12   accurate.
13       Do you recall treating with her for a
14   length of time?
15       A.   For a length of time, yes.
16       Q.   Almost a year?
17       A.   The specifics of the amount of time are
18   blurry, I don't -- I can't say yes or no.
19       Q.   All right.  The statement that she made
20   to you you've testified to this afternoon to the
21   effect that if you had another concussion you could
22   die.  Did she tell you that in the beginning of the
23   treatment, the end of the treatment, in the middle of
24   the treatment, when did she tell you that?
25       A.   I honestly don't remember.  As far as our

235

1    entire meetings and treatment, I don't remember when
2    exactly.
3        Q.   Well, do you remember whether it was
4    towards the beginning in one of the original meetings
5    you had with her or was it towards the end?
6        A.   I don't remember.
7        Q.   Now, did it just come up out of the blue?
8        A.   Don't remember.
9        Q.   What else do you remember her ever
10   telling you during all your treatment?
11       A.   I remember she told me after the EEG that
12   I do not have epilepsy.  She classified that out.
13       She said that there was significant
14   evidence saying that I had -- I had sustained a
15   serious brain injury.
16       And, as far as specifically what she
17   said, that's all I can remember.
18       Q.   And you understood she based that
19   diagnosis on what you told her?
20       MR. POGUST:  Objection.
21       A.   Yes.
22       Q.   What we're going to do now, sir, is we're
23   going to watch a couple of videos.  First let me ask
24   you this.
25       Do you recall -- I mean, you had worked a

236

1    couple, for lack of a better word, programs with
2    Mr. Rowan, correct?
3        A.   I don't really remember, no.
4        Q.   I mean, you had wrestled him before the
5    September episode, correct?
6        A.   I don't remember.
7        Q.   So you don't remember being choke slammed
8    by him once before?
9        A.   I don't remember.
10       Q.   All right.  We're going to watch a tape.
11       MR. POGUST:  Let me ask quickly.  Have
12   these been provided to our side?
13       MR. McDEVITT:  No.  You didn't request
14   it.
15       MR. POGUST:  We didn't request videos of
16   Evan or anything or any --
17       MR. McDEVITT:  No.
18       MR. POGUST:  Supposedly we did, but
19   that's my objection.
20       MR. McDEVITT:  You didn't.  You know --
21       MR. POGUST:  We'll work it out later.  If
22   we did, we did.  If we didn't, we didn't.
23   That's my objection.
24       MS. LACY:  It's on the CDs.
25       MR. McDEVITT:  What's that?

237

1        MS. LACY:  It's on the CDs if you want
2    copies.
3        MR. McDEVITT:  Yeah.  This is what we'll
4    do.  We're going to play it on the monitor.
5    You can watch it.  You should be able to watch
6    it there, Mr. Singleton.
7        THE WITNESS:  Okay.
8        MR. McDEVITT:  And we're going to make
9    both --
10       MS. LACY:  It's the same thing that's
11   posted.
12       MR. McDEVITT:  What we're going to do on
13   the CD is a match that you had with Mr. Rowan
14   on June 17th of 2012.  And then the one on
15   September 27th of 2012 where you supposedly got
16   injured.
17       We'll mark one for the court reporter and
18   we'll provide one to your counsel now so
19   they'll have that.  Okay?
20       THE WITNESS:  Okay.
21       MR. POGUST:  Thanks.
22       (Singleton vs. Erick Rowan 6/17/2012 and
23   9/27/2012 CD marked as Singleton Exhibit 20,
24   as of this date.)
25       MR. McDEVITT:  And then with respect to

60  (Pages 234 to 237)

238

1    whenever she gets that in there -- what exhibit
2    number is that?
3         THE COURT REPORTER:  20.
4    BY MR. McDEVITT:
5         Q.   You now have a CD that contains both of
6    those that are now marked as Exhibit 20.  And with
7    that, do you see on the screen there, Mr. Singleton,
8    the header for June 17, 2012?
9         A.   Yes.
10        Q.   All right.
11             (Whereupon, brief pause.)
12             (Whereupon, CD played.)
13   BY MR. McDEVITT:
14        Q.   Now, does seeing that video remind you
15   that you had previously done a choke slam with
16   Mr. Rowan?
17        A.   No.
18        Q.   He's a big boy, isn't he?
19        A.   Yeah.
20        Q.   He's actually bigger than you, isn't he?
21        A.   He's a lot bigger than me.
22        Q.   And do you agree that you did the move
23   correctly that time?
24        A.   It looked like I did, yeah.
25             MR. POGUST:  Do you want to just show him

239

1    one more time?
2             MR. McDEVITT:  Sure.
3         Q.   Would you like to see it one --
4             MR. POGUST:  Thank you.
5         Q.   And here you tucked your chin when you
6    got slammed.
7             MR. POGUST:  They're both on the same
8    video?
9             MR. McDEVITT:  Yes.  So if you want to
10   watch --
11            MS. LACY:  Two separate files.
12            MR. McDEVITT:  -- we'll watch it again.
13            MR. POGUST:  Yeah, one more time.
14   Thanks.
15            (Whereupon, CD played.)
16   BY MR. McDEVITT:
17        Q.   Now, when you saw that, do you agree that
18   you jumped to begin the move?
19        A.   Yes.
20        Q.   And you landed on flat back?
21        A.   Yes.
22        Q.   And you tucked your chin?
23        A.   Yes.
24        Q.   And you didn't get hurt in that move, did
25   you?

240

1         A.   No.
2         Q.   All right.  Now, let's move forward to
3    the date in question, September 27.
4              Now, this is three months after you did
5    the move with Mr. Rowan in the tape we just showed,
6    and before we run that, I'm going to ask you this.
7              You had then an additional three months
8    to practice this particular move from the one I
9    showed you in June and the night in question, right?
10        A.   I don't know.
11        Q.   Well, do you agree it's three months
12   between June and September?
13        A.   Yes.
14        Q.   And you were continuing to practice in
15   that time period, weren't you?
16        A.   Yes.
17        Q.   All right.  And just by way of a
18   question.  When this tape starts to roll, your hand
19   is taped.  Did you have an injured hand for some
20   reason?
21        A.   No.
22        Q.   That was just for costuming?
23        A.   Yeah.
24        Q.   All right.  And, by the way, the tape you
25   just saw in June where you're kind of stumbling into

241

1    Mr. Rowan before he puts his hand on your neck.
2         A.   Yes.
3         Q.   That's what we call selling, right?
4         A.   Yes.
5         Q.   You were selling the idea you were hurt?
6         A.   Yeah.
7         Q.   But you weren't, were you?
8         A.   No.
9         Q.   All right.
10            MS. LACY:  Can you scroll to 11:55,
11   please.
12            (Whereupon, CD played.)
13            MR. POGUST:  Does it -- let me, can I ask
14   you a question because we've never seen this.
15   Is that the end of the tape there or does it --
16   if you keep playing, will it go further?
17            MR. McDEVITT:  I think it goes further.
18            MS. LACY:  It goes a little further.
19            MR. POGUST:  Okay.
20            MR. McDEVITT:  Does this part play
21   further?
22            MR. POGUST:  Yes.
23            MS. LACY:  Yes.
24            MR. POGUST:  Can we just play it?
25            MR. McDEVITT:  Yeah, play it further.

61  (Pages 238 to 241)

242

1          MR. POGUST:  I appreciate it.  Thanks.
2          (Whereupon, CD played.)
3   BY MR. McDEVITT:
4       Q.   Now, that's the same move you did in
5   June, right?
6       A.   Yes.
7       Q.   Did you tuck your head there?
8          MR. POGUST:  Do you want to see it again?
9          THE WITNESS:  Yes, please.
10         MR. POGUST:  So where the --
11         MR. McDEVITT:  I'm just asking if he can
12   tell from that.
13         MR. POGUST:  Yeah, if he can, I mean.
14         (Whereupon, CD played.)
15   BY MR. McDEVITT:
16      Q.   Can you tell by watching that,
17   Mr. Singleton, whether your head actually hits the
18   mat when he throws you to the mat?
19      A.   Yes.
20      Q.   And you think it did?
21      A.   Yes.
22      Q.   Right.  And in the first one it didn't,
23   right?
24      A.   No.
25      Q.   So would you agree that the reason you

243

1   got hurt on this move is because you executed the
2   fall differently than you did the first time?
3          MR. POGUST:  Objection.
4       A.   Somewhat.
5       Q.   Did you ever talk to Mr. Rowan that
6   night?
7       A.   Not that I remember.
8       Q.   And is it your testimony that you were
9   unconscious for a couple seconds after you hit the
10   mat there?
11      A.   I think so, yes.
12      Q.   You don't remember rolling over and
13   putting your hands down like you did?
14      A.   No.
15      Q.   That was just instinct?
16      A.   I don't know.
17      Q.   Did you tell anybody in the locker room
18   immediately thereafter that you had hit your head?
19      A.   I don't remember.
20      Q.   Do you know how it came to anybody's
21   attention that you had a head injury?
22      A.   Don't remember.
23      Q.   And just so the record's clear.  I think
24   it is.  That match that you just saw was the last
25   time you performed a match for WWE; is that correct?

244

1       A.   To the best of recollection, yes.
2       Q.   And that move that you performed, I think
3   as we talked about earlier this morning, was a move
4   you've seen performed countless times in wrestling
5   shows, correct?
6       A.   Yes.
7       Q.   It's a staple of professional wrestling,
8   isn't it?
9       A.   A staple?
10      Q.   Yes, a common move done in wrestling.
11      A.   Yes.
12      Q.   And it's one that you fully expected that
13   you would do when you signed up to be a professional
14   wrestler, isn't it?
15      A.   Yes.
16      Q.   And it's one that you would have known if
17   you do it wrong, you're going to get hurt?
18      A.   I didn't expect to get hurt this bad.
19      Q.   You may not have expected to, but if you
20   did it wrong, you were going to get hurt; you knew
21   that, didn't you?
22      A.   Yes.
23      Q.   And that's exactly what happened, isn't
24   it?
25      A.   Yes.

245

1          MR. POGUST:  Objection.
2       Q.   All right.  I want to show some photos
3   next, if I might, Mr. Singleton, of some body
4   building photographs.  And let's start with some
5   things you have on your Instagram account.
6          And let me ask you this:  Is it fair to
7   say, Mr. Singleton, that you are a very passionate,
8   dedicated weightlifter?
9       A.   Yes.
10      Q.   Is that your current passion these days?
11      A.   Lifting weights, yes.
12      Q.   How much do you bench press?
13      A.   My one rep max is about 550, 600.
14      Q.   And what's your one rep max for leg
15   presses?
16      A.   1700 pounds.
17      Q.   That's almost -- well, it is a small car,
18   isn't it?
19      A.   Yeah.
20      Q.   And how often do you work out?
21      A.   Six days a week.
22      Q.   And where do you work out?
23      A.   Gold's Gym.
24      Q.   Do they -- when you go into Gold's Gym,
25   do you have to log in?

62  (Pages 242 to 245)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

246

1    A.   Yes.
2    Q.   So there's a record over there, if you
3  will, of how many times you go there to work out?
4    A.   There should.
5    Q.   Do you have a workout buddy?
6    A.   Yeah.
7    Q.   Who is he?
8    A.   Daryl.
9    Q.   What's his last name?
10   A.   Heise.
11   Q.   What does he do for a living?
12   A.   He's a cop.
13   Q.   Is he a trainer?
14   A.   No.
15   Q.   Do you have a trainer?
16   A.   It's Daryl.
17   Q.   So he's your trainer too?
18   A.   Yes.
19   Q.   And he's a passionate weightlifter?
20   A.   Yes.
21   Q.   Have you ever thought about becoming a
22  trainer?
23   A.   I've thought about it.
24   Q.   And why don't you?
25   A.   I don't know.

247

1    Q.   What do you plan on doing with your life
2  now?
3    A.   Ultimately the goal is to become a
4  personal trainer.
5    Q.   Do you have to go back to school for
6  that?
7    A.   There's a cert -- a certain certification
8  that you get.
9    Q.   The pictures that you post on Instagram
10  of weight racks and whatnot, are they designed to
11  show that's what you're lifting?
12   A.   No.  It's just a general concept, I like
13  lifting weights.
14   Q.   Have you ever posted something on
15  Instagram of somebody else to try to suggest it was
16  you?
17   A.   Not that I know of, no.
18   Q.   For example, on your Instagram account,
19  there's a video of a leg shaking.  Do you recall
20  that?
21   A.   No.
22   Q.   Twitching.  With a comment about, this is
23  what happens when you do a heavy work -- leg workout?
24   A.   Doesn't sound familiar to me.
25   Q.   Do you recall ever posting somebody

248

1  else's leg on your Instagram account?
2    A.   To the best of my recollection, no.
3    Q.   There's not much reason to do that, is
4  there?  Let's -- let's watch --
5         MR. McDEVITT:  Can we watch this one
6  first?
7         MS. LACY:  The first one or the second
8  one?
9         MR. McDEVITT:  The leg twitching.
10        MS. LACY:  Can you please pull up the
11  7:25:14 leg twitching video.
12        (Whereupon, brief pause.)
13        MR. McDEVITT:  You can play that, right?
14        THE VIDEOGRAPHER:  Yes.
15        MR. McDEVITT:  Hang on one minute.
16        For the record, what we're going to do is
17  play some things that appear on his Instagram
18  account.  What we're going to play is on the CD
19  which I'm giving you a copy of.
20        MR. POGUST:  Thanks.
21        MR. McDEVITT:  And then the -- what we're
22  going to play is also going to be marked as a
23  CD with the exhibit of --
24        THE COURT REPORTER:  21.
25        MR. POGUST:  The second one is 21, right?

249

1         MR. McDEVITT:  Yes.
2         MR. POGUST:  Okay.
3         (Singleton Leg Twitching CD marked as
4  Singleton Exhibit 21, as of this date.)
5         MR. McDEVITT:  All right.  If you could,
6  go ahead and run that.
7         (Whereupon, CD played.)
8  BY MR. McDEVITT:
9    Q.   Do you remember posting that,
10  Mr. Singleton?
11   A.   I do not remember that.
12   Q.   Is that your leg?
13   A.   Looks like it.
14   Q.   Do you remember what you said when that
15  was posted?
16   A.   No.
17        MR. McDEVITT:  Let's mark this.
18        (Evan Singleton Instagram Account Page
19  marked as Singleton Exhibit 22, as of this
20  date.)
21  BY MR. McDEVITT:
22   Q.   Mr. Singleton, that twitching we just saw
23  on the leg, is that similar to the twitching that
24  you've claimed is one of your symptoms?
25   A.   No.

63 (Pages 246 to 249)

250

Q.   How does that differ?

A.   Usually when you get a good workout, the muscles that you exercised tend to shake until eventually the blood that is in your muscles goes to a different part of your body.  The muscle spasms that I have are completely unpredictable in what part of my body they will affect, how long they will affect and what instigates them.

Q.   What instigates them?

A.   It's completely random.  Sometimes it's stress, sometimes it's not.

Q.   When did you last have one?

A.   Earlier today.

Q.   Coming here?

A.   Yeah.

Q.   All right.  And when your body twitches, does it look different than what your leg looked like in that picture?

A.   Yes.

Q.   In what way?

A.   Mostly when I have my twitches, to the best of my recollection, when I have my body spams, it always happens in my upper body and it usually affects my neck, shoulders, arms, back and hips.  So it kind of -- it kind of just affects -- well, to the

251

best of my recollection, it only usually affects my upper body.

Q.   All right.  Looking at Exhibit 22, what did you write under that video?

A.   Now that's how you know you got a great leg workout.

Q.   All right.  And what date did you post that?

A.   7/25/2014.

Q.   So that would have been when you were down in Florida?

A.   Yes.

Q.   So would it be fair to say that you were doing great leg workouts during the time you couldn't be performing for WWE?

A.   I don't know.

Q.   Are you done with your answer?

A.   Yeah.

Q.   Now, why do you post things like this on your Instagram account?  What's the purpose of that?

A.   To inspire people to go out there and have great leg day exercises of their own.

MR. McDEVITT:  All right.  Let's do this. Yeah, the next one.

MS. LACY:  Okay.  Can we do the lifting,

252

7/15/14, please.

MR. POGUST:  Are these videos or pictures?

MR. McDEVITT:  Videos.

MS. LACY:  Yeah.

(Whereupon, CD played.)

BY MR. McDEVITT:

Q.   How much were you lifting there?

A.   300.  I think the Smith machine is 25. Oh, I'm sorry.  I think it's 305, not 325.

Q.   So if I counted right, you benched 300 and some pounds seven times?

A.   Yes.

Q.   Does that sound about right?

A.   Yeah.

Q.   And do you recall what you posted with that one?

A.   No.

MR. McDEVITT:  Let's mark this.

(Evan Singleton Instagram Account Page marked as Singleton Exhibit 23, as of this date.)

BY MR. McDEVITT:

Q.   Do you see the post below the video we just saw?

253

A.   Yes.

Q.   And would you read it, please?

A.   One of the hardest workouts I've ever done.  Got this one from @1dayumay.  Start at Smith machine incline bench with your body weight, which is 315.  Go until failure and take a plate off.  Go until failure, take another plate off.  Objective, you are not allowed to stop benching until you hit 100 reps total.  It's a killer.

Q.   And is that what you did that day?

A.   I don't remember that.

Q.   Well, you say one of the hardest workouts I've ever done.

A.   Yeah.

Q.   Did you do that workout that you described here?

A.   Probably, I don't remember that.

Q.   Who's the person that's depicted in that video with you?

A.   Some random guy I got to spot me.

Q.   You don't have any idea who it is?

A.   I mean, I was cool with him.  If you ask me his name, I have no idea, I don't remember.

Q.   Where was that done at?

A.   Gold's Gym in Tampa.

64 (Pages 250 to 253)

254

1      Q.   In Tampa.  And so this is in July of
2   2014, right?
3      A.   Yes.
4      Q.   Again, when you were unable to perform
5   for WWE?
6      A.   I don't know.
7      Q.   And how many hours were you -- what do
8   you mean you don't know?  What don't you know?  Is
9   that you in the pictures?
10     A.   Yes.
11     Q.   So you were doing this when you were
12  unable to perform for WWE?
13     A.   Yes.
14     Q.   Did doing this make you dizzy?
15     A.   No.
16     Q.   It didn't produce symptoms?
17     A.   No.
18     Q.   So you're able to do really heavy
19  exercise without becoming symptomatic?
20     A.   Yes.  And honestly, if I'm being
21  completely honest, it's one of the best parts --
22  it's -- it is the best part of my day.  It's the only
23  thing during the day that makes me feel better.
24     Q.   Working out?
25     A.   Yes.

255

1      Q.   Did you ever ask any of the doctors --
2   or, strike that.
3           Did any of the doctors you spoke to tell
4   you that as long as you remain symptomatic you
5   shouldn't be doing exercises like that?
6      A.   I don't remember.
7      Q.   Do you know that doctors who see you
8   doing that think it's completely inconsistent with
9   what you were telling them your symptoms were?
10          MR. POGUST:  Objection.
11     A.   No.
12     Q.   Do you know that Dr. Rogers testified to
13  that effect?
14          MR. POGUST:  Objection.
15          MR. McDEVITT:  What's your objection?
16          MR. POGUST:  Does he know what Dr.
17  Rogers -- he said -- he already said that he
18  has no idea what Dr. Rogers testified to, he's
19  never seen it.
20          MR. McDEVITT:  Well, that's not an
21  objection.  That's a statement, that's not an
22  objection.
23          MR. POGUST:  No, I said, I made an
24  objection.
25          MR. McDEVITT:  Yes.

256

1          MS. LACY:  Can you please --
2          MR. POGUST:  It was asked and answered.
3          MS. LACY:  -- play the --
4          MR. McDEVITT:  That's an objection.
5          MR. POGUST:  Thank you.
6          MS. LACY:  -- 7/16/14 of the video,
7   please.
8           (Whereupon, CD played.)
9           (Evan Singleton Instagram Account Page
10  marked as Singleton Exhibit 24, as of this
11  date.)
12  BY MR. McDEVITT:
13     Q.   Is that you in that video?
14     A.   Yes.
15     Q.   And how would you describe the exercise
16  you're doing there?
17     A.   As far as?
18     Q.   What's the name of that exercise?
19     A.   That's called a seated machine row.
20     Q.   And how much are you rowing?
21     A.   Five plates, 45.
22     Q.   225 pounds?
23     A.   Yes.
24     Q.   One arm?
25     A.   Yes.

257

1      Q.   How many times?
2      A.   I don't know, I wasn't counting.
3      Q.   And that's principally a back exercise?
4      A.   Yes.
5      Q.   And am I correct that the day that you
6   posted that video was July 16th of 2014?
7      A.   Yes.
8      Q.   Who's taking these pictures for you?
9      A.   Again, just someone that I was nice to
10  and was nice back to me in the gym.
11     Q.   And when you were going to the various
12  doctors that you were seeing during this time frame,
13  did you show them these?
14     A.   No.
15     Q.   Did you tell them about them?
16     A.   I don't remember.
17     Q.   Did you tell them that you were doing all
18  this heavy weight training?
19     A.   I don't remember.
20     Q.   And this one says:  Praise back day,
21  going heavy and going hard, right?
22     A.   Yep.
23     Q.   And what's the purpose of putting all
24  those hashtags?
25     A.   My understanding of Instagram is you put

65 (Pages 254 to 257)

258

1  a video or an image up, and then you put hashtags in.
2  The hashtags would be like if you're searching for a
3  certain type of video or an image, you type hashtag
4  and then like a one-word description of that picture
5  or video, and then everyone who put that hashtag in
6  their picture or video comes up.
7      Q.  Do you do this because you're hoping to
8  get some kind of endorsements?
9      A.  No.
10      Q.  Do you get this so that you hopefully
11  gain some followers?
12      A.  Not necessarily, no.
13      Q.  Again, you're just doing this to inspire
14  others?
15      A.  Yes.
16          MS. LACY:  Can you please play the video
17  at 7/27/14.
18          (Evan Singleton Instagram Account Page
19  marked as Singleton Exhibit 25, as of this
20  date.)
21          (Whereupon, CD played.)
22  BY MR. McDEVITT:
23      Q.  Okay.  Those are shoulder shrugs, right?
24      A.  Yes, sir.
25      Q.  How many pounds?

259

1      A.  That was 495, I think.
2      Q.  And you're doing multiple reps?
3      A.  Yes.
4      Q.  And this was done on or posted on July
5  27, 2014?
6      A.  Yes.
7      Q.  Again, I've given you Exhibit 25,
8  correct?
9      A.  Yes.
10      Q.  And what did you say that day when you
11  posted this?
12      A.  Heavy shrugs to finish off an end of the
13  week shoulder and back workout.  3 sets of 15.  Let's
14  go.
15      Q.  And, again, this is what you were doing
16  at the time you were unable to wrestle for the WWE?
17      A.  Yes.
18          MS. LACY:  Can you please play the
19  7/31/14.
20          (Evan Singleton Instagram Account Page
21  marked as Singleton Exhibit 26, as of this
22  date.)
23          THE WITNESS:  Thank you.
24          (Whereupon, CD played.)
25

260

1  BY MR. McDEVITT:
2      Q.  How much weight are you doing leg presses
3  with there?
4      A.  Oh, God.  I don't even know off the top
5  of my head.  If you want me to count, you're going to
6  have to give me a second.
7      Q.  Well, let me ask you this:  Are each one
8  of those plates 45 pounds?
9      A.  Yes.
10      Q.  So on the top rack you got one, two,
11  three, four, five, six -- 12 on the top rack, right?
12      A.  Yes.
13      Q.  12 times 45.  And then on the bottom you
14  have at least one, two, three, four, five, six -- at
15  least 6 or 12 on the bottom, both sides.
16      A.  Yes.
17          MR. POGUST:  24 times 45, whatever that
18  is.
19      Q.  Over a thousand pounds?
20      A.  Right.
21      Q.  Which is consistent with what you were
22  saying.  What was your one rep max?
23      A.  It's about 1700.
24      Q.  1700 pounds.  Do you have to get a
25  special machine to even do 1700 pounds.

261

1      A.  Yeah, kind of.  Well, not necessarily, as
2  long as the machine that you're using is bolted to
3  the ground.
4      Q.  What's a -- do you know, what is the
5  world record for leg press?
6      A.  I have absolutely no idea.
7      Q.  Do you know what the world record is for
8  bench press?
9      A.  Isn't it one thousand -- I want to say
10  it's over a thousand pounds, I think.
11      Q.  Are you stronger now than you've ever
12  been?
13      A.  Right now?
14      Q.  Yeah.
15      A.  No.
16      Q.  When were you the strongest?
17      A.  Before my body building competition last
18  year.
19      Q.  And that was what time last year?
20      A.  The show was in June, so -- I don't
21  really remember.
22      Q.  You were pretty cut up for that show,
23  weren't you?
24      A.  Yes.
25      Q.  What does that mean when I say cut up?

66 (Pages 258 to 261)

262

1     A.   Low body fat percentage.
2     Q.   And you have to do certain things to get
3  that way, don't you?
4     A.   Diet and exercise, yes.
5     Q.   How did your exercise routine change?
6     A.   Lighter weights with more reps.
7     Q.   And that made you the strongest you've
8  ever been in your life?
9     A.   No.
10    Q.   I'm sorry, I thought that's what you just
11 said?
12    A.   No, no.  Before I started changing up
13 that.  I was going heavy and then I started dieting
14 down and I started going lighter.
15    Q.   Right.  So right before you began your
16 dieting for the body building is when you were your
17 strongest?
18    A.   Yes.
19    Q.   And when would that have been?  What
20 year?  Was that last year?
21    A.   I don't remember an exact time.  Maybe
22 like two months, two months before June.
23    Q.   Two months before June of 2015?
24    A.   Yes.
25    Q.   It would have been after you came back

263

1  home?
2     A.   Yes.
3     Q.   So after you came back home you basically
4  got to be the strongest you've ever been?
5     A.   After a little bit of training, yeah.
6     Q.   Yeah.
7          (Evan Singleton Facebook Account Page
8     marked as Singleton Exhibit 27, as of this
9     date.)
10 BY MR. McDEVITT:
11    Q.   I just wanted to ask you.  In the front
12 of this, which is from your Facebook page, correct?
13    A.   Yes.
14    Q.   There's a -- that picture in the bottom
15 of page 1, that's you?
16    A.   Yes.
17    Q.   And is that in the body building
18 competition?
19    A.   Yes.
20    Q.   Was that taken during the body building
21 competition?
22    A.   Yes.
23    Q.   And when I say cut up, you were pretty
24 cut up in that picture, weren't you?
25    A.   Yes.

264

1     Q.   What do you weigh in that picture?
2     A.   Maybe like 240.
3     Q.   240?
4     A.   Ish.
5     Q.   And you weigh what now?
6     A.   300.
7     Q.   What did you weigh before you started
8  doing this?
9     A.   About 360.
10    Q.   I'm sorry.  So you went from 360 to what
11 weight did you say you were in this picture?
12    A.   Around 240.
13    Q.   So you lost 120 pounds?
14    A.   Uh-hum.
15    Q.   Over what period of time?
16    A.   Maybe like 24 weeks.
17    Q.   Twenty-four weeks?
18    A.   Around there, yeah.
19    Q.   And would it be fair to say that you
20 can't lose 120 pounds or 120 pounds in 24 weeks
21 unless you're also doing some pretty rigorous
22 training?
23    A.   Well, diet was more important than
24 anything else.
25    Q.   During that time, though, you have to do

265

1  the rigorous training to get the body shape, right?
2     A.   Yes.
3     Q.   So how many days or how many hours a day
4  were you working out then?
5     A.   Maybe like two, two and a half.
6     Q.   Two and a half hours each day?
7     A.   Yes.
8     Q.   And what did you say you weigh now?
9     A.   300.
10    Q.   So now you put back on 60 pounds?
11    A.   Yes.
12    Q.   Do you think these weight fluctuations do
13 any harm to your body?
14    A.   I don't know.
15    Q.   Did you ever ask anybody?
16    A.   No.
17    Q.   Who took these pictures of you in that
18 pose?
19    A.   These were from the show.  These were
20 from the show, these were taken by the photographer
21 that they had.
22    Q.   All right.
23         (Evan Singleton Instagram Account Page
24    Photograph marked as Singleton Exhibit 28, as
25    of this date.)

67 (Pages 262 to 265)

266

1  BY MR. McDEVITT:
2  **Q.   This should be Exhibit 28, Mr. Singleton.**
3  A.   Yes.
4  **Q.   What is Exhibit 28?**
5  A.   It looks like a picture of me.
6  **Q.   And, again, that's posted on May 20th of**
7  **2015?**
8  A.   Yes.
9  **Q.   And it says #NPCcompetitor.  Do you see**
10  **that?**
11  A.   Yes.
12  **Q.   What does NPC stand for?**
13  A.   National Physique Committee.
14  **Q.   And is that some body building**
15  **organization?**
16  A.   Yes.
17  **Q.   Is that the one you were going to compete**
18  **in?**
19  A.   Yes.
20  **Q.   Where was this picture taken?**
21  A.   At Gold's.
22  **Q.   Gold's in?**
23  A.   Lancaster.
24  **Q.   Lancaster.  And you're fairly lean in**
25  **this picture, correct?**

267

1  A.   Yes.
2  **Q.   What was your weight then?**
3  A.   Maybe like 250.
4  **Q.   250.  Were you working anywhere when you**
5  **were doing all this training?**
6  A.   Yes.
7  **Q.   Where were you working?**
8  A.   I believe I was doing Securitas, the
9  security temp agency.
10  **Q.   Is that when you were at the Manheim Auto**
11  **Show?**
12  A.   Yes.
13  **Q.   That's what you were doing there?**
14  A.   Yeah.
15  **Q.   And you got reprimanded there for doing**
16  **some things, didn't you?**
17  A.   For doing some things?
18  **Q.   Yeah.  Did you get reprimanded for**
19  **calling some car gay pink or something like that?**
20  A.   I don't know.
21  **Q.   Did you get reprimanded?**
22  A.   Did I get reprimanded?
23  **Q.   Yeah, by your employer.**
24  A.   No.
25  **Q.   Did they fire you?**

268

1  A.   Yeah.
2  **Q.   Why did they fire you?**
3  A.   They said I wasn't grasping what it took
4  to do the job right.
5  **Q.   Okay.**
6  **(Evan Singleton Instagram Account Page**
7  **marked as Singleton Exhibit 29, as of this**
8  **date.)**
9  THE WITNESS:  Thank you.
10  BY MR. McDEVITT:
11  **Q.   I'm showing you Exhibit 29.  Do you**
12  **recognize that document?**
13  A.   No.
14  **Q.   Is this something you posted?**
15  A.   Looks like it.
16  **Q.   Got 4 sets with this repping out 15 each**
17  **set.  Just another day.  This is posted on June of**
18  **2014.  Does that sound like your workout routine 4**
19  **sets of 15 reps?**
20  A.   It sounds like it.
21  (Evan Singleton Instagram Account Page
22  marked as Singleton Exhibit 30, as of this
23  date.)
24  MR. McDEVITT:  I don't know if you were
25  told this, Mr. Singleton, but when you're done

269

1  with the deposition, the requirement is you
2  have to take your lawyers into a gym and make
3  them lift.
4  THE WITNESS:  I'm looking forward to
5  that.
6  MR. POGUST:  Yeah, you can bench press my
7  body.
8  MR. McDEVITT:  That would give you one
9  year to do that.
10  MR. POGUST:  One year.
11  (Whereupon, brief discussion off the
12  record.)
13  (Whereupon, resumed.)
14  BY MR. McDEVITT:
15  **Q.   I'm showing you Exhibit 30.  Do you**
16  **recognize Exhibit 30?**
17  A.   No.
18  **Q.   Is this something you posted?**
19  A.   It looks like it.
20  **Q.   And this was on July 22nd of 2014?**
21  A.   Okay.  Yes.
22  **Q.   It says:  Heavy ass back workout.**
23  **Repping out 3 sets of 15 with 8 plates for T bar**
24  **rows.  Getting stronger every day.  8 plates of 45.**
25  **Is that what that is?**

68 (Pages 266 to 269)

270

1    A.  Yes.
2    Q.  So that's what, 360 pounds?
3    A.  Yes.  Yes.
4    Q.  And then, is that the exercise where you
5  bend over and pull it up to your --
6    A.  Closed grip, but yes, essentially.
7    Q.  All right.
8      (Evan Singleton Instagram Account Page
9    marked as Singleton Exhibit 31, as of this
10    date.)
11  BY MR. McDEVITT:
12    Q.  I'm showing you what's been marked as
13  Exhibit 31.  Do you recognize that document?
14    A.  No.
15    Q.  Does that appear to be you in that
16  picture?
17    A.  Looks like it.
18    Q.  Do you have a weight belt like that?
19    A.  Yeah.  Well, I did, I don't anymore.
20    Q.  All right.  And this is designed to
21  depict the size of your back?
22    A.  Yes.
23    Q.  And this is --
24    A.  Well, the weight belt is used to protect
25  your back when you're doing heavy work, heavy lifts.

271

1    Q.  Understood.  But, I mean, the point of
2  the picture is to show how big your back is?
3    A.  Yes.
4    Q.  And this was posted on July 29th of 2014?
5    A.  Yes.
6    Q.  So this, again, would have been while you
7  were down in Florida?
8    A.  Yes.
9    Q.  Unable to perform for WWE?
10    A.  Yes.
11    Q.  In fact, all these pictures that I've
12  shown you are in that category, aren't they?
13    A.  Yes.
14      MR. McDEVITT:  We have a series of
15    individual photographs.  We can mark them
16    individually or as one cumulative.
17      MR. POGUST:  Mark them as one.
18      MR. McDEVITT:  Yeah.  Mark this as a
19    cumulative Exhibit 32.
20      (Multiple Photographs marked as
21    Singleton Exhibit 32, as of this date.)
22  BY MR. McDEVITT:
23    Q.  Mr. Singleton, I've handed you a group of
24  pictures taken by a photographer by the name of Jeff
25  Binns.  Do you recognize these photographs?

272

1    A.  Yes.
2    Q.  And this is you in a series of posing
3  positions, correct?
4    A.  Yes.
5    Q.  Do you recall when these were taken?
6    A.  This was at the show in June.
7    Q.  June of last year?
8    A.  Yes.
9    Q.  Did you pay him to take these pictures?
10    A.  No.
11    Q.  All right.  And this is the results of
12  the hard work you were telling us you did to get into
13  this shape?
14    A.  Yes.
15    Q.  Where you went from being the strongest
16  you were to dieting and working out and becoming
17  this, right?
18    A.  Yes.
19    Q.  And you did all that during a time your
20  lawyers were representing in court that you were
21  disabled, right?
22    A.  Yes, I don't know.
23    Q.  All right.
24      MR. McDEVITT:  I only have a little bit
25    more for you, Mr. Singleton.

273

1      THE WITNESS:  Okay.
2      MR. McDEVITT:  In fact, if you want to
3    take a five minutes, I might be able to
4    simplify it.
5      MR. POGUST:  Let's do that.
6      MR. McDEVITT:  We'll be done in a
7    couple -- hopefully before the day is done.
8      THE VIDEOGRAPHER:  The time is 3:11 p.m.
9    Off the record.
10      (Whereupon, off the record.)
11      (Whereupon, resumed.)
12      THE VIDEOGRAPHER:  The time is 3:24 p.m.
13    Back on the record.
14  BY MR. McDEVITT:
15    Q.  Mr. Singleton, I asked you earlier today
16  whether you recalled seeing a presentation that Dr.
17  Maroon gave to FCW/NXT in August of 2012.  And I
18  believe you indicated that you didn't remember and
19  that you hadn't seen the tape recording of this
20  presentation.
21    A.  Yes, sir.
22    Q.  Is that accurate?
23    A.  Yes, sir.
24    Q.  What we want to do is, we're going to
25  play at least part of that now to see if it refreshes

69 (Pages 270 to 273)

274

1    your memory as to whether you saw it.  Okay?
2        A.  Okay.
3            MS. LACY:  They already have one of them
4    because it was produced.
5            MR. POGUST:  Yeah.  All right.  If you
6    need it, it's not --
7            MR. McDEVITT:  I mean, this is one you
8    have, so.
9            MR. POGUST:  Yeah, that's fine.  We're
10   going to mark it, though?
11           MS. LACY:  Do you want to mark it as an
12   exhibit?
13           MR. POGUST:  You probably should.
14           MR. McDEVITT:  Yeah, we'll mark this.
15           (CD marked as Singleton Exhibit 33, as
16   of this date.)
17           MR. McDEVITT:  For the record --
18           MS. LACY:  The time is going to be 15:30,
19   but don't play it yet.
20           MR. McDEVITT:  And for the record, we're
21   going to move the tape ahead to the part of the
22   presentation where he talks about head
23   injuries.  All right?
24           And I'd like you to watch it with the
25   idea of seeing if it refreshes your memory as

275

1    to whether you were there or not.
2            THE WITNESS:  Okay.
3            (Whereupon, CD played.)
4    BY MR. McDEVITT:
5        Q.  Does it trigger any recollection on your
6    part as to whether you were there during that
7    presentation?
8        A.  No.
9            MR. POGUST:  Live you mean.  Didn't watch
10   the video but was actually in the audience?
11           MR. McDEVITT:  Actually in the audience.
12       A.  No.
13       Q.  Could have been, could not have been, you
14   just don't remember one way or the other?
15       A.  I never remember that, no.
16       Q.  Did you see the heads of some of the
17   people sitting in the audience?
18       A.  Oh, it was kind of -- oh, the heads of
19   the audience, yeah.
20       Q.  Did you recognize any of them?
21       A.  Erick Rowan was in there.
22       Q.  Erick who?
23       A.  Erick Rowan.
24       Q.  Okay.  Anybody else did you recognize?
25       A.  Not really too-too much, no.

276

1        Q.  Do you remember Teon, your roommate,
2    talking about this presentation with you?
3        A.  No.
4        Q.  Do you remember whether the wrestlers
5    were talking about the presentation?
6        A.  No.
7        Q.  And am I correct that what you heard him
8    say there about won't be returned to the ring if
9    you're symptomatic is the same thing that Dr. Amann
10   told you that you previously testified?
11       A.  Yes.
12           MR. McDEVITT:  All right.  I think at
13   this time I don't have any further questions,
14   Mr. Singleton.
15           Depending on the outcome of what happens,
16   I may have some more I want to ask in the
17   future.
18           You have, I'm sure your lawyers will tell
19   you, the right to review the transcript of your
20   testimony to make sure it accurately reflects
21   what you said.  Okay.  You also have the right
22   to change your testimony, but if you do, you're
23   subject to being recalled to be questioned
24   about it.
25           THE WITNESS:  Okay.

277

1            MR. McDEVITT:  So your counsel will talk
2    to you about that.  And, in the meantime, I
3    have no further questions.
4            MR. POGUST:  We have a couple of
5    follow-ups.
6    EXAMINATION BY
7    MR. POGUST:
8        Q.  Evan, you testified earlier today
9    regarding an exhibit which I believe was marked as
10   Singleton 16.  It's the Plaintiffs' Second Amended
11   Complaint.
12           Mr. McDevitt asked you a question about
13   at the time that this was filed back in June of 2015
14   whether you were able to drive or were driving, and
15   you testified that you were.  Was that answer
16   correct?
17       A.  No.
18       Q.  So why did you say that then?
19       A.  I misheard him when he asked the
20   question.  I thought he said this year, May of this
21   year.
22       Q.  Okay.  And when did you -- when did you
23   first start to drive after, after your accident?
24       A.  The specific time I don't remember.
25       Q.  How long ago from today?  Months?  A year

70  (Pages 274 to 277)

278

1  ago?
2      A.  It was some time after I saw Dr. Chu.  I
3  saw Dr. Chu.  She put me on some medication.  And
4  after my body spasms started to go down in frequency,
5  that's when I started driving again.
6      Q.  Okay.  Okay.  Now, you testified about
7  and Mr. McDevitt asked you questions about doing a
8  move wrong and you knew you could get hurt, correct?
9      A.  Yeah.
10     Q.  Did you ever think that doing this move
11 that was -- where you got hurt in the choke slam
12 would ever cause you to have long-term brain damage
13 as a result of you either doing it wrong or doing it
14 right and getting hurt?
15     A.  No.
16     Q.  Was that ever discussed with you by
17 anybody at WWE?
18     A.  Not that I remember, no.
19     Q.  Okay.  You were also asked about the
20 supplements that you had taken.  Did you -- do you
21 recall having any side effects after taking those
22 supplements; do they bother you in any way?
23     A.  No.
24     Q.  You graduated high school?
25     A.  Yep.

279

1      Q.  What year?
2      A.  2011.
3      Q.  Subsequent to, after graduating high
4  school, did you have any medical training at all?
5      A.  Medical training?
6      Q.  Medical training.
7      A.  No.
8      Q.  When was the first time you ever heard
9  the word intracranial hemorrhage?
10     A.  Phrased exactly like that?
11     Q.  Yeah, that, that term.
12     A.  Today.
13     Q.  Okay.  Did you ever do any Internet
14 research on the term intracranial hemorrhage?
15     A.  No.
16     Q.  Okay.  When you started with the WWE,
17 were you classified in a certain level in terms of
18 their trainees?
19     A.  Yeah.
20     Q.  And are there various levels?
21     A.  Yeah.
22     Q.  What are the levels?
23     A.  There's beginner, intermediate and
24 advanced.
25     Q.  Okay.  And did you -- how do you move

280

1  forward from one level to the next?
2      A.  That's not exactly set in stone.
3      Q.  Okay.
4      A.  There's no, you just start off in the
5  beginner class and then you just do moves over and
6  over again, try to work on putting matches together
7  and work on your might skills.  And then when the
8  trainers feel as though you're ready to advance,
9  that's when they put you in the next class up.
10     Q.  Okay.  And when you stopped working for
11 WWE, what level were you in?
12     A.  Beginner.
13     Q.  You were still in beginner?
14     A.  Uh-hum.
15     Q.  And what level was the person you were
16 wrestling in on the day you got injured?
17     A.  I'm almost positive he was -- he was in
18 intermediate.
19     Q.  Okay.  Do you ever recall -- now you saw
20 two videos of being choke slammed on two occasions,
21 the one where you got injured and one three months
22 before, correct?
23     A.  Yes.
24     Q.  Do you recall what training you received
25 in terms of the choke slam during that period of time

281

1  when you were employed by WWE?
2      A.  I'm sorry?
3      Q.  Do you recall the training that you
4  received?
5      A.  No.
6          MR. McDEVITT:  Object to the term
7      employed, but you can answer.
8          THE WITNESS:  Okay.
9      A.  No.
10     Q.  Okay.  Looking at the booking contract
11 which you were shown before, the agreement that you
12 had at the WWE.
13     A.  Yes.
14     Q.  Did you ever have a lawyer look at that
15 agreement?
16     A.  No.
17     Q.  How old were you when you got that
18 agreement?
19     A.  18.  Late 18, early 19.
20     Q.  But you were 18 at the time you got it?
21     A.  Yes.
22     Q.  Correct?
23     A.  Yes.
24     Q.  Okay.  Were you -- was it suggested by
25 anybody at WWE that you should take this to your

71 (Pages 278 to 281)

282

1  lawyer and have them review it to make sure that
2  everything looks okay, and then if it's okay to sign
3  it and send it back?
4      A.  No.
5      Q.  What was told to you?
6      A.  Sign it.  Send it back.  FedEx it back.
7      Q.  And tell -- and what did you do when you
8  got the agreement?
9      A.  I skimmed through it and then I signed
10  it.  Had someone notarize it and then I Fedexed it
11  back.
12      Q.  How soon after you got the agreement did
13  you do that?
14      A.  I don't remember.
15      Q.  Days?  Months?  Weeks?
16      A.  Days.
17      Q.  How were you feeling when you got the
18  agreement?
19      A.  Excited.  I was 18 years old and offered
20  a contract from WWE, that's almost unheard of.  I was
21  excited.  I was happy.
22      Q.  You were just shown a video of some -- of
23  a, for a better word, a seminar that was going on at
24  WWE regarding concussions.
25      A.  Yes.

283

1      Q.  Amongst other things.
2      A.  Yes.
3      Q.  Do you recall receiving any information
4  from WWE regarding head injuries and concussions?
5      A.  No.
6      Q.  Do you remember ever talking to anybody
7  about the long-term effect of concussions when you
8  were working for the WWE?
9      A.  No.
10      Q.  Were you ever told by anybody from the
11  WWE that concussions, even one concussion, can have a
12  long-term or permanent effect on you?
13      A.  Not to my recollection.
14      MR. McDEVITT:  Object to the form and
15  foundation.
16      A.  Not to my recollection.
17      MR. POGUST:  I think that's all we have.
18  Hold on.  Almost.
19  BY MR. POGUST:
20      Q.  I think -- you testified about, about
21  your weight lifting.  Tell us, how did that make you
22  feel when you were lifting the weights?
23      A.  Lifting weights now to me is the only
24  time of day dealing with my anxiety and my depression
25  and everything that's going on in my life, lifting

284

1  weights to me is the only time where I'm feeling
2  truly happy.  It's the only time that I don't have to
3  worry about anything.  I don't feel anxious.  I don't
4  feel depressed.  I just go in there and I lift.  And
5  it's -- to me it's ecstasy.  It's weird to say, but
6  to me -- it's a little corny -- but to me it's
7  ecstasy.  I love it.
8      Q.  It's like your therapy?
9      A.  It's better than therapy.
10      MR. POGUST:  Okay.  That's all I have.
11  FURTHER EXAMINATION BY
12  MR. McDEVITT:
13      Q.  You say nobody ever told you the danger
14  of a choke slam in the sense that you could be
15  seriously hurt if you did it wrong?
16      A.  Permanently, yes.
17      Q.  Why do you think they taught you to tuck
18  your head?
19      A.  That's how the move was performed.
20      Q.  Do you think that had something to do
21  with protecting your head from injury?
22      A.  I don't know.
23      Q.  You couldn't figure out why they would
24  tell you to tuck your head so your head didn't hit
25  the mat was to protect against injury?

285

1      A.  I don't know.  Maybe it was to help, help
2  with the, the impact.  Like the same thing that you
3  stretch out your arms when you do a bump.
4      Q.  Well, so did you think then it would be a
5  good idea to hit your head on the mat?
6      A.  No.
7      Q.  You could figure that out, can't you,
8  Mr. Singleton, that it's not a good idea to land on
9  your head?
10      A.  Yes.
11      Q.  You knew that before you ever started
12  wrestling with WWE, didn't you?
13      A.  Yes.
14      Q.  You don't need somebody to tell you that,
15  do you?
16      A.  I need to learn how to do the move
17  correctly.
18      Q.  And you were taught how to do the move
19  correctly, right?  And you did it correctly in June,
20  didn't you?
21      A.  I don't really remember that, but.
22      Q.  You just saw it on tape, didn't you?
23      A.  Yeah.
24      Q.  And you did it correctly, didn't you?
25      A.  Yeah.

72 (Pages 282 to 285)

286

1    Q.   All right.  And your counsel just asked
2  you -- and, by the way, in all the questioning he
3  just asked you, how many times did you say you didn't
4  remember?
5    A.   I don't know.  Once.  Twice.
6    Q.   One time.  Your memory seemed to be
7  pretty good when he was questioning you, didn't it?
8    A.   He only asked me four questions or five
9  or whatever.
10   Q.   Well, it's a little bit better than when
11  I was asking you questions, your memory seems to be
12  better when he's asking you, doesn't it?
13       MR. POGUST:  Objection.  Argumentative.
14   A.   I don't know.
15   Q.   He asked you when the first time you
16  heard the phrase intracranial hemorrhage was, and you
17  said today, is that -- did I understand that
18  correctly?
19   A.   Phrased that way, yes.
20   Q.   Phrased that way?
21   A.   Yeah.  Before that it was just
22  hemorrhage.  Intracranial, I never heard that.
23   Q.   Never heard it?  Do you know why it
24  appears then in three complaints filed on your
25  behalf?

287

1    A.   I don't know.
2    Q.   Did you reviewed -- if you reviewed it,
3  did you say, what does that mean?
4    A.   Well, I skimmed through it, I didn't --
5    Q.   It's just like a contract, you just skim
6  through these important legal documents, huh?
7        MR. POGUST:  Objection.  Argumentative.
8    A.   Yeah.
9    Q.   You don't really read them completely?
10   A.   I don't know.
11   Q.   Three different times it appears in the
12  legal documents that were filed on your behalf that
13  you had an intracranial hemorrhage and the first time
14  you heard that term was today?
15   A.   Yeah.
16   Q.   Didn't you tell us earlier in your
17  testimony that Candy's the one who told you that you
18  had that?
19   A.   Yeah, hemorrhage.
20   Q.   Did she tell those -- that phrase?
21   A.   Hemorrhage, yes.
22   Q.   Hemorrhage, not intracranial hemorrhage?
23   A.   No.
24   Q.   She told you you had a brain hemorrhage?
25   A.   Yeah.

288

1    Q.   So the word that you are saying you never
2  heard before was intracranial, not hemorrhage?
3    A.   Yeah.
4    Q.   You knew what a hemorrhage was, didn't
5  you?
6    A.   Brain bleed.
7    Q.   Yeah.  And that's a phrase you used
8  repeatedly to tell people you had a brain bleed,
9  right?  You knew that before you came here today,
10  didn't you?
11   A.   What, brain hemorrhage?
12   Q.   Yes.  Yes.  That you used the word brain
13  bleed to describe what supposedly had happened to
14  you?
15   A.   Yes.
16   Q.   And I think he also asked you whether
17  anybody ever gave you any information on concussions
18  when you were at WWE and you said no.
19   A.   Yeah.
20   Q.   Didn't Dr. Amann --
21   A.   Not to my knowledge.
22   Q.   Didn't Dr. Amann tell you that once you
23  got a concussion you would not be allowed back into
24  the ring until you healed?
25   A.   Yes.

289

1    Q.   Isn't that information about concussions?
2    A.   I don't know.
3    Q.   What would you consider that to be --
4    A.   Doesn't that pertain to everything?
5    Q.   -- if not information about concussions?
6    A.   Doesn't that pertain to everything?
7    Q.   What does that pertain to everything?
8    A.   What he said?
9    Q.   No, it pertains to concussions.  He
10  told -- didn't you testify he told you --
11   A.   I don't remember.
12   Q.   -- that if you get a concussion and
13  you're still symptomatic, you will not be permitted
14  back into the ring?
15   A.   Yes.
16   Q.   So he did tell you information about
17  concussions?
18   A.   No.  He told me I wasn't allowed back in
19  the ring until I didn't have symptoms anymore.  He
20  didn't give me background information on concussions
21  at all.
22   Q.   That's information about concussions,
23  isn't it?
24       MR. POGUST:  Objection.
25   Q.   Did you think that that the people from the

73 (Pages 286 to 289)

290

1    WWE were supposed to assume that you were a complete
2    ignoramus about concussions?
3         MR. POGUST:  Objection.
4    A.   I don't know.
5    Q.   You had been a football player, an
6    amateur wrestler.
7         MR. POGUST:  Objection.
8    Q.   Were they supposed to assume that you
9    came in there just absolutely knowing nothing about
10   what a concussion was?
11   A.   Yeah.
12   Q.   And you didn't know that if you got hit
13   on the head and got dizzy that you suffered a
14   concussion?
15   A.   I didn't know.
16   Q.   You didn't know that?
17   A.   No.
18   Q.   Well, what did you think was happening
19   when you got hit in the head?
20   A.   I didn't get hit in the head.  I never
21   had a problem with my brain until I was with WWE.
22   Q.   Well, when you heard the term -- you
23   heard the term concussion before you went to WWE,
24   didn't you?
25   A.   I don't know.

291

1    Q.   You never heard --
2    A.   I don't, I don't, I don't watch the news.
3    I don't read news articles.  I don't do any of that.
4    Q.   Is it your sworn testimony, sir, that
5    from the day you walked in the WWE you had never
6    heard the word concussion?
7    A.   No.
8    Q.   No, you didn't or --
9    A.   No, I -- I did, but I wasn't familiar
10   with it.
11   Q.   Well, when you heard it, what did you
12   think it was?
13   A.   A brain injury.
14   Q.   A brain injury.  And what did you think
15   caused the brain injury?
16   A.   I don't know.
17   Q.   Did you think that might be getting hit
18   in the head?
19   A.   I don't know.  Maybe.
20   Q.   Well, what else did you think caused a
21   concussion?
22   A.   Anything could be caused by any number of
23   things.  I don't know.
24   Q.   Well, what did you think caused the
25   concussion?

292

1    A.   I don't know.
2    Q.   So you just knew there was a word
3    concussion?
4    A.   It was a -- it was a brain problem,
5    that's what I knew.
6    Q.   Brain problem --
7    A.   Yes.  Brain injury.  Brain problem.
8    Q.   Brain injury.  What causes an injury?
9    A.   I don't know.
10        MR. POGUST:  Objection.
11   A.   An accident.  An infection.  A disease.
12   I don't know.
13   Q.   And then you saw a tape of Dr. Maroon,
14   which you can't testify you weren't there, can you?
15   A.   I don't remember that.
16   Q.   So if you were there, he provided you all
17   kind of information about concussions, didn't he?
18   A.   I don't remember that.
19   Q.   You don't remember.
20        MR. POGUST:  Objection.
21   Q.   It doesn't mean you weren't there, does
22   it?
23   A.   I don't remember.
24   Q.   But you would admit that he's providing
25   everybody in FCW information about concussions, isn't

293

1    he?
2    A.   I don't know.
3    Q.   Well, you just saw the tape.
4    A.   Yeah.
5    Q.   Was he?
6    A.   Yeah.
7    Q.   And when you came into the WWE, didn't
8    you do an impact test?
9    A.   I don't remember.
10   Q.   Well, do you know what an impact test is?
11   A.   Is that the testing for brain injury?
12   Q.   That is the baseline test that when you
13   came into the company you were given a baseline test
14   to determine what your brain function was.
15   A.   Okay.
16   Q.   Do you recall that?
17   A.   No.
18   Q.   Do you recall being asked how many
19   concussions you had at that point in time?
20   A.   No.
21   Q.   In answering the question how many you
22   had?
23   A.   No.
24   Q.   You don't remember that?
25   A.   No.

74 (Pages 290 to 293)

294

1    Q.   Do you remember being tested again for
2  concussion or on the impact after you had the
3  supposed injury in September?
4    A.   No.
5    Q.   If the record shows you were tested
6  several times for impact, they were doing concussion
7  testing for you?
8    A.   I don't remember.
9    Q.   And you went through all that without
10  knowing what a concussion was?
11    A.   I don't know.  I don't remember.
12    Q.   And did you bother to ask anyone, why am
13  I doing all this stuff?
14    MR. POGUST:  Objection.
15    Q.   What's the purpose of this?
16    A.   I don't know.
17    MR. POGUST:  Did you ask?  Did you say,
18  what's the purpose of this?
19    Q.   Did you ask?
20    A.   No.
21    Q.   Did you ask anybody, why am I taking
22  these tests?
23    A.   No.
24    Q.   So as you sit there today you have no
25  idea why?

295

1    A.   No.  It was WWE, I was -- I was willing
2  to do what they told me.
3    Q.   So if they told you to go jump off a
4  bridge, would you have done that, too?
5    A.   Probably.
6    Q.   Probably.
7    A.   It's WWE.
8    Q.   And you really wanted to be in WWE,
9  didn't you?  And you didn't make it, so now we
10  have --
11    MR. POGUST:  Objection.
12    Q.   -- all this, right?
13    MR. POGUST:  Objection.  Now you're just
14  arguing.
15    Q.   You didn't make it, did you?
16    A.   No.
17    Q.   And your lifelong dream you didn't
18  accomplish, did you?
19    A.   No.
20    Q.   And you washed out?
21    MR. POGUST:  Objection.
22    Q.   And you washed out, didn't you?
23    A.   Washed up?
24    Q.   You washed out.  You packed your bags and
25  went home.

296

1    A.   Yes.
2    Q.   And you quit?
3    A.   Yes.
4    Q.   After you took all the money?
5    MR. POGUST:  Objection.
6    A.   I don't know.
7    MR. McDEVITT:  I have no further
8  questions for you.
9    MR. POGUST:  We have no further questions
10  for you.  We're done.  Thanks.
11    THE VIDEOGRAPHER:  This concludes our
12  video deposition.  The time is 3:48 p.m.  Off
13  the record.
14    (Wherefore, off the record.)
15    (Whereupon, videotaped deposition
16  adjourned 3:48 p.m.)

297

2  STATE OF _____ )
3                           ) :ss
4  COUNTY OF _____ )

7    I, EVAN M. SINGLETON, the
8  witness herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.

15    _____
16            EVAN M. SINGLETON

20  Sworn and subscribed to before
21  me, this        day of
22  , 2016.

24    _____
25    Notary Public

75 (Pages 294 to 297)

298

```
 1          C E R T I F I C A T E
 2
 3          I, JOSEPHINE H. FASSETT, a Registered
 4   Professional Reporter, Certified Court Reporter and
 5   Notary Public do hereby certify that the witness,
 6   whose deposition is hereinbefore set forth, was first
 7   duly sworn by me on the date indicated, and that the
 8   foregoing deposition is a true and accurate record of
 9   the testimony given by such witness.
10
11          I FURTHER CERTIFY that I am not employed
12   by nor related to any of the parties to this action
13   by blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15
16          IN WITNESS WHEREOF, I have subscribed my
17   hand this 13th day of May 2016.
18
19          _____
20          JOSEPHINE H. FASSETT, RPR, CCR
             NCRA License No. 32148
             CCR License No. 30XI00098400
21
22
23
24
25
```

300

```
 1              E R R A T A
 2        I wish to make the following changes and/or
 3   corrections for the following reasons:
 4   PAGE LINE
 5   ____ ____ CHANGE:_____
 6   REASON:_____
 7   ____ ____ CHANGE:_____
 8   REASON:_____
 9   ____ ____ CHANGE:_____
10   REASON:_____
11   ____ ____ CHANGE:_____
12   REASON:_____
13   ____ ____ CHANGE:_____
14   REASON:_____
15   ____ ____ CHANGE:_____
16   REASON:_____
17   ____ ____ CHANGE:_____
18   REASON:_____
19   ____ ____ CHANGE:_____
20   REASON:_____
21   ____ ____ CHANGE:_____
22   REASON:_____
23
24   _____   _____
25     WITNESS' SIGNATURE            DATE
```

299

```
 1
 2          INSTRUCTIONS TO WITNESS
 3
 4      Please read your deposition over carefully and
 5   make any necessary changes and/or corrections.  You
 6   should state the reason in the appropriate space on
 7   the Errata Sheet for any changes and/or corrections
 8   that are made.
 9      After doing so, please sign the Errata Sheet and
10   date it.
11      You are signing same subject to the changes
12   and/or corrections you have noted on the Errata
13   Sheet, which will be attached to your deposition.
14      It is imperative that you return the original
15   Errata Sheet to the deposing attorney within thirty
16   (30) days of receipt of the deposition transcript  by
17   you.  If you fail to do so, the deposition transcript
18   may be deemed to be accurate and may be used in
19   court.
20
21
22
23
24
25
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099