# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **RUSS MCCULLOUGH, RYAN SAKODA, and MATTHEW ROBERT WIESE, individually and on behalf of all others similarly situated,** | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION NO.** |
| | : | **3:15-cv-001074 (VLB)** |
| **v.** | : | **Lead Case** |
| | : | |
| **WORLD WRESTLING ENTERTAINMENT, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **EVAN SINGLETON and VITO LOGRASSO,** | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION NO.** |
| | : | **3:15-CV-00425 (VLB)** |
| **v.** | : | **Consolidated Case** |
| | : | |
| **WORLD WRESTLING ENTERTAINMENT, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### PLAINTIFFS EVAN SINGLETON AND VITO LOGRASSO'S
### MEMORANDUM IN OPPOSITION TO
### DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S
### <u>MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

I.      FACTUAL BACKGROUND ............................................................................... 3

    A.      Vito LoGrasso's Wrestling Career and Relationship with WWE.......... 3

    B.      Evan Singleton's Wrestling Career and Relationship with WWE ........ 4

    C.      WWE's Knowledge of Head Injuries...................................................... 5

II.     ARGUMENT...................................................................................................... 7

    A.      Significant Issues of Material Fact Exist Regarding Plaintiffs'
           Fraud-by-Omission Claims ..................................................................... 7

           1.      Plaintiffs articulate specific facts showing fraud by
                  omission. ...................................................................................... 7

           2.      Evidence in discovery demonstrated the presence of
                  fraudulent intent....................................................................... 9

                  a.      WWE was aware of the association between
                          repetitive head trauma, wrestling, and CTE prior
                          to September of 2006. ..................................................... 11

                  b.      WWE's physician allowed LoGrasso to continue
                          to wrestle despite expressing complaints of
                          concussion-like symptoms and without any
                        warnings related to the possibility of long-term
                        neurological diseases resulting from repetitive
                        head trauma ................................................................... 15

                  c.      WWE has never spoken to LoGrasso or Singleton
                          regarding the dangers associated with repetitive
                        head injuries. ................................................................. 17

           3.      WWE knowingly omitted facts related to the long-term
                    risks of concussive and sub-concussive blows to the
                    head........................................................................................ 18

                  a.      WWE Misconstrues Plaintiffs' Allegations
                        Regarding the Risks of Repeated Concussive
                        Head Trauma................................................................... 18

                  b.      There is no inherent contradiction in Plaintiffs'
                        claims. ........................................................................... 20

          c.      **Plaintiffs show disputed issues of fact as to WWE's knowledge of CTE during LoGrasso's employ** ................................................................... 21

          d.      **WWE's cited authorities are inapposite** .......................... 22

     4.      **Plaintiffs detrimentally relied on WWE's fraudulent omissions.** ................................................................... 23

          a.      **Plaintiffs testified to their reliance on wwe's intentional omissions** .......................................... 23

          b.      **Singleton detrimentally relied on WWE's omissions about the long-term risks of repeated head injuries.** ................................................. 26

          c.      **LoGrasso has suffered neurological injuries proximately caused by his detrimental reliance on WWE's fraudulent omissions.** .......................... 27

     5.      **WWE had a duty to disclose to LoGrasso** ................................. 30

          a.      **A special relationship existed between WWE and LoGrasso** .......................................................... 31

          b.      **Application of the continuing course of conduct doctrine is proper here** ................................... 33

   B.      **Vito LoGrasso's Claim is Not Time Barred** ............................ 35

     1.      **LoGrasso's awareness of headaches does not preclude tolling.** ................................................................... 35

     2.      **WWE's continuing course of conduct tolls the statute of repose.** ................................................................... 37

          a.      **WWE committed an initial wrong.** ................................... 37

          b.      **WWE had a continuing relationship with LoGrasso** ...................................................................... 39

          c.      **WWE breached its duty to LoGrasso** ............................... 39

     3.      **WWE's fraudulent concealment tolls the statute of limitations** ................................................................... 40

III.     **CONCLUSION** ......................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Turner Corp.*, No. 00 CIV 4677 HB, 2001 WL 225049 (S.D. N.Y. Mar. 2, 2001) ............................................................................................ 20

*Alpha Portland Cement Co. v. Curzi*, 211 F. 580 (2d Cir. 1914) ......................... 27

*Am. Family Mut. Ins. Co. v. Missouri Dep't of Ins.*, 169 S.W.3d 905 (Mo. Ct. App. 2005) .................................................................................................... 9

*Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313 (2d Cir. 2006) ........................................................................................ 3

*Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987) ........................................ 2

*Bartone v. Robert L. Day Co.*, 656 A.2d 221 (Conn. 1995) ................................. 41

*Bergeron v. Select Comfort Corp.*, No. A-15-CV-00657-LY-ML, 2016 WL 155088 (W.D. Tex. Jan. 11, 2016) .................................................................... 21

*Chudy v. Sovereign Ridge, LLC*, No. HHDCV085024333S, 2012 WL 4801603 (Conn. Super. Ct. Sept. 18, 2012) ................................................... 7

*City of Philadelphia v. Lead Indus. Ass'n, No. 90-7064*, 1992 WL 98482 (E.D. Pa. Apr. 23, 1992) .......................................................................... 25

*Crigger v. Fahnestock & Co.*, 443 F.3d 230 (2d Cir. 2006) ................................ 24

*Danise v. Safety-Kleen Corp.*, 17 F. Supp. 2d 87 (D. Conn. 1998) ..................... 29

*Derby v. Conn. Light & Power Co.*, 355 A.2d 244 (Conn. 1974) .................... 11, 14

*Dime Sav. Bank of N.Y., FSB v. Fucetola*, No. CV91286416S, 1994 WL 67054 (Conn. Super. Feb. 24, 1994) ......................................................... 30

*DiMichele v. Perrella*, 158 Conn. App. 726 (2015) ............................................. 30

*Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224 (S.D.N.Y. 1995) ............................ 24

*Franchey v. Hannes*, 207 A.2d 268 (Conn. 1965) ................................................ 8

*Haesche v. Kissner*, 640 A.2d 89 (Conn. 1994) .................................................. 29

*Hall v. Ashland Oil Co.*, 625 F. Supp. 1515 (D. Conn, 1986) .................. 25, 26, 28

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996) ............................................ 24

*Hunt v. Cromartie*, 526 U.S. 541 (1999)................................................... 1

*In re NFL Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016) ........... 22

*In re NFL Players' Concussion Injury Litig.,* 307 F.R.D. 351 (E.D. Pa 2015) 22, 23

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012) ............................. 2

*Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245 (5th Cir. 1997) ........................... 24

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ................................... 36

*Kohn v. John M. Glover Agency, Inc.*, No. CV000339053, 2001 WL 527507
(Conn. Super. Ct. Apr. 24, 2001) .............................................................. 33

*Lagassey v. State*, 846 A.2d 831 (Conn. 2004)........................................................ 35

*Law v. Camp*, 116 F. Supp. 2d 295 (D. Conn. 2000)................................................ 30

*Lindsay v. Pierre*, 879 A.2d 483 (Conn. App. Ct. 2005) ......................................... 35

*MacDermid Printing Solutions, Inc. v. Cortron Corp.*, 2014 U.S. Dist.
LEXIS 111526 (D. Conn. 2014) .................................................................. 23

*Macellaio v. Newington Police Dep't, et al*, 75 A.3d 78 (Conn. App. 2013)........ 41

*Maslak v. Maslak*, No. LLICV126006437, 2013 WL 5663798 (Conn. Super.
Ct. Sept. 27, 2013) ..................................................................................... 43

*Master–Halco, Inc. v. Scillia Dowling & Natarelli, LLC*, 739 F.Supp.2d 109
(D. Conn.2010)............................................................................................ 24

*N.J. Carpenters Health Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 324
(D.N.J. 1998) ............................................................................................... 25

*N.Y. State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98 (2d Cir. 1996)... 11, 14

*Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031 (D.C. Cir. 1980)....................... 21

*Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199 (D. Conn. 2013)..................... 3

*Neuhaus v. DeCholnoky*, 905 A.2d 1135 (Conn. 2006)........................................ 37

*Patrick v. LeFevre*, 745 F.2d 153 (2d Cir. 1984) ............................................... 2, 41

*Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331 (D.
Conn. 2013) ................................................................................................. 24

*Pub. Utils. Maint., Inc. v. Sec'y of Labor*, 417 F. App'x 58 (2d Cir. 2011).......... 11

*Puro v. Henry,* 449 A.2d 176 (Conn. 1982) ........................................................ 2, 41

*Republic Bank & Trust Co. v. Bear, Stearns & Co.,* 707 F. Supp. 2d 702 (W.D. Ky. 2010) ........................................................................................... 24

*Reville v. Reville*, 93 A.3d 1076 (Conn. 2014) ................................................... 7

*Rosen v. Thornburgh*, 928 F.2d 528 (2d Cir. 1991) ........................................... 41

*Sanchez v. Triple-S Mgmt. Corp.,* 492 F.3d 1 (1st Cir. 2007) ............................. 8

*Sarkissian Mason, Inc. v. Enter. Holdings, Inc.,* 572 F. App'x 19 (2d Cir. 2014) .............................................................................................................. 8

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir. 1997) .............. 24

*Sherwood v. Danbury Hosp.,* 896 A.2d 777 (Conn. 2006) ................................... 38

*Simpson v. City of New York*, 793 F.3d 259 (2d Cir. 2015) ................................. 36

S*utera v. Estate of Washton*, No. 556177, 2003 WL 1478788 (Conn. Super. Ct. Mar. 14, 2003) ........................................................................... 8

*Trefoil Park, LLC v. Key Holdings, LLC*, 2015 U.S. Dist. LEXIS 31476 (D. Conn 2015) ................................................................................................. 23

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.,* 822 F.3d 650 (2d Cir. May 23, 2016) .......................................................................................... 8

*Vivenzio v. City of Syracuse*, 611 F.3d 98 (2d Cir. 2010) .................................... 3

*Weinstein v.* Weinstein, 882 A.2d 53 (2005) ..................................................... 24

*Whitehead v. St. Joe Lead Co., Inc.*, 729 F.2d 238 (3d Cir. 1984) ...................... 25

*Witt v. St. Vincent's Med. Ctr.,* 746 A.2d 753 (Conn. 2000) ........................... 34, 37

*Yurevich v. Sikorsky Aircraft Div.,* 51 F.Supp.2d 144 (D. Conn. 1999) .............. 23

<u>Rules</u>

Fed. R. Civ. P. 701 ...................................................................................... 8

## I.    INTRODUCTION

The central issues in deciding Defendant World Wrestling Entertainment Inc.'s ("WWE") liability in this matter were previously defined by this Court in its Order Partially Lifting Stay of Discovery ("Discovery Order") on January 15, 2016:

> (1) whether WWE had or should have had knowledge of and owed a duty to disclose to those plaintiffs the risks of long -term degenerative neurological conditions resulting from concussions or mild traumatic brain injuries to wrestlers who performed for WWE in the year 2005 or later, (2) whether and when WWE may have breached that duty, and (3) whether such a breach, if any, continued after Singleton and LoGrasso ceased performing for WWE.

Discovery Order (Dkt. 107).  Also at issue is whether the statute of limitations governing Plaintiff Vito LoGrasso's claim can be tolled under Connecticut's continuing course of conduct and fraudulent concealment doctrines.  This Court may have already gleaned from WWE's motion that there are numerous genuine issues of fact surrounding all of these elements in the above-captioned matter.

WWE, however, asks this Court to abandon the standards governing Rule 56.  It demands that the Court view video of Plaintiffs' deposition testimony to make credibility determinations that are the within the province of the jury.  *See* **Memorandum of Law in Support of Motion for Summary Judgment ("Def. Memo.")** at 2 n.1 (Dkt. 189).  Then, it evaluates the record as if a reasonable jury cannot make inferences and a claim cannot survive without some "smoking gun." However, it is well established that circumstantial evidence can create questions of fact that preclude the entry of summary judgment.  *See Hunt v. Cromartie*, 526 U.S. 541-42, 551–52 (1999) (finding "it was error to resolve the disputed fact of intent at the summary judgment stage" when circumstantial evidence was susceptible to different interpretations or inferences by the trier of fact).  In fact,

this Court already instructed, "[F]raudulent concealment may be inferred by a reasonable trier of fact from the balance of the evidence, even if only by circumstantial evidence."  Memo. of Decision Granting in Part and Denying in Part WWE's Motion to Dismiss ("MTD Order") at 47 (Dkt. 116) (citing *Puro v. Henry,* 449 A.2d 176, 180 (Conn. 1982).  Moreover, Rule 56 does not exist to decide lawsuits when the waters are murky.  *See In re Publ'n Paper Antitrust Litig.* ("*In re Paper*"), 690 F.3d 51, 61 (2d Cir. 2012) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252-53 (2d Cir. 1987)) ("[S]ummary judgment is not a substitute for trial.").  This is especially true where a defendant's state of mind is at issue:

> [W]here subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable.  The need for a full exposition of facts is profound under such circumstances since determining a man's state of mind is "an awesome problem," capable of resolution only by reference to a panoply of subjective factors.  Furthermore, a sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution. Traditionally, this function has been entrusted to the jury.

*Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) (citations omitted).  "Thus, when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial.'" *In re Paper*, 690 F.3d at 61 (quoting *Apex Oil Co*., 822 F.2d at 252-53)).

To that end, "'the [C]ourt is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.'"  *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d

199, 207 (D. Conn. 2013) (quoting *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 207 (D. Conn. 2013) (quoting *Am. Home Assurance Co. v. Hapag Lloyd Container Linie*, *GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006)).  In the instant case, significant issues of fact, described below, exist which require that Plaintiffs Vito LoGrasso and Evan Singleton ("Plaintiffs") be permitted to present their case at trial.

## I.   FACTUAL BACKGROUND

### A.   Vito LoGrasso's Wrestling Career and Relationship with WWE

LoGrasso first began performing for WWE as "enhancement talent" in 1991.  Local Rule 56(a)(2) Statement ("SODF") ¶ 306.  He later signed a booking contract with and performed for WWE from 2005 until 2007.  SODF ¶ 306.  During that two-year period (and throughout his wrestling career), LoGrasso received countless blows to the head.  SODF ¶¶ 50, 53, 318.  However, he never lost consciousness and therefore did not believe at the time that he was experiencing concussions.  SODF ¶ 313.  LoGrasso did not realize that you could suffer a concussion without losing consciousness, and he had no understanding of the long-term ramifications that could result from the blows to the head he was receiving.  SODF ¶¶ 313, 320.  With hindsight, LoGrasso believes he suffered head injuries during several matches in 2006 and 2007.  SODF ¶ 318.

While LoGrasso was performing for WWE, he was discouraged from reporting injuries.  SODF ¶ 310.  ███████████████████████

████████████████████████████████████████████████████████



████████ SODF ¶ 312. ██████████████████████████████

███████████████████████████████████████████████████

SODF ¶¶ 316-317. ████████████████████████ SODF ¶ 317.

███████████████████████████████████████████████████

███████████████████████████████████████ SODF ¶¶ 297,

320.

    LoGrasso's departure from WWE did not signal the end of his communications with the company. ████████████████████████

███████████████████████████████████████████████████

SODF ¶ 329. ██████████████████████████████████████

███████████████████████████████████████████████████

█████████████ SODF ¶¶ 74, 328. ██████████████████████

███████████████████████████████████████████████████

████████████████ SODF ¶ 329.

    LoGrasso relied on WWE to look out for his well-being.  SODF ¶ 330.  When WWE claimed that Chris Benoit's death was the result of drugs and unrelated to CTE, LoGrasso believed them.  SODF ¶¶ 322-323.  He thought "whatever Chris Benoit did or how or that stuff didn't pertain to me at the time, because I didn't think it was me."  SODF ¶ 325.  As a result, he did not seek help or learn that his symptoms stemmed from his wrestling career until his symptoms worsened in 2014.  SODF ¶ 326.

    **B.**    **Evan Singleton's Wrestling Career and Relationship with WWE**

    Singleton signed a booking contract with WWE on December 16, 2011. SODF ¶ 147. ██████████████████████████████████████████



SODF ¶¶ 236, 237.

SODF ¶¶ 206, 346.

SODF ¶ 231.

.   SODF ¶¶ 213, 351-54.

SODF ¶ 352.

SODF ¶¶ 180, 252.

SODF ¶ 338.   And he certainly did not understand that a single blow to the head like the one he received could result in injuries and symptoms as serious as those he now lives with.  SODF ¶ 332

**C.**    **WWE's Knowledge of Head Injuries**

While there may be some debate around the science of CTE, WWE has been aware of its potential dangers and the other long-term risks of repeated head injuries since at least 2006.  SODF ¶¶ 31, 271-91.  WWE should have known about Dr. Omalu's 2005 and 2006 articles revealing the presence of CTE in professional football players, and that knowledge should have raised red flags for WWE about the risks of professional wrestling.  SODF ¶ 273.  It should have conducted its own investigation and educated its wrestlers when it found out that its employee, Chris Nowinski, had started investigating the science of concussions.  SODF ¶¶ 274-283.  It should have conducted its own investigation and educated its wrestlers when that employee, Chris Nowinski, published his book *Head Games* in September 2006.  SODF ¶¶ 274-283.  It should have

conducted an even further   investigation when its own wrestler, Chris Benoit, tragically and unexpectedly took his own life and that of his wife and son in 2007. SODF ¶ 97.  Unfortunately, WWE did not take any of these steps until after Dr. Omalu found in 2007 that Benoit suffered from CTE.  SODF ¶¶ 98, 294-95.  Even then, WWE refused to acknowledge that CTE might pose a threat to the wrestling community.  SODF ¶¶ 300-04.  It did not educate wrestlers like LoGrasso about the potential long-term risks of repeated head injuries.  SODF ¶¶ 115, 320-321, 328.  It simply engaged in a campaign to smear and discredit Dr. Omalu.  SODF ¶¶ 299-304.

In fact, WWE took precisely zero proactive steps to address the emerging problems associated with long-term head injuries until it hired Dr. Joseph Maroon in 2008.  SODF ¶ 169.  And did those steps in 2008 include a program to educate its wrestlers?  No. ███████████████████████████████  SODF ¶ 295.  █████████████████████████████████████████████████████████

████████████████████████████████████████████. SODF ¶ 296.  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ SODF ¶ 296.

████████████████████████████████████████████████████████████████

█████████████████████████████████████████ SODF ¶ 297.  ██████████

████████████████████████████████████████████████████████████████

██████████████████████ SODF ¶ 297.  ████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ SODF ¶ 181.  And

did WWE make any efforts to warn former talent who it knew remained in the professional wrestling business and were likely to be unaware of new research and information about long-term neurological diseases?   No.   SODF ¶ 329. ███████████████████████████████████████████████████████ and a reasonable jury could find that these paltry efforts were intentionally delayed for several years and, as such, amounted to fraudulent concealment from Plaintiffs.

## II.   ARGUMENT

### A.   Significant Issues of Material Fact Exist Regarding Plaintiffs' Fraud-by-Omission Claims

#### 1.   *Plaintiffs articulate specific facts showing fraud by omission.*

To prove a fraudulent non-disclosure claim, a party must present facts showing "the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak . . . . A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment."   MTD Order at 61 (Dkt. 116) (quoting *Reville v. Reville*, 93 A.3d 1076, 1087 (Conn. 2014)).   While Connecticut courts have stated that fraud by omission exists in "exceptional circumstances," they have also explained that those "exceptional circumstances" exist where there is a duty to speak.   *Chudy v. Sovereign Ridge, LLC*, No. HHDCV085024333S, 2012 WL 4801603, at *4 (Conn. Super. Ct. Sept. 18, 2012).   "[T]his rule is not operative if 'the circumstances or the existence of a confidential relationship gives rise to a duty to speak.'" S*utera*

*v. Estate of Washton*, No. 556177, 2003 WL 1478788, at *20 (Conn. Super. Ct. Mar. 14, 2003) (quoting first *Franchey v. Hannes*, 207 A.2d 268, 271 (Conn. 1965)).

As this Court has said, Plaintiffs may show fraud by omission by presenting evidence that WWE was aware of head trauma risks in wrestling, failed to disclose those risks to its wrestlers, and, as a result, wrestlers sustained injuries. Memo. of Decision Denying WWE's Motion for Reconsideration ("Reconsideration Order") at 10 (Dkt. 185). Further, since WWE's failure to disclose the risks of wrestling may have benefited WWE and harmed the uninformed wrestlers, fraudulent intent may be inferred. Reconsideration Order at 6. Here, genuine issues of material fact exist in this case about what WWE knew about the long-term risks of repeated head injuries, when it knew about those risks, and whether it had a duty to share that knowledge with Plaintiffs. The cases relied on by WWE, which deal with fraud by misrepresentation rather than omission, do not change this. *See, e.g., U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 663 n.14 (2d Cir. May 23, 2016); *Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 10 (1st Cir. 2007).

Plaintiffs' inability to identify who at WWE committed a fraud against him or explain the legal theory behind the Second Amended Complaint is likewise not a basis for granting summary judgment. The testimony cited by WWE was an attempt to elicit a legal opinion from Plaintiffs. SODF ¶¶ 167-168. Such testimony is a violation of Rule 701 and is not a basis for summary judgment. Fed. R. Civ. P. 701. *Cf. Sarkissian Mason, Inc. v. Enter. Holdings, Inc.*, 572 F. App'x 19, 23 (2d Cir. 2014) (citing *Am. Family Mut. Ins. Co. v. Missouri Dep't of Ins.*, 169 S.W.3d 905,

910 (Mo. Ct. App. 2005) (finding that an testimony, which "consisted largely of the legal opinion that plaintiffs' presentation, as a whole, constituted a trade secret, did not create a genuine issue of material fact that would render summary judgment inappropriate"). Instead, this Court should look to the record evidence, summarized in Section I *supra*, that details the knowledge WWE had about the long-term risks of repeated head injuries and its failure to share that knowledge with wrestlers, including Plaintiffs, in a timely fashion.

> **2. *Evidence in discovery demonstrated the presence of fraudulent intent***

In a dogged effort, WWE presents three main points in support of their argument that discovery demonstrates the absence of a fraudulent intent. In doing so, WWE presents the following three positions as factual "certainties": (1) WWE was not aware of the potential link of repetitive head trauma, wrestling, and CTE until September 2007; (2) LoGrasso "never reported any head injury [and] there would be no occasion for Dr. Rios to discuss repetitive head injury with him, and no ability for Dr. Rios to tell LoGrasso about a discovery not even announced until after LoGrasso was released"; and (3) "WWE's actions after the September 2007 SLI press conference belie fraudulent intent, and reveal a two-fold highly responsible strategy to deal the then (and still) emerging science." *See* WWE's Unredacted Memo. of Law in Support of Motion for Summary Judgment ("MSJ Memo.") at 10-12 (Dkt. 189).

However, a closer dissection will reveal that these purported pillars are nothing more than mere misrepresentations, distractions, and half-truths—defying record evidence, public statements, and any application of common

sense.   Specifically, as illustrated below, WWE fails to acknowledge they were on notice before 2006 that repetitive head trauma can lead to CTE when one of WWE's own employees, after suffering from the career-ending effects of repeated concussions, was actively researching the issue ███████████████████████████████

█████████████████████████████████████████████████████████████████

SODF ¶¶ 277-285.   WWE further fails to acknowledge that after employee Nowinski's *Head Games* was published in September 2006, the WWE had further knowledge of and access to his research and conclusions into concussions and long-term neurological diseases.   SODF ¶¶ 279-322. In fact, WWE specifically knew about Nowinski's criticisms of the WWE during the media storm that followed the publication of Nowinski's book, including when he made various comments about his experience with concussions from wrestling for the WWE. Ex. X, SODF ¶¶ 284-285.   Then in 2007, despite being armed with the benefits of this knowledge and when confronted with the spotlight of Chris Benoit's death—which linked wrestling and repetitive head trauma to CTE—WWE chose to lead their wrestlers, including LoGrasso, astray by emphatically denying wrestling was related to Chris Benoit's CTE.   SODF ¶ 322.   In lieu of sharing the information that they had accumulated and had access to, WWE chose to withhold information and expose their wrestlers, LoGrasso and Singleton, to the very risk of future debilitating, permanent injuries they would go on to sustain.   The motive—money and avoiding negative media—is obvious and needs no "smoking gun," as WWE suggests.   Common sense easily connects the dots linking the

WWE's potential financial exposure to the association between wrestling, repetitive head trauma, and CTE.

<blockquote>

a.    <u>WWE was aware of the association between repetitive head trauma, wrestling, and CTE prior to September of 2006.</u>

</blockquote>

As illustrated below, publically available statements establish that WWE was on notice of the connection between CTE and repetitive head injuries through the research of their very own employee Nowinski. SODF ¶¶ 277-285. The law in Connecticut is clear—matters coming to knowledge of an agent of a corporation (such as Nowinski) within the scope of his authority are conclusively presumed to have been reported to its principal (such as WWE). *Derby v. Conn. Light & Power Co.*, 355 A.2d 244 (Conn. 1974). *Accord Pub. Utils. Maint., Inc. v. Sec'y of Labor*, 417 F. App'x 58, 62 (2d Cir. 2011) (quoting *N.Y. State Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 105 (2d Cir. 1996)) (tasking an employer with constructive knowledge of a dangerous condition and OSHA violation when there is "'"proof either that the employer actually knew, or 'with the exercise of reasonable diligence, could have known of the presence of the violative condition."'"").

Here, Nowinski was a former WWE wrestler who was forced to retire from WWE in 2003 following a diagnosis of post-concussion syndrome from injuries sustained in the ring. SODF ¶¶ 276-277. Nowinski's post-concussion syndrome followed a kick to the head that knocked him out and set in motion a constellation of debilitating symptoms that included cognitive problems, severe headaches, and depression. SODF ¶ 276. Following his retirement, Nowinski became an employee of WWE and remained its employee until February of 2008. *See* SODF

¶277.  While employed by WWE and retired from wrestling, Nowinski stated that, in order to understand his own symptoms and condition, he began researching the connection between repeated concussions and permanent degenerative neurological conditions.  SODF ¶ 278.  ███████████████████████████

████████████████████████████████████████████████████████████

██████████████████████  SODF ¶ 285.   Nowinski's research culminated in him authoring and publishing a book about the long-term neurological consequences of repeated concussions called "Head Games" in <u>September 2006</u>, at which time Plaintiff LoGrasso was still wrestling for WWE.[1]  SODF ¶ 279.  The promotional material on Nowinski's website from October 2006, succinctly characterized the research that Nowinski had been gathering for three years:

> His personal quest to understand his condition led him to discover that he had suffered not one concussion, but many over the course of an amateur career in football and his professional career in wrestling, and it was the cumulative effect of these injuries that had ended his career. He also learned that the worst was not necessarily behind him, as he uncovered research linking multiple concussions with serious long-term neurological disorders like Alzheimer's disease, memory impairment, and depression.

SODF ¶ 280.

---

[1] It strains all bounds of logic and credibility for WWE to suggest not only that was it unaware of Nowinski's research into concussions prior to his book being published in September 2006, but also that after the book was published, with all of the press surrounding his findings on concussions and CTE as well as criticisms directed at WWE, WWE still remained unaware of Nowinski's findings and did no investigation for itself.  WWE wants this Court to believe that a company that has been historically hyper-focused on media attention was mysteriously unaware that one of its employees was on a press tour related to a book about the effects of repetitive head trauma.  Fortunately, the Court does not live in the fabricated reality that WWE creates every day for its viewers.

Additionally, excerpts from Mr. Nowinski's MySpace page posted on or prior to September 1, 2006 have been directly quoted by other media outlets as stating:

> I quickly discovered that what the medical community knows about concussions and what the sports world knows are miles apart. I decided to bridge that gap. In the short term, sports concussions can lead to emotional, behavioral, and cognitive disorders, and sometimes even death. In the long term, they can increase one's risk of Alzheimer's, depression, and many other neurological disorders. (Emphasis added)

SODF ¶ 281.  During the entirety of Nowinski's research, he was employed by the WWE and was having regular interaction with the senior members of management, who likely would have certainly inquired about his health and well-being, and having conversation about his research.  SODF ¶¶ 277-285.   In fact, in reference to the time period after his retirement and before his book was published (June 2003 to September 2006), Nowinski stated:

> The WWE has been unbelievably supportive. Not only did they fly me around the country to see any doctor I asked for and spared no expense, but even after I said I wasn't likely to come back they still honored my contract. For eighteen months after the injury I couldn't have held down a job, so that kept me from a very bad place. I love my new role with the company, and I think they like having me there.

SODF ¶ 282.  This public reference clearly shows that WWE not only was aware of Nowinski's search for answers regarding repetitive head trauma and associated injuries, but also was a supportive partner in his search for answers.  WWE was contemporaneously procuring information while they were sending Nowinski to research the injuries associated with repetitive head traumas that ended his career.

Between June 2003 and September 2006, it is undisputed that Nowinski was an employee of the WWE, who had regular interaction with WWE executives

████████████████████ was actively researching the link between multiple concussions and serious long-term neurological disorders like Alzheimer's disease, memory impairment, and depression.  SODF ¶¶ 277-285.  Connecticut law provides that matters coming to knowledge of Nowinski during his employment with WWE and with their active support in his quest for answers are conclusively presumed to have been reported to its principal, the McMahons and WWE Management.  *Derby*, 355 A.2d 244.  *Accord Pub. Utils. Maint.*, 417 F. App'x at 62  (quoting *N.Y. State Elec. & Gas Corp.*, 88 F.3d at 105) (tasking an employer with constructive knowledge of a dangerous condition and OSHA violation when there is "'"proof either that the employer actually knew, or 'with the exercise of reasonable diligence, could have known of the presence of the violative condition."'").  This Court has even recognized, "If Nowinski indeed undertook research and published a book and made public statements concerning head injuries, such facts are publicly available for plaintiff to use in building a case to the extent such facts are relevant to the surviving claim."  *See* Order Denying Plaintiffs' Motion for Reconsideration (Dkt. 183).

Within the confines of the Court's order, Plaintiffs have meticulously documented Nowinski's publicly available statements to firmly discredit WWE's position and establish that, during the time that LoGrasso performed between 2005 and May 2007, WWE had first-hand knowledge of reported risks of long-term degenerative neurological diseases resulting from repeated head injuries. Thereby, Plaintiffs have established evidence of contemporaneous fraudulent intent.

        **b.**    **WWE's physician allowed LoGrasso to continue to wrestle despite expressing complaints of concussion-like symptoms and without any warnings related to the possibility of long-term neurological diseases resulting from repetitive head trauma**

In its Motion for Summary Judgment, WWE claims that "LoGrasso never reported a head injury to Dr. Rios" and that "there was no occasion for Dr. Rios to discuss repetitive injury with [LoGrasso]." *See* MSJ Memo. at 12.   WWE's position is not only in direct contravention to the record evidence and appears to be stuck in a game of semantics intended to distract the Court.  The record is clear—already armed with Nowinski's research, WWE chose to withhold the risks of long-term neurological disease even when presented the opportunity and while LoGrasso was directly reporting symptoms associated with concussions and head injuries.  SODF ¶¶ 46, 316, 319.

While wrestling for the WWE, LoGrasso suffered various blows to his head, ███████████████████████████████████████████████.  SODF ¶¶ 309, 316, 319-320.  These injuries occurred following Nowinski's publication of "Head Games" including, but not limited to, the following matches:  Vito vs. MVP, Regal, and Dave Taylor on January 16, 2007 in Little Rock, Arkansas; Vito vs. Mr. Kennedy on January 30, 2007 in Houston, Texas; Vito vs. William Regal on August 29, 2006 in Reading, Pennsylvania; Vito vs. William Regal on September 12, 2006 in Worcester, Massachusetts;  and Vito vs. William Regal on October 10, 2006 in Jacksonville, Florida.  SODF ¶ 318.  LoGrasso does not dispute that he was not diagnosed with a TBI or concussion during or immediately following these matches.   SODF ¶ 40.   Moreover, LoGrasso admits that his knowledge of

concussions was rudimentary and largely incorrect at the time.  SODF ¶ 313.  Not unlike many other wrestlers, LoGrasso was not someone who read or understood scientific and medical literature or terminology or understood how to identify a concussion.  SODF ¶ 313-14.  At the time, LoGrasso understood these as

> just blows to the head, because I was not educated in CTE or head trauma, because my understanding was that a concussion was that you had to be knocked out.  I didn't understand that you had all these other symptoms that went along with it, because I wasn't educated and nobody told me about this    .

SODF ¶ 320.  His current physicians can only surmise that he did in fact suffer multiple concussions at this time due to the symptoms he was experiencing and reporting to Dr. Rios, his treating WWE physician.  SODF ¶ 325.

On various occasions while wrestling, LoGrasso informed Dr. Rios, WWE's physician, of concussion like symptoms, such as "headaches," "feeling woozy," and "fatigue, feeling lethargic, tired, etc."  SODF at ¶¶ 316, 319.  However, consistent with Nowinski's criticism of WWE's concussion protocol (or lack thereof) Dr. Rios chose to not conduct a thorough examination.  SODF ¶ 317.

Even more disturbing, following publication Nowinski's "Head Games" and in immediate response to Chris Benoit's suicide and murder of his wife and son, WWE stated that Benoit's CTE "had nothing to do with wrestling" and suggested the murders could have been caused by a "steroid rage" rather than taking the opportunity to share the risks associated with repetitive head trauma learned from Nowinski.  SODF ¶ 322.  Unfortunately, LoGrasso "trusted in the WWE and what they were saying at the time" with regard to Benoit's murders and suicide not relating to wrestling.  SODF ¶ 323.  In the end, neither the WWE nor Dr. Rios spoke to LoGrasso about concerns of concussions or repeated concussion

before his career ended in 2007.  SODF ¶¶ 324-325.  In fact, LoGrasso has never once been contacted by the WWE since his career ended expressing concern about concussions or repeated concussions suffered by wrestlers.  SODF ¶ 327.

              c.      <u>WWE has never spoken to LoGrasso or Singleton regarding the dangers associated with repetitive head injuries.</u>

      WWE devotes an inordinate amount of space in their Motion for Summary Judgment celebrating itself and its purported "two-fold highly responsible strategy to deal with [CTE and head trauma]." ████████████

██████████████████████████████████████████████

███████████████████████████████     ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████  MSJ Memo. at 13.

██████████████████████████████████████████████

██████████████████████████████████████████████

███████     SODF ¶ 100.  In an extended encore to its own back-patting, WWE references ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

      First, not a scintilla of this professed evidence is relevant to LoGrasso as he was no longer associated with WWE during this timeframe, and WWE admits that it did nothing to educate or assist former talent.  SODF ¶ 297.  Despite WWE's claims, the record evidence establishes that neither LoGrasso nor

Singleton were ever spoken to or warned about the risks associated with multiple head trauma.  In fact, at the time of his deposition in May of 2016, Evan Singleton still had never heard of CTE nor had he spoken to anyone from the WWE regarding CTE.  SODF ¶¶ 320, 331, 338.

Second, there simply is no record evidence that Singleton was ever warned.   Instead, without providing any proof, ████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████ SODF ¶¶ 184, 332. ████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████ SODF ¶¶ 333, 336-337.

3. *WWE knowingly omitted facts related to the long-term risks of concussive and sub-concussive blows to the head.*

a. **WWE misconstrues Plaintiffs' allegations regarding the risks of repeated concussive head trauma.**

In their motion, WWE improperly attempts to narrow Plaintiffs' allegations. A cursory review of Plaintiffs' true allegations regarding omitted facts reveals that they are in fact much broader than what WWE implies.

The SAC makes clear that Plaintiffs allege that WWE knew the risks of "repetitive concussive events, sub-concussive events, and/or other brain

injuries…" SAC ¶ 55.  Plaintiffs further allege that WWE was aware of the risks of "repeated head trauma and multiple concussive events…"  SAC ¶ 56. Those risks include an increased risk of CTE, but crucially also include the following: "…greater risk for chronic neuro-cognitive illness and disabilities…" (SAC ¶ 55); "…loss of brain function and dementia…" (SAC ¶ 58); and "…loss of brain cells and cerebral atrophy." (*Id*.); "…long term brain damage." (SAC ¶ 64).



SODF ¶ 271.  All of these potential symptoms are long-term risks of severe and/or repetitive concussive or sub-concussive events.  WWE had a duty to warn its wrestlers of these risks.  It did not.

The evidence is undisputed that the WWE did not institute a serious concussion prevention and protocol program until after Chris Benoit's very public death in 2007.  SODF ¶ 294.  CTE, while certainly life-threatening and in the realm of WWE's knowledge, is simply one of the many risks of repeated concussive and sub-concussive blows to the head about which WWE should have warned their wrestlers.  It did not.

LoGrasso was not warned about *any* of these risks.   SODF ¶¶ 328-329. Plaintiff LoGrasso was given no training on the long-term risks of repeated concussive blows.   SODF ¶ 329.   Had LoGrasso been told about the risks by the WWE, even following his retirement, then he would have received more timely treatment for his neurological condition and the symptoms that he did not know were associated with repeated concussive blows until 2014. SODF ¶¶ 325-326.

Thus, by focusing *only* on CTE as the fact that the WWE knew and omitted, WWE attempts to improperly limit the scope of Plaintiffs' claim and, in doing so, entirely missed the mark.   For this reason, WWE's motion fails to dispose of Plaintiffs' cause of action for fraud by omission, and the Motion should be denied.

> **b.      There is no inherent contradiction in Plaintiffs' claims.**

WWE's claim that Plaintiffs' claims cannot succeed because of  media reports surrounding concussions and CTE is simply not support by the cases it cites.   WWE starts with *Alexander v. Turner Corp.* for the proposition that a plaintiff "cannot show misrepresentation or intent to misrepresent when the alleged fraudulently concealed information was contained in a publicly available document."  No. 00 CIV 4677 HB, 2001 WL 225049, at *5 (S.D. N.Y. Mar. 2, 2001). First, as with so many other cases cited by Defendants, *Alexander* considers fraud under New York law, rather than Connecticut law.  Second, the *Alexander* plaintiff alleged he was induced to execute a contract by misrepresentations that others in similar situations had signed agreements with identical terms, even though the terms of those other agreements were publicly available and clearly

not the same as those he was offered.  He in *Alexander* also happened to be an officer of the defendant at the time he executed the contract and was presumed to be in a position where he would have knowledge about the contract. *Id.* at *5.

In *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031, 1037 (D.C. Cir. 1980) the alleged fraudulent practice of overbooking a flight but guaranteeing a "confirmed reservation" was well known, and the defendant airline there "acknowledged it practice of overbooking and explained its benefits."  In *Bergeron v. Select Comfort Corp.*, No. A-15-CV-00657-LY-ML, 2016 WL 155088, at *7 (W.D. Tex. Jan. 11, 2016), the defendant was also forthcoming publicly about defects with its product.

By comparison, plaintiffs were not WWE officers, and plaintiffs were not employing Nowinski, Maroon, or Lovell.  Thus, they did not have access to the same information as WWE.  Likewise, WWE was not forthcoming.  It intentionally made misleading statements discounting and denying what information was publicly available.  As a result, the cases cited above are inapposite.

       c. <u>Plaintiffs show disputed issues of fact as to WWE's knowledge of CTE during LoGrasso's employ</u>

Even if Plaintiffs' allegations were limited to CTE – which they are certainly not – Plaintiffs still present enough evidence to show that WWE knew or should have known that repeated exposure to concussive events could lead to CTE as far back as at least September of 2006, if not before.  As set forth in Section II.A.2 *supra*, WWE is charged with the knowledge Nowinski, WWE's employee, gained when he was researching and writing *Head Games* from 2003 to 2006.  ▮

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

████   SODF ¶ 285.  In addition, it is reasonable to infer that WWE learned of the risks discussed in *Head Games* when it was published in 2006.  Finally, it is reasonable to infer that WWE learned of the risks and media coverage of the book and statements criticizing WWE.  SODF ¶ 285.  Such statements included when Nowinski very publicly criticized WWE's concussion protocol:

> "The worst part about the experience was that for those first few weeks doctors couldn't (and didn't) help me - they didn't diagnose me properly, they didn't ask the right questions, they didn't warn me of the risks - and that's why I kept getting back in the ring and hurting myself further. I later found out that was because most of them didn't understand the injury."

SODF ¶ 284.

These facts alone are more than sufficient to show that, at bare minimum, there is a factual dispute as to whether or not WWE knew or should have known about the risks of CTE prior to 2007 while Plaintiff LoGrasso wrestled actively.

### d.    WWE's cited authorities are inapposite

WWE cites a host of authorities purporting to show that they did not omit a known fact, none of which have any application here. For instance, in an attempt to show that other courts have held that there can be no fraudulent omission of a warning about CTE, WWE cites to *In re NFL Players' Concussion Injury Litig.,* 307 F.R.D. 351, 397-398 (E.D. Pa 2015) and *In re NFL Players Concussion Injury Litig.,* 821 F.3d 410, 441 (3d Cir. 2016).  However, those cases simply approved of a settlement wherein the NFL agreed to compensate their former players for fraudulently concealing from them the risks of concussive blows to the tune of $765M dollars. 307 F.R.D. at 361. While the trial court did note that the research

on CTE is incomplete, that was in the context of judging the adequacy of the settlement against objectors complaining that the settlement did not compensate for CTE. *Id.* at 397. Thus, the Court merely overruled an objection to a class action settlement, but did not, as WWE implies, hold that a warning about the *risk* of CTE or other long-term concussive symptoms would be inappropriate because of the uncertainty of the science.

Similarly, WWE's other cited authorities regarding "known facts" do not deal with fraudulent *omission* claims like the one at issue here. Rather, they deal with garden-variety intentional or negligent misrepresentation. *See Yurevich v. Sikorsky Aircraft Div.*, 51 F.Supp.2d 144, 152 (D. Conn. 1999) (negligent misrepresentation); *Trefoil Park, LLC v. Key Holdings, LLC*, 2015 U.S. Dist. LEXIS 31476 at *24 (D. Conn 2015) (fraudulent misrepresentation); *MacDermid Printing Solutions, Inc. v. Cortron Corp.*, 2014 U.S. Dist. LEXIS 111526 (D. Conn. 2014) (negligent and fraudulent misrepresentation). In short, WWE fails to assert *any* authority that Plaintiffs cannot base their fraudulent omission claim on the WWE's manifest failure to warn Plaintiffs of the risks of exposure to repeated concussive or sub-concussive impacts. WWE's motion must be denied.

### 4. *Plaintiffs detrimentally relied on WWE's fraudulent omissions.*

#### a. <u>Plaintiffs testified to their reliance on wwe's intentional omissions.</u>

WWE argue that Plaintiffs must have reasonably relied on its fraudulent omissions about the risks of long term damages arising from head trauma in order to recover. However, WWE cites to inapplicable precedent involving fraud claims considered under state fraud, securities fraud, and common law fraud that

have elements absent from Connecticut law.  For example, WWE's citation to *Crigger v. Fahnestock & Co*, for the proposition that a plaintiff "cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth" is misleading.  443 F.3d 230, 234 (2d Cir. 2006).  *Crigger* upheld a jury verdict, decided under New York's fraud law, which includes an element of reasonable reliance like securities fraud claims.  *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996).  In Connecticut, there is no requirement of "reasonable reliance" or "justifiable reliance" under Connecticut's fraud law:

> Fraud consists in deception practiced in order to induce another to part with property or surrender some legal right and which accomplishes the end designed . . . The elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment.

*Patriot Expl., LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 364–65 (D. Conn. 2013); *Master–Halco, Inc. v. Scillia Dowling & Natarelli, LLC*, 739 F.Supp.2d 109, 114 (D. Conn.2010) (*quoting Weinstein v. Weinstein*, 882 A.2d 53 (2005) The other cases cited by Defendant's in this section suffer from similar defects.  *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (decided fraud claim brought under New York law); *Republic Bank & Trust Co. v. Bear, Stearns & Co.*, 707 F. Supp. 2d 702, 710 (W.D. Ky. 2010) (decided under Kentucky securities fraud law)*; Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1229 (S.D.N.Y. 1995) (deciding fraud claim brought under New York law); *Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1254 (5th Cir. 1997) (decided under the Louisiana Products Liability Act, La. R.S. 9:2800.52 *et seq*.); *N.J. Carpenters Health Fund v.*

*Philip Morris, Inc.*, 17 F. Supp. 2d 324, 334 n.13 (D.N.J. 1998) (decided under New Jersey law, which includes reasonable reliance as one of 5 elements of fraud); and *City of Philadelphia v. Lead Indus. Ass'n, No. 90-7064*, 1992 WL 98482, at *5-6 (E.D. Pa. Apr. 23, 1992) (decided under common law fraud, which includes as an element of a fraud claim that plaintiffs establish justifiable reliance by the recipient on the misrepresentation).

Nevertheless, whether Plaintiffs may have been aware of some of the risks of concussive or sub-concussive blows prior to the Benoit study does not mean that WWE is entitled to summary judgment. As courts in this district have held previously, "knowledge of a risk is not necessarily the same thing as knowledge of the *extent* of the risk." *See Hall v. Ashland Oil Co.*, 625 F. Supp. 1515, 1520 (D. Conn, 1986) (denying summary judgment where substantial question of material fact existed as to benzene manufacturer's duty to warn industrial customer's employee of risks associated with benzene handling) (emphasis added).  *See also Whitehead v. St. Joe Lead Co., Inc.*, 729 F.2d 238 (3d Cir. 1984) (denying summary judgment for lead manufacturer who argued that dangers of lead exposure were well-known).  At bare minimum, significant issues of fact remain as to what the WWE knew and when they knew it, giving rise to the duty to warn, as well as Plaintiffs' reliance on WWE's failure to warn.

Plaintiffs both relied on WWE to educate them about their health and safety while wrestling.  SODF ¶ 330.  However, they were not properly educated. LoGrasso did not understand that you could have a concussion without being knocked unconscious.  SODF ¶ 313.  Singleton also had little to no knowledge

about concussions.  SODF ¶¶ 331-332.  ████████████████████████████████

███████████████████████████████████████████.  SODF ¶ 333.  This evidence

certainly raises the question of whether Plaintiffs were properly warned as to the

extent of the risks.  *Ashland Oil Co.*, 625 F. Supp. at 1520

     Chris Benoit's murder-suicide provided WWE the platform to publicly and

privately deny a relationship between CTE, concussion injuries, and professional

wrestling.  WWE latched onto any excuse other than CTE as the cause of the

horrific event, blaming "steroid rage."  SODF ¶ 322.  These denials resounded in

the mind of LoGrasso, who had been trained under and relied on WWE's policies

for years.

        b.    **Singleton detrimentally relied on WWE's omissions about the long-term risks of repeated head injuries.**

     Singleton's knowledge that a wrestler might be injured, and the ending of

his wrestling career in 2012, do not foreclose his fraud-by-omission claim against

WWE.  This is because he "has plausibly alleged that WWE failed to disclose

information which could conceivably have prevented him from wrestling, could

have enabled him to mitigate the risks of wrestling and could have prompted him

to obtain medical treatment promptly after wrestling."  Order Denying Motion for

Reconsideration at 6 (Dkt. 185).  The information WWE failed to disclose is not the

general possible of serious injury.  It is the long-term risks of repeated head

injuries.  These are the injuries from which Singleton now suffers and which he

was unaware of prior to being injured in September 2012.  SODF ¶¶ 352, 354.

WWE's claim that there is no evidence of these injuries belies the record.  SODF

¶¶ 352, 354.

**Contrary to WWE's blatant distortion of the record (and its own Local Rule 56(a)(1)),** ████████████████████████████████████████████. **SODF ¶ 184.** E██████████████████████████████████████████████████████████████████████ ████████████████████████████████████ **SODF ¶¶ 336-337.** █

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ **SODF ¶¶ 337-338.**

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

**SODF ¶¶ 337-338.** ████████████████████████████████████████████

████████████████████████████ **SODF ¶ 338.**

**With respect to Singleton's contract with WWE,** ████████████████

████████████████████ **SODF ¶ 149.  The booking contract does not discuss** <u>unknown risks</u>.  **Thus, "it cannot be said that he assumed a risk the danger of which was unexplained to him although it was known to his employer and was in fact due to that employer's own failure to take proper precautions not to expose his servant to a needless and unnecessary risk."** *Alpha Portland Cement Co. v. Curzi*, **211 F. 580, 584 (2d Cir. 1914).  For this reason, the booking contract does not create a basis for summary judgment.**

        **c.**    <u>**LoGrasso has suffered neurological injuries proximately caused by his detrimental reliance on WWE's fraudulent omissions.**</u>

**Where, as here, material facts remain in dispute regarding whether adequate warnings were provided to LoGrasso, whether it was reasonable for LoGrasso to rely upon WWE's knowledge of those dangers, and whether it was reasonable for LoGrasso to rely on WWE to warn him of those dangers, summary**

judgment should be denied. *Ashland Oil Co.*, 625 F. Supp. at 1520.  WWE was aware of the long-term risks associated with repeated head injuries but it failed to share that information, including how to identify signs and symptoms of concussions, with LoGrasso.  *See supra* Section I; SODF ¶¶ 328-329.  More importantly, LoGrasso relied on the omissions, thinking that WWE was looking out for his health and safety.  SODF ¶¶ 26, 330.  LoGrasso believed he was being observed and assessed by WWE employees and medical professionals present at performances.  SODF ¶¶ 315-316, 321.

LoGrasso repeatedly asserted that he was not and should have been "educated" about the dangers of "head trauma". *See* SODF ¶ 320 (claim is about "not providing information about head injuries and CTE"… "not getting evaluated for head trauma"… "there was no evaluation on how my physical well-being was…"; WWE "should have given me the information that could be happening in your head, some awareness or some knowledge of head trauma"; "...they did not provide any information about CTE awareness or concussions."); SODF ¶ 130 ("I was not educated in CTE or head trauma… I didn't understand that you had all these other symptoms that went along with [had trauma], because I wasn't educated and nobody told me about this.").  This is despite specifically telling Dr. Rios, WWE's attending physician, that he had concussive symptoms such as "feeling a little woozy," "sweating profusely," experiencing "[f]atigue," "feeling lethargic", and "that I had headaches." SODF ¶¶ 46, 316, 319.

Despite these reports from LoGrasso, Dr. Rios never informed him of the signs and symptoms of concussions, nor diagnosed of effectively treated him

when LoGrasso was exhibiting signs of a concussion.  As a result, LoGrasso now suffers from depression, severe headaches, hearing loss, mood swings, restlessness, lethargy, and long-term neurological injuries. SODF ¶ 320.  These facts are sufficient for a reasonable trier of fact to determine that WWE's omissions proximately and directly caused LoGrasso's injuries.   WWE's argument to the contrary simply raises the possibility that LoGrasso's injuries were caused by something other than their own omission of material facts, such as the omissions of other wrestling federations. However, this is an issue for the trier of fact.

WWE's cited authorities are inapposite.  For example, WWE cites *Danise v. Safety-Kleen Corp.* as precedent for a court to reject a fraud claim and for the proposition that a failure to warn about a dangerous product cannot be the proximate cause of an injury.  17 F. Supp. 2d 87 (D. Conn. 1998).  First, fraud was not a claim in *Danise*, which considered claims about the violation of Connecticut's Products Liability Law.  *Id.* at 88.  *See also Haesche v. Kissner*, 640 A.2d 89 (Conn. 1994) (considering summary judgment on claims for violations of Connecticut Products Liability Act and Connecticut Unfair Trade Practices Act).  Second, *Danise* actually recognizes that if a plaintiff shows that "a warning would have altered his or her behavior in such a way as to prevent the harm that occurred" the lack of warning may be the proximate cause of an injury.  *Danise*, 17 F. Supp. 2d at 95.  *See also Haesche*, 640 A.2d at 92 (noting that in Connecticut "a product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities.").  Third, recovery in *Danise*

was ultimately defeated because an adequate warning of the danger of the product was disclosed in writing to the product purchaser, which did not change the behavior of the product user.  The decision in *Danise* is inapplicable here in that WWE failed to provide a warning at all, and thus the lack of warning could be held to be the proximate cause of the WWE wrestlers' injuries.

WWE also erroneously cite cases where the alleged fraudulent misrepresentation occurred after the injury.  *Dime Sav. Bank of N.Y., FSB v. Fucetola* does not stand for the proposition that courts will reject fraud claims when a plaintiff fails to establish an adequate warning would have prevented injuries.  No. CV91286416S, 1994 WL 67054, at *2 (Conn. Super. Feb. 24, 1994).  Rather, in *Fucetola*, the fraud claim failed at the summary judgment stage because the wrongful conduct (a false, fraudulent, or forged conditional certificate of occupancy) followed the plaintiff's injury (entering a mortgage without a valid certificate of occupancy).  *Id.* at *3.  WWE also cite *Law v. Camp*, 116 F. Supp. 2d 295, 308 (D. Conn. 2000) for the proposition that LoGrasso would not have suffered his damages but for the statements.  In *Law*, as in *Fucetola*, the cause and effect were not in the requisite order, in that the alleged fraudulent statements may have come after the plaintiff's injuries.

### 5.    WWE had a duty to disclose to LoGrasso

As conceded by WWE, "[a] duty to disclose will arise if the parties share a 'special relationship.'" *DiMichele v. Perrella*, 158 Conn. App. 726, 732 (2015).  WWE, however, incorrectly argues that there is no such relationship between WWE and LoGrasso. This position should be rejected at this stage as the record

shows disputed facts concerning whether a special relationship existed sufficient to create a duty to disclose.

> a. A special relationship existed between WWE and LoGrasso

This Court previously noted that a special relationship "is one that is built upon a fiduciary or otherwise confidential foundation characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." MTD Order at 36 (citations omitted). Here, the record shows that WWE in fact retained both superior knowledge and expertise regarding the prevention and diagnosis of head trauma.

<u>First</u>, the disputed facts show a sufficient basis for establishing WWE's superior knowledge no later than 2006, while LoGrasso was still wrestling for WWE. This includes that WWE knew about Nowinski's repeated concussions and post-concussion syndrome in 2003, and prevented him from wrestling further. SODF ¶ 274. This includes when, as a WWE employee, Nowinski was researching the long-term risks of repeated head injuries while he was employed at WWE, ███ ████████████████████████████████████████████████████ SODF ¶ 285. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ SODF ¶¶ 292, 298. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ SODF ¶¶ 293-294.

**Second**, the record shows that there are disputed facts concerning that LoGrasso did not retain similar knowledge and placed confidence in the information and guidance provided by WWE. For instance, the record shoes that LoGrasso did not have the knowledge of the undisclosed risks associated with wrestling, including the inherent long-term risks of repeated head injuries. SODF ¶ 329. In fact, evidence supports that LoGrasso did not know he could and would suffer latent, neurological diseases from wrestling. SODF ¶ 330. The record also shows that LoGrasso placed confidence and trust in WWE's Dr. Rios who was available to WWE wrestlers during matches and to address injuries, such as head injuries, sustained in the ring. SODF ¶ 330. Finally, whether the booking contract signed by LoGrasso sufficiently discloses all risks (including CTE or injuries associated with multiple head trauma which are not specifically mention) requires a factual determination. SODF ¶¶ 11-20. This is also true as to whether the disclosures in the booking contract offer any factual basis to conclude LoGrasso did or did not rely on the superior knowledge and position of WWE as his employer. *Id.* 13-18.

These facts are sufficient to support both that WWE had superior knowledge to LoGrasso and that LoGrasso placed his trust and confidence in WWE, thereby creating a special relationship with LoGrasso or at the least, create a question of fact improper for determination on a motion for summary judgment. *Kohn v. John M. Glover Agency, Inc.*, No. CV000339053, 2001 WL 527507, at *2

(Conn. Super. Ct. Apr. 24, 2001) ("The Connecticut Supreme Court has defined a fiduciary relationship as one characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." [ ]Whether a fiduciary or special relationship exists has been found on numerous occasions to be a question of fact.").   Thus, this Court should reject WWE's argument that there was no special relationship.

### b.   Application of the continuing course of conduct doctrine is proper here

WWE incorrectly maintains that the record is void of any facts showing WWE has a continuing duty to LoGrasso to disclose the long-term risks of head trauma.   To this end, WWE rests its argument solely on whether there was a misdiagnosis (or knowledge of misdiagnosis) by WWE doctors who treated LoGrasso, thereby establishing a continuing duty.   A misdiagnosis, however, is not the sole basis in establishing the first factor of a continuing duty. Instead, as this Court already noted, if WWE *had concerns* about the health effects and long term risks of wrestling related injuries, then the initial factor is satisfied under Connecticut law.  MTD Order at 37-38.   And here, the record shows that WWE did in fact have early concerns and knowledge as to the possible and likely long-term risks of head trauma, especially from its experience with Nowinski both as a WWE wrestler suffering concussions and later as a concussion researcher while employed with the WWE.  SODF ¶¶ 274-286.[2]

---

[2] WWE offered no argument as to the second factor – a continuing concern. *Id.*

In arguing that the continuing course of conduct doctrine cannot toll LoGrasso's claim, WWE fails to address the evidence in support of the allegations this Court highlighted as supporting WWE's internal concern and knowledge of the risks:

> For example, the WWE is alleged to have created its Wellness Program in 2006 on the advice of its attorney after the deaths of several former wrestlers from drug and alcohol abuse. WWE's attorney is alleged to have recommended to head this Program Doctor Maroon, a noted neurosurgeon and head injury specialist for the NFL, who, together with a colleague, invented the ImPACT concussion test. [SAC ¶ 76, n. 26]. This fact alone, indeed to WWE's credit, plausibly suggests WWE had knowledge causing it to have an early and strong concerns about the health effects of wrestling and the long-term neurological health of WWE wrestlers.

MTD Order at 39.  Additional factual evidence shows WWE's expanding concerns and knowledge after LoGrasso left WWE. ████████████████████

████████████████████████████████████████████

████████████████ SODF ¶ 292. ████████████████████

████████████████████████████████████████████

SODF ¶ 293. ████████████████████████████████

████████████████████████████ SODF ¶298.  Despite all of this expanding concern and knowledge, WWE failed to disclose any information to LoGrasso even though it: (1) continued to contact him concerning other aspects of the Wellness Program; and (2) knew he was planning to continue wrestling. SODF ¶¶ 317-18. As such, application of the continuing course of conduct doctrine is proper here.  *See generally Witt v. St. Vincent's Med. Ctr.*, 746 A.2d 753 (Conn. 2000).

B.    Vito LoGrasso's Claim is Not Time Barred

WWE makes the preposterous claim that, while it is undisputed that WWE somehow avoided all of the media reports surrounding CTE from 2005 onward, it is also undisputed that LoGrasso was aware or should have been aware of those very same reports.  But what is good for the goose is good for the gander.  Both LoGrasso and WWE's assertions that they were unaware of those reports create the same barrier to WWE's motion for summary judgment.  They present genuine issues of material fact that should be decided by the trier of fact.

    1.    *LoGrasso's awareness of headaches does not preclude tolling.*

In the instant case, "the harm alleged [by LoGrasso] is an increased risk for permanent degenerative neurological Conditions."  MTD Order at 26.  That harm did not become actionable until LoGrasso's discovery of "a causal connection between the defendant's breach of duty and the resulting harm to the plaintiff." *Lindsay v. Pierre*, 879 A.2d 483, 484-85 (Conn. App. Ct. 2005) (quoting *Lagassey v. State*, 846 A.2d 831, 846-47 (Conn. 2004)).   Here, WWE has only proven that LoGrasso knew he was suffering headaches.  There is a genuine issue of material fact as to whether LoGrasso knew, prior to 2012, that those headaches were connected to the repeated head trauma he received while wrestling.   In fact, LoGrasso testified, "I didn't understand why I was getting them, and that's when [2006] things changed for me and my health changed with my head."   SODF ¶ 316.   At the time, LoGrasso told his WWE physician, Dr. Rios, about the headaches, and █████████████████████████████ SODF ¶ 317.

Mr. LoGrasso was not educated about post-concussion syndrome.  SODF ¶ 320.  He did not read about it in newspapers or in WWE locker rooms or receive any other information about CTE during his time at WWE.  SODF ¶ 320.  He did not know the Chris Benoit murder-suicide was related to CTE in 2007 because "WWE had said that it had nothing to do with wrestling."  SODF ¶ 322.  Therefore, LoGrasso did not understand that his headaches were a sign or symptom of post-concussion syndrome in 2007.  SODF ¶ 325.  Rather, Lograsso testified,

> [I]t wasn't until 2014 that I started to get myself checked out and realized that something could possibly be wrong.
>
> So whatever Chris Benoit did or how or that stuff didn't pertain to me at the time, because I didn't think it was me.  But it wasn't until I started going to these doctors, and they started telling me that I had these symptoms, that I thought that it could be me.  And that's when I started to do my own research, do my own read up.  But there was no reason for me to read up on something that had nothing to do, that didn't pertain to me.

SODF ¶ 325.

While WWE may question when LoGrasso made a connection between his headaches and other symptoms and CTE, such disbelief is not a basis for summary judgment.  "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'"  *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).  A reasonable jury could find that LoGrasso did not, as a result of WWE's campaign of misinformation, understand his symptoms were the sign of a greater problem until 2014.  Therefore, a genuine issue of material fact exists as to when

LoGrasso discovered the connections between his symptoms and the possibility of long-term neurological problems resulting from his wrestling career.

### 2. WWE's continuing course of conduct tolls the statute of repose.

This Court has already twice recognized in this case that the continuing course of conduct exception to Connecticut's statute of repose was well pled and might apply to LoGrasso's fraudulent omission claim. *See* MTD Order at 35-43; Reconsideration Order at 13-17. LoGrasso "must show the defendant: '(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the original wrong; and (3) continually breached that duty.'" Order on Motion to Dismiss at 35 (quoting *Witt v. St. Vincent's Med. Ctr.*, 746 A.2d 753, 762 (Conn. 2000)). "Any continuing duty owed by a defendant must 'rest on the factual bedrock of actual knowledge.'" Order on Motion for Reconsideration at 13 (quoting *Neuhaus v. DeCholnoky*, 905 A.2d 1135, 1142 (Conn. 2006)).

### a. <u>WWE committed an initial wrong.</u>

WWE starts from the mistaken position that LoGrasso must have reported an injury to WWE before it owed him some duty. In truth, WWE assumed a duty because it was aware of a risk of which LoGrasso had no knowledge. ████████ ████████████████████████████████████ *See* SODF ¶ 292 (████████ █████████████████████████████████████████████████████████████ ██████████████████); SODF ¶292 (████████████████████████████ █████████████████████████████████). Second, evidence in the record also suggests that WWE knew of CTE and/or other long-term risks

of repeated head injuries far earlier by virtue of its relationship with Nowinski prior to September 2006, when Nowinski was forced to retire because of repeated concussions ██████████████████████████████████████████████ ████████████ SODF ¶ 285.

These facts easily distinguish the instant case from *Sherwood II*. In *Sherwood II*, WWE points out:

> the defendant established, and the plaintiff does not dispute, that the defendant did not know, and could not have known, which units of blood in its blood bank's inventory had been screened for the presence of HIV antibodies and which units had not been so screened and, therefore, did not knowingly provide the plaintiff with unscreened blood as of the date of the plaintiff's surgery

*Sherwood v. Danbury Hosp.*, 896 A.2d 777, 793-94 (Conn. 2006). By comparison, LoGrasso disputes what WWE knew about CTE and when it gained that knowledge. A reasonable juror could certainly conclude from these facts that WWE was aware of the findings published in "Head Games" in 2006. A reasonable jury could also conclude that WWE was aware of Dr. Omalu's highly publicized papers regarding concussions and CTE in the NFL. SODF ¶¶ 94, 298. Both of these events occurred while LoGrasso was still wrestling for WWE. SODF ¶ 318. Yet WWE never advised LoGrasso of this risk. SODF ¶¶ 75, 329.

WWE argues that it did not know LoGrasso suffered blows to the head and never treated for any such injuries. However, LoGrasso contests this, testifying that he suffered blows to the head, told WWE's ringside doctor Dr. Rios about them, and was treated for them. SODF ¶¶ 316-17, 319. But at no time did Dr. Rios advise LoGrasso of the risks associated with head injuries or even treat him for a concussion, ██████████████████████████████████████████████

███████████████   SFO ¶¶ 317, 320.  Dr. Rios and WWE's failure to advise LoGrasso in 2006 or earlier of the long-term risks of concussive and subconcussive blows is the initial wrong committed by WWE.

> **b.** **WWE had a continuing relationship with LoGrasso**

WWE maintained a continuing relationship with all of its former wrestlers through its Wellness Program. ████████████████████████████

██████████████████████████   SODF ¶ 31  ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████   SODF ¶¶ 169, 172, 177.  ██████████████████████

████████████████████████████████████████████

██████████████████████████   SODF ¶ 180.  ███████████

████████████████████████████████████████████

██████████████████████████████████████   SODF ¶¶ 75, 328.

████████████████████████████████████████████

SODF ¶ 329.  This continuing contact with LoGrasso, coupled with knowledge that LoGrasso was still wrestling and facing the long-term risks of concussions, created a continuing relationship and duty for WWE to warn LoGrasso of the long-term risks of concussions.

> **c.** **WWE breached its duty to LoGrasso**

████████████████████████████████████████████

████████████████████████████████.   SODF ¶ 329.   A reasonable juror

**Page 39 of 45**

could conclude that this failure by WWE was an intentional breach of its duty to warn LoGrasso. The logic is not difficult to follow:

- **WWE previously treated LoGrasso for head injuries through its agent Dr. Rios.**

- **WWE knew at least as early as 2006 about the link between blows to the head and long-term neurological problems, including CTE.**

- **WWE did not warn LoGrasso of those risks during his tenure at WWE.**



Based on these facts, a reasonable jury could determine that LoGrasso breached its duty to warn LoGrasso, and the continuing course of conduct exception tolls the statute of limitations governing his claim.

### 3.   *WWE's fraudulent concealment tolls the statute of limitations*

Whether LoGrasso *has proven* by clear and convincing evidence that WWE fraudulently concealed the long-term risks of repeated head injuries is not the relevant inquiry under Rule 56. Rather, this Court must determine whether a jury *could reasonably find*:

(1) the defendants' actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiff's cause of action; (2) the defendants' intentional concealment of these facts from the plaintiff; and (3) the defendants' concealment of these facts was for the purpose of obtaining delay on the plaintiff's part in filing a complaint on his cause of action.

*Macellaio v. Newington Police Dep't, et al*, 75 A.3d 78, 83-84 (Conn. App. Ct. 2013) (citing *Bartone v. Robert L. Day Co.*, 656 A.2d 221 (Conn. 1995)). When evaluating a fraud claim like this one, "where a defendant's intent and state of mind are placed in issue, summary judgment is ordinarily inappropriate." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (citations omitted). As the Second Circuit cautions, "a sojourn into an adherent's mind-set will inevitably trigger myriad factual inferences, as to which reasonable persons might differ in their resolution." *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984).

The supposed "admissions" on which WWE relies are meaningless. LoGrasso's testimony merely shows that he does not have direct knowledge of WWE's attempts to conceal information about the long-term risks of repeated head injuries. SODF ¶ 115. But, again, direct evidence of a "smoking gun," is not required. *See Puro,* 449 A.2d at 180 ("[F]raudulent concealment may be inferred by a reasonable trier of fact from the balance of the evidence, even if only by circumstantial evidence.").

This Court has already recognized the inferences that can be drawn from LoGrasso's allegations:

Plaintiffs have alleged, for example, that the Wellness Program was created for WWE by an attorney in response to the death of a former wrestler and appears to have immediately embraced a critic of some aspects of recent CTE studies. As noted earlier, the WWE and its executives also made statements questioning one doctor's conclusion that a deceased former wrestler likely suffered from CTE.

> **These facts, assumed to be true for the purposes of this motion, are sufficient to plausibly allege intent on the part of the WWE to conceal a cause of action for the purpose of obtaining delay.**

MTD Opinion at 47.  Evidence developed in discovery supports these allegations.



SODF ¶¶ 292-294.

SODF ¶¶ 300-04, 322.

A jury can infer from this evidence that WWE was trying to delay or prevent the filing of lawsuits against it and avoid the expense of assisting former and current wrestlers medical problems stemming from their WWE performances.

WWE's argument that LoGrasso failed to engage in due diligence falls flat when it was WWE's fraudulent conduct that prevented him from "investigating" further.  WWE made every effort to discredit reports that Chris Benoit suffered from CTE.  SODF ¶¶ 300-04, 322.  LoGrasso believed them, testifying that he "trusted in the WWE and what they were saying at the time" with regard to Benoit's murders and suicide not relating to wrestling.  SODF ¶ 323.  Understandably, LoGrasso though "whatever Chris Benoit did or how or that stuff didn't pertain to me at the time, because I didn't think it was me."  SODF ¶ 325.  This is certainly a reasonable conclusion in the face of the many public statements by WWE that the Chris Benoit tragedy was the result of drug abuse and not CTE.  *See Maslak v. Maslak*, No. LLICV126006437, 2013 WL 5663798, at *7

(Conn. Super. Ct. Sept. 27, 2013) ("Typically, a plaintiff will prove reasonable diligence either by showing that: (a) the circumstances were such that a reasonable person would not have thought to investigate, or (b) the plaintiff's attempted investigation was thwarted."). But when LoGrasso's mental and physical health began to deteriorate further in 2014, he sought medical help and learned for the first time that his symptoms might relate to the injuries he suffered while wrestling. SODF ¶¶ 325-326.

A jury could reasonably infer from this evidence that WWE's intent was to conceal the risks of head injuries to prevent any litigation by its wrestlers, including LoGrasso. A jury could also reasonably determine that WWE succeeded. Through its public relations machine and its lawyers, WWE successfully convinced the public, including LoGrasso, that Benoit's death was unrelated to CTE; concealed from its former wrestlers, including LoGrasso, that they faced risks of long-term degenerative neurological problems; and prevented wrestlers, including LoGrasso from seeking medical advice and pursuing litigation against it.

III.    CONCLUSION

WWE's summary judgment motion and Local Rule 56(d)(1) Statement are, in reality, its closing statement. It asks this Court to accept argument as fact, draw inferences beyond what the evidence supports, and determine the credibility of every witness. When one subtracts these improper tactics, the actual undisputed facts are limited and do not support summary judgment under Rule 56(b). Instead, there are numerous genuine issues of material fact surrounding Plaintiffs' claims for fraudulent omission and the tolling of the

statute of limitations.  Plaintiffs therefore respectfully request that this Court deny

WWE's motion for summary judgment.


Dated:  September 9, 2016                    Respectfully Submitted,

                                            *s/ Michael J. Flannery*
                                            **Michael J. Flannery**
                                            **CUNEO GILBERT & LADUCA, LLP**
                                            **7733 Forsyth Boulevard, Suite 1675**
                                            **St. Louis, MO  63105**
                                            **Telephone:(314) 226-1015**
                                            **Facsimile: (202) 789-1813**
                                            **mflannery@cuneolaw.com**

                                            **Charles J. LaDuca**
                                            **CUNEO GILBERT & LADUCA, LLP**
                                            **4725 Wisconsin Avenue, Suite 200**
                                            **Washington, DC 20016**
                                            **Telephone: (202) 789-3960**
                                            **Facsimile: (202) 789-1813**
                                            **charles@cuneolaw.com**

                                            **Konstantine W. Kyros**
                                            **KYROS LAW OFFICES**
                                            **17 Miles Rd.**
                                            **Hingham, MA 02043**
                                            **Telephone: (800) 934-2921**
                                            **Facsimile: 617-583-1905**
                                            **kon@kyroslaw.com**

                                            **William M. Bloss**
                                            **Federal Bar No: CT01008**
                                            **KOSKOFF, KOSKOFF & BIEDER**
                                            **350 Fairfield Avenue**
                                            **Bridgeport, CT 06604**
                                            **Telephone: 203-336-4421**
                                            **Facsimile: 203-368-3244**

                                            **Robert K. Shelquist**
                                            **Scott Moriarity**
                                            **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
                                            **100 Washington Ave., S., Suite 2200**
                                            **Minneapolis, MN 55401-2179**

Telephone: (612) 339-6900
Facsimile: (612) 339-0981
rkshelquist@locklaw.com
samoriarity@locklaw.com

Harris L. Pogust, Esquire
Pogust Braslow & Millrood, LLC
Eight Tower Bridge
161 Washington Street Suite 940
Conshohocken, PA 19428
Telephone: (610) 941-4204
Facsimile: (610) 941-4245
hpogust@pbmattorneys.com

Erica Mirabella
CT Fed. Bar #: phv07432
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-580-8270
Erica@mirabellaLLC.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of September, a copy of the foregoing

was served via this Court's electronic case filing system.

*s/Michael J. Flannery*
Michael J. Flannery