## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

———————————————————————————

RUSS MCCULLOUGH, RYAN SAKODA, and
MATTHEW ROBERT WIESE, Individually and on
behalf of all others similarly situated,

     Plaintiffs,

v.

WORLD WRESTLING ENTERTAINMENT, INC.,

     Defendant.

———————————————————————————

JOSEPH M. LAURINAITIS, a.k.a.
Road Warrior Animal,
JIMMY "SUPERFLY" SNUKA, by and through
his guardian, Carole Snuka,
PAUL ORNDORFF, a.k.a. Mr. Wonderful,
SALAVADOR GUERRERO IV, a.k.a. Chavo
Guerrero, Jr.,
CHAVO GUERRERO, SR., a.k.a. Chavo Classic,
BRYAN EMMETT CLARK, JR., a.k.a. Adam
Bomb,
ANTHONY NORRIS, a.k.a. Ahmed Johnson,
JAMES HARRIS, a.k.a. Kamala,
DAVE HEBNER,
EARL HEBNER,
CHRIS PALLIES, a.k.a. King Kong Bundy,
KEN PATERA,
TERRY MICHAEL BRUNK, a.k.a. Sabu,
BARRY DARSOW, a.k.a. Smash,
BILL EADIE a.k.a. Ax,
JOHN NORD, a.k.a. The Bezerker,
JONATHAN HUGGER a.k.a. Johnny The Bull,
JAMES BRUNZELL, a.k.a. Jumpin' Jim,
SUSAN GREEN, a.k.a. Sue Green,
ANGELO MOSCA, a.k.a. King Kong Mosca,
JAMES MANLEY, a.k.a. Jim Powers,
MICHAEL "MIKE" ENOS, a.k.a. Blake Beverly,
BRUCE "BUTCH" REED, a.k.a. The Natural,
CARLENE B. MOORE-BEGNAUD, a.k.a. Jazz,

Civil Action No.
3:15-cv-001074 (VLB)
Lead Case

SYLVAIN GRENIER, |
OMAR MIJARES a.k.a. Omar Atlas, |
DON LEO HEATON, a.k.a. Don Leo Jonathan, |
TROY MARTIN, a.k.a. Shane Douglas, |
MARC COPANI, a.k.a. Muhammad Hassan, |
MARK CANTERBURY, a.k.a. Henry Godwin, |
VICTORIA OTIS, a.k.a. Princess Victoria, |
JUDY HARDEE a.k.a. Judy Martin, |
MARK JINDRAK, |
GAYLE SCHECTER as Personal Representative |
of Estate JON RECHNER a.k.a Balls Mahoney, |
BERNARD KNIGHTON as Personal |
Representative of Estate of Brian Knighton, a.k.a. |
Axl Rotten, |
MARTY JANNETTY, |
JON HEIDENREICH, |
TERRY SZOPINSKI, a.k.a. The Warlord, |
SIONE HAVEA VAILAHI, a.k.a. The Barbarian, |
LARRY OLIVER, a.k.a. The Crippler, |
BOBBI BILLARD, |
ASHLEY MASSARO, a.k.a. Ashley, |
PERRY SATULLO a.k.a Perry Saturn, |
DAVID SILVA a.k.a Sylvano Sousa |
JOHN JETER a.k.a Johnny Jeter, |
CHARLES BERNARD SCAGGS a.k.a Flash Funk, |
CHARLES WICKS a.k.a Chad Wicks, |
TIMOTHY SMITH, a.k.a. Rex King, |
TRACY SMOTHERS, a.k.a. Freddie Joe Floyd, |
MICHAEL R HALAC, a.k.a. Mantaur, |
RICK JONES, a.k.a. Black Bart, |
KEN JOHNSON, a.k.a. Slick, |
GEORGE GRAY, a.k.a. One Man Gang, |
FERRIN JESSE BARR, a.k.a. JJ Funk, |
LOU MARCONI, |
ROD PRICE, |
DONALD DRIGGERS, |
RODNEY BEGNAUD, a.k.a. Rodney Mack, |
RONALD SCOTT HEARD, a.k.a. Outlaw Ron |
Bass, and |
BORIS ZHUKOV, |
  |
        Plaintiffs, |
  |
v. | Civil Action No.
 | 3:16-cv-01209 (VLB)
WORLD WRESTLING | Consolidated Case

2

**ENTERTAINMENT, INC., and**
**VINCENT K. MCMAHON, Individually and as**
**Trustee of the Vincent K. McMahon Irrevocable**
**Trust U/T/A dtd. June 24, 2004, as Trustee of the**
**Vincent K. McMahon 2008 Irrevocable Trust U/T/A**
**dtd. December 23, 2008, and as Special Trustee of**
**the Vincent K. McMahon 2013 Irrev. Trust U/A dtd.**
**December 5, 2013, and as Trustee of Certain Other**
**Unnamed McMahon Family Trusts, and as**
**Controlling Shareholder of WWE,**

                                    **Defendants.**

## PLAINTIFFS' FIRST AMENDED COMPLAINT

The Plaintiffs, by and through undersigned counsel, bring this Complaint against the Defendant, World Wrestling Entertainment, Inc. ("WWE") and Vincent K. McMahon ("VKM"), Individually, and as Trustee of the Vincent K. McMahon Irrevocable Trust U/T/A dtd. June 24, 2004, as Trustee of the Vincent K. McMahon 2008 Irrevocable Trust U/T/A dtd. December 23, 2008, and as Special Trustee of the Vincent K. McMahon 2013 Irrev. Trust U/A dtd. December 5, 2013, and as Trustee of Certain Other Unnamed McMahon Family Trusts, and as Controlling Shareholder of WWE, and allege, upon facts and information and belief, except for the allegations concerning Plaintiffs' own actions, as follows. Please note that although the Complaint is divided into Counts as suggested by the Federal Rules, each and every paragraph alleged in each and every Count is intended to be taken as alleged in, and incorporated by reference, in every Count.

## INTRODUCTION

1.     This case involves retired professional wrestlers and performers who sustained long term neurological injuries during their tenure with WWE.  As is

3

detailed hereinafter, the Plaintiffs were intentionally and systematically deprived of valuable rights guaranteed under State and Federal law, all under the direction and control of its self-styled Chairman of the Board, Vincent K. McMahon.

2.      These injuries involve a neurological disease and an ongoing disease process called Chronic Traumatic Encephalopathy (CTE) as well as the effects of Traumatic Brain Injuries (TBI) that occur as a consequence of repetitive head trauma sustained by the Plaintiffs as professional wrestlers in matches sponsored, controlled, choreographed, and created by WWE.

3.      The wrestling moves that involve the occupational head trauma that causes CTE and associated diseases from the accumulated effects of TBIs are the result of wrestling moves and maneuvers that were performed "correctly" by the Plaintiffs. In other words, the head trauma that has resulted in injury is the accumulated effect of many impacts to the Plaintiffs' heads that occurred on a regular, routine basis during their WWE careers.

4.      The long-term, occupational neurological injuries sustained by the Plaintiffs resulted from both concussions and sub-concussive head injuries, which occurred in the ordinary course of each of the Named Plaintiffs' WWE tenure.

5.      As alleged herein, the WWE routinely failed to care for the Named Plaintiffs' repetitive head injuries during their careers in any medically competent or meaningful manner that complied with any known published contact sports "return to play guidelines" at the time the injuries occurred.

6.      As such, each of the Named Plaintiffs as a WWE performer sustained neurological injuries by simply participating in WWE matches.

7.     WWE wrestling matches, unlike other contact sports, involve very specific moves that are scripted, controlled, directed and choreographed by WWE. As such, the moves that resulted in Named Plaintiffs' head injuries were the direct result of the WWE's actions.

8.     The WWE owes a legal duty to the each one of the Plaintiffs for reasons set forth in the Complaint below including but not limited to: the WWE's superior knowledge of the medical science of head trauma in athletes; WWE's paid sponsorship of medical studies of CTE with the Concussion Legacy Foundation; WWE's collection of information about retired wrestlers including the provision of medical information, outreach, letters, care and treatment to hundreds of drug addicted former wrestlers whose symptoms derive from CTE; WWE's ongoing relationship with the wrestlers in broadcasting their violent matches in which they sustained head trauma, with WWE in many cases paying the Plaintiffs ongoing royalty payments; WWE's tight scripting, control and direction of the Plaintiffs as wrestlers/referees or managers of moves and maneuvers; WWE's provision of doctors, trainers and producers at matches to observe and care for them; WWE's legal duties (including those imposed by State and federal statutes) from an employer-employee relationship with the named Plaintiffs and the WWE has a duty to speak to the Named Plaintiffs concerning risks of neurological damage, other risks and likely medical conditions given WWE's near total control and influence over professional wrestling in the United States.

9.     Continuing into 2016 the WWE has failed to warn and fraudulently misrepresented and concealed from the Plaintiffs the nature and extent of the

occupational long-term neurological injuries that are present in each of the Named Plaintiffs as a consequence of their wrestling careers. Some of this activity specifically includes: WWE's public statements questioning the CTE diagnoses in the Benoit and Martin deaths; WWE's large financial contributions to the Concussion Legacy Foundation, which has ignored any study, care or treatment plan of the named Plaintiffs; WWE's ongoing drug and alcohol programs that directly target retired wrestlers with neurological diseases caused by wrestling, which WWE characterizes as "humanitarian gestures" have delayed and prevented the Plaintiffs from obtaining diagnosis, treatment, and information necessary to prevent additional and ongoing harm.

10.    Each of the Named Plaintiffs relied upon WWE and the Chairperson Vincent K. McMahon ("VKM"), directly or through WWE furnished staff to inform them of their occupational injuries, to instruct them how to properly treat their injuries, and to provide them with the federal and state rights they are entitled to by law.

11.    Instead of upholding its duty to its employees, WWE placed corporate gain over its wrestlers' health, safety, and financial security, choosing to leave the Plaintiffs severely injured and with no recourse to treat their damaged minds and bodies.[1] WWE refused to provide health insurance to its employees, employee benefits, and payments to Social Security, and repeatedly violated State and federal statutes intended to protect persons such as Plaintiffs.

---

[1] Each of the Named Plaintiffs will attest to WWE performances where they received head injuries, the long-term effects and implications of which are still being observed today.

12. Evidence linking repetitive head injuries and TBI to long-term neurological problems in contact sport athletes, has been known for decades and recently CTE has been at the center of a health crisis involving NFL players. WWE, the largest wrestling entertainment company in the United States, in which head injuries and TBI are a regular occurrence, was aware of the evidence that wrestlers suffered the long term effects of these injuries since its inception. Even into 2016 the WWE is failing to warn or take any steps to help retired wrestlers with head injury issues.

13. WWE has deliberately ignored and actively concealed from the Named Plaintiffs, medically important and possibly lifesaving information about specific neurological conditions like CTE that afflict wrestlers and contact sport athletes with similar clinical histories of head trauma. The WWE knows that its wrestlers including the Plaintiffs are at great risk for these diseases such as CTE that can result in suicide, drug abuse and violent behavior that pose a danger to not only the athletes themselves but also their families and community, yet the WWE does nothing to warn, educate or provide treatment to them.

14. Publicly, the WWE has taken inconsistent and misleading positions about the nature of CTE and its relationship to head trauma in wrestling. The WWE has sought to cast the issue of long-term risks of head trauma in wrestlers as single incidents involving concussions or aberrant in-ring accidents that result in specific head injuries to individual wrestlers. However, the WWE in its own financed and published studies with the Concussion Legacy Foundation, now knows this characterization of CTE to be false. To be clear, wrestling of the type the WWE

7

promotes causes latent occupational head trauma that can cause CTE disease and related TBI issues in wrestlers including the Named Plaintiffs. The disease caused by head trauma in wrestling is not an open and obvious concussion or head injury that occurs in consequence of a single event in a wrestlers' career. CTE is an unseen, latent disease process that emanates directly from wrestling activity. The WWE has done everything in its power to deny, conceal and deflect attention from acknowledging that this disease even exists in the community of retired wrestlers of which the Named Plaintiffs are part.

15.     The WWE, like the tobacco companies before it, has sought to position itself as studying the science of a disease that may result from activity it sponsors, promotes, controls and profits from, yet the studies that WWE finances ignore the very disease caused by WWE's own activities. The WWE's funding of CTE research that includes published papers implicates their knowledge and concealment.

16.     Unlike the tobacco companies however, the WWE is simultaneously raising scientific doubts with respect to CTE while the organization it funds (and sits on the board of) promotes the exact opposite conclusions of CTE science. The Foundation the WWE supports believes that CTE exists and seeks to educate, warn and seek avenues for treatment of CTE. Thus unlike the tobacco research which was at least internally consistent in its agnostic conclusions about any link with smoking and lung cancer, the WWE constantly contradicts the conclusions of the CTE foundation it funds. As will be shown below, each statement made by the WWE about CTE is directly and rather precisely rebutted by the very researchers it funds.

In all of this however there is an important omission by both the foundation the WWE: there is simply no mention of wrestling.[2]

17.    The WWE in asserting as a defense "The State of CTE Science is not a known fact," revives old concepts of causation that have long been discredited by our accepted standards of public health in 2016. Public health and medicine must balance the existing state of CTE science against consequences of failing to act; the evidence assembled by the plaintiffs indicates that the WWE has failed to act responsibly.

18.    CTE, TBIs, and the disease processes that results from repetitive head trauma sustained by the Named Plaintiffs requires diagnosis, care and treatment by a qualified neurologist. As the world's leading CTE expert explained in a 2008 book: "The disease model of gridiron dementia [CTE] resembles the disease model of mesothelioma (cancer of the lining of the lungs) due to occupational exposure to asbestos. Mesothelioma occurs in retired asbestos workers after a very long

---

[2] For example the WWE medical director Dr. Maroon told the media on March 15, 2016: "There are more injuries to kids from falling off bikes, scooters, falling in playgrounds than there are in youth football. But it's much more dangerous riding a bike or a skateboard than playing youth football." The strongest rebuke of Dr. Maroon and the WWE's position came from the head of the Organization the WWE finances: "Christopher Nowinski who told media: "The statement being made that it is more dangerous to ride a bike or skateboard than play youth football is false." (http://www.huffingtonpost.com/2015/03/18/nfl-doctor-youth-football-bike_n_6895584.html).

In this litigation the WWE takes the position and cites as a defense a controversial "4th International Conference on Concussion in Sport in Zurich (2012) which stated: "The speculation that repeated concussion or subconcussive impacts cause CTE remains unproven." The conclusion was attacked by Dr. Anne McKee the primary researcher of the Concussion Legacy Foundation of which the WWE is funds and Paul Levesque hold a board seat. Dr. McKee wrote on March 17 2013: "This is a time that calls for immediate action to reduce the amount of head trauma experienced by athletes in all sports to prevent CTE… and it is now irresponsible to justify inaction by requesting a level of scientific proof that will take decades to acquire." See Scientists Claim that Link between concussions and CTE is "unproven could impact NFL Lawsuit Available at http://www.nj.com/ledger-dalessandro/index.ssf/2013/03/scientists_claim_that_link_between _concussions_and_cte_is_unproven_could_impact_nfl_lawsuits.html.

latent period, which can range from ten to seventy-five years. The risk of developing mesothelioma correlates with the age and time of first exposure to asbestos and with the duration and cumulative exposure to asbestos. Following cessation of exposure to asbestos deleterious biochemical and molecular responses to the asbestos fibers continue and progress to the development of a cancer many years later. Gridiron dementia possesses a similar disease model. The deleterious effects of repeated concussions to brain cells and nerve fibers are additive and cumulative." Dr. Omalu continues: "The major shift in scientific thought is that seemingly innocuous blows to the head during the play of football, which may not be recognized by the players themselves or team physicians, may not be innocuous after all, especially in the long term. Over several or many years of playing football, repeated unnoticed impacts to the head and seemingly uneventful blows to the head, which are part of the game, may in the long term unknowingly induce permanent damage to the biochemical functioning of the brain cells and result in gridiron dementia."[3]

19.     Dr. Omalu's reasoning applies with equal force to WWE wrestlers and Named Plaintiffs for whom the repeated head trauma experienced during their careers is equal to, or exceeds, that of other contact sport athletes including NFL players. Indeed, the only four deceased WWE wrestlers whose brains were examined for this disease were both found to have CTE by Dr. Omalu.

20.     WWE, instead of acting on these 2007 and 2009 (and as of October 2016 two new wrestlers with signs of CTE in named plaintiffs Jon Rechner and

---

[3] *See* Omalu, Bennet, "Play Hard, Die Young: Football Dementia, Depression, and Death", p. 26-28 (2008).

Brian Knighton) findings by studying additional wrestlers' brains who died (many by suicide or drug overdose), chose to 1) publicly attack and question Dr. Omalu's findings; and 2) donate $2.7 million to the Concussion Legacy Foundation headed by a former WWE wrestler who has despite studying 187 brains for CTE since 2013, has not studied a single wrestler's brain.  Over 100 wrestlers have died in this time period.

21.     WWE continues to ignore the major neurological health crisis in the professional wrestler community, despite holding itself out as the guardian and authority on wrestler health and safety.[4]  For example, the WWE announced in May 2013: "WWE is proud to help advance this critical research to help anyone at risk of suffering CTE… WWE has been, and will continue to be, very proactive on taking measures to ensure the health and wellness of our talent." Boston University Medical Campus, "WWE Donates $1.2 Million to SLI for Boston University CTE Treatment Program", Boston University, *available at* http://www.bumc.bu.edu/2013/05/17/wwe-donates-1-2-million-to-sli-for-boston-university-cte-treatment-program/. As such, WWE has failed to uphold its duty to provide the Named Plaintiffs with the rules, policies, warnings and current information about CTE that would have protected them from present injury.

22.     WWE controlled Plaintiffs' personal lives just as strictly as their professional careers.  WWE regulated what the Plaintiffs could wear in public, how

---

[4] Particularly in circumstances where WWE directly regulated wrestler health and safety, including requiring wrestlers to wear padded helmets in training, ostensibly banning certain wrestling moves like the piledriver, implementing drug testing policies, including public suspension of wrestlers for violations, and creating a 'Talent Wellness Program' in 2006 designed to promote wrestler health and safety.

they traveled, where they trained, how they trained, where, when, and how they performed, and what medical treatment they received, if any.  WWE controlled the information the wrestlers received, always providing rules, regulations, and protocols to be followed, as well as training for new moves and performances. WWE owned and controlled all the events. For example, WWE even enforced a dress code on its wrestlers, including Plaintiffs, as evidenced by Exhibit L, WWE's Dress Code Requirements.

23.     Chairperson Vincent K. McMahon and WWE exercised near total control over Plaintiffs, creating the characters or "gimmicks," scripting the storylines of the performances, and through total control over a wrestler's career, determined who found success or failure in the ring.  WWE maintained its own medical personnel who provided care and treatment if WWE itself deemed treatment necessary.  As a result, Plaintiffs completely and reasonably relied on WWE and VKM's knowledge, information, and authority in deciding whether to perform or seek treatment for injuries.

24.     Despite WWE's ironclad control over the Plaintiffs, WWE refused and continues to refuse to classify its wrestlers as employees.  WWE maintains the untenable position its wrestlers are independent contractors, requiring its wrestlers to sign unconscionable "Booking Contracts," employment contracts of adhesion intended solely for the benefit of WWE and VKM. These contracts were drafted by the WWE and its army of attorneys to restrict and abolish all of Plaintiffs' rights and to fraudulently misrepresent and deceive both Plaintiffs and the federal government.   The misclassification of wrestler-employees as "independent

contractors" effectively eliminated WWE's wrestlers' knowledge of any employment rights they had under federal and state law, including OSHA, FMLA, and the NLR Act. The Booking Contracts are nothing more than an unconscionable scheme to save money in violation of public policy and the legal rights of the Plaintiffs.

25.     Additionally resulting from WWE's intentional misclassification of its wrestlers, WWE forces its employees to rely on the goodwill of its own medical staff to monitor, diagnose, and treat injuries since the majority of Plaintiffs could not afford their own insurance or health care while performing for WWE.  Many of these wrestlers have only a high school degree (or in some cases did not graduate high school) and do not have the knowledge or the resources to diagnose and treat injuries (or to know when to seek treatment), particularly for latent neurological injuries.

26.     WWE utilized its corporate culture to conceal injuries and prevent the Plaintiffs from receiving necessary medical treatment and information relating to the causes and symptoms of those injuries.  The failure to provide this information and medical treatment has resulted in long-term degenerative neurological conditions as a direct consequence of the Plaintiffs' wrestling careers. Particularly, WWE did not evaluate the wrestlers before resuming ring activity, which downplayed the head trauma they received and ignored the risks from repetitive injury.

27.     More akin to a 19th century carnival out which wrestling emerged than a modern American corporation, WWE's actions have systematically eliminated

any avenue for its wrestlers' voices to be heard and their rights enforced. The WWE's traveling circuit of performers, who work hundreds of nights a year, has striking parallels to the abuse and coercion found in vaudeville working conditions of the last century.

28.    Had WWE not fraudulently misclassified its wrestlers, including Plaintiffs, as independent contractors, Plaintiffs would have been protected by OSHA, FMLA, the NLR Act, and other federal and State laws (including various state Worker's Compensation laws) which would have ensured proper medical care and treatment for injuries occurring during employment, including necessary medical leave for recovery and guaranteed employment upon return, and protective gear and procedures designed to minimize injury.

29.    WWE was aware that medical publications had established a significant risk factor for short-term and long-term neuro-cognitive health complications resulting from concussive and sub-concussive injuries to athletes (and the general population), both from single incidents and repetitive impacts from the occupation of wrestling. During these decades, WWE was further aware of the work of numerous entities, including the NFL and NHL, studying the performance and effectiveness of safer return to play rules and protocols aimed to reduce the risk of neurological injury.[5]

30.    The published medical literature dating back as far as 1928 demonstrates an observed link between repetitive blows to the head and injurious

---

[5] WWE, like the sports of boxing, football, hockey, rugby and other contact sports, was aware of the health risks associated with repetitive blows producing sub-concussive and concussive results and the fact that some members of the WWE wrestler population were at significant risk of developing long-term brain damage and cognitive decline as a result.

neurocognitive effects. Indeed the landmark study called "Punch Drunk" published in the Journal of the American Medical Association by Dr. Harrison Stanford Martland who was the Chief medical examiner in Essex County New Jersey, became the foundation of all sports related head injury studies to the present. By 1963, a substantial body of medical and scientific evidence relating to neurocognitive injuries in contact sports developed which specifically studied sports' TBIs and promoted guidelines for medical personnel responsible for athletes to diagnose, grade, and treat concussions.   Grading systems were implemented to assess the severity of concussions.  Despite WWE's inception in 1963[6], and numerous policies on neurocognitive injuries in sports developing since the 1980s, including 'return to play' guidelines, WWE failed to implement a policy until 2007.

31.    Even a WWF program aired April 4, 1981, used the term in which WWF announcer Kal Rudman ("Killer Kal") asks then wrestler Pat Patterson if wrestlers get "punch drunk." Patterson answers: "Some of them do… In boxing punishment is taken to the head only, in wrestling it's all over the body."

32.    In 1995, over ten years before WWE would implement an actual concussion policy, WWE aired a televised, scripted event describing the dangers of post-concussion syndrome, the associated risks and noted the comparisons to football players and boxers.  Dr. Jeffrey Unger, a WWE physician, diagnosed a

---

[6] The entity that is now known as WWE was started in 1952 by Jess McMahon as Capitol Wrestling Corporation (CWC).  On January 24, 1963, the World Wide Wrestling Federation (WWWF) was formed by Vince McMahon, Sr. when the CWC started branding its own wrestling champion.  The business would be renamed World Wrestling Federation (WWF) and then become World Wrestling Entertainment, Inc. (WWE).

15

WWE Superstar, Shawn Michaels with a fake, scripted post-concussion syndrome and detailed the return to play guidelines WWE enacted.  Unfortunately, while demonstrating to the public and the wrestlers that WWE was aware of the injuries and risks its wrestlers sustained, and how to appropriately treat the injuries, WWE was actually taking no affirmative steps to implement a policy to treat the wrestlers or even to inform them how to treat themselves.

33.    WWE actively suppressed broader awareness of the link between sub-concussive and concussive injuries in its wrestling performances and the chronic neurocognitive damage, illnesses, and decline suffered by former wrestlers, including the Plaintiffs,[7] by taking the actions described within this Complaint.

34.    WWE fraudulently concealed and omitted information about head injuries from the wrestlers by using its authority and existence of a duty, including the presence of WWE ringside and in-house doctors such as Doctor Ferdinand Rios, Doctor Martha Dodson, Doctor Jeffrey Unger, Doctor Christopher Amann, Doctor Joseph Maroon and others, to downplay injuries, encourage unsafe return to play procedures, and prescribe pain medication.[8] The WWE doctors often watched the events and would be in a position to observe injuries likely to result in a concussion and/or the rapid deceleration of the head. The doctors would also be responsible to advise the Plaintiffs whether to return to the ring. In 2007, a

---

[7] Notably, sub-concussive head injuries are not distinguishable the way a broken ankle or knee injury is, and so Plaintiffs relied on WWE's superior knowledge to diagnose and treat the injuries which grew worse over their career and beyond in order to receive the necessary medical treatment and care to prevent further injury and increased risks of future harm.

[8] For example, WWE's Chief Medical Director, Joseph Maroon, has made many public statements downplaying the risks of concussions, including a March, 2015 observation that "the problem with CTE, although real, is being overexaggerated".

16

Congressional Investigator asked when the WWE would give: "the doctor ringside authority to take someone out if they seemed to suffer a brain injury like they do in football?" Dr. Black answered: "Dr. Rios--- he does go in and does look at the talent in the ring while they're still in the ring sometimes to assess them. So we do have a doctor there present at every event." *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: David Black p. 146-147) (September 25, 2007), *available at* http://web.archive.org/web/20090103083353/http:// oversight.house.gov/documents/20081231140749.pdf.   Doctors interviewed state the WWE would ignore sound medical advice about symptoms of concussions and prematurely return the wrestlers to the ring, "9 out of 10 times."[9]

35.    WWE further concealed and omitted information about Plaintiffs' head injuries by using and hiring in-ring referees to provide further illusion that their injuries were monitored by WWE, as they were responsible for noticing wrestlers' injuries and taking necessary steps to prevent further injury.[10]  Despite observing numerous injuries, the referees were limited by the lack of injury protocols, and had to rely on their own decisions with no medical training to end a match, rarely ever ending a match due to injury.[11]    The Plaintiffs relied on WWE's

---

[9] For example, Dr. Rios treated a wrestler named Rene Dupree after he was struck in the head and presented with a visible hematoma, which was sutured in the locker room. Dupree was not rested but in fact continued to perform. Named Plaintiff Jonathan Hugger states he was knocked out by hitting his head on concrete on a televised broadcast on 7/15/2002 whereupon he was examined by a WWE Doctor and told to "shake it off."

[10] The referees would communicate with the performers and the control room, known in WWE as "gorilla position", where on-the-fly decisions would be made, particularly regarding injuries and choreography.

[11] Named Plaintiff and famous WWE referee, Earl Hebner, who performed from 1988 to 2005, observed that wrestlers relied on the referees to maintain safety and end matches when injuries occurred.  However, the referees were limited by WWE's own protocols and scripting, often

acknowledgment of their injuries to know when to receive treatment, and absent WWE taking action to halt the match or provide treatment, the Plaintiffs did not know whether they had an injury or the steps needed to prevent further injury. Just as the public believed the referees were properly officiating a match, the Plaintiffs believed the referees and WWE were properly monitoring their injuries.

36.     WWE furthered its scheme to conceal the risks of head injuries from its wrestlers by recognizing concussions were suffered in-ring, but took no steps to end the performances or treat the injuries, thereby downplaying the risks to the Plaintiffs and convincing them they were suffering no long-term injuries.[12]  For example, in a WWE produced program called "Confidential," in an episode (airing sometime in 2002-2004), WWE trainer Larry Heck told the audience: "Guys have gotten concussions in the ring and been able to finish matches and you know not really remember what happened".  Clearly, the WWE protocols were deficient to protect its wrestlers given that WWE was aware of the injuries, had trainers present, and referees and medical personnel to diagnose and stop the matches, but no actions were undertaken to protect numerous wrestlers.[13]

37.     Thus the WWE not only ignored head injury issues but actively promoted concussions themselves as a positive attribute of the violence that its

---

watching helplessly as wrestlers were repeatedly beaten in the head while WWE took no action to prevent further injury. *See, e.g.*, Royal Rumble on January 24, 1999 where Mick Foley received at least 11 unprotected blows to the head with a metal chair by The Rock, while Earl Hebner stands by.

[12] In fact, WWE often promoted the performance's violence and lauded wrestlers for returning to play despite being rendered unconscious or disoriented due to their exposure to sub-concussive and concussive forces.

[13] Further, WWE's voluntary actions to provide agents, staff, medical personnel, and in-ring referees to promote and protect the wrestler's health and safety was a continuance of the duty it had undertaken and continues to shirk.

performances were based upon. For example the WWE published a glossy art-style book in 2003 appropriately called: "WWE Unscripted," Leiker, Ken and Vancil, Mark, "WWE Unscripted: Edited", Pocket Books, (2003) which featured performers describing their concussions as an attribute that made wrestling not only real but demonstrated the performers toughness.  One page even features a large image of text that reads: "I've had A lot of Bad Injuries but luckily I've been able to bounce back from them- 7 Concussions, 3 broken noses, 2 broken ribs, a shattered ankle, stitches in my head over 35 times." (WWE Unscripted p. 122) Another page features a full page photograph of a scar on the back of WWE star Stone Cold Steve Austin's head with overwriting that reads: "This scar I got on the back of my head was delivered from Vince McMahon himself with a steel chair." ". . . I can't complain about it, we've traded a few, and I'm kinda proud of it actually." <u>WWE Unscripted</u>, at 142. On another page Brock Lesnar explains: "When I hit, I don't remember anything because I got a concussion. I won the match, but I couldn't tell you what happened…." *Id.*, at 175.

38.    WWE capitalized on its superior authority to conceal and downplay the Plaintiffs injuries by enforcing a rigid culture of silence designed to prohibit acknowledging injuries, promoting suffering pain in silence, and above all, returning to the ring quickly for financial security.  The wrestlers' pay depended upon their ability to perform, but WWE also lost money if the wrestlers were not consistently performing.   This inherent conflict of interest resulted in WWE

demoting, harassing, harming the Plaintiffs' in-ring character, and even terminating the Plaintiffs for self-reporting injuries.[14]

39.     Plaintiffs had to rely on WWE's unilateral decisions to issue rules to improve upon wrestler health and safety. During these decades, WWE voluntarily provided its wrestlers and the public with misleading information and regulations that adversely affected the short and long term health of WWE wrestlers, including the Plaintiffs.

40.     WWE negligently failed to carry out its duty to notice, acknowledge, diagnose, treat, and inform its wrestlers of the risks associated with TBI and CTE. WWE actively suppressed and kept secret information about CTE and TBI it knew would change the economics of the performance and the health of wrestlers such as the Plaintiffs.[15]

41.     Despite its knowledge and controlling role in governing wrestler conduct during and after performances, WWE turned a blind eye to the risk and failed to warn and/or impose safety regulations which would have reduced the adverse health consequences to its wrestlers.

---

[14] For example, Named Plaintiff, Jonathon Hugger, states that if a wrestler reported an injury "the WWE would hurt your character" "you kept your mouth shut or you would get 'heat from the office' if you got too opinionated or spoke up about injuries or anything you would be [messed] with". Named Plaintiff Joe Laurinaitis, states "WWE is a big dance, if you don't do it, someone else will, and 99% of the time you perform under duress.  Injured you suck it up and perform, keep your mouth shut".  Named Plaintiff, Ken Patera, states, "If you spoke up about injuries, you would be labeled 'injury prone' and lose your spot".

[15] The repetitive blows to the head, particularly after suffering a concussion, leads to long-term injuries resulting from the rapid deceleration of the brain, which potentially shears the axons from the neurons.  Such axons facilitate interneuronal communication which potentially cause diseases such as Parkinson's disease and Alzheimer's disease.  Such repetitive blows often result in WWE from punches, kicks, and solid blunt objects striking the skull, or being forcefully thrown to the ground onto the wrestlers' head, neck, and back.  For example, the body slam is one of the most basic maneuvers in wrestling, and even when correctly performed, results in the rapid deceleration of the brain within the skull upon hitting the mat, causing injury.

42.     Although the consensus among experts in the scientific community in the early 1970's increasingly discussed the growing problem of TBIs among athletes, the WWE turned a blind eye to the mounting evidence and failed to even implement a concussion policy or issue any warnings. By the 2000s, a number of wrestlers began dying from of the effects of this negligence and near total lack of care, warnings, protection and appropriate treatment. After the death of one of their superstars at age 38, the WWE finally adopted a medical policy in 2006, which unfortunately was too little too late for the named Plaintiffs, most of whom spent the height of their careers in an unreasonably dangerous work environment: the scripted matches conducted by WWE.

43.     Suddenly, in 2006, the WWE, created and funded the WWE's Talent Health and Wellness Program, allegedly created to provide counseling, care, and treatment to its current and former wrestlers. The Talent Wellness Program noticeably lacked any offer of care, treatment or information relating to concussions and sub-concussive injuries suffered by former wrestlers, but WWE provided substance dependency treatment determined by WWE non-medical employees.

44.     WWE's Talent Health and Wellness Program implemented the same ImPACT testing protocols as the NFL and was led by Dr. Joseph Maroon, the developer of ImPACT testing.  However, unlike the NFL's ImPACT protocols, WWE still maintained complete, blind reliance on its wrestlers' self-reporting of injuries in an effort to minimize the consequences to the WWE.[16]

---

[16] The NFL requires immediate removal from play upon sustaining a concussion, not self-assessment and affirmative notice to sideline doctors before providing treatment like WWE has

45.     WWE undertook a responsibility (a) to make truthful statements; (b) not to wrongfully advance improper, biased, and self-serving opinions and media statements; (c) not to discredit publicly well-researched and credible studies that came to a conclusion adverse to the WWE's financial and political interests specifically their failure to credit peer reviewed studies of CTE in WWE wrestlers; (d) not to publicly announce WWE would finance programs designed to study brain injuries and support "critical research to help anyone at risk of suffering from CTE", and then take no action to further the study of said brain diseases in retired wrestlers; and, (e) to inform all former wrestlers, all current wrestlers, and the public, regarding the risks of CTE and TBI in wrestling.

46.     WWE further voluntarily assumed a duty to investigate, study, and truthfully report the medical risks associated with CTE and TBI in wrestling through its publicly stated implementation of a concussion policy, neurological testing and public announcements expressing its commitment to the issue.  WWE hired a Medical Director who has publicly attacked and criticized the studies that have found a link between contact sports and brain damage.  Doctor Maroon's public statements downplaying the science of CTE as "over exaggerated" implicate him in this denial of his former employer, the NFL.  Now his WWE colleague, Dr. Mark Lovell, whose repeated statements and documented views provide an avenue for the WWE to continue to deny, conceal and omit information for the care or treatment of the community of retired wrestlers including the Named Plaintiffs.

---

sought to require.  However, as Dr. Maroon states in presentations to WWE wrestlers, the programs are identical, thereby creating reliance by the wrestlers on WWE's noticing an injury and taking the necessary steps to protect the wrestler's health and safety.

47.     Additionally, WWE has donated over three million dollars to the Concussion Legacy Foundation, ("CLF") founded as the Sports Legacy Institute by former WWE Superstar Christopher Nowinski.  CLF holds itself out as a research institute dedicated to studying concussions, which both current and former wrestlers relied on for information on whether their injuries related to concussions from WWE.  However, such research has been reported as compromised by WWE's donations and influence on the CLF's governing board on which a WWE executive sits.[17]  No wrestler's brain has been studied by CLF since the WWE donated to the organization.

48.     The WWE Finances Studies to Cast itself as "studying the Issue" while Avoiding reaching Scientific Conclusions that Would Harm the WWE. The WWE tactics in financing studies mirrors that of the tobacco companies, while donating large sums of money to research it can claim that existing studies of wrestlers are flawed, incomplete or inadequate and that there is always "more to learn." Additionally the WWE has not earmarked any of its large donations to study wrestlers but rather to study the issue "generally."

49.     Mr. Levesque who has been the WWE spokesman and sits on the Board of what is likely the world's most prominent CTE research group, could not be more transparent in his use of this "general" financing as a distraction from CTE in wrestling. Telling USA Today: "Obviously, I think it's such a huge concern for everybody right now in sports and in the military. As we learn more and more about

---

[17] *See* Hohler, Bob, "Ex-wrestlers say one of their own sells them short", Boston Globe, (June 12, 2016), *available at* https://www.bostonglobe.com/sports/2016/06/11/cozy-ties-between-concussion-foundation-and-wwe-cause-concerns/QNUhqzfn79EUPcB5GIH7nK/story.html.

concussions and what can become of it, I think it's a problem for everybody."  He further distinguishes football from WWE when it comes to hard impacts: "If you're in the NFL, your goal is to try to hit the other guy as hard as possible…. The goal in what we do is the exact opposite." *See* Mihoces, Gary, "WWE funds research into treatment of chronic brain trauma", USA TODAY Sports, (May 16, 2013), *available at* http://www.usatoday.com/story/sports/

2013/05/16/wwe-concussions-chris-nowinski-research-sports-legacy-institute-cte/2178667/.

50.    WWE continues to actively and continuously deny any link between CTE and TBI sustained by former wrestlers in WWE performances and practices and the neurological symptoms and problems (such as headaches, confusion, depression, drug abuse, severe memory loss, hearing loss, dementia, Alzheimer's, and Parkinson's disease) from which they now suffer.[18]  WWE's Counsel, Jerry McDevitt, in July, 2015 blamed the issue on Plaintiffs' Counsel: "Before this guy [Mr. Kyros] started trolling around looking for people to sue, we didn't have one person, none, claiming they had any kind of traumatic brain injuries, or dementia or ALS or any of the kind of stuff you see associated with the NFL". Associated Press, "WWE seeking to block concussion- related lawsuits", ESPN.com (July 6, 2015), http://www.espn.com/espn/

---

[18] This includes public statements such as gratuitous press releases, public statements by the WWE medical director, media statements by legal counsel, statements denying the veracity and quality of research on a deceased wrestler's brain (Benoit), legal threats to journalists who report on the issue, large donations to a brain bank that now do not study wrestlers' brains, and public statements without rational scientific basis that wrestling is fundamentally different from football regarding hard impacts.

story/_/id/13182418/world-wrestling-entertainment-seeking-block-concussion-related-lawsuits. **Instead of embracing the issue, WWE once again attacks opposing Counsel.**

51.     The WWE's denial continues even in the face of a WWE financed study published by researchers at the CFL, called Concussion in Chronic Traumatic Encephalopathy by McKee, Stein, Alvarez published in October 2015. The study did not apparently include any professional wrestlers or references to them. The abstract of the study reads in part:

> "CTE has been associated with a variety of types of repetitive head trauma, most frequently contact sports. In cases published to date, the mean length of exposure to repetitive head trauma was 15.4 years. The clinical symptoms of the disease began after a mean latency of 14.5 years with a mean age of death of 59.3 years. Most subjects had a reported history of concussions with a mean of 20.3. However, 16% of published CTE subjects did not have a history of concussion suggesting that subconcussive hits are sufficient to lead to the development of CTE. Overall, the number of years of exposure, not the number of concussions, was significantly associated with worse tau pathology in CTE. This suggests that it is the chronic and repetitive nature of head trauma, irrespective of concussive symptoms, that is the most important driver of disease."

Stein, TD, et al., "Concussion in Chronic Traumatic Encephalopathy, <u>Curr Pain Headache Rep.</u> (Oct. 2015), *available at* http://www.ncbi.nlm.nih.gov/

pubmed/26260277.

52.     Consistent with WWE's self-assumed role as guardian of wrestler health and safety, WWE intended for the general public, WWE wrestlers, the named Plaintiffs, and participants at every level of wrestling to rely on the misinformation it propagated, and to act upon the misinformation.

53.     During the same time period, WWE through the public statements of its Medical Director and its legal spokesman, actively sought to suppress the findings of other members of the medical communities that demonstrated the link between in-ring sub-concussive and concussive head impacts and post-career neurocognitive damage, illness and decline.

54.     Such statements by WWE and its agents, including attorneys who assumed the role of public relations propagandists, were made with reckless disregard to the truth or falsely of such statements and the consequence to the wrestlers who relied upon them.

55.     WWE's active and purposeful concealment and misrepresentation of the severe neurological risks of repetitive TBI exposed wrestlers to dangers they could have avoided had the WWE provided them with truthful and accurate information. Many of the Plaintiffs sustained repetitive TBI while in the WWE and now suffer from latent neurodegenerative disorders and diseases, all of which, in whole or in part, were caused by the WWE's acts and/or omissions.

56.     The WWE caused or contributed to the injuries and increased risks to Plaintiffs through its acts and omissions by, among other things: (a) historically ignoring the true risks of CTE and TBI in WWE wrestling; (b) failing to disclose the

true risks of repetitive TBI to WWE wrestlers; and (c) deliberately spreading misinformation concerning the cause and effect relationship between TBI in WWE wrestling and latent neurodegenerative disorders and diseases.

57.     On information and belief, WWE's motive to ignore and misrepresent the link between CTE and TBI sustained in WWE performances and neurocognitive injury and decline was economic. WWE knew or suspected that any alterations to wrestling programs that minimized the dangerous moves could weaken its product, which relies on violent action to sell. The WWE also believes to this day that recognizing that link and the health risk to WWE wrestlers would impose an economic cost in providing needed healthcare to its disabled and injured performers that would significantly and adversely change the profit margins enjoyed by WWE.

58.     The Plaintiffs are left with this lawsuit seeking this Court's jurisdiction to enforce years of intentionally deprived federal and State rights insidious employment oppression, and decades of severe, neurological injuries, which former wrestlers continue to suffer daily from the ongoing, debilitating effects.  The Plaintiffs request this Court to provide them with the relief sought, thereby finally providing Plaintiffs with the rights they have been denied since being employed by WWE, and ending a corporate practice which has trampled over thirty years of socially responsible federal and state regulation and legislation.

59.     As demonstrated in this Complaint, WWE's exploitation of the wrestlers in this action must rank as one of the most callous examples of worker mistreatment in modern times. The WWE and VKM have engaged in a pattern of

statutory and regulatory violations in order to deprive the Plaintiffs of fundamental and vested rights.

60.     Plaintiffs seek declarations of liability, injunctive relief, medical monitoring, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs and Plaintiffs' Spouses as a result of the Defendants' intentional tortious misconduct, including fraud, intentional misrepresentation, and negligence.

## JURISDICTION AND VENUE

61.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(11), because there are forty or more persons whose individual claims are being brought herein and the amount in controversy for each Plaintiff exceeds $75,000.00 dollars, exclusive of costs, interest, and attorneys' fees. The overall amount in controversy exceeds $5,000,000, exclusive of interest, costs, and attorney's fees. Those claims can be tried jointly in that they involve common questions of law and fact. In addition, the Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over the claims of individual Plaintiffs who are citizens of a state different from the states of citizenship of all Defendants.

62.     This Court has personal jurisdiction over the Defendants because they conduct substantial and continuous business in the State of Connecticut and/or in the state of the residence of the named Plaintiffs.

63.     On information and belief, all WWE policies and decisions relevant to the conduct alleged herein occurred primarily in WWE's corporate offices in Connecticut.

64.     Joinder is permissible pursuant to Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same series of occurrences, and questions of law or fact common to all Plaintiffs in this action. Common questions of law and fact will arise in this action including but not limited to:

a) Whether the WWE, through its own voluntary undertaking, was negligent in its response to the health effects of repeated head impacts and the injuries consequently suffered by the Plaintiffs;

b) Whether the WWE committed negligence, gross negligence, and/or fraud in misrepresenting the risks of repeated head impacts in WWE Matches to the Plaintiffs; and,

c) Whether repeated head impacts during performances in the WWE cause latent neurodegenerative brain disorders and disease.

d) Whether the Plaintiffs where misclassified as independent contractors and deprived of valuable rights under OSHA, National Labor Relations Act, Workers Compensation Laws and the Family Medical Leave Act, and employers contributory tax payments. Whether the Plaintiffs were victimized by a continuous fraudulent scheme hatched and carried out through the WWE over a period of many years, continuing to this day which involved among other wrongs:

i) Violation of the tax code of the U.S. which injured the Plaintiffs;

ii) Violations of the mail fraud statute 18 USC 1341;

iii) Violations of the wire fraud statute 18 USC 1343;

iv) Violation of the State Worker's Compensation statutes of the various States;

v) Violation of the Occupational Health and Safety Act;

vi) Violation of the Family Health and Safety Act;

vii) Creation of a culture of coercion and intimidation resulting in the procurement of unconscionable boilerplate Booking Contracts designed and intended to deprive the Plaintiffs of money, property, and valuable civil rights. 18 U.S.C. § 1962(c).

65.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events or omissions that give rise to the claims occurred within the State of Connecticut and this district and/or in the transferee forum, because the Defendants conduct a substantial part of their business within this district and/or in the State of the Plaintiffs' residence.

## PARTIES

66.     Plaintiffs and Plaintiffs' Spouses are those persons identified below, who adopt, in whole or in part, the allegations and Counts herein.

67.     Plaintiff Joseph Michael "Joe" Laurinaitis, a.k.a. Road Warrior Animal ("Laurinaitis") is 55 years old and resides in Defiance, Missouri. Laurinaitis is arguably a member of the most well-known tag team in WWE history, while his brother, John Laurinaitis was a long time senior executive of WWE's talent relations department and a close associate of Vince McMahon in all aspects of the business. Laurinaitis wrestled for the WCW and WWE throughout the 1980s,1990s and 2000s. Laurinaitis asserts he was given a boilerplate contract in the WWE in

30

which "nothing was up for negotiation." Laurinaitis wrestled hundreds of nights per year in the WWE and performed at their strict direction.  He was even threatened with fines for wearing jeans on an airplane and changing a 7am flight to a later one. Laurinaitis alleges there was little to no treatment by WWE ringside doctors. Laurinaitis sustained numerous head injuries in WWE matches. He specifically recalls at least four major concussions he suffered while performing in WWE. In one instance, he was double suplexed in 1992 while performing with the Beverly Brothers and suffered an impact, which herniated two discs in his neck. He was "powerbombed" by Shawn Michaels in 1997 immediately after returning from neck surgery. Laurinaitis has had at least 11 surgeries from the cumulative effects of his wrestling career. Laurinaitis' tag team partner, Michael Hegstrand died in 2003 of a heart attack at the age of 46. Laurinaitis continues to receive royalties from his WWE performances, along with letters offering drug and alcohol rehabilitation. Laurinaitis suffers from cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue.  Laurinaitis suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Laurinaitis has suffered personal and pecuniary injuries including conscious pain and suffering and emotional distress.

68.     Plaintiff Jimmy Snuka, a.k.a. Superfly ("Snuka") and his guardian, Carole Marie Snuka, is 72 years old and resides with his wife Carole Snuka in Atco, New Jersey.  Snuka was born in Fiji and received minimal education. Snuka is illiterate and although he cannot read or write, his wife alleges that the WWE "had him sign stuff all the time." Snuka performed for WWE between 1982 to 1985 and 1989 to 1992, returning in 1993. Snuka made sporadic appearances for WWE between 2005 and 2009. Snuka also wrestled for the ECW between 1992 and 1996, at least once for WCW. Snuka was the WWE headliner for much of his tenure, participating in Wrestlemania V, VI and VII and is one of the most famous wrestlers in the world. Snuka's high-flying style that served to popularize wrestling around the world, is one of the most successful WWE performers of all time. Snuka's signature move the "superfly splash" was to dive off of the top rope and land on his opponents. Snuka also was involved in one of the most famous stunts in WWE history on October 17, 1983 when he leapt 15 feet off the top of a metal cage in Madison Square Garden. Snuka sustained numerous blows to the head and reports multiple events that are consistent concussions. During a WWE interview Snuka was famously struck in the head with a coconut which smashed open as his "opponent" (another deceased WWE wrestler named Roddy Piper) mocked his Melanesian heritage whipped him with a belt and stuffed bananas in his mouth. Snuka recalls that at the time he sustained neurological problems as a result of being struck in the head, and he suffered dizziness and chronic headaches. Snuka now experiences cognitive difficulties including, but not limited to, depression, anger, mood swings, headaches, dizziness, severe loss of memory, confusion.

Snuka suffers from significant cognitive and neuropsychological impairment, post-concussion syndrome due to the traumatic brain injuries that he sustained repeatedly as a result of successive blows to the head during his wrestling career. Snuka suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Snuka has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

69.     Plaintiff Paul Orndorff, a.k.a. Mr. Wonderful ("Orndorff") is 66 years old and resides with his wife in Fayetteville, Georgia.  Orndorff headlined Wrestlemania I and wrestled with Hulk Hogan and Mr. T.  He was a major figure being one of the WWE's top stars during the "Golden Era" of 1983 to 1988 and was Hulk Hogan's primary opponent into the 1990s. Orndorff also wrestled for WCW in 1990 and from 1992 to 1995.  Inducted into the WWE Hall of Fame in 2005, Orndorff was a famous wrestling instructor, both well-known and well regarded. He alleges that he was "pressured to work injured" and that despite his loyalty to WWE, the company has "treated him like nothing."  He has three herniated discs in his back, neck injuries, requires knee surgeries, shoulder and hip replacements. After a long and fabled career with WWE, Orndorff suffers from severe cognitive difficulties, including, but not limited to, difficulty sleeping, confusion, headaches, dizziness, severe loss of

memory, and fatigue resulting from the routine head trauma sustained during his WWE career.  Orndorff also gets easily confused, is clinically depressed, paranoid, repeats himself constantly and has severe mood swings. Orndorff at the height of his career was one of the most successful performers in wrestling and was one of a fortunate few wrestlers that could afford and purchased long term disability insurance, the policy however expired at age 65.  He is now on disability and Medicare.  Orndorff suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Orndorff has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

70.    Plaintiff Salvador Guerrero IV, a.k.a. Chavo Guerrero, JR ("Guerrero Jr.") is 45 years old and resides in Rancho Santa Margarita, California.  Guerrero Jr. is from well-known wrestling family, and wrestled as a headliner for WWF during from 2001 to 2011. He wrestled for WCW 1996 to 2001. He was a featured WWE performer including wrestling in Wrestlemania and No Disqualification matches. Guerrero Jr. was a four time WWE cruiserweight champion two-time tag team champion as well as the ECW champion. Guerrero Jr. suffered head injuries in WWE.  He describes the WWE culture as brutal, with near total disregard for his health and safety. By way of example on August 24, 2004, he was hit in the head

with a knee in a Shooting Star Splash by another wrestler. Guerrero, Jr. was knocked completely unconscious for many minutes, with Stephanie McMahon at ringside before being hospitalized with a concussion and subarachnoid hemorrhage. In 2005 he was kicked in the eye which fractured his orbital bone, yet shortly thereafter he was still required to "drop his belt" (lose to another wrestler) in the ring at the direction of the WWE. Guerrero Jr. suffers from cognitive difficulties, including, but not limited to frequent headaches, anxiety, involuntary muscle movements, insomnia, dizziness, memory loss, and fatigue. Guerrero, Jr. suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Guerrero, Jr. has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

71.    Plaintiff Chavo Guerrero, Sr., a.k.a. Chavo Classic ("Guerrero") is 67 years old and resides in Dewey Arizona. Part of a dynastic wrestling family, he wrestled for WWF during the 1970s and made a few appearances at Madison Square Garden. He was featured in 2004 as part of storyline involving his brother and son. Guerrero's brother, famed WWF star Eddie Guerrero, died of a drug related heart attack in 2005. His son is also a Plaintiff in this action. Plaintiff Guerrero suffered head injuries during his stint in WWE, hitting a ring post and

falling out of the ring.  He never heard the word "concussion." "You got your bell rung sometimes" but there was rarely treatment, inquiry or intervention by WWE staff or ringside doctors unless it was an obvious medical emergency.  Guerrero suffers from cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue.  Guerrero suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Guerrero has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

72.    Plaintiff Bryan Emmett Clark, Jr., a.k.a. Adam Bomb ("Clark") stands at 6' 7" 290 pounds, is 51 years old and resides in Mesa, Arizona.  Clark wrestled for WWE from 1993 to 1995 and again in 2001. Clark wrestled for WCW from 1990-1991 as the "Nightstalker" and returned to WCW from 1997-2001 as "Wrath." Clark wrestled 280-290 days per year with WWF.  He was given the gimmick of a man exposed to radioactive elements. Clark asserts WWE's culture was to not ask any questions because if he did he alleges he would lose his bookings and his income. Clark says it was common in WWE and wrestling to be knocked in the head and lose consciousness. On September 23, 2001, he had a bad neck injury in Pittsburg, Pennsylvania when he was choke slammed by the Mark William Calaway a.k.a. The Undertaker (a famous wrestler) and discs in his neck were injured.  Clark eventually

had these discs replaced in 2014 and had spinal surgery. Clark is scheduled for another knee replacement in 2016. Clark has peripheral neuropathy, sleep problems and involuntary movements during sleep. He suffers from headaches, progressively worsening severe memory loss such that he has difficulty driving to his local grocery store, depression, anxiety and cognitive impairment. He is currently applying for disability.  After Clark hired counsel to represent him, the WWE's VP of Talent Relations, Mark Carrano contacted Clark with an offer to pay him $10,000, ostensibly for past and future royalties for his WWE appearances. The contact by WWE with Mr. Clark occurred sometime in October, 2015. Clark did not execute the document called a Contractor Nostalgia Agreement, a type of document identified as unconscionable in this Complaint that the WWE is now actively offering to retired wrestlers. When Clark filed his claims against the WWE, the WWE alerted Counsel that Clark had in fact signed a release of his claims, but cited to a January 5, 1996 release that Mr. Clark has no recollection of signing and does not have in his possession which WWE refused to produce to Counsel, but then filed the document under seal as an exhibit to a sanctions motion.  Clark suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Clark has suffered personal

and pecuniary injuries, including conscious pain and suffering and emotional distress.

73.     Plaintiff Anthony "Tony" Norris, a.k.a. Ahmed Johnson ("Norris") is 52 years old and resides in Houston Texas. Norris wrestled for WWF from 1995 to 1998 and for WCW 1999-2000.  He was recruited to WWE by Michael Hayes, and was sent to Connecticut to Meet Vince McMahon. Norris brought his lawyer, but upon arrival Mr. McMahon stated that he "hated lawyers" and instructed Norris' lawyer to leave the office, as there was nothing to negotiate. Norris became the first African American WWF Intercontinental champion in 1996. Norris selected the name Ahmed Johnson over the WWE suggestion of the ring name "Buck," and oddly he was billed from "Pearl River Mississippi." Norris sustained numerous injuries in WWE career he was known for performing "suicide dives" which required him to go through the ropes onto the floor, sometimes landing on his head. Norris was struck with a wooden two by four injuring his arm, which required hospitalization due to infection. He injured his knee when another wrestler tackled him too low His back was struck with a steel rail by Goldust and he required back surgery from injuries sustained in WWE. On January 21, 1996. Norris was knocked out completely, after a guitar was smashed over his head by Jeff Jarrett in Madison Square Garden; leading to a hospital visit and long-term neurological injuries. Norris suffered repeated and chronic head impacts throughout his career resulting in cognitive difficulties, including, but not limited to, headaches, difficulty sleeping severe loss of memory. He is under the care of a neurologist, on numerous medications and currently on SSDI.  Norris suffered routine, repetitive blows to the

head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Norris has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

74.     Plaintiff James Harris, a.k.a. Kamala ("Harris") is 65 years old and resides in Senatobia, Mississippi. Harris has a 9th grade education. Harris wrestled for WWE in 1984, 1986-1987 where he main evented with Hulk Hogan, returned in 1992-93, went to WCW in 1995, and then made WWE appearances from 2001 to 2006.   Harris, an African-American, was portrayed the gimmick of a savage Ugandan Giant, who wore a mask, did not speak, entered to the beat of tribal drums, face paint, was barefoot, ate live chickens and had masked handlers. Harris stated, "I thought the gimmick was a stereotype, I was just trying to make me some money, I didn't care, I didn't want to hurt anything. I never got embarrassed – I was alright with it." A commentator wrote of such characters, "inaugurating a new era of racial insensitivity that relegitimized anti-black racism in seriocomically guise… Kamala the Ugandan Giant, who came in to the ring with an animal print loincloth, tribal painting on his face and chest, and sometimes, a tribal mask and spear. He was so 'wild' that he needed a handler, so he was often accompanied by a masked fellow in a pith helmet…"[19]  (This "handler" in the pith helmet was another wrestler/WWE

---

[19] Shoemaker, David, The Squared Circle: Life, Death and Professional Wrestling, 136 (NY Gotham Books 2014).

agent named Steve Lombardi who when contacted by Plaintiffs' investigators after being released from WWE in May 2016 after 33 years there, stated his belief that the WWE was a "careful company," and that he would testify for the WWE and that those involved in the cases against the company were "con men.") At 410 pounds Harris was required to fly coach class, was required to be barefoot at all times, and wrestled hundreds of nights per year for the WWE.  Harris wrestled Andre the Giant in cage matches and opponents such as Hulk Hogan.  Harris was hit with punches in the ring, hit his head on the concrete floor, smashed his head on the mat and would be "dazed" many times in correctly performed moves in WWE matches. Harris had no medical insurance after he retired and could not afford to pay doctors, which delayed treatment of his declining health. In 2011, he was finally able to obtain state assistance with the help of a social worker.  Harris was only then diagnosed with late stage diabetes with poor circulation in his legs. In December of 2011, his left foot was amputated, and then after his leg failed to heal, his left leg was amputated. In April 2012, his right foot was amputated and later his right leg was removed. Harris is currently on twice-weekly dialysis. He is on SSDI and Medicare/Medicaid and is in debt for unpaid medical bills. Having suffered countless and repeated blows to the head throughout his notable WWE career, Harris is suffering from cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue, is on medication for depression as well as generally poor health. The WWE sends him "Wellness Letters" offering drug rehab and suicide hotline as well as paying him royalties. Harris' last check paid to him in March 2016 was for $98.01 for his annual quarterly royalties for his

performances.   Harris suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Harris has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.



75.    Plaintiff Earl Hebner ("Earl Hebner") is 66 and resides in King William, Virginia.  Identical twin brother to Plaintiff Dave Hebner, Earl Hebner is considered the most famous referee in WWE history and was the Senior WWE Referee from 1988 to 2005, officiating most WWF events during those years. During his 17-year career he officiated more high profile matches than nearly every referee in WWE history.  Earl Hebner sustained major and numerous injuries in his role as referee which was part of many famous storylines. One fan writer observes: "I have many pleasant memories of Earl the official; mostly stemming from his incredible

bumping ability. A referee who can take an awesome bump is an underrated commodity. … Earl would take such a severe bump that it was believable that he'd be lying around injured for minutes afterwards. He'd draw gasps from the crowd."[20] For example on February 5, 1988 Earl Hebner was picked up over Hulk Hogan's head and thrown or "gorilla press slammed" over the ropes into the aisle knocking over several wrestlers. As a result of the numerous and repeated head trauma Earl Hebner sustained while employed by WWE, he now suffers from neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. Earl Hebner suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Earl Hebner has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

76.    Plaintiff Dave Hebner ("Dave Hebner") is 66 years old and resides with his wife in Mechanicsville, Virginia. Dave Hebner was a WWF employee without a Booking Contract for 27 years (from on or about 1986-2015) and was a referee with his identical twin brother, Earl Hebner. As a referee in WWE Dave Hebner was part of the performance and took bumps, falls and performed in matches often being subjected to maneuvers of the highly trained wrestlers. Dave Hebner suffered

---

[20] Dixon, James, et al., "The Complete WWF Video Guide, Volume I", 202 (2012).

numerous blows to the head throughout his career and has experienced cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue.  Dave Hebner was diagnosed with dementia in the past two years and has recently been diagnosed with Parkinson's disease.  Dave Hebner suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Dave Hebner has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

77.    Plaintiff Chris Pallies, a.k.a. King Kong Bundy ("Pallies") is 60 years old and at 6'4" and 450 pounds is a famous heavy weight wrestler who resides in Glassboro, New Jersey. Pallies was recruited into the WWE and asked Vince McMahon what the booking contract covered. Vince McMahon replied; "that the contract includes everything up to and including your first born." It was not subject to negotiation. Pallies says he was referred to as a "WWF product" by WWE staff. He characterized the schedule as "brutal," working hundreds of nights per year and sometimes seven nights a week, with "double shots" on weekends - two shows on Saturday and two shows on Sunday. He was fined for missing a show and threatened with fines for wearing shorts on a plane to the shows. Pallies was the headliner for Wrestlemania II's steel cage match with Hulk Hogan and faced the

Undertaker in Wrestlemania XI. Pallies wrestled for WWF briefly in 1981 then from 1985 to 1988 and from 1994 to 1995.  Pallies states "you wrestled injured" or you didn't earn money. He sustained head trauma from various moves and chair shots and was prevented by WWE from receiving adequate time to recover which resulted in neurological injuries culminating in cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and burning pain all over his body. He is now on Medicare and has been on SSDI for the past eight years. Pallies suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Pallies has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

78.    Plaintiff Ken Patera ("Patera") is 72 years old and resides in Woodbury, Minnesota. Patera is a highly decorated Olympic weightlifter, winning gold at the pan-American games and winning four consecutive weightlifting championships. In the 1970s, Patera was one of the world's strongest men. He is the only American to clean and press 500 lbs. (507) and is the last American to excel at weightlifting on an international level. Patera wrestled for WWWF starting in 1977 when he wrestled Bruno Sammartino in Madison Square Garden. He returned for a year in 1980 and returned at the behest of Vince McMahon in 1984.

Patera was regularly asked to demean himself "to put over" (to make an opponent look good) lessor talents to promote WWE chosen stars or wrestlers, "they had me job all over the place" using wrestling terminology for being required to lose. Patera describes a total and complete lack of concern for wrestler health and safety, providing for example a 1987 match in Madison, Wisconsin where his injuries required 450 stitches and eventual surgery, despite no ambulance, doctor, or even ice on site at the performance. He sustained numerous injuries while wrestling for WWE, and states, "In WWF you are a piece of meat, and once you can no longer perform they show you the door." Patera suffered numerous concussions, one from being clotheslined in Fort Meyers, after which he was confused and unaware of his surroundings for three hours. Patera was on the road almost every day and had at least seven major surgeries resulting from his injuries with WWE. Patera estimates he sustained numerous concussions in WWE. He also sustained many back and neck injuries in WWE events. Patera alleges that the repeated blows to his head resulted in neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. He has been on SSDI and Medicare/Medicare for more than a decade. He receives royalty checks for his violent performances in WWE of about $264 per annual quarter. Patera suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior

45

to, during, and after his WWE career. As a proximate result of WWE's negligence, Patera has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

79.    Plaintiff Terry Michael Brunk, a.k.a. Sabu ("Brunk") is 51 and resides in Allendale, Michigan. Described by the WWE Encyclopedia as the "Homicidal, Suicidal, Genocidal, Death Defying Maniac," "Sabu is best remembered for the abundance of injuries he suffered." In his long career Brunk wrestled for the ECW 1993-1995, WCW in 1995, returned to ECW 1996-2000 and with WWE ECW brand from 2006 to 2007. The WWE wanted to exploit the extreme style of wrestling recruiting Brunk to smash through tables, and engaging in Extreme rules matches that pushed the limits of violence in wrestling, for example January 28, 2007, Brunk received a choke slam over the top rope and through a table. Brunk broke his neck in 1994 in an ECW match with Chris Benoit (the first wrestler diagnosed with CTE), he sustained numerous injuries, Brunk also sustained broken ribs, a broken jaw. Brunk is without medical insurance and requires immediate hip surgery (he is having difficulty walking) for which a gofundme page has been set up to help raise funds for his medical bills. Brunk's repeated, chronic, and countless head trauma has resulted in severe neurological injuries including cognitive difficulties, including, but not limited to headaches, mood swings, difficulty sleeping and loss of memory.  Brunk suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of

long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Brunk has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

80. Plaintiff Barry Darsow, a.k.a. Smash ("Darsow") is 56 years old and resides in Maple Grove, Minnesota. Darsow wrestled for WWF from 1987 to 1993 and WCW in 1994-1995 and 1997-1999 In WWE Darsow wrestled as part of a tag team called Demolition with Plaintiff Bill Eadie. They had an extensive "run" with the WWE winning the "belts" at Wrestlemania IV and remained the WWE Tag Team Champions for a record 478 days. Demolition also had the longest cumulative run of Tag Team Champions in WWE of 678 days. The schedule was rigorous, with Darsow working hundreds of nights per year for the WWE. Darsow suffered extensive injuries throughout his career, was knocked out numerous times including being hit over the head with a chair that knocked out seven teeth. Darsow has severe neurological injuries from the repeated, chronic, and routine head trauma resulting in cognitive difficulties, including, but not limited to, constant headaches, difficulty sleeping, severe loss of memory. Darsow suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE

career.  As a proximate result of WWE's negligence, Darsow has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

81.    Plaintiff Bill Eadie, a.k.a. Ax ("Eadie") is 68 years old and resides in Roswell, Georgia.  Eadie wrestled for WWF from 1983-1984 as the masked Superstar and 1986-1990 as Super Machine and Demolition's Ax. Eadie was a Three Time World Tag Team Champion with Plaintiff Barry Darsow in a team called Demolition. Eadie wrestled more than 200 nights per year and explained that: "there was no concern for [his] well-being;" that at WWE, he was "not allowed to get hurt;" and that he was considered "a piece of meat." There were few doctors who provided ringside treatment nor any medical follow-up for head injuries. Eadie suffered extensive injuries throughout his career, was knocked out numerous times, and has severe neurological injuries from the repeated, chronic, and routine head trauma resulting in cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue.  Eadie suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Eadie has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

82.     Plaintiff John Nord, a.k.a. The Berserker, a.k.a. The Viking ("Nord") is 56 years old and resides in Crystal, Minnesota.  Nord wrestled for WWF from 1991 to 1993 and WCW 1997-1998. Nord estimates he wrestled in over 500 matches with WWE. Nord Broke his shoulder against the Undertaker, and broke his neck in a match with the Ultimate Warrior. Nord explains that if you "could not wrestle they would not pay you or pay you $100." Nord has had 12 operations he attributes to his wrestling career, and states he has "more metal in my neck than you can believe." Nord says he had four documented concussions. Medical treatment largely consisted of ice or "pain pills to keep going so you don't get fired." Nord has been on disability for six years, having had seven neck fusions.  Nord suffered major head injuries during his career resulting from sustained and repeated head trauma.   Nord endures neurological injury manifesting as severe cognitive difficulties, including, but not limited to confusion, headaches, dizziness, loss of memory, and fatigue. After Nord hired counsel to represent him, the WWE's VP of Talent Relations, Mark Carrano contacted Nord with an offer to pay him $10,000 ostensibly for past and future royalties for his WWE appearances. The contact by WWE with Mr. Nord occurred sometime in December 2015 or January 2016. Mr. Carrano then induced Nord to execute a document called a Contractor Nostalgia Agreement on January 15, 2016, a type of document identified as unconscionable in this complaint that the WWE is now actively offering to retired wrestlers. When Nord filed his claims against the WWE, the WWE alerted counsel that Nord had signed a release of his claims, WWE refused to produce the document to counsel, then filed the document under seal as an exhibit to a sanctions motion.  Nord

suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Nord has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

83.     Plaintiff Jonathan Hugger, a.k.a. Johnny the Bull, a.k.a. Johnny Stamboli ("Hugger") is 38 years old and resides in Phoenix, Arizona. Wrestling for WCW 1999-2001 and transferred immediately to WWE from 2001 to 2004 when WCW-WWE merged. Hugger states that the WWE exercised near total control over him while at WWE and that he was fined for lateness and wearing clothing that did not conform to dress code. For example, he was fined $500 for wearing a baseball cap on a bus at 3:00 a.m. because the dress code was "business casual." Hugger states he was fined $500 for wearing certain casual clothing on an airplane arriving at a hotel at 7:00 a.m. on a redeye flight from Los Angeles to Toronto. Hugger states; "You kept your mouth shut about injuries, compensation or anything else or you would get heat from the office" and the WWE would "hurt your character" meaning you would be told to lose. Hugger was knocked out numerous times in WWE events, including by being slammed onto concrete. Noting that every bump was like being in a car accident to his body, he endured grueling hours, pain pills, and he believes several concussions.  Hugger engaged in hardcore matches for

WWE where he was clotheslined, struck with steel chairs, and knocked unconscious. Notably, he was knocked unconscious in developmental by Accie Julius Connor a.k.a. D Lo Brown in 2001. On July 15, 2002, he hit the back of his skull on concrete in East Rutherford, New Jersey when John Bradshaw Layfield stormed into the locker room to get his title belt. At the time he did not know it was a concussion, but merely shrugged it off as another injury where there was no protocol or treatment of any kind. Hugger alleges he sustained routine, continuous, and chronic head trauma even from correctly performed moves in WWE matches that have resulting in neurological injuries manifesting as cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. Hugger suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Hugger has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

84.     Plaintiff James Brunzell, a.k.a. Jumpin' Jim ("Brunzell") is 66 years old and resides in St. Paul, Minnesota. Wrestling for WWE from 1985 to 1993, Brunzell would wrestle 300 nights per year often as many as 25-26 days each month. He even once wrestled 43 days in a row. Brunzell suffered countless head injuries and was not permitted the necessary and adequate time to heal, resulting in

compounded and worsening neurological injuries. Brunzell stated he was approached by Rene Goulet after he started wrestling for WWE in 1985 and was told he needed to sign the agreement he was proffered or "else he would be fired." No negotiation was permitted. Brunzell likened the working conditions at WWE to being an "indentured slave." He states that any discussions of being overworked would be met by a "pink slip," and that any protests were muted by the economic realities: "if you didn't wrestle through injuries you would not be paid." Brunzell believes he sustained several major concussions in his WWE career and numerous times in WWE had his "bell rung." He recalls being in Salt Lake City Utah in 1988 when he was hit by another wrestler who weighed 315 lbs. who threw a high kick that connected with his jaw. Brunzell states: "My horizontal speed came to a halt and I slammed the mat with the back of my head I saw a flash of light and stars. I was dizzy, nauseous, and unstable on my feet for three days." He finally saw a WWE affiliated doctor in Los Angeles who stated he had a "3rd degree concussion." WWE agent Chief Jay Strongbow agreed that his very next match with Hercules should be "light" and instructed his opponent to avoid slamming or hitting Brunzell's head. He continued to perform and didn't miss a day. Brunzell has had a shoulder replacement, knee replacement, and a partial hip replacement along with back and neck problems. He works for a janitorial supply company and has insurance though that job, though Brunzell attributes most of his injuries to his wrestling career. As a result of the numerous and repeated head injuries during his WWE career, Brunzell has cognitive difficulties, including, but not limited to, short term memory loss, anxiety for which he takes medication and difficulty sleeping.

Brunzell suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Brunzell has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

85.    Plaintiff Susan Green, a.k.a. Sue Green ("Green") is 62 years old and resides in West Columbia, South Carolina.  Green wrestled with WWWF from 1972 to 1979 without a Booking Contract and pioneered WWE's women's wrestling in the 1970s.  She was the second female wrestler ever to perform in Madison Square Garden and took the title from Mary Lillian Ellison a.k.a. Fabulous Moolah in 1976. Green wrestled with WWF until 1984. Green states that as a female wrestler that her along with others were tightly controlled by Ellison who handled and controlled the booking for virtually all the woman wrestlers for the WWF during the period she wrestled. In her wrestling career including in the WWF Green suffered numerous injuries to her head, neck, and spine, and currently has nerve damage in her lower back that affects both legs. As a result of the repeated and chronic head trauma Green suffered during her career, she currently endures cognitive difficulties, including, but not limited to headaches, memory loss, depression, anxiety, difficulty sleeping for which she is prescribed medication (Paxil, Xanax and Ambien). She is currently disabled on Medicaid and receives SSDI.  Green suffered

routine, repetitive blows to the head during her WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure her health and safety and inform her of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after her WWE career. As a proximate result of WWE's negligence, Green has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

86.     Plaintiff Angelo Mosca, a.k.a. King Kong Mosca ("Mosca") is 78 years old and resides in St. Catherines, Ontario. Mosca was fabled football player for 14 years before his wrestling career (1959-1972) and was a five-time Grey Cup Champion and is in the Canadian Football Hall of Fame. Building on his notoriety in Football, Mosca began working in WWE as early as 1970. Mosca states he wrestled for WWF without a Booking Contract into the 1980s and is known for being the WWE's most hated "bad guy" in 1981 when battling for the world championship and is featured in the WWE Encyclopedia. Mosca was diagnosed with Alzheimer's disease in 2015 after suffering repeated blows to his head throughout his long career. Mosca believes that his wrestling career including his WWE matches significantly contributed to his long-term head injuries. Mosca suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain

trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Mosca has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

87.    Plaintiff James Manley, a.k.a. Jim Powers ("Manley") is 57 years old and resides in Merritt Island, Florida. Manley wrestled for WWF from 1984 to 1994, some matches in the ECW 1994-1995 and WCW 1996-1998. Manley was a member of the popular tag team the Young Stallions. Manley sustained numerous head injuries while in WWE including being knocked unconscious in a WWE Match in Italy with the Tag Team Demolition (Bill Eadie and Barry Darsow who are also named Plaintiffs in this action), additionally Manley states he has had his "bell rung" numerous times at WWE events. Manley suffers from cognitive difficulties, including, but not limited to, headaches, loss of balance, dizziness (bumps into walls and sometimes falls down) and he has difficulty even going down stairs in his home, severe memory loss, (constantly forgets who people are) and has trouble sleeping, he has mood swings and anxiety. Manley is prescribed medications for his conditions. He has had three hip surgeries, rotator cuff surgeries and is currently on Medicaid and has been disabled on SSDI for approximately ten years. Manley suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and

after his WWE career.  As a proximate result of WWE's negligence, Manley has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

88.     Plaintiff Mike Enos, a.k.a. Blake Beverly of Tag Team Beverly Brothers ("Enos") is 62 years old and resides in Tampa, Florida. Enos wrestled for WCW in 1990, 1996-1999 and in the WWF from 1991 to 1993. Enos performed as Blake Beverly who teamed with his "brother" Bau Beverly. Enos states he was injured numerous times in WWF events, including when the top rope broke, knocking Enos unconscious. Enos was not taken to the hospital, but "walked off" the injury. He suffers from ruptured discs in his back. As a result of the repeated and chronic head trauma during WWF matches, Enos suffers from neurological injuries including cognitive difficulties, including, but not limited to, depression for which is his prescribed medication, headaches, dizziness, loss of memory, depression, and fatigue. Enos suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Enos has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

89.     Plaintiff Butch Reed, a.k.a. The Natural ("Reed") is 61 years old and resides in Kansas City, Missouri. Reed wrestled for WWE from 1986 to 1988 and

appeared in Wrestlemania III and Wrestlemania IV. Reed also wrestled for the WCW 1989-1992 as "Doom." An African American wrestler, he was given the gimmick by WWF to dye his hair blonde, and so be known as "naturally blonde." He didn't want to do it but "rolled with it." He says Vince McMahon liked to force wrestlers to change to gimmicks that McMahon created. Reed alleges this was so that the WWE could control ownership of the gimmick, and ring name he and other wrestlers were assigned and used by the WWE. Reed wrestled close to 300 nights per year, twice on weekends and often wrestled seven days a week. Reed states there were few WWE doctors or medical examinations or safety rules generally. Reed was hurt when "a chair hit me across the head and fell out of the ring and I couldn't get up for awhile." He says such incidents were relatively commonplace, "seeing stars" or getting hit with a thrown punch that landed called a "potato," sometimes "kicked so hard you were paralyzed for a few seconds." The preferred WWE medical treatment was "Take yourself up, spit on it, put a band aid on it." "If you could put your boots on you needed to be in the ring, otherwise there was no payday." Reed believes he suffered numerous, repeated and chronic head injuries, resulting in long-term neurological injuries and cognitive difficulties from his WWE matches, including, but not limited to, headaches, dizziness, loss of memory, problems falling asleep and fatigue. He is on SSDI and Medicaid and receives royalty checks from the WWE. His last check was for $69. Reed suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life

neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Reed has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

90.     Plaintiff Carlene Denise Moore-Begnaud, a.k.a. Jazz ("Moore-Begnaud") is 42 years old and resides in Lafayette, Louisiana. She wrestled for ECW 1999-2000, for WWE from 2001 to 2004, and several matches 2006-2007 as part of the WWE's revived ECW brand. Moore-Begnaud was one of the most successful and skilled female wrestlers of her era. She was a two time WWE Woman's Champion. Moore-Begnaud wrestled as the company's top female heel and participated in Wrestlemania X8 and XIX. Her character was that of a tough female whose WWE tag line was "the bitch is black and the bitch is back." She was injured while wrestling in WWE events, including being kicked in the temple where she was completely knocked out. She went through a table on Monday Night Raw. Moore-Begnaud injured her knee so badly it required surgery and she was forced to drop her title during her recovery. She suffers from long-term neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, and loss of memory. Moore-Begnaud suffered routine, repetitive blows to the head during her WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure her health and safety and inform her of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after her WWE career.  As a proximate result of

WWE's negligence, Moore-Begnaud has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

91.     Plaintiff Sylvain Greiner ("Greiner") is 38 years old and resides in Terrebonne, Quebec. He wrestled for WWE from 2003 to 2007 along with his tag team partner Rene Gougen and Rob Conway to form the tag team La Resistance. He wrestled approximately 200 nights per year while at WWE and is a four time WWE World Tag Team Champion. Many of his matches required that he be thrown on a table that broke under him, he performed this finish night after night. In some cases he would land on his head and neck. At some point he broke his neck while wrestling in WWE and continued to perform nightly. The rule was "you don't get hurt" and medical attention was not sought or administered unless absolutely essential. Seeing doctors was in fact discouraged and the WWE had very little supporting medical staff if any at the matches. Grenier states his broken neck was not diagnosed until he secretly asked a state athletic commission doctor in Madison Square Garden, New York who examined him for five minutes, who told Grenier that it appeared to be broken based on the bulge he felt. Grenier later had an MRI that confirmed it was broken in two places. He was knocked out many times and sometimes would forget his "spot" due to disorientation after a blow to the head and would be criticized for his performances- his explanation of his head injuries was unpersuasive to WWE staff. Grenier likens his career at the WWE to an "animal circus" in which the wrestlers where not treated humanely. He suffers from long-term neurological injuries and cognitive difficulties, including, but not limited to, severe migraines, loss of sensation in his right arm, hearing loss, neck

pain, dizziness, and loss of memory. Grenier suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Grenier has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

92.    Plaintiff Omar Mijares, a.k.a. Omar Atlas ("Mijares") is 78 years old and resides in San Antonio, Texas. Mijares, a Latin American wrestler with a 6th grade education, was a well-known wrestler throughout most of his career. Mijares began working with WWE on and off starting in 1970s. Mijares says "he trusted the WWE people," but found little health or safety rules in place during his time in the ring. As the WWE expanded he started working for WWE more regularly 1984 with his fast acrobatic style. Although Mijares was well known, he was eventually transformed by the WWE into a "jobber to the stars" and by 1993 he was directed for $200 a night to "put the WWE stars over," meaning he was asked to repeatedly lose in order to make the WWE headliners look better. At the time Mijares says he needed to work, but says his last years in WWE stained his lifetime of work, after a life dedicated to wrestling he was forced to lose and perform beneath his skill level. Mijares received numerous injuries in WWE matches in his long career and he was routinely punched, kicked and sustained head injuries often in routine correctly performed moves. His wrestling career both in and out of the WWE left him with

two knee replacements, a left hip replacement, and nerve damage to his elbow that required surgery. After wrestling he worked for the San Antonio probation department and is now on Medicare and his own insurance. Mijares receives Wellness Letters from the WWE, but no royalties. He suffers from long-term neurological injuries and cognitive difficulties, including, but not limited to depression, trouble sleeping, headaches, severe hearing loss, mood swings, confusion, extreme and loss of memory. Mijares suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Mijares has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

93.    Plaintiff Don Leo Heaton, a.k.a. Don Leo Jonathan ("Heaton") 6'6" and 300 pounds is 84 years old and resides in Langley British Columbia. A storied wrestler with a legendary career he wrestled for WWWF in the 1970s as a top star with many Madison Square Garden appearances. Heaton is featured in the WWE encyclopedia[21] as being "The Mormon Giant" who competed with Andre the Giant. He wrestled Pedro Morales for the WWWF World Championship in 1973. Heaton is listed as one of the greatest 100 wrestlers of all time in a popular reference. Heaton is disabled, cannot walk, and is on Medpay by the Canadian Government. He

---

[21] "WWE Encyclopedia: The Definitive Guide to the WWE", "Brian Shields" and "Kevin Sutherland", 100 (DK Publishing, London, 2012).

suffers from long-term neurological injuries and cognitive difficulties, including, but not limited to headaches, dizziness, and loss of memory.  Heaton suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Heaton has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

94.     Plaintiff Troy Martin, a.k.a. Shane Douglas ("Martin") is 51 years old and resides in New Brighton, Pennsylvania. He wrestled variously for WCW, ECW and WWE from 1989-2001. Martin became a headliner and champion for ECW as "The Franchise," ECW was later merged with the WWE. Because of his success in ECW the WWE hired him in 1995 and recast him as a college dean called "Dean Douglas." The recast of his gimmick was significant as it altered his image as a serious wrestler. As one wrestling writer explains: "It was little surprise to most that Martin became the latest talented performer to be saddled with a no-hype gimmick that seemed almost designed to mock the performer…. Just a year earlier he was considered one of the cutting edge talents in the business, but the Shane Douglas character had been swallowed up by the WWF machine and remolded to their liking."[22]   Martin has suffered routine, repeated, and chronic head trauma

---

[22] Dixon, James, "Titan Sinking: The Decline of the WWF in 1995", 126 (Dixon/History of Wrestling Publishing 2014).

resulting in long-term neurological injuries and cognitive difficulties from the WWE, including, but not limited to, headaches, dizziness, loss of memory, and fatigue.   Martin suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.   As a proximate result of WWE's negligence, Martin has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

95.    Plaintiff Marc Copani, a.k.a. Muhammad Hassan ("Copani") is 34 years old and resides in Liverpool, New York. He wrestled for WWE's developmental territory 2002-2004 and WWE from 2004 to 2005, wrestling at least four days a week for most of that time. Copani, an Italian, became one of the most hated "heels" in the WWE being cast as an Arab-American Muslim who had hooded henchman attend to him. His career ended with the July, 2005 London Terrorist bombings when it became politically unpopular for the WWE to continue this gimmick. He was told he would be "taking time off" before he was finally released. He sustained numerous injuries while at WWE, including hitting the back of his neck when he went through the stage as part of a storyline. Copani was knocked in the head with closed fist punches and was knocked out at least twice with little to no intervention by the WWE medical staff in attendance. Copani states that you "wrestled through injuries" at WWE otherwise you would "lose your spot" and be "subjected to

63

ridicule." Copani has suffered routine, repeated, and chronic head trauma resulting in long-term neurological injuries and cognitive difficulties from his tenure at WWE, including, but not limited to, depression, headaches, dizziness, loss of memory, and fatigue.  Copani suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Copani has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

96.    Plaintiff Mark Canterbury, a.k.a. Henry Godwin ("Canterbury") is 51 years old and resides in Lindside, West Virginia. He wrestled for WCW 1992-1994 and WWE from 1994-1999, and a brief attempt at a return to WWE developmental in 2006-2007. Canterbury was given the gimmick of Arkansan pig farmer who carried a bucket of slop that he would throw at his opponents including in an "Arkansas Hog Pen Match." The cartoonish nature of this did not diminish the dangers faced in WWE. In fact, Canterbury fractured his neck in 1998 on Monday Night Raw after he was instructed by WWE staff against his objections to perform a dangerous flip called a Doomsday Device which resulted in a mouthful of broken teeth and a fractured C7 vertebrae.  He made a brief return after his surgery. He alleges he sustained at least three major concussions in WWE. Canterbury has suffered routine, repeated, and chronic head trauma resulting in long-term neurological

injuries and cognitive difficulties from the WWE, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. He is currently on SSDI from his broken neck, back issues and inability to work. After retaining counsel to investigate his claims, Canterbury responded to a letter mailed to him by the WWE offering drug and alcohol Rehabilitation services. Canterbury was addicted to pain medication in whole or in part from his many wrestling injuries including neurological injuries. Upon admission to the Drug Rehabilitation Facility on June 15, 2016 in Tampa Florida, he was asked to sign a WWE drafted document signed by Mark Carrano, Vice President of Talent Relations. Canterbury signed this document without counsel and states he believed it was paperwork for the facility. The unconscionable terms of this document can leave no doubt of its purpose. The document disavows any duty to Canterbury, seeks to make Canterbury's entry into Rehab contingent on him not being able to cite the WWE's rehab payment in any legal proceedings, and seeks to release the WWE from any personal injury claims. When Canterbury filed his claims against the WWE, the WWE alerted counsel that Canterbury had signed a release of his claims, WWE refused to produce the document to counsel, then filed the document under seal as an exhibit to a sanctions motion. In sum, Mr. Canterbury was duped. Canterbury suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE

career. As a proximate result of WWE's negligence, Canterbury has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

97.     Plaintiff Victoria Vickie Otis, a.k.a. Princess Victoria ("Otis") is 53 years old and resides in Pasco, Washington. She has an eighth grade education and began wrestling at age 18. There was a "code of silence" in wrestling "you keep your mouth shut be it injuries or what income you earned." Otis wrestled for WWE in 1982 and 1984. She was knocked out several times and would throw up after the incidents. She was seriously injured in the WWE ring, including when she landed on the top of her head in September, 1984 in Philadelphia, where she felt an "ungodly pain and tingling from head to her toes" after the match. She went to the hospital and it was discovered she had cracked two vertebrae in her neck.  She was advised to have surgery but could not afford it. She was told by the WWE booking agent to "take a break" and "see how things went." She never returned. She suffers from neck injuries, reduced range of motion, long-term neurological injuries and cognitive difficulties, including, but not limited to headaches, memory loss, insomnia and trouble sleeping. She is applying for disability, has no insurance and receives no royalties from WWE.  Otis suffered routine, repetitive blows to the head during her WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure her health and safety and inform her of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after her WWE career.  As a proximate

result of WWE's negligence, Otis has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

98.     Plaintiff Judy Hardee, a.k.a. Judy Martin ("Hardee") is 60 years old and resides in Gaston, South Carolina. Hardee wrestled for WWE from 1978-1989 and was one of the most successful female wrestlers of her era. Like other wrestlers at the time, her career at WWE was tightly controlled by Fabulous Moolah (Mary Lillian Ellison). Hardee was paid in cash and paid her own taxes during her tenure at WWE. Hardee states: "If you were hurt you had go in the ring, the show must go on." In a WWE show in Hartford, Connecticut she was hit in the head with a metal chair by Moolah. Hardee was bleeding and was told by Moolah "you'll be alright," however Pat Patterson a WWE agent who had recruited her into WWE insisted she go to the local emergency room where she received 13 stitches. Hardee was often injured while wrestling, including taking bumps and falls on hard rings, hitting turnbuckles to which she attributes her back injuries which required surgery in 1998. Hardee suffers from long-term neurological injuries and cognitive difficulties, including, but not limited to, headaches, loss of memory and difficulty sleeping. Hardee has her own insurance from her job working in a hospital, and attributes most of her injuries to her wrestling career. Hardee was paid a WWE royalty check of $40 in the past few years and receives letters from WWE offering drug and alcohol treatment. Hardee suffered routine, repetitive blows to the head during her WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure her health and safety and inform her of the risks of long-term, later-in-life neurodegenerative impairments

from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after her WWE career. As a proximate result of WWE's negligence, Hardee has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

99.    Plaintiff Mark Jindrak ("Jindrak") is 38 years old and a resident of Rochester, New York (currently living in Mexico City). He wrestled for WCW 1999-2001 and WWE from 2001 to 2005. At one point he was cast with a narcissistic gimmick that depicted himself as obsessed with his own physique and was told to call himself "The Reflection of Perfection."  He sustained numerous head injuries in the WWE. For example, in 2004 he was involved in a botched move with Scot Renald Garland a.k.a. Scotty 2 Hotty, which resulted in a concussion, after which there was no head check or medical evaluation of any kind. In 2004, he was kicked in the head where he sustained head trauma with little to no intervention or evaluation by WWE staff. Jindrak states "After the match the guys were joking about 'having your bell rung like that' including jokes from WWE officials." Jindrak states that "at WWE there was no test, no evaluation, no doctor, not smelling salts, there was no follow-up on concussions or anything else." A few weeks before he was released from WWE his head was slammed into an unpadded barrier made of metal- "it was a hard blow and I was bleeding pretty good." After the match a WWE trainer closed the wound with glue but never checked for a concussion or had a doctor or medical evaluation. He explains: "I was not vocal in follows ups because it was not the WWE mentality, if you got injured you were a 'pussy' if you requested any help you would lose work dates in the WWE." Jindrak alleges he has suffered

routine, repeated, and chronic head trauma resulting in long-term neurological injuries and cognitive difficulties from the WWE, including, but not limited to, difficulty sleeping, headaches, dizziness, loss of memory, and fatigue. Jindrak suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Jindrak has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

100.   Plaintiff Bernard Knighton (father of deceased), Estate of Brian Knighton, a.k.a. Axl Rotten ("Knighton") represents a 44-year-old retired wrestler who resided in Berlin, Maryland. Knighton wrestled for WCW, ECW and WWE. Knighton wrestled for WWE in 2005 including in a WWE Pay Per View Event. In 2001 the WWE acquired other wrestling organizations called Extreme Championship Wrestling ("ECW") and World Championship Wrestling "WCW." The ECW promoted an extreme style of wrestling, which featured "hardcore" matches known for a bloody, brawling style. As explained in the Successor Liability count the WWE is responsible for Mr. Knighton's injuries in ECW as well as WCW and WWE in that there was continuity of management, personnel, assets and general business between the companies. The WWE continues to market ECW and WCW videos and products to this day. Hardcore wrestling involves more lax rules (or no rules) and

often features unusual environments such as ladders, tables and chairs as well as the use of objects to strike the participants. Knighton was a mainstay in the ECW promotion, and wrestled as a Tag Team partner with deceased plaintiff Jon Rechner. Both Rechner and Knighton died in 2016 at the age of 44. Shortly before his death Knighton been in assisted living and confined to a wheelchair while recovering from back surgery. Knighton participated in the WWE Former Talent Rehab Program. He was sent by WWE to the Hanley Recovery Center in West Palm Beach, Florida on November 9, 2009. He was admitted to the program for drug and alcohol abuse issues which he completed on December 7, 2009. After completing the rehab program Knighton attended a WWE funded out-patient program and was called by WWE staff, Ann Russo Gordon on a weekly basis for at least most of 2010 to monitor his progress. Ann Russo Gordon was the Manager of the WWE Talent Relations Department.  After struggling with these issues upon information and belief was told by WWE staff that administers the drug and alcohol program that he could not return to the program again because of his limited WWE career. Knighton was thus shut out of future WWE rehab by the unilaterally administered WWE drug and alcohol program.  In a letter to his father and step-mother in 2011, Knighton wrote: "I'm going to start seeing a therapist to help me because I have been diagnosed with depression & anxiety. I need help and I want help both medically and for my mental issues. You may think I'm weak but I'm pretty damn strong for all I've been through." After retaining counsel to investigate his claims, Knighton died of a drug overdose on February 4, 2016 in a McDonald's Restaurant in Maryland. Knighton suffered numerous and repeated head injuries during his

WWE, WCW and ECW career and suffered from neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory. A neuropathology study of Mr. Knighton's brain conducted by Dr. Julia K. Kofler and Dr. Bennet Omalu revealed evidence of early stages CTE. The report reads in part: "given the history of prolonged exposure to repetitive blunt force impacts of the head during the decedent's wrestling career, the neuropathologic findings are most suggestive of early incipient Chronic Traumatic Encephalopathy (CTE)." The Findings located "RARE NEUROFIBRILLARY TANGLES" of Tau protein in four sections of Knighton's brain.  Knighton suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Knighton suffered personal and pecuniary injuries, and ultimately death.

101. Plaintiff Gayle Schechter (the deceased's fiancé) as personal representative of the Estate of Jon Rechner a.k.a Balls Mahoney ("Rechner") and their minor son represents a 44 year old wrestler who resided in Spring Lake Heights, New Jersey. Rechner wrestled for ECW and was a key figure in the ECW revival after the organization merged with the WWE.  Rechner first appeared in the WWE as enhancement talent in the 1990s, including in a TV match in 1995 where he appeared as an Evil Santa Claus (Xanta Klaus)- that is as a wrestler who loses

to opponents to make them look good. For much of his career Rechner looked like a large guy one might find at a heavy metal concert, wearing a band t-shirt and ripped jeans. While he could demonstrate classical pro wrestling skill, it was the hardcore style that Mahoney excelled at and Rechner became one of the most popular wrestlers in the original ECW promotion known for its hardcore style. In 1997, he teamed with Axl Rotten (fellow deceased plaintiff Brian Knighton who also died within months of Rechner also at age 44) and were best known for slugging it out with opponents with steel chairs- branded the "Hardcore Chair Swingin' Freaks." Whenever he hit an opponent, fans would chant "Balls." He held the ECW World tag team title three times in 1998-99. He appeared in about 18 ECW pay per view events. When the WWE acquired the ECW brand Rechner would become one its biggest stars in its ECW branded shows, and of the many ECW original stars the WWE hired for the brand re-launch, Rechner lasted among the longest wrestling for the WWE/ECW from 2005 until 2008. Rechner experienced headaches and memory loss, and declining physical and mental health with limited health care until shortly before he passed away on April 12, 2016 at age 44. A neuropathology study of Mr. Knighton's brain conducted by Dr. Julia K. Kofler and Dr. Bennet Omalu revealed evidence of CTE. The report reads in part "the diagnosis of CTE is consistent with his long career as a professional wrestler." Rechner suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain

trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Rechner suffered personal and pecuniary injuries, and ultimately death, which also resulted in the conscious pain and suffering and emotional distress of his family members.

102.   Plaintiff Marty Jannetty ("Jannetty") is 55 years old and resides in Columbus, Georgia.  He wrestled for the WWF from 1987 and 1996 and continued to wrestle part-time for WWF for about twenty years. His most popular act was the Rockers with Shawn Michaels. Jannetty made a brief comeback to WWE in 2005-2007 and an appearance on Raw in 2009. He wrestled more than 300 shows per year for WWF and twice on weekends. He suffered numerous high-profile injuries during his performances. He asserts WWE sometimes had doctors who mostly distributed drugs. "Generally we had to take care of ourselves, I would help other guys pop shoulders back into place." Jannetty described WWE as a place where "You lick your own wounds." That the medical treatment provided was mostly 'tape and go.' According to Jannetty the WWE trainers, agents and writers were well aware of each wrestler's injuries and wrestlers often conferred amongst themselves and WWE staff about the injuries so they "could work around them." This "working around" was the preferred and commonplace method of dealing with injuries rather than seeking medical treatment. Jannetty says he was never treated for concussions or head injuries, and that it was commonplace to experience a momentary loss of consciousness in the ring from a move. Closed fist punches occur regularly, many guys threw them "stiff" because they were unskilled and could not properly pull them. Jannetty alleges he was knocked out by Kevin Nash

73

in February 1994, when the WWF referee - Joe Maranalla - woke him up and told him he had been knocked out. There was no medical intervention by WWE doctors or staff. Jannetty was forced off his own accord to leave the tour because he was so dizzy he could not walk very well.  As a direct result of leaving the wrestling tour due to the undiagnosed signs and symptoms of severe head trauma, Jannetty lost his job and suffered economic harm. He was later rehired. Jannetty was treated in WWE sponsored alcohol rehab in October of 2014 and was told that he was self-medicating because of all of his serious injuries. Jannetty cannot walk very well because of injuries to his ankles. In March 2015, he spoke to Anne Russo Gordon who he identifies as a WWE employee in the Wellness department and asked about getting help for medical treatment. He asserts he was told by WWE, "if we did it for you we would have to do it for everybody." Jannetty suffers obvious impairments from being knocked unconscious numerous times. Jannetty has black outs throughout the day where he suffers confusion and is unaware of his surroundings.  Jannetty has suffered routine, repeated, and chronic head trauma resulting in long-term neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. He has no health insurance and is attempting to acquire disability coverage. Jannetty suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE

career. As a proximate result of WWE's negligence, Jannetty has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

103.    Plaintiff Jon Heidenreich ("Heidenreich") 6'7" 300 pounds, is 44 years old and resides in Picayune, Mississippi. Heidenreich wrestled for WWE from 2001-2002 in developmental, and 2003 to 2006 as a Tag Team Champion and wrestled in Pay-Per-Views and main events with wrestlers such as the Undertaker. Heidenreich has been injured countless times and knocked out frequently in WWE events.  He was treated by Dr. Rios, a WWE employee who was one of the few doctors he has seen in his life. He characterizes the travel schedule as "insane, wrestling hundreds of night per year", "you work nonstop so there is no time to heal." Heidenreich bears the marks of his career and has a large permanent knot/cyst the size of baseball on his forehead.  Heidenreich sustained numerous repeated and chronic head trauma resulting in severe neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, severe depression, loss of ability to work, and fatigue. Heidenreich has been suicidal and has received treatment for his condition. Heidenreich also has congestive heart failure. Heidenreich says that he cannot work and will stay in bed sometimes four to five days at a time, and has seen psychiatrists for severe depression. He has no health insurance and is currently applying for disability. He received his last royalty check from the WWE in 2015 for $130. Heidenreich suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take

all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Heidenreich has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

104.    Plaintiff Terry Scott Szopinski, a.k.a. The Warlord ("Szopinski") is 53 years old and resides in Pompano Beach, Florida. Szopinski wrestled for WWE from 1988 to 1992 with The Barbarian (named Plaintiff Sione Havea Vailahi) as part of the popular Tag Team "Powers of Pain." He also performed in WCW 1995-1996. He described the WWE performance schedule as "full time and rigorous" and performed over 300 shows per year.  Szopinski was routinely injured in WWE events and had his bell rung on many occasions. Szopinski suffered numerous and repeated head injuries resulting in neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. Szopinski has no health insurance, and works as a bouncer in a nightclub. After Szopinski hired counsel to represent him, the WWE's VP of Talent Relations, Mark Carrano contacted Szopinski with an offer to pay him $10,000, ostensibly for past and future royalties for his WWE appearances. The contact by WWE with Mr. Szopinski occurred sometime in December 2015 or January 2016. Mr. Carrano then induced Szopinski to execute a document called a Contractor Nostalgia Agreement on January 8, 2016, a type of document identified as unconscionable in this complaint that the WWE is now actively offering to retired wrestlers. When

Szopinski filed his claims against the WWE, the WWE alerted Counsel that Szopinski had signed a release of his claims. The WWE refused to produce the document to counsel, then filed the document under seal as an exhibit to a sanctions motion. Szopinski suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Szopinski has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

105.    Plaintiff Sione Havea Vailahi, a.k.a. The Barbarian ("Vailahi") is 57 years old and resides in Charlotte, North Carolina.  He wrestled for WWE from 1988 to 1992 and from 1994 to 1995 as a high-profile performer with named Plaintiff Terry Scott Szopinski in a tag team called "Powers of Pain." He also wrestled in WCW 1995-2000. He wrestled as his partner more than 300 nights per year and "worked like a horse." Vailahi's finishing move was a dive that he hit his opponents with night after night, that he alleges resulted in nerve damage and occupational injuries. Vailahi has neck and back injuries and was hit in the head with steel chairs resulting in 'blackouts' while at WWE. Vailahi suffered numerous and repeated head injuries in WWE resulting in neurological injury and cognitive difficulties, including, but not limited to, headaches, dizziness with loss of consciousness, loss of memory, and fatigue. Vailahi suffered routine, repetitive blows to the head during

77

his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Vailahi has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

106.   Plaintiff Larry Oliver, a.k.a. Rip "The Crippler" Oliver ("Oliver") is 63 years old and resides in Homosassa, Florida. He wrestled for WWF from 1987 to 1988 and has had both knees replaced along with neck surgery and has suffered spinal injuries while wrestling. Oliver states he was flown by WWE to Sacramento California to wrestle the Ultimate Warrior in 1988, and that "I gave them my body to put him over and he tried to take my head off with a real clothesline." This was a famous match featuring Oliver as Super Ninja Versus the Ultimate Warrior on Saturday Night's Main Event on NBC. Oliver sustained serious neck injuries in consequence of his WWE appearances. Oliver has been deemed federally disabled since 2000 and is on Medicare/Medicaid and SSDI. Oliver has been referred to a psychiatrist for depression, memory loss, and inability to sleep. As a result of the routine, repeated, and sustained head trauma, Oliver suffers from neurological injury and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, insomnia, and fatigue. Additionally, Oliver was diagnosed with Alzheimer's disease and is prescribed Donepezil. Oliver suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and

treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Oliver has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

107.   Plaintiff Bobbi Billard ("Billard") is 40 years old and lives in Las Vegas, Nevada.   She injured her neck in WWE's women's wrestling developmental program in 2003-2004.   Billard wrestled eight hours a day and had her neck fused in 2004. Billard states that the WWE treated her injury with disdain, criticizing her as "afraid of breaking a fingernail."   As a result of the repeated and chronic head trauma she sustained while wrestling for WWE, Billard suffers from neurological injury and cognitive difficulties, including, but not limited to, headaches, dizziness, and loss of memory, depression and fatigue. Billard suffered routine, repetitive blows to the head during her WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure her health and safety and inform her of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after her WWE career. As a proximate result of WWE's negligence, Billard has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

108.   Plaintiff Ashley Massaro a.k.a Ashley ("Massaro") is 37 years old and lives in Smithtown, New York. Massaro was the winner of the WWE "Diva Search

contest" in 2005, which won her a job as a wrestler at WWE. She wrestled between 2005 and 2008 in WWE televised main events and untelevised "house" shows. Massaro was soon pushed as a WWE star performed in two Wrestlemania Events in 2007 and 2008, and even appeared on the cover of Playboy magazine in 2007 in a deal handled by WWE executive John Laurinaitis. Massaro states that from the inception of her WWE career that she was coaxed into in ring activities with inadequate training, she in fact she received no training as a professional wrestler before being directed by WWE staff to perform in ring activities. She usually performed 4 days a week and would have had little to no time to properly train even if training had been offered. Instead Massaro states she "learned as she went," often sustaining injuries in the learning process. She sustained several concussions, including being knocked unconscious for five minutes in a Match with Torrie Wilson, after the incident she was told to "shake it off," and received no care or treatment. Massaro sustained a hairline fracture in her spine and has a five-inch metal plate in her ankle from a spiral fracture that occurred on a WWE televised event. Massaro required revision surgery on the ankle in 2010 in which the bone was shaved and the metal plate was removed and replaced. She also sustained back injuries including herniated discs in C4 and C5. After Massaro sustained a shattered knuckle on her right hand that was put in a cast. Massaro states that Vince McMahon ordered that the cast sawed off her hand by backstage WWE crew so that she could perform despite fact that the cast was not scheduled to come off for several more weeks. She states the WWE requires you to "sign your life away" and that she has been battling the long-term health effects of her WWE

career since she left the company. After leaving the WWE, Massaro sought help from the WWE, which she worked out with Anne Russo Gordon (a Manager of the WWE Talent Relations Department). Gordon ran the "WWE Former Talent Rehab Program" which treated Massaro for drug addiction in September 2010. Massaro is also scheduled to have knee surgery in November 2016 for her wrestling injuries which is paid for under New York's Medicaid program. Massaro believes her problems related to the medicines that she began taking to treat her numerous worked related injuries. During her tenure at WWE she was seen and treated by WWE Dr. Rios who shot her with cortisone as well as prescribed pain medications and muscle relaxers. She describes Dr. Rios as a "good man under the thumb of the WWE" who did his best to care for wrestlers like herself despite the pressure by the WWE to have her perform with injuries. She cites the culture of the WWE as indifferent the safety and health of performers who are unaware of their rights and that the WWE did not report her injuries or accidents to OSHA or public health officials. Massaro even related an incident while she was on a WWE Middle East tour, in which she was sexually assaulted on a military base in Kuwait. Upon her return to the United States, she was seen by Dr. Rios who interviewed her about the incident. Dr. Rios reported the incident to WWE executives who soon thereafter met with Massaro to apologize for their negligence but persuaded her that it would be best not to report it to appropriate authorities. This incredible situation derives from the WWE's employment misclassification scheme wherein the WWE (deems itself) neither responsible for Massaro's safety (despite being on a WWE tour in the Middle East) nor does the WWE deem itself responsible to report or collect data

about incidents such as this. The WWE in order to protect its public image and insulate itself from paying for its injured workers prefers to remain silent. Massaro receives royalties from the WWE with a recent payment being $149.41 in June 2016, and she received a letter from Paul Levesque under the "WWE Former Talent Drug and Alcohol Rehabilitation Assistance Program." Which offers help on "24/7 basis," the letter reads: "Help will be provided to participants regardless of the reason for departure from WWE or amount of time performed fro WWE." Massaro suffers from depression for which she takes medication, migraine headaches, anxiety, and memory loss. Massaro still receives medical treatment for her work related injuries and conditions. Massaro suffered routine, repetitive blows to the head during her WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure her health and safety and inform her of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after her WWE career. As a proximate result of WWE's negligence, Massaro has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

109.    Plaintiff Perry Satullo a.k.a Perry Saturn ("Satullo") is 50 years old and resides in Albert Lea, Minnesota. A long time wrestler who appeared in a few WWF events as early as 1992, then at the ECW from 1995-1997 and the WCW 1997-2000, and the WWE 2000-2002. Satullo was a three time ECW champion and held titles in WCW including the WCW world tag team title with Chris Benoit with who he left WCW to perform in the WWE in 2000. Satullo became part of a group called the

Radicalz and was known for his extreme style of wrestling and would be awarded two WWE Hardcore Champion titles. Satullo has sustained numerous injuries from his wrestling career and has had two shoulder replacements, needs a hip replacement, has neck injuries- fusion of C5, C6 and C7 that limit his mobility. He sustained numerous head injuries in WWE, WCW and ECW events from which he now suffers long term neurological harm. Satullo experiences what he calls "blank spots" and "black outs" when he cannot recall events that just happened along with severe memory loss. Satullo get frustrated very easily with moods swings that damage his relationships and employment prospects. Satullo has been diagnosed and treated for near constant severe headaches including a migraine in 2015, which required hospitalization for several days. Satullo has started medicine for these headaches, which he is able to obtain through state assistance. Satullo is currently undergoing neurological care for his many injuries. He states that he is disabled and cannot work and attempting to apply for Social Security disability, but that like many wrestlers will have a hard time showing any work history because of the WWE's misclassification scheme outlined in this complaint. Satullo suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Satullo has suffered personal

and pecuniary injuries, including conscious pain and suffering and emotional distress.

110.    Plaintiff David Silva a.k.a Sylvano Sousa ("Silva") is 62 years old and resides in New Bedford, Massachusetts. Silva began wrestling for the WWWF in 1971 for Vince McMahon, Sr. and performed routinely for the WWF until 1987. Sousa estimates he performed in thousands of WWF matches as a "jobber" during these years. Sousa states that he sustained numerous injuries while wrestling and that there was no medical care or insurance for wrestlers "back then." Silva recalls he was knocked out in a Match in Cape Cod performing with Ivan Koloff, although injured he finished match. If you got hurt you were discouraged from taking time off or seeking medical attention, the WWF was "a rough and tumble place," where injuries including being knocked in the head and seeing stars were commonplace. Silva had heard the term "punch drunk," but "never thought about it" and believes that his many years working for WWF caused his neurological problems he now is experiencing including memory loss, headaches, bad bouts of depression, and trouble sleeping. Silva states that he battled addiction to pain medication on and off for the past 20 years from his wrestling injuries. Silva says that he and others "are not treated like anything" by WWE despite his long tenure in making the stars look good. Silva is currently on disability. Silva suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and

reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Silva has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

111.    Plaintiff John Jeter, a.k.a Johnny Jeter ("Jeter") is 34 years old and resides in Scottsdale, Arizona. Jeter started his career in WWE developmental Ohio Valley Wrestling program in 2001 and performed for WWE until 2008. He was mailed a booking contract by Dr. Tom Pritchard in 2003 and later signed a WWE booking contract in 2005. He was paid weekly during his tenure and was mailed form 1099s. In 2006 he was made part of the "The Spirit Squad," the gimmick consisted of a stable of five male cheerleaders which won the World Tag Team Championship. Jeter notably wrestled alongside Mr. McMahon as a supporter in his matches against opponents. Jeter also performed on the WWE's ECW brand. Jeter explains that there was an "unwritten rule book" in the WWE, which discouraged access to medical care. The reason was simple; if you were injured you could be fired, in consequence he was "fearful about getting injured," as he would not only lose his job but his entire career which he had worked years to acquire.  Jeter stated that injuries including being knocked out were not usually formally reported but were routine and known to be an ordinary event. He recalls being knocked out in the spring of 2003 and suffering from a splitting headache for weeks after. He states it was routine to have "your bell rung" and he was kicked, punched, smacked and dropped on his head as part of his work. During these events Jeter was in his mid-20s and felt the WWE was in full control of his destiny. Jeter described the locker room culture as "toxic," and that he and others were "treated like cattle." "I cannot

stress how toxic the environment at WWE was, you keep your mouth shut and ears open." The travel schedule was "insane", and states he wrestled 225-250 shows per year at the height of his career. Since there was no offseason, injuries would not heal and the preferred remedy was pain medication. Jeter sustained injuries that could not be "worked through" including a severe bone spur in his lower back that required surgery. Jeter became hooked on pain medicine as a result of his injuries, which led to his departure from WWE.  Jeter experiences bouts of depression and anxiety, and lowered mental acuity, which he attributes to the head trauma he sustained in WWE. Jeter is fearful for his future and believes he is now at risk for more neurological problems in the years ahead. Jeter suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Jeter has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

112.   Plaintiff Charles Bernard Scaggs a.k.a Flash Funk ("Scaggs") is 51 years old and resides in Celebration, Florida. Scaggs wrestled for WCW from 1992 to 1996 as 2 Cold Scorpio before moving to ECW 1994-1996 where he was a four time World Television Champion. Due to his charisma and success he was recruited by the WWE in 1996-1999. He met with Vince and Linda McMahon in

Connecticut and signed his agreement at Mr. McMahon's desk. He did not have a lawyer nor understand most of the terms but "was caught up in the excitement of getting into the WWE." Although his gimmick 2 Cold Scorpio- a Warrior type, was what had made him successful, he was given a new gimmick upon signing with WWE because WWE wanted to own and control your name. His new gimmick was a racially stereotypical character named "Flash Funk" which was a "cross between Rick James and a pimp." He donned flashy clothes: a white fur coat, gold chains, a wide brim bright blue hat and was accompanied to the ring with two dancing girls called "funkettes." He had a popular high-flying style of wrestling that he says took a toll on his body. During his WWE tenure he described a schedule that was "hectic as hell" and he wrestled 230-250 times per year with no offseason to rest or recoup from injuries. The preferred treatment for injuries was to tape himself up and take a pain pill. He states that low impact head injuries were common, routine and ordinary, the wrestling moves required him to hit his head on the matt at nearly every performance. Scaggs called such events "stingers" and that he could expect about five per busy weekend with one being "serious" wherein he would see "white spots" or "stars." As a result of such events he would become "loopy" and "my timing would be off." On occasion he would forget where he was or that the match had ended. WWE officials and other wrestlers were very aware of this phenomena and would "cover" for him and other wrestlers that were "rocked" in the ring, meaning the WWE would be able to improvise and choreograph events in real time around these routine miscues that result from these day to day transient neurological injuries in the performers. Scaggs has been knocked unconscious

which he believed were "concussions" after which he vomited, had his jaw broken and teeth knocked out, cracked ribs and many other lessor injuries. Scaggs does odd jobs to make ends meet including helping his ex wife in the cleaning business, painting and yard work along with traveling with his old friends to autograph signings and occasional in-ring activity. Scaggs says he cannot afford insurance or healthcare. Scaggs has numerous old injuries and osteoarthristis and bone spurs in his knees that make walking difficult at times. Scaggs has had bouts of depression, headaches, mood swings, and memory loss he believes are related to his many head injuries.  Scaggs suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Scaggs has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

113.   Plaintiff Charles Wicks, a.k.a Chad Wicks ("Wicks) is 38 years old and resides in Mason City, Iowa. Wicks wrestled for WWE from 2004-2006. Wicks signed to the WWE's developmental program in 2004 by Dr. Tom Pritchard, he signed a booking contract that was not negotiated by a lawyer. At the time Wicks was very happy to be signed to WWE, as it seemed a great career opportunity, as he loved athletics and wrestling. Wicks, demonstrated skill and was assigned a tag team partner and they were elevated to the WWE televised main roster. Wicks gimmick

with his partner was that of Chippendale style dancers who appealed to female fans, their Tag Team was creatively named "the Dicks." Wicks, was told that Vince McMahon devised the gimmick. After initial success he found himself subject to ridicule, hazing and abusive behavior by WWE staff and other wrestlers. Wicks, says the WWE was indifferent to the health and safety of wrestlers like himself. Wicks, says that he sustained numerous head injuries and that seeing stars "was routine after you hit after a fall." Wicks, suffers from headaches, was treated for ADHD, has severe memory loss, and had severe depression for 8 years after his WWE career. Wicks, believes these issues were caused in whole or in part by the head trauma he sustained in the WWE.  Wicks, has no health insurance and gets by selling Japanese water machines and occasional construction work in the concrete industry. After retaining counsel to investigate his claims Wicks was contacted in September 2016 by WWE employee Howard Finkel who told Wicks that the WWE had 9 years of royalty payments that were owed to him and that the checks would be available around Christmas. Wicks stated his desire to start what he termed a "Post WWE support group" that would help retired wrestlers recover from what he characterized as a physically and emotionally "devastating" experience.  Wicks suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence,

Wicks has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

114.    Plaintiff Timothy Smith, a.k.a. Rex King ("Smith") is 54 years old and resides in Mulberry, Florida. He wrestled for WWF starting 1993 as part of the Tag Team "Well Dunn." Smith says that the WWE culture was "Keep your mouth shut and ears open." As soon as he was recruited into WWE on Friday, October 13, 1993, he was injured by a 500-pound wrestler, Nelson Frazier, Jr. in a power slam: "He crushed me - I was black and blue above my knees to shoulders, I could barely move or walk. There was no ambulance - two guys carried me into the locker room." The WWE road agent present, Chief Jay Strongbow, called him an ambulance. Smith later learned that his pelvis had been crushed and no surgery could aid because the cartilage had been separated. He was out of work for nine months. He was told by WWE employee, JJ. Dillon, that he would be paid $500 per week. Smith says received exactly one check, when he called to locate his additional checks he was told by Mr. Dillon "the emperor says he cannot afford to pay you for doing nothing." Smith's understanding was that the term "The Emperor" was a reference to VKM. Smith says there was little attention paid to him by WWE medical staff or treatment rendered and that he was "hit over the head all the time," hit with chairs, pushed through tables, and sometimes he would wake up in the ring and not know where he was or why he was there. Smith walks with a cane, having had his hip replaced and three discs herniated in his neck from his wrestling career.  Smith's tag team partner, Steve Doll, died in 2009.  Smith has suffered countless, repeated, and chronic head trauma resulting in long-term neurological injuries and cognitive

difficulties, including, but not limited to headaches, dizziness, loss of memory, severe suicidal depression, and fatigue. He has been on SSDI for past five years. The WWE pays him meager royalties, with his last check totaling $55. Smith suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Smith has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

115.   Plaintiff Tracy Smothers ("Smothers"), a.k.a. Freddie Joe Floyd is 53 years old and resides in Fort Branch, Indiana.  A storied performer who spent most of his career outside of the WWE. Smothers wrestled for ECW 1997- 2000. Smothers was recruited in 1996 to provide needed experience to a struggling roster. Smothers was given the gimmick Freddie Joe Floyd, the name was a inside joke on rival promoters whose organization was absorbed into the WWE, the gimmick itself was "to depict a dim-witted southern yokel." Smothers described WWE as a very political place in which the staff played "mind games" and fostered a coercive culture in which you had to watch what you said and could not report injuries for fear of retribution: losing your job. Smothers, described a basic flat back bump, correctly performed by an experienced wrestler as being in his experience the equivalent of being rear ended in a low impact automobile accident. Smothers

returned to WWE in 2000 and worked for over a year as a wrestler/trainer in Memphis. In one instance, Smothers states that a wrestler named Joey Abs (Jason Arhndt) was instructed by WWE agents to hit him over the head with a steel chair as the finish to a match. The blow "nailed me" and "I was knocked out" he reportedly was throwing up for days and experienced dizziness for up to 6 weeks after the incident until he was fired in the aftermath of his symptoms. Smothers described the WWE training staff as abusive, ignorant of any medical protocols, in wrestling "you became your own doctor." In 2005, Smothers also appeared at WWE's ECW show "One Night Stand." During his WWE experience he suffered countless repeated head trauma and sustained neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness/loss of balance, and acute short-term loss of memory. Smothers has no health insurance, receives no royalties but does receive annual letters from the WWE offering drug and alcohol rehabilitation. Smothers suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Smothers has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

116.   Plaintiff Michael Robert Halac, a.k.a. Mantaur ("Halac") at 6" 1' 400 pounds is 47 years old and resides in Omaha, Nebraska.  He wrestled for WWE at

various times between 1995 and 1997. His assigned gimmick was to be a half man, half bull and to act like an animal. It was not a popular character with one writer observing the idea was "consigned to the annals of history as another failed career-killing experiment born from the mind of Vince McMahon."[23] Halac explains he did as he was told, "shut your mouth and keep your ears open that's how it was." Halac alleges he had many events consistent with a concussion in WWF. He sustained serious injuries in WWE such as landing on his head on metal stairs when his whole body went numb with little to no intervention or treatment by WWE staff, in that incident Halac injured his neck, spine and back. Today discs two through six are fused.  Noting that if he wanted to be paid, he had to fight through the pain and wrestle despite his severe injuries. Halac suffered repeated and chronic head trauma resulting in neurological injury and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. He takes pain medication every day, has half range motion in his neck, cannot feel his arms or fingers and is having surgery to restore sensation. Halac cannot work, has insurance through Medicaid, and recently received his first SSDI disability check. Halac received a WWE royalty check of $105 in November 2015. Halac suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE

---

[23] Dixon, James, "Titan Sinking: The Decline of the WWF in 1995", 57 (Dixon/History of Wrestling Pub., 2014).

career.  As a proximate result of WWE's negligence, Halac has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

117.   Plaintiff Rick Jones, a.k.a. Black Bart ("Jones") is 67 and resides in Weatherford, Texas. He wrestled for WWF in 1989 for a little over a year, including performing in WrestleMania VI in 1990. Jones also wrestled in 1991 for WCW as "Dead Eye Dick." Although Jones spent most of his career outside of WWE, he says wrestling in the WWE was more intense, with more pressure to aggressively perform than at other promotions. Jones was given the gimmick of being a "bad cowboy" with a black hat and long beard by Dusty Rhodes and was given the name "Black Bart" by WWE as Vince McMahon wanted to "own your name." Jones explains that "you kept your mouth shut, put guys over and don't complain about injuries or anything else" or you would be fired. Jones explained: "If you were sick or hurt, you vanished form the booking sheet, if you were not on the sheet you didn't get paid." In a WWE appearance at Madison Square Garden (he believes in 1991) while wrestling Koko B. Ware in a strong finish "I felt my back go out in the arena, "to which Jones attributes a permanent back injury. He sustained numerous head injuries, which were simply called "bell ringing." While in WWE Jones was knocked unconscious at least three times by another wrestler named Tugboat (Fred Ottman). Tugboat was large wrestler who worked "stiff" and "knocked me out colder than a witch" after taking a clothesline Jones woke up in the locker room. On another occasion Jones hit his head on pavement outside the ring. Jones observed that there were WWE trainers that performed basic tasks but mostly

looked out for bigger stars while he and most of the wresters were "on our own." Having sustained repeated and chronic head trauma wrestling for WWE, Jones endures cognitive difficulties, including, but not limited to, depression, headaches, severe dizziness, severe loss of memory. Jones states he has involuntary muscle movements that are likely due to nerve damage and loss of hearing for which he needs but cannot afford hearing aids. Jones has received WWE letters offering drug and alcohol rehabilitation, Jones contacted WWE staff sometime in 2015 to ask for help to pay for heart surgery that he could not afford under his wife's insurance plan, although WWE staff told him that they would investigate options no one returned his call, he took medical loans which he is struggling to pay. Jones is disabled and receives SSDI from his past work as a construction foreman. Jones suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Jones has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

118.   Plaintiff Ken Johnson, Sr., a.k.a. ("Johnson") is 59 years old and resides in Louisville, Kentucky.  Johnson is currently a pastor at Shiloh Baptist church in Louisville with a congregation of about 400 people. Johnson worked for WWE from 1986 to 1993, in which he signed a contract without counsel that was

offered on a "take it or leave it" basis by Vince McMahon. Johnson did his own taxes and his income was reported by WWE on 1099s. Johnson worked as a "manager." A manager in the WWE was part of the "storyline" in which he purported to represent certain wrestlers as part of the act. Johnson was depicted as a stereotypical African American and given the name "Slick" a "jive soul bro." Johnson says the McMahon instructed producers to focus on his lips when he appeared on television to do his promos. During most of his tenure at WWE he worked over 300 nights per year sometimes 30-40 nights straight with no breaks. Johnson as a "manager" never received formal training how to properly perform wrestling moves in WWE but "learned as he went." Most often he was instructed after he took a bump or fell improperly injuring himself, after the event someone would approach and tell him "do it this way next time." In 1987 in a match in Houston with Hulk Hogan he fell through the ropes and was spitting up blood from internal injuries. On another occasion in 1987 during a skit when a dog was chasing him, he fell and broke his wrist. In 1989, he believes he had his "bell rung" after being body slammed by George the Animal Steele, and that after the incident, Vince McMahon sent someone to the ring to ask if he was ok. In another match Johnson was hit in the head by Davy Boy Smith and was thrown over ropes onto the concrete below in which he hit his head. Johnson sustained head trauma in WWE resulting in cognitive difficulties, including, but not limited to, anxiety and mood swings, headaches, dizziness, loss of memory, and difficulty sleeping. Johnson has no health insurance and is forced to pay out-of-pocket for the medications he needs for his diabetes and other health problems. Johnson has also made a few

appearances on WWE programs since 2007. WWE sends him letters offering drug and alcohol rehabilitation, pays him about $200 in royalties each year (in the past more) and as recently as April 2016 WWE paid Johnson $2,500 to induct a wrestler who died at age 41 "Big Bossman" into the WWE Hall of Fame.  Johnson suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Johnson has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

119.    Plaintiff George Gray, a.k.a. One Man Gang, a.k.a. Akeem ("Gray"), 6'7" and 400 pounds, is 55 and resides in Baton Rouge, Louisiana. He wrestled for WWF full-time from 1987 to 1990. Gray worked for WCW in 1991, and 1995-1996 when he held the WCW US title. He performed in three WrestleMania events including a 2001 appearance. He says "keep your mouth shut is the first rule of the business, you keep quiet, keep your mouth shut and do what you are supposed to do, if you talked you got pushed down in the card and made less money." His gimmick, "One Man Gang", was akin to a motorcycle gang character with a Mohawk, denim jacket, and skull jewelry. Vince McMahon called Gray and told him his character was being remade as a black African, despite Gary being white. He was rebranded "Akeem the African Dream."   In Gray's words "a racially stereotypical black guy." Gray

performed in shows with a burning trash barrel that exploded and African tribal dancers jumping around him chanting "Akeem." Gary says that little to no medical attention was given to him. "If anything happened to you, you were responsible for it. I traveled injured, at least 300 nights a year for WWE on the road." He did not know what a concussion was, but was punched, kicked, dropped on his head every night, "You got banged up every day." Gray alleges that he suffered many concussions in WWE events from being knocked around in metal cages, punched in the head, hit with metal chairs, and thrown head first into concrete. Gray never contemplated that his brain would suffer long-term injury from the head trauma, and he continued to work injured throughout his career. Gray suffers from the routine and repeated head trauma endured during his WWE career with neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue. He cannot stand for any period due to neck and back injuries and has never had a brain test because he cannot afford it. He is currently uninsured and disabled on Medicare with herniated discs in his neck and back. After Gray hired counsel to represent him, the WWE's VP of Talent Relations, Mark Carrano contacted Gray with an offer to pay him $10,000 ostensibly for past and future royalties for his WWE appearances. The contact by WWE with Mr. Gray occurred sometime around December 2015. Mr. Gray did not execute the document, called a Contractor Nostalgia Agreement, a type of document identified as unconscionable in this complaint that the WWE is now actively offering to retired wrestlers. Gray suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite

WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Gray has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

120.    Plaintiff Ferrin Jesse Barr, a.k.a. JJ Funk ("Barr") is 55 and resides in Vancouver, Washington. He wrestled for WWE from 1986 to 1987. Barr says if you asked questions about pay or travel you would get "bad bookings" and lose money. He was fined for being late even though he was on time to perform, after he was delayed due to an accident on the highway he was traveling on that delayed traffic. Barr was knocked unconscious numerous times, it would be common to be hit seeing stars, as well as kicked and punched in the head because WWE's choreographing required the action to seem as real as possible. According to Barr, sometimes punches called potatoes landed because they were accidental or some people were not skilled. Barr had to work through the injuries: "you had no choice but to work through injuries if you wanted to get paid." Barr tore his ACL and was told to perform by taping it up from his foot to hip with four rolls of tape each night rather than have time off to properly heal. Barr was injured by another WWE wrestler intervening in a fight outside the ring, being kicked in the head causing his eye to fall out due to orbital bone fractures. Barr suffered repeated and chronic head trauma from WWE events including being hit in the head with metal chairs resulting in cognitive difficulties, including, but not limited to, headaches,

dizziness, loss of memory, mood swings, and fatigue. Barr has a neck fusion (discs four and five) from his career. Barr suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Barr has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

121.   Plaintiff Lou Marconi ("Marconi") is 42 years old and resides in Willow Spring, North Carolina. Marconi wrestled 10 to 15 times per year for the WWE between 1994 and 2000. Marconi also wrestled in several ECW matches in 1997-1998. During his matches, he was used as "enhancement talent" to make the other full time WWE wrestlers look good at his expense and the expense of his body. Marconi alleges that wrestlers such as himself that were not on the WWE full time roster were subjected to more harsh, less careful treatment than regular WWE performers.  He states he sustained what he alleges were at many concussions in WWE (although in his early 20s at the time, he did not know what a concussion was), he recalls seeing 'white flashes' after hitting his head or was knocked out. For example, in October 1996, he was clotheslined by Stone Cold Steve Austin in Ohio resulting in head injury for which he received no medical attention. Marconi sustained routine, repeated, and chronic head trauma resulting in long-term neurological injuries and cognitive difficulties, including, but not limited to,

headaches, memory loss, hearing loss in right ear due to nerve damage.  Marconi suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Marconi has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

122.   Plaintiff Rod Price ("Price") is 54 years old and resides in Ponchatoula, Louisiana. He wrestled for WWE in 1992, 1994, 1996 and 1997 as enhancement talent mostly in untelevised matches that occurred before a TV taping. Price also wrestled for ECW in 1998-1999. According to Price the wrestlers that performed "jobs" such as himself were routinely subjected to physical abuse at the hands of more experienced and regular WWE performers, as his health and safety was given even less of a priority than full time WWE wrestlers. He states he had numerous head injuries in WWE events and sustained routine, repeated, and chronic head trauma resulting in long-term neurological injuries and cognitive difficulties, including, but not limited to, headaches, depression, insomnia, hearing loss in left ear, memory loss. Price is currently on Medicaid and social security disability. Price suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and

inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Price has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

123.   Plaintiff Donald Driggers ("Driggers") is 54 years old and lives in Columbia, South Carolina. He wrestled as "enhancement talent" for WWF between 1985 and 1988 performing in dozens of matches including TV tapings. He wrestled Hercules, Rick Rude, Bret Hart and many top performers in WWF. As enhancement talent his job was to make other wrestlers "look good" and he sustained many head injuries in the process. Driggers has suffered routine, repeated, and chronic head trauma resulting in long-term neurological injuries and cognitive difficulties, including, but not limited to depression, headaches, dizziness, loss of memory, and fatigue. Driggers is currently applying for SSDI. Driggers suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career.  As a proximate result of WWE's negligence, Driggers has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

124.    Plaintiff Rodney Begnaud, a.k.a. Rodney Mack ("Begnaud") is 45 and resides in Lafayette, Louisiana.  Begnaud wrestled for WWE from 2002 to 2004 and 2006-2007 on the WWE's ECW brand. His WWE assigned gimmick was to portray himself as an "anti-white" black militant. Begnaud explains it "was a 'no no' to discuss injuries or your job would be in jeopardy." His dialogue consisted of lines such as "Damn Right!" and "Yeah!" with his manager uttering lines such as "Kill Whitey" and "Free James Brown." He says he was not treated for injuries or tested for signs of head injuries after sustaining blows to his head them in the ring. Begnaud has suffered numerous concussions as a result of the repeated and chronic head trauma sustained while wrestling for WWE.  His injuries have resulted in long-term neurological injuries and cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue.  Begnaud suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Begnaud has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

125.    Plaintiff Ronald Heard, a.k.a. Outlaw Ron Bass ("Heard") is 67 years old and resides in Thonotosassa, Florida. Heard wrestled for WWE in 1987 to 1989. Heard states that he was hit in the head with tables and chairs, and had bumps

performed on him on concrete. Heard suffered routine, repeated and sustained head trauma in WWE matches resulting in long-term neurological injuries and cognitive difficulties, including, but not limited to, headaches and migraines, dizziness, loss of memory, and sleeping problems. Heard has received royalties from the WWE in past few years of between and $50 and $100. Heard is currently on Medicare. Heard suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Heard has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

126.    Plaintiff Boris Zhukov ("Zhukov") is 57 and resides in Wirtz, Virginia. He started wrestling for WWF in September of 1987 until December 1990 and performed in the WWE headline event Wrestlemania IV and VI. Zhukov estimates he wrestled 275-300 nights per year while at WWE. Zhukov's gimmick was that of a Russian Communist from the Soviet Union and teamed with another wrestler to form a tag team called the Bolsheviks. Zhukov's birth name was James Harrell and he is of English/Irish descent. Upon entry into the WWE he legally changed his name to Boris Zhukov, he did so because the WWE and Vince McMahon he learned would "own you" if you didn't do this. When Vince McMahon learned that he was legally Boris Zhukov he says it caused much friction and accounts for his failure

to get a "Push" in WWE. He signed the boilerplate booking contract, which "you had to sign if you wanted to work," and his income was reported on 1099s by WWE. Zhukov says that; "you had to watch what you say" about injuries and compensation or you would be "going out the door," and "blackballed." Zhukov says that shortly after the cold war ended and the Berlin wall was torn down his career effectively ended as he was informed by WWE that there was no need for a Russian gimmick any longer. Zhukov states he sustained head injuries many times performing in the WWE and sustained other injuries while with the organization. Zhukov says that regularly and correctly performed moves in WWE required him to hit his head "very hard on the ring floor." He was treated by WWE and hospitalized for an infection he acquired in the ring. He has cognitive difficulties, including, but not limited to, migraine headaches, hearing loss, difficulty sleeping, depression/mood swings, loss of balance and dizziness, as well as loss of memory. Zhukov's sports medicine doctor informed him that these symptoms and conditions relate to head trauma he sustained as a wrestler. He currently works as truck driver. Zhukov suffered routine, repetitive blows to the head during his WWE career that were improperly diagnosed and treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure his health and safety and inform him of the risks of long-term, later-in-life neurodegenerative impairments from repetitive brain trauma, which was owed and reconfirmed prior to, during, and after his WWE career. As a proximate result of WWE's negligence, Zhukov has suffered personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

127.    WWE is legally responsible for the injuries and damages complained of herein.

128.    Defendant World Wrestling Entertainment, Inc. is a company existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut and conducts business in this jurisdiction.

129.    Although WWE is a public company, it is controlled by a small group of related executives who manage both polices and the conduct of wrestlers during matches. Vince McMahon has been Chairman of WWE since the retirement of his father, Vince McMahon Sr., in 1980. Vince McMahon has served as CEO from 1980 to 1993, and from 2009 to the present. McMahon controls over 80 percent of WWE's voting power. McMahon's wife, Linda McMahon, served as WWE President from 1993 to 2009, and as CEO from 1997 to 2009. Their daughter, Stephanie McMahon Levesque, is WWE's Chief Brand Officer. Her husband, Paul Levesque, also known as Triple H, is Executive Vice President, Talent, Live Events & Creative.

### GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS
### <u>AGAINST WWE</u>

130.    WWE is the largest wrestling entertainment organization in the world. Since purchasing its main competitor, World Championship Wrestling, in 2001, WWE has had no serious competitors in the field of wrestling entertainment. The company generates approximately $500,000,000 dollars in revenue annually, and in a classic monopoly with monopoly power.

131.    The majority of WWE's revenues stem from its televised wrestling events. WWE programs consistently rank among the most popular in weekly

television ratings. WWE programming is broadcast in more than 170 countries and 35 languages and reaches more than 650 million homes worldwide.

132. For nearly three decades, WWE has been the world's pre-eminent provider of Pay-Per-View programming, consistently ranking among the highest selling live event programs in the world. In fact, WWE's own Business Summary describes itself as:

"An integrated media and entertainment company, engage[d] in the sports entertainment business in North America, Europe, the Middle East, Africa, the Asia Pacific, and Latin America. The company operates through Network, Television, Home Entertainment, Digital Media, Live Events, Licensing, Venue Merchandise, WWEShop, and WWE Studios segments. It operates WWE Network, a live streaming network that offers pay-per-view events, original programming, and video-on-demand library; and produces television programming, reality shows, and other programming, as well as produces content via home entertainment platforms, including DVD, Blu-Ray, subscription, and transactional on-demand outlets. The company also offers broadband and mobile content through its Websites and third party Websites; produces live events; and licenses various WWE themed products, such as video games, toys, apparel, books, and music. In addition, it designs, sources, markets, and distributes various WWE-branded products, such as T-shirts, caps, and other novelty items; operates WWEShop, an e-commerce storefront; and

WWE Studios that produce and distribute filmed entertainment content, such as movies for theatrical, home entertainment, and/or television release. World Wrestling Entertainment, Inc. was founded in 1980 and is headquartered in Stamford, Connecticut."[24]

**WWE Disregards Wrestlers' Rights & Safety.**

133.    Despite WWE's cultural and commercial success under the leadership of WWE, the WWE has failed both to protect its wrestlers from injury and to afford them the basic state and federal protections granted by statute.

134.    Although WWE continued to grow larger and financially stronger, it kept antiquated rules and traditions where its wrestlers received little to no healthcare or appropriate medical treatment.[25] WWE, under the voting control of VKM, actively formulated and implemented a cunning scheme to deprive its workers of fundamental statutory protections.

135.    WWE tightly controls wrestling matches and performances it conducts. Its events are scripted with choreographed moves, with predetermined winners and losers. Each match has a carefully written, ongoing storyline.  Over the years, the storylines have grown more elaborate to hold viewer interest and increase television ratings and advertising revenue.

136.    WWE controls and dictates the match outcome and carefully scripts the choreographed violence of the wrestlers. As violent action has become more popular, WWE has introduced more dangerous moves into the typical match.  For

---

[24] WWE Wrestling Entertainment, Inc. (WWE) – NYSE, Profile, "Business Summary", Yahoo! Finance, finance.yahoo.com/q/pr?s=WWE, *last visited* June 15, 2016.
[25] Despite WWE's enormous revenues, WWE does not provide its wrestlers, past or current, with health insurance, disability insurance, or unemployment insurance.

example, all dangerous moves such as the piledriver and any use of props require the pre-approval of WWE executives.[26]

137.   This total control of the performance also determines which wrestlers will succeed in the WWE, who will win, who will get a "push" to be a big star and ultimately who will be paid more or financially ruined. As one writer explains: "At the core of wrestler abuse is pro wrestling's defining characteristic: the promoters' arbitrary power to select winners and losers. The promoters' unchallengeable authority to not only write the scripts but decide which wrestlers to push and which to use as jobbers invites the full range of imaginable abuses."[27] Another writer explains wrestling's dominance over its wrestlers as follows: "In football or baseball, your job is to win, but in wrestling your job is to follow the script- and for some guys, a lot of the time the script says you lose."[28] The WWE controls not only the level of danger, the safety, and outcome of a performance, but exerts total control over the performers' livelihood and career through its script writing. The pressure to conform without question is thus overwhelming.

---

[26] *See* Stephanie McMahon, Congressional Testimony, pp. 120-123, *available at* https://web.archive.org/web/20091203033324/http://oversight.house.gov/images/stories/document s/20081231140942.pdf ("They have to be approved. Piledrivers, chair shots, everything has to be approved, and it has to be approved by Vince. Q: So chair shots do need to be approved by – A: Absolutely. Q: Vince McMahon before they occur? A: Yes.").

[27] Wilson, Jim, Chokehold Pro Wrestling's Real Mayhem Outside the Ring, Xlibris Corp., p. 436 (2003) (Observing "because pro wrestling is not based on wrestling ability or skill, virtually all wrestlers are at least occasionally required to suspend ego or dignity by agreeing to be defeated. But … losing…. Is a delicate matter because it may affect a wrestler's marketability and hence, an entire career. Wrestlers prefer to win simply because losing diminishes their crowd appeal; like other audiences, wrestling crowds do not approve of losing, do not like losers and do not want to pay to watch losers. ... Over the years the wrestling industry developed a sure-fire technique of ruining a wrestler's popularity, having him lose, especially repeated losing."). *Ibid.* 120-121.

[28] Shoemaker, David, The Squared Circle: Life, Death, and Professional Wrestling, Penguin Books, p. 229 (2013).

138.   WWE wrestlers throughout most of their careers, perform in matches hundreds of times per year. Most of the Named Plaintiffs report wrestling over 200 nights per year with some reporting they performed over 300 nights per year. In the 1990s Named Plaintiff Jim Brunzell reports wrestling 26 nights per month, in one instance 43 days in a row. Some report multiple performances per night. The performance schedule is designed to maximize the profits made by WWE, in reckless disregard of the welfare of the wrestlers.

139.   Wrestling with the required frequency also requires extensive travel from city to city and sometimes around the world with little time to sleep, and no time to rest or recuperate from performances. This rigorous schedule also engendered an 'in group' culture that made family life almost impossible.[29]   Such lifestyle furthered the Named Plaintiffs' reliance on WWE.

140.   A WWE publication even uses the grueling travel schedule to highlight the prowess of its wrestlers, and the injuries they endure. As Dustin Runnels, a.k.a. Golddust explains "It takes a toll on the body, man, when you do 250, 270 days a year. All the travelling, then bumping night after night in that ring. My knees are bad, my lower back is really shot."[30] Paul Wight, a.k.a. Big Show explains in the same WWE publication: "It might take me an hour and 20 minutes to shower, because I hurt. That's just part of the business. The more you do it, the more you're gonna hurt. You can't do this for over 200 days a year and not pay a price. We're

---

[29] *See* Morton, Gerald W., <u>Wrestling to Rasslin: Ancient Sport to American Spectacle,</u> Bowling Green State University Press, p. 69 (1985) (Noting "given the conditions of their work, wrestlers often live an internal, loner or 'in group' life").
[30] WWE Unscripted Edited by Ken Leiker and Mark Vancil, Pocket Books, p. 89 (2003).

out there pounding our bodies. I've got lower back problems right now, three bulging discs…" *Id.*, at 144.

141.   In 2007, WWE attempted to downplay its own publications' statements and the rigorous working conditions it required of its wrestlers, when the Committee on Oversight and Government Reform held hearings seeking information about WWE's policies after a superstar performer named Chris Benoit (the first wrestler diagnosed with Chronic Traumatic Encephalopathy) killed himself and murdered his entire family.[31]

142.   During Stephanie McMahon's Congressional testimony, a Congressional investigator asked about the typical wrestler's schedule. Ms. McMahon's answer was "it is all looked at to make sure no one works too much. For example, John Cena, our top superstar, *who is booked the majority out of anybody*, last year worked 161 days. So when you look at that in the grand scheme of things, it doesn't seem like too hard of a schedule. But it definitely is, you know a tough schedule." *See* Stephanie McMahon, Congressional Testimony p. 29-30, *available at* https://web.archive.org/web/20091203033324/http:// oversight.house.gov/images/stories/documents/20081231140942.pdf

143.   When asked about informal or formal guidelines "on how many days talent can work in a month or a year", WWE's answer was: "informally, some talent they have dates that they cannot work more than. But we always look at that, and we never really hit that barometer". *Id.* at 30.

---

[31] Omalu, Bennet I., *et al.*, <u>Chronic Traumatic Encephalopathy</u>, JOURNAL OF FORENSIC NURSING (2009).

144.   WWE's Congressional answers are repudiated by the experiences of the dozens of Named Plaintiffs.  As late as 2003, in the WWE's own published books, the number of days said to be worked by its stars is "250, 270" and "over 200." The named Plaintiffs nearly all state the number of days worked per year was excessive and dangerous and at variance with the Congressional testimony in which the WWE executive called to testify classified 161 days per year by the top performer as a "tough schedule."

145.   Due to the fraudulent independent contractor status forced upon wrestlers and discussed more fully below, the Named Plaintiffs had no guarantee their positions as active, paid wrestlers would remain available in the event of injury, an event compounded by the onerous schedule with no off-season for rest and recovery. The WWE openly and explicitly fostered and supported a culture of "wrestling through the pain" because if a wrestler was injured he or she would miss work, potentially lose their spot, and not be paid during their convalescence. Personally admitting injury could even destroy a wrestler's WWE career.

146.   Additionally, upon information and belief, WWE until 2006 had no set medical evaluations, protocols or 'return to play' policies. The preferred treatment for an injury was to 'look the other way.' The Named Plaintiffs explain there 'was no getting injured in WWE.' The wrestlers were expected to perform if they wanted to maintain their position and get paid.

147.   The named Plaintiffs nearly all report working while injured and being encouraged and often required to work injured. Dozens of the Named Plaintiffs report being knocked unconscious during a match and being required to perform

112

the next show (or even continue the existing show) without any medical intervention or evaluation by WWE. In a lavishly illustrated WWE book published in 2003, the WWE highlights this culture through wrestler Bill Goldberg's explanation: "Everybody gets hurt out there- it's just to what extent they get hurt. The constant pounding on your body week after week after week after week after week after week makes your body more prone to injury. In football, if you go down, there's a guy behind you who can step in and fill your shoes. *Here you suck it up and keep going, play through your injuries*."[32]

148.   WWE's culture of silence requiring wrestlers to "suck it up and keep going" pressured the Named Plaintiffs to not report their injuries or risk not being paid or even terminated. Specifically, Named Plaintiff Ken Patera states in response to his injuries that he was called "injury prone", and was ridiculed as a result. Nearly all of the Named Plaintiffs will attest to numerous specific examples of the culture of silence and coercion that pervaded WWE during their careers.

149.   Since WWE itself chose not to monitor, track or treat the wrestlers for injuries, including concussions, the Named Plaintiffs were deprived of adequate ringside medical care and of any warnings of the risks resulting from continued performances, including TBI injuries and long-term neurocognitive illnesses they now suffer from.

150.   Ms. McMahon's Congressional testimony further evidences WWE's failure to properly protect its wrestlers, where the "Executive Vice President of Creative, Writing, Talent Relations and Live Events" states she spent her entire life

---

[32] WWE Unscripted, p. 96 (*emphasis added*).

since the age of thirteen affiliated or working for WWE and became a full time employee in 1998. (*See* Stephanie McMahon, Congressional Testimony p. 6-7, *available at* https://web.archive.org/web/20091203033324/http:// oversight.house. gov/images/stories/documents/20081231140942.pdf)

151.   Yet, when asked by Congressional investigators whether she was aware of any cases where WWE officials ever suggested a wrestler take time off for injury she answered evasively: "Not for medical but for personal, yes…." and then further cites a single wrestler who was unbooked for a live event "But it was not due to a medical reason." (*Id.*, at 133-134). Ms. McMahon even denied the fact that any WWE wrestler suffered concussions while performing for WWE: "Q: Are you aware of any times where wrestlers have I guess self-reported--- where wrestlers have self-reported to you that they received concussions and this information came from the wrestler rather than a treating doctor? Answer: Not that I am aware of, but I am not saying that it never happened." (*Id.*, at 114) In other words, in nearly a decade of full time work, the daughter of the CEO, and current executive in charge of script writing and talent relations, as well as vice president of the department charged with direct liaison with the wrestlers, Ms. McMahon was completely unaware of the numerous and severe injuries that plagued every one of the Named Plaintiffs on a near daily basis, and continue to produce scripts that continued to result in injuries.

152.   WWE manipulated the carnival tradition of silence, called kayfabe, to further prohibit its wrestlers from speaking out about their injuries and to reinforce

the iron control WWE held over them.[33]   The audience deception, scripting, prearranged outcomes, characters, and internal culture all required the Named Plaintiffs' silence, which WWE expanded to include injuries.

153.   During the 2000s, a writer observed: "The business is locked in its time-honored tradition of operating in a dark corner of the entertainment world with its own anachronistic rules and procedures. The spirit of kayfabe has survived to publicly protect the ugly side of pro wrestling's private face."[34]

154.   This code of silence and wrestling culture has served to insulate and protect the WWE and its inhumane health and safety practices while delaying awareness of the health crisis within the ranks of its wrestlers and has prevented the Named Plaintiffs from understanding their injuries and delaying any attempts to recover for their injuries.

155.   The wrestlers that perform regularly for WWE, at least since the early 1990s, are required to sign "booking contracts" that seek to strip them of any rights they may have to workers' compensation (and other protected statutory rights) by fraudulently classifying them as 'independent contractors.' "Injured stars usually have no health insurance and do not receive workers compensation. Moreover, stars that are fired do not possess many alternatives once terminated. Thus for

---

[33] Linda McMahon formally ended the official practice of kayfabe in 1989, when she testified to the New Jersey Athletic commission (to avoid fees and taxes) that wrestling was "an activity in which participants struggle hand-to-hand primarily for the purpose of providing entertainment rather than conducting a bona fide athletic contest. *See* Wilson, Jim, <u>Chokehold: Pro Wrestling's Real Mayhem Outside the Ring</u>, Xlibris Corp., p. 38 (2003).

[34] *Id.*, at 89-90.

both stars and journeymen, the power rests almost exclusively with the promoters."[35]

156.   Wrestling Journalist David Shoemaker observes in his 2013 book: "Despite the fact WWE wrestlers are, by definition, full-time employees, WWE designates them as independent contractors . . . To some degree, wrestlers' contracts are this way for historical reasons. In the territorial era of the 1970s and 80s, wrestlers were indeed independent contractors and operated as such, but the WWF/WWE absorbed that template when it expanded its territory nation- and worldwide. Now there's no doubt that wrestlers' status as "independent contractors" should be seen as a capitalist strong-arm tactic. WWE and its shareholders are surely aware that they're no longer operating a regional sideshow. Likewise, they're aware, if not by common sense then by the writ of their contracts, that the wrestlers they employ are not "independent contractors" any more than LeBron James or Peyton Manning are "independent contractors" for the Miami Heat and Denver Broncos."

Shoemaker, David, The Squared Circle: Life, Death and Professional Wrestling, Penguin Books, p. 346 (2013).

---

[35] *See* Zashin, Stephen S., Bodyslam from the Top Rope: Unequal Bargaining Power and Professional Wrestling's Failure to Unionize, 12 U. OF MIAMI ENT. & SPORTS. LAW REVIEW, p. 3 (1995), *available at* http://repository.law.miami.edu/cgi/viewcontent.cgi?article=1018&context=umeslr; *see also* Bentley, Aaron, "The_History and Future of the Independent Contractor in WWE/Pro Wrestling", http://www.voicesofwrestling.com/2015/06/10/the-history-future-of-the-independent-contractor-in-wwepro-wrestling/; Brustein, Joshua, and Hernandez, Raymond, "A Senate Run Brings Wrestling Into Spotlight", (July 15, 2010), http://www.nytimes.com/2010/07/16/nyregion/16mcmahon.html?_r=2&ref=joshuabrustein.

157.   Jesse Ventura, a former WWE wrestler and Governor of Minnesota from 1999 to 2003, writes in his Book:

All through your wrestling career, remember, you're an independent contractor. You're paying out enormous amounts in taxes. There's no pension, no health benefits. And the moment you're not making that draw, the promoters couldn't care less about you. You're a piece of meat. I knew guys that had worked hard for twenty years or more and still retired with nothing. Wrestling operated under some of the most unfair working conditions in the country. I don't know how they got away with it for so many years.

Ventura, Jesse,  I Ain't Got Time To Bleed: Reworking the Body Politic from the Bottom Up (1999).

158.   Dave Meltzer, publisher of the Wrestling Observer since 1983, told an author in 2003:

"The human costs have escalated totally out of control… the wrestlers, more than ever before, are pawns of an ugly system with no insurance, no collective bargaining and unsafe working conditions."

Quoted in Chokehold, p. 448.

159.   During Congressional hearings held in 2007, Ms. McMahon was asked whether WWE provided health insurance to its wrestlers.   Ms. McMahon responded, "No we do not".  When asked why, she responded, "Yes, because we have actually looked at it, and because wrestlers live all over the United States, it is very difficult to find any group that would actually support this, you know, people

who live all over the place. There are no discounted rates. There are no benefits to doing it." (Stephanie McMahon Congressional Testimony, p. 130). She continued to explain why WWE did not provide health insurance to its wrestlers: "A. because 60% have health insurance; and B. it did not seem like a logical course of action." (Id. p. 131).

160.   Upon research, Plaintiffs' testimony, and information and belief, the majority of wrestlers now and at the time of Ms. McMahon's testimony did not have health insurance at all.  WWE's own published book from 2003, 'WWE Unscripted', featuring photos and interviews of Stephanie McMahon herself (*See* p. 28-29, 146-147 210-211), provides evidence as to the lack of availability of insurance: Matt Hardy, A WWE wrestler explains: "You're responsible for your own insurance. Think about that for a minute. You're selling insurance, and I walk in and I say, 'Hey would you mind selling me a policy? I jump off the top rope and land on my head for a living- but I probably won't get hurt." You can imagine how that goes over."[36]

161.   The consequences and human toll of this health insurance 'policy' (and intentional depravation of other statutory rights) are that many of the Named Plaintiffs have now been injured to the point where they are at pre-retirement age and have been forced to avail themselves of the public assistance available through Social Security Disability and Medicaid.

162.   The Named Plaintiffs relied on WWE's assumed and superior position of authority and knowledge to inform them of their injuries. Yet, despite holding themselves out as caretakers for its wrestlers, WWE, its trainers, agents, and staff,

---

[36] Leiker, Ken and Vancil, Mark, "WWE Unscripted: Edited", Pocket Books, 159 (2003).

failed to provide specific instruction, information, and care and treatment to prevent and treat the Named Plaintiffs' injuries.

**Nature of WWE Professional Wrestling Performances.**

163.   The Named Plaintiffs sustained hundreds of blows to their heads and damaging rapid deceleration during their careers with WWE.  Many of these blows were a direct result of the choreographed and visually dramatic entertainment spectacle VKM developed to increase ratings, and many of these blows were routinely repeated as the most common moves resulted in head impacts and brain trauma.

164.   The long-term effects of the repeated falls, bumps, blows, and rapid deceleration to the head in routine and even correctly executed maneuvers, the Named Plaintiffs sustained have resulted in long-term degenerative neurological illnesses and diseases.

165.   From the outset of the Named Plaintiffs' WWE careers, WWE undertook a duty to properly train, oversee and choreograph the Named Plaintiffs' moves and performances.   Wrestlers are trained in facilities where WWE employees work and WWE employs trainers to advise the wrestlers how to conduct various maneuvers.

166.   WWE employs trainers, agents, producers, and medical professionals to organize, script, and oversee the performances.  The agents' responsibilities include writing scripts, determining the order of events for a performance, and advising the wrestlers what techniques must be used during an evening's matches.

WWE's agent (now called a producer) is directly responsible for the specific moves and results of each particular match, and has direct contact with each wrestler.

167.   Throughout the history of WWE, the trainer, agent, and other WWE staff have been jointly responsible for the safety of the wrestlers involved in each performance.

168.   The concepts for the storylines are provided by WWE staff writers and creative personnel, which have included Vince Russo, Michael Hayes and Pat Patterson, under the oversight of VKM himself. These ideas are then given to the agents to implement for each match.  The agent is responsible for explaining to the wrestlers the scripts and choreography each wrestler is expected to perform.  The template for the typical performance was developed by, and is to this day, largely governed by WWE's controlling shareholder, VKM.

169.   "There are approximately twelve basic patterns according to which a match can be choreographed, with another twelve or so types of matches that can employ these patterns. For example a match can go to the hero or the villain by pin fall, through the help of outside interference, by disqualification, and so on. The match can take place in a cage, with wrestlers strapped to each other . . . All told, there are approximately one hundred and forty-four basic variations on the general theme that the script can follow in the staging of a match."[37]

170.   During these matches, wrestlers sustain numerous trauma to the head, not just from direct blows, but from the rapid deceleration from basic bumps and slams to the mat. The most basic wrestling move is called a "bump" which is

---

[37] *See* "Wrestling to Rosslyn", p. 105.

where a wrestler falls to the mat backwards and lands forcefully on his or her back. Although wrestlers are taught to fall so the top of their back hits the mat, the force which they hit the mat results in the rapid deceleration of the head and trauma to the brain.  This move is repeated numerous times in each match.

171.   Another common, repeatedly used WWE move is the "body slam", where a wrestler is picked up and thrown forcefully to the ground.[38] Certain slams involve dropping a wrestler on his or her head.  Such moves are often performed incorrectly, resulting in the head hitting the mat or other surface with great force, causing concussions and sub-concussive blows. The numerous slams are delivered at varying speeds and driving force, requiring significant training to safely accomplish, and the careful eye of trainers and medical professionals to spot resulting injuries. All slams begin with a wrestler moving with acceleration downward with the resulting kenetic energy of the wrestler having to be absorbed upon impact.

172.   Other dangerous moves are often acrobatic feats involving lifting wrestlers more than six feet in the air and then smashing them to the ring floor. These moves include the colorfully named: neckbreaker, DDT, pile driver, brainbuster, and suplex. The pile driver, now largely banned, was once very popular in WWE and involved grabbing a wrestler, turning him upside down and dropping him head first into the floor. Even when performed properly the move presents serious risks of head injury and long-term brain damage as rapid deceleration of the brain on impact cannot be avoided.

---

[38] "There are approximately three hundred basic routines and up to one thousand terms for the estimated three thousand wrestling holds, moves and positions." *See Id.* at 46.

173.    These techniques which the Named Plaintiffs performed at various times, among other dangerous moves, were a result of VKM's evolution of wrestling entertainment to increase its popularity and ratings. According to an academic history of the sport: "McMahon proved to be one of the staunchest advocates of making wrestling more brawl than catch style. He encouraged wrestlers to bleed, to take their fights out of the ring and into the crowd, and to attempt flashy, high risk maneuvers." (*See*, Beekman, Scott A., <u>Ringside: A History of Professional Wrestling in America</u>, Praeger, p. 106 (2006).

174.    The same author further states:

The high-risk maneuvers and weapons that define hardcore wrestling present fantastically dangerous working environments for professional wrestlers. Serious injuries and shortened careers often result from prolonged involvement in these matches. The need to continue performing (and earning) after being injured in high-risk matches propels many wrestlers to rely on painkillers and illegal drug use. Hardcore matches result in in-ring injuries, which can increase use of prescription pain medications so that wrestlers can engage in high risk matches; a vicious cycle of bodily deterioration that takes a shocking toll of the wrestling fraternity. McMahon's continued, unnecessary reliance on hardcore matches in the WWF means that wrestlers must participate in dangerous encounters or spend their careers relegated to the netherworld of small, independent federations.

*Id.*, at 141-142.

175.   WWE confirms the push to increased violence in its own published book: "Vince McMahon made the era official, opening the December 15, 1997 Raw by telling viewers that the WWE now required parental discretion for younger viewers . . . They were about to up the level of violence, foul language and Diva skin".[39]  "The stunts became even more outrageous and dangerous." *Id.* "The crowd ate up all the bloodshed and table bumps, becoming invested in not only the extreme violence, but, more importantly the characters in the middle of the carnage." *Id.*, at 19.

176.   Instead of ensuring its wrestlers' health and safety, the Named Plaintiffs state WWE continually engaged in a pattern of behavior and practices deliberately designed to increase the injuries suffered by its wrestlers as a marketing tool.

177.   WWE's staff, trainers, agents, and medical personnel allowed and encouraged wrestling events to continue despite its wrestlers suffering injuries and the known medical risks such actions caused, and as a result WWE failed its duty to provide adequate training, safety protocols, and medical care and treatment to its wrestlers, resulting in the Named Plaintiffs' long-term injuries.

178.   During and after wrestling events, the WWE employed medical professionals and associated staff negligently or intentionally failed to diagnose concussions. Despite having assumed a duty to monitor head injuries suffered in-ring, which the Named Plaintiffs relied on, WWE did and does little for neurological injuries. WWE downplays TBI's significance and coerces wrestlers to return to the

---

[39] Robinson, Jon, "WWE: The Attitude Era", Brady Games, p. 15 (2015).

ring before they have healed. Such actions are in direct violation of OSHA requirements (often Family Medical Leave Act requirement as well) and good medical practice.

**WWE's Influence and Control Over Professional Wrestling.**

179. In part because of its financial power, monopoly status, and high visibility, the WWE has had an enormous and controlling influence over the wrestling industry.

180. Over many decades, WWE's influence has been expanded through its use of the media. Through weekly programs on TV, WWE produced films, the WWE Network- a streaming content service with over 1.5 million subscribers, WWE.com, and social media, the WWE has promoted WWE wrestling via every mass communication medium available.

**WWE Has Mythologized Violent Action**

181. WWE has used its promotion of violent in ring action to encourage its wrestlers, including the Named Plaintiffs, to fight through the pain, to adopt the persona of a brutal and ferocious warrior, and propagate the fraudulent representation that "getting your bell rung", "being dinged", and performing dangerous moves designed to 'harm' other wrestlers is a badge of honor and should be lauded. For example in a WWE published book, WWE Unscripted (2004 p. 121), Bubba Ray Dudley explains: "I've continued matches with concussions. One of the worst things that happened to me in WWE was in the Tables, Ladders, Chairs match in Las Vegas, when Chris Jericho gave me a Bulldog off a 10-foot ladder. I was completely knocked out, do not remember anything from the match

and managed to hit all of my spots. Jericho actually had to guide me through the match, tell me what was going on . . . We have no offseason; we don't know what it is to have any down time; we don't take time off. We tape it up and hope for the best."

182.   In a WWE produced program called Confidential that aired between (2002-2004), Paul Levesque, the current WWE Executive Vice President of Live Events, Creative and Talent Relations (husband of Stephanie McMahon) who sits on the board of the Concussion Legacy Foundation, openly venerated wrestler Kurt Angle for continuing a performance after being knocked out, Mr. Levesque stating on camera: "you can see it when Kurt was coming out, he was glass eyed looking around, there's a guy unconscious in the ring, he's just goin' and he new too he not like a veteran or anything my too hats off to him for that."

183.   To be injured and continue performing and not report the injury is an integral component to WWE's culture of silence, showcasing WWE's downplaying of the head injuries the Named Plaintiffs routinely sustained, and evidencing WWE's fraudulent concealment of the long-term degenerative neurological conditions which the Named Plaintiffs suffer.

184.   As a result, WWE has generated billions of dollars by promoting its violent product and inculcating in its wrestlers the dangerous ideas that (a) injuries and head impacts are a required and and even desired outcome in a wrestling performance; and (b) continuing to wrestle after suffering head impacts is a laudable and desirable goal without long-term consequences.

**WWE Markets Wrestling's Historical Matches and Violent Action Through Its Advertising, Promotional Materials, Books, Films and the Streaming Content on WWE Network.**

185.   WWE Network is an instrumentality of the WWE   which is a subscription-based streaming content service that features wrestling matches and films made for and owned by the WWE.  As of 2016, the network is a great success with more than 1.5 Million paid subscribers and the company boasts that it may reach 4 million paid subscribers in the next five years. WWE Network launched in February 2014, features WWE wrestling matches, performances, interviews, wrestlers, referees, commentators, and overall WWE environment in an artistic, promotional fashion. WWE Network editing of matches, interviews, "promos" along with camera angle and cinematography are intended to highlight certain violent aspects of the performances. As one observer noted: "the work of hardcore legends such as "Mick Foley, who earn their renown for their ability and willingness to 'take bumps,' to absorb as much pain as they can. This celebration of pain is further fetishized through lingering close-ups on faces twisted in anguish or masked in blood, of hands wavering on the edge of tapping out, of yielding to domination."[40]

186.   WWE has produced a wide range of popular televised programs including one of the longest running shows in television history, 'Monday Night Raw', which has been on air since 1993. The flagship product of the WWE, it has

---

[40] Hammond, Nicholas, <u>Chair to the Head: The Pleasure and Pain of Professional Wrestling</u>, Duke University Press, p. 11 (2005).

featured over 1,171 episodes two to three hours in length aired every Monday night. The segments on the program are referred to as 'Raw is War' and the 'War Zone.'

187.   Since at least 1978, WWE has produced television products that show WWE wrestling matches and programs that offer commentary and highlights of the matches and interviews of performers in the same way sporting events are covered by other networks. These programs include: WWE Championship Wrestling (1978-1986), All Star Wrestling (mid-1970s-1986), American Wrestling (1983-1985), Tuesday Night Titans (1984-1986), Prime Time Wrestling (1985-1993), The Main Event (1985-present), Wrestling Spotlight (1986-1995), Wrestling Challenge (1986-1996), WWE Superstars of Wrestling (1986-2001), WWE Mania (1993-1997), WWE Sunday Night Slam (1994-1995), WWE Action Zone (1994-1995), WWE Free for All (1996-1998), Livewire (1996-2001), Shotgun Saturday Night (1997-1999), Sunday Night Heat (1998-2008), SmackDown (1999-present), Metal (1999-2002), Jakked (1999-2002), Excess (2001-2002) , Tough Enough (2001-2004- 2011- Present), Confidential (2002-2004) , Afterburn (2002-2005), WWE Bottom Line (2002-2005), Velocity (2002-2006), WWE Experience (2004-Present), A.M. Raw 2005-Present), NXT (2010-Present), WWE Superstars (2009-Present) and  ECW (2006-2010). *See* Shields, Brian and Sullivan, Kevin, <u>WWE Encyclopedia: The Definitive Guide to WWE</u>, "WWE on TV", DK Penguin, Updated and Expanded Edition 2012, pp. 174-175 (2012).

188.   WWE also utilizes Pay-Per-View (PPV), a system to purchase a television program for private telecast, to showcase its headlining products.  The most well-known of these events is Wrestlemania, WWE's annual flagship event

produced since 1985. WWE's use of television, the internet, and the wires of the United States is integral to the success of the WWE.

189.    WWE releases many of these televised and pay-per-view events on home video, DVD, and Blu-Ray. These packaged releases, like the original airings, focus on violence as one of the WWE's greatest selling points: the wrestler as a bloodstained warrior fighting through pain and injury. To advance the WWE's purpose, WWE Network has created numerous highlight features that focus on the dangerous moves in pro wrestling. For example, DVDs featuring chair shots which until recently were a major selling point of violence in the matches.[41] These and many similar WWE productions are marketed and sold to advance WWE's culture of violence and entertainment.

190.    Despite claiming the elimination of chair shots, as recently as July 2014, WWE was promoting an unprotected chair shot to the head to sell its products.[42]

---

[41] *See generally*, Johnson, Liam, "10 Sickest WWE Steel Chair Shots Ever", WhatCulture.com, http://whatculture.com/wwe/10-sickest-wwe-steel-chair-shots-ever.php; TLC Tables, Ladders, Chairs 2009, WWE Home Video, DVD ("An innovative and dangerous event premieres in the WWE when the superstars of Raw, Smackdown, and ECW present WWE TLC…. Four unique matches highlight the hazardous evening, featuring some of the most devastating weapons in entertainment…". The voice introduction postulates "Can you imagine the feeling of getting slammed through a table? Splintered wood and twisted metal. Smashed with a steel chair? The jolt of solid steel. Fee falling off a ladder? The excruciating pain that awaits"). *See also* World Wrestling Entertainment: Bloodbath Wrestling's Most Incredible Steel Cage Matches", WWE Home Video, DVD ("The steel cage: It's used as a barrier and as a weapon. It keeps the competitors inside and the interference outside. The steel cage match is the most brutal form of sports entertainment…" The box case features matches by named Plaintiff Paul Orndorff who are thrown against steel bars often resulting in injury).

[42] *See* Mrosko, Geno, "WWE uses unprotected chair shot to the head to promote its Network" (July 12, 2014), http://www.cagesideseats.com/wwe/2014/7/12/5893661/wwe-uses-unprotected-chair-shot-to-the-head-to-promote-its-network.

191. WWE's message glorifying violence deemphasizes the risks associated with its wrestlers' head impacts and instead encourages its wrestlers to disregard the results of violent head impacts to advance their careers.

192. The WWE promotes a culture where performing injured is expected and acclaimed and this expectation has resulted in the WWE wrestlers being forced to ignore serious injuries and symptoms, including TBI, concussions, and sub-concussive blows.

193. WWE profits from this culture of toughness and violent action, and WWE's continuous enterprise to profit from its wrestlers' injuries has resulted in the Named Plaintiffs' long-term injuries.

194. The WWE's continuing enterprise exists largely through its collection of intellectual property that includes the wrestling performances of all the named plaintiffs. Other sporting events unfold in real time with no predetermined outcome- and involve live drama, which accounts for much of their popularity. Although these games are recorded and fixed for posterity, rare is the fan that watches a baseball, basketball or football game in its entirely, thus the continued value in these sports libraries is mostly confined to "highlight reels" or portions of the games which are a smaller share of the overall revenue sources for the respective owners of this intellectual property. While the WWE certainly produces and licenses new content in the form of continuous wrestling matches- much of the WWE's success stems from its ability to continue to monetize all of the historical wrestling matches.

195.   A wrestling fan, unlike most live sports fans, will and does re-watch old wrestling matches including performances featuring all of the named plaintiffs.

196.   A series of independently published Video guides designed for wrestling fans published by James Dixon evidence this fact. Styled the "The Complete WWF Video Guides" along with "The Raw Files" the books provide an unusual and fascinating insight in the enduring popularity of each scripted match. The Raw Files books for example offer "Every Match Reviewed," which is quite an undertaking in that Raw aired for three hours every Monday night since January 1993 (The show was cut down to 2 hours in 2012). The books published in conjunction with historyofwrestling.info the guides are newly being published (in 2016) featuring a team of writers and are expanding to include more matches.

197.   This fact is further borne out by the WWE's very successful Streaming Network that features thousands of old wrestling matches, as well as the WWE's promotion and engagement with its fans through it "historical" wrestling products such as the best selling (Upon release of the Second Edition in 2009 the book debuted as the number 10 on the New York Times Best seller list) "WWE Encyclopedia: The Definitive Guide to WWE," which recently released its Third edition in October 2016. This 400 page lavish book features high quality images and biographies of nearly all of the named plaintiffs. The back cover advises fans: "Every WWE Superstar to ever lace up a pair of boots . . . performers and Events from all generations immortalized with stunning imagery, it's all here. Then. Now. Forever." The book uniquely places the WWE's continuing relationship with the named plaintiffs in context, while its seeks to "honor" them, it also evidences how

the WWE is making money through its promotion of the collective historical performances of all the men and woman that wrestled in the WWE. None of the named plaintiffs believes they are compensated for their inclusion in the book, but the book does indirectly furnish some of them a revenue source. After retirement wrestlers including many of the named plaintiffs travel around the country to autograph signings where fans will often present the book for the wrestler to sign: the fee to the wrestler is usually about twenty dollars (though even this income is reduced as the show promoter takes a cut).

Head Injuries, Concussions, and Neurological Damage: History

198.   Medical science has known for many decades that repetitive and violent jarring of the head or impact to the head can cause TBI with a heightened risk of long term, chronic neuro-cognitive sequelae. This important medical history of what science knew about head trauma was in part compiled reviewing the similar claims by thousands of NFL players in MDL-2323 IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION in paragraphs 258-288.

199.   This history is pertinent because the WWE cannot assert that it operated without being aware of this information. As such the plaintiffs rely on this historical data to show that the risks of concussions and head trauma were well known to the WWE.

200.   The plaintiffs in the NFL lawsuit pointed out that the NFL was essentially ignoring the genesis of medical and scientific knowledge in contact sports by asserting that it was aware of the state of this science.

201.   The named Plaintiffs advance the same argument here and rely in part on the historical work illustrating the various states of clinical knowledge already done by plaintiffs counsel in the NFL lawsuit.

202.    The named plaintiffs believe a review of the literature shows that was there credible scientific evidence linking head trauma of the type experienced by wrestlers to TBI, and permanent brain injuries before 2006 the first year the WWE implemented any type of protocols.

203.    The named plaintiffs believe that a review of the studies, patterns and causes of CTE and the published epidemiology of sports related head trauma shows that the plaintiffs are at risk of CTE.

204.    The two issues are interrelated. The plaintiffs contend the WWE had for most of its history deficient policies related to actual incidents of head trauma and concussions. The named plaintiffs' factual recitations about their careers evidence this utter failure by the WWE as a fact. These failures cannot be excused but obviously the incidents themselves are not the sole basis for arguing that the WWE is liable for the wrestlers' injuries. What the plaintiffs argue is that the old forgotten head injuries some of which took place in the last century are the likely culprit and ultimate cause of the later development of CTE in these plaintiffs. Thus the history of head trauma combined with the current clinical data studied in the population of athletes with CTE shows that the Plaintiff are at risk for a disease that is currently being ignored by the WWE.

205.    WWE has known or should have known for many years the work of the American Association of Neurological Surgeons (the "AANS"). The AANS is a professional organization known to the WWE's medical director Dr. Joseph Maroon who lists his affiliation on his website biography. AANS has defined a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma." The AANS defines traumatic brain injury ("TBI") as:

a blow or jolt to the head, or a penetrating head injury that disrupts the normal function of the brain. TBI can result when the head suddenly and violently hits an object, or when an object pierces the skull and enters brain tissue. Symptoms of a TBI can be mild, moderate or severe, depending on the extent of damage to the brain. Mild cases may result in a brief change in mental state or consciousness, while severe cases may result in extended periods of unconsciousness, coma or even death.

206.    WWE has known or should have known for many years that TBI generally occurs when the head either accelerates rapidly and then is stopped, or is rotated rapidly. The results frequently include, among other things, confusion, blurred vision, memory loss, nausea, and sometimes unconsciousness. Rapid acceleration and deceleration to the head causes injury to the brain.

207.    WWE has known or should have known for many years that medical evidence has shown that symptoms of TBI can appear hours or days after the injury, indicating that the injured party has not healed from the initial blow.

208.    WWE has known or should have known for many years that once a person suffers a TBI, he or she is up to four times more likely to sustain a second one. Additionally, after suffering even a single sub-concussive or concussive blow, a lesser blow may cause TBI, and the injured person requires more time to recover.

209.    Unfortunately, the named Plaintiffs were not made aware of the serious risk posed to their long-term neurocognitive health.  Instead, WWE pressured its wrestlers to ignore the danger and continue wrestling after injured without adequate rest and recovery time.

210.    WWE has known or should have known for many years that clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple head injuries or concussions sustained during a WWE's

133

wrestler's career can cause severe neurocognitive problems such as depression and early-onset of dementia.

211.    WWE has known or should have known for many years that published peer reviewed scientific studies have shown that repeated traumatic head impacts (including sub- concussive and concussive blows) cause ongoing and latent brain injury. These injuries have been documented and associated with sports-related head impacts in both football and boxing.

212.   WWE has known or should have known for many years that neuropathology studies, brain imaging tests, and neuropsychological tests on many former athletes, including former WWE wrestlers, have established that wrestlers who sustain repetitive head impacts while performing have suffered and continue to suffer brain injuries that result in any one or more of the following conditions: early-onset of Alzheimer's Disease, dementia, depression, deficits in cognitive functioning, reduced processing speed, attention and reasoning, loss of memory, sleeplessness, mood swings, personality changes, and the debilitating and latent disease known as Chronic Traumatic Encephalopathy ("CTE"). The latter condition involves the slow build-up of the Tau protein within the brain tissue that causes diminished brain function, progressive cognitive decline, and many of the symptoms listed above. CTE is also associated with an increased risk of suicide.

213.   WWE has known or should have known for many years that CTE is found in athletes, including WWE wrestlers, football players, hockey players, and boxers, with a history of repetitive head trauma and/or rapid deceleration. Published papers including those financed by the WWE have shown that this condition is prevalent in retired professional football players and other contact

sports athletes who have a history of head injury. The changes in the brain caused by repetitive trauma are thought to begin when the brain is subjected to that repetitive trauma, but symptoms may not appear until months, years, or even decades after the last traumatic impact or the end of active athletic involvement.

214.   WWE has known for many years of the reported papers and studies documenting autopsies on former NFL football players and other contact sports athletes. The papers and studies including at least one major article financed by the WWE show that athletes who sustained long-term head trauma of the type experienced by WWE wrestlers suffered from CTE.

215.   As a result, published peer reviewed scientific studies have shown that concussive and sub-concussive head impacts while playing professional football are linked to significant risk for permanent brain injury. WWE wrestling, like professional football, involves repetitive head impacts causing concussive and sub-concussive injuries. In fact, WWE wrestling involve more strain on the head, brain, and neck as wrestlers have historically not worn helmets, padding, or braces, and do not receive vacation time and are required to perform after injury, causing further and sustained damage to the brain and spine.

216.   In a study of NFL retirees, 11.1% of all respondents reported having a diagnosis of clinical depression.

217.   NFL retirees experience earlier onset of Alzheimer's-like symptoms more frequently than the general American male population in the same age range.

**WWE Was and Is in a Superior Position of Knowledge and Authority and Owed a Duty to Its Wrestlers.**

218.   At all times, the WWE's unique historical vantage point at the apex of the sport of wrestling, paired with its unmatched resources as the most well-funded organization devoted to the business of wrestling, has afforded it unparalleled access to data relating to the effects of head impacts on wrestlers and has made it the only institutional repository of accumulated knowledge about head injuries to wrestlers.[43]

219.   WWE's accumulated knowledge about head injuries to wrestlers, and the associated health risks therefrom, was at all times vastly superior to that available to the Plaintiffs.

220.   From its inception, WWE unilaterally created for itself the role of protecting wrestlers, informing wrestlers of the safety concerns WWE wanted them to know, and imposing unilaterally a wide variety of rules to protect wrestlers from injuries including banning moves, and drug testing. At all times the WWE held itself out as the guardian of the wrestlers' best interests on health and safety issues.

221.   For these reasons, wrestlers and their families have relied on WWE's control of matters of wrestler safety, to recognize issues of wrestler safety, and to be truthful on the issue of wrestler safety.

---

[43] *Compare*   Ann McKee's statement, "We've come a long way in 5 years; this funding [by WWE] will further accelerate the pace of our research and hasten the development of methods to detect CTE during life as well as identify treatments to slow or stop its progression" *to* WWE's statement, "As part of its comprehensive Talent Wellness Program, WWE has been a leader in concussion prevention, education and management, with mandatory ImPACT testing for all talent…. In addition, WWE consistently updates its safety policies as new research becomes available." Boston University Medical Campus, "WWE Donates $1.2 Million to SLI for Boston University CTE Treatment Program", Boston University, *available at* http://www.bumc.bu.edu/2013/05/17/wwe-donates-1-2-million-to-sli-for-boston-university-cte-treatment-program/.

222.   For example, in 2013, WWE began funding research into CTE by donating $1.2 million to the Sports Legacy Institute. In public statements at the time, this activity was characterized as "a continuation of the Talent Wellness Program it started in 2006, which now includes the same neurological baseline testing used in the NFL and such pro wrestling mandates as a ban against bashing an opponent over the head with a metal chair." Paul Levesque stated: "we took out the things . . . that caused the most concussions and the most head impacts."[44] This statement by Levesque is an admission that concussions and head impacts were occurring at an unacceptable rate.

223.   On information and belief, since its inception, WWE received and paid for advice from medical consultants such as Dr. Maroon, Dr. Black and Dr. Lovell regarding health risks associated with wrestling, including the health risks associated with concussive and sub-concussive injuries. Such ongoing medical advice and knowledge placed the WWE in a position of ongoing superior knowledge to the wrestlers. Combined with the WWE's unilateral and monopolistic power to set rules and determine policies throughout its performance, WWE at all relevant times was in a position to influence and dictate how the performance proceeded and defined the risks the wrestlers were exposed to.

224.   As a result, WWE assumed the duty to act in the best interests of the health and safety of its wrestlers, to provide truthful information to its wrestlers

---

[44] Mihoces, Gary, "WWE funds research into treatment of chronic brain trauma" (2013), *available at* http://www.usatoday.com/story/sports/2013/05/16/wwe-concussions-chris-nowinski-research-sports-legacy-institute-cte/2178667/.

regarding the risks to their health, and to take all reasonable steps necessary to ensure the safety of its wrestlers, but failed to do so.

225.   As early as 1963, WWE assumed the duty to act in the best interests of its wrestlers, requiring WWE to provide truthful information to its wrestlers regarding their health and safety and to take all reasonable steps necessary to ensure the safety of its wrestlers.  The WWE's historical actions in connection with these legal duties have included, but are not limited to, the following:

A.    <u>Banning chair and prop shots to the head</u>. (2010). WWE employee Robert Zimmerman stated: "In January 2010, WWE amended its talent Wellness Program, specifically regarding the ImPact Concussion Management Program originally instituted in 2008, eliminating the use of folding chairs or props to "strike" an opponent in the head. The policy states "The WWE has eliminated using folding metal chairs to "strike" an opponent in the head. The WWE penalizes through fine and/or suspension the following: The intentional use of a folding metal chair to "strike" an opponent in the head. Any blow to the head that is deemed an intentional act. The fine or suspension will be directed by the EVP of Talent relations." The Named Plaintiffs have nearly all been subjected to these now banned hits to the head either from chairs or other objects *inter alia*: guitars, 2x4s, kendo sticks, microphones, coconuts, trash cans, ladders, canes, concrete blocks, bricks, and others, which upon information and belief are considered "props" under the 2010 policy.

B.    <u>Blood ban</u>. (2015, publicly). WWE no longer allows intentional bleeding or blading of wrestlers (stated publicly 2015). In April of 2015 after a

performer in Wrestlemania 31 apparently used a razor blade in the ring (months after the Haynes lawsuit was filed which asserted blood borne virus related claims) the WWE issued a statement: "the communication or contact between our performers and referees is part of our safety protocol. That said, unintentional blood sometimes occurs, and we do our best to minimize."[45]

C.    Banned Moves. (1963-present). The WWE throughout its history has banned certain dangerous or high risk moves.  There is no external oversight nor consistent publicity documenting the dates of such bans (since WWE avoids OSHA regulation through intentional misclassification of its employees), however, upon research, statements made by WWE employees past and present, Plaintiffs, and upon information and belief, WWE has undertaken steps to alter matches under the duty it owed its wrestlers to affirmatively make the performances safer by banning and regulating moves.  Upon information and belief, dozens of dangerous moves have been banned.  The banned moves are often simply no longer performed, a key reason why discovery is needed in this lawsuit will be to understand the process, logic and protocols which regulate the dangerous moves in WWE events, in addition to ratings and the threat of litigation. Additionally, it should be noted that after such a ban the said moves are allegedly often removed from video clips thereby destroying documentation of their use in the WWE.

On this issue, long-time WWE employee Jim Ross (inducted in WWE hall of fame in 2007 and considered the voice of the WWE[46]) posted on his blog on June

---

[45] *See* Hopwood, Philippa, "WWE respond after being accused of allowing Brock Lesnar to "Blade", http://www.givemesport.com/561123-wwe-respond-after-being-accused-of-allowing-brock-lesnar-to-blade.
[46] *See*, "Jim Ross", Wikipedia, https://en.wikipedia.org/wiki/Jim_Ross.

7, 2007, while presumably employed by WWE, in a section titled "On "banned"
moves":

> Some have asked about "banned moves" in the WWE. I have yet to
> see an official list of what is or isn't allowed, but I can assure you that
> moves that may be banned are done so with the wrestler's safety in
> mind. Some high-risk maneuvers are safer to execute than others even
> though all flying, high risk moves provide no guarantee of safety to
> the participants. I think it is wise to eliminate the maneuvers that hold
> the highest risk of serious injury. Old time wrestlers will opine that
> young wrestlers who rely almost exclusively on high-risk maneuvers
> simply can't wrestle. I don't know if I would be so bold to say that, but
> the art of mat wrestling and hold knowledge is very important, in my
> opinion, for any wrestler to learn, and to thoroughly understand first
> before "graduating" to the high flying stuff as a viable compliment to
> basic, fundamental mat wrestling and the utilization of holds. Do high-
> risk maneuvers have a place in today's business? Absolutely.
> However, common sense and logic must be factored into any decision
> to use these moves. As the bar seemingly continues to be raised as it
> relates to high risk offensive maneuvers, we are likely to see more
> injuries and see beginning wrestlers not learn the art of wrestling but
> focus more on the art of crashing and burning which will lead to
> shortened careers. Don't get me wrong, I like to see high risk moves
> as well as the next guy, but I also understand that these moves, when

missed by "this much" can lead to serious injuries which any company should want to avoid.

As Mr. Ross stated, WWE employees and the WWE were: 1) Aware of the risks of certain moves; 2) Did not publicly identify them nor was there likely an official list created; 3) Undertook a duty to its wrestlers based on "common sense and logic"; and 4) Presumably acted with "common sense and logic" when banning certain moves "with wrestlers' safety in mind".  Evidencing a legal duty taken up by WWE to regulate the moves in its matches and the safe performance and execution of them further evinces WWE's awareness of the risks of concussions from dangerous moves.  WWE concealed not only the risks of these moves, but also the existence, nature, and outcome of the dangerous moves throughout its history.

226.   The seeming failure to provide an analysis of the risks, the nature, extent and number of injuries from the moves, or any study or list of the moves evidence omission of essential health related information relating to the Named Plaintiffs, and showcase WWE's negligence, recklessness, and complete disregard for wrestler safety throughout WWE's history.  The failure to provide warnings, announcements, official rule changes, ban notices, or other publications and documentations of the moves in question evidence WWE's failure to warn, study and protect the Named Plaintiffs in allowing risky and dangerous moves, and then implementing bans on those moves too late to prevent injury.[47]

---

[47] On WWE Banned Moves, *see generally* "Top Twenty Moves WWE Banned For Being Too Dangerous", The Sportster, http://www.thesportster.com/wrestling/top-20-moves-wwe-banned-for-being-way-too-dangerous/; "10 Wrestling Moves WWE Banned For Being Too Dangerous", WhatCulture,          http://whatculture.com/wwe/10-wrestling-moves-wwe-banned-for-being-too-

227. Apparent Banned Moves in WWE include:

i) Curb Stomp. In April 2015, WWE banned a finishing move called a "curb stomp", which features delivering a foot stomp to a prostrate wrestler's head. The decision to ban the move reportedly related to it being too violent from a "PR standpoint."[48]

ii) Piledriver. A dangerous move in which a wrestlers grabs his/her opponent turns them upside down and drops into a sitting position driving the opponent head first into the Mat. According to wrestling media the piledriver was banned in 2000 after high profile performers sustained head and neck injuries.

iii) Vertebreaker, a piledriver-style move involving holding an opponent upside down back-to-back by the arms, then driving them to the mat by dropping to a seated position, causing the opponent to land on their shoulders, neck, and the back of their head. It was officially banned in May 2003, due to neck injury risks.[49]

D. **Prohibition on Use of Performance Enhancing Drugs**. (1987, 1991, 2006). As early as 1987, WWE stated it had an in-house drug testing policy. In 1991,

---

dangerous.php; "Top 10 Moves WWE Bannded For Being Too Dangerous", Sportskeeda, http://www.sportskeeda.com/slideshow/top-10-moves-wwe-banned-for-being-too-dangerous; "10 Dangerous Moves Banned By WWE", The Richest, http://www.therichest.com/sports/wrestling/10-dangerous-moves-banned-by-wwe/; "4 Moves Banned By The WWE", Information Entertainment News, http://infotainmentnews.net/2013/04/02/4-moves-banned-wwe/; and, "Top Illegal Finishing Moves in WWE", Cheap Heat, http://www.cheap-heat.com/top-illegal-finishing-maneuvers-in-pro-wrestling/.

[48] *See* "WWE Banning a Current Champion's Finishing Move", http://www.wrestlezone.com/news/572739-exclusive-wwe-banning-a-current-champions-finishing-move; and, "Seth Rollins Finally Reveals Why WWE Banned The Curb Stomp", http://whatculture.com/wwe/seth-rollins-finally-reveals-why-wwe-banned-the-curb-stomp.php.

[49] *See* "The Finish Line: 11.10.03: Leader Of The Banned", 411Mania, http://411mania.com/wrestling/the-finish-line-11-10-03-leader-of-the-banned/.

the WWE allegedly subjected wrestlers to tests for steroids. In 1993, WWE enacted more policies regulating drug use in the organization.  In February 2006, the WWE implemented a Substance Abuse and Drug Testing Policy, per WWE's website, the policy was designed to help the safety of its performers and was "Originally Implemented on February 27, 2006 Amended and Restated as of August 23, 2009, as of September 13, 2010, as of June 6, 2011, as of January 15, 2012 and as of July 23, 2013".[50]

228.   Implemented after the high profile death of 38-year-old WWE star Eddie Guerrero in November 2005, the 2006 WWE Wellness Policy and its drug program was claimed to protect its athletes' health and safety. In 2007 Congressional Testimony, Dr. Black was asked: "In November and December 2005, when Linda McMahon contacted you, did she give you any reason as to why they wanted you to initiate this testing again? A: The death of Eddie Guerrero." (*See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: David Black p. 23) (September 25, 2007), *available at* http://web.archive.org/web/20090103083353/ http://oversight.house.gov/documents/20081231140749.pdf.   WWE's current counsel in this case Jerry McDevitt was the drafter of the language of the Policy: "Jerry McDevitt…actually developed the language of the policy."   (Id. Black Congressional Testimony p. 14) McDevitt is also credited with creating the list of banned substances: "This was discussed with Jerry McDevitt, he and I went over

---

[50]   "Abuse   and   Drug   Testing   Policy",   WWE   Corporate, http://corporate.wwe.com/wellness/substance-abuse-drug-testing-policy, *last accessed* November 18, 2015.

the list, created the list…" (Black Id. p. 31) The penalties in the WWE Wellness Policy were also devised by Mr. McDevitt (Q: In the final area of the policy it says penalties for positive tests. Were those initial recommendations from you or from Jerry McDevitt? A: But I think he had it as a part of the first draft that he developed. Q: Okay. Those proposals initially came from him and were accepted by you without any changes? A: Correct." (Black Id. p. 36) When pressed on a decision to allow wrestlers to continue to perform despite positive tests Dr Black was asked Q: Were outside experts consulted during the development of the policy? A: Well, we had Jerry and myself." (Black Id. P. 39) The drug policy and the other measures undertaken by WWE through Jerry McDevitt, including the development of the wellness policy, its drug testing regime and suspension of its athletes evidence the legal duties owed and undertaken by WWE to its wrestlers' health and safety.

229.   The drug-testing regime implemented by the WWE clearly evidences that the WWE had undertaken a duty to the wrestlers that arises from a workplace safety premise that nullifies any defense that the wrestlers are independent contractors. Dr. Black- now a WWE employee listed on their website explains in his 2007 Congressional testimony: "This is a workplace drug test, but a very expanded workplace drug test." *Id.*, Black Congressional Testimony p. 27.

230.   The goals of the program are elicited by the Congressional Investigator: "Q: The program seems to be slightly different than at least by its name than workplace testing program. It is called a wellness program which suggest one concern is the health of the wrestlers." A: "Absolutely. No, absolutely. And the attention too was not just to suspend and punish. The intention--- much

like the NFL . . . we tested for two years without punishment . . . the intention is to get the wrestlers to engage in a healthier lifestyle and discontinue this use of drugs in a nonmedical way". Black Testimony, *Id.* at 29-30. Thus WWE likened its policies and assumed duties to those undertaken by the NFL to its athletes to provide safe working conditions.

231.   As wrestling's only major company, and only entity with the resources and history to regulate and govern wrestler conduct and safety (with near monopolistic power), the WWE has made it known to wrestlers that the WWE actively and pervasively governs wrestler conduct and health and safety both in and out of the ring. WWE has created policies and programs for wrestlers both during their career and after they retire. In public statements since its inception, WWE has stated that its goals include taking necessary steps for the safety, health and well-being of wrestlers and their families, even while denying its wrestlers fundamental statutory rights.

232.   WWE's approach has included developmental training programs to train new wrestlers. WWE uses a farm system to train and recruit new talent including having operated a developmental branch of the company called WWE NXT based in Winter Park Florida. The WWE explains:

> WWE's Professional Development program for both Main Roster and Developmental talent focuses on four key pillars of development – Life Skills, Education, Wellness and Career Success.
> - **Life Skills:** Provides talent with practical skills and solutions to manage their careers both in and out of the ring. Educational presentations and seminars help talent with decision-making and the development of their personal brand.
> - **Education:** Assists talent in reaching their full potential through programs that include financial education, college tuition reimbursement, language courses and media training.

- **Financial Education – A partnership with Money Management International (MMI) is designed to provide talent with educational resources that offer them valuable financial insight to build a bright future. This includes budget counseling, debt control, goal setting, understanding financial values, saving, choosing a tax professional and choosing a financial advisor.**
- **Media Training – Provides talent with a comprehensive training program that focuses on understanding today's media landscape, delivering key messages, tips and techniques for conducting interviews and the effective and appropriate use of social media. WWE's Talent Media Training program is conducted in partnership with Kevin Sullivan Communications.**
- **Continuing Education – Offers tuition assistance to all active WWE talent for college level courses, certificate programs or language courses.**
- **Wellness: Through programs designed in collaboration with WWE's Medical Team and Talent Relations department, talent receives relevant knowledge to aid their overall well-being and longevity. Seminars will provide information on living a healthy lifestyle as well as injury/illness prevention.**
- **Career Success: Designed to aid a talent's progression within WWE and beyond, career success provides assistance to talent the NXT and main roster levels, as well as those transitioning to prepare for life after WWE. A comprehensive rookie orientation program provides new talent with all relevant WWE information, including wellness education, strength and conditioning, financial education, media training, social media and continuing education.**

**Professional Development Summary, WWE Corporate, *available at* http://corporate.wwe.com/news/talent-philosophy.**

233.   For former wrestlers the WWE explains:

**WWE also extends a Professional Development Program to former WWE Talent, and in some cases, their family members. This Professional Development Program aims to provide guidance and support beyond talent's tenure with WWE.**

**WWE's Professional Development Program for former talent focuses on two major initiatives- Financial Education and Continuing Education.**

**Financial Education: WWE has partnered with Money Management International (MMI), the largest non-profit credit counseling agency in the country, to provide free Financial Education to former WWE Talent and their immediate family members.**

**Continuing Education: WWE offers financial scholarships to former WWE Talent in the amount of $5,000 per calendar year to be used for obtaining a college degree or completing a certificate program.**

**To keep Former WWE Talent up-to-date with current WWE news, WWE distributes a digital "Alumni Newsletter" on a quarterly basis. The newsletter includes information on WWE news, archives, wellness, professional development and more.**

234.   Since at least 2006, WWE has also instituted programs to support wrestler health and safety in and out of the ring, and the wrestlers and their families looked to WWE for guidance on these issues. By way of example, in 2007, WWE voluntarily undertook a drug rehabilitation program for active and retired wrestlers called the "WWE Former Talent Rehab Program." By 2010 the program had sent over 25 wrestlers to treatment facilities. The program is self-administered with WWE having the sole power to decide who to include in the program and when they are allowed to enter it. Upon information and belief, WWE makes medical decisions and judgments for the retired wrestlers about when they are entitled to drug treatment, the duration of that treatment and whether they are allowed to treat at all. If after a wrestler is treated under the program and subsequently relapses or requires further treatment, WWE makes the decision to reenter as well. A number of the Named Plaintiffs, many of whom have not received an annual letter informing them of the program, have treated under this program. The WWE web site explains:

**Beginning in September 2007, WWE distributed its first rehabilitation assistance offer to all former WWE contracted talent. The goal of the**

initiative is designed to help any former talent that may have a substance-related dependency problem. The WWE distributes an annual letter to all former talent notifying them of the program and relevant details. In November 2014, 707 former talent letters were sent out. The WWE has a confidential hotline for former talent to call and seek admittance to a certified treatment center, with all expenses covered by WWE. In addition, the WWE maintains regular contact with talent who have entered a rehab program or reached out for WWE assistance. To date, 10% of former talent have accepted assistance."

235.   The WWE unilaterally administers this program which is clearly designed to help wrestlers on health related matters. Additionally the WWE despite publication and administration of a drug rehab program has not adequately studied the clear link between the symptoms that lead to drug abuse: the depression, suicide, heart attack to the brain trauma the wrestlers have experienced.

236.   Despite unilaterally assuming the duty and power to govern wrestler conduct in and out of the ring, the WWE has for decades ignored, turned a blind eye to, and actively concealed the risks to wrestlers of repetitive sub-concussive and concussive head impacts, which can and do result in wrestlers being knocked unconscious or having their "bell rung" so that they are in a conscious but disoriented state.

237.   Thus, since its inception, and continuing into the present, WWE has been in a position, which affords it a special relationship of trust to its wrestlers as the self-anointed guardian of their health and safety. For that reason, from its inception and continuing into the present, the WWE owed a duty of reasonable care to keep WWE wrestlers informed of neurological risks, to inform WWE wrestlers truthfully, and not to mislead (for its own benefit) WWE wrestlers about the risks of permanent neurological damage that can occur from TBI incurred while wrestling.

148

238.   As explained more fully above, WWE throughout its history from 1963 to the present has identified dangerous moves, undertaken responsibility for the specific structure and set-up of the rings, provided inadequate medical care and treatment for the wrestlers through in-ring and out-of-ring care and advice, and through its Talent Wellness Program has acted in a supervisory role as guardian of wrestler safety.

239.   As a result of its position of authority and repository of a database of information throughout the WWE, the WWE was aware of how to protect WWE wrestlers from dangerous circumstances during a performance and took unilateral, but insufficient, measures to do so, preferring instead to protect its perceived financial interests.

240.   For decades, the WWE failed to warn WWE wrestlers of the medical risks it knew are associated with the inevitable repetitive head impacts and rapid decelerations during WWE performances and practices.

241.   Instead, the WWE ignored the risks and/or was willfully blind to the risks and/or actively concealed the risks from WWE wrestlers, despite its historic and self-declared role as the guardian of wrestler safety. For that reason, the WWE breached its duty of reasonable and ordinary care to the Plaintiffs by failing to provide them with necessary, adequate, and truthful information about the heightened risks of latent neurological damage that arise from repetitive head impacts during WWE performances and practices.

242.   On information and belief, over the past two decades, the WWE continued to proselytize to its wrestlers that it was the bastion of knowledge

149

concerning wrestling injuries, and that its performers should rely upon WWE for their safety. WWE convinced the wrestlers to rely upon its authority to investigate and advise WWE wrestlers on wrestling safety. WWE did not perform its self-anointed function in the exercise of due care, but instead placed its financial interests over the health and safety of its wrestlers.

243.    In May 2006 the WWE implemented as part of the Wellness policy an unwritten Cardiovascular screening program.  A stress echocardiogram on every WWE wrestler and referee to look for congenital heart issues as well as acquired heart disease. Each wrestler was given written clearance after the testing. Dr. Feuerrbach was the administrator of WWE's Cardiovascular Testing and Monitoring Program. Dr. Fuererbach confirmed to congressional investigators that the goal of the program was to test wrestlers for heart issues so that the wrestlers would be warned about the health risks they faced. "Q: You had mentioned earlier the program focuses on short-term risks; is that correct? A: Well, we're interested in all risk. Primarily the most pressing one is the short term risk . . ." Later Dr. Feuerrbach states again of the testing regime "our interest is not only short term though." And of the test "if one has a normal stress echocardiogram that can prognosticate further down the road into a longer term." Then doctor advised the Congressional Investigator that he would take action if he discovered an abnormality "two weeks ago I did a test on one of the talents. I was concerned with what I saw. The person was quite large, and I was having trouble getting pictures I was comfortable with, and so I sent them to immediately for a more sophisticated, you know, much more expensive test." (*See* Committee on Oversight and

Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Frederick Feurerbach p.20, 30 and 40) (September 25, 2007), *available at http://web.archive.org/web/20090103083515/http://oversight.house.gov/document s/20081231140854.pdf*

244.   When interviewed by Congressional Investigators in 2007, Dr. Tracy Ray, the WWE's Medical Review Officer was asked: "What would you describe in your view, what are the goals of the WWE policy?" Dr. Ray "A: . . . I believe that the WWE had concerns and has concern for the individuals that are involved in their production . . . I think there was just concern about their long-term health and wellness. Some of the deaths were due to cardiac reasons. Some of those deaths possibly due to drug use . . . I think they've addressed two of the major issues with the wellness program. I think that's their goal. I think their goal is to keep these guys healthy while they're performing and then try to be a big brother and lead them the right way as far as their medical care and what they do to their bodies, both for now and for when they get done with their careers." *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Dr. Tracy Ray p. 65, (September 25, 2007), *available at* http://web.archive.org/web/20090103083347/http://oversight.house.gov/ documents/20081231140832.pdf.

245.   Moreover, from at least 2007 until the present, the WWE publicly proclaimed positions about the study of head injury research, which it knew materially or should have known, were deceptive, with the intention that its wrestlers rely thereon. WWE disputed that any short-term or long-term harmful

effects arose from wrestling-related sub-concussive and concussive injuries, such as disputing the Benoit and Martin CTE studies discussed below. WWE arranged its own industry-funded research of over $2.7 million dollars, apparently in support of WWE's "agnostic" position about CTE in wrestlers by financing studies in other athletic events while omitting to study retired wrestlers, or using its financing to obtain and study wrestlers brains for CTE diagnosis despite its proclaimed role as the guardian of wrestler safety. Indeed in addition to a Board seat held by Mr. Levesque on this Concussion Legacy Foundation, the WWE received an award from this "foundation" for "Solving the Concussion Crisis." While the WWE was giving millions to researchers who were pointedly not studying wrestlers brains (over 100 wrestlers died since the WWE gave millions to CTE studies of other athletes), the WWE continued (to the present) its attacks on independent medical scientists such as Dr. Omalu that had already come to the opposite conclusion in peer reviewed published medical studies that had shown CTE in WWE wrestlers.

246.   In addition to the WWE's high profile gifts to Nowinski's CFL, the WWE has for years quietly given money to an organization called the Cauliflower Alley Club ("CAC"). The CAC was founded in 1965 to help retired professional wrestlers and is a non-profit charitable organization. According Karl Lauer, the CEO and president of the CAC for 36 of its 51 years the WWE has been "very good to the CAC" for the past 10 years, with the "WWE being a supporter of the CAC in one way or another in the last 30 years." Indeed VKM attended at least two CAC events in the 1990s and the WWE routinely donates money and sends its wrestlers, including many famous names to the CACs annual event.

247.   According to Mr. Lauer the CAC helps retired wrestlers with various occupational injuries, typically donating $500 to $2000 to each wrestler who is in need.

248.   According to Lauer the CAC often helps wrestlers with dementia or Alzheimer's disease. In the last two years, Lauer told Plaintiffs' investigators that he can name at least six major wrestling stars who held world titles that died of dementia or Alzheimer's.  Lauer would probably say well over 100 to as many as 150 wrestlers he knew suffered from dementia or Alzheimer's.  Lauer recommended going to the CAC website for deceased wrestlers, which list the name of the wrestler, their working name, their real name, the year they died and what they died of.  Lauer advised one would probably find several hundred wrestlers who died from Alzheimer's or dementia related injuries. According to Lauer the CAC recently lost Nicholas Bockwinkel to Alzheimer's, who was the CAC President for the last 8 years. Red Bastien was the President for the eight years, prior to Bockwinkel, and Bastien also passed away from Alzheimer's.

249.   The existence of the CAC and its relationship to the WWE is clear evidence that the WWE knew (or should know), that wrestlers like other contact sports athletes receive repetitive head trauma that dramatically increases the risks of developing neurocognitive disorders as they age.

250.   As such, while the WWE continued its existing common law duty to provide truthful scientific research and information about the risks of concussive and sub-concussive injuries to WWE wrestlers, including the Plaintiffs, who relied

153

on the WWE's research and pronouncements on that subject, it nevertheless failed to inform, warn, educate or treat the Named Plaintiffs.

251.   WWE knew, reasonably expected, and intended WWE wrestlers, including the Plaintiffs, to rely on its "research" and pronouncements concerning wrestler safety, in part, because of the historic special relationship between the WWE and the wrestlers and, in part, because the WWE knew that the vast majority of WWE wrestlers performed under non-guaranteed contracts and would willingly (and unknowingly) expose themselves to additional neurological injury and an increased risk of harm solely to safeguard their economic interests.

**The WWE Like the NFL Knew the Dangers and Risks Associated with Repetitive Head Impacts and Concussions.**

252.   At all relevant times since its inception to the present the WWE has been aware or should have been aware because of its business, that multiple blows to the head and/or rapid deceleration can lead to long-term brain injury, including but not limited to memory loss, dementia, addiction, depression and its related symptoms in its wrestlers.

253.   The WWE and its predecessor entities were founded by and run by three generations of the McMahon family. Named Defendant Vincent McMahon's father and grandfather were very successful and well known Boxing and wrestling promoters and staged numerous high profile events in New York City at Madison Square Garden. They were all sophisticated businessmen whose business involved making money, promoting athletes who were at risk for injury.

254.   The WWE in addition to promoting wrestling owned and promoted a Football League called the XFL that competed with the NFL in 2001.

**History of Science of Head Trauma Shows WWE's Awareness**

255.   A useful survey of the relevant high points of Sports Related Neurological injuries was undertaken by the plaintiffs in MDL-2323 IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION.

256.   The Named Plaintiffs rely on this historical survey and advance the same arguments about the WWE's imputed awareness of the clinical knowledge of head trauma.

257.   As above the named plaintiffs believe a review of the relevant literature illustrates that WWE was at all relevant times aware of credible scientific evidence linking head trauma of the type experienced by wrestlers to TBI, and permanent brain injuries. This knowledge existed and was known to WWE long before 2006. Just as the WWE ignored the head trauma issue then it continues to ignore CTE studies to the present.

258.   In 1928, pathologist Harrison Martland published an article in the Journal of the American Medical Association called "Punch Drunk." In coining the phrase he related abnormalities found in boxers brains, in what is a considered the foundational study on the science of head trauma, that is cited in first nearly every peer reviewed publication on CTE including the study financed by WWE written by Dr. McKee. The study was the first to link sub-concussive blows and "mild concussions" to degenerative brain disease.

155

259.   In 1937, the American Football Coaches Association published a report warning that football players who suffer a concussion should be removed from contact sports.

260.   In 1948, the New York State Legislature created the Medical Advisory Board of the New York Athletic Commission for the specific purpose of enacting rules for professional boxing designed to prevent or minimize the health risks to boxers. After a three year study, the Medical Advisory Board recommended, among other things, (a) an accident survey committee to study ongoing accidents and deaths in boxing rings; (b) two physicians at ring-side for every bout; (c) post- bout medical follow-up exams; (d) a 30-day period of no activity following a knockout and a medical follow up for the boxer, all of which was designed to avoid the development of "punch drunk syndrome," also known at the time as "traumatic encephalopathy"; (e) a physician's prerogative to recommend that a boxer surrender temporarily his boxing license if the physician notes that the boxer suffered significant injury or knockout; and (f) a medical investigation of boxers who suffer knockouts numerous times.

261.   The recommendations were codified as rules of the New York State Athletic Commission.

262.   In or about 1952, the *Journal of the American Medical Association* published a study of encephalopathy changes in professional boxers.

263.   That same year, an article published in the *New England Journal of Medicine* recommended a three-strike rule for concussions in football

(*i.e.,* recommending that players cease to play football after receiving their third concussion.)

264.   In 1962, Drs. Serel & Jaros looked at the heightened incidence of chronic encephalopathy in boxers and characterized the disease as a "Parkinsonian" pattern of progressive decline.

265.   A 1963 study by Drs. Mawdsley & Ferguson published in *Lancet* found that some boxers sustain chronic neurological damages as a result of repeated head injuries. This damage manifested in the form of dementia and impairment of motor function.

266.   A 1967 study Drs. Hughes & Hendrix examined brain activity impacts from football by utilizing EEG to read brain activity in performance conditions, including after head trauma.

267.   In 1969 (and then again in the 1973 book entitled *Head and Neck Injuries in Football*), a paper published in the *Journal of Medicine and Science in Sports* by a leading medical expert in the treatment of head injuries, recommended that any concussive event with transitory loss of consciousness requires the removal of the football player from play and requires monitoring.

268.   In 1973, Drs. Corelli's, Bruton, & Freeman-Browne studied the physical neurological impact of boxing. This study outlined the neuropathological characteristics of "Dementia Pugilistica," including loss of brain cells, cerebral atrophy, and neurofibrillary tangles.

269.   A 1975 study by Drs. Gronwall & Wrightson looked at the cumulative effects of concussive injuries in non-athletes and found that those who suffered

two concussions took longer to recover than those who suffered from a single concussion. The authors noted that these results could be extrapolated to athletes given the common occurrence of concussions in sports.

270.   Between 1952 and 1994, numerous additional studies were published in medical journals including the *Journal of the American Medical Association*, *Neurology*, the *New England Journal of Medicine*, and *Lancet* warning of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions. These studies collectively established that:

> repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function; encephalopathy (dementia pugilistica) is caused in boxers by repeated sub- concussive and concussive blows to the head;

> acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;

> with respect to mild head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

> immediate retrograde memory issues occur following concussions;

> mild head injury requires recovery time without risk of subjection to further injury;
> head trauma is linked to dementia;

> a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

**minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.**

271.   In the early 1980s, the Department of Neurosurgery at the University of Virginia published studies on patients who sustained TBI and observed long-term damage in the form of unexpected cognitive impairment. The studies were published in neurological journals and treatises within the United States.

272.   In 1982, the University of Virginia and other institutions conducted studies on college football teams that showed that football players who suffered TBI suffered pathological short-term and long-term damage. With respect to concussions, the same studies showed that a person who sustained one concussion was more likely to sustain a second, particularly if that person was not properly treated and removed from activity so that the concussion symptoms were allowed to resolve.

273.   The same studies showed that two or more concussions close in time could have serious short-term and long-term consequences in both football players and other victims of brain trauma.

274.   During a televised WWF event on April 4, 1981, Spectrum Wrestling broadcaster Kal Rudman asked then wrestler Pat Patterson if wrestlers get punch drunk. Rudman: "Do wrestlers get what they call punch drunk? Which really due to pin point hemorrhages in the brain?" Patterson: "Some of them do . . . some guys get thrown out of the ring and land right on their head or they get (mumbled) hit by a chair or they get run into a steel pole…..In boxing punishment is taken to

the head only in wrestling its all over the body." Patterson has been described by the most prominent journalist/historian of wrestling, Dave Meltzer as "Vince McMahon's right-hand man" and "one of the chief architects of the WWF, playing an integral role in helping it become a global phenomenon." (See: John F. Molinaro; Dave Meltzer; Jeff Marek (2002) Top Pro Wrestlers of All Time, Winding Stair Press p.197-198.)

275.    In 1986, Dr. Robert Cantu of the American College of Sports Medicine published *Concussion Grading Guidelines*, which he later updated in 2001.

276.    By 1991, three distinct medical professionals/entities, all independent from the WWE— Dr. Robert Cantu of the American College of Sports Medicine, the American Academy of Neurology, and the Colorado Medical Society— developed return-to-play criteria for football players suspected of having sustained head injuries.

277.    On information and belief, by 1991, the NCAA football conferences and individual college teams' medical staffs, along with many lower-level football groups (*e.g.,* high school, junior high school, and pee-wee league) had disseminated information and adopted criteria to protect football players even remotely suspected of having sustained concussions.

278.    Further, Rule 4.2.14 of the World Boxing Council's Rules and Regulations states: "[b]oxers that suffered concussion by KO [loss of consciousness], should not participate in sparring sessions for 45 days and no less than 30 days after concussive trauma, including but not limited to KO's, and should not compete in a boxing match in less than 75 days."

279.    In 1999, the National Center for Catastrophic Sport Injury Research at the University of North Carolina conducted a study involving eighteen thousand (18,000) collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season.

280.    A 2000 study, which surveyed 1,090 former NFL players, found that more than sixty (60) percent had suffered at least one concussion, and twenty-six (26) percent had suffered three (3) or more, during their careers. Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

281.    Also in 2000, a study presented at the American Academy of Neurology's 52nd Annual Meeting and authored by Dr. Barry Jordan, Director of the Brain Injury Program at Burke Rehabilitation Hospital in White Plains, New York, and Dr. Julian Bailes, surveyed 1,094 former NFL players between the ages of 27 and 86 and found that: (a) more than 60% had suffered at least one concussion in their careers, with 26% of the players having three or more and 15% having five or more; (b) 51% had been knocked unconscious more than once; (c) 73% of those injured said they were not required to sit on the sidelines after their head trauma; (d) 49% of the former players had numbness or tingling; 28% had neck or cervical spine arthritis; 31% had difficulty with memory; 16% were unable to dress themselves; 11% were unable to feed themselves; and (3) eight suffered from Alzheimer's disease.

282.   A 2001 report by Dr. Frederick Mueller that was published in the *Journal of Athletic Training* reported that a football-related fatality has occurred every year from 1945 through 1999, except for 1990. Head-related deaths accounted for 69% of football fatalities, cervical spinal injuries for 16.3%, and other injuries for 14.7%. High school football produced the greatest number of football head-related deaths.   From   1984   through   1999, sixty-nine football head-related injuries resulted in permanent disability.



283.   Additionally, between 1999 and 2001, upon information and belief, VKM and WWE became personally knowledgeable with the NFL's health and safety policies, including its policies on concussions and sub-concussive injuries, through the creation, development and promotion of XFL, LLC, a football league that was VKM's NFL off-season substitute with fewer rules and fewer penalties than the NFL.   Jim Ross, long-time employee of WWE, was both an announcer for the Atlanta Falcons in the 1990's and the "XFL's play-by-play announce team" in

2001.[51]  The XFL was a fully-functioning professional football league that played a full season in 2001, that had over 500 players with eight teams owned by the league itself.  All of the XFL's health and safety policies and protocols were developed and implemented by its co-owners, the WWE and NBC Universal which each had a 50% interest in the football league.

284.   In 2004, a convention of neurological experts in Prague met with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

285.   This echoed similar medical protocol established at a Vienna conference in 2001. These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.

286.   The University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a strong correlation between depression, dementia, and other cognitive impairment in NFL players and the number of concussions those players had received.

287.   A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado Medical Society, agree that athletes who lose consciousness should never return to play in the same performance."

---

[51] [51] *See* "Sooner scripting: J.R. goes Insider" (July 26, 2006), *available at* http://www.wwe.com/inside/news/archive/jrsoonercolumn.

288.   Indeed, the overwhelming evidence is that the WWE (and its XFL Football League) like the NFL and all sports businesses knew or should have known for decades of the harmful effects of sub-concussive and concussive injuries on a wrestler's brain, it actively omitted, concealed these facts from its referees, trainers and wrestlers.

289.   On information and belief during every decade referenced above, the WWE would have been advised by numerous physicians, in varying specialties, regarding the risks associated with the performance of wrestling, including the risks associated with head impacts and TBI. Clear evidence is of this early actual awareness is the Dr. Unger interview aired on Monday Night Raw aired December 4, 1995. The interview is actually part of a WWE storyline, in which a Star named Shawn Michaels is described as having had a serious concussion (after collapsing in the ring as part of the fiction). Dr. Unger not only describes post concussion syndrome in detail he offers that it is a big problem.

290.   Dr. Unger " In the United States there's about 4 million patients who suffer from some type of head trauma. As a result of the head trauma, about half of these patients develop a syndrome which includes problems such as ringing in the ears, nausea, vomiting, headache, blurred vision, different problems such as numbness of their hands and feet, forgetfulness, inability to concentrate… and this becomes a problem because these patients tend to get frustrated, and they get depressed as well. They have sleep disturbances. And all this persists for between two weeks to several months. However, there's a group of patients that may go up to three years before they show any improvement, and these patients have a very poor prognosis, and they don't seem to get better at all."

291.   Dr. Unger goes on to warn that the wrestler (Shawn Michaels) has abnormal neurological tests and that "he might be out considerably longer than I

164

expected. **Any indication of having Shawn return at this time to WWF are just totally premature." And " I'm not sure when Shawn is going to come back. I do know that there are many professional football players and boxers that never fully recover from these types of head injuries. With Shawn, the problem is that he's such as high impact type of athlete that I would have to be hundred percent certain he would not reinjure himself when he got back into the ring."**

292.   **Later Vince McMahon himself intones about the fragile nature of WWE athletes: Well, Shawn Michaels has unquestionably always been the very embodiment of what superstardom is really all about. But two weeks ago on Raw, the facade of superstardom was smashed in an instant when Shawn Michaels collapsed to the canvas. In that frightening moment, we realized that a superstar is really just like the rest of us -- a human being. They do feel pain. They're not invincible. Unquestionably, these athletes are driven by their insatiable desire to be the very best they can be. Here in the World Wrestling Federation, we cheer wildly as these superstars risk their bodies time after time constantly taking one step closer to the edge in an effort to thrill the crowd. Well, Shawn Michaels has been living on the edge and thrilling the crowds for quite some time. Shawn Michaels wowed us into believing that he could do just about anything because we've seen him do it. But now we find ourselves in the uncomfortable position of hoping he'll just be all right, all the while knowing we helped push him over the edge in our unquenchable thirst for excitement. However, like anyone who totally loves what they do, Shawn Michaels can't wait to get back in the ring, and believe me, he's even more anxious to get back than we are to see him back. But unfortunately, now there's a question as to when or even if Shawn Michaels should return at all.**

293.   The irony of this is that Michaels in fact did not have post concussion syndrome, it was merely a storyline to create dramatic impact for the fans. Author James Dixon reviewing the episode in a 2013 book writes: Vince McMahon about Shawn Michaels. If only he had adopted this attitude towards his "independent contractors" in real life rather than just kayfabe world. A lot of lives could have been saved." (Dixon The Raw Files 1995, Pub, historyofwretsling.info 2013  P. 83)

294.   Since the NFL plaintiffs assembled part this partial and incomplete listing about some seminal moments in the history of the medical and sports communities awareness of head trauma in MDL-2323 many events in recent medical history, CTE research has vast expanded.

295.    The clinical data leave little doubt that CTE is real and major problem in athletes like the named plaintiffs.

296.  A 2009 Paper Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy following Repetitive Head Injury By Dr. Anne Mckee observed: "Repetitive closed head injury occurs in a wide variety of contact sports, including football, boxing, wrestling, rugby, hockey, lacrosse, soccer, and skiing." And "Although the long-term neurological and neuropathological sequelae associated with repetitive brain injury are best known in boxing pathologically verified CTE has been reported in professional football players, a professional wrestler…" (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2945234/)

297.   A 2010 paper called Chronic Traumatic Encephalopathy By Dr Omalu and   Dr.   Bailes   detailed   the   findings   in   Chris   Benoit. (https://www.ncbi.nlm.nih.gov/pubmed/21175533)

298.   A 2012 Paper, Chronic Traumatic Encephalopathy By Michael Saulle and Brian D. Greenwald advised that Professional Wrestling is a risk factor for CTE. https://www.hindawi.com/journals/rerp/2012/816069/

299.   In September 2015, it was revealed by Boston University that 87 out of 91 NFL players or 96% of those studied had signs of CTE. In an irony that propels this lawsuit, the center associated with this study is financed in part by the WWE. (See: http://www.pbs.org/wgbh/frontline/article/new-87-deceased-nfl-players-test-positive-for-brain-disease/)

300.   In October 2016 it was announced that 138 or 152 college football players or 91% of those studied had CTE. (See http://sports.yahoo.com/news/concussion-foundation-91-percent-of-ex-college-players-studied-have-cte-210027021.html)

301.   Although over 100 wrestlers died since 2013, neither this organization nor WWE studied any of them.

302.   However, two wrestlers who died at the age of 44 in 2016 were studied by Dr. Julia K. Kofler and Dr. Omalu both showed signs of CTE. Their estates are now Named Plaintiffs. Along with Benoit and Martin cases show signs of CTE in 100% of the four wrestlers studied to date.

303.   The WWE's public response was to decline to comment and to blame counsel for "pushing" the CTE story to counter negative publicity about the WWE's court motions for sanctions in this case.

304.   As described above, the WWE has known for decades and certainly now knows that TBI can and does lead to long-term brain injury, including, but not limited to, memory loss, dementia, depression, and CTE and its related symptoms.

305.   Rather than take immediate measures to protect WWE wrestlers from these known dangers, from 1963 to 2006, and continuing to the present day, the WWE failed to disseminate to then-current and former WWE wrestlers relevant health information it possessed regarding the significant risks associated with TBI.

**The WWE Voluntarily Undertook the Responsibility of Studying Head Impacts In Wrestling, Yet Continues to Fraudulently Conceal Their Long-Term Effects.**

306.   WWE has engaged in a campaign of denial, misinformation and deception to prevent Plaintiffs from understanding the true nature and consequences of the injuries they have sustained, which campaign continues to the present day.

307.   WWE has continually represented directly to Plaintiffs, and indirectly to them through its artfully crafted public persona, that the safety of its wrestlers is a top priority. For example, Vincent K. McMahon told the Committee on Oversight and Government Reform of the U.S. House of Representatives, "Let me just say, [WWE] is always concerned about safety of our talent, absolutely. We were the first people to do any number of things to make things safe for our talent, if that's the direction in which you're going."[52] Stephanie McMahon said: "We really want to engage our talent and to be doing the best that we can for our talent. So with Chris Benoit, while a tragedy, I think has helped in some ways because it's helped us look at our talent and how can we treat them better." (Stephanie McMahon Congressional Testimony, p. 58).

308.   Yet, WWE has systematically ignored that its wrestlers have routinely suffered from concussions, or that its wrestlers suffer from long-term brain damage.   No one at WWE ever warned Plaintiffs about the risk of sustaining numerous sub-concussive and concussive blows, and instead ignored such risks.

---

[52] Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of Vince Kennedy McMahon (Dec. 14, 2007), available at https://www.scribd.com/doc/33253381/Vince-McMahons-Testimony-to-Waxman-committee.

309.   Dr. Bennett Omalu, who pioneered the research into CTE, studied the brain tissue of a deceased NFL player named Mike Webster and published his findings in Neurosurgery in July 2005.  A month previously, Terry Long, a 45-year-old Pittsburgh Steelers player committed suicide. Dr. Omalu opined that the cause may have been brain damage in line with his studies.

310.   In a pattern that echoes that of the NFL's original response to the discovery of CTE, WWE has attempted to discredit these studies.

311.   Dr. Joseph Maroon, NFL Pittsburgh Steelers team doctor for twenty-five years and now WWE's chief doctor, at the time attacked the CTE conclusion of Dr. Omalu.  Dr. Maroon reportedly told the Pittsburgh Post-Gazette that Dr. Omalu's conclusion that NFL Player Terry Long's suicide may have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon stated "to go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative . . . "

312.   The Dr. Omalu versus Dr. Maroon debate over Terry Long CTE diagnosis encapsulates all of the issues raised in this complaint.

313.   Dr. Omalu said of Terry Long: "People with Chronic Traumatic Encephalopathy suffer from depression. The major depressive disorder may manifest as suicide attempts. Terry Long committed suicide due to Chronic Traumatic Encephalopathy due to his long term play."

314.   Dr. Maroon: "I think it's fallacious reasoning, and I don't think it's plausible at all."  Dr. Maroon was not agnostic or subtle nor did he take cautious

169

approach about needing more details, instead Dr. Maroon, seemingly in order to derail this diagnosis and its implications, proclaimed to the world wide media at the time: "I think the conclusions drawn here are preposterous and a misinterpretation of facts."

315.    To the trained eye of Dr. Maroon who had been the team doctor of the Pittsburg Steelers and an NFL doctor for 30 years who had presumably had seen an NFL game, the "misinterpretation of facts" was that the deceased (diagnosed with CTE) was that "you have a history of no significant head injuries." In other words Dr. Maroon claimed that Terry Long had not sustained head injuries during his football career. Dr. Maroon: "I was the team neurosurgeon during his entire tenure with the Steelers, I rechecked my records; there was not one cerebral concussion documented in him during those entire seven years. Not one." It turned out that assertion itself was false (Long had been documented with concussion symptoms by Dr. Maroon) but the fact was that Dr. Maroon explained: "to conclude that his brain was damaged by football is more than a long stretch." <u>League of Denial</u> at 195-6.

316.    It is critical to consider that if the attack by the now WWE Medical Director Dr. Maroon on Dr. Omalu's CTE findings had succeeded and if Dr. Maroon had won the "debate" back in 2006, further research in CTE may have been stifled, slowed or foresworn altogether. Dr. Omalu did not yield and told his medical examiner boss: "If Terry Long did not have CTE, may I drop dead tonight." (LOD p. 195)

317.   However, when wrestlers began being diagnosed the WWE immediately took the "Maroonian" position- to deny, evade and avoid the conclusions about CTE. The WWE stated on ESPN, "[w]hile this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for [professional wrestlers] Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85 year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring . . . WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them."[53] Yet, Chris Benoit spurred "a more comprehensive look at [WWE's] talent".[54]

318.   WWE's request to examine the research and tests was feigned, as Dr. Omalu reported that "Dr. Maroon was there with us and he was shown all our research information, slides, and specimens- on Chris Benoit and all the athletes' brains we studied."[55]

319.   In November of 2006, Dr. Omalu formerly published a second paper in a peer reviewed Journal documenting his CTE findings in the brain of the above mentioned former Steelers' player Terry Long. He linked Webster and Long's career to the brain damage: "Our first and second cases both had long careers

---

[53] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.
[54] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque, 58, available at http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.
[55] Irwin, Muchnick, Concussion, Inc., p. 67 (ECW Press, 2015).

without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement."

320.   In a joint interview for the 2007 CNN documentary Death Grip: Inside Pro Wrestling, WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon questioned Dr. Omalu and Dr. Bailes's finding that Benoit had suffered from CTE. Using an inaccurate and misleading "talking point," Mr. McMahon told CNN: "The findings themselves say that Chris Benoit had the brain of an 85-year-old-man with dementia. And I would suggest to you that from a layman's standpoint, Chris Benoit could not do what he did for a living. He could not function as a normal human being. He couldn't even go to the airport, if in fact that report were accurate." This statement which deliberately distorts the Benoit study and the concept of CTE as a disease, was made without any medical foundation or expert opinion and appears to be part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had CTE.

321.   In 2009 a second wrestler named Andrew Martin was diagnosed with CTE. Dr. Julian Bailes commented to ESPN after studying WWE former wrestler Andrew Martin's brain in 2009: "People wondered if Mike Webster was an isolated event . . . and then came Terry Long and Andre Waters. When we announced our findings about Chris [Benoit], some in the media said it was 'roid rage.' We said at the time the real finding was that repeated head trauma was the cause. With Andrew Martin as the second case, the WWE and the sport in general have to ask

themselves, 'Is this a trend?' The science tells us that jumping off 10-foot ladders and slamming people with tables and chairs is simply bad for the brain."[56]

322.    In response, the WWE issued this statement:

323.    "While this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85-year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring." And "WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them." According to Bailes, the Brain Institute has never received a request from the WWE to see the Benoit records. He invited the WWE to review the data at any time.

324.    According to ESPN: "A WWE spokesman also pointed to the company's Talent Wellness Program that is summarized on the corporate Web site. It includes mandatory testing of brain function by all talent, specifically the ImPACT concussion management used by the NFL and other leagues that is overseen by WWE medical director Dr. Joseph Maroon, who has been the Steelers' neurosurgeon for more than 25 years." In other words the WWE was drawing comparisons and implementing policies used by the NFL. The WWE was also using its Wellness Policy to highlight that it is a safe company whose athletes are not at

---

[56] See ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.

risk for CTE. The WWE intended wrestlers and their families to rely upon these statements.

325. ESPN then asked Dr. Omalu: "what he was thinking when he discovered CTE in the brain tissue of Martin. " "What flashed through my mind?" he asked in his substantial Nigerian accent, voice rising in pitch near the end of an hourlong conversation. "I thought of Vince [McMahon], the CEO of WWE on CNN, denying the existence of CTE -- just like the NFL did." When I discovered Andrew Martin was positive, I was overwhelmed as well. I'm trying to make a difference in the lives of these people. "Denying that these athletes are at risk is wrong." The plaintiffs contend that Dr. Omalu was correct in both his diagnosis of CTE as well as his assessment that the WWE was wrong in denying the research that indicated WWE wrestlers are at risk for CTE. Entering 2016 the WWE's actions have not changed which necessitates the filing of this lawsuit.

326. In August 2010, three years after VKM used this "talking point," it was substantially repeated in an official WWE statement to ABC News: "It is natural that a father would try to come up with a reason why his son would tragically murder his wife and child, and then commit suicide. Based on the study by the Sports Legacy Institute that claimed Chris Benoit had the brain of an 85-year-old with dementia, Mr. Benoit asserts that head trauma was the cause of his son's aberrant, criminal behavior. However, common sense would dictate that this is impossible. Someone with the brain of an 85-year-old with dementia would be unable to keep a

traveling work schedule, drive himself to arenas, and perform intricate maneuvers in the ring much less commit a methodical murder-suicide over a 48 hour period."[57]

327.   In October 2010, in response to the WWE talking point, Mr. Benoit's father told news outlets there was a distinction between Benoit's CTE condition and an actual Alzheimer's patient. Benoit explained, "You have two things present with Alzheimer's disease, and it's an ameloid plaque and a protein. In CTE that is caused by brain damage, by trauma to the brain, you only see the plaque. There is no ameloid protein in there. So, there is a difference when they get it under the microscope." "When we came out with the findings in September of 2007 the first thing that we got back right away was pushback from WWE. 'This is impossible, to even suggest that Chris Benoit had the brain of an 85 year old. How could he possibly function? Take the plane, anything like this.' So, they didn't understand the science."[58]

328.   In 2008, Dr. Omalu had written: "The type of CTE found in football players is called gridiron dementia or concussion-drunk syndrome. A young retired football player who has gridiron dementia in his thirties, forties, or fifties will have the brain resembling the brain of a dementia-afflicted individual who is over eighty years old."[59]

---

[57] *See* Nelson, Ethan, *et al.*, "Chris Benoit's Murder, Suicide: Was Brain Damage to Blame?", ABC News, http://abcnews.go.com/Nightline/chris-benoits-dad-son-suffered-severe-brain-damage/story?id=11471875 (Aug. 26, 2010).

[58] *See* Caldwell, James, "WWE News: Detailed report on Michael Benoit's conference Monday – claims WWE owes Chris money & Linda's Senate run to protect WWE from investigations, more", Pro Wrestling Torch, http://pwtorch.com/artman2/publish/WWE_News_3/article_44845.shtml#.V4cJ4iMrKX0 (Oct. 27, 2010).

[59] *See* Omalu, Bennet, "Play Hard, Die Young: Football Dementia, Depression, and Death", p. 26.

329.    After Dr. Omalu discovered CTE in Mike Webster in a 2002 study, the NFL engaged in a protracted debate about the mounting evidence linking NFL induced head trauma to CTE and long-term neurological conditions. After attempting to discredit the research of doctors examining brain tissue of deceased NFL players including Dr. Omalu, the NFL acknowledged its mistake in July of 2010 and began overtly warning and noticing players that concussions "may lead to problems with memory and communication, personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever."[60] This warning became a key issue in MDL-2323, as the warning may began any Statute of Limitations for the fraud alleged. However, the plaintiffs argued that even when the warning was issued it did not warn any past players including the thousands of NFL retired player plaintiffs some of whom had played as early as the 1940s.

330.    The WWE has not warned any wrestlers as of 2016 and adheres to the Defense that the "State of CTE Science is Not a Known Fact" which it asserts in this litigation through its spokesman Dr. Mark Lovell. As such the WWE cannot avail itself of any Statute of Limitations defenses.

331.    The WWE follows that of the NHL and many of the same issues are raised in a lawsuit brought by retired hockey players against the NHL. The players

---

[60] The NFL created the Mild Traumatic Brain Injury Committee in 1994.  The NHL introduced a Concussion Policy in 1997 requiring NHL team doctors to document all concussions and collected data on standardized injury report forms.  In 1997 the NHL began baseline testing for its players and required team doctors and trainers to maintain records of all players believed to have concussions. Yet, WWE waited nearly a decade before adopting similar policies.

argue: "Recently, the NHL's Commissioner, Gary Bettman, an officer, director and managing agent of the NHL, whose statements are binding on the NHL, made a statement that "no evidence" connects brain trauma sustained during an NHL career and later-in-life neurological impairments, contrary to numerous historical and current scientific studies demonstrating such evidence. This statement tolls any applicable statute of limitations." (See IN RE: National Hockey League Players' Concussion Injury Litigation, Veitch el at V. NHL MDL No.14-2551)

332.   WWE's actions mirror the early failures of the NFL in failing to properly assess, diagnose, and treat players with signs and symptoms of concussions and head injuries during games that can lead to CTE. The WWE failed to warn Named Plaintiffs who suffered repeated head injuries during their WWE performances and nearly all of who exhibited clear signs of concussion, sub-concussive injury and post-concussion symptoms during their career. This failure to even take the basic step of warning or educating its wrestlers evidences the WWE's utter failure to grasp the crisis in which its wrestlers would soon face, and WWE failed to properly inform and provide necessary medical care to the Plaintiffs throughout their WWE careers despite the wealth of information including basic return to play concussion guidelines that were uniquely at WWE's disposal during Named Plaintiffs tenure at WWE.

333.   WWE created its "Wellness Program" in 2006, and then selected Dr. Maroon as its architect in March 2008, despite his involvement in public efforts to discredit Dr. Omalu's research.[61] Jerry McDevitt, an attorney for the WWE has been

---

[61] Despite the introduction of a WWE policy in 2006 that could leave no doubt of its awareness of these issues, the Named Plaintiffs report that aside from an offer for the WWE's self-administered

publicly credited with establishing the "medical-testing program to protect wrestlers' health."[62]  That attorney has stated that the untimely death of popular wrestler Eddie Guerrero in November of 2005 "was the catalyst to the program that [WWE] now ha[s] in place."[63] That attorney retained by WWE recommended that WWE employ Dr. Joseph Maroon to set the program up despite Maroon's obvious bias.[64]

334.   WWE's chief doctor, Dr. Joseph Maroon, has been involved in prior concussion and head trauma related cover-ups, including attempts to discredit research related to CTE.[65]

335.   The WWE Wellness policy advised; "WWE implemented its Talent Wellness Program on February 27, 2006 . . . Since its implementation, the Wellness Program has been refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals."[66]

336.   The policy introduced in 2006 (and amended since) significantly and importantly for the first time: 1) identifies concussions as a risk in WWE wrestling; 2) establishes testing for concussions; 3) implements "Return to Wrestle"

---

drug rehab program (the ongoing drug program awareness) they have received no treatment, warnings or guidance from WWE concerning long term health issues caused by their head injuries in the WWE.  WWE concealed important medical information, including the effects of multiple head traumas, and prematurely allowed (and indeed encouraged) Plaintiffs to return to the ring or to practice, even when injured.
[62] Deitch, "Heavyweight Champions." Pittsburgh City Paper (December 2, 2010) available at http://www.pghcitypaper.com/gyrobase/Content?oid=oid%3A88609.
[63] *Id.*
[64] *Id.*
[65] *See* http://concussioninc.net/?p=9617.
[66] *See* Corporate WWE.com, http://corporate.wwe.com/wellness/talent-wellness-summary.

guidelines; 4) modified training to emphasize techniques meant to "prevent unnecessary blows to the head"; and, 5) bans steel chair shots to the head.

337.    The WWE policy states: "WWE & ImPACT Concussion Management Program:

**WHAT**
- An ImPACT test measures the effects of a concussion through cognitive tests.
- ImPACT results are evaluated by Dr. Mark Lovell, neuropsychologist and director of the University of Pittsburgh Medical Center Sports Medicine Concussion Program.

**WHO**
- All WWE Talent [defined as "all talent under contract to WWE who regularly perform in ring services as a professional sports entertainer"] have been given a baseline ImPACT test.
- WWE Talent are given repeat baseline ImPACT tests annually.
- Baseline ImPACT tests are mandatory for all prospective talent during pre-contract screening.

**RETURN GUIDELINES**
- If a WWE Talent shows symptoms of a concussion or has suffered a concussion, then that WWE Talent will not be cleared for a return to wrestling until he/she passes an ImPACT test and is cleared clinically by a certified physician.
- ImPACT tests are typically taken by WWE Talent within 24-72 hours post injury.
- If the post-injury ImPACT results do not indicate a recovery, then that WWE Talent will not be cleared until he/she retakes the ImPACT test, passes the ImPACT test and is subsequently cleared clinically by a certified physician. Repeat ImPACT tests are usually administered 2-3 days after the first post injury ImPACT test.

WWE & ImPACT Concussion Management Program
- If symptoms dictate and/or ImPACT scores warrant, WWE will send a WWE Talent for a direct consultation with Dr. Lovell at the University of Pittsburgh Medical Center.
- Any talent that suffers a second concussion within an annual year from said talents first concussion, that talent will not return to in-ring work until after a one on one evaluation by Dr. Mark Lovell

**PREVENTION PROGRAMS & INITIATIVES**
- The WWE conducts a yearly educational seminar for all talent, referees, producers & medical personnel that addresses the topic

179

of concussions. The seminar covers concussion awareness, the WWE protocols for treatment, and the latest medical information regarding this area. The seminar is conducted by Dr. Joseph Maroon, MD.

• Developmental: In addition to education, the WWE has modified their training program to emphasize techniques and timing of maneuvers to prevent unnecessary blows to the head.

• The WWE has eliminated using folding metal chairs to "strike" an opponent in the head.

• The WWE penalizes through fine and/or suspension the following:
  – The intentional use of a folding metal chair to "strike" an opponent in the head.
  – Any blow to the head that is deemed an INTENTIONAL act

• The Fine and/or Suspension will be directed by the EVP of Talent Relations"

"WWE & ImPACT Concussion Management Program", WWE Corporate, PowerPoint, *available at* http://corporate.wwe.com/wpcontent/uploads/2014/07/WWEImPACT ConcussionProgram24.pdf.

338.   The Wellness Program uses a concussion diagnostic system which a "study of studies" in 2012 revealed may increase the risk of long term damage because of its error rate.[67]

339.   The Wellness Program also reaches out to former wrestlers to offer support for drug and alcohol abuse through the WWE Former Talent Rehab Program. However these contacts fail to advise former wrestlers, including Plaintiffs, about head injuries and CTE at all, let alone the consequence of possible drug and alcohol addiction from the history of head injuries from professional wrestling.

---

[67] *See* http://m.espn.go.com/general/story?storyId=8297794&src=desktop&wjb.

340.    Incredibly, although introduced in 2006 and still in effect as of the date of this Complaint, the Wellness Policy takes no account of former wrestlers head injuries and risk of CTE at all. Despite all of the Named Plaintiffs wrestling in WWE sustaining repetitive head trauma, concussions and TBIs while at WWE, the WWE and its policy makes no provision to adequately care or provide neurological medical treatment for them, warn them of the long term effects of their concussions or make any provision to monitor their health, nor does the WWE seek to provide for the study of deceased wrestlers brains for signs of disease.

341.    In 2010, WWE through its spokesman Jerry McDevitt, characterized the WWE Wellness program as "the finest monitoring program in American Sports," to a journalist. Mr. McDevitt in subsequent filings has denied this quote and casts as the journalist fancy, yet the quote attributed to Mr. McDevitt was confirmed by the journalist Mr. Dietrich who wrote the story to plaintiff's counsel. During the interview, McDevitt learned of yet another young wrestler's death, the Journalist writes:

> "The protocols, devised by Pittsburgh neurosurgeon Dr. Joseph Maroon, stress regular drug-testing and an increased awareness of concussions and cardiac health. It was, McDevitt boasted, the finest monitoring program in American sports -- and one sign of its success, he said, was that since it was adopted, the number of headlines involving dead wrestlers had trailed off.
>
> As we spoke, though, McDevitt's phone rang several times. His incoming e-mail alert went off, but he ignored that, too. Minutes later, his assistant came to the door and called him into the hallway. After a few moments, he re-entered the room, looking shaken. "I just found out that one of our former wrestlers died last night," he said.
>
> That wrestler was Lance Cade. He was 29 years old, and his death -- although ruled an accident -- came from ingesting multiple drugs on top of a weak heart. McMahon's election opponent had a new talking

point. But for wrestling fans everywhere, the real question is what more, if anything, can be done to protect their stars.

342.   Through this statement and others like it, WWE admits to undertaking a duty to monitor its wrestler's health and safety, and establishing its duty to provide full and accurate information to its wrestlers.[68] WWE assumed the duty but failed in its own undertaking. The wrestler in question had been released by the WWE in 2008, and died of a drug overdose in 2010. Despite the link between brain trauma and drug overdoses, Cade was not studied for CTE. Additionally, WWE's Wellness Program served to deceive any Named Plaintiffs by providing a false sense of security and assurance that their health and safety were being adequately monitored, both in the ring and as former wrestlers. The Wellness Program, by purporting to protect Plaintiffs, without making any provision for long term care led them into not seeking adequate treatment or otherwise protecting their health.

343.   As identified herein before the 2006 policy advanced by McDevitt, the WWE had for decades ignored and concealed known risks despite hundreds of medical articles and major American sports leagues implementing concussion policies, including the NHL's implemented 1997 policy. WWE downplayed the injuries at the time they were sustained during matches and  prematurely clearing wrestlers to return to perform whose health required recuperation time. WWE denied Plaintiffs the opportunity to recover from head injuries, to seek appropriate medical treatment, and to monitor themselves for long-term brain damage. The essence of this case is that those past failures combined with the now- current

---

[68]     *See*   "Heavyweight   Champions",   Pittsburgh   City   Paper, http://www.pghcitypaper.com/pittsburgh/heavyweight-champions/Content?oid=1380633.

state of CTE science that identifies it as latent disease process that wrestlers are at risk for implicates WWE's legal and assumed duties.

344.    Omalu noted, "Dementia, neuropsychological deficits, and psychiatric disorders are well- established sequelae of all types of brain injuries sustained from contact sports.  One would expect that given a confirmed association between contact sports, brain injury, and delayed sequelae of brain injury, a program should have been in place whereby all retired NFL players were monitored and followed up for the development of dementia and major depression . . ."[69] The NFL responded to the crisis by establishing a NeuroCognitive Benefit Plan in 2011, and creating a fund of over one billion dollars to settle MDL-2323 IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION.

345.    Today, the WWE has done nothing to monitor or follow-up with retired wrestlers for neurological care, examination or treatment, including the Named Plaintiffs. Yet, WWE was fully aware of these issues given: a) the science and medical attention directed to the Benoit CTE diagnosis, b) the crisis in NFL players, and c) in particular the WWE's own drug and alcohol abuse program that according to the WWE website sent 707 letters to "former talent,' and that a staggering "10% of former talent have accepted assistance."[70]

346.    In May of 2013, the WWE publicly announced it would donate $1.2 Million dollars to research for concussions and brain injuries in athletes. The WWE chose to donate to the Sports Legacy Institute, which is headed by a former WWE

---

[69] *See* Omalu, Bennet, "Play Hard, Die Young: Football Dementia, Depression, and Death", p. 15.
[70] *See* "Who We Are", WWE.com, http://corporate.wwe.com/who-we-are/talent, *last visited* July 14, 2016.

wrestler who claims that his wrestling career was ended due to concussions in the ring.[71]  According to the book "League of Denial: The NFL Concussions, and the Battle for The Truth": "Nowinski, of course, knew that the sport was staged, that the moves and the results were choreographed. But there was no way to comprehend the true violence of pro wrestling until he was in it . . . Nowinski got kneed, elbowed, drop-kicked, punched and otherwise smashed in the head."[72]

347.   At the time of this gift in 2013, the WWE's statements made by Paul Levesque (husband of Stephanie McMahon) to national media seemingly acknowledged that there are in fact concussions in the WWE and that rule changes have been required:

> In addition to eliminating chairs to the head, the WWE says it also has modified its training and maneuvers to curtail blows to the head. Levesque said the effort is showing results.
>
> "In 2011, we had 25 concussions of the 150 talented wrestlers on the road all year long…. In 2012, we only had 11," he said.

Mihoces, Gary, "WWE Funds Research Into Treatment of Chronic Brain Trauma, USA Today Sports (May 16, 2013), http://www.usatoday.com/story/sports/2013/05/16/wwe-concussions-chris-nowinski-research-sports-legacy-institute-cte/2178667/.

348.      This statement from a WWE executive strongly supports the inference that the Named Plaintiffs sustained numerous untreated, undocumented concussions in the WWE during their careers, and is further acknowledgment that the concussions were the result of dangerous moves that have now been curtailed.

---

[71] Nowinski, Chris, Head Games, Drummond Publishing Group, p. 2 (2007) ("Holy Shit, kid! You okay? Was the first think I heard after the kick to the head that led to the end of my wrestling career").
[72] Fainaru-Wada and Fainaru, Steve, League of Denial: The NFL Concussions, and the Battle for the Truth, Three Rivers, NY, p. 200 (2013).

Unfortunately, WWE still fails to acknowledge the uncontroverted medical science that concussions and repeated head injuries sustained by the Plaintiffs have caused permanent debilitating injuries.  In fact, WWE continues to conceal and deny this connection despite the overwhelming evidence and despite its wrestlers, including Plaintiffs, relying on its campaign of misinformation.

349.   Clearly speaking to the WWE duties: "WWE is proud to help advance this critical research to help anyone at risk of suffering CTE . . . WWE has been, and will continue to be, very proactive on taking measures to ensure the health and wellness of our talent."

Available  at:  http://www.bumc.bu.edu/2013/05/17/wwe-donates-1-2-million-to-sli-for-boston-university-cte-treatment-program/

350.   This donation, speech, and role of the WWE's contribution is important as: 1) the donation was made along with public statements by WWE executive Paul Levesque that paradoxically acknowledge concussion risks in wrestling while also downplaying the risks of concussions in wrestling; 2) the donation was made to an organization that has publicly criticized the NFL's failure to adequately address the concussion issue, and when the NFL donated $1 million to the same group it was seen as a "conflict of interest" and hotly debated;[73] 3) the donation is unaccompanied or earmarked for any specific study of retired wrestlers and the WWE's statements to distance the donation from the WWE's own health crisis among its former talent.  Unlike the NFL's one-million-dollar donation which was given specifically to study the brains of deceased football players, the WWE's

---

[73] League of Denial, p. 284 ("Nowinski became concerned that the donation would be perceived as an attempt by the NFL to buy BU's support").

donation makes no mention of the brains of deceased wrestlers, nor has it, upon information and belief, conducted any outreach to the community of retired wrestlers upon death to contribute to the Sports Legacy Institute's "brain bank."

351.   In addition to the large donation, and acknowledging concussions that occur in the WWE, Mr. Levesque made the following comments (without scientific basis) attempting to differentiate wrestling from football to the national media:

"Levesque said pro wrestling is fundamentally different from football when it comes to hard impacts."

"If you're in the NFL, your goal is to try to hit the other guy as hard as possible . . . The goal in what we do is the exact opposite," said Levesque.

"The goal in what we do is first and foremost ... protect your opponent. Without him you have nothing. ... Our whole goal is to make something look as devastating as possible and as impactful as possible with as little impact as possible. It's really the art of what we do. We really work on that with talent.

"If John Cena and I are in a story line together and I hit John Cena hard and he gets injured, and he's out, it hurts me as much as it hurts him. He's out; now my opponent that I'm in a story line with is gone and my storyline just ended."

The research figures to benefit other sports, but Levesque noted that WWE often gets its wrestlers from other sports: "We recruit a lot of our talent from other contact sports, NFL, NHL, rugby and the Olympics . . . It's important for us as to where they're coming from and what has happened to them prior to them getting to us because it's . . . in essence what we're getting as a talent."

He said the wrestlers are the show in the WWE.

"With us, we're making brands and we're making stars, and those stars are the most important thing we have," said Levesque. "We can't just go buy a second-string John Cena and have them be on the show."

Mihoces, Gary, "WWE Funds Research Into Treatment of Chronic Brain Trauma",
USA Today Sports, (May 16, 2013),
http://www.usatoday.com/story/sports/2013/05/16/wwe-concussions-chris-
nowinski-research-sports-legacy-institute-cte/2178667/.

352. Notably, the Boston Globe published a telling article on the relationship between Mr. Nowinski and the WWE.[74]  The article details WWE's donations to Nowinski's Concussion Legacy Foundation, the noticeable absence of wrestler brains in his brain bank, and the lack of concussion and CTE research on wrestlers after $2.7 million dollars of WWE financial contributions.

353.  Seeking to separate itself from the professional sports under fire for not providing adequate treatment for concussions, WWE has hidden behind the scripted performances, characterizing wrestling as some undefined activity called "Sports Entertainment." Indeed the term was allegedly coined by the WWE in order to avoid regulation and fees levied by State Athletic Commissions. An academic historian observes: "In 1989, McMahon decided that he would move to avoid paying these fees. In a meeting with the New Jersey Athletic Commission, WWF representatives admitted that their matches did not represent legitimate Athletic contests because the victors were predetermined. McMahon announced that his product could not be considered a sport, and therefore should not be licensed, because the WWF merely offered "sports entertainment."[75]

---

[74] Hohler, Bob, "Ex-wrestlers say one of their own sell them short", Boston Globe (June 12, 2016), *available at* https://www.bostonglobe.com/sports/2016/06/11/cozy-ties-between-concussion-foundation-and-wwe-cause-concerns/QNUhqzfn79EUPcB5GlH7nK/story.html.
[75] *See* Beckman, Scott A., Ringside: A History of Professional Wrestling in America, Praeger, p. 131 (2006).

354.    The WWE has cynically used the millions of dollars in contributions to Nowinski's group to foster the false notion that it is helping research CTE. While in fact, this WWE research money is used to study groups including NFL players that do not include any wrestlers. This utter failure to research CTE or earmark these funds to specifically study the brains of retired wrestlers is occurring into 2016, despite the overwhelming evidence (including the Benoit and Martin published CTE studies and the obvious calculus of the biomechanical forces on a wrestler's head who performs in any WWE wrestling match) that wrestlers sustained repetitive head trauma as do other contact sports athletes whose brains have been exhaustively pursued, and studied for CTE.

355.    The Named Plaintiffs, including Mr. Nowinski's former tag team partner Rodney Mack (Begnaud), acted in reliance on both misleading statements issued by WWE (attempting to downplay the severity of concussion and sub-concussive injuries), as well as WWE's continuing actions in failing to properly assess, diagnose, and treat concussion and sub-concussive injuries. As a result, the Named Plaintiffs have failed to take actions which otherwise could have mitigated their injuries, both during and after their wrestling careers.

The Congressional Inquiry and The WWE's Evasion of the Concussion Crisis.

356.    After Chris Benoit's murder-suicide of his family on June 24, 2007, investigations and scientific studies revealed Benoit suffered from CTE resulting from brain damage from his wrestling career.  The findings were published by Dr. Bennet Omalu in his seminal paper, "Chronic Traumatic Encephalopathy in a Professional American Wrestler".

188

357.   In the years following the Benoit study and the contemporary studies by the same doctors of football players showing the exact same type of brain damage, the NFL would admit that football causes concussions, warn players the game presents unique long term risks as well as fund and conduct studies of deceased NFL football players' brains.[76]  The WWE, by contrast, has done virtually nothing. It has failed to warn its wrestlers of the long-term effects of TBIs, failed to study the community of retired wrestlers' health crisis, failed to provide for the study of their brains, and failed to create a brain bank to diagnose the deceased wrestlers with CTE.

358.   As a result of Benoit's murder-suicide, the issue came before the United States House Committee on Oversight and Government Reform, which investigated the health and safety practices of the WWE.

359.   The testimony made under oath by Stephanie McMahon evidences the WWE's duties it undertook towards its wrestlers, including tracking concussions and studying retired wrestlers, and how WWE has failed in those duties.

360.   Most notably, the Congressional testimony provided the following evidence of WWE's misconduct: 1) admissions by the WWE that they failed to track and study concussions until the time of the hearing; 2) admissions that the WWE failed to study the need for or provide health insurance for its wrestlers, instead misclassifying the wrestlers as Independent Contractors even though they could not otherwise obtain insurance or be covered by Workers Compensation; 3)

---

[76] *See* Linshi, Jack, "Study: 96% of Deceased NFL Players' Brains Had Degenerative Disease", TIME (Sept. 30, 2014), http://time.com/3450674/nfl-brain-disease (The NFL brain bank to which the WWE has funded has studied 79 brains and found CTE in 79 of them or 96% positive for brain damage).

admissions that the WWE had no idea what retired wrestlers did after their careers ended and were unaware of any chronic injuries sustained by wrestlers; 4) admissions that WWE assumed total control over dangerous moves in WWE matches and recognized certain moves were dangerous or likely to cause concussions; 5) admissions that WWE assumed a duty to have ring side medical doctors and WWE had been advised to have medical attention at performances; 6) WWE tracked days worked and assumed a duty to set a schedule that would have a limit on performances; and, 7) WWE was ignorant of wrestling retirement age, was unaware of any self-reported injuries, and was ignorant of the tracked number of concussions.

**WWE Had a Duty to Plaintiffs and Breached That Duty.**

361.   WWE, as organizer and purveyor of professional wrestling in which head trauma is a regular and repeated occurrence, had a duty to act in the best interest of its wrestlers' health and safety – including to keep wrestlers informed of the neurological risks associated with head injuries suffered while wrestling for WWE and to obey applicable laws. WWE had superior knowledge and access to information, and should have disclosed that information to Plaintiffs and not concealed such information.

362.   Stephanie Levesque described the scene of a typical performance in her Congressional testimony as follows:

"The referee has an IFB, which is a hearing device.  And the referee is wired to what is called guerilla position…And then the referee, however, does still have communication with the people at that position, at that entry point, that are hidden from the camera.  So the referee, for example, if they need to cut the match short, we can tell the referee, cut the match short.  If it looks as though someone is hurt, we ask, is so and so okay? The referee goes over – and this is, you

**190**

know, very inside – but the referee goes over and either asks the
performer verbally, are you okay, and he will either get a response; or
if someone's unconscious, you know clearly he will end the match.  If
a person is okay, he gives a signal…. Because we know in our
business what is meant to happen and what isn't meant to happen."[77]

363.    Surprisingly, after such a detailed description of what would happen
if someone were hurt, when asked whether referees had ended a match due to
injury, Ms. Levesque responded "I can't think of an instance off the top of my head,
but I am sure that there are." *Id.* at 110.

364.    By virtue of its employment of medical staff and provision of treatment
to Plaintiffs, WWE assumed a duty to conduct itself reasonably and to provide
these services with reasonable care. WWE hired medical personnel whose stated
purpose was to monitor and assess the wrestlers inside and outside of the ring.
Plaintiffs reasonably relied on these medical personnel in determining whether
they should return to the ring and continue fighting or practicing or had suffered
serious injury necessitating further medical treatment.

365.    WWE's doctors and medical personnel failed to properly monitor,
diagnose, and treat Plaintiffs before, during, and after the wrestling matches, in
some cases allowing them to return to the ring despite "wooziness"—a sign of
brain trauma.

366.    Despite WWE's clear recognition its wrestlers suffered concussions,
when asked during her Congressional testimony whether a wrestler had been
diagnosed with a concussion, Ms. Levesque responded, "That I am aware of, no.

---

[77] *See* Committee on Oversight and Government Reform, U.S. House of Representatives,
Washington, D.C., Interview of: Stephanie McMahon Levesque 108-110 (Dec. 14, 2007), *available at*
http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf (emphasis added).

There was a doctor who issued a warning to us, you know, that this person could develop a concussion but currently didn't have signs of it, and that person never wound up developing one."[78] This is just one of countless examples of WWE's downplaying and hiding the injuries its wrestlers routinely suffer from and which have resulted in Plaintiffs' inability to recognize, understand, and receive treatment for the traumatic brain injuries suffered as a result of WWE's negligent and fraudulent conduct.

367.   WWE undertakes to train all wrestlers including those against whom Plaintiffs wrestled, and therefore WWE had a duty to do so with reasonable care. In fact, the training provided was inadequate and unreasonable, causing Plaintiffs harm.

368.   Upon information and belief, WWE regularly collected and continues to collect wrestler injury reports, including during Plaintiffs' careers with WWE, becoming a repository of substantial concussion and other head injury information and conducting exclusive analysis. Plaintiffs, lacking this information, had to rely on WWE to inform them of their health and safety information relating to their wrestling careers with WWE.

369.   By issuing statements and engaging in programs to address Plaintiffs' health, WWE had a duty to ensure that these statements were complete and were not misleading or fraudulent.  Instead, WWE provided incomplete information to Plaintiffs, who reasonably relied on it to their significant detriment.

---

[78] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 114 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf (emphasis added).

370.   Contrary to its assertions concerning safety, WWE demanded Plaintiffs perform acts, which it knew or should have known cannot be performed safely. For example, the use of dangerous weapons like steel chairs against the head by wrestlers cannot be done safely.

371.   WWE's staff meets with the wrestlers both before and after the performances, observing, instructing, interacting, engaging, and questioning the wrestlers, including Plaintiffs. In her Congressional testimony, Stephanie Levesque admitted as much:

> "The producer meets with the talent after the match.  The producer who is responsible for that match meets with the talent after the match and goes through what worked, what didn't work, *what were you feeling out there*, you know, all those kinds of things – or congratulating them if they had a great match."[79]

372.   Upon information and belief, WWE has as recently as 2015 implemented the use of helmets during training at WWE training facilities. Helmets had previously not been worn by wrestlers at the WWE training facilities and were not worn by the Plaintiffs when they trained and wrestled with WWE.

---

[79] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 43-44 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf (emphasis added).



**Captured from embedded video on WWE's WWE Tough Enough Facebook page,** *available at* **https://www.facebook.com/WWEtoughenough/videos/vb.181273445231240/10120 37205488189/?type=2&theater, posted on June 11, 2015.**

373.   **WWE has not, however, implemented the use of helmets or other safety apparatus during live shows and performances.   Had WWE properly classified its wrestlers and Plaintiffs as employees and therefore reported injuries as required, OSHA would have required stricter standards of protection for WWE's employees.**

374.   **WWE undertook a duty to inform the Named Plaintiffs of (a) potential risks of employment, including head injuries; (b) injuries being sustained during performances; (c) the proper treatment for those injuries, including return-to-play guidelines; (d) the long-term risks which could result from those injuries; and (e) the long-term risks which could result from continuing to perform after sustaining head trauma, including the risks of sustaining repetitive head trauma. WWE further owed Plaintiffs a duty to not require, encourage, and romanticize its wrestlers'**

injuries, thereby downplaying the Plaintiffs' injuries. WWE owed Plaintiffs a duty to provide treatment for in-ring injuries, including long-term consequences of those injuries. WWE owed Plaintiffs the necessary recovery time for injuries sustained in-ring without the risk of termination. WWE also Plaintiffs a duty to inform them of new-emerging science which directly related to their injuries sustained while performing for WWE.  However, WWE utterly failed to uphold any of these duties and as a result, the Named Plaintiffs have suffered long-term degenerative neurological injuries.

**COUNT I**
**ACTION FOR DECLARATORY RELIEF – MISCLASSIFICATION**

**(Against Defendant WWE, on Behalf of All Named Plaintiffs to whom WWE provided an unconscionable booking contract, "Contractor Nostalgia Agreements", or any other documents or payments purporting to limit their rights under Applicable laws of the United States)**

375.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

376.   As part of its artful and cunning scheme to defraud each of the Plaintiffs, the Defendant WWE and VKM as its Chairman and controlling shareholder (individually and/or through the blizzard of trusts he has created) intentionally misclassified the Plaintiffs as "independent contractors", without basis in law for doing so, and with the specific intention of depriving the Plaintiffs of money due to them which was retained by the Defendants and utilized to advance their business and augment their wealth.

377.   The misclassification by WWE was generally achieved by the presentation to the Plaintiffs of boilerplate Booking Contracts permeated with unconscionability.  For the purposes of the scheme to misclassify the Plaintiffs, the relevant sections of the unconscionable Booking Contracts are virtually identical. Four examples of these contracts are attached hereto as Exhibits A, B, C, and D. No substantial negotiation was permitted.

378.   The unconscionable Booking contracts were utilized by the Defendants to dupe the Plaintiffs into believing that they were independent contractors with few if any rights against the Defendants, and particularly no rights to:

a.  Require WWE to contribute to State and Federal employment taxes as is required by law with respect to employees; thus resulting in significant additional expense to Plaintiffs;

b.  Require WWE to purchase Worker's Compensation Insurance as would have been mandated by the laws of the various states so as to pay for on the job injuries, disabilities and wage loss, but for the deceitful misclassification;

c.  Require WWE to provide at its own expense health insurance and liability insurance or to pay out of pocket for work related injuries when such insurance was not available, instead of requiring Plaintiffs to make these payments;

d.  Require WWE to provide a reasonably safe work place as required by OSHA and its regulations;

e.  **Allow Plaintiffs to seek to organize a union under the NLR Act;**

f.  **Require WWE to follow Family and Medical Leave Act and provide the guidance issued thereunder;**

g.  **Require WWE to provide written notices as mandated by statutory law concerning the protections afforded under OSHA, FMLA, and Workers' Compensation.**

379.   **The unconscionable language artfully crafted by the WWE and its attorneys as the "booking contract" cannot establish the relationship between contracting parties as one of employer-employee or independent contractor. Case law requires an inquiry beyond the unconscionable contractual boilerplate to the actual nature of the relationship between the Plaintiffs and the WWE.**

380.   **The Booking Contracts state they are to be governed by Connecticut law. Connecticut follows the vast majority of jurisdictions in holding that contract language will be construed against the drafter. Here the drafter is clearly the WWE and its relentless army of attorneys. Of the numerous unconscionable Booking Contracts examined, there were no material deviations from the printed "form contract" imposed by the WWE, which is testimony to the vast discrepancy in bargaining power between the wrestlers and the WWE, the coercive nature of the relationship, and the fact that the significant majority of the wrestlers lacked both adequate (or even any) representation or sufficient educational training to even begin to comprehend the boilerplate Booking Contracts they signed, all as known and relied upon by the WWE.  Serious penalties were imposed by the WWE for**

questioning any demand it made of Plaintiffs as is elsewhere more particularly alleged.

381.   The Internal Revenue Service has established a twenty factor test, very similar to the codification of the common law as set forth in the Restatement of Agency (Third), Section 7.07, and under applicable Connecticut law, for distinguishing true Independent Contractors from employees. Plaintiffs were employees of the WWF, despite WWF's cunning scheme to misclassify them for its own profit.

382.   It would not matter or be a defense to the claim of misclassification if the WWE claims that it has a revenue ruling from the IRS on the issue of independent contractors. Such rulings are only as good as computer calculations. Applications for a revenue ruling in this case, in order to achieve "independent contractor" status would necessarily have to have been incomplete and misleading as to the degree of control exercised by the WWE over the wrestlers.

383.   The Plaintiffs and all wrestlers signing any one of the WWE's boilerplate Booking Contracts are required to comply with the WWE's instructions as to when, where, and how their "performance" is to be executed, and therefore should be classified as employees. See Rev. Rul. 87-41. Such requirements are among those imposed on employees, <u>not</u> those who are properly classified as "independent contractors."

384.   Sections 1.1 and 5.5 of the boilerplate Booking Contract provides that WWE shall exclusively control the Wrestlers appearances and services "without limitation", not only in matches but also personal appearances. WWE is given the

sole right to assign the wrestler's obligations to others. The WWE is given the right to "direct" the wrestler to create or design a copyrightable work which is then the property of the WWE.

385.   In accordance with Paragraph 9.6 of the Booking Contract "Wrestler agrees that all matches shall be finished in accordance with the Promoter's [WWE] direction", thus establishing a critical difference between athletes who participate in sporting events, and employees following a script. The object is not to win, but to follow the script, which the WWE has written, which often turns out to be a detriment to the wrestler's career and financial interests, and is routinely utilized by WWE to punish dissent through direct financial penalty.

386.   Indeed if the wrestler deviates from the scripted ending not only is the Wrestler fired, but ANY sums due under the contract are forfeit –not only for wrestling, but for royalties and anything else there is a "forfeiture of any payments due" See Booking Contract, paragraph 9.6, Exhibits A, B, C, and D.

387.  Above and beyond the requirements of the unconscionable boilerplate Booking Contracts, WWE maintained nearly total control over all aspects of the Plaintiffs' careers. Not only the location and time of performance was dictated, but also the duration and outcome of each match, the "persona" of the Plaintiffs including props, hairstyles, story lines, and "signatures moves" have continuously been dictated by the WWE under the guidance and iron control of its Chairman and controlling shareholder VKM. See *Seven-Up Bottling Co. v NLRB*, 506 F.2d 596 (1st Cir. 1974) (Holding that "Control" is a decisive element.  WWE maintains dictatorial control and often directs the action in the ring as it proceeds).

388.   Furthermore the WWE, operating principally through VKM, exercises total control over the Wrestler's scripted "character", typically termed their "gimmick." The wrestler's "gimmick" has a major impact upon his or her career, success, and earning power. Other entertainers such as actors, may advance based upon their skill in the profession, as do sports athletes. However the opportunities of professional wrestlers are carefully dictated by the WWE to serve its own interests often to the financial detriment of the wrestlers. For example, the WWE has a long history of assigning African American wrestlers' "gimmicks" as thugs or African savages. Those appearing to be "foreigners" are depicted as having low morality, or as terrorists.

389.   The detailed control which the WWE exercises over the performance of the wrestlers and the draconian penalties for not following those orders amply satisfy the "control" test of an employer-employee relationship.

390.   The second IRS-common law factor concerns "training" in its broad sense of not only physical training, but through the establishment of a "gimmick" and determining the outcome of the "match" including a choreograph of many of the moves. Training typically indicates that the employer wants the services rendered in a particular manner and certainly the WWE exercises near dictatorial control in that respect.  Numerous wrestling moves are required, some optional, and some recently banned because of their devastating effect (i.e. the "piledriver"), but previously were required during the tenure of most of the Plaintiffs.

391.   Currently, the WWE trains nearly all wrestlers internally. This was not the case in the period from 1985 through 2000 for example, where extreme training

methods producing musculature generally achievable only through the use of steroid enhancements, were commonly utilized by the wrestlers in order to maintain their positions with WWE. Thus control over training is another factor supporting the Plaintiffs' status as employees.

392.   The next IRS factor – "integration" is concerned with whether the "employer" could continue to operate its business without the services being provided by the individual whose status is in question. Since the WWE is in the business of providing "sports entertainment" through wrestling "matches" the business would collapse without the employee wrestlers. Replacement of an individual wrestler is not the issue as the test is applied to the class of workers in the aggregate.

393.   The next test is whether the services must be rendered personally, which implies a substantial degree of control over the methods used and the results. The WWE boilerplate Booking Contract is for a particular individual. Since the individual wrestler has a particularized persona established and approved in detail by the WWE and the matches are scripted along story lines involving complementary "gimmicks", there can be no assignment of the work to another wrestler by either of the participants. Only the WWE may make substitutions or change assignments. The "personal services" test therefore weighs heavily in favor of characterization of wrestlers as "employees".

394.   The next test involves hiring, supervising, and paying assistants. Independent contractors have the right to hire additional help, or substitute help to complete the work.   In the case of wrestlers, unlike professional boxers, the

wrestlers may not select the identity or existence of "corner" assistants, as these might interfere with the persona created. Wrestlers are not responsible for finding, hiring or firing any person to assist in the creation of WWE's desired match and its determined outcome, and in fact are prohibited to do so.

395.    For example, the WWE production RAW on the evening of December 14, 2015 saw the intervention into the "title match" of three outside wrestlers who supposedly came into the contest to assist in defeating a wrestler ("Roman Reigns") who, as a part of his script, was alleged to have "insulted" members of Vince McMahon's family.  Chairman McMahon, as a part of the script, interfered with the referee and was "knocked out" by a "superman punch" from "Roman Reigns" who became "champion" after miraculously beating off the other three interfering wrestlers and defeating his gargantuan opponent "Sheamus" –-a result and a performance all carefully scripted by the WWE, with Chairman McMahon at ringside.

396.    Therefore, this hiring/firing/supervising test classifies wrestlers as employees. It has always been the case that the WWE selected any "assistants" as well as other wrestlers to interfere in the match according to a planned script. Indeed, the "Referees" are mere actors whose role is dedicated to advancing the planned outcome, and in this match Chairman McMahon was personally present to insure the desired result. McMahon, an employee of WWE, did nothing different from Sheamus and Roman Reigns whom he cunningly classified as "independent contractors." Indeed, McMahon has total control over the performance while the "independent contractors" dared not deviate from orders.

397.   The existence of a "continuing relationship" provides support for an employer-employee relationship. Independent contractors typically complete one job and then the contract is finished and they may work for someone else. WWE contracts are for three years, excepting contracts with "Jobbers" or those on "handshake deals".  That the WWE has the option to terminate the contract does not detract from the nature of the relationship as employer-employee since such rights simply provide more control to the WWE. Unless the wrestler complies in all respects, he will not be utilized and his career will not advance.   The WWE has, and at all relevant times have always, had a practical monopoly upon the wrestling entertainment business.

398.   Wrestlers have "set hours of work" established by the WWE. WWE also establishes the story line, outcome of the match, and the characterization of the individual wrestlers, and their gimmicks, costumes and assistants. The WWE sets the time and place of the match and all essentials often for 150 – 250 matches per year per Wrestler. This test once again designates the Wrestler as an employee.

399.   The task of the wrestler is to show up for the performance and perform the part assigned. In large part the wrestler's success and future prospects are not determined by his wrestling skill, but by how he is characterized by the WWE – if he is allowed to win and to be assigned interesting story lines and "gimmicks". This is best achieved by following WWE's total control thus pleasing VKM.  This test once again designates the wrestler as an employee.

400.   Wrestler after wrestler, including Plaintiffs have stated that WWE is controlled by its Chairman Vince McMahon. VKM would not tolerate either any

negotiation or questioning of the unconscionable Booking Contracts, whether written or on a "handshake".  For example:

    a. Timothy Smith (a.k.a. Rex King) alleges that this WWF culture was "keep your mouth shut".  He was informed by older wrestlers when he stated with WWF that if he spoke up and didn't follow orders he would be considered a "trouble maker", "squashed" (i.e. physically hurt) in the ring, then fired;

    b. George Gray (a.k.a. "One Man Gang") alleges that "keep your mouth shut is [the] first rule of the business". If you wanted to wrestle, you didn't ask questions or you would be pushed down in the card and make less money.  Chairman McMahon personally remade his character to "Akeem the African Dream" and required he dress in a yellow Dashiki as a racially stereotypical black, complete with tribal dancers supplied by WWE.  Mr. Gray is Caucasian;

    c. Jonathan Hugger (a.k.a. Johnny Stamboli) alleges that he was handed a contract to sign by Jim Ross of WWE, which he executed with no negotiation on a "take it or leave it" proposition.  He was told he had to move to Cincinnati and to break his lease.  Mr. Hugger alleges that if he did not accept the WWE contract, you did not wrestle. Once he questioned a story line and was sent to Louisville, KY for two weeks as punishment;

    d. Ahmed Johnson alleges that WWE controls the Wrestlers by controlling the ability to manipulate their story lines and constantly telling them that

**"you have no other place to go." If you did not do everything WWE demanded the "mocking angles" are deployed to degrade your character with a degrading story line and constant losses. Then your TV appearances would dwindle and any merchandising income would dry up.**

401.   Next, the unconscionable Booking Contract requires exclusive full time devotion to the WWE during its term. Thus the Wrestler is prevented from utilizing his skills to enhance his income except through the WWE. Unlike an independent contractor, a WWE employee is not free to work for whom and when he chooses, and whether his work succeeds or fails.  As is alleged elsewhere herein, a WWE Wrestler must perform 200-250+ times per year in a physically exhausting profession where injuries are very common and where preforming with pain and serious injury is required to maintain regular assignments. Additionally the unconscionable Booking Contracts contain non-competition clauses. Therefore WWE monopolizes the wrestler's time and earning opportunities and this factor is entirely consistent with an employee, not an "independent contractor". See *Seven-Up Bottling Co. v. NLRB* 506. F.2d 596 (1st Cir. 1974).

402.   Next, where the work is done is determined by WWE.   From the boilerplate Booking Contract the WWE controls the location of the work, the travel to a designated route, and the work at specified places. *See* Rev Ruling 87-41 (The same is true with "handshake" deals).

403.   The Tenth IRS Test Factor states that if a "worker must perform services in the order or sequence set by the person…for whom the services are

performed, that factor shows that the worker is not free to follow the worker's own pattern of work. Rev. Ruling 87-41. Such requirements are consistent with status as an employee, but inconsistent with an "independent contractor" status. As is alleged above, the WWE maintains control over all important aspects of a performance – the Monday Night Raw "Championship" match of December 14, 2015 alleged above is but one example. Control over sequence, timing and the "intervention" of "outsiders" was essential to the acceptance of the performance by the audience.

404.  The next test involves the "furnishing of tools and materials". Although the boilerplate Booking Contract states that the wrestlers have the obligation to provide their own wardrobe, costumes and props, it is common knowledge in the industry that WWE provides the majority of the wrestler's "tools" and specifies their costume, even providing a preferred tailor. For example the "Divas" series show consultation between the wrestlers and wardrobe and make-up artists. Wrestler Roy Wayne Ferris ("Honkey-Tonk Man") regularly was instructed as a part of the performance to smash his guitar over his opponent's head after his scripted "victory" – only to have another guitar appear at the next match. Upon information and belief the Honkey-Tonk Man did not pay for the guitars, which were an essential tool of the performance. There are numerous other examples, not the least of which are the previously very common employment of "prop" chairs that were very often utilized by one wrestler to smash over the head of his opponent, all according to script.

405.   WWE has made significant investments in the facilities used by the worker in performing services. Such investments do not need to be capital investments in permanent fixtures, but can also be by way of leasing the facility in which the performance is to take place. Given that wrestlers perform 200-250 days a year, the WWE makes considerable investment in providing the "arena" for the performance, and further pays other employees to participate in making up the story lines and "gimmicks" of the wrestlers. Additionally, there are numerous production employees paid by WWE to set up the rings, provide various props to be used in the performance (such as the guitars mentioned above), to control the lighting, and provide security and the other numerous accouterments of a mass entertainment production. The wrestlers task is to appear at the time and place designated, perform according to a script with a predetermined outcome with the designated persona in a ring erected by the WWE or its agents and in an arena leased by the WWE or its agents. These factors weigh heavily in favor of a classification as "employee".

406.   The next factor is whether the wrestlers are actually at economic risk concerning a profit or loss from their profession. The Booking Contract has the wrestler providing only his costume and minor props (expensive props, chairs to be smashed over heads, and so on, outside interveners, are provided by and scripted by WWE. Wrestlers do not make significant monetary "investments" in their work. Buying a better office computer, tools or other physical devices will have no effect upon a wrestler's employment compensation since in large part his success in the field is dependent not only upon his physical skill, but more so upon

the persona assigned to him and the popularity of that persona over time among the wrestling audience and whether he can slavishly follow orders. The wrestler has no ability to strategically select his opponents to maximize his chance of success as a professional boxer might. That is all done by his employer- the WWE.

407.   Other professional athletes who show up to perform in arenas before the public at times specified by others are clearly considered "employees". Professional baseball, football, hockey and basketball players are <u>all</u> represented by unions and enjoy the benefits of collective bargaining agreements. They enjoy the benefits of the Family Medical Leave Act, 29 U.S.C. 2601, and social security taxes are contributed to by their employer as required by law. In the event of injury professional baseball players are covered by Workers' Compensation benefits and receive their salary less the Workers' Compensation benefits paid. Basketball players have been held by courts to be entitled to Workers' Compensation due to injuries caused by repetitive trauma. *New York Knickerbockers v. Worker's Compensation Appeals Board,* Cal: Court of Appeal, 2nd Appellate Dist., 5th Div. 2015.

408.   The distinction between other professional athletes and professional wrestlers includes that in wrestling the outcome is controlled not by the skill of the participants but by the WWE scriptwriters in accordance with their perception of the entertainment value of possible outcomes or the whim of Chairman VKM. There are no legitimate referees to enforce rules.  Indeed, even the "holds" and wrestling techniques are largely choreographed by the WWE, including modifications by the WWE during actual matches. Therefore, WWE performers hare subjected too much

more control over their jobs than other professional athletes who receive the benefits of employees, have the opportunity to unionize and receive the benefits of being classified as employees. See *Seven-Up Bottling Co. v. NLRB* 506. F.2d 596 (1st Cir. 1974).

409.   The Plaintiffs allege that professional wrestling is not a contest of skill but a drama with a pre-determined outcome.  WWE determines which wrestlers will face each other in a bout, how long the match will take, and the type of match desired. The wrestlers are told what costumes to wear, how to wrestle, when to wrestle, where to wrestle, and who is going to win and what, if any, outside interference there will be. *See also* "Body Slam from the Top Rope", 12 U. MIAMI ENT. & SPORTS L. REV. 1 (1994-95).

410.   The boilerplate Booking Contracts which wrestlers must execute in order to work contain a choice of law clause which selects Connecticut as the applicable jurisdiction. *See*, *e.g.*, Exhibit A, paragraph 13.7. Leaving aside for this section whether such a clause has validity, the law of Connecticut is in close agreement with the tests applied by the Internal Revenue Service for classification of an individual as an "independent contractor" or as an "employee".

411.   Under Connecticut law, the existence of an employer-employee relationship is a "factual issue" and is based in large part upon whether the individual is acting in an "autonomous manner" at the time of the injury. Who has the right to "means and methods of work" is important. *Chute v Mobil Shipping & Transportation Co*. 32 Conn. App. 16, 19-20 (1993), 632. A.2d 688. As has been alleged above, WWE exercises total control over the outcomes of the matches and

substantially regulates the choreographed match to the finish. No one in wrestling utilized the technique of smashing chairs over an opponent's head, or demanding bloodletting through cutting, except at the urging of the WWE. Connecticut law appears largely consistent with the IRS tests. Means and methods are dictated by the WWE, and the wrestlers have been intentionally and deceitfully misclassified as "independent contractors."

412.   The *Chute* case also holds that a mere declaration in a contract that one is an independent contractor or employee is <u>not</u> dispositive, but the actual relationship of how the work is conducted is a question of fact for the trier of fact. *Chute* at 732. Therefore, the self-serving boilerplate of the "unconscionable boilerplate Booking Contracts" required by WWE is not probative under Connecticut law –especially under circumstances where deliberate advantage by a multi-billion dollar corporation (and its virtual army of attorneys) is being taken of persons who have no training or experience to grasp the contrast of "employee" versus "independent contractor", and have been subjected to the cumulative effects of repeated concussions, broken bones, torn tendons and other very painful and often long-term injuries.

413.   The Plaintiffs are of course also deprived of the protections of the National Labor Relations Act as long as they are misclassified as "independent contractors" In *NLRB v United Insurance Co. of Am.*, 390 U.S. 254, 258 (1969), a twenty one point test very similar to the IRS test was set forth for resolving the difference between an independent contractor and an employee with the right to unionize. *See also* 55 A.L.R. Fed. 20 (1992).

414.   All of the Plaintiffs allege that WWE controlled the place, time and manner of their appearances, as well as the outcomes of the events, and to a large degree, what happened during the events – especially such dramatic occurrences as smashing a guitar or a chair over a wrestler's head, or subjecting them to a "pile driver" through which one participant's head is smashed into the ring floor or being bashed on the head with a metal chair. "Has the employer the general authority to direct what shall be done and when and how it shall be done – the right of general control of the work". *Compassionate Care. Inc. v. Travelers Indem. Co.* (Conn. App. Ct. #AC-34963, 12/31/2013), quoting favorably *Kaliszewski v. Weathermaster Alsco Corp.*, 148 Conn. 624, 629; 173 A.2d 497 (1961).

415.   In *Latimer v. Administrator*, 216 Conn. 237; 579 A.2d (1990), the Supreme Court of Connecticut held that where the "employer" held the right of discharge on an employee by employee basis, established the worker's schedules, required them to adhere to specific instructions, and that the worker's pay was not determined by the success of their enterprise and accomplished, with the equipment needed provided by the employer – the persons filling these criteria were employees for the Unemployment Compensation Act of Connecticut NOT "independent contractors". In similar fashion to *Latimer*, everyone who is a contestant in a WWE wrestling match is subject to the control of its script-writers, often in great detail as to moves, props, moves allowed and moves banned, the outcome, the persona and so on.  WWE wrestlers are under the dictatorial control of the WWE.

211

416.    The terms of the unconscionable boilerplate Booking Contracts provide much control; but, the Plaintiffs allege that in addition to the control provided by the language of the Booking Contract, the WWE exercised on a routine basis near dictatorial control over all aspects of its "product", under the direct guidance of its current "Chairman" and controlling shareholder Defendant Vincent K. McMahon with severe consequences for any disobedience including physical risk and career ruination.

417.    For example, setting the wrestler's persona can have a large influence on his income level. A "Hulk Hogan" personality may be set as a great hero – a "Captain America" type figure while the "Iron Sheik", a character whose current equivalent could be an ISIS-type character, is doomed in every match to ignominious defeat, or allowed victories just to stoke emotions for his inevitable defeat in a "revenge match".

418.    As soon as the audience tired of seeing the "heel" or "bad guy" pilloried, or the public whim moved on to a different type of "bad guy", the persona of the "hero" would simply be repositioned by the WWE as vanquishing a different foe while the "bad guy" would be likely out of a job. Success and reward continues for one, for the other, a career is short and swift –regardless of who was the more skilled or better trained wrestler, and all as pre-arranged by WWE.

419.    Such contests of "good" and "evil" are the daily fare of the WWE and the scenarios alleged are under the total control of the WWE and its script-writers, and constitute the working conditions of the Plaintiffs; all the while each of them, is under the supervision of WWE Chairman VKM.

420.   To find more success in the WWE, being what is termed a "baby face" (Good guy) or "heel" (Top bad guy) are earning positions – at least for a time. A wrestler that the WWE scriptwriters want to succeed they give a "push" which means a winning story line in matches. Most of the wrestlers are "mid-card" which means they are scripted to lose in order to "push" the top entertainers.  They are the human fodder of the WWE and are routinely dumped when their manipulation ceases to generate profit, booking contract or not, "handshake deal" or not.

421.   A case in point is Plaintiff Mark Copani (scripted as Muhammad Hassan). He was given a "push" as a Muslim American (he is Italian) and scripted for a match with the "Undertaker" then WWE's biggest star on 6/28/05.   His character was introduced with the Muslim "call to prayer" and he wore a Middle Eastern costume appropriate to his character, including a prayer rug. Mr. Copani was accompanied by several "henchmen," supplied by WWE in black hoods, who attacked other wrestlers as a part of the show. The WWE established Hassan as a hated figure in order to sell tickets. However, in July of 2005 after the terrorist bombing in London which killed 52 people, Mr. Copani's character became politically incorrect and he was told by WWE that he was being put on leave. He was terminated several months later, and his career ended – all at the control of the WWE.

422.   Plaintiff Tracy Smothers a.k.a. Freddie Joe Floyd was a well-regarded wrestler who worked very hard at conditioning and developing his in the ring athletic abilities. He was branded by Vince McMahon, WWE's "boss" as a cartoon type character, a preposterous persona McMahon wanted to explore. Tracy

Smothers' career was injured and he was terminated because the "buffoon" gimmick didn't catch on with the fans.

423.   It was well known among the Plaintiffs that the only way out of the WWE (except by termination) was by giving notice prior to the final 90 days of the Booking Contract. As soon as WWE discovered a wrestler wanted to leave, WWE through Vince McMahon would bury the character the wrestler utilized, and therefore the wrestler's prospects by having him loose repeatedly or be otherwise humiliated. Control of the wrestler's persona and match outcome, were not only utilized for entertainment purposes, but also to enforce total contractual control. If a wrestler dared to question the iron-clad WWE boilerplate Booking Contract, (or WWE's review of his "handshake deal") the fate of his "gimmick" relegated him to the graveyard of jettisoned WWE characters, and his opportunity for a financially rewarding career all but eliminated.

424.   In sum, Vince McMahon, the boss of WWE, had, has, and regularly exercises the ability to diminish or kill off the careers of wrestlers he did not like, or who offered any questioning let alone resistance to his iron control. The degree of control which Vince McMahon, through WWE, exercised over the careers and earning ability of wrestlers was and remains substantially more pervasive than would be tolerated by any "independent contractor", or by anyone in a commercially reasonable setting.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Against Defendant Vincent K. McMahon, as an Individual, and Vincent K. McMahon as Trustee of the Vincent K. McMahon Irrevocable Trust U/T/A dtd. June 24, 2004, as Trustee of the Vincent K. McMahon 2008 Irrevocable Trust U/T/A dtd. December 23, 2008, and as Special Trustee of the Vincent K. McMahon 2013 Irrev. Trust U/A dtd. December 5, 2013, and as Trustee of Certain Other Unnamed McMahon Family Trusts, and as Controlling Shareholders of WWE, on Behalf of All Named Plaintiffs to whom WWE provided an unconscionable booking contract, so- called Contractor Nostalgia Agreements or other documents purporting to limit their rights under Applicable laws of the United States and her courts)**

425.    Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all Exhibits.

426.    Vincent K. McMahon is an individual resident in Connecticut, according to the March 2015 "Annual Report" of the WWE, is its self-styled "Chairman of the Board and Chief Executive Officer", and has served in a top level executive capacity and member of the Board of Directors of WWE at all relevant times and according to his own numerous public statements is intimately involved in every aspect of every material decision by the WWE.

427.    For example, VKM provided an interview on December 14, 2007 before the House Committee on Oversight and Government Reform in which he told Committee investigators that he was also then "Chairman of the Board" and in that capacity had "some oversight over everything that we do" including marketing, talent relations and operations, including choosing talent and assigning talent to the WWE's different divisions. Committee on Oversight and Government Reform, US House of Representatives, Washington DC Interview of Vincent Kennedy McMahon December 14, 2007, pages 26-27.

428.   According to a Form 10-k filed by WWE for 2014: "In addition to serving as Chairman of our Board of Directors and Chief Executive Officer, Mr. McMahon leads the creative team that develops the storylines and the characters for our televised programming and live events. Mr. McMahon, from time to time, has also been an important member of our cast of performers."   Prior 10-K's contained substantially similar language for many years.

429.   According to Form 10-k filed by WWE for 2014: "A substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by Vincent K. McMahon. Mr. McMahon controls a majority of the voting power of the issued and outstanding shares of our common stock. Through his beneficial ownership of a substantial majority of our Class B common stock, Mr. McMahon effectively can exercise control over our affairs".   Prior 10k's contained substantially similar language for many years.

430.   According to Form 10-k filed by the WWE for 2014: "All of the issued and outstanding shares of Class B common stock are held by Vincent McMahon and other members of the McMahon family and trusts set up for these family members".   All the names of the "family trusts" (which appear to include trusts within trusts) are not provided in the filings and are not to Plaintiff's knowledge otherwise obtainable except through discovery from the Defendant who has unique possession and control over this information.

431.   According to Form 10-K filed by the WWE for 2014: "through his beneficial ownership of a substantial majority of our Class B common stock, our controlling stockholder, Vincent K. McMahon, exercises control over our affairs,

**and his interests may conflict with the holders of our Class A common stock"** (emphasis added). From 10-k's for years prior to 2014 contained substantially similar language.

432. Therefore, it is alleged that it is established through corporate filings and Mr. McMahon's own statements that he has effective control over the affairs of the WWE, including such control as may conflict with the interests of the shareholders of the Class A common stock. It is further alleged that at all relevant times he has maintained such control and exercised such control to the detriment of the Plaintiffs so as to cause them both monetary and physical injury as alleged herein.

433. Based upon the above allegations, and others set forth herein Defendant VKM individually, and in his capacity as Trustee of various family trusts through which he controls the voting power associated with the voting stock ownership of the WWE, has: a) maintained himself and his family members in positions of controlling power within the WWE, and b) has deliberately engineered a cunning scheme to defraud the Plaintiffs which cunning and artful scheme constitutes a pattern of racketeering activity, which has continued for well over two decades, and continues to this day, as a result of which racketeering activity the Plaintiffs have been and continue to be deprived of money and property amounting collectively to millions of dollars.

434. According to SEC filings, one of the Trusts controlled by VKM is the "Vincent K. McMahon 2013 Irrev. Trust U/A dated December 5, 2013," which maintains its offices at McMahon Ventures, LLC in Stamford, CT. From time to

time, other trusts have been identified in SEC Filings as the Stephanie McMahon Levesque Trust U/A Vincent K. McMahon Irrev. Trust dated June 24, 2004 and the Stephanie McMahon Levesque Trust U/A Vincent K. McMahon Irrev. Trust dated December 23, 2008. The trusts shift around from time to time.

435.   According to the December 5, 2015 SEC Form 13D, Jerry S. McDevitt, Mr. McMahon's attorney and the WWE's attorney (including the Class A shareholders potentially holding interests which conflict with VKM's), is the Trustee of both the 2008 and 2004 Trusts and sits on the "Business Advisory Committee" of the 2008 Trust. Upon information and belief, there are numerous other "Trusts" (and/or trusts within trusts) which hold WWE stock, established for the benefit of the McMahon family members, which according to other SEC filings identified herein, effectively allow VKM to exercise control over the affairs of the WWE which control he admits could be in conflict with the interests of the Class A shareholders of the WWE.

436.   The Defendant VKM (individually and as Trustee of his family trusts) are "persons" within the meaning of 18 U.S.C. Section 1961(3) who conducted the affairs of the Enterprise WWE through a pattern of racketeering activity in violation of 18 USC Section 1962(c), all as herein alleged.

437.   The Enterprise WWE is an association in fact within the meaning of Section 1961(4) The Enterprise is and has been an ongoing organization that functions as a continuing unit and is under the control of Defendant VKM individually and as he is Trustee of the various VKM family trusts and further as he maintains effective control over his sub-Trustees such as Jerry McDevitt. The

Enterprise was created by VKM (individually and as Trustee of his family trusts) and or used as a tool to effectuate the pattern of racketeering activity alleged herein.  The Defendant "Persons" are distinct from the Enterprise.

438.   The Enterprise falls within the meaning of 18 USC Section 1961 (4) and is under the control and has been infiltrated by VKM individually and as Trustee of his various family trusts together for the common purpose of defrauding the Plaintiffs out of their money and property by fraudulently representing to them and convincing them among other things that they were "independent contractors" rather than employees, all as controlled by schemed up and carried into action by Defendant VKM (individually and as Trustee of his family trusts) and those who provided knowing conspiratorial assistance for this fraudulent and illegal purpose.

439.   The Defendant Enterprise engaged in and affected Interstate Commerce because the wrestling matches which provided a substantial contribution to and basis of the earning activities of the Enterprise were conducted in various states and through the media such as television and the distribution of video tapes and "DVD's", presentations in arenas and other locations in numerous states of the country, and further often distributed through the Cable-TV and "pay-per view" outlets.

440.   According to 10-K forms filed by the WWE for various years, and its Annual Shareholder Reports, its net revenues for the years 2000-2009 are set forth below:

| 2000 | - 377.9 | 2005 | - | 366.4 |
| 2001 | - 438.1 | 2006 | - | 400.1 (in millions of dollars) |
| 2002 | - 409.6 | 2007 | - | 485.7 |
| 2003 | - 374.3 | 2008 | - | 526.5 |

**2004  - 374.9                    2009  -        475.2**

441.    Given the magnitude of these revenues and the performances put by the WWE in numerous states and through television, there can be no dispute that the activities of the WWE under the direction and control of VKM, individually and as Trustee of Trusts holding the controlling voting interest in WWE, has an effect upon interstate commerce.

442.    The WWE has exerted direct control over all of the "Booking Contracts" of the Plaintiffs and provided within those unconscionable contracts misrepresentations concerning the status of the Plaintiffs as "independent contractors" and as a result deprived the Plaintiffs of money and property otherwise due to them, as alleged above, all engineered by VKM.

443.    The Defendant VKM (individually and as Trustee of his family trusts) have asserted direct control over the creation and distribution of mass marketing and sales materials utilizing the work product obtained from the Plaintiffs through the fraudulent and cunning boiler plate Booking Contracts of the Enterprise.

444.    The Defendant VKM (individually and as Trustee of his family trusts) has promoted their cunning schemes and artifice to defraud through the use of the interstate wires and mails of the United States as alleged herein.

445.    The Defendant VKM (individually and as Trustee of his family trusts) have placed their own employees and agents in positions of authority and in control of the Enterprise and maintain complete and effective voting and executive control over the enterprise through VKM's direct control (as Chairman and Trustee) and by utilizing other "straw men" such as his attorneys as his alter ego's for the

purpose of controlling the Enterprise, despite its potential conflict with the substantial block of non-voting shareholders.

446.  The Defendant VKM (individually and as Trustee of his family trusts) has conducted (and participated in) the affairs of the WWE Enterprise through a pattern of racketeering activity that includes thousands of individual acts violating 18 USC Sections 1341 and 1343 (mail and wire fraud), as described herein, including the procurement and execution of each Booking Contract utilized to misclassify the Plaintiffs and to thus deprive them of money and property.

447.  In implementing their cunning fraudulent schemes, the Defendant VKM (individually and as Trustee of his family trusts), and through him the WWE Enterprise, were acutely aware that the Plaintiffs did not have the educational background experience and access to highly paid expert legal counsel (as the Defendant possessed and utilized to create the unconscionable Contracts) in order to be able to determine the falsity of the representations made to them by the Defendants about the Booking Contracts and their status as "independent contractors", and the financial consequences resulting to the Plaintiffs as a result of the misclassification of their status.

448.  Each of the Defendants, VKM (individually and as Trustee of his family trusts and through him the WWE Enterprise) engineered WWE's fraudulent mailings of Booking Contracts and interstate wire transmissions which constitute a pattern of "racketeering activity" within the meaning of 18 USC Section 1961 (1). Collectively, these violations constitute a pattern of racketeering activity within the meaning of 18 USC Section 1961, *et seq*. extending over more than twenty years.

449.   The acts of racketeering activity by Defendants VKM (individually and as Trustee of his family trusts, and through him the WWE enterprise) and WWE all had the same pattern and similar purpose of defrauding the Plaintiffs and depriving them of money. Each racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including the Plaintiffs and each of them. The Defendant, VKM's, fraudulent activities are part of his regular and usual way of conducting ongoing business of the WWE enterprise which has continued over at least the past twenty years and continues until this day, and constitutes a continuing threat to the property of the Plaintiffs and those currently employed by the Enterprise, WWE.

450.   The pattern of racketeering activity identified herein has been conducted systematically through the repeated fraudulent use of the mails and express courier transport of the United States by WWE, in violation of 18 USC 1341, through implementing the schemes identified herein, all under the control of VKM (individually and as Trustee) and others he utilizes as "Trustees" over whom he has effective control, and therefore control of the WWE Enterprise.

451.   In addition, the Defendant VKM's (individually and as Trustee) cunning scheme to defraud the Plaintiffs was further advanced and carried out through the repeated utilization of the wires of the United States by the interstate use of the telephone system, the internet system, by facsimile transmission and electronic mail, all used to present, execute, and implement the Booking Contracts, which misclassified the Plaintiffs and deprived them of money and property.

452.   The use of the mails and wires of the United States together with the size and scope of the scheme itself, the large amount of money involved and the conduct of the scheme over a substantial period of time, all have had an effect upon interstate commerce as that term of art is utilized within the meaning of 18 USC 1961 et seq. (the RICO Act).

453.   For example, the boilerplate Booking Contracts through which the Plaintiffs were misidentified as "independent contractors" were sent to the Plaintiffs through the utilization of the mails of the United States, and sometimes the wires of the United States, with a request that the contracts be signed and returned through the mails of the United States. This is a pattern that continued for over two decades, among the vast majority of the Plaintiff's (occasionally a Booking Contract" was handed to a Plaintiff), and was often renewed with each Plaintiff, many for several times. Examples of these Contracts, including dates, are exhibits to this Complaint. The dates of the mail fraud are approximately the dates on the Booking Contracts. Each mailing constitutes a separate act of mail fraud. Although numerous specific acts of mail fraud are detailed herein, the exact number and dates of the hundreds of Booking Contracts mailed to the Plaintiffs and other WWE wrestlers is something uniquely known to the Defendants, and will be available through discovery. Each and every Plaintiff was the victim of two or more such transactions, the explicit particulars of which are uniquely known to the Defendant VKM and his straw men.

454.   As provided in the Booking Contracts "notices" to the Wrestlers were typically specified as going to the Wrestler alone, but notices to the Defendants

were carefully required to be sent to the Defendants' "general counsel", or to the Defendant's office where they could be scrutinized by the WWE attorneys, while the Wrestlers were intimidated not to use attorneys. *See* Exhibit A, B, C, and D, paragraph 13.6. Use of the United States mail and telecopy (a.k.a. fax) constituted permitted notices under the Booking Contracts.

455. At all times, the Defendants maintained an organization of sophisticated "in house" and outside counsel, and knew well that the vast majority of the Wrestlers had little education, and certainly no legal education or ability to comprehend the scheme to which they were being subjected.

456. In accordance with specific allegations set forth herein, few if any of the Plaintiffs had any idea of what an "independent contractor" was, or the scope of the rights guaranteed under both State and Federal Law, which would be abandoned through that misclassification, and the money and property thus lost to the Plaintiffs as a result of the Defendants' cunning scheme.

457. This disparity of comprehension, well known to, and in fact relied upon, by the Defendants to further their cunning scheme was augmented by intimidation of the Plaintiffs as alleged herein. As is alleged herein the Plaintiffs were coerced by fear of their jobs and their physical safety to ask no questions and to submit to the dictates of the WWE as controlled by VKM, individually and as Trustee. As is alleged herein the Plaintiffs were coerced by fear of their jobs and their physical safety to ask no questions and to submit to the dictates of the WWE as controlled by VKM, individually and as Trustee. Moreover, the progression of a

wrestler's tenure in the WWE increased the vulnerability of such wrestler to the WWE's cunning schemes.

458. Repeated blows to the head and the neurological consequences well known to the Defendants, but artfully concealed from the Plaintiffs, reduced a wrestler's ability to comprehend the financial consequences of the Booking Contracts. Likewise, adoption of the lifestyle of a typical WWE performer developed financial dependence upon maintenance of income, and thus a wrestler would be less able to question the consequences of the circumstances, which maintained his income. Additionally, as injuries inevitably accumulated and as a wrestler observed the swift consequences to those who dared to question WWE's requirements, wrestlers were intimidated and coerced into fearful silence.

459. WWE's Misclassification Resulted in the Named Plaintiffs' Inability to Access Necessary Treatment for Their Workplace Injuries.

460. Additionally, Defendant McMahon, knew or upon the exercise of reasonable care ought to have known, that as the careers of the wrestlers progressed, accumulated neurological injury and physical injury would as a certainty diminish whatever minor capacity to fathom the complexities of the unconscionable Booking Contract that the Wrestlers may have initially possessed, and relentless physical injuries would jeopardize their careers, making expensive physical rehabilitation necessary but impossible without the income provided by their WWE employment.

461. By knowingly and improperly classifying the Plaintiff's as "independent contractors" the Plaintiffs were deprived of Worker's Compensation

benefits, the workplace protections available under the Occupational Safety and Health Act, and the time to effect recovery from injury under the Family and Medical Leave Act, and thus were left at the total mercy of the WWE as run by its chairman VKM, individually and through his complex organization of family Trusts and the "straw man" trustees that he utilized to do his bidding and perfect his racketeering enterprise.

462.   Through being deprived of access to these state and Federally guaranteed rights, the Plaintiffs were financially damaged among other ways, by in many cases having to pay for their own health care, having to pay higher health care premiums than they otherwise would have, by unnecessarily losing wages, and ultimately, by being discarded without benefits by the WWE for lack of physical ability to perform created by VKM's own cunning scheme to deprive the Plaintiffs of benefits in order to aggrandize his own remuneration and the value of his holdings and his family's holdings in WWE.

463.   Each of the Plaintiffs suffered material and substantial damage to their property as a result of their misclassification as "independent contractors." Taking the Booking Contract (Exhibit C) as an example:

a. The tax upon wages of an employee in 2007 according to Paragraph 5 "Instructions for Form 941" (Rev October 2007) amounted to 6.2% on EACH of the Employer and the Employee up to $97,500 in wages, and a further 1.45% in Medicare Tax of 1.45% for employer and employee on all compensation, not limited to   the first $97,500 in wages;

b. In contrast, the tax rate for FICA (a.k.a. "social security taxes") for an "independent contractor" for 2007 was 15.3% on the first 92.35% of $97,500 of income = $12,090). Medicaid tax was 2.9% unabated, on the whole income;

c. Therefore, the difference in tax to a wrestler making $100,000 characterized as wages as opposed to the same $100,000 as an "independent contractor" is calculated to be $14,130 (self-employment including Medicare) less $7,650 = $6,480. Since Form SE provides that ½ of the self-employment tax is deductible from gross income, which would give a $1,400 benefit to a taxpayer with an overall tax rate on adjusted income of 20%, reducing the independent contractor "penalty" to approximately $5,000/ per wrestler;

d. According to IRS requirements the Form 941's on employees must be filed 4 times per year, with an additional reconciliation return filed in January of the following year. Form 1099's for "independent contractors" are sent out in January of the year following the tax year.  The forms must be signed and/or under the pains and penalties of perjury, in the case of the 941 forms stating that the form is "true, correct, and complete";

e. In addition to the Federal tax forms that had to be filed by employers on behalf of employees, individual states have similar forms and require the deposit of taxes based upon employment payroll. The home state of the Defendants is one of those states, which had such requirements at all relevant times, which requirements were ignored by WWE.

464.   The Federal Form 941's were required to have been filed by the Defendant WWE for each and every quarter of each and every year for each and

227

every Plaintiff employed at any time during that quarter. Instead of filing truthful returns in accordance with the requirements of signing such returns under the pains and penalties of perjury, deliberately false and misleading returns were filed, now amounting to well over 50 such fraudulent returns, all filed by WWE under the direction and control of its Chairman and Chief Executive VKM, individually and as Trustee of his various family Trusts, in concert with the "straw men" he had appointed from time to time to do his bidding as Trustees of one or more of VKM's family trusts.

465.   The deliberately false and misleading 941 Federal forms were filed by WWE or others on behalf of and directed by WWE through VKM (individually and as Trustee) for the purpose of saving money for WWE, amounting to millions of dollars, and had the effect of depriving the Plaintiffs of the money which ought to have been paid by WWE for and on behalf of its employees, the Plaintiffs herein. By this method WWE's profits were enhanced and VKM's dividends, remuneration and the value of his holdings, directly and through his family Trusts, were enhanced.

466.   With respect to each and every filing of a 941 form which omitted the Plaintiffs and other wrestlers employed by the WWE and fraudulently characterized them as "independent contractors", such filing was accomplished utilizing the mails and/or the wires of the United States. Upon information and belief, the vast majority of said filings after 1985 were accomplished by wire instead of the US Mails and therefore constituted in each instance a separate act of wire fraud in violation of 18 USC 1343, done in furtherance of the cunning scheme of the

Defendant VKM, individually and as Trustee, to defraud each of the Plaintiffs of their property (in concert with the "straw-men" VKM appointed as Trustees of some of his family trusts.

467.   Each and every mailing and/or wire of the false and fraudulent 941 return constitutes a separate act of fraud with respect to each and every Plaintiff. The fraudulent filings were not isolated or made with respect to an individual but with respect to hundreds of individuals, carried out over twenty years, every year, and continuing until this day under the direction and control of VKM, individually and as Trustee of his family trusts, and by his "straw men" he appointed as Trustee(s) of some of his family trusts, all in advance of the racketeering activity.

468.   Upon inquiry to the Plaintiffs, Form 1099 (miscellaneous income, such as "independent contractor" income) was mailed by Defendant WWE each year to each of the Plaintiffs.

469.   Since these "1099" documents were fraudulent and utilized to deprive the Plaintiffs of their property, each fraudulent mailing constitutes a separate act of mail fraud, amounting in the aggregate to millions of dollars, of such acts conducted over a period of over twenty years and believed to be continuing currently under the direction and control of VKM, individually and as Trustee of his family trusts, and by his "straw men" he appointed as Trustee(s) of some of his family trusts, in concert with other "straw men" appointed by VKM.

470.   Each of the fraudulent mailings and interstate wire transmissions as above described constitutes a separate predicate act "racketeering activity" within the meaning of 18 USC Section 1961(5), amounting in the aggregate to a pattern of

racketeering activity consisting of <u>thousands of separate acts</u>, depriving hundreds of people of their money and property (including Plaintiffs) continuing over at least two decades, continuing currently. Without redress, these actions are likely to continue indefinitely into the future for as long as VKM individually and as Trustee retains effective control over the WWE.  WWE undertook these mailings at the direction and control of Defendant VKM, individually and as Trustee of his family trusts.

471.   To this day the WWE is conspiring to continue to deprive many of the Plaintiffs of their rights by "offering" them a "Contractor Nostalgia Agreement" which promises payment of a nominal sum in return for among other things, a release to the WWE of all claims of every nature and description. *See* paragraph 13 of Exhibit E, attached hereto.

472.   Since WWE and its effective owner and controller VKM will doubtless contend (in their inevitable publicity centered attempts to denigrate this Complaint and the motives of everyone associated with it except of course, their own), the Plaintiffs have no claims against WWE, then surely there is no reason to have a "general release" given to the WWE by former wrestlers for all known and unknown causes of action from the present back to the dawn of time put into this "Nostalgia" proposal.

473.   The real "nostalgia" is that yet again, as a part of their continuing scheme to deprive the Plaintiffs not only of their rights, but to even the knowledge of any rights, the WWE seeks to reaffirm its mischaracterization of its wrestlers as "independent contractors" –to give legal "pile drivers" and body slams to their

rights and thus to once again leave them dizzy, and in the dark, or unconscious about their legal rights.

474.   The "Contractor Nostalgia Agreement" solicitation is an integral part of an ongoing and continuing course of conduct by the WWE, continuing to this day, to maintain and enforce its suppression and prejudice of the rights of its employees through a pattern of racketeering activity. Said solicitation (and its "general releases") constitutes an acknowledgement of actionable wrongdoing by the WWE, and a renovation of any cause of action sought to be extinguished by the solicitation. Since WWE solicited the "Nostalgia Agreements" from wrestlers there was no material purpose to inserting a release of prior acts into the document except as an effort to cunningly perfect the scheme to cut off all legal recourse to Plaintiffs for their injuries.

475.   Such "Contractor Nostalgia Agreements" have been mailed to a number of the Plaintiffs, and each such mailing is an integral part of the cunning scheme of the Defendant VKM to carry out his racketeering activity. Each such mailing constitutes an independent act of mail fraud. *See* Exhibit E.

476.   Many of the Contractor Nostalgia Agreements were then discussed with a number of the Plaintiffs in follow up calls (not long after the mailing) in an effort to induce those Plaintiffs to sign the agreements and thus unwittingly provide the WWE with a comprehensive release from its wrongdoing. Each such call would constitute a separate act of wire fraud in interstate commerce (a predicate racketeering activity). Given the disability and limited resources of the Plaintiffs, the exact times and dates of these calls are uniquely within the

knowledge of the Defendants which will become available through the discovery process.

477. In addition to the ongoing relationship created through the Contractor Nostalgia Agreements, the WWE maintains and has at all relevant times maintained a voluminous "library" of the performances and images of the Wrestlers, which it utilizes under the auspices of the Booking Contracts. This library consists of videotapes, digital files, images, and is stored in media of various sorts. It includes offered "Legends" deals and marketing through the WWE internet presence, including streaming video, and "action figures".

478. As a result of the boilerplate Booking Contracts, the Plaintiffs (most or all) have been mailed payments over the years termed as "royalties" for the utilization of their appearances and images, and performances over their careers with the WWE. The exact time of mailing and amounts of these royalty checks is uniquely known to the WWE as most if not all of the Plaintiffs were distracted from keeping records as a result of their serious brain and other bodily injuries occasioned by their service in the WWE, and had no capacity in any event to comprehend that they should keep such records, or that more money was due than was paid.

479. The money earned by the WWE through the utilization of their media library containing the images and performances of the Plaintiffs derives particularly from the violence of the performances, choreographed by the WWE with reckless disregard for the health and safety of the Plaintiffs and resulting in serious injuries to the Plaintiffs thus generating a direct profit to the WWE.

480. Each and every one of the unconscionable boilerplate Booking Contracts attached to this Complaint as Exhibits were mailed to the Plaintiffs noted in the individual contract within a short time prior to Said Booking Contract being executed by the Plaintiff to which it applies. The vast majority of all Plaintiffs had their Booking contracts mailed to them. Some specific examples of the specific dates and that constitute separate acts of mail fraud, with the associated wrestlers are:

481. Salvador Guerrero, contract dated July 23, 2001, a true and accurate copy of which is attached as Exhibit A, hereto.

482. Salvador Guerrero, IV, contract dated June 3, 2004, a true and accurate copy of which is attached as Exhibit B, hereto.

483. Nelson Frazier, contract dated November 11, 2007, a true and accurate copy of which is attached as Exhibit C, hereto.

484. Salvador Guerrero, IV, contract dated April 5, 2010, a true and accurate copy of which is attached as Exhibit D, hereto.

485. The Booking Contracts attached to this Complaint as Exhibits are offered as typical examples of the booking contracts that were presented from time to time to each of the Plaintiffs, with minor changes not relevant to any issue in this matter. The exact dates of the solicitation of booking contracts relating to the Plaintiffs not covered by examples herein and other booking contracts for the Plaintiffs who have provided examples are uniquely within the knowledge and control of the WWE and its attorneys and will be revealed through discovery.

486.    The "Contractor Nostalgia Agreement(s)", hereinafter ("CNA"), Exhibit E, are further examples of the unconscionable and Fraudulent conduct of the RICO Enterprise "World Wrestling Entertainment, Inc." under the direction and control of Defendant Vincent McMahon (Individually and as Trustee).

487.    Said CNAs contain an unconscionable release clause, and further seeks to reinforce the cunning misclassification scheme hatched and implemented by the RICO Enterprise WWE under the direction and control of Defendant Vincent McMahon (Individually and as Trustee), all for the personal profit of Defendant Vincent McMahon (Individually and as Trustee).

488.    The use of the mails of the United States to provide the Booking Contracts to the Plaintiffs, (for the reasons stated in this Complaint) in each instance of mailing constituted an act of mail fraud in violation of 18 U.S.C. 1341, in furtherance of the cunning scheme of the Defendant Vincent McMahon (individually and as Trustee) to defraud the Plaintiffs and to personally profit.  Each Plaintiff was subjected to two or more such acts and in fact, often many dozens of such acts.

489.    Collectively, the above violations of 18 U.S.C. 1341, used to send out the booking contracts, the "Contractor Nostalgia Agreement(s)", and other stated materials to the various Plaintiffs, (and soliciting a mail back of said contracts) and follow on solicitation calls represent predicate acts of racketeering activity in violation of the Racketeer Influenced and Corrupt Practices Act. Each use of the mails as above alleged, was in furtherance of the intentional scheme to defraud the Plaintiffs, and materially assisted the Defendant Vincent McMahon in executing his

234

plan and scheme  (individually and as Trustee) to defraud the Plaintiffs and to personally profit at their expense.

490.   The use of the mails of the United States to provide the false and fraudulent tax forms (1099's) to the Plaintiffs, deriving from the false and fraudulent misclassifications of the Plaintiffs (misclassified as a result of allegations set forth elsewhere in this Complaint) constituted for each and every mailing to each and every individual Plaintiff, a separate act of mail fraud in violation of 18 U.S.C. 1341. Such acts of mail fraud were undertaken by the RICO Enterprise WWE in furtherance of the cunning scheme of the Defendant Vincent McMahon (individually and as Trustee) to defraud the Plaintiffs and profit Defendant McMahon individually and as Trustee, all under VKM's direction.

491.   In addition to the false and fraudulent tax forms (1099's) mailed to the Plaintiffs at least each year that payments were made for wrestling, additional supporting documents and checks were thereafter mailed to the Plaintiffs for "royalties" thereafter. Such "royalties" were an integral part of the scheme, and demonstrate the continuing nature of the RICO enterprise conducted over decades. For example:

a)   Plaintiff Carlene Begnaud, a.k.a. Jazz received checks in 2015 from royalties of approximately $50 per quarter and a 1099 in 2016 for five separate mailings.

b)   Mike Halac, a.k.a. Mantuar received two mailings a check for $105 and a 1099.

c)   James Harris, a.k.a. Kamala received two mailings.

d)      Chris Pallies, a.k.a. King Kong Bundy received 5 separate mailings.

e)      Marco Corelone, a.k.a. Mark Jindrak 1099 Scan;

492.    As further example, Butch Reed received $69.98 by a mailing on or about September 24, 2015 and a corresponding 1099 in 2016. Additionally, attached as Exhibit G hereto is a document consisting of three pages of mailings for Butch Reed with the corresponding "royalty" checks.  A detail of the royalty checks mailed for the years 2013, 2014, 2015 consisting of dozens of such checks and dozens of corresponding mailings is disclosed on said Exhibit.

493.    James Harris, a.k.a. Kamala received $98.01 by a mailing on or about March 24, 2016. Additionally, attached as Exhibit H hereto is a document consisting of four pages of mailings for Kamala regarding the corresponding royalty check. The Exhibit details the specific earnings for direct, multi-media, other licensing, and video WWE received, and the corresponding royalties WWE paid to Mr. Harris.

494.    Attached hereto as Exhibit I are copies of "1099" forms relating to the particular Plaintiff specified in each of said Exhibits, furnished to the said Plaintiffs by WWE under the direction and control of the Defendant Vincent McMahon, individually and as Trustee.

495.    The exact number of the Plaintiffs that were furnished 1099 forms both for wrestling and later for royalties and the number of years for which they were furnished 1099 forms and quarterly or yearly royalty checks and/or payments for wrestling employment, is uniquely known to and within the control of the WWE, operating under the direction and control of the Defendant Vincent McMahon, individually and as trustee. However, many dozens of examples are provided

herewith amply demonstrating the dates and contents of each mailing in furtherance of the scheme, extending over a long period of time, thus establishing the continuity of the continuing enterprise and the significant funds involved. Each "royalty" check paid an understated and fraudulent amount since the amounts were calculated through utilization of a "contract" which was fraudulently procured and therefore void *ab initio*.

496.   The use of the mails of the United States to provide the Royalty checks and 1099 forms to each of the Plaintiffs for wrestling income (earned as an employee but fraudulently misclassified as an "independent contractor" (excepting royalties) for the reasons stated in this Complaint), in each instance constitutes an act of mail fraud in violation of 18 U.S.C. 1341, in furtherance of the cunning scheme of the Defendant Vincent McMahon (individually and as Trustee) to defraud the Plaintiffs and profit himself by the use of and domination of the RICO Enterprise WWE. At least one 1099 was mailed to each of the Plaintiffs for each year said Plaintiff wrestled for the WWE. Said mailings took place in typically January, and were accomplished on behalf of the WWE Enterprise under the Direction and control of its Chairman, Defendant Vincent K. McMahon.

497.   Collectively, the above violations of 18 U.S.C. 1341, used to send out the royalty payments were utilized as an integral part of the scheme to induce the Plaintiffs to execute the unconscionable Booking Contracts.

498.   Each use of the mails as above alleged, was in furtherance of the intentional scheme to defraud the Plaintiffs, and materially assisted the Defendant Vincent McMahon in executing his plan and scheme (individually and as Trustee)

to defraud the Plaintiffs, and resulted in more money going to the Enterprise thus enhancing the value of the holdings of and remuneration to the Defendant Vincent McMahon (individually and as Trustee), and to further payments to the straw men which acted at his direction and control to enhance and perfect the scheme.

499.    In addition to the fraud and swindles above alleged which violate 18 USC 1341 the Defendant Vincent McMahon, individually and as trustee also engineered the WWE to cause violations of the wire fraud statute 18 USC 1343 including but not limited to the following: The WWE has established a video shop referenced on the Exhibits showing events for "Bruce Reed" which Exhibit is dated 9/24/2015. Set forth on pages 1, 2 and 3 of that Exhibit are shown numerous uses of the wires of the United States to sell videos and thus generate further income for the enterprise WWE and furtherance of the scheme of the Defendant, Vincent McMahon, individually and as trustee to defraud the Plaintiffs. For example, on Page 2 there is noted for-KOC-DV-9056 $4,844.44 earned by WWE during the third quarter of 2013, resulting in a payment to Bruce Reed of 0.23. As an additional example on Page 3 of the royalty sheet dated 3/24/2016 for Plaintiff James Harris there is shown as a royalty from HV Direct WWE No. 94879 for quarter four of 2015 earnings by WWE of $5,095.73 with a royalty paid to Plaintiff, James Harris of $1.46.

500.    On the Exhibits noted in the preceding two paragraphs there are dozens of examples of video tapes, direct videos (available over cable television or through computers) in which the wires of the United States were utilized to make money for the enterprise WWE enterprise and to further exploit and defraud the Plaintiffs under the direction and control of the Defendant Vincent McMahon,

individually and as trustee, all as derived from the initial Booking Contracts which are void *ab initio* because of their fraudulent procurement, unconscionable provisions, and for the other reasons alleged herein.

501. Such exploitation, denial of the rights, such misclassification, failure to pay appropriate taxes, failure to pay for and provide workers' compensation insurance, failure to pay proper compensation for the continued distribution of the Plaintiffs' images and work, and failure to recognize the rights of the employees under the numerous federal Acts identified above resulted in a tremendous profit for the RICO enterprise WWE at the expense of the Plaintiffs, which profit enhanced and augmented the value of the holdings of the Defendant Vincent McMahon who has infiltrated and controls the Enterprise WWE, individually and as trustee, and further augmented his compensation and that of his straw men that carry out his orders to the detriment of the Plaintiffs.

502. The misclassification of the Plaintiffs as "independent contractors" and:

a) the documentation of that misclassification utilizing the mails of the United States in violation of 18 USC 1341;

b) further the creation of the video archive, DVD products and digital streaming video products to generate further income to WWE after the active wrestling days of the Plaintiffs were finished, through the use of the wires and mails of the United States in violation of 18 U.S.C. 1341 and 1343 as a furtherance of the initial scheme, which is continuing;

c)    all form an integral part of the cunning scheme of the Defendant Vincent McMahon (individually and as trustee) to enhance the income of the RICO Enterprise WWE and therefore to increase the holdings of and compensation to Defendant Vincent McMahon, individually and as Trustee to further payments to the straw men which acted at his direction and control to enhance and perfect the scheme, and maintain iron control over the WWE Enterprise.

503.   The procurement of the unconscionable Booking Contracts through which the Plaintiffs were deliberately and fraudulently misclassified, the procurement of later CNA contracts, the use of the mails to furnish understated royalties with respect to wrestling employment, and the establishment of the "archive" of:

a) Video tapes;

b) DVDs;

c) Streaming Video Services including the WWE Network;

d) Photo Library;

e) "Action Figures" (likenesses of the wrestlers);

all constitute integral parts of the cunning scheme of Defendant Vincent McMahon (individually and as Trustee) to manipulate, maneuver, and defraud the Plaintiffs out of money for his benefit (and the benefit of the straw men he uses to carry out his orders) through the employment of the RICO WWE enterprise to effectuate his and carry out his scheme.

504. The alleged right to monetize the repeated display of the on camera destruction of human beings by procuring their performance in inherently dangerous activities through unconscionable boilerplate Booking Contracts obtained through fraud and duress, represents continued Racketeering Activity by the Defendant VKM and his minions, carried out through the WWE Enterprise for the profit of VKM and his minions, from the date Each Booking contract was executed, up to and including the present.

505. The value of the media library, which is maintained only through the royalty scheme brought into being by the unconscionable Booking Contracts provided a direct incentive to VKM to maintain the violence of the performances and to disregard the massive accumulated physical damage to the Plaintiffs that has effected all of them, and rendered many of them permanently disabled and unable to conduct their own affairs, either intellectually or physically, and further to monetize these performances in derogation of the intellectual property rights of the Plaintiffs.

506. VKM, individually and as Trustee of his family trusts (whether he or straw men were/are the Trustees), engaged in a pattern of racketeering activity intending to defraud the Plaintiffs, and to deprive them of their property and to affect their business, and have succeeded in that regard, to the tune of millions of dollars in the aggregate.

507. The above-described racketeering activities amounted to a common course of conduct intended to deceive each of the Plaintiffs and did deceive each of the Plaintiffs to the detriment of their money and property.

508. The acts of Racketeering all had the same pattern and purpose of defrauding the Plaintiffs and obtaining their money and property. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims including the Plaintiffs and was successful in obtaining the Plaintiffs' money and property.

509. Defendant VKM's (individually and as Trustee of his family trusts and through his straw men) fraudulent activities are part of his regular and usual method of conducting the ongoing business of the WWE enterprise over which he exercises iron control, and constitutes a continuing threat to the property of Plaintiffs, and all other wrestlers for the WWE similarly situated, and further constitutes a threat to the continued viability of the Enterprise WWE itself and its Class A shareholders.

510. The pattern of racketeering activity by Defendant VKM (individually and as Trustee of his family trusts, and in concert with his straw men) alleged herein and the WWE "enterprise" are separate and distinct from each other. Defendant VKM individually and as trustee of his various family trusts and through his Trustee straw men, engaged in the pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the WWE enterprise, and personally benefiting himself and his family members to the detriment of the Plaintiffs and the Class A and other disinterested shareholders of the WWE.

511. The Plaintiffs have been injured in their property by reason of the above alleged racketeering activities and course of conduct by the Defendant VKM

(individually and as Trustee of his family trusts and through his straw men). The Plaintiffs have been cost millions of dollars in taxes, insurance premiums, and, lost wages, lost expenses of medical care, lost unemployment benefits, and lost employment opportunities among other damages. These costs, which should have by law been imposed upon the WWE enterprise but for the racketeering activity, have instead been borne by the Plaintiffs to the profit of Defendant VKM (individually and as Trustee of his family trusts), and to the profit of his straw men.

512.   VKM, individually and through his status as Trustee of numerous Trusts holding and controlling Class B voting shares of WWE, and through his straw men (whom he also utilizes as "trustees" to do his bidding) maintains iron control over the management of the WWE, and has thoroughly infiltrated the WWE such that it is subservient to his bidding, and acts as a racketeering enterprise.

513.   The profits thus generated from the racketeering activity above described, in the past and continuing until now, accrue first to WWE and then to VKM and his minions as a result of his control.

514.   The Plaintiffs injuries were directly and proximately caused by the racketeering activity of Defendant VKM (individually and as Trustee of his family trusts, in concert with his straw men) as described above, operating through the enterprise WWE.

515.   By virtue of the above described violations of 18 USC 1962(c) the Defendant VKM's (individually and as Trustee of his family trusts)  are jointly and severally liable to the Plaintiffs for three times the damages the Plaintiffs have sustained, plus the costs of this litigation including reasonable attorneys' fees.

**COUNT III**
**UNCONSCIONABLE CONTRACTS**
**DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a)**
**(Against Defendant WWE, on Behalf of All Named Plaintiffs to whom WWE provided an unconscionable booking contract, so- called Contractor Nostalgia Agreements or other documents purporting to limit their rights under Applicable laws of the United States and her courts)**

516.    Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

517.    The Declaratory Judgment Act, 28 U.S.C. 2201, provides that where there is a controversy within its jurisdiction "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought".

518.    The several tests for whether a declaratory judgment action is appropriate to the circumstances alleged are set forth in *Grand Trunk W.R.R. Co. Consol. Rail Corp.*, 746 F. 2d, 323, 326 (6th Cir.1984), and reiterated many times thereafter such as in *Western World Insurance Company v Hoey*, 733 F.3ed (6th Cir. 2014). The facts of this case as above and herein alleged, amply meet the *Grand Truck* criteria.

519.    The conduct of each of the Defendants with respect to the procurement, execution, and maintenance of the unconscionable "Booking Contracts" (including the "Contractor Nostalgia Agreement") was and continues to be so egregious that to allow the Defendants to claim the benefits of or to enforce any part of these "contracts" against the Plaintiffs, including the forum selection clause and choice of law clause would create an unconscionable injustice and consequently reward the Defendants for conducting a carefully crafted and

wrongful course of fraudulent conduct through intentionally duping the Plaintiffs into believing that they had no rights available under otherwise available state and federal statutes and were mere legal slaves of the WWE.

520.  The aspects of the Booking Contracts, the "Contractor Nostalgia Agreement", the "handshake deals" that are outrageous, were procured by fraud, coercion and unequal bargaining power, and violate public policy and the statutes which are set forth in this Complaint, as well as references to applicable law. For those reasons and applicable law, here repeated and realleged in every detail, the Booking Contracts should be set aside and declared null and void, as having been procured and necessary through fraud, coercion, intimidation, while a progressive disease process hidden from the Plaintiffs was allowed to proceed and the WWE to rob the Plaintiffs of any ability to comprehend their circumstances.

521.  The unconscionable boilerplate booking contracts were employed by the Defendant WWE and its predecessors, through the direction of Defendant VKM and his straw men, to enshrine advantages for the WWE and its predecessors which violated the public policy of the United States and its individual States in order to procure monetary advantage for the Defendants by directly and intentionally duping the Plaintiffs with respect to valuable rights enjoyed by employees and others at the workplace.

522.  Defendant WWE, operating through and under the control of VKM and his straw men, and through the employment of the unconscionable boilerplate booking contracts conducted their intentional violation of statutory rights of Plaintiffs, which scheme is illustrated by the following examples.

523. In 1970, Congress created OSHA, a part of the United States Department of Labor, "to assure safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance."

524. The Williams, Steiger, Occupational Safety and Health Act of 1970 (84 Stat. 1590) clearly applies to employees such as the Plaintiffs. Under the Act there are strict reporting requirements for injuries, which have been completely or substantially ignored by the Defendants because fo their intentional and fraudulent misclassification of the Plaintiffs as "independent contractors," through the imposition of the unconscionable boilerplate Booking Contracts.

525. 29 U.S.C. § 654 sets forth the duties of employers and employees and provides as follows:

    a. Each employer:

        i. Shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

        ii. Shall comply with occupational safety and health standards promulgated under this chapter.

526. Failure to comply with 29 U.S.C. § 654(1) is evidence of the employer's negligence, and may be considered under the Counts of this Complaint which seek compensation for the physical, psychological and financial consequences of Plaintiffs' personal injuries suffered thereby.

527.   OSHA provides:

The employer shall ensure that each affected employee wears a protective helmet when working in areas where there is a potential for injury to the head from falling objects.

528.   Routinely, the Plaintiffs were subjected to danger from "falling objects" usually in the form of another wrestler, weighing typically over two hundred pounds and usually jumping from the top of a ring post, from chairs smashed over their head, and from otherwise being deliberately smashed into the ring floor, with the wrestler being the object driven to the floor resulting in rapid deceleration.

529.   For example, Bryan Emmett Clark had his head driven full force into a ring post by Savio Vega in a WWE match and suffered memory loss. Clark states it was common to get hit in the head and knocked out briefly.

530.   Laurinaitis was double suplexed in 1992, landed badly and received herniated discs in his neck.  None of this nor thousands of similar occurrences were ever reported to OSHA by the WWE as required by law.  Injuries were suppressed, not reported.

531.   Section 17, sub parts (a) and (i) of the OSHA Act provide:

(a) Any employer who willfully or repeatedly violates the requirements of section 5 of this Act, any standard, rule, or order promulgated pursuant to section 6 of this Act, or regulations proscribed pursuant to this Act, may be assessed a civil penalty of not more

than $70,000 for each violation, but not less than $5,000 for each willful violation.

(i)    Any employer who violates any of the posting requirements, as prescribed under the provisions of this Act, shall be assessed a civil penalty of up to $7,000 for each violation.

532.    The Defendants have willfully and consciously conspired to violated the OSHA Act by falsely knowingly and falsely characterizing their employees as "independent contractors", thus conspiring to deprive them of the benefits of the Act, and further to intensely pressure the wrestlers not to report injuries or to discuss dangerous conditions in any way, upon pain of losing their careers.

533.    OSHA requires notice be given to the protected employees. WWE did not ever post in any place of employment the poster notice required by OSHA informing their wrestling workers of their right to have an injury reported, or their workplace inspected. Wrestling workers were never informed that they <u>were protected from retaliation</u> "in any way" by exercising their rights under OSHA, and were duped into believing that they were "independent contractors" having no rights, thus being deprived of their statutory rights and being subjected to unreasonable danger of physical and economic harm which all of the Plaintiffs thus suffered in silence, knowing retaliation would be swift and certain and as they were unaware of their rights.

534.    Instead of being informed of their statutory rights under OSHA the wrestlers were induced through fraud and intimidation, into signing boilerplate contracts that allegedly "signed away" their rights – a proposition void at the outset

as known to WWE, but not known to the uneducated wrestlers who were uniformly subjugated to dictatorial control by the WWE, and who knew full well what the consequences of any attempt to exercise their "rights" would be – ruination of their careers and potential serious physical harm, and whose cognitive decline was created by WWE's conduct.

535.    Pursuant to 29 C.F.R. § 1904.35(b)(1)(i) and (ii), the following requirements must be honored and implemented by covered employers such as the WWE:

> You must set up a way for employees to report work-related injuries and illnesses promptly; and….

> You must tell each employee how to report work-related injuries and illnesses to you.

1904.35(b)(1)(i) and (ii).

536.    The Plaintiffs were never told how to report work-related injuries and instead were actively discouraged from doing so, since not wrestling, even if injured, would have a serious adverse effect upon their career as each employee well new through the coercive and intimidating culture of the WWE established under the direction and control of VKM and his agents.

537.    In addition to being deprived of rights under OSHA, the Plaintiffs were wrongfully classified as "independent contractors" and were deprived of the Worker's Compensation laws of the various States and the substantial medical benefits and language compensation that would have been available to them in many States in which they worked for WWE.

538.    Instead of having Workers' Compensation rights and receiving NOTICE of same as is required by most States (NOTICE is to be posted as with OSHA), no notice was given, no Workers' Compensation policy provided and the Plaintiffs had to either pay for their own health insurance (which before recent changes in the law did NOT cover consequences due to "pre-existing injuries") or to pay for surgeries and rehabilitation out of their own pockets. To question the system imposed by the WWE was to have no career instead of a meager one.

539.    Connecticut, the jurisdiction imposed by WWE's boilerplate Booking Contract, requires that NOTICES of the availability of Workers' Compensation be provided to employees, together with instructions concerning how to report injuries. WWE ignored its obligations to its Wrestler employees and created the medical costs of a culture in which exercises of rights guaranteed by statute swiftly led to unemployment. Permanent injuries would have been covered. WWE's motive was simple – Workers' Compensation insurance would have cost millions of dollars yearly and diminished profits.

B. National Labor Relations Act ("NLR Act").

540.    Additionally, the deliberate and cynical misclassification of the Plaintiffs as "independent contractors" deprived them of the ability to seek to organize and to bargain collectively. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other mutual aid or protection." *See* NLR Act, 1935.

541.   The NLR Act forbids employers from interfering with, restraining, or coercing employees in the exercise of rights relating to organizing, forming, joining, or assisting a labor organization for collective bargaining purposes, or from working together to improve terms and conditions of employment, or refraining from any such activity. Title 29, Chapter 7, Subchapter II, Section 8, United States Code. The right to organize a union is considered a fundamental human right.

542.   The NLR Act further provides: "Sec. 8. [§ 158.] (a) [Unfair labor practices by employer] It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this Title]".

543.   Section 8(c) provides in important part: that employers may NOT (3) by discrimination in regard to hire or tenure of <u>employment or any term or condition of employment</u> to encourage or discourage membership in any labor organization. (<u>emphasis supplied</u>).

544.   In 1948, the United States, operating through the General Assembly of the United Nations, adopted and affirmed the "Universal Declaration of Human Rights". Article 23 of that Declaration contains the following language: "Everyone has the right to form and to join trade unions for the protection of his interests."

545.   By way of example, NFL players who are classified as employees have a union, the National Football Players Association (NFLPA) that is a member of the AFL-CIO.  This right to unionize was conferred under federal law – the NLR Act. The NFLPA has been in existence since 1956 and formally represents the players

in negotiating agreements under seven Collective Bargaining Agreements ("CBA") since 1968.  The most recent CBA was ratified in 2011 and governs working conditions, benefits, workers' compensation, revenue distribution, player benefits and safety issues.

546.   The most recent NFL CBA limits the number of off-season practices, prohibits training camp abuses including requiring players to practice twice a day, governs the physical contact rules during games.  The CBA also relates to benefits to including pensions to players, created a neuro-cognitive disability plan for players with brain injuries. The plan guarantees salaries for injured players and guarantees the players about 47% of revenues.

547.   A noteworthy aspect of the NFL 2011 CBA relevant to the health issues facing the Named Plaintiffs, is the creation of a neuro-cognitive benefit plan.  The plan offers benefits to players with credited seasons who are evaluated by "neutral physicians" "for mild or moderate neurocognitive impairment".   In order to determine if a player has mild or moderate neurocognitive impairment, the player is scheduled for a comprehensive medical examination.

548.   The NFL benefits will be paid: If a player is found to have mild neurocognitive impairment, he will receive monthly benefits of at least $1,500. If a player is found to have moderate neuro-cognitive impairment, he will receive monthly benefits of at least $3,000. He may also qualify for reimbursement for medical expenses related to neuro-cognitive treatment, up to $10,000 per year.

549.   The NFL benefit plan is designed for younger players and pays for no more than 15 years, when the benefits will terminate at the age of 55 (at which time

a player may be able to pursue other benefits under the Plan – e.g. Total and Permanent disability).

550. The WWE wrestlers including the Named Plaintiffs are unable to seek any collective action under the NLF or a CBA nor seek to negotiate with the WWE over any of these benefits because of the misclassification identified herein. Additionally, the wrestlers' workplace is not even governed by the minimal levels expected at any workplace with no OSHA oversight or any injury reporting. The WWE brazenly maintains that the Named Plaintiff wrestlers are independent of any regulation because they are falsely said to be fully independent as if they were house painters, cleaners, subcontractors, who are in an independent business who happen to set foot in a WWE ring. This lawsuit is their only means of getting redress for this structural situation that has deprived them of the rights enjoyed by all workers in the United States.

551. In November, 2015, Jesse the "Body" Ventura, the 38th governor of Minnesota, was asked by a journalist: "You famously tried to get wrestlers to unionize before Wrestlemania 2. What was Vince McMahon's reaction when he found out?" Ventura replied, "Well, he threatened to fire me."[80]

552. On October 25, 2016, Mr. Ventura told the audience on the Steve Austin Show: "Vince is lucky I didn't go for the Senate. Had I got into the Senate I would have started a Senatorial investigation into why professional wrestlers are called 'independent contractors' when they're not. You work for one company, they

---

[80] *See* Giri, Raj, "Jesse Ventura On The Only Time Vince McMahon Stopped Him, Suing WWE, Problems with Hulk Hogan, Trump", Wrestling, Inc., http://www.wrestlinginc.com/wi/news/2015/1123/604137/jesse-ventura-on-the-only-time-vince-mcmahon-stopped-him/ (Nov. 23, 2015).

order you around, they control your whole life. How are you possibly an independent contractor, except they don't have to pay your social security." … "Look at the thousands of dollars it's cost all of us wrestlers to have to pay fifteen-percent, or whatever it is, as independent contractor on our taxes. That's a bee that's been under my saddle since I began wrestling. We are not independent contractors. I can't work for another promoter on Wednesday, and then work for you on Friday, it don't work that way." *See* Csonka, Larry, "Jesse Ventura Says Hulk Hogan Ratted Him Out When He Tried To Start A Union", 411Mania.com (Oct. 25, 2016), 411mania.com/wrestling/jesse-ventura-says-hulk-hogan-ratted-him-out-when-he-tried-to-start-a-union/.

553.    The very same bullying techniques utilized by the WWE and its agents to coerce and intimidate the Plaintiffs into signing boilerplate "Booking Contracts" wrongfully classifying them as "independent contractors" for the purpose of violating their rights as employees have been and are utilized by the WWE to insure that no wrestler, unlike all of their compatriots in other professional sports, will ever attempt to organize a union.  Specifically, any wrestler who attempted to organize a union or speak in favor of union activities would quickly have any "push" stopped and be subjected to a string of humiliating defeats thus effectively ending their careers in violation of Section 8(c) as above quoted.

554.    WWE, principally through its Chairman VKM (and others at his direction) enforced WWE's policy of "keep your mouth shut and don't ask questions", and through the deception inherent in their unconscionable "boiler plate" "Booking Contracts", cunningly created conditions and terms of

employment designed to stifle the rights of the Plaintiffs under the NLR Act, and thus deprive the Plaintiffs of fundamental and valuable rights.

555.   The Defendant WWE knew or reasonably should have known, at all times material, that the repeated traumatic head impacts the Plaintiffs endured while performing for WWE were likely to expose them to excess risk to neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, or similar cognitive-impairing conditions, and that the Plaintiffs might discover these injuries if the rights guaranteed to employees under various statutes were known to Plaintiffs and exercised by Plaintiffs;

a)   That based on the Defendant WWE's voluntary undertaking to study the issue of TBI, and its knowledge of the cumulative consequences of head blows and rapid decelerations it had a duty to advise Plaintiffs of that heightened risk;

b)   That Defendant WWE willfully and intentionally concealed from and misled the Plaintiffs concerning that risk, utilizing their unconscionable contracts as the mechanism to carry out this activity.

556.   The Defendant WWE operating under the direction and control of its Chairman VKM, and through VKM's straw men, recklessly endangered Plaintiffs and caused significant injury.

557.   The unconscionable boilerplate booking contracts procured from the Plaintiffs as above alleged, cause the Plaintiffs substantial economic harm and damage including but not limited to consequential damages, loss of wages, loss of tax payments earned which ought to have been paid by the Defendants on behalf

of the Plaintiffs for Social Security and Medicare, loss of earning capacity, damages due to the loss of the ability to enjoy life, loss of benefits guaranteed under state and federal statutes and the consequent harm caused by the denial of these rights and benefits.  The establishment of these entirely unfair and illegal contracts intentionally deprived the Plaintiffs of money and property.

558.   A just amount should be assessed for all of the damages caused by the unconscionable booking contracts, which contracts not only existed in the past, but continued to this day to injure the Plaintiffs as above alleged, and as a result of unjust, improper, and unconscionable advantage being taken of the intellectual property of the Plaintiffs, including their right to fair and just compensation for the use of their images and likenesses, and performances, all as alleged in this Complaint, whether in this Count or elsewhere.

559.   The contracts should be set aside as void *ab initio* as having been procured by fraud, and with the intent to enshrine an illegal purpose, that of depriving the Plaintiffs of the protections of federal law, and the numerous State workers' compensation laws that would have otherwise attached to their actions as employees.

560.   The economic rights of the parties and fair compensation to the Plaintiffs ought to then be re-determined on an equitable basis as if the contracts had not existed, particularly those current rights of the parties in their own likenesses, images, copyright materials, videos, images, products, and other intellectual property.

**COUNT IV**
**VIOLATIONS UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT,**
**29 U.S.C. § 1132(a)(3)**
**(On Behalf of All Plaintiffs Against WWE)**

561. Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

562. Defendant WWE and/or its agents, servants or employees is the Plan Administrator of various ERISA plans maintained by Defendant WWE for the benefit of its employees.

563. Although Plaintiffs had no basis to be aware, and did not realize at the time they signed their Booking Contracts, or worked fulltime for WWE, that Defendant WWE intended to treat Plaintiffs as employees, not as independent contractors, and improperly utilized the independent contractor designation for the purpose of denying Plaintiffs (and other wrestlers) the compensation and benefits that they would have been entitled to receive if properly characterized as employees of Defendant.

564. The form "Booking Contract" entered into between Defendant and Plaintiff wrestlers employed by Defendant WWE was a sham contract that improperly characterized Plaintiffs and the other wrestlers employed by Defendant WWE as "independent contractors" to enable Defendant to avoid paying Plaintiffs and other wrestlers the compensation and benefits to which they otherwise would have been entitled, including ERISA plan benefits.

565. Said contract is, and at all relevant times has been, a contract of adhesion, drafted exclusively by Defendant, who gives the wrestler no real

opportunity to negotiate or change any terms and who requires the wrestler to sign the Agreement as presented by Defendant as a condition of employment.

566.    Moreover, not only is the Agreement a contract of adhesion, but Defendant does not honor the Agreement to treat the wrestlers as "independent contractors" and, instead, reserves to itself the right to control the manner and method of the wrestlers' business.

567.    Also, as a result of improper misclassification and characterization of its employees as "independent contractors", the company fails to provide its employees the same retirement and health and other benefits it provides to all its other employees pursuant to employee benefit pension and welfare plans established under ERISA.

568.    By misclassifying its wrestlers as "independent contractors" rather than employees, Defendant has not only unjustly enriched itself (by avoiding the business costs of extending ERISA-protected benefits to its employees), but has also evaded and continues to evade compliance with state and federal laws (including ERISA) governing employee benefit plans.

569.    At all relevant times, Defendant asserted control over virtually all aspects of Plaintiffs' work.

570.    Defendant has created benefit plans under which it can avoid paying its wrestler-employees benefits altogether in direct contravention of ERISA's employee protections.

571.    Had Defendant complied with ERISA, Plaintiffs would have been eligible for substantial rights to benefits under various of Defendant's Plans.

572. By their mischaracterization of Plaintiffs as "independent contractors", however, Defendants have systematically excluded Plaintiffs from the definition of an "employee" covered by the Defendant's retirement plan or eligible to participate in the Defendant's 401(k) plan, group health care plan, group dental plan, group life plan, and long term disability plan, thereby denying Plaintiff benefits they are entitled to receive.

573. The Plaintiffs are entitled to equitable relief under ERISA, 29 U.S.C. § 1132(a)(3), including restitution and disgorgement for all benefits due and payable during the applicable employment period and retroactive reformation of their contract with Defendant, together with a corresponding recalculation of benefits, thereby placing Plaintiffs in the same financial position in which they would have been if the Defendants had complied with ERISA, thus preventing the Defendant' unjust enrichment.

574. Defendants' conduct has caused actual harm to Plaintiffs in an amount to be proven at trial.

575. In conformity with 29 U.S.C. § 1132(h), Plaintiffs are contemporaneously serving this Complaint, by certified mail, on the secretaries of Labor and Treasury.

### COUNT V
### SUCCESSOR LIABILITY AS TO ECW AND WCW
#### (Against WWE, on Behalf of the Particularly Named Plaintiffs)

576. Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

577.    Extreme Championship Wrestling ("ECW"), a professional wrestling promotion engaged in the business of wrestling entertainment, was owned and operated by Paul Heyman until it filed for bankruptcy in April, 2001. On or around early 2003, WWE (then WWFE, Inc.) finalized the purchase of ECW. However, WWE had been using ECW's name, performers, and music since 2001, and even filed for the ECW trademark on July 13, 2001. After ECW's bankruptcy proceedings ended in 2003, WWE had acquired any and all remainder of ECW's business operations, including its extensive video library.

578.    World Championship Wrestling ("WCW"), a professional wrestling promotion engaged in the business of wrestling entertainment, was owned and operated by AOL Time Warner until on or around March, 2001 when WWE (then WWFE, Inc.) purchased WCW.[81] Linda McMahon commented on the acquisition of WCW's name, extensive video library, and other property rights as "the perfect creative and business catalyst for our company". *See Id*. WCW, Inc. is now a Delaware subsidiary of WWE. *See* WWE's SEC Filings, List of Subsidiaries, *available* *at* https://www.sec.gov/Archives/edgar/data/1091907/000120677408000468/exhibit21-1.htm.

579.    Prior to WWE's purchases, ECW and WCW each maintained separate and distinct wrestling promotions with their own titles, belts, and performers.  Each promotion had exclusivity contracts with performers, which required buy-outs for

---

[81] On Friday March 23, 2001, WWF.com and WCW.com both posted the same press release stating that WWE had acquired WCW. *See* "The Sale of WCW to WWE", Wrestling-Online.com, Timeline from January 11, 2001 to May 29, 2001, *available at* http://www.wrestling-online.com/timeline/the-sale-of-wcw-to-wwe/, *last visited* November 6, 2016.

intra-promotional performances. Both ECW and WCW were wrestling organizations that directly competed with WWE until WWE's total acquisition of the companies.

580. Both ECW and WCW were known for their violent performances, including dramatizing brutal head trauma. *See* the following example of WWE's ECW produced merchandise:



From left to right, respectively: "ECW One Night Stand", produced by WWE and available for purchase at WWEshop.com; "The Rise & Fall of ECW", WWE produced and available for purchase at WWEshop.com; "Blood Sport ECW: The Most Violent Matches", WWE produced and available for purchase at WWEshop.com.

581. The Plaintiffs who wrestled for ECW sustained repeated head trauma while performing for ECW and are suffering from, and are at further risk of, long-term, latent, occupational injuries such as CTE.

582. The Plaintiffs who wrestled for WCW sustained repeated head trauma while performing for WCW and are suffering from, and are at further risk of, long-term, latent, occupational injuries such as CTE.

583. Upon respective acquisition, both WCW and ECW's normal business operations ceased and WWE assumed the liabilities and obligations of WCW and

ECW that is ordinarily necessary for the uninterrupted continuation of normal business operations of WCW and ECW.[82]   WWE had acquired both ECW and WCW's names, royalties, and normal business operations.

584.   On March 23, 2001, Vince McMahon addressed both WWF and WCW fans and wrestlers about the acquisition of WCW, noting a special simulcast on both WWE's Raw and WCW's Nitro programs later in that event where Vince McMahon would discuss the total acquisition of WCW. The same night it was fictionally announced that Shane McMahon had bought WCW. *See* King, Adam, "WWF Raw Is War 3.26.2001", The King's Wrestling Recaps, https://kingsrecaps.wordpress.com/2012/03/19/wwf-raw-is-war-3-26-2001/ (March, 19, 2012). Evidencing the complete and seamless merging of the two wrestling entities with WWE, Jim Ross and Paul Heyman, the founder of ECW and now WWE employee, discussed WWE's successful acquisition of WCW. *Id.* "The creation of a new WCW was forming in WWE". *See* "Big Bang: The untold story of the WCW pay-per-view that almost never happened", WWE Network, WWE.com, http://www.wwe.com/article/big-bang-untold-story-wcw-pay-view-almost-happened, *last visited* November 6, 2016; *see also* screenshot below:

---

[82] The WCW owned by AOL Time Warner subsequently changed its name to Universal Wrestling Corporation and ceased operating as a professional wrestling entertainment entity, existing solely to oversee existing contractual obligations and legal disputes.



**Night of Merger: Last Regular WCW Show Features Simultaneously broadcast WWE Raw and WCW Nitro with Vince McMahon and Shane McMahon announcing their control and ownership. March 26, 2001.**

585.  WCW's particular business of professional wrestling was uniquely maintained after WWE's acquisition, and upon information and belief, its corporate model was mostly left intact, even maintaining a continuity of ownership by carrying over high level management such as WCW's former president Eric Bischoff, WCW's Vice President of Talent John Laurinaitis, Arn Anderson as producer, Diana Myers from the legal department, Aaron Blitzstein in marketing, Rob Garner in advertising, and Steve Barrett in production. "The Sale of WCW to WWE", Wrestling-Online.com.   WCW's operation and structure maintained its departments, including production and creative. *Id.* WWE further maintained continuity of ownership with WCW by keeping a certain amount of Shane McMahon's ownership interest in WCW after the acquisition. Eric Bischoff, the former head of WCW and creative force behind the Monday night wars between WWE and WCW was hired by WWE to continue the storyline tension between the two brands. WWE bought around 25 WCW wrestler contracts immediately as part

of the purchase to aid in the continuation of this tension between WCW and WWE as they performed under the WCW brand.

586.   ECW's particular business of professional wrestling was uniquely maintained after WWE's acquisition, and upon information and belief, its corporate model was mostly left intact, even maintaining a continuity of ownership by carrying over high level management such Paul Heyman, and the ring-announcer Joey Styles.  Notably, ECW wrestlers Rob Van Dam and Tommy Dreamer performed for WWE as early as July 2001. WWE maintained continuity of ownership with ECW by fictionally announcing that Stephanie McMahon's bought an ownership interest in ECW after the acquisition.  Paul Heyman, the founder of ECW, was hired by WWE on March 5, 2001 indicating ECW's acquisition by WWE on Monday Night Raw. Paul Heyman continued to work for WWE, including as head-writer for WWE's Smackdown! from 2002-03 and WWE's developmental program OVW from 2005-06. Mr. Heyman was also directly involved with ECW's brand relaunch in 2005 and 2006. Mr. Heyman left WWE in 2006, but returned in 2012 and currently performs for WWE. Further, ECW's ring-announcer Joey Styles was hired by WWE and would ultimately become the lead commentator for WWE's *ECW on Sci-Fi* from 2006-08.

587.   Although WWE began utilizing the WCW and ECW brands as early as March and April, 2001, by July, 2001 both the ECW and WCW names and wrestlers had been integrated into WWE wrestling entertainment performances and storylines, with both brands joining together on the July 9, 2001 Monday Night Raw, forming "The Alliance" against WWE.  On July 22, 2001, WWE produced a Pay-Per-

View event titled "Invasion" where all three brands were pitted against each other. This storyline extended until November 2001.

588.   The general business operations of WCW, ECW and WWE are the same. WWE intended to incorporate WCW and ECW into WWE's business with as much continuity of structure and operation as possible.  This included a continuity of key personnel such as WCW and ECW executives and performers.

589.   After 2001, the WWE continued to use the logo of both ECW and WCW to brand its televised matches, DVDs, T-shirts, wrestlers and numerous products, including the following examples:

- The below cover of WWE's DVD Production published on July 22, 2001, which included both ECW and WCW brands prominently displayed alongside the WWF brand:



- **The below WWE official merchandise, prominently labeled Extreme Championship Wrestling, ECW, of Balls Mahoney, of which the Estate is a Named Plaintiff:**



- **The below DVDs produced by WWE where WCW is prominently displayed:**



- **The below comparison of an original ECW Merchandise Catalog (1997) (left), and WWE's August 29, 2005 ECW Magazine (right):**



590.   After acquisition, WWE continued to brand programs and Pay-Per-View shows as WCW events. The WWE held WCW title matches featuring WCW wrestlers competing for WCW title belts. For example, in the July 2, 2001 Raw, the last 20 minutes were dedicated to WCW, with WCW-themed graphics, ring design, referee and announcers. In the show, Booker T defended his WCW World title versus Buff Bagwell.  WWE continued to produce WCW events, programs, and media, through which WWE profited.

591.   WWE continued to brand programs and Pay-Per-View shows as ECW events.  For example, the WWE's documentary "The Rise and Fall of the ECW" published in 2004 was the second highest selling DVD in WWE history. In 2005, WWE held a Pay-Per-View event titled "ECW One Night Stand" and featured the Named Plaintiffs Terry Brunk, aka Sabu, Jon Rechner, aka Balls Mahoney, and Brian Knighton, aka Axl Rotten. In 2006, WWE aired a 191-episode series titled *ECW on Sci-Fi* which aired from June 13, 2006 until February 16, 2010. Other ECW Pay-

Per-View events, programs, and media were produced by WWE, through which WWE profited.

592.   WWE continues to use the ECW and WCW brands for wrestling entertainment, including wrestling matches, media, and products.   WWE has utilized the logos and tape libraries of the WCW and ECW before and after its purchases of their assets which continue to the present. This includes WCW and ECW clothing, videos, books, video games, DVDs, action figures, title belts, and many other forms of merchandise.   WWE Network still airs many WCW and ECW original shows and newer documentaries.

593.   WWE held itself out to the world as the effective continuation of WCW and ECW, merging the two companies into profitable WWE brands and integrating the wrestlers into WWE storylines and performances. Through its actions, WWE assumed the liabilities necessary for the uninterrupted continuation of the businesses of ECW and WCW, such as their obligations under ordinary vendor and utility contracts.

594.   There was a continuity of management, personnel, physical location, assets, and general business operation between WCW, ECW, and WWE, in that WWE hired many of the top managers and talent professionals in WCW and ECW; WWE hired many of the wrestlers from the acquired organizations; WWE took over the assets of WCW and ECW, such as videos and other promotional items and used such items for its own profit; and the general business operation of the acquired entities, namely professional wrestling entertainment, was continued and maintained by WWE.

595.   As a result of WCW and ECW's continuity of enterprise with WWE, ECW, WCW, and WWE are jointly and severally liable to the Plaintiffs as a successor in interest.

596.   As a result of the above mentioned facts, WWE is individually liable to the Plaintiffs under the doctrine of *de facto* merger for the obligations of WCW and ECW.

**COUNT VI**
**MEDICAL MONITORING**
**(Against Defendant WWE, on Behalf of All Named Plaintiffs)**

597.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

598.   The Plaintiffs experienced repetitive traumatic brain impacts and sudden decelerations during their respective WWE careers that significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

599.   Repetitive TBI during WWE practices and performances has a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau protein – sometimes over decades -- causes CTE, which is the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

600.    The performance of wrestling as designed and implemented in the WWE, including both practices and performance play, has exposed former wrestlers to hazardous conditions and out-of-the ordinary risks of harm. These repetitive head accelerations to which the Plaintiffs have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations and failure to notify Plaintiffs of significant rights protected by statute, the Plaintiffs' exposure to the risks of harm as described above would have been materially lower.

601.    Accordingly, the repetitive head impacts sustained by WWE wrestlers in WWE performances and practices exposed WWE wrestlers, including the Plaintiffs, to subtle and repetitive changes within the brain on the cellular level. For these reasons, the environment within which WWE wrestlers have sustained repetitive head impacts exposed them to substantive hazards.

602.    Depending on many factors, including the amount of the exposure to repetitive head impacts and the release of Tau protein, the wrestler/victim will develop a range of subtle to significant neurocognitive changes over time.

603.    The latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neurocognitive disability, decline, personality change, mood swings, rage, and, sometimes, fully developed encephalopathy.

604.    Like the organizers of boxing, the WWE was fully aware of the danger of exposing all WWE wrestlers to repetitive head impacts and decelerations,

including the repetitive sub-concussive and concussive blows that increase the risk to WWE wrestlers of, among other latent injuries, encephalopathy.

605.   As noted above, by its actions and omissions and fraudulent conduct, from 2006 to present, the WWE further breached its duty (which it had assumed as long ago as the 1960s) of reasonable and ordinary care to the Plaintiffs by failing to provide WWE wrestlers, including the Plaintiffs, with necessary, adequate, and truthful information about the heightened risks of neurological damage that arise from repetitive head impacts during WWE performances and practices.

606.   As a proximate result of the WWE's tortious conduct, the Plaintiffs have experienced an increased risk of developing serious latent neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and/or other and similar cognitive-impairing conditions, as well as a wide spectrum of other chronic injuries.

607.   The latent brain injuries from which Plaintiffs suffer require specialized testing (with resultant treatment) that is not generally given to the public at large.

608.   The available monitoring regime is specific for individuals exposed to repetitive head trauma and is different from that normally recommended in the absence of exposure to this risk of harm.

609.   The medical monitoring regime includes, but is not limited to, baseline tests and diagnostic examinations, which will assist in diagnosing the adverse health effects associated with wrestling-related TBI. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent

or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiffs experienced in the WWE.

610.   The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis of head injuries and their potential link to, *inter alia*, memory loss, impulse rage, depression, early-onset dementia, CTE, Alzheimer-like syndromes, and similar cognitive-impairing conditions.

611.   By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long-term injuries, disease, and losses will be materially reduced.

612.   By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long-term injuries, disease, and losses without adequate treatment will be materially reduced.

613.   Plaintiffs, therefore, seek an injunction creating a Court-supervised, WWE-funded medical monitoring program, which will facilitate the diagnosis and adequate treatment of Plaintiffs for neurodegenerative disorder or disease. The medical monitoring should include a trust fund to pay for the medical monitoring and treatment of Plaintiffs as frequently and appropriately as necessary.

614.   Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the continued risk of developing long-term physical and economic losses due to concussions and sub-concussive injuries.  Without Court-approved medical monitoring as described

272

herein, or established by the Court, the Plaintiffs will continue to face an unreasonable risk of continued injury and disability.

**COUNT VII**
**WRONGFUL DEATH AND SURVIVAL ACTIONS**
**(Bernard Knighton, as Personal Representative of**
**Brian Knighton's Estate, Gayle Schecter as personal representative of    |**
**Jon Rechner, Against the WWE)**

615.   Plaintiffs incorporate by reference all preceding paragraphs above as if fully set forth herein, including all exhibits referenced.

616.   Plaintiffs and their respective Executors or equivalent legal representatives under applicable state law (hereinafter "Executors") incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

617.   The Plaintiffs' legal representatives bring this action in their representative capacity of the decedent's Estate and next of kin and on behalf of the respective survivors of those Plaintiffs.

618.   As a direct and proximate cause of the conduct alleged herein, the WWE caused the Plaintiffs to develop the debilitating brain diseases and conditions set forth above, which diseases and conditions caused extreme pain, suffering, and anguish and, ultimately, the deaths of some Plaintiffs.

619.   The legal representatives of the deceased Plaintiffs claim damages recoverable under applicable law for all pecuniary and non-pecuniary losses suffered by the deceased Plaintiffs by reason of their deaths.

620.   As a direct and proximate result of the untimely deaths of the Plaintiffs, their respective survivors and/or surviving distributees have been deprived of the earnings, maintenance, guidance, support and comfort that they would have received from for the rest of the respective Plaintiffs' natural lives, and

have suffered commensurate pecuniary and non-pecuniary losses because of the Plaintiffs' wrongful deaths.

621.    The Plaintiffs' legal representatives claim the full measure of damages allowed under applicable law.

**COUNT VIII**
**<u>FRAUDULENT CONCEALMENT</u>**
**(Against the WWE, on Behalf of All Named Plaintiffs)**

622.    Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced. The WWE's concealment has occurred in the following ways:

623.    Publicly mischaracterizing the state of CTE science: including making False Press Statements about Benoit's Brain Contradicted by Dr. McKee. WWE has publicly questioned and attacked the findings in both wrestlers diagnosed, the WWE sought to create "controversy" when it issued press statements apparently not reviewed for accuracy by medical professionals. The statements may have been written by the Press Department, for example: for example: World Wrestling Entertainment (WWE) Full Statement to ABC News reads: "It is natural that a father would try to come up with a reason why his son would tragically murder his wife and child, and then commit suicide. Based on the study by the Sports Legacy Institute that claimed Chris Benoit had the brain of an 85-year-old with dementia, Mr. Benoit asserts that head trauma was the cause of his son's aberrant, criminal behavior. However, common sense would dictate that this is impossible. Someone with the brain of an 85-year-old with dementia would be unable to keep a traveling work schedule, drive himself to arenas, and perform intricate maneuvers in the ring much less commit a methodical murder-suicide over a 48 hour period."

274

624. The WWE has a duty not to make false statements about CTE. Indeed once again the plaintiffs can turn to Dr. McKee for help- the doctor who directs the Foundation that gives Mr. Levesque on behalf of WWE awards for "helping solve the concussion crisis." Dr. McKee discussing the brain of an NFL player named Tom McHale age 45 (The CTE found in wrestler Benoit when he was 40): " McKee pointed out that clumps of Tau, the brown splotches, had eaten away at McHale's identity. "This was not the normal brain of a 45-year-old man, McKee explained. It looked like the brain of a 72 year old boxer McKee said that she had been looking at brains for more than two decades and that what happened to Tom McHale was not at all normal 'I have never seen this disease in the general population, only in these athletes, McKee said. 'It's a crisis, and anyone who doesn't recognize the severity of the problem is in tremendous denial." (See League of Denial Mark Fainaru-Wada and Steve Fainaru tHree Rivers Press, NY 2013 p. 265)

625. WWE's refusal to acknowledge that two wrestlers have been diagnosed with CTE. The WWE publicly sought to examine the Benoit and Martin studies yet the WWE has and did not seek to fund research into brain studies of any other deceased wrestlers nor despite its multi million dollar donations to the Nowinski Concussion Legacy Foundation it has not sought to research the issue with Nowinski or commission any further CTE studies in wrestlers. The WWE is seemingly, including through its spokesman and attorney Jerry McDevitt in public statements, very interested in Benoit CTE case at a granular level: doubting science and brain slides which were reviewed by Dr. Maroon with Dr. Omalu and Dr. Bailes in 2008. The WWE seeks more "study" about peer reviewed published medical papers because it is unaware of the "chains of custody." The WWE claims that even though Dr. Maroon (while hired by WWE) reviewed the Benoit slides (and those of NFL players with CTE) of well known doctors work Bennett Omalu, Julian Bailes that the CTE conclusions were in doubt because the slides may not have

been Benoit's. McDevitt in a public letter to a wrestling journalist- Irv Muchnick dated December 16, 2010 wrote: " In one of your oft-repeated lies about Dr. Maroon and WWE, you repeatedly suggest that WWE did see the evidence it has requested because Dr. Maroon was shown slides represented to be of Benoit's brain when viewing the slides at West Virginia University . . .  As you no doubt known when you tell that lie, the issue is not what is depicted on the slides or whether Dr. Maroon was shown such slides. The issue is whether the tissue on the slides is in fact that of Chris Benoit."

626.   Yet when Dr. Maroon himself appears in a PBS documentary commenting about the work and specifically this slide and his review of this work he does not voice this extreme skepticism. Interviewer from PBS Frontline asking Dr. Maroon: "You eventually become involved with the meeting. I think you were helping to set it up with Omalu and Dr. [Julian] Bailes and Dr. Peter Davies and yourself. Why did that come about and your involvement in it? Take us to that meeting.        What        were        the        goals? Dr. Maroon answers: Well, I think with the papers that were being published and the observations made, clearly in the interest of protecting athletes and finding as much as we could about this problem, it was very reasonable to have someone like Dr. Peter Davies, who was a professor in the pathology department at Einstein Hospital in New York and an expert at Alzheimer's and neurodegenerative disease himself, he was selected as an independent observer to view the slides of Dr. Omalu relative to seven individual players that have been diagnosed to date at that time. Being an associate and colleague of Dr. Bailes, who was an associate of Dr. Omalu, I was asked to put together a meeting with Dr. Davies so that he and I could meet with Dr. Omalu and Dr. Bailes at the WVU Medical Center in Morgantown. On Oct. 1, 2008, we went there and indeed had the opportunity to review the slides, the actual tissue slides of the brains of seven NFL athletes and one pro wrestler who

had been diagnosed with chronic traumatic encephalopathy. (see http://www.pbs.org/wgbh/pages/frontline/sports/league-of-denial/the-frontline-interview-dr-joseph-maroon/#seg17)

627.   While Dr. Maroon opines on the meaning of what he saw at this meeting, "clearly they were not normal brains." He characterizes the situation as "very open and an honest, open discussion." Dr. Maroon does not question the integrity of Dr. Bailes, Dr. Davies or Dr. Omalu is presenting "faked slides" or suggests that the slides he reviewed where not of the players or wrestler.

628.   As the WWE makes no claims that it is in the business of analyzing CTE slides, instead the WWE states it relies on medical experts like Dr. Maroon to advise it. Nor does the WWE question whether Dr. Omalu, Dr. Bailes or Dr. Davies switched the seven other NFL players slides that Dr. Omalu had prepared and studied.  A reasonable conclusion by a trier of fact is that the true purpose of the WWE's inquiry about this "chain of custody" was not to advance knowledge of the Benoit and Martin cases but to delay and distort the scientific process that show CTE exists in wrestlers.

629.   The WWE through its spokesman Jerry McDevitt also observed that Dr. Omalu's 2010 publication of the seminal study of "Chronic Traumatic Encephalopathy in a Professional American Wrestler, "was buried in a relatively obscure Nursing Journal" (see www.ncbi.nlm.nih.gov/pubmed/21175533) A tier of fact could conclude his characterization was designed to downplay the significance of the study. Obviously the Journal published by the International Association of Forensic Nurses is both peered reviewed and published in line with academic standards found in other scientific publications. The WWE's spokesman comments were made (to a Wrestling Journalist who has published books and regularly blogs on the issue) so that wrestlers would rely on the WWE's views and weight of Dr. Omalu's research.

277

630.   Between the early 1960s and the present, the WWE knew that repetitive head impacts in wrestling performances and full-contact practices created a risk of harm to WWE wrestlers that was similar or worse than the risk of harm to, for example, boxers who receive repetitive impacts to the head during boxing practices and matches. Unlike boxers who have matches at most every few weeks or months, wrestlers perform typically 150-250 times per year.

631.   The WWE has been aware of and understood the significance of the published medical literature dating from as early as the 1960s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which WWE wrestlers are exposed.

632.   During that time period, the WWE knowingly and fraudulently concealed from then- current WWE wrestlers and former WWE wrestlers the risks of head injuries in WWE performances and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury.

633.   To present, the WWE's fraudulent concealment continues. During that time period, the WWE voluntarily funded and financed scientific research at the Concussion Legacy Foundation. Despite the conclusions of that WWE funded research the WWE repeatedly misrepresents to then WWE wrestlers, the United States Congress (in the Benoit related Hearings), and the general public that there is no link (or an insufficient scientific link) between TBI in WWE activities and later-in-life cognitive/brain injury, including CTE and its related symptoms.

634.   Given the WWE's superior and unique vantage point and its proclamation on the subject, the Plaintiffs reasonably relied upon the WWE for guidance on head injuries and concussions.

635.   The WWE's Talent Wellness Program provided letters and health and wellness advice, including drug rehabilitation medical advice, to former Talent, yet

notably omitted all information regarding concussions and sub-concussive injuries, which further concealed and minimized the risks of repetitive brain impacts the WWE knew existed for its then-current wrestlers and for its former wrestlers, who reasonably relied on the WWE's pronouncements and/or silence on this vital health issue.

636.   The WWE's research, pronouncements (notably the donation and public announcements to the Sports Legacy Institute beginning in 2013), along with its promoted Talent Wellness Program created an atmosphere of trust that the WWE had carefully undertaken the responsibility it assumed to research, test, study, and report accurate findings to the wrestlers and former wrestlers. On May 13, 2013 in a rare WWE press event, USA Today headlines announced to the world: "**WWE is gifting $1.2 million to help medical researchers study concussions and Brain Trauma. WWE is tag-teaming with medical researchers to take on CTE.** World Wrestling Entertainment, known for past stars such as Hulk Hogan and current champ John Cena, says it is making a gift of $1.2 million over three years to further research aimed at developing a treatment for Chronic Traumatic Encephalopathy. The brain disease, associated with repeated concussions, has come under scrutiny amid concussion-related lawsuits by more than 4,000 former NFL players against the league. CTE has been linked to depression and dementia. **Obviously, I think it's such a huge concern for everybody right now in sports and in the military. As we learn more and more about concussions and what can become of it, I think it's a problem for everybody," Paul Levesque, WWE executive vice president of Talent and Live Events, told USA TODAY Sports on Thursday.** The WWE says the gift is a continuation of the Talent Wellness Program it started in 2006, which now includes the same neurological baseline testing used in the NFL and such pro wrestling-specific mandates as a ban against bashing an opponent over the head with a metal

chair."   **WWE intended that its wrestlers rely upon this statement.**

637.   In an article found on the Boston University Medical Campus website the headline announces: "WWE Donates $1.2 Million to SLI for Boston University CTE Treatment Program." The continues: "WWE is proud to help advance this critical research to help anyone at risk of suffering CTE," said Paul Levesque, EVP Talent and Live Events for WWE. "*WWE has been, and will continue to be, very proactive on taking measures to ensure the health and wellness of our talent."* (Emphasis added)*.* "We appreciate the generosity of WWE," said Christopher Nowinski, Co-Founder and Executive Director of the Sports Legacy Institute. I enjoyed my time at WWE, and I am excited to reunite with the organization on this important cause that will benefit a lot of people we both care about." The article also makes an extraordinary apparently false statement- "More than 600 living athletes have committed to donate their brain to the CSTE after death, including dozens of current and former WWE superstars." (See: http://www.bumc.bu.edu/2013/05/17/wwe-donates-1-2-million-to-sli-for-boston-university-cte-treatment-program/) WWE intended that its wrestlers rely upon this statement. Since CTE is a latent degenerative disease that can only be diagnosed after death (as acknowledged in the Press statements in these articles), the WWE's "proactive measures" in financing CTE studies would by definition include retired wrestlers including named plaintiffs. As alleged herein the WWE and the organization its finances have failed find a single wrestler to study for CTE despite WWE's awareness of their unprecedented death rate.

638. Indeed since May 2013 Joint Press WWE- Concussion Legacy announcements and with apparently nothing done to advance CTE research in wrestling, the Boston Globe investigated this issue. In an article exploring the WWE's close ties to the Concussion Legacy Foundation is was revealed: "Nowinski, a cofounder and president of the Concussion Legacy Foundation, said by e-mail that he has not acquired the brains of professional wrestlers for CTE research since his nonprofit partnered with WWE in 2013, largely because he has scaled back actively pursuing brains of people who died." This from the pioneer "brain chaser" who sought and acquired Brains in dozens of NFL players so that those brains could be diagnosed with CTE. And instead of "dozens of current and former WWE superstars." The Globe identified eight wrestler pledges at least one of whom appears to have changed his mind about the integrity of the CLF, while two others are close associates of WWE. (https://www.bostonglobe.com/sports/2016/06/11/cozy-ties-between-concussion-foundation-and-wwe-cause-concerns/QNUhqzfn79EUPcB5GlH7nK/story.html)

639. More striking still, as revealed in the Globe article neither WWE nor Nowinski pursued any brain of a deceased wrestler despite: "The roll call of deaths since then includes WWE greats Dusty Rhodes (age 69), Roddy Piper (61), and Ultimate Warrior (54), as well as lesser stars such as Sean O'Haire (43) and Viscera (43)." (Id. Globe)

640. The concealment of CTE risks in wrestling was and is ongoing. Whether through WWE's Medical Director's statements, Ms. Levesque's Congressional Testimony, or Paul Levesque's public announcement regarding

concussion research, WWE has continued to deny the presence of concussions in WWE wrestling and the validity of studies pointing to the contrary. Dr. Joseph Maroon also denied and downplayed the link between repetitive brain impacts and short- and long-term brain damage including CTE in public interviews.

641. The WWE, therefore, concealed material facts and information with the intent to deceive and defraud, which caused Plaintiffs to become exposed to the harm referenced above. For those Plaintiffs who had retired prior to the above-mentioned misrepresentations, the WWE's concerted concealment of the risks to which they had been exposed in the ring delayed their ability to plan for their future and their families and to seek appropriate treatment of their latent neurodegenerative conditions.

642. The WWE knew and expected that Plaintiffs would rely on the inaccurate information provided by the WWE, and Plaintiffs in fact did reasonably rely on the inaccurate information provided by the WWE during and after their WWE careers.

643. As a direct and proximate result of the WWE's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

644. As a direct and proximate result of the WWE's willful concealment, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

As a result of the WWE's misconduct as alleged herein, the WWE is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT IX
## FRAUD
### (Against the WWE, on Behalf of All Named Plaintiffs)

645.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

646.   At least since the early 1960s, the WWE knew that repetitive head impacts and rapid decelerations in wrestling performances and full-contact practices created an unreasonable risk of harm to WWE wrestlers that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches. Boxers, however, perform far fewer than 150-250 times per year as wrestlers do.

647.   The WWE knew that the risks of brain injury could be reduced by implementing changes to the performance, akin to the ones other sports agencies had already adopted, such as (1) the baseline cognitive testing of wrestlers for comparison purposes during and after performances; (2) the active monitoring of wrestlers for signs of TBI, (3) the employment of a neurologist during performances; and, (4) return-to-ring rules consistent with proper medical management of TBI, or the use of helmets as OSHA would have required, (and periods of extended recuperation as required by Family Health and Medical Leave Act) but  for the WWE's fraudulent misclassification of their employees as "independent contractors."

283

648.   The WWE, however, withheld and actually covered up the information it knew about the risks of head injuries suffered during WWE performances from then-current WWE wrestlers and former WWE wrestlers and ignored the known risks to all WWE wrestlers.

649.   On information and belief, the WWE deliberately delayed implementing the changes to the performance it knew (or should have known) would reduce wrestlers' exposure to the risk of life-altering head injuries because those changes would be expensive and would reduce the profitability of WWE. WWE knew that violence sells and was in the essence of their entertainment package and favorable ratings.

650.   The WWE has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which WWE wrestlers are exposed.

651.   The WWE and its agents -- employed to formulate the Talent Wellness Program -- made these material misrepresentations with the intent to defraud the Plaintiffs.

652.   Given the WWE's superior and unique vantage point, and assumption of responsibility the Plaintiffs reasonably relied upon the WWE for guidance on head injuries and concussions.

653.   During that time period, the WWE knowingly and fraudulently concealed from then-current WWE wrestlers and former WWE wrestlers the risks of head injuries in WWE performances and practices, including the risks

associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury, and the cumulative impacts of such injuries.

654.   The WWE, however, withheld this information from then-current WWE wrestlers and former WWE wrestlers and ignored the known risks to all WWE wrestlers.

655.   Beginning in 2013, the WWE funded purported scientific research into CTE that purported to be to benefit then-current WWE wrestlers, all former WWE wrestlers, and the general public, while the WWE maintained its agnostic position that there was no scientifically proven link between repetitive sub-concussive and concussive injuries sustained during WWE wrestling and brain injury, including but not limited to CTE and its related symptoms.

656.   During their wrestling careers and after their retirement from the WWE, the Plaintiffs justifiably and reasonably relied on the WWE's omissions and misrepresentations to their detriment.

657.   As a result of WWE's misconduct as alleged herein, WWE is liable to Plaintiffs.

658.   The Plaintiffs were damaged by WWE's misconduct. They have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, permanent reductions in cognitive capacity and economic and non-economic damages that are ongoing and continuing in nature, including a substantial diminution in them.

659.   As a result of the WWE's fraud, the WWE is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

**COUNT X**
**NEGLIGENT MISREPRESENTATION**
**(Against the WWE, on Behalf of All Named Plaintiffs)**

660.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

661.   A special relationship exists (as previously alleged) between the WWE and the Plaintiffs sufficient to impose a duty on the WWE to disclose accurate information to the Plaintiffs.

662.   The WWE knew that repetitive head impacts and decelerations in wrestling performances and practices created a risk of harm to WWE wrestlers that was similar or identical to the risk of harm to NFL Players, boxers and other athletes who receive repetitive impacts to the head during practices and matches.

663.   The WWE was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of repetitive traumatic impacts to the head to which WWE wrestlers were exposed.

664.   The WWE, however, withheld this information from WWE wrestlers and ignored the risks to WWE wrestlers.

665.   The WWE made, and continues to make, material misrepresentations to its wrestlers, former wrestlers, and the public at large the CTE is not found in wrestlers. The WWE maintains in this lawsuit that there was and is no scientifically proven link between repetitive traumatic head impacts and later-in-life cognitive/brain injury, including CTE and its related symptoms. And unlike the

286

NFL the WWE has continued and refuses to acknowledge the link between professional wrestling and CTE.

666. The WWE maintains these representations by publicly mischaracterizing the state of CTE science in wrestlers in statements apparently not reviewed by medical professionals (indeed the WWE's few public statements that are contradicted by the very researchers the WWE finances), including asserting in this litigation "The state of CTE Science is not a Known Fact."

667. Defendant WWE, therefore, misrepresented and continues to misrepresent the dangers the Plaintiffs face in returning to action after sustaining a head injury and the long-term effects of continuing to wrestle after a head injury and/or repetitive injuries.

668. WWE made public statements, financed published articles that neglected wrestling, and mailed letters about possible symptoms of CTE while ignoring as likely cause- namely drug and alcohol addiction rates they defy all norms in any athletic group and showed self-serving "educational" videos to its wrestlers, which the WWE knew or should have known were misleading, downplaying and obfuscating to WWE wrestlers the true and serious risks of repetitive traumatic head impacts, either by physical blows and/or rapid decelerations.

669. WWE made material misrepresentations on multiple occasions, including but not limited to testimony at congressional hearings on the Benoit incident and other information issued to current and former WWE wrestlers.

670.   The Plaintiffs' reliance on the WWE was reasonable, given the WWE's superior and unique vantage point on these issues, and its assumption of the duty to provide a safe working environment.

671.   The Defendant's misrepresentations included the false statement that present WWE wrestlers were not at an increased risk of short-term and long-term adverse consequences if they returned too soon to a WWE performance or practice after suffering head trauma and, therefore, that former wrestlers had not been exposed to such increased risk during their time in the WWE.

672.   The WWE's misrepresentations included ongoing and baseless criticism of legitimate scientific studies that set forth the dangers and risks of head impacts, which WWE wrestlers regularly sustained.

673.   The WWE made these misrepresentations and actively concealed true information at a time when it knew, or should have known, because of its superior position of knowledge, that the Plaintiffs faced serious health problems if they returned to a performance too soon after sustaining a concussion. Once having sustained a concussion, the wrestlers were even less able to comprehend their circumstances due to the debilitating effects of the concussion.

674.   The WWE knew or should have known the misleading nature of their statements when they were made, and were under the obligation to disclose to its wrestlers the risks of head trauma known to WWE.

675.   The WWE made the misrepresentations and actively concealed information knowing that the Plaintiffs would and did rely on the misrepresentations or omissions in, among other things, how the Plaintiffs

addressed the concussive and sub-concussive injuries they sustained. For those Plaintiffs who had retired prior to the above-mentioned misrepresentations, the WWE's concerted concealment of the risks to which they had been exposed in and out of the ring delayed their ability to plan for their future and their families and to seek appropriate treatment of their latent neurodegenerative conditions.

676.   As a result of the WWE's misrepresentations, it is liable to Plaintiffs.

677.   As a result of WWE intentionally remaining silent concerning the items it knew of while knowing that the Plaintiffs did not possess such knowledge, and profiting from such silence, WWE is liable to Plaintiffs for all injuries, damage, and suffering it caused.

678.   As a direct and proximate result of the WWE's negligent misrepresentations, Plaintiffs have suffered and continue to suffer serious personal injury, including neurocognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, emotional distress, and loss of consortium. Plaintiffs seek the full measure of damages allowed under applicable law.

## COUNT XI
### FRAUDULENT NONDISCLOSURE
#### (On Behalf of All Plaintiffs Against WWE)

679.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

680.   WWE has failed to warn the Plaintiffs of the risks inherent in performing for WWE too soon after sustaining an initial concussion or sub-concussive injury, and which failure to warn of the specific signs and symptoms

of concussions and sub-concussive injuries and the risks associated with sustaining repetitive head trauma was intentional fraudulent withholding of information and non-disclosure of necessary information.

681.   WWE had particular knowledge of the signs and symptoms of concussion and sub-concussive injuries from as early as the 1980s and which knowledge has only increased up until the present.

682.   WWE had particular knowledge of the risks associated with suffering repetitive head trauma and sustaining concussive and sub-concussive blows to the head, including long-term neurological injuries, such as CTE, and as evidenced as "punch-drunk", from as early as the 1980s.

683.   Plaintiffs did not have knowledge of the particular hazards within WWE performances that caused the injuries and did not have the knowledge of the risks of continuing to perform for WWE with a concussion.  Plaintiffs did not know the signs and symptoms of concussions, and did not know they were injured and should not continue performing for WWE.

684.   WWE was particularly aware of Plaintiffs' lack of knowledge of the signs, symptoms, and risks associated with WWE wrestling, specifically the potential long-term, occupational injuries from repetitive head trauma.

685.   Despite knowing the Plaintiffs were unaware of the risks associated with WWE wrestling, and despite undertaking a duty to the Plaintiffs before, during, and after their employments with WWE, and which WWE continues to reaffirm through public statements, WWE failed to warn and failed to disclose this necessary health information to the Plaintiffs.

686.   Profit and continued viewership motivated WWE's fraudulent non-disclosure, as WWE knew that Plaintiffs would not have continued wrestling in the daily grueling and physically demanding manner that WWE required had they known of the injuries they were sustaining and would continue to endure throughout their life.

687.   WWE took advantage of its opportunity to control and manipulate the Plaintiffs by misclassifying them as independent contractors, thereby denying them all rights and protections under State and federal laws such as OSHA and FMLA.

688.   WWE capitalized on its fraud by convincing the Plaintiffs to rely solely on WWE and its policies to protect their health and safety, which the Plaintiffs did solely rely upon.

689.   After undertaking the duty to protect the Plaintiffs' health and safety, WWE then furthered its business at the expense of the Plaintiffs by creating an unsafe workplace where the Plaintiffs sustained numerous injuries, including repetitive head trauma.  WWE knew that the Plaintiffs were suffering repeated head trauma and that they were at risk of long-term neurological injuries, and knew the Plaintiffs relied on WWE to disclose all necessary health information which would protect them from injury, as they repeatedly stated to the Plaintiffs through training exercises, on-site medical personnel, and employees engaged in the Plaintiffs' well-being.

690.   WWE's employees were all responsible under WWE's duty to inform, warn, and protect the Plaintiffs' health and safety, but failed to do so, including its

personally involved CEO, Vincent K. McMahon, its executives in Talent Relations, including Stephanie McMahon, Paul Levesque, and John Laurinaitis. Additionally, this duty was created by WWE through on-site medical staff that WWE hired to monitor, observe, and treat the Plaintiffs for injuries to ensure seamless productions, including but not limited to Dr. Ferdinand Rios, as well as its medical personnel including Dr. Maroon, Dr. Amann, and Dr. Lovell, but which duty was not upheld. Additionally, employees monitoring the wrestlers' performances including referees who were specifically tasked with monitoring and observing Plaintiffs' injuries and preventing further injuries by immediately stopping the match did not disclose the Plaintiffs' injuries or uphold WWE's duty. Further, any and all WWE employees who were engaged with the Plaintiffs' performances, health and safety, and well-being also did not uphold WWE's duty to disclose to Plaintiffs' their necessary health information.

691.   At the expense of the Plaintiffs' long-term health, safety, and well-being, and in the interests of corporate gain and profit, WWE fraudulently refused to disclose necessary health information which would have protected the Plaintiffs' from their particularly sustained injuries.

692.   WWE's total avoidance and failure to disclose the risks associated with CTE in professional wrestling and its denials that WWE wrestlers suffer the type of concussive and sub-concussive injuries which result in long-term, occupational injuries such as CTE has resulted in non-disclosure over a period of years, continuing to this day, and which fraudulent actions are within any statutes of limitations and repose.  Regardless, WWE's ongoing fraudulent statements and

continued non-disclosure tolls any and all applicable statutes of limitations and repose.

693.  WWE's non-disclosure was fraudulent and resulted in Plaintiffs' sustaining life-long, neurological diseases and injuries, including addiction, depression, and CTE.

694.  As a result of WWE's fraudulent non-disclosure, Plaintiffs suffer from personal and pecuniary injuries, including conscious pain and suffering and emotional distress.

**COUNT XII**
**<u>NEGLIGENT HIRING</u>**
**(Against the WWE, on Behalf of All Named Plaintiffs)**

695.  Plaintiffs incorporate by reference all of the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

696.  Prominent NFL spokesman who were critical of the science of CTE found a new position at the WWE. The WWE has hired two of the most outspoken early deniers or skeptics of the science of CTE in Dr. Joseph Maroon and Dr. Mark Lovell. As such the WWE voluntarily and gratuitously inserted itself into the field of studying head injuries in wrestling the relationship between repetitive head impacts in wrestling and CTE and long term effects brain injury.

697.  In doing so, the WWE assumed a duty to the Plaintiffs to retain and employ persons within the WWE including its medical director along with individuals who advise and are responsible for the WWE's Talent Wellness Program who were professionally competent to warn, study, educate, care, treat and render opinions on the relationship between repetitive head impacts in wrestling and brain injury. The WWE had a duty ensure that those whom it hired had no conflict of interest, no ulterior motives and that each had the professional

293

and personal qualifications to conduct those studies and render opinions to the wrestlers that were scientifically rigorous, valid, defensible, and honest.

698. The WWE breached its duty to the Plaintiffs by hiring persons who were among the most outspoken deniers of CTE in the NFL. After leaving the NFL its two most prominent doctors involved on the wrong side of CTE research are both are hired by the WWE.

a) were uniquely unqualified to help educate, warn wrestlers about CTE;

b) were not competent to engage in rigorous and defensible scientific research;

c) were not competent to render valid and defensible opinions;

d) were directly associated with the earlier widely criticized and discredited NFL fraudulent industry-funded research which was doomed by conflict of interest and/or negligence; and/or

e) attacked as not credible the valid and defensible research and opinions generated by neuroscientists who were unconnected to and not paid by the NFL or WWE, without reasonable scientific basis to do so including direct attacks by Dr. Maroon on the work of Dr. Omalu.

699. Dr. Joseph Maroon is a well-known neurosurgeon who is the Pittsburg Steelers Team neurosurgeon as well as being the current "WWE Medical Director." Dr. Maroon was a consultant to the NFL's Mild Traumatic Brain Injury (MTBI) Committee, which has been referenced in other litigation for the production of "junk science" designed to insulate the NFL from criticism and legal liability in documenting the science and the incidence of CTE in NFL players. In this role Dr. Maroon is a controversial figure in the debate over CTE science and his views have been widely criticized.

700.    Dr. Maroon is featured in the Hollywood movie "Concussion" released by Sony pictures in December 2015. The film depicts real life events that mirror the events unfolding today in wrestling, including the diagnosis by Dr. Omalu of two more professional wrestlers with signs of CTE in October of 2016 and the absence of any comment of WWE or Dr. Maroon. The film uses Dr. Maroon and Dr. Omalu real names so presumably in the film the events and characters are accurately portrayed such that Sony and its producer Ridley Scott were not required to change the real names as is customary to avoid legal action by those depicted unfavorably. The film "examines how American football players suffer from major head injuries and life-long debilitating problems as a result of repeated concussions, and efforts by the National Football League to deny it." (imdb.com/title/tt3322364/?ref_=ttfc_fc_tt) In the movie, Maroon is being portrayed as a NFL-biased doctor who tries to deny any relationship between football concussions and the brain pathology which Dr. Bennet Omalu found and attributed to CTE. This is an unusual and controversial choice for the WWE to choose as its medical director.

701.    Dr. Maroon's most notorious quote made while at the WWE on March 18, 2015, widely reported: "I think the problem of CTE, although real, it's being over-exaggerated and it's being extrapolated to youth football and to high school football." "There are more injuries to kids from falling off bikes, scooters, falling in playgrounds than there are in youth football. But it's much more dangerous riding a    bike    or    a    skateboard    than    playing    youth    football."

(http://www.huffingtonpost.com/2015/03/18/nfl-doctor-youth-football-

bike_n_6895584.html)

702.   As mentioned elsewhere Dr. Maroon challenged Dr. Omalu's findings

in Pittsburg Steelers players- the first ever discovered with CTE- and dismissed

their behavior (self destructive) as related to the CTE diagnosis "purely

speculative." These are the views of the Medical director of an organization, which

has athletes plagued by an unprecedented incidence of suicides, drug abuse and

neurological symptoms.

703.   Dr. Maroon is entitled to his views but the WWE must be held

responsible for hiring one of the most outspoken critics of CTE science which a

reasonable trier of fact could conclude are dangerously false and fraudulent.

704.   The WWE also hired another controversial Doctor named Mark Lovell

who is listed on the WWE's website as being the director of its Neurological testing

program for WWE wrestlers. Like Dr. Maroon, Dr Lovell is publicly known as being

part of a self-identified group of skeptics on CTE who share a controversial history

in the discovery, documentation and treatment of NFL players with CTE.

705.   According to the Book League of Denial, which functions as history of

CTE and the Concussion debate in the NFL, Dr. Lovell was implicated in the

fabricated research created by the NFL to downplay the risk of concussions in NFL

players. Dr. Lovell was apparently caught off guard by the journalists-authors

methodical approach, which led to Dr. Lovell denying his earlier published

research. He is another controversial choice for the WWE to hire. This activity

certainly at a minimum raises issues of his credibility to speak on the state of CTE science given the claims of fraud and concealment made by the plaintiffs.

706.   The Books authors introduce Dr. Lovell by noting: "Yet now many of his fellow neuroscientists suspected that Lovell was involved in the NFL's effort to cover up its concussion problem. Lovell denied that was the case."

707.   "Yet much of what the NFL believed about concussions was there in black and white, with Lovell's name attached to it . . . Lovell had put his name to research that concluded, among other tings, that 1) Concussions are minor injuries and nearly all NFL players recover quickly and completely and 2) pro football doesn't cause brain damage, ever. Oddly paper number 6 even suggested neuropsychological testing was at best of limited use in assessing football-related concussions and at worst useless . . . Even his own partner Dr. Maroon seemed taken aback. Lovell backpedaling years later, argued that he was the victim of the inner working of Pellman's committee,, which he said produced the more inflammatory assertions without his knowledge."

708.   While being interviewed for the book, Dr. Lovell had to deny his authorship: "Neuropsychology was of limited use in diagnosing concussions? Obviously I didn't write that, Lovell said. Multiple concussions do not increase the risk of further injury? I didn't write that. NFL players don't get brain damage? I didn't write that, Lovell said again. He acknowledged he could have protested to the committee to try to get the passages changed. One former committee member said it was essentially revisionist history for Lovell to try to disavow responsibility

for a paper that, after all, had his name on it." League of Denial, 2013 by Mark Fainaru-Wada p. 177-180.

709.    As with Dr. Maroon, Dr. Lovell is entitled to his views past and present but the WWE must be held responsible for hiring one of the most outspoken critics of CTE science which a reasonable trier of fact could conclude are dangerously false and fraudulent.

710.    As a result of the WWE's negligence in hiring Dr. Maroon as its Medical Director and Dr. Mark Lovell as the director of its Neurological program, the Plaintiffs have been misled about their brain injuries to the present day, injuries that are progressive and latent. And relying on the WWE's judgment in hiring such individuals the plaintiffs did not take protective measures or seek the diagnosis and treatment they would have sought had they been told the truth by WWE appointed spokesman and medical consultants and representatives.

## COUNT XIII
## NEGLIGENT RETENTION
### (Against the WWE, on Behalf of All Named Plaintiffs)

711.    Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

712.    The WWE knew or should have known that the controlling members of the WWE Talent Wellness Program and WWE generally demonstrated an ongoing lack of competence, objectivity and inadequate judgment to study and render expert opinions on the issue of the relationship between repetitive head impacts in wrestling and brain injury.

713.   The WWE voluntarily assumed a duty to the Plaintiffs not to allow those incompetent persons it had hired within the Talent Wellness Program and WWE generally to continue to defend dangerously false, incompetent including past falsified studies and current held positions about "over-exaggerated" CTE and render medically incompetent and unsound opinions on the relationship between repetitive head impacts in wrestling and brain injury.

714.   During the time period when WWE's executives and medical director conducted research, provided opinions to national publications about CTE and its risks, and advised as well as failure to advise wrestlers and former wrestlers including the plaintiffs, the WWE knew or should have known that the purported research, opinions, and advice made by these individuals were false and indefensible, and to a reasonable degree of medical certainty would result in serious injury to the Plaintiffs.

715.   The WWE breached its duty to the Plaintiffs and the general public by allowing these incompetent and unqualified persons, under the auspices and with the imprimatur of the WWE:

      a)   were uniquely unqualified to help educate, warn wrestlers about CTE;

      b)   to continue to render invalid and indefensible opinions about CTE; and,

      c)   to continue to attack the credible and defensible research and opinions of neuroscientists not connected to or paid by the WWE including Dr. Omalu;

d)      were directly associated with the earlier widely criticized and discredited NFL fraudulent industry-funded research which was doomed by conflict of interest and/or negligence.

716.   The WWE's negligence allowed the incompetent members of WWE and the Talent Wellness Program to continue to advance their history of false and incompetent research and opinions in an attempt to suppress valid bio-medical science about CTE in wrestlers. The WWE's negligence allowed employees of WWE and the Talent Wellness Program to mislead the Plaintiffs, other former WWE wrestlers, and the general public regarding the permanent brain injury risks associated with repetitive head impacts in the performance of wrestling.

717.   As a result of the WWE's negligence in hiring Dr. Maroon as its Medical Director and Dr. Mark Lovell as the director of its Neurological program, the Plaintiffs have been misled about their brain injuries to the present day, injuries that are progressive and latent. And relying on the WWE's judgment in hiring such individuals the plaintiffs did not take protective measures or seek the diagnosis and treatment they would have sought had they been told the truth by WWE appointed spokesman and medical consultants and representatives.

## COUNT XIV
## CIVIL CONSPIRACY/FRAUDULENT CONCEALMENT
## (On Behalf of All Plaintiffs Against Defendant WWE)

718.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

719.    For decades, WWE, along with others who were employed by the WWE, including those who participated in the WWE Talent Wellness Program, acted in concert to perpetrate the fraudulent concealment of the connection between repetitive TBI and long-term neurocognitive damage, illness, and decline.

720.    The named Defendants, along with those who participated in the concerted efforts referenced above, knowingly failed to disclose and/or made continuing misrepresentations of material fact that there was an absence of any scientific basis to believe that repetitive TBI created any known long-term neurocognitive risks to WWE wrestlers. That misconduct by the named Defendants exposed Plaintiffs to an increased risk of brain injury and was the proximate cause of the Plaintiffs' brain injuries.

721.    Plaintiffs have suffered personal injuries as a result of the named Defendants' concerted activities.

**COUNT XV**
**INTENTIONAL DEPRIVATION OF STATUTORY RIGHTS**
**UNDER THE FAMILY MEDICAL & LEAVE ACT**
**(On Behalf of All Applicable Plaintiffs Against Defendant WWE)**

722.    Plaintiffs incorporate by reference all of the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

723.    Defendant WWE, operating through and under the control of VKM and his straw men, intentionally violated the statutory rights of Plaintiffs, which scheme is illustrated by examples of the foregoing Count, and as set forth herein.

724.    In 1993, the Family and Medical Leave Act became the law of the United States.  Among other rights, it guaranteed to employees of covered companies the right to receive up to 12 weeks off if an employee suffered a serious injury. *See* Section 102(a)(1)(D) of the Act. 29 U.S.C. § 2601, *et seq.*; 29 C.F.R. § 825.100, *et seq.*

725.    Pursuant to its own SEC filings, the WWE is a company covered by the Family and Medical Leave Act, as are the Plaintiffs, its employees, under any

301

reasonable definition of that word under all applicable law. Misclassification of the Plaintiffs as "independent contractors" through an outrageous contract which ignores the reality of Plaintiffs working conditions does not exempt the WWE from its obligations to the Plaintiffs under the Act, but is in fact an <u>offense</u> under the Act.

726. The Plaintiffs were prevented from becoming aware of their rights under the Act because of the highly coercive culture of the WWE as above alleged as manifested by the requirement of the unconscionable boiler plate Booking Contract and its deliberate and cunning misclassification of the Plaintiffs as "independent contractors".

727. Section 105 of the Act prohibits employers from interfering with or restraining the exercise of any right guaranteed by the Act:

(a) INTERFERENCE WITH RIGHTS. –

(2) EXERCISE OF RIGHTS. – It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title.

Section 105.

728. Under Section 107(a) of the Act it may be enforced through a civil action by employees providing not only for damages, but for the assessment of reasonable attorneys' fees as follows:

(a) CIVIL ACTION BY EMPLOYEES. –

(1) LIABILITY. – Any employer who violates section 105 shall be liable to any eligible employee affected—

(A) For damages equal to –

(i) The amount of –

(I) Any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II)    In a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (*or 26 weeks, in a case involving leave under section 102(a)(3)*) of wages or salary for the employee;

(ii)    The interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii)    An additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 105 proves to the satisfaction of the court that the act or omission which violated section 105 was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 105, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and

B.    for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

729.    As with the Workers Compensation Laws of the various states, and likewise as in the case of OSHA, the Family and Medical Leave Act <u>requires a visible posting of its rights in order for the employees to know about them</u>, as follows:

SEC. 109 NOTICE.

(a) **IN GENERAL.—Each employer shall post and keep posted, in conspicuous places on the premises of the employer where notices to employees and applicants for employment are customarily posted, a notice, to be prepared or approved by the Secretary, setting forth excerpts from, or summaries of, the pertinent provisions of this title and information pertaining to the filing of a charge.**

SEC. 109.

730.   The "Notice" requirement is further codified through 29 C.F.R. § 825.300 Employer notice requirements:

(a) *General notice*. **(1) Every employer covered by the FMLA is required to post and keep posted on its premises, in conspicuous places where employees are employed, a notice explaining the Act's provisions and providing information concerning the procedures for filing complaints of violations of the Act with the Wage and Hour Division. The Notice must be posted prominently where it can be readily seen by employees and applicants for employment. The poster and the text must be large enough to be easily read and contain fully legible text.   Electronic posting is sufficient to meet this posting requirement as long as it otherwise meets the requirements of this section. An employer that willfully violates the posting requirement may be assessed a civil money penalty by the Wage and Hour Division not to exceed $110 for each separate offense…. (2) Covered employers must post this general notice even if no employees are eligible for FMLA leave.**

29 C.F.R. § 825.300(a)(1) and (2).

731.   Failure to notify the employees is punishable by a fine.  In no case did the WWE notify its Wrestlers that they were entitled to benefits under the Family Medical and Leave Act (by posting or otherwise), and in fact actively concealed that right through its coercive culture which required the Wrestlers to agree to the boilerplate "unconscionable boilerplate Booking Contracts" which deliberately and intentionally misclassified them as "independent contractors" in order to deprive them of their rights.

732.   29 C.F. R. § 825.500 also imposes strict record keeping requirements upon employers covered by the Act. FMLA provides that covered employers shall make, keep, and preserve records pertaining to their obligations under the Act in accordance with the recordkeeping requirements of section 11(c) of the Fair Labor Standards Act (FLSA) and in accordance with these regulations.

733.   Among other requirements, the FMLA and its regulations require the employers to make and to preserve records of requests for leave made by employees, for any situation covered by the Act, including personal injury.

734.   The WWE has, with respect to its wrestlers, totally ignored and deliberately evaded its obligations under the FMLA with respect to notifying its employee wrestlers that they were covered by the act, accepting applications for leave, granting required applications for leave, providing benefits as required by the Act, holding jobs available as required by the Act, and keeping records as required by the FMLA.

735.   Failing to keep records as require by the FMLA is deliberate and intentional spoliation of evidence designed and intended to prevent the Wrestler employees for exercising their rights.  Failing to keep records required by law, and to provide notices required by law is a deliberate, and cynical and thus far successful attempt to deprive the Plaintiffs of their rights which has caused them damage.

736.   As a result of being deprived of their rights under the FMLA, the Plaintiffs suffered serious economic and physical damage, consequential damage, loss of earning capacity, and other cognizable damage including punitive damages for which they are entitled as just compensation and attorney fees as may be provided by the Act.

737.   For the reasons set forth above – that the Plaintiffs' rights were intentionally deprived because of an unconscionable contract founded upon an illegal basis in violation of the law and public policy, and further for the reasons set forth in the Count entitled Equitable Estoppel to Statutes of Limitations, any assertion of the affirmative defense of the statutes of limitations and repose ought to be set aside.

**COUNT XVI**
**<u>MANDATORY REPORTING</u>**
**DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a)**
**(On Behalf of All Plaintiffs Against Defendant WWE)**

738.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

739.   The Declaratory Judgment Act 28 U.S.C. 2201 provides that where there is a controversy within its jurisdiction "any court of the United States…may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought".

740.   The several tests for whether a declaratory judgment action is appropriate to the circumstances alleged are set forth in *Grand Trunk W.R.R. Co. v. Consol. Rail Corp.*, 746 F. 2d, 323, 326 (6th Cir.1984), and reiterated many times thereafter such as in *Western World Insurance Company v. Honey*, 733 F.3ed (6th Cir. 2014). The facts of this case as above and herein alleged, amply meet the *Grand Truck* criteria.

306

741.   As above alleged, the OSHA Statute, the Family Medical and Leave Act, and the Workers Compensation Statutes of the various states provide that employees shall receive certain statutory notices and that injuries and workplace conditions be reported. Those notices and the benefits which the Plaintiffs would have received but for the fraud and deception of the Defendants, were never received, but are retained by the Defendants and constitute a portion of the dividends, capital appreciation on WWE stock, salary and benefits paid to VKM, his family and associates and various Trusts by WWE.

742.   The Plaintiffs respectfully request that to the extent that money may compensate, that they be put in the position that they would have had if the Defendant WWE had honored its statutory obligations, and:

A.   that a fair and just amount be determined to provide compensatory medical benefits, retirement benefits, and salary benefits, earning capacity, cost of insurance, including interest on benefits so denied, and such consequential damage and attorney's fees as may be provided by law.

B.   that a fund to be administered under the control of the Court be established to administer the fair and just compensation which ought to be paid to the Plaintiffs as a result of the fraud, deception and coercion of the Defendants, and their cunning scheme to sweep aside Plaintiffs statutory rights, and

C.   To the extent allowed by law, and given the intentional and or wanton and reckless conduct of the Defendants in total disregard of their statutory obligations, that punitive damages be added to the fund and distributed to the

Plaintiffs in a just proportion to their injuries through an equitable formula determined by the Court.

743.    That as a matter of justice and equity, that the reports which ought to have been made to OSHA and to the Administrator of the Family Medical and Leave Act, but were never made, be made now, and that the Plaintiffs be furnished with copies.

**COUNT XVII**
**EQUITABLE ESTOPPEL TO STATUTES OF LIMITATIONS**
**DECLARATORY JUDGMENT ACT, 28 USC § 2201(a)**
**(On Behalf of All Plaintiffs Against Defendant WWE)**

744.    Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

745.    The Declaratory Judgment Act, 28 U.S.C. 2201, provides that where there is a controversy within its jurisdiction "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought".

746.    The several tests for whether a declaratory judgment action is appropriate to the circumstances alleged are set forth in *Grand Trunk W.R.R. Co. v. Consol. Rail Corp.,* 746 F. 2d, 323, 326 (6th Cir.1984), and reiterated many times thereafter such as in *Western World Insurance Company v. Hoey*, 733 F.3d (6th Cir. 2014). The facts of this case as above and herein alleged, amply meet the *Grand Truck* criteria.

747.    The conduct of each of the Defendants with respect to each and every Count and remedy claimed was and continues to be so egregious that to allow the Defendants to assert the affirmative defense of any <u>otherwise</u> applicable statute of

308

limitations (assuming arguendo one will be alleged) would be create an unconscionable injustice and consequently reward the Defendants for conducting a carefully crafted and wrongful course of fraudulent conduct intentionally duping the Plaintiffs into believing that they had no rights available and were mere slaves to the whims of the WWE and VKM, as the controlling shareholder of WWE.

748.   It would further allow the WWE to profit from the diminished cognitive ability of Plaintiffs and thus diminished their capacity to exercise or learn of their rights which progressed over time and which resulted from the conduct of the WWE as herein alleged.

749.   The conduct of the Defendants involves, among other wrongs, fraudulent nonpayment of FICA taxes over a period of years and the filing of fraudulent tax returns based upon the fraudulent misclassification of the Plaintiffs as "independent contractors", as above alleged in detail caused significant monetary damage to the Plaintiffs.

750.   The Plaintiffs cannot now receive a refund of the taxes they were forced to improperly pay because all requests for refunds must be filed within three years of the filing of the return. This is not a case on par with *Levy, et al. v. WWE* (USDC-CT #3:08-01289) which through its holding, concerned a situation as here in which the Plaintiffs were required to pay taxes that were the obligation of the <u>Defendants</u>. In this case we are not talking about a withholding that would have occasioned a refund to Plaintiffs as in *Levy*, but an illegal shifting of taxes mandated be paid by an employer, on behalf of an employee, through the abusive tactics of the WWE as implemented by the racketeering and other activities of its

Chairman Vince McMahon, who controls the WWE individually and through his family trusts and straw men.

751.    However, the matter may be rectified because there is <u>no civil statute of limitation</u>s upon the filing of a fraudulent return for FICA taxes by the Defendant. Therefore, the Defendants may be called upon to pay their fair taxes to the IRS, and upon the same basis, based upon their fraud, pay the Plaintiffs the unjust measure of taxes the fraud cost the Plaintiffs, together with appropriate interest thereon.

752.    The Plaintiffs, as above alleged in more detail, were given Booking Contracts in which it was wrongfully specified that they were "independent contractors". No discussion or negotiation of these ironclad unconscionable "Booking Contracts" was permitted.

753.    The Plaintiffs in overwhelming measure possessed little formal education and had absolutely no knowledge of the differences between an "employee" and an "independent contractor." The Plaintiffs were told by WWE that they were "independent contractors." WWE would tolerate no negotiations on that point and did not ever notify the Plaintiffs of the consequences of the WWE's false and unilateral declaration. The tests employed by Connecticut law and the Internal Revenue Service as stated above to determine classification as independent contractor or employee are far beyond the capabilities of the Plaintiffs to comprehend and evaluate, as was not only well known to the WWE, but relied upon by them in duping the Wrestlers and depriving them of their money and property.

754.    The boilerplate Booking Contract was presented to the Wrestlers by the WWE on an "its my way or the highway" basis. For example, Wrestler Anthony

Norris (a.k.a. Ahmed Johnson) attempted to bring an attorney to the Connecticut office of WWE to discuss the Booking contract. Vincent McMahon told Mr. Norris that "he hates lawyers" and had Norris' attorney escorted off of the property according to Norris. VKM apparently only hates <u>other</u> people's attorneys as he surrounds himself with not only many "in house" attorneys but high-profile outside national firms, and places his attorney confidants as trustees of his family trusts to do his bidding. *See* SEC Filings, Exhibit F hereto.

755.   In contrast to the unrepresented Plaintiff wrestlers, the WWE was represented by some of the most well-known law firms in the USA, some of whose members serve as Trustees for the very VKM's family trusts utilized to control the WWE. In addition at all relevant times the WWE has maintained an internal legal staff, resulting in a situation where the discrepancy in bargaining power between the parties was overwhelming, and the utilization of overwhelming bargaining power and coercive tactics by the WWE at VKM's direction, unconscionable.

756.   The Plaintiffs in overwhelming measure knew that achieving any success in the WWE depended in large part upon whether one pleased Vincent McMahon and his agents, and that attempting any form of dispute with McMahon or his agents would result in either not being hired, or being assigned an unfavorable "gimmick", or any "push" made for your character being eliminated and the wrestler being subjected to "mocking angles" as above described, with their career then essentially ruined. Numerous specific examples of the abusive and unconscionable "keep your mouth shut or else" culture created by the WWE under the direction and control of its Chairman are set forth herein.

757.   The daily life of a typical WWE Wrestler including the Plaintiffs was plagued with fear of unemployment, which fear was intentionally created by Vincent McMahon and his agents through the WWE to keep unquestioned control over the Wrestlers in order to reap the most profits for himself through the enterprise he controlled, the WWE.  The wrestling "culture" established over the years and continued by the WWE required that "the wrestler who does not obey orders is blacklisted". See "Bodyslam from the Top Rope: Unequal Bargaining Power and Professional Wrestling's Failure to Unionize", 12 U. Miami Ent. And Sports L. Rev. Dall 1994/Spring 1995, footnotes 175-177 and associated text.

758.   An example is Brian Clark who was recruited to WWE by a former well known WWE Wrestler turned WWE Agent "Sgt. Slaughter". Mr. Clark passed his "try out" in Charleston, SC and then was mailed a boilerplate Booking Contract by WWE to his home in Atlanta, Ga. Mr. Clark read the contract, and fully understood that there was no "negotiating" allowed. Mr. Clark had no idea that he was not being classified as an employee, or that there were any financial and physical consequences he would suffer as a result of the misclassification.

759.   Clark was never told that he was an "independent contractor" and has no idea what the difference between an "independent contractor" and an employee is. Clark alleges that there was no "independence" for wrestlers who worked for the WWE – you did as you were told, the matches came out as you were told, props used (such as chairs) were utilized when you were told, wrestling moves were included or removed –all as dictated by WWE. Clark alleges that WWE provided the

schedule, told you when and where to arrive and what you were to do, day after day.

760.  Mr. Clark observed that if anyone complained at WWE they were not around long. He was a "mid-level" wrestler. The men constantly complained to each other about injuries, the long schedule, constant traveling and poor pay, but they dared not complain to management knowing what the result would be swift and certain.

761.  On September 23, 2001, Mr. Clark was wrestling in a match in Pittsburg, PA televised on "pay per view" when he was "choke slammed" by the "Undertaker" which seriously injured two disks in his neck which later required surgery.

762.  Clark alleges that he suffered numerous concussions such as but not limited to having his head driven into a ring post by Savio Vega such that he lost track of his surroundings. Clark also alleges further that on 12/28/93 while wrestling Tatanka in Canton, Ohio he was suffered a very serious head blow when Tatanka landed on his skull after jumping on Clark from a top rope.  Clark alleges that Vince McMahon attended most televised or taped for television programs, and was readily available to personally witness the injuries experienced by the wrestlers. Having occasionally wrestled himself, McMahon would surely know how it felt to be smashed into the "mat" or the dangers of a "pulled punch" connecting instead of missing.

763.  Further Clark suffered serious shoulder injuries from the grinding schedule. He informed Vince McMahon of these injuries who tried to talk him out

of the need for surgery claiming that WWF needed Clark right then. However, the pain was too severe and Clark had shoulder surgery, which he had to personally pay for. This payment was a direct result of the WWE misclassifying the Wrestlers as independent contractors so as to save on Worker's Compensation premiums, well knowing that the Wrestlers would not comprehend what had been done to them.

764.   "Wrestling promoters call all of the shots: who will win, how they will win, how long the match will take . . . the wrestler who does not obey orders is blacklisted" N.Y. Times 11/9/1985, Section 1, page 27. The vast majority of the Plaintiffs are prepared to support that statement with respect to the WWE and its policies, with their testimony, and therefore allege it.

765.   Further, the types of injuries which wrestlers suffer – repeated head and body trauma, repeated concussions, are the very injuries that cause dementia and diminished intellectual capacity over time and thus increase even further the substantially disparate bargaining power of the Wrestlers and the WWE, all as known to the WWE, as the wrestlers suffer from cognitive decline, and the Booking Contracts are renewed.

766.   It is inevitable from the brutal nature of the performances scripted by the WWE that the Wrestlers become injured and require prolonged physical rehabilitation and surgery. Since their misclassification as "independent contractors" prohibited them from receiving workers compensation benefits (as well as the WWF never providing the notifications of the availability of such

benefits required by nearly all states) often the wrestlers were required to pay their own medical expenses as was Mr. Clark, or simply lose their career.

767. The circumstances surrounding the procurement, execution and maintenance of the unconscionable boilerplate Booking Contracts under the direction of VKM and his minions which included (but are not limited to):

A. Creation of an atmosphere where the Plaintiffs reasonably believed that WWE would not deal with any attorney for the Plaintiffs in good faith to negotiate a contract, but instead would demand a "take it or leave it" signing making any attempt at negotiation a virtual guarantee of injury to employment opportunities;

B. Intentional concealment of the rights of employees to the protections of numerous state and federal statutes, including but not limited to OSHA, Family Medical and Leave Act and the Workers Compensation acts of the various states, and the opportunity to organize and unionize under the National Labor Relations Act, including failure to provide required notices all as a part of a cunning scheme to profit the Defendants at the expense of the Plaintiffs;

C. Subjection of the Wrestlers to discipline or discharge for the exercise of their rights of free speech pursuant to the First Amendment of the Constitution of the United States and/or rights guaranteed by the Constitution of the State of Connecticut (First Article, Sections 3,4,14);

D. Systematic spoliation of or failure to maintain records required under OSHA, Family Medical and Leave Act and the Workers Compensation acts of the various States; thus knowingly and effectively suppressing evidence of its

own wrongdoing and committing hundreds of violations of federal and state statutes set forth in sub-paragraph B above.

        E.      Creating the certainly among the Wrestlers that if they requested any rights in a meaningful way that any "push" their character had would be stopped, and that their character would be subjected to humiliation, and all other steps taken to diminish their economic opportunities at WWE and in any other wrestling venue, thus effectively ending their careers.

    768.   "The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances." *Cheshire Mortgage Service, Inc.* v. *Montes,* 223 Conn. 80, 89, 612 A.2d 1130 (1992). The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." (Citations omitted; internal quotation marks omitted.) *McKenna* v. *Delente*, 123 Conn. App. 146, 158, 2 A.3d 38 (2010). "[T]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case." (Internal quotation marks omitted.) *Crews* v. *Crews*, 295 Conn. 153, 163, 989 A.2d 1060 (2010).

    769.   "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Internal quotation marks omitted.) *Hottle v. BDO Seidman, LLP, supra,* 268 Conn. 719.

770. The elements of "unconscionability" permeate the WWE-Wrestler relationship as above alleged. For example:

      A. The contract flatly declares that the Wrestlers are "independent contractors" in one paragraph, while the remainder of the contract is devoted to controlling every aspect of the Wrestler's work, thus rendering them unquestionably employees;

      B. The execution of the contract without questions by the Plaintiffs was achieved by the establishment of a coercive culture in which were made to understand that any questioning of the dictatorial control of VKM would result in their unemployment or the Booking Contract withdrawn;

      C. The deliberate misclassification of the Wrestlers by the WWE is designed to profit the WWE by eliminating the need of WWE paying FICA taxes at the federal level and State unemployment taxes, Workers Compensation and other benefits but instead piling them upon the wrestlers;

      D. Depriving the Wrestlers of unemployment benefits through the misclassification, thus making them more dependent upon WWE;

      E. Depriving the Wrestlers of their otherwise federally guaranteed right to organize and unionize under the National Labor Relations Act;

      F. Depriving the Wrestlers of the protections of a safe workplace and protective headgear as would otherwise be required by the National Labor Relations Act;

      G. Depriving the Wrestlers of Worker's Compensation insurance thus causing all of them to bear the costs of injuries suffered on the job during

their employment as a result of directions received from the WWE, or simply to lose their employment as the result of on the job injuries that cannot be repaired because of lack of insurance to save the WWE very substantial Workers Compensation insurance costs;

H.      Deliberately depriving the Plaintiff Wrestlers of the protections afforded to them by receiving notice of their rights under the Family Rights and Medical Leave act, and the Occupational Health and Safety Act, which required notices specifically inform the Wrestlers that they may not be discharged or discriminated against in their jobs for the mere exercise of rights which these statutes provide.

771.   All of the benefits to the WWE alleged in the preceding paragraph were achieved by the WWE through its controlling agent VKM and his straw men, at the expense of the Wrestlers through:

A.      The establishment and enforcement of a dictatorial wrestling culture in which the Wrestlers were indoctrinated to believe that Vince McMahon and the WWE "hated attorneys" (other than his own minions of course) and that utilization of any attorney to negotiate the "standard form" WWE "unconscionable boilerplate Booking Contracts" would result in  elimination of the Wrestler from consideration for employment, or the assignment of an unfavorable "gimmick" which would result in a short and unprofitable career;

B.      The employment by Chairman VKM and the WWE of numerous highly experienced attorneys, both in house and outside counsel, whose job was to protect the interests of WWE and VKM at the expense of what they knew was the

largely uneducated and totally unsophisticated Wrestlers employed by WWE – whose lack of education and knowledge of contractual terms was very well known to VKM, other top executives of WWE, and to the attorneys working for WWE who crafted the oppressive and unconscionable "Booking Contracts" that the Plaintiffs were required to sign without asking questions;

C.     All aspects of control over the Wrestler's career and opportunities for success were vested in and carefully guarded by the WWE. Whether the Wrestler won or lost was determined by the WWE. Whether he was to be smashed in the head or victimized by the application of extremely dangerous moves such as the "pile driver" or being smashed by a 250+ pound opponent jumping from the top of the corner post on to a Wrestler laying prone on the ring floor, whether he would be given time off to recover from injuries received not only on the job, but as a result of the directions of the WWE –all of this was totally controlled by the WWE which routinely flaunted statutory requirements pursuant to the direction and control of VKM;

D.     Further, where the Wrestlers performed, who their opponents were, what costumes they wore, whether characters would be "good" or "evil" and would be pushed (i.e. allowed to win) or remain stepping stones for other characters who were being "pushed" was all at the control of the WWE;

E.     In other words there was not only orders of magnitude in the intellectual and economic disparity brought to bear by the WWE against the Wrestlers in establishing the "Booking Contracts" and keeping the Wrestlers ignorant of the rights they intended to lose by signing these boilerplate Booking

Contracts, but once the contracts were signed the WWE's complete "choke hold" over the success or failure of the Wrestler's careers and physical well-being made effective dissent or meaningful bargaining or complaint virtually impossible.

772. The Plaintiffs careers were routinely manipulated, their health jeopardized, their injuries buried instead of being reported to authorities as required by law, WWE's required employer social security contribution fraudulently taken from them, their insurance premiums increased, and they were routinely denied the protection of laws applicable to their actual employment standing and position, such as Worker's Compensation, the Family Medical Leave Act, OSHA, and the ability to organize and negotiate as a union under the National Labor Relations Act –all as routinely applicable to all other professional athlete-entertainers.

773. In addition, even in the face of applicable regulatory penalties, the WWE routinely deprived the Wrestlers of the notices required by the various State and Federal Acts under which they had rights in spite of statutory requirements and specific Regulations started above that those Notices be provided, all as an integral part of a conspiracy to deprive the Wrestlers of their rights and to wrongfully convince them that they had no rights and no ability to protest if their employment was to continue.

774. The "Notice Posting" requirements of Workers Compensation Laws, FMLA and OSHA are specifically designed to draw the attention of unsophisticated and uninformed workers to knowledge of rights important to their personal health and safety, which were and are protected by these statutes. Such statutes have

been universally recognized as remedial in nature requiring liberal interpretation to accomplish their beneficial purposes. Manifestly a "contract" whose objective is to thwart knowledge of these rights and their exercise is per-se unconscionable, unenforceable, procured by fraud, and void *ab initio*.

775.    Additionally, as an integral part of the cunning scheme to deprive wrestlers of their rights, the WWE routinely ignored and actively circumvented the very record keeping requirements established by the Family Medical and Leave Act, OSHA and state Workmen's Compensation laws that would have allowed verification and quantification of the rights lost by the Wrestlers, the injuries suffered, and the monetary damages and benefits lost. This deliberate and cynical flaunting of applicable state and Federal Regulations by the WWE constitutes spoliation of evidence for which the WWE should be held to account for the damage it has caused its employees.

776.    The WWE cynically manipulated the careers of their wrestlers to prevent them from questioning the WWE's dictatorial control over their careers and to suppress their complaints.

777.    As has been alleged in detail in this Complaint, the wrestlers were subjected to a culture of fear for their economic and physical lives. Their bodies accumulated numerous debilitating injuries over time, all as known to the WWE, and these injuries and the lack of proper work protections and medical care made them by the day more dependent upon their WWE payments. In turn, those payments diminished as their careers were limited by injuries and the consequent disapproval by the WWE of any inability to perform while injured.

778.   In addition, many Plaintiffs from time to time were not wrestling under a "unconscionable boilerplate Booking Contracts" but under a "handshake deal" in which the only specified term was that a Wrestler would show up at the appointed time and place and perform as directed for a specified payment.

779.   Every contract, written or otherwise, imposes upon each party a duty of good faith and fair dealing in its performance and in its enforcement, including the duty not to interfere with the other party's performance, and further to act so as not to destroy the reasonable expectations of the other party regarding the fruits of the contract.

780.   The course of conduct of the Defendant WWE, under the direction and control of Defendant VKM and his straw men, deprived Plaintiffs of the fruits of their contracts, undermined and virtually abolished their careers, and was designed, intended and had the actual effect of depriving the Plaintiffs of:

A.   Not only a safe work place, but also the knowledge that the WWF was mandated by statute to post and display notices concerning rights under OSHA. *See* Exhibit J: REQUIRED OSHA Notice of Rights;

B.   Not only lack of Worker's Compensation benefits, but also the knowledge that the WWF was mandated by statute to post and display notices concerning rights under Worker's Compensation Laws.

C.   Not only the protections of the Family and Medical Leave Act, but also the knowledge that the WWF was mandated by statute to post and display notices concerning rights under the Family and Medical Leave Act. *See* Exhibit K: REQUIRED FMLA Notice of Rights.

781.   Courts, applying equitable principles, have laid down the doctrine of equitable estoppel by which a defendant may be estopped by his conduct from asserting defenses such as the statute of limitations. 51 Am.Jur.2d, Limitation of Actions, §§ 431-452; notes, 43 A.L.R.3d 429 and 44 A.L.R.3d 760. "Estoppel rests on the misleading conduct of one party to the prejudice of the other." Spear-*Newman, Inc. v. Modern Floors Corporation*, 149 Conn. 88, 91, 175 A.2d 565, 567. "In the absence of prejudice, estoppel does not exist." *Novella v. Hartford Accident & Indemnity Co.*, 163 Conn. 552, 563, 316 A.2d 394, 401 (1978). *Morris v. Costa*, 392 A.2d 468, 174 Conn. 592 (Conn. 1978).

782.   The conduct of the WWE at the direction and control of its Chairman VKM, as above alleged, was specifically intended and directed to mislead, deceive and coerce the Plaintiffs into believing that they had no rights under the various statutes outlined above, no rights to have the WWE pay its fair share of FICA and FUTA taxes, no rights to Workers Compensation Coverage, no rights to medical benefits, no rights to a safe workplace, no rights under the Family Medical and Leave Act, no rights to receive Notice Postings required by statute – in other words, no rights whatsoever that any *other* WWE employee would have, including the rights of other employees to participate in the retirement plan or other incentive plans offered to WWE employees who were not Wrestlers or Referees.

783.   The WWE at the direction and control of its Chairman VKM, as above alleged, specifically intended to prejudice the Plaintiffs by creating a work place atmosphere in which the Plaintiffs were denied whistleblower rights, and knowledge of such rights, and in which they would believe that any questions

about their Booking Contracts or "handshake" contracts would result in the effective end of their careers and their ability to make enough money to support their families and pay for the medical treatment necessitated by the work injuries inevitably accumulated through the unsafe work place in which they were required to perform by the WWE.

784.   The WWE under the direction and control of its Chairman VKM intentionally undertook to sidestep the reporting requirements of the Workers Compensation Law, OSHA, and FMLA in order that the true extent of the injuries to the Wrestlers not become known and that evidence thereof would not be maintained but instead suppressed to profit the WWE and VKM.

785.   The "unconscionable boilerplate Booking Contracts" and intentionally designed coercive "keep your mouth shut" culture of the WWE, created and energized by its Chairman VKM, were integral parts of depriving the Plaintiff Wrestlers of their legal rights, money, property and business opportunities in order to benefit the WWE, prop up its stock price and therefore the value of holdings of VKM and his family, and aggrandize the compensation to and dividends received by VKM and his family all to the detriment of the Plaintiff Wrestlers.

786.   Wherefore, the Plaintiffs contend and request that the Booking Contracts are and were unconscionable for the reasons set forth above, and their unconscionability of those contracts is a factor to be considered in equitable estoppel.

787.   Further, the unconscionable boilerplate Booking Contracts procured by fraud, deception, coercion and manifestly unequal bargaining power from the

Plaintiffs resulted in substantial prejudice to the Plaintiffs in that they were forced to pay an unjust share of FICA and FUTA taxes on their salaries, denied unemployment benefits, denied medical benefits under worker's compensation statutes, denied compensation for lost wages, disfigurement and permanent injuries under workers compensation statutes, denied participation in retirement plans, denied a safe work place under OSHA, and denied valuable rights under the Family Medical and Leaver Act –all at very substantial prejudice to their monetary interests, employment opportunities, and physical health and safety.

788.   Wherefore, Plaintiffs contend that any "statute of limitations defense must be set aside because of the unconscionable and unjust under the circumstances set forth above, the intentional failure to report evidence of injury, the known cognitive decline occasioned by such injury, and the intentional deprivation of rights guaranteed by numerous state and federal statutes, and the continuous pattern of racketeering activity engaged in for over twenty years.

789.   Wherefore, Plaintiffs contend that any statute of limitations defense must be set aside as unjust in the light of the intentional deprivation of notices required by remedial statutes to be given to the Plaintiffs which were intentionally concealed from them, and which concealment resulted in damage.

790.   Wherefore, Plaintiffs contend that any statute of limitations defense must be set aside because the effects of the accumulated physical injuries to the Plaintiffs were made significantly worse by the deprivation by the WWE of the statutorily required notices to Plaintiffs which were specifically designed to protect their lives and safety.

791. Wherefore, Plaintiffs contend that any statute of limitations defense asserted in response to any claim of this Complaint must be set aside because Defendant WWE under the control of its Chairman VKM, instead of gathering evidence and reports of injuries with respect to the Plaintiffs as required by OSHA and FMLA, and the Workers Compensation Laws of the several states in which the Plaintiffs worked, rather conspired to flaunt such reporting requirements to the detriment of the lives and safety of the Plaintiffs, and to the financial aggrandizement of the Defendants. The Plaintiffs were by fraud and coercion, led to believe that they were in fact "independent contractors" with no rights of employees, and that to even question that status would lead to swift unemployment, humiliation, and ruination of any job future prospects.

792. Further, it would be inequitable, unconscionable, and a reward to outrageous and illegal behavior to allow or affirm any statute of limitations defense to the claims asserted hereunder under the circumstances alleged in detail throughout the Complaint that the Defendants knew (or upon any reasonable inquiry should have known) that:

A. the Plaintiffs were *de facto* employees of the Defendants under any reasonable application of the legal definition of that word, but were coerced and duped into acquiescing into a fraudulent independent contractor status;

B. that employment placed substantial physical demands upon the Plaintiffs as a result of their performances as established by VKM in control of WWE, and consequently by WWE;

C.        as the result of inevitable repeated head trauma and accumulated brain injury deriving from their performances, often the result of choreographed smashes to the head by metal chairs or exceedingly dangerous moves such as the "piledriver," or jumping onto someone who is prone on the mat from a the top of a ring post and countless "body slams," the Plaintiffs would suffer permanent injuries to their cognitive abilities, their ability to process and comprehend information;

D.        as the result of the policy of WWE as established under the control of VKM that the Plaintiffs were required to work injured, to continue wrestling even after they had suffered obvious concussions, were dazed from being hit on the head, were knocked out, and otherwise suffered serious injuries;

E.        that the Defendants knew that the Plaintiffs in large part were uneducated, had little to absolutely no knowledge of the legal system or contract law, had no concept of the consequences of being classified as an "independent contractor" –and were frankly completely and thoroughly taken advantage of and duped by their employer under the guidance and control of Defendant VKM;

F.        as a result of the lack of any meaningful medical care or ability to review during the performance injuries which each of the Plaintiffs suffered on multiple occasions that the injuries would progress and worsen;

G.        as a result of the substantial and disabling accumulated effects of the numerous physical injuries sustained from their employment;

H.      as a result of the effect that accumulated blows to the brain and painful injuries to the rest of their bodies had upon the abilities of the Wrestlers to remember, to have any capacity to understand and grasp their rights;

I.      as a result of the calculated and cunning campaign of the WWE under the direction and control of its Chairman VKM to conceal from the Plaintiffs their rights to medical care, medical insurance, unemployment benefits, workers compensation benefits, the right to a safe workplace under OSHA, the right to organize a labor union to improve their working conditions, their rights to leave to recover from serious injuries sustained under the Family Medical and Leave Act;

J.      as a result of the creation of an atmosphere of fear and intimidation by the Defendants through which the Plaintiffs were coerced into asking no questions under fear of being unemployed with broken bodies and no salary to obtain medical care or support their families –where Defendant VKM caused the wrestlers that he hated dealing with attorneys and therefore would not  tolerate their use of legal counsel –while at the same time employing dozens of highly skilled attorneys to protect his own interests and those of WWE.

793.   Wherefore, Plaintiffs contend that any statute of limitations defense asserted in response to any claim of this Complaint must be set aside because it would be unjust and inequitable under the facts as above alleged taken in the light of applicable law and the fundamental mandate of this Court to do justice in every case.

794.   To allow the Defendants to assert a statute of limitations defense under circumstances where the Defendants intentionally engaged in a systematic

course of wrongful behavior and deprivation of rights continuing well over twenty years and to this very day, would be to handsomely reward unconscionable conduct.

**COUNT XVIII**
**AN ACCOUNTING AND DISGORGEMENT OF UNJUST AND ILLEGAL PROFITS**
**(On Behalf of All Plaintiffs Against Defendants WWE AND VKM)**

795.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

796.   Given that the unconscionable boilerplate booking contracts ought to be declared void ab initio for the reasons alleged above, the "royalty" provisions of those contracts are also null and void, and were procured by the same fraud, duress, and improper conduct which permeated the entire "Booking Contract" scheme.

797.   Under such circumstances the Plaintiff-wrestlers have equal rights with the WWE to the money earned from their images and performances, and the use of their persona to generate income.

798.   Under such circumstances, the Plaintiffs have equal rights to the ownership of their own intellectual property consisting of their performances, images, and all paraphernalia and promotions using their images, likenesses and persona rights to which were unjustly taken from them through the fraudulent imposition upon them of the unconscionable boilerplate Booking Contracts.

799.   As alleged, instead of being paid equally and equitably in accordance with their rights to their own images and taped performances, the fraudulently procured unconscionable contracts have been utilized to deprive the Plaintiffs of

their just portion of earnings derived from the unlawful use of their images and performances by the WWE under the direction and control of its Chairman and controlling shareholder Vincent K. McMahon.

800.   The Plaintiffs therefore have equal copyright interests in their intellectual property with the WWE and are entitled to a full and accurate accounting of money earned and a full and equitable share of the profits earned, which thus far have been illegally converted and retained by the WWE.

801.   The Plaintiffs after the provision of a proper accounting are entitled to their fair share (50%) of the profits earned, together with interest and the costs of this action due to the wrongful withholding by the Defendant WWE, which has been ongoing over the last two decades, and continues until this day, and indeed increases with every wrongful and unfair distribution made by the WWE.

802.   The profits after accounting, should be disgorged by the WWE and Vincent K. McMahon, the originator of the scheme, to the Plaintiffs, together with interest and costs, and as a matter of justice and equity, the Court should appoint a receiver to take charge of the proceeds and content of the WWE media library and make equitable distributions therefrom to the Plaintiffs.

**COUNT XIX**
**UNJUST ENRICHMENT**
**(On Behalf of All Plaintiffs Against Defendants WWE and VKM)**

803.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all Exhibits referenced.

804.   Defendants have willfully and consciously engaged in a massive and profitable scheme, pattern and/or practice of misrepresenting Plaintiffs'

employment, fraudulently concealing and omitting the long-term injuries the Plaintiffs suffered, and failing to uphold their duty to provide Plaintiffs with necessary care and treatment, expressly designed to enrich Defendants at the expense of Plaintiffs.

805. The Defendants have obtained substantial benefit as a direct result of their fraudulent misrepresentation, concealment, and omission, which in equity and good conscience they should not be able to keep.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and Plaintiffs' Spouses pray for judgment as follows:

A. Declaratory relief requested pursuant to 28 USC § 2201 against the WWE;

B. Granting an injunction and/or other equitable relief against the WWE and in favor of Plaintiffs for the requested medical monitoring;

C. With respect to Count V, Violation of ERISA:

1. An order reforming the Defendants ERISA Plans to include Plaintiffs, and requiring Defendants to pay restitution or otherwise credit Plaintiffs for all ERISA benefits to which they are retroactively entitled;

2. An order of restitution for the reasonable value of the benefits Plaintiffs are entitled to prevent Defendants' unjust enrichment;

3. An injunction barring Defendants from continuing to misclassify wrestlers as "independent contractors" and to classify them as "employees";

4.  An award of attorneys' fees, plus the costs and expenses of this action;

5.  Pre-and post-judgment interest, as afforded by law;

6.  Any other relief in equity as may be justified by the proof;

D.     Granting Plaintiffs and Plaintiffs' Spouses an award of compensatory and punitive damages against the WWE Defendants;

E.     With respect to all counts, awarding Plaintiffs and Plaintiffs' Spouses such other and further relief as may be appropriate; and

F.     Granting an award to all Plaintiffs and Plaintiffs' Spouses of prejudgment interest, costs and attorneys' fees.

G.     Granting multiple damages and attorney's fees under those Counts where applicable statutes permit the same.

H.     Disgorgement of all proceeds flowing from Defendants' unjust and unlawful fraudulent pattern and practice of misrepresenting, concealing, and omitting necessary information from Plaintiffs.

I.     For such other relief, the assessment of economic and consequential damages, damages for pain and suffering, damages for enjoyment of life, damages provided by statute;

J.     For such other relief as may be requested throughout the Complaint, or as may be provided under any theory of law, which may be applicable to the facts as they are alleged or as they may be proven at trial (whether designated to a particular Count or not), including all other relief as may be just and proper.

## JURY DEMANDED

**Plaintiffs hereby demand a trial by jury on all matters so triable.**

**Signed this 9th day of November, 2016.**

**Respectfully submitted,**

**/s/ Konstantine W. Kyros**
**Konstantine W. Kyros, Esq.**
**Bar no. ct30132**
**KYROS LAW OFFICES**
**17 Miles Road**
**Hingham, MA 02043**
**Telephone: (800) 934-2921**
**Facsimile: 617-583-1905**
**kon@kyroslaw.com**

**Brenden P. Leydon, Esq.**
**TOOHER WOCL & LEYDON LLC**
**80 4th Street**
**Stamford, Connecticut 06905**
**Telephone: (203) 517-0456**
**Facsimile: 203-324-1407**
**BLeydon@tooherwocl.com**

**S. James Boumil, Esq.**
**BOUMIL LAW OFFICES**
**120 Fairmount Street**
**Lowell, Massachusetts 01852**
**Telephone: (978) 458-0507**
**SJBoumil@Boumil-Law.com**

**Anthony M. Norris, Esq.**
**KYROS LAW OFFICES**
**17 Miles Road**
**Hingham, Massachusetts 02043**
**Telephone: (603) 995-1792**
**Facsimile: (617) 583-1905**
**anorris@kyroslaw.com**

**Erica C. Mirabella, Esq.**
**MIRABELLA LAW LLC**
**132 Boylston Street, 5th Floor**
**Boston, Massachusetts 02116**
**Telephone: (617) 580-8270**
**Facsimile: (617) 583-1905**

erica@mirabellaLLC.com

R. Christopher Gilreath, Esq.
GILREATH & ASSOCIATES
200 Jefferson Avenue, Suite 711
Memphis, Tennessee 38103
Telephone: (901) 527-0511
Facsimile: (901) 527-0514
chrisgil@sidgilreath.com

*Counsel for Plaintiffs.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2016, a copy of the foregoing Complaint was served via this Court's electronic case filing system.

/s/ *Konstantine W. Kyros*
Konstantine W. Kyros