1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF CONNECTICUT

3
    ---------------------------x
4   RUSS MCCULLOUGH, ET AL
                Plaintiffs,        3:15CV1074 (VLB)
5
                vs.
6
    WORLD WRESTLING                March 9, 2017
7   ENTERTAINMENT, INC.,
                Defendant
8   ---------------------------x

9                                  Federal Building
                                   450 Main Street
10                                 Hartford, Connecticut

11

12                        **ORAL ARGUMENT**

13

14

15  Held Before:
        The Honorable Robert A. Richardson
16          U.S.D.C. Magistrate Judge

17

18

19

20

21

22

23                   FALZARANO COURT REPORTERS, LLC
24                        4 Somerset Lane
                         Simsbury, CT 06070
25                          860.651.0258

```
 1        APPEARANCES:

 2             For the Plaintiffs:

 3                  KYROS LAW OFFICES
                    17 Miles Road
 4                  Hingham, MA 02043
                    800.934.2921
 5                       By:  KONSTANTINE KYROS, ESQ.
                              Kon@kyroslaw.com
 6                            ANTHONY M. NORRIS, ESQ.
                              Anorris@kyroslaw.com
 7
                    SYLVESTER J BOUMIL, ESQ.
 8                  120 Fairmount Street
                    Lowell, MA 01852
 9                  978.458.0507
                    SJBoumil@Boumil-Law.com
10
                    TOOHER WOCL & LEYDON, LLC
11                  80 Fourth Street
                    Stamford, CT 06905
12                  203.324.6164
                         By:  BRENDEN P. LEYDON, ESQ.
13                            Bleydon@tooherwocl.com

14             For the Defendant:

15                  K&L GATES LLP
                    210 Sixth Avenue
16                  Pittsburgh, PA 15222
                    412.355.6500
17                       By:  JERRY S. MCDEVITT, ESQ.
                              Jerry.mcdevitt@klgates.com
18                            CURTIS B. KRASIK, ESQ.
                              Curtis.krasik@klgates.com
19                            STEFANIE M. LACY, ESQ.
                              Stefanie.lacy@klgates.com
20
                    DAY PITNEY LLP
21                  242 Trumbull Street
                    Hartford, CT 06103
22                  860.275.0164
                         By:  JEFFREY P. MUELLER, ESQ.
23                            Jmueller@daypitney.com

24        Also Present:

25             John Fries
               Law Clerk
```

```
1                    (Commenced:  1:10 p.m.)

2

3              THE COURT:  Good afternoon.  Please be

4         seated.  We are here on Russ McCullough, Et

5         Al versus World Wrestling Entertainment,

6         Inc., docket number, 3:15CV1074 VLB.  I'm

7         Judge Robert Richardson.  Will counsel please

8         identify themselves for the record.

9              MR. KYROS:  Konstantine Kyros for the

10        plaintiffs.

11             MR. BOUMIL:  James Boumil, your Honor,

12        for the plaintiffs.

13             MR. NORRIS:  Anthony Norris for the

14        plaintiffs.

15             MR. LEYDON:  Brenden Leydon also for the

16        plaintiffs.  Good afternoon.

17             MR. MCDEVITT:  Jerry McDevitt for the

18        defendants, your Honor.

19             MR. KRASIK:  Curtis Krasik for the

20        defendant, your Honor.

21             MS. LACY:  Stefanie Lacy for the

22        defendants, your Honor.

23             MR. MUELLER:  Jeffrey Mueller from Day

24        Pitney for the defendants, your Honor.

25             THE COURT:  Okay.  Thank you.  Good
```

1        afternoon.

2              So, we are here on the final motion --

3        well, the final motion for sanctions that is

4        before me.  When we last left off, we had

5        finished oral argument on the request to

6        withdraw the admissions.  I reserved a

7        ruling.  We had argued the first motion for

8        sanctions relative to the interrogatory and

9        discovery responses.  And then both sides

10       agreed that it made sense to pick another

11       date to come back and argue the final motion

12       for sanction, at least the final motion

13       that's been referred to me.  As I understand

14       it, there's actually another motion for

15       sanctions that's pending as well, but that

16       has not been referred to me.

17             So, I have reviewed the briefs, as I

18       had indicated before.  I reviewed the briefs

19       in advance of the last hearing date.  I have

20       reviewed them again.  So I don't need you to

21       go into great detail, at least in terms of

22       what's in the briefs.

23             I have reread my notes and I do have

24       some questions for each of you.  I will

25       certainly let you make presentations, to the

1      extent that you want to, and to the extent

2      that you have prepared in the off week to

3      make opening statements or general arguments.

4      But again, I will remind you that I have read

5      the briefs in great detail and have read them

6      yet again in preparation for today.

7          One question that I have, I think, for

8      both sides, but it's probably more relevant

9      for the movant is I understand and appreciate

10     that you are not responsible for the division

11     of the various motions in this case, that is,

12     that you have a motion to dismiss -- you have

13     a couple of motions to dismiss pending right

14     now, and they are before Judge Bryant, and

15     she has referred the motion for sanctions for

16     me, and I will give this more thought.

17         But I guess one concern that I have is

18     to the extent that you are asking for

19     dismissal as a sanction, or for that matter,

20     even something less than a dismissal -- I

21     know your preferred option is a dismissal --

22     but as it relates at least to the merits of

23     the claim, that is, for instance, the

24     misclassification where you make certain

25     arguments in your motion to dismiss, whether

1        it's related to certain claims supposedly

2        being time barred or not creating a private

3        right of action, etcetera, etcetera.  I guess

4        my question is is it premature for me to rule

5        on those particular issues until Judge Bryant

6        weighs in on the underlying merits?  And the

7        reason I ask that is, in theory, if I were to

8        say, yes, these claims are time barred or

9        they lack merit or there is no private right

10       of action and therefore I am sanctioning them

11       -- I'm not saying that's where I am heading,

12       but if I were to say that, wouldn't you still

13       run the risk that Judge Bryant, who is

14       ultimately going to rule on the motion to

15       dismiss, if she then says, well, I think

16       they're actually not time barred, there is

17       some exception out there, whether it's

18       equitable tolling or continuing violation or

19       something like that, that tells me that these

20       claims do have merit, don't we have

21       inconsistent decisions where I have then

22       sanctioned them for something that Judge

23       Bryant says, well, actually the claim doesn't

24       lack merit or this does create a private

25       right of action?  And I think that is one

```
 1            thing that is weighing heavily on my mind.
 2                 And again, I know you're not
 3            responsible for how we are here; that you've
 4            got one judge deciding one group of motions
 5            and another judge deciding another one, but I
 6            will tell you that that is something that is
 7            causing me concern.  You don't necessarily
 8            have to answer that right now.  I will let
 9            each of you do presentations, but that is a
10            question that I would like to have
11            clarification for from both parties at some
12            point before the end of the day.
13                 So that having been said, are both
14            lawyers ready to proceed with respect to
15            their argument?
16                 MR. MCDEVITT:  We are, your Honor.
17                 THE COURT:  Okay.  Then why don't we go
18            forward on behalf of the defendant, the
19            movant, Attorney McDevitt.
20                 MR. MCDEVITT:  Your Honor, before I
21            begin our presentation, I actually spent a
22            lot of time thinking about the very point you
23            just raised, and it's a tough question.  I
24            may not even have the answer for that.
25                 Some of the claims, we think, are so
```

1          foreclosed by Judge Bryant's ruling that you

2          can make a clear determination that the

3          assertion of them here were violative of her

4          prior order.

5                    We think Judge Dorsey's order and

6          opinion in the Levy case forecloses the very

7          claims that are here.  And we think you can

8          make a ruling on that.

9                    I understand your point about the

10         possible inconsistency of you finding that

11         they've asserted claims that perhaps are

12         meritless and the theoretical possibility

13         that Judge Bryant may conclude otherwise.

14         And I understand the court's desire to avoid

15         that.

16                   I don't know if you talk with Judge

17         Bryant about such things or not.  I've

18         thought about that.  I don't know the answer

19         to that.

20                   Some of the other sanctions we've asked

21         for, your Honor, are kind of independent of

22         the fact that they have filed a first amended

23         complaint, we had to incur substantial costs,

24         filing a 75-page motion to dismiss, the Rule

25         11 motion, and the motion to dismiss on

1        behalf of Mr. McMahon in connection with the
2        original complaint because they refused to
3        correct the Rule 11 problems during the safe
4        harbor period, and waited until it was over,
5        and we went and filed all those papers, which
6        they then filed a first amended complaint,
7        and as we pointed in our sanction motion
8        there, they haven't fixed either.
9              I don't know what Judge Bryant is going
10       to do with the other sanctions motion, your
11       Honor.  They don't have -- I think they have
12       to file their answers to both March 15th.  I
13       don't know if Judge Bryant is contemplating
14       perhaps referring that sanction motion to
15       you.  I thought about the possibility of
16       perhaps waiting until Judge Bryant issued her
17       ruling on certain things and then taking up
18       certain portions of both the sanctions
19       motions to find if they had a good faith
20       basis for making some of the allegations that
21       they've made or more precisely the claims
22       that they've asserted.  And maybe there is
23       some judgment that that's a better time to
24       make a sanction call on certain things, after
25       you get the judge's ruling on the first

1      amended complaint.

2            But some of the things you're going to

3      hear today, your Honor, I mean, they're

4      completely independent, I think, of the

5      judge's ruling on it.  The plagiarism and the

6      fabrications and the falsifications in this

7      complaint are stunning.  And there's just no

8      -- that's not going to go away.

9        THE COURT:  I understand and appreciate

10      the difference between the copy and paste

11      situation and the question about the claims

12      just lacking merit.  And I agree with you

13      that there is a distinction between the two.

14            To the extent that you are asking me to

15      consider sort of the entire course of

16      conduct, I guess part of the reason that I

17      asked you the question that I asked at the

18      beginning -- and I don't know the answer to

19      that question myself yet, I will figure it

20      out -- is it seems to me that you want

21      everything -- I would think you would want

22      everything to cite it at the same time.  I

23      could be wrong because it is theoretically

24      possible for me to rule on bits and pieces

25      and reserve on other pieces, depending on

1      which way I go on the merits.  But I get the

2      impression from your prior presentation on

3      the other motion for sanctions as well as in

4      your brief, that you would like me to

5      consider all of the conduct at the same time

6      and sort of you allege at least a pattern,

7      from your standpoint, and I would think you

8      would want everything done in one ruling that

9      addresses what you call the pattern.

10          MR. MCDEVITT:  That would be our

11     approach, your Honor.  And frankly, I think

12     if you examine the case law on fraud on the

13     court, one of the lines that caught my eye,

14     and I think it sets a very good standard, is

15     you don't get a second chance to commit a

16     fraud on the court.  Once a court detects

17     fraud on the court, that's it.

18          And so if you apply that principle and

19     you find that they did try to commit fraud on

20     the court with these plagiarized allegations

21     from the NFL complaint, which is frankly

22     indisputable, I think that solves the dilemma

23     your Honor has, because you're not

24     necessarily passing on the bona fides of

25     whether this claim or that claim or whatnot

1           might be a Rule 11 violation.  You're passing

2           on to demonstrate fraud on the court that

3           they tried to perpetrate here, and

4           sanctioning them for that.  And there are

5           cases that throw out the entire complaint

6           when that is found.

7                 And so, I think, if you conclude, as we

8           submit, your Honor, this complaint is sort of

9           just the latest in a pattern of escalating

10          misconduct which has taken place, despite

11          admonitions by Judge Bryant, and in fact, has

12          worsened since the admonitions by Judge Bryant.

13                Up to the point of that caution that we

14          showed you last week, if there was any more

15          of it, she indicated very clearly, she was

16          going to refer it to disciplinary

17          authorities.  And you're now going to hear

18          more of it.  You heard more of it last week.

19          And so I think in answer to your question,

20          your Honor, yes, I think if you do conclude

21          that there was a conscious attempt to defraud

22          the court here in the filing of this original

23          complaint, that alone justifies dismissal,

24          without regard to whether you might think the

25          misclassification claims have enough

1        plausible merit that they're not a Rule 11

2        violation.  I don't think you have to reach

3        that.

4            I hope that answers your question, your

5        Honor.

6            THE COURT:  It does.  I appreciate it.

7        Thank you.

8            MR. MCDEVITT:  Your Honor, as I

9        indicated, this is the last of the -- not the

10       last but the next to the last sanctions

11       motion.  This complaint that was filed was

12       the twelfth legal document that was filed

13       against WWE in this campaign of what we

14       consider to be vexatious litigation.

15           In the Haynes case, which was the first

16       one, there was an original complaint and an

17       amended complaint.  That was dismissed.  In

18       the McCullough case, there was an original

19       complaint and a first amended complaint.

20       That was dismissed.  In the Frazier case,

21       there was an original complaint and a first

22       amended complaint.  That was dismissed.  In

23       the James case there was an original

24       complaint and a first amended complaint.

25       That was dismissed entirely.

```
 1                  In the Lograsso case and Singleton, we
 2            talked about at some length last week, there
 3            was the original complaint, there was a first
 4            amended complaint, and then when Judge Bryant
 5            admonished them on June 8th and gave them
 6            time to fix the problems, they filed a second
 7            amended complaint.
 8                  Of all those complaints, the only thing
 9            that ever survived was this one fraud by
10            omission count that we talked about last
11            week, that Judge Bryant had indicated harsh
12            skepticism about.
13                  So before this Laurinaitis case was
14            filed, they had already filed hundreds of
15            pages of allegations against the WWE, dozens
16            of claims against the WWE, and everything had
17            been thrown out, except one claim for fraud
18            by omission that survived only because
19            -- and we're going to show you -- they made a
20            fabricated allegation to sustain and get past
21            the motion to dismiss in the case of
22            Lograsso.  And that allegation, your Honor,
23            was an allegation that was made that WWE
24            supposedly had knowledge, in 2005, of this
25            supposed risk of neurodegenerative diseases
```

1    associated with concussions.  That was the

2    sustaining allegation in that complaint that

3    Judge Bryant held could get past the motion

4    to dismiss.  And as we're going to show you,

5    that was a categorically false allegation in

6    two different respects.

7        I am not, your Honor, in deference to

8    what you said, I'm not going to go through

9    all the grounds we said in our motion,

10   because those are exhaustive.  We'd be here

11   for days if we talked about all those.  What

12   I do want to make sure that I convey to the

13   court is a thorough understanding of the

14   status and the rulings that had occurred

15   prior to the time they filed this Laurinaitis

16   complaint.  Because I think if the court

17   knows everything that was going on at the

18   time, you'll understand how malevolent what

19   they did in this Laurinaitis complaint really

20   and truly was.

21       By design and construction, that

22   complaint is devised to circumvent Judge

23   Bryant's rulings, circumvent Judge Bryant,

24   and circumvent their own allegations that

25   they had made before about knowledge in 2005,

1          which was hanging them out to dry on their

2          attempts to sue WWE.  I'm going to show you.

3               At the time they filed this complaint,

4          your Honor, Judge Bryant had issued several

5          rulings that were pertinent to whether they

6          could bring a legitimate claim on behalf of

7          these people.

8               First, and I'm going to start showing

9          you some things in the Powerpoint.  The first

10         thing Judge Bryant had said was these claims

11         for these traumatic brain injuries that

12         they're trying to assert against the WWE,

13         negligence standards could not apply, as

14         Judge Bryant ruled here.

15              The court agrees with WWE under the

16         context of the court's exception, they could

17         only be held liable for reckless and

18         intentional conduct and not ordinary negligence.

19              So they knew negligence claims were out

20         of these cases, couldn't be asserted under

21         Judge Bryant's prior rulings.  She had also

22         ruled, and this was in her original motion to

23         dismiss in the Haynes case, that there was no

24         fraudulent concealment as a separate cause of

25         action under Connecticut law.  So she had

1    taken that out of the case.

2            She also ruled that their attempt to

3    assert medical monitoring claims as a

4    separate claim was not actionable under

5    Connecticut law.  And it notes they had

6    failed to articulate any authority for the

7    notion that medical monitoring was a separate

8    claim.

9            She had also not sustained any

10   fraudulent misrepresentation claim that they

11   had made.  She said:  Plaintiffs have failed

12   to plead specific facts indicating that WWE

13   made any specific statement that it knew or

14   should have known to be false at the time

15   upon which the plaintiff reasonably relied.

16           So the affirmative misrepresentation

17   claims were taken out of the case.  And you

18   heard Ms. Van Dyck even admit that last week

19   when she was talking about this is a fraud by

20   omission claim.  The reason is was is because

21   they tried to plead affirmative

22   misrepresentations and they couldn't.  So

23   Judge Bryant had taken out medical

24   monitoring.  She has taken out negligence.

25   She has taken out fraudulent concealment.

Falzarano Court Reporters LLC

1           She's taken out affirmative fraud claims on

2       the prior pleading.

3           She also had indicated that any claims

4       of pre-2012 -- and the significance of that

5       is the three year statute of limitation.

6       Pre-2012 people were barred by a statute of

7       Connecticut, barring a tolling doctrine that

8       could apply.  And she noted that the pre-2012

9       plaintiffs appear to concede that the acts or

10      omissions that form the basis for their suit

11      occurred more than three years prior to them

12      filing their suits, and instead relied solely

13      on tolling.

14          Now, what she did sustain, as I had

15      indicated, was this fraud by omission count.

16      And Mr. Kyros knew and he filed this lawsuit,

17      as the co-counsel knew, that he had managed

18      to avoid a motion to dismiss on that count by

19      the false allegation about 2005.

20          And I'll tell you why it's important,

21      your Honor.  Under both the pleading

22      standards and the substantive standards for

23      fraud, should have known doesn't get you

24      there.  Should have known is not a fraud

25      allegation.  You have to show actual

1           knowledge of something to sustain a fraud

2           claim.  And so what they did is they filed an

3           allegation that was supposedly based on a

4           2005 Mayo Clinic article, cited in the

5           original complaint, which I'm going to show

6           you right here.  This was a key allegation

7           that they had made to sustain the fraud

8           allegation.  And you'll see we've

9           highlighted.  "Specifically, WWE was aware in

10          2005 and beyond that wrestling for the WWE

11          and suffering head trauma would result in

12          long term injuries."  And they footnote it to

13          the Mayo clinic article called, "Concussions

14          causes of February 2005."  And then in that

15          sentence afterwards, it says, And, therefore,

16          it should have but never did warn plaintiffs

17          of the risks of concussions and other brain

18          injuries and whatnot.

19               Well, they know that that allegation

20          was false.  Judge Bryant relied on that

21          allegation in two different ways.  And I'm

22          going to show you, in our motion to dismiss

23          opinion, where she talks about this 2005

24          allegation.

25               First, she says that they allege that

1        WWE was aware in 2005 and beyond that

2        wrestling for WWE would result in long term

3        injuries.  And she even says:  It's unclear

4        how plaintiffs arrive at the year 2005.  The

5        paragraph containing this allegation cites a

6        link to an internet article on the website of

7        the Mayo Clinic regarding the causes of

8        concussion that is no longer available.

9            So, you can tell what Judge Bryant was

10        doing was what a good judge does.  She was

11        trying to find the Mayo Clinic article to see

12        does it say what they say it says but it

13        didn't.  We found the article and we put it

14        before her.  And we'll show you the article

15        in a minute.

16            The second place where she indicates in

17        her motion to dismiss reliance on this 2005

18        allegation is, she says:  Read liberally the

19        complaints allege that an increasing public

20        and scientific awareness for the risk related

21        to head trauma ultimately resulted in recent

22        discoveries regarding a link between repeated

23        head trauma and permanent degenerative

24        neurological conditions.

25            In particular, the WWE is alleged in

1            the various complaints to have had knowledge

2            of such a link as early as 2005.

3                 And then she drops a footnote and again

4            says, As the court noted in part 1D -- that's

5            the part I just showed you.  It is unclear

6            how the complaints arrive at the year 2005 as

7            the year in which WWE had knowledge of a link

8            between repeated head trauma from concussive

9            blows or permanent degenerative condition.

10                 So, after the judge issues her opinion,

11            it's pretty clear a couple of things.  He

12            knows that in reliance on his 2005 allegation

13            the court has dismissed, and the court did

14            dismiss, any pre-2005 plaintiffs, Haynes,

15            McCullough.  All those were dismissed because

16            they couldn't possibly allege fraud, if we

17            didn't have any knowledge of something until

18            2005 and those people all performed before

19            2005, they couldn't even have a fraudulent

20            concealment claim.  So those were all gone.

21            All pre-2005 claims, Haynes, McCullough,

22            Sakoda, all those claims were pre-2005 claims

23            that were thrown out.

24                 So, he knows that on the basis of his

25            own allegation of 2005, the court has relied

```
1              on it to sustain claims for people after 2005
2              and thrown out claims of people before 2005
3              because he's alleged that they didn't have
4              knowledge until 2005.
5                   So that, by the way, your Honor, means
6              most of the plaintiffs -- that ruling means
7              most of the plaintiffs in all of the United
8              States couldn't bring a fraud claim because
9              they're prior to 2005.  So he has to change
10             those allegations to get around his own
11             rulings.
12                  Now, in discovery, your Honor -- and by
13             the way, I want to show you up on the screen
14             here now, this is the 2005 Mayo Clinic
15             article that they cited that Judge Bryant
16             couldn't find.  As you can see, it doesn't
17             say one word about WWE knowing anything.  And
18             it doesn't talk about neurodegenerative
19             diseases at all.  All it talks about is some
20             very basic information about concussions.  It
21             doesn't mention CTE.  It doesn't even use the
22             word neurodegenerative disease anywhere in
23             the document.  There is no one, nobody that
24             would ever look at that and think that puts
25             anybody on notice of neurodegenerative diseases.
```

1              And to show you what a sham that

2         allegation was, your Honor, in the entire

3         time of discovery they didn't even attempt to

4         prove that WWE had this document or that it

5         showed neurodegenerative diseases.  They

6         didn't even ask anybody a question about it.

7         And we showed in our summary judgment motion

8         to Judge Bryant this document, so she now has

9         that before her.

10             In any event, your Honor, as we got

11        into the discovery, after they realized what

12        was going on with these 2005 claims, Judge

13        Bryant reinforced the significance of 2005 in

14        the discovery rulings.  They started to try

15        to get discovery beyond 2005.

16             And here's Judge Bryant's ruling again

17        on this 2005 business.  In the first part

18        this is when she lifted the stay that had

19        been in place in discovery.  She says this

20        before she issues, actually, her motion to

21        dismiss.

22             She says:  During this initial

23        liability phase discovery should be limited

24        to facts relevant to the question of -- and

25        she goes on to say what they are.  And as you

1           can see in the end of it is, "whether WWE had

2           or should have had knowledge of and owed a

3           duty to disclose to those plaintiffs the risk

4           of long term degenerative neurological

5           conditions resulting from concussions or mild

6           traumatic brain injuries to wrestlers who

7           performed for WWE in the year 2005 or later."

8               In discovery, they kind of ignored her

9           rulings and tried to demand discovery prior

10          to 2005, and we had to go back to Judge

11          Bryant on this whole issue and she issued,

12          again, a discovery ruling on the plaintiffs

13          motion to compel, denying it, in May 31 of 2016.

14              "As the court indicated in its recent

15          telephonic conference with the parties,

16          plaintiffs have not presented any factual

17          predicate whatsoever entitling them to

18          discovery documents or information dated

19          prior to the year 2005, and absent such a

20          factual predicate, plaintiffs motion to

21          compel is denied on that issue."

22              In addition to this, your Honor, in

23          addition to knowing that Judge Bryant had

24          relied on 2005 and enforced it in the entire

25          case, they also learned in the Lograsso case

```
1              that the first time that WWE heard anything

2              about any wrestler having a neurodegenerative

3              brain condition was when the public reports

4              about Chris Benoit came out that we talked

5              about at great length last week in September

6              of 2007.  And you saw, your Honor, what a

7              massive story that was.  That was everywhere.

8              So the predicate of using that as some notion

9              that we somehow failed to disclose what you

10             could learn by reading any newspaper in the

11             country became a very weak predicate for any

12             kind of fraud claim, as we have now

13             demonstrated, as we hoped, to Judge Bryant.

14                  So, in sum, he knows by the time he

15             files this lawsuit, that the 2005 Mayo Clinic

16             allegation had been exposed as an unworkable

17             sham in that case that had been used to

18             deceive the court to get past the motion to

19             dismiss in that case, but it operated to

20             effectively preclude him from bringing any

21             lawsuits on behalf of people who performed

22             prior to 2005.  His own allegations were

23             operating to do that.

24                  Judge Bryant also in that opinion made

25             some other findings that are directly
```

1          pertinent to the motion we have before you.

2          First, she finds in the ruling that other

3          allegations -- and this is what she's talking

4          about in the motion to dismiss in the Haynes

5          and McCullough case, that other allegations

6          are patently false.  They're simply copied

7          and pasted in whole cloth from one complaint

8          to another.  That's exactly what they did

9          here, only with the NFL complaint.

10              She goes on to say, with regard to --

11         and we talked about this last week -- "with

12         regard to Stephanie McMahon Levesque's

13         testimony, plaintiffs appear to have

14         repeatedly misrepresented both the substance

15         and meaning of Levesque's testimony."

16              They ignored that when they filed the

17         complaint in Laurinaitis.  And as you'll see,

18         even after she comes out with it a second

19         time and mentions it when she dismisses

20         Frazier and the James case, and again notes

21         that she had rebuked them for that, they put

22         it still in the first amended complaint and

23         refused to take it out.  It's still there.

24         Two times she's found that to be false.  Two

25         times she's mentioned she rebukes them for

1        it, and they still plead it.

2              They also knew, by virtue of the

3        conference, the judge, had specifically

4        admonished Mr. Kyros during the June 8th

5        conference.

6              "Mr. Kyros neither the defense nor the

7        court has time to waste, so you need to know

8        if you have facts not general notions."  And

9        then she puts, "only those claims that you

10       have good faith belief, based upon fact are

11       what you're supposed to be pleading," not

12       fictional plagiarism from an NFL case, and

13       attributing all this to us of what the NFL

14       did.

15             So he's already been told all these

16       things by a federal judge about pleading,

17       which, frankly, no lawyer who comes into

18       federal court should have to be told any of

19       this by a federal judge.  We all know what

20       the rules are.  We all know how to play

21       between the lines.  It's very unusual that

22       any judge has to tell anybody the kind of

23       things that he's being told repeatedly.

24             They had been told -- if we can go to

25       the next slide.  She actually tells them, I'd

1          really, really like you to read the federal

2          rules.  Give it some close consideration,

3          before you file anything else without a lot

4          of scrivener errors and a lot of inflammatory

5          opinions and referencing things that don't

6          have any language.  And then she emphatically

7          tells him, this is not -- this case is not

8          about the NFL.  I didn't want --  and

9          Mr. Kyros starts trying to tell her he

10         represented a large number of NFL football

11         players, which as we pointed out last week,

12         his name is not mentioned in any of the NFL

13         cases.  That's all I can tell you.  You can

14         go check the latest fee petitions that were

15         filed, approving everything about the class

16         counsel, and everybody that's involved and

17         his name doesn't appear anywhere.

18              But anyway, she tells him, this case is

19         not about football.  So again, he knows this

20         at the time he plagiarizes from the NFL case

21         to try to push that past the court without

22         the court even knowing that that's what he's

23         doing.

24              He also knows that there's two motions

25         to dismiss pending in the Frazier and Osborne

Falzarano Court Reporters LLC

1          case, which hadn't been decided as of the
2          time he filed the Laurinaitis case.  But he
3          knows he's on thin ice in those cases.  He
4          knows one of the cases has been brought on
5          behalf of an old girlfriend who has no
6          standing whatsoever to bring a wrongful death
7          case.  Clear law.  No argument can even be
8          made to the contrary, and the judge later
9          found that and tossed that case out.
10              He knows they've made a pattern of
11         false allegations in that case, which the
12         judge later found, and we'll review those in
13         a minute.  And he knows at that point in time
14         when he's filed this Laurinaitis case that
15         he's in violation, a willful violation of the
16         court's order in that case, as we went
17         through last week.
18              And you heard last week some of --
19         frankly, some of -- when you asked the
20         questions about what does "your" mean, you
21         frankly heard some of the dissembling that
22         Judge Bryant has talked about.  He stood up
23         and said your meant the lawyers when your is
24         defined to mean the plaintiffs.
25              In the midst of all this, your Honor,

1          in the midst of all this stuff that he knows

2          is going on, what Mr. Kyros is doing is he's

3          out recruiting more people to bring these

4          lawsuits, without regard to these things.

5               This is one of his advertisements where

6          he's trying to recruit people to bring these

7          lawsuits against the WWE.  He calls it the

8          WWE Concussion Lawsuit claim center, as if

9          there's some kind of asbestos type of claim

10         center that's been set up for people to call

11         him if there's an issue.

12              He recruits people who haven't

13         performed in decades.  People who are prior

14         to 2005 could not bring any fraud claims

15         because of Judge Bryant's rulings and his own

16         allegations.  And he goes on to, among other

17         things, some wrestling shows and pod cast

18         places where he's soliciting people,

19         basically saying that if he can get more

20         people to sign up to sue WWE, the sheer

21         numbers of people suing us will dictate an

22         outcome.  His words.  I want you to hear what

23         he says in this.

24

25              (Recording was played.)

1            MR. MCDEVITT:  Surely decide, I think,

2       an outcome, just the sheer number of people

3       suing us.

4            He goes to conventions, wrestling

5       conventions where these old timers, what they

6       do, judge, to make a couple bucks is they

7       sign autographs like many celebrities in

8       baseball and football do, and he goes there

9       handing out business cards, soliciting people

10      to sue the WWE.

11           This is from an affidavit that was

12      submitted earlier in the case from a wrestler

13      by the name of Shawn Walton who was there

14      testified in his affidavit that on June 11th,

15      he observed Mr. Kyros, and this other

16      wrestler that he hangs around with that

17      serves as kind of a runner for him,

18      approaching and talking to a number of former

19      WWE wrestlers whom I recognized from my

20      professional wrestling career.  I also

21      learned that Mr. Kyros was handing out his

22      business card to former WWE wrestlers.

23           If somebody is let go from the WWE,

24      former wrestler or whatnot, is released or

25      terminated, his people call them up and

1          solicit them to join in the lawsuit.  One of

2          them, a person by the name of Steve Lombardi,

3          just went on a show -- and this will give you

4          some feel of what's going on.  And you can

5          hear what Mr. Lombardi says is the problem

6          when they solicit these people.

7

8              (Recording was played.)

9

10            MR. MCDEVITT:  He's not even asked if he

11         has a concussion but he's asked to join a

12         concussion lawsuit.  Other wrestlers aware of

13         what's going on they go public and they

14         actually call it a sham, including one of

15         Mr. Leydon's clients, a guy by the name of

16         Buff Bagwell, who is actually bringing

17         another lawsuit against us.  This is

18         Mr. Bagwell in another interview he gave.

19         The audio is a little bad so we have typed it

20         below so you can hear what he's saying, your

21         Honor.

22

23             (Recording was played.)

24

25            MR. MCDEVITT:  Mr. Bagwell is actually

```
 1              involved in another piece of litigation
 2              against us.  So, so he's not reluctant to sue
 3              but he expresses the view that the whole
 4              thing is a scam.  And all of this, your
 5              Honor, is being done pursuant to these people
 6              being led to believe, as you saw last week,
 7              that Mr. Kyros had something to do with a
 8              settlement that took place in the NFL
 9              litigation, which as far as we can tell, he
10              has nothing to do with it.
11                   In fact, the last advertisement -- you
12              can see one of the advertisements that he
13              puts up.  This is from his own web page that
14              people are directed to.
15                   Kyros Law represents hundreds of former
16              NFL players in an over $750 million lawsuit
17              stemming from concussions suffered by players.
18                   Again, your Honor, you can check the
19              docket for the NFL case.  You won't find his
20              name representing anybody.  You won't find
21              that he negotiated any part of the settlement
22              with the NFL.  You won't find him on any
23              steering committee.  You won't find him
24              listed on the lawyers that just had fee
25              petitions approved by the court, nowhere.
```

```
 1              What he did do at one point, we'll come
 2         to this later, we raised this question
 3         originally in the Haynes litigation.  And
 4         after we raised the question in the Haynes
 5         litigation, he then filed some document in
 6         the NFL case, filing what he called an
 7         appearance on behalf of, I don't know, 150
 8         people or something like that.  That's it.
 9         That's what he did, as far as we can tell.
10              In any event, with all of that
11         knowledge, on July 18th he launches this
12         Laurinaitis lawsuit.  Included in the lawsuit
13         that alleges these people are all supposedly
14         having this permanent damage and neurological
15         damage, he includes people who don't allege
16         any neurodegenerative disease, people who
17         have signed releases against any of the
18         claims that they're being asserted, and
19         many people who, frankly, are still
20         performing.
21              They're still out there performing for
22         other people, doing exactly what they always
23         did, wrestling, which seems to preclude any
24         kind of notion that somehow they're relying
25         on something the WWE said or didn't say, and
```

1          that they would have somehow quit wrestling.

2          They're still out there doing exactly the

3          same thing as they always did.

4               Significantly, your Honor, and I think

5          this is frankly a credit to Mr. Bloss and his

6          ethics, and perhaps the ethics of some of the

7          other people, they don't join in the lawsuit,

8          and they were involved in the prior lawsuit.

9               This is the list here, you're seeing

10         now.  On the left is all the lawyers that

11         were involved in the prior lawsuits, prior to

12         Laurinaitis.  And you can see there's quite a

13         number of lawyers that were involved.  Now

14         we'll show you who leaves and isn't a part of

15         this lawsuit.  And they add two new people,

16         Mr. Boumil and Mr. Leydon.

17               So, all the prior lawyers didn't want

18         any part of this.  And frankly, you saw last

19         week how Mr. Bloss and Mr. Van Dyck didn't

20         even want to be around when this argument was

21         made, which I can't blame them.

22               As part of this fraud on the court,

23         when they filed the complaint, despite the

24         fact that it was an obvious circumvention of

25         Judge Bryant, maybe because it was, they

```
 1              didn't notify the court that it was a related
 2              case.  So it was assigned originally to Judge
 3              Eginton.  And they vigorously opposed a
 4              transfer to Judge Bryant, trying to say that
 5              it wasn't a related case and they didn't want
 6              to transfer it to Judge Bryant, which
 7              eventually it did occur.  But the goal of the
 8              entire lawsuit, as we're going to show you,
 9              was to construct new knowledge allegations
10              against the WWE by plagiarizing the
11              allegations that had been made in the NFL
12              case against the NFL, and circumventing the
13              2005 ruling that the judge had made that
14              precluded them from bringing claims on behalf
15              of these people.
16                   In connection with this fraud, they
17              plagiarized 8,200 words, 186 paragraphs, and
18              causes of action entirely that were in the
19              NFL complaint.  18 of the plaintiffs in the
20              case are still performing out there, despite
21              claiming to have brain damage.
22                   For example, we're going to show you,
23              just to give you an idea how fraudulent this
24              part of it all is.  We're going to show you
25              the allegations that were made on behalf of a
```

1          person by the name of Mark Jindrak, one of

2          the plaintiffs.  Jindrak alleges, quote, He

3          has suffered routine, repeated, and chronic

4          head trauma resulting in long term

5          neurological injuries and causing him

6          difficulties from the WWE, including but not

7          limited to, difficulties sleeping, headaches,

8          dizziness, loss of memory, and fatigue.  And

9          then as a proximate result of WWE's

10         negligence, which again they weren't even

11         allowed to reassert under Judge Bryant's

12         ruling, Jindrak has suffered personal and

13         pecuniary injuries, including conscious pain

14         and suffering and emotional distress.

15             On February 21st, this is an article

16         that appeared on ESPN.  This is just last

17         month, a couple weeks ago:  How American Mark

18         Jindrak won hearts of Mexico's -- I have a

19         hard time pronouncing it, but it's Mexican

20         wrestling.  And what he does is he performs

21         down there under a different name, by the

22         name of Marco Corleone.  That's his wrestling

23         name that he uses down there.  That's him you

24         see standing there in the picture there.  And

25         if it spins ahead and talks about how he's a

```
 1              prominent wrestler down there, how he's

 2              performing in Mexico, he's a crowd favorite,

 3              acting career on the rise, beautiful wife,

 4              infant son.  He's the gringo who made it big.

 5              This is a guy who's filing a lawsuit against

 6              us because he's supposedly brain damaged.

 7              This is another one of his pictures here of

 8              him in his pre-workout routine before he goes

 9              into the ring.  And you know, he's one of

10              many.

11                   We're going to show you here a little

12              video of some of the other people that we've

13              put together.  This is all -- in terms of

14              doing due diligence, your Honor, this is all

15              on the internet.  There's no mystery about

16              anything I'm going to show you.  Any due

17              diligence by these lawyers would show what

18              I'm going to show you.

19

20                   (Recording was played.)

21

22                   MR. MCDEVITT:  These are the people who

23              are supposedly brain damaged.  That's all

24              stuff that's since the lawsuit was filed.

25              This is Chavo Guerrero.  This is his son he
```

1          hits over the head with a chair.  He's a

2          plaintiff in the case too, both of them are.

3               Mr. Guerrero Sr. recently passed away.

4          But that was his son he hit on the head with

5          a chair.  Both of them are plaintiffs in the

6          case.

7               In addition to that, your Honor, 23 of

8          the plaintiffs signed releases precluding the

9          very claims that they are bringing.  I'm

10         going to show you a list of the plaintiffs

11         who signed releases, and the consideration

12         that these people received for releases that

13         precluded lawsuits that they have now brought

14         against us.

15              You can see it's quite a few.  Some of

16         them signed multiple releases.  Mr. Jindrak

17         is a twofer, he's not even performing and he

18         signed a release.  A couple like that.

19              And in fact, the one that, and we'll

20         cover these in a little bit later detail, the

21         one that I find to be very interesting is

22         Mr. Eadie.  Mr. Eadie had a case here before,

23         I think it was Judge Eginton years ago, which

24         we settled.  We'll show you a couple of the

25         terms of the release.  Represented by two law

```
 1              firms, including a Connecticut law firm, was
 2              paid hundreds of thousands of dollars for
 3              release of any and all claims, future now
 4              past.  He's suing us.
 5                   And, again, you get no explanation.
 6              How do you ignore this?  Why are you suing us
 7              with people who signed releases?
 8                   And in addition to that, your Honor,
 9              you have other violations which were obvious
10              when you read the complaint.  For example, in
11              paragraph 35, 507, they make the same
12              allegations about Stephanie McMahon that
13              they've been told repeatedly are false, and
14              the same allegations about us supposedly
15              criticizing Terry Long findings by Dr. Omalu
16              in 2005, when, in fact, we never said a word
17              about him, which Judge Bryant also has said
18              was false.
19                   With all that background, your Honor,
20              on August 5th, frankly, it didn't take long,
21              when you read this complaint, for us to
22              notice what they had done.  It was a
23              simple -- when you start seeing references to
24              the MTBI, which we're going to go through
25              with you.  The MTBI --
```

```
 1              THE COURT:  The NFL report?

 2              MR. MCDEVITT:  Yeah.  The MTBI, I mean,

 3         anybody who has read -- I don't know if your

 4         Honor has read the book League of Denial or

 5         read any of the stuff that's out there, about

 6         why the NFL had to settle, but there's a lot

 7         of reporting about this.  They know it.

 8              The MTBI was a committee of the NFL,

 9         which, according to the lawsuit, and in

10         reality, I mean, you can find these reports.

11         What they did is they had a committee that

12         was putting out scientific papers to the

13         players that made various statements about

14         the concussions and return to play and when

15         it was safe to return to play, and many of

16         these published in the neurosurgery magazine.

17         And the argument that the players were making

18         was that these scientific papers that the NFL

19         were putting out disarmed the players, misled

20         them into thinking it was safe to return to

21         play, when, in fact, you know, the science

22         was to the contrary.

23              So there was a lot of things that this

24         MTBI committee did that is the essence of the

25         lawsuit against the NFL.  And part of the
```

```
 1            reason why they paid the money, I suspect, to

 2            settle was because they had done it.  We

 3            didn't do anything like -- we're not the

 4            MTBI.  We didn't have an MTBI.  And so they

 5            took everything that was said in the

 6            complaint about the NFL and tried to

 7            attribute it to us.

 8                  But in any event, you know, what we did

 9            is we served them on August the 5th with our

10            first rule, when we realized what they were

11            doing, because you see these references and

12            they frankly make you wonder whether they're

13            even reading what they're filing.

14                  I mean, Mike Webster -- nobody who does

15            CTE stuff doesn't know who Mike Webster is.

16            He was the first case that Dr. Omalu

17            diagnosed in a football player of CTE.  It's

18            what started all this sort of awareness about

19            this was Mike Webster.  And most people who

20            play -- or watch professional football

21            certainly know who Mike Webster was.  I do

22            because I'm from Pittsburgh.  But he's a

23            pretty prominent player.  They turned him

24            into a wrestler.

25                  I mean, if you read the allegation,
```

1          Mike Webster becomes a wrestler.  You read

2          this and you go, are they even reading -- I

3          mean, the most basic function under Rule 11

4          is you've gotta read what you file.  And it

5          makes you wonder when you read this, are they

6          even discharging the most basic function of

7          Rule 11, which is reading what they're

8          filing, because nobody who read that would

9          not notice it.  It jumps right out at you.

10         What is this?  And so we went on the internet

11         and quickly found the complaint that they had

12         plagiarized from.

13              But in any event, so, we file on August

14         the 5th.  We file our first Rule 11 motion

15         and serve it to them, in accordance with the

16         safe harbor provision.  And frankly, what I

17         think is sort of an attempt to deceive the

18         court, their opposition calls that the first,

19         what they call, notice, and then they refer

20         to it as a letter.  It's not a letter.  It's

21         a formal motion.  It's called a motion.  It's

22         exactly what you're supposed to serve to them

23         under Rule 11.

24              And they say in that that they did not

25         get notice of the specific conduct warranting

1         sanctions.  And they grouse that it was sent

2         to them only eighteen days after they filed

3         the lawsuit.  Well, it didn't take us

4         eighteen days to figure out what they had

5         done.  It was pretty straightforward figuring

6         out what they had done, and put them on

7         notice of it.

8             In reality, if your Honor looks at our

9         motion, we cite chapter and verse of

10        controlling law, of what they were violating,

11        in terms of causes of action that they were

12        trying to assert.  And I want to show you

13        what we said in paragraph 15 of the motion,

14        to put them on notice that we were aware of

15        these fabrications.

16            Paragraph 15 of the motion says:  All

17        allegations regarding WWE's alleged knowledge

18        contrary to prior allegations regarding that

19        subject, made by plaintiffs' counsel in

20        related cases -- and it's referring to what

21        I've just showed you -- are not the product

22        of reasonable inquiry but are known to be

23        false by plaintiffs' counsel and are

24        patterned after allegations made against

25        different defendants in different industries

1          in different cases, having nothing to do with

2          WWE.

3                  In paragraph 18 of the motion, we tell

4          them, the complaint makes numerous

5          allegations which are not the product of a

6          reasonable investigation to determine if such

7          allegations have evidentiary support, but

8          instead are provable falsifications and

9          fabrications by those involved in the

10         drafting and approval of the complaint.

11         That's about as specific as you can get.

12                 You're manufacturing allegations and

13         you're putting them in the complaints, and

14         frankly, they knew they had done that.

15                 We made -- they made numerous

16         allegations about RICO and whatnot, an estate

17         planning trust with McMahons, and everybody

18         else, and we put them on notice of everything

19         that was wrong with that.

20                 As we continued our investigation, your

21         Honor, of these plaintiffs, and then

22         determined many of these people had signed

23         releases.  So what did we do, on August 19th

24         we served them with a supplemental Rule 11

25         motion, where we served them and put in the

1           motion, as you can see from the motion
2           itself, the actual release language for each
3           one of these plaintiffs that precluded the
4           claims that they were bringing.
5                They, again, called that in their
6           opposition a letter.  It's not a letter.
7           It's a formal supplemental motion and you
8           have it before you.  They did nothing, in
9           response to what we gave them.  They took no
10          action to remedy any Rule 11 violation
11          whatsoever.  They did not remove any of the
12          falsified allegations, which we're going to
13          go though with you in a minute from the NFL
14          case.  They did not dismiss any of the people
15          who had signed releases.  They didn't do
16          anything.  They stood on the complaint.
17               As a result, we had to prepare.  And
18          I'm sure, your Honor, if you saw the brief,
19          you can appreciate how expensive it was to
20          do.  We had to prepare a 75-page motion to
21          dismiss WWE -- the claims against WWE; a
22          46-page brief to dismiss the claims, the RICO
23          claims that had been made against
24          Mr. McMahon; and we had to file a 46-page
25          sanctions brief.  That's a combined total of

1              about 160 pages of legal briefing.  And

2              frankly, your Honor, I'm rather proud of our

3              brief.  I think, if you see them, we put a

4              lot of work in them.  We put a lot of law in

5              them, and we tried to justify what we're

6              doing.  So, that was very expensive

7              proposition for us to have to write briefs to

8              expose this whole plagiarism scheme that they

9              knew about it, and didn't do anything about.

10                  And we pointed out that the sanction

11             motions that we're seeking in the motion, not

12             just under Rule 11, but it's under the

13             inherent authority of the court, and it's

14             under Section 1927 for vexatious litigation.

15             Contrary to their assertion, it doesn't add

16             anything.

17                  When we filed our formal motion after

18             the safe harbor expired, because we were

19             relying on not just Rule 11, but vexatious

20             and Section 1927, we had a cover sheet that

21             advised the court we were relying on that,

22             and then we attached the two motions that we

23             had served on them without changing one word.

24             There's not a word difference in those

25             motions between what they were served with

1          prior to Safe Harbor, and what we're relying

2          on here as far as Rule 11 goes.  They had

3          notice of it.

4                  Then what happens, your Honor, November

5          9th and November 10th roll around, which is

6          kind of an interesting time frame.  After

7          they've done all this, after they've been put

8          on notice of these fabrications, after they

9          refused to do anything, after they forced us

10         to spend all this time and money briefing,

11         instead of responding then to the motions to

12         dismiss in the Rule 11 motions that they

13         forced us to file by not correcting anything,

14         they then file a first amended complaint on

15         November 9th, thereby mooting our entire

16         motion to dismiss, the whole time and the

17         money we spent on that and whatnot.

18                 They don't remedy the problems.  They

19         don't take out all the plagiarized

20         allegations, and they make new sensational

21         allegations that have no place in the

22         lawsuit.  And I showed you some of them last

23         week.  I'll show you them again.  The key one

24         being this allegation about a young lady who

25         used to work for us, hasn't been with us in

```
 1              ten years, time barred claim, makes a sexual
 2              assault claim, which is not even a claim in
 3              the litigation, just to get headlines,
 4              ignoring everything that Judge Bryant has
 5              already told them about including stuff like
 6              this in lawsuits, and they still make
 7              allegations, even in the first amended
 8              complaint, about Stephanie McMahon, I'll show
 9              you them, despite what the judge has said.
10                   Here's what the judge says in 3/21, she
11              tells them that, and this is what they allege
12              in the first amended complaint.  They still
13              -- still say it.  No matter what the judge
14              does, they keep putting it in there.  That's
15              the epitome of vexatiousness.
16                   They do the same thing about Terry
17              Long.  They made this allegation about Terry
18              Long, and that somehow or another, the WWE
19              had criticized this finding that Dr. Maroon
20              made about Terry Long, when, in fact, we said
21              nothing else.  Judge Bryant comments on this,
22              as you'll see, the very next day.
23                   November 10th, the day after they filed
24              the first amended complaint, Judge Bryant
25              comes out with her opinion in Osborne -- or I
```

1          keep saying Osborne, James and Frazier, which

2          tells you a lot about what they do.

3              In that opinion she notes several

4          things that would, I think, tell anybody that

5          knows what they know, which is, geez, we have

6          a complaint on record that has plagiarized,

7          they have caught us plagiarizing, they have

8          filed motions about all this, and now the

9          judge comes out with this opinion, maybe we

10         should do something.  Nope.  As you'll see,

11         they do nothing.

12             What she does and she goes through in

13         this opinion she comes out one day after they

14         filed this first amended complaint with these

15         series of admonitions to these lawyers.

16         We'll go through these in a minute here.

17             First, she notes that they had -- that

18         in the James case, they had declined to heed

19         her admonition to edit the unnecessary

20         verbiage, irrelevant allegations, conclusory

21         statements, and inflammatory language.

22             Next, she notes it again that in two

23         cases they had done it.  In filing the

24         amended complaints in Frazier and James,

25         Kyros and numerous other cosigning co-counsel

```
 1                    declined to heed this court's admonition to
 2                    edit the complaints to reduce their
 3                    unnecessary length and irrelevant,
 4                    inflammatory allegations.
 5                         She notes in this that they had made
 6                    facts which she calls facially specious
 7                    assertions upon information and belief and
 8                    with complaints that contain no information
 9                    from which the beliefs could be derived.
10                         Then she starts making findings that
11                    are even worse that he's made.  Kyros and his
12                    co-counsels' assertions that either wrestler
13                    had the condition upon information and belief
14                    must therefore be knowingly false.
15                         So now she's finding that they're
16                    making knowingly false allegations in lawsuits.
17                         The next thing she says, and again,
18                    she's talking here about -- we talked a
19                    little bit about this last week.  Mr. Frazier
20                    was a very -- a morbidly obese man who died
21                    in the shower, six years after he last
22                    performed for us, of a heart attack.  No
23                    autopsy, no diagnosis of CTE, no anything,
24                    and yet they allege he had CTE and died.  And
25                    the way they tried to plead causation was
```

1           that this nonexistent CTE somehow put him in

2           a worsened off condition such that he

3           couldn't survive a heart attack.  A ludicrous

4           allegation, quite frankly.  And that's what

5           she's commenting on here, is that this

6           allegation he had an inability to survive a

7           heart attack can be attributed with CTE a

8           baseless allegation, unprovable,

9           unsupportable which the court deems unworthy

10          of the barest measure of credibility.

11               She then describes other pleadings that

12          he makes as deceptive and misleading.  This

13          is an allegation he had made about

14          Mr. Osborne and his wrestling, trying to

15          suggest that he worked for 22 years, when, in

16          fact, he worked two years.

17               So, now we have knowingly false and

18          deceptive and misleading.  This next one she

19          talks about he makes half truths which

20          undermine his credibility.

21               The next one she talks about rebuking

22          him.  She talks in here about the Stephanie

23          McMahon allegation, which they know they put

24          in the original complaint and the first

25          amended complaint in Laurinaitis.  And the

1           next day the judge reminds them again that,

2           you know, she's already rebuked them for

3           that, saying it had no merit.

4                Again, you know, if I'm a lawyer on the

5           other side, one thing I'm going to do for

6           sure is I'm going to make sure I withdraw

7           that allegation.  Didn't happen.

8                Then she says -- again, she finds that

9           he used deliberately misleading language.

10          And this is in reference to the Terry Long

11          stuff, to suggest that we had criticized it

12          when we had said nothing about it.  So now

13          you have knowingly false, deliberately

14          misleading, half truths, you name it.

15               And she concludes with this statement,

16          the day after they filed the first amended

17          complaint, part of which we saw last week:

18          Kyros's false and misleading statements,

19          identified by WWE above, together with other

20          statements the court has examined, including

21          Kyros's unprovable claim that deceased in at

22          least one case cremated former wrestlers had

23          CTE, quote, upon information and belief,

24          unquote, are highly unprofessional.  These

25          misleading, deceptive, and baseless

1          allegations are precisely the type of

2          statements that many state Bar associations

3          have targeted in promulgating rules of

4          professional conduct which demand that

5          admitted attorneys speak with candor to the

6          trier of fact.  The court admonishes Kyros

7          and his co-counsel to adhere to the standards

8          of professional conduct, and applicable rules

9          and court order lest they risk future

10         sanction or referral to the disciplinary

11         authorities of the court.

12              That is the background one day after

13         they file what we now know to have been the

14         first amended complaint in response to the

15         plagiarized allegations being revealed.

16              What I did in light of this opinion --

17         it was obvious at this point Mr. Bloss and

18         everybody else was out of the case, that was

19         in the case before.  There were two new

20         counsel involved.  I was not clear, to be

21         honest with you, that they knew anything

22         about these orders and I wanted to make sure

23         they did.  So I corresponded with them and I

24         asked them, do you intend to stand, all these

25         counsel -- I emailed every one of them.  Do

1          you intend to stand on this first amended

2          complaint, in light of what Judge Bryant has

3          said here?  Do you intend to take any

4          corrective actions whatsoever?  In writing,

5          several writings, as a matter of fact.  They

6          refused to take any corrective action at all.

7          They didn't withdraw any allegations.  They

8          didn't withdraw the Stephanie McMahon

9          allegations that Judge Bryant had said was

10         false.  They didn't withdraw the Terry Long

11         allegations, despite what she said were

12         deliberately misleading.  They didn't do

13         anything.

14              So, what do we do?  We had to file

15         another, now 95-page brief for dismissal on

16         the merits, a 46-page brief on behalf of

17         Mr. McMahon, and a new Rule 11 motion, which

18         they have not responded to yet.  As your

19         Honor noted in the beginning, those motions,

20         the motion to dismiss on the Rule 11 the

21         amended complaint are currently with Judge

22         Bryant.  They will respond on the 15th to

23         those.

24              So, with that background, your Honor,

25         I'd like to now turn to what I consider to

1           be, frankly, one of the most deceptive things

2           I've ever seen done as a lawyer.  And that is

3           the details of this plagiarism scheme that

4           was involved here.

5                As I told you, there was over 8,200

6           words and 186 paragraphs from the NFL

7           complaint.  And just to give you some sense

8           of it all, your Honor, if I may.

9            Permission to approach, your Honor?

10               THE COURT:  Yes.

11               MR. MCDEVITT:  What we've done here,

12          your Honor, is to give you some sense of the

13          amount of plagiarism, we've pulled together

14          all the paragraphs that they plagiarized.

15          And essentially, to understand the color

16          coding scheme, everything you see in this

17          document that's in red is from the NFL

18          complaint, word for word.  The inner

19          delineation will show you what they added.

20          The blue type and whatnot will show you what

21          they added and what they changed.

22               So everything you see in red is *in haec*

23          *verba* taken from the NFL complaint, just to

24          give you some order of the magnitude of it.

25               A little bit more if I might, your

1          Honor, in terms of understandings.  I want to
2          show you a little bit more about the MTBI
3          committee of the NFL, so you can understand
4          what happened here.
5              This, what you're seeing on the screen
6          there now, is from the NFL complaint, about
7          how the NFL lawsuit relied upon the MTBI
8          committee and how they said that this
9          committee was involved in publicizing various
10         findings from its inception in 1994.  And
11         then you see the last one where it says, the
12         MTBI committee published its findings in a
13         series of sixteen papers between 2003 and
14         2009.  Again, trying to get behind that 2005
15         allegation that they were stuck with.
16             Next line, please.  This is some of the
17         -- these are extracts from papers that this
18         MTBI committee put out.  And this is a matter
19         of record.  They put out, I think it was
20         twelve of them.  I think they published
21         twelve different papers in neurosurgery that
22         were supposedly behind the NFL's knowledge
23         and was part of the accusations about how
24         they misled players, all the rest of that.
25         And you can see, just to give you some

1           example of what the NFL was putting out in

2           these papers that they were publishing in

3           these official magazines.

4                 NFL paper number four, October of 2004

5           -- again, these are all prior to the 2005

6           allegations they were making, where they'll

7           say things, like, there's no evidence of

8           chronic encephalopathy in this group of

9           football players.

10                Mr. Krasik tells me sixteen papers.

11          And you'll see, going all the way down to the

12          NFL paper number seven, in January of 2005.

13          Again, all these published in neurosurgery,

14          that return to play does not involve a

15          significant risk of a second injury either in

16          the same game or during the season.

17                This is the things the NFL was putting

18          out and publishing, not the WWE.  The NFL put

19          these out.

20                So, with that in mind, your Honor, I'd

21          like to start showing you some of the worst

22          plagiarisms and fabrications they invented in

23          this lawsuit against us, starting with

24          paragraph 506.  And what we've done with

25          this, your Honor, is you'll see the

        1           references.  We've cross referenced in this

        2           Powerpoint where you'll find the allegation

        3           in the NFL complaint and the corresponding

        4           allegation effort that's been plagiarized in

        5           the Laurinaitis complaint.

        6                This one is from the NFL amended

        7           complaint, paragraph 280, and was found in

        8           the Laurinaitis complaint of 506, for

        9           example.  And in this one, as you can see

       10           what they did is they took allegations about

       11           the NFL's concussion pamphlet and attributed

       12           it to us.  Then, they come down and they have

       13           a quote where it says, originally it said,

       14           the NFL stated, "that we want to make sure

       15           all NFL players are fully informed to take

       16           advantage of the most up-to-date information

       17           and resources as we continue to study the

       18           long term impact of concussions."

       19                And you can see what we've done.  We've

       20           put below that the press release that the NFL

       21           issued.  It's Roger Goodell that said that,

       22           not WWE.  Roger Goodell made that statement.

       23                And then what I think is really

       24           nefarious is not only do they take a

       25           statement that they know was not made by WWE

1           but was made by Roger Goodell and attribute

2           it to us, but then they add the sentence,

3           "WWE intended that its wrestlers rely upon

4           this statement."

5                I've got a feeling you're going to see

6           later, when they got caught with this, oh, it

7           was a typo.  That is not a typo.  That is

8           deliberately creating a false fact when it

9           says, WWE intended the statement that it

10          never made be relied upon by its wrestlers to

11          support a fraud.  That is about as deceptive

12          as a lawyer can be to write something like that.

13               The next slide, 545.  Here, in the NFL,

14          they alleged, for the reasons I had told you

15          about, with the MTBI, is the NFL voluntarily

16          and gratuitously inserted itself in the

17          business of studying and subsequent rendering

18          expert opinions about the relationship

19          between repetitive head impacts and football,

20          and they just changed that to "the WWE had

21          inserted itself into the business of studying

22          and subsequently rendering expert opinions."

23          And I guarantee you, your Honor, if we were

24          to go into litigation in this and ask them in

25          interrogatories what was behind that, you'd

1          see the same obfuscation you saw last week

2          because there is no answer to that because we

3          never did anything like that.  It's a

4          complete, total fabrication.

5               547, this is another one of these.  In

6          this one they changed the allegations to the

7          NFL which had some sense with the MTBI

8          committee because that was arguably at least

9          industry funded research by the NFL that they

10         were putting out that was allegedly

11         fraudulent.  Here they change that to say,

12         "the WWE breached its duty to plaintiffs and

13         the general public by hiring persons who, if

14         you look at D, created fraudulent

15         industry-funded research."

16              Now, you know, I guarantee it, if we

17         ask them to identify what fraudulent

18         industry-funded research WWE ever did there's

19         no answer to that because we never did.

20         Never put out any research like this, and

21         none is identified anywhere in here.  It's

22         just a false allegation.

23              548, it gets worse.  Here, again,

24         they're talking about all these MTBI findings

25         that I'm showing.  "The NFL's negligence in

1          this regard resulted in a body of falsified
2          industry-funded research that purposely and
3          or negligently contested and suppressed valid
4          and truthful biomedical finds."  That's all
5          scratched out and that's all of a sudden made
6          WWE.  And then it goes, in the original one,
7          says the NFL's negligence allowed the MTBI
8          committee to use falsified industry-funded
9          research to mislead the plaintiffs, other
10         former NFL players, and the general public
11         regarding the risk associated with repetitive
12         head impact in the game of football.  All of
13         that is changed to the WWE supposedly, just
14         by the simple expedience of a plagiarist pen
15         crossing out NFL and putting WWE in there.
16         And then if that's not enough, again, they
17         add a sentence here:  WWE intentionally
18         funded and created junk science.
19              There's nowhere in here that they
20         identify any science that WWE ever created or
21         put out.  WWE is not in the science business.
22         WWE doesn't have an MTBI committee.  WWE
23         didn't publish anything in neurosurgery.
24         Period.  Ever.
25              That makes me angry, to be honest with

1          you.  I admit I get angry when I read that

2          kind of stuff.  That is so outside the lines

3          of what lawyers do that they shouldn't even

4          be allowed to practice law in this court, to

5          be frank.

6               534.  This is more.  WWE made public

7          statements, published articles and issued

8          pamphlets and paraphernalia to its wrestlers

9          which the WWE knew, da-da-da-da-da.

10              You'll remember last week how they kept

11         dancing and jumping around when they couldn't

12         answer the question about what published

13         articles.  That goes all the way back to

14         Lograsso when they were alleging that we

15         published articles.  And we asked them what

16         articles did we publish.  They couldn't

17         answer it then, can't answer it now, because

18         we didn't, but yet they allege this kind of

19         stuff.

20              Next one, please.  This is another one

21         where they just delete the MTBI committee of

22         what they did and just substitute the WWE's

23         talent wellness program.  And you can see

24         above how they took this right out of the --

25         it says alleged negligent retention and

```
 1              negligent harm.  So just cross out MTBI
 2              committee and substitute the WWE and it
 3              doesn't matter whether it has any pertinence
 4              or not.
 5                   503, this is another one that makes my
 6              blood boil.  The NFL often appeared before
 7              congress.  People would testify before
 8              congress.  These papers were submitted to
 9              congress by the NFL.  We never submitted any
10              papers to congress, never.  Not in the
11              corporate lifetime of WWE did they ever
12              submit any paper to congress about the
13              effects of concussions or traumatic brain
14              injuries or anything like that.  And yet,
15              what do we have here?
16                   From 2006 to the present, with this
17              editing, the WWE's fraudulent concealment
18              continued.  During that time period, WWE
19              voluntarily funded and produced its own
20              purported scientific research, and through
21              that research repeatedly misrepresented to
22              then current and former WWE wrestlers, the
23              United States Congress, and the general
24              public that there is no link or an
25              insufficient scientific link between MTBI and
```

```
 1              WWE activities and later-in-life cognitive
 2              brain injury.
 3              Absolutely, 100 percent false, and they know
 4              it.  They know we never submitted any such
 5              thing like that to congress or made any
 6              statements.  In fact, if you remember, that
 7              was the one last week that you were
 8              questioning Ms. Van Dyck about where they
 9              made the allegations that the WWE supposedly
10              specifically stated that wrestlers with
11              diagnosed MTBI didn't get it as a result of
12              wrestling for WWE, and we kept probing, where
13              did WWE ever say that?  And she danced around
14              you, and then she finally says -- and that
15              was the allegation they made in the
16              complaint.  Then she finally says, well, we
17              based that on a film that we gave them of a
18              report that Dr. Maroon gives the talent after
19              they made the allegations.
20                   So they didn't have that whenever they
21              made the allegation.  They were just making
22              it up.  And if you look at the tape, you
23              won't see Dr. Maroon say anything like that.
24              He doesn't say anything like that.  Nobody
25              could watch that tape, that's a reasonable
```

1            person, and think Dr. Maroon is doing

2            anything other than educating talent about

3            the risk of concussion and to report when

4            they get a concussion so they can receive

5            proper medical treatment.  At no time does he

6            make that statement that they say.  So,

7            frankly, that was misleading to you when you

8            asked that question when they did that.

9                And here it is again, where they're

10           saying United States Congress.  And I'm going

11           to show you that whoever drafted this knew

12           this because in a later paragraph watch what

13           they do with the United States Congress thing.

14                522.  Now look at the editing for this

15           one.  This shows you how they knew that that

16           prior allegation in 503 about congress was

17           false.  Look what they do in 522.  Here the

18           allegation in the last paragraph is beginning

19           in -- with the NFL, it was 1994.  Now it

20           becomes, beginning in 2013, the WWE and its

21           agents funded purported scientific research

22           that misrepresented to then-current WWE

23           wrestlers, and then look what it deletes,

24           "NFL players and the United States Congress."

25           So they knew.  That's 19 paragraphs right

1          after they alleged we had misrepresented to

2          congress they delete that because they know

3          it's false.

4               532.   The WWE -- now this is edited to

5          say, the WWE made and continues to make

6          material representations -- and here's

7          another one that shows they knew that was

8          false -- material representations to its

9          wrestlers, former players, scratch out

10         congress, and the public at large.   And

11         again, this nonsense that we supposedly make

12         these kind of statements, which they can't

13         identify where any such statements were ever

14         made because they weren't.   But, again, this

15         goes to show you, the drafter knew when he

16         left that other one in there about congress

17         it's false because he scratches it out here.

18              227.   Now, all of a sudden, now we're

19         changing scientific reports.   In 1937,

20         according to the NFL complaint, the American

21         Football Coaches Association published a

22         report warning that players who suffer

23         concussions should be removed from sports --

24         from contact sports.

25              Now that's changed to:   The 1937

```
 1              American Football Coaches Association
 2              published a report warning that wrestlers.
 3              That report doesn't have anything to do with
 4              wrestlers.
 5                   And, again, this is one of those ones
 6              you read it and you go, is anybody reading
 7              these things.  Doesn't this kind of jump out
 8              at you?  Why would the 1937 American Football
 9              Coaches Association be writing a report about
10              wrestlers?  It would jump out at you.  Any
11              lawyer doing -- even reading this complaint
12              would say, huh.  Show me that report.  I want
13              to see that report because I can't believe
14              they would write that kind of report.
15                   Four different law firms signed this
16              complaint.
17                   Paragraph 254.  Here's another one that
18              makes you wonder are they even reading these
19              things.  Now it's in 2000 talking about the
20              American Academy of Neurology and Dr. Bailes
21              surveying over 1000 former NFL players,
22              between the ages of 87 and 86, and making the
23              various findings about them.  And then all of
24              a sudden in D, it becomes 49 percent of the
25              former wrestlers.  How did that happen?
```

1          Again, if anybody is reading -- when

2     we're reading this, this is what occurs to us

3     that there's something really bizarre with

4     this complaint because anybody reading this

5     would go, if they're surveying football

6     players, what are they making findings about

7     49 percent of former wrestlers for.

8          249.  Here's the one I was telling you

9     about before, Mike Webster, former Pittsburgh

10    Steeler.  In the allegation in the NFL

11    complaint, it talks about his head impacts

12    while a player for the Steelers.  They change

13    it to "disabling impacts while a wrestler for

14    the Steelers."

15         Again, could anybody say they read this

16    complaint and didn't catch that.  A wrestler

17    for the Steelers?  The Steelers aren't into

18    wrestling.

19         257, another one of these

20    falsifications about science.  Convention of

21    neurological experts in Prague met to talk

22    about ice hockey, rugby.  And they changed

23    that to, "the experts recommended that

24    wrestlers never be returned to play."

25         Again, this is supposedly 2004, so this

1          is all supposed to be part of what WWE knew

2          prior to 2005 about this stuff, these

3          fabricated allegations.

4                And there are many more, your Honor, I

5          could go through, but I think this makes the

6          point.  If you look at page 15 and 16 of our

7          opening brief, we demonstrated they not only

8          lifted paragraphs, but specific counts and

9          all the rest of this kind of stuff.  And we

10          all know as a pleader in federal court that

11          the allegations of fact that we make are

12          taken as true by a court who is relying on

13          compliance with Rule 11, and that they will

14          be taken as true for deciding whether there's

15          a lawsuit and whether a defendant is going to

16          be subjected to the burdens of the lawsuit.

17          We all know that.  They know that.

18                And I would submit to you, your Honor,

19          there is both a numerical and logical reason

20          why Rule 11 precedes Rule 12 in the

21          architecture of our federal rules.  Because

22          without compliance with Rule 11, you cannot

23          have meaningful Rule 12 practice.

24                If somebody is free to do what they did

25          here, anybody could be relegated to a lawsuit

```
 1              on fabricated allegations and a court would

 2              have no opportunity to know otherwise unless

 3              it's exposed like it was here.

 4                   And that's why I think, your Honor,

 5              going back to the original point I made to

 6              you, when things like this get caught,

 7              unfortunately, they probably happen more than

 8              we think in our system.  When you catch them,

 9              you have a choice.  You either let it go or

10              you come down hard on it, and you make a

11              statement that this is not going to happen in

12              a courtroom.  And I think, ultimately, to be

13              honest, your Honor, I think that's the choice

14              that the court is going to have here on what

15              you do with this stuff, because this has no

16              place in our system.

17                   We've cited cases from the federal

18              court about all this stuff.  Just to review a

19              couple of them, your Honor.  I think this

20              case is a very similar case.  This is a --

21              MS. LACY:  Brown should be in there.

22              MR. MCDEVITT:  The Brown case that we've

23              cited in there.

24              THE COURT:  I've read Brown thoroughly.

25              MR. MCDEVITT:  Okay.  And this is the
```

```
 1              words they used to describe it:  Plaintiff
 2              has essentially undermined the integrity of
 3              the judicial process by lying to the court.
 4              And that is what it is.  It is lying to the
 5              court, in telling you you should assume the
 6              truth of these allegations which we are
 7              drafting which we know are a lie.
 8                   Some other authorities for your Honor.
 9              We've cited these other cases where
10              plagiarized allegations from a different case
11              without any factual basis involved a strong
12              sanction of dismissal.  So, in the rare
13              circumstances where this is caught, the
14              court's dismissed them.
15                   Next slide, please.  This is some words
16              from -- prior to this, we had, unfortunately,
17              something similar to this before, in state
18              court, before then trial judge, Chase Rogers,
19              who now, as you know, is the chief justice of
20              the supreme court in Connecticut.  This case
21              involved a lot of litigation misconduct, too,
22              brought by a former licensing agent of the
23              WWE who sued the WWE for not paying him
24              commissions on licenses that he procured, and
25              in the course of discovery we unearthed a,
```

1          basically, criminal scheme that he had been

2          involved in involving bribery and everything

3          else, and he perjured himself and fabricated

4          evidence and falsified.

5               And it's sort of funny, judge, because

6          I remember the day we showed up before Judge

7          Rogers her saying to me, Well, Mr. McDevitt

8          you can file your motion, but in Connecticut

9          it's very rare that we will dismiss the cases

10         as a sanction.

11              I said, Your Honor, I understand it and

12         I understand why that's a rule.  All I ask

13         you to do is read what we filed and you make

14         your own judgment.  And this is what she did.

15         Because when you see it, it's offensive.

16              She said here:  We do this to deter

17         others who might think that we can engage in

18         that kind of misconduct.  And I think the

19         words that she said there are very

20         appropriate here.

21              Next, your Honor, I'd like to show you

22         Mr. Kyros's response to being caught doing

23         this in the media.  And this, I think

24         typifies the pattern of unable to accept the

25         fact that what you're doing is wrong and

 1          correct yourself and engaging in, frankly,

 2          public deception.

 3                In the Hartford Courant, he defends the

 4          lifting of what I've shown you, saying, it's

 5          common for lawsuits to use language from

 6          prior cases.  As for statements wrongly

 7          attributed to WWE employees, Kyros said those

 8          were typos that should not distort the main

 9          point.

10                Your Honor, I think that a typo is I

11          hit A when I mean O.  I don't think a typo is

12          when you create a sentence and sentences,

13          like they have done, that attribute

14          statements to WWE made for the purpose of

15          reliance by wrestlers, when it's a complete

16          total fabrication.  That is not a typo.  And

17          his inability to recognize that is disturbing

18          and I think it's another reason to impose

19          sanctions.

20                The other points that he makes is

21          another reaction that he made.  And this was

22          to law.com who covers these cases.  One of

23          the wrestlers' attorney, Konstantine Kyros,

24          said in an email that the WWE suit does rely

25          on the NFL case because the issue of history

1           of the science of head trauma brought to

2           light in the NFL fight lay the groundwork for

3           the legal claims in this case.

4                He said, The WWE basically found a few

5           paragraphs in which the word "players" was

6           replaced with the word "wrestler", using a

7           tool in Microsoft, no doubt.  Unquote.

8                Kyros said the argument, quote, that a

9           few typos of patently false allegations shows

10          the flimsiness of the WWE's untenable

11          position on the health crisis in wrestling.

12               So here he's telling the media that it

13          was just a few typos and just a few instances

14          where player was replaced with wrestler.  And

15          I'll leave it to your Honor's good judgment

16          as to whether what you saw that that's what

17          that is.

18               I think, your Honor, what you've seen

19          now is not typos.  It is evidence of a very

20          deliberate scheme to create a false body of

21          allegations to change the knowledge

22          allegations that he had made in eleven prior

23          complaints that he didn't want to live with

24          anymore, so that he could bring a bunch more

25          frivolous claims brought by people who are

```
 1              still performing and who have signed releases.
 2                   The other Rule 11 violations, your
 3              Honor, if I could just briefly address some
 4              of what they did.  The Rule 11 -- the
 5              plagiarism was just one.  Many of these Rule
 6              11 issues that we raised they didn't even
 7              bother to respond to, which I think, under
 8              the law, concedes the argument.
 9                   These are some of the arguments that
10              they failed to address.  The argument that
11              they knew from the Lograsso action when WWE
12              learned about these neurodegenerative
13              diseases being in September 2007, they didn't
14              address that.
15                   As I pointed out before, they've
16              continued to make these false allegations
17              about Stephanie and they don't explain why.
18                   Next slide.  The court in McCullough,
19              as I mentioned to you briefly, dismissed all
20              these claims of medical monitoring,
21              negligence, negligent misrepresentation,
22              fraud, and fraudulent concealment.  They
23              don't explain why they're asserting them here
24              if the court has already said that those
25              don't constitute valid claims.
```

1           With respect to the arguments we

2     presented that their claims are not

3     independent causes of action such as, for

4     example, the independent contractor argument,

5     all the rest of that, they make no response

6     to any of these points that we made in our

7     brief.  And there is a legal consequence when

8     you default on making a response to an argument.

9           And this is the law that governs that.

10    That they have thereby conceded the validity

11    of the arguments by not responding to them.

12    We've cited to you a couple of cases from

13    other jurisdictions where when they don't

14    respond, the court deems the matter to be

15    conceded.  And we point out to you here that

16    Judge Bryant applied that principal in her

17    very first opinion when she dismissed the

18    affirmative claim for fraudulent concealment.

19    She noted that they had not bothered to even

20    respond to that, and therefore, it conceded

21    the validity of our argument.

22          To talk briefly about the

23    misclassification of Rule 11 violations, your

24    Honor.  Some of these plaintiffs that they

25    are bringing this lawsuit on behalf of

1          performed over forty years ago, and are now

2          claiming now that they were -- they didn't

3          even perform in this decade or this century.

4          That's how old these things are.  And they're

5          now trying to claim that they were

6          mischaracterized as independent contractors.

7               It's not the first time this claim was

8          made in this court.  It was made before Chief

9          Judge Dorsey years ago, in 2009.  He

10          addressed that such claims on behalf of

11          people who frankly were more timely than

12          these people were still time barred but more

13          timely than these people.  And this is what

14          he said about whether they had such a private

15          right of action.

16               He says:  This is consistent with the

17          rule that there is no private action to

18          enforce the tax code.

19               He also held in that case that the

20          statute of limitations would begin to run on

21          such a claim from the moment they recognized

22          that they were being classified as

23          independent contractors.  In other words,

24          when they signed the booking contracts,

25          which, by the way, they agree the booking

```
 1              contracts would be treated that way.

 2                   And so he finds in this case any claims

 3              arising out of defendants' control of

 4              plaintiff's services accrued at the start of

 5              their services, i.e., at the execution of the

 6              booking contracts, which were all outside the

 7              six year limitation and thus are time barred.

 8                   Just about every claim that's in Levy,

 9              there may be one, I'm not sure, but most of

10              the plaintiffs here, if not all of them, are

11              far older than the plaintiffs who are time

12              barred in Levy.  And all of these claims, all

13              of them, are barred under judge -- if you

14              apply his ruling, every claim is barred here.

15              And they knew about the Levy case.  They even

16              refer to it in the complaint.  So, it's not

17              like they don't know about it.  And we

18              pointed that out to them in our Rule 11

19              motion, and we have cited, as your Honor has

20              seen, legions of cases from every

21              jurisdiction.

22                   As far as I know, there is no contrary

23              authority that there is no private right of

24              action for misclassification under the tax

25              code.  Your argument and your remedy is
```

1        administrative in nature.  You go to the

2        Internal Revenue Service and you file a

3        complaint with them, and you have a certain

4        time period to do that.  None of them did

5        that.  So I'm not aware, and I don't think

6        they've cited a single case, I think, from

7        the papers they've filed so far.  We haven't

8        seen their opposition on the motion to

9        dismiss.  They haven't cited a single case

10       that there's a private right of action along

11       the lines of what they're trying to assert

12       here.

13              With respect to limitations, your

14       Honor, none of these people have performed in

15       this decade.  None of them have performed in

16       this century -- some of them haven't

17       performed in this century.  The court has

18       already held, as I pointed out, that the

19       court bars the degenerative claim.  And the

20       court made a very clear distinction here --

21       oh, I'm sorry, if I can go back, your Honor,

22       I forgot one point about Levy.

23              They try to claim it's a different

24       claim, but ironically they plagiarized from

25       the Levy complaint too.  This is, you can

```
1              see, and they're making the claim here, the

2              top part is the verbiage of the Levy

3              complaint that the court threw out, and the

4              bottom what they did then.  So, the

5              plagiarism isn't just limited to the NFL.

6                   Skipping ahead then to the statute of

7              limitations issue.  The court made -- and if

8              you look at the court's opinion, it was very

9              clear that what the court was saying was

10             these long term neurodegenerative diseases

11             for purposes of the motion to dismiss she was

12             treating as a different injury than a

13             concussion or the original brain trauma

14             because they were late developing and

15             arguably late and all the rest of that kind

16             of stuff.  And we have issues with the

17             judge's ruling but that's her ruling.  But

18             the important part of that is the concussions

19             and stuff like that.  She's never held that

20             concussions that occurred twenty years ago or

21             thirty years ago are somehow not time barred.

22             And in fact, on her ruling they are.  All

23             she's basically saying is these later long

24             term degenerative diseases come up many years

25             later.  They might not be if you had a
```

1              tolling doctrine.

2                   They haven't even pled a tolling

3              doctrine individually for these people.  The

4              one that they tried to plead in Lograsso of

5              the continuous course of conduct, they didn't

6              even attempt to plead for any of these

7              particular plaintiffs.  They haven't pled any

8              diligence by any plaintiff at all, in any of

9              this stuff.  And they don't cite to the court

10             a single tolling doctrine that would cover

11             what they're doing here.  So we think that's

12             pretty clear.

13                  The other part that I'd like to spend

14             just a brief period of time is on the releases.

15                  And they said in response to our

16             argument, your Honor, at document 258,

17             paragraph 13 on page 13, they say, quote,

18             defendants have refused, to this day, to

19             provide copies of the contracts they allege

20             constitute releases.

21                  Again, that's a knowingly false

22             statement.  They were provided copies of

23             these releases not once, but twice.  They

24             were attached to our motion for sanctions,

25             and they were attached to our motion to

1       dismiss.  They've had copies of these

2       releases for months.  They know exactly what

3       they say.

4           When they were -- when this originally

5       happened, when we served them with our

6       motion, we just had the language and

7       thereabout the release.  They wrote back the

8       next day or something and said could you give

9       us copies of the releases.  And our answer

10      was you need to talk to your clients.

11          Frankly, we thought there might be more

12      releases out there.  You need to talk to your

13      own clients.  They signed these documents

14      too.  Do your own due diligence.  By the time

15      we got around to filing our motion, they had

16      them, and they've had them for months and

17      they're still pursuing the claims on their

18      behalf.

19          They allege -- the only thing they say

20      is these releases, all of them, everything,

21      were fraudulently obtained and therefore void.

22          Again, your Honor, the court has

23      admonished them repeatedly to read rules and

24      comply with the rules.  Every lawyer knows

25      that fraud is subject to Rule 9.  You have to

1          plead fraud with specificity and

2          particularity.  They haven't done that with

3          respect to any of these releases, nor have

4          they tried to do it with any of these releases.

5               What I'd like to show you to show you

6          how disingenuous that is is the language from

7          Mr. Eadie's, which we can bring up on the

8          screen here.  Again, Mr. Eadie is the one I

9          was telling you about that had a claim here

10         before the judge here.

11              THE COURT:  He's the one who went before

12         a judge in connection with a release and had

13         a hearing on the fairness or the

14         enforceability of the release?

15              MR. MCDEVITT:  I don't remember if there

16         was a hearing on the -- if the judge had a

17         hearing.

18              THE COURT:  You mentioned, I thought, in

19         your paperwork that some of the people who

20         signed releases they actually appeared in

21         court with respect to that release.  Did I

22         misread that?

23              MR. MCDEVITT:  I'm not sure what your

24         Honor is reading.  I don't recall saying

25         that.  On this one what I can tell you is

1           I -- I wasn't as involved in this one because

2           I was doing some other stuff for them at the

3           time.  But if you look at the release, these

4           litigants were represented by two law firms.

5           Mr. Eadie, he was represented by Robert

6           DeCrescenzo of Updike Kelly and Spellacy,

7           which I understand is a fairly reputable firm

8           in Connecticut, and another fellow by the

9           name of Howard Mitz, who I know is dead now.

10          And if we could sort of go through some -- go

11          back to the beginning, Stef, on this thing,

12          on the release.

13              Some of the -- I mean, in terms of how

14          this release doesn't cover this, they've

15          never offered any explanation.  But you can

16          see the representation first in paragraph two

17          that Mr. Eadie makes that he was fully

18          authorized and had reviewed the agreement and

19          was aware of its contents, legal effects, and

20          has been independently advised by counsel of

21          its choice.

22              In the release language, Mr. Eadie says

23          he shall have no rights whatsoever in or to

24          WWE's market or works and WWE's past and

25          present future distribution, exploitation,

1      promotions, displaying, merchandising,

2      licensing, marketing, and or use of its marks

3      and works, including but not limited to no

4      rights to any compensation of any form

5      whatsoever for such distribution,

6      exploitation, promotion, displaying,

7      merchandising, licensing, marketing.  He's

8      suing us here, I might add, for royalties

9      contrary to what that says.

10          The next paragraph, paragraph four,

11     Mr. Eadie agreed that this release was a

12     complete, total and final termination of any

13     and all business, professional, personal and

14     or commercial relationships between the

15     parties, except as provided for herein, and

16     that he enters into the agreement with no

17     expectation of any kind of any future income,

18     royalties, privileges, benefits, and the

19     rights of compensation remuneration from the

20     WWE.  Below that, as you can see, he's paid a

21     handsome sum for this release, $435,000.

22          If you read through it all, this

23     release, which I'll spare the time on, but

24     it's a very broad release of any claims,

25     discovered, undiscovered claims, the kind

1          that you write when you want those kind of

2          releases.  And on the next page, which I

3          think is kind of interesting, he specifically

4          disavowed, with counsel, that there's been

5          any kind of fraudulent inducement involved in

6          signing this document, the very thing that

7          they're trying to allege was occurring here,

8          when these people signed releases,

9          represented by two counsel, that disavowed

10         that, nevertheless that's what they allege,

11         and then refused on in the release.

12              And as you can see, your Honor, on the

13         back page of that release, paragraph 16.  16

14         says this agreement shall be considered as

15         drafted jointly by all the parties and no

16         ambiguity or uncertainty found in the terms

17         shall be construed by either party.  And

18         below that it shows he was represented by two

19         counsel.

20              And so, you know, again, they have

21         offered absolutely no basis whatsoever for

22         why that release is not being honored.

23         That's not the only one.  There are other

24         ones.

25              Mr. Satullo, Perry Satullo, and I can

```
 1                    go through all of them.  This is another

 2                    example.  This man received $84,000 for a

 3                    release.  And you can see his release.  He

 4                    releases the WWE of any and all claims,

 5                    liabilities, obligations, whatsoever law or

 6                    equity now known or hereafter discovered,

 7                    arising out of or in connection with the

 8                    contract.

 9                        A very broad release.  And you can see

10                    here, Brad Small, Esquire, was his attorney,

11                    on the last page.  He was represented by

12                    counsel too.

13                        So these are two releases where the

14                    guy's represented by counsel receiving

15                    substantial money and they're suing us.

16                        The next one is Mr. Laurinaitis, the

17                    lead plaintiff.  $31,000 he gets for a

18                    similar release to the one that you just saw.

19                    And again, same broad release that he gives.

20                    And says the release is good, even if he

21                    becomes aware later of different facts from

22                    those you now know or believe to be true,

23                    it's your intention to hereby fully, finally

24                    and forever, ta-da-da-da-da.

25                        And these people all promised not to
```

1              sue us but yet they are.

2                   And then finally, Mark Jindrak, the

3              fellow I showed you previously, still

4              performing.  This is a release he signs for

5              $25,000 to obtain his early release from the

6              contract he had with WWE.  And again, gives

7              the same broad release as the ones you've

8              seen.

9                   And I could go on and on and I've

10             showed you the chart, your Honor.  But again,

11             they have not said any reason why these

12             releases are not good.  All they do again is

13             show, I think, is a lack of credibility.  Our

14             position is every contract these guys ever

15             signed, no matter what it was or when they

16             signed it, by every one of these, none of

17             them are valid.  They're all unenforceable.

18             They're all fraudulent, without any specifics

19             about any pleading, about anything.

20                  Getting close to the end, your Honor.

21             The other violations, and my last point -- we

22             cited some case law for you in the briefs,

23             and this reiterates it, ample law that there

24             are sanctions imposed for filing claims that

25             violate releases.  And they, again, have not

1     shown any reason why they didn't.

2          So, lastly, I think there's some other

3     claims that were previously dismissed.  We

4     kind of touched on this before.  We can skim

5     through this quick.  I think this largely

6     reiterates what I told you before.  These

7     claims were all previously dismissed by the

8     court, yet are reiterated here, without any

9     real differences.

10          And then lastly, your Honor, some

11     overall law that I just wanted to make sure

12     the court is aware of.  This first quote I

13     think is the one I referred to previously in

14     the beginning.  Fraud on the court, quote,

15     uniquely calls for dismissal after its very

16     first occurrence.

17          Suffice it to say, your Honor, this

18     isn't even the first occurrence where they

19     have been found to be engaging in practices

20     that no reputable lawyer would ever think has

21     any place in litigation.  They have been

22     doing it consistently from Day One.  They

23     have been found to have been doing it in two

24     judicial opinions by the judge.  They had

25     been admonished about doing it in a status

1           conference, and frankly been caught.

2                   This Third Circuit case, Keister case,

3           somewhat analogous in this sense.  They then

4           filed an amended complaint also, but the

5           court didn't impose a sanction on them of

6           attorney's fees for deliberately trying to

7           mislead the court in connection with a Rule

8           11 motion.

9                   And the court says something that I

10          think is especially apt.  Plaintiff asserts

11          that it's improper to impose sanctions based

12          on the misleading content of the second

13          amended complaint because the court permitted

14          Levy to amend.  We disagree.  Such an

15          exception would erode the goal of Rule 11,

16          accountability.

17                  The standard, your Honor, under Rule 11

18          as your Honor I'm sure knows, is objective

19          unreasonableness.  Rule 11, one of the

20          branches of Rule 11 says very clearly,

21          factual contentions must have factual support

22          done after a reasonable investigation.

23                  If you fabricate allegations, as they

24          did here, that has to be a per se violation

25          of that branch of Rule 11.  I cannot see how

```
 1              is it not per se a violation of that branch

 2              of Rule 11 and it was done here repeatedly.

 3                   Under 1927 and inherent authority, the

 4              key point, your Honor, is bad faith.  Have

 5              they acted in bad faith?  You've seen ample

 6              indications that they have.  You've seen

 7              repeated admonitions given to them that have

 8              been ignored.  And you've seen conduct that I

 9              don't think you've probably seen in many

10              cases in your career, hopefully won't see again.

11                   So respectfully, your Honor, I think to

12              leave off where we began, Judge Bryant very

13              clearly said if this conduct continues that

14              it was going to have repercussions,

15              presumably severe ones, and it should, and we

16              ask that the court impose severe sanctions on

17              them for this kind of conduct.  Thank you,

18              your Honor.

19                   THE COURT:  Thank you.  All right.  It

20              is ten till three, so why don't we take a

21              brief recess and come back in fifteen

22              minutes, so five after the hour.

23

24                   (Recess:  2:52 p.m. to 3:55 p.m.)

25
```

```
 1              THE COURT:  Good afternoon.  Please be
 2        seated.  We are back.  I understand we had
 3        some technology issues but everybody is ready
 4        to go.  I have checked and it sounds like our
 5        court reporter might be available until about
 6        5:30.  We are trying to see if we have a
 7        courtroom deputy who can stay until 5:30.
 8        That is in works.
 9              Let me just quickly ask do any of the
10        lawyers have any issue staying till 5:30.
11        All right.  Seeing no hands and hearing
12        nothing, I assume the answer to that is yes.
13        I hope that we can probably stay until 5:30
14        assuming that we can get the courtroom deputy
15        issue straightened out.
16              With that, are you ready to proceed?
17              MR. KYROS:  I am.
18              THE COURT:  All right.
19              MR. KYROS:  Thank you, your Honor, for
20        having a hearing and giving us the
21        opportunity to address the court.  In spite
22        of Mr. McDevitt's strategy of personally
23        attacking plaintiffs' attorneys in an attempt
24        to discredit us, and thereby discredit the
25        plaintiffs' case before it can even be heard,
```

```
 1              we're here to answer Mr. McDevitt's plethora
 2              of false allegations of attorney misconduct,
 3              and I would like to emphasize, without losing
 4              the real issue, which is the claims of a
 5              group of WWE wrestlers brought against the
 6              WWE for its misconduct.  And that's the real
 7              issue here.
 8                   This group of 60 men and women has been
 9              diminished even as we have proceeded in this
10              case.  In the past month, in fact, this year
11              alone, these people are dying.  And you know,
12              while we're arguing over distraction issues,
13              these people are being prevented from getting
14              adequate healthcare.
15                   In fact, while preparing for this
16              hearing, another named plaintiff, named Ron
17              Bass died two days ago.  And it's not been a
18              good couple of months.  Named plaintiff Chavo
19              Guerrero, Sr. died on February 11th.  Rex
20              King, his name is Timothy Allen Smith, died
21              on January 9th.  Jimmy Snuka, who is
22              obviously one of the most famous wrestlers in
23              the world, who was part of this case, died on
24              January 15th.  And so that's four named
25              plaintiffs in the Laurinaitis case that have
```

1          died this year.

2                In addition, several other wrestlers

3          that aren't part of the case died.  One of

4          those was Ivan Koloff, who is somebody I had

5          sent a letter of representation to the WWE

6          about two years ago and they sued him.

7                And, you know, whether or not the WWE

8          takes the -- which I think I saw this

9          morning, that the causes of death were, you

10         know, at issue, this really misses the point,

11         which is that this group suffers from

12         occupational harm and long term diseases that

13         cause, contribute, and really affect their

14         lifestyle.

15               And this is my introductory statement.

16         We're going to get into some specifics.  I

17         just wanted to go in.

18               This health crisis, in my view, stems

19         from the totally archaic workplace structure

20         that really emerged unchanged from the

21         unregulated working conditions that

22         throughout the last century were really

23         structured to enrich these promoters.  And

24         the wrestling business, like the boxing

25         business or some of these other unregulated

1          businesses, you know, existed at a time in

2          our country when workers' rights and the

3          protections of these laws were in their

4          nascent form.

5               And the WWE really, in this situation,

6          in 2017, is sort of this legacy business.

7          And it's a very unique situation that I've

8          encountered when I began the odyssey of

9          representing these people.

10               And what we have here is no longer a

11          sort of a regional carnival side show where

12          there would be these regional promoters

13          staging wrestling tournaments, and -- matches

14          is the correct term -- on a random Saturday

15          night.

16               The WWE, and the McMahon family, and

17          their dynasty has really created this entity

18          that harnessed the popularity of the world's

19          oldest sport in a manner that really dwarfs

20          the efforts of all the promoters that

21          preceded them, whether it's Albee in the

22          vaudeville circuit or Don King in the boxing

23          circuit.  This sort of promotion has

24          succeeded beyond anybody's wildest

25          imaginations to create this giant

1          multibillion dollar enterprise.  But its

2          origins are in this period of time when there

3          wasn't a lot of regulation.  And I think the

4          real tragedy of the case is if you look at

5          the billions of dollars that are made by the

6          McMahons, they could have easily provided for

7          all these wrestlers.  There's really not that

8          many of them.  And the McMahon family has

9          really just sort of adhered to this older

10         model of exploitation and really didn't want

11         to change with the times.

12              Objectively speaking, based on the

13         facts that we have uncovered by talking to

14         all these people and really researching the

15         business, which I'll get into in my

16         presentation, the situation of unfair

17         bargaining power really doesn't have any

18         other precedent in athletic promotions.  Even

19         boxing promotions were limited, to some

20         extent, just through the fragmentation of the

21         business.

22              So Don King's phenomenal success, who

23         was famously criticized for some of his sharp

24         practices where he would control the booking

25         and the management, and you know, maybe the

1                    outcome, but here that's not the case.  Right?

2                         Here, that's not the case.  The WWE and

3                    the McMahon family control everything.  Okay?

4                    There's really no question that the innate

5                    ability of a boxer to ascend through his

6                    natural ability is somewhat distinct from the

7                    model where all wrestlers are subject to what

8                    is really a monopsony where there's only one

9                    buyer of the product because of this sort of

10                   consolidation.

11                        I don't need to go into the whole

12                   history, but this is a part of the case

13                   because of the historical elements that led

14                   to this scenario both from the workplace

15                   structure side as well as what happened.

16                   Okay?  And I mean, I could go into some

17                   details in a few minutes but this is sort of

18                   my just general introductory piece.

19                        You know, the exploitative situation

20                   that existed in boxing actually did attract

21                   the attention of congress and they passed the

22                   Muhammad Ali law and some other health and

23                   safety acts.  And those acts actually sort of

24                   became criticized because there was no

25                   private right of action and there wasn't a

1      lot of oversight because you still have this

2      shadowy world and these subcultures.

3              And wrestling, as I'll very briefly

4      describe, and it's a thread of analysis

5      that's in the complaint, which goes to a lot

6      of our equitable arguments, is something that

7      functions in its own universe.  And then one

8      of the reasons for its enduring popularity

9      and the millions of fans that really

10     appreciate wrestling is because of this.  You

11     feel like you're in some, you know, sort of

12     an alternative reality and it's sort of very

13     compelling.  And I wouldn't have really

14     thought about it.

15             I had been a wrestling fan when I was

16     younger, but I wasn't sort of involved.  And

17     you'll find sort of this hipster generation

18     of people that are very interested in

19     wrestling for this reason.

20             But underneath that is this total

21     control by the WWE.  They're really not

22     regulated by anybody, and there's no rules

23     whatsoever.  They control wrestling at the

24     highest levels.  They determine the winners,

25     the losers, the careers, the lives, the

```
 1              futures of all these people at their sole
 2              discretion.  And that is documented in the
 3              complaint.
 4                   The familiar tools that pretend to have
 5              the color of legality are, as we've seen --
 6              and you know, I think one of the problems is
 7              when I was in law school or when I was
 8              studying and looking at things, the answer to
 9              our law school examinations in contracts was
10              unconscionability is not the right answer,
11              because these forms of unconscionable
12              contracts had sort of, you know, seen their
13              day, and it was less likely that in modern
14              society that we would see this kind of, you
15              know, disparity in bargaining power in a
16              structural way.  But that's what we have here.
17                   And the more I learn about the business
18              practices, talking to the clients, and
19              talking to people in the business through
20              massive investigation, which I've spent
21              several years basically doing, these
22              preemptive releases and these post-employment
23              releases, sometimes decades after the guy's
24              performed, or the men and women performed,
25              are designed really because probably of some
```

1           of these cases.  I'm not clear on the result

2           of the Eadie case, but I know that in the

3           Jessie Ventura case, they got hit on a unjust

4           enrichment, and after that these handshake

5           deals kind of went out the window.

6                I think up to the period in the late

7           '80s the WWE was using sort of this, you

8           know -- that was to their advantage.  They

9           didn't want to give the wrestlers guaranteed

10          contracts because it was just better, it was

11          easier, it was an unregulated situation.

12               When Ventura who is -- he's very well

13          known.  He speaks very -- this is the former

14          governor of Minnesota and he speaks quite

15          regularly about the exploitative practices in

16          pro wrestling.  And I kind of put the lines

17          together.  I think that's a possible

18          explanation for the reasons that they started

19          proffering these sort of unconscionable

20          boilerplate booking contacts.

21               And they even, in a very unusual way,

22          will go to a wrestler such as many of the

23          named plaintiffs that are in this case, which

24          I find some ethical issues with.  If I'm

25          representing them and they're offering them

```
 1              $10,000 to sign a release of all their
 2              claims, I think that's a bit of a problem.
 3              And the claims that they're releasing have
 4              nothing to do with the proffer of the $10,000
 5              on the -- the guys call them legends
 6              contracts but the WWE calls them contractor
 7              nostalgia contracts, which are, usually in
 8              the past year or so, they get a call from
 9              Mark Corona and they get kind of a hard sell.
10              Hey, this is a great, lucrative deal.  We're
11              going to give you the 10,000, and they then
12              actually work off the 10,000 off of
13              supposedly royalties.  Now, why the WWE would
14              do this, we aren't completely sure.
15              Obviously, it doesn't delay proof of
16              liability but some discovery would be needed
17              to sort of figure that out, I think.
18                   THE COURT:  Are you questioning the
19              proficiency of the consideration for the
20              release?  I'm just not quite sure where
21              you're going.
22                   MR. KYROS:  I am.  I'm questioning that
23              if they're going to use those releases as a
24              defense to a traumatic brain injury in an
25              occupational injury case, that the wrestler
```

```
 1              is unsophisticated, he's not represented by
 2         counsel.
 3              You know, actually, my partner,
 4         Mr. Boumil would like to present about some
 5         of the more substantive issues.  We sort of
 6         divided it up.  So if it's okay, I'll just
 7         run through this.  But he's going to address
 8         the unconscionability, at least if you permit
 9         us to.
10              I'm saying this as a general narrative
11         of what our theory of this case is.  And
12         these post-employment things, I think, are
13         troubling.  And I do believe that's the
14         design.  They may have some other business
15         purpose but they're designed to prevent any
16         lawyer or anyone bold enough to sort of come
17         in, challenge whatever issues these guys
18         have, and probably preemptively knock them
19         out with some kind of threat of Rule 11.
20             THE COURT:  So if I have questions about
21         this, I should reserve them for Attorney Boumil?
22             MR. KYROS:  Yes.
23             THE COURT:  Okay.
24             MR. KYROS:  If there's anything he can't
25         answer, I'm happy to -- I'm pretty fluent in
```

```
1            the material, but I just wanted to not step
2            on his and I know he has a very detailed
3            presentation.
4                 THE COURT:  Thank you.
5                 MR. KYROS:  I'll say very briefly that
6            we do have case authorities in Connecticut,
7            as well as federal law, with respect to the
8            enforceability of these things.  And
9            obviously one thread that does run through
10           this complaint are the principles of equity
11           that our system of justice does rely upon.
12                And, again, broadly, this argument
13           about this -- this next argument about the
14           misclassification in the workplace structure,
15           and you'll read online, you know, a myriad of
16           articles:  Wrestlers aren't paying contracts.
17           This is unfair.  It doesn't seem to be this
18           -- there's this unpublished decision that
19           they're heavily relying upon which obviously
20           we don't believe applies.  But the issue
21           really isn't as academic as a law on
22           misclassification cases that are out there.
23           I say that in all sincerity because the
24           actual effect of this have been very profound
25           in this group of people, because you have the
```

```
1            archaic system without any workplace

2            structure that has related to a group that is

3            engaged in a very, very physical activity in

4            their, you know, in their employment, we

5            argue.

6                  And they sustain -- almost every man

7            and woman in this case has sustained

8            occupational injuries; broken necks, broken

9            backs, fused disks, hip replacements,

10           shoulders, necks, knees.  For the most part

11           they have inadequate medical care to treat,

12           especially as they age, including some of

13           those clips, which I'll get to in a minute.

14                 Many of these people have Go Fund Me

15           pages trying to raise money to get a hip

16           replacement or a shoulder replacement or just

17           raise some money.  And when I worked with

18           them, they often are not eligible for social

19           security disability because they haven't paid

20           their taxes in many years because they don't

21           have the income or -- these people do

22           function, tend to function on the sort of

23           margins of society.  And they are made, in

24           some cases, depending on, you know, how much

25           money they get from these little regional
```

1          side shows they travel around, they might get

2          SSI.

3                But over-layered on top of all of this

4          is where I think the opportunity for the

5          court to act and help is the latent

6          occupational diseases that have recently come

7          to light in the sense of their awareness.

8          And this will be sort of a paradox that

9          develops in the case because they're going to

10         say, oh, we didn't know anything until 2007.

11         But that's not the case.  And I can prove

12         that pretty easily right now.

13               The CTE debate, I think, is an

14         opportunity.  I mean, this disease robs them

15         of their memories and of their minds.  And

16         the evidence is overwhelming that the

17         wrestlers are at risk and obviously are going

18         to suffer or be at great risk for suffering

19         neurological diseases.  The evidence on this

20         is not even a close call I can show you a

21         couple of wrestling matches.

22               The case, the amended case, and I

23         understand the sanctions are on this case.

24         But the case that we filed is the first

25         lawsuit that has a plaintiff that's a

1        deceased wrestler who has chronic traumatic

2        encephalopathy.

3            Ironically, when the diagnosis came

4        from Dr. Ben Omalu and it was published in a

5        Boston Globe story in October it came with

6        the lead that it was also an MMA fighter

7        named Jordan Parsons who had been struck and

8        killed, and I facilitated their brains to go

9        to Omalu.  And you know, I felt that there

10       would be a sort of a clear relationship

11       because MMA is perceived to be a very violent

12       sport, where CTE may be more likely.  And the

13       media didn't really make that connection.

14       But the court should be making that

15       connection because we have a confirmed

16       diagnosis in the case.

17           And you know, this sort of removes, I

18       think, this case from all these sort of

19       structural problems, procedural issues,

20       counsel's done bad things.  The hard science

21       is that these folks have CTE.  In fact, the

22       third and fourth cases so diagnosed.  I think

23       McDevitt has cited that there was an article

24       that mentions two other wrestlers, one of

25       whom I think has done a published study, and

```
 1            the other I'm not sure.  I'm not sure that

 2            takes away fundamentally.  The four

 3            publically identified pro wrestlers that have

 4            been studied, their brains have been

 5            analyzed, they all have CTE.

 6                 And finally, I'll say, just on this

 7            introduction, Mr. McDevitt has created his

 8            own sort of story line.  He frequently

 9            alleges that this lawsuit against the WWE is

10            all about money.  This is his repetitive

11            thing.  In fact, he told the Connecticut Law

12            Journal that I'm a modern day ambulance chaser.

13                 This is not an isolated comment.  This

14            is an ongoing series of personal attacks

15            which incidentally violate the rules of

16            professional conduct.  When I was privileged

17            to be admitted to the Connecticut federal

18            court, I was handed a book and I went through

19            the book and Mr. McDevitt is basically

20            violating every -- everything in it.  Okay.

21            Everything.  But I'll get to that later.

22                 The case is about money because the WWE

23            is generating literally millions of dollars,

24            much of it from the wrestling performances of

25            the named plaintiffs and their colleagues.
```

1           Because the way the WWE makes a lot of its

2      income -- now, they do produce events, and --

3      and I point this out in the complaint, but

4      these complaints are big.  And one thing that

5      I do credit their team is they're able to

6      repeat something over and over and over, and

7      eventually it becomes true.

8           I don't bear, and my colleagues don't

9      bear any resemblance to the group of lawyers

10     that are portrayed in all these filings.  And

11     I really appreciate getting the opportunity

12     to speak.  I was in one hearing on June 8th

13     in front of Judge Bryant and I don't think I

14     got a word in edgewise.  Obviously, she had

15     issues with the complaint.  I complied with

16     her order.  I amended -- we revised the

17     complaint within ten days, and that complaint

18     survived a motion to dismiss on a very

19     important, very central theory of the case.

20     And that case has actually now been cited by

21     the Ohio court of appeals, and it's

22     consistent with the NHL MDL decision.

23          So these are sort of the opening salvos

24     in what could be a long campaign for

25     occupational illness in brain injuries, just

1           as there had been an earlier sort of movement

2           to try and help workers exposed to asbestos

3           and other things with latent occupational

4           injuries.

5                And there's been another decision that

6           didn't involve us, but Wendy Fleishman, I

7           think, filed a case in New York, sort of an

8           opt out.  I don't know.  I think she filed --

9           she filed in state court.  And that case is a

10          CTE diagnosis in a football player, and the

11          judge ruled -- I think it was a recent

12          decision, about a month or two ago, making

13          very close comparisons to asbestos.  And the

14          S and P issued some sort of report saying

15          that they believed that the liabilities for

16          chronic traumatic encephalopathy could reach

17          hundreds of millions of dollars a year.  Not

18          quite to the level of asbestos, but they

19          really felt that it could be significant.

20               These are not frivolous cases.  These

21          are cases that are going to come and compel

22          large companies such as the defendant in this

23          case, to not save money, cut corners.  With

24          the amount of money they spent on this

25          defense, they probably could have taken care

```
1              of half the guys in the case.  I mean, it's

2              ridiculous.

3                   The well being of these wrestlers is

4              the issue in this case.  The WWE's failures

5              at the time they were wrestling is a central

6              fact of the case.  But they have also, as we

7              will demonstrate, and we've tried to do, gone

8              out into the world and said no, no, no, we're

9              doing everything we can, and they've made all

10             sorts of affirmative omissions.

11                  They've also made statements

12             definitively sort of trying to get away from

13             the issue.  I think Mr. McDevitt said last

14             week that we're not scientists, the science

15             is still emerging.  These are typical quotes,

16             you know, on the equivocal nature of this.

17                  So, you know, but I have -- and

18             finally, just this last.  I have to address

19             it because, you know, I feel that I'm under

20             siege.  I mean there's 10,000 articles on

21             Google talking about what a bad

22             unprofessional person that I am.  That

23             doesn't bear any resemblance to me.  I've

24             adhered to every rule, I've adhered to every

25             order, and I take everything seriously.
```

```
 1              I think one of the issue is that when I
 2         am reading some of these opinions, I'm not
 3         100 percent clear on what exactly
 4         constitutes, you know, this problem or that
 5         problem.
 6              I mean I'm a little bit lost sometimes
 7         and I've done my best, as an attorney, to
 8         advocate for these people and present the
 9         facts.  And I'm going to go through some of
10         these facts that are in dispute.
11              When they speak, we don't have to
12         accept their version.  And a lot of the
13         things that I just heard are not accurate.  A
14         lot of things look bad because that's their
15         side of the story, but I'd like to get, you
16         know, a few facts in front of you.
17              Honestly, you know, I think that
18         Mr. McDevitt is frantic, and they realize
19         that the attorney that's advocating for these
20         people is me.  Okay.  Now, my co-counsel are
21         excellent but I'm obviously the target.  I'm
22         named hundreds of times in all these
23         pleadings.  It's very unusual.
24              The first one was the action where they
25         sued four of my clients, which I was actually
```

1          trying -- we were trying to say, all right,

2          let's maybe not file as many cases.  We'll

3          send some nonpublic letters to these folks

4          and try and get this situation under control.

5          Maybe they want to, you know, talk.  No,

6          that's fine.  The scorched Earth tactics

7          though shouldn't be ignored. I noticed he

8          didn't really talk too much about that.  I'm

9          sure he'll say, well, we're trying to protect

10         ourselves from frivolous litigation in a

11         preemptive strike.  Two of the plaintiffs are

12         dead.

13              All right.  Well, anyway, I would say

14         there's also a frantic attempt by McDevitt to

15         protect the WWE's huge financial assets.

16         Just even by reducing the very slightest

17         percentage to compensate and protect these

18         wrestlers.  These people are in total health

19         crisis.  And he's also in a frantic attempt

20         to suppress the fact that WWE knew about the

21         dangers of head trauma for years, and now

22         they're going to face, and they are facing a

23         looming CTE epidemic and they don't want to

24         resolve it.

25              The sole aim of this motion for

```
 1              sanctions and attempt to dismiss the case at

 2              this early premature stage is to prevent

 3              exposure of the WWE's practices and conduct

 4              towards people who enabled them to dominate

 5              the wrestling world and make billions of

 6              dollars.

 7                   I do have a presentation.  It's pretty

 8              lengthy.  I'm going to try and run through

 9              it.  Basically it goes through some of the

10              issues I just raised.  Mr. Boumil is going to

11              go through some of the case authorities that

12              support our positions on these specific

13              things that they've raised in the motion.

14                   Unfortunately, after half an hour, I

15              brought a Mac computer.  So is it okay if I

16              sit at the table to just advance the slides?

17                   THE COURT:  That's fine.

18                   MR. KYROS:  Okay.  Thank you.  So the

19              WWE, according to my research, began in 1963.

20              There were earlier entities but the standard

21              wrestling history that I bought on Amazon,

22              it's called the History of Professional

23              Wrestling WWE 1963-1989, describes the sort

24              of genesis of this company.  I don't think

25              the earlier iterations of it are that
```

1           important because everybody who is a named
2           plaintiff is going to be after 1963.  But
3           when I wrote that the 1963 to present, I was
4           referencing this.  So when they filed
5           sanctions and they said that WWE does not
6           exist as an organization in 1963, I'm
7           assuming that they're saying that it was
8           Capital Wrestling or Titan Sports or some
9           other entity.  I think it's a typical sort of
10          overwrought thing.  The world refers to them
11          as the WWF and they were actually then later
12          be WWWF, like with an extra W.  Vince
13          McMahon, Vince K. eventually dropped that.
14               During this period, the business was
15          relatively unregulated because according to
16          one academic this was a harmless and
17          inconsequential form of entertainment.
18          Another sort of element that is a thread
19          through this case is that the wrestling
20          business adhered to a code of silence.  And
21          it's not exactly a code of silence.  It was
22          designed to keep the outside world from
23          knowing both the wrestling moves that it was
24          sort of a choreographed performance, but it
25          also exerted a great deal of cultural and

```
1              social control over the performers.  And when
2              we get to the equity arguments, I think that
3              this fact has to be acknowledged.
4                   You know, baseball players and football
5              players they have their own codes but
6              wrestling really is governed by the legacy of
7              this earlier business.  And even some of the
8              younger wrestlers that -- because I represent
9              wrestlers from all generations -- they still
10             had people or parents -- it's a very dynastic
11             business where family members or other people
12             sort of participate.
13                  During this period, the territories are
14             controlled by the current defendant in the
15             case's father, who is known as Vince J.
16             McMahon.  He was a very popular promoter of
17             wrestling.
18                  Briefly, this is sort of a timeline.
19             In 1969, this entity obtained a revenue
20             ruling which Mr. McDevitt relies upon,
21             amazingly, in its motion for sanctions in
22             this case.  And he says, The plaintiffs'
23             counsel served frivolous misclassification
24             and cited to this.  And I know this was on
25             your thing, but I couldn't resist.
```

1              The facts of this revenue are obviously

2        antiquated.  And the allegations on the face

3        of the complaint make live everything in it.

4        And the things I've highlighted in red are

5        obviously contradicted by reality.

6              The wrestlers engaged in a distinct

7        occupation of his own, engaged only for a

8        short period of time.  These people are

9        signed to contracts where they wrestle

10       hundreds of nights exclusively and can't work

11       for other promoters.  We'll get into that.

12       So I just wanted to point that out.

13             In '73, the current defendant, the

14       current chairman is initiated into the

15       business.  An academic historian, I believe

16       he's the University of Ohio, named Scott

17       Beekman, who wrote one of the few sort of

18       coherent histories of wrestling, describes

19       how McMahon removed -- sort of evolved the

20       catch style of wrestling into what it

21       ultimately became with these much more high

22       flying, high risk maneuvers.  And this is

23       significant because the degree of control

24       that is ultimately exercised over all the

25       moves is going to come into play as to, you

 1              know -- and I noticed that at certain points

 2              McDevitt tried to get away from this concept,

 3              and he even said that, I believe, some of the

 4              plaintiffs in the consolidated case called

 5              their own spots.  Again, these are some of

 6              the issues.

 7                   Here's a fact that I think most people

 8              don't know about.  In 1976 the WWF promoted

 9              Muhammad Ali versus a very famous Japanese

10              wrestler, and in fact, it was subject to a

11              recent book.  And just briefly this is where

12              I'm going to begin sort of my constructive

13              notice.  And I'll actually have actual notice

14              that contradicts the 2005 date.

15                   The discovery -- the motion for

16              sanctions now, not a motion to dismiss, not a

17              factual sort of debate.  No, no, no.  The

18              motion for sanctions, you know, they didn't

19              know anything from 2007.  Well, if they knew

20              anything about Muhammad Ali and they're

21              promoting fights, they may have had some

22              knowledge.

23                   And this brings me, just to jump back a

24              little bit.  Because the current state of

25              medical science is going to be an overarching

1          issue.  It's a generally accepted principle

2          of medicine that when human beings suffer

3          blunt force trauma to the head and there's an

4          acceleration and deceleration of injuries to

5          the brain, there's a risk of permanent brain

6          damage.  So the seminal study, and this thing

7          is quoted in every CTE study and every

8          medical journal.  It starts in 1928.  And

9          that's, you know, plagiarized, I would say

10         copied from the NFL case.  And this is going

11         to be copied in every case involving

12         occupational injuries that relate to blunt

13         force trauma to the head.

14              The syndrome is called punch drunk

15         dementia pugilistica, post concussion

16         syndrome.  Now it's called chronic traumatic

17         encephalopathy.  But earlier they had other

18         names for it.  There's related diseases:

19         Dementia, Parkinson's Disease, Alzheimer's,

20         and ALS.

21              Standard reference work -- standard

22         reference work, for example, it is well

23         established that a person subjected or

24         repetitive constantly subject to constant

25         blows such as boxers and football players may

1    develop neurological signs and symptoms, such

2    as punch drunk syndrome.

3         This is quoted, actually, in a really

4    good article that came out last year called

5    Chronic Traumatic Encephalopathy Real

6    Disease, Not a New One.  Basically this

7    academic describes how the evolution has been

8    -- it wasn't a revolution.  It was an

9    evolution of knowledge.  So if you were

10   knocked unconscious in a sport, there would

11   have been the knowledge that you're going to

12   have to sit out for a couple of months if

13   you're a boxer.  And I'll move more quickly

14   here.

15        1978, interestingly enough, I didn't

16   know this until fairly recently.  WWF started

17   a mixed martial arts championship.  You know,

18   once again, I think would evidence some

19   knowledge of the risks of head trauma.

20        Now, here -- I hope we have volume on

21   this.  So this is the first piece of evidence

22   that I was able to find after voluminous and

23   luck, because we don't have discovery in the

24   case.  And when we did try and get discovery

25   in the consolidated case, they wouldn't

```
 1              provide any information about head injuries
 2              or concussions.  The only thing they would
 3              provide is there was something about long
 4              term risks.  Actually, I think this falls
 5              into that.  So I'm not sure why it wasn't
 6              provided.  Oh, it wasn't provided because
 7              it's pre-2005.  I'm sorry.
 8                   So, this is a WWF program that was
 9              filmed in 1981.  It's a two-hour piece.  And
10              then sort of at the tail end of it, they have
11              some interviews after the wrestling matches.
12              It's very short.  The interviewer is famous.
13              His name is Kal Rudman, Killer Kal.  And he
14              asks this wrestler named Pat Patterson if
15              wrestlers get punch drunk.  And punch drunk
16              as we know or should know is basically the
17              term for a condition that's similar to
18              chronic traumatic encephalopathy.  And this
19              was known.  This was sort of something that
20              people in this business that would have been
21              participating in these type of athletics
22              would have known about.  So, I got lucky and
23              we stumbled upon this.
24                   And Pat Patterson incidentally -- well,
25              let me play this clip.  And I think it's
```

1           very, very succinct, if we can hear it.

2

3                (Recording was played.)

4

5           MR. KYROS:  I apologize, your Honor.

6      It's not audible.  He says -- I actually have

7      it in writing.  He's asked if pro wrestlers

8      get punch drunk and he answers that some of

9      them do.  In boxing, punishment is taken to

10     the head only.  In wrestling, it's all over

11     the body.  I'm not sure why the audio doesn't

12     work.

13          The interview is significant not just

14     because it's some random wrestler.  If you

15     read the top of the next page, Patterson

16     retired from wrestling to become Vince

17     McMahon's right-hand man and main booking

18     assistant, working with some other folks, and

19     he was the chief architect of the WWE.

20     Anybody who knows anything about WWE

21     wrestling knows who Pat Patterson is.  He is

22     sort of one of the, you know, important

23     figures in the development of the promotion,

24     and he is, you know, considered a very

25     important figure.  So he's just not some

```
 1                    marginal guy.
 2                         THE COURT:  What's his medical
 3               background?
 4                         MR. KYROS:  Excuse me?
 5                         THE COURT:  What's his medical
 6               background?
 7                         MR. KYROS:  His medical background?
 8                         THE COURT:  Yes.
 9                         MR. KYROS:  I would assume he has no
10               medical background.  I would assume he's a
11               wrestler.
12                         MR. MCDEVITT:  He has a seventh grade
13               education.
14                         MR. KYROS:  Okay.  We'll get to a
15               medical background.  I have it.
16                         Very briefly, '80s they sort of come to
17               dominate wrestling.  I think that's sort of a
18               well-known fact.  Here is a 1986 book that
19               was very popular.  And when you read it --
20               and just direct on -- most studies indicate
21               chronic or traumatic brain -- chronic brain
22               damage concern, repetitive sub-concussive
23               blows, such as those sustained regularly in
24               training or more damage than one time
25               knockouts.  Again, 1985, but why is boxing
```

```
 1              relevant.  Oh, 1988, two years after the
 2              book, WWE promotes a boxing match with Sugar
 3              Ray Leonard which I believe would put them on
 4              in constructive notice of boxing literature
 5              related head trauma.  They claim that, you
 6              know, we don't know anything until 2007, but
 7              common sense and I think somebody with, you
 8              know, an understanding of the wrestling
 9              business and the promotion would understand
10              if they're promoting boxing, they would
11              probably have to have some awareness of these
12              risks.
13                   THE COURT:  Well, the quotes that you
14              just showed us that you weren't able to play,
15              you have the wrestlers saying some wrestlers
16              do get punch drunk but then he seems to be
17              making a comparison to boxing, which is he's
18              essentially saying in boxing you're getting
19              hit in the head all the time, whereas in
20              wrestling you're also getting hit in the
21              body.
22                   MR. KYROS:  Well, as I --
23                   THE COURT:  If I can finish the
24              question, please.
25                   So my question for you is so how would
```

1           -- I don't get the apples to apples

2           comparison from the boxing to the wrestling,

3           even if there are studies out there that show

4           that people could get punch drunk or have

5           concussion issues in boxing prior to 2005,

6           how does that translate into wrestling, where

7           boxing has the quote you just gave us, more

8           head shots than you see in wrestling?

9              MR. KYROS:  I interpret the quote as

10          wrestlers take more punishment.  So the quote

11          is essentially that do wrestlers get punch

12          drunk.  Patterson answers some of them do,

13          and then he describes a variety of scenarios

14          where they hit their head.  And he said, in

15          boxing, the punishment is taken to the head

16          only, but in wrestling it's taken to the

17          whole body.  So what I interpreted this

18          statement to mean is that wrestlers were more

19          at risk for getting punch drunk because they

20          not only sustain hits to the body, they also

21          sustain hits to the whole body.  That was my

22          interpretation.  I, unfortunately, can't play

23          the clip.  I think that's what the audio sort

24          of indicates.

25              THE COURT:  Okay.

```
 1              MR. NORRIS:  Your Honor, real briefly.
 2         I think to answer your question there's two
 3         parts to it.  One is the case is based on
 4         repetitive head trauma.  And that involves a
 5         rapid deceleration of the brain, as we
 6         alleged in the complaint.  That type of
 7         injury is every time they fall, every bump.
 8         That's happening to their body, as well as
 9         their head.  And so that quote goes to that.
10              The second part of your question, how
11         can you go apples to apples.  WWE had -- they
12         promoted boxing.  They also had the XFL.
13         They keep trying to distance themselves from
14         boxing, from football, yet the owners of this
15         company chose to be involved in both.  How
16         can they be involved in both those things and
17         not be aware of the types of medical
18         literature and also the long term
19         ramifications of both of those companies --
20         those organizations.
21              THE COURT:  But is the medical
22         literature speaking to wrestling or is it
23         speaking to all three sports?
24              MR. NORRIS:  Your Honor, I would -- I
25         would say that it is not sport specific.  It
```

1                 is -- a repetitive head trauma is a

2                 repetitive head trauma, whether it is a line

3                 backer or a wrestler or a boxer.  And the --

4                 someone in charge of any of these

5                 organizations, they're intelligent people.

6                 They have degrees.  They also hire medical

7                 professionals.  They have a responsibility to

8                 know that's repetitive head trauma.

9                     If there is literature out there that

10                says repetitive head trauma causes long term

11                neurological injury, whether it's specific to

12                wrestling, whether it is specific to

13                football, whether it is specific to boxing,

14                we have case law that shows that it is an

15                employer's responsibility to know of

16                dangerous workplace environments.

17                    That is what we are alleging here.

18                That there is a dangerous workplace

19                environment that they hid.  And that

20                dangerous workplace environment is the long

21                term neurological injuries that was caused by

22                the repetitive head trauma.

23                    THE COURT:  We talked about discovery

24                issues last week, where you asked for what

25                you've just articulated to me here in open

1        court during the course of discovery?

2            MR. NORRIS:  Your Honor, last week

3        involved the Singleton Lograsso case, in

4        which case we were limited to 2005 and

5        beyond.  That is a matter that I think will

6        likely be brought up at a future point in

7        time.  As to whether the 2005 date is the

8        appropriate date or not, I think all of us

9        feel that discovery was restricted as a

10       result of that.  And I don't think we got all

11       of the discovery that was probably necessary.

12           THE COURT:  I'm just asking with respect

13       to this particular case.  Has a discovery

14       request been issued or served on you that

15       would cover the answer that you just gave

16       minutes ago here in open court?

17           MR. NORRIS:  No, we have not received any.

18           THE COURT:  Okay.

19           MR. NORRIS:  Thank you.  I'm going to

20       defer back.

21           MR. KYROS:  All right.  This is the

22       1988.  I'll mention this pretty briefly.  It

23       relates to the sort of workplace structure.

24       In 1989 the WWE petitioned to deregulate

25       wrestling, if you can believe it, not that it

1          wasn't deregulated enough.  They testified

2          that professional wrestling was just

3          entertainment and that the participants are

4          trained to avoid serious injuries.  It is an

5          activity where the participants struggle hand

6          to hand for the primary purpose of providing

7          entertainment to spectators, rather than a

8          bona fide athletic contest.

9               So they sort of removed themselves from

10         the purview of many state athletic

11         commissions, not all.  Some of the state

12         athletic commissions maintain their

13         jurisdiction.  But in a number of the big

14         states, they were able to do this

15         successfully.  And I think this will go to

16         some of the issues in the case.

17              You asked about whether or not they

18         knew.  And I think, again, this 2005 date, my

19         interpretation of the 2005 date in the

20         Lograsso case was, in essence, that this was

21         cited -- and I know that a huge amount of the

22         presentation was spent on it, but basically

23         what happened there, if you read the sentence

24         above it, it says that for decades this

25         common body of medical and scientific

1          knowledge was known, for example,

2          specifically, there was this article.

3                  Now, I'm not sure that that was the

4          best place or way to do it and Judge Bryant

5          seemed to really seize upon it.  But we could

6          have picked any one of these other events and

7          that date could have become the benchmark.

8                  So this next clip is, I think, you

9          know, I'm not even sure, you know that --

10         once -- I'm not clear as to why this clip

11         isn't decisive on removing the 2005 date.

12                 So this takes place ten years before.

13         The WWE in 1993 created a program called

14         Monday Night Raw.  It became one of the most

15         successful programs in television history,

16         and it's still running.  And in 1995 one of

17         the superstars of the promotion named Shawn

18         Michaels is depicted, actually, ironically

19         enough, in a fictional story line, as having

20         a concussion.  And this was deemed to be

21         something interesting.

22                 And I'll play this clip.  I think this

23         is a very important clip.  By the way, these

24         clips are not something that, as they did,

25         just pulled out of the internet without any

```
 1              evidence.  These things are all referenced in
 2              the lawsuit.  These are referenced in the
 3              Laurinaitis case.  Some of the clips that
 4              they showed I don't have any frame of
 5              reference for those, but this is something
 6              that they're aware of.  And I'll play this.
 7                   This is a medical professional.  This
 8              isn't Pat Patterson.  This is an actual
 9              doctor who my investigator interviewed and
10              he's referenced by many of the plaintiffs.
11              When they were on the west coast -- I believe
12              he was a west coast doctor who worked in some
13              capacity, it seems like for many years, at
14              least from the '80s up until this point for WWE.
15
16                   (Recording was played.)
17
18                   MR. KYROS:  I'm going to stop it.
19              That's basically Vince McMahon coming on and
20              sort of saying that they're humans.  I think
21              this story line conclusively demonstrates
22              that they had actual awareness of
23              post-concussion syndrome, of concussions.
24              And the record reflects that they're claiming
25              that they didn't implement a policy for more
```

Falzarano Court Reporters LLC

1           than ten years after this thing is aired.

2           And they're saying, you know, to the court

3           put sanctions on us for, you know, making

4           these assertions.  I think it's unfair.

5                Very briefly, there was, in the

6           complaint, our research indicated and we took

7           a look at it, there was only one major

8           entity.  It was a charitable organization

9           called the Cauliflower Alley Club, which is

10          named after the injuries that boxers and

11          wrestlers receive to the ears, which is now

12          actually curable, but it's blood out of the

13          ears.  And we interviewed the president of

14          this entity who had been there for 36 years.

15          And he went on to say, Well, oh, yeah, the

16          previous president had Alzheimers and they

17          helped people with Alzheimers and dementia

18          and related diseases.  And you know, we

19          weren't able to really get into discovery

20          with it, but he told us that WWE financed

21          them and had been a part of the organization

22          for many years.  Mr. McMahon was given an

23          award by them in 1996.  So you know, again,

24          it seems to me that they would be on notice

25          that there was a serious issue with respect

```
 1              to the wrestlers.

 2                   There's another boxing match in 1997.

 3              Here's a Raw magazine.  It actually quotes

 4              the doctor but I'm not sure the doctor is

 5              real.  But this is your brain and it goes on

 6              to sort of describe, you know, the risks of,

 7              you know, getting your brain smashed with a

 8              chair.

 9                   As Mr. Norris had already mentioned

10              this is something that nowhere appears in the

11              motions for sanctions, or as I can tell, in

12              their motion for summary judgment -- excuse

13              me, in the motion -- well, anywhere in the

14              motion to dismiss.  Is that the WWF, the same

15              entity launched this XFL organization and ran

16              a football league with over 500 football

17              players in the year 2001.  So they are

18              telling the court that we knew nothing about

19              injuries to the head in the year 2001, and

20              there's no similarities between our medical

21              knowledge with the NFL.  It seems unlikely.

22              At the very minimum, it removes the 2005 date

23              to 2001 or before.  Presumably they had

24              trainers and people setting up the league.

25                   So if someone received a concussion in
```

1              the XFL, did they just put them back out
2              there, just like they did with the wrestlers?
3              I think not.  I think that there must have
4              been some return to play protocols in the
5              XFL.
6                    So once again, I don't think, you know,
7              if discovery would reveal it.  I don't know
8              specifics.  I wasn't able to get into which
9              doctor treated who.  I do have a couple of
10             XFL players.
11                   But this next clip is very short.  And
12             I have to think, this is, I think, my last
13             clip.  So, if you bear with me.  This one is
14             very short.  This one is from 2002 to 2004.
15             And now how I know that is because actually
16             Curt told me that there was a logo and then I
17             Wikipediad this.  It turns out it's from a
18             program called Confidential.  And this was
19             sort of a behind the scenes program that WWE
20             ran.
21                   This one is pretty short.  It's more
22             significant in a certain way, because if you
23             look at the way the NFL case is pled, the
24             veneration of the violence and the
25             concussions and all this stuff was part of

```
 1              the concealment.  And it also goes to these
 2              other issues, evidence of nondisclosure,
 3              culture of toughness.  It's a very short
 4              clip.  And we had the investigators talk to
 5              the trainer.  The trainer actually still
 6              works there.  I was a little surprised, so
 7              he's a very loyal guy.  I was kind of surprised.
 8
 9                  (Recording was played.)
10
11                  MR. KYROS:  So there's a bunch of
12              interesting things in this clip.  One is that
13              the man sort of laughing is Paul Levesque,
14              and he's the -- you know, he's one of the
15              major corporate execs of the company.  And I
16              believe that in the scenario he's describing
17              is that a wrestler has been knocked
18              unconscious.  And he's sort of happily saying
19              how tough this guy was because he continued
20              to perform with a concussion.  And then, in
21              fact, in the video, I believe, I'm not 100
22              percent sure, someone told me, but I can't
23              verify.  It looks like Stephanie McMahon is
24              actually helping the wrestler.  So, you know,
25              again, this predates 2005.
```

1           Another major piece of evidence -- and

2      again, major piece of evidence.  These are

3      things I didn't get in the discovery.  These

4      are things I did reasonable investigation

5      under Rule 11, for years, looking, finding,

6      getting all this stuff, talking to wrestlers,

7      talking to wrestling fans, buying things on

8      eBay, figuring out what was going on, and

9      just scouring all of these things.

10           Now this book is very unusual.  Most

11      wrestling books describe, you know, from a

12      fan standpoint.  This one is called

13      Unscripted.  And it is this sort of -- it's

14      really nice.  It's an art book.  It's a big

15      oversize book, and it's got all these great

16      glossy pages, very high production value.

17      And it's unique in that it spends a lot of

18      time talking about the injuries, to

19      concussions, and almost all the issues that

20      are raised by the plaintiffs in this case.

21      It's like they're almost like saying this was

22      a good thing.  We had no off season.  We

23      couldn't buy insurance, and we were wrestling

24      through all sorts of injuries.

25           In fact, the quote that I have on this

1        first one is a wrestler describes -- he

2        actually describes that they helped with some

3        medical care actually.  And he's never seen

4        anybody hurt left out to starve.  Well, you

5        know, maybe that's true, maybe that's not,

6        based on the allegations here.

7             But on your personal time, you're

8        responsible for your healthcare.  Think about

9        that for a minute.  You're selling insurance,

10       I walk in and say, hey, would you mind

11       selling me a policy.  I jump off the top rope

12       and land on my head for a living.  This

13       implicates maybe a concussion.  I probably

14       won't get hurt.  You can imagine how that

15       goes over.

16            More significantly, we have this page

17       from the book where at the very top it notes

18       concussions.  And I'm not sure I'm going to

19       be able to read that.

20            Christopher Jericho gave me a bulldog.

21       I couldn't remember anything.  Hold on a

22       second.

23            I've continued matches with

24       concussions.  One of the worst things that

25       ever happened to me in the WWE was a tables

```
 1              ladders and chairs match in Las Vegas when
 2              Jericho gave me a bulldog off a ten foot
 3              ladder.  I was completely knocked out.  I do
 4              not remember anything from the match.
 5                   All right.  Let's see.  Then we have a
 6              whole bunch of pages where Stephanie is
 7              featured.  Then we have this interesting --
 8              this compares wrestling to football.
 9                   Here's Chris Benoit sort of in an
10              eerily prescient statement.  I'm sure I'm
11              going to have some problems.
12                   This is the wrestler that tragically
13              murdered his family and killed himself.  He
14              was the first wrestler ever diagnosed with CTE.
15                   I want to move on to some of the
16              substantive issues and talk about McDevitt's
17              tactics.  And I'll try and move quickly
18              because we're under time considerations.
19                   McDevitt has, in fact, as I mentioned,
20              turned this case into a WWE story line.  In
21              fact, the first news story I find, the
22              lawsuit alleges WWE hid the risks.  Attorney
23              Konstantine Kyros, whose name sounds like a
24              wrestling hero bad guy filed a lawsuit.
25                   You can see the wrestling media has
```

1    sort of taken on.  The WWE concussion lawsuit

2    where Konstantine Kyros attacks the McMahons.

3    This case has become poisoned through this

4    sort of narrative that they've created.  And

5    McDevitt, as I mentioned, has an affinity,

6    not that I don't admire his bellicosity in

7    some ways, he is an expert in the

8    manipulation of language, messaging, media,

9    fiction versus reality, the use of phrases to

10   discredit and conjure up imagery.

11        And here is a prime example, which is

12   one of the main features of his attack.  He

13   says that I engaged in an internet

14   solicitation scheme.  This phrase isn't

15   meaningful at all.  It doesn't mean anything.

16   To the extent that it is found, it is found

17   in criminal conduct.  And this shows how the

18   WWE's an expert in the manipulation of

19   language, I think.

20        The word solicitation has a double

21   meaning.  In ordinary English use, the word

22   solicitation is the act of asking for

23   something.  You see it at stores that say no

24   solicitor.  However, in this context, in the

25   way that he's sort of making the narration,

1          it is stated as an implication that there's

2          an ethical violation of the rules of

3          professional responsibility that I'm going

4          out and violating the rules by soliciting

5          people in some unethical way.

6               The use of the word internet, however,

7          sort of softens the meaning and brings it

8          back.  Although I heard here, I guess he's

9          using Steve Lombardi and some other people to

10         make the accusation now.

11              The reason it softens the meaning is

12         lawyers are allowed to use websites and the

13         internet to advertise and to collect clients.

14         So internet solicitation scheme is a

15         meaningless statement.  And the interesting

16         thing is if you sort of look at -- and

17         obviously, the word scheme is used to denote

18         devious plot.  I mean that's the sense that

19         it's an ethically inappropriate thing.

20              Now, if you remove the word internet

21         and you do a Google search, internet

22         solicitation, oh-oh, that really conjures up

23         bad stuff.  And then if you actually type the

24         exact phrase, every result, with the

25         exception of two criminal cases, which are

1          federal crimes, every single result in Google

2          for term internet solicitation scheme, which

3          is something he repeats in every motion and

4          everything, is this case.  This is something

5          he created.

6                  Criminal conduct is and has been part

7          of McDevitt's entire story line from the very

8          beginning.  Barratrous plan is being aided,

9          assisted, and fueled by disgruntled former

10          wrestlers who performed decades ago in

11          Kyros's scheme.  That's something he wrote in

12          the opposition to our motion when they sued

13          the wrestlers.

14                  Barratry, of course, is a criminal

15          offense, frequently inciting and stirring up

16          quarrels and lawsuits.  And I have a bunch of

17          different definitions.  But you know, it's

18          Scotch law, which McDevitt, I believe is a

19          Scottish name.  It's the crime of a judge who

20          receives a bribe for judgment.  But you know,

21          this isn't really subtle.

22                  He uses this terminology.  He's been

23          using it from the very inception of this

24          case.  So if he's alleging perjury or

25          misconduct now, how is he doing that at the

1           very beginning of the life cycle of this

2           case?  So on March 24th when he first served

3           me the first motion for sanctions on my

4           birthday, he, you know, used this word

5           barratry, and we're like what is this.  On

6           May 31st, during the deposition of Paul

7           Levesque, Mr. Bud, who is defending with

8           Mr. Krasik, who is -- excuse me, Mr. Krasik

9           was defending, Mr. Budd was just sitting

10          there.  He didn't like some question or

11          something and he said talk about Exhibit A to

12          enact indictment against Mr. Kyros.  He tried

13          to tell the court reporter not to put it in,

14          and then as you see, it got on the record.

15               And then here, this is that book I got

16          when I got admitted to the Connecticut rules.

17          It says a lawyer should be courteous and

18          honest.  Well, we're kind of beyond that.

19          You shouldn't be making disparaging remarks,

20          calling me an ambulance chaser and all these

21          crazy things.  It's so over the line as to be

22          ridiculous.

23               He played and he cites this statement

24          from the radio interview that I gave in which

25          he says that I am saying that I'm going to

```
 1              file as many cases as I can to frivolously
 2              sort of, you know, put liability on the WWE
 3              in some kind of cash grab.  I'd like to play
 4              the clip in its entirety.
 5
 6                   (Recording was played.)
 7
 8              MR. KYROS:  All right.  And this is
 9              another very short one.  And it is the same
10              interview that they introduced for sanctions.
11              And remember that Mr. McDevitt's narrative is
12              that I'm telling the world, that I'm telling
13              the world, and I'm telling these people and
14              misrepresenting them that they're going to
15              make hundreds of thousand.  All sorts of
16              strange quotes that have no basis in fact or
17              reality.  And this is an answer that I gave
18              to the wrestling community about the money.
19
20                   (Recording was played.)
21
22              MR. KYROS:  I think that handles that.
23              I don't have anymore media.  I'm going to try
24              and run through these real quick.  I found an
25              academic article that describes how Vince
```

1           McMahon has handled situations where his

2           company -- where his image has been called

3           into question.  And this academic has --

4                THE COURT:  Before you do that, and I

5           don't mean to cut you off.

6                MR. KYROS:  Okay.

7                THE COURT:  But since you are on the

8           clock and since I do have some questions that

9           I do want to ask.

10               MR. KYROS:  Okay.

11               THE COURT:  I do want to at some point

12          before we leave today, and maybe you're

13          planning on doing it.  I don't want to take

14          you off script.  But I do want to hear, since

15          your brief doesn't fully cover it for me, how

16          you explain the NFL complaint what

17          Attorney McDevitt calls -- what he refers to

18          as the plagiarism, which you call a form

19          document, and you make reference to typos.  I

20          want to hear a little bit more, please, about

21          how you explain that, especially having seen

22          the highlighted documents.  So if we can do

23          that sooner rather than later, I would

24          appreciate that.

25               MR. KYROS:  Okay.  The lead in to that,

1           I'd just briefly say that he started his

2      presentation attacking me, it's a familiar

3      theme, saying that he's differentiating this

4      case from the NFL case, and he did so in a

5      rather unusual way.

6           In addition to the copy and plagiarism

7      allegations, he argued that I and the lawyers

8      representing the wrestlers here deceived them

9      and basically got them to think we're

10     handling the NFL case.

11          And you know, I don't think this

12     deserves any consideration.  If anybody here

13     thinks that the NFL case isn't in some way

14     related to this case, I think the two share

15     similarities and that's very obvious.

16          I've obviously not told my clients or

17     anyone else that I single-handedly settled

18     the NFL case.  This is a McDevitt distortion.

19          THE COURT:  Attorney McDevitt, for one.

20          MR. KYROS:  Okay.

21          THE COURT:  You read earlier about how

22     one rule is we try to treat each other with

23     respect and you said we've gone beyond that.

24     I do remember him referring to you as

25     attorney, you keep calling him McDevitt.  So

1           can we just call him Attorney McDevitt,

2           whatever feelings you guys may have for each

3           other.

4                MR. KYROS:  I meant no disrespect.

5                THE COURT:  Thank you.  So I understood

6           him to be suggesting that you hadn't had

7           involvement in the NFL.  Are you suggesting

8           that you did have involvement in the NFL.

9                MR. KYROS:  Yes.  I actually -- today he

10          said that if you search the docket, I have a

11          notice of appearance.  I think he sort of

12          corrected himself.  But at last count, my

13          firm represents 543 NFL players.

14               Two years ago I filed a notice of

15          appearance in 485 of them and I actually sent

16          it to Jerry, Mr. McDevitt, Attorney McDevitt,

17          and he's continuing this story line.

18               If you look at the way he presented his

19          argument, he once again sort of threads the

20          needle.  He's more careful.  And he crafted

21          the statement, every opinion in a certain

22          circuit, Mr. Kyros's name isn't anywhere

23          obtaining the settlement, and everything.  So

24          the nuances of leadership and, you know,

25          getting onto the plaintiffs' steering

```
 1              committee are probably lost on wrestlers, as
 2              far as most people.  And I do have a clip
 3              from Jim, but I think we don't need to
 4              address.
 5                   A wrestler or anybody else may in a
 6              simplistic way articulate somebody who
 7              represents a lot of people in a particular
 8              case, and that's my practice in many areas
 9              where a client of the firm or a potential
10              client will call in and say do you
11              represent -- are you the lawyer handling the
12              Actos cases or something because that's the
13              way they conceptualize it.  It's not a -- it
14              may be something Attorney McDevitt didn't
15              know.  I don't think so.  And he certainly
16              knew that I had a notice of appearance in the
17              case.
18                   The issue with respect to -- and here's
19              the notice of appearance.  I actually filed
20              the fifth wrongful death case with co-counsel
21              in California, which was Curtis Whitley who
22              died of CTE.  He's the fifth NFL player, I
23              believe, diagnosed, at least according to
24              this article.  Excuse me, sixth wrongful
25              death case.
```

1          These things relate to Bryant.  And

2     let's see.  Okay.  Here's the plagiarism.

3          The idea that lawyers would copy a

4     complaint and use the copied complaint as the

5     template for their complaint I think is not

6     something that's sanctionable.  I think that

7     this is a common, routine, ordinary practice.

8     At least in the realm of plaintiff practice

9     that I engage in.

10         If you look at the docket in MDL 2323

11    with all the NFL lawsuits many of them are

12    virtually identical.  Eventually there was a

13    short form complaint, but if you look before

14    the MDL form you'll see that the lawsuits

15    basically come up with the sort of the gist

16    of the claims.

17         The issue that I was looking at where

18    we had these opinions in some of the case was

19    that the law is built on similarities and on

20    making analogies and coming up with the

21    correct language to frame your arguments

22    around the causes of action and around the

23    issues that relate to the facts that you're

24    presenting.  So I said to the group, well, we

25    should look at what was pled -- and we relied

```
 1            heavily on the NHL case and we relied heavily

 2            on the NFL case.

 3                 The NFL case was a little bit different

 4            because we had the advantage of the NHL case,

 5            which Judge Bryant actually quotes very

 6            favorably in her opinion and is the reason

 7            that the Lograsso case proceeded is the NFL

 8            case had a lot of different issues with

 9            preemption.  So a lot of the meat of the

10            argument didn't get there.  But the essence

11            of the problem from McDevitt's argument is

12            that copying is part of our system.  And in

13            fact, if you look at it, he kind of stretches

14            the argument in two ways.  This is copying.

15            Okay.  And plagiarism tends to say when we're

16            passing off this work as our own.  I'm not

17            sure that's the correct term.  I think

18            copying would be the correct term.

19                 The idea that you can't do that, I

20            don't think squares with the way that people

21            practice.  But over layered within that is

22            that we were trying to mislead the court with

23            these misstatements, and it's not true.  Okay.

24                 The typographical errors that came

25            about in that complaint are unfortunate, but
```

 1          a clear reading of them is that they were

 2          obviously an inadvertent mistake, and we have

 3          case authority here in Connecticut that

 4          something that has the ring of a typo,

 5          doesn't warrant dismissal, since there was no

 6          intention to mislead.

 7                Of course we know who Mike Webster is.

 8          McDevitt got up here and -- Attorney McDevitt

 9          got up and said that the, you know, everybody

10          knew Mike Webster.  Well, if you read the

11          sentence, what obviously happened is that the

12          word wrestler and player sometimes used

13          interchangeably by people drafting or helping

14          on a case.  And I had put a directive down

15          and said that we should, you know, make sure

16          that the word player is not used where

17          wrestler is the preferred term.  So somebody

18          probably did some kind of find and replace

19          and that's how those got mistaken.

20                But the body of it, large sections were

21          borrowed.  That is true.  But where you

22          really see the, I think, silliness of the

23          argument is that --

24          THE COURT:  How do you justify, for

25          instance, the change where you've got a quote

```
 1              by Roger Goodell, who is the commissioner of
 2              the NFL and it's changed to imply -- not
 3              imply, to state that quote is attributed to a
 4              WWE official?  I mean that's not borrowing a
 5              form allegation.  That is taking someone's
 6              quote and attributing it to someone who did
 7              not make that quote.  How is that a typo?
 8                   MR. KYROS:  Because when we cut and
 9              pasted the complaint, we went through and
10              edited the form.  So all of the sort of
11              structure of the language was being utilized
12              because we felt that we were missing some
13              elements.  There's an incantation of formula
14              when you look at the structure.
15                   In fact, if you look at the structure
16              of each of the plaintiffs at the end of their
17              allegations, some of that was -- we looked at
18              all the ways that they reformulated that
19              structure and I think we borrowed that from
20              another complaint.  So, that is an error but
21              it wasn't intended to mislead.  Right?
22                   The obvious one is the Mike Webster one
23              where you can see it very transparently that
24              it's a typo.  The Goodell one, his name isn't
25              mentioned.  So it was the drafter, when they
```

```
 1              were editing it, didn't notice that it was

 2              not appropriate to Goodell.  That was --

 3              that's, you know, the underlying --

 4                   THE COURT:  But how do you miss that

 5              complaint?  I mean, I was a plaintiff's

 6              lawyer for 24 and a half years.  Who is

 7              reading the complaint, when you said you've

 8              got a quote in there?  I mean, what was the

 9              good faith basis for saying, oh, it's okay to

10              leave this quote in the complaint?

11                   MR. KYROS:  Inadvertent mistake.

12                   THE COURT:  Okay.  What about with

13              respect to the allegations that there were

14              certain documents, studies, etcetera, created

15              by the WWE?  What good faith basis did you

16              have for that one?

17                   MR. KYROS:  Well, we made a comparison

18              to the two cases, right, and there are

19              similarities and there are dissimilarities.

20              Obviously, the similarities far outweigh the

21              dissimilarities.

22                   With respect to the specifics in the

23              pleadings, which generally are written in a

24              very general way, we were trying to get to

25              the essence of what those constructions were.
```

1           And in our view, there are representations

2           made by the WWE that fit into those categories.

3               Specifically, I think on the one that

4           you're referencing, is the Chris Nowinski

5           book, Head Games.  I believe that one of the

6           issues is that the WWE, in a sense, makes

7           these statements in an evasive way.  But

8           they're -- let me see.

9           THE COURT:  Do you have, for example,

10          evidence or anything to support the

11          allegation that the WWE published pamphlets

12          to its players, published articles regarding

13          concussions?

14          MR. KYROS:  What paragraph is that in?

15          THE COURT:  I believe that is paragraph

16          534 or rather where it alleges that WWE

17          published -- made public statements,

18          published articles, and issued a concussion

19          pamphlet to its players.  What do you have

20          that backs that up?

21          MR. KYROS:  I take the magazines.

22          That's the piece of evidence that I just

23          brought in would be -- I think, again, this

24          is a general statement that these -- I know

25          that they issued various magazines and things

```
 1              that are -- two of the things I just put in,

 2              you know, front of the court are obviously

 3              public statements.  Whether you call them

 4              articles or not, I think I would.  And the,

 5              you know, the claim is that these were

 6              designed to downplay and mislead the

 7              wrestlers about the risks of these injuries.

 8                   THE COURT:  Is there a concussion

 9              pamphlet that was issued to the WWE wrestlers?

10                   MR. KYROS:  I don't have possession of a

11              pamphlet.

12                   THE COURT:  Well, have you heard of one

13              or seen one?  You made an allegation in the

14              complaint that one existed.  This is part of

15              the copy and paste from the NFL complaint to

16              the WWE complaint.

17                   MR. KYROS:  Well, actually concussion

18              pamphlet was crossed out.  It says pamphlets

19              and paraphernalia, published articles, just

20              sort of a general statement.

21                   THE COURT:  So what's the pamphlet that

22              you were referring to that's relevant to the

23              concussion complaint that was issued to the

24              wrestlers?

25                   MR. NORRIS:  Your Honor, if I can jump
```

1           in here.  I think it is, you know, clear that

2           there was copy and pasting done, and it was,

3           you know, sloppy.  It was sloppy.  But under

4           Rule 11, which is why we're here, there has

5           to be an intent to mislead.  There has to be

6           some underlying bad faith or purpose behind

7           this that we want to defraud the court.  And

8           the complaint, taken as a whole, relates the

9           laws and the facts together.  And I think all

10          of us, all the plaintiffs' attorneys would

11          stand on the merits of the case.

12              THE COURT:  Did you guys read the

13          complaint before signing and filing it?  You

14          have multiple law firms here.  Did you read

15          the complaint before it was signed and filed

16          after you did the copy and paste job?  That's

17          a yes or no question.  It's an easy yes or no

18          question.

19              MR. NORRIS:  We did, your Honor.

20              THE COURT:  Okay.  And so when you say

21          there has to be an intent element, how do you

22          read the complaint, multiple well spoken,

23          well accomplished trial lawyers, and miss

24          these statements?  They are either accurate

25          or they are inaccurate.  You either know they

1           are accurate or you know they are not

2           accurate.  You know if you have a good faith

3           basis for these or not.  That's my question.

4           That's the part that disturbs me the most,

5           and I haven't heard quite the answer that I'm

6           looking for that comes close to it.  We did a

7           sloppy job.  But when I see things in briefs

8           that say things like, well, they're typos or

9           it's like using a form book, it's not like

10          using a form book when you're taking factual

11          allegations.

12               If you said in a jurisdictional section

13          of the complaint, for instance, in a Title 7

14          case you need to have fifteen employees or

15          more, we have filed with the CHRO, the EEOC,

16          within 180 days, assuming that's true, we

17          requested a right to sue letter, we filed in

18          court within 90 days of our receipt.  Yeah,

19          you can copy and paste that, assuming there's

20          a factual basis for those statements.  But

21          I'm seeing things here in this complaint that

22          I'm just at a loss to understand, sloppy or

23          not, how multiple lawyers could read this and

24          say, wait, do we have that?  And that's, I

25          guess, what I want to hear before I write

```
 1              whatever recommended ruling I write to Judge
 2              Bryant on this subject.  How does this
 3              happen?  How did this happen?
 4                   I mean, someone had to read the
 5              complaint and make sure that they were good
 6              faith allegations made in this complaint.
 7              You don't just say let's copy the NFL
 8              complaint and change all players to
 9              wrestlers, change all NFL players to WWE,
10              sign the complaint and file it away.
11                   So that's what I want to hear, an
12              explanation to before -- I'll stay past 5:30,
13              but I want to hear what the explanation is
14              for that.  And it's got to be more than it's
15              just like a form book.  It doesn't have to
16              be.  I guess that can be your answer, but
17              that's not the winning answer.  I'll warn you
18              that much.
19                   MR. NORRIS:  You said you practiced in
20              plaintiffs firm for many years.  Unlike the
21              defense industry, generally speaking, there
22              aren't as many of us.  We don't have as many
23              paralegals.  We don't have as many
24              secretaries.  It is a few of us working hard.
25              That's how this happened.
```

1          THE COURT:  Okay.

2          MR. KYROS:  If you look at the size of

3     this, your Honor, they painstakingly went

4     through.  They compare it.  And there are a

5     couple of examples with the Goodell and

6     pamphlets.  I think pamphlets is sort of a

7     generic term.  You know, I think that a few

8     of these are definitely unfortunate.

9          The overall notion was to use this as a

10    template because this was a case that settled

11    and it got relief for the NFL football

12    players.  And we were looking at the best

13    possible way to make our case.  And we wanted

14    to utilize the language, the structure.  We

15    weren't trying to deceive the court.  We

16    weren't trying to come up with facts that

17    didn't make sense.

18         And if you look at the way with their

19    painstaking sort of comparisons, you'll see

20    that they were, you know, for the most part,

21    pretty, you know -- there were changes

22    throughout these sections.  And a lot of the

23    sections -- like, I'm looking at page eight.

24    So I can see that it's been very much

25    tailored.  I assume the blue is where we

1          edited.  And it's, you know, fairly

2          extensive.  The factual allegations have been

3          burnished and really sort of, you know,

4          brought out that this is very specific.

5               Maybe as the case went through the

6          further end of the complaint, because it is

7          quite lengthy, the, you know, the job that we

8          did and, you know, in altering these things

9          is not quite as precise.  And these handful

10         of problematic -- I did -- I realized that

11         the term MTBI, okay, that stands for mild

12         traumatic brain injury.  And I think I heard

13         Attorney McDevitt say that, you know, I think

14         some of those changes didn't relate to the

15         committee.  That's just a word that, you

16         know, frequently appears in these types of

17         lawsuits.

18               And to the extent that there were a

19         couple of mistakes in here, you know,

20         emphatically, the goal was not to deceive the

21         court, to say, look, we need to bootstrap

22         this particular element because we feel and

23         felt that there was plenty factual basis,

24         which, your Honor, if you look at the -- just

25         here's the Laurinaitis case, all right, and I

1           assume this is relatively same stock paper.

2           So, the, you know, the amount that's alleged

3           to have been borrowed, you know, they're

4           making out it was the whole case.  It

5           actually is a relatively slim portion of it

6           in the totality.

7                These aspects of the case were, you

8           know, are -- that was what we do as lawyers.

9           We look at previously filed cases that have

10          been successful and we want to use the causes

11          of action, which I don't think can be

12          plagiarized.  You know, the causes of action

13          are, in fact, you know, I don't know if

14          they're a form.  They're a formula.  And if

15          you're dealing with a situation where you

16          have an allegation about chronic traumatic

17          encephalopathy that's been, you know,

18          diagnosed in a group of athletes and you have

19          a giant sports organization that we believe

20          is responsible, we have to -- and the claims

21          in these cases are relatively complicated.

22                We are looking for the ways, and I've,

23          you know, we have briefs.  We've hired

24          independent people to sort of give us a

25          perspective on how fraudulent concealment

1              works, how there is a duty to speak, and

2              we've integrated all that information.

3                      In the Laurinaitis case, despite this

4              mistake and embarrassment to have these

5              allegations that allow Attorney McDevitt and

6              them to say that we are bad lawyers and

7              everything is an unfortunate thing.  But it

8              shouldn't take away from the years of work

9              that were put into this case.  And both the

10             factual allegations that we as -- that go on

11             for, I believe, the first 70, 80, 100 pages

12             of the cases with respect to all the

13             plaintiffs, obviously are the product of

14             reasonable investigation.

15                     I would say that all the material in

16             the introduction all relate very specifically

17             to our research with respect to the very

18             specifics of how WWE operates, the evidence

19             that we've assembled about their knowledge of

20             head injuries, the screening of all the

21             public statements that they have made,

22             looking at the way they operate.

23                     Most sensationally, since our

24             involvement in the case, it was revealed that

25             there is this -- and we don't have time to

```
1                 really go into it today.  There was this very
2                 unusual conflict of interest with the Boston
3                 group, headed by Chris Nowinski, who was
4                 originally a critic of the WWE, and then he
5                 became famous because of his ability to
6                 acquire the brains of deceased athletes.  And
7                 he's launched his institute with Chris
8                 Benoit's brain.  And then in 2013, and I
9                 think that is, you know, something we changed
10                in there, he takes significant amounts of
11                money.  The WWE becomes the largest donor of
12                his group.  And I would say read this article
13                by Bob Hall about cozy ties between BU and
14                WWE.  And it really kind of paints a picture
15                of corporate influence over scientific
16                research because that group failed, since
17                2007, unlike the NFL.
18                     So there are differences and
19                similarities.  The NFL ultimately said, well,
20                you know what, we're going to, you know, take
21                a look at this and they started financing
22                studies for CTE for football players.  They
23                have given millions of dollars to the group
24                and haven't earmarked any of the money to
25                study wrestlers.
```

```
 1                  The studies that came about through
 2           Dr. Omalu came about through this action.
 3           Without this action there would have been no
 4           movement to get the wrestlers diagnosed with
 5           chronic traumatic encephalopathy and reveal
 6           the health risks.
 7                  Whether we win or lose the case, this
 8           is something that's going to go beyond us
 9           because the science community and the medical
10           community had ignored this group of people
11           because they're largely marginalized.
12                  The case which Boumil -- I don't know
13           if he has time to speak -- the counts, this
14           entire section, starting on page 196, right,
15           with the handful of these -- you know, again
16           what I characterize as typos, this section is
17           filled with completely unique legal argument
18           and has been very, very comprehensively
19           researched and studied and applied to the
20           facts that are unique.  So the idea that we
21           were simply out to just copy the NFL case, I
22           think everything that I've spoken here, you
23           know, I hope the court realizes that that's
24           not what our intent was.
25                  A lot of lawyers will do types of
```

1           things like that.  I was involved in a class

2           case a couple of weeks ago, and it was -- we

3           had a call and somebody else filed, what they

4           call on top of us, and it was revealed that

5           they had forgot to change the name of the

6           plaintiff.  They had used our plaintiff and

7           they had filed the case in New Orleans.

8                So, you know, the copying and pasting

9           in lawsuits is, unfortunately, a commonplace

10          thing.  And this lawsuit, yes, it does copy

11          and paste certain elements, but those

12          elements were designed to help these people,

13          and they were designed to utilize those

14          constructions, those sort of incantations

15          formulas, legal arguments and the way that

16          they structure things so that we could get a

17          better chance, because I felt that there was

18          a deficiency based on the fact that these

19          cases were getting dismissed, that we needed

20          to look at what has been successful.  So,

21          let's use this as a template.  Let's examine

22          what they did correctly and evaluate

23          everything there and then change the facts,

24          not change real facts, look at the facts, as

25          they pertain to what we have uncovered with

```
 1              respect to our investigations, and put those
 2              in -- here's my slide here.
 3                   This is my bookshelf with respect to
 4              the books that, you know, I've read and
 5              researched to build this case.  All of this
 6              research has gone into this Laurinaitis case.
 7              And you know, these unfortunate typos are,
 8              you know, are not what should be the issue here.
 9                   And, also, after I -- after we got the,
10              you know, this issue, I hired somebody else.
11              I actually had the complaint proofread,
12              believe it or not, by a couple people.  The
13              problem is you can't, unless you know all the
14              details and you read League of Denial, you
15              wouldn't know that.  So a potential, like on
16              the issue you raised with the pamphlets, you
17              know, it's possible that, you know, one of
18              the -- you know, one of the drafters would,
19              you know, look at that and say, all right,
20              well, pamphlet seems like a standard thing.
21              They wouldn't have known necessarily that
22              there was a very specific issue with a pamphlet.
23                   Additionally, I had, after we, you
24              know, got this case into shape, I had one of
25              these, you know, he says he's published
```

1           books, but he's a wrestling historian and I

2           had him basically go through the complaint.

3           With respect to the factual allegations, most

4           of that was centered on one of the things.  I

5           think it's in the second sanctions but

6           there's like a date of 2005 through 2015 on

7           Dave Hebner.  And they even say, oh, it might

8           be a typo.  But the, you know, the amount of

9           research, the amount of work that went into

10          this, you know, this doesn't reflect on that.

11               And you know there are a couple of

12          things here that, you know, are not exactly

13          WWE.  That's true.  And actually, we amended

14          when we filed the first amended complaint.

15          We attempted to look at all these issues and

16          remove them, and did a very significant job.

17          I think we missed a few, from what I gathered

18          from the second motion for sanctions, but we

19          attempted to remedy all those.

20               I will also say, and I don't think this

21          came up is that the notice that we received

22          -- I believe the 18 days after we filed the

23          case, they sent us some sort of letter saying

24          that, you know, sanctions, you know, so on

25          and so forth, which we had been accustomed

1          to.  They did not reference the plagiarism

2          allegations.  They did not mention many of

3          the things that are raised in the complaint.

4          And we're just scratching our heads because

5          what we looked at -- if you look at the way

6          the Rule 11 rules, you're supposed to have

7          some sort of safe harbor.

8               As I understood it, and my familiarity

9          with the sanctions practice was through this

10         case, and so we had, you know, a group of us

11         had looked at all these rules with respect to

12         how sanctions are.  And my understanding was

13         that we would get a document of memorandum

14         that would outline all the issues, so that if

15         we had seen something that would be

16         potentially embarrassing like this, or

17         potentially raise this issue we would have

18         been able to change it.

19              You know, their defense is, oh, we'll

20         issue the changes.  Well, we did.  We looked

21         at it and we made an effort to revise it and

22         we added the first CTE case to the complaint.

23              And you know, if I haven't answered it

24         sufficiently, I'd be happy to, you know, give

25         you more detailed about my thinking or

```
 1              thought process about how his came about.
 2              But this was not in any way intended to be
 3              deceptive, bad faith or even a way to, you
 4              know, create a legal argument which we didn't
 5              believe that we had sufficient facts for.
 6                   The case that we filed, as it stands,
 7              has myriad factual allegations that support
 8              the claims of the wrestlers.  And you know
 9              this, I think, while unfortunate, isn't an
10              important basis to rule upon the merits of
11              the case or dismiss the case or, you know --
12              I think the remedy here is what we've done
13              and is to fix it.
14                   THE COURT:  Thank you.  Let me confer
15              with the staff to see who can stay longer
16              than 5:40.  Let's take a brief two-minute
17              recess.
18
19                   (Recess:  5:40 p.m. to 5:53 p.m.)
20
21                   THE COURT:  We're back on the record.
22              Ready to proceed?
23                   MR. KYROS:  Yes, thank you, your Honor.
24              I'm just going to go very briefly through
25              some of the material I had assembled for
```

1          this.  As I mentioned, there was an academic

2          article.  I'll describe that very briefly.

3               The conclusion of this guy's master's

4          thesis was that McMahon repeatedly questions

5          the integrity of those who have gone on

6          professional wrestling stages of world

7          conflict.  Interestingly, McMahon duplicates

8          this strategy in areas that are a challenge

9          to his corporate reputation.  He plays

10         himself the hero against a variety of

11         villains.  If he succeeds, the accusations

12         hold little to no worth regardless of whether

13         or not McMahon has actually established that

14         the actions did not happen.

15              He actually has like a chart that he

16         describes these different crises.  It's not

17         really readable on this.  They had various

18         issues which it affected their company, and

19         their response is to attack the accuser.

20              In that sense, it is relevant to the

21         lawsuit because Attorney McDevitt has

22         attacked journalists who have questioned the

23         CTE issue long before our involvement in the

24         case.  Wrestlers that have questioned their

25         treatment have actually been sued by WWE

```
 1              doctors for defamation.
 2                   The CTE advocate, who they now embrace,
 3              was actually soundly criticized in sort of a
 4              media exchange.  And now myself and my
 5              co-counsel who are fighting for the rights of
 6              these wrestlers are being attacked.
 7                   I noticed that Attorney McDevitt had
 8              shown some media reports.  Here's a few.  He
 9              was discrediting a journalist who was
10              reporting on this Benoit CTE study.  There's
11              some sensational media, but this is nothing
12              but a cash grab.  Here's the WWE hitting back
13              with a very detailed list of sort of
14              allegations against Nowinski.  Here's a
15              Law 360 article.  I'm not sure of the quote
16              there; I guess, I'm scheming for a big
17              payout.
18                   Let's see.  In threats directed in the
19              course of -- In the course of legal threats
20              directed at me for my reporting, WWE lawyer
21              Jerry McDevitt has maintained in this
22              statement, this is about a chain of custody
23              issue on the Benoit brain tissue,
24              sensationalism about my plaintiffs.  So it
25              goes both ways.
```

1              And you know, here's some quotes.  And

2         again, I don't -- I think if you look at the

3         statements, I think he plays some statement

4         to the media.  I have gone out of my way to

5         be very measured in my statements about the

6         WWE and Attorney McDevitt.  That hasn't been

7         reciprocated.

8              Statements -- you know, this statement

9         is not a supportable statement.  WWE is being

10        targeted by attorneys who tell them there's

11        hundreds of thousands of dollars they could

12        make by joining a class action lawsuit.  That

13        doesn't have any support.

14             Jerry McDevitt:  It's an embarrassment

15        to be a lawyer sometimes.  They find

16        destitute people who have no money, tell them

17        there's money to be made, that's what's

18        going.  He feels bad for the families because

19        they're not going to see any money.

20             Look, he has First Amendment rights,

21        but Attorney McDevitt is certainly within his

22        rights, but we're trying to resolve an issue

23        here which I believe is a meritorious one.

24        And you know, my goal is not to unfairly

25        attack a company, it's to bring cases that

1           are meritorious, that articulate facts that
2           have been litigated in a very similar context
3           with the NCAA players, with the NFL football
4           players, and for the hockey players.  And of
5           all those cases, this group of people is the
6           group that really has no structure to their
7           employment and no safety net.
8                   Here's a quote I found from a book
9           called Choke Hold:  Vince McMahon does not
10          suffer critics gladly, he sues them.  McMahon
11          admitted ruthless aggression is an endearing
12          quality for his lawyer, Jerry S. McDevitt,
13          and he talks about some of the cases they filed.
14                  And I think I heard that you, well,
15          leaving that aside.  A review of the docket
16          looks like the satellite litigation that
17          we're dealing with here on these sanctions
18          motions is fairly common practice with people
19          that get involved with the WWE.
20                  Nicole Bass is a former performer.  It
21          looks like there was sanctions motion there.
22          She recently died, actually, but this was
23          many years before that.
24                  Hellwig versus Titan Sports, that's a
25          famous wrestler.  Looks like there were

1          sanctions filed there.

2               There's another case.  I can't quite

3          make it out.  It's a motion for sanctions.

4          Blood versus Titan Sports, I think that's a

5          different case, motion for sanctions.  Order

6          denying Hart.  I think this was a case after

7          with a family that was suing for royalties.

8          There was motion for sanctions filed there.

9          Patterson, motions for sanctions.

10              Some of these, I'm not sure whether

11         they got the sanctions, so, I'll hedge my --

12         but certainly they're involved in a lot of

13         sanctions practice and have a lot of

14         experience with it.

15              I believe this is against the

16         journalist Geraldo Rivera for sanctions.

17              McDevitt's style, I think we can see --

18         actually, here's an example of the type of

19         offense during Vince McMahon's congressional

20         -- he was giving testimony before a

21         subcommittee and the government investigator

22         asked about a book that featured 89 dead

23         professional wrestlers and Attorney McDevitt

24         said I think that's the book that had a

25         couple people on the list twice.  That's the

1          quality of the journalism.

2                   This actually was a question.  You

3          know, he used some colorful language in this

4          committee defending his client, which he

5          obviously vigorously does.

6                   Here is a very troubling quote.  When

7          the WWE filed a declaratory judgment action

8          against four people that I sent letters of

9          representation to them.  And this quote, I

10         think, I mean -- you know, I think it's in

11         the complaint.  I mean, I'm sort of

12         astonished by the quote.

13                  Before this guy started trolling around

14         looking for people to sue, where you have one

15         person and none of them claiming they had any

16         kind of traumatic brain injuries, or dementia

17         or ALS or the stuff associated with the NFL.

18                  That's a problematic statement.

19         Obviously the complaint, you know,

20         contradicts that statement.  And what we're

21         seeing now contradicts it.

22                  Here's Robert Windham and myself, that

23         I went to see.  He was a defendant.  And

24         there's a living defendant who is not doing

25         very well.  That's a news story.

1             And I'm just going to finish up with
2        Steph.  So, there's a lot of heat and there's
3        a lot of discussion about our
4        characterization of some testimony that was
5        given by Stephanie McMahon.  I have -- I
6        didn't actually bring it.  I have an
7        annotated transcript that's all beaten up.
8        I've read this testimony many, many times.
9        And of the people that -- of the WWE
10       employees and people involved, her testimony
11       is sort of the most insightful because we're
12       the investigators to the probe.  The issues
13       that clearly had spoken to some of the
14       wrestlers and they had an idea of what was
15       going on.  They asked how many times they
16       worked and they asked a lot of things about
17       the structure of the employment.  And
18       repeatedly, which we've put in the complaint,
19       the answers are sort of evasive or outright
20       wrong.  And to the issue with respect to
21       concussion, I'm not the only one who reached
22       this conclusion.
23             So, here's a story published in 2010
24       which basically quotes the same part of the
25       testimony that are at issue.  So, you know,

```
1              they went a little further, this particular
2              journalist.  And this is sort of an activist
3              journalist by the way, that's been in
4              conflict with Attorney McDevitt, I think.
5              There's some exchange of letters that he
6              posted.  And he was sort of an activist about
7              the CTE issue.
8                   So the notion that we are
9              mischaracterizing the testimony is already
10             removed from the element I think of bad faith
11             when we already have people who are in the
12             wrestling industry writing news stories about
13             this seven years ago.
14                  THE COURT:  But don't you have Judge
15             Bryant reaching that conclusion?
16                  MR. KYROS:  Did I have Judge Bryant
17             reach that conclusion?
18                  THE COURT:  Didn't Judge Bryant say that
19             the testimony from Stephanie Levesque McMahon
20             is being mischaracterized or was being
21             mischaracterized?
22                  MR. KYROS:  Judge Bryant did have
23             language like that in her opinion.  My goal
24             was to correct that impression because I
25             don't believe, honestly, that the testimony
```

1         has been mischaracterized.

2              THE COURT:  But she's reviewed the

3         transcript, Judge Bryant?

4              MR. KYROS:  I assume that she has

5         reviewed the transcript, and I -- but I'm

6         looking at the transcript and I'm looking at

7         the way that the transcript has been

8         interpreted and I believe that a

9         interpretation that we make is correct.  I

10        mean, I think that -- I don't see any other

11        way to read it.  But I, you know...

12             THE COURT:  Well, I guess my only

13        question for you on that issue is you have

14        Judge Bryant stating or concluding, based on

15        her review of the transcript, that you are

16        mischaracterizing her testimony, and the

17        defendant basically says so why do you keep

18        pushing it in the face of Judge Bryant's

19        conclusion.  Judge Bryant seems to say why

20        are you continuing to push it in the face of

21        that conclusion.  So it would be helpful just

22        to hear what your explanation is for pushing it.

23             MR. KYROS:  The statement, I believe,

24        stands as an important element in the case.

25        And the reason for that is because when the

```
 1              WWE makes statements and when its officials
 2              do make statements it's relatively
 3              infrequent.  And this was in front of a
 4              subcommittee investigating the death of one
 5              of the performers for CTE.  And the
 6              wrestlers, the public, and everybody else
 7              would have access to this.  So there's no
 8              question that the forum in which the
 9              questions and answers were given is a very
10              important one.  And the reason that the
11              transcript of the congressional testimony is
12              made public is so that things that relate to
13              the truth or falsity of, you know, the
14              situations, in this case, the reality of what
15              was happening at the WWE, I think it's a
16              tremendously important issue.
17                   And I mean absolutely no disrespect to
18              Judge Bryant with respect to her opinion.
19              And I've actually tried to go outside that
20              and characterize the testimony as we feel
21              that it is.  I think a plain reading of the
22              testimony is you can't reach any other
23              conclusion.  And she's impeached, and I
24              can show you the document.
25                   THE COURT:  Judge Bryant has reached a
```

1              different conclusion, hasn't she?

2                   MR. KYROS:  Well, her conclusion, I

3              think, is based on the way we pled the case.

4              For example, in the 2005 issue that's what we

5              wrote.  So Judge Bryant said they relied upon

6              the 2005 date.  That's a pleading from the

7              plaintiffs.  So we needed to have -- my view

8              is that we needed to have done a better job

9              in stating the argument that we're making.

10             And I don't think that, you know, doing that

11             there's anything wrong with that.

12                  I mean the statement stands as an

13             important one.  The community of wrestlers

14             are fixated on this statement in fact.  This

15             is a statement that sort of like energizes

16             people because they feel that it is inaccurate.

17                  And you know, you know, I mean, if

18             you've read the statement, I would say

19             that -- you know, I parsed it out and I've

20             sort of really analyzed it.  I've spent some

21             time here because I do think it's an

22             important issue and it keeps arising.

23                  When the plaintiff alleged that they

24             deny the existence of -- deny concussions,

25             deny the existence, deny this stuff, that is

```
1              supported by this testimony.
2                     The portion -- if you look at the --
3              you have to look at the testimony as a whole.
4              It goes on for several pages.  I actually
5              have the testimony in this script.  A full
6              analysis of misleading statements leaves
7              little room for any other conclusion.  And
8              which as I mentioned, was shared by this
9              journalist, and many, many people in the
10             community.  I believe that they're making a
11             hyper-technical defense as the definition of
12             the word denied, as they tend to do in a lot
13             of context.
14                    We are using this as the notion --
15             look, even if she was -- if the statement was
16             as to her own personal knowledge, which I
17             understand must be the defense, because I
18             can't read the statement the way other people
19             seem to, it's not a remotely credible
20             statement based on the allegations in the
21             complaint, you know, so it would still
22             operate as evidence of a denial.  She --
23                 THE COURT:  No, that's okay.  Don't
24             interrupt him, please.
25                 MR. KYROS:  She's asked if wrestlers
```

1           have self-reported concussions, if they

2           received concussions.  She's not aware of it.

3           She's not saying it never happened.  Is she

4           aware of an incident where a wrestler in a

5           match received a concussion?  The answer is no.

6               We believe the answers are untrue and

7           misleading.  They are representations to the

8           congress, representations to the public,

9           they're a representation to the wrestlers,

10          and the truth or inaccuracy is in doubt.

11              The questions were being asked because

12          a performer killed his family and himself and

13          he was later diagnosed with CTE, which is a

14          consequence of wrestling and head trauma.  So

15          the congressional investigators are trying to

16          figure out what's going on.  Are there

17          concussions?  Are there reported concussions?

18          Are there not reported concussions?  And this

19          person is in front of this committee to

20          answer questions truthfully with an aim to

21          educate the world and the congress and

22          everybody else about what is happening.  This

23          is taking place in the year 2007.

24              A cursory look at the allegations that

25          we've been able to collect, you know, the

1           plaintiffs articulate they were knocked out,

2           they received a concussion and this is a

3           routine event.  But I don't actually have to

4           rely upon these statements that are

5           disconnected from Mrs. McMahon.

6                THE COURT:  But I'm focusing on the

7           statements from Mrs. McMahon because there is

8           an indication from Judge Bryant that you've

9           mischaracterized that.  And I guess the

10          question, the specific question I'm asking

11          you, is while you may have other evidence

12          that you can rely on, I'm trying to figure

13          out why you continued to rely on the

14          statement that Judge Bryant said was

15          mischaracterized.  Is the answer what you had

16          said earlier that you were trying to convince

17          Judge Bryant otherwise or what am I missing here?

18               MR. KYROS:  Well, your Honor, we filed

19          the case separate and apart from the other

20          case.  So the -- you know, the body of facts

21          that we've had in this complaint stands

22          together.  So I believe, when I read the

23          decision, that I had done an inadequate job

24          and that our team had done an inadequate job

25          of really articulating what the statement meant.

1           The statement, the way we quoted it, is

2      quoted without a lot of narrative or

3      commentary or context.  It just sort of

4      quotes the statement.  And of course, you

5      have, you know, defense counsel who are very

6      experienced in trying to create a different

7      idea of what the statement means.  And you

8      know we believe that it is an important statement.

9           I mean, so, you know -- I mean, look,

10     the fundamental argument that the plaintiffs

11     are making is that the WWE is concealing the

12     risks of head injuries and they're

13     downplaying the risks of all the concussions.

14     And why is it important to know there were

15     concussions?  Because the old forgotten

16     concussions that were in the WWE throughout

17     the plaintiffs' tenure are the very things

18     that are going to -- that give rise to the

19     occupational disease, CTE and the related

20     things.  So if we have an example of a

21     corporate executive, grew up in the business,

22     gets in front of the congress and says that

23     they're not aware to direct questions, that

24     is an important issue.  And alternative

25     interpretations are possible, but we are

1           trying to do a better job to explain to the

2           court why those statements mean what we see

3           them to mean.

4                You know, she gets up there and she

5           sees nothing, it's possible, not that I'm

6           aware of, not saying it never happened.  She

7           answers many other questions in the context

8           of that transcript that are in the complaint

9           about the long term risks.  Here, I'll give

10          you -- and so you know, I believe these are

11          denial of the facts and an evasion.

12               Even if we took the premise that she

13          subjectively was up there and saying, well, I

14          don't know a concussion, that is, in our

15          view, that would function as a way to deny

16          the existence of these things.  Because the

17          impression and the way it's answered, you

18          can't reach any other conclusion.  I'll get

19          to the proof of that.

20               I mean here's the testimony we just

21          went over:  Not that I'm aware of, no.  Let's

22          see.  I mean this answer also is problematic.

23          It ignores the fact that sub-concussive blows

24          occur.  Once again, it's a deceptive answer.

25               The question at the very -- the second

1          to last question at the bottom by Mr. Cullen

2          I think is a central element of the case.

3               To the extent that there is an injury,

4          that an acute injury in the ring, the

5          wrestler breaks his leg in the ring, to what

6          extent does WWE provide coverage for that

7          injury?

8               We pay for it in total.

9               And to the extent that this is a

10         chronic injury that has occurred:  A wrestler

11         develops arthritis or because of repeated

12         contact or that kind of injury, does the WWE

13         cover the costs of any treatment for those

14         kinds of chronic injuries that have occurred

15         in the ring?

16              The answer:  There hasn't been any

17         chronic treatment like that but unless you

18         say -- actually, yes.  If someone has a bad

19         knee for example, they get ice before and

20         after their match.  In that regard, yes.

21              He answers okay.

22              She answers:  But I can't think of any

23         major injury that someone has had that was

24         chronic and required outside rehabilitation

25         that we were unable to provide.

```
1                  Well, we have 60 men and women that
2            that is not an accurate answer.  So I believe
3            that the testimony is important and that's
4            why we're retaining it.
5                  MR. NORRIS:  I just want to jump in here
6            real fast.  A couple of things.  Stephanie
7            McMahon Levesque had testified that she has
8            been an active member of this corporation
9            since she was thirteen, I believe.  And since
10           then, she has then held numerous positions
11           within this company, including a very active
12           role in what the WWE calls the gorilla
13           position where they just watch everything
14           that happens on numerous angles.  They see
15           everything.  She presumably did this for
16           years.  And this is something that is a
17           fact-based determination on whether she did
18           testify incorrectly, whether she lied,
19           whether it was deceptive, or whether she was
20           honest.
21                  The plaintiffs have asserted a
22           particular view.  And even taking out our
23           rhetoric that is in the pleadings and you
24           just look at the facts, which is what her
25           testimony was was that she was not aware of
```

1          any concussions in the WWE since she was 13

2          all the way to the present day.  That is part

3          of what has been ongoing within the WWE.  And

4          that's this what we have tried to label as an

5          environment, a culture of pushing everything

6          away.

7              Let's say, well, that stuff does happen

8          but it happen in the NFL.  It doesn't happen

9          here.  We aren't aware of it.  And you can

10         only do that so far in the face of ongoing

11         facts like all of the -- all of the images of

12         the bruises on the heads, the bleeding, every

13         bump, the scientific facts that show that

14         just every time they fall over onto their

15         back, and there's a rapid deceleration of the

16         brain.  How far can a company go to distance

17         themselves from a hazardous workplace

18         environment through ignorance.  And we think

19         that they've gone too far.

20             The testimony, taking out the rhetoric,

21         is an example, in 2007, of her denying an

22         existence of something.  And that something

23         is concussions within the WWE which is

24         repetitive head trauma.  And concussions are

25         at the heart of this case, and that's why it

```
 1            was included.  Thank you.
 2                 THE COURT:  Thank you.  Anything
 3            further?
 4                 MR. KYROS:  I do.  I said here statement
 5            is impeachable by verifiable facts.  Named
 6            plaintiff Chavo Guerrero, Jr. was knocked
 7            unconscious in 2004 and was taken to the
 8            hospital.  Stephanie McMahon was ringside.
 9            There's commentary that the whole family has
10            selective memory.
11                 This is from Michael Benoit in response
12            to a report about a news story that ran about
13            the article.  Obviously, Mr. Guerrero had a
14            concussion.  He was taken to the hospital.
15                 The book that I had shown a couple
16            photographs, this Unscripted book I think
17            provides some pretty damning evidence on this
18            issue.  Stephanie McMahon appears throughout
19            the book.  And the book states in numerous
20            places, which I read earlier on the record,
21            about Ray Dudley having concussions.  He
22            continued matches with concussions.  Brock
23            Lesnar, he didn't remember anything because
24            he had a concussion.  He had a CAT scan, he
25            had a pretty severe concussion.
```

```
 1                It actually contradicts both points.  I
 2          mean, I suppose she can say I didn't read the
 3          book but the book is published by the WWE and
 4          now we're really starting to parse language
 5          and we get ourselves away from, you know, the
 6          type of allegations here that are going to
 7          prove the case.
 8                And I sort of pressed the issue.  I
 9          mean, she's obviously aware, constructively
10          aware of the numerous allegations that we
11          have here, but the overwhelming evidence to
12          the contrary is that she never watched a
13          wrestling match where a head injury happened
14          and never thought that blunt force trauma to
15          the head could cause a concussion.
16                In any event, she had documented actual
17          awareness because of the 2003 book and her
18          actual presence at an event that we can
19          document.  So, you know, I think it's
20          decisive that she did know about concussions
21          and she knew performers had concussions, and
22          she knew about reported concussions.  When
23          asked by congressional investigators, she
24          didn't.  This is, you know, this is pled
25          accurately.  It's not something that we
```

1           should be sanctioned for.  We're not trying

2           to unfairly attack her.  We're looking at the

3           record, we're looking at the facts, and we

4           built an argument based on that.  That's why

5           the allegations continue to be included.

6           That's our view.

7                I think I covered this already about

8           the NFL.  I have a quote from Jim Brunzell

9           but I don't think -- unless you'd like to

10          hear it, I could play it.  That was what they

11          led with, Jim Brunzell, said that the law

12          firm had settled the case for 4 billion.  I

13          have the full message that he had.

14               THE COURT:  Not necessary.  Thank you.

15               MR. KYROS:  Basically he said that he

16          had a concussion, and that he went to

17          Dr. Unger and then he wrestled for a few

18          days, and had a light match.  So it was a far

19          more nuanced statement.

20               I mean, here's an email from

21          Mr. McDevitt.  And normally I wouldn't

22          include communications between us but he

23          always does, Attorney McDevitt.  And he says

24          that my investigator is harassing one of the

25          key witnesses in the case, Dr. Rios.  And he

1           asked me to cease my harassment, accuses me

2           of offering to pay him, and stop

3           communicating with him.

4                So, you know, to the extent that he's

5           alleging that we didn't do our due diligence,

6           he's sending emails when I'm having an

7           investigator reach out to one of the most

8           important figures in the history of the

9           organization who treated most of the named

10          plaintiffs.

11               I mean, this an example that's in the

12          complaint.  This is sort of ground that's

13          covered in there.  Here's the plagiarism

14          which I think we covered.

15               I wanted to conclude that, you know,

16          the standard of bad faith is very high, and

17          that the case -- an inadvertent mistake or a

18          statement that has the ring of a typo doesn't

19          warrant dismissal in the case, as there is no

20          intention to mislead.  This is the Stoltz

21          versus Town of West Hartford case in 1995.

22               The court should also take into

23          considerations other clear statements in the

24          complaint when assessing the plaintiffs'

25          actual claims, and should not take typos as

1          deceptive statements.

2               THE COURT:  I have no further questions.

3          Thank you.

4               MR. KYROS:  Thank you.

5               MR. BOUMIL:  Thank you, your Honor, for

6          your patience today.  I haven't appeared

7          before this court before, so I'd like to take

8          my minute to put a framework on this.

9               First, one of the first things we were

10         accused of today was -- and it's in the brief

11         of Attorney McDevitt -- that the standard is

12         that we were attempting to extort a quick

13         settlement.  And they actually used those

14         words.  And that's the standard, I believe,

15         he set for himself for his Rule 11 motion.

16         He's not content simply with the statutory

17         standard.  He raises it to include a proof

18         that we're trying to extort a quick

19         settlement.  Well, let's look at the matter,

20         if we can, logically, based upon the dockets

21         and the facts.

22              When this case was filed, the Rule 11

23         motions in the other cases had already been

24         filed.  And the motions to dismiss had

25         already been filed.  Now, first, I point out

1          to the court that I had nothing whatever to

2          do with those other cases.  It's not because

3          I want to throw distance between myself and

4          the other counsel.  It's simply a fact.  I

5          had nothing whatever to do with them.

6                And the judge's decision in this case,

7          I mean, in the other cases, came down after

8          we had already filed this case.  So anyone

9          who looks carefully at the WWE and its

10         strategy, it's stated strategy for dealing

11         with litigation, and looks at the fact that

12         there were hundreds of pages of Rule 11

13         motions and motions to dismiss already filed

14         would not be under any delusion that you were

15         going to file this case and suddenly use it

16         to extort a quick settlement that had been so

17         unsuccessful in all of the other prior cases.

18         So I respectfully suggest that that is a

19         reckless allegation tossed into their Rule 11

20         motion to disparage opposing counsel, which

21         defies logic and reason and has no basis

22         whatever in fact.

23                I've been in practice about 45 years,

24         your Honor, and I'll tell you this is the

25         first time -- I did some research before I

```
 1            got here.  This is the first time I've ever
 2            been faced with a Rule 11 motion.  And I've
 3            litigated in many cases, like Attorney
 4            McDevitt also, to jury trials in criminal and
 5            civil cases, hold some of the largest
 6            judgments in individual states, in those
 7            states, been co-counsel with some of Attorney
 8            McDevitt's partners in other cases, had very
 9            successful relationships.  People who are
10            currently his partner to parse it.  They
11            came.  They were at other firms at the time.
12            They are currently his partners.  And have
13            always had successful relations and enjoyed
14            good cordial relations with other attorneys.
15                 The allegations in this matter are very
16            out of control, I think, with these Rule 11
17            motions.  Another thing that they did was
18            they said that -- they tried to cast
19            aspersions on Attorney Leydon with filing
20            other frivolous cases, and they cast those on
21            me as well, your Honor.  There's a whole
22            paragraph saying that I participated in
23            filing harassing and baseless lawsuits in the
24            state of Massachusetts, in conjunction with
25            Attorney Kyros.
```

```
 1                    What actually happened there, your
 2          Honor, to take one second, is that we filed a
 3          case against Nordstrom, a gigantic
 4          conglomerate, and we filed a case against
 5          Kohl's, another gigantic conglomerate, hardly
 6          helpless people.  And we brought those cases
 7          as a class action in the United States
 8          District Court in Boston.  And the judge in
 9          that case who wrote the opinion for the
10          district court stated in his opinion that we
11          had demonstrated that both of those companies
12          had violated the Massachusetts code of
13          regulations with respect to sales of goods
14          that they made.  In other words, they said
15          the goods were marked down 50 percent, the
16          sale was fake.  There was no markdown.  And
17          in fact, said -- went further and said that
18          the fake sale, the violation of the
19          regulations, actually procured our clients to
20          go to the stores and make the sale.  And he
21          found against us on the basis of an obscure
22          portion of Massachusetts general laws Chapter
23          93A, which is a consumer statute, saying that
24          he didn't feel as though we had demonstrated
25          damage because the actual item bought wasn't
```

1         demonstrated to be worth less than was paid

2         for it, even though the whole transaction was

3         based on a fraud, false advertising, which he

4         found, was to be the case.

5               But the judge, far from finding the

6         case to be frivolous and harassing said --

7         opined in his opinion, which is a published

8         opinion, that the law of Chapter 93A and

9         damages thereon in the Commonwealth of

10        Massachusetts was, in his words, somewhat

11        muddled.  And he commiserated with both sides

12        of this case that Massachusetts Supreme Court

13        hadn't given anybody particularly good

14        direction, and that case is now before the

15        First Circuit for decision.  No decision has

16        come down yet.

17              So it is reckless in the extreme to

18        bring before this court, an aspersion against

19        an attorney who participated in that -- in

20        those cases in good faith by saying we filed

21        harassing and frivolous cases.  It just isn't

22        true.

23              There were no Rule 11 cases, no Rule 11

24        cases -- no Rule 11 motions in those cases.

25        And in fact, the attorneys were

```
1       extraordinarily cordial to each other.  We

2       shook hands before and after the arguments,

3       congratulated each other, as is our custom in

4       Boston in such proceedings, and as I dare say

5       is probably the custom down here in the usual

6       case.  But it goes on.

7            They claimed in our -- in their

8       opposition, their Rule 11 motion, that we

9       were trying to file private causes of action

10      under OSHA when OSHA had no such private

11      cause of action.  And I received a letter

12      from Attorney Mueller, one of the warning

13      letters about Rule 11:  Why are you filing

14      all of these causes of action, which aren't

15      causes of action?  You should know better.

16           Well, your Honor, I didn't take that

17      lightly.  I didn't just ignore him.  I wrote

18      back to him and said, Dear, sir, you haven't

19      read what we wrote.  Try starting there.

20      Those are not causes of action.  Those are

21      simply groupings of allegations that we put a

22      caption on.  You can't get a Rule 11 motion

23      granted based upon the choice of words in a

24      caption which isn't even part of the

25      allegation of the complaint.  But I did take
```

```
 1              his point, and I said, you know, maybe you

 2              have -- maybe you are being confused by the

 3              caption.  We intend to file an amendment.  We

 4              will regroup them for you, and that is

 5              exactly what we did.

 6                   Nevertheless, after my letter, and

 7              after having done the regrouping, we now find

 8              a new sanctions motion coming down the pike

 9              that we have to answer next week, which makes

10              the very same allegations, which they know

11              from my letter are completely false.

12                   Now, let's get into some of the details

13              here.  You heard Attorney McDevitt say, to

14              the plaintiffs all of these contracts are

15              void, wherever and whenever they were filed.

16              They're void.  That's their excuse for not

17              recognizing releases.  That's the

18              underpinning of part of their case.

19                   I was very pleased to hear that because

20              it's the first time I've heard in this case

21              any of them acknowledge that that is the

22              underlying claim.  That is the forest, while

23              their briefs try to direct us not to the

24              trees but to branches on trees so that we

25              miss the overall scope of the complaint.
```

1            We do claim, in fact, claim that their

2       contracts are void, and that has major

3       consequences.  Let's start with some simple

4       Hornbook law.  And I hope this is -- there's

5       some magic here to getting this thing to work.

6            This is from a real basic book that we

7       all get familiar with as freshman in law

8       school.  See, *corpus juris secundum*, 17A.

9       Contracts contrary to public policy; that is,

10      those which tend to be injurious to the

11      public or against the public good are illegal

12      and void.  That's the contracts that the WWE

13      puts out, your Honor, and we'll explain why.

14           Down at the bottom, a contract, the

15      subject, or operation, or tendency of which

16      violates public policy or the established

17      interests of society is not enforceable.

18      We start with this basic Hornbook law that we

19      all learn in contracts in the first year of

20      law school.

21           The simple iteration of it is a

22      contract to enforce a gambling debt, a

23      contract to bump somebody off, or rob a bank,

24      or what have you, but the doctrine is much

25      more sophisticated than just that.  So let's

1          take a look at their contracts, your Honor,

2          and some of the public policies which they

3          violate.

4                  Let's start with a simple one.  This is

5          one of their booking contracts that they put

6          out.  Well this booking contract says that

7          the wrestler is going to hire the WWE

8          attorney to do certain things for him during

9          the course of the contract, which is

10         typically for three years, and that he is

11         going to prospectively, and this is the

12         interesting part about it, because of a case

13         I'll cite in a minute.  He's going to

14         prospectively waive the conflict of interest

15         by utilizing the WWE attorney to represent

16         him in negotiations with WWE, and the

17         wrestler may be at adverse positions.  This

18         is one of the integral portions of their

19         booking contract that they have people sign.

20                 These people, your Honor, that you saw,

21         with all due respect to them, that you saw

22         posturing in various interviews, the

23         wrestlers, now it is no disparagement to

24         those young gentlemen that they can't match

25         wits with Attorney McDevitt and the host of

1          attorneys that the WWE employs to draft up

2          these documents.  And that's important for

3          another case that we'll get into.

4               Well, what's wrong with the WWE

5          representing both sides of the equation, even

6          though they tell you you have the right to go

7          get your own lawyer.  Well, if you have that

8          right, which we all know, why do you put it

9          in this contract in this manner for?  Well,

10         this violates Rule 1.7 of the Connecticut

11         rules of professional conduct, this part of

12         the contract does and therefore violates

13         public policy.

14              Why is that?  Because it's asking you

15         to waive a conflict that hasn't even been

16         described to you yet because the situation

17         hasn't even come up.  It's a prospective

18         exculpatory clause.  Under Connecticut law,

19         as I will show your Honor, and these permeate

20         their booking contracts, things like this, a

21         prospective, exculpatory waiver is void.  You

22         just can't do it, not under Connecticut law.

23              So, again, a nice case here under

24         Connecticut law, Brown versus Soh.  It is

25         well established that contracts which violate

1          public policy are unenforceable.  And then

2          this interesting cause, it reminds you of

3          Judge Bryant's reading of the United States

4          Constitution as a living document.  What does

5          it say?

6               How do you determine whether the

7          contract violates public policy?  The

8          ultimate determination of what constitutes

9          the public interest must be made considering

10          the totality of the circumstances at any

11          given case -- of any given case, against the

12          backdrop of current societal expectations.

13               Well, we're going to argue this in the

14          motion to dismiss too, your Honor, but the

15          point is that the inquiry as to whether these

16          contracts are void because they violate

17          public policy is fact specific.  And when the

18          allegation is made, and this type of law

19          exists, you cannot claim that the contention

20          that the contract is void somehow flies in

21          the face of Rule 11 and is utterly frivolous

22          and without basis.  That claim in and of

23          itself is subject to Rule 11.  It is so silly.

24               Now, the next reference in Brown versus

25          Soh is we further note that considering --

```
 1          this has to do, your Honor, with the -- Brown
 2          versus Soh was a case in which there was a
 3          person being hired at a race car school and
 4          the race car ran over him.  He was an
 5          employee, so he got injured.  And the
 6          question was they issued him a 1099.  They
 7          said, oh, you're not covered.  You don't get
 8          any workers' comp, you don't get anything,
 9          you're an independent contractor.  So what
10          does this have here?  What do they say?
11               Just as the WWE does, just as they put
12          in their Rule 11 motion, they say, well, the
13          wrestlers were told they were independent
14          contractors.  Sitting there in bold.  And how
15          can they stand before the court now and
16          disclaim what they knew.  It was put in
17          writing for them.
18               Well, Connecticut courts say, your
19          Honor, that you can put that in writing, all
20          you want.  You can put it in as big capital
21          letters, all you want.  You can have them
22          initial it 5,000 times all you want, it means
23          nothing.
24               Considering the economic compulsion
25          facing those in search of employment, to
```

```
1          suppose that a plaintiff had any bargaining
2          power defies reality.  And this was an
3          exculpatory agreement, just as the WWE's is
4          where they say, in their boilerplate contract
5          they say, if you get injured, you waive all
6          claims against the WWE.  Even if we caused
7          the injury, at some point in the future,
8          under circumstances that are not defined, if
9          we do something wrong that injures you,
10         you're waiving us from being able to bring
11         any kind of a claim.
12              Under Connecticut law your Honor, that
13         type of prospective exculpatory demise of
14         tort liability simply cannot stand.  It
15         violates Connecticut law.  To stand before
16         this court and claim otherwise is a Rule 11
17         violation.
18              As I went through this, your Honor, I
19         began to start wondering, if they had read
20         their own motion, like they're accusing us of
21         not having read the complaint.
22              Now, we go to another one, Traveler's
23         Indemnity.  This has to do with another one,
24         2006 case.  This is throughout the law of
25         Connecticut, your Honor.  You simply can't do
```

1          what they did in this boilerplate booking

2          contract.  It violates the public policy.

3          It's void.  But we're just getting started on

4          how these contracts violate public policy.

5          They violate the public policy the whole 20th

6          century, which I'll try to encapsulate in a

7          couple minutes.

8              The issue of whether the exculpatory

9          cause and the contract between these parties

10         is unenforceable as a matter of public policy

11         is not appropriate for summary judgment,

12         because it has to be dug into, it has to be

13         considered, fact specific.  The court has to

14         weigh the testimony and decide who is

15         believable and who isn't.  If it's not even

16         appropriate to decide that on summary

17         judgment, how is it appropriate to decide it

18         on a Rule 11 motion when we don't even have a

19         decision on whether anything should be dismissed.

20             THE COURT:  So do all of the plaintiffs

21         have the exact same release agreement with

22         the same language?

23             MR. BOUMIL:  Just about, your Honor.

24             THE COURT:  Just about or yes?

25             MR. BOUMIL:  I saw one this morning,

1           your Honor, from this Epi person that

2           appeared to be different.  I'll say all the

3           ones I have -- that's we asked them when they

4           raised this issue to not imply give us one

5           paragraph out of the contract, but to provide

6           us with the contract, because some of the

7           contracts have two releases that are

8           conflicting.  And I think they're

9           deliberately conflicting, so that if the

10          wrestler even could begin to understand what

11          he was signing, by the time he'd get done

12          reading two conflicting releases, he would be

13          thoroughly confused and not know what he was

14          doing.

15              So that Epi one is one that does appear

16          to be off the beaten path.  That's the first

17          time I've seen that was this morning.

18              THE COURT:  And can't you guys get

19          copies of these releases from your clients or

20          they don't have them?

21              MR. BOUMIL:  Your Honor, these people,

22          as Attorney Kyros told you, a lot of these

23          people, because of their injuries, are living

24          on the margins of society.  Some of them are

25          on SSI.  Very sadly, it is a, truism which

1            the court perhaps can take judicial notice

2            of, that 50 percent of the NFL players, by

3            the time they're five years out of the NFL

4            are broke.

5                 So these aren't people that -- this is

6            not the Rock and Hulk Hogan we're talking

7            about.  These are the average wrestlers that

8            maybe wrestle for a couple of years, make a

9            few bucks, and then, unfortunately, your

10           Honor, it goes and it's gone, and they're

11           lucky if they have a storage bin somewhere to

12           put some of their documents.  So, no, they

13           don't have them.

14                We have scoured our clients for

15           documents.  And every booking contract that

16           we could find, after specifically talking to

17           all the plaintiffs is attached to our client.

18           We didn't have the others and we told them

19           that, and they wouldn't send them to us.

20                So here's the release, your Honor,

21           that's in the booking contract, excerpt

22           contract, and nostalgia agreement, Exhibit 22

23           document 267-1.  This comes from them.  It's

24           their document that they gave us.

25                Here's the release that they want these

1          people to sign.

2                  Release:  Unforeseen, discovered,

3          undiscovered, accrued, unaccrued, contingent,

4          fixed.

5                  Sign a release today and you take the

6          risk that five years from now you develop CTE

7          and you don't know who you are or where you

8          are, but you be smart enough to understand

9          what you're doing now.  That's why

10         Connecticut says these don't work.  This

11         isn't a release.  This is a joke.  This is an

12         overbearing, unbalanced exercise of power.

13         It is not a release.

14                 Same thing down in E:  In the event of

15         physical injury arising out of a contract

16         with professional activities, as an

17         independent contractor he's not entitled to

18         any workers' comp.

19                 Well, you know what, your Honor,

20         there's specific cases in Connecticut that

21         say, again, it doesn't matter what the

22         parties say.  They can write the independent

23         contractor 60,000 times on 150 pages and have

24         the guy initial it every time.  It doesn't

25         mean anything.

1          The only thing that matters is who

2     exercises control over the right and means of

3     work, and as Attorney Kyros has showed you,

4     that's the WWE.  They tell the guy when he's

5     going to show up, where he's going to show

6     up, who is going to win the match, what's

7     going to happen between the time he gets in

8     that ring and goes.

9          Yes, not every breath he takes is

10    scripted, but if you're going to try to push

11    your ratings by having good guys and bad guys

12    and, you know, the Iron Sheik, and the bad,

13    whoever he is, I don't want to cast aspersion

14    on any group, but if you just look at the

15    thing on Monday night, you see who the good

16    guys and bad guys are.  They change,

17    depending upon who society thinks is a good

18    guy and bad guy this week.  I suppose some

19    people consider that entertainment, but there

20    you go.

21          There you go.  That's what happens.

22    Now why else are these contracts void as

23    against public policy?  Well, the contracts,

24    your Honor, work a reversal of all of the

25    major social legislation of the 20th century.

1           That's what they're intended to do.  That's

2       what they do in bold letters.  And Attorney

3       McDevitt admits this in his brief.  He says,

4       We told them they were independent

5       contractors and they signed on that dotted line.

6           Yes, that's all part of the fraud, your

7       Honor.  That's all part of the story line.

8       The fact that you push it right in their face

9       and say you are an independent contractor to

10       people that have no clue what those words

11       mean and are the subject of, under the

12       Internal Revenue Service, a 20 part test,

13       under the Connecticut law another 20 part

14       test, one of these guys knows what that

15       means?  No.  No, he knows if he signs the

16       piece of paper he gets some money.  That's

17       what he knows.

18           So, what do we have?  Occupational

19       Safety and Health Act.  Beneficial

20       legislation passed by and signed on a

21       bipartisan basis, and signed by of all

22       people, Richard Nixon, in 1970.

23           The laudable goal of the act was to

24       provide a safe workplace for American workers

25       to the extent possible.  And it set up a

1           whole government program to examine unsafe

2           job places, to try to stop people from being

3           killed and maimed, as was happening, and it's

4           what the social legislation tried to address.

5                But OSHA doesn't apply if you're an

6           independent contractor.  You don't get this

7           notice.  This notice is very important, your

8           Honor, because that has to be posted in your

9           workplace.  As an employer covered by OSHA

10          you have to make sure your employees know

11          about it.  You have to make sure if they're

12          injured they know how to report the injury.

13          And then there are reporting requirements on

14          you.  You have to maintain records of who got

15          injured, how they got injured, when they got

16          injured, what was the injury so that the

17          government can maintain statistics and

18          monitor your business.

19                Now, I know the WWE probably doesn't

20          think it would help their ratings that Hulk

21          Hogan wrestled in a helmet, but OSHA has a

22          regulation that says that somebody that's

23          going to suffer a bang to the head has to

24          wear protective head gear.  So how do you

25          take care of that?  You tell your guy this

1           doesn't apply to you.  You're an independent

2           contractor.  You don't even mention OSHA.

3           You don't have any rights.  You don't have

4           any rights, you're an independent contractor.

5                  Now, President Clinton comes along and

6           he has another beneficial piece of social

7           legislation, again, enacted on a bipartisan

8           basis, rights under the Family Medical and

9           Leave Act.  This is important, your Honor,

10          because they didn't get this notice either,

11          because, once again, if you're an independent

12          contractor, you don't get a notice under the

13          Family Medical and Leave Act.  You get

14          nothing.  That was another part of the fraud.

15                 So you didn't get the notice.  You

16          weren't notified of the Family Medical and

17          Leave Act.  In addition, you signed a

18          boilerplate contract of adhesion, a booking

19          contract that says -- that directly

20          contradicts the rights that you're supposed

21          to have.  It says, If you're out for eight

22          weeks, we can fire you.  Tough luck.

23                 These are guys that wrestle 200 nights

24          a week.  They're not like football players or

25          boxers that maybe fight once a year.  These

1          guys wrestle 200 night a week, your Honor.

2          They get picked up and body slammed down onto

3          a hard mat, which used to be the most popular

4          move.  25 percent of all the moves in WWE

5          before the recent reformation were body slams.

6               How many thousands of times in a year

7          did they get body slammed down?  So they get

8          hurt.  They get broken legs, broken arms,

9          torn rotator cuffs.  The Family Medical and

10         Leave Act gives you twelve weeks to recover,

11         but it also gives you something else which is

12         just as important.  It says at the end of the

13         twelve weeks, you must be restored to your

14         job or to a reasonably equivalent job.

15              Major social legislation of the 20th

16         century acted in the early 1990's and

17         applicable to all of these people.  The

18         booking contracts that they were made to

19         sign, the booking contracts of adhesion wipes

20         these rights away.

21              Well, there's one more right.  Probably

22         one of the most fundamental, the Connecticut

23         Workers' Compensation Act is somewhat unique

24         in that it -- well, I haven't done a survey

25         of all fifty states, so I shouldn't say that.

1           It's different than our workers' compensation
2           act in that you apply both in the state and
3           without.  And it recognizes that, you know,
4           if you were injured in California, California
5           workers' comp might apply in California, but
6           you would also have rights under the
7           Connecticut worker's comp law.
8                And this, basically, is another notice
9           -- didn't get the color on this one, that has
10          to be posted in the workplace.  But again,
11          your Honor, you have to make sure your
12          employees know about it.  You have to make
13          sure that they know where to report an
14          injury.  But, again, your Honor, if you're an
15          independent contractor, you don't have any of
16          those rights.
17               So think of the grandiose social policy
18          that the booking boilerplate, booking
19          contract of adhesion scrubs away, basically
20          all good social legislation of the 20th
21          century.  In addition, of course, it scrubs
22          away, if you're an independent contractor,
23          you don't have the right to organize and join
24          a union.  Something which is guaranteed by
25          the National Labor Relations Act, and also,

1          your Honor, guaranteed by a treaty of the

2          United States because it is part of the

3          universal declaration of human rights, that

4          you have the right to join a union, a treaty

5          ratified by the United States government,

6          and, in effect, all around the world.  The

7          booking contract wipes away that public

8          policy as well, as if it didn't exist.

9               So we respectfully submit, your Honor,

10         that these pieces of paper that these

11         gentlemen were told to sign are not worth the

12         paper they're written on.  And many of the --

13         you're going to hear, "well, some of them may

14         have been represented by attorneys."  I don't

15         care if they were represented by 100

16         attorneys, they're rights you cannot simply

17         take away.

18              In Massachusetts, if a landlord doesn't

19         deposit your security deposit in a separate

20         account, he's liable for three times damages.

21         It doesn't matter that the big law firm in

22         Massachusetts represented you in signing that

23         lease, it is simply a matter of statute, and

24         that's it.  And it's the same here in

25         Connecticut.  And they can say all they want,

1            but it doesn't get them out of the fact that

2            these contracts are not contracts at all.

3            They are unilateral subjugation of people and

4            taking away their rights.

5                  The nostalgia agreements that they were

6            paid for later on, some of them $10,000, same

7            thing, have all the same elements, do all the

8            same thing.

9                  Some of those are touted as the

10           releases.  In fact, most of the releases of

11           the so-called nostalgia agreements that were

12           executed later on, which are really very

13           curious, your Honor.

14                 You know, just look at the

15           circumstances.  None of us were born

16           yesterday.  You go to a guy that you haven't

17           spoken to in five or six years with all of

18           this concussion litigation percolating and

19           you give him a contract and say sign here for

20           ten years, sign here for $10,000.  You don't

21           have to do anything.  Maybe some day we'll

22           call you, and you can come and appear in the

23           ring and take your bow as an old wrestler.

24                 Why would the WWE do that?  Try to get

25           another release, cut off their rights,

1          especially seeing, they think, Attorney Kyros

2          was out there driving his ambulance around or

3          chasing one or whatever they think he was

4          doing.  So, in a few of these situations

5          that's what was done.

6                So the release is not any good anyway.

7          They're worthless, wasn't worth the trouble

8          to mail them out.

9                Now, there was a few other items that

10         where we had made completely reckless

11         allegations.  Let me point out, just as an

12         aside, of the case law that they cite to you,

13         your Honor.  21 of the cases are unpublished

14         opinions and therefore under the rules in and

15         most circuits, have no precedential value.

16         One of those is the Levy case.

17               The Levy case, which they claim is the

18         coup de gras, we went ahead and we filed --

19         and the Levy case knocks us out and we should

20         have known better.  Well, first of all, it's

21         an unpublished opinion, and therefore, as I

22         say, is not precedent in the Second Circuit.

23               But even if it were, even if it was a

24         published opinion, you've got to actually

25         read the case, as they suggested that we do.

```
 1              You've got to read the thing carefully.

 2                   Levy, if you read it, read it, the

 3         judge, it's my own opinion, I guess, but the

 4         judge, to me, seemed pained writing the

 5         opinion in Levy.  Because he was basically

 6         saying, you guys haven't given me anything.

 7         Maybe I'd like to do something for you but

 8         you've written such a stupid complaint, I

 9         have no place to hang my hat.

10                   Levy, 1, they failed to allege any

11         damages.  What are we doing in the federal

12         court if we have no damages?  They did not

13         plead anything about the seven and a half

14         percent contribution that the employer is

15         supposed to make, as we did in this case.

16                   They just didn't do anything about

17         that.  They didn't claim -- it was supposedly

18         a case where they were claiming for a refund.

19         But think of it for a second, your Honor.  I

20         think this is why the judge was so perplexed.

21         If the WWE didn't withhold the money from

22         you, how can you make a complaint that you

23         should be entitled to a refund?  You already

24         got everything, and the judge notes that.

25                   And you know, I can see him scratching
```

```
 1          his head as he's writing this opinion saying,
 2          what are these guys really asking me for.  So
 3          they go into Levy 2.  And basically, it's the
 4          same thing all over again.  They haven't
 5          alleged damages.  They cite the booking
 6          contracts and they say, well, these are
 7          unfair, but they don't say that the booking
 8          contracts are void.  They don't make any kind
 9          of a claim like we did.  And they don't say,
10          again, how they were damaged.
11              So that's not precedent that bars us.
12          That was just a poorly pleaded case that,
13          also, by the way, when we are told that this
14          shows that there is no private right of
15          action for getting your money back, that
16          simply flies in the face of law to the
17          contrary.  And you know, they're supposed to
18          tell you about cases that are contrary to
19          their opinion, but I guess that just slipped
20          through the cracks, they say.
21              I heard Attorney McDevitt say there's
22          no case that disputes Levy.  It clears the
23          field.  Well, again, it would have been nice
24          if somebody had actually read some cases.
25              Here's one here, a published opinion.
```

1        There is nothing inconsistent with this

2        purpose in allowing a private cause of

3        action, whereas here an employee seeks an

4        order to force an employer to correct the

5        employee's record, and make the appropriate

6        FICA contributions for wages earned by the

7        employee.

8            In fact, your Honor, when you go

9        through a good part of the case law.  There

10       are plenty of cases that say Levy is decided

11       wrong.  There's some that say Levy is decided

12       right.  No doubt at all about that.

13           But where a matter is subject to

14       reasonable dispute, and is not a published

15       binding precedent before this court, to cite

16       that in support of an over the top Rule 11

17       sanction motion, I respectfully suggest is

18       itself a Rule 11 violation, which Rule 11

19       provides for.

20           Here's another one here from Maryland.

21       And it cites a specific law that says that --

22       it's 26 USC 7434 -- which provides that a

23       plaintiff -- a party who has been victimized

24       by the filing of a false information has a

25       right of civil action against the person who

1          did that to him.

2                 Now understand how complete --

3          understand how complete the fraud was here,

4          your Honor.  These people were so bamboozled

5          that they didn't think to go make a contest

6          within three years, which is what you have to

7          do, three years from the filing of your

8          return, in order to get a refund from the

9          Internal Revenue.  They had no ability to go

10         get a refund from the Internal Revenue.  At

11         that time that was gone.  That was long taken

12         away from them.  So, we have no ability to go

13         back to the Internal Revenue and ask them for

14         money and say, this was all followed up.

15                You heard about that laughable revenue

16         ruling that they put in their Rule 11

17         complaint that they're relying on.  The one

18         from the 1960s, from the days when it was

19         assumed, and apparently, the people that

20         wrote the revenue ruling were also

21         bamboozled.  In the 1960s the wrestlers

22         engaged in a real athletic contest and their

23         skill determined who was going to win.

24                When Gorgeous George went in there to

25         fight, who Muhammad Ali patting himself

1          after, Gorgeous George won because he was

2          skillful, even though he jumped all around in

3          that ring and his wig never came off.

4               No, it wasn't his skill.  It was

5          because that's what they were told that the

6          case was going to -- how the case was going

7          to come out.

8               If I could just run on because I don't

9          want to take up the whole evening here.

10              There's a specific United States

11         Supreme Court on the misclassification,

12         Nationwide Mutual Insurance versus Darden,

13         that talks about under federal law, we're

14         going to look to the state law, we're going

15         to look to the common law of the state to

16         determine who is an employee and who is an

17         independent contractor.  And again, United

18         States Supreme Court says, we don't care what

19         you say in your contract.  We care what the

20         real fact is.

21              Now we get to the statute of

22         limitations, tolling.  Well, there's plenty

23         of law on these OSHA notices, the Family

24         Medical and Leave Act notices, causes of

25         action, especially under the Family Medical

1          and Leave Act.  You can't -- the cause of

2          action doesn't accrue if the person doesn't

3          have notice that they were covered by the

4          act.  That's why they put these colorful

5          posters, and they're supposed to be

6          everywhere, so your employees know about it.

7          But you get an employee to sign a contract

8          with a prospective release in it, you tell

9          them they're an independent contractor, well,

10         you've taken away their right, and until they

11         have reason to know that they had a right,

12         the statute doesn't run.

13               Equitable tolling, here we go, a Second

14         Circuit case.  Equitable estoppel -- and I'm

15         not going to play games with the other side

16         on whether it's tolling or equitable

17         estoppel.  There are plenty of cases.  The

18         courts say these terms are used

19         interchangeably, perhaps inartfully

20         sometimes, but they're essentially -- the

21         principle under it is fairness.

22               The principle under it is you're

23         appealing to a court of equity to do justice.

24         And what's justice in this circumstance.

25         That's something that the court has to weigh

1           based on the facts.

2                 Equitable estoppel, in the modern

3           sense, arises from the conduct of a party,

4           using that word in its broadest meaning, as

5           included his spoken his positive acts and his

6           silence on negative omissions to do anything.

7           Its foundation is justice and good

8           conscience.  Okay.

9                 So negative omissions to do anything,

10          you don't post the signs, you don't give the

11          people notice that under the law of the

12          state, they're not independent contractors.

13          Under the Family Medical and Leave Act

14          they're entitled to their rights, which you

15          tell them that they don't have.  Under the

16          workers' compensation statute that you are

17          entitled to workers' compensation, you don't

18          have to be as things used to be before, that

19          if you had a preexisting condition, you

20          couldn't get coverage.

21                So if one of these guys, you know,

22          broke his rotator cuff and had a real problem

23          or had a couple of slipped disks in his back,

24          which is common as anything for those guys,

25          where are they going to get coverage from?

1          Who is going to sell them an insurance

2          policy?  They couldn't get one in those days.

3              And then as far as Rule 11 motion,

4          equitable tolling -- here's one from the

5          district court of Connecticut, this court,

6          United States District Court.  The district

7          court should not have resolved the fact

8          specific equitable tolling issue on

9          defendant's motion to dismiss.

10             The resolution of this issue is thus

11         heavily dependant on the facts of the case

12         and cannot be decided on a motion to dismiss.

13             Well, how can they simply sweep it

14         aside on a Rule 11 motion, saying that our

15         assertion of the doctrine, recognized

16         consistently in Connecticut law, and

17         recognized in federal law by cases that say

18         it applies to every federal statute.  How can

19         they say that that is bad faith, frivolous,

20         no foundation, no basis?  I mean, it's,

21         again, the over the top language in the

22         sanction motion is itself, I respectfully

23         suggest, sanctionable because it so departs

24         from the actual case law that it becomes a

25         WWE story line, which is not an argument of law.

```
1                    Here's another one.  Equitable estoppel
2           arises from the principle that no man will be
3           permitted to profit from his own wrongdoing
4           in a court of justice.
5                    I would say that's probably the most
6           fundamental of the equitable principles, your
7           Honor.
8                    You can't do a wrong to somebody.  You
9           can't sweep away all the beneficial social
10          legislation of the 20th century.  You can't
11          have them sign prospective releases in a
12          contract of adhesion where the bargaining
13          power is outrageously different.  You can't
14          do all of those things for your own profit,
15          because you don't want to pay workers'
16          compensation insurance, you don't want to pay
17          somebody for being off for twelve weeks and
18          then have to give them their job back.  It's
19          cheaper to just sweep all of this under the
20          rug and tell them they're an independent
21          contractor and they don't have any rights.
22          That's much more a profitable self-serving
23          thing to do.
24                   So, why give these people a fair
25          chance?  Well, that may be what they chose to
```

1      do, but that isn't what the law says should

2      happen, after they've made that choice.  They

3      cannot profit from their own laws.

4           Now, although Attorney McDevitt did not

5      mention, except peripherally, the RICO

6      matter, I do want to just take a little shot

7      at that to show that that's certainly not

8      frivolous either.

9           Again, the pleading of the RICO matter

10     must be taken in the context of everything

11     that I've just said.  These contracts were

12     crafted to deprive these people of all their

13     rights.  They contain clauses that were

14     clearly illegal under Connecticut law.  The

15     signature was procured on them by utilizing

16     the mails of the United States to do so. Send

17     them out, get them back.  The wires of the

18     United States to talk them into signing.

19     Some of these contracts, later on, the

20     nostalgia contracts were negotiated over the

21     telephone.

22          What do we need to show for RICO?

23     Well, to establish a claim for violation we

24     must show that he was injured by the

25     defendant's conduct of an enterprise through

1          a pattern of racketeering activity.  It's

2          pretty simple.  The enterprise is the WWE.

3              The trust which Attorney McDevitt puts

4          in his motion we've got to ignore those

5          trusts because what do they have to do with

6          anything.  Some of them weren't formed until

7          after the WWE was formed.  Certainly didn't

8          have anything to do with the wrestlers

9          beforehand.  Sorry, but that's just plain silly.

10             If I am conducting an illegal ongoing

11         racketeering enterprise and I pass the baton

12         to two of my associates, they assume

13         responsibility for all of the crimes of the

14         -- all of the acts of the racketeering

15         conspiracy backwards and forward.  That's

16         another Hornbook law, your Honor, and they

17         know that.  So, that's just silly.

18             If I call myself and call myself a

19         trust for estate purposes, I don't exculpate

20         myself by simply saying I'm not Vincent

21         McMahon, I'm Vincent McMahon trustee.  When

22         you're all done, Vincent McMahon controls --

23         he has a choke hold on the WWE, such that if

24         you read the SEC filings, your Honor, he says

25         candidly in the SEC filings, as he must, my

1        interests may be adverse to those

2        shareholders who don't have voting.

3            The WWE has got two classes of

4        shareholders, Vincent McMahon who has all the

5        votes, and the publicly traded shares.  He

6        doesn't have all the votes.  I think it's 86

7        percent or something, and the publicly traded

8        shareholders who have no vote whatever.  So,

9        however you want to look at it, this

10       gentleman, for good or ill, is in control of

11       the enterprise.  Has a choke hold on it.

12       From his own filings, he's involved in all of

13       the aspects, creative aspects of it, which

14       means making up the good and evil scripts and

15       scenarios.  He's a very creative, dynamic

16       individual to be sure, but maybe a little bit

17       too creative and dynamic and too insistent to

18       his attorneys that it's either his way or the

19       highway because they, like the Rule 11

20       motion, overreached, the booking contracts

21       and nostalgia contracts overreached.  They

22       try to accomplish too much and in so doing

23       failed.  Thank you, your Honor.

24           THE COURT:  Thank you.

25           MR. BOUMIL:  I'd be happy to answer any

```
 1              question you may have.
 2                   THE COURT:  I have none.  Attorney
 3              McDevitt, do you have a brief response or --
 4              by brief, I mean brief.
 5                   MR. MCDEVITT:  Could I ask you what you
 6              mean by brief, judge, because I understand
 7              the need to get out of here, I do.  And I
 8              have some points I could make.  There was a
 9              lot that was said there that had nothing to
10              do with the motions.
11                   The last part you heard about contracts
12              supposedly against public policies, there's
13              not even a claim for that in the case.  The
14              contracts are alleged to be unconscionable.
15              You heard him say that these people made a
16              few bucks.  These are contracts that paid
17              these guys hundreds of thousands and millions
18              of dollars.
19                   But I thought -- I thought it was
20              interesting that Mr. Kyros's presentation
21              began in the manner in which he did because
22              it is exactly, exactly 100 percent the reason
23              the judge issued the final sanction that she
24              did to him because of this misrepresentation
25              about deaths that he tries to blame on the
```

```
 1              WWE.  And he started out by talking about
 2              these people are dying and then he mentioned
 3              a bunch of wrestlers that died. I'm sure you
 4              can remember that.
 5                   We have a little Powerpoint, your Honor,
 6              that shows you -- and remember what the judge
 7              chastised him for was suggesting that people
 8              who died of heart attacks in the shower and
 9              people who died of drug overdoses, that that
10              somehow had something to do with WWE.  And
11              he's sitting there telling "these people are
12              dying."  And here's a little Powerpoint we'd
13              like to show you about the wrestler deaths
14              that he just recently referenced, that you
15              can see how he's still doing the same thing.
16                   George Steele, 79 years old, dies of
17              kidney failure.  It has nothing with brain
18              damage.
19                   Ivan Koloff, the man he was telling you
20              about, all the published reports, 74 years
21              old, had been battling liver cancer for
22              years.  Nothing to do with the WWE.
23                   Headlines of Jimmy Snuka, another
24              wrestler who recently died, an elderly man of
25              73, stomach cancer.
```

1           Chavo Guerrero, the man I showed you

2       earlier this morning hitting his son over the

3       head with a chair, that's one of the

4       plaintiffs, elderly man, 68 years old, dies

5       of liver cancer.

6           This fellow, Timothy Well, 55 years

7       old, according to published news reports,

8       follows complications from kidney failure.

9           Nicole Bass, a 52 year old woman, dies

10       of a massive stroke.

11           None of these, none of these.  And this

12       is Ron Bass, this is another fellow that he

13       mentioned, dies of a burst appendix.

14           None of these have anything to do with

15       brain injuries.  None of these have anything

16       to do with WWE.  Yet, he begins his

17       presentation to you with exactly the same

18       thing that the judge told him to stop doing,

19       that were unprofessional.  That's how he

20       began the presentation with you.

21           And, frankly, in between, there was a

22       lot of that.  And in the end, you heard even

23       more misrepresentations about Stephanie

24       McMahon thing.  Mr. Norris stands up at the

25       end of that and says to you that Stephanie

1          McMahon completely misrepresented things in

2          her testimony by supposedly saying she was

3          not aware of any concussions in WWE since she

4          was 13 years old.

5               You will not find any testimony like

6          that in that report.  It's just absolutely

7          false to say that.  And the judge has the

8          testimony.  In fact, if you look at

9          Stephanie's testimony, she actually talks in

10         the testimony about a wrestler getting

11         knocked out in the ring.  She talks about

12         people getting concussions in her testimony.

13         She wasn't denying that concussions occurred

14         in the WWE.

15              The question that they had asked her

16         was whether she was aware of any documented

17         concussions, documented concussions that had

18         taken place since the WWE began its wellness

19         program in the year 2006.  That was the

20         precise question she was asked.  And she said

21         she was not aware of any documented ones

22         since that happened, which was a very brief

23         time before she testified.  She never said

24         there was never any concussions in WWE's

25         history or any of these other lies that they

1           keep repeating ad nauseam.  You heard him say

2           it today.  All you've got to do is read the

3           transcripts and you can see that.

4                   There's so many other things, your

5           Honor.  Quite frankly, the notion that they

6           would stand before you and say now, oh, this

7           was sloppiness, and you know we did read it

8           and I didn't hear some of the counsel say

9           whether they read it.  I heard Mr. Norris say

10          he read it.  I didn't hear the rest of the

11          counsel say they had read this complaint.

12                  If it was sloppiness then why didn't

13          they fix it when we notified them of it?  Why

14          didn't they correct it then?  Why did they

15          make us file a formal motion, 95 pages and

16          whatnot and document everything before they

17          did anything about it?

18                  Now, with respect to this Pat Patterson

19          issue.  One of the things that you heard, and

20          it conflates everything here is concussions.

21          And you lose track of the fact that what

22          they're standing and talking with you about

23          is things happened forty years ago.  Injuries

24          like that, there's just no way they're not

25          barred by statutes of limitation.  I'm sorry.

1          There's no tolling doctrine whatsoever that

2     Judge Bryant or they have ever tried to plead

3     that would allow them to recover for

4     concussions that were incurred twenty,

5     fifteen, twenty, thirty, forty years ago.

6     And Judge Bryant was very careful in making

7     that distinction.

8          She says, This case is not about

9     concussion management.  Yet everything they

10    do, they get up there now and they try to

11    talk about what WWE knew about concussions

12    and knew about post-concussion syndrome.

13    That's not the issue.  The issue is what did

14    WWE know about these neurodegenerative long

15    term diseases that are supposedly latent.

16    That's what the whole issue was that Judge

17    Bryant was writing about.  That's the claim

18    she sustained that would go forward, not

19    these other ones.

20          In fact, she even said, right here I'm

21    showing you the order she issues in document

22    160, "this case is not about concussion

23    prevention.  Discovery of information and

24    production of documents which merely reflect

25    a desire to limit concussions and prevent

1          injury to WWE talent or specific incidents of

2          head trauma occurring during WWE activities

3          are not relevant."

4               They tried to make it sound like we

5          didn't turn over something to you.  They

6          tried to get it and the judge said it isn't

7          relevant because of what the case is about.

8          It's not about concussion management or about

9          concussions or post-concussion syndrome.

10         Those are all injuries that are clearly time

11         barred.  That's all they talk to you about.

12              And what do they do?  They come in here

13         with Pat Patterson.  I want to show you

14         something about Pat Patterson.

15              Pat Patterson, and this is how

16         deceptive that whole thing is.  Your Honor

17         asked the right questions.  Pat Patterson is

18         a man who left school.  This is a man who

19         left school -- this is what they allege about

20         Pat Patterson.  Let's sort of move it ahead

21         if we can.

22              This is the book he just came out with.

23         And he's a gay man, not that that matters,

24         but that's part of his whole story of things

25         that he's overcome in his life.  And he says

1         right in his book, I quit school.  I quit

2         school and I would never have to work in an

3         office.  And in another place he actually

4         says, I got a diploma after seven years of

5         grade school.  This is the man that they're

6         talking about.

7              Now, what he's doing in that passage

8         that they showed you is he's cutting what's

9         called a wrestling promo.  They try to make

10        themselves look like tough guys.  That's what

11        he's doing.  He's trying to say we're tough

12        guys.  We get this, we get punch drunk.  But

13        the suggestion that this seventh grade guy

14        with no scientific training, was decades

15        ahead of Dr. Omalu in supposedly figuring out

16        that people get punch drunk or dementia from

17        CTE, it's just ludicrous.  And that's not

18        that what they just alleged in the complaint.

19        That's why they did all this NFL stuff that

20        they can't really justify doing for you.

21             With respect to Dr. Unger, much the

22        same.  Everything Dr. Unger says in there,

23        just so the court understands what's going

24        on, Mr. Kyros knows this because he's

25        questioned people about this.  Shawn Michaels

1          was a prominent wrestler.  He got beat up in

2          a bar fight.  It's kind of embarrassing when

3          one of the professional talents gets beat up

4          in a bar fight.  So they have to come up with

5          a cover story for why he's not appearing on

6          TV.

7               If you remember the show that they

8          showed you, he's not hit or anything, he just

9          falls down and acts like he's hurt.  And so

10         the cover story for it all is Dr. Unger

11         coming on and saying, oh, well, he has

12         post-concussion syndrome and that's why he

13         can't perform.  And they make up this whole

14         elaborate story for why he can't perform.

15         It's fiction.  That's all it is.

16              And it's about post-concussion

17         syndrome.  It's not about CTE.  It's not

18         about neurodegenerative diseases.  It's not

19         about any of the things that the scientific

20         records show unquestionably.  Dr. Omalu's

21         first discovery of this CTE business that has

22         fueled all this occurred in 2005 with Mike

23         Webster in a seminal finding that he made

24         that he even said this is the first reported

25         case in football, and the first one that

1          happened in wrestling is 2010.  And that is

2          indisputable.  They can't dispute that and

3          they know that's true.

4               Let me just look at my notes real

5          quick.

6               THE COURT:  Okay.  Do we think we can

7          wrap up in the next six minutes by 7:30 so

8          that I can send people home?

9               MR. MCDEVITT:  Let me look and I'll try

10          to do that as best as I can, your Honor.

11               THE COURT:  Let me rephrase.  We are

12          going to send people home at 7:30.  Do you

13          think you can wrap up before they do go home?

14               MR. MCDEVITT:  I will.  The other thing,

15          your Honor, everything they were saying was

16          all geared towards negligence based

17          arguments.  Knew, should have known, all

18          these -- it had nothing to do with fraud

19          claims, which is what the judge has already

20          said they can't do.  And they didn't address

21          that point with you.

22               Continually they talked about McDevitt

23          has a story line.  This is the judge's

24          findings.  This is not me saying this.  This

25          is the judicial findings about their conduct,

```
 1              their tactics, what they've been doing in
 2              this case.  It's not just me saying this.
 3              This is the judge.
 4                   As far as this NFL work that he
 5              supposedly does, I don't think he answered
 6              your question.  He has nothing to do with
 7              that settlement in that NFL case, and he
 8              didn't say he did.
 9                   As far as his notice of appearance that
10              he entered, we told you about that during my
11              presentation.  He entered that after we
12              raised the question in the Haynes case that
13              this guy was running around telling everybody
14              he had something to do with the NFL
15              settlement and he didn't.  Then he files this
16              notice of appearance.  But there is not a
17              shred of evidence that he had anything
18              whatsoever to do with negotiating a
19              settlement, obtaining a settlement, even
20              dealing with the NFL lawyers in any way in
21              that case.
22                   You heard him say typographical errors
23              were unfortunate.  And again, your Honor, I'd
24              like to pull up the two paragraphs that I've
25              highlighted, 548 and 506, real quick, if I
```

```
 1              could.
 2                      This statement, "WWE intentionally
 3              funded and created junk science."  That's not
 4              unfortunate.  That's not sloppy.  That's
 5              deliberate.  They added that deliberately and
 6              they didn't address who did that.  How do you
 7              write that off as sloppiness to create that
 8              lie?
 9                      506, same thing.  Added that sentence.
10              This was the one after Roger Goodell's
11              statement.  "WWE intended its wrestlers rely
12              upon this statement."
13                      That's not sloppiness.  That's the
14              deliberate falsification of something
15              attributed to WWE, supposedly said to make
16              wrestlers lie, when they didn't say it at all.
17                      Mr. Kyros says he hired proofreaders to
18              read the complaint.  With all due respect,
19              your Honor, that not a lawyer's job to hire
20              proofreaders.
21                      THE COURT:  I understand and appreciate
22              that.
23                      MR. MCDEVITT:  You know, you're supposed
24              to read it and your --
25                      THE COURT:  You need not push that on
```

1          me.  They're not involved in the case, the

2          proofreaders, I'm guessing.

3               MR. MCDEVITT:  All right.  Let me just

4          look real quick.  He told you wrestlers were

5          all fixated on this Stephanie McMahon thing.

6          You saw testimony last week from Vito

7          Lograsso and Evan Singleton.  I asked them,

8          did you even read that testimony?  No, they

9          didn't even know it existed.  The only person

10         who is fixated on it is Mr. Kyros.  And he's

11         fixated on continually misrepresenting what

12         it was.

13              It wasn't congressional testimony, by

14         the way, so you know.  It was behind closed

15         doors in Representative Henry Waxman's

16         committee.  It wasn't even public.  The

17         transcript was released months later.  Nobody

18         could have even read it.  Nobody could have

19         even seen it.  And none of them ever did, but

20         he keeps running around trying to say that

21         what she said there was false and trying to

22         cover up something.

23              And I guess, your Honor, there are many

24         other points I could make about the

25         presentation you got.  Much of what

1          Mr. Boumil said is argument on merits that we

2    haven't heard or seen.  We look forward to

3    responding to it when they finally get around

4    to filing a motion to dismiss.  It's not

5    going to be hard to knock down every one of

6    his arguments.  I know you don't have time

7    for them now.

8          But it's clear law.  It's not the Levy

9    necessarily, the case.  There's no case out

10   there that says there's a private cause of

11   action and he hasn't cited one.  There's case

12   after case after case after case.  And again,

13   the statute of limitations bars all these

14   claims to begin with.

15         So, again, your Honor, I think what you

16   heard and what you saw was a lot of

17   obfuscation.  You didn't hear any real

18   explanation for why they did this with the

19   NFL case.  This isn't just cut and pasting.

20   This is deliberate falsification.  And I

21   submit they didn't read this complaint.  They

22   hired a proofreader to read a complaint.

23   That's embarrassing for a lawyer to stand in

24   a federal court and say that's what I did, I

25   hired a proofreader.

1              Thank you, your Honor.  I do appreciate
2         all the time and I appreciate your staff's
3         time.  Sorry to keep you as late as we did.
4              THE COURT:  Thank you.  All right.  We
5         are done for the day.  I suppose if the
6         lawyers want to come back another day and
7         argue some more, you're more than welcome to
8         argue some more.  I don't know that I need to
9         hear some more.  But I'll let you, if anyone
10        feels like they haven't had a sufficient
11        opportunity to argue their various position
12        after all the briefs I've read and all the
13        oral argument that I've heard.  Certainly
14        tell me if you want to schedule something
15        else.  You can contact chambers within the
16        next 24 hours and let me know if you want an
17        additional day, be it telephonic or in
18        person.  I don't think I need it.  But if you
19        really, really, really, really, really,
20        really, really want to, really want to, you
21        can.  Everybody understand the subtlety on
22        that one?  All right.  Good.
23             We are now in recess.  Thank you all.
24        You are welcome to shake hands if you want
25        to.  I heard someone say that usually does

1           happen.  It has happened.  I won't be around

2           to see it happen, but it would be nice if you

3           did.  The court is now in recess.  Thank you.

4

5             (Concluded:  7:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2

3            I hereby certify that the foregoing 245

4        pages are a complete and accurate

5        computer-aided transcription of my original

6        stenotype notes taken of the proceedings, which

7        were held in re:  RUSS MCCULLOUGH, ET AL VS.

8        WORLD WRESTLING ENTERTAINMENT, INC., held

9        before the Honorable Robert A. Richardson, USDC

10       Magistrate Judge, U.S. District, 450 Main

11       Street, Hartford, Connecticut on March 9, 2017.

12

13

14

15            s/s Irma Sanchez-Farnham

16            IRMA SANCHEZ-FARNHAM
               Court Reporter
17

18

19

20

21

22

23

24

25