<pre>
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF CONNECTICUT

 3

 4      ---------------------------x

 5   RUSS MCCULLOUGH, ET AL
                   Plaintiffs,        3:15CV1074 (VLB)
 6
             vs.
 7
     WORLD WRESTLING                 March 2, 2017
 8   ENTERTAINMENT, INC.,
                   Defendant
 9      ---------------------------x

10                                   Federal Building
                                     450 Main Street
11                                   Hartford, Connecticut

12

13                    ORAL ARGUMENT

14

15

16   Held Before:
           The Honorable Robert A. Richardson
17              U.S.D.C. Magistrate Judge

18

19

20

21

22

23                FALZARANO COURT REPORTERS, LLC
24                    4 Somerset Lane
                    Simsbury, CT 06070
25                     860.651.0258
</pre>

```
 1        APPEARANCES:

 2            For the Plaintiffs:

 3                CUNEO GILBERT & LADUCA LLP
                  4725 Wisconsin Avenue NW, Suite 200
 4                Washington, DC 20016
                  202.789.3960
 5                    By:  KATHERINE VAN DYCK, ESQ.
                           Kvandyck@cuneolaw.com
 6
                  KYROS LAW OFFICES
 7                17 Miles Road
                  Hingham, MA 02043
 8                800.934.2921
                      By:  KONSTANTINE KYROS, ESQ.
 9                         Kon@kyroslaw.com

10                         ANTHONY M. NORRIS, ESQ.
                           Anorris@kyroslaw.com
11
                  SYLVESTER J BOUMIL, ESQ.
12                120 Fairmount Street
                  Lowell, MA 01852
13                978.458.0507
                  SJBoumil@Boumil-Law.com
14
                  MIRABELLA LAW
15                132 Boylston Street
                  Boston, MA 02116
16                617.580.8270
                      By:  ERICA MIRABELLA, ESQ.
17                         Erica@mirabellallc.com

18                TOOHER WOCL & LEYDON, LLC
                  80 Fourth Street
19                Stamford, CT 06905
                  203.324.6164
20                    By:  BRENDEN P. LEYDON, ESQ.
                           Bleydon@tooherwocl.com
21
                  KOSKOFF KOSKOFF & BIEDER
22                350 Fairfield Avenue
                  Bridgeport, CT 06604
23                203.336.4421
                      BY:  WILLIAM M. BLOSS, ESQ.
24

25
```

1          <u>For the Defendant:</u>

2              K&L GATES LLP
               210 Sixth Avenue
3              Pittsburgh, PA 15222
               412.355.6500
4                  By:  JERRY S. MCDEVITT, ESQ.
                        Jerry.mcdevitt@klgates.com
5
                        CURTIS B. KRASIK, ESQ.
6                       Curtis.krasik@klgates.com

7                       STEFANIE M. LACY, ESQ.
                        Stefanie.lacy@klgates.com
8
               DAY PITNEY LLP
9              242 Trumbull Street
               Hartford, CT 06103
10             860.275.0164
                   By:  JEFFREY P. MUELLER, ESQ.
11                      Jmueller@daypitney.com

12         <u>Also Present:</u>

13             John Fries
               Law Clerk
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Commenced:  10:42 a.m.)

 2

 3              THE COURT:  Please be seated.  We're here

 4         this morning on United States -- excuse me,

 5         Russ McCullough versus World Wrestling

 6         Entertainment, et al, docket number 3:15CV1074

 7         (VLB).  I'm Judge Robert Richardson.  Will

 8         counsel please identify themselves for the

 9         record.

10              MR. BLOSS:  William Bloss, your Honor, for

11         plaintiffs in the Singleton matter.

12              MS. VAN DYCK:  Katherine Van Dyck on

13         behalf of the plaintiffs, Evan Singleton and

14         Vito Lograsso.

15              MR. NORRIS:  Anthony Norris on behalf of

16         plaintiffs.

17              MR. KYROS:  Konstantine Kyros on behalf of

18         plaintiffs Evan Singleton and Vito Lograsso, as

19         well as the Rhode Island plaintiffs, your Honor.

20              THE COURT:  Thank you.

21              MS. MIRABELLA:  Erica Mirabella on behalf

22         of the plaintiffs.

23              MR. BOUMIL:  James Boumil on behalf of the

24         Lograsso matter.

25              MR. LEYDEN:  Brendon Leyden for the
```

```
 1              plaintiffs.
 2                   MR. MCDEVITT:  Jerry McDevitt on behalf
 3              World Wrestling Entertainment, your Honor.
 4                   MR. KRASIK:  Good morning, your Honor.
 5              Curt Krasik of behalf of World Wrestling
 6              Entertainment.
 7                   MS. LACY:  Stefanie Lacy on behalf of
 8              World Wrestling Entertainment, your Honor.
 9                   MR. MUELLER:  Good morning, your Honor.
10              Jeffrey Mueller from Day Pitney on behalf of
11              World Wrestling Entertainment.
12                   THE COURT:  Thank you.  Okay.  We are here
13              for a oral argument on the motion to withdraw
14              the admissions.  So, parties ready to go forward?
15                   MS. VAN DYCK:  Yes, your Honor.
16                   MR. MCDEVITT:  Yes, your Honor.
17                   THE COURT:  All right.  Let's start with
18              the plaintiffs.  Please proceed.
19                   I'll just tell you all that I have read
20              the briefs in connection with this matter, and
21              so I have good familiarity with the arguments.
22              You certainly don't have to repeat everything
23              or close to everything that's in your briefs.
24              I have read them thoroughly.  I do have some
25              questions that I'll ask along the way, but you
```

1          should feel free to make your best pitch.

2                MS. VAN DYCK:  Thank you, your Honor.

3          Katherine Van Dyck on behalf of plaintiffs,

4          Evan Singleton and Vito Lograsso.

5                We're here today regarding the motions to

6          withdraw admissions that we filed.  As your

7          Honor is well aware, we're here because we

8          served our request for admission at 11:42 a.m.

9          on the day after the deadline.  That was less

10         than twelve hours late, but WWE is correct that

11         under Rule 36 that means that our responses

12         were deemed admitted.

13               WWE is wrong that there was any sort of

14         nefarious conduct or that our responses were

15         somehow deficient.  Their claim of prejudice,

16         frankly, baffles me and -- but we are here.

17               So what does Rule 36 require to withdraw

18         admissions?  We have to show that it would

19         allow the presentation of this matter on the

20         merits, and we have to show that there is no

21         prejudice to WWE.

22               Regarding the first matter, our clients

23         have, throughout this litigation, asserted that

24         they had no knowledge of the long term risks of

25         CTE.  Their responses to the request for

```
1              admissions denied knowledge of the multitude of
2              media articles and various news coverage of
3              CTE.  And to deem an admission would be,
4              frankly, extremely prejudicial to them and
5              would not result in a trial on the merits.  It
6              would result in a complete reversal of
7              plaintiffs' position in this lawsuit.
8                   Regarding prejudice, WWE had plaintiffs'
9              responses to request for admission for a month
10             before they deposed plaintiffs.  In their
11             opposition to our motion to withdraw, they
12             admit that they were able to examine plaintiffs
13             during their depositions about those responses,
14             and, in their opinion, impeach them regarding
15             those responses.
16                  They had them for almost two months
17             before the close of discovery.  If WWE felt
18             that those responses were deficient, they could
19             have, during the discovery period, filed a
20             motion to compel and brought what they consider
21             to be deficient responses to this court's
22             attention.  WWE chose not to do that.  WWE had
23             our responses for more than two months before
24             -- actually, more than three months before they
25             filed their motion for summary judgment.  If
```

 1          they felt that the responses were -- made it

 2     difficult to prepare their motion for summary

 3     judgment, they could have brought it to the

 4     court's attention before then.  They chose not to.

 5          They've made several arguments in their

 6     oppositions that are more in the style of a

 7     motion to compel.  Discovery is closed and they

 8     have waived those arguments.

 9          There is simply no prejudice here.  To

10     deem these matters admitted would result in a

11     trial not on the merits, and so plaintiffs

12     request that the admissions be withdrawn.

13          THE COURT:  Thank you.  Let me ask you on

14     the -- on the authenticity, there are about 100

15     or so articles, as I recall, where they ask you

16     to admit the authenticity of some articles.

17      As it relates to the reasonableness of the

18     investigation on your part, couldn't you have

19     gone on the internet to double check to see if

20     those articles were in fact authentic?

21          MS. VAN DYCK:  I suppose we could have,

22     your Honor.  Frankly, the requirement of

23     reasonable inquiry doesn't mean that I have to

24     go out and search the entire public record, all

25     of Google, to determine whether a document is

```
 1          authentic.  The cases that WWE cited in support
 2          of that involved documents.  For instance, one
 3          involved documents that were actually produced
 4          by the responding party.  The plaintiff had
 5          asked the defendant please verify, you know,
 6          verify or authenticate these documents, and the
 7          responding party said we can't because those
 8          employees are no longer with us and we don't
 9          know how that document was created.  So you're
10          talking about a document that was at some point
11          within the custody and control of the
12          responding party.
13              Other times when they're asking -- when a
14          party asks for somebody to admit the
15          authenticity of the document, they're asking
16          about the content.
17              For instance, one of the cases cited by
18          WWE involved a party producing or attaching a
19          CV to a request for admission and asking the
20          responding party to admit or deny that the
21          person who was identified in the CV, I think,
22          was a professor.
23              So, that's not what they're asking us to
24          do.  I have no idea what process WWE went
25          through to compile these documents.  I don't
```

1          know if they were sitting in a desk drawer in

2          somebody's office at WWE headquarters.  I don't

3          know if they used Google.  And I'm pretty

4          confident that Rule 36 doesn't mean that I have

5          to conduct over 100 Google searches, pull up an

6          article based on a headline, and then compare

7          it to what's been printed out, and say, yes,

8          this is true and accurate.  If anything, WWE

9          should have, when they served these documents

10         on us, provided a declaration saying these are

11         true and accurate copies, admit or deny that

12         you've seen them.

13              THE COURT:  All right.  Thank you.

14              MS. VAN DYCK:  Thank you, your Honor.

15              MR. MCDEVITT:  Good morning, your Honor.

16              THE COURT:  Good morning.

17              MR. MCDEVITT:  Before I get to my argument

18         in chief, I would just simply note that counsel

19         admitted the fundamental proposition that

20         because of them being late, under the rules,

21         are automatically deemed admitted, everything.

22         And the burden is, under Rule 36, uniquely on

23         them at that point, to move to withdraw them,

24         if uncontested, and they never did that for

25         five months.

```
 1              THE COURT:  I understand the way the rule
 2         operates.  I guess one question I have for you
 3         is they send you an email that sort of
 4         apologetically says, look, sorry, that this is
 5         late or untimely or whatever the magic word
 6         was.  It was a miscommunication.  Just out of
 7         curiosity, did you ever respond to them either
 8         by way of email or otherwise to say, well,
 9         we're taking the position that they're deemed
10         admitted?
11              You say it automatically happens, which
12         it does, but they're within twelve hours they
13         send you a cover email.  Does anyone ever say
14         to them, hey, by the way, our position is
15         they're automatically admitted?
16              MR. MCDEVITT:  There was some email
17         traffic after that in which we asked for a
18         conference.  The conference never occurred.  I
19         don't believe, in direct answer to your
20         question, we ever said in an email that we take
21         the position they're deemed admitted because,
22         frankly, that's, I think -- I mean obviously
23         known to everybody who practices law.  All you
24         have to do is read the rules to know that.  So,
25         the burden was on them, I think, your Honor, to
```

1          ask us for a conference to see if we could

2          consent to withdrawing them.

3               Had they asked for that, we would not

4          have, and I'll tell you why.  It's in the case

5          law and we're going to go through this.  These

6          weren't just late.  The problem wasn't that

7          they were late.  They were horribly defective.

8               THE COURT:  No, I understand that you have

9          two parts.  That we essentially have where

10         they, one, they were late; two, even if they

11         were timely, your position is that they are

12         nonresponsive; and then number three, as I

13         understand it, you also claim that you suffer

14         prejudice.

15              But focusing on the first one, which is

16         they were late and they're late by some twelve

17         hours, slightly under twelve hours, I guess.

18         There's the rule and then there's the practice,

19         if you will.  And so in terms of how one is

20         dealing with opposing counsel, I just want to

21         know, before we move on to the second item, do

22         you at any point say to them, yeah, thanks for

23         the apology, but it doesn't matter, we're

24         taking the position that your admissions that

25         you basically -- you're stuck with these

1           admissions, as a result of your untimeliness,

2           thereby giving them a chance to file something

3           with the court either asking for permission

4           impromptu to have an extension of time to

5           respond of twelve hours, or giving them an

6           opportunity at that point to immediately file

7           something with the court trying to withdraw

8           their admissions or other steps?

9               I'm not saying I don't understand the way

10          the rule works.  I'm just saying in practice,

11          did you ever say anything to them that would

12          let them know, hey, as you know, the way the

13          rule operates is as follows and we appreciate

14          your cover email but too bad?

15              MR. MCDEVITT:  When we filed our motion

16          for summary judgment, obviously, we advised

17          them at that point in time that these

18          admissions had all been deemed and that no

19          motion to withdraw had ever been filed.  And it

20          was only then, after we already moved for

21          summary judgment, that they then moved to withdraw.

22              But your Honor, if I can be frank, they

23          have six law firms.  I mean, they know the

24          rules the same way we do.  The rules are

25          automatic.  And frankly, had they moved, as you

1          pointed out in there, we would have brought it

2          to the judge's attention.

3               And keep in mind, as you're going to see

4          when we go through the PowerPoint here, Judge

5          Bryant gave them a thirty-day extension here,

6          with a specific order that this was not

7          supposed to be used for delay purposes or

8          dilatory objections and all the rest of this

9          kind of stuff.  And that's exactly what they did.

10              I mean what Ms. Van Dyck didn't tell you

11         about these articles that they refused to admit

12         to, they refused to admit to the authenticity

13         of articles that they themselves cite in the

14         complaint against us, to show you how

15         unreasonable they are.

16              Every one of the articles and every one

17         of the media things that were put in play here

18         were attached to the request for admissions.

19         They were easy to authenticate.  They have six

20         law firms.  They could have divvied it up.

21         They could have went online in two seconds and

22         authenticated every one of those.  They didn't

23         authenticate one of them and then came back

24         instead with objections.

25              If I could go through -- have I answered

1          your question, your Honor?

2                THE COURT:  You have, thank you.

3                MR. MCDEVITT:  If I could just give a

4          little bit more background to why these were

5          very important.

6                Four of the cases that have been filed

7          against the WWE in this campaign have been

8          dismissed outright.  The only claim that

9          survived so far was in the Lograsso case.  And

10         it was one that the court itself expressed

11         skepticism about and helped to frame the

12         discovery that would take place and it was

13         aimed at the admissions.  And the court itself

14         was very skeptical about this claim.  And the

15         key issues that the court says, and you'll see

16         the quote right on the screen there, sustaining

17         one claim, which was a claim of fraud by

18         omission that the argument being that the WWE

19         supposedly failed to tell Mr. Singleton and

20         Mr. Lograsso something about CTE.

21               In the court's framing of the issues

22         before discovery occurred, this is what Judge

23         Bryant said in sustaining it.  "The court is

24         skeptical of the inherent contradiction which

25         underlies plaintiffs' fraud claims.

1          "Plaintiffs simultaneously argued on the

2     one hand that studies and data linking MTBI

3     with permanent degenerative neurological

4     conditions were both widespread and widely

5     publicized.  And on the other hand the

6     plaintiffs had no knowledge of any of this

7     widely publicized information, and instead

8     relied on their detriment on a television

9     entertainment company to explain to them the

10    dangers of volunteering for compensation to be

11    hit in the head repeatedly with a metal folding

12    chair."

13         So that's the first time in Judge

14    Bryant's opinion where she explains that all

15    this publicity and all this stuff that was out

16    there to be learned goes to a key issue in the

17    case that she sustained of the fraud claim

18    about detrimental reliance.

19         She does it a second time in the same

20    opinion.  She says, "The fact that some or all

21    of the material known facts alleged to have

22    been disclosed are within the public domain and

23    could undermine plaintiffs' claim of

24    detrimental reliance at the very least."

25         So that's two times in her opinion

1          sustaining the claim and sort of setting the

2          stage, if you will, for what discovery is

3          relevant where she acknowledges that this

4          publicity, that they've alleged themselves at

5          great detail in their complaint is a key

6          factual issue.  What did these plaintiffs know

7          and how did they not know this stuff?

8               A third issue that she brought up and

9          emphasized that was going to be for further

10         factual development went to limitations issues,

11         again, which plays into this whole issue of

12         publicity.  And she says specifically, "further

13         factual development is needed to determine

14         whether any of the pre-2012 plaintiffs

15         discovered or should have discovered actual

16         harm in the form of an increased risk for

17         latent permanent degenerative neurological

18         conditions prior to 2013."  The significance of

19         that being that's when Mr. Lograsso's claim

20         would be time barred because of the date he

21         filed under the three year statute of Connecticut.

22               So, Judge Bryant, in her own opinion,

23         expressly sets forth why all this information

24         about publicity and what was out there and what

25         was known in the public realm is directly

1    relevant to this notion that the WWE somehow

2    fraudulently omitted to tell them what you

3    could learn by reading in the newspapers

4    frankly.  So, they've known it was relevant,

5    decidedly relevant.

6         So what do we do?  We serve requests for

7    admissions, including one that they themselves

8    had cited in their complaint against us as

9    publicity that they said was out there and

10   showed all this stuff.  We've attached the

11   newspaper article, if it was a newspaper

12   article.  If it was a video, we would attach

13   the video or a transcript of the video.  So all

14   they had to do -- there's a massive compilation

15   of what was out there to demonstrate how

16   widespread this publicity was.

17        And if I could, your Honor, I need to

18   explain, in case your Honor is not familiar

19   with the event, a key event in this case, is

20   Chris Benoit.  Chris Benoit was a performer for

21   the WWE.  He was under contract.  He was a

22   well-known performer, a very reputable person.

23   One weekend in 2007 he goes home and commits

24   one of those horrific acts that shocks

25   everybody.  What happened is he went home and

1           murdered his wife, brutally murdered her,

2           strangled his son, and committed suicide.  A

3           horrific set of circumstances.  As your Honor

4           can imagine, given who he was and whatnot the

5           publicity was everywhere.  I mean you couldn't

6           open up a newspaper without reading about this.

7                What happened was a former wrestler by

8           the name Chris Nowinski, who was a Harvard

9           educated former football player, had become a

10          WWE wrestler at one time.  Chris performed as a

11          talent by the name of Chris Harvard.  He got a

12          concussion and went into his life's work as

13          being one of the leading advocates today on

14          concussion research and CTE awareness.  He was

15          a former WWE talent, as a matter of fact.

16               He, at the time, made arrangements with

17          Mr. Benoit to get Chris Benoit's brain to study

18          it for the CTE phenomenon which had been at

19          that time percolating since 2005 when Dr.

20          Bennet Omalu first discovered CTE in the brain

21          of Mike Webster, the former Pittsburgh Steeler

22          football player and a couple of other

23          Pittsburgh Steelers, which I'm familiar with

24          because I'm from Pittsburgh, and actually

25          represented the medical examiner that Dr. Omalu

1          worked for.  So, I know about that.

2                  But in any event, this Chris Benoit stuff

3          was everywhere and Mr. Lograsso had worked with

4          Chris Benoit.

5                  If I could show you just a PowerPoint

6          briefly.  You'll see here this is coming up.

7          This is some of the media that was out there

8          about Chris Benoit, video media.  It was

9          everywhere, CNN, ESPN.  Very sensational

10         because what had happened was in September of

11         2007, Mr. Nowinski, Dr. Omalu, and the people

12         that they were then associated with, called a

13         high profile press conference up in New York

14         where they made the announcement that Dr. Omalu

15         had reportedly discovered CTE in the brain of

16         Chris Benoit.  It was everywhere.  It was the

17         sports story, frankly, of the year.  It was the

18         first time it was ever diagnosed in a

19         professional wrestler.

20                 So basically what we did is in our

21         request for admissions we asked them to admit

22         this was all out there.  Anybody who wanted to

23         know about this stuff all you had to do was

24         watch television.  So we gave them all that.

25                 In 2009 a second wrestler by the name of

1         Chris -- or Andrew Martin, same thing happened.

2         He died, they got his brain.  Dr. Omalu

3         reportedly studied it, and again records CTE in

4         December of 2009.  That's the second time that

5         it's discovered.  You'll see it here on the

6         screen, some of the media.  Again, it was out

7         there.  Putting it out there that a second

8         wrestler had supposedly been diagnosed with

9         having this CTE.

10              So by 2007 and by 2009 there had been

11         these widespread public knowledge about these

12         findings and CTE reportedly found in the brains

13         of two WWE ex-performers together with all the

14         discussions about the alleged symptomology and

15         everything else that supposedly goes with it.

16              So we put all this together in the

17         request for admissions in furtherance of what

18         Judge Bryant said was the fact finding that we

19         were supposed to do and served it on them.

20         They then asked for a request for an extension,

21         another thirty days to do this, which was fine.

22              Judge Bryant issues the following order,

23         which you're going to see on the screen in a

24         second here.  And she says, "The parties are

25         advised the court is not granting these motions

1          simply to provide the parties additional time

2          to provide extensive and repetitive briefings

3          in support of general objections as to

4          vagueness or breadth.  The extension is

5          provided to the parties as a courtesy if either

6          party has a specific objection to a specific

7          request supported by authority that the court

8          can efficiently resolve without wasting

9          judicial resources."

10              They then missed the deadline, as they've

11         now admitted.  Sent us the email that you have

12         there by Ms. Van Dyck, saying that they were

13         late, and served on us what was frankly nothing

14         more than a pile of evasive, nonresponsive

15         objections and refusal to comply, frankly, with

16         Judge Bryant's order.  They weren't allowed to

17         make these kind of objections under her order

18         and that's all they did.

19              So the key here, your Honor, is not just

20         that they were a day late.  It is they were

21         completely, utterly, dilatory, nonresponsive,

22         and part really, frankly, of a pattern of what

23         you're going to see, as we go through today, in

24         terms of discovery problems and problems with

25         counsel that have plagued this case and have

1           been noted by Judge Bryant in every opinion

2           that she's written, and in the only status

3           conference she's ever held in this case, which

4           we'll get into this afternoon.

5                 Despite what -- the judge's order, what

6           we got was nothing more than a bunch of

7           dilatory objections.  And to show you how

8           dilatory these were, first, what I'd like to do

9           is play for you a clip from Vito Lograsso's

10          deposition where I ask him what he knows about

11          these things.

12                So the next thing you will see is

13          Mr. Lograsso being questioned what did he know

14          about these media reports.

15

16                (Recording was played.)

17

18          MR. MCDEVITT:  In light of those

19          admissions, your Honor -- I'm sorry, did your

20          Honor have a question?

21                THE COURT:  Go ahead.

22                MR. MCDEVITT:  In light of those

23          testimonial admissions, now I'd like to compare

24          that to what we got in the answers to the

25          questions.

1              First, RFA number 4, this is Mr. Lograsso

2         at 121.  This is the response you get when you

3         ask the direct question:  Admit that you knew

4         in 2007 Chris Benoit killed his wife, child,

5         and himself.

6              We get an objection.  It's supposedly

7         beyond the scope of the order.

8              And then 121, asked if he was aware of

9         the media reports that Chris Benoit had CTE

10        caused by head trauma, and again, we get an

11        objection.

12             So these are the kinds of things that

13        they did.  They didn't answer these things.

14        And they were trying to avoid making admissions

15        that they knew were fatal to their claim.

16        That's what this is about.

17             THE COURT:  I understand that.  I guess

18        the video clip, and I've read the transcript

19        that you attached to the brief, and quoted in

20        the brief.  I guess my question is, skipping

21        ahead to the issue of prejudice, if you have

22        him already admitting in the deposition, how do

23        you suffer prejudice if you already have the

24        admission from a different source?  He's

25        admitted that's he's familiar with the Chris

1         Benoit situation.  It was everywhere, as he

2         says, and as you say.  So then why do you need

3         -- what's the prejudice you suffer on the

4         request for admission?  You're citing one or

5         the other in your summary judgment.  Certainly,

6         if it goes to trial and summary judgment is

7         denied you're going to cross examine him on

8         that deposition probably by playing the video.

9         But how do you suffer prejudice from that

10        admission being withdrawn and you have the

11        admission from another source, that is, from

12        the plaintiff's testimony directly?

13             MR. MCDEVITT:  Your Honor is 100 percent

14        correct that in our summary judgment motion we

15        do, in fact, rely on the actual admissions that

16        he made in his testimony.  And we adhere to the

17        view that not withstanding all this, that we're

18        still entitled to summary judgment.  However,

19        as any advocate would want to do, you're

20        entitled to and you want to present the fairest

21        and strongest case you can present for summary

22        judgment.  We were entitled to have responsive

23        answers to these admissions.  They were under

24        an order to do so, and they didn't.  I mean,

25        there's no reconciling that testimony with

1           these answers.  That's just evasive,

2           nonresponsive, and under Rule 36 the court can

3           deem those to be admitted because they are.

4           And so it's a little bit stronger when you have

5           admissions that are filed by counsel saying,

6           yes, we admit he knew.  That's pretty much

7           conclusive.  That's the end of the game.  And

8           that's what they're trying to avoid doing to

9           keep things fuzzy here.  So, I think we're

10          entitled to that.

11                Beyond the two that I showed you, your

12          Honor, these kind of dilatory objections were

13          made in response to sixteen different request

14          for admissions, which I'll show you

15          sequentially beginning with 120.  And these

16          were all for Lograsso.  And what we tried to

17          do, your Honor, is because when we're drafting

18          these, you know, we don't know what he's going

19          to admit and what he's not.  So we're trying to

20          make sure that we cover every possible year

21          that would preclude him under the statute of

22          limitations.

23                So, the first one, for example:  Admit

24          that there was extensive media coverage in

25          September 2007 reporting that Chris Benoit had

 1          CTE caused by head trauma sustained while
 2          wrestling.
 3                That's an allegation they make in their
 4          own complaint, frankly.  And you saw all the
 5          media coverage I just showed you, which they
 6          saw attached to it.  I mean, what are they
 7          contending it's all a forgery, that we've made
 8          this all up, that this media didn't exist?  And
 9          yet we can't even get a straightforward answer
10          to a question like that.  And they're making
11          this vague and ambiguous objection, which Judge
12          Bryant said, I'm not giving you an extension
13          for this kind of objection.  I'm giving you an
14          extension so you can respond.
15                Same thing, if we can show you 150.
16          Every one of these is the same thing:  Admit
17          that there was extensive media coverage
18          throughout 2007 and 2008 reporting it.
19                And again, all they had to do is look at
20          what was attached.  What we attached shows the
21          extensive media coverage in 2007 and 2008, and
22          they could have admitted it.
23                151, admit that you are aware of media
24          reports Chris Benoit had CTE caused by head
25          trauma not later than January 2009.

1           You already saw him admitting he knew in

2      2007, and yet we can't get those kind of

3      admissions.  And I could go on and on.  That

4      echoes for 120, 151, 181.  I'll save some time

5      by just telling you which ones:  181, 182, 183.

6      Then we segue in the 183 section to Andrew

7      Martin and that they knew about that.  184,

8      205, 206, 207, 208, 233, 234, 235, and 236.

9      Every one of these, you know, just simple,

10     straightforward, admit that you knew about

11     media coverage.  And every one of them was the

12     same:  Object as vague and irrelevant.  They

13     can't possibly, in good faith, claim that's

14     irrelevant in light of the judge's order saying

15     this is what is relevant.  That's not good

16     faith.  That's bad faith denials under Rule 36.

17          All of these basically, your Honor, we're

18     seeking the kind of admissions from Lograsso

19     that, if admitted, would have clearly

20     established under Judge Bryant's orders that he

21     is time barred, and would have put an end to

22     the case.  That's why they don't want to give

23     these admissions.

24          Lastly, your Honor, another one.  And

25     this all goes to the point where Ms. Van Dyck

1          saying their denials are consistent with their

2          theory of the case.  They're completely

3          inconsistent.  The whole theory of the case in

4          the complaint was widespread publicity.  Now,

5          all of a sudden they're denying it.

6                But lastly, I want to show you Lograsso

7          237, which is another one that shows you the

8          lengths they'll go to to admit anything.

9                This one asks them to admit that no later

10         than January 1, 2010 that Chris Benoit and

11         Andrew Martin had been diagnosed as having CTE

12         caused by head trauma sustained while wrestling.

13               And first, we get an objection, contrary

14         to what the judge's order says.  And then,

15         without waiving it, you get a nonresponsive

16         answer which just says -- he states that he had

17         read about the autopsy for Chris Benoit and

18         Andrew Martin.  That's not responsive.  That's

19         ducking the question.  He's admitting he read

20         about it but he's refusing to give an admission

21         or a denial that he knew by January 1, 2010

22         exactly what was said there.

23               And again, the admission is fatal to any

24         claim.  It bars them under the statute of

25         limitations.  And that's why we're getting

1          these unreasonably refusals.  And had they

2          moved on a timely fashion, your Honor, we would

3          have brought all these arguments to Judge

4          Bryant and said they should be deemed admitted

5          anyway under the rules.

6               So even if you let them be withdrawn,

7          they're inadequate, they're violative of the

8          order, they should be deemed admitted.

9               There was also a specious objection on

10         behalf of Mr. Singleton.  For your Honor's

11         information, Mr. Singleton is the only one of

12         the litigants in the first couple of cases that

13         didn't have a limitations issue.  So the

14         limitations issue wasn't pertinent to him.  But

15         so some of the other requests we made focused

16         and drilled down on some of his allegations.

17              For example, in the complaint here, he

18         alleged falsely, as we showed in discovery,

19         that he had sustained a concussion during an

20         event while he was performing down at the minor

21         leagues, essentially, of the WWE, and that

22         thereafter he had an undiagnosed intracranial

23         hemorrhage from months, that the WWE somehow --

24         it's completely false, as we showed in

25         discovery.  And in fact, in discovery, they

1           produced three different medical records, all

2           of which showed he didn't have any intracranial

3           hemorrhage at all.  So we asked this question:

4           Admit that there's no objective measurable test

5           demonstrating that you had an intracranial

6           hemorrhage.

7                   And again, we get this objection:

8           Objects because he does not have personal

9           medical expertise and this is a premature

10          request for disclosure of expert opinion.

11                  Well, that's bad faith.  The lawyers have

12          the three medical reports by the doctors that

13          treated him, every one of them which say he

14          didn't have intracranial hemorrhage.  You don't

15          have to be -- we're not asking Mr. Singleton to

16          render a medical opinion.  We're asking them to

17          make an admission that they know is compelled

18          by the evidence that's in their possession, and

19          they refused to do it.

20                  And in fact, if you look -- we're going

21          to show you Mr. Singleton's testimony on this

22          very subject here in the next section.

23                  But first, this is one of the reports,

24          for example, that they had and they refused to

25          do this.  Says right in there:  Cerebral

1          hemispheres, no intracranial mass listed; no

2          evidence of intracranial hemorrhage, and yet

3          they refuse to take that out of the case, which

4          has been a pattern all along, which is false

5          allegations are made, the evidence shows

6          they're false, and they refuse to remove these

7          from the case.

8                Now I'll show you what Mr. Singleton said

9          about this subject when I cross examined him on

10         it.

11               THE COURT:  Let me cut you off there.  It

12         gets back to so we're at -- so let's say I

13         agree with you on the timeliness issue.  In

14         practice, I would have probably had a

15         discussion with opposing counsel if they were

16         eleven hours late, but that's neither here nor

17         there.  We agree -- I think both sides agree

18         that they are technically late with respect to

19         the response.  And I understand and appreciate

20         your frustration with the responses that you

21         did receive.

22               I guess my question though is but on the

23         issue of prejudice, when you point to me, for

24         instance, what the doctors' reports do in fact

25         say that actually answer the question for you,

1          almost as well as the request for admission,
2          how do you suffer prejudice when you can point
3          to the doctor's report and say, here's what the
4          doctor's report says?
5               I understand that it caused you to go
6          through additional effort and it caused you to
7          incur expense, but if you can put in the
8          doctor's report that confirms that he has no
9          intracranial hemorrhage, then what's the
10         prejudice that you suffer from the fact that
11         they don't admit it?
12              MR. MCDEVITT:  Well, it's the same, I
13         think, basic point, in response to your Honor's
14         first question.  We think we're entitled to put
15         in the strongest possible arguments, and that
16         includes admissions made by counsel after the
17         evidence is in, that a certain contention has
18         no factual basis in fact.  It makes it easier
19         for the judge.  It's a disservice to the court,
20         frankly, not to do that, as well as a
21         disservice to us.  So, we have to go through
22         and spell out to the judge in elaborate
23         filings.  We go through time and costs, here's
24         the three medical reports, here's the
25         testimony.  We go through the time and cost in

1          what a simple admission would have taken care.

2               And it's not just this, your Honor.  This

3          is like -- if this was the only thing, we

4          wouldn't be here.  This has been going on, as

5          you're going to see this afternoon, from day

6          one in this case.  These false allegations that

7          get made, with no basis in fact, and then they

8          don't withdraw them whenever they're shown to

9          be false, and in fact, keep making them, as

10         they're still doing now, despite Judge Bryant

11         issuing in her last opinion, one of the

12         strongest admonitions I've ever seen given to a

13         lawyer, frankly.  It's still going on.  And so

14         that's why this is before you.  It is very

15         prejudicial to have to continue to have to

16         incur the time and expense of dealing with

17         these red herrings that they keep throwing out

18         here.

19              But if I could, your Honor, if I could

20         show you what Mr. Singleton had to say.  Again,

21         just to show you the unreasonable refusal to

22         admit here, that would warrant sanctions.

23

24              (Recording was played.)

25

1           MR. MCDEVITT:  So again, he admits he's

2     been telling people something that's

3     essentially false, and yet we can't get an

4     admission to that effect to go to the judge and

5     say that issue is out of the case.

6           Now, instead of getting answers, your

7     Honor, we got -- this is the boilerplate

8     objection we got in response to something like

9     102 different of our requests.  I'll show you

10    what their objection was.

11          This is an inadequate objection under

12    Rule 36.  They go on to say we object as

13    determining the accuracy of the exhibits can't

14    be determined from reliable sources or without

15    imposing undue hardship.  Subject to the

16    foregoing general and specific objections,

17    plaintiff has no independent information about

18    the processes used for compiling these exhibits

19    and cannot speak to their accuracy in as much

20    as counsel for WWE appears to have compiled

21    these exhibits from a variety of sources, they

22    would be in the best position to authenticate

23    them.

24          We've attached them, and in some cases,

25    your Honor, that once you attach the exhibits

1          you're asking for a stipulation of authenticity

2          about, they have the duty to make a reasonable

3          inquiry to determine if they are.  It has

4          nothing with whether they're documents or

5          whether they're not.  These are documents that

6          are in the public realm, easily accessible by a

7          Google search.  How we compiled them is kind of

8          irrelevant, frankly.  The question is was this

9          an article that was published in 2007 about CTE

10         and wrestling that was in the public realm.  If

11         it is, yes.

12              THE COURT:  So let me ask you.  I've read

13         the cases that you've cited in your brief and I

14         guess the Doe case is the one that I think

15         comes closest to it but it's not crystal clear

16         to me what the documents were.  In some of the

17         other cases -- what the documents were in

18         doubt.  In some of the other cases it looks

19         like they're talking about documents that were

20         created by, prepared by or in the possession of

21         agents or representatives or former agents or

22         former representatives.  Do you have a case or

23         what's the best case that you can point me to

24         where someone is required to -- that is most

25         analogous to this situation?  They didn't

1           create these documents.  Their agent didn't

2           create the documents, their former agents

3           didn't create the documents.  At least in terms

4           of authenticating them, what's the best case

5           that you cite that indicates that they have an

6           obligation to sort of, as I did, comb the

7           internet and go through Google or however you

8           would say they should have authenticated these

9           articles?

10               MR. MCDEVITT:  This may not be directly

11          responsive to your question, your Honor,

12          because I don't know off the top of my head all

13          the cases we've cited, whether there's any that

14          specifically hold as you've asked.  The case

15          that we think is most pertinent is that

16          Beberaggi case, where they came in with late

17          answers and a bunch of defective responses and

18          whatnot and the court said it wouldn't further

19          a presentation on the merits to allow them to

20          withdraw.  That's the -- I think that's out of

21          the Southern District.  That I think is the

22          most analogous to this.  But I don't think Rule

23          36 makes any distinction between, for example,

24          a requirement that you can only seek admission

25          on authenticity about documents that a party

1            generates.  It doesn't contain that kind of

2            limitation.

3                 And your Honor, again, I go back to this,

4            they refuse, and we'll show you, they refused

5            to admit the authenticity of articles that are

6            both cited in our complaint and then articles

7            that they relied upon in opposing summary

8            judgment.

9                 So on the one hand, you want the judge to

10           consider these articles in opposing summary

11           judgment, and advance them as evidence before

12           the court, and at the same time tell us why we

13           can't tell you whether they're authentic or

14           not.  I mean, that's not good faith.

15                THE COURT:  And I understand that.  And I

16           don't mean to overly focus on the issue, but I

17           guess my question is -- so, again, back to the

18           prejudice element, which is part of what you

19           have to show or what has to be demonstrated

20           here.  Why can't you -- I mean, presumably, the

21           defendants found these articles from somewhere,

22           at least on the authentication issue which is

23           slightly different that the "did you read

24           this," "did you see this."  Why can't the

25           defendant authenticate the articles either on

```
 1                summary judgment before trial if summary
 2                judgment is denied?  Why can't the defendant
 3                get on the stand and say here are the following
 4                articles that we found, here's how we found
 5                them, this supports our claim that they were
 6                all in the public domain and then you also have
 7                deposition testimony from the plaintiffs,
 8                admitting at least that certain things were,
 9                the Chris Benoit issue, for instance, was all
10                over the media or everywhere or whatever the
11                quote was?  So why can't you authenticate the
12                articles yourself?
13                     MR. MCDEVITT:  Well, I think the
14                prejudice, your Honor, comes from if the court
15                doesn't consider them in the summary judgment
16                argument.  You're right.  If summary judgment
17                is denied and whatnot, then, of course, we'd
18                have to go through the time and expense of
19                going out and authenticate all these articles
20                and the rest of that stuff.
21                     The point is we wanted these articles
22                before the court on summary judgment because
23                she herself said, she is inherently skeptical
24                of these claims, and pointed out, frankly, in
25                parts that we didn't attach to the quote, that
```

1        we hadn't raised on the motion to dismiss the

2        issue of this widespread publicity and all the

3        rest of that kind of stuff.  So we wanted to

4        get it before the judge on summary judgment to

5        say you're absolutely right.  Here's all the

6        publicity that was out there and show the

7        court.  So the prejudice to us now comes from

8        if they are withdrawn and not allowed to be

9        considered by the court on the summary judgment

10        motion, not so much for whether they read them.

11        In fact, your Honor, if you read our summary

12        judgment brief, we don't need to rely on it

13        because -- whether they read them -- because of

14        Lograsso's admission and with Singleton,

15        Singleton ended up saying he didn't even know

16        about CTE.  So that's not even a concern with

17        him.  But in terms of Lograsso, we want those

18        before the court on summary judgment.  And if

19        they're withdrawn, now we don't have a chance.

20              Had they moved before the close of

21        discovery, we would have been able to say to

22        Judge Bryant, well, look, judge, we don't think

23        that they should be withdrawn, but if you're

24        going to permit them to be withdrawn, then

25        obviously we're going to have to go to the

1          burden of going out and authenticating all

2          these to get them before you on summary

3          judgment, and if they put us through that time

4          and expense, then we're going to come back on

5          the Rule 36 and ask for an award of costs for

6          their unreasonable refusal to admit, all of

7          which was denied us because they didn't bother

8          to move.  They sat on their rights.  Did

9          nothing.  Let us go to time and expense of

10         filing a motion for summary judgment, and only

11         then did they come in and brief it.

12              And frankly, as your Honor is focused in

13         on the prejudice part, there's two aspects.

14         They have to show both.  They have to show the

15         withdrawal aids the presentation on the merits.

16         How do they aid the presentation on the merits

17         to pretend that this media, that they

18         themselves allege existed, doesn't exist, and

19         they haven't discharged that burden at all?

20         When we pointed out the correct standard, your

21         Honor, and all they said there was the same

22         thing that Ms. Van Dyck said here.  Their

23         position was the same as its been in the

24         litigation.  We showed that's not the case.

25         They couldn't even file a reply brief.  They

1          had no reply brief filed, when we pointed out

2          the correct standard to apply here and that

3          they hadn't even come close to meeting it.

4                  So, I do think there's prejudice, your

5          Honor, in the sense that we want the complete

6          record before Judge Bryant on summary judgment

7          in this massive publicity.  If it's withdrawn

8          now, we don't get the benefit of that.

9                  THE COURT:  And let me cut you off and

10         follow up on this because I think it's an

11         important point, at least in my mind.  So, I

12         have read the summary judgment briefs.  I've

13         read a lot in this case, all your briefs on the

14         request for admissions, all of the motions for

15         sanctions, as well as the summary judgment

16         briefs, and I have gone through, in some

17         detail, not in full detail, the statements of

18         disputed facts, the Rule 56(a) 1 and 2

19         statements, and it wasn't crystal clear to me,

20         because I didn't go through all of the exhibits

21         on summary judgment.

22                 You guys have gone through a lot of trees

23         on this case, let me tell you.

24                 So with respect to the publicity, I know

25         that you mentioned it in the summary judgment

1          brief, and I know that you rely on the request

2          for admissions.  Were the articles actually

3          attached for Judge Bryant on summary judgment?

4               MR. MCDEVITT:  I believe so.  I think so

5          your Honor.  They're certainly attached to the

6          request for admissions.

7               I believe we did attach all of the

8          articles, or maybe highlighted them.  The

9          56(a)(1) statements, they are attached.  And,

10         you know, in supplementing your Honor's point,

11         I mean, it would also be our view, and hope

12         Judge Bryant recognizes this, but not

13         withstanding any unreasonable refusal on their

14         part to admit to the authenticity of those

15         articles that she can take judicial notice of

16         them.  I mean, they're so pervasive and so

17         widespread and relied upon, as I said.  I keep

18         saying it.  They rely on them in their

19         complaint and in the summary judgment and yet

20         they turn around and say, oh, we're not going

21         to admit to the authenticity of the very things

22         we relied upon to sue you.

23               THE COURT:  Yeah, I -- don't take my

24         questions as a sign that I don't understand and

25         appreciate the frustration that you're standing

1          here articulating to me.  I guess the question

2          I have is if your articles are attached to the

3          summary judgment motion, at least to the Rule

4          56 statement, the articles are in front of

5          Judge Bryant, correct?

6               MR. MCDEVITT:  Hopefully.  Hopefully, your

7          Honor, she can look at them and make her own

8          opinion.  What I didn't want to run into is

9          some ruling that says Judge Bryant can't

10         consider them because they didn't admit them

11         and they're not proven to be authentic, so she

12         can't consider this volume of evidence, because

13         from the very point she said was going to be

14         the focal point for discovery that we tried to

15         conduct.

16              THE COURT:  And so is part of what you

17         would argue that on summary judgment there is

18         no independent effort on your part to

19         authenticate the articles that are attached

20         because you rely on the admissions wherein they

21         admitted the authentication by default?

22              MR. MCDEVITT:  That's our primary

23         position.  And then I guess secondarily we

24         would argue that if you agree that they are

25         allowed to withdraw their admissions and that

1          somehow there's not been authenticated at least

2          -- we didn't go to CNN, for example, and say is

3          this a true and correct copy of your program --

4          you can regard these media articles as

5          self-authenticating for judicial notice

6          purposes and hopefully consider them that way.

7          But obviously, your Honor, if they are not

8          allowed to withdraw these admissions that these

9          media articles were out there, then we don't

10         need to get to that point.

11              THE COURT:  Thank you.

12              MR. MCDEVITT:  I think your Honor that

13         I've covered everything that I needed to cover.

14         But, again, we would have, had they filed a

15         motion to fix what they did, we would have

16         brought all these issues before Judge Bryant.

17         And if she had ruled in their favor, we would

18         have said, your Honor, we would need an

19         extension of the short discovery period if we

20         have to now go out and authenticate all of

21         these things, that's going to be a mass of time

22         and cost that we'll have to do, and they denied

23         us the ability to do that by not moving.  It

24         was their burden to move, your Honor.  We had

25         no burden to move anything here.  It was their

1        fault.

2             If you have any other questions, I'll be

3        glad to answer, your Honor.  If not, that

4        completes my argument.

5             THE COURT:  I don't.  Thank you very much.

6             MR. MCDEVITT:  Thank you, your Honor.

7             THE COURT:  Anything further for the

8        plaintiffs?

9             MS. VAN DYCK:  Yes, your Honor.  Thank

10        you, your Honor.

11             So, going to one of the last points that

12        Mr. McDevitt was making.  Plaintiffs are not

13        denying the existence of widespread media

14        reports.  We're arguing here over

15        authenticating documents, it seems to me.  And

16        I am a little perplexed because it seems to me

17        that we've made no objections to the use of

18        these articles in their summary judgment

19        motion, as you've said, and you just discussed.

20        It can be treated as authentic by the court, if

21        we agree to that, and I don't see any problem

22        with that.

23             We're simply -- the plaintiffs simply,

24        properly deny knowledge of the media reports in

25        their responses to requests for admission.  And

1          I think that's an important distinction here.

2          We're not denying their existence, as

3          Mr. McDevitt said.  We're denying plaintiffs'

4          knowledge of them.

5              Mr. McDevitt also talked about the fact

6          that we did not file a reply brief.  I'd like

7          to remind the court that there is a local rule

8          here that provides that we're not required to

9          file a reply brief.  And I believe it even

10         specifically says that's not considered an

11         admission by not filing a reply brief to

12         anything in the opposition.

13             And then regarding the two cases that you

14         and Mr. McDevitt discussed.  Mr. McDevitt said

15         that the that Beberaggi case was the case that

16         was most analogous to their claims.  In that

17         matter, the responding party received request

18         for admission, I believe it was in June.  They

19         did not file any response.  The plaintiff

20         agreed to an extension.  They again didn't file

21         a response.  They went to the court.  The court

22         gave them another extension.  They again didn't

23         file a response.  Over six months had passed

24         before the party made any attempt to respond to

25         the request for admission.  So in that case

1          it's actually quite different from this one

2          when we're talking about less than twelve hours.

3              In the Doe case, as you mentioned, your

4          Honor, is correct, it was very unclear, in that

5          opinion, what the documents actually were.  But

6          in the request for admission the opinion states

7          that the requesting party identified the origin

8          of the documents.  I'm not even sure exactly

9          what that means.  But, again, here we didn't

10         receive, other than a printout of the articles,

11         any kind of representation as to even a URL as

12         to where the documents came from.

13             Finally, Mr. McDevitt just came up here

14         and argued about the deficiency of our

15         responses.  Mr. McDevitt did not raise any of

16         those arguments during the discovery period.

17         He could have filed a motion to compel

18         regarding our responses.  They chose not to.

19         They chose to wait until after they filed their

20         summary judgment motion to bring the deficiency

21         to the attention of the court.  And so now we

22         are stuck in a position where summary judgment

23         has been fully briefed and we're arguing about

24         discovery.  So, they sat on those deficiencies.

25         They chose not to raise them during the

1           discovery period, and they've waived them.

2                THE COURT:  Thank you.  Let me ask you one

3           question or ask for one clarification.  When I

4           was asking questions of Attorney McDevitt, he

5           had indicated that part of the problem, from

6           his standpoint, is if Judge Bryant is unable to

7           consider the articles that he attached to

8           summary judgment on some basis that they are

9           not properly authenticated in light of the

10          potential withdrawal of the motions for

11          admissions.  Did I just understand you to say

12          that you do not object to -- while you will not

13          authenticate them, you do not object to Judge

14          Bryant relying on the articles when she's

15          ruling on summary judgment?

16                MS. VAN DYCK:  No, your Honor.  I mean I

17          understand that those articles exist.  I just

18          can't authenticate them.  I'm not the one who

19          compiled them.  My client can't authenticate

20          them.  And it seems to me that that's what

21          those request for admissions are asking us to do.

22                THE COURT:  Thank you.  And I take it

23          there's nothing in the summary judgment --

24          there was nothing that I saw in the summary

25          judgment briefs, wherein you objected to the

```
 1                  use of the articles?
 2                       MS. VAN DYCK:  I don't believe we did.  I
 3                  would need to go back and check but I'm pretty
 4                  sure we didn't.
 5                       THE COURT:  All right.
 6                       MS. VAN DYCK:  Thank you, your Honor.
 7                       THE COURT:  Thank you.  Anything further?
 8                       MR. MCDEVITT:  No, your Honor.  I just had
 9                  the same reaction your Honor had.  As I
10                  understand it, they're now saying,
11                  notwithstanding their refusal to admit to
12                  authenticity, that they don't dispute that any
13                  of those should be considered by Judge Bryant
14                  for the purposes for which they are offered in
15                  summary judgment, which I'm glad to hear.  I
16                  still think that, as we showed, the other ones
17                  that we were entitled to have an admission on
18                  were improperly answered and that's another
19                  reason to not allow those to be withdrawn.
20                       We did not, as I've pointed out in our
21                  summary judgment brief, rely on any deemed
22                  admission that either or all of the plaintiffs
23                  actually read any of the articles.  We didn't
24                  rely on that.  I know that's not an issue.  It
25                  was really the authenticity of it and the
```

1              failure to admit the ones I showed you on

2              behalf of Mr. Lograsso in light of his

3              testimony.  And the other ones that I think

4              they gave an inadequate answer to,

5              Mr. Singleton and all that, again, I don't

6              think they should be allowed to withdraw those.

7              Those are not responsive answers.  They were in

8              violation of the court's order.  Thank you,

9              your Honor.

10                  THE COURT:  Thank you.  All right.  Thank

11              you to both counsel for making professional,

12              civil, and effective arguments here.  I will

13              take the -- I am not going to rule from the

14              bench on this.  I do understand your arguments.

15              I appreciate your arguments.  They were very

16              good on both sides, and I will issue a ruling

17              quickly.

18                   I think the next thing we have is our one

19              o'clock argument.  Is there anything further we

20              need to address while we're in court on this

21              argument, on the admissions?

22                  MR. MCDEVITT:  Not from our side.

23                  MS. VAN DYCK:  No, your Honor.

24                  THE COURT:  All right.  Then we are set

25              for one o'clock on the various motions for

1           sanction.  Thank you.  Court is now in recess.

2

3           (Recess:  11:38 a.m. to 1:16 p.m.)

4

5           THE COURT:  We're back on McCullough

6       versus WWE.  It looks like we have the same

7       lawyers, so I don't need you to tell me your

8       appearances.  We are here for oral argument on

9       the motions for sanctions, which I believe are

10      docket numbers 198 and 228.

11          Are both sides ready to proceed?

12          MR. MCDEVITT:  We are, your Honor.

13          MS. VAN DYCK:  Yes, your Honor.

14          THE COURT:  Okay.  We'll start with the

15      defendant.

16          MR. MCDEVITT:  Good afternoon, your Honor.

17          THE COURT:  Good afternoon.

18          MR. MCDEVITT:  Your Honor, before I give

19      the argument in chief on either of the

20      sanctions motions, I assume we're talking about

21      the -- does your Honor want to deal with the

22      first sanction motion and then let them argue

23      it, and then deal with the second or do you

24      want me to argue both at the same time?

25          THE COURT:  I can do whichever one the

1          parties prefer.

2              MR. MCDEVITT:  It makes no difference to

3          me, your Honor.

4              MS. VAN DYCK:  I think we'd prefer to

5          address them separately, your Honor.

6              THE COURT:  Okay.  Then let's do the first

7          one first, and the second one second.

8              MR. MCDEVITT:  All right.  Your Honor, I

9          have a -- before arguing either -- the

10         substance of either motion, I think when it

11         comes to sanctions motions, I think the law

12         gives guidance that passes more than pro law.

13         It is something that is supposed to be

14         considered by the court when determining

15         whether sanctions are necessary, in determining

16         whether there's been a pattern of misconduct

17         that has gone uncorrected.  And part of that is

18         what we are going to show you in the

19         introductory section before we start to turn to

20         the actual motions that's at issue.

21              Before we even go into that, your Honor,

22         I'd like to say this.  One of the great

23         privileges I have had of representing the WWE

24         since 1987 is I have been lucky to appear in

25         courts all over the country.  I've spent a lot

1          of my time in the courts of Connecticut.  And

2          I've had the great privilege of practicing in

3          this court before several judges and working

4          with many different Connecticut lawyers who are

5          among the finest lawyers I've ever met:  Stan

6          Twardy, Maryann Bordello, Paul Slater, Jim

7          Scheer, Gene Riccio, Frank Riccio, and so many

8          others.  I know you know Joe Garrison, where

9          you came up in his law firm.  I can say

10         unqualifiedly I've never had any experiences

11         like what has occurred in this case with any of

12         those people.  This is not characteristic of

13         the Connecticut Bar.  And frankly, I think the

14         reason is because this case was not conceived

15         by a member of the Connecticut Bar and didn't

16         start in Connecticut, as we're going to show you.

17              And in terms of framing where we begin

18         with the sanction motions today, I think what

19         you're going to hear today is about a pervasive

20         pattern of serious misconduct of the kind that

21         when the courts detect it are obligated

22         fortunately to act to prevent fraud on the

23         court.  You don't get a second chance to commit

24         a fraud on the court in this country, generally

25         speaking.  And you're going to see that's what

1           we're dealing with repeatedly.  And it has been

2           going on, more significantly, since day one of

3           these cases, and we can review, and I'll go

4           over that history with you, which has led up

5           to, I think, a point of where we begin is with

6           the last words that were issued on this subject

7           by Judge Bryant, who has now issued two

8           opinions, and had a status conference last

9           year.  And in both the opinions and in the

10          status conference, has issued very direct and

11          repeated admonitions towards Mr. Kyros, which

12          have been systematically ignored, and as you're

13          going to see, the conduct has gotten worse.

14                And if we could, I think we'd begin with

15          the latest admonition of -- this is what Judge

16          Bryant, a very experienced and distinguished

17          federal judge, said in her recent opinion just

18          this past November.  This is her last opinion.

19          That, "The court admonishes Kyros and his

20          co-counsel to adhere to the standards of

21          professional conduct and to applicable rules

22          and court orders, lest they risk future

23          sanctions or referral to a disciplinary

24          committee of this court."

25                I know your Honor practiced law a long

1          time before you became a judge.  I think we can

2          all agree that that kind of an admonishment is

3          very unusual in our federal court system and is

4          very much deserved here.  And I'm going to

5          review with you the history that's led up to

6          that admonition because I think it's the

7          starting point for the court's analysis of what

8          to do about what you hear today.

9              These cases, your Honor, broadly

10         speaking, began in October of 2014, not in

11         Connecticut.  And they began, unquestionably,

12         following an internet solicitation scheme run

13         by Mr. Kyros, whereby, on the internet, he

14         suggested to people that he had been involved

15         in procuring the settlement of the NFL in the

16         NFL CTE litigation and could do the same thing

17         here, and soliciting former WWE people to join

18         in an effort to sue WWE in the hopes of

19         replicating it.

20             Many of these men that have joined this

21         lawsuit still do so on the assumption that

22         Mr. Kyros' law firm had something to do with

23         that, which he didn't.  And I want to play for

24         you a tape recording of one of the recent

25         plaintiffs, Jim Brunzell, in a recent interview

1          he gave, which shows you how these people have

2          been misled about what these lawsuits are

3          about, and what his involvement has been.

4                 This is a man by the name of Jim Brunzell

5          in a recent interview that he gave.

6

7                 (Recording was played.)

8

9                 MR. MCDEVITT:  And so you can see, your

10         Honor, that he's one of many.  And there's been

11         other statements made by the various plaintiffs

12         in this case, operating under the assumption

13         that these people had something to do with the

14         NFL settlement, and they didn't have a thing to

15         do with it.  You can scour every opinion

16         written in the Third Circuit on the NFL

17         settlement and you won't find Mr. Kyros' name

18         anywhere, involved in negotiating that

19         settlement, obtaining that settlement, class

20         counsel, nothing.

21                And you also heard him say, "we don't

22         want money now."  And you're going to see more

23         evidence.  These people don't even know what

24         these lawsuits are about.  They want money now.

25                But in any event, this whole campaign

1        that is behind Judge Bryant's admonition began

2        in October 2014.  And I'll show you how it all

3        unfolded with the next map that we're going to

4        show you.

5            The first case was brought in Oregon on

6        behalf of a performer by the name of Billy Jack

7        Haynes, and then the second case was the one we

8        talked about this morning, Lograsso, which was

9        brought in the Eastern District of

10       Pennsylvania, followed by the Frazier case,

11       which was down in Tennessee, followed by

12       another purported class action out in

13       California, followed by another action in Texas

14       on behalf of James.

15           And I think it's important to point out,

16       your Honor, that in all of these cases there

17       was no Connecticut counsel involved in the

18       drafting or allegations of this complaint.

19       There's no issue as to whether any Connecticut

20       counsel was involved in any of these

21       improprieties that are associated with this

22       thing.

23           Every one of these cases, except for

24       Haynes, involved a situation where these

25       talents signed forum selection clauses

1        obligating the cases to be brought in

2        Connecticut, and eventually those judges all

3        transferred them here.

4             But the first one that did was the Haynes

5        case.  And in the Haynes decision the court

6        there specifically found that Mr. Kyros had

7        been engaged in improper forum shopping because

8        she was aware of all these other cases that he

9        was bringing throughout the country, which were

10       duplicative cases, and entered an order saying

11       she was persuaded that there was evidence of

12       forum shopping and became the first court to

13       transfer the case back to Connecticut, where it

14       was assigned to Judge Bryant.  Every one of the

15       cases after that, that got transferred to

16       Connecticut were then all sent to Judge Bryant.

17            So the focal point, your Honor, I think

18       of this map, to show you, is that all of these

19       cases, except for the Laurinaitis case, none of

20       them originated in Connecticut.  They all

21       originated elsewhere, did not involve

22       Connecticut counsel.

23            There's been a pattern in every one of

24       these cases.  Starting with the Haynes case, it

25       has continued unabated, which Judge Bryant is

 1            well aware of, and which we had pointed out to

 2            her, starting in the Haynes case.

 3                 And what they do typically, there's never

 4            been, in all of this, any single complaint that

 5            they've filed and stood on.  The first

 6            complaint that they file is always some

 7            voluminous thing full of scandalous,

 8            impertinent information, largely designed for

 9            media attention, largely designed for what

10            Judge Bryant called an audience other than the

11            court.  That has started with the Haynes case.

12            It has been the case in every single one since.

13            Then we usually follow them and say there's

14            Rule 11 violations, put them on notice of it,

15            and they file an amended complaint, which

16            either takes care of all of them, or doesn't

17            take care of any of them, or some combination

18            thereof.

19                 But for example, in the Haynes case, if

20            we can bring up what they allege in the Haynes

21            case.  This is the history of these sort of

22            allegations that are behind the admonition.

23                 In the Haynes case, again, this is a case

24            about supposed head injuries that a wrestler

25            sustained, they allege, among other things,

1          that the WWE forced its wrestlers to use

2          steroids, cocaine, and other illegal drugs.

3          They allege things about a 13-year-old who is

4          supposedly imitating wrestling and killing

5          somebody, and then they put in that the

6          plaintiff, Mr. Haynes, had contracted hepatitis

7          while wrestling for WWE.  This is like

8          twenty-something years ago.

9               No claim was made in the case about

10         hepatitis.  But inevitably what happens is the

11         media attention that follows.  I'll show you.

12         Big headlines that serve to demonize the WWE,

13         all about things that have nothing to do with

14         the lawsuit that's even being brought about

15         hepatitis C and whatnot.

16              After that case was filed, the misconduct

17         continued when they filed the Singleton case,

18         the Singleton-Lograsso case.  This was the

19         first of two cases in which they accused

20         falsely the WWE of engaging in tortious

21         activity which killed the plaintiffs and they

22         were alive.  The plaintiffs were alive.

23              As you can see here, this was an

24         allegation that they made here that the WWE had

25         engaged in tortious conduct which caused and or

1              contributed to his untimely death, and the

2              plaintiffs were alive.

3                   This is one of the first examples we have

4              where we're just wondering do they even read

5              these things that they're filing because no

6              reasonable lawyer complying with Rule 11 would

7              ever sign a document that alleges that the

8              plaintiffs are dead when the plaintiffs are

9              alive.  That was said to be, by Mr. Kyros, at

10             the time, a scrivener error.

11                  We then came before the court in that

12             setting on June 8th in the status conference

13             before Judge Bryant.  During that conference,

14             Judge Bryant engaged in a dialogue with

15             Mr. Kyros about some of these errors that he

16             had made.  And as you can see by the quote

17             there, when he's responding to this notion

18             about alleging that the plaintiffs were dead,

19             he called it scrivener error.  And then he goes

20             on to talk about somebody who wasn't even a

21             plaintiff in the case, a fellow by the name of

22             Nelson Frazier, a former wrestler, who died of

23             a heart attack in the shower six years after he

24             last performed for WWE, as if we're responsible

25             for that.  And the court even questions him:

 1              Does the complaint reference Mr. Frazier?  I

 2       don't get what you're doing here.  You're going

 3       to get a better grip on the pleadings.  That's

 4       the first thing she says to him.

 5              She also goes on and he starts talking

 6       about this notion that he represents supposedly

 7       a bunch of NFL players.  And this is pertinent

 8       to what you're going to hear later this

 9       afternoon.  And the judge tells him:  I don't

10       want to hear talk about generalities, and I'd

11       really like to give you some time to get your

12       arms around the pleading standards, and warns

13       him about all this hyperbolic and inflammatory

14       language that he's been larding up these

15       complaints with.

16              And again, she then continues to give him

17       this admonishment.  She tells him that once he

18       has the complaint worthy of discovery it's

19       pointless to order discovery and gives him

20       time, essentially, to file another amended

21       complaint to take care of these things.

22              The next week, the next week, despite a

23       federal judge telling him, What are you going

24       to do, reference every dead wrestler in a

25       complaint?  He goes down to Texas and files the

1          James complaint and does exactly that.  He

2          files a complaint on behalf of one wrestler who

3          last performed for the WWE twenty years ago and

4          files a complaint which lists in 39 graphic

5          paragraphs, 39 different performers who had

6          died from different causes, including ones you

7          can see here.  Like, one man who died because

8          he had a heart condition, a 500-something pound

9          man.  Owen Hart who died during a failed stunt

10          in the paper, which had nothing to do with

11          brain injury or anything like that, just to

12          sensationalize the filing of a complaint, in

13          direct opposition to what the federal judge

14          told him, which we quote there, in Connecticut.

15          Once again, what happened was the media

16          coverage ensued about how sensational these

17          allegations were about all these wrestlers

18          dying and all the rest of that, even though it

19          was exclusively about one plaintiff supposedly

20          dying because of head injuries, who, in fact,

21          had died of a drug overdose something like

22          twenty years after he last performed for WWE.

23          After that case, he then filed, caused to

24          be filed in California another duplicative

25          class action on behalf of three people.  Again,

1          this case -- every case that I've talked to you

2          about so far has ultimately been dismissed by

3          the judge except for the one count in Lograsso.

4          But he then files this McCullough case, and for

5          the second time, despite since saying it was

6          scrivener error the first time he accuses us of

7          killing people who were alive, repeats in this

8          case the same idea that these people, these

9          three plaintiffs, all of whom are alive, had

10         been -- that tortious activity caused their

11         deaths.  This, again, after a federal judge

12         talked to him about that.

13              We then come, in the sequence of things,

14         to the March 21st opinion of Judge Bryant where

15         she dismisses the McCullough case in its

16         entirety.  She dismisses the Haynes case in its

17         entirety, and she dismisses everything in the

18         Lograsso Singleton case in its entirety, except

19         for the single count we talked about this

20         morning, the fraud by omission claim.  And in

21         this opinion, as she did in June 8th, she

22         issues several admonitions to Mr. Kyros, all of

23         which are subsequently ignored, which we're

24         going to review for you.

25              First, she points out what I've told you,

1          that the complaints are excessively lengthy and

2          appear aimed at an audience other than the

3          court.  That's the first time she says that.

4          She says that a couple of times later, because

5          he keeps doing it.

6                    And then she references the fact that

7          despite the prior admonishment of them in the

8          June 8th conference, there's precious few

9          allegations that have anything to do with the

10         claims he filed.  And then she says, "Other

11         allegations are patently false.  They are

12         simply copied and pasted whole cloth from one

13         complaint to another," which is a very telling

14         thing, because you're going to see that's

15         exactly what they did in the second sanctions

16         motion when it come to an NFL complaint.

17                   She also goes on to make other sort of

18         damning comments, if you will.  In the ones

19         that we've had highlighted she points out that

20         with respect to the fraud claims, which are the

21         only one that survived, the length of the

22         complaint was deceiving because the length

23         belies an utter lack of substance.

24                   And in another finding that's really

25         important they had continually alleged that

 1            Stephanie McMahon had given false testimony to

 2            a congressional committee.  And by way of

 3            background, your Honor, as to the Benoit

 4            incident that happened that I explained to you

 5            this morning, that occurred during the time

 6            when Henry Waxman's committee was doing a lot

 7            of steroid type investigations in baseball, so

 8            they decided they wanted to take some testimony

 9            from people from the WWE, largely about the

10            fact that Mr. Benoit was found to have had

11            steroids at his house after the murders.  So

12            they wanted to do some questions about the drug

13            testing programs, and mostly what it's about.

14                 So they make these allegations in the

15            complaint that Stephanie McMahon had lied to

16            Congress about concussions that somehow

17            supposedly had misled these plaintiffs, which

18            was an utterly false allegation.  She said no

19            such thing.  And the judge specifically finds

20            that in this opinion.  "With regard to

21            Stephanie McMahon's testimony, plaintiffs

22            appear to have repeatedly misrepresented both

23            the substance and meaning of her testimony."

24            And as you'll see, despite that admonition,

25            they kept doing it and are still doing it

1            today, despite the judge saying it.

2                    Next slide, please.  After all that, the

3            next complaint that they file is the

4            Laurinaitis complaint.  And that's the one

5            that's going to be the subject of the second

6            motion we have today.  And true to form in this

7            larded up complaint, which is hundreds of pages

8            long, it's a complete violation of the rule

9            that you're supposed to be a short concise

10           statement of your claim, allegations are put in

11           here about a female talent by the name of

12           Ashley Massaro, that have nothing to do with

13           head injuries, that she supposedly was sexually

14           assaulted on a military base in Kuwait by

15           persons unknown.  It's not said.  There's no

16           claim for any kind of sexual assault.  There

17           couldn't be any claim for sexual assault.  It's

18           completely time barred.  And yet this is thrown

19           into this complaint to grab media attention and

20           demonize the WWE and it does.  Once again, you

21           can see here's some of the headlines that then

22           play out about a lawsuit that is supposedly

23           about head injuries and concussions, that now

24           the headlines are that this woman is alleging

25           some sexual assault cover up in the WWE

1        lawsuit, when, in fact, there's no such claim

2        at all.  It's just a larded up complaint, same

3        stuff that they've been cited for doing.

4            Following that, and in the most recent

5        opinion, Judge Bryant issues her opinion in the

6        James case and in the Frazier case.  These were

7        two wrongful death cases, your Honor, that I

8        talked to you about, originally brought in

9        Texas and Tennessee, tossing both of those

10       cases out, and issues some of the strongest

11       admonitions -- and I've been doing this, I

12       guess, now, 37 years.  This is some of the

13       strongest admonitions I've ever seen a federal

14       judge level at an attorney.

15           And so to review those, first, she points

16       out that on June 8th she ordered them to file

17       -- appear at a status conference, and she

18       references, "among other admonitions of counsel

19       for inflammatory and unprofessional conduct,

20       the court refer plaintiffs counsel" and she

21       goes on to what she referred them to do, which

22       I've already covered.

23           Next slide.  Here she said -- she notes

24       that they had declined to heed the court's

25       admonition to edit unnecessary verbiage and

1          irrelevant allegations, conclusionary

2          statements, and inflammatory language, and

3          specifically noting that she admonished them

4          and they just basically ignored her.

5              She says below that, in filing amended

6          complaints in Frazier and James, that those

7          were the ones that made the allegations about

8          other wrestlers dying and stuff that had

9          nothing do with anything.  She notes, "Kyros

10         and numerous other cosigning counsel," and

11         again, none of them are Connecticut counsel,

12         "declined to heed this court's admonition to

13         edit the court's complaints to reduce their

14         unnecessary length and inflammatory, irrelevant

15         allegations."

16             Then she goes on to say:  True to form in

17         over forty pages of briefing only four vaguely

18         conclusory assertions of fact are made to

19         supposedly link Mr. Frazier's death.  Again, he

20         died of a heart attack in the shower.  This is

21         a morbidly obese gentleman.  He's about

22         500-something pounds.  He died of a heart

23         attack in the shower six years after he last

24         performed for us.  No autopsy was ever done on

25         him.  Nobody had ever diagnosed him with CTE,

1          yet they put him in a lawsuit and try to blame

2          us for it.

3                But anyway, she goes on to say that the

4          court notes, in particular, the facially

5          specious assertions upon, quote, information

6          and belief, both Frazier and Osborne had CTE.

7          The complaints contain no information from

8          which such a belief could be derived.

9                She then goes on -- next slide please.

10         She then goes on to say:  It's impossible to

11         plausibly allege, much less prove, either

12         wrestler had CTE.  Kyros and his co-counsels'

13         assertion that either wrestler had the

14         condition upon information and belief, must

15         therefore be, quote, knowingly false.

16               That's a damning allegation or a damning

17         conclusion for any federal judge to make about

18         an advocate that they are presenting knowingly

19         false allegations to the court of law.

20               She then goes on to say:  Thus counsel's

21         allegation of Frazier's inability to survive a

22         heart attack can be, quote, more likely than

23         not attributed to CTE, as yet another bald and

24         baseless allegation, unprovable and

25         unsupportable, which the court deems unworthy

1          of the barest measure of credibility.

2                And then with respect to Osborne, she

3          goes on to make some more findings about that.

4          And Mr. Kyros, in the way he pled, tried to

5          make it sound that Mr. Osborne had wrestled for

6          WWE for 22 years, when he didn't.  He wrestled

7          for two years and hadn't wrestled for twenty

8          years.

9                And she even points this out:  Kyros'

10         allegation of a 22-year career is deceptive and

11         misleading.  It suggests that Osborne wrestled

12         for WWE for 22 years, as opposed to

13         approximately two years.

14               It goes on to say:  Kyros' half truths

15         undermine his credibility and the credibility

16         of filings submitted by plaintiffs' counsel.

17               Next slide.  Now she deals with the

18         Stephanie McMahon allegation that I had told

19         you it was false.  And she says, "WWE next

20         argues that Kyros misled the court with respect

21         to the allegation that WWE executive Stephanie

22         McMahon concealed the concussion risk involved

23         in WWE wrestling in testimony before congress."

24         She goes back and even notes, "in its March

25         22nd opinion, the court examined this

1          allegation and found it to be without merit,

2          rebuking Kyros for repeatedly misrepresenting

3          the substance and meaning of Ms. McMahon's

4          testimony," which as I pointed out, your Honor,

5          he's still doing, and still doing it to this

6          day and he's doing it in the Laurinaitis

7          complaint, despite this federal judge saying

8          this twice now.

9               Then it goes on to say, "once again,

10         Kyros' deliberately misleading language

11         suggesting that WWE directly contested a

12         specific CTE study in 2005 further undermines

13         his and his plaintiffs' credibility, but does

14         not merit the imposition of sanctions."

15              Let me tell you what that one's about

16         because we're going to hear that on the

17         objections on the interrogatories.  In 2005

18         Dr. Bennet Omalu, the forensic neuropathologist

19         that I was telling you about in Pittsburgh did

20         his second analysis of a Pittsburgh Steeler, a

21         fellow by the name of Terry Long, who played

22         right guard.  I don't know if you remember him.

23         He was a really big guy.  Actually, my firm was

24         representing him.  He was under criminal

25         indictment.  But in any event, he diagnosed him

1          as having CTE too.  This was in 2005, two years
2          before any wrestler was ever said to have had
3          it.  And there was some local publications and
4          whatnot.  WWE never said a word about the
5          findings.  They wouldn't have any reason to say
6          anything about the findings, yet Kyros alleges
7          in there that we contested the findings and we
8          challenged the findings.  And as you can see,
9          that's one of the things in the interrogatories
10         we tried to ask him about and they dance
11         around, because they know it's false.  They
12         can't answer it.  And she's finding it here
13         that that allegation was false, because we
14         never did anything like that.
15              Next slide please.  And then she ends up
16         -- and Judge Bryant I think has been very
17         judicious and quite frankly very patient with
18         these lawyers and with Mr. Kyros.  She very
19         well could have sanctioned him, but she's been
20         I think giving them plenty of rope, and I think
21         they're on their last stand hopefully, but in
22         any event, this is what she says.  "The court
23         would be well within its power of discretion to
24         sanction counsel."  But then she goes on --
25         next slide please.  And then she says this:

 1           This is the final admonition.  Kyros' false and

 2      misleading statements, identified by WWE above,

 3      together with other statements the court has

 4      examined, including Kyros' unprovable claim

 5      that deceased, and at least in one case,

 6      cremated former wrestlers had CTE, quote, on

 7      information and belief, unquote, are highly

 8      unprofessional.  These misleading, deceptive,

 9      and baseless allegations are precisely the

10      types of statements that many state Bar

11      associations have targeted and promulgated

12      rules of professional conduct which demand an

13      admitted attorney speak with candor to the

14      trier of fact.  The court admonishes Kyros and

15      his co-counsel to adhere to the standards of

16      professional conduct and to applicable rules

17      and court orders, lest they risk future

18      sanction or referral to a disciplinary

19      committee of this court.

20           That is where things left off, your

21      Honor.  And to show you Mr. Kyros' response to

22      all this, publicly, this is what he then says

23      when the media starts questioning him about

24      what Judge Bryant did.  First, he tells the

25      Connecticut Law Tribune that Judge Bryant's

1          ruling, "Ignores that the deaths of Nelson

2          Frazier and Matthew Osborne were consequences

3          of an abusive and exploitative culture within

4          the WWE that showed and is still showing no

5          regard for its wrestlers' health."

6              That's an insult because if you read

7          Judge Bryant's opinion, she carefully reviewed

8          the allegations about the cause of death, and

9          I've shown you.  It said there's no basis to

10         even make an allegation that the WWE had

11         anything to do with these men's deaths.  The

12         guy died of a heart attack in the shower six

13         years after he last performed and you're going

14         to try to blame the WWE for that?  So he first

15         tried to ridicule her opinion.  And then a

16         second thing he says is, "Kyros called the

17         admonishment unfortunate and told me he felt

18         justified in making the charges he made,

19         including an argument that Osborne had CTE,

20         even though it was not proven.  I don't think

21         it was unprofessional," he says.

22             So you can see that these admonitions

23         that they don't mean anything to him.  He

24         continues to do what he's doing and we're going

25         to show you in the motions that we're now going

1           to turn to that he does the same things in

2           these two sanctions motions and worse.

3               With that, your Honor, I'll turn it,

4           unless you have any questions about the

5           background, to the actual motion for sanctions

6           on the interrogatories.

7               The interrogatories involved two things.

8           First, a willful disobedience of a clear

9           compulsion order that was issued by Judge

10          Bryant.  This is not a discovery motion.  This

11          is a violation of a court order, willful

12          deliberate and we're going to show you that.

13              Second, subornation of perjury by

14          Mr. Kyros.  And I use that term understanding

15          criminal law.  I am not just a civil lawyer.  I

16          have tried several criminal prosecutions

17          repeatedly to verdict.  I understand federal

18          criminal law.  And I understand the elements of

19          subornation, and the principal one is

20          procurement.

21              And there's not much question, as you're

22          going to see, he procured false testimony from

23          Mr. Lograsso and Mr. Singleton after he sat

24          through a deposition and heard them give

25          testimony directly at odds with the

1          interrogatory responses he had them sign and

2          verify.

3                    And not to give any shade to the other

4          lawyers, but I do believe in being fair to

5          other lawyers.  I don't think anybody had

6          anything to do with the subornation aspect,

7          except Mr. Kyros.  And I think it's pretty

8          obvious from the affidavit that he filed in

9          response to this, which we'll show you here in

10         a second.

11                   And just by way of background, your

12         Honor, to talk about this, one of the problems

13         we had in the case and still have with them, in

14         addition to the ones we talked about this

15         morning, is they make these allegations in the

16         complaint to support the fraud allegation that

17         we know -- I mean it's sort of an odd thing --

18         we know they're false from the beginning.  We

19         know we didn't say some of the things that they

20         said.  But so we try to flush that out in

21         interrogatories with specifics.  Who do you say

22         said this?  Where did they say it?  The kind of

23         things you do when you're dealing with a fraud

24         case to try to get the specifics, and it became

25         very obvious that they weren't able to do those

1        kind of things, and so we served them with
2        interrogatories, which we're going to go
3        through and show you how they didn't answer them.
4            After they didn't answer them, then they
5        came back with these supplemental ones that the
6        judge ordered them to respond to, which are not
7        responsive, and Mr. Kyros now submits this
8        affidavit in response to the charge that these
9        are false.
10            First, he admits that he discussed the
11        responses with Mr. Lograsso by telephone on
12        June 14th.  That's the day before they gave it
13        to us.  So, they verbally talk about them on
14        the phone.
15            Next slide.  Same thing with
16        Mr. Singleton.  So he basically says that he
17        and Mr. Singleton and Mr. Lograsso discussed
18        the responses that they were to be given the
19        day before they served us, which was June 14th.
20        He doesn't say anywhere in here that the actual
21        answers that he was going to have them sign
22        verifications to were shown to them by June
23        14th.  And there's no evidence that they were.
24        And frankly, I don't see how they could have
25        been, given the testimony we're going to show

1        you that any man would sign affidavits if what

2        they're saying in the interrogatory answers are

3        true in light of their testimony.

4              On the 15th of June we were sent

5        unverified responses, which we notified, I

6        think it was Ms. Van Dyck.  I think we notified

7        her that these are not verified and they need

8        to be properly verified.  The next day we were

9        given verified responses, just the response,

10       not attached to the interrogatories, nothing

11       that would indicate that Mr. Lograsso or

12       Singleton had actually seen them, just the

13       verification pages signed by Mr. Lograsso and

14       Mr. Singleton.  And when that was done, as far

15       as we're concerned, they submitted perjurious

16       answers and then we had subornation of perjury,

17       and we're also going to show you they're

18       completely nonresponsive also.

19             Now, if we could, your Honor, just by way

20       of giving further background, if I could show

21       you a PowerPoint about what the claim was that

22       we were probing here.  This is what Judge

23       Bryant -- part of this I showed you this

24       morning.  This is the background for the IROGs

25       that they're ducking and evading, and I'd also

1          submit they're committing perjury about.

2                  Plaintiffs fraudulent omission complaint

3          survived -- these are the words of Judge

4          Bryant, only, quote, to the extent that the

5          claims assert that in 2005 or later WWE became

6          aware of and failed to disclose to its

7          wrestlers information concerning a link between

8          repeated head trauma and permanent degenerative

9          neurological condition, as well as specialized

10         knowledge concerning the possibility its

11         wrestlers could be exposed to greater risk for

12         such conditions.

13                 And then she goes on to talk about the

14         errant contradiction, all the stuff that I

15         showed you this morning.

16                 So, again, you know, the question is what

17         are these fraud claims.  So our interrogatories

18         went back to the complaint allegations, the

19         things they alleged, for example, that the WWE

20         specifically stated, this is their word not

21         mine, specifically stated that wrestlers with

22         diagnosed brain injuries didn't receive them as

23         a result of wrestling for WWE.  They'd make

24         those kind of allegations, and they knew that

25         was false.  We never said anything like that.

1              So, you'd ask them in interrogatories,

2       who said that, when did they say that,

3       etcetera, etcetera, the kind of things you do,

4       if you're a defense lawyer, to understand the

5       basis of the claim or flush out and show that

6       there's no basis for these allegations, which

7       we knew all along.  So that's what they were for.

8              It became obvious that we weren't going

9       to get sufficient answers, if I could show you

10      the timeline here of what happened.  On March

11      7th, and we were all operating on a very tight

12      discovery schedule because Judge Bryant had

13      lifted the stay, only for very limited

14      discovery on this narrow fraudulent omission

15      claim.  So on the 7th of March we got effective

16      responses, which are just totally

17      nonresponsive.  They required meet-and-confers

18      and all that, which we did.  It took till the

19      22nd for them to agree that they were going to

20      supplement the responses by that day, but they

21      didn't honor that deadline, and we were told

22      that they needed more time.  By the 30th we got

23      the first supplemental responses, which were

24      equally defective and nonresponsive.  So, they

25      didn't do even what they said they were going

1          to do.  And on April 20th we moved to compel.

2          But we were in the situation where discovery

3          was closing by June 1st, if you run the

4          calendar and you can see how briefing probably

5          wasn't even going to be concluded on our motion

6          to compel or decided by the judge until the

7          close of discovery, so we couldn't take any

8          chances and had to go forward with depositions

9          without having these interrogatories.

10              So on May 11th we take Mr. Singleton's

11         deposition.  And remember, your Honor, by the

12         time we take this man's deposition, the only

13         claim left in the case is a fraud claim.  All

14         right?  So we show up and we take

15         Mr. Singleton's deposition.  And I want to show

16         you a clip of what Mr. Singleton says in

17         response to some questions about whether he

18         knows what the lawsuit is about.  It's the same

19         point I was making with Mr. Brunzell.

20

21              (Recording was played.)

22

23              MR. MCDEVITT:  As you'll see, your Honor,

24         I mean after somebody claiming fraud gives that

25         kind of testimony, there's not much left of a

```
 1              fraud claim.  They can't tell you anything,
 2              doesn't even know you're making one, let alone
 3              being able to tell you who defrauded him or
 4              what the fraud was.  And as you'll see,
 5              following this deposition -- and I would point
 6              out that the two lawyers who sat through this
 7              deposition and the next one I'm going to show
 8              you are Mr. Kyros and Mr. Norris, so they knew
 9              he gave that testimony.  I don't know whether
10              the other lawyers in the room read his
11              testimony or not before these signed
12              verifications were done.  But Mr. Kyros and
13              Mr. Norris knew about that testimony.  They sat
14              there and they heard it and they are the ones
15              that are involved in the verification.
16                   The same thing happens after he gives
17              that testimony, which as far as we were
18              concerned, would negate any fraud claim.  We
19              then took Mr. Lograsso's deposition, the next
20              week.  And I'll show you what his testimony was
21              about this business about fraud.
22
23                   (Recording was played.)
24
25                   THE COURT:  May I have just a second, please.
```

1             MR. MCDEVITT:  I'm sorry, your Honor.

2

3         (Pause.)

4

5             THE COURT:  Okay.  Thank you.  Please

6         continue.

7             MR. MCDEVITT:  As matters turn out on the

8         timeline, your Honor, the day after

9         Mr. Lograsso is deposed, Judge Bryant then

10        issued her compulsion order ordering them to

11        answer these interrogatories that really went

12        to the question of what's the basis for fraud.

13        We had already deposed them and were fairly

14        confident that at that point it nullified any

15        basis for fraud.  But in any event, the

16        significance is and we had pointed out in our

17        motion to compel, that they were evading

18        answering specifics about these allegations

19        that they had made in the complaint, these

20        vague allegations that WWE supposedly said this

21        or that by refusing to give the specifics.  So,

22        she issues this order, which has an unusual

23        component to it, which grants our motion in

24        part of the interrogatory we're going to talk

25        about, and she actually goes to the length of

1           saying, "where plaintiff is unable to identify

2           a statement or speaker in response to the

3           interrogatory, plaintiff must state that fact."

4           Which in plain English, your Honor, if they had

5           made the allegation that WWE said something and

6           they didn't have evidence of it, they were

7           supposed to say that.  As you're going to see,

8           that's exactly what they refused to do again.

9                Now, the interrogatories in question,

10          your Honor, there were five interrogatories in

11          common that both of them had to answer, all

12          dealing with the specific allegations of fraud.

13          There was a sixth one that Mr. Lograsso had to

14          answer that had to do with the onset of his

15          symptomology which was uniquely relevant to his

16          case because he had statute of limitations

17          issues.  And so the question was, when did

18          these alleged symptoms that you claim you

19          started to suffer, when did you start suffering

20          them, who treated you for them, etcetera,

21          etcetera.  And he was ordered to answer any

22          interrogatory that went to that point.

23               The interrogatories in question, we'll

24          review in a minute, but the point about

25          sanctions, your Honor, I think the law is

```
1              pretty clear, that willful disobedience of an

2              order is one ground for dismissal.  And it's

3              pretty hard not to see willful disobedience

4              when you look at -- and I can use every one as

5              an example, but, first, we're going to look at

6              Lograsso interrogatory number 6 to show you

7              willful disobedience.

8                   This was the interrogatory question

9              that's on the screen.

10                  And does your Honor have copies of the

11             interrogatories, because I can hand up a hard

12             copy, in fact, I probably should.

13                  May I approach, your Honor?

14                  THE COURT:  Yes.  I actually do have

15             copies but you're welcome to pass one up.

16             Thank you.  All right.

17                  MR. MCDEVITT:  Lograsso interrogatory 6 is

18             on the screen.  And as you can see, it asks him

19             to identify all the symptoms he's experienced

20             since his relationship with WWE ended, which

21             you contend are associated with TBI sustained

22             while performing for WWE.  And then it asks for

23             four specific things:  Date of onset of the

24             symptoms; length of the symptoms; identity of

25             the healthcare professional or examiner who
```

1           treated you for such symptom.  Three things, I

2           should say.  And, again, he didn't answer this

3           originally.

4                 Now, let's bring up on the screen that,

5           above there, that's his original answer, I'm

6           showing you there.  The one that Judge Bryant

7           overruled and said was an inadequate answer.

8           Now I'm going to phase in below that the answer

9           he gave after the court ordered him to answer

10          it.  And as you can see, all the highlighted

11          language is exactly the same.  He didn't change

12          a word.  The only words that changed is on the

13          bottom he says, pursuant to Rule 33(d)

14          plaintiff refers to the medical records he is

15          producing in the first one.  And then in the

16          second one he says already produced, which is

17          even -- not even an adequate 33(d) designation

18          anyway because your Honor, I'm sure knows, when

19          you use that in lieu of answering an

20          interrogatory, you have to reasonably

21          particularize the documents from which the

22          answer can be derived and that certainly

23          doesn't do that.

24                So what you have here is despite a judge

25          saying that that answer he gave is inadequate,

1           in haec verba, because it repeated exactly

2           without changing.  How is that not willful

3           noncompliance with the order?  He didn't change

4           anything.  They didn't answer anything.

5           Doesn't provide when the symptoms began,

6           doesn't say who treated them for them or anything.

7                Now the answers also deliberately

8           mislead.  It fails to identify not only when a

9           single symptom began or a doctor who treated

10          it.  And really what it's designed to do, your

11          Honor, to show, and we know this now, he

12          doesn't have any medical records that show he

13          had any of these symptoms.  His whole claim is

14          a fraud, to be frank.  None of these show these

15          symptoms at any time from when he's claiming he

16          had them, except for one, this hearing loss

17          claim that he references in his answer.  And in

18          reality, as they know, all the medical records

19          that they produced in the case show that this

20          hearing loss was not caused by any kind of

21          damage to his brain.  It was congenital, and he

22          said it was congenital.  Every one of the

23          doctors' reports says he's been deaf since

24          birth and he himself has said that.

25                Here's one of, for example, the medical

1        records that was produced in the case by

2        Mr. Lograsso.  It states right on it:

3        Congenitally deaf on left, severe loss on

4        right.  Patient notes hearing loss in left ear

5        since birth and remembers right ear being bad

6        for a long time.

7            There's a tape recording, I'll play it

8        for you next.  This is Mr. Lograsso's own words

9        talking about his hearing loss.

10

11           (Recording was played.)

12

13           MR. MCDEVITT:  That was obviously said

14       prior to litigation when he had no litigation

15       motives.  He's admitting that -- he's out there

16       publicly telling everybody that he's been deaf

17       since birth.  Now his nonresponsive answer to

18       an interrogatory in a compulsion order he

19       weaves in this notion that his hearing loss is

20       somehow associated with that, without saying

21       when and who diagnosed it that way.

22           So, that's a clear example of a willful

23       refusal to answer an interrogatory.  And you'll

24       see more of those as we go through.  The more

25       serious -- it's kind of hard to create

1          seriousness, so an equally serious thing is

2          ones that are flat out perjury, which we're

3          going to turn to now.

4               Both Lograsso and Singleton were asked

5          specific interrogatories to track allegations

6          in paragraphs 222 and 230 of the second amended

7          complaint.

8               And just to show you how we did this,

9          your Honor, what you see in the split screen

10         there is on the top is the allegation that they

11         made in paragraphs 222 and 230, that WWE

12         materially misrepresented the risks faced by

13         plaintiffs relating to head injuries.  "WWE,

14         through misleading and deceptive public

15         statements and published articles and

16         downplayed known long term health risks of

17         concussions to plaintiffs."  That's their

18         allegation, that we published articles and made

19         public statements and downplayed things to

20         plaintiffs.

21              And remember, we're probing detrimental

22         reliance here.  What did we say to you that was

23         a fraud?  And so you can see how the

24         interrogatory is phrased:  Identify each and

25         every deceptive public statement, published

1           article which you contend downplayed long term

2           health risks by WWE.  That was the allegation

3           that we wanted to probe.

4                The truth is WWE has never made any such

5           public statements or published any articles

6           whatsoever.  We know that.  They still haven't

7           identified any.  That comes out of the NFL

8           litigation which they plagiarized.  And we'll

9           show you that this afternoon.

10                The second one that we tried to drill

11           down on, that they supplied perjurious answers,

12           is numbers 14 and 15.  And you'll see on your

13           screen there on the top is the allegation from

14           the complaint, which was in the second amended

15           complaint, paragraphs 178 and 180.  They made

16           the same allegation on behalf of Singleton, the

17           same allegation on behalf of Lograsso.  That

18           part that we've highlighted where they say that

19           WWE, quote, specifically stating that WWE

20           wrestlers with diagnosed brain trauma did not

21           receive these injuries as a result of wrestling

22           for WWE.

23                So, once again, we probed that by asking

24           them who at WWE specifically stated that WWE

25           wrestlers with diagnosed brain trauma did not

1        receive those injuries.  And you can see by the

2        question, we say, "include in your answer the

3        date, place, and persons making such a

4        statement, and how and when such statements

5        first came to your attention."

6             Now, you know, you would think given what

7        you saw already with their testimony, when

8        they're asked did anybody defraud you you think

9        they'd know what the answer to that one is

10       going to be.  None.  As you're going to see,

11       that's not the answer we got.  And to comply

12       with the judge's order, should have been, we

13       cannot identify such a speaker, if they

14       couldn't identify such a speaker with such a

15       statement.  That isn't what we got.  Instead,

16       we got perjury.

17            And before showing you how they perjured

18       themselves, I need to you show you some other

19       testimony that was given by Lograsso and by

20       Mr. Singleton.  And what Mr. Kyros eventually

21       claims is he was synergizing the testimony with

22       their answers.

23            I already talked to you about Stephanie

24       McMahon's congressional testimony and how the

25       judge has found twice now that that was

1          repeatedly mischaracterized.  In actuality, the

2          testimony that we derived from Mr. Singleton

3          and Lograsso showed that allegation was even

4          more in bad faith because they didn't even know

5          about it.  They hadn't read it.  They didn't

6          know anything about it.  So you could never

7          have formed the basis of any kind of fraud

8          claim that these people had somehow read her

9          testimony in congress and were somehow deceived

10         by it.  It was so farfetched to begin with, and

11         they never even read it.

12              So, first, let me show you the quote that

13         the judge made about Stephanie McMahon's

14         testimony.  First, she said -- this is what

15         they alleged in the complaint, what you have on

16         the screen there now.  I'll give you a second

17         to read it.

18              Now I'll show you next what the judge's

19         findings were on that.  First one is what she

20         said in the McCullough opinion, which we

21         reviewed already, that that was a repeated

22         misrepresentation of what she said.  And she

23         had, by the way, the entire congressional

24         testimony of Stephanie McMahon.  It was given

25         to Judge Bryant to read.

1          The second part of the opinion, the

2     PowerPoint I should say, is what she says again

3     in the most recent opinion of Frazier where she

4     refers back to the March 22nd opinion noting

5     that she rebuked them previously for doing

6     that.  Yet, you're going to see despite that,

7     he weaves this into the perjurious answers that

8     he now gives.

9          Now, first, let me show you a clip of

10    Mr. Singleton when he's confronted with the

11    question about Stephanie McMahon's

12    congressional testimony.  You can see what he says.

13

14          (Recording was played.)

15

16          MR. MCDEVITT:  So that would negate, it

17    would seem, any ability of Mr. Singleton to

18    answer any interrogatories about what defrauded

19    him by alleging anything about Stephanie

20    McMahon's congressional testimony.  As you'll

21    see that's not what happens.  Mr. Lograsso's

22    testimony is much the same, and I'll show you

23    his testimony on this.

24

25          (Recording was played.)

1            MR. MCDEVITT:  So once again, you have

2       both of the plaintiffs who make allegations

3       that congressional testimony by Stephanie

4       McMahon was somehow fraudulent and misled them

5       in something, denying they even knew anything

6       about it.

7            Now, when Mr. Kyros, however, has them

8       sign the interrogatory answers, as you'll see,

9       this is what he does.  This is the answer to

10      Singleton's, in part.  And you have the

11      complete answers in the interrogatories before

12      you, so, I'm just highlighting the relevant

13      part that shows the perjury.

14           Asked to identify each and every

15      deceptive statement and published article by

16      WWE which contended downplayed long term risks

17      to plaintiffs.

18           Singleton who admitted he never even read

19      her testimony, now identifies Stephanie

20      McMahon's congressional testimony as responsive

21      to the interrogatory, even though he'd never

22      read it.

23           Mr. Lograsso, same thing.  He said he

24      never read anything.  He's asked the same

25      question.  What does he do?  He identifies it

1          in two different -- plaintiffs refer WWE to the

2          McMahons' congressional testimony.

3              In addition to incorporating Stephanie

4          McMahon's testimony or Stephanie McMahon in the

5          perjurious answers, he also wove in references

6          to a fellow by the name of Chris Nowinski.

7          Chris Nowinski, as I explained to you, is a

8          former WWE wrestler who is really at the

9          forefront of concussion research and bringing

10          this whole issue to light throughout the

11          country.  He's testified before congressional

12          committees.  His people are one of the leading

13          researchers in the country on this whole

14          subject.

15              And Mr. Nowinski, after he sustained his

16          injury with the WWE, as I indicated, he's a

17          very intelligent guy.  He's a Harvard graduate.

18          So he decided he was going to dedicate his life

19          to run this research and whatnot on concussion

20          research and ended up writing a book on his own

21          time called Head Games, where he talked about

22          the risk of concussions and his research on it

23          and was trying to sound the alarm bell that

24          people needed to manage concussions a little

25          bit more vigorously than they had been, and

1              started to talk about CTE, and all the things

2              that you've been reading about in the papers

3              ever since.

4                     Anyway, so we asked both of these people

5              who -- whether they knew anything about Chris

6              Nowinski.  First, I'll show you what Mr.

7              Singleton said about Chris Nowinski.

8

9              (Recording was played.)

10

11                  MR. MCDEVITT:  And then we did the same

12             thing with Mr. Lograsso.  We asked him.

13

14             (Recording was played.)

15

16                  MR. MCDEVITT:  So one would think, again,

17             after listening to that testimony, apart from

18             the fact that both had previously, in a

19             deposition, disclaimed any knowledge of a claim

20             of fraud or any basis for a fraud claim, can

21             hardly claim that either Chris Nowinski or

22             Stephanie McMahon had anything to do with

23             defrauding them.  Yet again, you'll see the

24             answers to the IROGs that Mr. Kyros drafted and

25             had them subsequently sign after they gave this

1      testimony, and it says something different

2      about Mr. Nowinski.

3          This is Mr. Singleton's answer to what

4      defrauded him.  In the second -- Christopher

5      Nowinski's public statements regarding how

6      effective WWE ImPACT is at monitoring and

7      treating wrestlers downplayed the risks that

8      plaintiffs face and continues to face.

9      Christopher Nowinski's published book Head

10     Games, ta-da-da.

11         So here's a guy that doesn't even know

12     Chris Nowinski when he gives his testimony,

13     doesn't say anything about Chris Nowinski, now

14     all of a sudden he's signing interrogatory

15     answers saying this is part of what defrauded

16     him.

17         And apart from that, your Honor, you'll

18     notice, even this is completely lacking any

19     kind of detail.  Chris Nowinski's book doesn't

20     downplay long term risks of concussion.

21     Christ, it's the advent of bringing the whole

22     thing to attention.  And nowhere do they even

23     say, well, what is it that you're forgetting

24     that this guy never even read the book.

25     There's nothing in here that says anything in

1          that book downplayed anything or that WWE had

2          anything to do with it.  It's him writing a book.

3              Then the next one is, here's Singleton

4          again, when he's asked to identify a person who

5          said that WWE wrestlers with diagnosed brain

6          trauma didn't receive these as a result of

7          wrestling for WWE.  Again, we get this

8          nonresponsive answer.  But it ends up, again,

9          weaving in Chris Nowinski supposedly somehow,

10         somewhere, unknown, unsaid, significantly

11         downplayed the long term risk of concussive and

12         sub-concussive blows.  Completely unresponsive

13         to the question of who at WWE supposedly said

14         what you said, and weaving in Chris Nowinski,

15         who is a guy he's already said he doesn't know

16         anything about.

17             This is another one of Lograsso's, who

18         said he doesn't read books and didn't read

19         books.  What's he weave in to his answer?

20         Chris Nowinski's published book Head Games is

21         part of what he identifies as somehow to try,

22         even though he doesn't read books and never

23         read the book.

24             So, again, this is Mr. Lograsso

25         supposedly identifying, again, trying to get

```
1            from him the answer of who was it that

2            supposedly said this about diagnosed brain

3            trauma not as a result of wrestling.  Again, no

4            answer to question, but again smears

5            Mr. Nowinski by putting his name in here as

6            somehow defrauding him even though he didn't

7            even read the book.  This is what we're talking

8            about here.

9                 The last one, Dr. Joseph Maroon.

10           Dr. Maroon is a very nationally recognized

11           neurosurgeon.  He is -- has been for decades, I

12           guess, the Pittsburgh Steelers team doctor.

13           Back in the days of Chuck Noll, Chuck Noll

14           didn't like the fact that doctors didn't have

15           any objective criteria for making

16           return-to-play decisions.  He told Joe Maroon

17           he wanted to have some kind of objective

18           standards developed to do that.  And Dr. Maroon

19           and his colleagues at the University of

20           Pittsburgh Medical Center devised a test called

21           ImPACT, which is a standard of care that's used

22           throughout the country now for people to assist

23           in diagnosing concussions and making

24           return-to-play decisions and things of that

25           nature.  He's been spending his whole life
```

1          basically trying to help people deal with

2          concussions.

3               When this whole stuff started to happen,

4          after Chris Benoit and whatnot, what the WWE

5          did is we didn't want to just license the

6          ImPACT test, we wanted to get the people

7          actually who devised it to help us.  And we

8          hired Dr. Maroon to be the medical director of

9          the WWE.  He came after Lograsso.  I mean,

10         Lograsso really had no dealings with Dr. Maroon

11         at all nor, frankly, any of the people in the

12         Laurinaitis case that you're talking about.

13              And Dr. Maroon actually had went down to

14         Orlando in a tape we produced to them in

15         discovery, despite them saying we never told

16         them anything about it.  It's a tape of

17         Dr. Maroon going down to Orlando where

18         Mr. Singleton was performing and giving

19         extensive presentations about what to do if you

20         think you have a concussion.  They were showing

21         CTE up on the slides and they were trying to

22         educate these guys about the risk of it and if

23         they need to self-report it, they thought they

24         had a concussion so they could get proper

25         medical treatment.

```
 1                 These guys were both asked about
 2        Dr. Maroon, and I'll show you their testimony
 3        about -- I'll show you, actually, Mr. Singleton
 4        because he's the only one that had it.  I'll
 5        show you Mr. Singleton's testimony about
 6        Dr. Maroon.

 7

 8             (Recording was played.)

 9

10             MR. MCDEVITT:  So Mr. Singleton, who
11        wasn't in Florida at the time Dr. Maroon gave
12        his presentation to all talent.  It was
13        required to be present.  There was objective
14        evidence that he was present.  He sent out a
15        tweet that day saying thank you for the
16        information WWE, but his testimony claimed he
17        didn't remember even being there, couldn't tell
18        you anything about it.  Yet, again, whenever
19        he's asked to identify his basis for fraud in
20        the verifications Mr. Kyros has him sign, he
21        weaves in, again, Dr. Maroon's presentation
22        which he says he doesn't even know anything
23        about and he can't remember.
24             Dr. Maroon's presentations which
25        plaintiff contends he did not attend or
```

```
 1              otherwise downplays the risk of concussion,

 2              etcetera, etcetera.

 3                   So again, you have three different people

 4              woven in to these answers and somehow being

 5              involved in defrauding these plaintiffs, even

 6              though under oath they testified directly

 7              contrary to that.  You cannot reconcile these

 8              things.  And that to me is a serious offense by

 9              any lawyer to do that.  But frankly, it's

10              typical.  They don't want to admit that

11              allegations that they made had no basis in fact

12              in the first place, so we get this obfuscation.

13                   Apart from the perjury, now, if we can

14              move briefly to the noncompliance.  Again, this

15              is the last one where Singleton -- the second

16              one where he weaves in Dr. Maroon.

17                   Now, if we can move then just briefly to

18              the noncompliance, generally apart from what

19              I've told you about.  This one, again, to sort

20              of tee up for you what we were trying to figure

21              out.  At the top, again, you'll see the

22              allegations that they made in the complaint.

23              This is about that Terry Long thing that I've

24              addressed for the court before where they talk

25              about Dr. Omalu's findings with Terry Long in
```

1          paragraph 66 of the second amended complaint.

2          And then immediately right after that, they

3          make the allegation, "in a pattern that echoes

4          that of the NFL's original response and

5          discovery of CTE, WWE attempted to discredit

6          these studies."

7               WWE never said a word about this.  They

8          wouldn't have any reason to say anything about

9          this study.  This is 2005.  That was two years

10         before anybody ever even talked about CTE or

11         wrestlers.  And so we asked him, and again this

12         was a specific interrogatory:  Identify

13         everything you can was done by WWE to discredit

14         the studies in paragraph 66 of the second

15         complaint as alleged in paragraph 67.

16              And, again, they were ordered to answer

17         this.  And this is the same one that I pointed

18         out to you.  Judge Bryant, in a recent opinion

19         says that what he said about this was false.

20         It was just misleading.  We never said anything

21         about this.  And this is, again -- this is what

22         she said about that.  "Once again this

23         deliberately misleading language suggesting

24         that WWE directly contested a specific CTE

25         study in 2005 undermines his credibility, which

1          does not merit the imposition of sanctions."

2                And, again, she doesn't know what I'm

3          telling you about these interrogatories that

4          he's still doing this when she says this.

5                Go to the next slide.  So what you have,

6          your Honor, again, we could go through every

7          one of these interrogatory answers and I could

8          show you how they're nonresponsive, but I think

9          you can read them yourself and see.  Every

10         question we asked them what you get is instead

11         of an answer to the question, you get what I

12         call broken field running where they're just

13         saying what they want to say about their theory

14         of the case rather than trying to answer the

15         question.

16               And what's the explanation for the

17         perjury?  This is what the explanation was for

18         why they did that.  Mr. Kyros states,

19         "Plaintiffs supplemental interrogatory response

20         synergized the facts provided during their

21         deposition testimony, as well as additional

22         facts that were uncovered through discovery by

23         plaintiffs' counsel."

24               Your Honor, I don't know the principle of

25         synergizing.  I have not heard that.  I do know

Case 3:15-cv-01074-JAM   Document 316   Filed 03/29/17   Page 107 of 155

107

1          what subornation means.  That has a bigger

2          parlance.  And I think on the law that we have

3          cited here, this is highly sanctionable conduct

4          for several reasons.  It is willful

5          disobedience of a compulsion order, and it is,

6          no question, perjurious answers.

7               If we could just summarize some of the

8          law we have here.  These are the cases that we

9          cited in our brief where courts routinely

10         dismiss claims as a sanction when somebody

11         gives perjurious interrogatory responses.  And

12         those are.  There's not any serious question

13         that those people denied any reliance on

14         Stephanie McMahon or Dr. Maroon or Chris

15         Nowinski, and yet in compulsion -- in

16         court-ordered answers that's what we get.

17              Next slide please.  This is, again, some

18         -- this Margo case I think is fairly similar.

19         It's a Second Circuit case.  If I remember my

20         facts correctly and that your Honor there was

21         one difference.  What the plaintiff's lawyer

22         did in that case is after the plaintiff gave

23         the testimony that was the admissions that he

24         didn't like, he then used the errata sheet

25         method, that's very rarely used, that you can

1          use to correct errors in depositions and you

2          can actually change substance in depositions,

3          but if you do, you're usually subject to have

4          the witness recalled.  He tried to change it

5          that way in that case and it didn't work, and

6          the court ended up granting the sanction for

7          trying to change all the answers.

8               Judge Bryant also, in previous cases, the

9          Zaleski case, struck responses that were not

10         even reviewed by the plaintiffs.  We among

11         other relief, had asked the court to order them

12         to disclose documents to the court, at least at

13         minimum for in camera review, to show that

14         these responses that these plaintiffs were

15         asked to sign were actually seen by them before

16         they submitted verifications.  I have reason to

17         doubt that.  I don't know how they can sign

18         them, given what testimony they gave.  There's

19         no evidence that if they did see them, they

20         haven't produced any.  And frankly, the crime

21         fraud exception doesn't apply, if there's been

22         any attempt to suborn perjury then the crime

23         fraud exception would not apply and protect

24         those from discovery anyway.

25               And, again, this is the point, your

 1              Honor, that I raised at the beginning.  When

 2       there's a pattern of misbehavior, the court is

 3       supposed to consider whether further misconduct

 4       is likely to continue, and whether sanctions

 5       will deter the parties from engaging in same or

 6       similar conduct.

 7              As you're going to see, we not only have

 8       this but we have even, I don't know if it's

 9       more serious or equally serious, conduct in the

10       next motion we're going to be arguing involving

11       what the court's treated a fraud on the court

12       when they detect it.

13              So, that there has been a clear pattern.

14       You have seen how Judge Bryant has tried the

15       gentle stick, if you will, of admonitions, and

16       precautions, and giving them second chances and

17       whatnot.  It hasn't worked.  And we'd

18       respectfully submit perhaps it's time for

19       greater sanctions.

20              Again, this is dismissal, which is what

21       we've asked for.  Well, to be precise what

22       we've asked for with Lograsso's claim and

23       Singleton's claim is that we should obtain

24       dismissals of both on the substance under

25       summary judgment motion, and as a sanction for

1          this kind of misconduct, as a belt and

2          suspenders approach, I think, as for both.  And

3          as we've shown here, you can do it when there's

4          been willfulness, which we have shown.  There

5          is clear fault on the part of the sanctioned

6          party.  They have not complied or tried to

7          comply with the court's order.  And you don't

8          even need to find willfulness for lesser

9          sanctions that could be imposed, which include

10         counsel fees and possibly, as you saw the judge

11         indicated that if anymore of this misconduct

12         occurred, she was going to consider referral to

13         the Bar and disciplinary authorities.  And I

14         think this one, together with what you're going

15         to hear this afternoon, might well be the

16         appropriate sanction.

17              Quite frankly, your Honor, the way I look

18         at sanctions, I guess I'm kind of old fashioned

19         in this regard, I think I've done my job when I

20         present the evidence to the court.  At that

21         point it's for the court to determine what

22         standards apply in this courtroom.  I don't

23         write the rules.  I think I've discharged my

24         responsibility when I bring this stuff to the

25         attention of the court.  I trust in the court's

1          judgment as to what it thinks will be the

2          appropriate sanction.  Thank you, your Honor.

3               THE COURT:  Thank you.

4               MR. KYROS:  Your Honor, can we take a

5          short recess?

6               THE COURT:  Yeah, let's take a -- we'll

7          take a ten minute recess.

8

9               (Recess:  2:28 p.m. to 2:46 p.m.)

10

11              THE COURT:  All right.  We are back.  Are

12         the plaintiffs ready to proceed?

13              MS. VAN DYCK:  Yes, your Honor.  Thank you

14         for the break.

15              I understand that your Honor has another

16         motion to consider, so, I'll try to be brief.

17              After listening to Mr. McDevitt's

18         presentation to the Court, I think there's one

19         thing that we need to be very clear on in

20         considering this motion.  And that is that this

21         is a Rule 37 motion.  This is page 12 of WWE's

22         memo in support of their motion for sanctions

23         and they clearly lay out here Rule 37 and the

24         standards for granting the motion for Rule 37.

25         There is no Rule 11 motion pending in the

```
 1                 Singleton and Lograsso matter.  So I just want
 2                 to make sure that's clear in considering this.
 3                     Mr. McDevitt brought up a bunch of
 4                 motions to dismiss.  That's been ruled on.
 5                 We're dealing with discovery in this case.
 6                     I also want to point out that in
 7                 discovery this case had a bit of an unusual
 8                 timeline.  The court had originally entered a
 9                 stay on all discovery in this matter, when
10                 motions to dismiss were filed.  No 26(f)
11                 reports, even today, have been exchanged.  The
12                 court issued a limited lift on the stay of
13                 discovery and gave us six months to conduct
14                 discovery on the issue of liability.  There was
15                 no scheduling order in place.  And the revised
16                 responses were submitted or rather the -- I'm
17                 sorry.  The plaintiffs were deposed before
18                 revised discovery responses were due.  So I
19                 think all of this has to be viewed with that
20                 timeline in mind.
21                     WWE's motion should be denied for three
22                 reasons.  First, I'll get into this in more
23                 detail, but WWE has not shown any evidence of
24                 perjury.  What they've shown is testimony from
25                 the plaintiffs that they had no knowledge, when
```

1              they were wrestling -- when they were wrestling

2              for WWE.  When they were performing for WWE,

3              they had no knowledge of CTE.  They had no

4              knowledge of Chris Nowinski and his struggles

5              with head injuries.  They had no knowledge of

6              Dr. Omalu's report.  Dr. Maroon did not educate

7              Mr. Singleton.  Mr. Singleton disputes that he

8              went to the presentation that was put on by Dr.

9              Maroon, but even if WWE is correct, that

10             presentation was wholly inadequate, as we

11             discussed in our opposition to the summary

12             judgment motion.

13                   All that -- so that is -- so when

14             Mr. McDevitt comes up here and shows you

15             testimony from the plaintiffs saying, I don't

16             know, I don't know, I don't know, that's

17             precisely the point.  Nobody told them.  WWE

18             had knowledge of Chris Nowinski's head

19             injuries.  Dr. Maroon had knowledge of CTE.

20             Ms. McMahon had knowledge of it and nobody told

21             plaintiffs.

22                   Second, there's no evidence of prejudice

23             here.  WWE made no -- Mr. McDevitt made no

24             mention of prejudice in the hour and a half he

25             just spoke.  The word prejudice does not appear

1    in either WWE's original motion or their reply,

2    and that's because they can't show it.

3         As your Honor pointed out this morning,

4    with respect to the request for admission, they

5    can't show it because they were able to depose

6    plaintiffs about the information sought in the

7    interrogatories.  They were able to question

8    the plaintiffs about this information.  They

9    just showed you several different video

10   excerpts from plaintiffs' depositions where

11   they asked plaintiffs about it.  So, there's no

12   prejudice.

13        Third, our responses are complete, and

14   I'll get into that shortly.  And finally, WWE's

15   motion is untimely.  They had our second

16   supplemental responses for 55 days before they

17   did anything.  They waited until after they

18   filed their summary judgment motion to bring

19   this motion for sanctions.  So, they've waived

20   these arguments and they should have the

21   brought them earlier so the court could deal

22   with them before summary judgment briefing

23   commenced.

24        Finally, the remedy that WWE is asking

25   for, dismissal, is the most extreme remedy that

1           this court can enter.  It is the most extreme

2           remedy.  There are alternatives and WWE hasn't

3           even mentioned them.

4                So, with that in mind, let's talk about

5           what this case is about.  WWE has pointed out

6           we are here on a fraudulent omission claim.

7           That is what is left.  What is fraudulent

8           omission?  The failure to make a full and fair

9           disclosure of known facts connected with a

10          matter about which a party assumed to speak.

11          This is from the court's motion to dismiss

12          opinion.

13               The court acknowledged that fraudulent

14          omission is not about telling somebody

15          something false.  Fraudulent omission can be

16          about -- can occur if WWE remained entirely

17          silent on the issue.  If WWE knew and failed to

18          disclose information which remained -- which

19          credibly receded or seriously undermined the

20          opinions of other statements of facts it

21          expressed, it may have failed to disclose

22          information in breach of its duty to its former

23          wrestlers.

24               So, we're here on a fraudulent omission

25          claim not a fraudulent misrepresentation claim.

1          Despite that, WWE tells the court, in its reply

2          for the sanctions, the interrogatories in

3          question were designed to flush out the

4          specifics of any alleged fraudulent statements

5          or omissions made to or heard by these two

6          plaintiffs.  Again, we're not here about

7          fraudulent statements made by plaintiffs.  We

8          are proceeding on a fraudulent omission claim.

9              So, with that in mind, WWE repeatedly

10         asked the plaintiffs during their depositions

11         what is fraud.  Our clients are not lawyers.

12         Their depositions are not intended to elicit

13         legal opinions on the definition of fraud.

14         They don't know what fraud is.  And they're not

15         required to know every single fact in this case

16         that we contend -- that their lawyers contend

17         amounts to fraud.

18             In any event -- and I'm sorry if this

19         small.  This is from Mr. Lograsso's deposition

20         at page 226.  He did identify, precisely the

21         nature of the claim that he's making against

22         WWE, stating, "It's about not providing

23         information about head injuries and CTE during

24         my time there, and not getting proper care, not

25         getting proper medical treatment, not getting

1          evaluated for head trauma."

2                  So let's turn to interrogatory --

3          Lograsso interrogatory number 11 and Singleton

4          interrogatory number 12.

5                  Lograsso interrogatory number 11 asks or

6          instructs, "Identify each and every deceptive

7          public statement and published article of or by

8          WWE which you contend downplayed known long

9          term health risks of concussions to plaintiffs,

10         as alleged in the second amended complaint."

11                 Now, Mr. McDevitt has come up here and

12         said plaintiffs committed fraud because they

13         weren't able to define fraud when they were

14         deposed because they didn't know who

15         Mr. Nowinski or Ms. McMahon were, and they

16         couldn't specifically -- and Mr. Singleton

17         couldn't specifically identify any fraud by

18         Dr. Maroon, but that's precisely the point,

19         your Honor.  As I said before, this is a

20         fraudulent omission claim.  The plaintiffs

21         don't know who Mr. Nowinski is.  They did not

22         know that Mr. Nowinski suffered multiple

23         concussions and has struggled with head

24         injuries as a result of his wrestling career

25         with WWE.

```
 1                  Who did know that?  WWE.  WWE knew that
 2             by -- at least by virtue of the publication of
 3             Mr. Nowinski's book, Head Games.  They knew it
 4             when they refused to let him wrestle.  WWE knew
 5             this when they refused to let Mr. Nowinski
 6             wrestle anymore, but WWE did not disclose this
 7             to either plaintiffs.
 8                  So, this is where I think that we're
 9             getting confused.  And I think that there's
10             some confusion in this courtroom generally --
11             not with your Honor, but generally in this case.
12                  THE COURT:  Oh, I'm confused.
13                  MS. VAN DYCK:  Your Honor is confused.
14                  THE COURT:  I'm not sure I follow that
15             explanation as it relates to the answer that
16             was given to the interrogatory.  But if you're
17             leading up to that, I'll let you go on.
18                  MS. VAN DYCK:  Certainly, your Honor.  So,
19             in this answer, plaintiffs refer WWE, first, to
20             publications served -- that we served in
21             response to requests for production.  And these
22             were various articles where we allege that WWE
23             and representatives downplayed risks of
24             concussions.  Those were not statements made
25             directly to plaintiffs, but that's not -- the
```

1          way I read this interrogatory, that's not what

2          this asks for.  This asks about public

3          statements and published articles downplaying

4          risks of concussions to plaintiff.  So, that

5          seems to me to be asking generally for what we

6          contend WWE did to downplay risk of

7          concussions.  It doesn't have to be statements

8          made directly to plaintiffs.  Plaintiffs don't

9          have to have knowledge of that.  It's simply a

10         general --

11              THE COURT:  So you don't read the "to

12         plaintiffs" in that interrogatory request as

13         referring to statements to plaintiffs?

14              MS. VAN DYCK:  No, your Honor.  I read it

15         as the risks of concussions to plaintiffs.  In

16         other words, the concussion risks that

17         plaintiffs are facing.

18              THE COURT:  Okay.

19              MS. VAN DYCK:  Does that answer your question?

20              THE COURT:  That answers my question.

21              MS. VAN DYCK:  Okay.  Thank you.  So with

22         that in mind, there is no inconsistency between

23         plaintiffs' deposition testimony and their

24         interrogatory responses.  Plaintiffs were not

25         -- did not have the knowledge that WWE had.

1        WWE failed to share it with them and that is

2        what plaintiffs testified to.  They don't know

3        who Chris Nowinski is.  And that is consistent

4        with these responses which are, identifying

5        public statements and published articles by WWE

6        downplaying the risks of concussions, which

7        plaintiffs -- that's how I read the "to

8        plaintiffs."

9            THE COURT:  Okay.

10           MS. VAN DYCK:  Moving on to what was

11       Lograsso interrogatory number 14, and Singleton

12       interrogatory number 15:  Identify who at WWE

13       specifically stated that WWE wrestlers with

14       diagnosed brain trauma did not receive these

15       injuries as a result of wrestling for WWE.

16           Again, this isn't asking for statements

17       made directly to plaintiffs.  It's asking for

18       statements generally.  These are contention

19       interrogatories, your Honor.  They're not

20       necessarily asking for knowledge held by

21       plaintiffs.  They're asking for the contentions

22       being made in this case, and that's how we

23       responded to them.

24           THE COURT:  Well, but that one ends with

25       and when -- "how and when such statements first

1   came to your attention."  How do you read that

2   one?

3       MS. VAN DYCK:  Your Honor, I read that as

4   a lawyer we're trying to give full information

5   to WWE as to our position in this case, and the

6   fact that we intend to support our claims.  If

7   we hadn't included this type of information in

8   our responses and then included it in our

9   opposition to summary judgment, we'd be here on

10   a different motion.  So, I feel like we're in a

11   bit of a catch-22.

12       Perhaps, plaintiff testified to not

13   knowing about this but that doesn't mean it's

14   not relevant to the case or illustrative of

15   knowledge that WWE failed to share.

16       THE COURT:  No, I meant you just explained

17   to me how you understood "to plaintiffs" in

18   interrogatory number 12.  How is it that you

19   construe or interpret the final section of this

20   interrogatory, which is, "and how and when such

21   statements first came to your attention"?

22       MS. VAN DYCK:  I think that "your" can

23   include counsel.

24       THE COURT:  Okay.  But aren't they, at

25   this point, trying to figure out, at least as

```
 1              it relates to the fraudulent -- whether it's a

 2              fraudulent statement or a fraudulent omission

 3              claim, detrimental reliance, and when they

 4              learned of either -- when there was either the

 5              fraudulent statement or the fraudulent

 6              omission, relative to when they would have

 7              relied on it, which is an element of the fraud

 8              claim?  Don't your clients need to either --

 9              they've got to rely on something, whether it's

10              the fraudulent statement or the fraudulent

11              omission, correct?

12                   MS. VAN DYCK:  Correct.  There does have

13              to be some element of reliance.  And the

14              element of reliance, the way we meant that here

15              is our clients relied on -- they didn't know

16              anything, when they were wrestling, so this

17              didn't come to their attention until after

18              their wrestling careers ended.

19                   THE COURT:  Then how did they rely on it?

20                   MS. VAN DYCK:  It's an omission claim,

21              your Honor.  So, with fraudulent omission --

22                   THE COURT:  I understand the concept of

23              fraudulent omission.  You knew some material

24              fact, you had an obligation to tell me about

25              it, you failed to tell me about it.
```

```
 1              MS. VAN DYCK:  Right.

 2              THE COURT:  But on this one doesn't your

 3         answer include...

 4              MS. VAN DYCK:  Well, I think that's why we

 5         struggled with answering these, your Honor,

 6         because we do have a fraudulent omission claim.

 7         So when the statements came to your attention

 8         doesn't really make sense in the context of a

 9         fraudulent omission claim, where they didn't

10         tell our clients about these risks and our

11         clients relied on that.  They didn't know about

12         it.  WWE had a duty to tell them about it, and

13         they didn't, and so our clients continued with

14         their wrestling careers.

15              And so, the part about when did this come

16         to your attention is confusing and that's why

17         we -- I think that's why we struggled with

18         responding to these because when they came to

19         our attention -- I have trouble answering that

20         for you right now, to be honest, because the

21         reliance is going into the wrestling ring,

22         without the knowledge that WWE had a duty to

23         disclose.

24              THE COURT:  Isn't the correct answer then

25         just what you said?  This is a fraudulent
```

1           omission claim.  We contend that certain

2           statements were not made to us and we relied on

3           the silence, therefore, there are -- the

4           statements in question did not come to our

5           attention until afterward because the

6           statements were -- they withheld information

7           from us that was material.  Isn't that the

8           appropriate way to answer that question, if

9           that's the position you're taking?

10               MS. VAN DYCK:  That may be a more

11          appropriate way.  I think that this particular

12          response does state that Dr. Rios never advised

13          plaintiffs of the long term risks of head

14          injuries, and plaintiff was not informed of the

15          connection between wrestling and his long term

16          injuries, and he was allowed to return to the

17          ring.

18               THE COURT:  Okay.  Continue please.

19               MS. VAN DYCK:  So, I'm just -- as

20          Mr. McDevitt did, I'm not going to go through

21          each individual interrogatory because I know

22          that this can be -- you have a lot to cover

23          today.

24                I do want to talk briefly about the crime

25          fraud exception that Mr. McDevitt is trying to

```
 1                 invoke here.  He's asked for discovery from
 2                 plaintiffs and is attempting to pierce the
 3                 attorney-client privilege via the crime fraud
 4                 exception.  The cases that WWE relied on
 5                 involved parties --
 6                     THE COURT:  So are you done discussing the
 7                 substantive answers to the interrogatories?
 8                 Are we only going to talk about those two?
 9                     MS. VAN DYCK:  I can discuss them in more
10                 detail, if you would like, your Honor.  I'm
11                 prepared to.
12                     THE COURT:  I think I would like to hear
13                 more about the substantive answers, please.
14                     MS. VAN DYCK:  Yes, your Honor.  So this
15                 is the same one we were talking about, except
16                 it's Mr. Singleton's response.
17                     So, here, we talk about previously
18                 recorded presentations served on plaintiffs by
19                 WWE.  And just to clarify for your Honor, the
20                 plaintiffs served several -- I'm sorry, WWE
21                 served us with several recorded presentations
22                 that were made by Dr. Maroon and Chris
23                 Nowinski, and at which other WWE executives
24                 such as Stephanie McMahon, were present, and
25                 this is something that Mr. McDevitt talked
```

1           about earlier.

2                  There was a presentation that WWE alleges

3           that Mr. Singleton attended. Mr. Singleton has

4           testified that he has no memory of attending

5           that and that he did not attend it.  However,

6           that presentation discussed concussions and the

7           risks associated with concussions for about

8           five minutes.

9                  Dr. Maroon had given a presentation, I

10          think, in 2010, that was at least an hour long,

11          that exclusively discussed concussions and the

12          risks -- and the long term risks of concussions

13          and CTE.  When he was deposed about the

14          significant difference in length of those two

15          presentations, he testified that there was

16          significant information omitted from the second

17          five-minute presentation on concussions and

18          that it was only intended as a supplement of

19          the previous lengthy presentation that we know

20          Singleton, Mr. Singleton didn't attend.  That

21          was only given to the main roster.

22                 So, here, when we're talking about who

23          stated that WWE wrestlers with diagnosed brain

24          trauma did not receive these injuries as a

25          result of wrestling for WWE, we're referring

1          to, perhaps, this -- we're referring to these

2          presentations that were made by WWE to its

3          wrestlers, and statements that were made by

4          people such as Chris Nowinski and Stephanie

5          McMahon at those presentations.  And I can tell

6          you they came to our attention when they were

7          served, and they came to plaintiffs' attention

8          when they were served on us.

9               THE COURT:  All right.  And is there a

10         specific statement that you would have to

11         identify in answering these questions or a

12         specific failure in the --

13              MS. VAN DYCK:  I'm sorry?

14              THE COURT:  In looking at the

15         interrogatory itself, the date, place, and

16         persons making such a statement, and how and

17         when it first came to your attention.  So I

18         take it, again, on the statement, you say it's

19         an omission, so there is no statement?

20              MS. VAN DYCK:  There is no statement,

21         correct.  And then at these presentations that

22         were made, the statements were grossly

23         inadequate.  And the date would have been

24         identified because we specifically -- we've

25         discussed the recordings and those recordings

1          have date stamps on them.  So, there would be

2          dates and speakers with respect to those

3          recordings.

4               THE COURT:  Okay.  Can we jump back to

5          number 6, please.

6               MS. VAN DYCK:  Yes, your Honor.

7               THE COURT:  So how do you respond to

8          Attorney McDevitt's argument that the response

9          to this one was inadequate?

10               MS. VAN DYCK:  Your Honor, the problem

11          we're having here is that Mr. Lograsso didn't

12          receive treatment and was not diagnosed while

13          he was wrestling for WWE.  He went to Dr. Rios

14          after wrestling matches and he complained of

15          symptoms and was simply given B-12 shots.  So,

16          he was never technically diagnosed with a

17          concussion.  So, that's why we're struggling

18          with identifying the onset of the dates.  Mr.

19          Lograsso had a long wrestling career.  We've

20          identified the symptoms, but frankly, your

21          Honor, we have had trouble identifying the

22          dates when they onset because they occurred

23          over a long period of time.  That's what we've

24          tried to convey here.

25               THE COURT:  Well, do you take the position

1          that the medical records that were produced

2          actually identified specific symptoms, other

3          than the hearing loss?

4               MS. VAN DYCK:  Yes, your Honor.

5               THE COURT:  That are consistent with the

6          concussion symptoms?

7               MS. VAN DYCK:  The ones we've produced do

8          discuss the symptoms, yes, your Honor.  I

9          believe they do.  I want to be clear.  I

10          haven't looked at them closely in some time,

11          but I believe they do.

12               THE COURT:  So wouldn't you have an

13          obligation though to identify for them where

14          those symptoms are stated in the records, as

15          opposed to saying, "see the records, find it

16          yourself"?

17               MS. VAN DYCK:  If your Honor -- if your

18          Honor is telling me that, I'm happy to go back

19          and amend these to do that.

20               THE COURT:  Well, I'm not telling you

21          anything.  I'm just asking you, you have an

22          interrogatory question that -- I guess my

23          question is if you're turning over the records,

24          don't you have some obligation, rather than to

25          generally tell him to just look at the records

1          that have been produced to identify where in

2          the records he can find the answers to the

3          questions that he's asked in the interrogatory?

4                MS. VAN DYCK:  I understand what you're

5          saying, and perhaps we could have been more

6          precise, and maybe we should have been more

7          precise, and I'm happy to go back and correct

8          that.

9                THE COURT:  Thank you.

10               MS. VAN DYCK:  Okay.  I turn next to

11         Lograsso interrogatory number 12 and Singleton

12         interrogatory number 13.

13               With respect to Mr. Lograsso's response,

14         I think that this is precisely what you and I

15         just discussed with respect to another

16         interrogatory that states that, WWE never

17         discussed the importance or relevance of the

18         study to his career or his short and long term

19         health.  And I think that's completely in

20         compliance with Judge Bryant's order that we

21         state when we can't identify something.  That's

22         what we've done here.  WWE -- and that's what

23         -- and that's consistent with what Mr. Lograsso

24         testified to.  WWE didn't tell him about it.

25         He doesn't know anything about it.  And that's

1          consistent with a fraud by omission claim.

2                    THE COURT:  Okay.

3                    MS. VAN DYCK:  And again, with

4          Mr. Singleton, it's the same thing.  He has no

5          specific information relevant to this and has

6          no recollection of the specific instances.

7                    So, again, Mr. Singleton is explicitly

8          stating here he does not know.  He was never

9          told about it.  That's consistent with his

10         deposition testimony.  And we can't give

11         information, as Mr. McDevitt has pointed out,

12         that our clients don't have.  We can't invent

13         our clients' knowledge about WWE discrediting

14         Dr. Omalu, and I think that we've properly

15         responded in that context here.

16                    THE COURT:  All right.

17                    MS. VAN DYCK:  Here we have Lograsso

18         interrogatory number 15.  Identify in detail

19         who at WWE criticized the legitimate scientific

20         studies as alleged in the second amended

21         complaint, and when that came to your

22         attention.

23                    Again, we've referred them to

24         publications that we served on them.  I think

25         that that's proper.  We served them with a

1              number of publications where WWE is discussing

2              CTE.  We've referred them to Dr. Maroon's

3              public statements.  We've referred them to

4              Christopher Nowinski's published book.  And

5              I'll say that that phrase right there regarding

6              Christopher Nowinski's book is perhaps

7              inartfully worded.  I think the point there is

8              there was a book that was published and WWE

9              criticized the book and downplayed it.  And

10             that is inartfully worded.  I'll acknowledge

11             that, your Honor.

12                  Additionally, plaintiff --

13                  THE COURT:  Right.  But do you tell them

14             where WWE supposedly criticized and downplayed

15             the book?

16                  I believe those are on the publications we

17             served on them.  I'd have to go back and check,

18             your Honor.

19                  THE COURT:  But again wouldn't you need to

20             answer the interrogatory by telling them that?

21             I mean it gets to, I guess, from what I'm

22             hearing and from what I've read there is sort

23             of this it's out there in the documents.  But

24             you've got an obligation, especially in light

25             of Judge Bryant's ruling, to have told them

1       where in the documents it is, as opposed to,

2       find it yourself, it's out there somewhere.

3       And that, I guess, I find a little bit

4       frustrating because when I was in practice, I

5       used to specifically tell them if I'm producing

6       documents, it's on page six of the document I

7       produced.  If there's a false statement or a

8       misleading statement in Head Games, see chapter

9       six, page 59, there it is, congressional

10      testimony on such and such a day, see page 48,

11      as opposed to it's there.

12           MS. VAN DYCK:  I think that's fair, your

13      Honor.  And as was -- when we discussed

14      earlier, I'm happy to go back and correct that.

15           THE COURT:  Okay.

16           MS. VAN DYCK:  And with respect to

17      Mr. Singleton's response to interrogatory

18      number 16, again, this is one where we stated,

19      as Judge Bryant ordered, that he has no

20      recollection of a specific person who

21      downplayed the risk.  So, if he doesn't have a

22      recollection, I can't create one.  I think this

23      one is consistent with her order.

24           THE COURT:  Okay.  I think the defendants

25      would argue that the correct answer to that is

1          none, because how does he rely on something

2          that -- it's been pled that they downplayed the

3          risk.  Theoretically the fraudulent omission is

4          we relied on the downplaying of the risk.

5          Wouldn't you need to establish that they

6          downplayed the risk?  That's part of your

7          fraudulent omission claim, they relied on the

8          downplaying of the risk?

9               MS. VAN DYCK:  I think -- again, here it

10          specifically -- it says that.  He has no

11          recollection of the person who downplayed the

12          risk.  Instead WWE simply omitted all of that

13          information and failed to inform him of any of

14          the studies or the risks.

15               THE COURT:  Okay.

16               MS. VAN DYCK:  All right.  So now we have

17          Lograsso interrogatory number 16.  Identify all

18          alleged omissions or misrepresentations made by

19          WWE to you for each and then detail the

20          specific statement or omission.

21               Now with this one I think it was proper

22          to limit it to all alleged omissions.  We don't

23          have a misrepresentation claim.  And we have

24          not -- it's correct that we didn't identify

25          specific dates.  This one, again, we stated

1          that WWE provided medical care to Mr. Lograsso

2          and that he understood that they would provide

3          him medical care and treatment for in-ring

4          injuries.  I think that we gave a much more

5          detailed answer here.  We simply were unable to

6          provide exact dates.

7               THE COURT:  Okay.  Keep going, please.

8               MS. VAN DYCK:  And again, here, we gave a

9          much more detailed answer.  We simply didn't

10         provide exact dates.  For instance, Mr.

11         Singleton has consistently alleged throughout

12         this litigation that his trainer, Bill DeMott,

13         encouraged him to wrestle after suffering

14         injuries and failed to warn him of the risks of

15         injuries.  It also failed to educate him and

16         the developmental roster in the same way it

17         educated its main roster.

18              And its main roster, your Honor, to be

19         clear, are wrestlers who appear on the

20         televised programs that you see on networks

21         such as USA.

22              THE COURT:  All right.

23              MS. VAN DYCK:  I believe that covers all

24         of the interrogatories that WWE is complaining

25         about.  Now, I've offered to -- I've suggested

1              that some of these responses could be revised.

2              And to the extent the court thinks that is

3              necessary, we're happy to do that.

4                   Unfortunately, WWE sat on these responses

5              for almost two months.  They had them for 55

6              days before they filed their motion for

7              sanctions.  They waited until after the summary

8              judgment briefing was complete, and I think

9              that that's put us all in an awkward position.

10             Had they raised it sooner, it would have been

11             easier to deal with.  But that's where we are.

12             And we are perfectly willing to go back and

13             correct them to the extent you think is

14             necessary.

15                  With regard to the crime fraud exception,

16             I think it's -- there is no evidence of perjury

17             here, your Honor.  As I discussed, the

18             plaintiffs testified that they had no

19             knowledge, which is illustrative of WWE's

20             failure to educate them.  There's been no

21             showing of probable cause by WWE.  And with

22             respect to perjury, there's no evidence of

23             intent here.  You have to show some willful

24             intent to present false testimony, and that's

25             not what is happening here, your Honor.

1           As we discussed with respect to, for

2      instance, one of the interrogatories, we simply

3      have a different reading of the language than

4      WWE has.

5           Now, WWE cited a host of cases where the

6      crime fraud exception implemented to pierce the

7      attorney-client privilege.  But in each of

8      those cases those dealt with clients who had

9      either been convicted, pled guilty, or already

10     been indicted for the conduct that was the

11     basis of the crime fraud exception it dealt

12     with.

13          In one such case, the client had actually

14     admitted to a federal agent that they had lied

15     under oath.  So, that's the type of extreme

16     circumstance when the crime fraud exception is

17     invoked, and that's simply not the case here.

18     We have inconsistencies in testimony.  We're

19     dealing with discrepancies.  We're dealing with

20     questions of fact and those are all issues for

21     a jury.  It's simply not perjury.

22          THE COURT:  Okay.  Thank you.

23          MR. MCDEVITT:  I think it's important to

24     point out the obvious.  We're not here on a

25     motion to compel.

```
 1              THE COURT:  I understand.
 2              MR. MCDEVITT:  All the arguments that
 3         they're making were made prior to the court
 4         entering the compulsion order and the court
 5         ordered them to answer these and they just
 6         didn't.  And frankly, unfortunately, I have to
 7         say this, much of the argument you just heard
 8         is utter pretext and I'm going to demonstrate
 9         that to you.  I hate having to do it, but it's
10         what's going on here.
11              First of all, your Honor asked a correct
12         question.  These interrogatories are designed
13         to flush out detrimental reliance and ask them
14         about the word "your."  And you heard counsel
15         say, oh, they interpret that to mean them not
16         the plaintiff.
17              Here's the definitions in the
18         interrogatories of the word "your."  You or
19         your shall refer to plaintiff.  Right there.
20         Everybody knows that.  I'm not asking -- the
21         lawyers aren't the ones that were defrauded.
22         The plaintiffs are the ones that are defrauded,
23         and we are trying to find out from them what
24         exactly is it that you contend you were
25         defrauded on.  And as far as omission theories
```

1          go, your Honor, this notion that there can be

2          sort of fraud floating around in the air that

3          somebody can be defrauded about things that

4          they don't know about it, that's not my

5          understanding of fraud by omission.  Fraud by

6          omission, I'll give you my example of it, is,

7          you know, I buy a house from you and you know

8          the house is infested with asbestos and you

9          don't tell me about it, and I buy the house and

10         later I find out that there was asbestos in the

11         house, and you knew it and you chose not to

12         tell me about it, I know then I can say, well,

13         I relied on the absence of there being no

14         asbestos in the house, and he had some

15         obligation to tell me there was asbestos in the

16         house, and because I relied on it, I got hurt.

17         This is nothing like this.  There's a sort of

18         fraud floating through the air somewhere.

19             The second place that she engaged in

20         obvious pretext for the court, quite frankly,

21         is in what she told you about the answer to

22         Singleton 15.  Singleton 15, for example, asked

23         the question:  Identify in detail who at WWE

24         criticized the legitimate scientific studies --

25         I'm sorry, I just want to make sure I'm on the

1              right one.

2                   Identify in detail who at WWE

3        specifically stated that WWE wrestlers with

4        diagnosed brain trauma did not receive these

5        injuries as a result of wrestling for WWE.

6                   A few points about that.  That's not an

7        omission.  That's an allegation of a specific

8        statement that was made by WWE that they

9        supposedly relied on.  That's their words; that

10       we specifically stated that.  And so we asked

11       them, "Who said that to you?"  And what you

12       heard her tell you was -- and they admit

13       there's no answer to it.  And so what they did

14       is what she tells you and she admitted it.

15       That's based -- now she's trying to justify

16       that -- on the basis of tapes they got after

17       they made that allegation.  Those tapes had

18       nothing to do with that allegation.  It wasn't

19       based on that.

20                   What happened was, in the original

21       complaint, they alleged that WWE had never told

22       these people anything about concussion risks

23       and whatnot.  And we showed that was

24       categorically false in discovery.  We sent to

25       them the tapes of Dr. Maroon standing before

1          these men, including Singleton, we believe,

2          talking about the risks of concussion, showing

3          a picture of a brain with CTE to these people,

4          telling them, not hiding it from them, putting

5          it right there.  This is CTE.  This is the risk

6          of things.  That's why you need to report when

7          you get a concussion, etcetera, etcetera.  And

8          asked them, your allegation that we don't tell

9          these people anything is false.  You're going

10         to withdraw the lawsuit?  Well, no, they're not

11         going to withdraw the lawsuit.  And then

12         Singleton shows and he doesn't remember.  He

13         doesn't remember going there.  I don't remember

14         if I saw it.  I can't remember anything.  But

15         the allegation was made something different to

16         that.  And they couldn't have been relying on

17         those tapes for the allegations because they

18         didn't even have those when they made that

19         allegation.  That's utter pretext to say

20         they're referring to the tapes.  The tapes

21         don't have any statement by anybody.  And

22         Dr. Maroon -- they don't contend that

23         Dr. Maroon makes the statement in question

24         that, quote, WWE wrestlers with diagnosed brain

25         trauma did not receive these injuries as a

1        result of wrestling for WWE.  That was the

2        question they were to answer.  That was to saw

3        how it came to your attention, meaning the

4        plaintiffs and they didn't answer, and they

5        still haven't answered it.  It's not in those

6        tapes.  It's not been said by anybody, and this

7        is what happens.

8              They make these allegations.  We spend so

9        much time and money, the court spends so much

10       time on it, just trying to get a simple answer

11       to a simple question.  Who said that?  And what

12       you get is pretext in response when you ask the

13       question.

14             Going back to some of the other things

15       that Ms. Van Dyck said.  She opened by saying

16       that Mr. Singleton disputes going to that

17       presentation.  I don't think that's an accurate

18       statement.  A dispute is when Mr. Singleton

19       testified I did not go to that meeting.  He

20       doesn't say that.  What he says is I don't

21       remember.  I don't remember if I went or not.

22       I can't recall.  That's a big difference

23       between saying I dispute going to the meeting.

24       And as I indicated to you, part of our summary

25       judgment submission has a tweet under his

1           handle, Twitter, that very day of the meeting

2           saying, "thank you WWE for the information."

3           We think he was there and he's lying and saying

4           he wasn't there.  But nevertheless to say he

5           disputes is a mischaracterization.  He doesn't

6           dispute it.

7                As far as prejudice goes, your Honor, how

8           is any party, when you stop to think about our

9           system of justice, how is any party not

10          prejudiced by perjury?  It goes to the whole

11          essence of why we're here.  Perjury taints

12          everything about this case.  And it's been

13          present.  Mr. Lograsso was caught dead to

14          rights perjuring himself about the whole

15          episode with hitting his head on a chair or

16          hitting his head on the steps, which we told

17          him was false.  We bring him into a room, and

18          we play the tape for Mr. Lograsso, the one

19          where he says he injured his head by hitting

20          his head on a steel chair, completely false.

21          Shows it's false, has him admit that it was

22          false.  So perjury has been in this case in

23          more ways than one.

24               In terms of going through some of these

25          specifics, with number 14 and number 15, she

1          says, she didn't interpret that to be directed

2          to the plaintiffs.

3                Well, again, that's the "your" thing that

4          we talked about.  It's obvious what we're

5          trying to do is find out the detrimental

6          reliance.  Your questions were, quite frankly,

7          right on the money.  That's exactly what we're

8          trying to do is nail down what was going on.

9          And if you look at it closely there's just no

10         answer to the question.  There still is no

11         answer to the question.

12               The question essentially is, in 14, it

13         says:  Who was it that said this people with

14         brain trauma didn't receive those injuries as

15         wrestlers?

16               Can you answer that question as you sit

17         there, your Honor?  Can you get the answer from

18         reading this interrogatory?  What human being

19         said that?  No.  And the answer --

20               THE COURT:  The question to me, I assume,

21         it's a rhetorical question.

22               MR. MCDEVITT:  Well, they are, your Honor.

23         But really, I mean, in fairness, you should be

24         able to read that answer to the

25         interrogatories, know, as a jurist, what person

1           from WWE said that.  You can't tell that from
2           that answer.  I can't tell that from that
3           answer, and we're two years into this litigation.
4                With respect to what she said about 15,
5           I've already covered that.
6                You asked about Lograsso number 6.  And
7           by the way, all these offers of, oh, we'll fix
8           that, we'll change that, that's what they said
9           during the original meet-and-confer conference
10          when they filed these answers.  And we pointed
11          all these things out to them.  You haven't
12          identified anybody.  Oh, we'll fix that.  And
13          they didn't then.  And after the judge orders
14          them to fix it, they didn't then.  And now here
15          we are and they come and say, oh, we could have
16          done better.  We could've answered those
17          questions.  They didn't answer those questions
18          because there is no answer to the questions.
19          The allegations were false to begin with, and
20          they didn't want to admit it.
21               And with respect to Lograsso number 6,
22          The one you were questioning about the
23          symptomology, there's no dispute.  They didn't
24          change a word.  It's exactly the same answer.
25          They didn't give any answer whatsoever to it.

1            And the reason has nothing to do with confusion
2            about the records.

3                What they did in this case is we asked
4            them to produce the medical records, and they
5            wouldn't.  They didn't produce any.  We had to
6            go out and incur the cost of subpoenaing all
7            these medical records of these people.  And in
8            a perversity, at the end of the discovery
9            period, they asked us to turn over to them
10           their own clients' medical records, which they
11           were supposed to be getting and giving to us,
12           which Judge Bryant denied because it was their
13           responsibility to get them anyway.  We have the
14           medical records.  And the problem for
15           Mr. Lograsso is all these claims that oh, he
16           has this and he has that, when you look at the
17           medical records, there's medical records that
18           cover these time periods, they don't say
19           anything like that.  They can't designate a
20           medical record that says he has memory losses
21           and such and such because there are none, and
22           that's why they try to hide this.  Exactly what
23           you just said, just sort of just throw out
24           there that it's somewhere, it's somewhere in
25           there.  It's designed to hide the fact it isn't

1           in there, and that's why they do this kind of

2           stuff.

3                 With respect to 12 and 13, again, the

4           question, your Honor, in item 12 is

5           straightforward:  What was done by WWE to

6           discredit these studies?

7                 And that's the Terry Long stuff.  That's

8           the Terry Long study.  That's specific to that.

9           That's the one I showed you that the judge

10          already said was false.  We didn't do that, and

11          she's standing up here telling you they'll

12          correct the answers -- well, they can't because

13          it's false.  They know that by now.  They have

14          judicial opinions that say that that's false.

15                Lograsso 15, that she was trying to

16          justify, same thing:  When did all this come to

17          your attention?  There's no answer to that,

18          said they would correct it, same stuff.  In

19          short, your Honor, all of these explanations

20          that they give you, if you really look at the

21          question, and you really look at the answer,

22          they simply can't answer because there is no

23          answer to these.  They've been caught dead to

24          rights fabricating allegations that they can't

25          back up is what's going on here.

1              And in terms of the crime fraud

2      exception, I think that her statement about

3      crime fraud is incorrect.  A lot of the law on

4      the Second Circuit -- I've litigated crime

5      fraud exception before the Second Circuit.  I

6      know a little bit about it.  And under the

7      Zolin test if there's a prima facie case made

8      up of a crime, the court has ample authority to

9      in camera ask for the documents that will show

10     you whether or not they actually sent these

11     interrogatory answers to these people to sign

12     under oath before they had them sign a

13     verification.  And for whatever reason, they

14     don't want you to know whether they did or not.

15     And I suspect I know the answer is because they

16     didn't.  And these people were just basically

17     told to sign these verifications and we send

18     them off.  My guess is these people never read

19     them.  They couldn't read those and sign those.

20             And despite her denial that there's no

21     perjury, I think you heard her say there's

22     inconsistencies in the testimony.  Yeah, when

23     the guy says I don't know Chris Nowinski and I

24     never read his book, and then all of a sudden

25     he's signing a verification saying I somehow

```
1              relied on the book is a basis of fraud.  That's
2              pretty blatant stuff, your Honor.
3                   And in short, your Honor, I would ask
4              that the court grant the relief we've
5              requested.  Thank you, your Honor.
6                   THE COURT:  Thank you.  Anything further
7              for the plaintiffs or are we ready to move on
8              to the other motion?
9                   MS. VAN DYCK:  Nothing further from the
10             plaintiffs, your Honor.  And also Mr. Bloss and
11             I have not entered appearances in Laurinaitis
12             and ask to be excused from that portion of the
13             hearing.
14                  THE COURT:  I didn't hear you.
15                  MS. VAN DYCK:  I'm sorry.  Mr. Bloss and I
16             have not entered our appearances in the
17             Laurinaitis matter and we would like to ask to
18             be excused for the remainder of the hearing, if
19             that's all right.
20                  THE COURT:  Any objection?
21                  MR. MCDEVITT:  No objections, your Honor.
22                  THE COURT:  I have no objection to you
23             leaving but hold on --
24                  MR. KYROS:  Could we take a short recess?
25                  THE COURT:  We'll take a short recess in
```

```
1              sixty-seconds or we can take that short recess
2              now, but don't leave.  If you can come back
3              from the brief recess.  So we'll take a
4              five-minute recess.  I will ask that the two of
5              you stay just for a moment.  I want to see if I
6              have one follow-up question for you.  If not,
7              you're free to go.
8                   Court is now in recess.  Five minutes.
9
10             (Recess:  3:37 p.m. to 3:44 p.m.)
11
12             THE COURT:  Attorney Bloss and
13        Attorney Van Dyck, thank you for sticking
14        around.  I've decided that you can leave now.
15        I appreciate you sticking around.  I don't have
16        the follow-up question I thought I might have,
17        so, you are excused.
18             MS. VAN DYCK:  Thank you, your Honor.
19             MR. BLOSS:  Thank you, your Honor.
20             THE COURT:  All right.  Are we ready to
21        proceed on motion number 2?
22             MR. MCDEVITT:  Your Honor, could I inquire
23        how long the court plans to go tonight?  I know
24        we obviously badly underestimated how long this
25        was going to take, and I apologize to your Honor.
```

```
1              THE COURT:  I was thinking we'd go until
2         about ten till five.
3              MR. MCDEVITT:  That's roughly 55 minutes
4         from now, your Honor.  I think it's going to be
5         tight to get this done, especially with their
6         answer, in 55 minutes.  But whatever the court
7         wants to do.
8              THE COURT:  Well, let me ask the parties
9         their preference.  If we don't finish today,
10        when are we coming back?  I've got -- I can try
11        to see when staff can stay or how long they can
12        stay.  I know that my courtroom deputy is going
13        to have to leave before five.  I haven't
14        conferred with the court reporter.
15             MR. MCDEVITT:  I don't know about opposing
16        counsel, whether they have any flights or not.
17        We do.  I mean, mine is 5:45.  There are, from
18        what I understand, some later flights I might
19        be able to get.
20             THE COURT:  So are you asking for an
21        earlier departure than 4:50?
22             MR. MCDEVITT:  Well, if I could catch that
23        flight, I wouldn't mind, your Honor.  And as
24        far as rescheduling, again, I can come back as
25        soon as the court can find a hole in the
```

1          schedule if you want to do that to present this

2          argument.

3               I'm fully ready to do it.  I just think

4          it's going to take a little bit longer than 55

5          minutes for everybody to present their

6          situation to you.

7               THE COURT:  Okay.

8               MR. BOUMIL:  Your Honor, our defense of

9          the second motion would be divided between two

10         counsel.  And I've seen Attorney McDevitt and

11         his thoroughness in his presentation, so I

12         respectfully suggest that the likelihood that

13         we will finish before the appointed hour is

14         minuscule.  And I, for one, would like to see

15         the whole thing done at once.  And therefore,

16         although I come -- it's cost me a 200 mile

17         round trip, there's no flights involved, so I'm

18         not as inconvenienced as the others, but I'd be

19         happy to come back at a time convenient for

20         everyone to finish this.  I think it's

21         something in which we all have a considerable

22         stake in the outcome.  It's something in which

23         people's reputations before the Bar are at

24         stake, and it's something, therefore, we would

25         like to be argued thoroughly and without having

```
1                to rush through it.
2                     THE COURT:  Well, I am fine if everybody
3                wants to conclude for the day and come back on
4                another day for the entire argument.  I am fine
5                if you want to start now and we go until we get
6                to a finishing point, either way.  This seems
7                to be a rare area where you guys seem to be on
8                the same page and in agreement.  So I'm happy
9                to encourage that Kumbaya kind of thing.  I'll
10               let you decide what we do.
11                    MR. MCDEVITT:  I would tend to agree, your
12               Honor.  I'd rather do it all at one time.
13                    THE COURT:  So why don't we conclude for
14               the day and find a date that works on the
15               calendar for everybody.
16                    MR. MCDEVITT:  Do you want us to get our
17               calendars out now, your Honor?
18                    THE COURT:  Yes.  The complication is
19               we're not in my courtroom.  We're in Judge
20               Thompson's courtroom, so my schedule is not in
21               front of me.  Sounds like we might be able to
22               do it here.  We can go off record.
23
24                    (Off the record discussion was held.)
25
```

1               THE COURT:  So let's do March 9th at one

2          o'clock and we'll try to get the same

3          courtroom.  This is Judge Thompson's courtroom.

4          I don't know what his calendar looks like but

5          we will find a courtroom, I'm sure.

6               MR. MCDEVITT:  Appreciate it, your Honor.

7          Thank you very much for your patience.

8               THE COURT:  All right.  Anything further?

9          Court is now in recess.  Thank you all.

10

11               (Concluded:  3:52 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       CERTIFICATE

2

3          I hereby certify that the foregoing 154

4    pages are a complete and accurate computer-aided

5    transcription of my original stenotype notes

6    taken of the proceedings, which were held in re:

7    Russ McCullough, Et Al versus World Wrestling

8    Entertainment, held before the Honorable Robert

9    A. Richardson, USDC Magistrate Judge, U.S.

10   District Court, 450 Main Street, Hartford,

11   Connecticut on March 2, 2017.

12

13

14          /s/Irma Sanchez-Farnham

15          IRMA SANCHEZ-FARNHAM
               Court Reporter
16

17

18

19

20

21

22

23

24

25