UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RUSS McCULLOUGH, *et al.,* | : | No. 3:15-cv-01074 (VLB) |
| | : | Lead Case |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| WORLD WRESTLING | : | |
| ENTERTAINMENT, INC., | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| EVAN SINGLETON and VITO | : | No. 3:15-cv-00425 (VLB) |
| LOGRASSO, | : | Consolidated Case |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| WORLD WRESTLING | : | |
| ENTERTAINMENT, INC., | : | |
| | : | |
| Defendant. | : | April 14, 2017 |

DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S
<u>REDACTED LOCAL RULE 56(a)(1) STATEMENT</u>

Pursuant to Rule 56(a)(1) of the Local Rules of the United States District
Court for the District of Connecticut, Defendant World Wrestling Entertainment,
Inc. ("WWE") hereby sets forth a concise statement of each material fact as to
which it contends there is no genuine issue to be tried.

I.      <u>Media Coverage of Reported Diagnoses of CTE in Benoit and Martin</u>

1.      Plaintiffs' counsel, Katherine Van Dyck, stipulated that the Court can
consider the print and electronic media articles attached to WWE's First Set of
Requests for Admission to LoGrasso and Singleton (the "RFAs") demonstrating

extensive media coverage from 2007 through 2011 reporting that Chris Benoit, a former WWE performer, had CTE caused by head trauma sustained while wrestling and from 2009 through 2011 that Andrew Martin, another former WWE performer, reportedly also had CTE.  (Doc. 317 at 5; Exhibits to WWE's First Set of RFAs to LoGrasso & Singleton, App. Tab 1).[1]

## II.   Facts Pertinent to Plaintiff LoGrasso

### A.   LoGrasso Never Sought Or Received Treatment For A Head Injury

2.   ████████████████ CONFIDENTIAL ████████████████
████████████████████████████████████████████
████████████████████ (LoGrasso Depo. Ex. 19, App. Tab 2).

3.   ████████████████ CONFIDENTIAL ████████████████
(LoGrasso Depo. at 339:8-9, App. Tab 3; WWE-SING00000305-06, App. Tab 4).

4.   ████████████████ CONFIDENTIAL ████████████████
████████████████████████████████████████████
████████████████████ (Levesque Depo. at 104:9-18, App. Tab 5; S. McMahon Depo. at 16:13-19, 96:24-97:12, App. Tab 6).

5.   LoGrasso admitted that Dr. Rios was not his personal physician. (LoGrasso Depo. at 194:18-195:2, App. Tab 3).

6.   LoGrasso admitted that Dr. Rios was a good doctor.  (LoGrasso Depo. at 377:11-14, App. Tab 3).

7.   ████████████████ CONFIDENTIAL ████████████████
████████████████████████████████████████████

---

[1] "App. Tab _" refers to exhibits attached to the Appendix filed concurrently herewith.

██████████████████ CONFIDENTIAL ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████ **(Declaration of John**

**Laurinaitis, App. Tab 7).**

8.      **LoGrasso admitted that he had his own personal physician, Dr.**

**Jeffry Tambor, during the entirety of the time that he performed for WWE.**

**(LoGrasso Depo. at 190:23-191:20, App. Tab 3).**

9.      ███████████████ CONFIDENTIAL ███████████████

████████████████████████████████████████ **(Levesque**

**Depo. at 156:12-19, 170:2-18, App. Tab 5; S. McMahon Depo. at 14:16-15:11, App.**

**Tab 6; V. McMahon Depo. at 9:17-22, 36:4-37:21, 41:14-23, App. Tab 8).**

10.     **While performing for WWE, LoGrasso never told Dr. Rios that he**

**suffered a head injury in a match.  (LoGrasso Depo. at 319:8-15; 376:7-9, App. Tab**

**3).  Similarly, LoGrasso never had Dr. Rios examine him for a specific head injury**

**that LoGrasso reported to him.  (LoGrasso Depo. at 58:14-59:15, App. Tab 3).**

11.     **LoGrasso never once told Vince McMahon that he thought he had a**

**head injury in a match.  (LoGrasso Depo. at 375:24-376:2, App. Tab 3).**

12.     **LoGrasso never once told Stephanie McMahon that he thought he**

**had a head injury in a match.  (LoGrasso Depo. at 375:19-23, App. Tab 3).**

13.     **LoGrasso never once told WWE Senior Vice President of Talent**

**Relations, John Laurinaitis, that he thought he had a head injury in a match.**

**(LoGrasso Depo. at 376:3-6, App. Tab 3).**

14.     **LoGrasso admitted that he "never received medical treatment from**

WWE or WWE's Talent Wellness Program" before or after he was released by WWE for the head injuries he now claims to have sustained.  (Response to Interrogatory No. 5 of LoGrasso's Supplemental Objections and Responses to WWE's First and Second Set of Interrogatories ("LoGrasso Supp. Irog Resp. No."), App. Tab 9).

15.     In the Second Amended Complaint ("SAC"), LoGrasso only identified one specific match in which he now claims to have sustained head trauma, specifically, a match with Steven Regal which LoGrasso originally claimed took place in September 2006.  LoGrasso originally claimed that "he struck his head against concrete steps."  SAC ¶ 134.

16.     In subsequent interrogatory responses, LoGrasso identified five specific matches in which he now claims to have suffered traumatic brain injury ("TBI").  (LoGrasso Supp. Irog Resp. No. 1, App. Tab 9).

17.     LoGrasso admits that he "did not seek or receive any treatment" for a head injury following any of the five WWE matches identified in LoGrasso's interrogatory responses in which he now claims to have suffered a traumatic brain injury.  (LoGrasso Supp. Irog Resp. No. 2, App. Tab 9).

18.     Following the match with Regal in which LoGrasso claimed to have hit his head on steps, LoGrasso admits he did not report any head injury at all.



CONFIDENTIAL

(LoGrasso Supp. Irog Resp. No. 1, App. Tab 9; LoGrasso Depo. Ex. 21, App. Tab 10).

19.     In his deposition, LoGrasso initially swore under oath that he

suffered a head injury in his match with Regal from his head supposedly hitting the steps leading to the ring and that this injury was the onset of his alleged symptoms of traumatic brain injury including headaches. (LoGrasso Depo. at 35:5-37:15, 205:1-206:15, App. Tab 3). However, LoGrasso later admitted in his deposition that his head never actually hit the steps when showed slow motion footage from that match. (LoGrasso Depo. at 209:19-212:15, App. Tab 3; DVD depicting slow motion footage from 10/10/06 match, App. Tab 11).

20.     After a match on August 29, 2006, which is another of the five matches identified by LoGrasso in which he now claims that he sustained an unreported TBI, he also spoke to Dr. Rios thereafter.  ████████ CONFIDENTIAL ████████

████████████████████████████████████████████████

██████████████████████████ (LoGrasso Depo. at 224:19-225:24, App. Tab 3; LoGrasso Depo. Ex. 21 at WWE_SING00000518, App. Tab 10).

**B.      LoGrasso Regularly Received Blows to the Head From Chairs and Other Objects While Performing In Other Wrestling Promotions Before Coming to WWE, But Not In WWE**

21.     Prior to performing for WWE under the LoGrasso Booking Contract, LoGrasso performed for Extreme Championship Wrestling ("ECW") and World Championship Wrestling ("WCW"). (LoGrasso Depo. at 38:3-19, App. Tab 3).

22.     LoGrasso repeatedly received blows to the head from chairs and other objects while performing in ECW and WCW. (Affidavit of George Germanakos ("Germanakos Aff."), App. Tab 12 at ¶¶ 5-6); LoGrasso Depo. at 163:15-166:20, 176:7-14, App. Tab 3).

23.     LoGrasso has known since 1999 that a famous wrestler named Bret

Hart was forced to retire after suffering a concussion in the WCW Starrcade show in December 1999.  (LoGrasso Depo. at 49:8-14, 51:9-16, App. Tab 3).

24.    LoGrasso also wrestled in the December 1999 Starrcade event and watched the match in which Bret Hart sustained a career-ending concussion from a kick to the head.  (LoGrasso Depo. at 52:7-23, 65:6-25, App. Tab 3).

25.    LoGrasso admitted that what happened to Bret Hart at the December 1999 WCW Starrcade show was big news in the wrestling business.  (LoGrasso Depo. at 54:4-10, 67:11-24, App. Tab 3).

26.    When asked in his deposition how he knows that the symptoms he is now claiming were not caused by receiving blows to the head from chairs and other objects while performing in ECW and WCW, LoGrasso admitted "[n]obody knows, I don't know."  (LoGrasso Depo. at 177:15-20, App. Tab 3).

27.    LoGrasso admitted that "[d]uring my time at WWE, I did not take any chair shots."  (LoGrasso Depo. at 265:24-266:4, App. Tab 3).

**C.    LoGrasso Has Asserted Differing Claims Of When His Alleged Symptoms Began But, Regardless, It Is Undisputed That He Never Advised WWE Of Any Such Symptoms Or Received Medical Treatment from WWE After He Was Terminated In 2007**

28.    ███████████████████ CONFIDENTIAL ███████████████████

███████████████████████████████████ (LoGrasso Depo. at 140:17-142:4, 144:16-23, App. Tab 3; Brandywine050416_000020-37, 68-83, App. Tab 13; OpenMRI_032316_000002-3, App. Tab 14).

29.    In the SAC, filed on June 15, 2015, LoGrasso initially claimed that "[b]y 2008, [he] was showing symptoms of neurological injury in the form of residual, pounding headaches."  (SAC at ¶ 140).

30.     In subsequent interrogatory responses, LoGrasso claimed that his alleged "symptoms have been chronic since the time of their inception in approximately 2007." (LoGrasso Supp. Irog Resp. No. 6, App. Tab 9).

31.     Still later, LoGrasso testified on May 18, 2016 that his symptoms started after he supposedly suffered a head injury in the aforementioned match against Regal from his head supposedly hitting the steel steps.  (LoGrasso Depo. at 35:5-37:15, 205:1-206:15, App. Tab 3).  But LoGrasso was forced to admit later in his deposition when showed slow motion footage from that match that his head never hit the steps.  (LoGrasso Depo. at 209:19-212:15, App. Tab 3).

32.     LoGrasso admitted that he did not have any communications with WWE about symptoms of traumatic brain injury after he last performed for WWE in 2007.  (Response to Request No. 7 of WWE's First Set of RFAs, App. Tab 15).

33.     LoGrasso admitted that WWE has not provided any kind of medical care to him since he left WWE.  (LoGrasso Depo. at 279:3-6, App. Tab 3; Response to Request No. 8 of WWE's First Set of RFAs, App. Tab 15).

34.     LoGrasso "does not believe that he received any medical treatment from or as a result of WWE's Talent Wellness Program."  (LoGrasso Supp. Irog Resp. No. 5, App. Tab 9).

35.     

(Levesque Depo. at 142:2-6, App. Tab 5; V. McMahon Depo. at 227:2-228:6, App. Tab 8; S. McMahon Depo. at 132:12-16, 133:11-15, App. Tab 6).

36.     The only written communications that LoGrasso has received from

WWE since he left WWE are annual letters in which WWE offers to pay for drug or alcohol rehabilitation if needed by a former performer.  (LoGrasso Depo. at 277:10-279:12, App. Tab 3; WWE_SING00000507, App. Tab 16; WWE_SING00000508, App. Tab 17; WWE_SING00000509-10, App. Tab 18; WWE_SING00000511, App. Tab 19).



37.  CONFIDENTIAL

(Levesque Depo. at 153:8-154:14, App. Tab 5; S. McMahon Depo. at 132:12-133:15, App. Tab 6; V. McMahon Depo. at 227:2-228:6, App. Tab 8).

38.  CONFIDENTIAL

(LoGrasso Depo. Ex. 3, App. Tab 20; LoGrasso Depo. at 92:25-93:19, App. Tab 3).

**D.    During the Time that LoGrasso Performed for WWE Between 2005-2007, WWE Had No Knowledge Of Any Reports Linking Concussions with Long-Term Degenerative Neurological Diseases**

39.  CONFIDENTIAL

(Levesque Depo. at 173:12-174:3, App. Tab 5; S. McMahon Depo. at 51:3-11, App. Tab 6; V. McMahon Depo. at 22:12-22, 117:8-118:1, App. Tab 8).

40.    There is no evidence that WWE had knowledge of the 2005 Mayo Clinic web page referenced in paragraphs 28-30, and 56 of the Plaintiffs' SAC.

(App. Tab 21).

41.    During discovery, Plaintiffs' Counsel did not even ask any of the WWE witnesses if they knew of the 2005 Mayo Clinic article.

42.    The 2005 Mayo Clinic article says nothing about long-term neurodegenerative diseases caused by repetitive head traumas.  (App. Tab 21).

43.    ███████████████ CONFIDENTIAL ███████████████

████████████████████████████████████████████████

███████████████████████    (S. McMahon Depo. at 75:22-76:2, App. Tab 6).

44.    Dr. Omalu's sentinel findings of CTE in an NFL player, Mike Webster, were published in July 2005 in an article in Neurosurgery.  The article did not mention professional wrestling, and its conclusions were limited to the NFL.  In that regard, the 2005 article stated "[t]his case study by itself cannot confirm a causal link between professional football and CTE"; it then went on to conclude that it "constitutes a forensic epidemiological sentinel case that draws attention to a possibly more prevalent yet unrecognized disease because of the rarity of CNS-targeted autopsies in the cohort of retired NFL players."  (App. Tab 22).

45.    LoGrasso admitted that there was no talk about CTE in WWE's locker rooms in 2005.  (LoGrasso Depo. at 231:18-20, App. Tab 3).

46.    LoGrasso admitted that there was no talk about CTE in WWE's locker rooms in 2006.  (LoGrasso Depo. at 232:9-11, App. Tab 3).  LoGrasso does not recall any WWE wrestlers or WWE management talking about CTE in 2006. (LoGrasso Depo. at 232:12-17, App. Tab 3).

47.    On or about June 24, 2007, Chris Benoit, who was a WWE performer

at the time, murdered his wife and son, and then committed suicide in a widely

publicized crime. (Exhibit 85 to WWE's First Set of RFAs, App. Tab 1).



48.        CONFIDENTIAL

(Levesque Depo. at 173:12-174:3, App.

Tab 5; S. McMahon Depo. at 51:3-11, App. Tab 6; V. McMahon Depo. at 22:12-22,

117:8-118:1, App. Tab 8; WWE_SING00000550-70, App. Tab 23).

49.        CONFIDENTIAL

(Levesque Depo. at 226:21-228:5, App. Tab 5;

V. McMahon Depo. at 32:7-33:25, App. Tab 8).

50.    On September 25, 2007, WWE's counsel requested certain non-

public information from SLI regarding Chris Benoit's reported diagnosis with

CTE, including evidence of the chain of custody of Chris Benoit's brain.  CONFIDE

(Levesque Depo. at 226:21-228:5,

App. Tab 5; V. McMahon Depo. at 32:7-33:25, App. Tab 8; WWE_SING00000575-78,

App. Tab 24; WWE_SING00000579-83, App. Tab 25; WWE_SING00000584-89, App.

Tab 26; WWE_SING00000590-91, App. Tab 27; WWE_SING00000592-94, App. Tab

28; WWE_SING00000619-20, App. Tab 29; WWE_SING00000621-23, App. Tab 30).

51.    Because LoGrasso was terminated in May 2007, he was no longer

affiliated with WWE at the time of the Benoit murders/suicide in June 2007 or SLI's press conference regarding Benoit's reported diagnosis with CTE in September 2007.  (LoGrasso Depo. at 252:17-253:1, 339:8-10, App. Tab 3).

52.     Dr. Omalu did not publish a peer-reviewed article regarding Benoit until September 2010, when he published an article styled "Chronic Traumatic Encephalopathy in a Professional American Wrestler" in the Journal of Forensic Nursing.  In that report, Dr. Omalu described his presentation as "the first reported case of chronic traumatic encephalopathy (CTE) in a professional American wrestler."  (App. Tab 31).

E.     **LoGrasso Knew Of The Extensive Media Reports Beginning In September 2007 That Chris Benoit Was Diagnosed With CTE, But Did Nothing To Determine the Cause Of His Own Alleged Symptoms**

53.     LoGrasso knew both Chris Benoit and his wife Nancy, and Chris Benoit was a friend of LoGrasso.  (LoGrasso Depo. at 235:15-236:2, App. Tab 3).

54.     LoGrasso admitted that Chris Benoit's murder of his wife and son and subsequent suicide was a huge story in the media and was well-known in the wrestling business.  (LoGrasso Depo. at 236:13-20, 239:6-18, App. Tab 3).

55.     LoGrasso knew it was publicly reported that Benoit had CTE around the time of the murders.  (LoGrasso Depo. at 239:2-5, App. Tab 3).

56.     The various media reports attached to the RFAs describe the alleged clinical symptoms of CTE.  Specifically, the Reuters article entitled "Brain injury, not steroids, seen in wrestler death" published on September 5, 2007 stated "[n]eurologists with the Sports Legacy Institute who examined Benoit's brain found it pockmarked throughout with evidence of chronic traumatic

encephalopathy (CTE) whose symptoms include depression, dementia, and erratic behavior."  (Exhibit 32 to WWE's First Set of RFAs, App. Tab 1).

57.     The Miami Herald article entitled "Benoit diagnosed with brain disorder" published on September 5, 2007 stated "CTE occurs in people who have suffered multiple concussions, commonly manifests as dementia or declining mental ability and Parkinsonism or tremors and lack of coordination.  It can also cause unsteady gait, inappropriate behavior and speech problems."  (Exhibit 33 to WWE's First Set of RFAs, App. Tab 1).

58.      The USA Today article entitled "Brain damage from a game; Former star Primeau knows concussion risks and passes on lessons" published on May 28, 2009 stated "[t]he array of CTE symptoms includes loss of memory, confusion, emotional problems and early-onset dementia."  (Exhibit 69 to WWE's First Set of RFAs, App. Tab 1).

59.     The ABC News article entitled "Chris Benoit's Murder, Suicide:  Was Brain Damage to Blame?" published on August 26, 2010 stated "Benoit was believed to have been prone to insomnia, mood swings, depression and alcohol abuse.  All of these behaviors can be symptoms, doctors say, of brain damage."  (Exhibit 85 to WWE's First Set of RFAs, App. Tab 1).

60.     LoGrasso admitted that he did not visit his personal doctor after hearing about the Benoit reported CTE diagnosis to inquire whether he had anything to worry about. (LoGrasso Depo. at 241:11-242:4, App. Tab 3).

61.     LoGrasso admitted that he could have asked his own personal doctor, Dr. Tambor, any questions he wanted to about headaches, but admitted

he never told Dr. Tambor about getting headaches.  (LoGrasso Depo. at 56:24-57:24, App. Tab 3).

62.     LoGrasso continued to wrestle for other wrestling promotions after he was terminated by WWE in May 2007 during the time that he now claim to have been suffering from alleged symptoms of traumatic brain injury from wrestling. (LoGrasso Depo. at 94:4-7, 265:4-7, App. Tab 3).

63.     LoGrasso cannot identify anything he did in 2008, 2009, 2010, 2011, 2012 or 2013 to determine the cause of the symptoms he now contends he was experiencing in those years.  (LoGrasso Depo. at 261:5-262:6, App. Tab 3).

64.     LoGrasso admitted that WWE did not do anything between 2008 and 2013 to prevent him from discovering the cause of his alleged injuries. (LoGrasso Depo. at 264:16-25, App. Tab 3).

65.     LoGrasso admitted there was no reason between 2008 and 2013 he could not have read or watched public media reports that discussed at length the emerging science about CTE and concussions.  (LoGrasso Depo. at 374:14-25, App. Tab 3).

66.     LoGrasso admitted that he could have read reports of the emerging science about CTE and concussions in the newspapers the same as anybody else.  (LoGrasso Depo. at 375:1-5, App. Tab 3).

67.     LoGrasso admitted that the Chris Benoit that he knew did not have a brain like an 85-year old with dementia, and nobody who knew Chris Benoit would have thought he had dementia or the brain of an 85-year old with dementia. (LoGrasso Depo. at 254:25-255:10, App. Tab 3).

68.     LoGrasso admittedly knew that the deterioration of Muhammad Ali was due to blows to the head, and that one could deduce he had brain damage from blows to the head. (LoGrasso Depo. at 251:15-252:14, App. Tab 3).

F.     **Admissions Of LoGrasso That He Has No Basis To Assert A Claim For Fraud By Omission Against WWE**

69.     LoGrasso admitted he could not identify anyone at WWE who supposedly defrauded him.  (LoGrasso Depo. at 229:21-230:18, App. Tab 3; DVD Depicting Video Excerpts of LoGrasso's Depo., App. Tab 32).

70.     LoGrasso testified that he is not accusing anyone at WWE of trying to defraud him.  (LoGrasso Depo. at 230:13-18, App. Tab 3).

71.     LoGrasso does not have any knowledge that anyone in WWE management ever told Dr. Rios not to tell him something about head injuries or concussions.  (LoGrasso Depo. at 377:15-378:3, App. Tab 3).

72.     LoGrasso never heard anyone in WWE management tell Dr. Rios not to tell him something about concussions.  (LoGrasso Depo. at 377:24-378:3, App. Tab 3).

73.     LoGrasso has no evidence that anybody at WWE ever directed someone in the medical staff to withhold any information from him.  (LoGrasso Depo. at 378:4-13, App. Tab 3).

74.     LoGrasso has no knowledge that anybody at WWE ever told Dr. Rios or the medical staff to lie to him about anything.  (LoGrasso Depo. at 378:9-13, App. Tab 3).

75.     LoGrasso never read any congressional testimony related to the Benoit matter.  (LoGrasso Depo. At 250:9-13, App. Tab 3).

III.    **Facts Pertinent to Plaintiff Evan Singleton**

A.    **Admissions of Singleton that He Knew and Accepted the Risks Inherent in Professional Wrestling**

76.    **Singleton started watching professional wrestling in the late-1990s, and saw wrestlers doing choke slams, power slams, jumping off ladders, and hitting each other over the head with chairs.  In his sophomore year of high school Singleton decided that is what he wanted to do.  (Singleton Depo. at 24:4-25:1, 25:7-22, App. Tab 33).**

77.    **Singleton understood that, in professional wrestling, if you don't perform moves correctly you could hurt yourself or your opponent.  (Singleton Depo. at 29:8-16, App. Tab 33).**

78.    **Singleton specifically knew you could hit your head while wrestling and get injured.  (Singleton Depo. at 163:13-15, App. Tab 33).**

79.    **Singleton also knew that the difference between Muhammad Ali's condition when he was a fighter and later in his life was due to brain injury. (Singleton Depo. at 37:3-17, App. Tab 33).**

80.    ████████████████ CONFIDENTIAL ████████████████ ████████████████  **(Singleton Depo. Ex. 11, App. Tab 34).**

81.    **Singleton performed for WWE under the name Adam Mercer. (SAC ¶ 13).**

B.    **Singleton Was Injured Performing A Move That He Fully Expected To Perform When He Signed Up To Be A Professional Wrestler**

82.    **When doing a "flat back" you are taught to tuck your chin, the same thing you are supposed to do when on the receiving end of a choke slam.**

(Singleton Depo. at 27:9-16, App. Tab 33).

83.      Singleton was told before receiving a choke slam that he would get hurt if he did not tuck his chin.  (Singleton Depo. at 28:6-21, App. Tab 33).

84.      Singleton received a choke slam in a match with Erick Rowan on June 17, 2012.  Singleton executed the flat-back maneuver correctly by tucking his chin and did not get injured from the move.  (Singleton Depo. at 238:5-240:1, App. Tab 33).

85.      Singleton received the same choke slam maneuver in another match against Erick Rowan on September 27, 2007 and claims to have received a concussion when he did so. (Singleton Depo. at 40:19-25, 142:16-143:3, 242:4-243:4, App. Tab 33).

86.      The choke slam maneuver is a common move performed in professional wrestling and one that Singleton had seen performed countless times and one he fully expected that he would perform when he signed up to be a professional wrestler.  (Singleton Depo. at 244:2-15, App. Tab 33).

87.      Singleton knew that if he performed the choke slam maneuver wrong he would get hurt, and admitted that is what happened on September 27, 2012.  (Singleton Depo. at 244:16-25, App. Tab 33).

88.      Singleton knew in advance that the choke slam move was going to be done to him on September 27, 2012.  (Singleton Depo. at 211:9-12, App. Tab 33).

89.      Singleton admitted he got injured doing exactly what he signed up to do and could not explain in his deposition why he is suing WWE after thinking

16

about it for 22 seconds.  (Singleton Depo. at 38:14-18, App. Tab 33; DVD Depicting

Video Excerpts of Singleton Depo., App. Tab 35).

    **C.    After Retaining Dr. Maroon and ImPACT in March 2008, WWE Regularly Provided Information to Its Performers, Including Singleton, Regarding the Risks of Head Injuries**

    **90.**    CONFIDENTIAL

(WWE_SING00000277-97, App. Tab 36; S. McMahon Depo. at 62:10-63:7, 91:15-

91:17, App. Tab 6; V. McMahon Depo. at 105:16-106:1, App. Tab 8; Levesque

Depo. at 129:21-24, App. Tab 5; Maroon Depo. at 8:11-23, App. Tab 37).

    **91.**    CONFIDENTIAL

(Lovell Depo. at 11:5-

10, App. Tab 38).

    **92.**    CONFIDENTIAL

(Lovell Depo. at 24-

27, App. Tab 38).

    **93.**    CONFIDENTIAL

(V. McMahon Depo. at 36:2-37:21, App. Tab 8; Levesque Depo. at 130:24-

131:6, App. Tab 5).

94.   ████████████ CONFIDENTIAL ████████████

████████████████ **(Lovell Depo. at 57:20-59:1, App. Tab 38).**

95.   ████████████ CONFIDENTIAL ████████████

████████████████████████████████

**(Lovell Depo. at 58:3-59:1, App. Tab 38).**

96.   ████████████ CONFIDENTIAL ████████████ **(Lovell**

**Depo. at 63:9-12, App. Tab 38).**

97.   ████████████ CONFIDENTIAL ████████████

**(Maroon Depo. Ex. 18, App. Tab 37)**

98.   ████████████ CONFIDENTIAL ████████████

████████████████████████

████████████████████████████

████████████████ **(WWE_SING00000056-79, App. Tab 39; Levesque**

**Depo. at 129:25-131:6, App. Tab 5; S. McMahon Depo. at 49:20-50:6, App. Tab 6;**

**Lovell Depo. at 58:3-59:1, App. Tab 38).**

99.   ████████████ CONFIDENTIAL ████████████

████████████████████████████

████████ **(V. McMahon Depo. at 188:16-189:5, App. Tab 8).** ████ CONFIDENTIAL ████

████████████████████████

████████████████████████

████████████████████████

████████ **(Maroon Depo. at 161:3-162:2, App. Tab 37).**

**100.** ██████████ CONFIDENTIAL ██████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**(V. McMahon Depo. at 42:16-43:3, App. Tab 8; Levesque Depo. at 137:12-18, App. Tab 5).**

**101.** ██████████ CONFIDENTIAL ██████████

███████████████████████████████████████████████

██████████████ CONFIDENTIAL ██████████████

██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[2] ████████████████ CONFIDENTIAL ████████████████
██████████████████████████████████ █
████████████████████████████████████
██████████████████████████████



CONFIDENTIAL

102.    ██████████████ CONFIDENTIAL ███████████████

████████████████████████████████████████████████

██████████████████████████████████████ **(V. McMahon**

**Depo. at 42:16-43:22, App. Tab 8; S. McMahon Depo. at 106:7-107:12, App. Tab 6;**

**Levesque Depo. at 138:8-24, App. Tab 5).**

103.    ██████████████ CONFIDENTIAL ██████████████

████████████████████████████████████████████████

██████████████████████████████ **(WWE_SING00000096, App. Tab**

**60; DeMott Depo. at 247:24-248:12, App. Tab 61).**

104.    ██████████████ CONFIDENTIAL ██████████████

████████████████████████████████████████████████

███████████ **(WWE_SING00000096, App. Tab 60).** ████ CONFIDENTIAL ████

████████████████████████████████████████████████

███████████████████████████████████ **(DeMott Depo. at**

**247:24-248:12, App. Tab 61).**

105.    Singleton claims not to recall if he attended the August 9, 2012

meeting (Singleton Depo. at 18:1-25, App. Tab. 33).  The Twitter account

@MercerWWE tweeted on August 9, 2012 "Thank You @WWE for giving me the

background."  (Singleton Depo. Ex. 8 at 61, App. Tab 62).  To the best of WWE's

knowledge, the @MercerWWE twitter handle came directly from Evan Singleton.

(Affidavit of Amanda Tustian, App. Tab 63; Affidavit of Rob Naylor, App. Tab 64).

D.    **Singleton Was Never Medically Cleared By WWE To Wrestle After His**
**Alleged Injury on September 27, 2012**

106.    **Prior to September 27, 2012, Singleton was told by a WWE physician**

that he would not be permitted to perform if he received a concussion and remained symptomatic.  (Singleton Depo. at 84:4-85:2, App. Tab 33).

107.   Singleton knew that as long as he continued to report headaches or memory problems or subjective symptomology, he would not be put back in the ring following a concussion.  (Singleton Depo. at 84:23-85:2, App. Tab 33).

108.   Other than the incident on September 27, 2012, Singleton did not report any head injury to WWE doctors or trainers.  (Singleton Depo. at 142:16-24, App. Tab 33; Response to Interrogatory No. 2 of Supplemental Objections and Responses to First and Second Set of Interrogatories, App. Tab 65).

109.   ██████████████ CONFIDENTIAL ██████████████

████████████████████████████████████████████████

(Greenberg021916_000027, App. Tab 66); WWE_SING00000419, App. Tab 67).

110.   ██████████████ CONFIDENTIAL ██████████████

████████████████████████████ (WWE_SING00002236- 37, App. Tab 68; WWE_SING00002243-44, App. Tab 69; WWE_SING00002247- 49, App. Tab 70).

111.   ██████████████ CONFIDENTIAL ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (DeMott Depo. at 112:20-113:12, App. Tab 61).

112.   ██████████████ CONFIDENTIAL ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



**CONFIDENTIAL**

(Lovell Depo. at 189:6-190:2, App. Tab 38).

113.   **CONFIDENTIAL**

(DeMott Depo. at 113:13-114:4, App. Tab 61; Maroon Depo. at 33:8-21, App. Tab 37; Response to Request 2 of WWE's First Set of RFAs, App. Tab 71; Singleton Depo. at 64:25-65:2, 81:23-25, App. Tab 33).

114.   **CONFIDENTIAL**

(Stacy DePolo Affidavit, App. Tab 72).

115.   In the SAC, it was alleged that Singleton sustained an intracranial hemorrhage as a result of the September 27, 2012 match.  SAC ¶ 113.

116.   Singleton was given three MRIs of the brain, two in Florida in 2012 and one in Pennsylvania in 2015.  (Singleton Depo. at 41:22-42:9, App. Tab 33).

117.   All three MRIs indicate that Singleton does not have an intracranial hemorrhage.  (Singleton Depo. at 44:19-46:5, App. Tab 33).

118.   **CONFIDENTIAL**

(WWE_SING00000416-17, App. Tab 73 (Lovell); IMPACT_SING00000634-38, App. Tab 74 (Unterberg); IMPACT_SING00000572-75, App. Tab 75 (Maroon); Mattingly Depo. Ex. 28, App. Tab 76 (Mattingly)).

119.  ████████████ CONFIDENTIAL ████████████ **(Lovell**

**Depo. at 96:25-97:25, App. Tab 38; WWE_SING00000416-17, App. Tab 73).**

120.  ████████████ CONFIDENTIAL ████████████

████████████████████████████████████

████████████████████████████████████

████████████  **(Lovell Depo. at 117:5-118:2, App. Tab 38).**

121.  ████████████ CONFIDENTIAL ████████████

████████████████████████████████████

████████████  **(Lovell Depo. at 182:5-183:11, App. Tab 38).**

122.  ████████████ CONFIDENTIAL ████████████

████████████████████████████████

████████████  **(Lovell Depo. at 183:12-23, App. Tab 38).**

123.  ████████ CONFIDENTIAL ████████  **in the FAC (¶ 28 n.5),**

**Plaintiffs cited a Mayo Clinic website that defines "post-concussion" syndrome to**

**mean "a complex disorder in which various symptoms — such as headaches and**

**dizziness — last for weeks and sometimes months after the injury that caused the**

**concussion . . . . In most people, post-concussion syndrome symptoms occur**

**within the first seven to 10 days and go away within three months, though they**

**can persist for a year or more." (App. Tab 77).**

124.  ████████████ CONFIDENTIAL ████████████

████████████████████████████  **(Lovell Depo. at 136:6-12,**

App. Tab 38).

125. ███████████████ CONFIDENTIAL ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ (Mattingly Depo. Ex. 28 at 3, App. Tab 76). ████ CONFIDENTIAL ████

█████████████████████████████████████████ (Mattingly

Depo. at 75:25-76:14, App. Tab 78).

126. ███████████████ CONFIDENTIAL ███████████████

█████████████████████████████████████████

███████████████████████████████████████████████

████████ (Mattingly Depo. at 76:15-25, App. Tab 78). ████ CONFIDENTIAL ████

█████████████████████████████████████████ (Mattingly

Depo. at 78:3-6, App. Tab 78).

127. ███████████████ CONFIDENTIAL ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████ (Rodgers-Neame Depo. at 115:8-13,

App. Tab 79).

128. ███████████████ CONFIDENTIAL ███████████████

██████████████████████████████ (Maroon Depo. at 33:8-21, App. Tab

37; SAC ¶ 107; Singleton Depo. at 64:25-65:2, 81:23-25, App. Tab 33; Response to

Request 2 of WWE's First Set of RFAs, App. Tab 71).

E.   **Admissions of Singleton That He Has No Basis To Assert A Claim Of Fraud By Omission Against WWE**

129.   Singleton had never heard of CTE until he was asked about it in his deposition.  (Singleton Depo. at 118:7-23, App. Tab 33).

130.   Nobody has told Singleton that he has CTE and he does not have any fear of having CTE.  (Singleton Depo. at 119:1-14, App. Tab 33).

131.   Singleton conceded that he was injured by an accident.  (Singleton Depo. at 162:21-23, App. Tab 33).

132.   Singleton did not know that he is making a fraud claim in this case. (Singleton Depo. at 164:8-13, App. Tab 33; DVD Depicting Video Excerpts of Singleton Depo., App. Tab 80).

133.   Singleton was unable to identify anyone at WWE who committed a fraud on him.  (Singleton Depo. at 164:17-22, App. Tab 33; DVD Depicting Video Excerpts of Singleton Depo., App. Tab 80).

134.   Singleton was unable to identify anything done or not done by WWE that he considers to be fraudulent to him.  (Singleton Depo. at 165:14-22, App. Tab 33; DVD Depicting Video Excerpts of Singleton Depo., App. Tab 80).

135.   Singleton was unable to identify anything that anybody at WWE failed to tell him that he thought he should have known.  (Singleton Depo. at 164:20-22, App. Tab 33; DVD Depicting Video Excerpts of Singleton Depo., App. Tab 80).

136.   Singleton was unable to identify anything that was said to him by Dr. Amann or Dr. Maroon that was false.  (Singleton Depo. at 168:15-169:12, App. Tab 33).

137.   Singleton has never read any testimony that anybody gave before a committee of Congress and, in particular, Singleton never read any testimony of Stephanie McMahon.  (Singleton Depo. at 19:4-19, App. Tab 33).

138.   Singleton never watched any television programs in which Vince and Linda McMahon were interviewed regarding Chris Benoit.  (Singleton Depo. at 19:20-20:9, App. Tab 33).

IV.   <u>The State of CTE Science Is Not A Known Fact</u>

139.   The First International Conference on Concussion in Sport was held in Vienna in 2001.  Its objectives were to provide recommendations for the improvement of safety and health of athletes who suffer concussive injuries in sport.  (Declaration of Mark R. Lovell ("Lovell Decl."), App. Tab 81).

140.   The Summary and Agreement Statement issued by the First International Conference on Concussion in Sport in 2001 does not mention chronic traumatic encephalopathy or any other long-term neurocognitive disease as a potential risk of concussions.  (Lovell Declaration at Ex. 1, App. Tab 81).

141.   The Summary and Agreement Statement issued by the First International Conference on Concussion in Sport in 2001 stated "the science of concussion is at the early stages and therefore management and return to play decisions remain largely in the realm of clinical judgment on an individual basis." (Lovell Decl. at Ex. 1, App. Tab 81).

142.   The Second International Conference on Concussion in Sport was held in Prague in 2004.  The Summary and Agreement Statement issued by the Second International Conference on Concussion in Sport in 2004 does not

mention chronic traumatic encephalopathy or any other long-term neurocognitive disease as a potential risk of concussions.  (Lovell Decl. at Ex. 2, App. Tab 81).

143.   The Summary and Agreement Statement issued by the Second International Conference on Concussion in Sport in 2004 continued to state that "the science of concussion is at an early stage, and therefore management and return to play decisions remain largely in the realm of clinical judgment on an individual basis."  (Lovell Decl. at Ex. 2, App. Tab 81).

144.   The Third International Conference on Concussion in Sport was held in Zurich in 2008.  The Consensus Statement issued by the Third International Conference on Concussion in Sport in 2008 stated with regard to "chronic traumatic brain injury":  "Epidemiological studies have suggested an association between repeated sports concussions during a career and late life cognitive impairment.  Similarly, case reports have noted anecdotal cases where neuropathological evidence of chronic traumatic encephalopathy was observed in retired football players.  <u>Panel discussion was held and no consensus was reached on the significance of such observations at this stage.</u>  Clinicians need to be mindful of the potential for long-term problems in the management of all athletes."  (Lovell Decl. at Ex. 3, App. Tab 81) (emphasis added).

145.   The Fourth International Conference on Concussion in Sport was held in Zurich in 2012.  The Consensus Statement issued by the Fourth International Conference on Concussion in Sport in 2012 stated with regard to chronic traumatic encephalopathy:  "<u>[I]t was . . . agreed that a cause and effect relationship has not been demonstrated between CTE and concussions or</u>

<u>exposure to contact sports</u>.  At present, the interpretation of causation in the modern CTE case studies should proceed cautiously."  The 2012 Consensus Statement further stated:  "It was agreed that CTE represents a distinct tauopathy with an unknown incidence in athletic populations.  <u>It was further agreed that CTE was not related to concussions alone or simply exposure to contact sports</u>.  At present, there are no published epidemiological, cohort or prospective studies relating to modern CTE.  Owing to the nature of the case reports and pathological case series that have been published, it is not possible to determine the causality or risk factors with any certainty.  As such, <u>the speculation that repeated concussion or sub-concussive impacts cause CTE remains unproven</u>."  (Lovell Decl. at Ex. 4, App. Tab 81) (emphasis added).

146.   A 2014 paper written by Christine M. Baugh, Clifford A. Robbins, Robert A. Stern, and Ann C. McKee, MD, entitled "Current Understanding of Chronic Traumatic Encephalopathy," stated "our neuropathologic understanding of CTE is based on <u>a biased sample of individuals</u> who are predominantly among those most exposed to repetitive head impacts (eg, professional football players, professional boxers).  That 2014 paper also voiced the concern that

> <u>As CTE research has a particular ability to be misunderstood by the lay public and sensationalized in the media</u>, caution needs to be exercised when discussing results of scientific studies and generalizing the results to the population as a whole.  Many individuals have some history of head impacts incurred through sports participation or other activities.  However, the pathological mechanism linking this initial trauma, whether concussive or subconcussive, to later-life CTE, pathology has yet to be elucidated.  Furthermore, <u>without a more complete understanding of the incidence, prevalence, and possible risk factors that lead to the development of CTE, it is impossible for the general population to accurately assess their risk of CTE</u>.  Unfortunately, the popular

media, which has reported on CTE because of its association with professional athletics, often does not present findings with the same accuracy, caution, or contextualization as the original peer-reviewed scientific publications.  In order to avoid causing undue panic in individuals who have a history of concussions or other traumatic brain injuries, the scientific community and the media need to clearly address <u>the considerable gaps that exist in our understanding of CTE</u>.

(Lovell Decl. at Ex. 5, App. Tab 81) (emphasis added).

147.   A 2015 paper published by the Department of Defense entitled

"Literature Review:  The Biological Basis of Chronic Traumatic Encephalopathy

Following Blast Injury," stated:

<u>The current state of the science does not allow for a conclusive determination of whether exposure to head injury is associated with the development of CTE pathology or clinical symptoms</u>. . . .  CTE has drawn significant public and media attention given the large at-risk population (e.g., military service members, contact sport athletes).  <u>Experts have noted concern over the potential clinical and legal consequences of widespread misunderstanding of CTE</u>.  In light of these factors, the need for additional research is clear, particularly population-based studies, the use of standardized pathology protocols, and the development of clinical diagnostic criteria.

It further stated that "<u>the evidence does not allow for a conclusive determination of whether exposure to head injury is sufficient and causative in the development of CTE pathology</u>."  (Lovell Decl. at Ex. 6, App. Tab 81) (emphasis added).

148.   The National Institute of Health stated in a report published in 2015 that "[i]t is also especially important for the community to understand that it is not yet possible to correlate clinical symptoms or future brain health with the signature pathologic feature of CTE."  (Lovell Decl. at Ex. 7, App. Tab 81).

**DEFENDANT WORLD WRESTLING
ENTERTAINMENT, INC.,**

By:   /s/ Jerry S. McDevitt
**Jerry S. McDevitt (pro hac vice)
Terry Budd (pro hac vice)
Curtis B. Krasik (pro hac vice)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: (412) 355-6500
Fax: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: terry.budd@klgates.com
Email: curtis.krasik@klgates.com**


**Thomas D. Goldberg (ct04386)
Jonathan B. Tropp (ct11295)
Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: tgoldberg@daypitney.com
Email: jbtropp@daypitney.com
Email: jmueller@daypitney.com**


**Its Attorneys.**

## <ins>CERTIFICATE OF SERVICE</ins>

I hereby certify that on April 14, 2017 a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 _/s/ Jeffrey P. Mueller_____