# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

───────────────────────────────── |

**RUSS MCCULLOUGH, RYAN SAKODA, and
MATTHEW ROBERT WIESE, Individually and on
behalf of all others similarly situated,**

     **Plaintiffs,**

**v.**

**WORLD WRESTLING ENTERTAINMENT, INC.,**

     **Defendant.**

─────────────────────────────────|

**Civil Action No.
3:15-cv-001074 (VLB)
Lead Case**

**JOSEPH M. LAURINAITIS, a/k/a
Road Warrior Animal,
CAROLE M. SNUKA on behalf of Estate of
JAMES W. SNUKA ,
PAUL ORNDORFF, a/k/a Mr. Wonderful,
SALAVADOR GUERRERO IV, a/k/a Chavo
Guerrero, Jr.,
KELLI FUJIWARA SLOAN on behalf of estate of
HARRY MASAYOSHI FUJIWARA,
BRYAN EMMETT CLARK, JR., a/k/a Adam
Bomb,
ANTHONY NORRIS, a/k/a Ahmed Johnson,
JAMES HARRIS, a/k/a Kamala,
DAVE HEBNER,
EARL HEBNER,
CHRIS PALLIES, a/k/a King Kong Bundy,
KEN PATERA,
TERRY MICHAEL BRUNK, a/k/a Sabu,
BARRY DARSOW, a/k/a Smash,
BILL EADIE a/k/a Ax,
JOHN NORD, a/k/a The Bezerker,
JONATHAN HUGGER a/k/a Johnny The Bull,
JAMES BRUNZELL, a/k/a Jumpin' Jim,
SUSAN GREEN, a/k/a Sue Green,
ANGELO MOSCA, a/k/a King Kong Mosca,
JAMES MANLEY, a/k/a Jim Powers,
MICHAEL "MIKE" ENOS, a/k/a Blake Beverly,
BRUCE "BUTCH" REED, a/k/a The Natural,**

**CARLENE B. MOORE-BEGNAUD, a/k/a Jazz,**
**SYLVAIN GRENIER,**
**OMAR MIJARES a/k/a Omar Atlas,**
**DON LEO HEATON, a/k/a Don Leo Jonathan,**
**TROY MARTIN, a/k/a Shane Douglas,**
**MARC COPANI, a/k/a Muhammad Hassan,**
**MARK CANTERBURY, a/k/a Henry Godwin,**
**VICTORIA OTIS, a/k/a Princess Victoria,**
**JUDY HARDEE a/k/a Judy Martin,**
**MARK JINDRAK,**
**GAYLE SCHECTER on Behalf of Estate of**
**JON RECHNER a.k.a Balls Mahoney,**
**BARBARA MARIE LEYDIG & BERNARD**
**KNIGHTON as co-representatives of Estate of**
**Brian Knighton, a/k/a Axl Rotten,**
**MARTY JANNETTY,**
**JON HEIDENREICH,**
**TERRY SZOPINSKI, a/k/a The Warlord,**
**SIONE HAVEA VAILAHI, a/k/a The Barbarian,**
**LARRY OLIVER, a/k/a The Crippler,**
**BOBBI BILLARD,**
**ASHLEY MASSARO, a/k/a Ashley,**
**PERRY SATULLO a/k/a Perry Saturn,**
**DAVID SILVA a/k/a Sylvano Sousa**
**JOHN JETER a/k/a Johnny Jeter,**
**CHARLES BERNARD SCAGGS a.k.a Flash Funk,**
**CHARLES WICKS a.k.a Chad Wicks,**
**SHIRLEY FELLOWS on Behalf of Estate of**
**TIMOTHY ALAN SMITH, a/k/a Rex King,**
**TRACY SMOTHERS, a/k/a Freddie Joe Floyd,**
**MICHAEL R HALAC, a/k/a Mantaur,**
**RICK JONES, a/k/a Black Bart,**
**KEN JOHNSON, a/k/a Slick,**
**GEORGE GRAY, a/k/a One Man Gang,**
**FERRIN JESSE BARR, a/k/a JJ Funk,**
**LOU MARCONI,**
**ROD PRICE,**
**DONALD DRIGGERS,**
**RODNEY BEGNAUD, a/k/a Rodney Mack,**
**RONALD SCOTT HEARD on Behalf of Estate of**
**RONALD HEARD, a/k/a Outlaw Ron Bass, and**
**BORIS ZHUKOV,**

             **Plaintiffs,**

**v.**

**Civil Action No.**
**3:16-cv-01209 (VLB)**
**Consolidated Case**

WORLD WRESTLING                            |
ENTERTAINMENT, INC., and                   |
VINCENT K. MCMAHON, Individually and as    |
Trustee of the Vincent K. McMahon Irrevocable |
Trust U/T/A dtd. June 24, 2004, as Trustee of the |
Vincent K. McMahon 2008 Irrevocable Trust U/T/A |
dtd. December 23, 2008, and as Special Trustee of |
the Vincent K. McMahon 2013 Irrev. Trust U/A dtd. |
December 5, 2013, and as Trustee of Certain Other|
Unnamed McMahon Family Trusts, and as      |
Controlling Shareholder of WWE,            |
                                           |
             Defendants.                   |
_____|

### PLAINTIFF WRESTLERS' SECOND AMENDED COMPLAINT AGAINST DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC. AND DEFENDANT VINCENT K. MCMAHON

The Plaintiffs bring this Second Amended Complaint against the Defendant World Wrestling Entertainment, Inc. ("WWE") and Vincent K. McMahon ("VKM"), Individually, and as Trustee of the Vincent K. McMahon Irrevocable Trust U/T/A dtd. June 24, 2004, as Trustee of the Vincent K. McMahon 2008 Irrevocable Trust U/T/A dtd. December 23, 2008, and as Special Trustee of the Vincent K. McMahon 2013 Irrev. Trust U/A dtd. December 5, 2013, and as Trustee of Certain Other Unnamed McMahon Family Trusts, and as Controlling Shareholder of WWE, and allege, upon facts and information and belief, except for the allegations concerning Plaintiffs' own actions, as follows. Please note that although the Complaint is divided into Counts as suggested by the Federal Rules, each and every paragraph alleged in each and every Count is intended to be taken as alleged in, and incorporated by reference, in every Count as if restated.

## TABLE OF CONTENTS

I.     SUMMARY OF PLAINTIFFS' CLAIMS……………… ........................................ 1

II.    JURISDICTION AND VENUE ........................................................................... 4

III.   PARTIES……… .................................................................................................. 6

   A.    Counts Applicable to Plaintiffs ................................................................. 6

        a.    Chronic Traumatic Encephalopathy ("CTE") Exists in Professional Wrestlers and is Diagnosed in at Least Five Named Plaintiffs ......................................................................... 9

        b.    Alzheimer's Disease, Dementia, and Parkinson's Disease Exist in Professional Wrestlers and Has Been Diagnosed in at Least Four Named Plaintiffs ........................................................... 9

        c.    Documented Injuries to Many Plaintiffs Suggest That They are at Risk of Developing Neurological Diseases and CTE ...................... 10

   B.    Individual Plaintiffs' Allegations ............................................................ 11

        a.    Description of the Facts Presented by Each Plaintiff ......................... 11

        b.    Individual Plaintiffs' Factual Allegations ............................................. 16

IV.   FACTUAL BACKGROUND……… ................................................................... 71

   A.    WWE's Business Was Uniquely Structured to Profit from the Plaintiffs' Injuries ................................................................................. 71

        a.    How WWE Became The World's Largest Wrestling Organization: Selling Violence ................................................... 71

        b.    WWE's Ironclad Control ................................................................. 75

   B.    Defendants' Scheme to Deprive Plaintiffs of Fundamental Statutory Protections ............................................................................. 79

   C.    Chronic Traumatic Encephalopathy is a New Name for an Old Disease……. ............................................................................................. 80

        a.    The Long-Present and Evolving Understanding of Concussion Science ......................................................................... 80

        b.    Concussions and Post-Concussion Syndrome are Long-Recognized Injuries ................................................................... 82

        c.    Sub-Concussive and Repetitive Head Trauma Cause Latent Neurological Injuries ...................................................................... 83

d.     Head Trauma's Consistent Symptoms ................................. 84

e.     The Necessary Preventative Steps Developed By Sports
       Medicine ...................................................................... 5

D.   WWE's Knowledge of the Effects of Concussions ................................ 86

a.     WWE's Long Association with the Cauliflower Alley Club ............... 87

b.     WWE Promoted a "Wrestler Versus Boxer" Event .......................... 87

c.     WWE Promotes Boxing Matches.......................................... 88

d.     The WWE Promotes the XFL Football League ................................ 89

e.     WWE Highlights Head Injuries................................................ 90

f.     WWE Knew What Post-Concussion Syndrome was in 1995.............. 92

g.     The Named Plaintiffs Sustained Concussions with Actual WWE
       Awareness....................................................................... 93

h.     Medical Literature at WWE's Disposal Established the Dangers
       of Concussions and Sub-Concussive Injuries and the Need for
       Proactive Preventative Steps................................................ 95

i.     These Plaintiffs' In-Ring Injuries Necessitated Action By WWE ....... 98

j.     WWE Former Performers' Lingering and Latent Symptoms
       Required (And Still Requires) WWE Take Action............................ 101

k.     Drug and Alcohol Rehabilitation Letters Implicate WWE's
       Knowledge...................................................................... 102

E.   WWE's Responsibility to the Plaintiffs' Health and Safety.................... 103

a.     Plaintiffs' Forced Reliance on WWE...................................... 103

b.     WWE Covers 100% of All In-Ring Injuries ............................... 104

c.     WWE's Continuing Special Relationship with the Plaintiffs ............ 105

F.   WWE's Refusal to Accept the Existence of CTE in Professional
     Wrestling… ...................................................................... 106

a.     WWE's Ties to the Concussion Legacy Foundation......................... 106

b.     WWE's Refusal to Provide Necessary Health Information............... 110

V.   CAUSES OF ACTION ...................................................... 112

**COUNT I:      FRAUDULENT NONDISCLOSURE**............................................ **112**

**COUNT II:     ACTION FOR DECLARATORY RELIEF --
                MISCLASSIFICATION** ..................................... **115**

**COUNT III:    UNCONSCIONABLE CONTRACTS**....................................... **124**

**A.    Occupational Safety and Health Act**....................................... **126**

**B.    National Labor Relations Act** ...................................... **130**

**COUNT IV:     INTENTIONAL DEPRIVATION OF STATUTORY RIGHTS
                UNDER THE FAMILY MEDICAL & LEAVE ACT** .................... **135**

**COUNT V:      VIOLATIONS UNDER THE EMPLOYEE RETIREMENT
                INCOME SECURITY ACT, 29 U.S.C. § 1132(a)(3)**............... **138**

**COUNT VI:     SUCCESSOR LIABILITY AS TO ECW AND WCW** ................ **141**

**COUNT VII:    VIOLATIONS OF RACKETEER INFLUENCED AND
                CORRUPT ORGANIZATIONS ACT, 18 U.S.C § 1962(c)**...... **150**

**COUNT VIII:   FRAUD** ...................................................... **178**

**COUNT IX:     WRONGFUL DEATHS AND SURVIVAL ACTIONS**............... **181**

**COUNT X:      FRAUDULENT CONCEALMENT** .............................. **182**

**COUNT XI:     CIVIL CONSPIRACY TO COMMIT FRAUDULENT
                CONCEALMENT** ....................................... **189**

**COUNT XII:    EQUITABLE ESTOPPEL TO THE STATUTES OF
                LIMITATIONS** ...................................... **189**

**COUNT XIII:   MEDICAL MONITORING**............................................ **208**

**COUNT XIV:    MANDATORY REPORTING**.................................... **211**

**COUNT XV:     AN ACCOUNTING AND DISGORGEMENT OF UNJUST
                AND ILLEGAL PROFITS**........................................ **212**

**COUNT XVI:    UNJUST ENRICHMENT** ...................................... **214**

**VI.    PRAYER FOR RELIEF** ............................................... **215**

**VII.   JURY DEMANDED** ......................................................... **217**

**VIII.  CERTIFICATE OF SERVICE** ........................................... **219**

## I.   SUMMARY OF PLAINTIFFS' CLAIMS

1.     This case involves retired professional wrestlers and performers who sustained long term neurological and other injuries during their tenure with WWE. As is detailed hereinafter, the Plaintiffs were intentionally and systematically deprived by the WWE of valuable rights guaranteed under State and Federal law, all under the direction and control of its Chairman of the Board and controlling shareholder, Vincent K. McMahon.

2.     The injuries to each Plaintiff involve a neurological disease and an ongoing disease process called Chronic Traumatic Encephalopathy (CTE), as well as the numerous deleterious effects of Traumatic Brain Injuries (TBI) that occur as a consequence of concussive and sub-concussive repetitive head trauma sustained by the Plaintiffs as professional wrestlers in matches sponsored, controlled, choreographed, and created by WWE.

~~3.~~     The wrestling moves that result in the head trauma that causes CTE and associated diseases from the accumulated effects of TBIs are the result inevitable of WWE choreographed and maneuvers that were performed "correctly" by the Plaintiffs.

4.     The occupational neurological injuries sustained by the Plaintiffs resulted from both concussions and sub-concussive head injuries, which occurred in the ordinary course of each of the Named Plaintiffs' WWE tenure as the unavoidable result of the numerous rapid decelerations caused by the choreographed matches.

1

5.     As alleged herein, the WWE routinely failed to care for the Named Plaintiffs' repetitive head injuries during their careers in any medically competent or meaningful manner that complied with any known published contact sports "return to play guidelines" at the time the injuries occurred, or any other recognized medical standard.

6.     WWE wrestling matches, unlike other contact sports, involve very specific moves that are scripted, controlled, directed and choreographed by WWE. As such, the moves that resulted in Named Plaintiffs' head injuries were the direct result of the WWE's actions.

7.     The WWE owes a legal duty to the each one of the Plaintiffs for reasons set forth in the Complaint below including but not limited to:

i)      The WWE's superior knowledge of the medical science of head trauma in athletes;

ii)     WWE's paid sponsorship of medical studies of CTE with the Concussion Legacy Foundation (CLF) and sponsorship of the CLF;

iii)    WWE's collection of information about retired wrestlers including the provision of medical information, outreach, letters, care and treatment to hundreds of drug addicted former wrestlers that symptoms derive from CTE;

iv)     WWE's ongoing relationship with the wrestlers in broadcasting their violent matches in which they sustained head trauma to millions of subscribers on the WWE Network and other products,

v)      The WWE's in ongoing royalty payments to plaintiffs;

2

vi)   WWE's tight scripting, control and direction of the Plaintiffs as wrestlers/referees or managers of moves and maneuvers;

vii)   WWE's provision of doctors, trainers and producers at matches;

viii)   WWE's legal duties (including those imposed by State and federal statutes) from an employer-employee relationship with the named Plaintiffs and the WWE has a duty to disclose to the Named Plaintiffs the risks of neurological damage, other risks and likely medical conditions which are the inevitable consequence of each Plaintiff participating in WWE wrestling matches.

8.     Continuing to today, the WWE has failed to warn, fraudulently misrepresented and concealed from the Plaintiffs the nature and extent of the occupational long-term neurological injuries that have been suffered by each of the Named Plaintiffs as a consequence of their wrestling careers.

9.     The Plaintiffs' injuries have also been compounded by WWE's misclassifying them as independent contractors. The WWE fraudulently classified the Plaintiffs as independent contractors and prevented them receiving notice of federal and State protections under OSHA, the FMLA, and the NLRA.

10.    Most Plaintiffs signed one-sided adhesion contracts forced draconian and unconscionable provisions that were intended to sweep away the benefits of 20th century social legislation designed to provide workers with some workplace safety and benefits upon injury.

3

11.     The Plaintiffs did not receive any health insurance from WWE and were forced to rely on WWE's own personnel that assessed, diagnosed, treated, and advised on all injuries sustained in WWE performances.

12.     WWE itself fostered this reliance by repeatedly promising 100% coverage for all in-ring injuries while simultaneously ignoring and/or covering up the vast majority of latent and long-term injuries sustained by its performers.

13.     As stated herein the WWE has a duty to speak the full truth about the risks of CTE in plaintiffs.

14.     In sum, the Plaintiffs were physically broken without proper medical care, as they live out their lives now with debilitating injuries as a result of Defendants' broken promises. This action is brought to enforce the agreements made and duties owed to the Plaintiffs by Defendants, and to seek compensation for the harm perpetuated by the Defendants on the Plaintiffs.

## II. JURISDICTION AND VENUE

15.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(11), because there are forty or more persons whose individual claims are being brought herein and the amount in controversy for each Plaintiff exceeds $75,000.00 dollars, exclusive of costs, interest, and attorneys' fees. The overall amount in controversy exceeds $5,000,000, exclusive of interest, costs, and attorney's fees. Those claims can be tried jointly in that they involve common questions of law and fact. In addition, the Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) over the claims of individual Plaintiffs who are citizens of a state different from the states of citizenship of all Defendants.

16.     This Court has personal jurisdiction over the Defendants because they conduct substantial and continuous business in the State of Connecticut and/or in the state of the residence of the named Plaintiffs.

17.     On information and belief, all WWE policies and decisions relevant to the conduct alleged herein occurred primarily in WWE's corporate offices in Connecticut.

18.     Joinder is permissible pursuant to Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same series of occurrences, and questions of law or fact common to all Plaintiffs in this action. Common questions of law and fact will arise in this action including but not limited to:

Whether the WWE, through its own voluntary undertaking, was negligent in its response to the health effects of repeated head impacts and the injuries consequently suffered by the Plaintiffs;

a)   Whether the WWE, through its own voluntary undertaking, was negligent in its response to the health effects of repeated head impacts and the injuries consequently suffered by the Plaintiffs;

b)   Whether the WWE committed fraud in misrepresenting the risks of repeated head impacts in WWE matches to the Plaintiffs;

c)   Whether repeated head impacts during performances in the WWE cause latent neurodegenerative brain disorders and diseases;

d)   Whether the Plaintiffs were misclassified as independent contractors and deprived of valuable rights under OSHA, the National Labor Relations Act, Workers Compensation laws, and the Family Medical and Leave Act,

and employers' contributory tax payments; and

e) Whether the Plaintiffs were victimized by a continuous fraudulent scheme carried out through the WWE over a period of many years, continuing to this day which involved, among other wrongs:

    i) Violation of the tax code of the U.S. which injured the Plaintiffs;
    ii) Violations of the mail fraud statute 18 USC 1341;
    iii) Violations of the wire fraud statute 18 USC 1343;
    iv) Violation of the State Worker's Compensation statutes of the various States;
    v) Violation of the Occupational Health and Safety Act;
    vi) Violation of the Family Health and Safety Act;
    vii) Creation of a culture of coercion and intimidation resulting in the procurement of unconscionable boilerplate Booking Contracts designed and intended to deprive the Plaintiffs of money, property, and valuable civil rights. 18 U.S.C. § 1962(c).

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events or omissions that give rise to the claims occurred within the State of Connecticut and this district and/or in the transferee forum, because the Defendants conduct a substantial part of their business within this district and/or in the State of the Plaintiffs' residence.

III.    PARTIES

20.    Plaintiffs and Plaintiffs' Spouses are those persons identified below, who adopt, in whole or in part, the allegations and Counts herein.

A. *Counts Applicable to All Plaintiffs.*

21.    All of the Plaintiffs wrestled in matches for the WWWF, WWF, and WWE, which confer standing to each under plaintiff's theories of liability.

22.    Some of the plaintiffs, who are specifically identified below also wrestled for ECW and WCW. These plaintiff's allegations include Count V: Successor Liability.

23.     All of the plaintiffs allege by facts personally known to them that they were deprived benefits of a safe workplace under OSHA, an inability to properly report injuries and subjected an unregulated and coercive workplace structure created by Defendants including under Count I: Misclassification, COUNT VI: RICO Violations, and Count XIV: Mandatory Reporting.

24.     Nearly all of the plaintiffs signed unconscionable void ab initio booking contracts whose claims include Count II: Unconscionable Contracts.

25.     The plaintiffs without booking contracts are identified. They fall into two categories: a) pre-1980's wrestlers with handshake deals or b) So-called Jobbers who signed only waivers or nothing at all when appearing in WWE matches.

26.     The plaintiffs who signed releases with Contractor Nostalgia Agreements or upon entry into a WWE sponsored Drug Rehabilitation Treatment Program (apparently before and during this litigation) in violation of Connecticut law are identified. These plaintiff's claims include and are asserted in Count II: Unconscionable Contracts and Count VI: RICO violations.

27.     All plaintiffs are subject to Count IV: ERISA Violations.

28.     Count III covers all Plaintiffs who wrestled after 1993: Intentional Deprivation under FMLA.

29.     The wrestlers said to have signed other releases proffered by the Defendant, most often at the date that they left the WWE, without exception do not currently have this document in their possession. The Plaintiffs allege that the existence and attempted use of the releases themselves evidence the defendant's

ongoing fraudulent misconduct and tactics to deprive them of their rights. These Plaintiffs' claims include and are asserted in Count II: Unconscionable contracts and Count VI: RICO violations.

30.     The five Plaintiffs who are deceased, with CTE diagnosis and/or neuropathology report reflecting an occupational disease include and are asserted in Count IX: Wrongful Death and Survival Actions. The one other Plaintiff who died during the case has set up an estate and awaits a diagnosis.

31.     All the Plaintiffs suffered medically significant, repetitive blows to the head during their WWE careers that were neglected and improperly treated despite WWE's self-imposed and self-declared duty to take all reasonable steps to ensure their health and safety. The WWE also failed to inform Plaintiffs of the risks of long-term, neurodegenerative impairments from repetitive brain trauma.  As a proximate result of WWE's negligence, each plaintiff has suffered personal and pecuniary injuries including conscious pain and suffering and emotional distress. These claims include and are asserted in Counts X: Fraudulent Concealment, Count XI: Conspiracy and Count XIII: Medical Monitoring.

32.     All Plaintiffs' claims include and are asserted in Counts XV: Accounting and Disgorgement of Unjust and Illegal Profits and Count XVI: Unjust Enrichment.

33.     All the Plaintiffs claims include Equitable Estoppel (a/k/a "tolling"), deriving from the Defendants' intentional conduct as herein alleged.

34.     Summary of Plaintiffs Medical Claims of Injury and Death.

8

a. *Chronic Traumatic Encephalopathy ("CTE") Exists in Professional Wrestlers and is Diagnosed in at Least Five Named Plaintiffs.*

35.     Significantly, five of the named plaintiffs have had post-mortem neuropathology studies reflecting a diagnosis of an occupational disease related to brain trauma. These diagnoses show the existence of such diseases in professional wrestlers notwithstanding WWE's continued public denials and defenses to the plaintiffs' claims made herein.

   i.   Plaintiff Estate of James W Snuka, has a diagnosis of Alzheimer's disease and Chronic Traumatic Encephalopathy ("CTE");

   ii.  Plaintiff Estate of Harry Masayoshi Fujiwara, has a diagnosis of Alzheimer's Disease and Chronic Traumatic Myelo-Encephalopathy ("CTME");

   iii. Plaintiff Estate of Jon Rechner, has a diagnosis of Chronic Traumatic Encephalopathy ("CTE");

   iv.  Plaintiff Estate of Brian D. Knighton, has a diagnosis of early stage Chronic Traumatic Encephalopathy ("CTE");

   v.   Plaintiff Estate of Timothy Alan Smith, has a diagnosis of Chronic Traumatic Encephalopathy ("CTE");

b. *Alzheimer's Disease, Dementia, and Parkinson's Disease Exist in Professional Wrestlers and Are Diagnosed in at Least Four Named Plaintiffs.*

36.     Other living named plaintiffs are diagnosed with serious neurological diseases, an increased incidence of which is associated with occupational head trauma.

   i.   Plaintiff Paul Orndorff is diagnosed with dementia and MRI studies show brain evidence of brain trauma. He has been prescribed Aricept;

   ii.  Plaintiff Dave Hebner is diagnosed with dementia and Parkinson's disease. He has been prescribed Aricept;

9

iii.    **Plaintiff Angelo Mosca is diagnosed with Alzheimer's disease and prescribed Aricept;**

iv.    **Plaintiff Larry Oliver is diagnosed with Alzheimer's disease and prescribed Aricept.**

c.    ***Documented Injuries to Many Plaintiffs Suggest That They Are at Risk of Developing Neurological Diseases and CTE.***

37.    Other plaintiffs have documented serious injuries to their head, back, neck and shoulders from their WWE wrestling careers. These permanent injuries are strongly suggestive of past traumatic head injuries and evidence the WWE's actual past and ongoing notice and awareness of the risk of long-term neurological issues.

i.    **Plaintiff Terry Brunk twice broke his neck in an ECW matches, and once broke his jaw;**

ii.    **Plaintiff Bryan Emmett Clark has had neck and back disc replacements and repair surgeries from injuries sustained in WWE matches;**

iii.    **Plaintiff Mark Canterbury sustained fractured C-7 vertebrae in a WWE match;**

iv.    **Plaintiff Salvador Guerrero IV sustained a Subarachnoid hemorrhage in a WWE match.  He also sustained an orbital bone fracture to his skull in a WWE match;**

v.    **Plaintiff Barry Darsow sustained cracked vertebrae in a WWE match;**

vi.    **Plaintiff Earl Hebner experienced brain bleeding shortly after being struck in the head with a metal suitcase refereeing a WWE match;**

vii.    **Plaintiff Michael Halac sustained injuries to his cervical spine resulting in neck fusion surgery in a WWE match;**

viii.    **Plaintiff Jon Heidenreich sustained serious shoulder injuries requiring multiple surgeries from a WWE in-ring injury;**

10

      ix.    **Plaintiff Joe Laurinaitis sustained herniated two discs in his neck in a WWE match;**

      x.    **Plaintiff Shane Douglas sustained a fracture in his spine in a WWE event;**

      xi.    **Plaintiff Vickie Otis sustained two cracked vertebrae in a WWE match;**

      xii.    **Plaintiff Sylvain Grenier sustained broken vertebrae in a WWE match;**

      xiii.    **Plaintiff Terry Szopinksi herniated two discs during his tenure at WWE;**

      xiv.    **Plaintiff Marty Jannetty sustained a severe broken ankle in a WWE match;**

      xv.    **Plaintiff Ashley Massaro herniated discs in C4 and C5 vertebrae in a WWE event.**

**B. _Individual Plaintiffs' Allegations._**

    a.  _**Description of the Facts Presented by Each Plaintiff.**_

38.    **For each Plaintiff the following facts are presented:**

      i.    **Dates wrestled at WWE, ECW, WCW;**

      ii.    **Schedule**

      iii.    **Contracts/1099s/Ongoing Relationship with WWE;**

      iv.    **Injuries & Treatment/OSHA rules at WWE;**

      v.    **Control Exerted over the Plaintiffs by WWE;**

      vi.    **Medical Issues reported by each Plaintiff;**

      vii.    **Notes of additional relevant facts.**

39.    **Dates and Schedule. The dates wrestled at WWE, ECW, WCW are pertinent because even appearing in single match confers standing per plaintiff's**

theory of liability. The schedule, which includes facts such as the days wrestled per year, and the travel requirements is relevant because it shows:

    i.    The control exerted over each named plaintiff by WWE;

    ii.    A showing that the named plaintiffs were misclassified by WWE;

    iii.    An unsafe and coercive workplace created by WWE that lacked scheduled rest and an offseason;

    iv.    The frequency of the wrestling required to be performed by each plaintiff for WWE also demonstrates the nature, duration and extent of the repetitive occupational head trauma that plaintiffs allege they sustained in their performances for WWE.

40.    WWE Contracts. A showing that the named plaintiffs signed a booking contract demonstrates:

    i.    WWE's use of unconscionable contracts;

    ii.    The circumstances of signing show named plaintiffs comprehension, legal advice, and if there was any meaningful choice.

41.    1099s. The WWE's use of 1099s and unconscionable contracts relevant to demonstrate whether each named plaintiff received or recalls the WWE misclassification scheme and RICO violations through use of mails including preparation and mailing of these tax forms.

42.    Fines. The WWE's use of a system of fines, particularly fines for activity outside the ring is relevant to showing Defendants misclassification scheme described herein.

43. **Ongoing Relationship.** The WWE's ongoing relationship with the named plaintiff shows the existence, nature, and extent of the duties that may extend to the parties. These facts include:

    i.    WWE's annual mailing of letters offering Drug and Alcohol Rehabilitation and communications other materials such as scholarships and offers of help with financial planning. This relationship also includes information about any plaintiffs who availed themselves of the WWE's offers to treatment or other programs;

    ii.    WWE's payment of royalties for past performances including through Contractor Nostalgia Agreements;

    iii.    WWE's ongoing and current use of the wrestlers performances and likeness in: promotional materials or personal appearances such as Hall of Fame inductions or current appearances in shows or documentaries, ownership of the copyright and trademarks to their matches and ring names, merchandising deals, product licensing deals for things such as toys, clothing, and videogames. And whether the WWE current sells the wrestlers footage and airs the matches on the WWE 24/7 network to subscribers.

44. **Injuries and Treatment at WWE including Head Injuries.** The named plaintiffs' recollections of specific or general events about any injuries including any head trauma sustained in WWE matches are relevant to prove their claims about WWE's knowledge and duties regarding their long terms risks for neuro-cognitive diseases and the need for medical monitoring. As such the named plaintiffs relate.

    i.    The injuries sustained and any medical treatment they received;

    ii.    Whether there existed any written or formal protocols to report injuries, including head injuries. Whether WWE fulfilled its duties at all relevant times to maintain a safe workplace, including whether OSHA rules with respect to safety when

there is risk of head injuries as well as the regulations for reporting injuries were adhered to by WWE.

45.  **Ironclad Control by WWE.** The degree of control exerted by the WWE over the named plaintiffs demonstrates that Defendants exerted such control over the work activities of the Plaintiffs that they were employees and that Plaintiffs were each unable to report injuries. Specifically:

  i. Whether named plaintiffs report any facts they personally experienced about being misclassified workers, and exploited in the absence of legal protections in unsafe and dangerous working conditions;

  ii. Whether they were instructed, observed or overseen by WWE employees, doctors, trainers or agents in televised or untelevised matches;

  iii. Whether WWE assigned the Plaintiffs their gimmick, any racial or ethnic stereotypes, angles, storylines, career push, instructions to win or lose, their finishing move and other decisions by WWE over essential elements of their wrestling careers past, present and future;

  iv. Whether there existed in WWE, a corporate culture through which the WWE maintained any coercive and unregulated employment practices, through policies including unwritten rules or codes of conduct. These facts including whether there existed any elements of kayfabe or a code of silence in the wrestling profession to prevent, delay or inhibit the reporting of injuries or WWE's violations and noncompliance with employment laws;

  v. Whether any plaintiff was ever pressured to perform in WWE while actually injured including after sustaining head injuries. Whether they ever performed in a WWE event after a head injury or other injury without adequate rest within accepted contemporary medical standards and established sports medicine "return to play guidelines," in place in the years each named plaintiff wrestled.

46.  **Long-Term Occupational Medical Issues.** For each named plaintiff there is a summary of whether they sustained any injuries from their WWE career that require long-term rehabilitation. Further it is noted if these injuries are

degenerative in nature and if the injuries have any permanency associated with them. This is relevant because to the WWE duties owed for latent occupational diseases as well as the assertion made by Defendant that: "WWE covers 100 percent of all costs associated with any in-ring injuries and rehabilitation."

47.     Each named plaintiff also records whether he or she has any diagnosis and/or self-reported neurological issues from in-ring occupational activity that indicates a need for further neurological evaluation treatment and medical monitoring for serious neuro-cognitive diseases.

48.     Each named plaintiff has signed a medical authorization with counsel and each has provided their medical records, as such these summaries can be supplemented with additional diagnosis and documentation.

49.     With respect to plaintiffs facts as alleged. The plaintiffs allege that they suffer from neurological injuries and ask that all dates, names and facts be considered as to the best of their ability to recall. All allegations are upon information and belief to extent that standard is applicable to any statement made herein. Additionally any typographical errors as to dates, years wrestled, names or anything else herein are inadvertent error. Any and all such facts that relate to the named plaintiffs or anything else stated herein that can be objectively verified as true will be stipulated to upon notice of the error.

50.     Additionally the precise dates wrestled and the actual schedule are facts uniquely in possession of the WWE at this time due to the asymmetry in record keeping ability by the WWE and the impaired individual wrestler-plaintiffs. Both the existence of the booking contracts and tax information are facts uniquely

in possession of the WWE at this time due to the asymmetry in record keeping ability by the WWE and the impaired individual wrestler-plaintiffs. The existence and ongoing use of the named plaintiffs matches, likeness and merchandising deals are also facts uniquely known to WWE at this time. Finally, the existence of injury reports and the existence safety rules, banned moves, or other facts such as the incidence of injuries, OSHA compliance, Workers Compensation claims made against WWE and other internal reports are facts uniquely in possession of the WWE at this time due to record keeping by the WWE.

b. *Individual Plaintiffs' Factual Allegations.*

51.     Plaintiff Joseph Michael "Joe" Laurinaitis, a/k/a Road Warrior Animal ("Laurinaitis") resides in Defiance, Missouri.

i. **Dates:** Laurinaitis wrestled in WWE during 1990-92, 1997-99, and 2003. He wrestled for WCW in 1996-1997, and 2001.

ii. **Schedule:** Laurinaitis wrestled in WWE over 250 nights per year. He states: "The schedule was beyond imagination. WWE had the most aggressive schedule in wrestling no question. It was to maximize profit from syndication of the matches on TV. It would be 14 days on straight, four days off. Sometimes I would fly from Japan to Hawaii, then to LA and from LA take the red eye to Madison Square Garden, wrestling in each city with no rest just crazy".

iii. **Contract and Ongoing Relationship with WWE:** Laurinaitis signed a boilerplate contract in the WWE in which "nothing was up for negotiation." He was mailed 1099s each year he wrestled. He currently continues to receive royalties from his past WWE performances, along with letters offering drug and alcohol rehabilitation. Laurinaitis was inducted into WWE Hall of Fame in 2011 and appeared on WWE in 2012 on the 1000th episode of Monday night Raw. His likeness and wrestling matches in which he sustained injuries are featured heavily on WWE's website and the WWE Network.

iv. **Injuries and Treatment at WWE:** Laurinaitis states: "There were very few if any ringside doctors. No OSHA notices were ever posted." He was told WWE would cover medical care for In-Ring injuries. He sustained numerous head injuries in WWE matches, specifically recalls at least four major concussions

16

in WWE. He states: "I wrestled hundreds of nights per year- for most part there was no treatment for these at all, I shrugged these common (head hits) off as minor incidents- dozens, I mean every night we hit our head." He was double-suplexed in WWE match resulting in herniated discs in his neck.

v.  **WWE's Ironclad Control.** Laurinaitis states: "Since the WWE created this business they followed almost no legal rules, there was no employment law, there was no OSHA, certainly I never saw and notices or heard of our legal rights. The wrestlers were a bunch of young athletes under the control of the WWE office. The standing rule was: "do as you are told and do it right away." They controlled the gimmick "Legion of Doom" and own the associated trademarks.

vi.  **Long-Term Occupational Medical Issues:** He has neck injuries and orthopedic injuries requiring surgeries from WWE matches. He has worsening memory loss, headaches, and dizzy spells and is being treated for severe sleep apnea.

vii.  **Notes:** Laurinaitis' brother, John Laurinaitis is a long time WWE senior executive and close associate of Vince McMahon, this association is relevant to the extent the plaintiff had greater access, and awareness of the unsafe working conditions and structure at WWE.

52.  Plaintiff Carole M. Snuka, the Estate of James W. Snuka a/k/a Jimmy

'Superfly' Snuka ("Snuka") resides in Coral Springs, Florida.

i.  **Dates:** Snuka wrestled at WWE between 1982-1985 and 1989-1993. He appeared in ECW in 1992-1996 and WCW in 2000. He continued to make appearances in WWE performances between 2005 and 2015.

ii.  **Schedule:** Snuka performed for WWF in hundreds of matches and was the headliner for much of his time at WWF. He was a main star in WrestleMania V, VI, and VII.

iii.  **Contract and Ongoing Relationship with WWE:** Snuka signed WWE contracts frequently over the course of his WWE career.  Snuka signed these contracts because he trusted WWE and referred to Vince McMahon as his "brother Vinny". The WWE was aware he could not understand the contracts because it was known that Snuka could not read or write. He was not represented by attorneys at any time when signing these agreements. The WWE mailed Snuka form 1099s. He was inducted into the WWE Hall of Fame in 1996.

iv.  **Injuries and Treatment at WWE:**  Snuka sustained numerous blows to the head and described to his doctors before his death multiple events that were consistent with concussions. During an infamous WWE interview, he was

struck in the head with a coconut that smashed open on contact. The night after his induction into the Hall of Fame in 1996, he was hit in the head with a steel chair by Kane.

v. **WWE's Ironclad Control:** Snuka's signature move, the "Superfly Splash", was to dive off the top rope and land on his opponent. These moves were orchestrated under the WWE's control and direction. Snuka was involved in one of the most famous stunts in WWE history on October 17, 1983 when he leapt 15 feet off the top of a giant metal cage erected by WWE in Madison Square Garden.

vi. **Long-term Occupational Medical Issues:** Shortly before his death, Snuka was diagnosed by his treating neurologists with brain damage related to wrestling-related injuries. His death certificate lists encephalopathy and dementia among the causes of his death. Snuka died during the pendency of this lawsuit and his brain and spinal cord were studied by neuropathologists. The Neuropathology Report shows that Snuka had Alzheimer's disease and Chronic Traumatic Encephalopathy ("CTE").

vii. **Notes:** Snuka was one of the most famous and recognized wrestlers in the world, and he is considered one of the most successful WWE performers of all time. Upon his death, he was eulogized by Stephanie McMahon who called him "one of the greatest icons in the history of our business."

53.    Plaintiff Paul P. Orndorff a/k/a Mr. Wonderful ("Orndorff"), resides in

Fayettville, Georgia.

i. **Dates:** Orndorff wrestled for WWE from 1983 to 1988 and WCW from 1992 to 1995.

ii. **Schedule:** Orndorff states: "I was definitely a full-time employee. I worked every Christmas, every Holiday. I was in a different city or hotel nearly every night. I may have gotten home 5 days a month. Everything revolved around WWF, 365 days a year when you worked for them."

iii. **Contract and Ongoing Relationship with WWE:** Orndorff signed two contracts with WWE. The WWE mailed him checks, contracts and tax forms (1099s) to his home in Georgia during the years he wrestled for them.  The WWE mailed him letters offering treatment for drug abuse. In 2005, he was inducted into the WWE Hall of Fame. He receives royalties that are deducted from money that WWE paid him in the past several years. The WWE paid him two thousand dollars to sign collector cards in the past few years and in 2014 the WWE paid him fifteen hundred dollars for a personal appearance on Monday Night Raw.

iv. **Injuries and Treatment at WWE:** While at a WWF match in New York, Orndorff sustained a serious neck injury. Due to his dementia related memory loss, he does not recall the exact dates but believes it was in 1988. Although the WWE paid for the initial exams, the condition worsened resulting in three neck surgeries that placed metal plates and screws in Orndorff's neck. This injury caused his right arm to atrophy, impacting his physique and ability to wrestle. He states head injuries occurred frequently, more times than he can remember and believes that the cage matches and stunts he performed at WWE were dangerous and unregulated.

v. **WWE's Ironclad Control:** Orndorff states: "While I was wrestling I was paid as an independent contractor. The term initially sounded good, but I was definitely a full time employee."

vi. **Long-term Occupational Medical Issues:** Orndorff has had three neck injuries and lost the use of one of his arms from WWE matches. He has difficulty sleeping, confusion, severe memory loss, is clinically depressed, and exhibits paranoia. He has severe mood swings and uncontrollable emotions. He does not drive anymore because he forgot he was driving a car. He has recently been to a neurologist. His MRI shows: "white matter chronic hemorrhage most suggestive of previous traumatic head injury." Orndorff was recently diagnosed with dementia and prescribed Aricept (Donepezil).

54.     Plaintiff Salvador "Chavo" Guerrero, IV ("Guerrero") resides in

Rancho Santa Margarita, California.

i. **Dates:** Guerrero began wrestling professionally for World Championship Wrestling ("WCW") in 1996 and remained with WCW until it was acquired by WWE on March 26, 2001. Guerrero wrestled for WWE from 2001 through 2011.

ii. **Schedule:** Guerrero was on the road and performing in matches 280 days per year. Over the course of his WWE career, he estimates that he performed in approximately 3,000 matches.

iii. **Contract and Ongoing Relationship with WWE:** When WWE took over WCW, it acquired Guerrero's WCW contract with only one month left. Then, without any negotiation, he signed a 3-year contract which reduced his pay by 60%, from $225,000 to $100,000 per year. Guerrero signed two 3-year contracts with WWE without representation as it was discouraged by WWE. He hired an agent to represent him when signing his third 3-year WWE contract, but that agent also represented Johnny Ace, which presented a conflict of interest as Johnny Ace was the very same person responsible for approving the contract. WWE frequently and repeatedly failed to pay Guerrero for his

participation in matches until he brought it to WWE's attention. He was mailed 1099s each year he wrestled.

iv.  **Injuries and Treatment at WWE:** Guerrero's ten year career consisted of thousands of moves that caused him injury. He remembers, "Every time I took a bump, it was akin to getting whiplash, and every single match was like being in a car crash." He reports he would see white light flashes hundreds of times. On the August 26, 2004 episode of Smackdown!, he was hit with a knee to his head and was completely knocked out. Stephanie McMahon, Johnny Ace, and the agents present at the time witnessed the injury. Guerrero was taken to the hospital where he was diagnosed with brain bleeding and a severe concussion.

v.  **WWE's Ironclad Control:** WWE controlled almost every aspect of Guerrero's professional and personal life. He was told what to wear and how to act when he was in and outside the ring. If WWE disapproved, he was fined. In addition, he could not work for any entity other than WWE, even in a TV show for example, without WWE's express approval. He was approached by the stunt coordinator for the television show Monk, and asked Johnny Ace for permission to appear on the show. WWE refused.

vi.  **Long-Term Occupational Medical Issues:** As a result of in-ring injuries, Guerrero suffers from cognitive difficulties, including frequent headaches, anxiety, dizziness, memory loss, insomnia, fatigue, and involuntary muscle movements.

55.   **Plaintiff Kelli Fujiwara Sloan represents the Estate of Harry Masayoshi**

Fujiwara ("Mr. Fuji"), currently pending in Montgomery County, Tennessee.

i.  **Dates:** Mr. Fuji wrestled for the WWWF, WWF, and WWE (hereinafter, referred to collectively or individually as "WWE") from 1972-1974; 1977-1978; 1981-1996; and was inducted into the WWE Hall of Fame in 2007.

ii.  **Schedule:** Mr. Fuji performed for WWE in hundreds, if not thousands of matches, and held multiple tag team and individual WWE championships. He had a grueling travel and performance schedule.

iii.  **Contract and Ongoing Relationship with WWE:** It is currently not known if Mr. Fuji signed contracts with WWE. The knowledge Ms. Fujiwara Sloan does have is limited to the fact that the WWE did not pay him a pension, provide workers' compensation insurance, or any other financial help when he became disabled.

iv.  **Injuries and Treatment at WWE:** Mr. Fuji sustained severe, repetitive head trauma throughout his WWE career, which generally went untreated. He was

eventually diagnosed with dementia, and, after his death, was diagnosed with CTE, as discussed in further detail below.

v. **WWE's Ironclad Control:** Mr. Fuji's gimmick from the inception of his WWE career was to be a Japanese "heel" or bad guy. Mr. Fuji was a Japanese-American, and his gimmick played to stereotypical roles,. He was called "The Devious One," and one of his main tricks was to throw salt in his opponents' eyes, briefly blinding them, in order to win the match.

vi. **Long-Term Occupational Medical Issues:** Prior to his death, Mr. Fuji experienced many neurological symptoms of CTE, including memory loss, confusion, and severe mood swings. He was diagnosed with dementia approximately 10 years before he died. As he aged, his condition worsened to the point where he had to be moved into an assisted living facility. He often did not recognize his friends and family. He became a shell of his former self, and when he was last brought to a WWE event by family, where he was to be honored, he did not seem to know where he was. This caused his family emotional distress. It also created a great financial burden for his family to provide for his care. After learning of other athletes who had been diagnosed with CTE, Mr. Fuji's family collectively decided to donate his brain and spinal cord to a well-known forensic pathologist. The neuropathology report diagnosed Mr. Fuji with both Alzheimer's disease and Chronic Traumatic Myelo-Encephalopathy (CTME), a type of CTE that also involves the spinal cord, which the report links to his professional history of blows to the head.

56. Plaintiff Emmett Bryan Clark, Jr., a/k/a "Adam Bomb," resides in Mesa, Arizona.

i. **Dates:** Clark wrestled for WWE between 1993-1995 and 2001. He wrestled for WCW 1997-2001.

ii. **Schedule:** Clark states: "it is mind boggling when I look back on it. It was 'go go go, it was a blur, I never saw my family, I had 270-280 dates per year." In addition to wrestling Clark was required to attend promotional events called 'meet and greets' with fans. Clark states the work schedule left his body no time to heal from injuries from the WWE imposed schedule. Clark states: "WWE would hand me a stack of plane tickets for a 20 day run of shows, I would be out on the west coast in LA, fly to Hawaii, fly to Japan then back to the states, I'd be home 2-3 days before it started again. It was 15-16-18-20 day runs in a row.... Looking back now I don't know how I did it, it was a brutal workplace."

iii. **Contract and Ongoing Relationship with WWE:** The WWE has not paid Clark any royalties in over ten years. After publicly defending the concussion

based lawsuits against WWE on social media, Clark was offered $10,000 and a Contractor Nostalgia Agreement. Clark states that his matches and likeness appear currently on the WWE Network, website and in books like the WWE Encyclopedia.

iv. **Injuries and Treatment at WWE.** Clark was injured numerous times in WWE matches. Routine injuries, particularly head injuries, were commonplace and he was often hit with chairs, turnbuckles, and other wrestlers' bodies.  He states he lost consciousness frequently from blows to the head: "Head injuries were common, I called it getting the "snot knocked out of you". Clark recalls many of the agents were former wrestlers who themselves had been knocked out so they recognized the signs of these injuries. Despite this, he was encouraged to shake it off and keep wrestling by WWE employees. After a neck injury in Pittsburg, PA he was told to "shake it off and go home". Clark's neck injury resulted in years of complications contained with pain medication and injections until he could pay for surgery in 2014.

v. **WWE's Ironclad Control:** WWE's culture was to not ask any questions, complain about the schedule or complain about injuries. Clark believed such actions would lead to his firing. WWE agents who are assigned to every match would observe these hits and the remainder of every match so they were aware but not very active in treating or evaluating injuries, particularly head injuries. Clark states that WWE employees were on hand to keep track of everything in each performance. Specifically, the head agent who ran every show would report back to Vince McMahon each night, all the results of the matches, who did what, if anyone was injured and information on the gate receipts.

vi. **Long-Term Occupational Medical Issues:** WWE did not pay for Clark's in-ring injuries, including his shoulder and elbow surgeries. WWE did not pay for his neck disc replacement with complete fusion and fixation. WWE did not pay for his lower lumbar disc replacement with a cadaver disc. Clark has been diagnosed with neurological issues including peripheral neuropathy, sleep problems and involuntary movements during sleep. He has headaches including migraines he treats with rizatriptan. He has very bad memory loss: "I often have trouble driving even to the grocery store." Clark also reports depression and anxiety.

57.     Plaintiff Anthony Norris, Jr. a/k/a Ahmed Johnson ("Norris"), resides

in Houston, Texas.

i. **Dates:** Norris wrestled for WWE from 1995 to 1998 and for WCW 1999-2000.

ii. **Schedule:** Norris wrestled hundreds of nights a year for WWE each year he worked at WWE. Norris states that the schedule at WWE was faster paced and had longer hours compared to other promotions.

iii. **Contract and Ongoing Relationship with WWE:** Norris states that he brought a lawyer to negotiate the terms of his booking contract, but Vince McMahon stated that he "hated lawyers," and instructed his lawyer to leave the office, telling him that there was nothing to negotiate.  Norris was mailed 1099s, does not get any royalties from his matches that are seen on the WWE website and on the Streaming Network.

iv. **Injuries and Treatment at WWE:** Norris states WWE agents instructed him to perform a move called a "suicide dive," a maneuver that required him to launch his 300 pound body head-first, often resulting in head injuries and black-outs. On January 21, 1996, Norris says he was knocked out after being hit in the head with a guitar by wrestler Jeff Jarrett in Madison Square Garden. He was taken to the hospital and diagnosed with a concussion. His back was seriously injured in a WWE match with Goldust, which required fusion surgery.

v. **WWE's Ironclad Control:** Norris became the first African American WWF Intercontinental single wrestler champion in 1996. Norris was assigned his ring name and gimmick by WWE. Norris says that while at WWE he worked through being hurt or injured, and that his injuries led to him being classified by WWE as "injury prone." This designation he believed was meant to discourage him and other wrestlers from taking time to properly treat and recuperate from injuries. Norris states there was no formal policy in place to report injuries or any policies set by doctors or anyone else, noting that it was a very loose and informal system where you were pressured to wrestle or lose pay.

vi. **Long-Term Occupational Medical Issues:** Norris is disabled, is being treated by a neurologist and prescribed over 30 medications, including those to treat issues including headaches, sleeping issues, and depression. He states that his memory loss is very bad and getting worse. He experiences severe headaches- intractable episodic headaches, and numbness to my face. He has had three back surgeries and three knee surgeries from WWE In-Ring incidents.

58.    Plaintiff James Harris, Jr. a/k/a Kamala ("Harris"), resides in

Senatobia, Mississippi.

i. **Dates:** Harris wrestled for WWE in 1984, 1986-1987 and 1992-93. He went to WCW in 1995, and returned to WWE from 2001 to 2006.

ii. **Schedule:** Harris wrestled hundreds of nights per year for the WWE, Harris states: "I was wrestling 300 nights a year."

iii. **Contract and Ongoing Relationship with WWE:** Harris states that he worked for WWE in the 1980s under a handshake deal with Vince McMahon. He was mailed a contract in 1992 which he signed without a lawyer or agent. Harris states that his education is one year of high school. WWF mailed him 1099s. WWE sends him letters offering drug treatment and he gets royalty checks of about $100. per quarter.

iv. **Injuries and Treatment at WWE:** Harris states that he was hit with punches, hit concrete floors, and bumped head and became dazed many times in WWE events. Harris says that he was not diagnosed with concussions, and did not know what they were. Harris states another danger was inexperienced wrestlers who worked stiff or green who could knock you out. Harris states that Randy Orton worked very stiff, and he was often dazed, or saw seeing stars from having his head hit. At WWE TV tapings there would be a doctor, who he approached for an exam and was typically told: "you're alright, send the next guy in."

v. **WWE's Ironclad Control.** Harris was told "keep your mouth shut or else Vince will make it worse for you." When he ignored this advice and asked about the schedule, injuries and pay he was told by Vince McMahon, "if you can make more money any place else you are free to go." This was not true because his contract did not allow him to wrestler anywhere but WWE. Harris relates that in an effort to control him, he signed a written contract in which the WWE would "hold back" 15% of his gross pay which he would forfeit if he did not continue to wrestle 300 nights a year. Harris stayed and received the 15% back: $17,000 for two years of constant wrestling. Harris, an African-American portrayed a savage Ugandan Giant called Kamala, who didn't speak, wore a mask and paint, entered the ring barefoot to the beat of tribal drums. Harris states that wrestling barefoot injured his feet, and that when he attempted to wear sandals, the WWE bookers got upset and told him that Vince McMahon said that he was never to wear shoes again, 'as it was not a savage look.'

vi. **Long-Term Occupational Medical Issues.** Harris is on SSDI which he obtained in January 2012 when social workers helped him get on dialysis. Previously without insurance he obtained help through Medicaid in December 2011. Harris was told that he had poor circulation in his legs (from diabetes).  After he received medical attention, he was put on dialysis three times a week but had to have his left foot amputated in December 2011. The amputation would not heal so they had to remove his leg above the knee. In April 2012, his right foot was amputated and then further amputated to the knee. Harris takes numerous medications including for depression, which

started in 2015 when his symptoms increased in severity. He reports memory loss and serious headaches.

59.     Plaintiff Dave Hebner ("Dave Hebner") resides in Mechanicsville,

Virginia.

  i.  **Dates:** Dave Hebner started working for the WWE as a referee and performer in the late 1970s or early 1980s. He remained with WWE until he was abruptly terminated in 2005.

 ii.  **Schedule:** WWE had full control over Dave Hebner's "exhausting" schedule by WWE and he was told where and when to officiate the matches.

iii.  **Contract and Ongoing Relationship with WWE:** To the best of his recollection, Dave Hebner signed a contract with WWE on a yearly basis over his almost-30-year career. Dave Hebner was mailed 1099s from WWE each year. Despite his independent contractor classification, Vince McMahon promised him that he would always have a job with the WWE. WWE paid Dave Hebner when he was out due to injuries over the course of his career. After his career ended, WWE paid for alcohol rehabilitation treatment. WWE does not pay Dave Hebner royalties.

 iv.  **Injuries and Treatment at WWE:** Dave Hebner suffered from broken ribs; a number of knee injuries which resulted in permanent damage that he still suffers from, a broken arm, damage to his rotator cuff, a severe elbow injury, a severe shoulder injury, and cuts due to being told to blade himself in matches.  He sustained repeated severe head trauma which was the result of taking bumps, hits, falls, and being hit on the head with props (including chairs and a shovel) as part of various storylines. He never received treatment for his head injuries.

  v.  **WWE's Ironclad Control:** Dave Hebner was repeatedly asked to work when he was sick or still recovering from an injury, and he never complained or refused. He sacrificed his health and put WWE before his family on many occasions.

 vi.  **Long-Term Occupational Medical Issues:** Dave Hebner's health started deteriorating shortly after he was terminated in 2005. In addition to permanent leg and back injuries, shortly after he was fired, he began experiencing cognitive difficulties, including, but not limited to, headaches, dizziness, loss of memory, and fatigue, as well as chronic depression. By 2011, he was evaluated by neurologists and neuropsychologists, without any help from WWE, and diagnosed with dementia. After more testing, he was diagnosed with Parkinson's disease. He now takes about twenty different prescription medications.

60.    Plaintiff Earl Hebner ("Earl Hebner") resides in King William, Virginia.

 i.  **Dates:** Earl Hebner worked as a referee for the WWF/WWE full-time for 17 years from 1988 until he was fired in 2005.

 ii. **Schedule:** Earl Hebner was on the road full-time, traveling 20-22 days per month during the years he worked at WWE. He was present at most TV tapings, Pay Per Views and many house shows.

iii. **Contract and Ongoing Relationship with WWE:** Earl Hebner believes he signed a contract with WWE but does not recall the details. He was paid by check and mailed 1099s to his home. Earl Hebner has received no royalties since 2005, but he does receive WWE letters offering drug and alcohol abuse treatment.

iv. **Injuries and Treatment at WWE:** Earl Hebner states that WWE was not a safety-oriented company-- they were in the business of entertainment that involved dangerous physical stunts. He liked to think of his role as being helpful to the wrestlers, but states he was not there for safety reasons. He notes there was no OSHA compliance or any employment or workplace safety policies that he was aware of in the years he worked for WWE despite his role as referee. His role as a referee was primarily to be part of the action. He performed as an actor that would actively participate in matches, get thrown in and out of the ring and be part of the storylines. He also facilitated the match by communicating with the wrestlers and the agents during each event, and in that role witnessed numerous day-to-day falls, bumps and injuries, including routine head injuries to many of the Plaintiffs.

 v. **WWE's Ironclad Control:** Earl Hebner observed that the WWE's stunts and wrestling moves became increasingly dangerous over the coarse of his career. When he started in wrestling, he realized people could be injured by accidents or mistakes, but that the wrestling style promoted by the WWE became more extreme and dangerous. In one event, called the Royal Rumble in 1999, The Rock (Dwayne Johnson) smashed a handcuffed Mick Foley over the head with unprotected chair shots 11 times. As can be seen on the tape part of the match was for him to stand by and ineffectually attempt to wave off the blows while this occurred. Earl Hebner would watch for signs of concussions or recognize when a wrestler was injured during a match and communicate that via headset to the agents and bookers. He had no medical training but through his own experience he would watch for these things. The default position from the office was a WWE policy, especially on TV that the show should continue "absent a broken bone, someone completely out cold or physically unable to continue." He did his best to help conduct things safely but that was not his role. He observed dangerous stunts but no safety rules were enforced or regulated.

vi. **Long-Term Occupational Medical Issues:** Earl Hebner sustained many orthopedic and head injuries in his 17 years in the ring. He cannot recall every time he was hit in the head, but states hits were frequent. He states that in WWE headshots themselves were a major selling point and the head was a frequent target for a referee or wrestler. In his very first match in February 1988, he was thrown by Hulk Hogan and landed on his shoulder, shattering the bone which required surgery.  WWE paid for it. In another match Earl Hebner was hit in the back of the head when Ted DiBiase threw a metal suitcase into the ring. By his account he was "knocked senseless." Shortly afterwards a doctor found that he had a brain bleed likely from the suitcase and he spent 21 days in the ICU.  WWE paid his medical bills. A pupil in his eye no longer constricts since the incident. He also reports headaches, dizziness, loss of memory as well orthopedic injuries from his WWF career.

vii. **Notes:** Earl Hebner is probably the best-known WWE wrestling referee and was the senior referee at every major WWE event during his tenure at the company.

61.    Plaintiff Chris Pallies, a/k/a King Kong Bundy ("Pallies") resides in Glassboro, New Jersey.

i. **Dates:** Pallies wrestled for WWE briefly in 1981 then from 1985 to 1988 and from 1994 to 1995.

ii. **Schedule:** Pallies states: "The schedule was brutal- real tough, I once did six nights on the New York swing and made $1100... three towns a night, seven nights a week sometimes, weekends were "double shots" two shows Saturday, two shows Sunday."

iii. **Contract and Ongoing Relationship with WWE:** Pallies was mailed a contract, and when he asked Vince McMahon what does the contract cover, Mr. McMahon replied: "It includes everything up to and including your first born." Pallies signed it. Pallies was mailed 1099s and still receives quarterly royalty checks, the last one worth $192. He also receives WWE mailed offers of drug rehabilitation.

iv. **Injuries and Treatment at WWE:** Pallies wrestled injured and was regularly hit in the head. He used chairs, trashcans and hit guys with all sorts of things. The same was done to him.  He states there were no medical protocols as seen in other sports and that he has not been contacted by WWE about long-term care.

v. **WWE's Ironclad Control:** Pallies states: "We were basically full time employees, I was fined for missing a show and threatened with fines for wearing shorts on the plane." The agents told Pallies what to do who in turn was told what to do from the executive office, ultimately VKM. Pat Paterson was the booker on most of the matches and VKM's right-hand man for 30 years. The agents Pallies recalls were Jack Lanza and Chief Jay Strongbow. The agents told Pallies what to do and when. He appeared in WrestleMania I, II, and III and headlined WrestleMania II's steel cage match with Hulk Hogan.

vi. **Long-Term Occupational Medical Issues:** Pallies has been on SSDI the past ten years. He reports headaches, dizziness, loss of memory, and burning pain all over his body, which may be from wrestling related nerve damage.

62. **Plaintiff Ken Patera ("Patera") resides in Woodbury, Minnesota.**

i. **Dates:** Patera states he worked for Vince McMahon Sr. around 1976-1978, he returned for one year in 1980 and again in 1984-1988.

ii. **Schedule:** Patera states he wrestled 25-35 straight days, and 250-300 nights a year for WWE; noting: "I was a piece of hamburger to these guys."

iii. **Contract and Ongoing Relationship with WWE:** During the Vince McMahon Sr. period Patera did not sign any contract, "we shook hands, everything was verbal with a handshake." The WWE mailed him weekly checks and he was given a cash draw while on the road. He was mailed 1099s each year he worked for WWE. Patera received a royalty check last year (2016) for $264. In the past few years WWE paid Patera $2000 to do an interview used in a WWE DVD. Patera is mailed WWE letters offering drug and alcohol treatment.

iv. **Injuries and Treatment at WWE:** WWE had very little medical staff. Patera was injured in a match with Rocky Johnson in 1987 at a TV taping in Madison Wisconsin. He fully detached his triceps, which required 450 stitches and surgery to repair that resulted in a special brace for wrestling after the operation. Patera states he was mocked by Vince McMahon when he asked for ice and an ambulance after the injury. Patera relates that there was no treatment for any head injuries. Patera says that he had six or seven head injuries in WWE that really stand out where he was really hurt. Patera notes that the WWE provided rings in which: "the floors were as hard as concrete because they didn't want them to break on TV tapings or were too cheap to assemble proper wrestling rings. We would get concussed taking normal bumps on these rings."

v. **WWE's Ironclad Control:** Patera was injured in a match with Barry Darsow of Demolition (Plaintiff). Patera's left shoulder was pulled completely out of socket and he was knocked out. Billy Jack Haynes was his tag partner. After

the match Vince McMahon who had seen that he had hit his head and dislocated his shoulder, approached him per Patera: "He looked at me up and down and asked "Can you make Houston?" Patera says that he reluctantly agreed and even took a taxi to the stadium, but upon when he arrived: "I still couldn't really see straight and my arm was useless because I could not get the shoulder back in right. I told Vince Jr. the situation and that I needed a doctor. He was angry and said: 'are you really going to leave the show and screw me?' I told him it was bad and I had to. This was his attitude. They weren't running anything safely at all and he had total control over all the boys."

vi. **Long-Term Occupational Medical Issues:** Patera states he has had three knee surgeries from WWE incidents and numerous orthopedic injuries. Patera states he was hit in the head hundreds of times in WWE events. He reports headaches, dizziness, loss of memory. Patera was on SSDI and now on Medicare/Medicaid.

63. **Plaintiff Terry Michael Brunk, a/k/a Sabu ("Brunk") resides in Allendale, Michigan.**

i. **Dates:** Brunk wrestled for the ECW 1993-1995, WCW in 1995, returned to ECW 1996-2000 and with WWE-ECW brand from 2006 to 2007.

ii. **Schedule:** Brunk wrestled hundreds of nights per year for the WWE during his tenure. He believed it to be full time.

iii. **Contract and Ongoing Relationship with WWE:** Brunk states he signed paperwork with WWE, but no longer has it. Paul Heyman (head of ECW who moved to WWE) advised him to sign the WWE contracts. When he started to question the terms, he was told: "I am your lawyer, just sign." Brunk was mailed 1099s and was paid royalties but has not received any money from WWE for several years. He is currently featured on the WWE website as a superstar and the WWE features and uses his many matches (including ECW hardcore matches) to sell subscriptions to the WWE network.

iv. **Injuries and Treatment:** He broke his neck in 1994 in an ECW match with Chris Benoit. He sustained numerous broken bones in and had countless head injuries in ECW, WCW and WWE. In a barbed wire match he tore open his biceps. The match can be seen on a WWE DVD: "Bloodsport- The ECW's most violent matches." The WWE website describes him as the human highlight reel and promotes his injuries, hardcore style and contribution to their brand.

v. **WWE's Ironclad Control:** Brunk wrestled for WWE after they bought ECW as part of their effort to promote the new WWE ECW Brand. Brunk was featured

on a WWE ECW branded pay per view (PPV) called One Night Stand on June 11, 2006. He wrestled Rey Mysterio for the WWE World Heavyweight Championship in an extreme rules match. The WWE match included chair shots to the head, and Brunk was required to be thrown through a table. Dr. Rios was present at the match and "disqualified" him from continuing.

vi. **Long-Term Occupational Medical Issues:** Brunk recently had hip surgery but is in debt from his medical bills, and needs other surgeries. Brunk reports headaches, mood swings, difficulty sleeping and loss of memory. Brunk states that he believes that the brain "may heal itself."

64. Plaintiff Barry Darsow, a/k/a Smash ("Darsow") resides in Maple Grove, Minnesota.

i. **Dates:** Darsow wrestled for WWF from 1987 to 1993 and WCW in 1994-1995 and 1997-1999.

ii. **Schedule:** He along with named plaintiff Bill Eadie were in a tag team called Demolition that had one of the longest runs in WWE history. They also won Tag Team titles in WrestleMania IV, V and VI. This success also meant long hours and a rigorous schedule of hundreds of nights a year with no scheduled time off for rest.

iii. **Contract and Ongoing Relationship with WWE:** Darsow signed a contract with no lawyer involved. Darsow states that he heard the term Independent contractor but didn't know its legal meaning. Darsow believed he was working for WWE full time and could not work anywhere else. He was mailed paychecks minus what cash he took while on the road. Darsow notes that the tax returns were very expensive to handle, as the WWE mailed 50 1099s each year and he had to hire an accountant. He receives royalty statements of about $100 per quarter and is mailed WWE letters offering help for drug abuse.

iv. **Injuries and Treatment at WWE:** Darsow reports that there would be quite a few times where he blacked out after getting slammed in a match. He recounts: After being knocked out VKM told Darsow that was "a helluva match." X-Rays later showed two cracked vertebrae.

v. **WWE's Ironclad Control:** Darsow believes that the WWE was aware of head injuries, but he states that "they loved it when I was nailed or a guy got hit in the head they knew it looked good for the crowd." Darsow explains that wrestling is designed to look as real as possible and would receive instructions by WWE agents who would say: "lay it in good, you are on camera make it good." Darsow says such instructions were to hit hard and perform hard- meaning make it as real as possible without killing anyone.

Darsow revealingly opines: "Vince (McMahon) knew all about headshots and he loved it, because we looked good on camera. There is nothing better than a dazed wrestler after a hard hit to the head- you cannot fake that look.

vi. **Long-Term Occupational Medical Issues:** Darsow sustained in-ring neck injuries, as well as a total knee replacement. Darsow's stomach muscles are torn down the middle from Andre the Giant standing on him in a WWF match. He cannot afford the $15,000 to repair them. Darsow also suffers from back injuries, including disc injuries that swell so painfully that he cannot walk and needs shots to control.  He laments that his head is "not right" and he has very bad headaches, difficulty sleeping, and severe memory loss.

65.     Plaintiff Bill Eadie, a/k/a Ax ("Eadie") resides in Roswell, Georgia.

i. **Dates:** Eadie wrestled for WWF from 1983-1984 as the masked Superstar and 1986-1990 as Super Machine and Demolition's Ax.

ii. **Schedule:** Eadie wrestled more than 300 nights per year and explained that: "there was no concern for [his] well-being;" that at WWE, he was "not allowed to get hurt;" and that he was considered "a piece of meat."

iii. **Contract and Ongoing Relationship with WWE:** Eadie signed the contracts which he describes as very one-sided and didn't make sense. Eadie relates: "they called us independent contractors but we were on the road over 300 nights a year. They also had non-compete clauses where we couldn't work anywhere else. These contracts were basically there to take advantage of vulnerable guys that wanted to work and be wrestlers." The WWE mailed him 1099s reflecting work in the 50 states where he performed.  WWE sends him letters offering drug and alcohol treatment.  He believes that it is because many of the wrestlers are addicted to pain pills from their injuries performing and that the head injuries are contributing to these pervasive drug problems.

iv. **Injuries and Treatment at WWE:** Eadie says: "After an injury the referee or trainer might throw you a cold towel, you were expected to carry on with injuries, perform every day, you had to be ready to move on to the next city. The office did not give a damn if you were hurt unless it was going to impact the actual show." Eadie believes that the doctors present at matches had no authority over WWE, and that there was no protocol or policy or regulation of any kind about when a wrestler could be in the ring other than the wishes of the WWE.

v. **WWE's Ironclad Control:** Eadie states there was no OSHA regulations and no method to report an injury or take time off. Eadie explains that the agents like Lanza, Tony Garea, Rene Goulet were 'yes men for the office' and were used to control the wrestlers.  Since they grew up in the business they could also "be trusted to keep quiet about the working conditions, injuries and the

WWE's health and safety violations." The wrestlers were always afraid of stepping out of line for fear of losing their job, paycheck, position on the card, and gimmick.

vi. **Long-Term Occupational Medical Issues.** Eadie suffers from recurring headaches, dizziness, and loss of memory.

66. **Plaintiff John Nord, a/k/a The Berserker, a/k/a The Viking ("Nord")**

resides in Crystal, Minnesota.

i. **Dates:** Nord wrestled for WWF from 1991 to 1993 and WCW 1997-1998.

ii. **Schedule:** Nord estimates he wrestled in over 500 matches with WWE.

iii. **Contract and Ongoing Relationship with WWE:** Nord states he may have signed a WWE contract. In December 2015, a WWE employee called him and mailed him paperwork about his royalties. He signed paperwork and was paid $10,000 for past and future royalties. The paperwork he signed was a Contractor Nostalgia Agreement dated January 15, 2016. Nord states: "I did not speak to any lawyer before signing this and did not believe it was related to my lawsuit and WWE did not discuss the lawsuit with me."

iv. **Injuries and Treatment at WWE:** Nord states: "The WWE was an unsafe place. I never saw any OSHA notices." He broke his shoulder against the Undertaker in Montreal and his ankle and neck against the Ultimate Warrior. He had operations due to his wrestling career, including seven neck fusions documented concussions. He notes that medical treatment at WWE was ice or be given pain pills to keep going just so he was not fired.

v. **WWE's Ironclad Control:** Nord: "I thought when I was young if you trained hard and learned you did good in life. But having concussions and other injuries was not something I ever thought of. WWF has never warned me about CTE, concussion or long-term effects of head injuries." He performed to WWE's strict standards but no steps were taken to protect his head or body.

vi. **Long-Term Occupational Medical Issues:** Nord has been on disability for seven years. He suffered major and minor head injuries during WWE matches. Nord reports neurological injuries manifesting as severe cognitive difficulties, including, but not limited to confusion, headaches, dizziness, and memory loss. Nord has also battled drug addiction and has been seeking treatment.

67.     Plaintiff Jonathan Hugger, a/k/a Johnny the Bull, a/k/a Johnny

Stamboli ("Hugger") resides in Phoenix, Arizona.

i.   **Dates:** Hugger wrestled for WCW 1999-2001 and transferred immediately to WWE from 2001 to 2004 when WCW-WWE merged.

ii.  **Schedule:** Hugger wrestled full-time 4-5 days per week for WWE. He attended weekly "Booking Committee Meetings" that were led by VKM and attended by all the booking agents. Stephanie McMahon and Paul Levesque, the wrestlers, and the writers were also present at these meetings.

iii. **Contract and Ongoing Relationship with WWE:** After WWE purchased WCW, Hugger signed a contract on the spot in a hotel room without a lawyer or negotiation. He believes that he was not treated like an independent contractor because he was told what to wear whenever WWE wanted and even speak how they instructed whether he was in a performance or not. He could not wrestle for other promotions or go to other places not WWE sanctioned. He was sent 1099s. The wrestlers spoke about the one-sided nature of the relationship but it was necessary in order to keep wrestling. "It was their way or the highway".

**Injuries and Treatment at WWE:** Hugger was knocked out numerous times in WWE events, including by being slammed onto concrete. He opines, "Every bump was like being in a car accident to my body. I endured grueling hours, pain pills, and what I think were several concussions. I did hardcore matches for WWE, I was clotheslined, struck with steel chairs, and knocked unconscious." Hugger notes, "I was knocked unconscious in developmental …D Lo Brown in 2001. The agents would be present at all events in which I was injured these included Arn Anderson, Dean Malinko and Fit Finley. On July 15, 2002, I was hit the back of his skull on concrete in East Rutherford, New Jersey when John Bradshaw Layfield stormed into the locker room to get his title belt. At the time I did not know it was a concussion, but merely shrugged it off as another injury where there was no protocol or treatment of any kind.

iv.  **WWE's Ironclad Control:** Hugger says questioning any aspect of WWE's creative control resulted in direct punitive action: "One time Bradshaw wanted to knock me and my three partners out single-handed, "lay us out", it was stupid because I was winning other matches. We said the idea was dumb…after the match we were sent to Louisville, KY for two weeks as punishment for questioning the story….We were exiled for two weeks" from TV. Even minor offenses resulted in fines or persona devolvement. Hugger personally had fines levied against him by WWE employee Michael Hayes while classified as an independent contractor, including a $500 fine for traveling on a bus in a baseball cap, and on another occasion a particular

33

pair of pants on an airplane, as it was against WWE's outside the ring dress code, labeled business casual. The weekly meetings would lay out the matches, the finishes, and who would win. The meetings took place every week for every show.

v. **Long-Term Occupational Medical Issues:** Hugger states with respect to concussions: "I was 20-21-22 years old I didn't know any better." Hugger has sleep apnea, headaches, fatigue and memory loss and, Hugger says he is "concerned about what is going to happen to me."

68.    Plaintiff James Brunzell, a/k/a Jumpin' Jim ("Brunzell") resides in St. Paul, Minnesota.

i. **Dates:** Brunzell wrestled for WWE from 1985 to 1993.

ii. **Schedule:** Brunzell wrestled 300 nights per year often as many as 25-26 days each month.  He once wrestled 43 days in a row. Brunzell states: "There is no comparison with the schedule of the territories and that of WWE. The schedule was brutal, I would be booked for 2-3 weeks at a time with no breaks."

iii. **Contract and Ongoing Relationship with WWE:** Brunzell started wrestling at WWE with no contract. However Rene Goulet, an agent, started pushing him to sign one and was told: "if you don't sign you will be fired." So he signed it. He was mailed 1099s.

iv. **Injuries and Treatment at WWE:** Brunzell performed injured numerous times, including in 1988 or 1989 when after a maneuver off the top rope was kicked in the jaw and slammed to the mat on the back of his head. He was knocked unconscious.

v. **WWE's Ironclad Control:** Brunzell laments that at "WWE you were not an independent contractor you were an indentured servant". He did not understand the difference between an independent contractor or employee at the time, but he knew he was overworked and underpaid. He could not disagree with WWE and knew he had no rights under VKM. Brunzell notes that WWE knew about each incident and ignored everything. WWE created a coercive workplace with no regulations. "It was run sort of like the mafia".

vi. **Long-Term Occupational Medical Issues:** Brunzell has had a shoulder replacement, knee replacement, partial hip replacement, as well as back, and neck problems. He reports acute short-term memory problems, difficulty sleeping and anxiety.

69.    Plaintiff Susan Green, a/k/a Sue Green ("Green") resides in West

Columbia, South Carolina.

i.   **Dates:** Green wrestled with WWWF from 1972 to 1984.

ii.   **Schedule:** Green wrestled in WWWF about four times a month in the 1970s.

iii.   **Contract and Ongoing Relationship with WWE:** Green received 1099s and states there was no health insurance or workers compensation.

iv.   **Injuries and Treatment at WWE:** Green was routinely hit in the head and sustained concussions throughout her career. She was injured in WWWF matches and recalls that in 1978, in White Plains, NY, after suffering a diagnosed concussion outside of the arena after slipping on ice. Once the injury was reported to Vince McMahon, Sr. concluded that she should not wrestle.  Moolah, her promoter, was furious and Green did not understand what was going on. She felt dizzy but did not think it was a big deal.

v.   **WWE's Ironclad Control:** The Fabulous Moolah tightly controlled the woman's troupe, and promoters such as Vince McMahon, Sr. were responsible for her safety.

vi.   **Long-Term Occupational Medical Issues:** Green is disabled, has nerve damage from numerous orthopedic injuries. Green is under the care of a neurologist and takes medications for depression, anxiety, and sleeping problems.

70.    Plaintiff Angelo Mosca, a/k/a King Kong Mosca ("Mosca") is 78 years

old and resides in Hamilton, Ontario.

i.   **Dates:** Mosca began working in WWE about 1970. Mosca wrestled for WWF without a Booking Contract into the 1980s.

ii.   **Schedule:** Mosca was an important figure in the WWE, where he was a heel wrestler named King Kong Mosca. In 1981, he was the WWF's most hated bad guy according to the WWF encyclopedia and participated in numerous TV matches.

iii.   **Contract and Ongoing Relationship with WWE:** Mosca's best recollection is that he was paid under an agreement when he was full time for WWE in 1981 and 1984. In the 1970s he believes he was paid on a handshake deal.

iv. **Injuries and Treatment at WWE:** Mosca sustained numerous hits to the head while performing, available on WWE Network which WWE continues to profit from.

v.

vi. **WWE's Ironclad Control:** WWE directly instructed Mosca what moves to perform, who was to win the match, and the finishing maneuvers.  He was told where and when to perform by WWE.

vii. **Long-Term Occupational Medical Issues:** Mosca is disabled and resides in a long-term care facility in Hamilton, Ontario. Mosca was diagnosed with Alzheimer's disease in 2015. Since then he has steadily gotten worse. He is on various medications including Aricept.

71. Plaintiff James Manley, a/k/a Jim Powers ("Manley") resides in Merritt Island, Florida.

i. **Dates:** Manley wrestled for WWF from 1984 to 1994, some matches in the ECW 1994-1995 and WCW 1996-1998.

ii. **Schedule:** Manley started performing for two-three days a week, but eventually became a main eventer with Paul Roma. He notes that the schedule was "insane, 5-6 nights week."

iii. **Contract and Ongoing Relationship with WWE:** Manley likely signed a contract, but cannot recall.  He was mailed 1099s. He is currently receiving royalties and has recently received letters offering drug treatment.

iv. **Injuries and Treatment at WWE:** Manley states that head injuries were common. He relates the following incident: "I was with Paula Roma in Italy so this would have been between 1987-89. We were wrestling Demolition (Bill Eadie and Barry Darsow- other plaintiffs) and they threw me out of the ring. The padding tripped me and I hit my head on the stairs. Bill Eadie who told me: "stay down, you are out but don't know it." The WWE agent was not pleased. I believe there was some discussion and debate whether I was okay or not. The Ultimate Warrior saw me sitting with my head in my palms and screamed what the hell is wrong with you? He fired off more questions, demanding that I tell him where I was. I finally managed to say Atlantic City, he screamed (that was just his way) that we were in Italy and demanded someone take me to the hospital. The doctors there told me it was a concussion, the WWF didn't care I was back on tour within a day or two. In retrospect this was crazy but that was what happened." Manley states: "I had many other head shots- I felt horrendous- sick, seeing stars, dazed. This was after suplexes, chair shots, working with stiff guys who hit you too hard, I was thrown into railings, this was routine."

v. **WWE's Ironclad Control:** Manley states: "We were treated as full time employees- the rules, the fines, the schedule, pretty much everything was full time."

vi. **Long-Term Occupational Medical Issues:** Manley has been on SSDI about ten years. He has numerous occupational injuries many orthopedic, neck injuries, rotator cuffs, three hip surgeries. He states that his equilibrium is off and becomes very dizzy. Manley states that his memory, especially his short-term memory is almost completely gone. Manley often becomes paranoid, has mumbled speech and repeats himself. He also reports headaches and trouble sleeping. Manley recently had to move to the first floor of his apartment building because he cannot easily walk up and down stairs.

72.     **Plaintiff Mike Enos, a/k/a Blake Beverly of Tag Team Beverly Brothers**

("Enos") resides in Tampa, Florida.

i. **Dates:** Enos wrestled for WCW in 1990, 1996-1999 and in the WWF from 1991 to 1993.

ii. **Schedule:** Enos performed 23+ days a month.  He recalls one stretch where he wrestled 47-57 days straight in Europe. "It was insane, we were just worked to death and the pay was low. In my last years as wrestler at WCW the schedule was less than half of what it was at WWF".

iii. **Contract and Ongoing Relationship with WWE:** Enos believes he had a signed contract. He did not have a lawyer, and was excited to be working at WWE. Enos states: "The distinction of being an Independent contractor was not explained or discussed that I can recall. I worked full time for WWE. I do get some very small checks for royalties I think maybe around $300/year total." WWE mails him letters on getting help for drug abuse.

iv. **Injuries and Treatment at WWE:** Enos sustained numerous injuries at WWE, including being knocked unconscious when a rope broke and he hit his head on concrete, and rupturing his L4 and L5 discs.  He believes Earl Hebner was the referee when he was knocked unconscious.  Enos suffered symptoms for days but there was never a medical evaluation.  He was expected to shake it off and doesn't remember any policy for resting after a head injury.  He remembers being knocked unconscious in a SummerSlam and many other times where an agent or wrestler might ask "how many fingers am I holding up?."

v. **WWE's Ironclad Control:** Enos reports that after his tag-team partner, Wayne Bloom, was seriously injured resulting in nerve damage that atrophied one of his arms, he was himself terminated after only a few months. "There was

37

no union or worker protection rules at all." He notes that in WWF, "we targeted the head. So it would be clear to anyone in authority what was going on here. The moves we performed, the slams, power bombs, suplexes, diving head butts, these are designed to entertain the fans by showing us getting head injuries". Enos anticipated that WWE was looking after their safety since WWE told him what to do or not to do when performing.

vi. **Long-Term Occupational Medical Issues:** Enos has long-term back injuries-discs L4 and L5 that were ruptured in a WWE event. Enos takes medication for depression, has memory loss both short and long term and has severe trouble sleeping for which he take various medicines that rarely work.

73. **Plaintiff Butch Reed, a/k/a The Natural ("Reed") resides in Kansas City,**

Missouri.

i. **Dates:** Reed wrestled for WWE from 1986 to 1988. Reed also wrestled for the WCW in 1989-1992.

ii. **Schedule:** Reed wrestled close to 300 nights per year, twice on weekends and often wrestled seven days a week.

iii. **Contract and Ongoing Relationship with WWE:** Reed relates: "We were not told about independent contracts, you worked for WWF…. You paid your own taxes, 1099s…. I took draws, cash at the shows to pay for food, lodging and beer. I get royalties from WWE now and have my recent statements. I receive less than $100 per quarter. I am featured on the WWE website and on the WWE network (2017)."

iv. **Injuries and Treatment at WWE:** Reed states that at WWE there were few doctors or medical examinations, or safety rules. He states: " I was hurt when a chair hit me across the head and I fell out of the ring and I couldn't get up for awhile. This stuff was commonplace, seeing stars or getting hit with a thrown punch we called 'potatoes,' or sometimes I got kicked so hard I was paralyzed for a few seconds." At WWF the medical treatment was: "take yourself up, spit on it, put a band aid on it." "If you could put your boots on you needed to be in the ring, otherwise there was no payday." When I hit my head, a WWF doctor would sometimes give me pain pills for a headache, saying, "you will be ok."

v. **WWE's Ironclad Control:** WWE required Reed, an African American, to dye his hair blonde for his gimmick and be "naturally blonde". He did not want to, but agreed to work for WWE. He recalls that VKM often required wrestlers to switch to gimmicks he had created in order to assert his control over the performer. The agents threatened Reed with fines for tardiness. Reed

recalls, "When I was asked to perform moves, I did it or I would be seeking employment elsewhere. It was their way or the highway."

vi. **Long-Term Occupational Medical Issues:** Reed experiences headaches, dizziness, loss of memory, and problems falling asleep.

74. **Plaintiff Carlene Denise Moore-Begnaud, a/k/a Jazz ("Moore-Begnaud") resides in Lafayette, Louisiana.**

i. **Dates:** Moore-Begnaud wrestled for ECW 1999-2000, for WWE from 2001 to 2004, and several matches 2006-2007 as part of the WWE's revived ECW brand.

ii. **Schedule:** Moore-Begnaud's was one of the most successful female wrestlers of her time in WWE and performed in WrestleMania 17 and 18.

iii. **Contract and Ongoing Relationship with WWE:** Moore-Begnaud attended WWE training at Ohio Valley Wrestling. She signed an agreement that was mailed to her with no negotiation that was offered on a take it or leave it basis. She was mailed 1099s by WWE.

iv. **Injuries and Treatment at WWE:** Moore-Begnaud states: "I was injured while wrestling in WWE events, including being kicked in the temple where I was completely knocked out. I went through a table on Monday Night Raw sustaining injuries I think May 13, 2002. Moore-Begnaud details that hits to the head were very common in WWE events. She also injured her knee which required surgery. There were WWE agents at the matches who observed everything.

v. **WWE's Ironclad Control:** Moore-Begnaud succinctly states: "When you are there the WWE owns you."

vi. **Long-Term Occupational Medical Issues:** Moore-Begnaud has memory loss, headaches, and long-term injuries to her neck & shoulders.

75. **Plaintiff Sylvain Greiner ("Greiner") resides in Terrebonne, Quebec.**

i. **Dates:** Greiner wrestled for WWE from 2003 to 2007.

ii. **Schedule:** Greiner wrestled approximately 200 nights per year and was constantly on the road, stating that "wrestling 15 days in a row was common. It was dangerous and unsafe, as my injuries didn't have to heal."

iii. **Contract and Ongoing Relationship with WWE:** At WWE's advice, Greiner trained at a wrestling school run by Rocky Johnson, for six to seven months.

He signed an agreement mailed to him for the Ohio Valley Wrestling WWE developmental program. Greiner states the "WWE Immigration Department arranged for a VISA for me. The WWE took care of all the arrangements for me; it was a special Visa for people on sports teams." He receives WWE letters offering drug rehabilitation.

iv. **Injuries and Treatment at WWE:** Greiner recalls a typical finish was being dropped through a hard, wooden table, breaking it. Night after night he was dropped through a table.  His neck was injured from the table but the agent, John Laurinaitis, insisted he continue performing despite the pain progressively worsening each night. In Greiner's experience, seeing a doctor was discouraged.  WWE had very little supporting medical staff. A doctor would be present for TV tapings and a trainer for ankle tapings occasionally. Eventually Greiner's neck injury required X-Rays where the doctor advised him to "take it easy" and rest. He still wrestled but was advised not to take bumps (landing on his back).  Greiner had a staff doctor review his neck and found he had been performing with a neck broken in two places.  He flew to Montreal where the physician was notably upset when he found out Greiner had been performing only the day prior. WWE required a second opinion and sent him to their own doctor who told Greiner the broken bones would heal and put him on a six month rest.

v. **WWE's Ironclad Control:** Greiner relates: "The WWE controlled my every move, after they went public they required a dress code, required us to wear business suits in rental cars, airplanes. You would be fined if you didn't have corporate clothes even when not working. I didn't know the difference in employment law between an independent contractor or full-time. I was definitely employed full time." The general rule was "you don't get hurt" and the WWE staff was aware of everything that happened. The agents were in charge of daily activities. Arn Anderson was his main road agent and others were Dean Malinko, Ted DiBiase, Fit Finley, and Tony Garea.  John Laurinaitis ran things for VKM since he was head of Talent Relations. Greiner believes WWE knew that he sustained head injuries.

vi. **Long-Term Occupational Medical Issues:** Grenier states that he has many injuries from his WWE career including severe migraines, loss of sensation in my right arm, hearing loss, neck pain, dizziness, and loss of memory. He has permanent damage from the calcification in his neck bones.  Grenier is currently seeing a neurologist who specializes in head trauma in athletes.

76.    Plaintiff Omar Mijares, a/k/a Omar Atlas ("Mijares") resides in San Antonio, Texas.

i. **Dates:** Mijares wrestled for WWF from about 1984-1993.

ii.  **Schedule:** The WWE schedule was full-time because they needed wrestlers always on TV.

iii.  **Contract and Ongoing Relationship with WWE:** Mijares may have signed a WWE contract but does not recall. Mijares has 1099s from 1988-1990 and a letter dated 1/15/1991 from Donna Rehm at WWE accounting. Mijares is mailed drug and alcohol letters and does not receive any royalties.

iv.  **Injuries and Treatment at WWE:** Mijares never received information about safety or head injuries. Mijares says: "I trusted the WWE people to have safer rings and wrestlers who were experienced, people that knew wrestling. I had a fast acrobatic style that required my opponents to be skilled and know wrestling moves. There was very little health or safety rules in place there and many people got injured including me. I knew nothing about head injuries, you hit your heads it was part of wrestling because the WWE always wanted more action."

v.  **WWE's Ironclad Control:** Mijares describes how WWE used his wrestling skill: "As I got older the WWE made me job (lose) to other wrestlers. By the last year of my career in 1993 I was paid $200 a night to "put the WWE stars over," meaning I was asked to repeatedly lose in order to make the WWE stars look better."

vi.  **Long-Term Occupational Medical Issues:** Mijares has depression, trouble sleeping, headaches, severe hearing loss, mood swings, confusion, extreme loss of memory and orthopedic injuries.

77.  Plaintiff Don Leo Heaton, a/k/a Don Leo Jonathan ("Heaton") resides

in Langley, British Columbia.

i.  **Dates:** Heaton wrestled in the 1970s, including the World Championship title with many Madison Square Garden appearances.

ii.  **Schedule:** Heaton, as a top star for WWE, was required to wrestle at WWE direction.

iii.  **Contract and Ongoing Relationship with WWE:** Heaton states that when he wrestled for Vince McMahon, Sr. there was no paperwork back then, only handshake deals. Heaton is currently featured in the WWE encyclopedia published in 2017 as being "The Mormon Giant." The WWE website recounts: "The 6-foot-6 competitor had great rivalries against the likes of Andre the Giant, Killer Kowalski… and had WWE Championship Matches against Bruno Sammartino and Pedro Morales." Heaton says he receives no royalties from the WWE.

iv. **Injuries and Treatment at WWE:** The WWE has not reached out about his long-term head injuries despite his stature in the wrestling world.

v. **WWE's Ironclad Control:** Heaton relates: "I came up in the world that made wrestling so popular." Heaton believes since the WWE took over the promotion of wrestling, it should help the people who built the business and educate the wrestlers about what they know about head injuries. He has pledged to donate his brain tissue to study the effects of wrestling and CTE.

vi. **Long-Term Occupational Medical Issues:** Heaton is disabled, has trouble ambulating, and is on Medpay by the Canadian Government. Heaton has long-term neurological injuries and cognitive difficulties, including, headaches, dizziness, and loss of memory.

78. Plaintiff Troy Martin, a/k/a Shane Douglas ("Martin") resides in New Brighton, Pennsylvania.

i. **Dates:** Martin wrestled variously for WCW, ECW and WWE from 1989-2001.

ii. **Schedule:** Martin states: "working for the WWF required exponentially more work, and far more time away from home, than the various regional promotions I had previously worked for. It was not uncommon to be on the road for as long as 28 days per month. In short, I was working many more hours and days and putting my body through far more physical punishment as a result of this arduous schedule."

iii. **Contract and Ongoing Relationship with WWE:** Martin signed a booking contract dated July 11, 1995.  He was paid as an independent contractor, with 1099s mailed by WWE from each state he performed in.

iv. **Injuries and Treatment at WWE:** Martin seriously injured his back in 1995 on Monday Night Raw and his legs would not respond to what he wanted them to do, two referees moved Martin behind the curtain and had to crawl about forty yards to the dressing room. He later learned he had a spinal fracture. Shortly after the injury, Martin was examined by a NY State Athletic Commission doctor named Richard Birrer who refused to clear him to wrestle. VKM, along with WWE employees Arnold Skaaland, Blackjack Lanza, George Steele, Pat Patterson, Jay Strongbow, and Howard Finkel, met with Dr. Birrer, who told VKM he could not clear Martin without clear diagnostics through either a CAT scan or MRI, ruling out Martin's presentations of asymmetrical reflexes, indicating a broken back or ruptured discs.  VKM asked Dr. Birrer what was the worst that could happen. Dr. Birrer told VKM that potential sexual dysfunction or being refined to a wheelchair. VKM became angry and allegedly shouted at the doctor, "I have a dressing full of wrestlers with sore backs but you're going to give this (expletive) an

excuse to not perform tonight?  Well, you can congratulate yourself, doctor, because you just screwed 25,000 of your fellow New Yorkers out of the most important match on the card."   Martin believes this is illustrative of his experience at WWE and their view of injuries. Martin was treated by Dr. Unger and does not remember any steps to prevent head injuries or educate them about the symptoms or risks.

v.  **WWE's Ironclad Control:** WWF exerted total control over Martin.  He was given his booking sheet each month detailing the month's events, with the cities and card for each city. He was handed a stack of airplane tickets and never asked what dates worked. It was 100% clear to Martin that it was an all or nothing proposition. "You either accepted every date you were listed for or you would be taken off the booking sheet – period!"  Every move had to be cleared by the assigned agent, for Martin, Blackjack Lanza, Rene Goulet, George Steele, Jay Strongbow, Tony Garea, and Pat Patterson.  After a match, the agent would sharply critique the performance and fill forms with positive and negative parts of the match that would be sent to executives.

vi.  **Long-Term Occupational Medical Issues:** Martin has had extensive occupational injuries broken bones, surgeries, and concussions, including incidents in WWE. Martin has symptoms of long-term issues from head trauma including headaches, depression, dizziness and memory loss.

79.  Plaintiff Marc Copani, a/k/a Muhammad Hassan ("Copani") resides in

Liverpool, New York.

i.  **Dates:** Copani wrestled for WWE's developmental territory 2002-2004 and WWE from 2004 to 2005.

ii.  **Schedule:** Copani wrestled at least four days a week.

iii.  **Contract and Ongoing Relationship with WWE:** Copani signed booking contracts that said he was independent contractor though he didn't really know what that meant.  He was mailed 1099s.

iv.  **Injuries and Treatment at WWE:** Copani states: "As I wrestled at WWE I was expected to continue performing through injuries. If I complained I expected that I might lose my spot in the roster through which I earned my pay."  After a match with Shawn Michaels in 2005, Copani woke up back-stage being examined by Dr. Rios. He told Copani that he was doing a concussion check and that he had been knocked out in the match.  He said to get some rest. The injury occurred on a Monday and he was back wrestling that Friday.  At the time, Copani viewed concussions as preferable to a broken ankle because he would not miss any matches.  Copani witnessed no health or safety checks, or OSHA regulations.

v. **WWE's Ironclad Control:** The culture demanded adherence to WWE's unwritten rules that injury or complaint about injury would result in ridicule by the office and could even be career-ending.  WWE assigned Copani, an Italian-American, the gimmick of being Muhammed Hassan- a Muslim "heel" or bad guy. The character proved to be extremely popular and controversial. Copani's WWE career came to an end when real life terrorist bombings hit London in 2005. WWE told him that he would be taking time off and he was never given another spot.

vi. **Long-Term Occupational Medical Issues:** Copani attributes his symptoms to head injuries at WWE including depression, headaches, dizziness, loss of memory.

80.    Plaintiff Mark Canterbury, a/k/a Henry Godwin ("Canterbury") resides

in Lindside, West Virginia.

i. **Dates:** Canterbury wrestled for WCW 1992-1994 and WWE from 1994-1999, and a brief return to WWE developmental in 2006-2007.

ii. **Schedule:** Canterbury wrestled hundreds of nights when on the main roster.

iii. **Contract and Ongoing Relationship with WWE:** Canterbury believes he signed a booking contract and received 1099s. He is paid royalties and his last check from WWE was in the amount of $55. During the summer of 2016, Canterbury became very depressed and was battling an addiction to pain pills. He received a letter from WWE offering help. He called and spoke to Bob Killar at WWE for about 30 minutes in June 2016. Mr. Killar made all the arrangements for him and within four days flew him to Tampa. He was picked up in a van and driven to the facility where he signed admission and other paperwork. Canterbury did not have a lawyer or communicate with anyone about this paperwork nor did he intend to drop his case. He stayed inpatient for eight weeks and feels much better.

iv. **Injuries and Treatment at WWE:** Canterbury says hits to his head were "routine" and believes he had three actual concussions in WWE. Canterbury sustained a career ending injury in a WWF match. He believes Pat Patterson and Jack Lanza were the agents. The match called for him to be given a move called a Doomsday Device. Canterbury expressed his concern to the agents, and indicated that he did not want to do the move. Canterbury explains that it was rare for anyone to question anything because if you did not do as you were told you would be punished. Canterbury was to have it performed on him. The move resulted in his head being driven straight into the mat. He recounts: "I weighed 328 pounds at the time and my neck went out. At first I thought it was a pulled muscle and I had a mouth full of chipped and broken

teeth, but the trainers had me lie on the cement floor and called an ambulance. The doctor said I had fractured my C-7 vertebrae. Vince, Pat Patterson and Jerry Brisco visited me in the hospital to ask what me what doctors said. They told me that WWE would take care of everything." The WWE paid for the surgery in which he received a piece of bone to fuse his spine. He lost mobility in his arm which is noticeably smaller today.

v. **WWE's Ironclad Control:** Canterbury was told his gimmick would be an Arkansan pig farmer who threw slop at his opponents. The workplace was unregulated and there were no safety rules that he was aware of other than what the office chose to implement. He performed moves as WWE instructed and matches were created and strictly overseen by WWE employees.

vi. **Long-Term Occupational Medical Issues:** Aside from his neck injury, Canterbury has depression, headaches, and memory loss.

81. Plaintiff Victoria "Vickie" Otis, a/k/a Princess Victoria ("Otis") is 53 years old and resides in Pasco, Washington.

i. **Dates:** Otis wrestled for WWE in 1982 to 1984.

ii. **Schedule:** Otis wrestled full-time, the majority of her wrestling was done in WWE.

iii. **Contract and Ongoing Relationship with WWE:** Otis worked under a promoter nicknamed Moolah (Mary Lillian Ellison). Moolah was paid by WWF and then Otis was paid by Moolah.  Moolah handled everything including rent and housing.  Years later, Otis had IRS disputes because of this period of time. Moolah was only supposed to get 30% of her earnings and Otis does not receive any royalties.

iv. **Injuries and Treatment at WWE:** Otis was knocked out several times in WWF and remembers throwing up after certain incidents. She had a "huge goose egg" over her eye after one match and received four concussions that she knows of.  She recalls getting knocked around very hard.  In September 1984, in Philadelphia, she sustained a career ending injury in a WWF ring resulting in two cracked vertebrae.  Otis could not afford the recommended surgery and WWE told her to "take a break" and "see how things went". When she asked WWE to help pay for her medical bills, WWE never responded.

v. **WWE's Ironclad Control:** "While there I was to obey a "code of silence" in wrestling: this meant you keep your mouth shut, be it injuries or what income you earned."

vi. **Long-Term Occupational Medical Issues:** Otis suffers from neck injuries directly related to WWE.  She has headaches, memory loss, insomnia and trouble sleeping.

82.     Plaintiff Judy Hardee, a/k/a Judy Martin ("Hardee") resides in Gaston,

South Carolina.

i. **Dates:** Hardee wrestled for WWE during the years 1978-1989.

ii. **Schedule:** Hardee states she wrestled over 100 nights per year with WWF during her eleven year career.

iii. **Contract and Ongoing Relationship with WWE:** Hardee was paid as an independent contractor. At WWE she worked with Pat Patterson who directed her activities. Hardee was paid a WWE royalty check of $40 in the past few years and receives letters from WWE offering drug and alcohol treatment.

iv. **Injuries and Treatment at WWE:** Hardee explains: "If you were hurt you had to go in the ring, the show must go on. In a WWF show in Hartford, Connecticut I was hit in the head with a metal chair by Moolah. I was bleeding pretty good, Moolah said "you'll be alright." Pat Patterson said I was going to need to get to a doctor. They took me to the local emergency room and I got 13 stitches to my forehead- can still see the scar." Hardee was often injured while wrestling, taking bumps and falls on the very hard WWE provided rings.  She believes hitting the turnbuckles in matches so hard is what led to her back surgeries.

v. **WWE's Ironclad Control:** Hardee reports that she did as she was told as there was no choice if you wanted to wrestle.  There was no outside OSHA regulation or medical protocols followed at any point.

vi. **Long-Term Occupational Medical Issues:** Hardee has long term back injuries which required surgeries. She reports headaches, loss of memory and difficulty sleeping.

83.     Plaintiff John Jeter ("Jeter") resides in Scottsdale, Arizona.

i. **Dates:** Jeter began his career in the WWE developmental Ohio Valley Wrestling program in the mid-September of 2001 and performed for WWE through 2008.

ii. **Schedule:** Jeter reports that his travel schedule was completely insane, and that he wrestled in 225-250 shows per year at the height of his career. There

was no offseason, and as a result, injuries did not heal and were dealt with instead by using pain medication.

iii. **Contract and Ongoing Relationship with WWE:** Jeter was mailed a booking contract by Tom Pritchard in 2003 and later signed a WWE booking contract in 2005. He was paid weekly and was mailed form 1099s by WWE. Jeter has also received some royalty payments from WWE by mail.

iv. **Injuries and Treatment at WWE:** Jeter reports that it was routine to have "your bell rung" and that he "was kicked, punched, smacked and dropped on my head as part of my routine matches." He sustained several concussions throughout his career. He was knocked unconscious in the spring of 2003 and suffered from a splitting headache for weeks after. Jeter sustained another concussion in 2006, which Vince witnessed. He reports that WWE had knowledge of wrestler injuries, and that after an injury, he was told by WWE agents that "sometimes in wrestling you just have to suck it up and work through these things."

v. **WWE's Ironclad Control:** Jeter reports the WWE functioned with unwritten rules to discourage reporting of injuries or anything else.

vi. **Long-Term Occupational Medical Issues:** Jeter eventually left WWE due because he had developed injuries that could not be "worked through" (including a severe bone spur the size of a golf ball in his lower back that required surgery). Jeter currently suffers from symptoms which he attributes to sustaining multiple untreated head injuries while working for WWE, including but not limited to depression, anxiety, and lowered mental acuity.

84.    Plaintiff Mark Jindrak ("Jindrak") is a resident of Rochester, New York

and currently living in Mexico City.

i. **Dates:** Jindrak wrestled for WCW 1999-2001 and WWE from 2001 to 2005.

ii. **Schedule:** Jindrak wrestled hundreds of nights per year at WWE.

iii. **Contract and Ongoing Relationship with WWE:** Jindrak came to WWF shortly after the WCW was acquired by WWE in July 2001. He was a WCW wrestler who invaded WWE as part of the WCW/ECW alliance storyline. He signed a booking contract, and was mailed 1099s.

iv. **Injuries and Treatment at WWE:** Jindrak suffered numerous head injuries while performing for WWE, including a concussion in 2004 after a botched move with Scot Renald Garland. He notes there was no head check or medical evaluation of any kind.  That same year he was kicked in the head and had other performers and WWE staff joking about how he had his "bells

47

rung". There was no evaluation or medical help despite WWE's knowledge. There was no test, evaluation, or doctor when he suffered concussions or head injuries. He notes that "a few weeks before I was released from WWE my head was slammed into an unpadded barrier made of metal, it was a hard blow and I was bleeding pretty good. After the match, a WWE trainer closed the wound with glue but never checked for a concussion or had a doctor or medical evaluation." Jindrak remembers that WWE agents would often laugh when he would be dizzy and confused in the ring for 10-15 seconds after impacts.

v.   **WWE's Ironclad Control:** Jindrak did not believe he could speak up and say, "Hey, my head is hurting" or that he could not perform after suffering an injury. He states, "They would bully you into keeping on". He remembers even off TV he was ordered to train for eight hours a day in a camp in Louisville, Kentucky where he performed a lot of "unnecessary falls and physical abuse everyday". He was not allowed to work anywhere else and there was never any OSHA oversight at WWE.

vi.   **Long-Term Occupational Medical Issues:** After my time WWE he developed a hard time sleeping and Headaches. He feels that his untreated concussions and head injuries may present long-term issues.

85.   **Plaintiff Gayle Schechter as Personal Representative of the Estate of Jon Rechner a/k/a Balls Mahoney ("Rechner") and their minor son, represent a 44 year old wrestler who resided in Spring Lake Heights, New Jersey. The Estate is in Monmouth County Surrogate's Court, New Jersey.**

i.   **Dates:** Rechner wrestled in WWF 1992-3, and 1995. ECW from 1996-2001 and WWE 2005-2008.

ii.   **Schedule:** In addition to his ECW and earlier WWE appearances, the WWE hired Rechner full time for its ECW brand, which included weekly TV matches.

iii.   **Contract and Ongoing Relationship with WWE:** Rechner is likely to have signed a booking contract and was paid with 1099s. The WWE features Rechner's ECW and WWE violent matches on its website, DVDs and the streaming WWE network. WWE did not pay him and does not pay his estate any royalties.

iv.   **Injuries and Treatment at WWE:** Rechner's violent footage including chair shots that is currently monetized and syndicated by WWE demonstrates that head injuries were almost the raison d'etre of his performances.

v. **WWE's Ironclad Control:** Rechner was one of the most popular hardcore style wrestlers and was, with fellow deceased Plaintiff Brain Knighton, referred to as the "Chair-Swinging Freaks."

vi. **Long-Term Occupational Medical Issues:** Rechner's death certificate lists cause of death as "pending further studies." An autopsy and neuropathology report prepared after Rechner died April 12, 2016 at the age of 44 concluded he had "Chronic Traumatic Encephalopathy." The comment on the report includes a statement "the diagnosis of CTE is consistent with his long career as a professional wrestler."

86.     Plaintiff Bernard Knighton and Barbara Marie Leydig, Co-Representatives of the Estate of Brian Knighton, a/k/a Axl Rotten ("Knighton"), who represents a 44-year-old retired wrestler who resided in Berlin, Maryland.

i. **Dates:** Knighton wrestled for WCW, ECW and WWE. Knighton briefly wrestled for WWE in 2005 including in a WWE Pay Per View Event.

ii. **Schedule:** Knighton made at least six WWE appearances in 2005, and performed hundreds of times in ECW.

iii. **Contract and Ongoing Relationship with WWE:** Knighton signed a WWE booking contract. Knighton participated in the WWE Former Talent Rehab Program. He was sent by WWE to the Hanley Recovery Center in West Palm Beach, Florida on November 9, 2009. He was admitted to the program for drug and alcohol abuse issues which he completed on December 7, 2009. After completing the rehab program Knighton attended a WWE funded out-patient program and was called by WWE staff, including Ann Russo Gordon, on a weekly basis for at least most of 2010 to monitor his progress. Ann Russo Gordon was the Manager of the WWE Talent Relations Department. After struggling with these issues Brian told his family that the WWE staff that administers the drug and alcohol program explained to him he could not return to the program again because of his limited WWE career. Knighton was then shut out of future WWE rehabilitation opportunities.

iv. **Injuries and Treatment at WWE:** Knighton was a hardcore wrestler in ECW and WWE performing moves that involved striking opponents' heads with objects such as chairs.

v. **WWE's Ironclad Control:** Knighton performed in his matches under WWE direction, knowledge and control.

vi. **Long-Term Occupational Medical Issues:** Brian died of a drug overdose on February 4, 2016 in a McDonald's Restaurant in Maryland. An autopsy and neuropathology study of Mr. Knighton's brain showed Knighton had early stage CTE. The report reads in part: "given the history of prolonged exposure to repetitive blunt force impacts of the head during the decedent's wrestling career, the neuropathologic findings are most suggestive of early incipient Chronic Traumatic Encephalopathy (CTE)." The Findings located "rare neurofibrillary tangles " of Tau protein in four sections of Knighton's brain.

vii. **Note:** Knighton's long time tag team partner is a named Plaintiff diagnosed with CTE, Jon Rechner who also died at age 44.

87. **Plaintiff Marty Jannetty ("Jannetty") resides in Las Vegas, Nevada.**

i. **Dates:** Jannetty began his 20+ year career with the WWE in 1988 and continued to wrestle for the WWE on-and-off through 2009.

ii. **Schedule:** Jannetty wrestled up to 300 WWE shows per year over the course of his WWE career. This included Saturdays and Sundays and sometimes performing in two shows in two different geographic areas in the same day, which required him to rush from one match to the next location. On a few occasions, he was late, and was fined $500.

iii. **Contract and Ongoing Relationship with WWE:** Shortly after Jannetty started wrestling for WWE, Pat Patterson provided him with a contract. He read it over quickly and did not understand a lot of it, nor was it explained to him, and he was not represented by counsel or an agent. He was told that everyone signs the contract "as-is" and that the terms were not up for discussion. Fearing that WWE would withdraw the offer if he voiced any questions or concerns, he signed. He was mailed 1099s each year he wrestled. He currently continues to receive royalties from his past WWE performances. The royalty payments have dwindled and despite his reaching out to WWE to question the amounts, no accounting has been provided. WWE has sent Jannetty letters offering drug and alcohol rehabilitation, and WWE paid for his treatment in 2014. Treatment was unsuccessful because Jannetty requires pain medication as a result of long-term injuries he sustained in the ring during his WWE career that WWE refuses to pay for surgery to correct.

iv. **Injuries and Treatment at WWE:** In a May 31, 1993 match, another wrestler performed an unexpected and unpredictable move which resulted in an injury to Jannetty's ankle. Following that injury, Dr. Unger took x-rays, and informed Jannetty that one of his ankles was broken. After Dr. Unger informed VKM, he proceeded to tape up Jannetty's ankle, give him 10 Vicodin pills, and send him to perform in another match that same day. He

sustained several additional injuries to his ankles over the years and generally it was just taped up and he was provided with an extremely high dose of pain pills and told to keep performing. Jannetty also sustained multiple untreated concussions. One such incident occurred in 1994 on a WWE European tour in Germany when he was knocked unconscious by a Powerbomb and WWE referee Joe Maranella had to wake him up. Jannetty reported the injury to WWE and WWE failed to take any action and Jannetty was forced to return home and he was temporarily terminated from WWE. The following year, Jannetty signed a new contract with WWE and returned to the ring. On the December 4, 1995 episode of RAW, Jannetty sustained another concussion in a match against Sycho Sid. This match was followed immediately by a segment featuring Dr. Unger discussing Post-Concussion Syndrome referenced in this lawsuit. Jannetty did not receive treatment or any warning concerning the risks of the concussion he sustained. Jannetty sustained another severe concussion the following year in an August 1996 match and the only response from WWE was hostility from Vince because Jannetty took too long to exit the ring after he was knocked out.

v. **WWE's Ironclad Control:** Jannetty spent his WWE career remaining silent when presented with one-sided contracts; while being forced to perform repeatedly while injured; and while not receiving time off necessary to heal from his injuries. Jannetty was involved in a match in 1991 which resulted in a serious injury to his opponent who WWE carelessly put him in the ring with despite the other individual having virtually no wrestling experience. The injury led to a lawsuit against WWE and Jannetty with Jannetty being found 5% responsible, and he was forced by a WWE attorney to accept the outcome and told that the portion of the funds he was responsible for would come out of his royalty payments. WWE has refused to provide him with any accounting despite Jannetty's repeated calls requesting an explanation.

vi. **Long-Term Occupational Medical Issues:** Currently, Jannetty suffers from two collapsed ankles, with one of his ankles being positioned sideways and the other one requiring a cast. He is in dire need of reconstructive surgery to correct the problem. He does not have health insurance and cannot afford to pay for the required surgery. Despite pleading with WWE repeatedly, WWE refuses to pay for the surgery. This injury has also led to an addiction to pain medication as mentioned above. Jannetty also sustained multiple, untreated head injuries in the ring while working for WWE, and now suffers from CTE symptoms including but not limited to occasional 30-minute black-outs; headaches; depression; and an inability to think clearly.

88.    Plaintiff Michael Robert Halac ("Halac") resides in Omaha, Nebraska.

i. **Dates:** Halac wrestled for WWE form 1994 through 1997.

51

ii. **Schedule:** Halac was classified by WWE as an Independent contractor, but WWE forced him to travel extensively and perform in shows across the country, while also prohibiting from wrestling form any other entity while he was under contract with the WWE.

iii. **Contract and Ongoing Relationship with WWE:** Halac was mailed a WWE contract, which he signed and returned with no representation, negotiation, or even discussion. He received Form 1099s from WWE by mail. He currently receives royalty payments of about $100 per quarter from WWE by mail. He also received a letter from WWE a few years ago offering drug rehab.

iv. **Injuries and Treatment at WWE:** Halac sustained multiple untreated injuries while performing for WWE, including to his neck and head (some of which he only later realized were concussions). When wrestling against Bam Bam Bigelow in 1995, he was hit with a head-butt off the top rope; his head then hit the canvas; and he was "seeing stars after." He was also injured in or around April of 1996 in Louisville. Halac got caught on the top rope and flew head-first into the steps just outside the ring. After that, "everything went numb;" he suffered a concussion; and his "buddies carried [him] to the hospital," where he was told that he "needed scans and other tests" which he could not afford. The next morning, he called the WWE office and explained that his neck was injured and asked to speak to Vince. Bruce Pritchard informed him that Vince was busy and that WWE needed him back in the ring wrestling. Halac explained that his neck was seriously injured and that he needed WWE to help him pay to have his neck checked out. The response Halac received was that if he went home, he "might have a job or [he] might not." Halac was more concerned about his neck than his job at that moment, and went to see a doctor in his home state of Nebraska. The doctor took x-rays and then informed him that the tendons, muscles and possibly discs in his neck were damaged and he needed to take approximately one month off and wear a neck brace. Halac returned to WWE as soon as he was able, and Bruce Pritchard informed him that WWE had terminated him.

v. **WWE's Ironclad Control:** Halac had no control over his image and was first forced into gimmicks he disdained, including one requiring him to wear a Bull's head costume, and then later to shave his head to appear as "Mantaur," a half-man-half-beast. In addition, he reports attending a WWE meeting with other wrestlers and Vince, just before the beginning of what is now known as the "attitude era," where Vince instructed them, "from now on you are going to have to have an attitude," and encouraged the wrestlers to go out and jump off cages and the top rope and to take head shots. He reported that WWE was aware of the risks involved, as he had overheard agents discussing concussions and their effects on wrestlers, and was told stories from agents who had been with the WWE for many years about wrestlers that were "punch drunk that had 20-30 concussions that needed to

climb into the ring to get a pay day." He asserts that WWE "knew guys would get this way" but failed to warn wrestlers or make changes because it would have been detrimental to their bottom line, and that "WWE [was] playing God with everyone's lives."

vi. **Long-Term Occupational Medical Issues:** As noted above, Halac sustained numerous injuries during his WWE career; wrestled through many of those injuries; and was not given time off to let his injuries heal. Halac's neck injury got progressively got worse to the point were six discs in his neck were fused together with calcium deposits; he had no mobility in his neck; and was in chronic pain. He recently had surgery and is the process of recovering. Halac experiences CTE symptoms including but not limited to severe depression, headaches, dizziness, loss of memory, and fatigue..

89. **Plaintiff Jon Heidenreich ("Heidenreich"),**resides in Carrierre,

Mississippi.

i. **Dates:** Heidenreich signed a developmental contract with WWE and worked for WWE from 2001-2002. He then returned to WWE in 2003 and was placed on the main roster and continued to wrestle for WWE through 2006.

ii. **Schedule:** Heidenreich reports that his WWE schedule was extremely grueling. He also reports that at WWE, he had to work non-stop, and as a result, had no time to heal from injuries. He wrestled hundreds of nights per year.

iii. **Contract and Ongoing Relationship with WWE:** Heidenreich signed contracts with WWE but did not understand the contracts. He believes that WWE did not pay him in full, but he was unable to correct the error as he found the contract so confusing. He reports that WWE did not want any of wrestler to seek advice from agents or attorneys, and that he was told not to discuss the details of his contracts with anyone else. WWE mailed him Form 1099s. He was paid about $100 in royalties by WWE in recent years.

iv. **Injuries and Treatment at WWE:** Heidenreich injured his right shoulder (third degree AC separation) and WWE did not want him to see a doctor. He eventually had to see a doctor, and the doctor performed the required surgery. Heidenreich was supposed to be in rehab from the injury for three months, but due to complications, was out for longer, and the day he was cleared to return to work, the WWE informed him he was being released. Heidenreich later severely injured his left shoulder, and has required four operations since, but since the WWE released him for injuring his right shoulder, he didn't take any time off for this injury. Heidenreich suffered an injury to his thigh while wrestling for WWE in a TV match. His wife took him to the ER shortly after, and he was diagnosed with a severe hematoma, and

was on crutches for weeks and the injury required extensive rehab. He again feared he would be terminated and returned to work as fast as he possibly could. This time, he was told he was going to be put on WWE's TV show, Smackdown. Heidenreich also broke his right hand while wrestling for WWE and was forced to wrestle with a removable cast do he did not have to take time off. In addition, while wrestling for WWE, he has broken fingers; both thumbs; torn his right pectoralis muscle; broken his tailbone; injured his right hip; tore his medial lateral ligament; tore the anterior cruciate ligament in his right knee; severely injured his left shoulder; severely injured his back; and severely injured his left knee. In addition, he sustained a number of concussions after being knocked unconscious.

v. **WWE's Ironclad Control:** After WWE terminated Heidenreich for taking time off to go through medically-required rehabilitation for an in-ring injury, he was fearful of losing his job again. This left to him wrestling through severe injuries and not taking time off to let new injuries heal, some of which developed into permanent injuries that he currently suffers from.

vi. **Long-Term Occupational Medical Issues:** Heidenreich has arthritis in both hands; pain from breaking his tailbone; pain from an injury to his right hip; severe pain in both shoulders (due in part to a large bone spur that still remains in his right shoulder); severe back pain (due to four bulging disks with bone spurs as evidenced by a recent MRI); and knee pain which is so severe that some days, he can barely walk (and for which he requires treatment from an orthopedic specialist but cannot afford). In addition, he suffered numerous head injuries, and was "knocked out so many times [he] can't even remember," and has since been diagnosed by a psychiatrist with manic depression and attention deficit disorder. His depression.

90.     **Plaintiff Lou Marconi ("Marconi"), resides in Novelty, Ohio.**

i. **Dates:** Marconi wrestled as "enhancement talent" at WWF from 1994-2000.

ii. **Schedule:** Marconi typically wrestled in a few matches per year.

iii. **Contract and Ongoing Relationship with WWE:** When WWE put on a show in Marconi's area, he would receive a phone call from WWE asking him to wrestle in the shows. Each time, he was paid a few hundred dollars per match, and would be handed a two-page waiver by an agent which he was asked to sign. He signed the waivers but was never provided with a copy. He was mailed 1099s by WWE.

iv. **Injuries and Treatment at WWE:** Marconi sustained numerous untreated head injuries while wrestling for the WWE. For example, in October 1996, Marconi was clotheslined by Stone Cold Steve Austin in Columbus, Ohio. Marconi was knocked unconscious and woke up in a daze. He recalls that

Jake "the Snake" Roberts held up his hand, asking how many fingers he was holding up, and asked Marconi if he was okay. Marconi shook of the injury. After the match, Vince admonished Steve for hitting Marconi so hard and had Steve apologize to Marconi. Marconi also reports he "didn't know what a concussion was," but that now, looking back, he realizes that each time when he was knocked unconscious or hit in the head and saw "white flashes," he had sustained a concussion. When he was in his 20s, having no knowledge regarding head injuries, if he "felt groggy after a head hit, [he] would take a few Advil's with a few beers."

v. **WWE's Ironclad Control:** Marconi reports that his "role was essentially to make the full-time WWF wrestlers look good at [his] expense, and the expense of [his] body." He also reports that "there was zero OSHA."

vi. **Long-Term Occupational Medical Issues:** He currently suffers from symptoms which he attributes to sustaining multiple untreated head injuries while working for WWE, including but not limited depression, migraines, memory loss, and hearing loss in right ear due to nerve damage.

91.     Plaintiff Terry Scott Szopinski, a/k/a The Warlord ("Szopinski") resides

in Pompano Beach, Florida.

i. **Dates:** Szopinski wrestled for WWE from 1988 to 1992 with The Barbarian (named Plaintiff Sione Havea Vailahi) as part of the popular Tag Team "Powers of Pain." He also performed in WCW 1995-1996.

ii. **Schedule:** Szopinski performed over 300 shows per year, adding "by far the most rigorous schedule of the promotions." "We were worked to death. Zero concern for us as athletes or human beings, what they cared about was revenue."

iii. **Contract and Ongoing Relationship with WWE:** Szopinski signed a booking contract, he was mailed tax forms and paid taxes as an independent contractor. Szopinski says: "Like most wrestlers I had no clue as to the significance of the distinction." He receives letters from WWE offering help for alcohol or drug problems. He is featured on the WWE Network, WWE books and DVDs. His last royalty check showed the WWE made $19,443.54 and his cut was $12.80. Szopinski signed a Contractor Nostalgia Agreement dated January 8, 2016. He did not speak to a lawyer before signing this. Szopinski: "I did not believe it was related to my lawsuit and WWE did not discuss the lawsuit with me. I would not have dropped my lawsuit and did not understand that I would be dropping my lawsuit. This was not discussed at all."

iv. **Injuries and Treatment at WWE:** Szopinski had numerous injuries while performing for WWE, including a back injury after which he could barely walk, couldn't sit, and after performing injured for an extended period of time, discovered by MRI that he had herniated discs. He was on crutches for eight weeks. Head injuries were considered minor events that might elicit a laugh if the performer was dazed. The only time the agents or VKM paid attention to head injuries if they thought a performer would miss a spot or was too loopy to perform. He states that WWE definitely knew who was injured because of this. VKM would be required to know anything that might impact the TV taping.

v. **WWE's Ironclad Control:** Szopinski states that WWE and VKM: "knew everything that went down. The stooges would report everything to Vince, he was watching us for injuries, who was hurt, drug use, personal issues, and we called him Caesar. So if you got hit in the head and missed a spot or had slurred speech it was a known thing."

vi. **Long-Term Occupational Medical Issues:** Szopinski's nerve damage has crippled his use of his hands, and he receives spinal and neck injections for pain. He reports headaches, dizziness, and loss of memory.

92. Plaintiff Sione Havea Vailahi, a/k/a The Barbarian ("Vailahi") resides in

Charlotte, North Carolina.

i. **Dates:** Vailahi wrestled for WWE from 1988 to 1992 and from 1994 to 1995 with named Plaintiff Terry Scott Szopinski in a tag team called "Powers of Pain." He also wrestled in WCW 1995-2000.

ii. **Schedule:** Vailahi performed more than 300 nights per year and "worked like a horse."

iii. **Contract and Ongoing Relationship with WWE:** Vailahi signed a booking contract and was mailed 1099s. He is paid small royalty checks and receives the WWE drug treatment offers.

iv. **Injuries and Treatment at WWE:** Vailahi's signature move at WWE was a flying head butt from the top turnbuckle where his opponents would be at least 10 feet from him when he jumped head first. WWE agents told him to perform this move explaining this was what the fans wanted to see. He weighed over 300 pounds and would make direct contact with the other wrestlers' head or shoulders and "feel dizzy afterwards." He was also instructed by WWE to take steel chair shots to the head that resulted in bent metal. He was never warned about the dangers of these moves.

v. **WWE's Ironclad Control:** Vailahi states: "If you reported that you were hurt or injured you would lose your spot and not be paid." "Our schedule was

very long and tough and it was difficult to allow my body to heal itself because we would be traveling most of the year."

   vi. **Long-Term Occupational Medical Issues:** Vailahi reports dizziness and blackout episodes as well as headaches, memory loss and loss of feeling in hands and arms.

   93.    Plaintiff Larry Oliver, a/k/a Rip "The Crippler" Oliver ("Oliver") resides in Homosassa, Florida.

   i. **Dates:** Oliver wrestled for WWF from 1987 to 1988.

   ii. **Schedule:** Oliver says the schedule was hectic: "three week tours then straight on to TV back and forth, back and forth."

   iii. **Contract and Ongoing Relationship with WWE:** Oliver does not recall if he signed a contract with WWE.

   iv. **Injuries and Treatment at WWE:** Oliver was injured in 1988 during a match in Sacramento with the Ultimate Warrior, with a clothesline. The match was on Saturday Night's Main Event on NBC. Oliver says the discs in his neck were injured during the match, for which he was paid $2500. Oliver says the WWE's idea of medical help was "call us when you are better."

   v. **WWE's Ironclad Control:** Oliver laments the control the WWE has over wrestling business and that they have never been regulated or required to provide long-term care to him and others who gave their lives to the business.

   vi. **Long-Term Occupational Medical Issues:** Oliver has depression, headaches, dizziness, loss of memory, insomnia and he is diagnosed with Alzheimer's disease.

   94.    Plaintiff Barbara "Bobbi" Billard resides in Las Vegas, Nevada.

   i. **Dates:** Billard entered into a developmental contract with WWE dated December 16, 2003 which was terminated after an injury by WWE in 2004.

   ii. **Schedule:** WWE required Billard to train for 8 hours a day, 6 days per week at WWE's wrestling school, Ohio Valley Wrestling (OVW). Billard was also required to attend shows and events some evenings.

   iii. **Contract and Ongoing Relationship with WWE:** WWE continued to mail Billard weekly checks through December 10, 2004. WWE classified Billard as

an independent contractor and mailed her a 1099 in 2004. She has never received royalty payments from WWE.

iv. **Injuries and Treatment at WWE.** Billard sustained a severe neck injury while training at OVM, and as a result, was released from her WWE contract in April 2004. Billard's neck injury was the result of repeated trauma to her head and she never received any treatment for her head injuries. Billard required a two-level spinal fusion of the discs between her C5, C6 and C7 vertebrae. WWE arranged for and paid for the surgery in July of 2004, several months after Billard had been released from her contract.

v. **WWE's Ironclad Control:** Billard states that after injuring her neck, she was harshly "criticized for not getting back into the ring, despite the fact that [she] was not medically cleared to do so, and that [she] eventually lost the strength in [her] left arm… and constantly felt like [she] was being stabbed with a knife down [her] spinal cord." Billard was discouraged from reporting her injury and then once she did became a target for harassment.

vi. **Long-Term Occupational Medical Issues:** Billard still suffers from the long-term effects of her neck injury, including but not limited to back pain and occasional numbness in her fingers. She is at heightened risk of further future complications from the level 2 neck fusion surgery such as arthritis of the neck. She also suffers from headaches, memory loss, and depression.

95. **Plaintiff Ashley Massaro ("Massaro") resides in Smithtown, New York.**

i. **Dates:** Massaro performed for WWE from 2005 through 2008.

ii. **Schedule:** Despite being told that she was being hired to act as the face of the WWE Women's Division rather than as a wrestler, Massaro was required to wrestle in shows 4-5 days per week.

iii. **Contract and Ongoing Relationship with WWE:** After winning the WWE's RAW Diva search on August 15, 2005, Massaro signed a contract that was provided to her by Johnny Ace. She was classified as an independent contractor and received Form 1099s from WWE by mail each year she wrestled. After her career with WWE had ended, Massaro received a letter from Paul Levesque dated November 7, 2014 regarding the "WWE Former Talent Drug and Alcohol Rehabilitation Assistance Program," which stated that "help will be provided to participants regardless of the reason for departure from WWE or amount of time performed for WWE," and then, with WWE's assistance, completed a drug rehabilitation program. She currently continues to receive small royalty payments from WWE.

iv. **Injuries and Treatment at WWE:** Massaro had no wrestling experience at the time she was hired by WWE; she requested but was never provided with any

wrestling training by WWE; and she was not permitted to train on her own, despite having requested permission to do so on her own time within her first two weeks of working for the WWE. This led to Massaro suffering from numerous, severe injuries within a short period of time. Further exacerbating her injuries, she was never permitted an appropriate amount of time off to allow her body to heal between injuries. For example, after shattering her knuckle during a match and having it placed in a cast, VKM wanted her to perform in a show. Even though Dr. Rios had instructed that the cast remain on for several more weeks, VKM ordered the crew to saw it off and she was then forced to wrestle in the show.

v.   **WWE's Ironclad Control:** Massaro was later instructed by WWE not to report a serious incident at a military base while on a WWE tour overseas. At the time, she was traumatized and in fear of losing her job, so she complied with this demand.

vi.   **Long-Term Occupational Medical Issues:** Massaro suffered from an in-ring leg injury in 2006 which has led to her requiring multiple surgeries and having a 5-inch metal plate and several screws in her leg. She currently requires another revisionary surgery. Additionally, Massaro suffered from numerous untreated head injuries, and currently suffers from CTE symptoms, including but not limited to depression, for which she takes medication; migraine headaches; and severe short-term memory loss. Massaro is currently undergoing treatment for these symptoms.

96.   Plaintiff Perry Satullo a/k/a Perry Saturn ("Satullo") resides in Albert

Lea, Minnesota.

i.   **Dates:** Satullo wrestled briefly for WWE in 1992, ECW in 1995-1997, WCW in 1997-2000, and WWE in 2000-2002.

ii.   **Schedule:** Satullo says the schedule was rigorous with no offseason or adequate rest.

iii.   **Contract and Ongoing Relationship with WWE:** Satullo signed contracts, was mailed 1099s each year he worked at WWE, and is paid some royalties from WWE.

iv.   **Injuries and Treatment at WWE:** Satullo sprained his neck and had a concussion in a match with Mike Bell in WWF. In another match, he was repeatedly struck on the head with metal trays.  He was told after that match he might not be able to fly home because of a concussion.

v.   **WWE's Ironclad Control:** Satullo says: "When you got hit in the head, you would not be treated unless it was really bad. If I complained to one of the

agents they would have laughed. No one would dare miss a match for a head injury; the response would be you want to cry to Vince that you have a headache?" Satullo says: "Reporting injuries was highly frowned upon. One time in WWF I could not move my arm due to an injury, I was told to work around it. I was in the ring with 100-degree fevers and almost vomiting." Satullo says that the WWF did pay for some of his medical care including a right ACL repair in 2003 with Dr. William Armstrong in Atlanta. He was told that he would be 5-10% disabled from that injury.

vi. **Long-Term Occupational Medical Issues:** Satullo has had surgery on both ACL's, had both shoulders replaced, ruptured discs in his back, has pins in his elbow and had pins in his hand, which is now crippled. He has had both hips replaced and can hardly stand. He has C-5-6-7 fused in his neck. He has battled drug addiction and homelessness. Satullo has severe memory loss, which he describes as: "my days are filled with blank spots and fear that someday I will wake up and not remember anything."

97. **Plaintiff David Silva a/k/a Sylvano Sousa ("Silva") resides in New Bedford, Massachusetts.**

i. **Dates:** Silva began wrestling for the WWWF in 1971 for Vince McMahon, Sr. and performed routinely for the WWF until 1987.

ii. **Schedule:** Silva alleges he performed in 388 WWE televised shows and many more times that in shows before live audiences.

iii. **Contract and Ongoing Relationship with WWE:** When Silva started in 1974 there were no written contracts, it was all handshake deals and he was paid cash after each show. When VKM took over in the 1980s he was paid with checks and mailed tax forms. He was never paid any royalties or mailed any letters about drug rehabilitation. In 2013 Howard Finkel (current longest tenured WWE office employee) inducted Silva into a local New England wrestling Hall of Fame, and in his speech he noted Silva's long history with WWE.

iv. **Injuries and Treatment at WWE:** Silva says he was hurt regularly in WWE events: "I dislocated my shoulder, and I would slam my knees, and I got back and neck injuries. We were treated with ice and tape. My head would hit turnbuckles, I would bang my head on the mat and see stars, and I would be suplexed and black out. I cannot recall all the incidents there were too many…." Silva says that in June 1987 he was extremely sick and addicted to pain medication from the accumulated injuries he sustained. Although he asked for medical help, the WWE paid him $500 instead for a weekend show that he did not perform in.

v. **WWE's Ironclad Control:** Silva describes the insular subculture at WWE as being governed by kayfabe and that even after VKM lifted the veil publicly so that he would not be regulated by State Athletic Commissions, the old code of silence was used to enforce discipline and a lack of oversight and regulation pervaded the culture.

vi. **Long-Term Occupational Medical Issues:** Silva has been on SSI since he left WWE in 1988. He has had a left hip replacement, right shoulder surgery; and has received shots in my back, spine and knees. Silva reports very bad headaches, memory loss and depression.

98.     Plaintiff Charles Wicks, a/k/a Chad Wicks ("Wicks") resides in Mason City, Iowa.

i. **Dates:** Wicks wrestled for WWE from 2004-2006 being largely trained in WWE's developmental program.

ii. **Schedule:** Wicks states it was a fulltime lifestyle and he was owned by WWE.

iii. **Contract and Ongoing Relationship with WWE:** Wicks was given a contract that he signed without a lawyer. He was paid as an independent contractor and mailed 1099s. He received the WWE drug treatment offers. Wicks was called in the past two years and told that he was being paid royalties but never received them.

iv. **Injuries and Treatment at WWE:** Wicks says that the WWE was indifferent to his health and safety. In WWE matches he sustained numerous head injuries: "seeing stars was routine after you hit after a fall." Wicks says that WWE agents such as Fit Finley, Dean Malinko, Arn Anderson and Sgt. Slaughter witnessed his injuries: "routine ones and more serious ones, and they were responsible for the matches at the shows. There was also a WWE doctor at the TV tapings."

v. **WWE's Ironclad Control:** Wicks was assigned a gimmick to with a partner to be Chippendale style dancers. The tag team was named "the Dicks." Wicks says that he was hazed by WWE staff such as trainer Bill Demott and other wrestlers including John Bradshaw Layfield (JBL). He characterized the WWE culture as "toxic."

vi. **Long-Term Occupational Medical Issues:** Wicks suffers from headaches, has been treated for ADHD, severe memory loss, and had severe depression for 8 years after his WWE career ended.

99.     Plaintiff Shirley Fellows, as personal representative of the Estate of Timothy Alan Smith, a/k/a Rex King ("Smith"), whom resided in Mulberry, Florida. The Estate is in the Circuit Court for Polk County, Florida, Probate Division.  Smith died January 9, 2017 as a Named Plaintiff in this lawsuit.

i.  **Dates:** Smith wrestled for WWE in 1993-1995 as part of Tag Team known as "Well Dunn."

ii.  **Schedule:** Smith was injured his first night at WWE but later performed full-time.

iii.  **Contract and Ongoing Relationship with WWE:** Smith signed a two-year booking contract with WWE in 1993. He was mailed 1099s to his homes in Sarasota, FL and Norcross, GA. He was paid royalties for at least the six years before his death.

iv.  **Injuries and Treatment at WWE:** In his first match on Friday, October 13, 1993, Smith was injured by a 500-pound wrestler, Nelson Frazier, Jr. in a power slam. The WWE road agent present, Chief Jay Strongbow, called him an ambulance. Smith was told by his doctors that his pelvis had been crushed and no surgery could aid. Smith was out of work for nine months. Smith says he was told by a WWE employee, JJ. Dillon, that he would be paid $500 per week, but recalls he received exactly one check. When he called to locate his additional checks he was told by Mr. Dillon "the emperor says he cannot afford to pay you for doing nothing." His understanding was that the term "The Emperor" was a reference to VKM.  Smith stated that little attention was paid to him by WWF medical staff or treatment rendered and that he was hit over the head all the time, including being hit with chairs or pushed through tables. He remembers waking up after matches in the ring and not remembering where he was or why he was there.

v.  **WWE's Ironclad Control:** Smith states the WWE maintained a code of silence.

vi.  **Long-Term Occupational Medical Issues:** Before he died during the pendency of this lawsuit, Smith had headaches, dizziness, loss of memory, severe suicidal depression, had been addicted to pain medications for many years. He had been on SSI for six years.  He walked with a cane, having had his hip replaced and three discs herniated in his neck. Smith donated his brain before his death in January 2017, which has now been studied and he is reported to have had Chronic Traumatic Encephalopathy.

100.    Plaintiff Tracy Smothers, a/k/a Freddie Joe Floyd ("Smothers") resides in Fort Branch, Indiana.

i.  **Dates:** Smothers wrestled for WWE in 1996 and 2000, a WWE Pay Per View in 2005, and in ECW 1997- 2000.

ii.  **Schedule:** Smothers states the WWE schedule is by far the most demanding of any wrestling promotion.

iii.  **Contract and Ongoing Relationship with WWE:** Smothers received 1099s. He does not get any royalties, but he does receive mailed drug rehab letters from WWE.

iv.  **Injuries and Treatment at WWE:** In 2000, Smothers was hit over the head and knocked out by chair shot. He says head injuries and concussion were routine at the WWE because they promoted an extreme style of wrestling.

v.  **WWE's Ironclad Control:** Smothers was assigned a gimmick as "a dim-witted southern yokel." Smothers says: "Working at WWE was very political and the staff played mind games to control all the young wrestlers." Smith explains: "I along with everyone else had to watch what we said, opinions expressed and I could not report being injured or hurt because you would be hazed or lose your job. You cannot imagine what this place was like, there were no safety rules or regulations."

vi.  **Long-Term Occupational Medical Issues:** Smothers has headaches, dizziness/loss of balance, and acute short-term loss of memory.

101.    Plaintiff Ricky Lynn Jones, a/k/a Black Bart ("Jones") resides in Weatherford, Texas.

i.  **Dates:** Jones wrestled for WWF in 1989 for a little over a year, including performing in WrestleMania VI in 1990. Jones also wrestled in 1991 for WCW.

ii.  **Schedule:** Jones recalls that "This was by far the hardest year of my life. WWF had me wrestling two weeks on the road with four days off; it was six months not going home."

iii.  **Contract and Ongoing Relationship with WWE:** Jones signed a contract with WWE. He does not receive royalties but does get letters offering drug and alcohol dependency help.

iv.  **Injuries and Treatment at WWE:** Jones remembers that when he would hit his head too hard and be dazed, unlike a broken ankle, he would be expected

to finish the match.  "You are going to put your head through that table, or you lose your job."   Jones says he sustained numerous head injuries, including being knocked unconscious at least three times by Fred Ottman, a/k/a Tugboat. One of these times he woke up in the locker room.

v.   **WWE's Ironclad Control: Jones says:** Jones believes that TV changed the nature of the matches to a more aggressive, dangerous style.  He was told exactly what to do: "Do it even if you get whacked in the head or you don't get your paycheck".

vi.   **Long-Term Occupational Medical Issues: Jones has depression, headaches, severe dizziness, hearing loss, cannot sleep and has very bad memory problems.**

102.   Plaintiff Ken Johnson, Sr., a/k/a Slick ("Johnson") resides in

Louisville, Kentucky.

i.   **Dates: Johnson worked in the role of 'manager' for WWE from 1986 to 1993.**

ii.   **Schedule: Johnson alleges he was on the road 30 and 40 days at a time. "I was there 300 days a year."**

iii.   **Contract and Ongoing Relationship with WWE: Johnson signed a booking contract that was mailed to him which was offered on a "take it or leave it" basis by VKM. Johnson states, "The contract was filled with legal jargon. I did not understand the meaning of the terms or what an independent contractor meant. I think the WWF actually used that to trick the wrestlers, because they didn't know what independent meant- the word sounded good. Really it wasn't true, we were effectively employed there full time." Each year I was at WWE he was mailed 1099s. Johnson receives letters offering drug and alcohol rehabilitation and about $50 each quarter in royalties. In April, 2016, the WWE paid him $2,500 to induct a wrestler who died at age 41, "Big Bossman," into the WWE Hall of Fame.**

iv.   **Injuries and Treatment at WWE: Although Johnson did not wrestle, he was part of the act that involved physical activity inside and outside the ring. He says he never received formal training how to properly perform wrestling moves, and learned as he went. After getting hurt, a WWE agent like Bobby Heenan would pull me aside and offer to teach me a few things so that I would not get hurt in the match the next time. Johnson cites a head injury in 1989 when he had his "bell rung" after being body slammed by George 'the Animal' Steele. Johnson says that: "after that incident, Vince sent someone to the ring to ask me if I was ok. So he knew I hit my head then."**

    v.  **WWE's Ironclad Control: Johnson was an actor and his assigned gimmick was to be a racial stereotypical African-American manager named "Slick". Johnson says the WWE: "wasn't running the business safely, they didn't follow the rules or the law." Questioning anything could get you fired, as wrestling was a very secretive business with its own codes and rules of behavior enforced by the WWE.**

    vi.  **Long-Term Occupational Medical Issues: Johnson has anxiety, mood swings and headaches. He has difficulty sleeping and memory loss: "I hardly remember anything and forget conversations all the time."**

    vii.  **Notes: Johnson is currently a pastor at Shiloh Baptist church in Louisville with a congregation of about 400 people.**

        **103.   Plaintiff George Gray, a/k/a One Man Gang, a/k/a Akeem ("Gray"),**

**resides in Baton Rouge, Louisiana.**

    i.  **Dates: Gray wrestled for WWF full-time from 1987 to 1990. He worked for WCW in 1991 and 1995-1996. He also performed in WWE WrestleMania events in 2001.**

    ii.  **Schedule: Gray says he wrestled at least 300 days per year, sometimes more at WWE.**

    iii.  **Contract and Ongoing Relationship with WWE: Gray signed a WWE contract and was mailed 1099s in Louisiana. Gray is paid royalties statements and was offered a Contractor Nostalgia Agreement that the WWE legal department tried to get him to sign after he had hired Counsel for this case in 2015. WWE features Gray on it's website, streaming network and in DVDs and books.**

    iv.  **Injuries and Treatment at WWE: Gray says he did not know what concussions were, and did not think about it. He was: "punched, dropped on his head, knocked around in metal cages, hit with chairs, and fell head first into concrete." Gray recounts an incident in which he went through the ropes, slipped and cracked his head on the concrete floor. "Slick (Ken Johnson) woke me up that was a very hard head hit on Live TV (Milwaukee in 1989)."**

    v.  **WWE's Ironclad Control: Gray explains: "When you worked in WWF the first rule was keep your mouth shut, you keep quiet, and do what you are told to do, you performed the moves you were told. If you spoke out you got pushed down in the card and made less money."**

vi. **Long-Term Occupational Medical Issues:** Gray says he has herniated discs in his neck from numerous back injuries and headaches, dizziness, and loss of memory.

104. **Plaintiff Ferrin Jesse Barr, a/k/a JJ Funk ("Barr") in Vancouver, Washington.**

i. **Dates:** Barr wrestled for WWE from 1986 to 1987.

ii. **Schedule:** Barr worked almost five months straight with almost no days off before starting on the road again.

iii. **Contract and Ongoing Relationship with WWE:** Barr states that he did not sign any written contract.  WWE mailed him checks (minus cash draws after shows) for which WWE then mailed him 1099s. Barr was never paid any royalties.

iv. **Injuries and Treatment at WWE:** Barr says he was knocked unconscious numerous times, and that it would be common to be hit and see stars. Barr: "I would get kicked and punched in the head because WWF choreographing required the action to seem as real as possible and they kept pushing the action. Additionally, sometimes punches we called "potatoes" actually landed with full force. I had to work through the injuries- I had no choice if I wanted my pay." Barr states that after he tore his  ACL in New York he was able to perform by "taping it up from my foot to my hip with four rolls of tape each night. I had to do this, WWF knew about it- there was simply no time off to heal." Barr says that his WWE career ended in 1987 when he was kicked in the head which fractured his orbital bone causing his eye to fall out. He was hospitalized after popping his eye back in and waiting 4 hours in the ER.

v. **WWE's Ironclad Control:** Barr says that: "If you asked questions at WWF about pay, travel, safety or most anything else you would get bad bookings and lose money. They controlled everything. I was fined $500 for being one hour late even though I was on time to perform. They fined me but looked the other way on injuries."

vi. **Long-Term Occupational Medical Issues:** Barr has fused discs in his neck, headaches, dizziness, loss of memory, mood swings, and fatigue.

105. **Plaintiff Rod Price ("Price"), resides in Ponchatoula, Louisiana.**

i. **Dates:** Price wrestled for WWE in 1992, 1994, 1996 and 1997 as enhancement talent mostly in untelevised matches that occurred before a TV taping. Price also wrestled for ECW in 1998-1999.

ii. **Schedule: Price would wrestle for WWE in two-week stretches, about a dozen shows each year.**

iii. **Contract and Ongoing Relationship with WWE: Price would be contacted by Bruce Pritchard when WWE would be in cities and towns nearby. Price thinks he may have signed a waiver and was paid about $300 per show in cash. Price is not paid any royalties.**

iv. **Injuries and Treatment at WWE: Price says that he was a "jobber" or "enhancement talent" when he wrestled for WWE. In this role he would be asked to make the other wrestlers he was with in a match look good by allowing them to win and beat him. Price says: "The practical effect of this was that I was not well treated, it would be fair to say my health and safety was given less priority or almost no priority than full time WWF wrestlers." Price says there were many instances where he sustained serious injuries in WWE matches. In one event he sustained a serious neck injury by Action Jackson kneeing him in the neck. His job was to get hit in the head and take hard falls. He recalls going into the ring, "but not much coming out of it, I would be real fuzzy going home."**

v. **WWE's Ironclad Control: Price says that his job was to wrestle new talent that WWE wanted to get a look at. His opponents would be "green" meaning that they did not have a lot of experience which meant that he was roughed up more. He did exactly what the agents told him to do, and put his body in the hands of the wrestlers as directed.**

vi. **Long-Term Occupational Medical Issues: Price has been on disability for four years, and has battled drug addiction.  He has had three neck surgeries and as a result has a plate with four screws.  He has had left knee replacement, back surgery and other orthopedic issues. Price has frequent migraines for which he takes medication. He also has depression, insomnia, hearing loss in left ear, and memory loss.**

106.  **Plaintiff Charles Bernard Scaggs ("Scaggs"), resides in Celebration,**

**Florida.**

i. **Dates: Scaggs wrestled in Japan from 1985-1992; WCW from 1992-1994; and ECW, where he became the ECW World Champion, from 1994-1996. He was then recruited by WWE and wrestled for WWE from 1996-1999 and again later from 2006-2007.**

ii. **Schedule: Scaggs' schedule was "hectic as hell." He wrestled 230-250 times per year, with no offseason to recover from injuries, which were instead treated with tape and pain medication.**

iii. **Contract and Ongoing Relationship with WWE:** Scaggs signed a booking contract, he was not represented by a lawyer and did not understand most of the terms, but signed anyway because he was caught up in the excitement of getting into the WWE. Scaggs received 1099s from WWE by mail as well as numerous tax documents for each city and state where he wrestled, which caused confusion. Scaggs was mailed WWE letters about drug rehabilitation. Scaggs has not received any royalty payments from WWE.

iv. **Injuries and Treatment at WWE:** Scaggs' in-ring injuries including a broken jaw; having his teeth knocked out; and cracked ribs. Scaggs also sustained frequent low-impact head injuries and was required to hit his head on the mat during almost every match. He reports that these injuries were called "stingers" and that in a busy week, he would expect to sustain approximately 5 such injuries, with at least one being "serious" and causing him to see "white spots." He reports that after these injuries, he became "loopy" and his timing was off. He frequently forgot where he was or that a match had ended. The WWE agents and other wrestlers were very aware of this and would "cover" for Scaggs and other wrestlers that were "rocked" in the ring. Scaggs was knocked unconscious repeatedly in matches. Some hits to his head caused him to vomit. Scaggs wrestled in the WWE "Brawl for All" in 1998 which was a boxing match with real punches and knockdowns, and he took numerous hits to his head.

v. **WWE's Ironclad Control:** WWE classified Scaggs as an independent contractor, but prohibited him from working for any other entity. He was given a new gimmick (a racially stereotyped character named "Flash Funk" who was a "cross between Rick James and a pimp") upon signing with WWE because WWE wanted to own and control his name.

vi. **Long-Term Occupational Medical Issues:** Scaggs suffers from symptoms which he attributes to sustaining multiple untreated head injuries while working for WWE, including depression, headaches, mood swings and impaired memory.

107.   Plaintiff Donald Driggers ("Driggers") is 54 years old and resides in Columbia, South Carolina.

i. **Dates:** Driggers performed as "enhancement talent" for WWF between 1985 and 1988.

ii. **Schedule:** As an enhancement talent, Driggers was expected to show up and perform wherever and whenever needed. He wrestled full-time, noting "If it was a busy stretch, I would wrestle three or four shows per night."

iii. **Contracts and Ongoing Relationship with WWE:** Driggers states that he didn't have a written contract, and would be paid a cash draw sometimes as little as $50 per show.

iv. **Injuries and Treatment at WWE:** Driggers role was to lose to other WWE performers and so had to sustain countless finishing moves. Driggers states: "I knew how to wrestle safe, but we got hit in the head. It was unavoidable. I would get hit so hard I would not know where I was." Driggers says he sustained "three major concussions" in WWE events but cannot recall the dates due to memory loss.

v. **WWE's Ironclad Control:** Driggers was instructed to perform by WWE agents including Ronnie Garvin, Jay Strongbow, Pat Patterson, Blackjack Lanza and Rene Goulet. His job was to "put over" the guys he worked with meaning to make them look good in the match by allowing them to perform moves on him and losing to them.

vi. **Long-term Occupational Medical Issues:** Driggers takes medicine for depression. He reports headaches, dizziness, and memory loss. He is on pain medications for his bodily injuries. Driggers states, "The doctors told me that all the wrestling is the main cause. The discs in my back and neck are injured from all the whiplash. I am applying for SSI through the help of my lawyers."

108.   Plaintiff Rodney Begnaud, a/k/a Rodney Mack ("Begnaud"), resides in

Lafayette, Louisiana.

i. **Dates:** Begnaud wrestled for WWE from 2002 to 2004 and 2006-2007 on the WWE's ECW brand. He wrestled for ECW in 2000.

ii. **Schedule:** Wrestling for WWE involved following WWE's schedule no matter what. The wrestlers were expected to travel and perform regardless of injury.

iii. **Contract and Ongoing Relationship with WWE:** Begnaud signed WWE contracts, and was mailed 1099s for his earnings while at WWE.

iv. **Injuries and Treatment at WWE:** Begnaud says that he was routinely struck in the head and believes he sustained concussions after which he was expected to shake them off and continue to perform.

v. **WWE's Ironclad Control:** Begnaud was assigned a racially stereotypical role, which portrayed an anti-white militant. Begnaud says: "It was a 'no no' to discuss any injuries or your job would be in jeopardy."

vi. **Long-Term Occupational Medical Issues:** Begnaud has memory loss as well as headaches, and dizziness.

109.   **Plaintiff Ronald Scott Heard, for the Estate of Ronald Heard a/k/a Outlaw Ron Bass ("Bass"), whom died March 7, 2017. The Estate is in the Circuit Court for Hillsborough County, Florida, Probate Division.**

i. **Dates:** Heard wrestled for WWE in 1987 to 1989.

ii. **Schedule:** Heard wrestled full-time, at least five days per week at WWE.

iii. **Contract and Ongoing Relationship with WWE:** It is believed that Heard signed a booking contract with WWE and was mailed 1099s for the duration of his WWE career. The WWE paid Heard royalties from 2012 through 2015 in the amounts of $356.71, $212.78, $157.70 and $234.87, respectively.

iv. **Injuries and Treatment at WWE:** Heard states that he was hit in the head with tables and chairs, and had bumps performed on him on concrete while at WWE.

v. **WWE's Ironclad Control:** Heard performed as directed by WWE agents.

vi. **Long-Term Occupational Medical Issues:** Before he died he had symptoms consistent with head injuries including headaches and migraines, dizziness, loss of memory, and sleeping problems. Before he died Heard donated his brain to determine if he had Chronic Traumatic Encephalopathy or brain injuries from his wrestling. The diagnosis is pending.

110.   **Plaintiff Boris Zhukov ("Zhukov"), resides in Wirtz, Virginia.**

i. **Dates:** Zhukov started wrestling for WWE in September of 1987 until December 1990 and performed in WrestleMania IV and VI.

ii. **Schedule:** Zhukov estimates he wrestled 275-300 nights per year while at WWE. Zhukov states it was an "extremely long and difficult schedule. I would wrestle two-three weeks without a break."

iii. **Contract and Ongoing Relationship with WWE:** Zhukov signed a WWE booking contract, "You had to sign if you wanted to work, there was no negotiation."  Zhukov was mailed 1099's and says that he didn't appreciate the distinction between employee and independent contractor at the time. He receives royalties from WWE. His last check was $70. He also receives the drug rehabilitation offers.

iv.  **Injuries and Treatment at WWE:** Zhukov says he would hit his head on the ring floor hard enough to 'see stars' many times. Zhukov notes that the ring itself was "just a rubber mat on plywood." He reports that he would hit his head in other ways, including on the turnbuckles or on other wrestlers' bodies during WWE matches.

v.  **WWE's Ironclad Control:** When he started wrestling at WWE, he legally changed his name to Boris Zhukov. Zhukov did this because VKM would effectively "own you" by controlling the ring names of the wrestlers. Zhukov believes that this move caused resentment by the WWE, as it did not wield total control over him as it did most of the other wrestlers whose ring names were assigned and owned by the WWE. Zhukov says that at WWE: "There was a culture of enforced silence. There was no way to speak openly about the schedule, injuries, pay or anything else. You would have to watch what you said or you could get blackballed or shown the door. The WWF culture was used as a tool of control over me and the other wrestlers there. There was no way to report injuries, violations of safety codes or anything else."

vi.  **Long-Term Occupational Medical Issues:** Zhukov reports migraine headaches, hearing loss, difficulty sleeping, depression/mood swings, loss of balance, dizziness, and loss of memory. He adds that his sports medicine doctor believes these symptoms are from his work as a wrestler.

## IV.  FACTUAL BACKGROUND

### A.  WWE's Business Was Uniquely Structured to Profit from the Plaintiffs' Injuries.

#### a.  *How WWE Became The World's Largest Wrestling Organization: Selling Violence.*

111.  The WWE was started in it current form in 1963 according to WWE reference books, and has grown into the largest wrestling organization in the world with no serious competitors.

112.  The company has always focused on its most successful angle: violence.  Violence sold tickets and made the company very lucrative.  At its core, WWE profits from its employees' injuries through the production of dangerous moves and storylines that highlight brutality.

113.   The majority of WWE's revenues stem from its televised and streaming wrestling events which are broadcast in more than 220 countries reaching more than 650 million viewers worldwide.

114.   Ratings for its broadcasts are integral to generating its significant revenues reported at $729 million in 2016.

115.   WWE's flagship TV show in which many plaintiffs wrestled, Monday Night Raw, on air since 1993, has featured over 1,276 episodes two to three hours in length.   The WWE has also promoted thousands of WWE wrestling matches which it televises, records and syndicates.

116.   The WWE was a pioneer Pay-Per-View (PPV) programming and promoted many of the most watched PPV events in history including the its flagship PPV event each year, WrestleMania. Many of the named plaintiffs participated in WWE's PPV events.

117.   In 2014 the WWE created the WWE Network, which is a subscription-based service that offers a 24-hour steaming channel as well as on-demand content from a vast WWE Library. The WWE Network provides residual profits from past performances, including those of the Plaintiffs. The Network offers subscribers a compendium of recorded performances, including the Plaintiffs' matches, documentaries of the Plaintiffs, histories of their matches, and descriptions of past violent performances and injuries.

118.   WWE's continuing enterprise exists largely through its collection of intellectual property that includes the wrestling performances of the Plaintiffs. While WWE certainly continues to produce and license new content, much of

WWE's success stems from its ability to continue to monetize all of its historical wrestling matches as wrestling fans do re-watch old wrestling matches, including those of the Plaintiffs.

119. WWE Libraries Inc. a WWE-owned subsidiary owns 150,000 hours of content and is the largest collection of professional wrestling videos in the world. The library owns all past and present WWE tapes dating back to the 1950s, including all predecessor entities. WWE has engaged in a campaign of purchasing the libraries of all defunct wrestling promotions. It not only owns all the ECW and WCW matches but nearly every match in the territories in which all named plaintiffs performed such as American Wrestling Association, Florida Championship Wrestling, and Jim Crockett Promotions. As such WWE owns all or nearly all of the matches in which the named plaintiffs sustained their injuries. With the advent of streaming technology the WWE has continued to profit to this day from each violent performance.

120. WWE Books publishes various publications featuring WWE wrestlers including its best seller, The WWE Encyclopedia. The most recent edition in 2016 features biographies, photos and descriptions of nearly all the named plaintiffs.

121. Collectively the products emphasize violence as one of WWE's greatest selling points.

122. The WWE's promotion of violent conduct is too numerous to document, but a cursory view of the WWE Network programing, DVDs, Books demonstrate that the WWE highlights the violence and dangerous moves in professional wrestling.

73

123.    For example a DVD Title sold by WWE is "Blood Sport: ECW The most Violent Matches." This one DVD alone features named plaintiffs Brian Knighton (deceased with CTE), Troy Martin, Charles Scaggs, Terry Brunk, and John Rechner (Deceased with CTE).

124.    WWE confirms its use of violence in its own published book: "Vince McMahon telling viewers. . . they were about to up the level of violence…".[1] "The stunts became even more outrageous and dangerous." *Id.* "The crowd ate up all the bloodshed and table bumps, becoming invested in not only the extreme violence…." *Id.*, at 19.

125.    Unlike NFL football, NHL Hockey or other contact sports in which head injuries are an incidental (albeit frequent occurrence) to the outcomes of the contests, in the WWE the plaintiffs' heads are a central focus of the action and frequent target of the opponents in the ring.

126.    Plaintiff William Eadie, a veteran wrestler explains that many moves at WWE specifically involved targeting the head. He relates: "The head would be driven into the turnbuckle, a drop kick would be delivered to the head, a knee would go to the head or chin. The other mainstays, pile drivers, power bombs and whatnot all involve slamming heads into the mat. In that sense WWF wresting was very much about hits to the head."

127.    These techniques which the Named Plaintiffs performed at various times, among other dangerous moves, were a result of VKM's evolution of wrestling entertainment to increase its popularity and ratings. According to an

---

[1] Robinson, Jon, "WWE: The Attitude Era", Brady Games, p. 15 (2015).

academic history of the sport: "McMahon proved to be one of the staunchest advocates of making wrestling more brawl than catch style. He encouraged wrestlers to bleed, to take their fights out of the ring and into the crowd, and to attempt flashy, high risk maneuvers." (*See*, Beekman, Scott A., <u>Ringside: A History of Professional Wrestling in America</u>, Praeger, p. 106 (2006).

128.   Plaintiff Bruce Reed explains that in WWE matches: "They had us do things containing spots (moves) that they should have never had us doing. Slams and Bams on floors, pile drivers, chairs- this was to draw a crowd. We were pounding each other for them- it was totally out of hand."

### b.   *WWE's Ironclad Control.*

### l. *Kayfabe: The Legacy of the Wrestling Code of Silence.*

129.   The WWE inherited a culture and created a workplace structure that ensured ensure professional wrestlers could be exploited without the protections accorded to other athletes, performers, actors, or employees in any dangerous occupation.

130.   One important aspect of this control is Kayfabe, a concept known to every wrestler and named plaintiff. Kayfabe was a tradition that insulated wrestling from scrutiny from the outside world. It functioned as a code of silence to protect the public from knowing that the matches were choreographed with pre-determined winners and losers. The wrestlers and promoters alike were expected to keep that and all other aspects of wrestling secret.

131.   The WWE was started in era of "strict kayfabe," and many of the plaintiffs especially those that wrestled in the 1970s and 80s lived under this regime.

132.   In 1989, it was the WWE that ended an important aspect of kayfabe for commercial reasons when its executives successfully petitioned New Jersey regulators to eliminate any oversight of WWE that governed professional sports and boxing (and the taxes and fees required). The WWE argued that oversight was no longer needed because wrestling was: "an activity in which participants struggle hand-in-hand primarily for the purpose of providing entertainment to spectators rather than conducting a bona fide athletic contest."

133.   The irony of the testimony is that although much of wrestling was illusion, the rate of unreported and undisclosed injuries was very real.

134.   The WWE had successfully deregulated itself from the outside world (called "Marks") and ironically removed scrutiny of the activity it sought to shield from OSHA, State Athletic Commissions, tax authorities and any other outsider to the business.

135.   After the testimony the New York Times 2/10/89 observed: "The promoters of professional wrestling have disclosed that their terrifying towers in spandex tights, massive creatures… Hulk Hogan, Andre the Giant, are really no more dangerous to one another than Santa Claus, the Easter Bunny and the Tooth Fairy."

136.   The named plaintiffs report that there is a wide-spread perception that their activity is "fake," that results in initial skepticism about the nature and extent of their occupational injuries from medical professionals and fans.

76

137.   The legacy of Kayfabe partly explains how the WWE managed to operate as an unregulated business for so long. A wrestler-author explains: "The business is locked in its time-honored tradition of operating in a dark corner of the entertainment world with its own anachronistic rules and procedures. The spirit of kayfabe has survived to publicly protect the ugly side of pro wrestling's private face." *See* Wilson, Jim, <u>Chokehold: Pro Wrestling's Real Mayhem Outside the Ring</u>, Xlibris Corp., p. 89-90 (2003).

138.   The plaintiffs attest to the existence of this culture that was maintained in WWE, namely that was an enforced code silence both within and without the company.

139.   Plaintiff Donald Driggers who wrestled for WWE 1985-1988 explains: "The WWF and wrestling business back then was a secret society. You earned your place, it was a tight knit family, back then it was kayfabe (code of silence), you kept the business to yourself from the outside world. If the people weren't wrestlers, they weren't smart to the business and you made sure they stayed ignorant. There was no wellness (programs), no agencies, back then people were protecting the business from the outside rules."

140.   Plaintiff James Manley explains, "The first and only rule was 'Keep you mouth shut and ears open."

141.   Plaintiff Vickie Otis states: "While there I was to obey a "code of silence" in wrestling: this meant you keep you mouth shut, be it injuries or what income you earned."

142.    Plaintiffs Timothy Alan Smith: described the culture at WWE: "Keep you mouth shut, ears open. When you break in the old timer agents tell you "listen and do as I say" I don't want to hear you in the ring."

143.    Plaintiff Ricky Jones relates that at WWE: "you kept your mouth shut, put guys over and don't complain about injuries or anything else, or you would be fired. If you were sick or hurt, you vanished from the booking sheet, if you were not on the sheet you didn't get paid."

144.    Plaintiff Jonathan Hugger states part of the WWE culture was: "you kept your mouth shut or would 'get heat with the office.'"

145.    Plaintiff Chris Pallies states: At WWE: "The rule was don't bring anything up about being hurt, don't ask any questions, go with the flow, it was part of their culture of control."

146.    The code of silence was used by WWE to foster a culture of "wrestling through the pain" because if a performer was injured he or she would miss work and prevent WWE from profiting from the missed performance.

147.    The Plaintiffs all attest they were discouraged from reporting injuries through a coercive WWE workplace structure in which they were expected to continue performing if they wanted to maintain their position in the roster and be paid.

148.    Plaintiff Donald Driggers: "If you were hurt you took away from yourself, so you were up against an unfair system."

149.    Plaintiff James Brunzell: The WWF made it very well known that if you took time off for an injury you would be fired or punished so that guys were made to be afraid even to go to a doctor."

150.    Plaintiff John Jeter: "There was an unwritten rule book in the WWE, which discouraged access to medical care. The reason was simple; if you were injured you could not work, which meant you could be fired. I was constantly fearful about getting injured not for the injury itself but because I might lose my job and career that took years build."

151.    Plaintiff Perry Satullo: "At WWF it was an unspoken rule that you wrestled hurt."

**B.  Defendants' Scheme to Deprive Plaintiffs of Fundamental Statutory Protections.**

152.    The WWE, under the voting control of VKM, methodically formulated and implemented a scheme to deprive its performers of basic State and federal protections granted by statute which are intended to lessen precisely the injuries that the Plaintiffs have suffered while employed by WWE.

153.    As outlined in Counts II, III, IV, V, and VII, Plaintiffs were deceived by a calculated fraudulent scheme concocted and carried out by VKM and WWE.  The unconscionable contracts, the misclassification, and the failure to provide adequate notice and protections under the FMLA, NLRA, and OSHA all evidence gross misconduct by WWE and violations of ERISA.

154.    The calculated and intentional scheme of the WWE and VKM intended to and did deprive the Plaintiffs of valuable statutory rights, which, if exercised, would have resulted in lessening the damage caused by Plaintiffs' work derived

injuries.  As an integral part of the cover up, the deprivation of rights prevented reports to OSHA, and Workers' Compensation insurers, and the application of OSHA standards and insurance standards to the workplace, including investigations concerning the origin and cause of injuries.  Preventing government intrusion into the carnage of the WWE workplace through the deception of misclassification was essential to preserving the WWE's ratings, profitability, and direct monetary rewards to VKM and his agents.

C. **Chronic Traumatic Encephalopathy is a New  Name for an Old Disease.**

a. ***The Long-Present and Evolving Understanding of Concussion Science.***

155.   A concussion consists of trauma to the head and a resulting transient loss of normal brain function.

156.   Concussions and sub-concussive blows to the head can trigger progressive degeneration of brain tissue that can lead to various neurodegenerative diseases.

157.   Diseases related to concussions and head trauma have over the years been known by a variety of names.

158.   These diseases may broadly be termed traumatic encephalopathy syndromes.

159.   Diseases related to head trauma include:

i) Sub-Concussion

ii) Concussion

iii) Post-Concussion Syndrome

iv) Chronic Traumatic Encephalopathy (CTE)

v) Chronic Traumatic Myelo-Encephalopathy (CTME)

vi) Dementia (Alzheimer's Disease)

vii) Parkinson's Disease

Earlier terms included:

viii) Punch Drunk

ix) Dementia Pugilistica

160.   At least nine named plaintiffs have been diagnosed with many of the serious diseases above.

161.   These diseases related to head trauma's long-term effects are long-established concepts in medicine and fall within the generally accepted principles and common knowledge of medicine and science as demonstrated by a robust peer reviewed literature.

162.   Over time, science has developed new names for the same injuries and has come to a more detailed etiology of these injuries and their immediate and progressive symptoms, but the underlying cause and steps to prevent them have been understood since long before the named plaintiffs stepped into a WWE ring.

163.   Head trauma itself has long been recognized as a serious workplace injury in many contexts including construction, mining, or any occupation in which a helmet or hardhat is required to be worn either by long-standing custom or OSHA rules. Occupational head injuries have long been understood, since long before the named plaintiffs wrestled for WWE to have long and short-term symptoms. Additionally it is well-established in work related injury law that when head trauma is suffered during employment through no fault of the employee, it is the

81

responsibility of the employer to cover the complete medical care needed, including long-term care.

### b. *Concussions And Post-Concussion Syndrome are Long-Recognized Injuries.*

164.   Plaintiffs argue post-concussive syndromes that result from occupational head trauma including wrestling of the type promoted by WWE have long been known.

165.   The epoch making report in the field was published in 1928 titled "Punch Drunk" by pathologist Harrison Martland. The study that identified specific symptoms attributed to boxers and that were found to result from the boxers' consistent head trauma.   Martland linked sub-concussive blows and "mild concussions" to degenerative brain disease.

166.   In 1937 a second ground-breaking paper by Lieutenant Millspaugh further honed into the dangers of repetitive head trauma in contact sports by redefining punch drunk as Dementia Pugilistica and noted that this injury was a combined physical and psychic syndrome that was caused by head trauma, which was usually repeated and frequent, and varied from comparatively insignificant abrasions, contusions and laceration, to brain concussions.

167.   By 1964, a year after WWE was founded, general acceptance of the connection between head trauma and these symptoms had been established as well as its unique prevalence in professional athletes that engaged in contact sports.

168.   A 1964 committee of neurological surgeons defined a concussion as "a clinical syndrome characterized by immediate and transient impairment of

82

neural function such as alteration of consciousness, disturbance of vision, equilibrium, etc., due to mechanical forces."  The committee also went into great detail about post-concussion syndromes such as post-traumatic dementia, post-traumatic delirium, traumatic encephalopathy, post-traumatic syndrome, punch-drunk syndrome, among others.

169.   This 1964 committee directly attributed disturbed consciousness, agitation, hallucinations, delusions, and/or disorientation, headaches, dizziness, neurasthenia, hypersensitivity to stimuli, and diminished concentration to concussions and post-concussion syndromes.

170.   Punch-drunk was specifically associated with chronic alcoholism and characterized by emotional and mental impairment.  These symptoms could last for months or indefinitely following a concussion or head injury.

171.   A consensus statement published in 1967 found common features of traumatic brain injury or concussions included rapid onset of usually short-lived neurological impairment, acute clinical symptoms that usually reflected a functional disturbance rather than structural injury, and a range of clinical symptoms that may or may not involve loss of consciousness.

### c.   *Sub-Concussive and Repetitive Head Trauma Cause Latent Neurological Injuries.*

172.   A 1968 paper by Oppenheimer," Microscopic Lesions in the Brain following head Injury," demonstrated neuropathologic changes in 59 deceased individuals who suffered all types of brain trauma from mild concussions to virtual decerebration.

173.    In 1973, Corsellis published a study of characteristic brain changes in retired boxers over a period of sixteen years. The study found a connection to alcoholism, rage reactions, memory impairment, memory loss, and dementia. The destroyed cerebral tissue could never be replaced and the process of degeneration could smolder on even after the athlete stopped boxing.

174.    Numerous studies published between 1952 and 1994, warned of the dangers of single concussions, multiple concussions, and head trauma. Collectively, these studies established that:

- Repetitive head trauma in contact sports, including boxing and football, has potential dangerous long-term effects on brain function; encephalopathy (dementia pugilistica) is caused in boxers by repeated sub-concussive and concussive blows to the head;
- Acceleration and rapid deceleration of the head that results in brief loss of consciousness in primates also results in a tearing of the axons (brain cells) within the brainstem;
- With respect to head injuries in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
- Immediate retrograde memory issues occur following concussions;
- Head injury requires recovery time without risk of subjection to further injury;
- Head trauma is linked to dementia-like symptoms;
- A football player who suffers a concussion requires significant rest before being subjected to further contact; and
- Minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing. The short and long term effects of head trauma induced diseases include a wide variety of neurological symptoms

### d.   *Head Trauma's Consistent Symptoms.*

175.    These symptoms are long-documented by sports medicine in athletes with head trauma include:

i) Dizziness

      ii) **Headaches**

      iii) **Depression**

      iv) **Insomnia and Sleeping problems**

      v) **Mood Swings**

      vi) **Suicidal Thoughts**

      vii) **Paranoid Thoughts**

      viii) **Violent Behavior**

      viii) **Abuse of Alcohol and Drugs**

**176.** **Additionally the onset of the above symptoms has been associated with a long latency periods between the blows to the head and the manifestation of noticeable symptoms that impair the activities of daily living. A decade or more can pass before the onset of severe symptoms in the affected athletes.**

**177.** **In addition to the plaintiffs with diagnosed diseases, all of the named plaintiffs report several of the above symptoms which they believe are related to the head trauma that was part of their WWE wrestling career.**

**178.** **The widespread persistence of these symptoms likely has a common cause in the plaintiffs: repetitive head trauma and concussive injuries from WWE wrestling.**

      e. *The Necessary Preventative Steps Developed By Sports Medicine.*

**179.** **As early as 1937, the American Football Coaches Association published a report warning that football players who suffer a concussion should be removed from contact sports.**

180.    In 1952, the New England Journal of Medicine recommended a three-strike rule for concussions in football where after three concussions the player ceases to play football.

181.    Dr. Robert Cantu of the American College of Sports Medicine developed the *Concussion Grading Guidelines* in 1986 that were intended to prevent repetitive concussive injuries in athletes. Dr. Cantu's guidelines were created because it was established science that repetitive head trauma caused significantly worse injury professional athletes.

D. *Wwe's Knowledge of the Effects of Concussions.*

182.    When WWE was created in 1963, concussion science had already long discovered the link between head trauma, concussions and long-term injuries through the assessment of pervasive symptoms in professional contact sports athletes as detailed above beginning with the landmark with the 1928 Martland and 1937 Millburgh studies.

183.    The WWE did not develop in isolation, but was established within an ever-growing community of professional sports organizations at all times.   The WWE would also promote other contact sports at the time plaintiffs performed such as Football and Boxing placing it firmly in the realm of medical knowledge possessed by these other sports.

184.    The symptomology that manifested from repetitive head trauma was seen in all major professional sports organizations to a degree far exceeding that of everyday society.

### a.   WWE's Long Association with the Cauliflower Alley Club.

185.   In 1965 an actor and professional wrestler, Mike Mazurki founded a non-profit organization for retired wrestlers and boxers called the Cauliflower Alley Club (CAC).

186.   Cauliflower Ear was a condition commonly found among wrestlers and boxers who sustained blows to the head.

187.   The long time president of the CAC, Karl Lauer well-known to WWE identified the WWE as a financial supporter of the organization since the 1980s.

188.   The organization primarily helps wrestlers with financial and medical problems, including those with dementia and Alzheimer's disease. Its past two presidents were diagnosed Alzheimer's disease.

189.   In 1996 Vince McMahon attended a CAC event which presented him an award.

190.   The WWE currently supports sends wrestlers and staff to the annual CAC events.

### b.   WWE Promoted a "Wrestler Versus Boxer" Event.

191.   In 1976 the WWE itself promoted a 15 round professional boxing/wrestling match involving Muhammad Ali and wrestler Antonio Inoki on June 26, 1976. The WWE promoted an event dubbed "Wrestler Versus Boxer" with the world's most famous boxer (and arguably most famous athlete of all time) in a match with a WWE wrestler. As such the WWE would have been required to know the relevant rules that governed boxing that took into account the risks of head injuries and the protocols for treating such athletes.

192.   In the 1976 second edition of the standard textbook "Greenfield's Neuropathology" one finds: "It is well established that persons subjected to repeated concussive or sub-concussive blows, such as boxers and footballers, may develop neurological signs and progressive dementia, the 'punch-drunk' syndrome. This description noted neuropathologically that numerous neurons had neurofibrillary tangles, especially in the temporal lobes, without many or any senile plaques, thus separating the neuropathological features from those of AD, and this clinical-neuropathological entity was termed "dementia pugilistica."

193.   As such the plaintiffs contend that the WWE at all relevant times from 1976 to the present knew or should have known about the long-term risks of head trauma.

c.   *WWE Promotes Boxing Matches.*

194.   The WWE would continue to promote boxing matches both inside and out of actual WWE events themselves:

a) WWE promoted PPV boxing match between Sugar Ray Leonard and Donny Lalonde on November 7, 1988.

b) WWE promotes Sugar Ray Leonard Versus Hector Camacho on March 1, 1997. In the event Camacho Knocks out Sugar Ray.

195.   In 1998 WWE Promoted a real boxing or "shootfighting" tournament from June 29 to August 24 called: "WWF Brawl for All."

196.   Each match consisted of three one-minute rounds.  The wrestler who connected with the most punches per round scored 5 points and a knockdown was

worth 10. If a wrestler was knocked out, the match ended. WWE ringside judges scored the matches.

197.     Named plaintiffs Mark Canterbury and Charles Scaggs participated in the event in which real punches where thrown and they received blows to the head.

198.     On March 28, 1999 the WWE sponsored an actual boxing match as part of its flagship WrestleMania XV Event. A wrestler/boxer named Butterbean delivers a vicious knock out with a punch thrown to Bart Gunn's head.

199.     At all relevant times the WWE was promoting boxing events the link between repetitive head trauma and the symptomology known as punch drunk and Dementia Pugilistica was firmly established within both the medical and boxing communities. The Rule 4.2.14 of the World Boxing Council's Rules had already required a month long rest period after loss of consciousness in the ring.

>        *d. The WWE Promotes the XFL Football League.*

200.     In 2001 the WWE with NBC created The XFL professional football league that played a full season with over 500 players with eight teams owned by the league itself.

201.     All of the XFL's health and safety policies and protocols were developed and implemented by its co-owners, the WWE and NBC Universal which each had a 50% interest in the football league.

202.     By promoting the XFL Football league with formers NFL players the WWE knew or should have known current sports medicine return to play guidelines and current concussion science.

*e. WWE Highlights Head Injuries.*

**203.   The WWE Features references to Concussions in its Programming, Books and Magazines:**

i.   **During a televised WWF event on April 4, 1981, WWE Wrestling broadcaster Kal Rudman asked then wrestler Pat Patterson if wrestlers get punch drunk. Rudman: "Do wrestlers get what they call punch drunk? Which really due to pin point hemorrhages in the brain?" Patterson: "Some of them do . . . some guys get thrown out of the ring and land right on their head or they get hit by a chair or they get run into a steel pole…."**

ii.   **The November 1999 WWF Monthly Magazine features a Story called: "This is Your Brain," in which a "doctor" comments on the risks of taking Chair Shots to the head.**



iii.   **In a WWE produced program called Confidential that aired between (2002-2004), Paul Levesque, the current WWE Executive Vice President of Live Events, praised wrestler Kurt Angle for continuing a match after being knocked out, Mr. Levesque stating on camera: "you can see it when Kurt was coming out, he was glass eyed looking around, there's a guy unconscious**

in the ring, he's just goin' and he new too he not like a veteran or anything my too hats off to him for that."

iv. In the same program WWE trainer Larry Heck in a praiseful tone tells the audience: "Guys have gotten concussions in the ring and been able to finish matches and you know not really remember what happened".

v. The WWE published an autobiographical book about Kurt Angle (It's True, It's True) in 2001, on page 231 he recounts getting knocked out during a match with Paul Levesque, and Stephanie McMahon. When he comes to his cannot remember what to do and notes that: "Vince [McMahon] didn't know what to do. He was thinking of pulling me out, but he wanted to finish the storyline." Angle notes that the match: "allowed me to step into the main event level and get respect." He cannot recall the events of the match but watching it on tape it was "so good… maybe I should have a concussion every time."

vi. In a WWE published book, WWE Unscripted (2004 p. 121), Bubba Ray Dudley observes: "I've continued matches with concussions. One of the worst things that happened to me in WWE was in the Tables, Ladders, Chairs match…. I was completely knocked out, do not remember anything from the match and managed to hit all of my spots."

vii. Another page features a full page photograph of a scar on the back of WWE star Stone Cold Steve Austin's head with overwriting that reads: "This scar I got on the back of my head was delivered from Vince McMahon himself with a steel chair." ". . . I can't complain about it, we've traded a few, and I'm kinda proud of it actually." <u>WWE Unscripted</u>, at 142.

viii. On another page Brock Lesnar continues the theme of concussions being almost praiseworthy: "When I hit, I don't remember anything because I got a concussion. I won the match, but I couldn't tell you what happened…." *Id.*, at 175.

204.    WWE was highlighting concussions in these ways, but chose to not take preventive steps to ensure the safety of its wrestlers by implementing any policies or protocols.

*f.    WWE knew what Post-Concussion Syndrome was in 1995.*

205.    WWE doctor, Jeffrey Unger who previously treated several named Plaintiffs including Troy Martin, Marty Jannetty and diagnosed Jim Brunzell with a concussion.

206.    On December 4, 1995 the WWE aired an extended interview with Dr. Unger in which he relates the dangers of what the WWE announcer describes as "Post-Concussion Syndrome".

207.    The interview was shown on Monday Night Raw for the intended audience of wrestling fans, but its detailed and accurate description of the long term effects of a performers purported concussion can leave no doubt that the WWE had actual awareness of a critical issue in this case as early as 1995.

208.    Vince McMahon does a long voice over referencing the doctor's presentation.

209.    The 2005 or 2007 date cited by the defense as the earliest date that the WWE had any awareness of the long-term effects of head trauma or concussions is thus is unsupportable.

92

210.    Dr. Unger explains to viewers: "As a result of the head trauma, about half of these patients develop a syndrome which includes problems such as ringing in the ears, nausea, vomiting, headache, blurred vision…, inability to concentrate… and this becomes a problem because these patients tend to get frustrated, and they get depressed as well. They have sleep disturbances. And all this persists for between two weeks to several months. However, there's a group of patients ….. have a very poor prognosis, and they don't seem to get better at all."

211.    Dr. Unger offers: "I do know that there are many professional football players and boxers that never fully recover from these types of head injuries."

212.    Doctor Omalu writes in a book about CTE, relates that "Post concussion syndrome," is actually a variant medical term for CTE.

213.    Plaintiff Marty Jannetty stated he sustained a concussion wrestling in the Monday Night Raw program featuring Dr. Unger on December 4, 1995.

214.    Jannetty say this his match immediately preceded the Dr. Unger interview and that despite the program he was not treated or warned about his head injury at that time or since.

215.    Jannetty says that his long time tag team partner Shawn Michaels who was the subject of the Dr. Unger segment actually did sustain a concussion which was the inspiration for the segment.

> ### g. *The Named Plaintiffs Sustained Concussions with Actual WWE Awareness.*

216.    Plaintiff Lou Marconi states that: "In October 1996, I was clotheslined by Stone Cold Steve Austin in Columbus, Ohio. I was briefly knocked out and

dazed. After the match Vince McMahon chewed out Steve for hitting me so hard and had Steve apologize to me."

217.   Plaintiff Barry Darsow states: "Tully Blanchard hit me over the head full force, straight down with a metal chair…. Vince McMahon was in the Gorilla position watching and told me afterwards that was "a halva match." I was knocked out cold and a bunch of teeth were chipped and broken…"

218.   Plaintiff Sylvain Grenier states: "After one match Stephanie McMahon approached me and said 'This is the second time you missed your spots' (moves pre-determined I should perform in the match). I explained to her that I blanked from hitting the canvas. I told her I hit my head and I didn't know what I was supposed to do I was completely lost. I was threatened with losing my position over the incident rather than being given medical attention."

219.   Plaintiff Moore-Begnaud states: "During a match in 2003 I was kicked in the head by Trish Status, I told agents "I'm lost" because I couldn't remember my moves due to the hit."

220.   Plaintiff Mark Copani States: "I was powerbombed by the Undertaker through a trapdoor in the stage. ... when I landed I bounced and landed on my neck. I can still feel it. I was dizzy and in pain. WWE Dr. Rios told me that I had a mild concussion…. The show ended about 45 minutes later and I drove from Buffalo back home to Syracuse."

221.   Plaintiff James Brunzell states: "I was knocked out colder than a mackerel." "It was like a flash, you see stars after a hit like that. I was wobbly, nauseated and dizzy the next few days…. When we got to Los Angeles a few days

later, the WWE had a doctor at the match. His name was Doctor Unger; he examined me by looking at my eyes and told me that he thought I had a third degree concussion…. A WWE agent ….instructed us to have a 'light' match, and he instructed Ray to avoid hitting me in the head. We had the match I took a few bumps but I didn't think anything of it."

> ### h. Medical Literature at WWE's Disposal Established the Dangers of Concussions and Sub-Concussive Injuries and the Need for Proactive Preventative Steps.

222.   As detailed above concussion science from 1963 reported the effects of head injuries in athletes.

223.   The sports medicine literature recognized that head injuries, concussions that resulted in specific symptoms that did not require loss of consciousness.

224.   Immediate symptoms experienced by athletes after being hit in the head included: disorientation, headaches, dizziness, hypersensitivity to light, and vomiting.

225.   The above symptoms were experienced by the plaintiffs routinely in WWE events.

226.   The plaintiffs report that common manifestations of head trauma routinely occurred and were recognized by WWE agents and employees.

227.   Plaintiff Troy Martin states: "The agents would actually say, 'Oh good, it's just a concussion.  You'll be fine.'

228.   Plaintiff Boris Zhukov states: "When I would go down very hard on the ring floor my head would hit hard enough that I would see stars quite a few times."

229.    Plaintiff Marty Jannetty describes an in 1994 on a WWE European tour in Germany when he was knocked unconscious by a Powerbomb and WWE referee Joe Maranella had to wake him up.

230.    Plaintiff Tracy Smothers states: "a young wrestler named Joey Abs …hit me over the head with a steel chair as the finish to a match. The blow nailed me, and my body went numb and I was knocked out. I vomited for days and experienced dizziness for a month and a half afterwards."

231.    The plaintiffs report that after being hit in the head or a hard fall in WWE:

> i) Seeing stars, or white flashes,
>
> ii) Being disoriented and could not remember their spots,
>
> iii) Being loopy
>
> iv) Getting their bell rung
>
> v) Being Knocked out
>
> vi) "Getting Rocked"

232.    As such the pervasiveness of these reports cannot be discounted and it was common knowledge by WWE that these symptoms were related to head trauma.

233.    At all relevant times during these reports by plaintiffs, the contact sports medical literature recognized that repetitive head trauma resulted in permanent brain injury that caused a series of debilitating symptoms.

234.    While professional boxing and football organizations had numerous studies being published about the long-term risks of head trauma within their

ranks, WWE notably pretends complete ignorance of any and all understandings of concussion science and its connection to the Plaintiffs' WWE performances. This contention even in the highly unlikely event it were true, should have been recognized as false by the WWE.   Neither willful nor pretended ignorance of established science exonerates the WWE of its duties.   While the studies all described specific symptoms that the professional athletes suffered and which the other organizations were taking steps to remedy, WWE, a worldwide professional sports entertainment corporation, while observing the same symptoms amongst its athletes, had to have made the same connection between the overtly dangerous moves it required its performers to enact and the disease symptoms manifested in retired performers.

235.   WWE knew that the risks of brain injury could be reduced by implementing specific changes to its performances. The medical literature had articulated and other professional sports organizations had adopted.  WWE knew that it (1) should have established baseline cognitive testing of performers for comparison purposes during and after performances; (2) should have actively monitored its performers for signs of brain injury; (3) should have employed a neurologist to actively assess performers during matches; and (4) implemented and effectively utilized return-to-ring rules consistent with proper medical management of head trauma and concussive injuries.   Additionally, the use of helmets per OSHA guidelines and periods of extended rest as required by the FMLA would have enhanced its performers' ability to enjoy increased health and safety.

### i.   *These Plaintiffs' In-Ring Injuries Necessitated Action By WWE.*

236.   As above the Plaintiffs all allege having their heads traumatized, demonstrating signs of dizziness, disorientation, and vomiting while performing for WWE.  The Plaintiffs have countless specific incidents detailing symptoms that they now understand as the results of head trauma. Many suffered noticeable concussions in-ring.  As described, *infra*, sound medical science had established that these symptoms required specific action be undertaken to prevent further injury.

237.   The Plaintiffs typically sustained hundreds of sub-concussive blows to their heads and repeated damage from rapid deceleration when they hit the ring.. These traumatic activities were a direct result of the choreographed and visually dramatic style VKM developed to increase ratings.   Many of these blows were routinely replayed for effect.

238.   Plaintiff Barry Darsow: "When I cracked my vertebrae with that chair shot it looked so good they replayed it over and over on TV and now online. In the replays they even slowed the footage of the chair slamming me in the head, I feel sick watching it."

239.   The most common moves, e.g. the "body slam" or the "pile driver", caused the performer to land forcefully on the ring floor resulting in the rapid acceleration and deceleration of the brain within the skull.  These moves were performed countless times in practice, road shows, house shows, dark shows, and televised shows.

240.   Every single time the Plaintiffs performed these moves they risked suffering additional head trauma.  Often, the Plaintiffs suffered head trauma during matches, and be visibly disoriented and confused.  Such symptoms would be obvious to WWE employees present at the performances, including the agents tasked with instructing the Plaintiffs on the current narratives and moves to perform, any present medical personnel, trainers, instructors, and any other WWE employee that watched the Plaintiffs perform.

241.   Even when the moves were performed correctly, the Plaintiffs could not avoid the impacts on the ring floor and endured inevitable head injury just by performing for WWE.  Every performance and training session presented these risks.

242.   When the moves were not performed correctly and the Plaintiffs sustained injuries that required medical attention, upon information and belief, WWE would author an Injury Report.  The Injury Report is believed to detail the event, the performers, the specific injury, and any treatment required for the injured party.  Plaintiffs believe that WWE collects, maintains, and compiles these Reports and uses them to assess overall injuries within the company, the dangerousness of the moves performed, and other statistics relevant to the sports entertainment business.  This information has not been made available to the Plaintiffs as would have been required by statute but for the intentional misclassification of the Plaintiffs as "independent contractors."

243.   Also in the event of injury, WWE ongoing narratives had to be altered to address the Plaintiffs absence or inability to perform as previously designed.

99

244.   WWE recorded the performances, had numerous employees present at each event (often high level executives for main shows like Monday Night Raw), and had employed medical professionals to allegedly monitor the Plaintiffs' performances and conditions before and after wrestling.   WWE even had a command station where every move the Plaintiffs made during a performance was scrutinized by WWE executives and employees to ensure compliance with the company's current narratives, and to gauge audience effect.

245.   On-site medical personnel such as Dr. Jeffrey Unger and Dr. Ferdinand Rios, would conduct pre-and post-match evaluations of the Plaintiffs. These WWE employees would prescribe medications, provide medical advice, and instruct them on whether it was safe to perform.

246.   WWE maintained constant observation of the Plaintiffs during performances.   It was aware when a Plaintiff missed a move, was slow to react during a sequence, or required assistance.   As the productions were often televised live, WWE had to rapidly switch camera angles, instruct referees to take action, and adjust sequences based upon the performers' ability to successfully complete a performance.   The result was WWE directly witnessed every single time the Plaintiffs suffered blows, displayed direct evidence of head trauma, suffered concussions, and lost consciousness.

247.   Even dark matches, performances never recorded and not acknowledged by a wrestlers' match history, had WWE employees present.   The agents were in charge of these matches and would dictate to the Plaintiffs the outcome of the matches, the moves to perform, particularly the finishing moves,

and any other details that needed to be worked out.  Medical personnel and trainers would also usually be present.

248.    In between matches, the Plaintiffs would meet with various Departments within WWE such as Creative to discuss narratives, agents to discuss moves and matches, and executives such as VKM and Stephanie McMahon.  These meetings put the Plaintiffs in direct contact with WWE employees where the employees observed the Plaintiffs cognitive, motor, and behavioral abilities as they changed over time and from match to match.

### j.    WWE Former Performers' Lingering and Latent Symptoms Required (And Still Requires) WWE Take Action.

249.    The repeated falls, bumps, blows, and rapid decelerations of the head in routine and even correctly executed maneuvers have resulted in long-term, degenerative neurological illnesses and diseases in the Plaintiffs, all as known to the Defendants.

250.    The Plaintiffs' symptoms have manifested as dementia, confusion, sleeplessness, depression, anxiety, and a constellation of neurological and psychological illnesses and diseases directly attributable to head trauma sustained during WWE performances and training.

251.    Former WWE wrestlers who died and are studied show signs of CTE. The symptoms that evidence CTE have now been conclusively linked to CTE in professional wrestlers at a high degree of those former performers studied, in large part because of this lawsuit.

### k.  Drug and Alcohol Rehabilitation Letters Implicate WWE's Knowledge

252.   WWE directly communicates with the Plaintiffs about their symptoms through the Substance Dependency letters.  It offers WWE-sponsored treatment for alcohol and drug dependency, a recognized associated symptom of repetitive head trauma documented in the medical literature as early as 1973 and one that is pervasive in the boxing and professional wrestling communities.

253.   According to the WWE's website: "Beginning in September 2007, WWE distributed its first rehabilitation assistance offer to all former WWE contracted talent. The goal of the initiative is designed to help any former talent that may have a substance-related dependency problem. The WWE distributes an annual letter to all former talent notifying them of the program and relevant details. In November 2014, 707 former talent letters were sent out. The WWE has a confidential hotline for former talent to call and seek admittance to a certified treatment center, with all expenses covered by WWE. In addition, the WWE maintains regular contact with talent who have entered a rehab program or reached out for WWE assistance. To date, 10% of former talent have accepted assistance."

254.   Nearly all the plaintiffs receive this letter which offers the program regardless of the amount of time the recipient wrestled for WWE.

255.   The program was administered by WWE employees Anne Russo Gordon and now by Bob Killar.

256.   Plaintiffs Ashley Massaro, Jon Nord, Marty Jannetty, Mark Canterbury and others have participated in the program.

257.    Deceased Plaintiff Brian Knighton was diagnosed with early stage CTE participated in the program before his drug overdose death.

258.    WWE has actual knowledge of the Plaintiffs' physical, neurological, and psychological deteriorations, illnesses, and diseases as WWE keeps track of its former performers for mailings, events, community updates, and royalty payments.  Many of the Plaintiffs attest to ongoing communications with the WWE, through mailings, phone conversations, and in-person meetings.

259.    Nowhere in the substance dependency letters does WWE acknowledge why the professional wrestling community is wrought with alcoholism and substance dependency issues, or offer treatments for the likely underlying neurological impairment that has lead to this health crisis.

E.    **WWE's Responsibility to the Plaintiffs' Health and Safety.**

260.    WWE owes the Plaintiffs a duty to protect their health and safety because it undertook intentional steps to ensure reliance on WWE's medical treatment and dispersal of necessary information by depriving the Plaintiffs of any external information, treatment, or required notice of statutory regulations and then by fostering complete dependence on its inadequate protections.

a.    *Plaintiffs' Forced Reliance on WWE.*

261.    When the Plaintiffs first began working for WWE, whether with a handshake deal or one of the Booking Contracts, the Plaintiffs were immediately cut off from all protections from State and federal regulations that they should have been entitled to due to WWE's misclassification of their performers as independent contractors.

262.   This misclassification prevented the Plaintiffs from receiving adequate recovery time after injuries under the FMLA (or Workers' Compensation) and meant they did not receive proper protective equipment such as helmets, guards, and safe work environments required by OSHA.

263.   The WWE did not provide the Plaintiffs with health insurance or Workers' Compensation Insurance and most could not afford their own health insurance and even if they could, no insurer would cover a professional wrestler individually.

264.   The code of silence that WWE enforced also served to prevent the Plaintiffs from communicating about their injuries with the outside world.   The Plaintiffs' attest an inability to speak about injuries because WWE intimidated the Plaintiffs with threats of termination, loss of payments and royalties, and ostracism in the community.   The Plaintiffs were expected to continue performing through the pain and ignore any injuries to ensure continuity of WWE's narratives and profits, at their own peril and in violation of law.

### b.  WWE Covers 100% of All In-Ring Injuries.

265.   When WWE directly acknowledged its responsibilities to the Plaintiffs' health and safety by self-insuring 100% coverage of all in-ring injuries.   The WWE prominently states on its website that it covers 100% of all in-ring injuries for its performers and also notes the utmost importance of its performers' health and safety.

266.   WWE employed medical professionals to foster clinical relationships with the Plaintiffs.   Dr. Rios and Dr. Unger would provide direct medical coverage

and advice before, during, and after performances and would be available to the Plaintiffs if they needed medical treatment.  The Plaintiffs received medications, splints, information, and all basic medical care relating to their in-ring performances from WWE employees or agents.

267.    Guidelines were developed through the years on the use of steroids, illicit drugs, and alcohol.  WWE functioned as a caretaker for its performers who as a result of the repetitive head trauma were becoming addicted to pain medications and other substances.

268.    Plaintiffs also reasonably relied on WWE's actions in not enacting policies and protocols to diagnose and treat concussive injuries and head trauma. WWE's inactions fostered a sense of security within the professional wrestling community because it said to the Plaintiffs that they had nothing to fear from the pervasive injuries that professional football and boxing organizations were actively trying to prevent.  The Plaintiffs trusted WWE and relied on it to protect their health and safety, WWE failed.

### c.  WWE's Continuing Special Relationship with the Plaintiffs.

269.    After the Plaintiffs retired from WWE wrestling, many often had difficulty finding meaningful work and that hardship only worsened as their clinical symptoms of neurological issues developed over time.

270.    WWE maintained a close relationship with the majority of the Plaintiffs, ensuring continued communications.  The Plaintiffs relied on WWE and often called their Talent helpline if they were in need of assistance.  Many sought employment with WWE because they could not find work elsewhere and some,

overcome by depression, resorted to substance abuse.  The vast majority of the Plaintiffs report suffering depression and anxiety after retiring from professional wrestling and most had no other group to turn to but the professional wrestling community – specifically, WWE.

271.   WWE sends substance dependency letters annually to its former performers offering free treatment, as well as community updates and quarterly royalty payments. Many of the plaintiffs have availed themselves of these offers.

272.   The Plaintiffs attend signings, celebrity performances, Hall of Fame inductions, support groups such as the Cauliflower Alley Club, and other community events.  Throughout all of this WWE is funding, organizing, attending, outreaching, and interacting with the Plaintiffs on an ongoing basis.

273.   In order for WWE to reach the Plaintiffs, WWE keeps information on its former performers, including addresses, telephone numbers, email addresses, employment status, and, upon information and belief, health statuses.

274.   The Plaintiffs all attest that they relied on WWE to treat their injuries from WWE performances and anticipated WWE would inform them of any latent or hidden injuries that WWE later discovered.

275.   The Plaintiffs continued to rely on WWE to protect them long after their last performance ends because WWE maintains its relationship with them and encourages this dependence through its actions.

F. *The WWE's Refusal to Accept the Existence of CTE in Professional Wrestling.*

    a. *WWE's Ties to the Concussion Legacy Foundation*.

276.   The WWE's has willingly inserted itself into CTE science.

277.    The WWE gives millions of dollars to a leading research group called the Concussion Legacy Foundation (CLF), formerly the Sports Legacy Institute.

278.    WWE executive Paul Levesque holds a board seat on the CLF.

279.    The CLF is headed by a former WWE wrestler Named Christopher Nowinski.

280.    Nowinski wrote a book while working for WWE (as a former wrestler working with state governments to promote voting initiatives) published in 2005 that serves as a introduction to the science of head trauma.

281.    Nowinski states that after sustaining concussions in WWE events he sought medical advice and treatment for the long-term effects which led to his education on the issue.

282.    Nowinski to this day is an outspoken critic of the NFL and it's handling of concussions and CTE.

283.    Nowinski had formerly been sharply critical of the WWE's health and safety practices.

284.    In June 2016, the Boston Globe published an article highlighting an apparent improper relationship with Nowinski's CLF and the WWE.

285.    According to the article the WWE is the largest single financial sponsor of the organization, spending millions of dollars to finance the CLF and its research in CTE.

286.    The CTE studies to date have not involved any professional wrestlers-excepting one in 2007, Christopher Benoit which was the very first and only wrestler studied by the group.

287.   The WWE has never accepted the findings that Benoit had CTE and continues to publicly dispute them.

288.   In October 2017, a journalist asked a spokesman for the WWE, whether wrestling could cause CTE, the spokesman replied: "no comment." The WWE spokesman did tell the same publication in December 2016: "we are not scientists," and "the evidence is not clear," whether wrestling over time causes brain damage. (CT. Law Journal, 10/5/17)

289.   In gifting millions of dollars to the CLF, WWE executives stated to USA Today: "Levesque said pro wrestling is fundamentally different from football when it comes to hard impacts. "If you're in the NFL, your goal is to try to hit the other guy as hard as possible . . . The goal in what we do is the exact opposite," said Levesque WWE Funds Research Into Treatment of Chronic Brain Trauma," USA Today Sports, (May 16, 2013).

290.   The WWE has financed the CLF's studies of CTE in NFL football players.

291.   A WWE Press Release announced: "WWE Donates $1.2 Million to SLI for Boston University CTE Treatment Program." "WWE is proud to help advance this critical research to help anyone at risk of suffering CTE," said Paul Levesque, EVP Talent and Live Events for WWE. "WWE has been, and will continue to be, very proactive on taking measures to ensure the health and wellness of our talent." "We appreciate the generosity of WWE," said Christopher Nowinski, Co-Founder and Executive Director of the Sports Legacy Institute. I enjoyed my time at WWE, and I am excited to reunite with the organization on this important cause

108

that will benefit a lot of people we both care about."

(https://www.bumc.bu.edu/2013/05/17/wwe-donates-1-2-million-to-sli-for-boston-university-cte-treatment-program/)

292.   A 2015 paper financed in part by WWE, describes CTE as a disease with a 15-20 year latency period.  The study states that subconcussive hits alone appear sufficient to lead to CTE, and that "chronic and repetitive nature of head trauma, irrespective of concussive symptoms, that is the most important driver of disease." Stein, TD, et al., "Concussion in Chronic Traumatic Encephalopathy, Curr Pain Headache Rep. (Oct. 2015)

293.   A 2017 paper similarly financed in part with WWE and NFL money found CTE in 99% of NFL players studied, the largest study of its kind to date.

294.   As such it is not plausible that the WWE is unaware of the risks of CTE in its performers.

295.   Additionally the WWE now by its involvement with CTE research, possesses objectively superior knowledge about CTE than the plaintiffs.

296.   The WWE has a duty to promptly disclose and speak the full truth regarding the health risks caused by concussive and sub-concussive blows to the plaintiffs.

297.   The WWE has breached this duty by fraudulently failing to disclose material information regarding the link between the type of head trauma sustained in WWE and the development of neuro-cognitive diseases such as CTE.

298.   The plaintiffs justifiably and reasonably rely on these fraudulent omissions and nondisclosures by WWE.

299. The relationship between Nowinski, the WWE and the CLF also appears to be directed at influencing the direction of the scientific study of CTE away from wrestlers.

300. Since 2013, the WWE despite its stated goals of helping "anyone at risk of suffering CTE," no WWE wrestlers been studied for CTE by the CLF or WWE. And none of the plaintiffs or former WWE wrestlers have been helped through education or proper warnings. Neither the WWE nor the CLF have diagnosed a single deceased WWE wrestler's brain in the four years since the announced multi-million dollar gifts.

301. In contrast, counsel for the plaintiff's in this lawsuit since April 2016, has arranged at least six donations of WWE wresters brains and five plaintiffs brains have been found to have CTE, with one further diagnosis pending.

### b. WWE's Refusal to Provide Necessary Health Information.

302. The plaintiffs have no familiarity with or any reason to access any medical literature concerning concussions, head injuries or sub-concussive injuries.

303. The plaintiffs as professional wrestlers have limited educational backgrounds and little to no access to the types of information required to understand their ongoing symptoms causes and treatment.

304. One named plaintiff stated a belief "that the brain heals itself."

305. Because of this asymmetric information and power, the plaintiffs relied upon and still rely upon the WWE for information about their health and safety.

306.   The WWE has never informed the plaintiffs of the negative long-term effects of their head injuries, and concussions.

307.   Defendants failed to provide adequate notice, care, treatment, and assistance to the Plaintiffs, despite their promises to do so, including but not limited to the following:

i.      warned the Plaintiffs of the signs and symptoms of a concussion so that the Plaintiffs could have self-diagnosed during a performance or diagnosed their match partner;

ii.      taught the Plaintiffs that confusion, dizziness, loss of motor function, and seeing stars were signs of an injury that required immediate medical attention;

iii.      taught referees to spot concussive symptoms and establish clear policies and protocols to ensure that the Plaintiffs could be properly treated upon identification of such symptoms;

iv.      ensure that onsite medical personnel could effectively spot and diagnose injuries and have the authority to engage policies and procedures to insure that Plaintiffs were properly treated;

v.      establish clear return-to-ring procedures that ensure that Plaintiffs with a concussive injury would not suffer more severe injuries by returning to perform before the brain had sufficient time to heal;

308.   WWE had at its disposal all the tools necessary to undertake the preceding steps to fulfill its obligations to the Plaintiffs.

309. WWE has a responsibility to fix the results of its failure to protect the Plaintiffs' health and safety by informing the Plaintiffs of their specific injuries and providing the promised 100% in-ring medical coverage.

310. Like other latent occupational hazards which create obligations to notify employees or workers about a hidden danger such as asbestos exposure that can cause mesothelioma, or Benzene exposure that can cause Leukemia, the WWE has a responsibility to notice all of its former performers of the latent injuries suffered in its workplace and provide sufficient compensation for the injuries its past neglect and intentional actions caused.

311. The Plaintiffs continued to rely on WWE to inform them of any injuries they sustained in WWE and WWE has continued to refuse to acknowledge that the Plaintiffs have suffered long-term neurological injuries from head trauma sustained in WWE performances, all as known to and relied upon by the WWE.

V.    CAUSES OF ACTION

### COUNT I
### FRAUDULENT NONDISCLOSURE
(On Behalf of All Named Plaintiffs Against Defendant WWE)

312. Plaintiffs incorporate by reference each and every prior and subsequent paragraph as though fully set forth herein, including all referenced Exhibits.

313. WWE has failed to warn the Plaintiffs of the risks inherent in performing for WWE too soon after sustaining an initial concussion or sub-concussive injury, and which failure to warn of the specific signs and symptoms of concussions and sub-concussive injuries and the risks associated with

sustaining repetitive head trauma was intentional fraudulent withholding of information and non-disclosure of necessary information.

314.   WWE had particular knowledge of the signs and symptoms of concussion and sub-concussive injuries at all relevant times and which knowledge has only increased up until the present.

315.   Plaintiffs did not have knowledge of the particular hazards within WWE performances that caused the injuries and did not have the knowledge of the risks of continuing to perform for WWE with a concussion.  Plaintiffs did not know the signs and symptoms of concussions, and did not know they were injured and should not continue performing for WWE.

316.   WWE demonstrated knowledge of post-concussion syndrome in 1995 in its televised programming. Its own physician narrated the risks of head trauma in professional wrestling and WWE performances, the signs and symptoms attributed to post-concussion syndrome and traumatic brain injuries, and the need to provide proper medical care and treatment to prevent further injuries.

317.   The result is WWE knew the Plaintiffs suffered repetitive head trauma from its performances that would result in long-term neurological injuries but never told them about the signs, symptoms, and risks of sustaining repetitive head trauma in professional wrestling.

318.   WWE was responsible for understanding the inherent risks in its business.  WWE had the sophistication, employees, and financial ability to understand the dangers and risks associated with the hundreds of impacts sustained during each of its performances and the resulting repetitive head trauma.

The Plaintiffs did not have the same ability and relied on WWE's intentionally inadequate distribution of this information.

319.   The public statements by WWE executives and spokespeople obfuscating the CTE diagnosis of Chris Benoit and the existence of CTE in professional wrestling further decreased the Plaintiffs' ability to understand their latent injuries.  Dr. Maroon and Dr. Lovell's employment indicated WWE's intent to conceal this information as both were very active public figures in the NFL concussion debate and both fervently downplayed and denied its existence in professional football.

320.   It is not plausible that WWE is ignorant of the current state of medical science when it is actively involved with the leading foundation studying CTE.

321.    The assertion that the "WWE is proud to help advance this critical research to help anyone at risk of suffering CTE." Infra para 300 is exactly the type of statement that plaintiffs rely upon.

322.   The unsophisticated Plaintiffs suffer from life-long, degenerative, and progressive neurological diseases and illnesses because of WWE's failure to protect them from head injuries during their performances and their failure to tell them that they were sustaining repetitive head trauma that causes long-term neurological injuries.

323.   The Plaintiffs' injuries have been exacerbated as a result of WWE's failure to disclose this necessary information because the Plaintiffs were unable to detect the latent injuries on their own or understand the symptoms that progressed gradually over time.  Had the Plaintiffs understood from the beginning what their

injuries were they would have taken steps to prevent further injury and reduce the impact on their lives through medications and treatments.  For some of the Plaintiffs, such treatments are now too late and offer no reprieve for the severe, end-stage illnesses that they suffer from, but which could have offered them significant increases in quality of life had they been able to properly care for themselves.

324.   Therefore, Plaintiffs ask this Court to award personal and pecuniary damages, including conscious pain and suffering and emotional distress that has been sustained as a result of WWE's fraudulent nondisclosure.

**COUNT II**
**ACTION FOR DECLARATORY RELIEF – MISCLASSIFICATION**
**(Against Defendant WWE, On Behalf of All Named Plaintiffs to whom**
**WWE provided an unconscionable Booking Contract, Contractor**
**Nostalgia Agreement, or any other documents or payments purporting**
**to limit their rights under applicable laws of the United States)**

325.   Plaintiffs incorporate by reference each and every prior and subsequent paragraph as though fully set forth herein, including all referenced Exhibits.

326.   Defendants misclassified the Plaintiffs as "independent contractors", without basis in law for doing so, and with the specific intention of depriving the Plaintiffs of money due to them which was retained by the Defendants and utilized to advance their business and augment their wealth.

327.   The misclassification by WWE was generally achieved by the presentation to the Plaintiffs of boilerplate Booking Contracts permeated with unconscionability.  For the purposes of the scheme to misclassify the Plaintiffs, the relevant sections of the unconscionable Booking Contracts are virtually

identical. Four examples of these contracts are attached hereto as Exhibits A, B, C, and D. No substantial negotiation was permitted by the Defendants.

328.   The unconscionable Booking contracts (and/or payment methods coupled with IRS Form 1099's) were utilized by the Defendants to dupe the Plaintiffs into believing that they were independent contractors with few if any rights against the Defendants, and particularly no rights to:

a. Require WWE to contribute to State and Federal employment taxes as is required by law with respect to employees; thus resulting in significant additional expense to Plaintiffs;

b. Require WWE to purchase Worker's Compensation Insurance as would have been mandated by the laws of the various states so as to pay for on the job injuries, disabilities and wage loss, but for the deceitful misclassification upon which the Plaintiffs were induced to rely.

c. Require WWE to provide at its own expense health insurance and liability insurance or to pay out of pocket for work related injuries when such insurance was not available, instead of requiring Plaintiffs to make these payments;

d. Require WWE to provide a reasonably safe work place as required by OSHA and its regulations, including headgear to lessen the effects of blows to the head and the effects of rapid deceleration on the head.

e. Allow Plaintiffs to seek to organize a union under the NLR Act;

f. Require WWE to follow Family and Medical Leave Act and provide the guidance and recovery periods required thereunder;

g. Require WWE to provide written notices as mandated by statutory law concerning the protections afforded under OSHA, FMLA, and Workers' Compensation.

329.   The unconscionable language artfully crafted by the WWE and its attorneys as the "booking contract" cannot establish the relationship between contracting parties as one of employer-employee or independent contractor. Case

law requires an inquiry beyond the unconscionable contractual boilerplate to the actual nature of the relationship between the Plaintiffs and the WWE.

330.   Defendants exhibited vastly unequal bargaining power, which they used to their advantage, to the detriment of the Plaintiffs. There were no material deviations from the printed "form contract" imposed by the WWE, the significant majority of the wrestlers lacked both adequate (or even any) representation or sufficient educational training to comprehend the boilerplate Booking Contracts they signed or the payments and 1099's they received, all known and relied upon by the WWE.  Serious penalties were imposed by the WWE for questioning any demand it made of Plaintiffs as is elsewhere more particularly alleged. Wrestlers who asked questions were threatened with having their careers ended.

331.   The Plaintiffs and all wrestlers signing any one of the WWE's boilerplate Booking Contracts (or otherwise performing for the WWE) are required to comply with the WWE's instructions as to when, where, and how their "performance" is to be executed, and therefore should be classified as employees. See Rev. Rul. 87-41.

332.   Sections 1.1 and 5.5 of the boilerplate Booking Contract provides that WWE shall exclusively control the Wrestlers appearances and services "without limitation", not only in matches but also personal appearances. WWE is given the sole right to assign the wrestler's obligations to others. The WWE is given the right to "direct" the wrestler to create or design a copyrightable work which is then the property of the WWE.

333. In accordance with Paragraph 9.6 of the Booking Contract "Wrestler agrees that all matches shall be finished in accordance with the Promoter's [WWE] direction."

334. If the wrestler deviates from the scripted ending not only is the Wrestler fired, but ANY sums due under the contract are forfeit –not only for wrestling, but for royalties and anything else there is a "forfeiture of any payments due" See Booking Contract, paragraph 9.6, Exhibits A, B, C, and D.

335. WWE maintained nearly total control over all aspects of the Plaintiffs' careers. Not only the location and time of performance was dictated, but also the duration and outcome of each match, the "persona" of the Plaintiffs including props, hairstyles, story lines, and "signatures moves" have continuously been dictated by the WWE under the guidance and iron control of its Chairman and controlling shareholder VKM.

336. The WWE, operating principally through VKM, exercises total control over the Wrestler's scripted "character", typically termed their "gimmick." The wrestler's "gimmick" has a major impact upon his or her career, success, and earning power. Other entertainers such as actors, may advance based upon their skill in the profession, as do sports athletes. However the opportunities of professional wrestlers are carefully dictated by the WWE to serve its own interests often to the financial detriment of the wrestlers.

337. The detailed control which the WWE exercises over the performance of the wrestlers and the draconian penalties for not following those orders amply satisfy the "control" test of an employer-employee relationship.

338.   Currently, the WWE trains nearly all wrestlers internally. However, from 1985 to 2000, WWE utilized extreme training methods to produce musculature in wrestlers, including steroid enhancements.  Defendants exhibited direction and control over training programs and methods.

339.   Plaintiffs' services were required to be personally performed. The WWE boilerplate Booking Contract is for a particular individual. with particularized persona established and approved in detail by the WWE and the matches are scripted along story lines involving complementary "gimmicks," no assignment of the work to another wrestler by either of the participants could functionally occur. Only the WWE could make substitutions or change assignments.

340.   Independent contractors have the right to hire additional help, or substitute help to complete the work. Plaintiffs were not permitted to select the identity or existence of "corner" assistants, as these might interfere with the persona created by Defendants. Plaintiffs were not responsible for finding, hiring or firing any person to assist in the creation of WWE's desired match and its determined outcome, and were prohibited to do so.

341.   WWE selected any "assistants" as well as other wrestlers to interfere in the match according to a planned script. Indeed, the "Referees" are mere actors whose role is dedicated to advancing the planned outcome, orchestrated and created exclusively by Defendants.

342.   The existence of a "continuing relationship" provides support for an employer-employee relationship. Independent contractors typically complete one job and then the contract is finished and they may work for someone else. WWE

contracts are for three years, excepting contracts with "Jobbers" or those on "handshake deals".  That the WWE has the option to terminate the contract does not detract from the nature of the relationship as employer-employee since such rights simply provide more control to the WWE. Unless the wrestler complies in all respects, he will not be utilized and his career will not advance.

343.   Wrestlers have "set hours of work" established by the WWE. WWE also establishes the story line, outcome of the match, and the characterization of the individual wrestlers, and their gimmicks, costumes and assistants. The WWE sets the time and place of the match and all essentials often for 150 – 250 matches per year per Wrestler. This test once again designates the Wrestler as an employee.

344.   The task of the wrestler is to show up for the performance and perform the part assigned. In large part the wrestler's success and future prospects are not determined by his wrestling skill, but by how he is characterized by the WWE – if he is allowed to win and to be assigned interesting story lines and "gimmicks". This is best achieved by following WWE's total control thus pleasing VKM.  This test once again designates the wrestler as an employee.

345.   WWE is controlled by its Chairman Vince McMahon. VKM would not tolerate either any negotiation or questioning of the unconscionable Booking Contracts, whether written or on a "handshake".  For example:

   a. Timothy Smith (a/k/a Rex King) alleges that this WWF culture was "keep your mouth shut".  He was informed by older wrestlers when he stated with WWF that if he spoke up and didn't follow orders he would be considered a "trouble maker", "squashed" (i.e. physically hurt) in the ring, then fired;

   b. George Gray (a/k/a One Man Gang) alleges Chairman McMahon personally remade his character to "Akeem the African Dream" and

120

required he dress in a yellow Dashiki as a racially stereotypical black, complete with tribal dancers supplied by WWE.  Mr. Gray is Caucasian;

c.  Jonathan Hugger (a/k/a Johnny Stamboli) alleges that he was handed a contract to sign by Jim Ross of WWE, which he executed with no negotiation on a "take it or leave it" proposition. Mr. Hugger alleges that if he did not accept the WWE contract, you did not wrestle. Once he questioned a story line and was sent to Louisville, KY for two weeks as punishment;

d.  Ahmed Johnson alleges that WWE controls the Wrestlers by controlling the ability to manipulate their story lines and constantly telling them that "you have no other place to go." If you did not do everything WWE demanded the "mocking angles" are deployed to degrade your character with a degrading story line and constant losses. Then your TV appearances would dwindle and any merchandising income would dry up.

346.   Plaintiffs' Booking Contract requires exclusive full time devotion to the WWE during its term, and contained non-competition clauses to the benefit of Defendants. Thus the Wrestler is prevented from utilizing his skills to enhance his income except through the WWE.

347.   Next, where the plaintiffs work is done is determined by WWE.  From the boilerplate Booking Contract the WWE controls the location of the work, the travel to a designated route, and the work at specified places.

348.   At all times relevant, WWE provides the majority of the wrestler's "tools" and specifies their costume, even providing a preferred tailor, even while claiming the wrestler provide his or her own costume.

349.   Plaintiffs' persona, script, match outcome, opponent, and moves were all scripted and controlled by Defendants.  As such, Plaintiffs were not in a position to influence the economic risk of making a profit or loss from a match, other than

to abide by Defendants' booking contract, placing all control of such matters in the hands of Defendants.

350.   All of the Plaintiffs allege that WWE controlled the place, time and manner of their appearances, as well as the outcomes of the events, and to a large degree, what happened during the events – especially such dramatic occurrences as smashing a guitar or a chair over a wrestler's head, or subjecting them to a "pile driver" through which one participant's head is smashed into the ring floor or being bashed on the head with a metal chair.

351.   The terms of the unconscionable boilerplate Booking Contracts provide much control; but, the Plaintiffs allege that in addition to the control provided by the language of the Booking Contract, the WWE exercised on a routine basis near dictatorial control over all aspects of its "product", under the direct guidance of its current "Chairman" and controlling shareholder Defendant Vincent K. McMahon with severe consequences for any disobedience including physical risk and career ruination.

352.   For example, setting the wrestler's persona can have a large influence on his income level. A "Hulk Hogan" personality may be set as a great hero – a "Captain America" type figure while the "Iron Sheik", a character whose current equivalent could be an ISIS-type character, is doomed in every match to ignominious defeat, or allowed victories just to stoke emotions for his inevitable defeat in a "revenge match".

353.   As soon as the audience tired of seeing the "heel" or "bad guy" pilloried, or the public whim moved on to a different type of "bad guy", the persona

of the "hero" would simply be repositioned by the WWE as vanquishing a different foe while the "bad guy" would be likely out of a job. Success and reward continues for one, for the other, a career is short and swift –regardless of who was the more skilled or better trained wrestler, and all as pre-arranged by WWE.

354.   Such contests of "good" and "evil" are the daily fare of the WWE and the scenarios alleged are under the total control of the WWE and its script-writers, and constitute the working conditions of the Plaintiffs; all the while each of them, is under the supervision of WWE Chairman VKM.

355.   A case in point is Plaintiff Tracy Smothers a/k/a Freddie Joe Floyd was a well-regarded wrestler who worked very hard at conditioning and developing his in the ring athletic abilities. He was branded by Vince McMahon, WWE's "boss" as a cartoon type character, a preposterous persona McMahon wanted to explore. Tracy Smothers' career was injured and he was terminated because the "buffoon" gimmick crafted by VKM didn't catch on with the fans.

356.   It was well known among the Plaintiffs that the only way out of the WWE (except by termination) was by giving notice prior to the final 90 days of the Booking Contract. As soon as WWE discovered a wrestler wanted to leave, WWE through Vince McMahon would bury the character the wrestler utilized, and therefore the wrestler's prospects by having him loose repeatedly or be otherwise humiliated. Control of the wrestler's persona and match outcome, were not only utilized for entertainment purposes, but also to enforce total contractual control. If a wrestler dared to question the iron-clad WWE boilerplate Booking Contract, (or WWE's review of his "handshake deal") the fate of his "gimmick" relegated him to

the graveyard of jettisoned WWE characters, and his opportunity for a financially rewarding career all but eliminated.

357.   In sum, Vince McMahon, the boss of WWE, had, has, and regularly exercises the ability to diminish or end the careers of wrestlers he did not like, or who offered any questioning let alone resistance to his iron control. The degree of control which Vince McMahon, through WWE, exercised over the careers and earning ability of wrestlers was and remains substantially more pervasive than would be tolerated by any "independent contractor," or by anyone in a commercially reasonable setting.

### COUNT III
### <u>UNCONSCIONABLE CONTRACTS</u>
### DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a)
### (Against Defendant WWE, On Behalf of All Named Plaintiffs
### to whom WWE provided an Unconscionable Booking Contract,
### Contractor Nostalgia Agreement, or other documents purporting to
### limit their rights under applicable laws of the United States and her Courts)

358.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as if fully set forth herein, including all exhibits referenced.

359.   The Declaratory Judgment Act, 28 U.S.C. 2201, provides that where there is a controversy within its jurisdiction "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought".

360.   The several tests for whether a declaratory judgment action is appropriate to the circumstances alleged are set forth in *Grand Trunk W.R.R. Co. Consol. Rail Corp.*, 746 F. 2d, 323, 326 (6th Cir.1984).  The facts of this case as above and herein alleged, amply meet the *Grand Truck* criteria.

361.   The conduct of each of the Defendants with respect to the procurement, execution, and maintenance of the unconscionable "Booking Contracts" (including the "Contractor Nostalgia Agreement") was and continues to be so egregious that to allow the Defendants to claim the benefits of or to enforce any part of these "contracts" against the Plaintiffs, including the forum selection clause and choice of law clause would create an unconscionable injustice and consequently reward the Defendants for conducting a carefully crafted and wrongful course of fraudulent conduct through intentionally duping the Plaintiffs into believing that they had no rights available under otherwise available state and federal statutes and were mere legal slaves of the WWE.

362.   The Booking Contracts, the "Contractor Nostalgia Agreement", the "handshake deals" are outrageous, were procured by fraud, coercion and unequal bargaining power, and violate public policy and the statutes which are set forth in this Complaint, as well as references to applicable law. For those reasons and applicable law, here repeated and realleged in every detail, the Booking Contracts should be set aside and declared null and void, as having been procured and necessary through fraud, coercion, intimidation, while a progressive disease process intentionally hidden from the Plaintiffs was allowed to proceed and the WWE to rob the Plaintiffs of any ability to comprehend their circumstances.

363.   The unconscionable boilerplate booking contracts were employed by the Defendant WWE and its predecessors, through the direction of Defendant VKM and his straw men, to enshrine advantages for the WWE and its predecessors which violated the public policy of the United States and its individual States in

order to procure monetary advantage for the Defendants by directly and intentionally duping the Plaintiffs with respect to valuable rights enjoyed by employees and others at the workplace.

364. Defendant WWE, operating through and under the control of VKM and his straw men, and through the employment of the unconscionable boilerplate booking contracts conducted their intentional violation of statutory rights of Plaintiffs, which scheme is illustrated by the following examples.

A. *Occupational Safety and Health Act.*

365. In 1970, Congress created OSHA, a part of the United States Department of Labor, "to assure safe and healthful working conditions for working men and women by setting and enforcing standards and by providing training, outreach, education and assistance."

366. The Williams, Steiger, Occupational Safety and Health Act of 1970 (84 Stat. 1590) clearly applies to employees such as the Plaintiffs. Under the Act there are strict reporting requirements for injuries, which have been completely or substantially ignored by the Defendants because of their intentional and fraudulent misclassification of the Plaintiffs as "independent contractors," through the imposition of the unconscionable boilerplate Booking Contracts.

367. 29 U.S.C. § 654 sets forth the duties of employers and employees and provides as follows:

Each employer:

Shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

126

Shall comply with occupational safety and health standards promulgated under this chapter.

Failure to comply with 29 U.S.C. § 654(1) is evidence of the employer's negligence, and may be considered under the Counts of this Complaint which seek compensation for the physical, psychological and financial consequences of Plaintiffs' personal injuries suffered thereby.

368.   OSHA provides:

The employer shall ensure that each affected employee wears a protective helmet when working in areas where there is a potential for injury to the head from falling objects.

369.   Routinely, the Plaintiffs were subjected to danger from "falling objects" usually in the form of another wrestler, weighing typically over two hundred pounds and usually jumping from the top of a ring post, from chairs smashed over their head, and from otherwise being deliberately smashed into the ring floor, with the wrestler being the object driven to the floor resulting in rapid deceleration to brain matter, with consequent damage.

370.   For example, Bryan Emmett Clark had his head driven full force into a ring post by Savio Vega in a WWE match and suffered memory loss. Clark states it was common to get hit in the head and knocked out.

371.   Laurinaitis was double suplexed in 1992, landed badly and received herniated discs in his neck.  None of this nor thousands of similar occurrences (collectively experienced by all of the Plaintiffs) were ever reported to OSHA by the WWE as required by law but for the fraudulent misclassification.  Injuries were suppressed, not reported.

372.   Section 17, sub parts (a) and (i) of the OSHA Act provide:

127

(a) Any employer who willfully or repeatedly violates the requirements of section 5 of this Act, any standard, rule, or order promulgated pursuant to section 6 of this Act, or regulations proscribed pursuant to this Act, may be assessed a civil penalty of not more than $70,000 for each violation, but not less than $5,000 for each willful violation.

    (i)    Any employer who violates any of the posting requirements, as prescribed under the provisions of this Act, shall be assessed a civil penalty of up to $7,000 for each violation.

373.   The Defendants have willfully and consciously conspired to violate the OSHA Act by falsely knowingly and falsely characterizing their employees as "independent contractors", thus conspiring to deprive them of the benefits of the Act, and further to intensely pressure the wrestlers not to report injuries or to discuss dangerous conditions in any way, upon pain of losing their careers.

374.   OSHA requires notice be given to the protected employees.  WWE did not ever post in any place of employment the poster notice required by OSHA informing their wrestling workers of their right to have an injury reported, or their workplace inspected. Wrestling workers were never informed that they <u>were protected from retaliation</u> "in any way" by exercising their rights under OSHA, and were duped into believing that they were "independent contractors" having no rights, thus being deprived of their statutory rights and being subjected to unreasonable danger of physical and economic harm which all of the Plaintiffs thus suffered in silence, knowing retaliation would be swift and certain and as they were unaware of their rights.

375.   Instead of being informed of their statutory rights under OSHA the wrestlers were induced through fraud and intimidation, into signing boilerplate

contracts that allegedly "signed away" their rights – a proposition void at the outset as known to WWE, but not known to the uneducated wrestlers who were uniformly subjugated to dictatorial control by the WWE, and who knew full well what the consequences of any attempt to exercise their "rights" would be – ruination of their careers and potential serious physical harm, and whose cognitive decline was created by WWE's conduct.

376.   Pursuant to 29 C.F.R. § 1904.35(b)(1)(i) and (ii), the following requirements must be honored and implemented by covered employers such as the WWE:

> You must set up a way for employees to report work-related injuries and illnesses promptly; and….
>
> You must tell each employee how to report work-related injuries and illnesses to you.

1904.35(b)(1)(i) and (ii).

377.   The Plaintiffs were never told how to report work-related injuries and instead were actively discouraged from doing so, since not wrestling, even if injured, would have a serious adverse effect upon their career as each employee well new through the coercive and intimidating culture of the WWE established under the direction and control of VKM and his agents.

378.   In addition to being deprived of rights under OSHA, the Plaintiffs were wrongfully classified as "independent contractors" and were deprived of the Worker's Compensation laws of the various States and the substantial medical benefits and language compensation that would have been available to them in many States in which they worked for WWE.

379.   Instead of having Workers' Compensation rights and receiving NOTICE of same as is required by most States (NOTICE is to be posted as with OSHA), no notice was given, no Workers' Compensation policy provided and the Plaintiffs had to either pay for their own health insurance (which before recent changes in the law did NOT cover consequences due to "pre-existing injuries") or to pay for surgeries and rehabilitation out of their own pockets. To question the system imposed by the WWE was to have no career instead of a meager one.

380.   Connecticut, the jurisdiction imposed by WWE's boilerplate Booking Contract, requires that NOTICES of the availability of Workers' Compensation be provided to employees, together with instructions concerning how to report injuries.  WWE ignored its obligations to its Wrestler employees and created the medical costs of a culture in which exercises of rights guaranteed by statute swiftly led to unemployment.  Permanent injuries would have been covered.  WWE's motive was simple – Workers' Compensation insurance would have cost millions of dollars yearly and diminished profits.

B. *National Labor Relations Act.*

381.   Additionally, the deliberate and cynical misclassification of the Plaintiffs as "independent contractors" deprived them of the ability to seek to organize and to bargain collectively. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other mutual aid or protection." *See* NLR Act, 1935.

130

382.   The NLR Act forbids employers from interfering with, restraining, or coercing employees in the exercise of rights relating to organizing, forming, joining, or assisting a labor organization for collective bargaining purposes, or from working together to improve terms and conditions of employment, or refraining from any such activity. Title 29, Chapter 7, Subchapter II, Section 8, United States Code. The right to organize a union is considered a fundamental human right.

383.   The NLR Act further provides: "Sec. 8. [§158.] (a) [Unfair labor practices by employer] It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this Title]".

384.   Section 8(c) provides in important part: that employers may NOT (3) by discrimination in regard to hire or tenure of <u>employment or any term or condition of employment</u> to encourage or discourage membership in any labor organization. (<u>emphasis supplied</u>).

385.   In 1948, the United States, operating through the General Assembly of the United Nations, adopted and affirmed the "Universal Declaration of Human Rights". Article 23 of that Declaration contains the following language: "Everyone has the right to form and to join trade unions for the protection of his interests."

386.   By way of example, NFL players who are classified as employees have a union, the National Football Players Association (NFLPA) that is a member of the AFL-CIO.  This right to unionize was conferred under federal law – the NLR Act. The NFLPA has been in existence since 1956 and formally represents the players

131

in negotiating agreements under seven Collective Bargaining Agreements ("CBA") since 1968.   The most recent CBA was ratified in 2011 and governs working conditions, benefits, workers' compensation, revenue distribution, player benefits and safety issues.

387.   In November, 2015, Jesse the "Body" Ventura, the 38th governor of Minnesota, was asked by a journalist: "You famously tried to get wrestlers to unionize before WrestleMania 2.   What was Vince McMahon's reaction when he found out?" Ventura replied, "Well, he threatened to fire me."[2]

388.   On October 25, 2016, Mr. Ventura told the audience on the Steve Austin Show: "Vince is lucky I didn't go for the Senate.   Had I got into the Senate I would have started a Senatorial investigation into why professional wrestlers are called 'independent contractors' when they're not. You work for one company, they order you around, they control your whole life. How are you possibly an independent contractor, except they don't have to pay your social security." … "Look at the thousands of dollars it's cost all of us wrestlers to have to pay fifteen-percent, or whatever it is, as independent contractor on our taxes. That's a bee that's been under my saddle since I began wrestling. We are not independent contractors. I can't work for another promoter on Wednesday, and then work for you on Friday, it don't work that way." *See* Csonka, Larry, "Jesse Ventura Says Hulk Hogan Ratted Him Out When He Tried To Start A Union", 411Mania.com (Oct.

---

[2] *See* Giri, Raj, "Jesse Ventura On The Only Time Vince McMahon Stopped Him, Suing WWE, Problems with Hulk Hogan, Trump", Wrestling, Inc., http://www.wrestlinginc.com/wi/news/2015/1123/604137/jesse-ventura-on-the-only-time-vince-mcmahon-stopped-him/ (Nov. 23, 2015).

25, 2016), 411mania.com/wrestling/jesse-ventura-says-hulk-hogan-ratted-him-out-when-he-tried-to-start-a-union/.

389.   The very same bullying techniques utilized by the WWE and its agents to coerce and intimidate the Plaintiffs into signing boilerplate "Booking Contracts" wrongfully classifying them as "independent contractors" for the purpose of violating their rights as employees have been and are utilized by the WWE to insure that no wrestler, unlike all of their compatriots in other professional sports, will ever attempt to organize a union.  Specifically, any wrestler who attempted to organize a union or speak in favor of union activities would quickly have any "push" stopped and be subjected to a string of humiliating defeats thus effectively ending their careers in violation of Section 8(c) as above quoted.

390.   WWE, principally through its Chairman VKM (and others at his direction) enforced WWE's policy of "keep your mouth shut and don't ask questions", and through the deception inherent in their unconscionable "boiler plate" "Booking Contracts", cunningly created conditions and terms of employment designed to stifle the rights of the Plaintiffs under the NLR Act, and thus deprive the Plaintiffs of fundamental and valuable human rights.

391.   The Defendant WWE operating under the direction and control of its Chairman VKM, and through VKM's straw men, recklessly endangered Plaintiffs and caused significant injury.

392.   The unconscionable boilerplate booking contracts procured from the Plaintiffs as above alleged, cause the Plaintiffs substantial economic harm and damage including but not limited to consequential damages, loss of wages, loss of

tax payments earned which ought to have been paid by the Defendants on behalf of the Plaintiffs for Social Security and Medicare, loss of earning capacity, damages due to the loss of the ability to enjoy life, loss of benefits guaranteed under state and federal statutes and the consequent harm caused by the denial of these rights and benefits.  The establishment of these entirely unfair and illegal contracts intentionally deprived the Plaintiffs of money and property.

393.   A just amount should be assessed for all of the damages caused by the unconscionable booking contracts, which contracts not only existed in the past, but continued to this day to injure the Plaintiffs as above alleged, and as a result of unjust, improper, and unconscionable advantage being taken of the intellectual property of the Plaintiffs, including their right to fair and just compensation for the use of their images and likenesses, and performances, all as alleged in this Complaint, whether in this Count or elsewhere.

394.   The contracts should be set aside as void *ab initio* as having been procured by fraud, and with the intent to enshrine an illegal purpose, that of depriving the Plaintiffs of the protections of federal law, and the numerous State workers' compensation laws that would have otherwise attached to their actions as employees.

395.   The economic rights of the parties and fair compensation to the Plaintiffs ought to then be re-determined on an equitable basis as if the contracts had not existed, particularly those current rights of the parties in their own likenesses, images, copyright materials, videos, images, products, and other intellectual property.

**COUNT IV**
**INTENTIONAL DEPRIVATION OF STATUTORY RIGHTS**
<u>**UNDER THE FAMILY MEDICAL & LEAVE ACT**</u>
**(On Behalf of All Named Plaintiffs Against Defendant WWE)**

396.    Defendant WWE, operating through and under the control of VKM and his straw men, intentionally violated the statutory rights of Plaintiffs, which scheme is illustrated by examples of the foregoing Count, and as set forth herein.

397.    In 1993, the Family and Medical Leave Act became the law of the United States.    Among other rights, it guaranteed to employees of covered companies the right to receive up to 12 weeks off if an employee suffered a serious injury. *See* Section 102(a)(1)(D) of the Act. 29 U.S.C. § 2601, *et seq.*; 29 C.F.R. § 825.100, *et seq.*

398.    Pursuant to its own SEC filings, the WWE is a company covered by the Family and Medical Leave Act, as are the Plaintiffs, its employees, under any reasonable definition of that word under all applicable law.  Misclassification of the Plaintiffs as "independent contractors" through an outrageous contract which ignores the reality of Plaintiffs working conditions does not exempt the WWE from its obligations to the Plaintiffs under the Act, but is in fact an <u>offense</u> under the Act.

399.    The Plaintiffs were prevented from becoming aware of their rights under the Act because of the highly coercive culture of the WWE as above alleged as manifested by the requirement of the unconscionable boiler plate Booking Contract and its deliberate and cunning misclassification of the Plaintiffs as "independent contractors".

400.    Section 105 of the Act prohibits employers from interfering with or restraining the exercise of any right guaranteed by the Act:

(a) INTERFERENCE WITH RIGHTS. –
        (2) EXERCISE OF RIGHTS. – It shall be unlawful for any employer
            to interfere with, restrain, or deny the exercise of or the attempt
            to exercise, any right provided under this title.

Section 105.

401.   Under Section 107(a) of the Act it may be enforced through a civil action by employees providing not only for damages, but for the assessment of reasonable attorneys' fees as follows:

402.   As with the Workers Compensation Laws of the various states, and likewise as in the case of OSHA, the Family and Medical Leave Act <u>requires a visible posting of its rights in order for the employees to know about them</u>, as follows:

**SEC. 109 NOTICE.**

(a) **IN GENERAL.—Each employer shall post and keep posted, in conspicuous places on the premises of the employer where notices to employees and applicants for employment are customarily posted, a notice, to be prepared or approved by the Secretary, setting forth excerpts from, or summaries of, the pertinent provisions of this title and information pertaining to the filing of a charge.**

**SEC. 109.**

403.   The "Notice" requirement is further codified through 29 C.F.R. § "825.300 Employer notice requirements", incorporates herein.

404.   Failure to notify the employees is punishable by a fine.  In no case did the WWE notify its Wrestlers that they were entitled to benefits under the Family Medical and Leave Act (by posting or otherwise), and in fact actively concealed that right through its coercive culture which required the Wrestlers to agree to the boilerplate "unconscionable boilerplate Booking Contracts" which deliberately and intentionally misclassified them as "independent contractors" in order to deprive them of their rights.

405.   29 C.F. R. § 825.500 also imposes strict record keeping requirements upon employers covered by the Act. FMLA provides that covered employers shall make, keep, and preserve records pertaining to their obligations under the Act in

136

accordance with the recordkeeping requirements of section 11(c) of the Fair Labor Standards Act (FLSA) and in accordance with these regulations.

406.   Among other requirements, the FMLA and its regulations require the employers to make and to preserve records of requests for leave made by employees, for any situation covered by the Act, including personal injury.

407.   The WWE has, with respect to its wrestlers, totally ignored and deliberately evaded its obligations under the FMLA with respect to notifying its employee wrestlers that they were covered by the act, accepting applications for leave, granting required applications for leave, providing benefits as required by the Act, holding jobs available as required by the Act, and keeping records as required by the FMLA.

408.   Failing to keep records as require by the FMLA is deliberate and intentional spoliation of evidence designed and intended to prevent the Wrestler employees for exercising their rights.  Failing to keep records required by law, and to provide notices required by law is a deliberate, and cynical and thus far successful attempt to deprive the Plaintiffs of their rights which has caused them damage.

409.   As a result of being deprived of their rights under the FMLA, the Plaintiffs suffered serious economic and physical damage, consequential damage, loss of earning capacity, and other cognizable damage including punitive damages for which they are entitled as just compensation and attorney fees as may be provided by the Act.

410.   For the reasons set forth above – that the Plaintiffs' rights were intentionally deprived because of an unconscionable contract founded upon an illegal basis in violation of the law and public policy, and further for the reasons set forth in the Count entitled Equitable Estoppel to Statutes of Limitations, any assertion of the affirmative defense of the statutes of limitations and repose ought to be set aside.

### COUNT V
### VIOLATIONS UNDER THE EMPLOYEE RETIREMENT
### INCOME SECURITY ACT, 29 U.S.C. § 1132(a)(3)
### (On Behalf of All Named Plaintiffs Against Defendant WWE)

411.   Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

412.   Defendant WWE and/or its agents, servants or employees is the Plan Administrator of various ERISA plans maintained by Defendant WWE for the benefit of its employees.

413.   Plaintiffs had no basis to be aware, and did not realize at the time they signed their Booking Contracts, or worked fulltime for WWE, that Defendant WWE improperly utilized the independent contractor designation for the purpose of denying Plaintiffs (and other wrestlers) the compensation and benefits that they would have been entitled to receive if properly characterized as employees of Defendant.

414.   The form "Booking Contract" entered into between Defendant and Plaintiff wrestlers employed by Defendant WWE was a sham contract that improperly characterized Plaintiffs and the other wrestlers employed by Defendant WWE as "independent contractors" to enable Defendant to avoid paying Plaintiffs

and other wrestlers the compensation and benefits to which they otherwise would have been entitled, including ERISA plan benefits.

415. Said contract is, and at all relevant times has been, a contract of adhesion, drafted exclusively by Defendant, who gives the wrestler no real opportunity to negotiate or change any terms and who requires the wrestler to sign the Agreement as presented by Defendant as a condition of employment.

416. Moreover, not only is the Agreement a contract of adhesion, but Defendant does not honor the Agreement to treat the wrestlers as "independent contractors" and, instead, reserves to itself the right to control the manner and method of the wrestlers' business.

417. Also, as a result of improper misclassification and characterization of its employees as "independent contractors", the company fails to provide its employees the same retirement and health and other benefits it provides to all its other employees pursuant to employee benefit pension and welfare plans established under ERISA.

418. By misclassifying its wrestlers as "independent contractors" rather than employees, Defendant has not only unjustly enriched itself (by avoiding the business costs of extending ERISA-protected benefits to its employees), but has also evaded and continues to evade compliance with state and federal laws (including ERISA) governing employee benefit plans.

419. At all relevant times, Defendant asserted control over virtually all aspects of Plaintiffs' work.

420.   Defendant has created benefit plans under which it can avoid paying its wrestler-employees benefits altogether in direct contravention of ERISA's employee protections.

421.   Had Defendant complied with ERISA, Plaintiffs would have been eligible for substantial rights to benefits under various of Defendant's Plans.

422.   By their mischaracterization of Plaintiffs as "independent contractors", however, Defendants have systematically excluded Plaintiffs from the definition of an "employee" covered by the Defendant's retirement plan or eligible to participate in the Defendant's 401(k) plan, group health care plan, group dental plan, group life plan, and long term disability plan, thereby denying Plaintiff benefits they are entitled to receive.

423.   The Plaintiffs are entitled to equitable relief under ERISA, 29 U.S.C. § 1132(a)(3), including restitution and disgorgement for all benefits due and payable during the applicable employment period and retroactive reformation of their contract with Defendant, together with a corresponding recalculation of benefits, thereby placing Plaintiffs in the same financial position in which they would have been if the Defendants had complied with ERISA, thus preventing the Defendant' unjust enrichment.

424.   Defendants' conduct has caused actual harm to Plaintiffs in an amount to be proven at trial.

425.   In conformity with 29 U.S.C. § 1132(h), Plaintiffs are contemporaneously serving this Complaint, by certified mail, on the secretaries of Labor and Treasury.

**COUNT VI**
**SUCCESSOR LIABILITY AS TO ECW AND WCW**
**(On Behalf of the Plaintiffs Who Performed For**
**Either ECW and WCW Against Defendant WWE)**

426.    Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth herein.

427.    Extreme Championship Wrestling ("ECW"), a professional wrestling promotion engaged in the business of wrestling entertainment, was owned and operated by Paul Heyman until it filed for bankruptcy in April, 2001. On or around early 2003, WWE (then WWFE, Inc.) finalized the purchase of ECW. However, WWE had been using ECW's name, performers, and music since 2001, and even filed for the ECW trademark on July 13, 2001. After ECW's bankruptcy proceedings ended in 2003, WWE had acquired any and all remainder of ECW's business operations, including its extensive video library.

428.    World Championship Wrestling ("WCW"), a professional wrestling promotion engaged in the business of wrestling entertainment, was owned and operated by AOL Time Warner until on or around March, 2001 when WWE (then WWFE, Inc.) purchased WCW.[3] Linda McMahon commented on the acquisition of WCW's name, extensive video library, and other property rights as "the perfect creative and business catalyst for our company". *See Id*. WCW, Inc. is now a Delaware subsidiary of WWE.

---

[3] On Friday March 23, 2001, WWF.com and WCW.com both posted the same press release stating that WWE had acquired WCW. *See* "The Sale of WCW to WWE", Wrestling-Online.com, Timeline from January 11, 2001 to May 29, 2001, *available at* http://www.wrestling-online.com/timeline/the-sale-of-wcw-to-wwe/, *last visited* November 6, 2016.

429.   Prior to WWE's purchases, ECW and WCW each maintained separate and distinct wrestling promotions with their own titles, belts, and performers.  Each promotion had exclusivity contracts with performers, which required buy-outs for intra-promotional   performances.   Both   ECW   and   WCW   were   wrestling organizations that directly competed with WWE until WWE's total acquisition of the companies.

430.   Both ECW and WCW were known for their violent performances, including dramatizing brutal head trauma. *See* the following example of WWE's ECW produced merchandise:



From left to right, respectively: "ECW One Night Stand", produced by WWE and available for purchase at WWEshop.com; "The Rise & Fall of ECW", WWE produced and available for purchase at WWEshop.com; "Blood Sport ECW: The Most Violent Matches", WWE produced and available for purchase at WWEshop.com.

431.   The Plaintiffs who wrestled for ECW sustained repeated head trauma while performing for ECW and are suffering from, and are at further risk of, long-term, latent, occupational injuries such as CTE.

142

432.    The Plaintiffs who wrestled for WCW sustained repeated head trauma while performing for WCW and are suffering from, and are at further risk of, long-term, latent, occupational injuries such as CTE.

433.    Upon respective acquisition, both WCW and ECW's normal business operations ceased and WWE assumed the liabilities and obligations of WCW and ECW that is ordinarily necessary for the uninterrupted continuation of normal business operations of WCW and ECW.[4]  WWE had acquired both ECW and WCW's names, royalties, and normal business operations.

434.    On March 23, 2001, Vince McMahon addressed both WWF and WCW fans and wrestlers about the acquisition of WCW, noting a special simulcast on both WWE's Raw and WCW's Nitro programs later in that event where Vince McMahon would discuss the total acquisition of WCW. The same night it was fictionally announced that Shane McMahon had bought WCW. *See* King, Adam, "WWF    Raw    Is    War    3.26.2001",    The    King's    Wrestling    Recaps, https://kingsrecaps.wordpress.com/2012/03/19/wwf-raw-is-war-3-26-2001/  (March, 19, 2012). Evidencing the complete and seamless merging of the two wrestling entities with WWE, Jim Ross and Paul Heyman, the founder of ECW and now WWE employee, discussed WWE's successful acquisition of WCW. *Id.* "The creation of a new WCW was forming in WWE". *See* "Big Bang: The untold story of the WCW pay-per-view    that    almost    never    happened",    WWE    Network,

---

[4] The WCW owned by AOL Time Warner subsequently changed its name to Universal Wrestling Corporation and ceased operating as a professional wrestling entertainment entity, existing solely to oversee existing contractual obligations and legal disputes.

WWE.com,http://www.wwe.com/article/big-bang-untold-story-wcw-pay-view-

almost-happened, *last visited* November 6, 2016; *see also* screenshot below:



**Night of Merger: Last Regular WCW Show Features Simultaneously broadcast
WWE Raw and WCW Nitro with Vince McMahon and Shane McMahon announcing
their control and ownership. March 26, 2001.**

435.   WCW's particular business of professional wrestling was uniquely

maintained after WWE's acquisition, and upon information and belief, its corporate

model was mostly left intact, even maintaining a continuity of ownership by

carrying over high level management such as WCW's Vice President of Talent John

Laurinaitis, Arn Anderson as producer, and other staff. "The Sale of WCW to WWE",

Wrestling-Online.com.     WCW's   operation   and   structure   maintained   its

departments, including production and creative. *Id.* Eric Bischoff, the former head

of WCW and creative force behind the Monday night wars between WWE and WCW

was hired by WWE. WWE bought around 25 WCW wrestler contracts immediately

as part of the purchase to aid in the continuation of this tension between WCW and

WWE as they performed under the WCW brand.

436.   ECW's particular business of professional wrestling was uniquely

maintained after WWE's acquisition, and upon information and belief, its corporate

model was mostly left intact, even maintaining a continuity of ownership by carrying over high level management such Paul Heyman, and the ring-announcer Joey Styles.  Notably, ECW wrestlers Rob Van Dam and Tommy Dreamer performed for WWE as early as July 2001. WWE maintained continuity of ownership with ECW by fictionally announcing that Stephanie McMahon's bought an ownership interest in ECW after the acquisition.  Paul Heyman, the founder of ECW, was hired by WWE on March 5, 2001 indicating ECW's acquisition by WWE on Monday Night Raw. Paul Heyman continued to work for WWE, including as head-writer for WWE's Smackdown! from 2002-03 and WWE's developmental program OVW from 2005-06. Mr. Heyman was also directly involved with ECW's brand relaunch in 2005 and 2006. Mr. Heyman left WWE in 2006, but returned in 2012 and currently performs for WWE. Further, ECW's ring-announcer Joey Styles was hired by WWE and would ultimately become the lead commentator for WWE's *ECW on Sci-Fi* from 2006-08.

437.    Although WWE began utilizing the WCW and ECW brands as early as March and April, 2001, by July, 2001 both the ECW and WCW names and wrestlers had been integrated into WWE wrestling entertainment performances and storylines, with both brands joining together on the July 9, 2001 Monday Night Raw, forming "The Alliance" against WWE.  On July 22, 2001, WWE produced a Pay-Per-View event titled "Invasion" where all three brands were pitted against each other. This storyline extended until November 2001.

438.    The general business operations of WCW, ECW and WWE are the same. WWE intended to incorporate WCW and ECW into WWE's business with as

much continuity of structure and operation as possible.  This included a continuity

of key personnel such as WCW and ECW executives and performers.

439.    After 2001, the WWE continued to use the logo of both ECW and WCW

to brand its televised matches, DVDs, T-shirts, wrestlers and numerous products,

including the following examples:

- The below cover of WWE's DVD Production published on July 22, 2001, which included both ECW and WCW brands prominently displayed alongside the WWF brand:



- The below WWE official merchandise, prominently labeled Extreme Championship Wrestling, ECW, of Balls Mahoney, of which the Estate is a Named Plaintiff:



146

- **The below DVDs produced by WWE where WCW is prominently displayed:**



- **The below comparison of an original ECW Merchandise Catalog (1997) (left), and WWE's August 29, 2005 ECW Magazine (right):**



440.   After acquisition, WWE continued to brand programs and Pay-Per-View shows as WCW events. The WWE held WCW title matches featuring WCW

wrestlers competing for WCW title belts. For example, in the July 2, 2001 Raw, the last 20 minutes were dedicated to WCW, with WCW-themed graphics, ring design, referee and announcers. WWE continued to produce WCW events, programs, and media, through which WWE profited.

441.   WWE continued to brand programs and Pay-Per-View shows as ECW events.  For example, the WWE's documentary "The Rise and Fall of the ECW" published in 2004 was the second highest selling DVD in WWE history. In 2005, WWE held a Pay-Per-View event titled "ECW One Night Stand" and featured the Named Plaintiffs Terry Brunk, aka Sabu, Jon Rechner, a/k/a Balls Mahoney, and Brian Knighton, a/k/a Axl Rotten. In 2006, WWE aired a 191-episode series titled *ECW on Sci-Fi* which aired from June 13, 2006 until February 16, 2010. Other ECW Pay-Per-View events, programs, and media were produced by WWE, through which WWE profited.

442.   WWE continues to use the ECW and WCW brands for wrestling entertainment, including wrestling matches, media, and products.  WWE has utilized the logos and tape libraries of the WCW and ECW before and after its purchases of their assets which continue to the present. This includes WCW and ECW clothing, videos, books, video games, DVDs, action figures, title belts, and many other forms of merchandise.  WWE Network still airs many WCW and ECW original shows and newer documentaries.

443.   WWE held itself out to the world as the effective continuation of WCW and ECW, merging the two companies into profitable WWE brands and integrating the wrestlers into WWE storylines and performances. Through its actions, WWE

148

assumed the liabilities necessary for the uninterrupted continuation of the businesses of ECW and WCW, such as their obligations under ordinary vendor and utility contracts.

444.   There was a continuity of management, personnel, physical location, assets, and general business operation between WCW, ECW, and WWE, in that WWE hired many of the top managers and talent professionals in WCW and ECW; WWE hired many of the wrestlers from the acquired organizations; WWE took over the assets of WCW and ECW, such as videos and other promotional items and used such items for its own profit; and the general business operation of the acquired entities, namely professional wrestling entertainment, was continued and maintained by WWE.

445.   As a result of WCW and ECW's continuity of enterprise with WWE, ECW, WCW, and WWE are jointly and severally liable to the Plaintiffs as a successor in interest.

446.   As a result of the above-mentioned facts, WWE is individually liable to the Plaintiffs under the doctrine of *de facto* merger for the obligations of WCW and ECW.

**COUNT VII**
**VIOLATIONS OF RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)**
**(Against Defendant Vincent K. McMahon, as an Individual, and Vincent K.**
**McMahon as Trustee of the Vincent K. McMahon Irrevocable Trust U/T/A dtd.**
**June 24, 2004, as Trustee of the Vincent K. McMahon 2008 Irrevocable**
**Trust U/T/A dtd. December 23, 2008, and as Special Trustee of the**
**Vincent K. McMahon 2013 Irrev. Trust U/A dtd. December 5, 2013, and as**
**Trustee of Certain Other Unnamed McMahon Family Trusts, and as Controlling**
**Shareholders of WWE, on Behalf of All Named Plaintiffs to whom WWE**
**provided an unconscionable Booking Contract, Contractor Nostalgia**
**Agreement, or other documents purporting to limit their rights under applicable**
**laws of the United States and her Courts, On Behalf of All Named Plaintiffs)**

447. Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

448. Vincent K. McMahon is an individual resident in Connecticut, according to the March 2015 "Annual Report" of the WWE, is its self-styled "Chairman of the Board and Chief Executive Officer", and has served in a top level executive capacity and member of the Board of Directors of WWE at all relevant times and according to his own numerous public statements is intimately involved in every aspect of every material decision by the WWE.

449. For example, VKM provided an interview on December 14, 2007 before the House Committee on Oversight and Government Reform in which he told Committee investigators that he was also then "Chairman of the Board" and in that capacity had "some oversight over everything that we do" including marketing, talent relations and operations, including choosing talent and assigning talent to the WWE's different divisions. Committee on Oversight and Government Reform, US House of Representatives, Washington DC Interview of Vincent Kennedy McMahon December 14, 2007, pages 26-27.

450.   According to a Form 10-k filed by WWE for 2014: "In addition to serving as Chairman of our Board of Directors and Chief Executive Officer, Mr. McMahon leads the creative team that develops the storylines and the characters for our televised programming and live events. Mr. McMahon, from time to time, has also been an important member of our cast of performers."   Prior 10-K's contained substantially similar language for many years.

451.   According to Form 10-k filed by WWE for 2014: "A substantial majority of the issued and outstanding shares of Class B common stock is owned beneficially by Vincent K. McMahon. Mr. McMahon controls a majority of the voting power of the issued and outstanding shares of our common stock. Through his beneficial ownership of a substantial majority of our Class B common stock, Mr. McMahon effectively can exercise control over our affairs".   Prior 10k's contained substantially similar language for many years.

452.   According to Form 10-k filed by the WWE for 2014: "All of the issued and outstanding shares of Class B common stock are held by Vincent McMahon and other members of the McMahon family and trusts set up for these family members".   All the names of the "family trusts" (which appear to include trusts within trusts) are not provided in the filings and are not to Plaintiff's knowledge otherwise obtainable except through discovery from the Defendant who has unique possession and control over this information.

453.   According to Form 10-K filed by the WWE for 2014: "through his beneficial ownership of a substantial majority of our Class B common stock, our controlling stockholder, Vincent K. McMahon, exercises control over our affairs,

__and his interests may conflict with the holders of our Class A common stock__"
(emphasis added).  From 10-k's for years prior to 2014 contained substantially
similar language.

454.   Therefore, it is alleged that it is established through corporate filings
and Mr. McMahon's own statements that he has effective control over the affairs of
the WWE, including such control as may conflict with the interests of the
shareholders of the Class A common stock. It is further alleged that at all relevant
times he has maintained such control and exercised such control to the detriment
of the Plaintiffs so as to cause them both monetary and physical injury as alleged
herein, and has personally profited as a result.

455.   Based upon the above allegations, and others set forth herein
Defendant VKM  individually, and in his capacity as Trustee of various family trusts
through which he controls the voting power associated with the voting stock
ownership of the WWE, has: a) maintained himself and his family members in
positions of controlling power within the WWE, and b) has deliberately engineered
a cunning scheme to defraud the Plaintiffs which cunning and artful scheme
constitutes a pattern of racketeering activity, which has continued for well over two
decades, and continues to this day, as a result of which racketeering activity the
Plaintiffs have been and continue to be deprived of money and property amounting
collectively to millions of dollars.

456.   According to SEC filings, one of the Trusts controlled by VKM is the
"Vincent K. McMahon 2013 Irrev. Trust U/A dated December 5, 2013," which
maintains its offices at McMahon Ventures, LLC in Stamford, CT.  From time to

time, other trusts have been identified in SEC Filings as the Stephanie McMahon Levesque Trust U/A Vincent K. McMahon Irrev. Trust dated June 24, 2004 and the Stephanie McMahon Levesque Trust U/A Vincent K. McMahon Irrev. Trust dated December 23, 2008. The names of the trusts shift around from time to time, but VKM remains in effective control.

457.   According to the December 5, 2015 SEC Form 13D, Jerry S. McDevitt, Mr. McMahon's attorney and the WWE's attorney (including the Class A shareholders potentially holding interests which conflict with VKM's), is the Trustee of both the 2008 and 2004 Trusts and sits on the "Business Advisory Committee" of the 2008 Trust. Upon information and belief, there are numerous other "Trusts" (and/or trusts within trusts) which hold WWE stock, established for the benefit of the McMahon family members, which according to other SEC filings identified herein, effectively allow VKM to exercise control over the affairs of the WWE which control he admits could be in conflict with the interests of the Class A shareholders of the WWE.

458.   The Defendant VKM (individually and as Trustee of his family trusts) are "persons" within the meaning of 18 U.S.C. Section 1961(3) who conducted the affairs of the Enterprise WWE through a pattern of racketeering activity in violation of 18 USC Section 1962(c), all as herein alleged.

459.   The Enterprise WWE is an association in fact within the meaning of Section 1961(4) The Enterprise is and has been an ongoing organization that functions as a continuing unit and is under the control of Defendant VKM individually and as he is Trustee of the various and shifting VKM family trusts and

further as he maintains effective control over his sub-Trustees such as Jerry McDevitt. The Enterprise was created by VKM (individually and as Trustee of his various family trusts) and or used as a tool to effectuate the pattern of racketeering activity alleged herein.  The Defendant "Persons" are distinct from the Enterprise.

460.   The Enterprise falls within the meaning of 18 USC Section 1961 (4) and is under the control and has been infiltrated by VKM individually and as Trustee of his various family trusts together for the common purpose of defrauding the Plaintiffs out of their money and property by fraudulently representing to them and convincing them among other things that they were "independent contractors" rather than employees, all as controlled by schemed up and carried into action by Defendant VKM (individually and as Trustee of his family trusts) and those who provided knowing conspiratorial assistance for this fraudulent and illegal purpose.

461.   The Defendant Enterprise engaged in and affected Interstate Commerce because the wrestling matches which provided a substantial contribution to and basis of the earning activities of the Enterprise were conducted in various states and through the media such as television and the distribution of video tapes and "DVD's", presentations in arenas and other locations in numerous states of the country, and further often distributed through the Cable-TV and "pay-per view" outlets.

462.   According to 10-K forms filed by the WWE for various years, and its Annual Shareholder Reports, its net revenues for the years 2000-2009 are set forth below:

| | | | |
|---|---|---|---|
| 2000 | - 377.9 | 2005 - | 366.4 |
| 2001 | - 438.1 | 2006 - | 400.1 (in millions of dollars) |

154

| | | | | |
|---|---|---|---|---|
| 2002 | - 409.6 | 2007 | - | 485.7 |
| 2003 | - 374.3 | 2008 | - | 526.5 |
| 2004 | - 374.9 | 2009 | - | 475.2 |

463.   Given the magnitude of these revenues and the performances put by the WWE in numerous states and through television, there can be no dispute that the activities of the WWE under the direction and control of VKM, individually and as Trustee of Trusts holding the controlling voting interest in WWE, has an effect upon interstate commerce.

464.   The WWE has exerted direct control over all of the "Booking Contracts" of the Plaintiffs and provided within those unconscionable contracts misrepresentations concerning the status of the Plaintiffs as "independent contractors" and as a result deprived the Plaintiffs of money and property otherwise due to them, as alleged above, all engineered by VKM.

465.   The Defendant VKM (individually and as Trustee of his family trusts) have asserted direct control over the creation and distribution of mass marketing and sales materials utilizing the work product obtained from the Plaintiffs through the fraudulent and cunning boiler plate Booking Contracts of the Enterprise.

466.   The Defendant VKM (individually and as Trustee of his family trusts) has promoted their cunning schemes and artifice to defraud through the use of the interstate wires and mails of the United States as alleged herein.

467.   The Defendant VKM (individually and as Trustee of his family trusts) have placed their own employees and agents in positions of authority and in control of the Enterprise and maintain complete and effective voting and executive control over the enterprise through VKM's direct control (as Chairman and Trustee)

and by utilizing other "straw men" such as his attorneys as his alter ego's for the purpose of controlling the Enterprise, despite its potential conflict with the substantial block of non-voting shareholders.

468.   The Defendant VKM (individually and as Trustee of his family trusts) has conducted (and participated in) the affairs of the WWE Enterprise through a pattern of racketeering activity that includes thousands of individual acts violating 18 USC Sections 1341 and 1343 (mail and wire fraud), as described herein, including the development, procurement and execution of each Booking Contract (or handshake deals) utilized to misclassify and defraud the Plaintiffs and to thus deprive them of money and property.

469.   In implementing their cunning fraudulent schemes, the Defendant VKM (individually and as Trustee of his family trusts), and through him the WWE Enterprise, were acutely aware that the Plaintiffs did not have the educational background experience and access to highly paid expert legal counsel (as the Defendant possessed and utilized to create the unconscionable Contracts) in order to be able to determine the falsity of the representations made to them by the Defendants about the Booking Contracts and their status as "independent contractors", and the financial consequences resulting to the Plaintiffs as a result of the misclassification of their status.

470.   Each of the Defendants, VKM (individually and as Trustee of his family trusts and through him the WWE Enterprise) engineered WWE's fraudulent mailings of Booking Contracts and interstate wire transmissions which constitute a pattern of "racketeering activity" within the meaning of 18 USC Section 1961 (1).

Collectively, these violations constitute a pattern of racketeering activity within the meaning of 18 USC Section 1961, *et seq*. extending over more than twenty years.

471.   The acts of racketeering activity by Defendants VKM (individually and as Trustee of his family trusts, and through him the WWE enterprise) and WWE all had the same pattern and similar purpose of defrauding the Plaintiffs and depriving them of money. Each racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including the Plaintiffs and each of them. The Defendant, VKM's, fraudulent activities are part of his regular and usual way of conducting ongoing business of the WWE enterprise which has continued over at least the past twenty years and continues until this day, and constitutes a continuing threat to the property of the Plaintiffs and those currently employed by the Enterprise, WWE, or who remain misclassified as "independent contractors".

472.   The pattern of racketeering activity identified herein has been conducted systematically through the repeated fraudulent use of the mails and express courier transport of the United States by WWE, in violation of 18 USC 1341, through implementing the schemes identified herein, all under the control of VKM (individually and as Trustee) and others he utilizes as "Trustees" over whom he has effective control, and therefore control of the WWE Enterprise.

473.   In addition, the Defendant VKM's (individually and as Trustee) cunning scheme to defraud the Plaintiffs was further advanced and carried out through the repeated utilization of the wires of the United States by the interstate use of the telephone system, the internet system, by facsimile transmission and electronic

mail, all used to present, execute, and implement the Booking Contracts (or "handshake deals"), which misclassified the Plaintiffs and deprived them of money and property.

474.   The use of the mails and wires of the United States together with the size and scope of the scheme itself, the large amount of money involved and the conduct of the scheme over a substantial period of time, all have had an effect upon interstate commerce as that term of art is utilized within the meaning of 18 USC 1961 et seq. (the RICO Act).

475.   For example, the boilerplate Booking Contracts through which the Plaintiffs were intentionally misidentified as "independent contractors" were sent to the Plaintiffs through the utilization of the mails of the United States, and sometimes the wires of the United States, with a request that the contracts be signed and returned through the mails of the United States. This is a pattern that continued for over two decades, among the vast majority of the Plaintiff's (occasionally a Booking Contract" was handed to a Plaintiff), and was often renewed with each Plaintiff, many for several times. Examples of these Contracts, including dates, are exhibits to this Complaint. The dates of the mail fraud are approximately the dates on the Booking Contracts. Each mailing constitutes a separate act of mail fraud. Although numerous specific acts of mail fraud are detailed herein, the exact number and dates of the hundreds of Booking Contracts mailed to the Plaintiffs and other WWE wrestlers is something uniquely known to the Defendants, and will be available through discovery. Each and every Plaintiff was the victim of two or more such transactions, the explicit particulars of which

are uniquely known to the Defendant VKM and his straw men and the staff he utilized to carry out his scheme through the Enterprise.

476.   As provided in the Booking Contracts "notices" to the Wrestlers were typically specified as going to the Wrestler alone, but notices to the Defendants were carefully required to be sent to the Defendants' "general counsel", or to the Defendant's office where they could be scrutinized by the WWE attorneys, while the Wrestlers were intimidated not to use attorneys. *See* Exhibit A, B, C, and D, paragraph 13.6. Use of the United States mail and telecopy (a/k/a fax) constituted permitted notices under the Booking Contracts.

477.   At all times, the Defendants maintained an organization of sophisticated "in house" and outside counsel, and knew well that the vast majority of the Wrestlers had little education, and certainly no legal education or ability to comprehend the scheme to which they were being subjected.

478.   In accordance with specific allegations set forth herein, few if any of the Plaintiffs had any idea of what an "independent contractor" was, or the scope of the rights guaranteed under both State and Federal Law, which would be abandoned through that misclassification, and the money and property thus lost to the Plaintiffs as a result of the Defendants' cunning scheme.

479.   This disparity of comprehension, well known to, and in fact relied upon, by the Defendants to further their cunning scheme was augmented by intimidation of the Plaintiffs as alleged herein. As is alleged herein the Plaintiffs were coerced by fear of their jobs and their physical safety to ask no questions and to submit to the dictates of the WWE as controlled by VKM, individually and as

Trustee. As is alleged herein the Plaintiffs were coerced by fear of their jobs and their physical safety to ask no questions and to submit to the dictates of the WWE as controlled by VKM, individually and as Trustee. Moreover, the progression of a wrestler's tenure in the WWE increased the vulnerability of such wrestler to the WWE's cunning schemes.

480.    Repeated blows to the head and the neurological consequences well known to the Defendants, but artfully concealed from the Plaintiffs, reduced a wrestler's ability to comprehend the financial consequences of the Booking Contracts. Likewise, adoption of the lifestyle of a typical WWE performer developed financial dependence upon maintenance of income, and thus a wrestler would be less able to question the consequences of the circumstances, which maintained his income. Additionally, as injuries inevitably accumulated and as a wrestler observed the swift consequences to those who dared to question WWE's requirements, wrestlers were intimidated and coerced into fearful silence all as VKM promoted and intended.

481.    WWE's Misclassification Resulted in the Named Plaintiffs' Inability to Access Necessary Treatment for Their Workplace Injuries.

482.    Additionally, Defendant McMahon, knew or upon the exercise of reasonable care ought to have known, that as the careers of the wrestlers progressed, accumulated neurological injury and physical injury would as a certainty diminish whatever minor capacity to fathom the complexities of the unconscionable Booking Contract that the Wrestlers may have initially possessed, and relentless physical injuries would jeopardize their careers, making expensive

physical rehabilitation necessary but impossible without the income provided by their WWE employment.

483.   By knowingly and improperly classifying the Plaintiff's as "independent contractors" the Plaintiffs were deprived of Worker's Compensation benefits, the workplace protections available under the Occupational Safety and Health Act, and the time to effect recovery from injury under the Family and Medical Leave Act, and thus were left at the total mercy of the WWE as run by its chairman VKM, individually and through his complex organization of family Trusts and the "straw man" trustees that he utilized to do his bidding and perfect his racketeering enterprise.

484.   Through being deprived of access to these state and Federally guaranteed rights, the Plaintiffs were financially damaged among other ways, by in many cases having to pay for their own health care, having to pay higher health care premiums than they otherwise would have, by unnecessarily losing wages, and ultimately, by being discarded without benefits by the WWE for lack of physical ability to perform created by VKM's own cunning scheme to deprive the Plaintiffs of benefits in order to aggrandize his own remuneration and the value of his holdings and his family's holdings in WWE.

485.   Each of the Plaintiffs suffered material and substantial damage to their property as a result of their misclassification as "independent contractors." Taking the Booking Contract (Exhibit C) as an example:

a. The tax upon wages of an employee in 2007 according to Paragraph 5 "Instructions for Form 941" (Rev October 2007) amounted to 6.2% on EACH of the Employer and the Employee up to $97,500 in wages, and a

further 1.45% in Medicare Tax of 1.45% for employer and employee on all compensation, not limited to the first $97,500 in wages;

b. In contrast, the tax rate for FICA (a/k/a "social security taxes") for an "independent contractor" for 2007 was 15.3% on the first 92.35% of $97,500 of income = $12,090). Medicaid tax was 2.9% unabated, on the whole income;

c. Therefore, the difference in tax to a wrestler making $100,000 characterized as wages as opposed to the same $100,000 as an "independent contractor" is calculated to be $14,130 (self-employment including Medicare) less $7,650 = $6,480. Since Form SE provides that ½ of the self-employment tax is deductible from gross income, which would give a $1,400 benefit to a taxpayer with an overall tax rate on adjusted income of 20%, reducing the independent contractor "penalty" to approximately $5,000/ per wrestler;

d. According to IRS requirements the Form 941's on employees must be filed 4 times per year, with an additional reconciliation return filed in January of the following year. Form 1099's for "independent contractors" are sent out in January of the year following the tax year.  The forms must be signed and/or under the pains and penalties of perjury, in the case of the 941 forms stating that the form is "true, correct, and complete";

e. In addition to the Federal tax forms that had to be filed by employers on behalf of employees, individual states have similar forms and require the deposit of taxes based upon employment payroll. The home state of the Defendants is one of those states, which had such requirements at all relevant times, which requirements were ignored by WWE.

486.   The Federal Form 941's were required to have been filed by the Defendant WWE for each and every quarter of each and every year for each and every Plaintiff employed at any time during that quarter. Instead of filing truthful returns in accordance with the requirements of signing such returns under the pains and penalties of perjury, deliberately false, fraudulent, and misleading returns were filed, now amounting to well over 50 such fraudulent returns, all filed by WWE under the direction and control of its Chairman and Chief Executive VKM, individually and as Trustee of his various family Trusts, in concert with the "straw

162

men" he had appointed from time to time to do his bidding as Trustees of one or more of VKM's family trusts.

487.   The deliberately false and misleading 941 Federal forms were filed by WWE or others on behalf of and directed by WWE through VKM (individually and as Trustee) for the purpose of saving money for WWE, amounting to millions of dollars, and had the effect of depriving the Plaintiffs of the money which ought to have been paid by WWE for and on behalf of its employees, the Plaintiffs herein. By this method WWE's profits were enhanced and VKM's dividends, remuneration and the value of his holdings, directly and through his family Trusts, were enhanced.

488.   With respect to each and every filing of a 941 form which omitted the Plaintiffs and other wrestlers employed by the WWE and fraudulently characterized them as "independent contractors", such filing was accomplished utilizing the mails and/or the wires of the United States. Upon information and belief, the vast majority of said filings after 1985 were accomplished by wire instead of the US Mails and therefore constituted in each instance a separate act of wire fraud in violation of 18 USC 1343, done in furtherance of the cunning scheme of the Defendant VKM, individually and as Trustee, to defraud each of the Plaintiffs of their property (in concert with the "straw-men" VKM appointed as Trustees of some of his family trusts.

489.   Each and every mailing and/or wire of the false and fraudulent 941 return constitutes a separate act of fraud with respect to each and every Plaintiff. The fraudulent filings were not isolated or made with respect to an individual but

with respect to hundreds of individuals, carried out over twenty years, every year, and continuing until this day under the direction and control of VKM, individually and as Trustee of his family trusts, and by his "straw men" he appointed as Trustee(s) of some of his family trusts, all in advance of the racketeering activity.

490.   Upon inquiry to the Plaintiffs, Form 1099 (miscellaneous income, such as "independent contractor" income) was mailed by Defendant WWE each year to each of the Plaintiffs.

491.   Since these "1099" documents were fraudulent and utilized to deprive the Plaintiffs of their property, each fraudulent mailing constitutes a separate act of mail fraud, amounting in the aggregate to millions of dollars, of such acts conducted over a period of over twenty years and believed to be continuing currently under the direction and control of VKM, individually and as Trustee of his family trusts, and by his "straw men" he appointed as Trustee(s) of some of his family trusts, in concert with other "straw men" appointed by VKM.

492.   Each of the fraudulent mailings and interstate wire transmissions as above described constitutes a separate predicate act "racketeering activity" within the meaning of 18 USC Section 1961(5), amounting in the aggregate to a pattern of racketeering activity consisting of <u>thousands of separate acts</u>, depriving hundreds of people of their money and property (including each Plaintiff) continuing over at least two decades, continuing currently. Without redress, these actions are likely to continue indefinitely into the future for as long as VKM individually and as Trustee retains effective control over the WWE.  WWE undertook these mailings at

the direction and control of Defendant VKM, individually and as Trustee of his family trusts, and represent a continuous and ongoing scheme.

493. To this day the WWE is conspiring to continue to deprive many of the Plaintiffs of their rights by "offering" them a "Contractor Nostalgia Agreement" which promises payment of a nominal sum in return for among other things, a release to the WWE of all claims of every nature and description. *See* paragraph 13 of Exhibit E, attached hereto.

494. Since WWE and its effective owner and controller VKM will doubtless contend, the Plaintiffs have no claims against WWE, then surely there is no reason to have a "general release" given to the WWE by former wrestlers for all known and unknown causes of action from the present back to the dawn of time put into this "Nostalgia" proposal.

495. The real "nostalgia" is that yet again, as a part of their continuing scheme to deprive the Plaintiffs not only of their rights, but to even the knowledge of any rights, the WWE seeks to reaffirm its mischaracterization of its wrestlers as "independent contractors" –to give legal "pile drivers" and body slams to their rights and thus to once again leave them dizzy, in the dark, or unconscious about their legal rights.

496. The "Contractor Nostalgia Agreement" solicitation is an integral part of an ongoing and continuing course of conduct by the WWE, continuing to this day, to maintain and enforce its suppression and prejudice of the rights of its employees through a pattern of racketeering activity. Said solicitation (and its "general releases") constitutes an acknowledgement of actionable wrongdoing by

the WWE, and a renovation of any cause of action sought to be extinguished by the solicitation. Since WWE solicited the "Nostalgia Agreements" from wrestlers there was no material purpose to inserting a release of prior acts into the document except as an effort to cunningly perfect the scheme to cut off all legal recourse to Plaintiffs for their injuries.  The Defendants utilize the alleged "releases" in this matter for the very purpose alleged.

497.   Such "Contractor Nostalgia Agreements" have been mailed to a number of the Plaintiffs, and each such mailing is an integral part of the cunning scheme of the Defendant VKM to carry out his racketeering activity. Each such mailing constitutes an independent act of mail fraud and evidences the continuing nature of the scheme. *See* Exhibit E.

498.   Many of the Contractor Nostalgia Agreements were then discussed with a number of the Plaintiffs in follow up calls (not long after the mailing) in an effort to induce those Plaintiffs to sign the agreements and thus unwittingly provide the WWE with a comprehensive release from its wrongdoing. Each such call would constitute a separate act of wire fraud in interstate commerce (a predicate racketeering activity). Given the disability and limited resources of the Plaintiffs, the exact times and dates of these calls are uniquely within the knowledge of the Defendants which will become available through the discovery process.

499.   In addition to the ongoing relationship created through the Contractor Nostalgia Agreements, the WWE maintains and has at all relevant times maintained a voluminous "library" of the performances and images of the Wrestlers, which it

utilizes under the auspices of the Booking Contracts. This library consists of videotapes, digital files, images, and is stored in media of various sorts. It includes offered "Legends" deals and marketing through the WWE internet presence, including streaming video, and "action figures".

500.   As a result of the boilerplate Booking Contracts, the Plaintiffs (most or all) have been mailed payments over the years termed as "royalties" for the utilization of their appearances and images, and performances over their careers with the WWE. The exact time of mailing and amounts of these royalty checks is uniquely known to the WWE as most if not all of the Plaintiffs were distracted from keeping records as a result of their serious brain and other bodily injuries occasioned by their service in the WWE, and had no capacity in any event to comprehend that they should keep such records, or that more money was due than was paid.

501.   The money earned by the WWE through the utilization of their media library containing the images and performances of the Plaintiffs derives particularly from the violence of the performances, choreographed by the WWE with reckless disregard for the health and safety of the Plaintiffs and resulting in serious injuries to the Plaintiffs thus generating a direct profit to the WWE.

502.   Each and every one of the unconscionable boilerplate Booking Contracts  attached to this Complaint as Exhibits were mailed to the Plaintiffs noted in the individual contract within a short time prior to Said Booking Contract being executed by the Plaintiff to which it applies. The vast majority of all Plaintiffs had their Booking contracts mailed to them. Some specific examples of the specific

dates and that constitute separate acts of mail fraud, with the associated wrestlers are:

503. Salvador Guerrero, contract dated July 23, 2001, a true and accurate copy of which is attached as Exhibit A, hereto.

504. Salvador Guerrero, IV, contract dated June 3, 2004, a true and accurate copy of which is attached as Exhibit B, hereto.

505. Nelson Frazier, contract dated November 11, 2007, a true and accurate copy of which is attached as Exhibit C, hereto.

506. Salvador Guerrero, IV, contract dated April 5, 2010, a true and accurate copy of which is attached as Exhibit D, hereto.

507. The Booking Contracts attached to this Complaint as Exhibits are offered as typical examples of the booking contracts that were presented from time to time to each of the Plaintiffs, with minor changes not relevant to any issue in this matter. The exact dates of the solicitation of booking contracts relating to the Plaintiffs not covered by examples herein and other booking contracts for the Plaintiffs who have provided examples are uniquely within the knowledge and control of the WWE and its attorneys and will be revealed through discovery.

508. The "Contractor Nostalgia Agreement(s)", hereinafter ("CNA"), Exhibit E, are further examples of the unconscionable and Fraudulent conduct of the RICO Enterprise "World Wrestling Entertainment, Inc." under the direction and control of Defendant Vincent McMahon (Individually and as Trustee).

509. Said CNAs contain an unconscionable release clause, and further seeks to reinforce the cunning misclassification scheme hatched and implemented

by the RICO Enterprise WWE under the direction and control of Defendant Vincent McMahon (Individually and as Trustee), all for the personal profit of Defendant Vincent McMahon (Individually and as Trustee).

510. The use of the mails of the United States to provide the Booking Contracts to the Plaintiffs, (for the reasons stated in this Complaint) in each instance of mailing constituted an act of mail fraud in violation of 18 U.S.C. 1341, in furtherance of the cunning scheme of the Defendant Vincent McMahon (individually and as Trustee) to defraud the Plaintiffs and to personally profit. Each Plaintiff was subjected to two or more such acts and in fact, often many dozens of such acts.

511. Collectively, the above violations of 18 U.S.C. 1341, used to send out the booking contracts, the "Contractor Nostalgia Agreement(s)", and other stated materials to the various Plaintiffs, (and soliciting a mail back of said contracts) and follow on solicitation calls represent predicate acts of racketeering activity in violation of the Racketeer Influenced and Corrupt Practices Act. Each use of the mails as above alleged, was in furtherance of the intentional scheme to defraud the Plaintiffs, and materially assisted the Defendant Vincent McMahon in executing his plan and scheme  (individually and as Trustee) to defraud the Plaintiffs and to personally profit at their expense.

512. The use of the mails of the United States to provide the false and fraudulent tax forms (1099's) to the Plaintiffs, deriving from the false and fraudulent misclassifications of the Plaintiffs (misclassified as a result of allegations set forth elsewhere in this Complaint) constituted for each and every mailing to each and

every individual Plaintiff, a separate act of mail fraud in violation of 18 U.S.C. 1341. Such acts of mail fraud were undertaken by the RICO Enterprise WWE in furtherance of the cunning scheme of the Defendant Vincent McMahon (individually and as Trustee) to defraud the Plaintiffs and profit Defendant McMahon individually and as Trustee, all under VKM's direction.

513. In addition to the false and fraudulent tax forms (1099's) mailed to the Plaintiffs at least each year that payments were made for wrestling, additional supporting documents and checks were thereafter mailed to the Plaintiffs for "royalties" thereafter. Such "royalties" were an integral part of the scheme, and demonstrate the continuing nature of the RICO enterprise conducted over decades. For example:

   a)   Plaintiff Carlene Begnaud, a/k/a Jazz received checks in 2015 from royalties of approximately $50 per quarter and a 1099 in 2016 for five separate mailings.

   b)   Mike Halac, a/k/a Mantuar received two mailings a check for $105 and a 1099.

   c)   James Harris, a/k/a Kamala received two mailings.

   d)   Chris Pallies, a/k/a King Kong Bundy received 5 separate mailings.

   e)   Marco Corelone, a/k/a Mark Jindrak 1099 Scan;

514. As further example, Butch Reed received $69.98 by a mailing on or about September 24, 2015 and a corresponding 1099 in 2016. Additionally, attached as Exhibit G hereto is a document consisting of three pages of mailings for Butch Reed with the corresponding "royalty" checks. A detail of the royalty checks mailed for the years 2013, 2014, 2015 consisting of dozens of such checks and dozens of corresponding mailings is disclosed on said Exhibit.

170

515.     James Harris, a/k/a Kamala received $98.01 by a mailing on or about March 24, 2016. Additionally, attached as Exhibit H hereto is a document consisting of four pages of mailings for Kamala regarding the corresponding royalty check. The Exhibit details the specific earnings for direct, multi-media, other licensing, and video WWE received, and the corresponding royalties WWE paid to Mr. Harris.

516.     Attached hereto as Exhibit I are copies of "1099" forms relating to the particular Plaintiff specified in each of said Exhibits, furnished to the said Plaintiffs by WWE under the direction and control of the Defendant Vincent McMahon, individually and as Trustee.

517.     The exact number of the Plaintiffs that were furnished 1099 forms both for wrestling and later for royalties and the number of years for which they were furnished 1099 forms and quarterly or yearly royalty checks and/or payments for wrestling employment, is uniquely known to and within the control of the WWE, operating under the direction and control of the Defendant Vincent McMahon, individually and as trustee. However, many dozens of examples are provided herewith amply demonstrating the dates and contents of each mailing in furtherance of the scheme, extending over a long period of time, thus establishing the continuity of the continuing enterprise and the significant funds involved. Each "royalty" check paid an understated and fraudulent amount since the amounts were calculated through utilization of a "contract" which was fraudulently procured and therefore void *ab initio*.

518.     The use of the mails of the United States to provide the Royalty checks and 1099 forms to each of the Plaintiffs for wrestling income (earned as an

employee but fraudulently misclassified as an "independent contractor" (excepting royalties) for the reasons stated in this Complaint), in each instance constitutes an act of mail fraud in violation of 18 U.S.C. 1341, in furtherance of the cunning scheme of the Defendant Vincent McMahon (individually and as Trustee) to defraud the Plaintiffs and profit himself and associates by the use of and domination of the RICO Enterprise WWE. At least one 1099 was mailed to each of the Plaintiffs for each year said Plaintiff wrestled for the WWE. Said mailings took place in typically January, and were accomplished on behalf of the WWE Enterprise under the Direction and control of its Chairman, Defendant Vincent K. McMahon.

519.   Collectively, the above violations of 18 U.S.C. 1341, used to send out the royalty payments and fraudulent tax documents were utilized as an integral part of the scheme to induce the Plaintiffs to execute the unconscionable Booking Contracts, by executing the result thereof.

520.   Each use of the mails as above alleged, was in furtherance of the intentional scheme to defraud the Plaintiffs, and materially assisted the Defendant Vincent McMahon in executing his plan and scheme (individually and as Trustee) to defraud the Plaintiffs, and resulted in more money going to the Enterprise thus enhancing the value of the holdings of and remuneration to the Defendant Vincent McMahon (individually and as Trustee), and to further payments to his straw men and agents who and which acted at his direction and control to enhance and perfect the scheme.

521.   In addition to the fraud and swindles above alleged which violate 18 USC 1341 the Defendant Vincent McMahon, individually and as trustee also

engineered the WWE to cause violations of the wire fraud statute 18 USC 1343 including but not limited to the following: The WWE has established a video shop referenced on the Exhibits showing events for "Bruce Reed" which Exhibit is dated 9/24/2015. Set forth on pages 1, 2 and 3 of that Exhibit are shown numerous uses of the wires of the United States to sell videos and thus generate further income for the enterprise WWE and furtherance of the scheme of the Defendant, Vincent McMahon, individually and as trustee to defraud the Plaintiffs. For example, on Page 2 there is noted for-KOC-DV-9056 $4,844.44 earned by WWE during the third quarter of 2013, resulting in a payment to Bruce Reed of 0.23. As an additional example on Page 3 of the royalty sheet dated 3/24/2016 for Plaintiff James Harris there is shown as a royalty from HV Direct WWE No. 94879 for quarter four of 2015 earnings by WWE of $5,095.73 with a royalty paid to Plaintiff, James Harris of $1.46.

522.   On the Exhibits noted in the preceding two paragraphs there are dozens of examples of video tapes, direct videos (available over cable television or through computers) in which the wires of the United States were and still are utilized to make money for the enterprise WWE enterprise and to further exploit and defraud the Plaintiffs under the direction and control of the Defendant Vincent McMahon, individually and as trustee, all as derived from the initial Booking Contracts which are void *ab initio* because of their fraudulent procurement, unconscionable provisions, and for the other reasons alleged herein.

523.   Such exploitation, denial of the rights, such misclassification, failure to pay appropriate taxes, failure to pay for and provide workers' compensation insurance, failure to pay proper compensation for the continued distribution of the

Plaintiffs' images and work, and failure to recognize the rights of the employees under the numerous federal Acts identified above resulted in a tremendous profit for the RICO enterprise WWE at the expense of the Plaintiffs, which profit enhanced and augmented the value of the holdings of the Defendant Vincent McMahon who has infiltrated and controls the Enterprise WWE, individually and as trustee, and further augmented his compensation and that of his straw men and agents that carry out his orders to the financial detriment of the Plaintiffs.

524.   The misclassification of the Plaintiffs as "independent contractors" and:

    a)   the documentation and execution of that misclassification utilizing the mails of the United States in violation of 18 USC 1341;

    b)   further the creation of the video archive, DVD products and digital streaming video products and other WWE paraphernalia to generate further income to WWE after the active wrestling days of the Plaintiffs were finished, through the use of the wires and mails of the United States in violation of 18 U.S.C. 1341 and 1343 as a furtherance of the initial scheme, which is continuing;

    c)   all form an integral part of the cunning scheme of the Defendant Vincent McMahon (individually and as trustee) to enhance the income of the RICO Enterprise WWE and therefore to increase the holdings of and compensation to Defendant Vincent McMahon, individually and as Trustee to further payments to the straw men which acted at his direction and control to enhance and perfect the scheme, and maintain iron control over the WWE Enterprise.

525.   The procurement of the unconscionable Booking Contracts through which the Plaintiffs were deliberately and fraudulently misclassified, the procurement of later CNA contracts, the use of the mails to furnish understated royalties with respect to wrestling employment, and the establishment of the "archive" of:

a) Video tapes;
b) DVDs;
c) Streaming Video Services including the WWE Network;
d) Photo Library;
e) "Action Figures" (likenesses of the wrestlers);

all constitute integral parts of the cunning scheme of Defendant Vincent McMahon (individually and as Trustee) to manipulate, maneuver, and defraud the Plaintiffs out of money for his benefit (and the benefit of the straw men he uses to carry out his orders) through the employment of the RICO WWE enterprise to effectuate his and carry out his scheme.

526.   The alleged right to monetize the repeated display of the on camera destruction of human beings by procuring their performance in inherently dangerous activities through unconscionable boilerplate Booking Contracts obtained through fraud and duress, represents continued Racketeering Activity by the Defendant VKM and his minions, carried out through the WWE Enterprise for the profit of VKM and his minions, from the date Each Booking contract was executed, up to and including the present.

527.   The value of the media library, which is maintained only through the royalty scheme brought into being by the unconscionable Booking Contracts provided a direct incentive to VKM to maintain the violence of the performances (to enhance ratings and thus profits) and to cover up the massive accumulated physical damage to the Plaintiffs that has effected all of them, and rendered many of them permanently disabled and unable to conduct their own affairs, either intellectually or physically, and further to monetize these performances in derogation of the intellectual property rights of the Plaintiffs.

528.   VKM, individually and as Trustee of his family trusts (whether he or straw men were/are the Trustees), engaged in a pattern of racketeering activity intending to defraud the Plaintiffs, and to deprive them of their property and to affect their business, and have succeeded in that regard, to the tune of millions of dollars in the aggregate.

529.   The above-described racketeering activities amounted to a common course of conduct intended to deceive each of the Plaintiffs and did deceive each of the Plaintiffs to the detriment of their money and property.

530.   The acts of Racketeering all had the same pattern and purpose of defrauding the Plaintiffs and obtaining their money and property. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims including the Plaintiffs and was successful in obtaining the Plaintiffs' money and property.

531.   Defendant VKM's (individually and as Trustee of his family trusts and through his straw men) fraudulent activities are part of his regular and usual method of conducting the ongoing business of the WWE enterprise over which he exercises iron control, and constitutes a continuing threat to the property of Plaintiffs, and all other wrestlers for the WWE similarly situated, and further constitutes a threat to the continued viability of the Enterprise WWE itself and its Class A shareholders.

532.   The pattern of racketeering activity by Defendant VKM (individually and as Trustee of his family trusts, and in concert with his straw men) alleged

herein and the WWE "enterprise" are separate and distinct from each other. Defendant VKM individually and as trustee of his various family trusts and through his Trustee straw men, engaged in the pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the WWE enterprise, and personally benefiting himself and his family members to the detriment of the Plaintiffs and the Class A and other disinterested shareholders of the WWE.

533.   The Plaintiffs have been injured in their property by reason of the above alleged racketeering activities and course of conduct by the Defendant VKM (individually and as Trustee of his family trusts and through his straw men). The Plaintiffs have been cost millions of dollars in taxes, insurance premiums, and, lost wages, lost expenses of medical care, lost unemployment benefits, and lost employment opportunities among other damages. These costs, which should have by law been imposed upon the WWE enterprise but for the racketeering activity, have instead been borne by the Plaintiffs to the profit of Defendant VKM (individually and as Trustee of his family trusts), and to the profit of his straw men and agents.

534.   VKM, individually and through his status as Trustee of numerous Trusts holding and controlling Class B voting shares of WWE, and through his straw men (whom he also utilizes as "trustees" to do his bidding) maintains iron control over the management of the WWE, and has thoroughly infiltrated the WWE such that it is subservient to his bidding, and acts as a racketeering enterprise.

535.   The profits thus generated from the racketeering activity above described, in the past and continuing until now, accrue first to WWE and then to VKM and his minions as a result of his control.

536.   The Plaintiffs injuries were directly and proximately caused by the racketeering activity of Defendant VKM (individually and as Trustee of his family trusts, in concert with his straw men) as described above, operating through the enterprise WWE.

537.   By virtue of the above described violations of 18 USC 1962(c) the Defendant VKM's (individually and as Trustee of his family trusts)  are jointly and severally liable to the Plaintiffs for three times the damages the Plaintiffs have sustained, plus the costs of this litigation including reasonable attorneys' fees.

**COUNT VIII**
**<u>FRAUD</u>**
(On Behalf of All Named Plaintiffs Against Defendant WWE)

538.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

539.   At least since the early 1963, the WWE knew (or should have known from readily available scientific literature) that repetitive head impacts and rapid decelerations in wrestling performances and full-contact practices created an unreasonable risk of harm to WWE wrestlers that was similar or identical to the risk of harm to boxers who receive the same or similar repetitive impacts to the head during boxing practices and matches.

540.   The WWE knew that the risks of brain injury could be reduced by implementing changes to the performance, akin to the ones other sports agencies

178

had already adopted, such as (1) the baseline cognitive testing of wrestlers for comparison purposes during and after performances; (2) the active monitoring of wrestlers for signs of TBI, (3) the employment of a neurologist during performances; and, (4) return-to-ring rules consistent with proper medical management of TBI, or the use of helmets as OSHA would have required, (and periods of extended recuperation as required by Family Health and Medical Leave Act) but  for the WWE's fraudulent misclassification of their employees as "independent contractors."

541.   The WWE, however, withheld and actually covered up the information it knew about the risks of head injuries suffered during WWE performances from then-current WWE wrestlers and former WWE wrestlers and ignored the known risks to all WWE wrestlers.

542.  On information and belief, the WWE deliberately delayed implementing the changes to the performance it knew (or should have known) would reduce wrestlers' exposure to the risk of life-altering head injuries because those changes would be expensive and would reduce the profitability of WWE. WWE knew that violence sells and was in the essence of their entertainment package and favorable ratings.

543.   The WWE has been aware of and understood the significance of the published medical literature dating from as early as the 1920s that there is a serious risk of short-term and long-term brain injury associated with repetitive traumatic impacts to the head to which WWE wrestlers are exposed.

544.   The WWE and its agents -- employed to formulate the Talent Wellness Program -- made these material misrepresentations with the intent to defraud the Plaintiffs.

545.   Given the WWE's superior and unique vantage point, and assumption of responsibility the Plaintiffs reasonably relied upon the WWE for guidance on head injuries and concussions.

546.   During that time period, the WWE knowingly and fraudulently concealed from then-current WWE wrestlers and former WWE wrestlers the risks of head injuries in WWE performances and practices, including the risks associated with returning to physical activity too soon after sustaining a sub-concussive or concussive injury, and the cumulative impacts of such injuries.

547.   The WWE, however, withheld this information from then-current WWE wrestlers and former WWE wrestlers and ignored the known risks to all WWE wrestlers.

548.   During their wrestling careers and after their retirement from the WWE, the Plaintiffs justifiably and reasonably relied on the WWE's omissions and misrepresentations to their detriment.

549.   As a result of WWE's misconduct as alleged herein, WWE is liable to Plaintiffs.

550.   The Plaintiffs were damaged by WWE's misconduct. They have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, permanent reductions in cognitive capacity and economic and non-

economic damages that are ongoing and continuing in nature, including a substantial diminution in them.

551.   As a result of the WWE's fraud, the WWE is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law

## COUNT IX
## WRONGFUL DEATHS AND SURVIVAL ACTIONS
### Against Defendant WWE,
Carole M. Snuka on Behalf of the Estate of James W. Snuka. The Estate is in the Probate Division of the Circuit Court For Broward County, Florida.
Gayle C. Schechter on behalf of the Estate of Jon Matthew Rechner. The Estate is in Monmouth County Surrogate's Court in New Jersey.
Barbara Marie Leydig and Bernard Knighton co-representatives on Behalf the Estate of Brian David Knighton. The Estate is State of Maryland Estate no: 16404.
Shirley Fellows on Behalf of the Estate of Timothy Alan Smith. The Estate is in The Circuit Court For Polk County, Florida Probate Division.
Ronald Scott Heard on Behalf of the Estate of Ronald Heard. The Estate is in The Circuit Court For Hillsborough County, Florida Probate Division.
Kelli Fujiwara Sloan on Behalf of the Estate of Harry Masayoshi Fujiwara. The Estate is currently being established in Montgomery County, Tennessee.

552.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

553.   Plaintiffs and their respective Executors or equivalent legal representatives under applicable state law (hereinafter "Executors") incorporate by reference the preceding paragraphs set forth above as if fully set forth herein.

554.   The Plaintiffs' legal representatives bring this action in their representative capacity of the decedent's Estate and next of kin and on behalf of the respective survivors of those Plaintiffs.

555.   As a direct and proximate cause of the conduct alleged herein, the WWE caused the Plaintiffs to develop the debilitating brain diseases and

conditions set forth above, which diseases and conditions caused extreme pain, suffering, and anguish and, ultimately, the deaths of some Plaintiffs.

556.   The legal representatives of the deceased Plaintiffs claim damages recoverable under applicable law for all pecuniary and non-pecuniary losses suffered by the deceased Plaintiffs by reason of their deaths.

557.   As a direct and proximate result of the untimely deaths of the Plaintiffs, their respective survivors and/or surviving distributees have been deprived of the earnings, maintenance, guidance, support and comfort that they would have received from for the rest of the respective Plaintiffs' natural lives, and have suffered commensurate pecuniary and non-pecuniary losses because of the Plaintiffs' wrongful deaths.

558.   The Plaintiffs' legal representatives claim the full measure of damages allowed under applicable law.

## COUNT X
## FRAUDULENT CONCEALMENT
### (On Behalf of All Named Plaintiffs Against Defendants WWE and VKM)

559.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

560.   From the moment the Plaintiffs contracted with WWE, WWE convinced them that it provided all necessary medical care, treatment and information relating to injuries sustained in the WWE ring.  It hired physicians like Dr. Rios and Dr. Unger to assess, diagnose, and clear the Plaintiffs before and after performances. It hired trainers to monitor and treat injuries at performances.  It tasked the referees with on-the-spot assessments and diagnosing of injuries and the responsibility to

take the appropriate actions.  It maintained complete control over the moves and spots used and banned in performances.  WWE even explicitly promises to cover 100% of all in-ring injuries.

561.    The Plaintiffs fully trusted that WWE was legitimately protecting their health and safety when they performed for WWE and believed that WWE would tell them if they were suffering long-term risks of injuries to prevent compounding damage.

562.    By so doing, it legitimized its omissions of fact and failure to protect and successfully duped the Plaintiffs into believing that any head injuries they received were minor, short-lived, and the butt end of jokes for WWE employees.

563.    As Copani notes, he would have rather suffered a concussion than a broken ankle because he believed that he could perform with a concussion but not a broken ankle. Martin recalled that agents would shrug off concussions with comments such as "Oh good. It's just a concussion. You'll be fine". Eadie remembers just throwing cold towels on his head for head injuries and being expected to continue performing.  Darsow recalls a match where he was knocked out cold after being hit over the head full force with a chair. VKM was in gorilla position and later lauded Darsow with "helluva match".

564.    This downplaying of head injuries compared to other physical injuries was directly due to WWE's false distribution of information relating to head trauma suffered in WWE performances.  WWE did not establish policies or protocols to prevent head trauma, it did the opposite.  Reed remembers, "If you could put your boots on, you needed to be in the ring, otherwise there was no pay-day". Corporate

profits was always put before the Plaintiffs' health and safety, despite WWE knowing that the Plaintiffs were evidencing known symptoms attributed to serious head injuries. Enos relates that agents would ask "how many fingers am I holding up" when a wrestler was dazed and confused, but that there was no rest ore treatment and no policies in place for that type of injury.

565.   WWE was in a unique position of superior power and authority and cultivated this relationship with the Plaintiffs by holding weekly meetings that would explicitly delineate the Plaintiffs' weeks, control the Plaintiffs' dress codes, and manage who performed where and how.  Hugger details weekly meetings including VKM, the agents, the writers, and the wrestlers would be held laying out matches, finishes, victors, and locations for the week.  Brunzell comments that there was no comparison with the schedule of WWE: "The schedule was brutal. I was booked 2-3 weeks with breaks".  WWE determined gimmicks and who would win or lose.  WWE was in complete control and if WWE wanted something kept silent, it was kept silent for fear of losing position or even employment.  Silva opines that the "old code of silence was used to enforce discipline and a lack of oversight  and regulation pervaded the culture".

566.   Despite this position of authority and the knowledge that WWE had from the medical literature that had developed on concussion science, including the signs, symptoms, causes, and effects of punch-drunk syndrome, Dementia Pugilistica, and post-concussion syndrome, WWE still insisted that its performers continue wrestling despite suffering head injuries. Brunzell recalls "If you took time

off for an injury you would be fired or punished so you would be afraid to ever go to a doctor".

567.   The intent for this strict adherence to performing injured is clear:  the WWE profits from its performances, and VKM acknowledges that violence sells. The Attitude Era is an example of VKM taking the company into a more violent direction.   Many of the moves themselves fetishize violent attacks targeting the head and spine, such as the brainbuster, piledriver, tombstone, and suplex.   WWE publications emphasize the brutality of these moves and the injuries that are sustained by their recipients.  As Darsow indicated, there was "nothing better [to VKM] than a dazed wrestler after a hard hit to the head" because the look could not be faked and looked great on camera.  A camera that made VKM and WWE billions of dollars through Pay-Per-View, live television, broadcasts, recordings, publications, and now most recently, streaming online services through the WWE Network.  WWE continues to profit from the Plaintiffs' injuries and performances through its streaming platforms.

568.   WWE therefore had to continue to mischaracterize, downplay, and conceal the fact its performers were being permanently injured to sustain its profits.   The Plaintiffs could not have uncovered the truth about their injuries through due diligence because WWE had sufficiently deceived them from the outset.   The Plaintiffs believed that no long-term neurological injuries were sustained from performing for WWE.

569.   WWE maintained this façade after the Plaintiffs retired by continuing to foster its duty and relationship to the Plaintiffs by hosting WWE events,

inducting the Plaintiffs into the Hall of Fame, providing rehab opportunities, paying royalties, inviting the Plaintiffs to signing events, paying them for certain activities, and indicating to the Plaintiffs that they were still part of the WWE family.

570.   All the while, WWE continued to publicly mischaracterize the state of CTE science, including by making inaccurate press statements about Christopher Benoit's CTE diagnosis in a peer-reviewed medical journal.  WWE has publicly questioned the findings in the first wrestlers diagnosed CTE, Benoit and Andrew Test Martin.   The WWE sought to create "controversy" when it issued press statements apparently not reviewed for accuracy by medical professionals. The statements may have been written by the WWE Press Department, for example: World Wrestling Entertainment (WWE) Full Statement to ABC News reads:

> "It is natural that a father would try to come up with a reason why his son would tragically murder his wife and child, and then commit suicide. Based on the study by the Sports Legacy Institute that claimed Chris Benoit had the brain of an 85-year-old with dementia, Mr. Benoit asserts that head trauma was the cause of his son's aberrant, criminal behavior. However, common sense would dictate that this is impossible. Someone with the brain of an 85-year-old with dementia would be unable to keep a traveling work schedule, drive himself to arenas, and perform intricate maneuvers in the ring much less commit a methodical murder-suicide over a 48 hour period."- September 5, 2007 ABC News

571.   The concealment of CTE risks in wrestling was and is ongoing.

572.   The WWE's Press statements all deny a link between wrestling and CTE.

573.   WWE's and Paul Levesque's public statements regarding CTE research see infra paragraph 276-301.

574.    WWE has continued to deny and evade the presence of CTE in WWE wrestling and the validity of studies pointing to the contrary.

575.    The WWE's Medical Director Dr. Joseph Maroon also denied and downplayed the link between repetitive head impacts and short- and long-term brain damage including CTE in public interviews. In 2015 while at WWE, Maroon telling ESPN that CTE is as "over exaggerated."

576.    Dr. Maroon told the Pittsburgh Post-Gazette that the conclusion that NFL Player Terry Long's suicide may have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon stated "to go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative . . . "

577.    Maroon's statements are at odds with accepted science that shows a relationship between brain diseases and suicidal behavior.

578.    The WWE, therefore, concealed material facts and information with the intent to deceive and defraud, which caused Plaintiffs to become exposed to the harm referenced above. For those Plaintiffs who had retired prior to the above-mentioned misrepresentations, the WWE's concerted concealment of the risks to which they had been exposed in the ring delayed their ability to plan for their future and their families and to seek appropriate treatment of their latent neurodegenerative conditions.

579.    The WWE knew and expected that Plaintiffs would rely on the inaccurate information provided by the WWE, and Plaintiffs in fact did reasonably

rely on the inaccurate information provided by the WWE during and after their WWE careers.

580.   Each time an important CTE study was published that made it more apparent to WWE that its performers past and present sustained permanent and life-altering injuries simply by performing, it had an obligation to inform its former performers of the injuries they sustained while performing so they could have the opportunity to receive treatment.  The WWE had a duty to full communicate what it knew and what it knows about CTE science and the risks to the plaintiffs. It is not the innocent employee's responsibility to understand and uncover the hazard in the workplace, but that of the negligent defendant who failed to properly protect its employees.  WWE failed to protect its employees and has continued to fail to properly act on its responsibility to the Plaintiffs.

581.   As a direct and proximate result of the WWE's fraudulent conduct, Plaintiffs have suffered physical injury, including, but not limited to, existing and latent cognitive conditions that create memory loss, diminished cognitive function, non-economic losses, and economic losses.

582.   As a direct and proximate result of the WWE's willful concealment, Plaintiffs have suffered and will continue to suffer substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing and continuing in nature.

583.   As a result of the WWE's misconduct as alleged herein, the WWE is liable to Plaintiffs for, and Plaintiffs seek, the full measure of damages allowed under applicable law.

## COUNT XI
## CIVIL CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT
**(On Behalf of All Named Plaintiffs Against Defendants WWE and VKM)**

584.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

585.   For decades, WWE, along with others who were employed by the WWE, including those who participated in the WWE Talent Wellness Program, acted in concert to perpetrate the fraudulent concealment of the connection between repetitive TBI and long-term neurocognitive damage, illness, and decline.

586.   The named Defendants, along with those who participated in the concerted efforts referenced above, knowingly failed to disclose and/or made continuing misrepresentations of material fact that there was an absence of any scientific basis to believe that repetitive TBI created any known long-term neurocognitive risks to WWE wrestlers. That misconduct by the named Defendants exposed Plaintiffs to an increased risk of brain injury and was the proximate cause of the Plaintiffs' brain injuries.

587.   Plaintiffs have suffered personal injuries as a result of the named Defendants' concerted activities.

## COUNT XII
## EQUITABLE ESTOPPEL TO THE STATUTES OF LIMITATIONS
### DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a)
**(On Behalf of All Named Plaintiffs Against Defendant WWE)**

588.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

589.   The Declaratory Judgment Act, 28 U.S.C. 2201, provides that where there is a controversy within its jurisdiction "any court of the United States . . . may

declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought".

590.   The several tests for whether a declaratory judgment action is appropriate to the circumstances alleged are set forth in *Grand Trunk W.R.R. Co. v. Consol. Rail Corp.,* 746 F. 2d, 323, 326 (6th Cir.1984), and reiterated many times thereafter such as in *Western World Insurance Company v. Hoey*, 733 F.3d (6th Cir. 2014). The facts of this case as above and herein alleged, amply meet the *Grand Truck* criteria.

591.   The conduct of each of the Defendants with respect to each and every Count and remedy claimed was and continues to be so egregious that to allow the Defendants to assert the affirmative defense of any <u>otherwise</u> applicable statute of limitations (assuming arguendo one will be alleged) would be create an unconscionable injustice and consequently reward the Defendants for conducting a carefully crafted and wrongful course of fraudulent conduct intentionally duping the Plaintiffs into believing that they had no rights available and were mere slaves to the whims of the WWE and VKM, as the controlling shareholder of WWE.

592.   It would further allow the WWE to profit from the diminished cognitive ability of Plaintiffs and thus diminished their capacity to exercise or learn of their rights which progressed over time and which resulted from the conduct of the WWE as herein alleged.

593.   The conduct of the Defendants involves, among other wrongs, fraudulent nonpayment of FICA taxes over a period of years and the filing of fraudulent tax returns based upon the fraudulent misclassification of the Plaintiffs

as "independent contractors", as above alleged in detail caused significant monetary damage to the Plaintiffs.

594.   The Plaintiffs cannot now receive a refund of the taxes they were forced to improperly pay because all requests for refunds must be filed within three years of the filing of the return. This is not a case on par with *Levy, et al. v. WWE* (USDC-CT #3:08-01289) which through its holding, concerned a situation as here in which the Plaintiffs were required to pay taxes that were the obligation of the <u>Defendants</u>. In this case we are not talking about a withholding that would have occasioned a refund to Plaintiffs as in *Levy*, but an illegal shifting of taxes mandated be paid by an employer, on behalf of an employee, through the abusive tactics of the WWE as implemented by the racketeering and other activities of its Chairman Vince McMahon, who controls the WWE individually and through his family trusts and straw men.

595.   However, the matter may be rectified because there is <u>no civil statute of limitation</u>s upon the filing of a fraudulent return for FICA taxes by the Defendant. Therefore, the Defendants may be called upon to pay their fair taxes to the IRS, and upon the same basis, based upon their fraud, pay the Plaintiffs the unjust measure of taxes the fraud cost the Plaintiffs, together with appropriate interest thereon.

596.   The Plaintiffs, as above alleged in more detail, were given Booking Contracts in which it was wrongfully specified that they were "independent contractors". No discussion or negotiation of these ironclad unconscionable "Booking Contracts" was permitted.

597.   The Plaintiffs in overwhelming measure possessed little formal education and had absolutely no knowledge of the differences between an "employee" and an "independent contractor." The Plaintiffs were told by WWE that they were "independent contractors." WWE would tolerate no negotiations on that point and did not ever notify the Plaintiffs of the consequences of the WWE's false and unilateral declaration. The tests employed by Connecticut law and the Internal Revenue Service as stated above to determine classification as independent contractor or employee are far beyond the capabilities of the Plaintiffs to comprehend and evaluate, as was not only well known to the WWE, but relied upon by them in duping the Wrestlers and depriving them of their money and property.

598.   The boilerplate Booking Contract was presented to the Wrestlers by the WWE on an "its my way or the highway" basis. For example, Wrestler Anthony Norris (a/k/a Ahmed Johnson) attempted to bring an attorney to the Connecticut office of WWE to discuss the Booking contract. Vincent McMahon told Mr. Norris that "he hates lawyers" and had Norris' attorney escorted off of the property. VKM apparently only hates other people's attorneys as he surrounds himself with not only many "in house" attorneys but high-profile outside national firms, and places his attorney confidants as trustees of his family trusts to do his bidding. *See* SEC Filings, Exhibit F hereto.

599.   In contrast to the unrepresented Plaintiff wrestlers, the WWE at all relevant times has maintained an internal legal staff, resulting in a situation where the discrepancy in bargaining power between the parties was overwhelming, and

the utilization of overwhelming bargaining power and coercive tactics by the WWE at VKM's direction, unconscionable.

600.   The Plaintiffs in overwhelming measure knew that achieving any success in the WWE depended in large part upon whether one pleased Vincent McMahon and his agents, and that attempting any form of dispute with McMahon or his agents would result in either not being hired, or being assigned an unfavorable "gimmick", or any "push" made for your character being eliminated and the wrestler being subjected to "mocking angles" as above described, with their career then essentially ruined.

601.   The daily life of a typical WWE Wrestler including the Plaintiffs was plagued with fear of unemployment, which fear was intentionally created by Vincent McMahon and his agents through the WWE to keep unquestioned control over the Wrestlers in order to reap the most profits for himself through the enterprise he controlled, the WWE.  The wrestling "culture" established over the years and continued by the WWE required that "the wrestler who does not obey orders is blacklisted". See "Bodyslam from the Top Rope: Unequal Bargaining Power and Professional Wrestling's Failure to Unionize", 12 U. MIAMI ENT. AND SPORTS L. REV. Dall 1994/Spring 1995, footnotes 175-177 and associated text.

602.   An example is Bryan Emmett Clark who was recruited to WWE by a former well known WWE Wrestler turned WWE Agent "Sgt. Slaughter". Mr. Clark passed his "try out" in Charleston, SC and then was mailed a boilerplate Booking Contract by WWE to his home in Atlanta, Ga. Mr. Clark fully understood that there was no "negotiating" allowed. Mr. Clark had no idea that he was not being

classified as an employee, or that there were any financial and physical consequences he would suffer as a result of the misclassification.

603.   Clark has no idea what the difference between an "independent contractor" and an employee is. Clark alleges that there was no "independence" for wrestlers who worked for the WWE – you did as you were told, the matches came out as you were told, props used (such as chairs) were utilized when you were told, wrestling moves were included or removed –all as dictated by WWE. Clark alleges that WWE provided the schedule, told you when and where to arrive and what you were to do, day after day.

604.   Mr. Clark observed that if anyone complained at WWE they were not around long. Wrestlers dared not complain to management knowing what the result would be swift and certain.

605.   On September 23, 2001, Mr. Clark was wrestling in a match in Pittsburg, PA televised on "pay per view" when he was "choke slammed" by the "Undertaker" which seriously injured two disks in his neck which later required surgery.

606.   Clark alleges that he suffered numerous concussions such as but not limited to having his head driven into a ring post by Savio Vega such that he lost track of his surroundings. Clark also alleges further that on 12/28/93 while wrestling Tatanka in Canton, Ohio he was suffered a very serious head blow when Tatanka landed on his skull after jumping on Clark from a top rope.  Clark alleges that Vince McMahon attended most televised or taped for television programs, and was readily available to personally witness the injuries experienced by the wrestlers.

194

Having occasionally wrestled himself, McMahon would surely know how it felt to be smashed into the "mat" or the dangers of a "pulled punch" connecting instead of missing.

607.   Further Clark suffered serious shoulder injuries from the grinding schedule. He informed Vince McMahon of these injuries who tried to talk him out of the need for surgery claiming that WWF needed Clark right then. However, the pain was too severe and Clark had shoulder surgery, which he had to personally pay for. This payment was a direct result of the WWE misclassifying the Wrestlers as independent contractors so as to save on Worker's Compensation premiums, well knowing that the Wrestlers would not comprehend what had been done to them.

608.   "Wrestling promoters call all of the shots: who will win, how they will win, how long the match will take . . . the wrestler who does not obey orders is blacklisted" N.Y. Times 11/9/1985, Section 1, page 27. The vast majority of the Plaintiffs are prepared to support that statement with respect to the WWE and its policies, with their testimony, and therefore allege it.

609.   Further, the types of injuries which wrestlers suffer – repeated head and body trauma, repeated concussions, are the very injuries that cause dementia and diminished intellectual capacity over time and thus increase even further the substantially dissipate bargaining power of the Wrestlers and the WWE, all as known to the WWE, as the wrestlers suffer from cognitive decline, and the Booking Contracts are renewed.

610.    It is inevitable from the violent nature of the performances scripted by the WWE that the Wrestlers become injured and require prolonged physical rehabilitation and surgery. Since their misclassification as "independent contractors" prohibited them from receiving workers compensation benefits (as well as the WWF never providing the notifications of the availability of such benefits required by nearly all states) often the wrestlers were required to pay their own medical expenses as was Mr. Clark, or simply lose their career.

611.    The circumstances surrounding the procurement, execution and maintenance of the unconscionable boilerplate Booking Contracts under the direction of VKM and his minions which included (but are not limited to):

A.    Creation of an atmosphere where the Plaintiffs reasonably believed that WWE would not deal with any attorney for the Plaintiffs in good faith to negotiate a contract, but instead would demand a "take it or leave it" signing making any attempt at negotiation a virtual guarantee of injury to employment opportunities;

B.    Intentional concealment of the rights of employees to the protections of numerous state and federal statutes, including but not limited to OSHA, Family Medical and Leave Act and the Workers Compensation acts of the various states, and the opportunity to organize and unionize under the National Labor Relations Act, including failure to provide required notices all as a part of a cunning scheme to profit the Defendants at the expense of the Plaintiffs;

C.    Subjection of the Wrestlers to discipline or discharge for the exercise of their rights of free speech pursuant to the First Amendment of the Constitution of the United States and/or rights guaranteed by the Constitution of the State of Connecticut (First Article, Sections 3,4,14);

D.    Systematic spoliation of or failure to maintain records required under OSHA, Family Medical and Leave Act and the Workers Compensation acts of the various States; thus knowingly and effectively suppressing evidence of its own wrongdoing and

196

committing hundreds of violations of federal and state statutes set forth in sub-paragraph B above.

E.     Creating the certainly among the Wrestlers that if they requested any rights in a meaningful way that any "push" their character had would be stopped, and that their character would be subjected to humiliation, and all other steps taken to diminish their economic opportunities at WWE and in any other wrestling venue, thus effectively ending their careers.

612.    "The determination of unconscionability is to be made on a case-by-case basis, taking into account all of the relevant facts and circumstances." *Cheshire Mortgage Service, Inc.* v. *Montes,* 223 Conn. 80, 89, 612 A.2d 1130 (1992). The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." (Citations omitted; internal quotation marks omitted.) *McKenna* v. *Delente*, 123 Conn. App. 146, 158, 2 A.3d 38 (2010). "[T]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case." (Internal quotation marks omitted.) *Crews* v. *Crews*, 295 Conn. 153, 163, 989 A.2d 1060 (2010).

613.    "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Internal quotation marks omitted.) *Hottle v. BDO Seidman, LLP, supra,* 268 Conn. 719.

614.    The elements of "unconscionability" permeate the WWE-Wrestler relationship as above alleged. For example:

A.     The contract flatly declares that the Wrestlers are "independent contractors" in one paragraph, while the remainder of the

contract is devoted to controlling every aspect of the Wrestler's work, thus rendering them unquestionably employees;

B.     The execution of the contract without questions by the Plaintiffs was achieved by the establishment of a coercive culture in which were made to understand that any questioning of the dictatorial control of VKM would result in their unemployment or the Booking Contract withdrawn;

C.     The deliberate misclassification of the Wrestlers by the WWE is designed to profit the WWE by eliminating the need of WWE paying FICA taxes at the federal level and State unemployment taxes, Workers Compensation and other benefits but instead piling them upon the wrestlers;

D.     Depriving the Wrestlers of unemployment benefits through the misclassification, thus making them more dependent upon WWE;

E.     Depriving the Wrestlers of their otherwise federally guaranteed right to organize and unionize under the National Labor Relations Act;

F.     Depriving the Wrestlers of the protections of a safe workplace and protective headgear as would otherwise be required by the National Labor Relations Act;

G.     Depriving the Wrestlers of Worker's Compensation insurance thus causing all of them to bear the costs of injuries suffered on the job during their employment as a result of directions received from the WWE, or simply to lose their employment as the result of on the job injuries that cannot be repaired because of lack of insurance to save the WWE very substantial Workers Compensation insurance costs;

H.     Deliberately depriving the Plaintiff Wrestlers of the protections afforded to them by receiving notice of their rights under the Family Rights and Medical Leave act, and the Occupational Health and Safety Act, which required notices specifically inform the Wrestlers that they may not be discharged or discriminated against in their jobs for the mere exercise of rights which these statutes provide.

615.   All of the benefits to the WWE alleged in the preceding paragraph were

achieved by the Defendants, at the expense of Plaintiffs through:

A.    The establishment and enforcement of a dictatorial wrestling culture in which the Wrestlers were indoctrinated to believe that Vince McMahon and the WWE "hated attorneys" and that utilization of any attorney to negotiate the "standard form" WWE "unconscionable boilerplate Booking Contracts" would result in elimination of the Wrestler from consideration for employment, or the assignment of an unfavorable "gimmick" which would result in a short and unprofitable career;

B.    The employment by Defendants of attorneys, to protect the interests of WWE and VKM at the expense of plaintiffs – whose lack of education and knowledge of contractual terms was known to defendants and leveraged by defendants to facilitate the, "Booking Contracts" Plaintiffs were required to sign without asking questions;

C.    Control of all aspects of Plaintiff's careers and opportunities for success. Whether the Wrestler won or lost was determined by the WWE. Whether he was to be smashed in the head or victimized by the application of extremely dangerous moves such as the "pile driver" or being smashed by a 250+ pound opponent jumping from the top of the corner post on to a Wrestler laying prone on the ring floor, whether he would be given time off to recover from injuries received not only on the job, but as a result of the directions of the WWE –all of this was totally controlled by the WWE which routinely flaunted statutory requirements pursuant to the direction and control of VKM;

D.    Control by Defendants where the Wrestlers performed, who their opponents were, what costumes they wore, whether characters would be "good" or "evil" and would be pushed (i.e. allowed to win) or remain stepping stones for other characters who were being "pushed";

E.    Defendants" maintenance of intellectual and economic disparity over plaintiffs and keeping the plaintiffs ignorant of their rights and by defendants' complete "choke hold" over the success or failure of the Wrestler's careers and physical well-being making effective dissent or meaningful bargaining or complaint virtually impossible.

616.  The Plaintiffs careers were routinely manipulated, their health jeopardized, their injuries buried instead of being reported to authorities as required by law, WWE's required employer social security contribution fraudulently

taken from them, their insurance premiums increased, and they were routinely denied the protection of laws applicable to their actual employment standing and position, such as Worker's Compensation, the Family Medical Leave Act, OSHA, and the ability to organize and negotiate as a union under the National Labor Relations Act –all as routinely applicable to all other professional athlete-entertainers.

617.   In addition, even in the face of applicable regulatory penalties, the WWE routinely deprived the Wrestlers of the notices required by the various State and Federal Acts under which they had rights in spite of statutory requirements and specific Regulations started above that those Notices be provided, all as an integral part of a conspiracy to deprive the Wrestlers of their rights and to wrongfully convince them that they had no rights and no ability to protest if their employment was to continue.

618.   The "Notice Posting" requirements of Workers Compensation Laws, FMLA and OSHA are specifically designed to draw the attention of unsophisticated and uninformed workers to knowledge of rights important to their personal health and safety, which were and are protected by these statutes. Such statutes have been universally recognized as remedial in nature requiring liberal interpretation to accomplish their beneficial purposes. Manifestly a "contract" whose objective is to thwart knowledge of these rights and their exercise is per-se unconscionable, unenforceable, procured by fraud, and void *ab initio*.

619.   Additionally, as an integral part of the cunning scheme to deprive wrestlers of their rights, the WWE routinely ignored and actively circumvented the

very record keeping requirements established by the Family Medical and Leave Act, OSHA and state Workmen's Compensation laws that would have allowed verification and quantification of the rights lost by the Wrestlers, the injuries suffered, and the monetary damages and benefits lost. This deliberate and cynical flaunting of applicable state and Federal Regulations by the WWE constitutes spoliation of evidence for which the WWE should be held to account for the damage it has caused its employees.

620. The WWE cynically manipulated the careers of their wrestlers to prevent them from questioning the WWE's dictatorial control over their careers and to suppress their complaints.

621. As has been alleged in detail in this Complaint, the wrestlers were subjected to a culture of fear for their economic and physical lives. Their bodies accumulated numerous debilitating injuries over time, all as known to the WWE, and these injuries and the lack of proper work protections and medical care made them by the day more dependent upon their WWE payments. In turn, those payments diminished as their careers were limited by injuries and the consequent disapproval by the WWE of any inability to perform while injured.

622. In addition, many Plaintiffs from time to time were not wrestling under a "unconscionable boilerplate Booking Contracts" but under a "handshake deal" in which the only specified term was that a Wrestler would show up at the appointed time and place and perform as directed for a specified payment.

623. Every contract, written or otherwise, imposes upon each party a duty of good faith and fair dealing in its performance and in its enforcement, including

the duty not to interfere with the other party's performance, and further to act so as not to destroy the reasonable expectations of the other party regarding the fruits of the contract.

624.   The course of conduct of the Defendant WWE, under the direction and control of Defendant VKM and his straw men, deprived Plaintiffs of the fruits of their contracts, undermined and virtually abolished their careers, and was designed, intended and had the actual effect of depriving the Plaintiffs of:

A.   Not only a safe work place, but also the knowledge that the WWF was mandated by statute to post and display notices concerning rights under OSHA. *See* Exhibit J: REQUIRED OSHA Notice of Rights;

B.   Not only lack of Worker's Compensation benefits, but also the knowledge that the WWF was mandated by statute to post and display notices concerning rights under Worker's Compensation Laws.

C.   Not only the protections of the Family and Medical Leave Act, but also the knowledge that the WWF was mandated by statute to post and display notices concerning rights under the Family and Medical Leave Act. *See* Exhibit K: REQUIRED FMLA Notice of Rights.

625.   Courts, applying equitable principles, have laid down the doctrine of equitable estoppel by which a defendant may be estopped by his conduct from asserting defenses such as the statute of limitations. 51 Am.Jur.2d, Limitation of Actions, §§ 431-452; notes, 43 A.L.R.3d 429 and 44 A.L.R.3d 760. "Estoppel rests on the misleading conduct of one party to the prejudice of the other." Spear-*Newman, Inc. v. Modern Floors Corporation*, 149 Conn. 88, 91, 175 A.2d 565, 567. "In the absence of prejudice, estoppel does not exist." *Novella v. Hartford Accident*

*& Indemnity Co.*, 163 Conn. 552, 563, 316 A.2d 394, 401 (1978). *Morris v. Costa*, 392 A.2d 468, 174 Conn. 592 (Conn. 1978).

626.   The conduct of the WWE at the direction and control of its Chairman VKM, as above alleged, was specifically intended and directed to mislead, deceive and coerce the Plaintiffs into believing that they had no rights under the various statutes outlined above, no rights to have the WWE pay its fair share of FICA and FUTA taxes, no rights to Workers Compensation Coverage, no rights to medical benefits, no rights to a safe workplace, no rights under the Family Medical and Leave Act, no rights to receive Notice Postings required by statute – in other words, no rights whatsoever that any *other* WWE employee would have, including the rights of other employees to participate in the retirement plan or other incentive plans offered to WWE employees who were not Wrestlers or Referees.

627.   The WWE at the direction and control of its Chairman VKM, as above alleged, specifically intended to prejudice the Plaintiffs by creating a work place atmosphere in which the Plaintiffs were denied whistleblower rights, and knowledge of such rights, and in which they would believe that any questions about their Booking Contracts or "handshake" contracts would result in the effective end of their careers and their ability to make enough money to support their families and pay for the medical treatment necessitated by the work injuries inevitably accumulated through the unsafe work place in which they were required to perform by the WWE.

628.   The WWE under the direction and control of its Chairman VKM intentionally undertook to sidestep the reporting requirements of the Workers

Compensation Law, OSHA, and FMLA in order that the true extent of the injuries to the Wrestlers not become known and that evidence thereof would not be maintained but instead suppressed to profit the WWE and VKM.

629.   The "unconscionable boilerplate Booking Contracts" and intentionally designed coercive "keep your mouth shut" culture of the WWE, created and energized by its Chairman VKM, were integral parts of depriving the Plaintiff Wrestlers of their legal rights, money, property and business opportunities in order to benefit the WWE, prop up its stock price and therefore the value of holdings of VKM and his family, and aggrandize the compensation to and dividends received by VKM and his family all to the detriment of the Plaintiff Wrestlers.

630.   Wherefore, the Plaintiffs contend and request that the Booking Contracts are and were unconscionable for the reasons set forth above, and their unconscionability of those contracts is a factor to be considered in equitable estoppel.

631.   Further, the unconscionable boilerplate Booking Contracts procured by fraud, deception, coercion and manifestly unequal bargaining power from the Plaintiffs resulted in substantial prejudice to the Plaintiffs in that they were forced to pay an unjust share of FICA and FUTA taxes on their salaries, denied unemployment benefits, denied medical benefits under worker's compensation statutes, denied compensation for lost wages, disfigurement and permanent injuries under workers compensation statutes, denied participation in retirement plans, denied a safe work place under OSHA, and denied valuable rights under the

Family Medical and Leaver Act –all at very substantial prejudice to their monetary interests, employment opportunities, and physical health and safety.

632.   Wherefore, Plaintiffs contend that any "statute of limitations defense must be set aside because of the unconscionable and unjust under the circumstances set forth above, the intentional failure to report evidence of injury, the known cognitive decline occasioned by such injury, and the intentional deprivation of rights guaranteed by numerous state and federal statutes, and the continuous pattern of racketeering activity engaged in for over twenty years.

633.   Wherefore, Plaintiffs contend that any statute of limitations defense must be set aside as unjust in the light of the intentional deprivation of notices required by remedial statutes to be given to the Plaintiffs which were intentionally concealed from them, and which concealment resulted in damage.

634.   Wherefore, Plaintiffs contend that any statute of limitations defense must be set aside because the effects of the accumulated physical injuries to the Plaintiffs were made significantly worse by the deprivation by the WWE of the statutorily required notices to Plaintiffs which were specifically designed to protect their lives and safety.

635.   Wherefore, Plaintiffs contend that any statute of limitations defense asserted in response to any claim of this Complaint must be set aside because Defendant WWE  under the control of its Chairman VKM, instead of gathering evidence and reports of injuries with respect to the Plaintiffs as required by OSHA and FMLA, and the Workers Compensation Laws of the several states in which the Plaintiffs worked, rather conspired to flaunt such reporting requirements to the

detriment of the lives and safety of the Plaintiffs, and to the financial aggrandizement of the Defendants. The Plaintiffs were by fraud and coercion, led to believe that they were in fact "independent contractors" with no rights of employees, and that to even question that status would lead to swift unemployment, humiliation, and ruination of any job future prospects.

636. Further, it would be inequitable, unconscionable, and a reward to outrageous and illegal behavior to allow or affirm any statute of limitations defense to the claims asserted hereunder under the circumstances alleged in detail throughout the Complaint that the Defendants knew (or upon any reasonable inquiry should have known) that:

A.    the Plaintiffs were *de facto* employees of the Defendants under any reasonable application of the legal definition of that word, but were coerced and duped into acquiescing into a fraudulent independent contractor status;

B.    that employment placed substantial physical demands upon the Plaintiffs as a result of their performances as established by VKM in control of WWE, and consequently by WWE;

C.    as the result of inevitable repeated head trauma and accumulated brain injury deriving from their performances, often the result of choreographed smashes to the head by metal chairs or exceedingly dangerous moves such as the "piledriver," or jumping onto someone who is prone on the mat from a the top of a ring post and countless "body slams," the Plaintiffs would suffer permanent injuries to their cognitive abilities, their ability to process and comprehend information;

D.    as the result of the policy of WWE as established under the control of VKM that the Plaintiffs were required to work injured, to continue wrestling even after they had suffered obvious concussions, were dazed from being hit on the head, were knocked out, and otherwise suffered serious injuries;

E.    that the Defendants knew that the Plaintiffs in large part were uneducated, had little to absolutely no knowledge of the legal

system or contract law, had no concept of the consequences of being classified as an "independent contractor" –and were frankly completely and thoroughly taken advantage of and duped by their employer under the guidance and control of Defendant VKM;

F.      as a result of the lack of any meaningful medical care or ability to review during the performance injuries which each of the Plaintiffs suffered on multiple occasions that the injuries would progress and worsen;

G.      as a result of the substantial and disabling accumulated effects of the numerous physical injuries sustained from their employment;

H.      as a result of the effect that accumulated blows to the brain and painful injuries to the rest of their bodies had upon the abilities of the Wrestlers to remember, to have any capacity to understand and grasp their rights;

I.      as a result of the calculated and cunning campaign of the WWE under the direction and control of its Chairman VKM to conceal from the Plaintiffs their rights to medical care, medical insurance, unemployment benefits, workers compensation benefits, the right to a safe workplace under OSHA, the right to organize a labor union to improve their working conditions, their rights to leave to recover from serious injuries sustained under the Family Medical and Leave Act;

J.      as a result of the creation of an atmosphere of fear and intimidation by the Defendants through which the Plaintiffs were coerced into asking no questions under fear of being unemployed with broken bodies and no salary to obtain medical care or support their families –where Defendant VKM caused the wrestlers that he hated dealing with attorneys and therefore would not tolerate their use of legal counsel –while at the same time employing dozens of highly skilled attorneys to protect his own interests and those of WWE.

637.   Wherefore, Plaintiffs contend that any statute of limitations defense asserted in response to any claim of this Complaint must be set aside because it would be unjust and inequitable under the facts as above alleged taken in the light

of applicable law and the fundamental mandate of this Court to do justice in every case.

638.   To allow the Defendants to assert a statute of limitations defense under circumstances where the Defendants intentionally engaged in a systematic course of wrongful behavior and deprivation of rights continuing well over twenty years and to this very day, would be to handsomely reward unconscionable conduct.

**COUNT XIII**
**MEDICAL MONITORING**
**(On Behalf of All Named Living Plaintiffs Against Defendant WWE)**

639.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

640.   The Plaintiffs experienced repetitive head injuries during their WWE careers that significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar neuro-cognitive conditions as demonstrated by the plaintiffs already diagnosed.

641.   Repetitive head trauma during WWE performances likely created microscopic injuries to the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Resulting in present physical injuries.

642. The WWE knew or should have known of dangers in exposing all WWE wrestlers to repetitive head impacts and decelerations, including the repetitive sub-concussive and concussive blows that increase the risk to WWE wrestlers of, among other latent injuries, encephalopathy.

643. The latent brain injuries from which Plaintiffs suffer require specialized testing (with resultant treatment) that is not generally given to the public at large.

644. The available monitoring regime is specific for individuals exposed to repetitive head trauma and is different from that normally recommended in the absence of exposure to this risk of harm.

645. The medical monitoring requested by plaintiffs includes, but is not limited to, baseline tests and neurological diagnostic examinations, that will assist in diagnosing the any adverse health effects associated with wrestling-related head injuries. This diagnosis will facilitate any treatment that can help prevent or mitigate the development of latent neurodegenerative disorders and diseases.

646. Each plaintiff should be given a neurological examination annually or as appropriate. The examination should be done by a board certified neurologist, neurosurgeon or doctor with experience in concussion management. The evaluation should include a full medical history of each plaintiffs head trauma/concussions; full symptoms reviewed and an assessment of conditions such as ADD, ADHD, depression, anxiety, panic attacks, sleep disorders, and seizure disorders. Such reviews involve the King-Devick test, balance

assessments, cognitive visual eye tracking with smooth pursuit and other exams. The required testing should also include blood testing of pituitary function, neuropsychological exams, and MRIs.

647. The available monitoring and testing is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis of head injuries and their potential link to, *inter alia*, memory loss, impulse rage, depression, early-onset dementia, CTE, Alzheimer-like syndromes, and similar cognitive-impairing conditions.

648. By monitoring and testing Plaintiffs, the risk that Plaintiffs will suffer long-term injuries, disease, and losses will be substantially reduced.

649. By monitoring and testing the Plaintiffs, any risk that Plaintiffs will suffer long-term injuries, disease, and losses without adequate treatment will be substantially reduced.

650. Plaintiffs, therefore, seek an injunction creating a Court-supervised, WWE-funded medical monitoring program, which will facilitate the diagnosis and adequate treatment of Plaintiffs for neurodegenerative disorders and diseases. The medical monitoring should include a trust fund to pay for the medical monitoring and treatment of Plaintiffs as frequently and appropriately as necessary.

651. Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the continued risk of developing long-term physical and economic losses due to concussions and sub-concussive injuries. Without Court-approved medical monitoring as described

herein, or established by the Court, the Plaintiffs will continue to face an unreasonable risk of continued injury and disability.

**COUNT XIV**
**MANDATORY REPORTING**
**DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201(a)**
**(On Behalf of All Named Plaintiffs Against Defendant WWE)**

652.    Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

653.    The Declaratory Judgment Act 28 U.S.C. 2201 provides that where there is a controversy within its jurisdiction "any court of the United States…may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought".

654.    The several tests for whether a declaratory judgment action is appropriate to the circumstances alleged are set forth in *Grand Trunk W.R.R. Co. v. Consol. Rail Corp.*, 746 F. 2d, 323, 326 (6th Cir.1984), and reiterated many times thereafter such as in *Western World Insurance Company v. Honey*, 733 F.3ed (6th Cir. 2014). The facts of this case as above and herein alleged, amply meet the *Grand Truck* criteria.

655.    As above alleged, the OSHA Statute, the Family Medical and Leave Act, and the Workers Compensation Statutes of the various states provide that employees shall receive certain statutory notices and that injuries and workplace conditions be reported. Those notices and the benefits which the Plaintiffs would have received but for the fraud and deception of the Defendants, were never received, but are retained by the Defendants and constitute a portion of the

211

dividends, capital appreciation on WWE stock, salary and benefits paid to VKM, his family and associates and various Trusts by WWE.

656.   The Plaintiffs respectfully request that to the extent that money may compensate, that they be put in the position that they would have had if the Defendant WWE had honored its statutory obligations, and:

> A.   that a fair and just amount be determined to provide compensatory medical benefits, retirement benefits, and salary benefits, earning capacity, cost of insurance, including interest on benefits so denied, and such consequential damage and attorney's fees as may be provided by law.

> B.   that a fund to be administered under the control of the Court be established to administer the fair and just compensation which ought to be paid to the Plaintiffs as a result of the fraud, deception and coercion of the Defendants, and their cunning scheme to sweep aside Plaintiffs statutory rights, and

> C.   To the extent allowed by law, and given the intentional and or wanton and reckless conduct of the Defendants in total disregard of their statutory obligations, that punitive damages be added to the fund and distributed to the Plaintiffs in a just proportion to their injuries through an equitable formula determined by the Court.

657.   That as a matter of justice and equity, that the reports which ought to have been made to OSHA and to the Administrator of the Family Medical and Leave Act, but were never made, be made now, and that the Plaintiffs be furnished with copies.

**COUNT XV**
**AN ACCOUNTING AND DISGORGEMENT**
**OF UNJUST AND ILLEGAL PROFITS**
**(On Behalf of All Named Plaintiffs Against Defendants WWE and VKM)**

658.   Plaintiffs incorporate by reference the preceding paragraphs set forth above as though fully set forth herein, including all referenced Exhibits.

659.   Given that the unconscionable boilerplate booking contracts ought to be declared void ab initio for the reasons alleged above, the "royalty" provisions of those contracts are also null and void, and were procured by the same fraud, duress, and improper conduct which permeated the entire "Booking Contract" scheme.

660.   Under such circumstances the Plaintiff-wrestlers have equal rights with the WWE to the money earned from their images and performances, and the use of their persona to generate income.

661.   Under such circumstances, the Plaintiffs have equal rights to the ownership of their own intellectual property consisting of their performances, images, and all paraphernalia and promotions using their images, likenesses and persona rights to which were unjustly taken from them through the fraudulent imposition upon them of the unconscionable boilerplate Booking Contracts.

662.   As alleged, instead of being paid equally and equitably in accordance with their rights to their own images and taped performances, the fraudulently procured unconscionable contracts have been utilized to deprive the Plaintiffs of their just portion of earnings derived from the unlawful use of their images and performances by the WWE under the direction and control of its Chairman and controlling shareholder Vincent K. McMahon.

663.   The Plaintiffs therefore have equal copyright interests in their intellectual property with the WWE and are entitled to a full and accurate accounting of money earned and a full and equitable share of the profits earned, which thus far have been illegally converted and retained by the WWE.

664.    The Plaintiffs after the provision of a proper accounting are entitled to their fair share (50%) of the profits earned, together with interest and the costs of this action due to the wrongful withholding by the Defendant WWE, which has been ongoing over the last two decades, and continues until this day, and indeed increases with every wrongful and unfair distribution made by the WWE.

665.    The profits after accounting, should be disgorged by the WWE and Vincent K. McMahon, the originator of the scheme, to the Plaintiffs, together with interest and costs, and as a matter of justice and equity, the Court should appoint a receiver to take charge of the proceeds and content of the WWE media library and make equitable distributions therefrom to the Plaintiffs.

**COUNT XVI**
**UNJUST ENRICHMENT**
**(On Behalf of All Plaintiffs Against Defendants WWE and VKM)**

666.    Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth herein.

667.    Defendants have willfully and consciously engaged in a massive and profitable scheme, pattern and/or practice of misrepresenting Plaintiffs' employment, fraudulently concealing and omitting the long-term injuries the Plaintiffs suffered, and failing to uphold their duty to provide Plaintiffs with necessary care and treatment, expressly designed to enrich Defendants at the expense of Plaintiffs.

668.    The Defendants have obtained substantial benefit as a direct result of their fraudulent misrepresentation, concealment, and omission, which in equity and good conscience they should not be able to keep.

**214**

669.   WWE has made significant investments in the facilities used by the worker in performing services. Such investments do not need to be capital investments in permanent fixtures, but can also be by way of leasing the facility in which the performance is to take place. Given that wrestlers often performed 200-250 days a year, the WWE makes considerable investment in providing the "arena" for the performance, and further pays other employees to participate in making up the story lines and "gimmicks" of the wrestlers. Additionally, there are numerous production employees paid by WWE to set up the rings, provide various props to be used in the performance (such as the guitars mentioned above), to control the lighting, and provide security and the other numerous accouterments of a mass entertainment production. The wrestlers task is to appear at the time and place designated, perform according to a script with a predetermined outcome with the designated persona in a ring erected by the WWE or its agents and in an arena leased by the WWE or its agents. These factors weigh heavily in favor of a classification as "employee."

## VI.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs and Plaintiffs' Spouses pray for judgment as follows:

A.   Declaratory relief requested pursuant to 28 USC § 2201 against the WWE;

B.   Granting an injunction and/or other equitable relief against the WWE and in favor of Plaintiffs for the requested medical monitoring;

C.   With respect to Count V, Violation of ERISA:

1. An order reforming the Defendants ERISA Plans to include Plaintiffs, and requiring Defendants to pay restitution or otherwise credit Plaintiffs for all ERISA benefits to which they are retroactively entitled;

2. An order of restitution for the reasonable value of the benefits Plaintiffs are entitled to prevent Defendants' unjust enrichment;

3. An injunction barring Defendants from continuing to misclassify wrestlers as "independent contractors" and to classify them as "employees;"

4. An award of attorneys' fees, plus the costs and expenses of this action;

5. Pre-and post-judgment interest, as afforded by law;

6. Any other relief in equity as may be justified by the proof;

D. Granting Plaintiffs and Plaintiffs' Spouses an award of compensatory and punitive damages against the WWE Defendants;

E. With respect to all counts, awarding Plaintiffs and Plaintiffs' Spouses such other and further relief as may be appropriate; and

F. Granting an award to all Plaintiffs and Plaintiffs' Spouses of prejudgment interest, costs and attorneys' fees.

G. Granting multiple damages and attorney's fees under those Counts where applicable statutes permit the same.

H.    Disgorgement of all proceeds flowing from Defendants' unjust and unlawful fraudulent pattern and practice of misrepresenting, concealing, and omitting necessary information from Plaintiffs.

I.    For such other relief, the assessment of economic and consequential damages, damages for pain and suffering, damages for enjoyment of life, damages provided by statute;

J.    For such other relief as may be requested throughout the Complaint, or as may be provided under any theory of law, which may be applicable to the facts as they are alleged or as they may be proven at trial (whether designated to a particular Count or not), including all other relief as may be just and proper.

## VII.   JURY DEMANDED

Plaintiffs hereby demand a trial by jury on all matters so triable.

Signed this 3rd day of November, 2017.

Respectfully Submitted,

/s/ Konstantine W. Kyros
Konstantine W. Kyros, Esq.
Bar no. ct30132
KYROS LAW OFFICES
17 Miles Road
Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com
S. James Boumil, Esq.
BOUMIL LAW OFFICES
120 Fairmount Street
Lowell, Massachusetts 01852
Telephone: (978) 458-0507
SJBoumil@Boumil-Law.com

Anthony M. Norris, Esq.

217

KYROS LAW OFFICES
17 Miles Road
Hingham, Massachusetts 02043
Telephone: (603) 995-1792
Facsimile: (617) 583-1905
anorris@kyroslaw.com

Erica C. Mirabella, Esq.
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, Massachusetts 02116
Telephone: (617) 580-8270
Facsimile: (617) 583-1905
erica@mirabellaLLC.com

R. Christopher Gilreath, Esq.
GILREATH & ASSOCIATES
200 Jefferson Avenue, Suite 711
Memphis, Tennessee 38103
Telephone: (901) 527-0511
Facsimile: (901) 527-0514
chrisgil@sidgilreath.com

Brenden P. Leyden, Esq.
TOOHER WOCL & LEYDON LLC
80 4th Street
Stamford, Connecticut 06905
Telephone: (203) 517-0456
Facsimile: 203-324-1407
BLeydon@tooherwocl.com

*Counsel for Plaintiffs.*

## **CERTIFICATE OF SERVICE**

     **I hereby certify that on this 3rd day of November, 2017, a copy of the foregoing Second Amended Complaint was served via this Court's electronic case filing system.**

                                   */s/ Konstantine W. Kyros*
                                   **Konstantine W. Kyros**