# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **RUSS MCCULLOUGH, RYAN SAKODA, and MATTHEW ROBERT WIESE,** <br> **individually and on behalf of all others similarly situated,** | : <br> : <br> : <br> : <br> : <br> : | |
| **Plaintiffs,** | : <br> : | **CIVIL ACTION NO. 3:15-cv-001074 (VLB) Lead Case** |
| **v.** | : <br> : | |
| **WORLD WRESTLING ENTERTAINMENT, INC.,** | : <br> : <br> : | |
| **Defendant.** | : | |
| **JOSEPH M. LAURINAITIS, _et al.,_** | : <br> : | |
| **Plaintiffs,** | : <br> : | |
| **v.** | : <br> : | **CIVIL ACTION NO. 3:16-CV-01209 (VLB) Consolidated Case** |
| **WORLD WRESTLING ENTERTAINMENT, INC. _et al.,_** | : <br> : | |
| **Defendants.** | : <br> : | |

## PLAINTIFFS' OPPOSITION, REQUEST FOR CLARIFICATION, AND REQUEST FOR EXTENSION OF TIME RELATING TO DEFENDANTS' RESPONSE TO PLAINTIFFS' SECOND AMENDED COMPLAINT AND MOTION FOR GUIDANCE

Plaintiffs humbly request clarification on how the Court interprets Defendants' Response to Plaintiffs' Second Amended Complaint and Motion for Guidance, Dkt. No. 365 ("Response") and whether Plaintiffs should treat the Response as a Motion to Dismiss under Fed. R. Civ. P. 12. If so, Plaintiffs request a thirty-day extension of time to respond to Defendants' Response and the Defendants' requested relief be denied.

## TABLE OF CONTENTS

I. PROCEDURAL HISTORY ..................................................................... 1

II. SUMMARY OF PLAINTIFFS' CLAIMS ............................................... 2

  A. Plaintiffs' Causes of Action Relate to Each Plaintiff As Alleged In the SAC. 2

  B. WWE Knowingly Created An Unsafe Workplace Devoid of Health and Safety Standards. ................................................................................ 3

    1. WWE's Unsafe Work Environment. ............................................. 3

    2. WWE's Refusal to Provide State and Federal Statutory Protections. ...... 4

    3. WWE Misclassified The Plaintiffs. ............................................. 4

  C. WWE's Long-Existing and Ongoing Failure to Protect Its Performers' Health and Safety. .................................................................................. 5

    1. WWE's Knowledge of Concussion Science ................................ 5

    2. WWE's Developing Understanding of the Inherent Risks in WWE Performances. .......................................................................... 7

  D. WWE's Duty to the Plaintiffs ...................................................... 7

    1. Duty Owed During Plaintiffs' WWE Careers. ............................. 7

    2. Ongoing Duty Owed to Plaintiffs After Their WWE Careers. ....... 8

III. LEGAL STANDARD ......................................................................... 10

IV. ARGUMENT ................................................................................... 12

  A. Defendants' Response Inadequately Meets the Fed. R. Civ. P. 12(a)(1) Standard. ............................................................................... 12

  B. Defendants' Response Fails as a Motion to Dismiss. ..................... 12

    1. Plaintiffs' Fraudulent Non-Disclosure Causes of Action. .......... 12

    2. Plaintiffs' Fraud Causes of Action. .......................................... 16

    3. Plaintiffs' Misclassification Causes of Action. .......................... 18

    4. Plaintiffs' Wrongful Death Causes of Action. ........................... 19

    5. Defendants' Continued Misinterpretation of Plaintiffs' Requested Remedy for Medical Monitoring. ......................................................... 20

  C. Defendants Should Not Be Granted Another Opportunity to Allege Further Defenses. .......................................................................... 22

V. CONCLUSION .................................................................................. 24

I.      **PROCEDURAL HISTORY**

On September 29, 2017, the Court issued an Order Regarding WWE's Motion for Judgment on the Pleadings [Dkt. No. 205] and WWE and Vincent K. McMahon's Motions to Dismiss and for Sanctions [Dkt. No. 262, 266, 269], Dkt. No. 362 ("9.29 Order").  The Court withheld judgment on Defendants' Motions pending an opportunity for Plaintiffs to file revised pleadings in the *Windham* and *Laurinaitis* actions. *See* 9.29 Order.  Additionally, the Court instructed Plaintiffs to provide the Court *in camera* with Affidavits for each Plaintiff in both actions detailing the Plaintiffs' specific factual claims against the Defendants. *Id.*, at 20.

The Plaintiffs complied with the Court's directives and on November 3, 2017, the wrestlers filed a revised Answer in the *Windham* action, Dkt. No. 364 and a Second Amended Complaint in *Laurinaitis*, Dkt. No. 363 ("SAC").  Plaintiffs delivered to the Court Affidavits for each Plaintiff in both actions that same day.[1] In these documents, Plaintiffs detailed the overwhelming factual evidence demonstrating WWE's fraudulent nondisclosure of the dangers of repetitive head trauma and concussions that are suffered in WWE performances.  Plaintiffs further detailed WWE's schemes led by VKM as Chairperson of WWE to defraud Plaintiffs of their rightfully earned profits.

On November 17, 2017, the Defendants filed a strange Response to Plaintiffs' pleadings both requesting guidance on what actions they should take in opposing Plaintiffs' claims and seemingly seeking dismissal under Fed. R. Civ. P. 12(b)(6). *See* Response, at 16.  Guised as a procedural Motion for Clarification, the Response

---

[1] WWE's defenses regarding Plaintiffs' Affidavits are nothing more than idle speculation and not based in fact or law.

makes substantive defense arguments under Fed. R. Civ. P. 12(a)(1) but fails to qualify as either an Answer or a Motion to Dismiss. Therefore, the Plaintiffs request clarification from the Court as to whether the Court considers the Defendants' Response as their Motion to Dismiss and, if so, Plaintiff requests an extension of thirty days to respond to the Defendants' Response.  If the Court considers the Response insufficient under Fed. R. Civ. P. 12(a)(1), then Plaintiffs request the opportunity to pursue default.

## II.    SUMMARY OF PLAINTIFFS' CLAIMS

### A. Plaintiffs' Causes of Action Relate to Each Plaintiff As Alleged In the SAC.

Plaintiffs' causes of action stem from a common failure by WWE to protect their health and safety during employment. *See* SAC, §§ I. and III.A. WWE's workplace culture and environment is common to each Plaintiff and WWE's failure to provide information on the link between repetitive head trauma sustained in this hazardous environment and the long-term injuries that would result from them are common to each Plaintiff. *Id.* Included in this is the common scheme to execute unconscionable contracts and fraudulently mischaracterize them as independent contractors. *Id.*, Counts II and III. Each Plaintiff has had individual experiences within this environment which Plaintiffs have alleged in the SAC. *Id.*, § III.B and Individual Affidavits, provided *in camera*.  Plaintiffs have properly complied with the Court's directives and Rules 8 and 9.

However, WWE cannot on one hand assert repetitiveness as a defense and then assert that Plaintiffs failed to allege claims individually for each Plaintiff.[2]

---

[2] Additionally, WWE's odd assertion that Plaintiffs' organizing the SAC's paragraphs by reference reduces its clarity is unfounded. To require a Complaint of this complexity to be organized by

Particularly where such allegations would become burdensomely repetitive given the commonality of the claims. It is for judicial economy and ease of litigation that Plaintiffs have brought *Laurinaitis* as one action given Plaintiffs' substantially similar claims that pass pleading standards when combined. Should the Court request Plaintiffs sever their claims into individual cases, then Plaintiffs are prepared to do so under Court directive.

### B. WWE Knowingly Created An Unsafe Workplace Devoid of Health and Safety Standards.

#### 1. WWE's Unsafe Work Environment.

During each of the Plaintiffs' WWE careers, WWE created rings that it has acknowledged were unsafe because they were too hard and unforgiving for WWE's brutal performances. *See, e.g.*, SAC, ¶ 61.iv.  The moves that were performed, including the most widely used maneuver, the body slam, required the Plaintiffs to land unsafely hard on these surfaces, including the rings, concrete floors, and tables causing injuries. *See* Plaintiffs' individual sections, SAC, § III.B, *particularly* ¶¶ 62.iv;  67.iii; and 82.iv, just as a couple of the numerous pled examples.  These moves were inherently dangerous, but when performed on unsafe ground, the risks and injuries attributable to them increased. Each Plaintiff performed on these unsafe rings and in this hazardous workplace. *Id.*, § III.B.

The Plaintiffs each allege that they had to perform these moves in these WWE-created stages on an alarmingly physically and emotionally taxing schedule.

---

accretion would reduce clarity not enhance it, and further, there is no Rule or precedent that prevents "incorporation by reference" as Plaintiffs have done. In fact, the opposite. Fed. R. Civ. P. 10(c).

*Id.* WWE required the Plaintiffs to engage in often daily performances and travel non-stop to fulfill their contracts. *Id.*; and ¶ 565.

WWE did not provide the means for on-site medical personnel to protect the Plaintiffs because WWE did not establish policies or protocols to understand, notice, and diagnose injuries during matches or any meaningful protocol available to the performers to end matches due to injury. *Id.* at ¶¶ 240; 245; and 307. On-site medical personnel were limited in their ability to treat the Plaintiffs due to WWE's overwhelming control over the Plaintiffs, requiring the Plaintiffs to continue performing despite injury and intentionally depriving them of proper medical care. *See, e.g.* SAC, § III.B and Plaintiffs' Affidavits.

### 2. *WWE's Refusal to Provide State and Federal Statutory Protections.*

None of the required OSHA, FMLA, or NLRA Notices were present during the Plaintiffs' WWE careers. *See* SAC, ¶¶ 153; 260; and Counts II, III, IV, V, and VII. The Plaintiffs were not aware of the protections available to them under State and federal regulations and could not avail themselves of these laws. *Id.* As a result, the Plaintiffs performed injured, performed an unhealthy number of days per year, received inadequate rest and recovery when injured, and were subjected to extremely dangerous work environments. *Id.*, *e.g.*, ¶ 374.

### 3. *WWE Misclassified The Plaintiffs.*

Knowing that WWE facilitated a very dangerous workplace and provided inadequate State and federal protections, the Defendants misclassified the Plaintiffs as independent contractors to prevent them from understanding their rights and thus ensuring ongoing corporate profits. *See* SAC, Count II; and ¶¶ 9,

4

418, 468; and 667.  The Plaintiffs were employees under the tests provided in the SAC and the Defendants knew that it exerted disproportional control over the Plaintiffs such that its performers could not be considered independent contractors. SAC, Count II; and ¶ 337.   Nevertheless, WWE insisted on misclassifying its performers. *Id.*

### C.  WWE's Long-Existing and Ongoing Failure to Protect Its Performers' Health and Safety.

#### 1.  *WWE's Knowledge of Concussion Science.*

WWE cannot disavow the decades of knowledge at its disposal by blindly castigating the science itself as undetermined.  Plaintiffs demonstrated that the science at WWE's formation in 1963 accepted punch-drunk syndrome and dementia pugilistica as a side-effect of repeated head trauma in professional sports. *See, broadly*, SAC, § IV.C.  By the 1980s, professional sports science had developed further and accepted that concussions were so deadly and so severe that specific protocols needed to be in place to ensure proper rest and recovery. *Id.*, at ¶¶ 192; 203; 566.  By 1995, when WWE created a detailed narrative where its own physician acknowledged the existence of concussions and sub-concussive blows in WWE performances and the severe risks attributable to these injuries, sports science had recognized that repetitive head trauma required athletic organizations to undertake steps to prevent its employees from suffering repeated concussions and sub-concussive blows. *Id.*, ¶¶ 205-215; 221; 245.   VKM himself acknowledged the risks during a speech in this 1995 storyline.[3] *Id.*, ¶ 208.  WWE of

---

[3] Yet in his deposition he claimed to have never heard of CTE or the risks attributable to concussions and sub-concussive blows until 2007. *Singleton Lograsso*, Deposition of VKM, p. 22

course continued to develop a deeper understanding of the concussion science as it engaged in other sports, including hosting professional boxing matches and founding a professional football league. *See* SAC, ¶¶ 199-202.

The Defendants' reliance on the limited discovery allowed in *Singleton Lograsso* cannot be dispositive on the issue of whether WWE had knowledge prior to 2005 because the limited discovery prevented Plaintiffs' from uncovering any information prior to 2005 despite the Plaintiffs' repeated attempts to conclusively establish WWE's knowledge with hard evidence. *See, e.g.* Deposition of Paul Levesque, p. 53 (Q: "All right. What year did you require doctors to be present at live events, WWE?" [Interjection by ]Attorney Krasik: "Again, only answer for 2005 forward." A: "Yeah. At – at 2005, doctors were required to be at the events.")[4] Additionally, this Court noted that "the *Laurinaitis* complaint appears to assert that WWE knew before 2005 of the risks of repeated head trauma….". *See* 9.29 Order, at 18.  WWE's continued assertions that its lack of knowledge has been established is patently false and furthers Plaintiffs' articulated requests to conduct discovery in this matter in order to prove once and for all that WWE had this knowledge and chose to not disclose it to the Plaintiffs. SAC, ¶¶ 50; 452; 475; 498; and 507.

---

(noting that the first time he had heard the term CTE was at a 2007 news conference). *See also*, SAC, ¶ 209.

[4] This continued in regards to the 1995 storyline with Dr. Unger: "MR: KRASIK: Counsel, we just wasted five minutes watching footage from a WWE show from years prior to 2005….. This witness is not answering questions about a WWE program that occurred years prior to 2005". *Id.*, at 190. This refusal was despite the direct relevancy to WWE's knowledge of concussion science in 1995, its knowledge of the existence of head trauma in WWE performances, and its knowledge of the policies and protocols that should be in place to prevent long-term harm.

6

### 2. *WWE's Developing Understanding of the Inherent Risks in WWE Performances.*

WWE's knowledge of concussion science is not limited to the Plaintiffs' dates of employment. It continues to learn new information about the dangerous effects of its performances through both published studies on the subject and diagnoses of its former performers.  The ongoing studies include the 2015 and 2017 studies and provide WWE with more conclusive evidence that the Plaintiffs suffered severe injuries while performing for WWE. SAC, ¶¶ 292; 293; 580. The diagnoses of Chris Benoit and each of the deceased professional wrestlers with CTE and neurological injuries provide telling proof of what deadly consequences can result from performing in WWE. SAC, ¶¶ 85; 86; and 301.

### D. WWE's Duty to the Plaintiffs.

### 1. *Duty Owed During Plaintiffs' WWE Careers.*

Plaintiffs detailed in length both through their Affidavits provided to the Court and the SAC WWE's overwhelming control over the Plaintiffs' lives. SAC, § III.B; and ¶¶ 129-30; 145; 330-340.  WWE was and is the leader in professional wrestling and this monopoly created a disproportionate relationship between the Plaintiffs and the Defendants. SAC, ¶ 565.  WWE's revenue, organizational structure, and function within the wrestling community all necessitated strict adherence to WWE's requirements as employer. *Id.,* ¶¶ 330; 362; 601.  This in turn created Plaintiffs' complete reliance on WWE's protections and benevolence. SAC, §§ III.B; and IV.E, ¶¶ 260-268.

WWE did not provide health insurance to its performers but did provide on-site medical personnel. SAC, ¶ 266. Plaintiffs did not have the means to seek

medical treatment or advice elsewhere and so relied on WWE's employees to notice and treat their injuries. SAC, ¶¶ 11; 379. As a result, WWE cannot hide behind the defense that Plaintiffs could have uncovered this information elsewhere as WWE directly prevented them from doing so by not providing health insurance, not providing protections under OSHA, FMLA, and the NLRA, and not implementing sufficient policies and protocols to inform, notice, and treat concussions and repetitive head trauma.  The Plaintiffs relied on WWE during their careers to be protected and to be treated for all in-ring injuries.[5] *Id.*; ¶¶ 265-66.  WWE knowingly failed to treat neurological injuries and as a result knowingly prevented the Plaintiffs from learning about these injuries. *Id.*, at 323; and 592.

### 2. Ongoing Duty Owed to Plaintiffs After Their WWE Careers.

After retiring from WWE with no knowledge of their latent injuries, the Plaintiffs maintained an ongoing relationship with WWE and VKM through royalty payments, communications, WWE-hosted events, signings, and even substance dependency treatment. *See* SAC, § IV.E.c. WWE also honored some of the Plaintiffs with WWE Hall of Fame status. SAC, ¶¶ 43, 51, 52, 53, 55, 97, 102; 272; 569. The Plaintiffs allege that WWE maintained a dominating position within the retired wrestler community and kept track of its former performers through phone calls, mailings, even seeking new contracts with them. *See* SAC, § III.B.  Some Plaintiffs even allege seeking medical care and treatment from WWE which was ultimately refused and were intentionally deprived of proper medical care. *Id.*

---

[5] WWE's position within the industry afforded it "expert" status on professional wrestling.  This included injuries. Plaintiffs' relied on WWE's knowledge of the industry and knowledge of the inherent risks performing for WWE could entail.

When WWE established its concussion management program in 2008, WWE was aware of many of the Plaintiffs' noticeable degenerative injuries yet has asserted a complete lack of knowledge in its pleadings.[6]  Despite this knowledge, its concussion management program notably failed to provide any management or notice for former performers such as the Plaintiffs. SAC, ¶¶ 185-190; 270-72.  In so doing, the Defendants acknowledge that Plaintiffs likely suffered long-term neurological injuries because WWE took no affirmative steps to protect them during their careers of which it now deems necessary, but at the same time provides no notice or treatment for these injuries to its former performers, including the Plaintiffs, and that such injuries would continue to worsen over time.[7]

The Defendants muddy the distinction between the initial duty to protect the Plaintiffs' health and safety during their WWE careers and the ongoing duty to remedy WWE's failure to do so.  As the SAC establishes, WWE had both an initial duty which it failed to adequately uphold and an ongoing duty to notify its former performers that were injured from WWE's hazardous workplace and suffer from progressive and ongoing injuries. SAC, ¶¶ 43; 260; 296-97; 342; 568-69.

WWE cannot continue to claim ignorance of this fact as it seems want to do as concussion science has continued to develop and continued to provide WWE with notice of the Plaintiffs' injuries.  The Defendants continue to owe Plaintiffs a duty to help them with their injuries because WWE caused these injuries from its

---

[6] The above referenced studies continue to bolster WWE's knowledge of the existence of latent, long-term injuries within its performances. SAC, ¶ 292-94.
[7] That being said, the substance dependency treatment mailers that provide WWE-funded treatment for alcohol and substance dependency in former performers seemingly provides treatment for a known condition of head trauma but utterly fails to recognize the root cause of such affliction. *See* SAC, ¶ 170.

failure to protect them during their careers. SAC, Count XIII.  Each published study triggers an obligation to notice the Plaintiffs of their injuries, and each time WWE becomes aware of a Plaintiff's degenerating injuries, it has an obligation to notice and treat those injuries.

## III.    LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 12(a)(1), the Defendants had until November 24, 2017, 21 days after Plaintiffs' filings, to respond to Plaintiffs' SAC. Fed. R. Civ. P. 12(a)(1). A Motion to Dismiss is not a responsive pleading under Fed. R. Civ. P. 12(a)(1). *Picking v. Penn.*, 5 FRD 280 (D. Pa. 1946).  However, where a motion under Rule 12 asserts a failure to state a claim defense, then the Rule 12 time requirement stops running. 189 F. Supp. 714 (1960).

"On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in plaintiffs' favor". *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *8 (S.D.N.Y. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)).  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible… [But, t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6)

motion." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013). "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson New, L.L.C.*, 680 F.3d at 189; *Hishon v. King & Spaulding*, 467 U.S. 69, 73 (1984); *Cooper v. Parsky*, 140 F.3d 433, 440 (2nd Cir. 1998) (dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A Rule 12(b)(6) motion is not the forum for fact-finding, fact disputes, or aspersions against Counsel, but instead the Court must accept the allegations in the Complaint as true. *See In re Nat. Hockey League Players' Concussion Injury Litig.*, 2015 WL 1334027, at *6 (D. Minn., March 25, 2015) (accepting as true NHL hockey player allegations that they suffered "'an increased risk of developing serious latent neurodegenerative disorders and diseases including but not limited to CTE, dementia, Alzheimer's disease or similar cognitive-impairing conditions'" and that "'CTE is caused by repeated sublethal brain trauma of the sort Plaintiffs repeatedly suffered'" and denying motion to dismiss fraud claims based on the NHL's alleged knowledge and concealment of the same). The issue on a motion to dismiss is not whether the Plaintiffs will prevail, but whether the Plaintiffs are entitled to offer evidence to support their claims. *United States v. Yale New Haven*

*Hospital*, 727 F.Supp. 784, 786 (D. Conn. 1990) (citing *Scheuer*, 416 U.S. at 232). In its review of a motion to dismiss the Court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken". *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2nd Cir. 1993).

## IV.    ARGUMENT

### A. Defendants' Response Inadequately Meets the Fed. R. Civ. P. 12(a)(1) Standard.

Defendants' Response is neither an adequate responsive pleading under Rule 12(a)(1) nor a Motion to Dismiss under Rule 12(b).  The Response is closest to a Motion to Dismiss in form because it seeks the dismissal of Plaintiffs' claims but provides no case law or evidence supporting its views other than generalized allegations and blanket defenses that are insufficient to meet Rule 12 muster.  Rule 12(b) requires every defense to a claim for relief be asserted in the responsive pleading and not withheld for successive motions. *See Graske v. Johnson*, 97 F. Supp. 678 (SDNY 1951) (noting that successive motions are no longer permitted and all defenses which a party seeks to raise by way of motion must be consolidated into one).  Here, the Defendants spend the majority of the motion regurgitating the Court's 9.29 Order and fail to meaningfully respond to Plaintiffs' SAC. Therefore, Plaintiffs request this Court find that Defendants' Response inadequately met Rule 12(a)(1) responsive pleading requirements.

### B. Defendants' Response Fails as a Motion to Dismiss.

#### 1. *Plaintiffs' Fraudulent Non-Disclosure Causes of Action.*

Regarding Plaintiffs' fraudulent nondisclosure causes of action, Defendants merely claim that:

> Plaintiffs' counsel in this case have continued to assert a legally basis fraudulent nondisclosure claim in the SAC on behalf of Plaintiffs who last performed for WWE before 2005 despite the absence of any evidence that WWE had actual knowledge of a reported link between wrestling and long-term degenerative neurological conditions before September 2007.

Response, p. 11.

As such, they seemingly rely on the lack of discovery prior to 2005 conducted in the *Singleton Lograsso* case regarding WWE's knowledge of repetitive head trauma in its performances and the long-term injuries the Plaintiffs now suffer from.  At this stage of litigation and regarding the *Laurinaitis* Plaintiffs' unique claims, the Defendants cannot rely on the limited discovery in *Singleton Lograsso* to rebut these Plaintiffs' claims. No discovery has been undertaken and Plaintiffs have unequivocally alleged direct knowledge prior to 2005 by providing the Court with uncontroverted evidence that both WWE and VKM knew during the Plaintiffs' careers of this link but failed to take any steps to protect the Plaintiffs or inform them of the associated risks.[8] SAC, ¶¶ 161; 183; 232; and § III.B.

WWE had a duty to fully and fairly disclose the dangerous link between its performances and long-term neurological injuries that it was aware of at the time. *Macellaio v. Newington Police Dep't*, 75 A.3d 78, 85 (Conn. App. 2013).  WWE's knowledge has been developing over the years, but it failed from the outset to take even the most baseline knowledge of professional sports head injuries it had at its

---

[8] Particularly the Dr. Unger storyline that constitutes an admission of fact. WWE's assertions that it is a false storyline may be a defense, but it also constitutes an admission that it continues to conceal the viability of the existence of these injuries in WWE performances.

disposal and implement it into adequate policies and protocols that would protect its performers.[9] *Id.*; and SAC, ¶ 371 (noting "[i]njuries were suppressed, not reported").  Nor did WWE provide even the most basic of information regarding head injuries to the Plaintiffs. *Alpha Portland Cement Co. v. Curzi*, 211 F. Supp. 580, 584 (2d. Cir. 1914) ("It cannot be said that he assumed a risk the danger of which was unexplained to him although it was known to his employer and was in fact due to that employer's own failure to take proper precautions not to expose his servant to a needless and unnecessary risk").

The Plaintiffs did rely on WWE's knowledge during their employment and would have acted differently had WWE provided this information to them. SAC, ¶¶ 323. WWE knew that the Plaintiffs lacked sufficient means and opportunity to learn this information on their own and intentionally withheld it to protect their profits. *Id.*, § IV.A. The Defendants knew that the specific moves and maneuvers it choreographed caused the Plaintiffs' harm and knew that it created an unsafe workplace. *Id.*, ¶¶ 225-227. Yet, each Plaintiff retired ignorant of the long-term injuries that they would suffer from for the rest of their lives.

WWE had an ongoing duty to inform the Plaintiffs of their workplace injuries, but failed to do so. *See Giulietti v. Giulietti*, 784 A.2d 905, 925 (Conn. App. 2001) (noting a continuing duty has been found where "there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or

---

[9] WWE does not need "actual knowledge" as the Defendants' contend, but only that it knew or upon reasonable inquiry should have known. The overwhelming body of medical literature detailing the effects of cumulative sub-concussive injuries were both overwhelming and adverse to WEW. This literature, coupled with the clear demonstrations of symptoms by the Plaintiffs, are enough indications that the Defendants were aware of the injuries Plaintiffs suffered during WWE performances.

some later wrongful conduct of a defendant related to the prior act").  Every time the Defendants received more conclusive evidence of the Plaintiffs' injuries that continued to solidify the fact that purely by performing in WWE performances the Plaintiffs' had received repetitive head trauma, the Defendants had an obligation to inform the Plaintiffs' of their injuries. *Id.*  The alleged studies in Plaintiffs' SAC that have been published recently affirm more than ever the injuries actually suffered and the Defendants' obligations to remedy those injuries.[10]  Sadly, the diagnoses of the deceased Plaintiffs with CTE and other neurological diseases provide the most solid evidence of the consequences of performing for WWE. *See* SAC, Count IX.

WWE is not entitled to make up its own facts. Science has long since established the link between repetitive head trauma and long-term neurological injuries. WWE knew that the Plaintiffs suffered head trauma repeatedly during its performances.  Yet it continues to brazenly deny these simple facts because of the effects it will have on its profits. Even Vince McMahon, Sr. acknowledged the risk of concussions in the 1970s, yet WWE now disavows all such facts. *See* SAC, ¶ 69. WWE's continuing refusal to uphold its duty is an affirmative and continuing act of

---

[10] Courts have held companies responsible for creating dangerous products or conditions that were not known at the time but upon discovery were responsible for remedying those injuries with a duty to warn. *See Flek v. GM LLC (In re GM LLC Ignition Switch Litig.)*, 202 F. Supp. 3d 362 (SDNY 2016) (holding that New York follows the "influential Restatement (Third) of Torts" by adopting a post-sale duty to warn); *see also* Restatement Third of Torts, Prod. Liab. § 11(a)(1) (holding that a business must provide a warning post-sale if the business knew or "reasonably should know that the product poses a substantial risk of harm to persons or property" and "those to whom a warning might be provided can be identified and can reasonably be assumed to be unaware of the risk of harm" and "a warning can be effectively communicated to and acted on by those to whom a warning might be provided" and "the risk of harm is sufficiently great to justify the burden of providing a warning"); *see also Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741 (Kan. 1993) (finding that a post-sale duty to warn should be determined on a case-by-case basis and should consider the ability of the manufacturer to locate its purchasers). Each new study or diagnosis of a Plaintiff is a trigger for WWE's ongoing duty to take corrective action and yet WWE continues to fail to act.

misconduct and WWE should be held accountable for the Plaintiffs' very real and life-altering degenerative injuries. *Sherwood v. Danbury Hosp.*, 746 A.2d 730, 738 (Conn. 2000).  The ongoing concealment and omissions are fraudulent conduct and the Defendants should not be permitted to conceal their fraud as *fraus est celare fraudem* makes clear.

### 2. Plaintiffs' Fraud Causes of Action.

Defendants allege that Plaintiffs' Fraud causes of action are legally baseless because the Plaintiffs failed to plead "with the requisite particularity any knowingly false statement of fact made by anyone at WWE to any Plaintiff, much less to each of the 60 Plaintiffs named in SAC". Response, at 11.  However, Plaintiffs have alleged with particularity that the Defendants defrauded Plaintiffs from understanding the link between repetitive head trauma sustained in WWE performances and the long-term injuries they now suffer from. *See* SAC, *generally*, and Counts VII and VIII.

Defendants continue to rely on a claimed lack of affirmative statements pled by the Plaintiffs, but fail to defend against Plaintiffs' allegations that Defendants defrauded the Plaintiffs by creating a dangerous workplace and cultivating reliance on their in-house medical treatment while at the same time <u>never</u> providing any care or treatment for neurological injuries or any information on repetitive head trauma in WWE performances. The Defendants, despite decades of knowledge, never provided any information to the Plaintiffs that would have saved the Plaintiffs from the injuries they now suffer from. SAC, § III.B; and ¶¶ 597; 636.

16

The Plaintiffs alleged that the Defendants held informational meetings where moves and maneuvers were discussed, narratives and storylines developed, and parameters established for how to engage in each performance. SAC, §III.B; and ¶¶ 248; 258; 565. Itineraries were provided by the Defendants and no regard was given to necessary rest and recovery for head injuries. Plaintiffs acknowledge broken bones were given attention over head trauma.[11] *Id.*, § III.B., *e.g.* ¶ 51; and ¶ 564. This lack of information despite constant interaction before, during, and after performances indicate ongoing, specific examples that WWE was aware of Plaintiff-specific injuries from WWE performances but defrauded the Plaintiffs by not providing the necessary health information to them.

Plaintiffs do allege that employees of WWE, including VKM, constantly advised the Plaintiffs to wrestle while injured. SAC, ¶¶ 87, 621. The Plaintiffs relied on these statements and changed their position to their detriment. Such allegations coincided with the WWE's representations through the unconscionable contracts that misclassified the Plaintiffs as independent contractors and indicated no Workers' Compensation, FMLA, or NLRA benefits applied and OSHA protections were not available to them. *Id.*, ¶ 153.

Further, Plaintiffs meticulously outlined allegations of multi-state activity relevant to the RICO requirement of effect upon interstate commerce. *See, generally,* SAC, Count VII. The statement of revenues goes with this allegation and

---

[11] Ironically, Defendants downplay the magnitude of concussions in its Response, noting that "mere concussions" should be distinguished from the resulting potential disease. Response, at 6. Plaintiffs allege that a concussion is a short-term injury, though very dangerous, and by not properly treating the injury, severe long-term effects can result. Plaintiffs allege that Defendants downplayed single concussions and sub-concussive blows, and failed to address any head trauma that has now resulted in the Plaintiffs suffering from those diseases that Defendants at least seem to accept the gravity of such diagnoses. *See, e.g.,* SAC, ¶ 227.

17

furthers Plaintiffs' pled particularity.   WWE committed fraud by coercing the Plaintiffs into signing unconscionable contracts in violation of numerous public policies and State and federal statutes that deprived the Plaintiffs of money and property. *Id.*, ¶ 599. The Defendants used the mails and wires of the United States as an integral part of carrying out their schemes.  *Id.*, ¶ 474.

Such schemes were supported by an atmosphere of coercion and intimidation that made continued employment dependent upon strict adherence to VKM's dictates, including wrestling while injured and being lied to under VKM's supervision about the consequences of those injuries. *Id.*, ¶ 567.   This also included hiring Dr. Maroon and Dr. Lovell. The Defendants could have hired any respected medical professionals in sports science, but specifically chose two very outspoken and well-known apologists for the NFL and who actively downplayed the link between professional football and CTE.  These decisions indicate WWE's intent to conceal such information in its own industry, and which taken alongside its other actions evidence fraud.

### 3.  *Plaintiffs' Misclassification Causes of Action.*

Plaintiffs alleged that the misclassification is a scheme that continues to this day.  *Id.*, ¶ 455.  WWE used the misclassification as independent contractors to renege on its responsibilities to the Plaintiffs' health and safety by denying them State and federal protections under OSHA, FMLA, and the NLRA. *Id.*, Count I. Plaintiffs demonstrated that they have a valid claim under the Declaratory Judgment Act because they were wrongfully misclassified as independent

contractors and which misclassification resulted in actual injury. *Id.*; *see also, New York v. Solvent Chem. Co.*, 664 F.3d 22, 26 (2nd Cir., 2011).

The Defendants continue to rely on their right to enforce illegal contracts and keep their ill-gotten gains because they had the power to intimidate, coerce, and hoodwink the Plaintiffs into signing them. *Id.* ¶¶ 264; 389; 476; 480. Plaintiffs detailed at length the unconscionability of these contracts and the schemes that developed them for WWE's corporate profits. SAC, Counts I, III, and VII.  These contracts violate a public policy and are unenforceable. *Solomon v. Gilmore*, 248 Conn. 769, 774 (1999).

Additionally, WWE may not avail itself of the referenced contracts and binding releases because in *Brown v. Soh*, 909 A.2d 43, 48 (2006), the Supreme Court of Connecticut noted that exculpatory contracts are "almost universally rejected in the employment context" being "void as against public policy". The court continued, that "it has long been recognized" that an employer may not by contract "absolve itself from liability for injuries sustained by its employee caused by the employer's…own negligence". *Id.*, at 48-9. These contracts are void *ab initio* and fail as a defense in this action.

### 4.  Plaintiffs' Wrongful Death Causes of Action.

Plaintiffs have plausibly alleged a causal relationship between WWE's conduct and the death of decedents and WWE cannot use the years between the Plaintiffs' WWE careers and their deaths as a defense because Plaintiffs have alleged long-term, latent, and degenerative neurological conditions of which, particularly where with Plaintiff decedent Fujiwara ("Fuji"), a clear diagnosis of CTE

exists. *See* SAC, Count IX; *and Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (ruling a claim has facial plausibility when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged). Plaintiffs established that WWE performances caused repetitive head trauma which has been linked to long-term neurological injuries, including CTE.  Fuji, a famed WWE Superstar, died of complications relating to his now diagnosed CTE.  WWE's failure to inform Fuji, or any of the decedents, of their injuries for years cannot be evidence that the causal connection does not exist.[12] WWE knew that Fuji was suffering from particular neurological injuries resulting from his WWE performances because he engaged in WWE events, signings, and other WWE-sponsored activities, as well as received royalties for the performances that caused him his injuries.  Fuji never learned of his injuries in time to prevent or delay his untimely death, but WWE knew all along.  WWE should not be allowed to unconscionably profit from Fuji's and each of the decedents' injuries that were a proximate result of WWE's actions.

### 5. *Defendants' Continued Misinterpretation of Plaintiffs' Requested Remedy for Medical Monitoring.*

Plaintiffs have repeatedly asserted that they bring Medical Monitoring as a remedy. *Firestone Tire & Rubber Co.*, 863 P.2d 795, 823 (1993) ("Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery").  Defendants do not assert

---

[12] This "time-lapse" defense is inadequate because Plaintiffs were directly prevented from discovering their injuries and understanding their manifesting symptoms due to the Defendants' ongoing fraudulent concealment and nondisclosure.

any defenses to the requested remedy, only that it is not a recognized cause of action under Connecticut law. *See* Response, p. 11.

There is precedent in Connecticut for medical monitoring in hazardous work environment cases. *See In Doe v. Stamford*, 241 Conn. 692 (1997); *Martin v. Shell Oil Co.*, 180 F.Supp.2d 313 (D. Conn. 2002); and *Denney v. Deutsche Bank AG*, 43 F.3d 253 (2d. Cir. 2006) (noting a showing of a defendant's conduct giving rise to the possibility of future harm to the plaintiff, even if the injury has not yet occurred, was sufficient to find standing for medical monitoring).

Plaintiffs deserve the peace of mind that they have been denied by the Defendants through WWE's decades of nondisclosure. Medical monitoring would provide the Plaintiffs with the most effective remedy known at this time for these types of injuries and has already been accepted as an adequate redress for long-term, progressive and ongoing neurological injuries that are degenerative in nature. *See In re: National Football League Players' Concussion Injury Litigation*, Final Approval Memorandum Opinion, No. 2:12-md-02323, *75 (E.D. Pa., Apr. 22, 2015) (finding that the "Settlement compensates the key harm alleged – the long term effects of repeated concussive hits – through medical monitoring and cash rewards); *c.f.* 17 A.L.R.5th, 327, para. 2[a] (the goal of medical monitoring is "to recover the quantifiable costs of periodic future medical examinations to detect the onset of physical harm, as distinguished from an enhanced risk claim which seeks compensation for the anticipated harm itself or for increased apprehension of such harm").  WWE benefits from the public goodwill it engenders from its claim that it covers 100% of all in-ring injuries. It should be held to its promise. *See* SAC, ¶ 321

(quoting WWE, "WWE is proud to help advance this critical research to help anyone at risk of suffering CTE").

### C. Defendants Should Not Be Granted Another Opportunity to Allege Further Defenses.

Plaintiffs have sufficiently articulated claims that pass the liberal standard for dismissal under Rule 12(b) and Defendants should not be granted another opportunity to allege further defenses in light of their failure to meet Rule 12(a) requirements. *See Breur Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182 (7th Cir. Ill. 1982) (attempting to control and limit expenses of litigation by allowing only one responsive pleading).  Further, the Defendants failed to request additional time to respond to Plaintiffs' SAC and instead chose to file their inadequately pled Response. *See*, *generally*, *U.S. v. Foust Distilling*, 36 FRD 92 (D. Pa. 1960).  WWE cannot rely on its perceived ambiguity in the local proceedings as it is well established that federal rules trump local and individual court rules. *Allstate Ins. Co. v. Administratia Asigurarrilor De Stat*, 163 FRD 196 (SDNY 1995) (ruling that there was no excusable neglect where defendants relied on local and individual court rules instead of the federal rules).

The Defendants failed to make any tolling arguments in their Response and so such defenses are deemed waived. Fed. R. Civ. P. Rule 12. As with the requested Medical Monitoring remedy, Defendants falsely assert that fraudulent concealment is brought as a cause of action. Response, at 11.  It is not. It is brought as a tolling mechanism which the Defendants do not address. As such, the Plaintiffs rely on their pleadings before the Court on these issues. *See In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig. PNC Bank Na*, 795 F.3d 380, 400 (3rd Cir., 2015)

(finding "equitable tolling is an appropriate remedy when principles of equity would make a rigid application of the statute of limitations unfair"). Further, the Defendants have failed to make any arguments against Plaintiffs' Misclassification (Count I); Unconscionable Contracts (Count III); Intentional Deprivation of Statutory Rights under the FMLA (Count IV); Violations under ERISA (Count V); Successor Liability (Count VI), Violations of RICO (Count VII); Equitable Estoppel (Count VIII); Mandatory Reporting (Count XIV); and Accounting and Disgorgement of Unjust and Illegal Profits (Count XVI) Counts, and as such all defenses against such Counts are deemed waived.

Instead, WWE focused on unfounded "plagiarism" arguments that distorted the SAC's allegations and omitted paragraphs to facilitate its inapposite allegations. Plaintiffs' repetition of legal allegations are relevant and accurate and not barred by the Rules where those allegations directly pertain to the facts as presented in the particular case.  Plaintiffs have detailed in depth how those claims relate to these Plaintiffs and therefore such emphasis on plagiarism must be ignored.

Additionally, at this stage of litigation findings of fact are inappropriate. *See In re Nat. Hockey League Players' Concussion Injury Litig.*, 2015 WL 1334027, at \*6. Plaintiffs have alleged equitable estoppel and Courts have found that a question of fact is presented when equities must be assessed. *See Delson v. Minogue*, 190 F. Supp. 935, 937-8 (EDNY 1961) (also finding that "[e]quitable estoppel has been invoked by the Courts to prevent a destruction or forfeiture of one party's rights by the conduct of the other. It is a standard of fair dealing applied by the courts").

WWE has done nothing but seek to prolong this litigation by preventing the Plaintiffs from conducting discovery (even preventing a required status conference for months) and now seeks to further delay Plaintiffs' ability to seek redress by requesting additional opportunities to make further defenses. Such needless litigating where Plaintiffs have conclusively outlined their claims should be denied and Plaintiffs should be allowed to conduct discovery. *See Victory v. Manning*, 128 F.2d 415 (3d Cir., NJ, 1942) (noting that to allow separate objections and defenses to be raised by separate motions would defeat the general purpose of the Rules and prolong litigation); *see also* Fed. R. Civ. P. 12(g) (specifying that "a party that makes a motion under this Rule must not make another motion under this Rule raising a defense or objection that was available to the party but omitted from its earlier motion"); *and* Fed. R. Civ. P. 12(h)(1) (emphasizing the strictness of Rule 12(g) by noting that "a party waives any defense listed in 12(b)(2-5) by…omitting it from a motion" described in Rule 12(g)(2) or "include[ing] it in a responsive pleading").

## V.    CONCLUSION

This is not a Motion for Summary Judgment, but an odd Response to a Second Amended Complaint.  The Plaintiffs' Affidavits and the SAC demonstrate the factual basis for the allegations made.   None of the Plaintiffs' allegations contradict the accepted laws of science or the accepted facts of history. Without such a clear demonstration of inaccuracy, the Plaintiffs are entitled to have their allegations taken as true on a Motion to Dismiss.   Therefore, Plaintiffs humbly request that this Court grant the following:

A.  **Oral argument on these Motions;**

B.  **Clarification on whether WWE's Response meets Fed. R. Civ. P. 12(a)(1) requirements;**

C.  **Clarification on whether WWE's Response is a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6);**

D.  **If WWE's Response is considered 12(b)(6) Motion, then Plaintiffs' request a thirty-day extension of time to respond;**

E.  **Defendants' requested relief within their Response be denied; and**

F.  **Plaintiffs be granted discovery in this matter.**

**Dated: December 11, 2017.**

**Respectfully Submitted,**

**/s/ Konstantine W. Kyros_____**
**Konstantine W. Kyros, Esq.**
**Bar no. ct30132**
**KYROS LAW OFFICES**
**17 Miles Road**
**Hingham, MA 02043**
**Telephone: (800) 934-2921**
**Facsimile: 617-583-1905**
**kon@kyroslaw.com**

**Anthony M. Norris, Esq.**
**KYROS LAW OFFICES**
**17 Miles Road**
**Hingham, Massachusetts 02043**
**Telephone: (603) 995-1792**
**Facsimile: (617) 583-1905**
**anorris@kyroslaw.com**

**S. James Boumil, Esq.**
**BOUMIL LAW OFFICES**
**120 Fairmount Street**
**Lowell, Massachusetts 01852**
**Telephone: (978) 458-0507**
**SJBoumil@Boumil-Law.com**

**Erica C. Mirabella, Esq.**
**MIRABELLA LAW LLC**
**132 Boylston Street, 5th Floor**

**Boston, Massachusetts 02116**
**Telephone: (617) 580-8270**
**Facsimile: (617) 583-1905**
**erica@mirabellaLLC.com**

**R. Christopher Gilreath, Esq.**
**GILREATH & ASSOCIATES**
**200 Jefferson Avenue, Suite 711**
**Memphis, Tennessee 38103**
**Telephone: (901) 527-0511**
**Facsimile: (901) 527-0514**
**chrisgil@sidgilreath.com**

**Brenden P. Leyden, Esq.**
**TOOHER WOCL & LEYDON LLC**
**80 4th Street**
**Stamford, Connecticut 06905**
**Telephone: (203) 517-0456**
**Facsimile: 203-324-1407**
**BLeydon@tooherwocl.com**

*Counsel for Plaintiffs.*

## **CERTIFICATE OF SERVICE**

**I hereby certify that on this 11th day of December, 2017, a copy of the foregoing Opposition was served via this Court's electronic case filing system.**

**/s/ Konstantine W. Kyros**
**Konstantine W. Kyros**