## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **RUSS MCCULLOUGH, et al.,** | : | |
| **Plaintiffs,** | : | |
| | : | **No. 3:15-cv-01074 (VLB)** |
| **v.** | : | **Lead Case** |
| | : | |
| **WORLD WRESTING** | : | |
| **ENTERTAINMENT, INC.,** | : | **March 25, 2018** |
| **Defendant.** | : | |
| | : | |

| | | |
|---|---|---|
| **EVAN SINGLETON and VITO** | : | |
| **LOGRASSO,** | : | |
| **Plaintiffs,** | : | **No. 3:15-cv-00425 (VLB)** |
| | : | **Consolidated Case** |
| **v.** | : | |
| | : | |
| **WORLD WRESTING** | : | **March 27, 2018** |
| **ENTERTAINMENT, INC.,** | : | |
| **Defendant.** | : | |
| | : | |

### MEMORANDUM OF DECISION GRANTING DEFENDANT WORLD WRESTLING ENTERTAINMENT, INC.'S MOTION FOR SUMMARY JUDGMENT [DKT NO. 330]

I. **Introduction**

This action was brought by professional wrestlers Evan Singleton and Vito LoGrasso, who allege that Defendant WWE fraudulently failed to inform them of a link between repeated concussive or subconcussive blows to the head and permanent degenerative neurological conditions. Now before the Court is Defendant World Wrestling Entertainment's ("WWE") motion for summary judgment on Singleton's and LoGrasso's claims for fraud by omission—the only claims that survived the Defendant's Motion to Dismiss [Dkt. No. 43]. For the reasons that follow, Defendant's motion is GRANTED.

## II. Background

### A. Defendants' Knowledge of a Link Between Head Trauma and Permanent Degenerative Neurological Conditions

A key issue in this case is when WWE first learned of a potential link between concussive and subconcussive blows suffered by professional wrestlers and permanent degenerative neurological disorders such as chronic traumatic encephalopathy ("CTE"). Plaintiffs' Rule 56(a)(2) statement is rife with mischaracterizations of the evidence as it pertains to this issue. After careful consideration of the evidence in the light most favorable to the Plaintiffs, the Court has determined that the evidence does not support a finding that WWE knew of a risk that repeated head injuries incurred while performing as a professional wrestler could cause permanent degenerative neurological conditions prior to September 5, 2007. The reasons for this finding are discussed in the paragraphs that follow.

Plaintiffs argue that WWE knew of the risks of repeated head injuries as early as the 1980s. In support, Plaintiffs cite to the deposition of Dr. Joseph Maroon, a neurosurgeon who developed a concussion assessment for athletes, in which he testified that doctors developed a concussion management protocol as early as the 1980s, and that they were aware of the risks of post-concussion syndrome "long before 2008." [Maroon Dep. at 21-22]. Plaintiffs also cite the testimony of Mark Lovell, a neuropsychologist who worked with Dr. Maroon on concussion testing amateur and professional football players beginning in the 1980s, professional hockey players beginning in 1997, professional soccer players beginning in 2005, and professional race car drivers in the early 2000s.

[Lovell Dep. at 24-35]. Dr. Lovell testified that putting an athlete who suffered a concussion back into a game too soon could cause "long-term issues" like memory loss, headaches, dizziness, balance issues, changes in mood and affect, and potentially suicidal ideation. [Lovell Dep. at 39-51]. Neither Dr. Maroon nor Dr. Lovell were retained by WWE prior to 2008. Therefore, even if Dr. Maroon's and Dr. Lovell's statements about concussion science in the 1980s and 1990s could be understood to imply that the risk of permanent degenerative neurological conditions was known to them or to other members of the medical community at that time, that knowledge cannot be imputed to WWE until 2008 at the earliest

In addition to the testimony of the doctors WWE retained to conduct concussion testing in 2008, Plaintiffs cite to two pre-2007 articles relating to concussions. The first is a 2005 Mayo Clinic article which describes "second impact syndrome," which "occurs when a person has a recurrent head trauma while still recovering from a concussion . . . [and] can lead to devastating swelling of the brain, which could [be ]fatal." [Pl. Exh. 23 at 2]. The article also states that "[s]ome people experience postconcussion syndrome, a condition in which the symptoms of concussion"—such as "memory and concentration problems, headaches, dizziness, confusion or irritiability"—persist for weeks or months after the initial head trauma." [Pl. Exh. 23 at 3]. According to the Mayo Clinic article, neither second impact syndrome nor postconcussion syndrome are permanent neurogenerative diseases. Rather, the article describes acute

swelling of the brain, and postconcussion symptoms that last months rather than permanently.

The second article was written by Dr. Bennett Omalu in 2005, and detailed the first known case of CTE in a professional football player. In his conclusions, Dr. Omalu stated,

> "This case highlights *potential* long-term neurodegenerative outcomes in retired professional National Football League players subjected to repeated mild traumatic brain injury. The prevalence and pathoetiological mechanisms of these *possible* adverse long-term outcomes and their relation to duration of years of playing football *have not been sufficiently studied.* We recommend comprehensive clinical and forensic approaches to understand and further elucidate this emergent professional sport hazard."

[Pl. Exh. 21 at SINGLETON_0000086] (emphasis added). The article also stated, "This case study by itself cannot confirm a causal link between professional football and CTE. However, it indicates the need for comprehensive cognitive and autopsy-based research on long-term postneurotraumatic sequelae of professional American football." *Id.* at SINGLETON_0000090. Plaintiff offers as evidence that WWE knew about this article news coverage relating to its equivocal and inconclusive article. [*See* Pl. Exh. 22, 48]. However, Plaintiff has offered no evidence that WWE was aware of any of this news coverage or of Dr. Omalu's 2005 article. Plaintiff further offers no evidence to suggest that at the time Dr. Omalu's article was published, any research existed that would suggest that Dr. Omalu's findings regarding one football player might apply to professional wrestlers, or that the frequency and severity of head trauma suffered by football players is similar to that suffered by professional wrestlers.

Plaintiffs also argue that WWE learned of a link between concussions and permanent neurodegenerative disease from Chris Nowinski, a former wrestler who retired from wrestling in 2003 following a diagnosis of post-concussion syndrome. Plaintiffs claim that Nowinski remained employed by WWE following his retirement from wrestling, and that during that time, he began researching the connection between repeated concussions and permanent degenerative neurological conditions. [Dkt. 346 ¶ 163]. Based on this research, Nowinski published a book in September 2006, titled "Head Games: Football's Concussion Crisis." [Pl. Exh. 24].

Plaintiff's exhibits regarding Nowinski's work with WWE between 2003 and 2006 are consistent with the affidavit that Nowinski filed with the Court in connection with a discovery dispute in this case. He stated, "After I retired from wrestling in 2003, I occasionally participated in WWE programs as an independent contractor through independent contractor agreements. As my LinkedIn profile indicates, I primarily participated in programs designed to increase youth voter turnout in political elections." [Dkt. No. 182-2 ¶ 2]. He further stated, "I did not work at WWE corporate headquarters as part of my participation in these programs. I did not have 'regular interactions with WWE executives,' as Plaintiffs assert, as part of my participation in these programs." *Id.* ¶ 3. Nowinski further described his research as "independent" and stated that he lived in Boston, MA while he was researching his book. *Id.* ¶ 4.

This Court has previously addressed Nowinski's involvement with WWE between 2003 and 2006, holding that "Plaintiff . . . has offered no facts to suggest

that Nowinski's work with 'Smackdown Your Vote' during the time period in which he researched and authored the book provides him with any knowledge relevant to" WWE's specific knowledge of or an appreciable risk of a link between wrestling activity and permanent degenerative neurological conditions. [Dkt. Nos. 160, 183]. Since the Court issued that ruling, Plaintiffs have not offered any new evidence showing that WWE was aware of Nowinski's research, that anyone at WWE read Nowinski's book, or that anything in Nowinski's book would suggest a link between professional wrestling and permanent degenerative neurological conditions. Indeed, while Nowinski did wrestle professionally, he also played football for many years, and if the title of the book provides an accurate assessment of its content, the book focuses on a "concussion crisis" in football, not wrestling.[1]

In June 2007, the professional wrestler Chris Benoit killed his wife and child before committing suicide, prompting Nowinski to publicly speculate that "untreated concussions might have caused [Benoit] to snap." [Pl. Exh. 36]. During a September 5, 2007 press conference, it was revealed that the wrestler

---

[1] **Plaintiffs' Rule 56(a)(2) statement states, "WWE knew prior to September 2006 that its employee Chris Nowinski was researching the risks of long-term neurological issues and CTE with repeated concussions in the years leading up to the publishing of his book. Mr. McMahon even confronted Nowinski about the accusations. Moreover Linda McMahon, CEO of WWE at the time, and Nowinski had a conversation about Nowinski's research. At the very latest, WWE knew about Nowinski's research and findings when his book was published in September 2006 and began a media tour discussing concussions he suffered in the WWE." [Dkt. No. 346 ¶ 170 (citations omitted]. Upon review of the cited deposition testimony, the Court finds that the deposition testimony Plaintiffs cite in support of this statement does not, when fairly considered in context, suggest that WWE was aware of Nowinski's work on concussion research until September 2010. [V. McMahon Dep. at 189-90, 202-03, 212].**

Benoit had been diagnosed with CTE. [V. McMahon Dep. at 22; S. McMahon Dep. at 51; Pl. Exh. 20]. In the immediate aftermath of this revelation, Vince and Stephanie McMahon made several statements to the media in which they questioned the credibility of the study. In particular, Vince McMahon stated that "I would, as a layman certainly wonder whether or not that report has any credibility" and Stephanie McMahon stated that "these studies have not been proven." [Pl. Exh. 31]. Vince McMahon mentioned his skepticism that Benoit could truly have had the brain of an 85-year old with dementia to news outlets, and in a letter to Benoit's estate's attorney as late as December 2009. [Pl. Exhs. 16, 31, 33]. While Benoit's diagnosis was revealed in September 2007, a peer review article regarding Benoit's condition was not published until September 2010. [Def. Exh. 31].

### B. Concussion Mitigation Efforts

Despite making public statements calling into question the validity of the Benoit diagnosis, WWE took affirmative steps to inform wrestlers of the risks of a brain injury and to assess the risks occasioned by wrestling. In March 2008, WWE retained Dr. Maroon as its medical director, and licensed the Immediate Post-Concussion Assessment and Cognitive Testing software ("ImPACT"). [Def. Exh. 36 at WWE_SING00000277-97; S. McMahon Dep. at 62-63, 91; V. McMahon Dep. at 105-06; Levesque Dep. at 129; Maroon Dep. at 8]. The contract that secured the services of Dr. Maroon and the license for ImPACT also secured the services of Dr. Lovell. [Lovell Dep at 11]. After retaining Dr. Maroon and licensing ImPACT, WWE added neurological testing to its Wellness Program for

current WWE talent for the first time. [V. McMahon Dep. at 36-37; Levesque Dep. at 130-31]. In the Spring of 2008, ImPACT administered baseline tests to current WWE talent. [Lovell Dep. at 57-59]. During baseline testing, the wrestlers are educated about the signs and symptoms of concussions, including a list of 22 symptoms of a concussion. [Lovell Dep. at 58-59]. Since 2008, WWE talent have been given baseline tests once per year. [Lovell Dep. at 63].

The extent to which WWE talent was educated about the risks of permanent degenerative neurological conditions resulting from concussions between 2008 and 2010 is in dispute. However, Dr. Maroon and Chris Nowinski gave several presentations to talent regarding traumatic brain injuries between 2010 and 2015. [V. McMahon Dep. at 42-43; Levesque Dep. at 137; Def. Exhs. 40-59].

C. LoGrasso

LoGrasso entered into a written booking contract with WWE regarding LoGrasso's wrestling services effective June 25, 2005. [LoGrasso Dep. Exh. 19]. WWE released LoGrasso from his contract with WWE on May 16, 2007. [LoGrasso Dep. at 339; WWE-SING00000305-06]. During the time that LoGrasso performed for WWE between 2005 and 2007, WWE had a doctor named Dr. Rios who attended WWE events and treated WWE talent for in-ring injuries. [Levesque Dep. at 104; McMahon Dep. at 16, 96-97]. Dr. Rios treated LoGrasso in this capacity, but Dr. Rios was not LoGrasso's personal physician. [LoGrasso Dep. at 194-95]. In June 2006, Defendant distributed a memorandum stating that "Dr. Rios [was] not the personal physician for any WWE . . . Talent," and that "Dr. Rios' main responsibility [was] to treat Talent at [WWE events] for injuries

suffered as a result of a performance" and "[a]ny medical follow-ups for injuries" was to be done by the talent's personal physician." [J. Laurinaitis Decl.]. The parties dispute whether LoGrasso actually received a copy of this memorandum. In February 2006, WWE instituted a Talent Wellness Program, which initially only involved drug testing and cardiovascular testing. [S. McMahon Dep. at 14-15].

LoGrasso claims that he suffered head trauma during five specific matches, the latest of which took place on January 30, 2007. LoGrasso alleges that he told WWE's ringside physician, Dr. Rios, that he was experiencing concussion-like symptoms, such as "headaches," "feeling woozy," and fatigue, feeling lethargic, tired, etc." [LoGrasso Dep. at 56, 58-59, 318-21]. Plaintiff alleges that Dr. Rios did not provide appropriate care for a concussion, but rather administered vitamin B-12 shots. [LoGrasso Dep. at 58, 321-22, Pl. Exh. 38].

LoGrasso never received medical treatment from WWE or WWE's Talent Wellness Program for head injuries. [LoGrasso Supp. Response to WWE Rog. 5]. He did not receive treatment from or as a result of WWE's Talent Wellness Program for any injuries or illnesses. [LoGrasso Supp. Responspse to WWE Rog. 5]. LoGrasso also admitted that he had no communications with WWE about symptoms of traumatic brain injury after he last performed for WWE in 2007, and that WWE has provided no medical care to him since he left WWE. [LoGrasso Response to WWE RFA 7, 8]. LoGrasso has, however, received annual letters from WWE in which WWE offers to pay for drug or alcohol rehabilitation if needed by a former performer. [LoGrasso Dep. at 277-79; WWE_SING00000507-511].

LoGrasso was terminated by WWE in May 2007.  [LoGrasso Dep. at 252-53].
In May 2009, LoGrasso sent an email to WWE seeking employment as a trainer,
but he did not state in that communication that he was suffering from symptoms
of traumatic brain injury.  [LoGrasso Dep. Exh. 3; LoGrasso Dep. at 92-93].
LoGrasso was friends with Benoit and his wife, and he stated that he knew that
the murder-suicide was a huge story in the media and was well-known in the
wrestling business.  [LoGrasso Dep. at 236, 239].  LoGrasso also knew that
Benoit's CTE diagnosis was publicly reported around the time of the crime.
[LoGrasso Dep. at 239].  LoGrasso testified that he remembered WWE denying
Benoit's actions had anything to do with wrestling, stating "[w]hen you make a
statement like that, you say, okay it had nothing to do with wrestling.  You know,
and I trusted in the WWE and what they were saying at the time."  [LoGrasso Dep.
at 237, 326].

    D.  <u>Singleton</u>

   Singleton received his baseline ImPACT test on December 1, 2011 and was
educated about the signs and symptoms of concussions at that time.  [Lovell
Dep. at 58-59; Def. Exh. 37].  While Singleton denies attending any of WWE's
informational sessions regarding concussion risks, he was required to attend a
presentation on August 9, 2012, AND  on August 9, 2012, Singleton's professional
Twitter account stated "Thank You @WWE for giving me the background."  [Def.
Exhs. 60, 62].

On September 27, 2012, Singleton sustained a concussion while
performing a "choke slam" maneuver during a match.  He denies sustaining a

concussion at any time other than during the September 27, 2012 match. [Singleton Dep. at 142-43]. The "choke slam" maneuver is a common move performed in professional wrestling and one that Singleton had seen performed countless times and one he fully expected that he would before when he became a professional wrestler. [Singleton Dep. at 244]. Singleton was told before receiving a choke slam that he would get hurt if he did not tuck his chin during the move. [Singleton Dep. at 28]. However, during the September 27, 2012 match, he did not perform the maneuver correctly and was injured as a result. [Singleton Dep. at 244]. After September 27, 2012, Singleton was never medically cleared by WWE to wrestle, and he never wrestled again. [Singleton Dep. at 64-65, 81].

### III.  Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance*

*Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)).  "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

IV.  <u>Discussion</u>

While the parties have submitted a veritable avalanche of paper along with their summary judgment briefing, the Court has limited the issues that it will consider on summary judgment to (1) whether the statutes of repose may be tolled as to LoGrasso due to fraudulent concealment of facts giving rise to a cause of action; and (2) whether Defendants committed fraud by omission by failing to warn Plaintiffs of the risk of long-term degenerative neurological

disorders resulting from head trauma.  Although the legal standards for fraud by omission and fraudulent concealment are not identical, both require that the party committing the fraudulent omission or concealment actually knew of the concealed or omitted fact.

      **1.  <u>LoGrasso's Claim is Barred by Connecticut's Statutes of Limitation and Repose</u>**

Connecticut General Statutes § 52-577 allows a tort action to be brought within three years "from the date of the act or omission complained of."  Conn. Gen. Stat. § 52-577.  Operation of Section 52-577 cannot be delayed until the cause of action has accrued, "which may on occasion bar an action even before the cause of action accrues."  *Prokolkin v. Gen. Motors Corp.*, 170 Conn. 289, 365 A.2d 1180, 1184 (1976).  Because LoGrasso stopped wrestling in May 2007—and he was therefore last exposed to the risks of neurological damage via repeated head injuries years prior to the expiration of the statute of repose for tort claims—his claim cannot survive unless the statute of repose is tolled.

Section 52-595 tolls any statute of limitations or repose, including Section 52-577, if a defendant fraudulently conceals a cause of action from a plaintiff.  *See Connell v. Colwell*, 214 Conn. 242, 571 A.2d 116, 118 (1990) (concluding that "the exception contained in § 52–595 constitutes a clear and unambiguous general exception to any Connecticut statute of limitations that does not specifically preclude its application.").  Section 52-595 provides, "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person

so liable therefor at the time when the person entitled to sue thereon first discovers its existence."

To demonstrate fraudulent concealment of a cause of action, Lograsso must offer evidence that the Defendant "(1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) intentionally concealed these facts from the plaintiffs; and (3) concealed the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action." *Falls Church Grp., Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105 (2007). The standard of proof for fraudulent concealment requires "clear, precise, and unequivocal evidence." *Id.* Additionally, LoGrasso's claims cannot survive under the doctrine of fraudulent concealment if undisputed evidence shows that LoGrasso "discovered or should have discovered actionable harm in the form of an increased risk for latent, permanent degenerative neurological conditions prior to 2013," *McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 549 (D. Conn. 2016).

Plaintiff has offered no evidence to suggest that Defendant was aware of the risk that repeated head injuries of the type commonly suffered by professional wrestlers could cause permanent degenerative neurological conditions prior to September 5, 2007, when Benoit's CTE diagnosis was publicly revealed. Plaintiff admits that he was aware of the Benoit murder suicide, that the incident was a common topic of conversation among professional wrestlers, and that he considered Benoit a friend prior to Benoit's death. LoGrasso also knew that Benoit's CTE diagnosis was publicly reported around the time of the crime.

Although WWE attempted to discredit the finding that Benoit had CTE, and tried to distance WWE from Benoit's behavior, no reasonable jury could find that WWE concealed the fact of Benoit's diagnosis from LoGrasso. Because Plaintiff has offered no evidence from which a reasonable jury could conclude that Defendant fraudulently concealed the cause of action in this case from LoGrasso, the Court finds that LoGrasso's claim is time-barred. Moreover, for the reasons discussed below, even if no statute of repose applied to LoGrasso's claim, it would not survive summary judgment.

### 2. Plaintiff has Failed to Raise a Genuine Issue of Fact that would Preclude Summary Judgment on the Fraudulent Omission Claim

"The essential elements of an action in common law fraud . . . are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Censor v. ASC Techs. of Connecticut, LLC*, 900 F. Supp. 2d 181, 222-23 (D. Conn. 2012) (quoting *Sturm v. Harb Dev. LLC,* 298 Conn. 124, 142, 2 A.3d 859 (Conn. 2010)). "Fraud by nondisclosure, which expands on the first three of [the] four elements [of fraud], involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak, under circumstances in which there was a duty to speak . . . . A lack of full and fair disclosure of such facts must be accompanied by an intent or expectation that the other party will make or will continue in a mistake, in order to induce that other party to act to her detriment." *Saggese v. Beazley*

*Co. Realtors*, 155 Conn. App. 734, 752-53 (2015) (quoting *Reville v. Reville,* 312 Conn. 428, 441, 93 A.3d 1076 (2014)).

"[T]he party asserting [a fraud] cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal." *Saggese* 155 Conn. App. at 753 (quoting *Harold Cohn & Co. v. Harco Int'l, LLC,* 72 Conn. App. 43, 51 (2002)). This "clear and convincing standard . . . forbids relief whenever the evidence is loose, equivocal or contradictory." *Saggese,* 155 Conn. App. at 754 (quoting *Shelton v. Statewide Grievance Committee,* 85 Conn. App. 440, 443-44 (2004)).

While Connecticut law does not foreclose recovery for fraud by omission where the omitted facts were publicly available, a plaintiff's claim may not survive summary judgment unless he or she offers evidence that this publicly available information was known to the defendant. *See McCullough v. World Wrestling Entm't, Inc.*, 172 F. Supp. 3d 528, 566 (D. Conn.), *reconsideration denied,* No. 3:15-CV-001074 (VLB), 2016 WL 3962779 (D. Conn. July 21, 2016), and *appeal dismissed,* 838 F.3d 210 (2d Cir. 2016) (stating (1) "The Court does not read *Saggese* as holding that under Connecticut law a defendant cannot be held liable for non-disclosure of publicly available facts"; and (2) "the development of a factual record may reveal that WWE did not possess or fail to disclose "known facts" about CTE or other degenerative conditions and whether such conditions could result from participation in WWE wrestling events.").

To survive summary judgment, Plaintiffs must raise material issues of fact that would allow a reasonable jury to find by clear and convincing evidence that Defendants knowingly and intentionally failed to fully and fairly disclose the risk that concussions could cause permanent degenerative neurological disorders for the purpose of inducing Plaintiffs to continue wrestling, and that Defendants had a duty to disclose such information. Plaintiffs must also raise material issues of fact that would allow a reasonable jury to find by a preponderance of the evidence that Plaintiffs relied on Defendants' fraudulent omissions to their detriment.

"In ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). This is because "[i]t makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–55 (1986). Therefore, where the law requires that an element of a cause of action be satisfied by "clear and convincing" evidence at trial, the Court must grant summary judgment where evidence presented is of "insufficient caliber or quantity to allow a rational finder of fact to find [that element] by clear and convincing evidence." *Id.*

Defendants argue that Plaintiffs' fraudulent omission claims cannot survive summary judgment because (1) Plaintiffs admitted in their depositions that they

did not know they were asserting fraud claims and could not identify anyone who had defrauded them; (2) Plaintiffs have offered no evidence that Defendants allegedly failed to disclose information about the risk of permanent degenerative neurological disorders with the specific intent to defraud the Plaintiffs; (3) Plaintiffs have offered no evidence that Defendants knew of a link between professional wrestling and permanent degenerative neurological conditions prior to a 2007 press release which revealed that the wrestler Stephen Benoit was posthumously diagnosed with chronic traumatic encephalopathy ("CTE"); (4) Plaintiffs have offered no evidence to support their claim that they detrimentally relied on Defendants' alleged omission; and (5) Defendants had no duty to disclose information about the risks of permanent degenerative neurological conditions to the Plaintiffs.

LoGrasso's claim cannot survive summary judgment because undisputed evidence in the record demonstrates that WWE did not know of a potential link between concussions and permanent degenerative neurological disorders until after LoGrasso stopped wrestling. LoGrasso therefore could not have relied upon any omission to choose to continue wrestling, and any injury he suffered while wrestling could not have resulted from WWE's failure to state what it did not know.

With respect to Singleton, the parties agree that WWE was aware of the risk that concussions or subconcussive blows could cause permanent degenerative neurological conditions before Singleton sustained his career-ending head injury in September 2012. Defendant argues that WWE cannot be held liable for fraud

by omission, because it had developed a concussion testing and education program in which Singleton participated or should have participated prior to his injury during which WWE disclosed to Singleton the risk of sustaining a brain injury while wrestling.

In particular, Singleton was instructed to attend a presentation on August 9, 2012 relating to drug abuse and concussion risks. The presentation was approximately 45 minutes long, and included a description of the WWE's concussion management policy. While the portion of the presentation discussing concussions is relatively brief, Dr. Maroon stated during the presentation, "What happens if you take too many headshots and you go back into the ring before any symptoms have been cleared? . . . If your brain doesn't completely respond and heal and you get hit again, there is a potential danger of having more damage to your brain." [Def. Exh. 48]. Dr. Maroon then displayed a slide showing the brain of an NFL player who he said died from CTE, and stated that while he did not think it was possible to eliminate concussions among WWE performers, that WWE had implemented a testing program that was the same as the one now used by the NFL to prevent any performers from returning to the ring before they are completely asymptomatic. *Id.*

Singleton denies attending this program, and points out that while Defendants have claimed the presentation was mandatory, no efforts to track attendance were undertaken. However, Defendants have offered undisputed evidence that the presentation took place, and that Singleton's supervisor was instructed to "[p]lease have all Talent present for the meeting." [Def. Exh. 60].

Holding a training session in which it is explained that repeated concussions can cause CTE and that CTE can be fatal, is not consistent with a deliberate effort to withhold information for the purpose of inducing Singleton to continue wrestling. Plaintiffs have offered no evidence that Singleton's alleged failure to attend this session was the result of a deliberate effort on WWE's part to prevent him from learning about concussions or CTE. Consequently, no reasonable jury could find anything other than that WWE attempted to inform Singleton about the risks of concussions. His failure to cooperate with that attempt—or WWE's allegedly negligent failure to ensure that all talent in fact attended the presentation—do not transmute WWE's effort to educate performers about concussion risks into fraudulent omission.

WWE attempted to disclose to Singleton the risk that repeated concussions or subconcussive blows could cause the permanent degenerative neurological disorder CTE, and Singleton was injured after WWE made this attempt. Accordingly, Plaintiff has not offered any evidence suggesting that WWE intentionally omitted any information in order to induce Singleton to continue wrestling. Plaintiff has therefore failed to raise a genuine issue of fact that would preclude summary judgment as to Singleton's fraud by omission claim.

V. <u>Conclusion</u>

For the foregoing reasons, Defendant's motion for summary judgement is GRANTED. The Clerk is directed to enter judgment for the Defendant as to Plaintiffs Singleton and LoGrasso.

Once again, the Court notes Plaintiffs' counsels have asserted facts and advanced legal theories for which there is no reasonable evidentiary and legal basis; and once again cautions that such conduct subjects counsel to Rule 11 sanctions. Counsel are advised to read the record in its entirety before filing anything with the Court to assure their reasonable belief in any and all future assertions of fact and law.

**IT IS SO ORDERED.**

_____

Hon. Vanessa L. Bryant
United States District Judge

**Dated at Hartford, Connecticut: March 27, 2018**