UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RUSS McCULLOUGH, *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> WORLD WRESTLING ENTERTAINMENT, INC., <br><br> Defendant. | : NO. 3:15-cv-01074-VLB <br> : LEAD CASE |
| EVAN SINGLETON and VITO LOGRASSO, <br><br> Plaintiffs, <br><br> vs. <br><br> WORLD WRESTLING ENTERTAINMENT, INC., <br><br> Defendant. | : NO. 3:15-cv-00425-VLB <br> : CONSOLIDATED CASE |
| JOSEPH M. LAURINAITIS, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> WORLD WRESTLING ENTERTAINMENT, INC. and VINCENT K. MCMAHON, <br><br> Defendants. | : NO. 3:16-cv-01209-VLB <br> : CONSOLIDATED CASE |

**SUPPLEMENTAL DECLARATION OF JERRY S. McDEVITT REGARDING ATTORNEY'S FEES RECOVERABLE FOR SANCTIONS ORDERS AGAINST ATTORNEY KYROS AND THE KYROS LAW FIRM**

I, Jerry S. McDevitt, hereby declare under penalty of perjury as follows:

1.  I am a partner in the law firm of K&L Gates LLP, and have been since 1987, and practice out of the firm's Pittsburgh office. I am and have been lead counsel representing Defendants in these consolidated cases since the first case was originally filed by Mr. Kyros in October 2014 in Oregon.

2.  I submit this Supplemental Declaration in further response to the Court's inquiry at the hearing on March 30, 2021 regarding the application to sanctions awards of the so-called forum rule set forth in the Second Circuit decision *Simmons v. New York Transit Authority*, 575 F.3d 170 (2d Cir. 2009) which was decided on August 3, 2009 and Judge Arterton's opinion in *Lawrence v. Richman Group of Connecticut, LLC*, 660 F. Supp. 2d 292 (D. Conn. 2009), decided approximately one month after the *Simmons* decision.

3.  The *Simmons* opinion regarding the "forum rule" was not in the context of a sanction order. To be sure, one month later Judge Arterton did rely on *Simmons* in her decision to apply the forum rule to an award of counsel fees as a sanction.

4.  However, two months after *Simmons* and one month after Judge Arterton's decision in *Lawrence*, the Second Circuit affirmed a different decision of Judge Arterton in a sanctions case in which it was argued that she erred by using out-of-district rates to calculate the attorneys' fees awarded as a sanction. *See On Time Aviation, Inc. v. Bombardier Capital, Inc.*, 554 Fed. Appx. 448 (2d Cir. 2009). After noting its recent decision in *Simmons*, the Second Circuit pointed out that the reasoning behind the calculation of awards under fee shifting statutes is not precisely analogous to the rationale for a sanctions award and then noted that the purpose of a Rule 11 award is deterrence of baseless filings and the curbing of abuses. *Id.* at 452. *See also Ceglia v. Zuckerberg*, 2012 WL 503810 (W.D.N.Y. 2012) (extensively

2

discussing forum rule and rejecting its application to Rule 11 or Rule 37 sanctions and noting deterrent function of both types of sanctions orders).

5. It respectively remains our position that the Court is not required to apply the forum rule to the determination of the proper amount of counsel fees to be awarded for each of the three sanction orders. In this case, which involves multiple serious instances of misconduct, we respectfully submit that only a substantial award will serve the deterrence function. Nevertheless, I submit this declaration to provide additional factual reasons why the forum rule should not apply as well as facts supporting my selection as lead counsel, and the reasonableness of my rate, in the event the Court still considers the forum rule to be a consideration.

## My Experience With WWE and CTE

6. I have been lead counsel for WWE in virtually all litigation matters since 1987, and have handled cases of a diverse nature for WWE in federal courts throughout the country ever since. As a result, I have unique and extensive knowledge of WWE's business and its practices and the legal principles applicable to its business.

7. Between June 22-24, 2007, Chris Benoit, a prominent WWE performer murdered his wife and son, then committed suicide at the family residence in Georgia. The crimes received extensive national media coverage, and were followed by litigation threats from an attorney representing Mr. Benoit's father.

8. I was retained by WWE to advise and represent their interests regarding the Benoit matter, and any resulting litigation, including, but not limited to, any initiated by Benoit's father. I appeared on national television shows representing WWE's interests in the matter.

3

9. On September 5, 2007, a second wave of immense publicity ensued when it was announced at a press conference in New York that Chris Benoit reportedly had been diagnosed with CTE. Benoit was the first wrestler reportedly diagnosed with CTE. Prior to that point, CTE has been reportedly found during the brain autopsies of a few NFL players.

10. The pathological work behind the Benoit CTE diagnosis was reportedly performed by Dr. Bennet Omalu, the same person who had made the seminal discovery of CTE in Mike Webster, the former Pittsburgh Steeler.

11. The early discoveries of CTE in football players prior to the Benoit report were all made in the Medical Examiner's Office of Allegheny County, which is where Pittsburgh is located. That office was headed by Dr. Cyril Wecht, a prominent forensic pathologist with an international reputation for, among other things, his work on the assassination of President Kennedy. Dr. Omalu was on the staff of the Medical Examiner's office of Allegheny County when the CTE diagnosis was made of not only Mike Webster, but two other former Pittsburgh Steelers, Terry Long in 2006 and Justin Strzelczyk 2007.

12. By the time Dr. Omalu reportedly made the first diagnosis of CTE in a professional wrestler on September 5, 2007 in the Benoit case, I was also acting as lead counsel for Dr. Wecht in connection with an 84-count federal indictment in the Western District of Pennsylvania. The charges included honest services fraud, and centered on Dr. Wecht's alleged use of the county morgue to further his private autopsy practice. One of the central allegations was that Dr. Wecht had used county facilities and resources to further his private autopsy practice by having histological slides made there of tissue from private autopsies, and by using county photographers and computers to record and store pictures of various body parts. Dr.

Omalu assisted Dr. Wecht in his private autopsy practice, and eventually became a key prosecution witness at the trial of Dr. Wecht.

13. After Dr. Omalu's Benoit diagnosis, there was substantial overlap in the knowledge I obtained regarding Dr. Omalu as a result of the conjunction of his involvement in two important matters I was working on at the same time–the Benoit matter and the defense of Dr. Wecht.

14. Following the reported public announcement of CTE in Benoit, I advised WWE on numerous aspects of the issues raised by Dr. Omalu's reported diagnosis.

15. In the aftermath of the Benoit diagnosis, I rendered legal advice regarding WWE's wellness program, including retaining Dr. Joseph Maroon, a leading concussion expert who practiced at the UPMC facilities in Pittsburgh and who was instrumental in devising the so-called IMPACT system used in concussion management.

16. During this period, I advised WWE on risk reduction and management as the knowledge about CTE emerged, and WWE took numerous steps to reduce concussions, manage concussions, and to educate talent on the risks of head injury. The evidence of those actions became a matter of record in this consolidated litigation, and Judge Bryant noted some of these preventative steps in her decision granting summary judgment to WWE on the claims of Evan Singleton.

17. On behalf of WWE, I also undertook attempts to obtain complete and full disclosure of the work supporting Dr. Omalu's CTE diagnosis of Benoit including all chain-of-custody records. My efforts included corresponding with those people who had associated with Dr. Omalu, and lawyers representing Dr. Omalu. Those efforts continued in ensuing years, including during discovery in one of the consolidated cases.

18. In January of 2008, the trial of Dr. Wecht commenced. Dr. Omalu was called as a key prosecution witness. As a result of my cross-examination of him in that case, as well as the knowledge I gained about Dr. Omalu from his supervisor, Dr. Wecht, I came to learn much useful information about Dr. Omalu's methods and practices for any cross-examination which would be needed against him in any case, including in particular on CTE cases.

19. After months of trial, concluding in March of 2008, during which I did not call a single witness and only cross-examined government witnesses, the jury in the *Wecht* case could not reach a verdict on any of the counts. Thereafter, the Third Circuit directed that a new judge take over the case, and the new jurist quashed all the search warrants involved in the case, leading to the dismissal of all charges.

20. WWE was acutely aware of my work in the *Wecht* case, and how it supplemented my knowledge about Dr. Omalu. In 2010, I was featured in the *National Law Journal's* annual "Winning" section for my defense of Dr. Wecht. I previously was featured in the "Winning" section in 2003 for my defense of WWE in a high profile sexual harassment case in the Eastern District of New York.

### The Early Indication of Kyros Law Recruiting Plaintiffs

21. In the timeframe following the *Wecht* trial, Dr. Omalu continued his work promoting himself as the world's leading expert on CTE and serving as an expert in CTE litigation which was emerging as a hotbed of litigation. Much of the publicity regarding such litigation centered around the litigation against the NFL, which reportedly eventually settled for over a billion dollars. The initial announcement of a settlement in that case occurred on or about

August 29, 2013. To my knowledge, the NFL was represented in the CTE litigation by a major New York law firm, Paul, Weiss, Rifkind, Wharton & Garrison, LLP ("Paul, Weiss").

22. I have worked with various lawyers at Paul, Weiss firm on other matters. They are excellent lawyers, and their rates are generally higher than the rates charged by K&L Gates for lawyers of similar vintage and experience.

23. At some point prior to October 2014, I and WWE became aware of internet solicitations by Mr. Kyros of former performers of WWE to join him in bringing CTE litigation against WWE styled after the NFL litigation.

24. The early solicitations of the Kyros firm implied to the wrestlers being solicited that his firm has been instrumental in achieving the billion dollar result for NFL players and that they would do the same as against WWE.

## The Initial Lawsuits

25. In terms of the forum rule being considered by the Court, it is important to note that the consolidated CTE cases brought by Mr. Kyros did not originate in Connecticut.

26. The first case filed against WWE by Attorney Kyros was in Oregon on behalf of Billy Jack Haynes as a putative class action claim on October 23, 2014. In that first case, and in all subsequent cases, the pleadings placed at issue Dr. Omalu's CTE diagnosis of Benoit and the WWE's reactions to it, all of which I was knowledgeable about.

27. Shortly after filing the *Haynes* case in Oregon, Attorney Kyros filed a duplicative class action case in the Eastern District of Pennsylvania ("the *LoGrasso* case"), a third duplicative class action case in California ("the *McCullough* case"), a wrongful death case in Tennessee ("the *Frazier* case"), and another wrongful death case in Texas ("the *Osborne*

7

case"). In each of those cases, Attorney Kyros had other non-Connecticut firms acting as co-counsel and had amassed a battery of law firms in various states who signed on to the pleadings to wage massive and duplicative litigation against WWE.

28. Aside from my specialized knowledge of WWE and CTE summarized above, my law firm had offices in every jurisdiction noted above except Tennessee, all of which was known to WWE when selecting counsel.

29. At the time it was necessary for WWE to select counsel to defend against this onslaught of CTE litigation in multiple venues, it was necessary to not only have the specialized expertise needed to defend such cases but also a firm which could effectively implement a national strategy to deal with the forum shopping of the Kyros firm. Because of my knowledge of the fact that contracts with performers generally had a forum selection clause, and the fact we were able to work with partners in our sister offices, we were successful in obtaining orders from every court involved in the initial onslaught of litigation transferring the cases to the federal court in Connecticut, where all the cases were eventually consolidated before Judge Bryant.

30. As of the time the cases were transferred to Connecticut, neither I nor to the best of my knowledge anybody at WWE was aware of any Connecticut firm who had been engaged in defending against CTE claims generally or class actions or wrongful death cases based on CTE claims specifically. Certainly no Connecticut firm, or any firm for that matter, at that time had anything close to the expertise I and my firm had developed representing WWE generally, or in regard to CTE matters, or regarding the issues involved in Dr. Omalu's CTE diagnosis of Benoit.

31. I would further note that throughout most of the underlying litigation, there was minimal involvement by Connecticut lawyers on behalf of the various Plaintiffs. During the early phases of the cases, the principal lawyers were the Kyros firm out of Massachusetts, the Cuneo, Gilbert & LaDuca firm from Maryland, and Robert Shelquist of Lockridge Grindal Nauen PLLP from Minnesota. I believe both firms were among Plaintiffs' liaison counsel in the CTE litigation against the NHL. Mr. Bloss spoke briefly at the initial status conference before Judge Bryant many years ago, and I believe conducted one deposition. He, his firm, and most all of the other firms involved at the onset and early phases subsequently withdrew as counsel once sanction orders began to be issued against Mr. Kyros.

32. After we obtained the transfer of the cases to Connecticut, and as a result of our expertise, we were able to have two of the early class action cases in *Haynes* and *McCullough* dismissed on Rule 12 motions on March 21, 2016. During the early phases of the consolidated litigation, Judge Bryant issued orders indicating there would be potential sanctions imposed if Mr. Kyros and his firm continued forum shopping, which had been noted by the federal judge in Oregon in the *Haynes* case.

33. By the time *Haynes* and *McCullough* were dismissed, we had not yet even filed the motions to compel which eventually led to the sanctions order in the *LoGrasso* case. We filed that motion to compel on April 20, 2016.

34. The *Laurinaitis* case, filed as a mass action, not a class action, was not even filed until July 18, 2016, nearly two years after the first case was filed. The *Laurinaitis* case was originally filed in Connecticut due to Judge Bryant's admonition about further forum shopping and was consolidated with the other cases which were still pending, specifically the

9

*LoGrasso* case, the two wrongful death cases, and a declaratory judgment action WWE had commenced regarding the timeliness of other claims Mr. Kyros had threatened.

35. After two years of litigation, it would have made no economic sense, nor been in the best interests of WWE, to dismiss me or my firm on the *Laurinaitis* case in order to satisfy the so-called forum rule for purposes of the Rule 11 motions necessitated by the Complaint and Amended Complaint in that matter. By that time, we had successfully obtained dismissal of two of the cases and had devised solid motions to dismiss, all of which were eventually granted in the two wrongful death cases, as well as a strategy for a summary judgment motion in the *LoGrasso* case, which was also eventually granted. We also had intimate familiarity at that time with the antecedent misconduct of Mr. Kyros and his firm and all the prior admonitions given to him by Judge Bryant, which a new firm would have had to spend considerable time and expense to get up to speed on.

36. The claims in *Laurinaitis* were also far broader than in any of the prior lawsuits, and included not only CTE claims, but also misclassification claims, royalty claims, ERISA claims and other claims. My decades of representing WWE on such matters, and knowledge of the facts and law as applied to the WWE practices placed at issue in that case, could not have been replicated by any Connecticut firm, and WWE was and is acutely aware of that fact. In 2009, I had also served as lead counsel to WWE in *Levy, et al. v. World Wrestling Entm't, Inc.*, No. 3:08-01289 (PCD), 2009 WL 2382022 (D. Conn. July 31, 2009), in which I was successful in obtaining dismissal of similar claims.

37. The results of our representation speak for themselves. All cases were dismissed with prejudice. The cases in which sanctions were granted are now both final, and the Second Circuit has affirmed the dismissal of those two cases on the merits. The dismissals of

those two cases are not part of the recently filed certiorari petition by Mr. Kyros, which WWE has opposed in any event.

38. In closing, I respectfully submit this Declaration for the Court's consideration and evaluation of the application of the forum rule and the reasonableness of my fees. I further note that my fees are comparable to Connecticut lawyers of similar vintage and experience, albeit not necessarily in CTE matters, as evidenced by the Supplemental Declaration of Mr. Mueller filed contemporaneously with this Declaration. I stand ready to answer any further question the Court may have on this matter.

39. I, Jerry S. McDevitt, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: April 5, 2021

Pittsburgh, Pennsylvania

_____
Jerry S. McDevitt